# EXHIBIT 2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § |
| | § 20-03190-sgj |
| JAMES D. DONDERO, | § |
| | § |
| Defendant. | § |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**DECLARATION OF MR. JAMES P. SEERY, JR. IN SUPPORT OF THE DEBTOR'S MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AGAINST MR. JAMES DONDERO**

I, James P. Seery, Jr., pursuant to 28 U.S.C. § 1746(a), declare under penalty of perjury as follows:

1.　　I am a member of the Board of Directors (the "<u>Board</u>") of Strand Advisors, Inc. ("<u>Strand</u>"), the general partner of Highland Capital Management, L.P. (the "<u>Debtor</u>" or "<u>HCMLP</u>"), and the Debtor's Chief Executive Officer ("<u>CEO</u>") and Chief Restructuring Officer ("<u>CRO</u>").　I submit this Declaration in support of the Debtor's *Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* (the "<u>Motion</u>"), being filed concurrently with this declaration.　Unless stated otherwise, this declaration is based on my personal knowledge, my review of the documents described below, and my communications with certain of the Debtor's employees, directors, and counsel.

**A.　　An Independent Board Is Appointed to Oversee the Debtor's**
**Affairs; Mr. Dondero's Role Becomes Limited and Subject to the**
**Board's Oversight; and Mr. Dondero Is Later Forced to Resign**

2.　　On October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Court</u>").　On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[2]

3.　　On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No.

---

[2] All docket numbers refer to the docket maintained by this Court.

281] (the "Settlement Motion").  On January 9, 2019, this Court entered an Order granting the Settlement Motion [Docket No. 339] (the "Settlement Order").

4.     As part of the Settlement Order, this Court also approved a term sheet (the "Term Sheet") [Docket No. 354-1] between the Debtor and the Official Committee of Unsecured Creditors (the "Committee") pursuant to which Mr. John S. Dubel, Mr. Russell Nelms, and I were appointed to the Board (collectively, the "Independent Directors").  A true and correct copy of the Term Sheet is attached as **Exhibit 1**.

5.     As required by the Term Sheet, on January 9, 2020, Mr. James Dondero resigned from his roles as an officer and director of Strand and as the Debtor's President and Chief Executive Officer.  True and correct copies of Mr. Dondero's resignation letters dated January 9, 2020, are attached as **Exhibit 2**.

6.     While resigning from those roles, Mr. Dondero remained an unpaid employee of the Debtor and retained his title as portfolio manager for each of the investment vehicles and funds managed by the Debtor.  However, pursuant to the Term Sheet, Mr. Dondero's authority was subject to oversight and ultimately termination by the Independent Board:

> Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination.

**Exhibit 1** at 3 of 62.

7.     Although ultimate decision making authority remained with the Board, by resolution passed on January 9, 2020, the Board authorized me to work with the Debtor's traders and Mr. Dondero with respect to certain of the Debtor's assets where Mr. Dondero remained

portfolio manager. A true and correct copy of the Board's January 9, 2020, resolution is attached as **Exhibit 3**.

8.      During the pendency of the Debtor's bankruptcy case, it became apparent that it would be more efficient and lead to better financial results to have a traditional corporate management structure oversee the Debtor's operations and assets. Consequently, after due deliberation, the Board determined that it was in the best interests of the Debtor's estate to appoint me as the Debtor's CEO and CRO. This Court approved my appointment as CEO and CRO on July 16, 2020. [Docket No. 854].

9.      My appointment as CEO and CRO formalized my role and my authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its managed investment vehicles, funds, and subsidiaries, and I routinely carried out such responsibilities, particularly after the seizure by Jefferies, LLC of the Highland Select Equity Fund, L.P. ("Select") prime brokerage account managed by Mr. Dondero as a result of Select's failure to post margin.

10.      On August 12, 2020, the Debtor filed its Plan of Reorganization with this Court [Docket No. 944] (as subsequently amended, the "Plan"). The Plan provides for, among other things, the monetization of the Debtor's assets for the benefit of the Debtor's creditors. Also in August 2020, the Debtor entered into a mediation with certain of its creditors which resulted in, among other things, a settlement with Josh and Jennifer Terry, Acis Capital Management, L.P. ("Acis LP"), and Acis Capital Management GP LLC ("Acis GP" and together with Acis LP, "Acis").

11.      After the Acis settlement was publicly announced, Mr. Dondero voiced his displeasure with not just the terms of the Acis settlement, but that a settlement had been reached

4

at all.  On October 5, 2020, Mr. Dondero objected to the Debtor's motion seeking approval of the Acis settlement, thereby creating an actual conflict with the Board and the Debtor.  [Docket No. 1121].

12.    In addition, the Dugaboy Investment Trust – Mr. Dondero's family trust – continued to press its proof of claim alleging that the Debtor, and by extension the Board and I, had mismanaged Highland Multi Strategy Credit Fund, L.P. ("MSCF") with respect to the sale of the MSCF's assets in May of 2020.  *See, e.g.*, Proof of Claim No. 177; Docket No. 1154.

13.    It was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity while taking positions adverse to the interests of the Debtor's estate.  Thus, on October 2, 2020, I requested that Mr. Dondero resign as a portfolio manager at the Debtor and from any roles that he had at MSCF or he would be removed from the positions in accordance with the Settlement Order.  A true and accurate copy of my October 2, 2020, e-mail to Mr. Dondero is attached as **Exhibit 4**.

14.    After consultation with his counsel and a review of the Settlement Order, Mr. Dondero resigned from his positions with the Debtor.  A true and accurate copy of Mr. Dondero's October 9, 2020, e-mail is attached as **Exhibit 5**.[3]

## B.    Mr. Dondero Interferes with the Debtor's Business and Instructs and Threatens Certain of the Debtor's Employees

15.    Regrettably, since tendering his resignation, Mr. Dondero has interfered with the Debtor's operations and the management of the assets under its control, and has otherwise acted directly and through entities he controls to improperly exert pressure on certain of the Debtor's employees.

---

[3] Mr. Dondero may still hold certain director positions at some of the Debtor's direct and indirect subsidiaries or managed entities.  The Debtor is in the process of removing Mr. Dondero from those positions where advisable and practicable.

16.     The Debtor serves as the servicer, portfolio manager, or equivalent of certain pooled collateralized loan obligation vehicles (collectively, the "CLOs").  The Debtor's sole client in these matters is the CLO issuer, and not any individual shareholder or noteholder of the CLO.

17.     NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") are investment advisors directly or indirectly controlled by Mr. Dondero.  I understand that the Advisors and certain investment funds advised by the Advisors and/or their affiliates own interests in the CLOs for which the Debtor serves as portfolio manager or servicer.

18.     On October 16, 2020, the Advisors wrote to me and, among other things, questioned the Debtor's business judgment and "request[ed] that no CLO assets be sold without prior notice to and prior consent from the Advisors."  A true and correct copy of the Advisors's October 16, 2020, letter is attached as **Exhibit 6**.  Because the Advisors provided no legal basis for the "request" and I was unaware of any, I did not accede to the Advisors' "request" nor did I otherwise respond to their letter.

19.     On November 24, 2020, the Advisors sent another letter where they again questioned the Debtor's business judgment and "re-urge[d] [their] request that no CLO assets be sold without prior notice to and prior consent from the Advisors."  A true and correct copy of the Advisors's November 24, 2020, letter is attached as **Exhibit 7**.

20.     I am advised that the Debtor has no contractual, legal, or other obligation to provide notice to, or obtain the consent of, the Advisors (or any other holder of interests in the CLOs) before exercising its business judgment to manage and service the CLOs, including in

6

connection with the sale of the CLOs' assets. Unfortunately, I shortly learned that these "requests" were just a part of Mr. Dondero's attempts to interfere with the Debtor's business.

21. On November 24, 2020, Mr. Dondero personally intervened to prevent sales of certain CLO assets that he knew I had authorized. Upon learning that the trades I had authorized were being executed, Mr. Dondero sent an e-mail to Mr. Matthew Pearson (with copies to Mr. Hunter Covitz and Mr. Joseph Sowin) in which he said "No…… do not." An hour later, Mr. Pearson cancelled the trades but Mr. Dondero warned Mr. Pearson that "HCMFA and DAF has [sic] instructed Highland in writing not to sell any CLO underlying assets . . . there is potential liability, don't do it again please."

22. Mr. Dondero's threat had the intended effect as Mr. Sowin (an HCMFA employee, not an employee of the Debtor) responded by saying that "Compliance should never have approved this order then – will coordinate with them Jim [Dondero]. Post: Please block all orders from Hitting the trading desk for the fun[ds] Jim [Dondero] mentioned."

23. On November 27, 2020, after learning that I had attempted to effectuate the trades, Mr. Dondero continued to interfere with the Debtor's business and engage in threating conduct, this time writing to Thomas Surgent (the Debtor's Chief Compliance Officer) that "I understand Seery is working on a work around to trade these securities anyway. Trades that contradict investor desires and have no business purpose or investment rational. You might want to remind him (and yourself) that the chief compliance officer has personal liability." A true and correct copy of the e-mail string that includes all of the aforementioned communications is attached as **Exhibit 8**.

24. On December 3, 2020, the Debtor demanded that the Advisors "cease and desist from making or initiating, directly or indirectly, any instructions, requests, or demands to

7

HCMLP regarding the terms, timing, or other aspects of any portfolio transactions of any of the CLOs." A true and correct copy of the Debtor's December 3, 2020, letter to the Advisors' counsel is attached as **Exhibit 9**.

25. The Debtor made the same demand of Mr. Dondero the following day. A true and correct copy of the Debtor's December 4, 2020, letter to Mr. Dondero's counsel is attached as **Exhibit 10**.

**C.    The Debtor Demands that Mr. Dondero and His Affiliates Satisfy Certain Demand Notes, and Mr. Dondero Issues an Explicit Threat**

26. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), Highland Capital Management Funds Advisors, LP, and Highland Capital Management Services, Inc. (collectively, the "Corporate Obligors") are the makers under a series of promissory notes in favor of the Debtor (collectively, the "Corporate Obligors' Notes").

27. In addition, Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor (collectively, the "Dondero Notes" and together with the Corporate Obligors' Notes, the "Demand Notes").

28. Each of the Demand Notes provides, among other things, that (a) all accrued interest and principal "shall be due and payable upon demand," and that (b) the maker shall pay the holder (*i.e.*, the Debtor) all court costs and costs of collection, including reasonable attorneys' fees and expenses, if, among other things, the Note is "collected through a bankruptcy court." True and correct copies of the Demand Notes are attached as **Exhibits 11 through 23**, respectively.

29. On December 3, 2020, at my instruction, the Debtor's counsel sent letters to representatives of Mr. Dondero and each of the Corporate Obligors demanding payment of all unpaid principal and accrued interest due under the Demand Notes by December 11, 2020

8

(collectively, the "Demand Letters").   True and correct copies of the Demand Letters are attached as **Exhibits 24 through 27**, respectively.   These demands were made to collect funds that will be required to fund the reorganized Debtor and the trust under the Plan that is subject to confirmation before this Court in January 2021.

30.    Shortly after the Debtor sent the Demand Letters, Mr. Dondero sent a text message to me that stated only: "Be careful what you do – last warning."   A true and correct copy of Mr. Dondero's text message is attached as **Exhibit 28**.

31.    Mr. Dondero called me the following day, ostensibly to discuss his so-called "pot plan."[4]   I immediately expressed my substantial concern regarding Mr. Dondero's text message and told him that his threat was completely unacceptable and likely unlawful.   In response, Mr. Dondero suggested that "the lawyers" would address his threatening message and failed to disavow or apologize for the text, saying only (at the end of the conversation) that he did not mean to threaten any physical harm.

32.    Later that day on December 4, 2020, at my instruction, Debtor's counsel sent Mr. Dondero's counsel a letter demanding that Mr. Dondero "cease and desist from (a) communicating directly with any Board member without counsel for the Debtor, (b) making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents, or (c) communicating with any of HCMLP's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero."   The

---

[4] It is noteworthy that, in an attempt to present potential alternatives to the creditors, I (and the Board) provided material assistance to Mr. Dondero in his efforts to propose a "pot plan" to the creditors.   In fact, after Mr. Dondero provided sparse bullet points for his pot plan, I drafted a full term sheet with the assistance of Debtor's counsel. Thereafter, I spent nearly two hours on a Zoom meeting/call with Mr. Dondero and his counsel (Mr. Dondero joined by phone and not video) reviewing my draft term sheet with his material terms.   Mr. Dondero's counsel requested that I – and not them – present the term sheet to the Committee, which I subsequently did.   After the presentation, I advised Mr. Dondero and his counsel that I had sent the detailed term sheet to the Committee and that I had walked them through the potential terms.   There can be no question that I have been supportive of presenting Mr. Dondero's terms to the Committee.

Debtor specifically put Mr. Dondero on notice that the Debtor intended to file this Motion.  A true and correct copy of the Debtor's December 4, 2020, letter to Mr. Dondero's counsel is attached as **Exhibit 29**.

D.      **The Debtor's Request for a Temporary Restraining Order**

33.      Mr. Dondero cannot be permitted to directly (or indirectly through his corporate entities or anyone else acting on his behalf) control, interfere with, or even influence the Debtor's business and operations or threaten or intimidate the Debtor or any of its directors, officers, employees, professionals, or agents.

34.      Based on the foregoing, as a member of the Board and as the Debtor's CEO and CRO, I respectfully request that the Court grant the Motion in its entirety and enter the proposed Order in the form affixed to the Motion.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: December 7, 2020.

*/s/ James P. Seery, Jr.*
James P. Seery, Jr.

10

# EXHIBIT 1

## Highland Capital Management, L.P.

### Preliminary Term Sheet

This term sheet ("<u>Term Sheet</u>") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "<u>Debtor</u>") and the Official Committee of Unsecured Creditors (the "<u>Committee</u>") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "<u>Chapter 11 Case</u>"), pending in the Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125]. This Term Sheet shall be subject to approval by the Bankruptcy Court.

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "<u>Debtor</u>"). |
| | The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "<u>Committee</u>"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "<u>Independent Directors</u>"): James Seery, John Dubel, and Judge Russell Nelms. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement). |
| | The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

|  | source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "CEO") should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
|---|---|
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as President and CEO of the Debtor, and (4) will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities. Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination. Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("CRO") to the |

| | Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**. |
| | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor other than Mr. Dondero. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol"). |
| | Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege"). |
| | With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by |

|  | the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
|---|---|
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |
| **Reservation of Rights** | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date. Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |

## Exhibit A

**Debtor's Corporate Governance Documents**

# WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR

## OF

## STRAND ADVISORS, INC.

### January 9, 2020

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

## I. AMENDMENT OF BYLAWS

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors, and to add certain provisions respecting director qualifications and the removal of directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved, and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

## II. ELECTION OF DIRECTORS

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and Russell Nelms to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED**, that James Seery, John Dubel, and Russell Nelms, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER**, that any officer of the Company is authorized to take any such actions as

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

**RESOLVED FURTHER**, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

**RESOLVED FURTHER**, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

### III.    STIPULATION WITH THE BANKRUPTCY COURT

**WHEREAS**, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

**WHEREAS**, the Company is the general partner for HCMLP;

**WHEREAS**, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

**WHEREAS**, the Company and the Stockholder wish to enter into a stipulation (the "Stipulation") with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such Stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by these resolutions to be re-elected upon the expiration of his or her term; (c) upon the death, disability, or resignation of a member of the Board, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and (i) acceptable to the Stockholder and the Committee or (ii) selected by the remaining members of the Board; and (d) not take any action or exercise the voting power of such shares in any way that is inconsistent with the term sheet agreed to by HCMLP and the Committee and any order of the Texas Court approving such agreement and compromise between HCMLP and the Committee;

**WHEREAS,** for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

**WHEREAS,** it is in the intent of the parties that the Stipulation will no longer be effective or bind the Company or the Stockholder following the termination of the Bankruptcy Case.

**NOW, THEREFORE, BE IT RESOLVED**, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**


_____
James Dondero


*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

**First Amendment to Bylaws of**
**Strand Advisors, Inc.**

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.**     Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.**     Article III, Section 5, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 5. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Debtor") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11 and reasonably acceptable to the stockholders; (y) nominated by the stockholders and acceptable to the Committee; or (z) selected by the duly appointed independent directors.

**3.**     The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Removal of Directors.  Once appointed, the independent directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the independent directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the Company has caused this amendment to be signed this 9th day of January, 2020.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

## INSERT STRAND ADVISORS, INC. LETTERHEAD

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

**Re:**     **Strand Advisors, Inc. – Director Agreement**

Dear [ _____ ]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

1.     **APPOINTMENT TO THE BOARD OF DIRECTORS.**

     a.     Title, Term and Responsibilities.

          i.     Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

          ii.     You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

     b.     Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board.  You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

     c.     Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

     d.     Information Provided by the Company. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification,

on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

2. **COMPENSATION AND BENEFITS.**

a. <u>Retainer</u>. The Company will pay you a retainer for each month you serve on the Board (the "<u>Retainer</u>") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months. The parties will re-visit the Retainer after the sixth month. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b. <u>Expense Reimbursement</u>. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c. <u>Invoices; Payment</u>.

i. In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided. Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii. You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d. <u>Indemnification; D&O Insurance</u>. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated [_____], a copy of which is attached hereto as **Appendix A** (the "<u>Indemnification Agreement</u>"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e. <u>Tax Indemnification</u>. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3. **PROPRIETARY INFORMATION OBLIGATIONS.**

a. <u>Proprietary Information</u>. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

     b.    <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

     c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

## 4.    OUTSIDE ACTIVITIES.

     a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

     b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

     c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

## 5.    TERMINATION OF DIRECTORSHIP.

     a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

     b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

     c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

## 6.    GENERAL PROVISIONS.

     a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

        b.      <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

        c.      <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

        d.      <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

**ACCEPTED AND AGREED:**


_____
[NAME]
Date: _____

## INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware partnership (the "**Debtor**") (solely as to <u>Section 29</u> hereunder), and [_____] (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company, on its own behalf and for the benefit of the Debtor, to retain and attract as directors the most capable Persons is in the best interests of the Company and the Debtor and that the Company and the Debtor therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in <u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties (including the Debtor solely as to <u>Section 29</u> hereunder) agree as follows:

1.      <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)      "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

    (b)    "**Claim**" means:

        (i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

        (ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

    (c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

    (d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

2

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e) "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f) "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g) "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i) "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j) "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k) "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)    "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)    "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)    "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)    References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.    <u>Indemnification</u>.

(a)    Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)     For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3.     <u>Contribution</u>.

(a)     Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.     <u>Advancement of Expenses</u>. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this <u>Section 4</u>, the final sentence of <u>Section 9(b)</u>, or <u>Section 11(b)</u> in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to <u>Section 9</u>, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.     <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with <u>Section 4</u>, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.     <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with <u>Section 9</u> below.

9.     <u>Determination of Right to Indemnification</u>.

(a)     <u>Mandatory Indemnification; Indemnification as a Witness</u>.

(i)     To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with <u>Section 2</u>, and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

(ii)     To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

(b)     <u>Standard of Conduct</u>. To the extent that the provisions of <u>Section 9(a)</u> are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i)     if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii)     if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

       (c)    <u>Making the Standard of Conduct Determination</u>. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under <u>Section 9(b)</u> to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under <u>Section 9(b)</u> shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to <u>Section 8</u> (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

       (d)    <u>Payment of Indemnification</u>. If, in regard to any Losses:

       (i)    Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

       (ii)    no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

       (iii)    Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

       (e)    <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this <u>Section 9(e)</u> to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this <u>Section 9(e)</u> or Indemnitee gives its initial notice pursuant to the second sentence of this <u>Section 9(e)</u>, as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

        (f)    <u>Presumptions and Defenses</u>.

        (i)    <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

        (ii)    <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)    <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    <u>Remedies of Indemnitee</u>.

(a)    In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 11(a)</u>. The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)     In the event that Indemnitee, pursuant to this <u>Section 11</u>, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)     In the event that a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this <u>Section 11</u> shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under <u>Section 9</u>.

(d)     If a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this <u>Section 11</u>, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.     <u>Settlement of Claims</u>. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this <u>Section 12</u>, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.     <u>Duration</u>. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.     Other Indemnitors. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 14.

15.     Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.     Liability Insurance. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.     <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.     <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.     <u>Indemnitee Consent.</u> The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.     <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.     <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

(a)    if to Indemnitee, to the address set forth on the signature page hereto.

(b)    if to the Company, to:

Strand Advisors, Inc.
Attention:     Isaac Leventon
Address:      300 Crescent Court, Suite 700
              Dallas, Texas 75201
Email:         ileventon@highlandcapital.com

Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.    Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.    Enforcement.

(a)    Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.    Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.    Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29.    Guaranty By Debtor.  The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**").  If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee.  Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations.  This guaranty by the Debtor is for the full amount of the Guaranteed Obligations.  The Debtor's obligations under this Agreement are continuing. Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full.  The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor.  The Debtor's liability under this Section 29 is unconditional.  It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name:
Title:

HIGHLAND CAPITAL MANAGEMENT,
LP (solely as to <u>Section 29</u> hereunder)

By: _____
Name:
Title:

INDEMNITEE:

_____

Name:      [_____]
Address: _____
         _____
         _____

Email:

## **Exhibit B**

## **Amended DSI Retention Letter**

January ___, 2020

Attn:  Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX  75201

>  Re:  Development Specialists, Inc. ("DSI")
>  Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company").  This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019.  However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
3. Mr. Sharp will fulfill such duties as directed by the Independent Directors and/or CEO, if any, of the Company with respect to the Company's restructuring and bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), including implementation and prosecution of the Chapter 11 Case.
4. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:
    a. assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

Highland Capital Management, LP
December ___, 2019
Page 2

    b.  advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

    c.  attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

    d.  providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

    e.  rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel. The individuals are:

Highland Capital Management, LP
December ___, 2019
Page 3

|                        |              |
|------------------------|--------------|
| R. Brian Calvert       | $640.00/hr.  |
| Thomas P. Jeremiassen  | $575.00/hr.  |
| Eric J. Held           | $495.00/hr.  |
| Nicholas R. Troszak    | $485.00/hr.  |
| Spencer G. Ferrero     | $350.00/hr.  |
| Tom Frey               | $325.00/hr.  |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company. The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services. As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice. If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time. In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required. If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice. Notwithstanding anything to the contrary contained herein, the Company

Highland Capital Management, LP
December ___, 2019
Page 4

shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication.  DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company.  DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law.  Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies.  Any such indemnity shall survive the expiration or termination by either party of this Agreement.  Except as provided

Highland Capital Management, LP
December ___, 2019
Page 5

in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination (not subject to further appeal) by a court of competent jurisdiction to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case. Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's professional staff, neither DSI nor its professionals have any known conflicts with the parties in this case. DSI will separately provide its connections to parties in this case and/or their professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business planning and operations. DSI's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of one year subsequent to the completion and/or termination of this Agreement; provided that the Company shall not be prohibited from (x) making general advertisements for employment not specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited requests for employment.

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of DSI employees, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

Highland Capital Management, LP
December ___, 2019
Page 6

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of this Agreement and supersedes and is intended to nullify any other agreements, understandings or representations relating to the subject of this Agreement. This Agreement may not be amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance by signing an original copy of this Agreement on the signature lines below, then returning one fully-executed Agreement to DSI's office. The Agreement will become effective upon execution by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.

AGREED AND ACKNOWLEDGED:

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

_____
By: _____, Independent Director
Date: _____

**Exhibit C**

**Document Production Protocol**

**A. Definitions**

    a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**

    a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**

    a. For email, Debtor uses Outlook Email on an Exchange server. Veritas Enterprise Vault is used to archive emails. Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email communications have been preserved and are not at risk of deletion due to normal document retention practices. Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b. The file server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c. The Sharepoint server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago. Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva. Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein.

    f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data. Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h. Bloomberg data is archived for five years. Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

    i.  Files may be saved locally on laptops/work computers used by employees of Debtor. This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere. Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees. Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

**D.  Not Reasonably Accessible Documents**

    a.  Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

        i.  Deleted, slack, fragmented, or other data only accessible by forensics;

        ii.  Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

        iii.  On-line access data such as temporary internet files, history, cache, cookies, and the like.

    b.  To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

**E.  Collection and Search Methodology**

    a.  Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than seven (7) days after the Committee requests ESI from the Debtor. DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates. Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs). Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

    b.  The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

c. A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above. Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

**F. Format of Documents Produced**

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

    f.   For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

    g.   For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

    h.   For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

    i.   The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

        i.  Production Bates begin
        ii.  Production Bates end
        iii. Production Bates begin attachment
        iv. Production Bates end attachment

    Notwithstanding the aforementioned, all parties acknowledge that Debtor's Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

    j.   Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email

thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k.  Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

l.  To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

## G.  Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status

a.  No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b.  Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c.  Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d.  Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e.  Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the | 2 |

|  | document |  |
|---|---|---|
| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID |  |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available |  |
| Extension | The file extension | .doc |

| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

## **Exhibit D**

## **Reporting Requirements**

## I.     **Definitions**

A.     "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.     "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.     "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.     "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.     "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.     "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.     "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.     "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I. "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J. "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

**II. Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A. **Covered Entities**: N/A (See entities above).

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

    a) Stage 1 and Stage 2: ordinary course determined by the CRO.

    b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

    a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) Stage 3:

    (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

    a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

### III. Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) advance notice require three business days notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

## IV.    Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

    b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

2.     Related Entity Transactions

    a)   <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)   <u>Stage 3</u>:

        (1)   Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)   Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages):

    a)   Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)   The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)   The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.   **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**V.     Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.   Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VIII.**    **Additional Reporting Requirements – All Stages (to the extent applicable)**

A.      DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B.      The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.**    **Shared Services**

A.      The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B.      The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.**    **Representations and Warranties**

A.      The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.      The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.      The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

### Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

    1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
    2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

    1. Highland Prometheus Master Fund L.P.
    2. NexAnnuity Life Insurance Company
    3. PensionDanmark
    4. Highland Argentina Regional Opportunity Fund
    5. Longhorn A
    6. Longhorn B
    7. Collateralized Loan Obligations
        a) Rockwall II CDO Ltd.
        b) Grayson CLO Ltd.
        c) Eastland CLO Ltd.
        d) Westchester CLO, Ltd.
        e) Brentwood CLO Ltd.
        f) Greenbriar CLO Ltd.
        g) Highland Park CDO Ltd.
        h) Liberty CLO Ltd.
        i) Gleneagles CLO Ltd.
        j) Stratford CLO Ltd.
        k) Jasper CLO Ltd.
        l) Rockwall DCO Ltd.
        m) Red River CLO Ltd.
        n) Hi V CLO Ltd.
        o) Valhalla CLO Ltd.
        p) Aberdeen CLO Ltd.
        q) South Fork CLO Ltd.
        r) Legacy CLO Ltd.
        s) Pam Capital
        t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

    1. Highland Opportunistic Credit Fund
    2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
    3. NexPoint Real Estate Strategies Fund
    4. Highland Merger Arbitrage Fund
    5. NexPoint Strategic Opportunities Fund
    6. Highland Small Cap Equity Fund
    7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

## **Schedule B**

**Related Entities Listing (other than natural persons)**

Case 20-03190-sgj Doc 30-2 Filed 02/07/20 Entered 02/07/20 19:32:57 Page 73 of 178

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

# EXHIBIT 2

January 9, 2020

**HAND DELIVERY**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:    Resignation of James Dondero

To Whom It May Concern:

I, James Dondero, hereby give notice of my resignation as, and do resign as, the President and Chief Executive Officer of Highland Capital Management, L.P. (the "HCMLP").

My resignation is effective January 9, 2020.

Please ensure that HCMLP's records and any filings with any state or federal authorities are modified as necessary to reflect my resignation.

Sincerely,

James Dondero

January 9, 2020

**HAND DELIVERY**

Strand Advisors, Inc.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:    Resignation of James Dondero

To Whom It May Concern:

I, James Dondero, hereby give notice of my resignation as, and do resign as: (1) an officer of Strand Advisors, Inc. (the "Company"), in any and all capacities now or formerly held by me, including as president, and (2) a director of the Company, including as Chairman of the Board of Directors.

My resignation is effective January 9, 2020.

Please ensure that the Company's records and any filings with any state or federal authorities are modified as necessary to reflect my resignation.

Sincerely,

James Dondero

# EXHIBIT 3

## Minutes of the Meeting of the
## Independent Directors of Strand Advisors, Ltd.

### January 9, 2020 - January 10, 2020

**I.      Meeting on January 9, 2020**

At approximately 3:30 p.m. Central Time, the board of directors (the "Board") of Strand Advisors, Ltd. ("Strand") called their first meeting to order.  Directors present in person were John Dubel, James Seery, Jr., and Russell Nelms.  No directors were present telephonically.

Also in attendance on January 9, 2020, were (i) Jeff Pomerantz, Ira Kharasch, John Morris, and Greg Demo of Pachulski Stang Ziehl & Jones ("Pachulski"), (ii) Melissa Hayward of Hayward & Associates ("Hayward"), (iii) Brad Sharp, Fred Caruso, James Romey, and Jack Donoghue of Development Specialists, Inc. ("DSI"), and (iv) Isaac Leventon and David Klos of Highland Capital Management, L.P. ("HCMLP").

### a.   Introductions and Background

The directors commenced the meeting by introducing themselves and welcoming the guests in attendance at the meeting.  Mr. Leventon, in house counsel at HCMLP, then provided a brief background of Strand's corporate governance.  This presentation included a discussion of James Dondero's resignation as an officer and director of Strand in accordance with the settlement approved by the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 9, 2020, and the stipulation entered into by and among (i) HCMLP, (ii) the official committee of unsecured creditors in HCMLP's bankruptcy proceeding, (iii) Strand, and (iv) James Dondero, which was filed with the Court on January 9, 2020.  The presentation also included an overview of Strand's current officers.

Mr. Leventon then provided a brief overview of HCMLP, HCMLP's employees and management, including Mr. Dondero's prior roles at HCMLP, and HCMLP's status as a registered investment advisor.  The directors asked Mr. Leventon various questions concerning the current management of both HCMLP and Strand and a discussion occurred concerning how both HCMLP and Strand would be managed going forward.  This discussion also included various questions about the funds and entities managed by HCMLP and how those funds are constituted.

### b.   DSI Presentation to the Board

Following this discussion, DSI began their presentation to the Board.  A copy of DSI's presentation is attached to these minutes as Appendix I.  DSI's presentation included, among other things, a detailed overview of HCMLP's balance sheet, cash flows, assets, notes receivable, and HCMLP's valuation process.  During the course of DSI's presentation, the directors asked questions and engaged in lengthy dialogue with DSI concerning HCMLP's operations.  These conversations also included substantial input from both Mr. Klos and Mr. Leventon of HCMLP and the lawyers from Pachulski and Hayward.

As part of this presentation, the Board and the guests present at the meeting also discussed HCMLP's proprietary trading through its and the Select Equity Fund's prime brokerage accounts with Jefferies, LLC (together, the "Prime Accounts"), and the margin requirements for those accounts. For this discussion, the Board invited Joseph Sowin to join the meeting. Mr. Sowin discussed with the Board and the guests present the various trading issues in the Prime Accounts, the margin calls that had been made to date, and how HCMLP had reacted to those margin calls. This discussion also include a discussion about how the protocols implemented in HCMLP's bankruptcy proceeding affected trading.

During this discussion, the Board adjourned the meeting briefly to hold an executive session. Following their return, Mr. Dubel moved to designate James Seery, Jr., as the Board's representative on issues involving trading in the Prime Accounts and to authorize Mr. Seery to approve any trades made in the Prime Accounts. Judge Nelms seconded, and the Board's resolution designating Mr. Seery as the Board's representative on issues involving trading in the Prime Accounts and authorizing Mr. Seery to approve any trades in the Prime Accounts was passed with unanimous approval.

Following this resolution, Mr. Sowin was excused from the meeting.

**c. DSI Engagement**

The Board next discussed the engagement of Mr. Sharp and DSI as HCMLP's chief restructuring officer. The Board reviewed DSI's engagement letter and unanimously approved the signing of the DSI engagement letter and the retention of Mr. Sharp and DSI.

**d. Open Items and Next Steps**

After the execution of the DSI engagement letter, the Board and the guests present at the meeting discussed, on a high level, the open items that needed to be addressed by the Board. Following this discussion, the Board voted to adjourn the meeting for the evening and to reconvene on January 10, 2020, to review the balance of the open items.

The meeting adjourned for the evening at approximately 6:30 p.m. Central Time.

**II.    Meeting on January 10, 2020**

At approximately 7:30 a.m. Central Time, on January 10, 2020, the Board reconvened. Directors present in person were John Dubel, James Seery, Jr., and Russell Nelms. No directors were present telephonically.

Also in attendance on January 10, 2020, were (i) Jeff Pomerantz, Ira Kharasch, and Greg Demo of Pachulski, (ii) Brad Sharp, Fred Caruso, James Romey, and Jack Donoghue of DSI, and (iii) David Klos and Brian Collins of HCMLP.

**a. DSI Presentation (Continued)**

After the meeting was called to order, the Board asked DSI to continue their presentation. DSI, the Board, and the guests present at the meeting had a lengthy discussion on HCMLP's cash

flows, liquidity, and operating budget. As part of this discussion, Mr. Klos answered a series of questions posed by the Board and there was a lively discussion among all parties concerning HCMLP's operating cash flows, expenses, and liquidity.

### b. Human Resources Presentation

Following this discussion, the Board asked for a presentation from Brian Collins, HCMLP's human resources director on certain employee issues, including employee compensation and bonuses. As part of this presentation, Mr. Collins responded to numerous questions from the Board, from DSI, and from attorneys from Pachulski. At the conclusion of this discussion, the Board requested additional information on employee bonuses, which Mr. Collins and DSI said they would provide.

Mr. Collins and Mr. Klos were excused from the meeting.

### c. Scheduling of Meetings

The Board next briefly discussed with DSI and the attorneys from Pachulski a few additional open items and asked for separate meetings to be scheduled with the persons having pertinent information on such items.

The Board also scheduled their next meeting for Tuesday, January 14, 2020, and invited representatives from DSI and Pachulski to join that meeting.

Mr. Pomerantz, Mr. Kharasch, and Mr. Demo from Pachulski and DSI were excused from the meeting.

### d. Meeting with Senior Management

The Board then had a closed door session with Scott Ellington, HCMLP's general counsel and other members of HMCLP's senior management.

The meeting adjourned at approximately 12:15 p.m. Central Time.

_____
John S. Dubel

_____
James P. Seery, Jr.

_____
Russell F. Nelms

flows, liquidity, and operating budget. As part of this discussion, Mr. Klos answered a series of questions posed by the Board and there was a lively discussion among all parties concerning HCMLP's operating cash flows, expenses, and liquidity.

### b. Human Resources Presentation

Following this discussion, the Board asked for a presentation from Brian Collins, HCMLP's human resources director on certain employee issues, including employee compensation and bonuses. As part of this presentation, Mr. Collins responded to numerous questions from the Board, from DSI, and from attorneys from Pachulski. At the conclusion of this discussion, the Board requested additional information on employee bonuses, which Mr. Collins and DSI said they would provide.

Mr. Collins and Mr. Klos were excused from the meeting.

### c. Scheduling of Meetings

The Board next briefly discussed with DSI and the attorneys from Pachulski a few additional open items and asked for separate meetings to be scheduled with the persons having pertinent information on such items.

The Board also scheduled their next meeting for Tuesday, January 14, 2020, and invited representatives from DSI and Pachulski to join that meeting.

Mr. Pomerantz, Mr. Kharasch, and Mr. Demo from Pachulski and DSI were excused from the meeting.

### d. Meeting with Senior Management

The Board then had a closed door session with Scott Ellington, HCMLP's general counsel and other members of HMCLP's senior management.

The meeting adjourned at approximately 12:15 p.m. Central Time.

_____
John S. Dubel

_____
James P. Seery, Jr.

_____
Russell F. Nelms

flows, liquidity, and operating budget. As part of this discussion, Mr. Klos answered a series of questions posed by the Board and there was a lively discussion among all parties concerning HCMLP's operating cash flows, expenses, and liquidity.

**b. Human Resources Presentation**

Following this discussion, the Board asked for a presentation from Brian Collins, HCMLP's human resources director on certain employee issues, including employee compensation and bonuses. As part of this presentation, Mr. Collins responded to numerous questions from the Board, from DSI, and from attorneys from Pachulski. At the conclusion of this discussion, the Board requested additional information on employee bonuses, which Mr. Collins and DSI said they would provide.

Mr. Collins and Mr. Klos were excused from the meeting.

**c. Scheduling of Meetings**

The Board next briefly discussed with DSI and the attorneys from Pachulski a few additional open items and asked for separate meetings to be scheduled with the persons having pertinent information on such items.

The Board also scheduled their next meeting for Tuesday, January 14, 2020, and invited representatives from DSI and Pachulski to join that meeting.

Mr. Pomerantz, Mr. Kharasch, and Mr. Demo from Pachulski and DSI were excused from the meeting.

**d. Meeting with Senior Management**

The Board then had a closed door session with Scott Ellington, HCMLP's general counsel and other members of HMCLP's senior management.

The meeting adjourned at approximately 12:15 p.m. Central Time.

_____
John S. Dubel

_____
James P. Seery, Jr.

_____
Russell F. Nelms

# EXHIBIT 4

**From:** James Seery [mailto:jpseeryjr@gmail.com]
**Sent:** Friday, October 02, 2020 5:52 PM
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Cc:** John Dubel <jdubel@dubel.com>; Russell Nelms <rfargar@yahoo.com>
**Subject:** HCMLP Roles

Jim:

Further to our discussion on September 24, Michael Lynn has advised the Pachulski firm that you or an entity controlled or affiliated with you will be objecting to the HCMLP settlement with Acis and Josh Terry. In addition, one of your trusts has filed a claim against HCMLP related to the management of Multi-Strat.

In light of these facts, we believe it is time for you to resign your portfolio manager position at HCMLP, any remaining roles at Multi-Strat, and certain other positions at entities managed or controlled by HCMLP. As you stated on our call, I agree that over the last few months the PM role has been in title only with most ultimate authority vested in the Board. Nonetheless, it is untenable for you to have a role at the Debtor or the major funds managed by the Debtor while at the same time taking positions in court contrary to what the Board has determined is in the best interest of the estate.

I appreciate your desire to challenge the Acis agreement and obtain final court determination on its reasonableness. Hopefully when that hearing is complete and there is a determination by the court, we will have an opportunity to consider a larger settlement of the case with you. But until the legal fighting is resolved, the Board believes it is in the best interests of the estate, its employees, and all other interested parties that you not be on both sides of the issues, even if in name only.

Please let me know if it preferable to you to resign or if removal by the board at this time is better. Specifically, we would like you to resign or be removed from the portfolio manager role at HCMLP and all roles at the Multi-Strat/Credit Opportunities entities.

I look forward continuing our discussions to resolve the case. If we are unable to do that, I am confident that together we can engineer a smooth and efficient transition that facilitates value maximization for the estate and all of its stakeholders.


Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

# EXHIBIT 5

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**Date:** October 9, 2020 at 4:43:44 PM EDT
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** John Dubel <jdubel@dubel.com>, Russell Nelms <rfargar@yahoo.com>, "D. Lynn (Judge Lynn)"
<michael.lynn@bondsellis.com>
**Subject: Re: HCMLP Roles**

Counsel has advised me that according to January 9 order, I must at your request resign from
Highland. So Therefore, based on your request below I resign.

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

On Oct 2, 2020, at 5:52 PM, James Seery <jpseeryjr@gmail.com> wrote:

Jim:

Further to our discussion on September 24, Michael Lynn has advised the Pachulski firm that
you or an entity controlled or affiliated with you will be objecting to the HCMLP settlement
with Acis and Josh Terry. In addition, one of your trusts has filed a claim against HCMLP
related to the management of Multi-Strat.

In light of these facts, we believe it is time for you to resign your portfolio manager position at
HCMLP, any remaining roles at Multi-Strat, and certain other positions at entities managed or
controlled by HCMLP. As you stated on our call, I agree that over the last few months the PM
role has been in title only with most ultimate authority vested in the Board. Nonetheless, it is
untenable for you to have a role at the Debtor or the major funds managed by the Debtor
while at the same time taking positions in court contrary to what the Board has determined is
in the best interest of the estate.

I appreciate your desire to challenge the Acis agreement and obtain final court determination
on its reasonableness. Hopefully when that hearing is complete and there is a determination
by the court, we will have an opportunity to consider a larger settlement of the case with
you. But until the legal fighting is resolved, the Board believes it is in the best interests of the
estate, its employees, and all other interested parties that you not be on both sides of the
issues, even if in name only.

Please let me know if it preferable to you to resign or if removal by the board at this time is
better. Specifically, we would like you to resign or be removed from the portfolio manager
role at HCMLP and all roles at the Multi-Strat/Credit Opportunities entities.

I look forward continuing our discussions to resolve the case.  If we are unable to do that, I am confident that together we can engineer a smooth and efficient transition that facilitates value maximization for the estate and all of its stakeholders.


Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# EXHIBIT 6



October 16, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201

Dear Jim:

We are writing to reiterate the concerns we have expressed about the scope and maintenance of quality of the services currently being provided by Highland Capital Management, L.P. ("HCMLP") to NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") under their respective shared services agreements (together, the "Shared Services Agreements" or "Agreements"). As you know, the Shared Services Agreements obligate HCMLP to provide a variety of investment, administrative, legal, and back-office services to the Advisors. These responsibilities on the part of HCMLP are critical to the Advisors' ability to provide top-notch advisory services to the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they have advisory contracts.

In particular, the refusal by HCMLP to allow its employees to work on certain matters that jointly affect HCMLP and the Advisors has resulted in the Advisors incurring additional third-party costs and expenses to procure services that should rightfully be performed by HCMLP under the Shared Services Agreements. These third-party services, for which the Advisors are already compensating HCMLP under the Agreements, represent supplemental costs and expenses that the Advisors should not be obligated to pay.

Additionally, it is our understanding that all HCMLP employees will be given notice that their employment will be terminated effective as of December 31, 2020. If these employees are terminated, or are informed that they will be terminated and elect to resign, HCMLP will no longer be able to carry out its duties and obligations under the Agreements. We would thus like to request assurances from HCMLP that if elects to terminate its employees, it will work in good faith with the Advisors to put in place an orderly transition plan. Such a plan would provide for an effective transfer of services to the Advisors, seek to maximize employee retention, and permit the Advisors (or their affiliates) to hire any and all HCMLP employees, which would ensure the delivery of uninterrupted services previously provided by HCMLP under the Agreements.

Finally, we understand that HCMLP is contemplating the sale of certain assets held in several CLOs, the interests in which are also owned by the Advisors and/or the Funds advised by

NexPoint, HCMFA and/or their affiliates.   The sale of such assets has the potential to negatively affect the valuation of the Funds.  Specifically, a rush to sell these assets at fire sale prices could result in both the Funds and HCMLP not realizing their full value.  Accordingly, we hereby request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

We feel certain that our mutually shared goals are to minimize disruption and costs, to prevent the dislocation of services to the Advisors and the Funds, and to maximize returns for Funds and accounts advised by NexPoint, HCMFA, HCMLP, or any of their affiliates.  We believe that through working cooperatively we can achieve these goals.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

# EXHIBIT 7

# NEXPOINT

November 24, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to follow up on our letter dated October 16, 2020 and to reiterate the concerns we have expressed about the sale of certain assets held in several CLOs, the interests in which are also owned by the NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") and/or the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they and their affiliates have advisory contracts.   As we have previously advised, the sale of such assets has the potential to negatively affect the valuation of the Funds, and a rush to sell these assets at fire-sale prices could result in both the Funds and Highland Capital Management, L.P. ("HCMLP") not realizing their full value.  In addition, with recent CLO quarterly payments being made and potential upside for the remaining securities held by the CLOs, sales of these securities at this time could further negatively impact the valuation.   We have previously requested that no CLO assets be sold without prior notice to and prior consent from the Advisors.  We understand that Charitable DAF HoldCo, Ltd. has made a similar request. Accordingly, we hereby re-urge our request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

cc:    Thomas Surgent (tsurgent@highlandcapital.com)
       John Dubel (jdubel@dubel.com)
       Russell Nelms (rfargar@yahoo.com)

# EXHIBIT 8

**From:** Jim Dondero <JDondero@highlandcapital.com>
**Date:** November 27, 2020 at 2:46:35 AM EST
**To:** Thomas Surgent <TSurgent@highlandcapital.com>
**Subject: Fwd: SKY equity**

I understand Seery is working on a work around to trade these securities anyway. Trades that contradict investor desires and have no business purpose or investment rational.
You might want to remind him ( and yourself) that the chief compliance officer has personal liability.

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

Begin forwarded message:

> **From:** Joe Sowin <JSowin@highlandcapital.com>
> **Date:** November 24, 2020 at 3:58:24 PM EST
> **To:** Jim Dondero <JDondero@highlandcapital.com>
> **Cc:** Matt Pearson <MPearson@highlandcapital.com>, Hunter Covitz
> <HCovitz@highlandcapital.com>, Compliance <Compliance@hcmlp.com>
> **Subject: Re: SKY equity**
>
> + Conpliance
> We did not know that but Understood going forward.
>
> Compliance should never have approved this order then - will coordinate with them Jim
>
> Post: Please block all orders from Hitting the trading desk for the fungus Jim mentioned.
>
> Happy to discuss if needed.
> Joe
>
> > On Nov 24, 2020, at 2:29 PM, Jim Dondero <JDondero@highlandcapital.com>
> > wrote:
> >
> > HFAM and DAF has instructed Highland in writing  not to sell any CLO
> > underlying assets..... there is potential liability, don't do it again please
> >
> > James Dondero
> > Highland Capital Management
> > 972-628-4100
> > jdondero@highlandcapital.com
> > www.highlandcapital.com

On Nov 24, 2020, at 3:20 PM, Matt Pearson
<MPearson@highlandcapital.com> wrote:


I've cxl'd both SKY and AVYA sales – only completed a small
amount of each

SKY 4.5k @ $32.05
AVYA 2,269 @ $17.81

---

**From:** Jim Dondero
**Sent:** Tuesday, November 24, 2020 2:19 PM
**To:** Matt Pearson <MPearson@HighlandCapital.com>
**Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>;
Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin
<JSowin@HighlandCapital.com>
**Subject:** Re: SKY equity

No...... do not

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com


> On Nov 24, 2020, at 2:20 PM, Matt Pearson
> <MPearson@highlandcapital.com> wrote:
>
>
> ok
>
> ---
>
> **From:** Hunter Covitz
> **Sent:** Tuesday, November 24, 2020 12:40 PM
> **To:** Gatekeeper <Gatekeeper@hcmlp.com>
> **Cc:** Matt Pearson
> <MPearson@HighlandCapital.com>; Joe Sowin
> <JSowin@HighlandCapital.com>; Hunter
> Covitz <HCovitz@HighlandCapital.com>
> **Subject:** SKY equity
>
> Please sell ~half of the positons in Gleneagles
> and Grayson in the current 32+ context.
>
> Please sell ~48,500 shares in each CLO, ~97k
> shares total.
>
>
> **HUNTER COVITZ**  |  HEAD OF STRUCTURED
> PRODUCTS

2

&lt;image001.jpg&gt;

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
 O: 972.628.4124   |   C: 214.394.5510
hcovitz@highlandcapital.com  |   www.highlandcapital.com

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# EXHIBIT 9



**PACHULSKI STANG ZIEHL & JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

LOS ANGELES
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory V. Demo

December 3, 2020

212-561-7730
gdemo@pszjlaw.com

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111

Dear James:

Reference is made to the following recent communications (collectively, the "***Communications***"): (i) the letter, dated October 16, 2020, from Dustin Norris of NexPoint Advisors, L.P. ("***NexPoint***") to James Seery of Highland Capital Management, L.P. ("***HCMLP***"), (ii) the letter, dated November 24, 2020, from Dustin Norris of NexPoint to James Seery of HCMLP, and (iii) the email, dated November 25, 2020, at 6:48pm, from you to me.

We understand that each of NexPoint and Highland Capital Management Fund Advisors, L.P. ("***HCMFA***," and together with NexPoint, the "***Advisors***") is an investment adviser directly or indirectly controlled by James Dondero, and that each such Advisor is no longer an affiliate of HCMLP.

According to the Communications, the Advisors and certain investment funds advised by the Advisors and/or their affiliates own interests in pooled collateralized loan obligation vehicles ("***CLOs***") for which HCMLP serves as portfolio manager or servicer.

In each of the Communications, NexPoint or its counsel "requests" that HCMLP refrain from selling any CLO assets without notice and prior consent from the Advisors. This request is based on the Advisors' apparent belief that the sale of assets by the CLOs has the potential to negatively affect the valuation of the funds that hold their interests by causing the CLOs not to realize "their full value".



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 3, 2020
Page 2

The Advisors do not have the right, either under the documents governing the CLOs or applicable law, to instruct HCMLP with respect to specific portfolio management decisions. As portfolio manager or servicer of the CLOs, HCMLP has contractual and fiduciary duties to each CLO as a whole, and not to any investor in any CLO. If you disagree, please provide the authority that supports your position.

Specifically, please note the following:

- HCMLP in its role as servicer, portfolio manager, or equivalent of each CLO has full discretion to make decisions to purchase and sell assets on behalf of the CLO subject only to the terms of its service agreement, indenture, and the trustees/directors of each respective CLO.

- The sole client of HCMLP is the CLO issuer, and not any individual shareholder or noteholder of the CLO.

- All decisions made by HCMLP in its capacity as servicer, portfolio manager, or equivalent of each CLO, including without limitation the timing and execution of any sale transaction, are made by HCMLP taking into account such factors as HCMLP determines to be appropriate and are not subject to the requests or instructions of any investor or other party.

- There is no legal basis pursuant to which the holders of preferred shares or notes in the CLOs may influence the investment decisions of HCMLP or the CLO.

For these reasons, NexPoint, HCMFA, and their affiliates, including Mr. Dondero, are hereby advised to cease and desist from making or initiating, directly or indirectly, any instructions, requests, or demands to HCMLP regarding the terms, timing, or other aspects of any portfolio transactions of any of the CLOs.

HCMLP reserves and does not waive all of its rights at law and in equity.



December 3, 2020
Page 3

Please direct all further questions to me.

Sincerely,

Gregory V. Demo

cc: HCMLP Board of Directors (*by e-mail*)
Jeffrey Pomerantz (*by e-mail*)
John Morris (*by e-mail*)

# EXHIBIT 10



**PACHULSKI**
**STANG**
**ZIEHL**
**JONES**

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

L O S   A N G E L E S , C A
S A N   F R A N C I S C O , C A
W I L M I N G T O N , D E
N E W   Y O R K , N Y

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

Jeffrey N. Pomerantz

December 4, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones,
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

Dear Judge Lynn:

As you know, my firm represents Highland Capital Management, L.P. ("***HCMLP***").  HCMLP filed bankruptcy on October 16, 2019, and it is currently under the protection of the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj11.

As you also know, HCMLP is currently managed by the board of independent directors (the "***Board***") at Strand Advisors, Inc., HCMLP's general partner, and James P. Seery, Jr., HCMLP's chief executive officer and chief restructuring officer.  Your client, James Dondero, resigned from HCMLP at the direction of the Board in October 2020 and has no authority or oversight over HCMLP or the decisions that HCMLP makes with respect to assets under its management.

On November 24, 2020, Mr. Seery, in his capacity as the chief executive officer of HCMLP, directed Hunter Covitz, an HCMLP employee, to cause the sale of certain assets held by certain pooled collateralized loan obligation vehicles ("***CLOs***") for which HCMLP serves as portfolio manager or servicer.  Before such sale could be executed, your client, Mr. Dondero, emailed Mr. Covitz, among others, and directed them to halt the sale and to disobey Mr. Seery's direct order to sell.  At your client's direction, Mr. Covitz and others

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P O  BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

WEB  www.pszjlaw.com



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

December 4, 2020
Page 2

stopped the sale and refused to comply with Mr. Seery's direction. Copies of the relevant correspondence are attached hereto as Appendix A. HCMLP also received the following letters: (i) the letter, dated October 16, 2020, from Dustin Norris of NexPoint Advisors, L.P. ("*NexPoint*") to James Seery of HCMLP and (ii) the letter, dated November 24, 2020, from Dustin Norris of NexPoint to James Seery of HCMLP. Copies of these letters are attached as Appendix B. These emails and letters are collectively referred to as the "*Communications*".

We understand that each of NexPoint and Highland Capital Management Fund Advisors, L.P. ("*HCMFA*," and together with NexPoint, the "*Advisors*") is an investment adviser directly or indirectly controlled by James Dondero, and that each such Advisor is no longer an affiliate of HCMLP.

According to the Communications, the Advisors and certain investment funds advised by the Advisors and/or their affiliates own interests in certain of the CLOs.

In addition to Mr. Dondero's correspondence nullifying, impeding, and other contradicting Mr. Seery's order, in certain of the Communications, NexPoint or its counsel "requests" that HCMLP refrain from selling any CLO assets without notice and prior consent from the Advisors. This request is based on the Advisors' apparent belief that the sale of assets by the CLOs has the potential to negatively affect the valuation of the funds that hold their interests by causing the CLOs not to realize "their full value".

Neither Mr. Dondero nor the Advisors has the right, either under the documents governing the CLOs or applicable law, to instruct HCMLP with respect to specific portfolio management decisions. As portfolio manager or servicer of the CLOs, HCMLP has contractual and fiduciary duties to each CLO as a whole, and not to any investor in any CLO. If you disagree, please provide the authority that supports your position.

Specifically, please note the following:

- HCMLP in its role as servicer, portfolio manager, or equivalent of each CLO has full discretion to make decisions to purchase and sell assets on behalf of the



December 4, 2020
Page 3

>    CLO subject only to the terms of its service agreement, indenture, and the trustees/directors of each respective CLO.

- The sole client of HCMLP is the CLO issuer, and not any individual shareholder or noteholder of the CLO.

- All decisions made by HCMLP in its capacity as servicer, portfolio manager, or equivalent of each CLO, including without limitation the timing and execution of any sale transaction, are made by HCMLP taking into account such factors as HCMLP determines to be appropriate and are not subject to the requests or instructions of any investor or other party.

- There is no legal basis pursuant to which the holders of preferred shares or notes in the CLOs may influence the investment decisions of HCMLP or the CLO.

Your client's actions actively interfered with the management of HCMLP's bankruptcy estate and the property of such estate. Your client's actions also violated the Bankruptcy Code and the order entered by Judge Jernigan on January 9, 2020 [Docket No. 339].

For these reasons, Mr. Dondero and his affiliates and related parties, including NexPoint, HCMFA, and their affiliates, are hereby advised to cease and desist from making or initiating, directly or indirectly, any instructions, requests, or demands to HCMLP, its officers, and employees regarding the terms, timing, or other aspects of any portfolio transactions of any of the CLOs.

On December 3, 2020, a letter to the same effect was sent to counsel for the Advisors.

HCMLP reserves and does not waive all of its rights at law and in equity.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 4, 2020
Page 4

Sincerely,

Jeffrey N. Pomerantz

Enclosures
cc:     HCMLP Board of Directors
        John Morris
        Gregory Demo

# APPENDIX A

## Gregory V. Demo

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Tuesday, November 24, 2020 4:32 PM |
| **To:** | Hunter Covitz |
| **Cc:** | Thomas Surgent; Gregory V. Demo |
| **Subject:** | FW: SKY equity see below from Dondero |

Hunter:

I just received a copy of this email. Jim Dondero has no authority over the HCMLP managed CLOs. The purported direction is inappropriate, violative of the Bankruptcy Court orders, and of no effect.

I am the CEO and CRO of HCMLP. HCMLP has full authority to manage the positions in the CLOs. If I direct you to make a sale, please do so. If you cannot, please advise me immediately and explain why.

I will call you at 9:00am ET tomorrow to discuss this issue.

Jim

**From:** Jim Dondero [mailto:JDondero@HighlandCapital.com]
**Sent:** Tuesday, November 24, 2020 2:19 PM
**To:** Matt Pearson <MPearson@HighlandCapital.com>
**Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>; Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin <JSowin@HighlandCapital.com>
**Subject:** Re: SKY equity

No...... do not

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

> On Nov 24, 2020, at 2:20 PM, Matt Pearson <MPearson@highlandcapital.com> wrote:

> ok

> **From:** Hunter Covitz
> **Sent:** Tuesday, November 24, 2020 12:40 PM
> **To:** Gatekeeper <Gatekeeper@hcmlp.com>
> **Cc:** Matt Pearson <MPearson@HighlandCapital.com>; Joe Sowin <JSowin@HighlandCapital.com>; Hunter Covitz <HCovitz@HighlandCapital.com>
> **Subject:** SKY equity

> Please sell ~half of the positons in Gleneagles and Grayson in the current 32+ context.

Please sell ~48,500 shares in each CLO, ~97k shares total.

**HUNTER COVITZ**  |  HEAD OF STRUCTURED PRODUCTS

<image001.jpg>

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
 O: 972.628.4124   |   C: 214.394.5510
hcovitz@highlandcapital.com   |   www.highlandcapital.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

## Gregory V. Demo

| | |
|---|---|
| **From:** | Hunter Covitz <HCovitz@HighlandCapital.com> |
| **Sent:** | Tuesday, November 24, 2020 4:41 PM |
| **To:** | Jim Seery |
| **Cc:** | Thomas Surgent; Gregory V. Demo |
| **Subject:** | RE: AVYA sell-See below comment from Dondero |

We sold the following .. just put pencils on the rest down near the end of the trading day to revisit tomorrow.

SKY 4.5k @ $32.05
AVYA 2,269 @ $17.81

Hunter Covitz
Cell: 214.394.5510

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, November 24, 2020 3:35 PM
**To:** Hunter Covitz <HCovitz@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Greg Demo <gdemo@pszjlaw.com>
**Subject:** FW: AVYA sell-See below comment from Dondero
**Importance:** High

Hunter:

The my prior message applies to this chain as well.

Did you get these and the SKY sales off today?  If so, please provide me with a full report on the prints.

Jim

---

**From:** Jim Dondero [mailto:JDondero@HighlandCapital.com]
**Sent:** Tuesday, November 24, 2020 2:18 PM
**To:** Matt Pearson <MPearson@HighlandCapital.com>
**Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>; Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin <JSowin@HighlandCapital.com>
**Subject:** Re: AVYA sell

Why?  Let's not please

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

On Nov 24, 2020, at 2:20 PM, Matt Pearson <MPearson@highlandcapital.com> wrote:

ok

---

**From:** Hunter Covitz
**Sent:** Tuesday, November 24, 2020 1:19 PM
**To:** Gatekeeper <Gatekeeper@hcmlp.com>
**Cc:** Joe Sowin <JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>; Hunter Covitz <HCovitz@HighlandCapital.com>
**Subject:** AVYA sell

Please sell 213k shares (~$3.8mm) of Avaya in the high 17/18 current context. Please respond with other interest.

| Fund | CLO |
|------|-----|
| Aberdeen CLO | 4,000 |
| Brentwood CLO Ltd | 20,000 |
| Eastland CLO, Ltd. | 50,000 |
| Grayson CLO, Ltd. | 38,000 |
| Greenbriar CLO LTD | 34,000 |
| Red River CLO, Ltd. | 5,000 |
| Rockwall II | 6,000 |
| South Fork CLO Ltd. | 8,000 |
| Stratford CLO, Ltd. | 23,000 |
| Westchester CLO, Ltd. | 25,000 |
| | 213,000.00 |

**HUNTER COVITZ** | HEAD OF STRUCTURED PRODUCTS

<image001.jpg>

300 Crescent Court | Suite 700 | Dallas, Texas 75201
O: 972.628.4124 | C: 214.394.5510

hcovitz@highlandcapital.com  |  www.highlandcapital.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

## Gregory V. Demo

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Friday, November 27, 2020 10:19 AM |
| **To:** | Gregory V. Demo; Jeff Pomerantz |
| **Cc:** | John Dubel; Russell Nelms |
| **Subject:** | FW: SKY equity |



Jim Seery

---

**From:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Date:** Friday, November 27, 2020 at 9:28 AM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Subject:** Fwd: SKY equity

Please see below. We should discuss

Begin forwarded message:

> **From:** Jim Dondero <JDondero@highlandcapital.com>
> **Date:** November 27, 2020 at 2:46:35 AM EST
> **To:** Thomas Surgent <TSurgent@highlandcapital.com>
> **Subject:** Fwd: SKY equity
>
> I understand Seery is working on a work around to trade these securities anyway. Trades that contradict investor desires and have no business purpose or investment rational.
> You might want to remind him ( and yourself) that the chief compliance officer has personal liability.
>
> James Dondero
> Highland Capital Management
> 972-628-4100
> jdondero@highlandcapital.com
> www.highlandcapital.com
>
> Begin forwarded message:
>
> > **From:** Joe Sowin <JSowin@highlandcapital.com>
> > **Date:** November 24, 2020 at 3:58:24 PM EST
> > **To:** Jim Dondero <JDondero@highlandcapital.com>

**Cc:** Matt Pearson <MPearson@highlandcapital.com>, Hunter Covitz
<HCovitz@highlandcapital.com>, Compliance <Compliance@hcmlp.com>
**Subject: Re: SKY equity**

 + Conpliance
We did not know that but Understood going forward.

Compliance should never have approved this order then - will coordinate with them Jim

Post: Please block all orders from Hitting the trading desk for the fungus Jim mentioned.

Happy to discuss if needed.
Joe

> On Nov 24, 2020, at 2:29 PM, Jim Dondero
> <JDondero@highlandcapital.com> wrote:
>
>  HFAM and DAF has instructed Highland in writing  not to sell any CLO
> underlying assets..... there is potential liability, don't do it again please
>
> James Dondero
> Highland Capital Management
> 972-628-4100
> jdondero@highlandcapital.com
> www.highlandcapital.com

>> On Nov 24, 2020, at 3:20 PM, Matt Pearson
>> <MPearson@highlandcapital.com> wrote:
>>
>>
>> I've cxl'd both SKY and AVYA sales – only completed a
>> small amount of each
>>
>> SKY 4.5k @ $32.05
>> AVYA 2,269 @ $17.81

>> **From:** Jim Dondero
>> **Sent:** Tuesday, November 24, 2020 2:19 PM
>> **To:** Matt Pearson <MPearson@HighlandCapital.com>
>> **Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>;
>> Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin
>> <JSowin@HighlandCapital.com>
>> **Subject:** Re: SKY equity
>>
>> No...... do not
>>
>> James Dondero
>> Highland Capital Management
>> 972-628-4100
>> jdondero@highlandcapital.com
>> www.highlandcapital.com

On Nov 24, 2020, at 2:20 PM, Matt Pearson <[MPearson@highlandcapital.com](mailto:MPearson@highlandcapital.com)> wrote:

ok

---

**From:** Hunter Covitz
**Sent:** Tuesday, November 24, 2020 12:40 PM
**To:** Gatekeeper <[Gatekeeper@hcmlp.com](mailto:Gatekeeper@hcmlp.com)>
**Cc:** Matt Pearson <[MPearson@HighlandCapital.com](mailto:MPearson@HighlandCapital.com)>; Joe Sowin <[JSowin@HighlandCapital.com](mailto:JSowin@HighlandCapital.com)>; Hunter Covitz <[HCovitz@HighlandCapital.com](mailto:HCovitz@HighlandCapital.com)>
**Subject:** SKY equity

Please sell ~half of the positons in Gleneagles and Grayson in the current 32+ context.

Please sell ~48,500 shares in each CLO, ~97k shares total.

**HUNTER COVITZ  |**  HEAD OF STRUCTURED PRODUCTS

<image001.jpg>

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
 O: 972.628.4124   |   C: 214.394.5510
[hcovitz@highlandcapital.com](mailto:hcovitz@highlandcapital.com)   |   [www.highlandcapital.com](http://www.highlandcapital.com)

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# APPENDIX B



October 16, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201

Dear Jim:

We are writing to reiterate the concerns we have expressed about the scope and maintenance of quality of the services currently being provided by Highland Capital Management, L.P. ("HCMLP") to NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") under their respective shared services agreements (together, the "Shared Services Agreements" or "Agreements"). As you know, the Shared Services Agreements obligate HCMLP to provide a variety of investment, administrative, legal, and back-office services to the Advisors. These responsibilities on the part of HCMLP are critical to the Advisors' ability to provide top-notch advisory services to the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they have advisory contracts.

In particular, the refusal by HCMLP to allow its employees to work on certain matters that jointly affect HCMLP and the Advisors has resulted in the Advisors incurring additional third-party costs and expenses to procure services that should rightfully be performed by HCMLP under the Shared Services Agreements. These third-party services, for which the Advisors are already compensating HCMLP under the Agreements, represent supplemental costs and expenses that the Advisors should not be obligated to pay.

Additionally, it is our understanding that all HCMLP employees will be given notice that their employment will be terminated effective as of December 31, 2020. If these employees are terminated, or are informed that they will be terminated and elect to resign, HCMLP will no longer be able to carry out its duties and obligations under the Agreements. We would thus like to request assurances from HCMLP that if elects to terminate its employees, it will work in good faith with the Advisors to put in place an orderly transition plan. Such a plan would provide for an effective transfer of services to the Advisors, seek to maximize employee retention, and permit the Advisors (or their affiliates) to hire any and all HCMLP employees, which would ensure the delivery of uninterrupted services previously provided by HCMLP under the Agreements.

Finally, we understand that HCMLP is contemplating the sale of certain assets held in several CLOs, the interests in which are also owned by the Advisors and/or the Funds advised by

NexPoint, HCMFA and/or their affiliates. The sale of such assets has the potential to negatively affect the valuation of the Funds. Specifically, a rush to sell these assets at fire sale prices could result in both the Funds and HCMLP not realizing their full value. Accordingly, we hereby request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

We feel certain that our mutually shared goals are to minimize disruption and costs, to prevent the dislocation of services to the Advisors and the Funds, and to maximize returns for Funds and accounts advised by NexPoint, HCMFA, HCMLP, or any of their affiliates. We believe that through working cooperatively we can achieve these goals.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

# NEXPOINT

November 24, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to follow up on our letter dated October 16, 2020 and to reiterate the concerns we have expressed about the sale of certain assets held in several CLOs, the interests in which are also owned by the NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") and/or the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they and their affiliates have advisory contracts.   As we have previously advised, the sale of such assets has the potential to negatively affect the valuation of the Funds, and a rush to sell these assets at fire-sale prices could result in both the Funds and Highland Capital Management, L.P. ("HCMLP") not realizing their full value.  In addition, with recent CLO quarterly payments being made and potential upside for the remaining securities held by the CLOs, sales of these securities at this time could further negatively impact the valuation.   We have previously requested that no CLO assets be sold without prior notice to and prior consent from the Advisors.  We understand that Charitable DAF HoldCo, Ltd. has made a similar request. Accordingly, we hereby re-urge our request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

Thank you for your prompt attention to this matter.

Sincerely,

*Dustin Norris*

Dustin Norris


cc:     Thomas Surgent (tsurgent@highlandcapital.com)
        John Dubel (jdubel@dubel.com)
        Russell Nelms (rfargar@yahoo.com)

# EXHIBIT 11

# PROMISSORY NOTE

$100,000                                                                November 27, 2013

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED THOUSAND and 00/100 Dollars ($100,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

# EXHIBIT 12

# PROMISSORY NOTE

$2,500,000                                                                October 12, 2017

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

# EXHIBIT 13

# PROMISSORY NOTE

$3,825,000                                                   February 2, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.     <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.     <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.     <u>Tax Loan</u>. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

      5.     <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      6.     <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      7.     <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

# EXHIBIT 14

# PROMISSORY NOTE

$150,000.00                                                           March 28, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

# EXHIBIT 15

# PROMISSORY NOTE

$200,000.00                                                                                        June 25, 2018

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

# EXHIBIT 16

# PROMISSORY NOTE

$2,500,000                                                                                        August 1, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

# EXHIBIT 17

# PROMISSORY NOTE

$2,500,000                                                          August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.    The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.    The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.    Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

# EXHIBIT 18

# EXHIBIT 19

# PROMISSORY NOTE

$2,400,000.00                                                                                    May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

# EXHIBIT 20

# PROMISSORY NOTE

$5,000,000.00                                                                                   May 3, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

# EXHIBIT 21

# PROMISSORY NOTE

$400,000                                                                                           May 29, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

# EXHIBIT 22

# PROMISSORY NOTE

$150,000                                                                                    June 26, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "*Note*").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.


**MAKER:**


_____

FRANK WATERHOUSE

# EXHIBIT 23

# PROMISSORY NOTE

$900,000                                                            September 25, 2019

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of NINE HUNDRED THOUSAND and 00/100 Dollars ($900,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

# EXHIBIT 24

## HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

     Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        D. Michael Lynn

**Appendix A**

ABA #:  322070381
Bank Name:  East West Bank
Account Name:  Highland Capital Management, LP
Account #:  5500014686

# EXHIBIT 25

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019.  Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021.  Payee reserves all rights with respect to such amounts.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

**Appendix A**

ABA #:             322070381
Bank Name:         East West Bank
Account Name:  Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 26

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
c/o NexPoint Advisors, LP
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Demand on Promissory Notes:

Dear Mr. Dondero,

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 11/27/13 | $100,000 | $171,542.00 | $526.10 | $172,068.10 |
| 10/12/17 | $2,500,000 | $3,149,919.12 | $41,423.60 | $3,191,342.72 |
| 10/15/18 | $750,000 | $874,977.53 | $10,931.23 | $885,908.76 |
| 9/25/19 | $900,000 | $750,279.14 | $12,662.24 | $762,941.38 |
| **TOTALS** | **$4,250,000** | **$4,946,717.79** | **$65,543.17** | **$5,012,260.96** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

**Appendix A**

ABA #:           322070381
Bank Name:     East West Bank
Account Name:  Highland Capital Management, LP
Account #:       5500014686

# EXHIBIT 27

## HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Services, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Services, Inc. ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 3/28/18 | $150,000 | $158,776.59 | $3,257.32 | $162,033.91 |
| 6/25/18 | $200,000 | $212,403.27 | $2,999.54 | $215,402.81 |
| 5/29/19 | $400,000 | $409,586.19 | $5,256.62 | $414,842.81 |
| 6/26/19 | $150,000 | $153,564.74 | $1,675.16 | $155,239.90 |
| **TOTALS** | **$900,000** | **$934,330.79** | **$13,188.64** | **$947,519.43** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
         James Romey
         Jeffrey Pomerantz
         Ira Kharasch
         Gregory Demo

**Appendix A**

ABA #:            322070381
Bank Name:     East West Bank
Account Name:  Highland Capital Management, LP
Account #:     5500014686

# EXHIBIT 28




**JD**

Jim >

office until Monday and
will speak with me then.

From Lynn

Tue, Nov 24, 10:39 AM

Update on UBS please

Tue, Nov 24, 1:01 PM

No update. Will let you
know if something
changes. Assume that you
and Lynn are pushing on
the Pot plan. Thanks

Tied up this afternoon

Delivered

Today 5:26 PM

Be careful what you do –
last warning.

  iMessage 

# EXHIBIT 29



**PACHULSKI STANG ZIEHL & JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Jeffrey N. Pomerantz

December 4, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones,
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

Dear Judge Lynn:

I write to follow up on our recent communications concerning Mr. Dondero's written threat to Jim Seery and related matters.

As we have informed you, on December 3, just hours after HCMLP sent letters demanding payment on a series of notes tendered by Mr. Dondero and certain of his affiliated entities, Mr. Dondero sent a text message to Mr. Seery that stated "Be careful what you do – last warning." This threat was, and remains, completely unacceptable.

Mr. Dondero called Mr. Seery earlier today, ostensibly to discuss the "pot plan." Early in the call, Mr. Dondero suggested that "the lawyers" would address his threatening message and failed to disavow or apologize for the text, saying only (at the end of the conversation) that he didn't mean to threaten any physical harm.

Mr. Seery and the other members of the Independent Board are disturbed by Mr. Dondero's explicit threat and his lack of contrition. Because Mr. Dondero does not seem to appreciate the seriousness of this matter, the Board has instructed us to prepare an emergency motion seeking injunctive relief, including enjoining Mr. Dondero from communicating directly with any Board member or making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 4, 2020
Page 2


In the interim, the Debtor demands that you instruct Mr. Dondero to cease and desist from (a) communicating directly with any Board member without counsel for the Debtor, (b) making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents, or (c) communicating with any of HCMLP's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero.

HCMLP reserves and does not waive all of its rights at law and in equity. Please direct all further questions to me.

Sincerely,

Jeffrey N. Pomerantz


cc:     HCMLP Board of Directors (*by e-mail*)
        Jeffrey Pomerantz (*by e-mail*)
        John Morris (*by e-mail*)
        Gregory Demo (*by e-mail*)