# EXHIBIT 28

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding |
| | § | |
| vs. | § | No. 20-3190-sgj11 |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



**DECLARATION OF JOHN A. MORRIS**
**IN SUPPORT OF THE DEBTOR'S MOTION FOR AN ORDER REQURIING MR. JAMES**
**DONDERO TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CIVIL CONTEMPT**
**FOR VIOLATING THE TRO**

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares as follows:

1.    I am a partner in the law firm Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Motion") being filed contemporaneously herewith.[2]  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.    Attached as **Exhibit G** is a true and correct copy of certain text messages between James Dondero and Jason Rothstein.[3]

3.    Attached as **Exhibit K** is a true and correct copy of a letter from Pachulski Stang Ziehl & Jones LLP to D. Michael Lynn, dated December 23, 2020.

4.    Attached as **Exhibit L** is a true and correct copy of an e-mail string dated December 18, 2020, concerning certain trading activity.

5.    Attached as **Exhibit M** is a true and correct copy of the Response to K&L Gates LLP, dated December 22, 2020.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[3] Because this Motion is related to the Debtor's motion for a preliminary injunction that will be heard on January 8, 2021, for the convenience of the Court and the parties, the Debtor adopts for this Motion the order of exhibits set forth in the *Debtor's Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held on January 8, 2021.* [Adv. Pro. Docket No. 45], and any amendments thereto.

6.      Attached as **Exhibit N** is a true and correct copy of the Response to K&L Gates LLP, dated December 23, 2020.

7.      Attached as **Exhibit P** is a true and correct copy of an e-mail string dated December 12, 2020, concerning a possible deal.

8.      Attached as **Exhibit Q** is a true and correct copy of an e-mail string dated December 16, 2020 regarding list for joint meeting.

9.      Attached as **Exhibit R** is a true and correct copy of certain text messages between James Dondero and Melissa Schroth

10.      Attached as **Exhibit S** is a true and correct copy of certain text messages between James Dondero and Isaac Leventon.

11.      Attached as **Exhibit U** is a true and correct copy of a letter from Bonds Ellis to J. Pomerantz, dated December 29, 2020.

12.      Attached as **Exhibit W** is a true and correct copy of an e-mail string dated December 15, 2020, concerning The Dugaboy Investment Trust and Get Good Trust Common Interest Agreement.

13.      Attached as **Exhibit X** is a true and correct copy of a letter dated December 30, 2020, from K&L Gates to Pachulski Stang Ziehl and Jones.

14.      Attached as **Exhibit Y** is a true and correct copy of an e-mail between Grant Scott and Scott Ellington dated December 23, 2020.

15.      Attached as **Exhibit Z** is a true and correct copy of the transcript of the deposition of Mr. James Dondero, dated January 5, 2021.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: January 7, 2021.

_/s/ John A. Morris_____
John A. Morris

# EXHIBIT G



ero 000022

# EXHIBIT K



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

Jeffrey N. Pomerantz

December 23, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

**Re:     Termination of James Dondero Access to Office and Services**

Dear Judge Lynn:

As you know, on December 10, 2020, a temporary restraining order was entered against Mr. James Dondero by the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>TRO</u>").  Case No. 20-03190-sgj, Docket No. 10 (Bankr. N.D. Tex. Dec. 10, 2020.

Pursuant to the TRO, Mr. Dondero was, among others things, prohibited from communicating with the employees of Highland Capital Management, L.P. (the "<u>Debtor</u>") (subject to certain limited exceptions) and interfering with or otherwise impeding, directly or indirectly, the Debtor's business.  We have discussed with you several instances in which Mr. Dondero breached the terms of the TRO and will not repeat them here.

As you also know, the Debtor manages certain collateralized loan obligations (the "<u>CLOs</u>").  The Debtor sought to cause the CLOs to sell certain publicly-traded equity securities, including AVYA and SKY (tickers), prior to Thanksgiving.  Mr. Dondero blocked these trades.  That conduct, among other things, caused the TRO to be entered.

These trades were also the subject to the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager,*

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com



December 23, 2020
Page 2

*to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "CLO Motion"), which was filed by, among others, NexPoint Advisors, L.P. ("NPA") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"). At the hearing on December 16, 2020, Judge Jernigan stated both that she agreed that the CLO Motion was brought by "Mr. Dondero, through different entities" and that it was frivolous.

On December 22, 2020, employees of NPA and HCMFA notified the Debtor that they would not settle the CLOs' sale of the AVYA and SKY securities. To justify their conduct, those employees mimicked the frivolous arguments made in the CLO Motion. This conduct violated the TRO, and HCMLP reserves all rights to seek appropriate sanctions with respect to such violation.

As a result of this conduct, among other things, HCMLP has concluded that Mr. Dondero's presence at the HCMLP office suite and his access to all telephonic and information services provided by HCMLP are too disruptive to HCMLP's continued management of its bankruptcy case to continue.

As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.

Further, as of the Termination Date, Mr. Dondero's access to his @highlandcapital.com email account will be revoked, and Mr. Dondero will no longer have access to that email account or any emails, calendars, or contacts associated with that email account.

In addition, Mr. Dondero's access to the HCMLP system and all services maintained on that system, including his Bloomberg terminal, will be revoked as of the Termination Date.

HCMLP will also terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the "Cell Phones"). HCMLP demands that Mr. Dondero immediately turn over the Cell Phones to HCMLP by delivering them to you; we can make arrangements to recover the phones from you at a later date. The Cell Phones and



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 23, 2020
Page 3

the accounts are property of HCMLP. HCMLP further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone. HCMLP, as the owner of the account and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information.

Any attempt by Mr. Dondero to enter the Office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass. Similarly, any attempts by Mr. Dondero to access his @highlandcapital.com email account or any other service previously provided to Mr. Dondero by HCMLP will be viewed as an act of trespass, theft, and/or an attempted breach of HCMLP's security protocols.

Finally, HCMLP demands that Mr. Dondero take all steps necessary to retain and protect from loss, destruction, alteration or defacement all documents, communications, and information relating to the Debtor, the Debtor's assets, any assets managed by the Debtor, or the Debtor's employees.

HCMLP reserves all rights that it may have whether at law, equity, or in contract, including the right to restrict the access of HCMFA and NPA employees to the Office and HCMLP-provided services. Nothing herein will be construed as a waiver of any such rights.

Sincerely,

J. Pomerantz/gvb

Jeffrey N. Pomerantz

cc:     Ira Kharasch, Esq.
        John Morris, Esq.
        Gregory Demo, Esq.

# EXHIBIT L

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** FW: Jefferies recap
**Date:** Fri, 18 Dec 2020 16:03:32 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.png

---

**From:** Joe Sowin
**Sent:** Friday, December 18, 2020 3:34 PM
**To:** Jim Dondero ; DC Sauter
**Subject:** FW: Jefferies recap

**JOSEPH R. SOWIN**

**Co-Chief Investment Officer & Global Head of Equity Trading**

**HIGHLAND CAPITAL**
**M A N A G E M E N T**
**F U N D   A D V I S O R S**

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.419.4492 | C: 203.912.5935 | F: 972.628.4147

jsowin@highlandcapital.com| www.highlandcapital.com

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Friday, December 18, 2020 3:32 PM
**To:** Steven Haltom <SHaltom@HighlandCapital.com>; Brad Gianiny <bgianiny@jefferies.com>; Cyrus Eftekhari <CEftekhari@HighlandCapital.com>; Christopher A Bianchi <cbianchi@jefferies.com>; James Colasanto <jcolasanto@jefferies.com>; James Romey <jromey@DSIConsulting.com>; Joe Sowin <JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>; NYMO1 <NYMO1@Jefferies.com>; Ronald Wong <rwong@jefferies.com>; R-Settlement <R-Settlement@Highlandfunds.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: Jefferies recap

To be clear, Avaya should be allocated evenly to the 10 CLOs that hold it. NO account sold short. Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery <jpseeryjr@gmail.com>
**Date:** Friday, December 18, 2020 at 4:30 PM
**To:** Steven Haltom <SHaltom@HighlandCapital.com>, Brad Gianiny <bgianiny@jefferies.com>, Cyrus

Eftekhari <CEftekhari@HighlandCapital.com>, Christopher A Bianchi <cbianchi@jefferies.com>, James Colasanto <jcolasanto@jefferies.com>, James Romey <jromey@DSIConsulting.com>, Joseph Sowin <JSowin@HighlandCapital.com>, Matt Pearson <MPearson@HighlandCapital.com>, NYMO1 <NYMO1@Jefferies.com>, Ronald Wong <rwong@jefferies.com>, R-Settlement <R-Settlement@Highlandfunds.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: Jefferies recap

The NXRT is out of the HCMLP internal.

SKY should be allocated evenly across Grayson and Greenbriar CLO

Avaya should be allocated pro rata across all of the CLOS except Acis 7.

Please call me with any questions.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Steven Haltom <SHaltom@HighlandCapital.com>
**Date:** Friday, December 18, 2020 at 4:21 PM
**To:** Brad Gianiny <bgianiny@jefferies.com>, Cyrus Eftekhari <CEftekhari@HighlandCapital.com>, Christopher A Bianchi <cbianchi@jefferies.com>, James Colasanto <jcolasanto@jefferies.com>, Jim Seery <jpseeryjr@gmail.com>, James Romey <jromey@DSIConsulting.com>, Joseph Sowin <JSowin@HighlandCapital.com>, Matt Pearson <MPearson@HighlandCapital.com>, NYMO1 <NYMO1@Jefferies.com>, Ronald Wong <rwong@jefferies.com>, R-Settlement <R-Settlement@Highlandfunds.com>
**Subject:** RE: Jefferies recap

Brad,

What accounts are these in?

**Steven Haltom | Manager, Operations**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

972.628.4178 | shaltom@hcmlp.com | www.hcmlp.com

---

**From:** Brad Gianiny <bgianiny@jefferies.com>
**Sent:** Friday, December 18, 2020 3:02 PM
**To:** Cyrus Eftekhari <CEftekhari@HighlandCapital.com>; Christopher A Bianchi <cbianchi@jefferies.com>; James Colasanto <jcolasanto@jefferies.com>; Jim Seery

<jpseeryjr@gmail.com>; James Romey <jromey@DSIConsulting.com>; Joe Sowin <JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>; NYMO1 <NYMO1@Jefferies.com>; Ronald Wong <rwong@jefferies.com>; R-Settlement <R-Settlement@Highlandfunds.com>

**Subject:** Jefferies recap

SKY- sld 22k @ 32.2251

NHF- sld 10k @ 10.5461

AVYA- sld 6412 @ 19.7598

Brad Gianiny

Equity Sales Trader

Jefferies LLC

520 Madison Avenue, 2nd Floor

New York, NY 10022

W: 212-284-2291

C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT M



**LAW OFFICES**
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

LOS ANGELES
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory Demo

December 24, 2020

212-561-7700
gdemo@pszjlaw.com

**Via E-mail**

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

**Re:** *In re Highland Capital Management, L.P.*, **Case No. 19-34054-sgj (Bankr. N.D. Tex)**

Dear Counsel:

As you know, we represent Highland Capital Management, L.P. (the "Debtor"), the debtor-in-possession in the above-captioned bankruptcy case.

On December 8, 2020, your firm filed that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "Motion")[1] on behalf of Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "Movants"). After hearing the sworn testimony of the Movants' witness and the arguments made on the Movants' behalf, Judge Jernigan found that the Motion was "a very, very frivolous motion" and that your firm "wasted [her]

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

time." (Transcript, 64:5-12) An order was entered denying the Motion on December 18, 2020 [D.I. 1605].

On December 22, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) re-asserting almost verbatim the frivolous arguments raised in the Motion. Concurrently, we received notice that certain of the Movants' employees would not settle trades on behalf of the CLOs that were authorized by the Debtor acting in its capacity as the CLOs' portfolio manager. The Movants' employees who interfered with the Debtor's directions justified their conduct by asserting – again almost verbatim – the frivolous arguments raised in the Motion.

The Movants have caused the Debtor to incur substantial costs defending itself against the Motion and preparing to defend against the frivolous suits forecasted in the Letter. The Debtor demands that the Movants withdraw the letter by 5:00 p.m. CT on Monday, December 28, 2020, and confirm that the Movants and anyone acting on their behalf will take no further steps to interfere with the Debtor's directions as the CLOs' portfolio manager. If the Movants fail to timely comply with these demands, the Debtor shall seek prompt judicial relief, including seeking sanctions under Federal Rule of Bankruptcy Procedure 9011.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:    Jeffrey Pomerantz, Esq.
       Ira Kharasch, Esq.
       John Morris, Esq.
       John J. Kane, Esq.

# Exhibit A



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HMCFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HMCFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders.  Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing.  While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request.  Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act"). As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021.  The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

# EXHIBIT N



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

LOS ANGELES

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory Demo

December 24, 2020

212-561-7700
gdemo@pszjlaw.com

**Via E-mail**

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

**Re:**   ***In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex)**

Dear Counsel:

As you know, we represent Highland Capital Management, L.P. (the "Debtor"), the debtor-in-possession in the above-captioned bankruptcy case.

On December 8, 2020, your firm filed that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "Motion")[1] on behalf of Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "Movants"). After hearing the sworn testimony of the Movants' witness and the arguments made on the Movants' behalf, Judge Jernigan was convinced that the Movants were in fact Mr. James Dondero seeking to disrupt

_____

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

HCMP's estate by using different controlled entities to accomplish his ends.

On December 23, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) informing us that they were seeking to terminate certain CLO management agreements for "cause." For the reasons set forth herein, among others, such action is sanctionable under the circumstances and is otherwise prohibited by the CLOs' governing documents.

First, the Movants are owned and/or controlled by Mr. Dondero. These facts were disclosed in the Movants' public filings with the Securities and Exchange Commission and confirmed by Mr. Dustin Norris's testimony at the hearing held on December 16, 2020. Consequently, the Movants' attempt to terminate the CLO management agreements violates the order entered on January 9, 2020 [D.I. 339] (the "January Order"), which prohibits Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." A copy of the January Order is attached as Exhibit B.

Second, "cause" does not exist to terminate the CLO management agreements. The Debtor has a duty under the Investment Advisers Act of 1940 to the CLOs, not to any specific investor in the CLOs. *See, e.g., Goldstein v. SEC,* 451 F.3d 873, 881-82 (D.C. Cir. 2006) ("[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . ."). The Debtor has, at all times, fulfilled its statutory and contractual duties to the CLOs and will continue to do so. As counsel, you have a duty to investigate the spurious allegations in your pleadings, but you failed to do so. Your clients' desire to re-assert control over the CLOs is not evidence to the contrary.

Third, the Movants, by their own admission, consider themselves affiliates of the Debtor. Under the management agreements, affiliates of a manager cannot replace a manager, and therefore, are prohibited from removing a manager.

Please confirm to us, in writing, no later than 5:00 p.m. CT on Monday, December 28, 2020, that you are withdrawing the Letter and that the Movants and CLO Holdco, Ltd., commit not to take any



James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 3

actions, either directly or indirectly, to terminate the CLO management agreements. If we do not receive such confirmation, the Debtor will seek immediate relief from the bankruptcy court, including an action for contempt for violating the January Order and sanctions under Federal Rule of Bankruptcy Procedure 9011 or otherwise.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:    Jeffrey Pomerantz, Esq.
       Ira Kharasch, Esq.
       John Morris, Esq.
       John J. Kane, Esq.

# Exhibit A



December 23, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HMCFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HMCFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

In other cases, such companies in combination with CLO Holdco hold, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full. In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

In pleadings filed with the Bankruptcy Court, you asserted that one or more of the entities identified above lacked the authority to seek a replacement of the Debtor as fund manager because of the alleged affiliate status of the beneficial owners of such entities. We disagree.

Consequently, in addition to our request of yesterday, where appropriate and consistent with the underlying contractual provisions, one or more of the entities above intend to notify the relevant trustees and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United States Bankruptcy Code, including the automatic stay of Section 362. The basis for initiating the process for such removal includes, but is not limited to, the fact that HCMLP's duties, as set forth in the portfolio management agreements of the CLOs, are subject to the requirements of the Investment Advisers Act of 1940 ("Advisers Act"). HCMLP appears to be acting contrary to those duties under the agreements and where HCMLP is not fulfilling its duties under the portfolio management agreement it is therefore violating the Advisers Act. Thus, because HCMLP is (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced, including key investment professionals identified in the transactional documents for those CLOs (generally Mark Okada and Jim Dondero); (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan confirmation; (iii)

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 23, 2020
Page 3

adding a replacement manager as subadviser prior to January 31, 2021; and (iv) for other cause, the Advisors, Funds, and CLO Holdco have concluded that they have no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so.

Because the process of removal is being initiated, subject to the applicable provisions of the Bankruptcy Code, we respectfully request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing. To the extent there are CLO transactions prior to the confirmation, we intend to fully explore the business justification for doing so, as we do not believe there is any rational business reason to liquidate securities prior to that time.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

Exhibit B



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 9, 2020**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

### ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2.      The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.      The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

4.     The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.     The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.     All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.     Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.     Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.     Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

3

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

11.     Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

12.     Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

4

13.     The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

# EXHIBIT P

**From:** Scott Ellington <SEllington@HighlandCapital.com>

**To:** Michael Lynn <dmljng@gmail.com>

**Cc:** Jim Dondero <JDondero@HighlandCapital.com>, John Bonds <john@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>, "John Wilson" <john.wilson@bondsellis.com>

**Subject:** Re: Possible deal

**Date:** Sat, 12 Dec 2020 23:55:16 -0600

**Importance:** Normal

---

It will be JP Sevilla.
I will tell him that he needs to contact you first thing in morning

Sent from my iPhone

On Dec 12, 2020, at 8:44 PM, Michael Lynn wrote:

That said we MUST have a witness NOW.

Sent from my BlackBerry 10 smartphone.

**From:** Michael Lynn
**Sent:** Saturday, December 12, 2020 8:42 PM
**To:** Jim Dondero; John Bonds; Bryan Assink; John Wilson
**Subject:** Possible deal

The possible deal with the debtor went nowhere. It llos like trial.

Sent from my BlackBerry 10 smartphone.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT Q

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Subject:** Re: List for joint meeting
**Date:** Wed, 16 Dec 2020 13:42:51 -0600
**Importance:** Normal

---

On it.

Sent from my iPhone

On Dec 16, 2020, at 1:33 PM, Jim Dondero wrote:

I'm going to need you to provide leadership here.

Sent from my iPhone

Begin forwarded message:

**From:** Michael Lynn
**Date:** December 16, 2020 at 1:07:50 PM CST
**To:** Douglas Draper , Jim Dondero
**Subject: Re: List for joint meeting**

I can't think of any others tassuming Zorada is with K&L Gates). I would contact the lawyers I have no opinion on additional contacts.

I had thought you would be representing more entities than the two trusts.

Sent from my BlackBerry 10 smartphone.
Original Message
From: Douglas Draper
Sent: Wednesday, December 16, 2020 11:13 AM
To: Michael Lynn; Jim Dondero
Subject: List for joint meeting

1) Daf john Kane attny 2) highland capital management fund advisors George Zorada 3) nexpoint advisors Laureen Drawhorn 4) highland clo funding Mark Maloney 5) employees David Neier
Do we want to add or delete anybody from the list. Is the best route to have me call the lawyer or have a someone contact the client contact for the lawyer. Please advise
On another matter I think it would be a good idea to have a second client contact for my two clients. Give me your thoughts

Sent from my iPhone
Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.
CONFIDENTIALITY NOTICE:

INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT R



ero 000014

# EXHIBIT S



# EXHIBIT U

## BONDS ELLIS EPPICH SCHAFER JONES LLP
### ATTORNEYS & COUNSELORS

D. MICHAEL LYNN  |  D: 817.405.6915  |  MICHAEL.LYNN@BONDSELLIS.COM

December 29, 2020

*Via Email*:
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

      **Re:**    *In re: Highland Capital Management, L.P.* **– Case No. 19-34054**

Dear Jeff:

      I am in receipt of your letter sent via email on the evening of December 23, 2020.

      In response to the Debtor's demand concerning Mr. Dondero's cell phone, it is our understanding that the phone Dondero is currently using was purchased by Dondero several weeks ago and that the Debtor is not paying for the use of that phone. We are at present not sure of the location of the cell phone issued to Mr. Dondero by the Debtor, but we are not prepared to turn it over without ensuring that the privacy of attorney-client communications by text or email is protected. We are, however, willing to have an independent third party review any items that we would designate as privileged. Our office would need to review what is on the phone to determine what we would designate as privileged before it could reach such a person. In that regard, virtually all communications made between myself and other attorneys employed by Bonds Ellis Eppich Schafer Jones LLP have been through that phone and in many cases are preserved either as texts or emails.

      Sincerely,

      */s/ D. Michael Lynn*

      D. Michael Lynn

Cc:    Jim Dondero
       John Bonds

# EXHIBIT W

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Fwd: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement
**Date:** Tue, 15 Dec 2020 15:47:38 -0600
**Importance:** Normal
**Attachments:** Common_Interest_Agreement_-_Dondero_(00374777-2xBDDDE)_(002)_(Bonds_Ellis_comments).docx

---

Sent from my iPhone

Begin forwarded message:

**From:** Bryan Assink
**Date:** December 15, 2020 at 3:42:42 PM CST
**To:** Michael Lynn , Scott Ellington , John Bonds , John Wilson , Douglas Draper
**Subject: RE: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement**

All,

Attached is the Common Interest Agreement with our comments.

Best,
Bryan

---

**From:** Michael Lynn
**Sent:** Tuesday, December 15, 2020 2:53 PM
**To:** Scott Ellington ; John Bonds ; Bryan Assink ; John Wilson
**Subject:** Fw: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement

Bryan or John will review the agreement for us.

Sent from my BlackBerry 10 smartphone.

---

**From:** Deborah Hepting <dhepting@hellerdraper.com>

**Sent:** Tuesday, December 15, 2020 2:16 PM

**To:** 'Jim Dondero'; Michael Lynn

**Subject:** The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement

Please note from Douglas:

Attached please find the form agreement. Please review and advise who I should contact about being a party. Please forward for me to Scott Ellington. As you send me names, we will contact the lawyer to get this moving.

Thanks,

Douglas S. Draper
**Heller, Draper & Horn, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, LA 70130

Office: (504) 299-3300

Direct: (504) 299-3333

Fax: (504) 299-3399

Email: ddraper@hellerdraper.com

Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.

CONFIDENTIALITY NOTICE:
INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT X



R. Charles Miller
202.778.9372
chuck.miller@klgates.com

December 31, 2020

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

     Re: <u>Termination of Dondero access to office and services</u>

Dear Counsel:

     We are writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund,  NexPoint Capital, Inc. and the other retail funds advised by the Advisors (together, the "Funds").

     We have been provided a copy of your December 23, 2020 letter to Mr. Lynn regarding the termination of Mr. Dondero's access to the office and services.  We are extremely concerned that the loss of such access by Mr. Dondero could have serious effects for our clients and do unintended damage to their interests.  In particular, the Funds, many of which are publicly-listed, registered with and regulated by the Securities and Exchange Commission, and have thousands of shareholders, may be economically disadvantaged to the extent that the Debtor's actions deny Mr. Dondero the access and ability to provide the necessary and contractual services to them.

     Mr. Dondero is portfolio manager and/or officer of various entities which occupy space in the premises and have shared access to email accounts, computers and other relevant material pursuant to the terms of various shared services agreements (the "Agreements"), which the Debtor has not rejected and for which such entities pay the Debtor significant fees.  We are not aware of any provisions under the Agreements which give the Debtor the power to determine which employees of NexPoint Advisors,

L.P. and other entities may enter the premises or have access to the email and related systems.  If there are, please direct us to those provisions.  The Debtor has given written notice to the Advisors and the Funds that the Agreements will remain in place until January 31, 2021, at which time they will terminate, and our clients have been and are acting in reliance on those written representations from the Debtor.

Mr. Dondero is the lead (and in some cases the sole) portfolio manager for certain of the Funds.  He is intimately involved in the day-to-day operations and investment decisions regarding those Funds and in the operations of the Advisors.  We believe that denying Mr. Dondero access to the premises, email and related systems will materially and adversely affect the function and reputation of the Advisors and the Funds.  We ask that the Debtor reconsider its position refusing Mr. Dondero necessary access to the email, operating systems and building required to serve the Funds and the Advisors.

Sincerely,

*/s R. Charles Miller*

R. Charles Miller


Cc:

D. Michael Lynn (via email)

# EXHIBIT Y

**From:** Grant Scott <gscott@scottlawgroupllc.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** FW: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?
**Date:** Wed, 23 Dec 2020 15:02:50 +0000
**Inline-Images:** image001.jpg

---

FYI, now

**From:** John J. Kane
**Sent:** Wednesday, December 23, 2020 9:58 AM
**To:** Grant Scott ; dsauter@nexpointadvisors.com; A. Lee Hogewood
**Cc:** Brian Clark
**Subject:** Re: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?


866-399-4184

Conf Id: 5549564

Sent from my iPhone



On Dec 23, 2020, at 8:52 AM, Grant Scott <gscott@scottlawgroupllc.com> wrote:


FYI

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Sent:** Wednesday, December 23, 2020 9:51 AM
**To:** Grant Scott <gscott@scottlawgroupllc.com>
**Cc:** Jason Post <JPost@NexpointAdvisors.com>; Hogewood, III, A. Lee <A.Lee.HogewoodIII@klgates.com>
**Subject:** RE: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?

Yes. Copied here. Is there a dial-in?

**D.C. Sauter**

O: 972.628.4117 | C: 469.877.6440

---

**From:** Grant Scott <gscott@scottlawgroupllc.com>
**Sent:** Wednesday, December 23, 2020 8:48 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Subject:** It appears Jim will be available for a 9AM CT call. Can the K&L people make it?

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.



# EXHIBIT Z

```
 1

 2        IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
 3              DALLAS DIVISION
    IN RE:            )
 4                    ) CHAPTER 11
    HIGHLAND CAPITAL         )
 5  MANAGEMENT, L.P.,        ) CASE NO.
                      ) 19-34054-sgj11
 6       Debtor.      )
    _____ )
 7
    HIGHLAND CAPITAL         )
 8  MANAGEMENT, L.P.,        )
                      ) Adversary Proceeding
 9       Plaintiff,  ) No. 20-3190-sgj11
                      )
10   v.               )
                      )
11  JAMES D. DONDERO,       )
                      )
12       Defendant.   )
    _____ )
13

14       REMOTE VIDEO-RECORDED DEPOSITION OF

15            JAMES D. DONDERO

16         TUESDAY, JANUARY 5, 2021

17

18

19

20

21

22

23  REPORTED BY:

24  MICHAEL E. MILLER, FAPR, RDR, CRR

25  JOB NO. 188154
```

Page 2

```
 1
 2
 3
 4
 5              Tuesday, January 5, 2021
 6              9:50 a.m. CST
 7
 8
 9        REMOTE ORAL VIDEO-RECORDED DEPOSITION
10   OF JAMES D. DONDERO, held via Zoom conference
11   pursuant to the Federal Rules of Civil Procedure
12   before Michael E. Miller, Fellow of the Academy
13   of Professional Reporters, Registered Diplomate
14   Reporter, Certified Realtime Reporter and Notary
15   Public in and for the State of Texas.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   REMOTE APPEARANCES:
 3   PACHULSKI STANG ZIEHL & JONES
 4   Attorneys for Debtor
 5   780 Third Avenue
 6   New York, NY 10017
 7   BY:   JOHN MORRIS, ESQ.
 8         HAYLEY WINOGRAD, ESQ.
 9         JEFFREY POMERANTZ, ESQ.
10         GREGORY DEMO, ESQ.
11         IRA KHARASCH, ESQ.
12
13   LATHAM & WATKINS
14   Attorney For UBS
15   885 Third Avenue
16   New York, NY 10022
17   BY:   SHANNON MCLAUGHLIN, ESQ.
18         ZACHARY PROULX, ESQ.
19
20   JENNER & BLOCK
21   Attorney for Redeemer Committee
22   353 North Clark Street
23   Chicago, IL 60654
24   BY:   TERRI MASCHERIN, ESQ.
25
```

Page 4

```
 1
 2   REMOTE APPEARANCES:
 3   SIDLEY AUSTIN
 4   Attorneys For the Creditors Committee
 5   2021 McKinney Avenue
 6   Dallas, TX 75201
 7   BY:   PENNY REID, ESQ.
 8         PAIGE MONTGOMERY, ESQ.
 9         MATTHEW CLEMENTE, ESQ.
10         ALYSSA RUSSELL, ESQ.
11
12   KING & SPALDING
13   Attorney for Highland CLO Funding, Ltd.
14   500 West 2nd Street
15   Austin, TX 78701
16   BY:   REBECCA MATSUMURA, ESQ.
17
18   BONDS ELLIS EPPICH SCHAFER JONES
19   Attorneys for James Dondero
20   420 Throckmorton Street
21   Fort Worth, TX 76102
22   BY:   JOHN BONDS, ESQ.
23         BRYAN ASSINK, ESQ.
24
25
```

Page 5

```
 1
 2   REMOTE APPEARANCES:
 3   DEBEVOISE & PLIMPTON
 4   Attorneys for HarbourVest Partners
 5   919 Third Avenue
 6   New York, NY 10022
 7   BY:   ERICA WEISGERBER, ESQ.
 8
 9   CARLYON CICA CHARTERED
10   Attorneys for Integrated Financial
11   Associates Inc.
12   265 East Warm Springs Road
13   Las Vegas, NV 89119
14   BY:   CANDACE CARLYON, ESQ.
15
16   ALSO PRESENT:
17      La Asia Canty, Paralegal
18      Pachulski Stang Ziehl & Jones LLP
19
20   VIDEOGRAPHER:
21      Rick Richey, TSG Reporting Inc.
22
23
24
25
```

Page 6

1
2    ————
3         P R O C E E D I N G S
4    January 5, 2021, 9:50 a.m. CST
5    ————
6         THE VIDEOGRAPHER:  Good morning,
7    ladies and gentlemen.  My name is Rick Richey.
8    I'm a legal videographer in association with
9    TSG Reporting Inc.
10        Due to the severity of the COVID-19
11   and following the practice of social distancing,
12   I will not be in the same room with the witness.
13   Instead, I will record this videotaped deposition
14   remotely.
15        The court reporter, Mike Miller, also
16   will not be in the same room and will swear the
17   witness remotely.
18        Do all parties stipulate to the
19   validity of this video recording and remote
20   swearing and that it will be admissible in the
21   courtroom as if it had been taken following Rule
22   30 of the Federal Rules of Civil Procedure and
23   the state rules where the case is pending?
24        Do all agree?
25        MR. MORRIS:  Yes.

Page 7

1
2         MR. BONDS:  Yes.
3         MR. MORRIS:  Does anyone not agree?
4         (Pause.)
5         MR. MORRIS:  Having heard nothing,
6    let's proceed.  Thank you.
7         THE VIDEOGRAPHER:  This will be the
8    start of Media No. 1 in the video-recorded
9    deposition of James Dondero.  Today's date is
10   January 5th, 2021.  It's 9:52 a.m. Central
11   Standard Time.
12        The case is In re Highland Capital
13   Management LP, Debtor, Chapter 11, Case
14   No. 19-34054-sgj11 in the United States
15   Bankruptcy Court for the Northern District of
16   Texas, Dallas Division.
17        The attorneys' appearances have
18   already been noted on the steno record, so would
19   the court reporter please swear the witness.
20        MR. BONDS:  Wait just one second.
21   There's an adversary proceeding that this case is
22   actually – or this deposition is actually being
23   taken in.  It's 20-03190-sgj.  Thank you.
24   ///
25   ///

Page 8

1         J. DONDERO
2    ————
3         JAMES D. DONDERO,
4         having been duly sworn,
5         testified as follows:
6    ————
7         EXAMINATION
8    ————
9    BY MR. MORRIS:
10        Q.  Good morning, Mr. Dondero.  Can you
11   hear me okay?
12        A.  Yes.
13        Q.  Okay.  My name is John Morris from
14   Pachulski Stang Ziehl & Jones, counsel for the
15   debtor.
16        Where are you located this morning,
17   sir?
18        A.  Highland Capital Management's
19   conference room, same as last time.
20        Q.  Is there anybody in the room with you
21   right now?
22        A.  No.
23        Q.  Do you have a telephone with you?
24        A.  Yes.
25        Q.  Is the phone off?

Page 9

1         J. DONDERO
2         A.  Yes.
3         Q.  Are you aware that the debtor sent a
4    letter to your lawyers instructing you not to be
5    on the premises after December 31st, 2020?
6         A.  Yes.
7         Q.  Did you get the debtor's permission
8    to enter the premises this morning?
9         A.  Implicitly for this depo, I believe.
10        Q.  Okay.  Did you get any explicit
11   consent or approval for you to be in the offices
12   this morning?
13        A.  Not that I'm aware of.
14        Q.  Did you ask or did anybody on your
15   behalf ask the debtors if you could participate
16   in today's deposition at the Highland offices?
17        A.  I don't know.
18        Q.  You're not aware of that, right?
19        A.  Correct.
20        Q.  Okay.  John Bonds is defending you
21   today; is that right?
22        A.  Yes.
23        Q.  And he's at the Bonds Ellis firm,
24   right?
25        A.  Yes.

J. DONDERO

1
2    Q.   And the Bonds Ellis firms represents
3  you in your individual capacity, correct?
4    A.   Yes.
5    Q.   Is there any other law firm that
6  represents you in your individual capacity in the
7  Highland bankruptcy or in the adversary
8  proceeding?
9    A.   I don't believe so.
10   Q.   Okay.  Does the Bonds Ellis firm
11  represent any entity in which you have an
12  ownership or control interest, or do they just
13  represent you in your individual capacity?
14   A.   I don't know for sure.
15   Q.   Okay.  But as you sit here right now,
16  do you have any reason to believe that the Bonds
17  Ellis firm represents anybody other than you in
18  your individual capacity in connection with the
19  bankruptcy case?
20   A.   I don't know.
21   Q.   Okay.  You understand that we're here
22  today for your deposition, right?
23   A.   Yes.
24   Q.   And do you understand that today's
25  deposition is being taken in connection with the

J. DONDERO

1
2  debtor's motion for -- (audio malfunction) --
3        (Clarification requested by the
4  stenographer.)
5        MR. MORRIS:  I'll ask it again.
6  BY MR. MORRIS:
7    Q.   Mr. Dondero, do you understand that
8  today's deposition is being taken in connection
9  with the debtor's motion for preliminary
10  injunction against you?
11   A.   Yes.
12   Q.   Do you intend to participate in the
13  hearing on the debtor's motion for preliminary
14  injunction?
15       MR. BONDS:  Objection, form.
16       MR. MORRIS:  You can answer.
17   A.   I don't know.
18  BY MR. MORRIS:
19   Q.   Do you intend to make -- do you
20  intend to testify at the debtor's hearing for
21  preliminary injunction?
22       MR. BONDS:  Objection, form.
23   A.   I don't know.
24  BY MR. MORRIS:
25   Q.   You may or you may not; is that

J. DONDERO

1
2  right?
3    A.   Yes.
4    Q.   Okay.  Are you on any drugs or any
5  medication right now?
6    A.   No.
7    Q.   Is there anything that you're aware
8  of that might affect your memory today?
9    A.   No.
10   Q.   Are you aware of anything that would
11  prevent you from testifying competently today to
12  the best of your ability?
13   A.   No.
14   Q.   You understand that you're under oath
15  right now?
16   A.   Yes.
17   Q.   Are you aware that on December 10th
18  the debtor obtained a temporary restraining order
19  against you?
20   A.   Roughly.
21   Q.   Okay.  Did you ever personally read a
22  copy of the temporary restraining order?
23   A.   No.
24   Q.   So you've never seen the order
25  itself; is that right?

J. DONDERO

1
2        MR. BONDS:  Objection, form.
3    A.   Correct.
4  BY MR. MORRIS:
5    Q.   Do you have an understanding of what
6  the order restrains you from doing?
7    A.   Just in the most general sense.
8    Q.   Tell me your understanding of what
9  the temporary order restrains you from doing.
10   A.   Talking to the independent board
11  directly or talking directly to Highland
12  employees.
13   Q.   Is there any other aspect of the
14  temporary restraining order that you're aware of
15  that would otherwise constrain or restrain your
16  conduct?
17   A.   Those are the points I remember.
18   Q.   Do you recall that before the Court
19  entered the temporary restraining order, it held
20  a hearing to consider the debtor's request?
21   A.   I -- I don't know.
22   Q.   Did you listen to the hearing?
23   A.   No.
24   Q.   Did you read a transcript of the
25  hearing?

Page 14

J. DONDERO

2    A.  No.

3        Q.  Do you respect the Court's authority

4    in this case?

5        MR. BONDS:  Objection, form.

6        A.  Yes.

7    BY MR. MORRIS:

8        Q.  Is there any particular reason why

9    you didn't take the time to read the Court's

10   temporary restraining order that was entered

11   against you?

12       A.  No.

13       Q.  James Seery is a member of the board

14   of Strand Advisors, the debtor's general partner,

15   right?

16       A.  Yes.

17       Q.  And you've been aware of that since

18   at least last January, correct?

19       A.  Yes.

20       Q.  And you're also aware that Mr. Seery

21   is the debtor's CEO and CRO, right?

22       A.  Yes.

23       Q.  And you've been aware of that since

24   last July, correct?

25       A.  Yes.

Page 15

J. DONDERO

2        Q.  Did you ever review the declaration

3    that Mr. Seery submitted in connection with the

4    debtor's motion for a temporary restraining order

5    against you?

6        MR. BONDS:  Objection, form.

7        A.  No.

8    BY MR. MORRIS:

9        Q.  Do you know what Mr. Seery alleged in

10   his declaration -- withdrawn.

11       Do you know the substance of what

12   Mr. Seery alleged in his declaration in support

13   of the debtor's motion for the TRO?

14       A.  No.

15       Q.  Did you care that the debtor was

16   seeking a TRO against you?

17       A.  I didn't think about it.

18       Q.  Have you thought about it since the

19   order was entered?

20       A.  Not really.

21       Q.  Okay.  You didn't submit a

22   declaration of your own in opposition of the

23   motion for TRO, right?

24       A.  I don't know.

25       Q.  You don't recall signing anything, do

Page 16

J. DONDERO

2    you?

3        A.  I've signed a lot of things, but

4    I'm -- I don't recall an opposition.

5        Q.  Let's talk about some of the events

6    that led to the entry of the TRO.

7        The debtor serves -- (audio

8    malfunction) --

9        (Clarification requested by the

10   stenographer.)

11       THE WITNESS:  I didn't touch the

12   microphone at this end and it's six inches or

13   eight inches from my mouth.

14       MR. MORRIS:  Yeah, let's try again,

15   Mr. Dondero.  Thank you.

16   BY MR. MORRIS:

17       Q.  The debtor serves as the portfolio

18   manager for certain collateralized loan

19   obligation vehicles; isn't that right?

20       A.  I don't want to testify to that.

21       Q.  Does the -- does the debtor manage

22   CLOs?

23       MR. BONDS:  Objection, form.

24       MR. MORRIS:  Withdrawn.

25       ///

Page 17

J. DONDERO

2    BY MR. MORRIS:

3        Q.  Can we agree that CLO stands for

4    collateralized loaning obligations?

5        A.  Yes.

6        Q.  Okay.  And does the debtor -- is the

7    debtor party to certain contracts that gives it

8    the right and responsibility to manage certain

9    CLO vehicles?

10       MR. BONDS:  Objection, form.

11       MR. MORRIS:  You can answer.

12       A.  Yes.

13   BY MR. MORRIS:

14       Q.  And you're aware of that because you

15   personally signed some of those contracts and

16   agreements, right?

17       A.  I don't know.

18       Q.  Okay.  NexPoint Advisors LP, are you

19   familiar with that firm?

20       A.  Yes.

21       Q.  That's an advisory firm; is that

22   right?

23       A.  Yes.

24       Q.  And we'll just refer to that as

25   NexPoint; is that okay?

Page 18

1           J. DONDERO
2       A. Yes.
3       Q. You have a direct or indirect
4   economic or ownership interest in NexPoint,
5   correct?
6       MR. BONDS: Objection, form.
7       MR. MORRIS: You can answer.
8       A. Yes.
9   BY MR. MORRIS:
10      Q. You're the president of NexPoint,
11  correct?
12      A. I believe so.
13      Q. And you own NexPoint's general
14  partner; is that right?
15      A. I don't know.
16      Q. Do you know who owns NexPoint's
17  general partner?
18      A. No.
19      Q. As the president of NexPoint, is it
20  fair to say that you control that entity?
21      A. Generally.
22      Q. Highland Capital Management Fund
23  Advisors LP, are you familiar with that firm?
24      A. Yes.
25      Q. And that's also an advisory firm,

Page 19

1           J. DONDERO
2   correct?
3       A. Yes.
4       Q. And we'll refer to that firm as Fund
5   Advisors; is that fair?
6       A. Sure.
7       Q. And we'll refer to Fund Advisors and
8   NexPoint together just as "the advisors"; is that
9   fair?
10      A. I think you should be more specific
11  than that, but --
12      Q. Okay. I apologize. Are you
13  finished?
14      If at any time I ask a question and
15  you don't understand, will you let me know that?
16      A. Yes.
17      Q. Okay. You have a direct or indirect
18  economic or ownership interest in Fund Advisors,
19  correct?
20      A. Yes.
21      Q. You're the president of Fund
22  Advisors; is that true?
23      A. I believe so.
24      Q. And you own Fund Advisors' general
25  partner; is that right?

Page 20

1           J. DONDERO
2       A. I don't believe I own as much of it
3   as I own of NexPoint, but I don't know the
4   numbers.
5       Q. Okay. As one of the two beneficial
6   owners of Fund Advisors and as the president of
7   Fund Advisors, is it fair to say that you control
8   that entity?
9       A. Yes.
10      Q. Okay. And Fund Advisors and NexPoint
11  manage certain investment funds; is that right?
12      A. I'm sorry, I missed the point of that
13  question.
14      Q. Didn't hear? Okay.
15      Fund Advisors, which we've talked
16  about, and NexPoint, which we've talked about,
17  those two entities manage certain investment
18  funds; is that right?
19      A. Yes.
20      Q. And one of the investment funds that
21  the advisors manage is Highland Income Fund. Do
22  I have that right?
23      A. Yes. I'm not sure which fund that
24  is, but yes, that's -- that's one of them.
25      Q. Are you the portfolio manager of the

Page 21

1           J. DONDERO
2   Highland Income Fund?
3       A. I believe so.
4       Q. Do you hold any titles at the
5   Highland Income Fund other than portfolio
6   manager?
7       MR. BONDS: To the extent you know.
8   Don't speculate.
9       A. I don't -- I don't know. I know I'm
10  portfolio manager on virtually all of the funds.
11  BY MR. MORRIS:
12      Q. Is there any fund that you're not the
13  portfolio manager for that you're aware of?
14      A. I don't know.
15      Q. Are you the portfolio manager of
16  NexPoint Capital Inc.?
17      A. If that name refers to a fund, I
18  believe so.
19      Q. Okay. You're not sure if that refers
20  to a fund?
21      A. There's a fund with the symbol NHF.
22  If that's the name -- which I don't think you
23  have the exact name. If that's the name of it,
24  then I believe -- I believe I'm the portfolio
25  manager. The name that you just gave sounded

Page 22

```
 1          J. DONDERO
 2  more like a holding company name or a subsidiary
 3  name for NexPoint.  If it's not a fund, I'm not
 4  the portfolio manager.  If it is a fund, I
 5  believe I am.
 6      Q.  Okay.  Do you hold -- are you
 7  familiar with an entity called NexPoint
 8  Capital Inc.?
 9      A.  No.
10      Q.  Okay.  How about NexPoint Strategic
11  Opportunities Fund, is that a fund that is
12  managed by one of the advisors?
13      A.  I believe that's the name for NHF.
14  That's what I thought you were referring to.
15  That's the one that's a fund, and that's the one
16  that I'm portfolio manager on.
17      Q.  Okay.  Do you hold any titles at
18  NexPoint Strategic Opportunity Fund other than
19  portfolio manager?
20      A.  I don't know.
21      Q.  The advisors caused each of the funds
22  to invest in certain CLOs that are managed by the
23  debtor, right?
24      MR. BONDS:  To the extent you know.
25  Don't speculate.
```

Page 23

```
 1          J. DONDERO
 2      MR. MORRIS:  John, if there's an
 3  objection, I welcome it.  If there's a direction
 4  not to answer, I welcome it.  But what I don't
 5  welcome is guiding the witness.  If he doesn't
 6  remember, he's done this so many times, he knows
 7  what he's doing.
 8      You want me to ask the question
 9  again, Mr. Dondero?
10      THE WITNESS:  Please.
11  BY MR. MORRIS:
12      Q.  The two advisors that we talked
13  about, they manage funds, right?
14      A.  Yes.
15      Q.  And those funds have invested in
16  certain CLOs that are managed by the debtor,
17  correct?
18      A.  The problem I have with that question
19  and the part that I don't want to testify as
20  agreeing to or acknowledging is that the debtor
21  manages those CLOs, because I won't testify to
22  the debtor being in good standing, and I won't
23  testify to the debtor not being in default, and I
24  won't testify to the debtor having the capability
25  to manage those CLOs --
```

Page 24

```
 1          J. DONDERO
 2      Q.  Will you -- I'm sorry to interrupt.
 3  Go ahead.
 4      A.  No, I mean, that's -- so I won't -- I
 5  won't testify affirmatively to the second half of
 6  that question.
 7      Q.  Okay.  But you will admit, won't you,
 8  that the debtor has -- is party to contracts that
 9  give it the right to manage CLOs in which the
10  advisors caused the funds to invest, right?
11      MR. BONDS:  Objection, form.
12      MR. MORRIS:  You can answer.
13      A.  The beginning and end of what I want
14  to testify to is that the advisor is parties --
15  party to contracts.  The contracts have --
16  provide the ability to manage assets in the CLO
17  subject to a bunch of different things, subject
18  to not being in default, subject to the ability,
19  subject to the capability and being registered
20  advisor, et cetera, et cetera.
21      I don't want to have any testimony
22  that implies that the advisor is in good standing
23  or able or capable of managing those CLOs or that
24  Jim Seery is even an investment professional.
25      ///
```

Page 25

```
 1          J. DONDERO
 2  BY MR. MORRIS:
 3      Q.  Okay.  I think I understand.
 4      When you used the word "advisor" in
 5  your last answer, you were referring to the
 6  debtor; is that right?
 7      MR. BONDS:  Objection, form.
 8  BY MR. MORRIS:
 9      Q.  It's the debtor that has -- let me
10  try again.
11      It's the debtor that has the
12  contracts with the CLO, right?
13      A.  Yes.
14      Q.  But it's your contention that the
15  debtor is in default and that Mr. Seery and the
16  debtor otherwise don't have the capability to
17  manage the CLOs.  That's what you're saying,
18  right?
19      A.  I don't want to argue, and it's for
20  the lawyers and the Court to decide, but I don't
21  want to be affirmatively acknowledging that
22  Seery's an investment professional.  I don't want
23  to be affirmatively acknowledging that he has any
24  employees and staff when he's told them all
25  they're being terminated in the next few weeks.
```

Page 26

```
1              J. DONDERO
2         I don't want to acknowledge that he
3   is in compliance and can operate those contracts
4   if I believe those contracts are in default
5   because, A, the advisor's in bankruptcy, and B,
6   none of the key man provisions are being adhered
7   to by the advisor.
8         I don't want to in any form or
9   fashion acknowledge or represent or somehow be
10  twisted into testifying that he is in good
11  standing or has the ability to manage those CLOs.
12  It may be found by somebody that he is, but I
13  don't want to be in any way inferred to be
14  sanctioning it.
15        Q. Okay. Are you aware – have any of
16  the contracts pursuant to which the CLOs and the
17  debtor are the parties, have any of those
18  contracts been terminated, to the best of your
19  knowledge, since the petition date?
20        A. I believe they're subject to stays,
21  among other things, but I'm not – I'm not a
22  lawyer.
23        Q. Has anybody sought to lift the stay
24  in order to terminate the contracts, to the best
25  of your knowledge?
```

Page 27

```
1              J. DONDERO
2         A. I don't know where – I don't know.
3         Q. Has any of the CLOs ever contended
4   that the debtor was in breach in their agreement?
5         A. I believe the beneficial holders
6   have.
7         Q. I understand that –
8         A. But I don't know – I don't know if
9   the CLOs have.
10        Q. Okay. I'm asking you a different
11  question, and just answer my question.
12        To the best of your knowledge, has
13  any CLO contended that the debtor is in breach of
14  any of the agreements that they have between
15  them?
16        MR. BONDS: Objection, form.
17        A. I don't know.
18  BY MR. MORRIS:
19        Q. You're not aware of any such
20  contention, right?
21        A. I don't know.
22        Q. You're not aware of any contention by
23  the CLOs that the debtor is in default under any
24  CLO contract, correct?
25        MR. BONDS: Objection, form.
```

Page 28

```
1              J. DONDERO
2         A. I don't know regarding the CLOs.
3   BY MR. MORRIS:
4         Q. Did you ever ask them? Withdrawn.
5         Did you ever ask anybody on behalf of
6   the CLOs whether they were going to declare a
7   default under the CLO management agreements?
8         MR. BONDS: Objection, form.
9         A. I don't know.
10  BY MR. MORRIS:
11        Q. You don't know if you asked? I'm
12  just asking you if you ever asked the question.
13        A. Not of the CLOs. Those questions
14  were asked regarding the beneficial owners, and I
15  think the beneficial owners did that, but I
16  didn't have direct knowledge or contact with the
17  CLOs.
18        Q. Okay. And the beneficial owners are
19  not parties to the CLO management agreements
20  between the CLOs and the debtor, correct?
21        MR. BONDS: Objection, form.
22        A. I don't want to draw a legal
23  conclusion of the rights of the beneficial owners
24  and the people who have the risk and the people
25  who have the ultimate decision authority whether
```

Page 29

```
1              J. DONDERO
2   or not they can be circumvented or ignored by an
3   intermediate nonfinancial – nonfinancially
4   interested party. I don't want to – I don't
5   want to speculate on that.
6         MR. MORRIS: Okay. I move to strike.
7         And I'm not asking for a legal
8   conclusion; I'm asking for your understanding.
9   BY MR. MORRIS:
10        Q. Is it your understanding that
11  beneficial owners are parties to the CLO
12  management agreements between the debtor and the
13  CLOs?
14        MR. BONDS: Objection to form.
15        MR. MORRIS: You can answer.
16        A. I think that asks for a legal
17  conclusion.
18  BY MR. MORRIS:
19        Q. It does not. I'm asking you as a
20  factual matter based on your understanding as the
21  portfolio manager of the funds and the president
22  of the advisors who made these investments. I'm
23  asking you –
24        MR. BONDS: Objection, form.
25        ///
```

1          J. DONDERO
2   BY MR. MORRIS:
3       Q.  -- in that capacity.
4          In that capacity, do you have any
5   understanding that the beneficial owners are
6   parties to the CLO management agreements between
7   the debtor and the CLOs?
8          MR. BONDS:  Objection, form.
9       A.  My understanding is that the
10  beneficial owner should always be considered.
11         MR. MORRIS:  Okay.  I move to strike.
12  I'm not asking you whether they should be
13  considered.
14  BY MR. MORRIS:
15      Q.  I'm asking you very specifically
16  whether you believe that they are parties to the
17  contract.
18         MR. BONDS:  Objection, form, asked
19  and answered.
20      A.  Yeah, I believe you're asking me for
21  a legal conclusion, and I won't give one.
22  BY MR. MORRIS:
23      Q.  Okay.
24         MR. MORRIS:  La Asia, can we please
25  put up Exhibit 1.  Let's share the screen and put

1          J. DONDERO
2   up Exhibit 1.
3          (Dondero Deposition Exhibit 1
4   marked.)
5   BY MR. MORRIS:
6       Q.  Mr. Dondero, I appreciate that it's
7   difficult to do this remotely, and as we
8   discussed last time, the one thing that I'm
9   certainly not doing today is playing gotcha with
10  documents.
11         So I'm going to put documents up on
12  the screen from time to time, and to the extent
13  that you think you need to read more of the
14  document in order to have full context, will you
15  let me know that?
16      A.  Sure.
17      Q.  Okay.  This is a letter dated
18  October 16th from NexPoint to Mr. Seery.
19         Do you see that?
20      A.  Yep.
21      Q.  Okay.  Are you familiar with this
22  document?  Have you ever seen it before?
23      A.  Generally.  I'm generally familiar
24  with it, but I haven't seen it before.
25      Q.  Okay.  Do you recall when you first

1          J. DONDERO
2   learned that this document was sent?  Was it at
3   or around the time the document was sent?
4       A.  It was at or around the time, yes.
5       Q.  Did you discuss with NexPoint any of
6   the substance that is in this letter?  And again,
7   I'm happy to scroll through it if that would be
8   helpful.
9          MR. BONDS:  Objection, form.
10      A.  Just generally.
11  BY MR. MORRIS:
12      Q.  Did you -- I don't want to know about
13  any conversations, but did you speak with anybody
14  at K&L Gates about this particular letter, just
15  yes or no?
16      A.  My primary conversation was with
17  internal counsel.  K&L Gates might have been on
18  some phone call or two.
19      Q.  Okay.  Whose idea was it to send this
20  out?
21         MR. BONDS:  Objection, form.
22      A.  Whose idea?  I -- I don't think
23  anybody viewed it as an idea as much as a
24  regulatory necessity.
25         ///

1          J. DONDERO
2   BY MR. MORRIS:
3       Q.  And did you authorize the sending of
4   this particular letter?
5       A.  Not specifically.
6       Q.  Did you generally support the sending
7   of the letter?
8       A.  Yes.
9       Q.  And you knew the letter was being
10  sent; is that fair?
11      A.  Yes.
12      Q.  And you didn't object to the sending
13  of this letter, right?
14      A.  I did not object.
15      Q.  Okay.  And since learning that the
16  letter was sent, have you ever directed NexPoint
17  to withdraw the letter?
18      A.  No.
19      Q.  You have the power to do that, don't
20  you, sir?
21      A.  I -- I don't believe so.  When the
22  chief compliance officer believes it's a breach
23  of regulatory compliance, the chief compliance
24  officer in financial institutions has personal
25  liability, and I don't believe that other C-suite

1           J. DONDERO
2   executives can overrule the chief compliance
3   officer.
4        Q.  Who is the chief compliance officer?
5        A.  Jason Post.
6        Q.  Did Mr. Post ever say that he would
7   not withdraw the letter because of regulatory
8   compliance?
9        MR. BONDS:  Objection, form.
10       A.  I – not that I know of.
11  BY MR. MORRIS:
12       Q.  Did you ever discuss with Mr. Post
13  whether or not this letter should be withdrawn?
14       A.  Again, I didn't believe I had the
15  authority to.
16       Q.  Okay.  And he never told you that he
17  couldn't; that's just the implicit conclusion
18  that you drew because he was the chief compliance
19  officer; is that fair?
20       A.  Implicit conclusion?  It's more the
21  understanding I have of compliance from having
22  lived it the last 20 years.
23       MR. MORRIS:  Okay.  Let's put up
24  Exhibit 2, please.
25       (Dondero Deposition Exhibit 2

1           J. DONDERO
2   marked.)
3        MS. CANTY:  Do you see it, John?
4        MR. MORRIS:  I think we still have
5   Exhibit 1.
6        MS. CANTY:  Okay.  Give me a second.
7   BY MR. MORRIS:
8        Q.  Okay.  This is another letter that
9   was sent by NexPoint to Mr. Seery, this one dated
10  November 24, 2020.
11       Do you see that, sir?
12       A.  Yes.
13       Q.  And you saw this letter at or around
14  the time it was sent, right?
15       A.  I didn't see the letter specifically,
16  but I'm aware of it.
17       Q.  And you knew it was going to be sent;
18  is that fair?
19       A.  Yes.
20       Q.  And did you authorize this letter to
21  be sent on behalf of the advisors and the funds
22  that are listed there?
23       MR. BONDS:  Objection, form.
24       A.  Let me give the consistent testimony
25  I gave last time.  It wasn't an authorization.  I

1           J. DONDERO
2   was aware of it.  It was, I believe, a continued
3   regulatory breach from the standpoint of the –
4   of compliance that drove the letter.
5   BY MR. MORRIS:
6        Q.  When there's a regulatory breach, is
7   there an obligation to alert anybody other than
8   the portfolio manager?
9        A.  I know that's being investigated.  I
10  don't know the answer regarding a breach like
11  this.
12       Q.  Are you aware of any notification
13  that NexPoint made to anybody in the world, other
14  than Mr. Seery, with respect to the matters set
15  forth in Exhibit 1 and Exhibit 2?
16       MR. BONDS:  Objection, form.
17       A.  I don't know, and I'm not in a
18  position to comment at this point.
19  BY MR. MORRIS:
20       Q.  I'm just asking you if you know
21  whether – I'm asking for your knowledge.
22       Do you know whether NexPoint ever
23  advised anybody, other than Mr. Seery, of the
24  allegations that are set forth in Exhibit 1 and
25  Exhibit 2?

1           J. DONDERO
2        MR. BONDS:  Objection, form.
3        A.  I don't know, nor would I necessarily
4   be informed if compliance self-reports this to
5   the SEC or other regulatory bodies.  But I do not
6   know.
7   BY MR. MORRIS:
8        Q.  And nobody told you that, right?
9        A.  I don't know.
10       Q.  Is there – did you see any written
11  analysis or memorandum that was prepared by
12  your – by the chief compliance officer with
13  respect to the matters set forth in Exhibit 1 and
14  Exhibit 2?
15       A.  I know there was a multipage analysis
16  that was done, but I've never seen it.
17       Q.  And was it written by the chief
18  compliance officer or was it written by legal
19  staff?
20       A.  I was told he did it in conjunction
21  with external counsel.
22       Q.  But you've never seen it?
23       A.  I've never seen it.
24       Q.  Did you support the sending of this
25  letter?

J. DONDERO

1
2     A.  Yes.
3     Q.  Since learning that this letter was
4  sent, have you directed NexPoint to withdraw this
5  letter?
6     A.  No, I have not.
7     Q.  Okay.  Around Thanksgiving you
8  learned that Mr. Seery was seeking to sell
9  certain securities that were owned by certain
10  CLOs managed by the debtor, right?
11     A.  I believe I was informed after the
12  fact.
13     Q.  You were informed that certain sales
14  of securities owned by the CLOs were being sold
15  at Mr. Seery's direction, right?
16     A.  Yes.
17     MR. BONDS:  Objection, form.
18  BY MR. MORRIS:
19     Q.  Okay.  And at around that time, once
20  you learned that, you personally intervened to
21  stop those trades, right?
22     MR. BONDS:  Objection, form.
23     A.  Yes.
24     MR. MORRIS:  Can we put up Exhibit 3,
25  please.

J. DONDERO

1
2     (Dondero Deposition Exhibit 3
3  marked.)
4  BY MR. MORRIS:
5     Q.  This is an e-mail string.  We're
6  going to start at the bottom and work up, just so
7  we can get it in order.  And you'll see the
8  bottom begins with an e-mail from Hunter Covitz.
9     Do you see that?
10     A.  Yes.
11     Q.  Who is Mr. Covitz?
12     A.  Covitz, Hunter Covitz manages our CLO
13  asset – or our CLO assets, primarily.
14     Q.  Is he a High– – is he a debtor
15  employee or is he employed by any other entity?
16     A.  I believe he's a debtor employee.
17     Q.  Okay.  Do you see there's a reference
18  there to gatekeeper@hcmlp.com?
19     A.  Yes.
20     Q.  Are you – withdrawn.
21     Is that – withdrawn.
22     Is it your understanding that that's
23  kind of a basket of different e-mail addresses
24  that are held together by the Gatekeeper address?
25     A.  I wouldn't describe it that way, but

J. DONDERO

1
2  it is a bucket of e-mails.
3     Q.  Okay.  And is your e-mail address or
4  was your e-mail address included within
5  Gatekeeper?
6     A.  Historically, it was.
7     Q.  And do you know when that stopped
8  being the case?
9     A.  I do not know.
10     Q.  Was it after the time that you
11  resigned from your position at the debtor?
12     A.  I do not know.
13     Q.  Okay.  Matt Pearson is below
14  Gatekeeper.  Do you know who Mr. Pearson is?
15     A.  He is a – generally an equity trader
16  that works for Joe Sowin.
17     Q.  And are Mr. Pearson and Mr. Sowin
18  employees of the debtor?
19     A.  I don't believe so.  I don't believe
20  Joe is.  I don't know if Matt is.  I don't know.
21     Q.  Okay.  But is it fair to say that
22  pursuant to this e-mail, Mr. Covitz is giving
23  direction to sell certain securities held by the
24  CLOs?
25     A.  Yes.

J. DONDERO

1
2     Q.  Can we scroll to the e-mail above
3  that, please.  And then Mr. Pearson acknowledged
4  that e-mail a little bit later in the day, right?
5     A.  Yes.
6     Q.  Okay.  And if we can –
7     (Interruption by the videographer.)
8     MR. MORRIS:  It's okay.  Let's
9  proceed and we'll do the best we can.
10  BY MR. MORRIS:
11     Q.  Mr. Covitz's e-mail was the – do you
12  see the subject matter is Sky Equity?
13     A.  Yes.
14     Q.  And do you have an understanding of
15  what Sky Equity refers to?
16     A.  It's a – it's a post-restructured
17  equity that the funds have held for years.
18     Q.  Okay.  So if we could scroll up to
19  your e-mail that's right there, did you receive a
20  copy of Mr. Covitz's original e-mail?
21     A.  It appears so.
22     Q.  Okay.  And did you give the
23  instruction to the recipients of Mr. Hunter
24  Covitz's e-mail not to sell the Sky Equity as had
25  been instructed by Mr. Seery?

J. DONDERO

1
2     A. Yes.
3     Q. And you understood at the time that
4  you gave the instruction to the people on this
5  e-mail that they were trying to execute trades
6  that Mr. Seery had authorized, right?
7        MR. BONDS: Objection, form.
8        THE WITNESS: Can you repeat the
9  question, please.
10       MR. MORRIS: Sure.
11 BY MR. MORRIS:
12    Q. At the time that you gave the
13 instruction, no, do not, you knew that you were
14 stopping trades that had been authorized and
15 directed by Mr. Seery, correct?
16    A. Yes.
17    Q. Did you speak with Mr. Seery before
18 instructing the recipients of your e-mail not to
19 execute the SKY transactions?
20    A. No, I did not.
21    Q. Did you take any steps to seek the
22 debtor's consent before instructing the
23 recipients of this e-mail not to execute the SKY
24 transactions?
25    A. I'm sorry, please repeat that again.

1          J. DONDERO
2  The -- I missed the first part of the sentence.
3     Q. No problem.
4        Did you take any steps to seek the
5  debtor's consent before instructing the
6  recipients of your e-mail --
7        MR. BONDS: Objection, form.
8  BY MR. MORRIS:
9     Q. -- to stop the SKY transactions, to
10 stop executing the SKY transactions?
11    A. No.
12    Q. Thank you.
13       Can we scroll up to the response.
14 Okay. Stop there.
15       Mr. Pearson responded later that
16 afternoon. Do you see that?
17    A. Yes.
18    Q. And in response, he canceled all of
19 the SKY and AVYA sales that the debtor had
20 directed but which had not yet been executed,
21 right?
22    A. Yes.
23    Q. And if we can scroll up to the e-mail
24 above that, you responded to that as well, didn't
25 you?

1          J. DONDERO
2     A. Yep.
3     Q. Can you please read your response out
4  loud.
5     A. HFAM and DAF -- or HFAM and DAF has
6  instructed Highland in writing not to sell any
7  CLO underlying assets. There is potential
8  liability. Don't do it again, please.
9     Q. All right. The written instructions,
10 is that a reference to the first two exhibits
11 that we looked at? And if you want to go back
12 and check them out, we can, but I'm trying to --
13 I want to know what writings you're referring to.
14 Withdrawn.
15       Are the writings that you're
16 referring to the two exhibits that we just looked
17 at, Exhibit 1 and Exhibit 2?
18       MR. BONDS: Objection, form.
19    A. Generally, yes.
20 BY MR. MORRIS:
21    Q. Are you --
22    A. I don't know if -- I don't know if
23 there were more than those two, but generally,
24 letters of those substances -- well, generally,
25 letters of those substance -- of that substance

1          J. DONDERO
2  is what I'm referring to.
3     Q. I appreciate that, Mr. Dondero.
4        Do you recall any other writings that
5  you were referring to at the time you sent this
6  e-mail?
7     A. I'm just saying I don't know if there
8  were others or if there were other e-mails. I
9  don't know. But there were -- they would have
10 been similar in terms of substance as those two.
11    Q. Okay. Do you see the reference there
12 in the latter portion of your e-mail, quote,
13 there is potential liability, don't do it again?
14    A. Yes.
15    Q. Who was the intended recipient of
16 that message?
17    A. At this juncture, it's to Matt
18 Pearson, I believe.
19    Q. And why would Matt Pearson have
20 personal liability -- withdrawn.
21       Why did you decide to tell
22 Mr. Pearson that he had potential liability for
23 executing the transactions that Mr. Seery had
24 directed?
25       MR. BONDS: Objection, form.

J. DONDERO

2  A.  Yeah, to be clear, it doesn't say
3  personal liability.  I said potential liability.
4  I believe this is -- I believe what was done here
5  is bona fide typical class action activity that
6  we've suffered from historically, when the
7  interests of beneficial holders are ignored when
8  assets are sold for no business purpose.  No
9  business purpose.  No definable, discernible,
10  articulated business purpose.
11      There's -- I think there's potential
12  liability for the manager, the fund complex, you
13  know, and sometimes for the individuals involved.
14  But my potential liability was a general
15  statement.
16      THE WITNESS:  You know what, guys,
17  listen.  I've got a couple of calls I've got to
18  make that I'm ten minutes late for, so we're
19  going to need to take a break for a few minutes
20  here, ideally now, or after the next question,
21  please.
22      MR. MORRIS:  I'm happy to take a
23  break now.  How long are you thinking, though?
24      THE WITNESS:  Ten or 15 minutes.
25      MR. MORRIS:  Yeah, that's perfectly

J. DONDERO

2  fine, Mr. Dondero.  Can you just state on the
3  record that you will not talk to any Highland
4  employee, including Mr. Ellington or
5  Mr. Leventon, you will not communicate with them
6  or their counsel in any way with respect to this
7  deposition?
8      THE WITNESS:  Yeah, I promise.  I
9  haven't -- yeah.  I will not talk to them.  The
10  only Highland employee I might talk to is Jerome,
11  who's handling the systems for this call, and
12  that's it.
13      MR. MORRIS:  I'm fine with that, but
14  really, I'm requesting not only Highland
15  employees but not to talk to anybody about the
16  testimony today.  I'm going to accommodate you
17  and --
18      THE WITNESS:  I won't.  Nobody cares
19  about this deposition.  I won't talk to anybody.
20      MR. MORRIS:  Okay.
21      THE WITNESS:  I'll be back in ten or
22  15 minutes, okay?
23      MR. MORRIS:  Okay.
24      THE VIDEOGRAPHER:  10:41 a.m. Central
25  Standard Time, we're off the record.

J. DONDERO

2      (Recess taken, 10:41 a.m. to
3  11:16 a.m. CST)
4      THE VIDEOGRAPHER:  11:16 a.m., we're
5  back on the record.
6  BY MR. MORRIS:
7      Q.  Mr. Dondero, can you hear me?
8      A.  Yes.
9      Q.  Okay.  Are you aware that the
10  deposition taking place today is pursuant to
11  Court order?
12      A.  Yes.
13      Q.  Did you schedule meetings and
14  telephone calls during the day today,
15  notwithstanding the Court's order?
16      A.  I didn't formally schedule anything.
17      Q.  Okay.  So you have nothing scheduled
18  for the rest of the day; is that right?  You're
19  here to answer questions?
20      A.  Correct.
21      MR. MORRIS:  Okay.  Can we get the
22  last exhibit back up on the screen, please.
23  Okay.  Can we scroll --
24  BY MR. MORRIS:
25      Q.  We were last looking at your e-mail.

J. DONDERO

2  Can we see the response above that, please?
3  Okay.  And that's Mr. Sowin responding.
4      Do you see that?
5      A.  Yes.
6      Q.  And Mr. Sowin was following your
7  instructions; is that right?
8      A.  His response is what it is.  I'm
9  not -- what do you mean by following my
10  instructions?
11      Q.  Well, he issued an order -- it says,
12  quote:  Please block all orders from hitting the
13  trading desk for the -- I assume he meant
14  funds -- Jim mentioned.
15      Do you see that?
16      A.  Yes.
17      MR. BONDS:  Objection, form.
18  BY MR. MORRIS:
19      Q.  And that's exactly what you wanted to
20  happen, right?
21      A.  I'm sorry, could you unhighlight
22  that?  It's hard for me to read with the
23  highlight.  Okay.  Thank you.
24      Yeah, they -- I think they tried to
25  figure out a way to prevent it from inadvertently

J. DONDERO

1          J. DONDERO
2  happening.
3     Q.  Okay.  And Mr. Sowin's – the
4  substance of Mr. Sowin's e-mail is consistent
5  with your intent to prevent any further trades
6  from the CLOs, right?
7     MR. BONDS:  Objection, form.
8     A.  My intent was to prevent trades that
9  weren't in the best interests of investors, that
10  investors – the beneficial holders had
11  articulated they didn't want sold while these
12  funds were in transition, and that the – there
13  was no business purpose or benefit to the debtor
14  to sell these assets.
15  BY MR. MORRIS:
16     Q.  That –
17     A.  So that's – that was the rationale I
18  was trying to capture.
19     THE WITNESS:  Hold on for me one
20  second.  Jerome just stepped in.  What does the
21  systems guy want Jerome to do?
22     MR. MORRIS:  Figure out a way to turn
23  the lights on.
24     (Technical comments off the
25  stenographic record.)

J. DONDERO

1          J. DONDERO
2     MR. MORRIS:  Let's go forward.
3     THE WITNESS:  So we're okay with
4  Jerome?  That's it for now?
5     MR. MORRIS:  Yeah.
6     THE WITNESS:  All right.  Thank you.
7  BY MR. MORRIS:
8     Q.  You didn't correct anything that
9  Mr. Sowin did – said in this e-mail, did you?
10     A.  No.
11     Q.  You didn't tell –
12     MR. BONDS:  Can you repeat the
13  question?  I didn't understand it.
14     MR. MORRIS:  That's okay.
15  BY MR. MORRIS:
16     Q.  Mr. Dondero, you didn't correct
17  anything that Mr. Sowin wrote in this e-mail, did
18  you?
19     A.  No.
20     Q.  You didn't tell Mr. Sowin that he
21  misunderstood your intent, did you?
22     A.  I don't believe so.
23     Q.  And you didn't give any explanation
24  to him as to why you did not want to sell any CLO
25  underlying assets except for what you wrote in

J. DONDERO

1          J. DONDERO
2  that e-mail below, right?
3     MR. BONDS:  Objection, form.
4     A.  I – I believe I – well, the e-mails
5  stand on their own.  I think the reasons below
6  are sufficient.  I think I had a conversation
7  with Joe besides that, and there was an
8  unawareness on the trading desk and with Hunter
9  that the interest of investors had been expressed
10  and ignored by Seery, you know, so – they
11  weren't aware of that.  They thought that was
12  unusual and inappropriate.
13  BY MR. MORRIS:
14     Q.  In your role as portfolio manager, is
15  it – do you believe it's your responsibility to
16  always defer to the desires of your investors?
17  Do you cede – do you cede – withdrawn.
18     Do you cede responsibility and your
19  business judgment for making transactions to your
20  investors?
21     MR. BONDS:  Objection, form.
22     A.  In this case, it would be
23  appropriate.  In general, it would depend.
24  BY MR. MORRIS:
25     Q.  Okay.  A few days later, you learned

J. DONDERO

1          J. DONDERO
2  that Mr. Seery was trying a work-around to
3  effectuate the trades anyway, right?
4     A.  Yes.
5     Q.  And you wrote to Thomas Surgent to
6  let him know that you were aware that Seery was
7  trying a work-around to effectuate the trades,
8  right?
9     A.  I believe there was such an e-mail.
10     Q.  Okay.  Can you just scroll up and see
11  that e-mail, please.  All right.  Stop right
12  there.
13     Who is Mr. Surgent?
14     A.  He's the chief compliance officer of
15  Highland Capital.
16     Q.  The debtor?
17     A.  Yes.
18     Q.  Okay.  And how long has he held that
19  position to the best of your recollection?
20     A.  A long time.  More than five years.
21     Q.  What does it mean to – when you
22  wrote that Mr. Seery was, quote, working on a
23  work-around to trade these securities?  What does
24  that mean?
25     A.  As a noninvestment professional and

Page 54

J. DONDERO

1 
2 as a nontrader and as a nonportfolio manager, he
3 set up an account for himself, I believe,
4 directly with Jefferies to trade the securities
5 in the CLOs.
6     Q. How did you learn that?
7     A. I think we still get trade reports
8 from Jefferies, or Jefferies -- the Jefferies
9 trades get reported back into the system and have
10 to be input by Joe, and so Joe sees the trades
11 come back from Jefferies at the end of the day.
12     Q. And Joe is Joe Sowin?
13     A. Yes.
14     Q. And he works for you; is that right?
15         MR. BONDS: Objection, form.
16         MR. MORRIS: Withdrawn.
17 BY MR. MORRIS:
18     Q. He works for one of the advisors; is
19 that right?
20     A. I believe he works for HFAM, but I'm
21 not a hundred percent certain.
22     Q. And the work-around was -- is that
23 another way of saying that Mr. Seery tried to do
24 the trades that he thought were appropriate
25 without your interference?

Page 55

J. DONDERO

1 
2         MR. BONDS: Objection, form.
3     A. I'm not going to agree with that
4 speculation. If you want me to speculate, I
5 think Seery had no business purpose and he was
6 doing it to tweak myself and everybody else.
7 BY MR. MORRIS:
8     Q. Did he tell you that?
9     A. No. I'm speculating.
10     Q. Okay. Do you have any idea why he
11 made the trades?
12     A. He -- he had no --
13     Q. Withdrawn. I'm sorry.
14         Do you have any idea why he wanted to
15 make the trades?
16     A. I didn't speak to him directly.
17     Q. Okay.
18     A. Indirectly -- I didn't speak to him.
19 I didn't speak to him directly. It was --
20     Q. Do you have any personal knowledge as
21 you sit here right now as to why Mr. Seery wanted
22 to effectuate the trades that you were blocking?
23         MR. BONDS: Objection, form.
24     A. I've thought about it at length. I
25 can't come up with a business purpose that would

Page 56

J. DONDERO

1 
2 supersede an account that's in transition and the
3 beneficial owners have made it clear that the
4 manager's not in compliance, they're moving the
5 accounts, and knowing the individual assets that
6 were sold, I can't -- I couldn't think of a
7 business purpose that Seery would be operating
8 under.
9         MR. MORRIS: Okay. I move to strike.
10 I'm not asking you for what you think. I'm
11 asking you for facts.
12 BY MR. MORRIS:
13     Q. Do you have any knowledge of any
14 facts as to the business justification or
15 rationale for why Mr. Seery wanted to make these
16 trades?
17         MR. BONDS: Objection, form.
18     A. No, I don't believe there are any.
19 BY MR. MORRIS:
20     Q. And you never asked him; is that
21 right?
22     A. Correct.
23     Q. And you never instructed anybody on
24 your behalf or on behalf of the advisors or on
25 behalf of the funds to ask Mr. Seery why he

Page 57

J. DONDERO

1 
2 wanted to make these trades, right?
3     A. That's not correct.
4     Q. Nobody ever told you that they'd had
5 a conversation with Mr. Seery in which
6 Mr. Seery -- (audio malfunction) --
7         (Clarification requested by the
8 stenographer.)
9 BY MR. MORRIS:
10     Q. Did anybody ever tell you that they
11 had spoken with Mr. Seery and Mr. Seery had
12 provided an explanation, a business rationale for
13 the transactions that he wanted to effectuate?
14         MR. BONDS: Objection, form.
15     A. Yes. Yes.
16 BY MR. MORRIS:
17     Q. Who was that?
18     A. Joe Sowin.
19     Q. When did he tell you about this
20 conversation?
21     A. It was at or about this time in...
22     Q. And what did Mr. Sowin tell you?
23     A. Seery told him it was for risk
24 minimization or risk reduction.
25     Q. Did he tell him anything else?

J. DONDERO

1
2      A.  No.  He said risk reduction was why
3  he was selling the securities.
4      Q.  That's the only rationale that
5  Mr. Seery gave to Mr. Sowin; is that your
6  testimony?
7      A.  Yes.
8      Q.  Okay.  Did Mr. Sowin tell you that he
9  asked any questions of Mr. Seery?
10      A.  He asked him why he was selling them.
11      Q.  And you've given me the entirety of
12  the answer as conveyed by Mr. Sowin to you; is
13  that right?
14      A.  Yes.
15      Q.  Is Mr. Sowin's conversation with
16  Mr. Seery about the justification for these
17  trades reflected in any document or any e-mail
18  anywhere that you can recall?
19      A.  Not that I recall.
20      Q.  Did K&L Gates explain their
21  understanding of the business rationale of these
22  trades in any of the letters that they sent on
23  behalf of the funds or any of the advisors?
24      A.  Not that I'm aware of.  I'm not
25  aware.

J. DONDERO

1
2      Q.  Do you know Dustin Norris?
3      A.  Yes.
4      Q.  Do you know that he testified in
5  December in connection with this bankruptcy
6  matter?
7      A.  Yes.
8      Q.  Did you ever tell Dustin Norris about
9  the conversation Mr. Sowin had with Mr. Seery
10  that you've described here?
11      A.  I believe he was aware of it.
12      Q.  Do you know -- did you talk to him in
13  advance of his testimony?
14      A.  I talk to Dustin most every day.
15      Q.  And did you tell Dustin that he
16  should make sure to alert the Court about this
17  conversation with Mr. Sowin and Mr. Seery?
18      A.  No.
19      Q.  Did you think it was important that
20  the Court know Mr. Seery's business rationale?
21      A.  I thought it was a nonsensical answer
22  on Seery's part.  I didn't have an opinion on
23  whether or not the Court should know.
24      Q.  Now, you -- at the time, you were
25  speaking to Mr. Seery directly; isn't that right?

J. DONDERO

1
2      A.  Rarely.  I didn't -- since the
3  injunction or since -- rarely.  I can't remember
4  the last time I've spoken to him.  Scott
5  Ellington has been the appropriate go-between as
6  far as I understand it.
7      Q.  Okay.  Was there anything that
8  prevented you in November 2020 from picking up
9  the phone to talk to Mr. Seery about his desire
10  to effectuate these transactions?
11      A.  No.  The last time I -- yeah, I'm
12  remembering, the last time I talked to Seery was
13  the day after Thanksgiving.
14      Q.  Okay.  Is there anything that you're
15  aware of that prevented you from picking up the
16  phone and asking Mr. Seery for his business
17  justification for these trades prior to
18  December 10, 2020?
19          MR. BONDS:  Objection, form.
20      A.  No.  I expressed my disapproval via
21  e-mail.
22  BY MR. MORRIS:
23      Q.  Okay.  Why did you decide to write to
24  Mr. Surgent on November 27th?
25      A.  I wasn't sure he was aware of Seery's

J. DONDERO

1
2  work-around, and I know Thomas has an acute
3  awareness of his personal liability for
4  regulatory breaches or doing things that aren't
5  in the best interests of investors, and I don't
6  believe he has the extra insurance and
7  indemnities that Seery has.
8      Q.  If he was acutely aware of it, why
9  did you feel the need to remind him of that in
10  your e-mail to him?
11      A.  Because I don't think he was aware
12  that Seery was doing a work-around on behalf of
13  the debtor that he was compliance officer of.  I
14  wasn't convinced he was aware, so I included him
15  on the e-mail.
16      Q.  Did you intend to suggest that by
17  following Mr. Seery's orders to execute the
18  trades, that Mr. Surgent faced personal
19  liability?
20      A.  That's the way it works.
21      Q.  Okay.  And you wanted him to know
22  that, right?
23      A.  I wanted him to know that Seery was
24  doing inappropriate trades and doing
25  inappropriate work-around, in my opinion.  I

Page 62

J. DONDERO

1  didn't think Thomas was aware. I thought Seery
2  was operating independently.
3      Thomas might have been aware, but I
4  didn't think so. I don't talk to -- I haven't
5  talked to Thomas in I don't know when, so I
6  thought it was important for him to know.
7      Q. Okay. You have communicated with
8  Mr. Seery from time to time via text message,
9  right?
10     A. Yes.
11     MR. MORRIS: Can we put up Exhibit 4,
12  please.
13     (Dondero Deposition Exhibit 4
14  marked.)
15     MR. MORRIS: And if we can scroll
16  down a little bit. Okay.
17  BY MR. MORRIS:
18     Q. This is a text that you sent at the
19  bottom there at 5:26 p.m. to Mr. Seery; is that
20  right?
21     A. Yes.
22     Q. Can you just read that text, that
23  5:26 out loud?
24     A. Be careful what you do, last warning.

Page 63

J. DONDERO

1      Q. Why did you write that?
2      A. Because all the reasons we just went
3  over. And I think he's violating the Advisers
4  Act. He's putting the funds and the debtor at
5  risk, in jeopardy of class action lawsuits, and
6  he's going against the interests of investors
7  that are in transition, and expressed a desire to
8  not have their assets sold, especially when
9  there's no business reason.
10     And for all the reasons articulated
11  below -- I mean, for all the reasons we just went
12  over, and there are a few others I probably
13  haven't remembered off the top of my head, but
14  it's -- I think it's -- I think his activities
15  regarding the CLOs is incredibly inappropriate,
16  unfounded and malicious, and he hadn't sold that
17  many securities at that point in time, somewhat
18  de minimis amounts, but it was a warning to tell
19  him to stop; otherwise, rightfully, the
20  beneficial owners would take more significant
21  actions, which I think they should and they will.
22     Q. What significant action are the
23  beneficial owners going to take?
24     A. I don't know. But there's a lot more

Page 64

J. DONDERO

1  things that they can push on, like you were
2  suggesting earlier, asking earlier in terms of
3  self-reporting to the SEC.
4      Q. But you haven't done that yet, to the
5  best of your knowledge; is that right?
6      A. I'm not aware.
7      Q. You wrote there that it's the last
8  warning.
9      Do you see that?
10     A. Yes.
11     Q. How many other warnings have you
12  given Mr. Seery?
13     A. All the e-mails we just went over.
14     Q. Anything else?
15     A. No.
16     Q. Okay. You got document requests in
17  this -- in connection with this matter; isn't
18  that right?
19     A. Yes.
20     MR. MORRIS: Okay. Can we put up
21  Exhibit 5, please.
22  BY MR. MORRIS:
23     Q. You know, before we look at that,
24  earlier this morning you mentioned -- you made a

Page 65

J. DONDERO

1  reference to internal counsel.
2      Do you recall that?
3      A. Yes.
4      Q. Okay. Who were you referring to?
5      A. D.C. Sauter.
6      Q. And D.C. Sauter is internal counsel
7  for who?
8      A. I'm sorry, was there a question
9  there?
10     Q. Yes. I apologize.
11     D.C. Sauter is internal counsel for
12  who, for which entity?
13     A. NexPoint.
14     Q. Okay. Were you referring to anybody
15  else?
16     A. No.
17     Q. Okay. You mentioned Scott Ellington
18  earlier, right?
19     A. Yes.
20     Q. And who is Mr. Ellington?
21     A. He's general counsel at Highland
22  historically. I think his role has been
23  redefined as settlement counsel, that's how it
24  was described to me, I guess, six, nine months

J. DONDERO

1
2  ago, six months ago.
3      Q.  Mr. Ellington is employed by the
4  debtor, right?
5      A.  Yes.
6      Q.  And do you know when he first became
7  employed by the debtor?
8      A.  Over a decade ago.
9      Q.  Do you know whether Mr. Ellington has
10  any employer other than the debtor?
11      A.  I don't know.
12      Q.  He never told you that he had an
13  employer other than the debtor, did he?
14      A.  I don't know.
15      Q.  You know if he told you or not,
16  right?  Did he ever tell you that?
17      A.  He never told me that, no.
18      Q.  And you have no facts or reason to
19  believe, as you sit here right now, that the
20  debtor is -- withdrawn.
21          You have no facts or reason to
22  believe right now that Mr. Ellington has any
23  employer other than the debtor, correct?
24          MR. BONDS:  Objection, form.
25      A.  I'd like to stick with:  I don't

J. DONDERO

1
2  know.
3  BY MR. MORRIS:
4      Q.  You have no reason to believe that;
5  is that fair?
6      A.  Correct, I don't know.
7      Q.  Okay.  He's not -- Mr. Ellington is
8  not your personal lawyer, right?
9      A.  No.
10      Q.  He's never represented Jim Dondero
11  personally; is that right?
12      A.  No.
13          MR. MORRIS:  Let's look at the
14  document request, please, Exhibit 5.
15          (Dondero Deposition Exhibit 5
16  marked.)
17  BY MR. MORRIS:
18      Q.  If we could go -- let me just ask you
19  generally, Mr. Dondero.
20          Have you ever seen this document
21  before?
22      A.  No.
23      Q.  Are you aware that the debtor served
24  document requests on the Bonds Ellis firm for
25  documents in connection with its motion for a

J. DONDERO

1
2  preliminary injunction?
3      A.  Yes.
4      Q.  How did you learn that?
5      A.  I heard about it from my lawyers.
6      Q.  Okay.  Did you oversee the search for
7  responsive documents?
8      A.  Response -- I know we were responsive
9  and compliant, but I delegated it to my
10  assistants and the employees at Bonds Ellis.
11      Q.  Which assistants did you delegate
12  this to?
13      A.  Tara Loiben.  I think primarily Tara
14  Loiben.
15      Q.  And who is Ms. Loiben?
16      A.  She's my assistant.
17      Q.  And who is she --
18      A.  I'm sorry?
19      Q.  Who is she employed by?
20      A.  I -- I don't know for sure.  I think
21  Highland, but I don't know.  I don't want to
22  speculate.
23      Q.  What instructions -- (audio
24  malfunction) --
25          (Clarification requested by the

J. DONDERO

1
2  stenographer.)
3  BY MR. MORRIS:
4      Q.  What instructions did you give her in
5  order to search for documents?
6      A.  I didn't -- I didn't give her any.
7  She worked with that and she had -- she has full
8  access to my e-mail, and I gave her my phone for
9  the better part of a couple days in the office.
10      Q.  You -- until the end of 2020, you had
11  an e-mail address with an HCMLP or a Highland
12  e-mail address, right?
13      A.  Yes.
14      Q.  Have you stopped -- has that e-mail
15  address ceased to be in use?
16      A.  I've switched to an e-mail at the
17  bank as of -- whatever it was, last week or...
18      Q.  In the year 2020, did you use any
19  e-mail address other than the Highland e-mail
20  address?
21      A.  No.
22      Q.  You don't have a Gmail address or any
23  other personal e-mail address?
24      A.  I have an old Gmail address, but it's
25  dormant.  I haven't logged on to it in years.

Page 70

1              J. DONDERO
2     Q.  Okay.  And you understood that the
3  debtor's document request called for the
4  production of all text messages that were
5  responsive to the requests, right?
6     A.  Yes.
7     Q.  Can we just scroll down to the
8  requests themselves?  Right there.
9        Do you see Request No. 3 is for all
10 communications between you and any person
11 employed by the debtor?
12    A.  Yes.
13    Q.  And did you understand that the
14 request was limited to the time period of, I
15 think, December 10th, 2020 to the end of the
16 month?
17    A.  I didn't read the details of this.  I
18 didn't get into it.  I didn't do the document
19 production that I believe was completed and
20 responsive.  I delegated that.
21    Q.  Did you review the documents before
22 they were produced?  Do you know what was
23 produced?  Withdrawn.  Two different questions.
24        Did you review the documents for
25 completeness before your lawyers delivered them

Page 71

1              J. DONDERO
2  to my firm?
3     A.  Only in the most general -- when
4  she'd print out a stack of them, I'd just thumb
5  through the stack of them, and that was it.  But
6  other than that, no.
7     Q.  Did you do anything to satisfy
8  yourself that you had produced all responsive
9  documents?
10    A.  I trust Tara's work ethic and
11 capabilities, and I trust the lawyers at Bonds
12 Ellis, so I didn't -- I didn't intervene or
13 supersede or supervise.
14    Q.  So you didn't do anything to make
15 sure -- you didn't do anything personally --
16 withdrawn.
17        You didn't take any steps personally
18 to make sure that all responsive documents had
19 been produced, right?
20        MR. BONDS:  Objection, form.
21    A.  I wasn't involved personally, but I
22 do believe it was responsive and complete.
23 BY MR. MORRIS:
24    Q.  Until early December, you had a phone
25 that was bought and paid for by the debtor,

Page 72

1              J. DONDERO
2  right?
3     A.  Yes.
4     Q.  What happened to that phone?
5     A.  It was disposed of as part of getting
6  a replacement phone in anticipation of
7  potentially a transition.
8     Q.  Who decided to dispose of it?
9     A.  That's historically what we've done
10 with all of our historic phones, when we've
11 gotten new phones.  I've gotten a new phone, I
12 guess, every four or five years, and the old ones
13 have always been destroyed.
14    Q.  Who decided to destroy this --
15 withdrawn.
16        When you say it was disposed of, what
17 does that mean?
18    A.  As far as I know, it was disposed of
19 in the garbage, but I don't know if it was
20 recycled or whatever.
21    Q.  And who decided to throw it in the
22 garbage?
23    A.  We've always -- we've always done
24 that when we've gotten new phones, versus trading
25 them in, for the senior executives.

Page 73

1              J. DONDERO
2     Q.  I appreciate that, but I'm just
3  talking about the very specific phone that the
4  debtor bought and paid for for your benefit.  Who
5  made the decision to dispose and throw that phone
6  away?
7        MR. BONDS:  Objection, form.
8     A.  I -- like I said, I understood it to
9  be our standard process and protocol.  I don't
10 know.  I can't label anybody with the decision.
11 BY MR. MORRIS:
12    Q.  Well, who threw it away?
13    A.  I don't know.
14    Q.  You don't know if you threw the phone
15 away?
16    A.  No, I -- I don't know.  No, I don't
17 remember throwing it away, but I don't know who
18 did.
19    Q.  Did you have conversations with
20 anybody about the decision to throw away the
21 phone?
22    A.  Like I said, it wasn't a decision or
23 a new decision.  It's been the process, as far as
24 I understand it, every time we've upgraded phones
25 over the last 30 years.

J. DONDERO

1
2      Q.   You just throw it in the garbage?
3  You don't try to get a credit for it by returning
4  it?
5      A.   No.
6      Q.   Okay.   Did you ever speak with
7  Mr. Ellington about your phone that was bought
8  and paid for by the debtor?
9      A.   I think Ellington's phone and my
10  phone and I think -- I think right around the
11  same time, in anticipation, in case there was a
12  transition or in case there was a liquidation
13  plan, it was time to move the phone ownership
14  away from the estate.   The estate wasn't going to
15  pay for it anymore anyway in another couple of
16  weeks so, I --
17      Q.   Were you aware --
18      A.   I'm sorry, what's your question?
19      Q.   Are you aware that the UCC had asked
20  for your text messages before the time that you
21  disposed of your phone?
22      A.   No.
23      Q.   Nobody ever told you that the UCC
24  wanted your phone?
25      A.   No.

J. DONDERO

1
2      Q.   When exactly did you dispose of your
3  phone?
4      A.   On or about when I got my new phone.
5      Q.   Who at the debtor did you tell that
6  you disposed of your phone?
7      A.   I don't -- I don't remember who.   Was
8  it Jason Rothstein was involved in getting my new
9  phone and knew that I was disposing of my old
10  phone?   I don't know who else knew.   But again,
11  it was standard procedure.
12      Q.   Did it ever occur to you to get the
13  debtor's consent before doing this?
14      MR. BONDS:   Objection, form.
15      A.   No.
16  BY MR. MORRIS:
17      Q.   Did you have the phone number
18  transferred to your personal account?
19      A.   Yes.
20      Q.   Did you ever ask the debtor for its
21  permission to do that?
22      A.   No.
23      Q.   Did you ever give the debtor notice
24  that you were doing that?
25      A.   I didn't believe it was necessary or

J. DONDERO

1
2  appropriate.
3      Q.   So you wanted it to be a secret?
4      MR. BONDS:   Objection, form.
5      A.   No.   No, I wouldn't describe it as a
6  secret.   I would say I didn't think it was
7  necessary or appropriate.
8          Every executive that's ever left
9  Highland has always kept their phone number,
10  period.   Highland's never said, no, we're keeping
11  the phone number, ever, out of the two or 300
12  people that have come through Highland.   And I
13  don't believe most businesses try and retain the
14  phone number of employees when they leave.   It's
15  ludicrous on its surface.
16  BY MR. MORRIS:
17      Q.   Okay.   So let me just make sure that
18  I understand this.
19          You threw the phone -- withdrawn.
20          Somebody threw the phone that the
21  debtor bought and paid for in the garbage without
22  the debtor's knowledge or consent; is that right?
23      MR. BONDS:   Objection, form.
24      A.   I'd just repeat my testimony, that
25  it's always been our process to destroy old

J. DONDERO

1
2  phones when we get new phones.
3  BY MR. MORRIS:
4      Q.   You were no longer an employee of the
5  debtor at the time, correct?
6      A.   At the time?   I believe I was an
7  employee of the debtor since January.
8      Q.   Well, you stayed on as an unpaid
9  employee until mid October; isn't that right?
10      A.   Right, but I -- but I don't even
11  think my phone was paid for by the debtor.   I
12  think my phone was paid for by shared services by
13  NexPoint.   I -- I don't know what you're -- I
14  don't know what you're getting at or what
15  you're -- you're asking me.
16      Q.   It's not complicated.
17          Did you tell the debtor that you
18  threw away your phone at any time until this
19  deposition?
20      A.   Did I tell the debtor?   Like I said,
21  I didn't think it was the debtor's phone.   No, I
22  did not tell the debtor or get permission.   No, I
23  did not.
24      Q.   And did you tell the debtor that you
25  were changing the phone number?

J. DONDERO

1
2      A.  No.
3      Q.  And did Mr. Ellington help you change
4   the phone number?
5           MR. BONDS:  Objection, form.
6      A.  I didn't change the phone number.
7   BY MR. MORRIS:
8      Q.  Withdrawn.
9           Did Mr. Ellington help you have the
10  phone number transitioned to your personal
11  account?
12          MR. BONDS:  Objection, form.
13     A.  No.  No.  It was Jason -- Jason
14  Rothstein handles the technology stuff and the
15  phone stuff.
16  BY MR. MORRIS:
17     Q.  Did Mr. Ellington also change his
18  phone number to his own personal account?
19     A.  My understanding was there was
20  numerous senior executives that changed their
21  phone in anticipation of being terminated by the
22  debtor shortly.
23     Q.  Who else did it?
24     A.  I don't know.  I thought it was -- I
25  didn't think it was just Ellington and I.  I

J. DONDERO

1
2   thought it was a bunch of senior execs.  But --
3      Q.  What's the basis --
4      A.  -- who cares?  Who cares?  I didn't
5   care.  I don't know.  I mean --
6      Q.  I don't care if you care or not.  I'm
7   asking you questions.
8           What is the basis for your statement
9   that other people besides you and Mr. Ellington
10  changed the phone numbers?
11          MR. BONDS:  Objection, form.
12     A.  That was my understanding.  That was
13  my understanding.  But I don't -- I don't recall
14  specifics.  I didn't pay attention.
15  BY MR. MORRIS:
16     Q.  What is the basis for the
17  understanding?  Did somebody tell you that?
18          MR. BONDS:  Can you repeat the
19  question?
20  BY MR. MORRIS:
21     Q.  What is the basis for your
22  understanding?  Did somebody tell you that
23  employees of Highland other than Mr. Ellington
24  had changed the phone numbers?
25     A.  Yes.  My understanding was everybody

J. DONDERO

1
2   had to move their phones in the next 30 days or
3   next 25 days, based on Seery's termination
4   notice.
5      Q.  Did Jim Seery -- withdrawn.  I'm
6   perfectly fine.
7           MR. MORRIS:  Can we put up Exhibit 6,
8   please.
9           (Dondero Deposition Exhibit 6
10  marked.)
11  BY MR. MORRIS:
12     Q.  That's Jason Rothstein.
13          Do you see that?
14     A.  Yes.
15     Q.  He didn't throw the phone in the
16  garbage, did he?
17     A.  I don't know.
18     Q.  Well, according to the text that he
19  sent you on December 10th, he left your own --
20  old phone in the drawer of Tara's desk.
21          Do you see that?
22     A.  Yes.
23     Q.  So he didn't think that it was his
24  responsibility as of December 10th to throw it in
25  the garbage, did he?

J. DONDERO

1
2      A.  I don't know.
3      Q.  He left it in Tara's desk, didn't he?
4      A.  On December 10th.  But I don't know
5   what he did on December 11th.
6      Q.  Did you tell him to do anything?
7      A.  I don't -- all I know is the phone's
8   been disposed of.  That's all I know.
9      Q.  Okay.  Did you tell Mr. Rothstein to
10  take the phone out of Tara's desk and throw it in
11  the garbage?
12     A.  I did not.
13     Q.  Did you tell Tara to take the phone
14  out of her desk and throw it in the garbage?
15     A.  I did not.
16          MR. MORRIS:  Okay.  Can we put up
17  Exhibit 7, please.
18          (Dondero Deposition Exhibit 7
19  marked.)
20          MR. MORRIS:  Can we just scroll down
21  a little bit.
22  BY MR. MORRIS:
23     Q.  Is this a text message from you to
24  Tara?
25     A.  Yep.

J. DONDERO

1
2     Q.  If we could scroll up just a little
3  bit so we can see the date.
4          Well, it doesn't have a date, but do
5  you recall when you asked Tara to come in to
6  work -- (audio malfunction) --
7          (Clarification requested by the
8  stenographer.)
9  BY MR. MORRIS:
10     Q.  -- to come in to work on discovery.
11  Do you recall when you sent this text message,
12  Mr. Dondero?
13     A.  No.
14     Q.  Do you know how Tara -- withdrawn.
15          Did Tara come in to work on discovery
16  at any time?
17     A.  Yes.
18     Q.  And did you give her any instructions
19  on what to do?
20     A.  Again, just generally.
21     Q.  What were the general instructions
22  that you gave her?
23     A.  Work with the Bonds Ellis guys.
24  Here's the access to my computer and my phone.
25  Be complete and be responsive.

J. DONDERO

1
2     Q.  Did you ever speak with Mr. Ellington
3  about your document production?
4     A.  No.
5     Q.  Did Mr. Ellington play any role in
6  searching for, reviewing or producing responsive
7  documents?
8     A.  Nope.
9     Q.  Did you ever speak with Mr. Leventon
10  about your document production?
11     A.  Nope.
12     Q.  Did Mr. Leventon play any role in
13  searching for, reviewing or producing responsive
14  documents?
15     A.  Nope.
16     Q.  Did you ever speak with anybody
17  employed by the debtor, other than Tara, about
18  your document production?
19     A.  Tara's got an assistant, or my other
20  assistant that works with Tara, Kelly, would have
21  been the only other person.
22          She might have been -- Tara had to go
23  back and see her girls during lunch, so I think
24  she used Kelly to do some of the legwork.
25     Q.  Let's talk about the TRO for a

J. DONDERO

1
2  second.
3          MR. MORRIS:  Can we put up Exhibit 9,
4  please.
5          (Dondero Deposition Exhibit 9
6  marked.)
7  BY MR. MORRIS:
8     Q.  This is the temporary restraining
9  order that was signed on December 10th.
10          Do you see that?
11          If we could scroll down just a little
12  bit.  Yeah.
13     A.  Okay.
14     Q.  You've never seen this document
15  before, right?
16     A.  Yes, I haven't read it.
17     Q.  And I know I asked you earlier today
18  what your understanding was of how this order
19  restrained you.
20          Do you remember those questions?
21     A.  Yes.
22     Q.  Okay.  Is there anything, upon
23  reflection, that you need to add in order to make
24  the record complete as to your understanding of
25  the scope of the injunction?

J. DONDERO

1
2     A.  Not at this moment.
3          MR. MORRIS:  Can you put up
4  Exhibit 10, please.
5          (Dondero Deposition Exhibit 10
6  marked.)
7  BY MR. MORRIS:
8     Q.  All right.  Have you seen this letter
9  before, sir?
10     A.  No.  I mean, not specifically.  I
11  probably received it, but I haven't read it.
12     Q.  All right.  I just want to go back to
13  the phone for a second to see if I can nail this
14  down.
15          Did you dispose of the phone
16  somewhere around December 10th, 2020?
17     A.  I -- I don't know.  Probably.
18     Q.  Well, we just looked at that e-mail,
19  right, that was from Mr. Rothstein.
20          MR. MORRIS:  Can we get that back?
21     A.  Yes.
22          MR. MORRIS:  I just want to see what
23  the date of that was.  Yes.  Okay.
24  BY MR. MORRIS:
25     Q.  So that's December 10th at 6:25 p.m.,

J. DONDERO

2  right?

3      A.  Yes.

4      Q.  Okay.  So according to Mr. Rothstein,

5  as of that date at that time, your phone was in

6  Tara's desk, right?

7      A.  Yes.

8      Q.  You have no reason to disbelieve

9  that, do you?

10      MR. BONDS:  Can you repeat the

11  question?  I'm sorry.

12      MR. MORRIS:  Withdrawn.

13  BY MR. MORRIS:

14      Q.  So is it fair to say, then, that the

15  phone was disposed of and thrown in the garbage

16  sometime after December 10th?

17      A.  I don't know.

18      Q.  Well, as of December 10th,

19  Mr. Rothstein told you that it was in Tara's

20  desk, right?

21      A.  Yes.

22      Q.  Okay.  So if he – Jason's not a

23  liar, is he?

24      A.  No.

25      Q.  Do you have any reason to believe

J. DONDERO

2  that the phone was anywhere other than Tara's

3  desk at 6:25 p.m. on December 10th?

4      A.  I don't know.

5      Q.  You have no reason to believe that

6  that statement by Mr. Rothstein is untrue,

7  correct?

8      A.  Correct.

9      Q.  Do you know how it came to be that

10  the phone was disposed of in the manner that

11  you've described?

12      A.  Nope.

13      Q.  You can't tell me who did it; is that

14  right?

15      A.  Correct.

16      Q.  And you can't tell me when, after

17  December 10th, that happened, right?

18      A.  Correct.

19      Q.  Okay.  Thank you.  Let's go back to,

20  I guess, Exhibit 10.  If we can just scroll down

21  a little bit.

22      I understand that you haven't seen

23  this document before.  Go to the next page,

24  please – no.  Yeah, next page.

25      Do you see the first full paragraph

J. DONDERO

2  there beginning "On December 22nd"?

3      A.  I'm going to have to get up and read

4  that.  Just hold on a sec.

5      Q.  Okay.  Take your time.

6      A.  Yes, I see that.

7      Q.  Okay.  Having read that paragraph, do

8  you have any basis to dispute any of the

9  statements in that paragraph?

10      MR. BONDS:  I'm sorry.  Can you read

11  it again or can you ask your question again?

12      MR. MORRIS:  Sure.  I'd like to know

13  if Mr. Dondero has any basis to dispute any

14  assertion made in that paragraph.

15      A.  I disagree with every sentence in

16  that paragraph based on my 30 years of experience

17  and understanding how to operate a registered

18  investment advisor and how to do it in the

19  interest of performance, investors and a

20  registered investment advisor.

21  BY MR. MORRIS:

22      Q.  All right.  Let's try this

23  differently.  I shouldn't have done that.

24      The first sentence, do you have any

25  basis to disagree with any aspect of the first

J. DONDERO

2  sentence of that paragraph?  And let me just read

3  it aloud, if I may.

4      A.  That – all right.  What's your

5  question?

6      Q.  Is there anything inaccurate about

7  the first sentence?

8      A.  I believe my instructions in the

9  e-mails we went over were to not do the trades.

10  You know, that sentence implies not settle the

11  trade, which means to not do the trades once they

12  were already bona fide.  I – I don't recall that

13  ever being my contention.

14      I would have preferred they be

15  reversed, but my instructions, I believe, in

16  everything we went over were to not do the

17  trades, stop doing trades that are adverse to the

18  interests of investors, but it wasn't regarding

19  settling outstanding trades.  So I think that

20  sentence on its face is in error.

21      Q.  Okay.  So but it's true, then, that

22  you instructed employees of NPA and HCMFA on or

23  around December 22nd to stop doing the trades of

24  Avaya and Sky, correct?

25      A.  Yes.

J. DONDERO

1
2    Q.   Near the closing bell on -- we're
3    going to go back in time just a couple of days --
4    on Friday the 18th, Mr. Sowin informed you that
5    Seery wanted to sell these securities, right?
6    A.   I don't recall that specifically.
7    MR. MORRIS:  Okay.  Can we put up
8    Exhibit 11, please.
9    (Dondero Deposition Exhibit 11
10   marked.)
11   MR. MORRIS:  Okay.  And if we can
12   just go down to the bottom of it.  Yeah.
13   BY MR. MORRIS:
14   Q.   So that e-mail at the bottom, that's
15   Mr. Seery's direction to sell Avaya securities
16   from the CLOs, right?
17   A.   I don't know what's happening here.
18   I don't know if this is fuzzy or my eyes are
19   getting worse, but can we enlarge these a little
20   bit, or I'm going to have to get up each time.
21   Yeah.  This is nutty and vindictive.
22   I think everybody realizes that there's no
23   liquidity in the markets the three days before
24   Thanksgiving and Christmas.  There's no urgency
25   or reason to sell any of these securities that

J. DONDERO

1
2    couldn't have waited until January or February.
3    There's no business purpose in
4    selling any of those securities, yet he's pushing
5    them through for self-serving or vindictive
6    reasons.  I -- or maybe trying to get more issues
7    in front of the judge.  I have no idea, but
8    this -- this stuff makes absolutely no sense and
9    no business purpose.
10   But I'm sorry, what's your question?
11   MR. MORRIS:  Okay.  I move to strike
12   and I'd ask you to listen to my question.
13   BY MR. MORRIS:
14   Q.   It's simply that you learned, just
15   before the closing bell on Friday, December 18th,
16   that Mr. Seery wanted to sell Avaya securities
17   out of the CLOs?
18   MR. BONDS:  Objection, form.
19   THE WITNESS:  Yeah, hold on.  I need
20   to interrupt for a second.  When you strike
21   something, does that mean it doesn't end up in
22   the record?
23   MR. MORRIS:  The judge will decide
24   whether or not it does.  It's my request that the
25   judge strike it from the record.  She'll make the

J. DONDERO

1
2    ruling.
3    THE WITNESS:  Okay.  But then my
4    lawyer can ask to put it in as my understanding
5    of something at the end or something of the
6    deposition or...
7    MR. MORRIS:  I don't want to give you
8    legal advice, Mr. Dondero, but yes, that's
9    generally how it works.
10   THE WITNESS:  Okay.  Thank you.
11   BY MR. MORRIS:
12   Q.   So again, the question is simply
13   whether you learned near the closing bell on
14   Friday, December 18th, that Mr. Seery wanted to
15   sell Avaya shares out of the CLOs?
16   MR. BONDS:  Objection, form.
17   A.   It appears so.
18   BY MR. MORRIS:
19   Q.   Okay.  And can you just scroll up
20   above that, please.  And -- okay.
21   Do you see that Mr. Sowin, in fact,
22   forwards this right to you?
23   A.   Yes.
24   Q.   And it was on the basis of this that
25   you instructed the NPA and HCMFA employees not to

J. DONDERO

1
2    execute these sales?
3    A.   Yes.
4    Q.   After the TRO was issued, did you
5    ever instruct any employees of NPA or HCMFA not
6    to interfere or impede with the debtor's
7    management of the CLOs?
8    A.   No.
9    Q.   To the best of your knowledge, did
10   anyone ever instruct the employees of NPA and
11   HCMFA not to interfere or impede with the
12   debtor's management of the CLOs?
13   A.   No.
14   Q.   Did you ever provide a copy of the
15   TRO to any employees of NPA and HCMFA?
16   A.   I did not.
17   Q.   Do you know if anybody ever provided
18   a copy of the TRO to any of the employees of NPA
19   and HCMFA?
20   A.   I do not know.
21   MR. MORRIS:  Okay.  Can we put up
22   Exhibit 12, please.
23   (Dondero Deposition Exhibit 12
24   marked.)
25   ///

1          J. DONDERO
2   BY MR. MORRIS:
3       Q.   Okay.  This is a letter that was sent
4   to K&L Gates.
5          Do you know who K&L Gates represents
6   in connection with this matter?
7       A.   Some of the retail funds.
8       Q.   And do they also represent the two
9   advisors?
10      A.   Yes.  I believe they're one of --
11  yes.
12      Q.   Attached to this letter, there's an
13  Exhibit A, if we can go down, and we'll find a
14  letter from K&L Gates there.  Okay.
15         This is another letter from K&L Gates
16  dated December 22nd, 2020.  Are you able to see
17  that, sir?  Can we scroll down a little bit?
18      A.   Yes.  Yes, I can see the letter.
19      Q.   Okay.  Were you aware that this
20  letter was sent at the time that it was?
21      A.   I was aware, yes.
22      Q.   And these are the same entities,
23  except for CLO Holdco, that had filed the prior
24  motion that was denied by the Court, right?
25      A.   I'm sorry, ask that question again.

1          J. DONDERO
2   These were --
3       Q.   Yeah, let me just do a little
4   background.
5          A couple of -- about a week before
6   this letter was sent, the entities represented by
7   K&L Gates, except for CLO Holdco, had made a
8   motion in the bankruptcy court, right?
9       A.   Yes.
10      Q.   They had asked the Court to pause, to
11  impose a pause on the debtor from selling any CLO
12  assets; is that right?
13      A.   I don't -- I don't know what
14  exactly -- I don't know the details of what they
15  requested.
16      Q.   Okay.  Did you authorize the filing
17  of that motion?
18      A.   Authorize the filing?  I
19  championed -- I pushed and encouraged the chief
20  compliance officer and the general counsel to do
21  what they believed was right as rigorously as
22  possible, and it manifested itself in the letters
23  that you're speaking of.
24      Q.   And you -- and you approved of these
25  letters, right?

1          J. DONDERO
2       A.   I -- not directly and not
3   specifically, but I encouraged them to do what
4   they thought was right.
5       Q.   Okay.  And you were aware that
6   letters with the substance contained in them were
7   going to be sent -- (audio malfunction) --
8          (Clarification requested by the
9   stenographer.)
10  BY MR. MORRIS:
11      Q.   -- to the debtor?
12         THE STENOGRAPHER:  And the answer
13  again, please?
14         MR. BONDS:  And I objected as to
15  form.
16         THE STENOGRAPHER:  And the answer
17  again, please?
18      A.   I was aware that letters were being
19  sent, and I was aware that motions -- or a motion
20  was being filed.
21  BY MR. MORRIS:
22      Q.   This letter was also sent on behalf
23  of CLO Holdco, Ltd.
24         Do you see that?
25      A.   Yes.

1          J. DONDERO
2       Q.   Are you the direct or indirect
3   economic or beneficial owner of CLO Holdco, Ltd.?
4       A.   No.
5       Q.   Who is?
6       A.   I believe the DAF and HarbourVest.
7       Q.   And who controls the DAF?
8       A.   Grant Scott.
9       Q.   Who is the beneficial owner of the
10  DAF?
11      A.   Three char- -- three or four
12  charitable organizations.
13      Q.   And who controls CLO Holdco?
14      A.   I don't know exactly.
15      Q.   Do you?
16      A.   No.
17      Q.   And who are the possibilities?
18      A.   CLO Holdco, my understanding is it
19  was a -- it was an investment amalgamation
20  between HarbourVest and the DAF, so with the DAF
21  having the primary -- or the largest ownership
22  interest.
23      Q.   And with that largest ownership
24  interest, is the DAF able to control CLO Holdco?
25      A.   I don't know.  Maybe.

J. DONDERO

1
2    Q. You've never asked that question?
3    A. Nope.
4    Q. Did you ever instruct any of the
5    advisors or funds to withdraw this letter?
6        MR. BONDS: Objection, form.
7    A. No.
8    BY MR. MORRIS:
9    Q. To the best of your knowledge, has
10   anyone on behalf of the advisors, the funds or
11   CLO Holdco ever instructed K&L Gates to withdraw
12   this letter?
13   A. Not that I'm aware of.
14   Q. Okay. I want to just see if I can
15   refresh your recollection a bit.
16       When you talked about the DAF and
17   HarbourVest, is it possible that you're confusing
18   that with HCLOF?
19   A. You know, you're right. It could be.
20   Maybe it is CLO Holdco -- you know what, let me
21   just -- let me not speculate. But the CLO Holdco
22   might just be the DAF, and the combined entity
23   might be the level above that. I -- I don't know
24   exactly. Let me leave it at that.
25   Q. Okay. That's fair.

J. DONDERO

1
2        This is the -- I think you've
3    testified -- I'm trying to speed this up a little
4    bit, believe it or not -- that you supported the
5    sending of this particular letter, right? And if
6    you need to read more of it, let me know.
7    A. No, I -- again, the thrust of it, the
8    theme of it, the -- when you think bad or illegal
9    or regulatorily inappropriate stuff has happened,
10   what did you do, when you knew it, et cetera.
11   And I think the responsibilities of that
12   transcend a lot of things, you know.
13   Q. But you are aware that these very
14   same entities, except for CLO Holdco, had
15   advanced the very same arguments to the
16   bankruptcy court just six days earlier and their
17   motion is denied, right?
18       MR. BONDS: Objection, form.
19   A. Yes. And with all due respect to the
20   Court, it doesn't mean that it was wrong or
21   inappropriate to advance the argument.
22   BY MR. MORRIS:
23   Q. Okay. But having advanced the
24   argument on December 16th and having had it
25   rejected, you support these entities pressing the

J. DONDERO

1
2    same arguments again against the debtor, right?
3    A. We try and do what's right.
4        MR. MORRIS: Okay. Can we put up
5    Exhibit 13, please.
6        (Dondero Deposition Exhibit 13
7    marked.)
8        MR. MORRIS: And if we can go to
9    Exhibit A on the back. Thanks.
10   BY MR. MORRIS:
11   Q. This is another letter sent the next
12   day, right, on December 23rd, from K&L Gates?
13   And we can scroll down further, again.
14       Do you recall that there was yet
15   another letter sent on the 23rd?
16   A. Yeah, I don't recall specifically,
17   but...
18   Q. Can we scroll down a little bit
19   further in this document.
20       Do you recall that there came a time
21   when K&L Gates, on behalf of the advisors and the
22   funds, told the debtor and its counsel that it
23   was considering initiating the process for
24   removing the debtor as portfolio manager of the
25   CLOs?

J. DONDERO

1
2        MR. BONDS: Objection, form.
3    A. I believe they -- I don't know if
4    you're asking me a reservation of rights or
5    whatever, but I think they should do everything
6    as rigorously as possible to try and protect the
7    investors.
8    BY MR. MORRIS:
9    Q. Are you aware of any prohibition of
10   doing what you're -- withdrawn.
11       Are you aware that the debtor made an
12   offer to assign the CLO management agreements to
13   NexPoint back in the beginning of December?
14   A. I -- I do remember that, and I did
15   get a summary of that, and it was untenable in
16   terms of what it was wrapped in.
17   Q. What was untenable about it?
18   A. Off the top of my head, it would give
19   Seery releases for bad acts or inappropriate
20   trades. It required a reimbursement for, I
21   think, a million dollars of Pachulski fees
22   relative to this subject, and I think it also
23   wanted an up-front payment for the present value
24   of the future management fees to be paid to the
25   estate.

J. DONDERO

1
2    Q.  And who made the decision to reject
3  the debtor's offer?
4    A.  Made a decision to reject the –
5  reject the – it wasn't a rejection of the offer
6  as much as a disagreement that that is the way
7  CLO contracts transfer, that the manager doesn't
8  have the right to extort from the next manager
9  when the investors want to transfer.
10        So there's a facilitation that
11  Highland could provide, but Highland is not in a
12  position, based on our understanding of the
13  market, to demand consideration.
14    Q.  Okay.  Who made the decision to
15  reject the offer?
16    A.  I was involved in that.  It wasn't a
17  formal rejection, but it was a view that it was
18  an inappropriate offer.
19    Q.  Did anybody decide or suggest that
20  maybe we should make an appropriate offer?
21    A.  Not yet.
22    Q.  Was there any reason why, for the
23  past month, when the debtor has provided an
24  opportunity to transfer these CLO management
25  contracts, that none of the advisors or anybody

J. DONDERO

1
2  representing them has sought fit to make an
3  appropriate counteroffer?
4    A.  We can get an appropriate
5  counteroffer out tomorrow.
6    Q.  Okay.  Is there anything that's
7  prevented that over the last month instead of
8  writing letters and engaging in this litigation?
9    A.  The fundamental prerequisites were so
10  inappropriate that it dissuaded us from putting a
11  normal, commercial, reasonable thing forward.
12  But we'll put something commercial, reasonable
13  and appropriate through tomorrow, and we'll see
14  how far it goes.
15    Q.  Did you support the sending of this
16  particular letter at the time it was sent?
17    A.  I – generally, yes.
18    Q.  Okay.  Have you authorized any of the
19  entities on this letter to initiate the process
20  to remove the debtor as the fund manager of any
21  CLO?
22      MR. BONDS:  Objection, form.
23    A.  That's not my position, and it's not
24  without legal considerations regarding what's
25  subject to a stay and what's appropriate at this

J. DONDERO

1
2  juncture.
3        But – but I believe, subject to
4  whatever is legally appropriate, they should and
5  they will be moving to replace the manager as
6  quickly as possible and holding the manager
7  responsible for bad acts prior to transfer.
8  BY MR. MORRIS:
9    Q.  Have you authorized any of the
10  parties that are signatory to this letter to
11  initiate the process to remove the debtor as the
12  fund manager for the CLOs?
13    A.  I am not that involved.  I haven't
14  authorized it per se.  Again, I'm encouraging the
15  executives in charge to do the right thing, given
16  the circumstances and what's best for investors,
17  especially their retail investors and their
18  obligations under the '40 Act.
19    Q.  You're the president of the two
20  advisors, right?
21    A.  Yes.
22    Q.  And you're the portfolio manager of
23  the funds, right?
24    A.  Yes.
25    Q.  Couldn't you give the direction to

J. DONDERO

1
2  take steps to initiate the process to remove the
3  debtor?
4      MR. BONDS:  I'm sorry, can you repeat
5  the question?
6  BY MR. MORRIS:
7    Q.  Don't you have the power to do that?
8      MR. BONDS:  I'm sorry.  I couldn't
9  hear your question.
10      MR. MORRIS:  Withdrawn.
11  BY MR. MORRIS:
12    Q.  Did you ever discuss with any – with
13  anybody about whether to initiate the process to
14  remove the debtor as the portfolio manager of the
15  CLOs?
16    A.  I think it's a logical remedy, and I
17  believe the executives, and particularly like the
18  executives – the chief compliance officer always
19  has personal liability, and I think Jason Post
20  knows that, and I think he's pushing as hard as
21  he can for the benefit of investors in a
22  situation where people are moving against the
23  best interests of investors.
24        And I encourage him to move as
25  aggressively as possible subject to whatever the

1           J. DONDERO
2   limits of bankruptcy court, but I can't be --
3   I've got too many other things to do to be
4   directly involved in the details, so I'm not
5   involved in the details.
6       Q. I see.
7           Did you ever instruct the parties
8   that are signatory -- withdrawn.
9           Did you ever instruct K&L Gates to
10  withdraw this letter?
11      A. No.
12      Q. To the best of your knowledge, has
13  anybody on behalf of the advisors, the funds or
14  CLO Holdco ever instructed K&L Gates to withdraw
15  this letter?
16      A. No.
17      Q. Will you commit that each of the
18  entities on whose behalf this letter was sent
19  will cease and desist from taking any steps to
20  initiate the process to remove the debtor as the
21  CLO manager?
22      MR. BONDS: Objection, form.
23      A. Say that again.
24  BY MR. MORRIS:
25      Q. Will you commit on behalf of each of

1           J. DONDERO
2   the funds and the advisors to cease and desist
3   from taking any steps to replace the debtor as
4   the portfolio manager of the CLOs?
5       A. That would be inappropriate. I'm not
6   sure it would be illegal, but I think it would be
7   a regulatory breach, and I think it would not be
8   in the best interest of investors if we were to
9   agree to anything like that. I think that's nuts
10  and it's nutty to ask that.
11      Q. People say that about me all the
12  time.
13          Did you ever exchange any e-mails or
14  texts with any employee of the parties on this
15  document, on the issue of whether or how to
16  remove the debtor as the CLO's fund manager?
17      A. Not that I recall.
18      Q. Did you ever discuss with any
19  employee of the debtor the topic of removing the
20  debtor as the portfolio manager of the CLOs?
21      A. Not that I recall.
22      MR. MORRIS: Okay. It's 1:35. Can
23  we just take a ten-minute break and resume -- is
24  it 12:35 where you are, Mr. Dondero? We'll
25  resume at 1:45 Eastern, 12:45 Central.

1           J. DONDERO
2       THE WITNESS: I'm sorry, I can't hear
3   you. We return at what time?
4       MR. MORRIS: In ten minutes, at
5   12:45.
6       MR. BONDS: And I want to say too,
7   John, that your notice showed that there was a
8   1:30 deposition Central Time of somebody else,
9   and we intend -- I mean, we planned on that, so
10  we're going to need to be through at 1:30.
11      MR. MORRIS: Yeah, you can do that if
12  you want. You can do that if you want, but the
13  record will also reflect that we started at least
14  20 minutes late and we took at least a 35-minute
15  break for Mr. Dondero. So you leave whenever you
16  want, but be guided by that.
17          Let's take a break.
18      MR. BONDS: Well, I'm telling you
19  that if you want to go forward, you can.
20      MR. MORRIS: I will. Thank you. I
21  appreciate that.
22      THE WITNESS: All right. See you
23  guys in 10 minutes.
24      THE VIDEOGRAPHER: 12:36 p.m.,
25  Central Standard Time. We're off the record.

1           J. DONDERO
2       (Recess taken, 12:36 p.m. to
3   12:49 p.m. CST)
4       THE VIDEOGRAPHER: 12:49 p.m.,
5   Central Standard Time. We're back on the record.
6   BY MR. MORRIS:
7       Q. All right. Can you hear me,
8   Mr. Dondero?
9       A. Yes.
10      Q. Is it fair -- do you think it's fair
11  to say that your personal interests are adverse
12  to the debtor's?
13      A. No.
14      Q. They asked for your resignation back
15  in October, right?
16      A. Yes.
17      Q. And you opposed the debtor's plan on
18  file, right?
19      A. Yes.
20      Q. And you objected to the debtor's
21  settlement with ACIS; is that right?
22      A. Yes.
23      Q. And you're going to object to the
24  debtor's settlement with HarbourVest; is that
25  right?

Page 110

```
1              J. DONDERO
2        MR. BONDS: Objection, form.
3        A. I don't know for sure. I believe so.
4 I don't know.
5 BY MR. MORRIS:
6        Q. And the debtor commenced an adversary
7 proceeding against you; is that right?
8        MR. BONDS: Objection, form.
9        A. I'm not aware of that in particular.
10 BY MR. MORRIS:
11       Q. The debtor sought and obtained a TRO
12 against you; isn't that right?
13       A. Oh. Okay, yes.
14       Q. And they also started a lawsuit?
15 They filed a complaint against you -- is that
16 right -- for preliminary and permanent injunctive
17 relief?
18       A. I'm aware of it, yes.
19       Q. And the debtor has removed you from
20 its offices, right?
21       A. Yes.
22       Q. And based on all of that, would you
23 agree that your personal interests are adverse to
24 the debtor?
25       A. No.
```

Page 111

```
1              J. DONDERO
2        Q. Okay. Since the TRO was entered,
3 have you ever discussed your litigation strategy
4 with Mr. Ellington?
5        A. Not -- no. Not that I'm aware of.
6 That's not the subject of our conversations.
7 He's more of a go-between, and he's more of an
8 overall strategist.
9        Q. And he's a strategist for your -- you
10 know, for the defense and prosecution of your
11 personal interests, right?
12       A. No.
13       Q. No?
14       Do you remember that there were
15 actually two motions on the calendar on
16 December 16th? There was the motion that you
17 brought that was called, I guess, the active
18 ordinary course transactions motion, and then
19 there was the motion brought by the K&L Gates
20 firm on behalf of -- (audio malfunction) --
21       (Clarification requested by the
22 stenographer.)
23 BY MR. MORRIS:
24       Q. -- the advisors and the funds, where
25 they sought the pause of the sale of CLO assets.
```

Page 112

```
1              J. DONDERO
2        Do you remember that those two
3 motions were on the calendar a couple of weeks
4 ago?
5        A. I remember that K&L Gates one. The
6 first one, I don't remember.
7        Q. Do you remember discussing with
8 Mr. Ellington the need for a witness for one of
9 those motions?
10       A. No. I don't remember the motion.
11       Q. Do you remember that Mr. Ellington
12 suggested that J.P. Sevilla serve as a witness
13 for one of those motions?
14       A. I don't remember that.
15       MR. MORRIS: Put up Exhibit 15,
16 please.
17       (Dondero Deposition Exhibit 15
18 marked.)
19 BY MR. MORRIS:
20       Q. If we can go down here, do you see
21 that on Saturday, December 12th, Mr. Lynn wrote
22 to you and said: It looks like a trial?
23       A. Yes.
24       Q. Can you scroll up above that, please.
25 Keep going. And then Mr. Lynn -- I'm sorry, not
```

Page 113

```
1              J. DONDERO
2 so much.
3        And then Mr. Lynn wrote: That said,
4 we must have a witness now.
5        Do you see that?
6        A. Yes.
7        Q. Now, go up to the top, and
8 Mr. Ellington writes to you and to others: It
9 will be J.P. Sevilla. I will tell him that he
10 needs to contact you first thing in the morning.
11       Have I read that correctly?
12       A. Yes.
13       Q. Now, this is after the TRO is
14 entered, right?
15       A. Like I said, I'm not -- I see my name
16 on the cc list. I don't have an awareness of
17 what this is about, so...
18       Q. Okay. Do you know what trial
19 Mr. Sevilla was going to testify at?
20       A. No.
21       Q. You didn't produce --
22       A. You can refresh my memory, but I
23 don't have a recollection from this.
24       Q. To be fair, Mr. Dondero, I don't
25 know. This is discovery, and I'm just asking a
```

1            J. DONDERO
2  question, if you know.
3      A.  Okay.
4      Q.  Do you recall if you produced this
5  e-mail in discovery?
6      A.  I have no idea.
7      Q.  Do you recall looking to
8  Mr. Ellington for leadership in helping to
9  coordinate all the lawyers acting on your behalf
10  and on behalf of the entities owned and
11  controlled by you?
12      A.  I know I needed some coordination,
13  but I think I went in a different direction, and
14  that's why I brought on Douglas Draper, and he's
15  been functioning in that role of joint defense
16  and coordination.
17      Q.  But you did tell Mr. Ellington, after
18  the TRO was entered, that you needed him to
19  provide leadership with respect to the
20  coordination of your litigation interests, right?
21      A.  I -- I don't -- I don't remember.
22  Like I said, I ended up going in a different
23  direction, but I -- I don't -- I don't know as
24  far as your question is concerned.
25      MR. MORRIS:  Okay.  Can we put up

1            J. DONDERO
2  Exhibit 16, please.
3          (Dondero Deposition Exhibit 16
4  marked.)
5      MR. MORRIS:  Scroll down to the
6  bottom.  Not that far.  Right there.
7  BY MR. MORRIS:
8      Q.  So this is an e-mail from Mr. Draper
9  to you on December 16th.
10          Do you see that?
11      A.  Yes.
12      MR. BONDS:  I'm going to object.
13  Mr. Draper is a lawyer.
14      MR. MORRIS:  He is.  I understand
15  that.
16      MR. BONDS:  Anything that was
17  produced that relates to Douglas Draper and Mike
18  Lynn and Jim Dondero is attorney-client
19  privileged.
20      MR. MORRIS:  You're entitled to make
21  that assertion, but if we just look at the top so
22  we can clear this up.  All the way to the top.
23  Mr. Dondero forwards this to Mr. Ellington.
24  Mr. Ellington is not Mr. Dondero's personal
25  lawyer.  He is the lawyer for the debtor, and

1            J. DONDERO
2  your firm doesn't represent any business
3  interest, so there's no claim that this is
4  somehow provided pursuant to a shared services
5  agreement.  Unless you can tell me that there's a
6  common -- (audio malfunction) --
7          (Clarification requested by the
8  stenographer.)
9      MR. MORRIS:  -- a common interest
10  between Mr. Ellington and Mr. Dondero,
11  Mr. Dondero has waived the privilege.  State your
12  position, and I'm happy to state mine, but I need
13  to ask questions.
14          Can we go back down to the bottom,
15  please.  All right.
16  BY MR. MORRIS:
17      Q.  So on December 16th, Mr. Draper is
18  looking to get a joint meeting together, right?
19          Do you remember that?
20      A.  I'm sorry, what's the question?
21      Q.  Do you recall that on or around
22  December 16th, Mr. Draper was looking to get a
23  joint meeting among all the lawyers representing
24  you and your business interests as well as the
25  employees for Highland?

1            J. DONDERO
2      A.  What I do know is Douglas Draper has
3  put together a mutual defense agreement, and I
4  think the 16th is right about when he came on
5  board.  He had to reach out and get people's
6  e-mails and contact information and be able to
7  coordinate it.
8          But he's now fully engaged and fully
9  functional in that role.  Ellington is not
10  involved in that role at all.  Can you -- but I
11  don't know exact time frames or exactly who said
12  what to who when, but go ahead, ask me whatever
13  you want.
14      Q.  You mentioned a mutual defense
15  agreement.  Do I have that right?
16      MR. BONDS:  Objection --
17      A.  I don't know what -- I don't know
18  what the legal term is.
19  BY MR. MORRIS:
20      Q.  Okay.  But there's a joint --
21      MR. BONDS:  Don't talk about that,
22  Jim.
23      MR. MORRIS:  Okay.
24  BY MR. MORRIS:
25      Q.  Let me ask you this:  Did Scott

J. DONDERO

1
2  Ellington participate in the drafting of the
3  joint interest or mutual defense agreement?
4      A.  No.
5      Q.  Did Isaac Leventon participate in the
6  drafting of a joint defense or mutual defense
7  agreement?
8      A.  No.
9      Q.  Did you ever discuss with either of
10 them the topic of a joint defense or a mutual
11 defense agreement?
12     A.  That was entirely with Draper.
13     Q.  Okay.  Let's scroll up the page a
14 little bit.  There's a response from Mr. Lynn.
15         Do you see that?
16     A.  Yes.
17     Q.  And then if we scroll up a little
18 further, you forward it to Mr. Ellington, right?
19 If we can go to the --
20     A.  Yes.
21     Q.  And you said:  I'm going to need you
22 to provide leadership here.
23         Have I read that correctly?
24     A.  Yes.
25     Q.  Why did you send this e-mail string

J. DONDERO

1
2  to Mr. Ellington on December 16th?
3      A.  I don't remember.
4      Q.  What leadership were you looking for?
5      A.  I can't piece it together from here.
6  I don't remember.  I can't piece it together from
7  the e-mail, and I don't remember.
8      Q.  Why did you need Mr. Ellington to
9  provide leadership?
10     A.  I don't know.
11     Q.  Does --
12     A.  I don't remember.
13     Q.  Okay.  Does looking at the topic, a
14 list for a joint meeting, refresh your
15 recollection that you wanted Mr. Ellington to
16 coordinate all of the lawyers working on your
17 behalf and on behalf of the entities in which you
18 own an interest?
19     A.  No.  I mean, because that was the
20 beginning of the string, but the middle of the
21 string starts going in different directions.  I
22 can't say -- I can't say what I wanted him to
23 have leadership with.
24     Q.  Can you think of any -- any issue at
25 all, looking at this e-mail string, as to what he

J. DONDERO

1
2  would be providing leadership for if it's not to
3  coordinate your defense counsel?
4      A.  I don't want to speculate, but
5  again -- I don't want to speculate, but, again,
6  the middle of the string looks like it goes in
7  different directions than just forming the mutual
8  defense thing.
9      Q.  Okay.  So you have no recollection
10 why you forwarded this e-mail to Mr. Ellington on
11 December 16th and why you told him that you need
12 him to provide leadership here; is that your
13 testimony?
14     A.  Correct.
15     Q.  Is Mr. Ellington a party to any joint
16 defense or mutual defense agreement that you're a
17 party to?
18     A.  I believe the employees' counsel is
19 part of the working group, although I've been on
20 calls when the employees' counsel has been on and
21 when it hasn't.  But I don't even -- I think the
22 employee group is divided into a couple different
23 groups, and I don't know if Ellington is part of
24 both groups.
25         But I -- Ellington individually is

J. DONDERO

1
2  not part of the working group, and I'm not sure
3  which, if one or both, of the employee groups
4  he's in.
5      Q.  So there's two employee groups; is
6  that right?
7      A.  I'm beyond my involvement and
8  expertise, but I thought there were two employee
9  groups, but I don't even know that for sure.
10     Q.  And has your counsel conferred with
11 counsel for either or both of the employee
12 groups?
13         MR. BONDS:  I'm sorry, can you repeat
14 the question?
15         MR. MORRIS:  Yes.
16 BY MR. MORRIS:
17     Q.  Has your counsel at Bonds Ellis
18 conferred with counsel for either or both of the
19 employee groups?
20     A.  I don't know.
21         MR. MORRIS:  John, I would call for
22 the immediate production of any --
23         MR. BONDS:  I don't think we have it,
24 but I can check on that.
25         MR. MORRIS:  I would call for the

Page 122

```
 1              J. DONDERO
 2   immediate production of any joint defense or
 3   mutual defense agreement to which any debtor
 4   employee is a party --
 5        MR. BONDS:  I don't think that there
 6   are any.
 7        MR. MORRIS:  And I would call for any
 8   drafts, okay?
 9        MR. BONDS:  Again, I don't think
10   there are any.
11        MR. MORRIS:  Okay.  You can give me
12   that representation.
13   BY MR. MORRIS:
14        Q.  Let's look at the top, at
15   Mr. Ellington's response.  And what did he tell
16   you in response to your statement that you need
17   him to provide leadership?
18        A.  You mean the two words there?
19        Q.  Yep.
20        A.  It looks like he typed back:  On it.
21        Q.  Yeah.
22            Did Mr. Ellington subsequently
23   provide leadership, as you had asked?
24        A.  I don't remember.  Nothing I can
25   recall.
```

Page 123

```
 1              J. DONDERO
 2        Q.  Did Mr. Ellington ever participate in
 3   any conference calls with your counsel at Bonds
 4   Ellis?
 5        A.  Not that -- not that I recall.
 6   Ellington's time has been spent primarily, the
 7   vast majority, representing and working with the
 8   employee group.  I know that.  It's been
 9   difficult to get his attention on anything else
10   so --
11        Q.  Listen carefully to my question.  I'm
12   not asking you to tell me what Mr. Ellington
13   does.  I'm simply asking whether you know that
14   Mr. Ellington has participated in conference
15   calls with your counsel at Bonds Ellis at any
16   time after December 10th.
17        A.  I don't know.
18        Q.  Did you ever participate in any calls
19   with Mr. Ellington and any lawyer at Bonds Ellis?
20        A.  Over the year, for sure.  There have
21   been -- earlier in the year there were several
22   times, but I can't recall one recently.
23        Q.  So you have no recollection of ever
24   participating in a phone call with Mr. Ellington
25   and any lawyer at Bonds Ellis at any time since
```

Page 124

```
 1              J. DONDERO
 2   December 10th; is that your testimony?
 3        A.  I -- I can't recall.  I'm willing to
 4   be refreshed.  I can't recall.  There were --
 5   there were -- some of the calls that stick out in
 6   my mind I believe occurred prior to that date, so
 7   I can't -- I can't recall any post that date.
 8        Q.  Okay.  You didn't produce this e-mail
 9   in response to the Court's order, did you?
10        A.  I don't know.
11        Q.  And that's because you didn't take
12   the time to look at the production before it was
13   delivered to my firm, right?
14        A.  I -- I believe the -- yeah, I mean,
15   it's a process I don't -- I don't get directly
16   involved in.  Counsel has to decide what's
17   responsive, what's privileged, what's complete,
18   what's appropriate.  That's not my job.
19        Q.  Are you aware that any documents for
20   which a privilege was asserted were supposed to
21   be delivered to the Court last December 31st?
22        A.  I'm not saying that's what -- I have
23   no idea whether we produced this or didn't
24   produce it.  And if we didn't, I don't know why.
25        Q.  Do you know that the UCC has asked
```

Page 125

```
 1              J. DONDERO
 2   for the financial statements for Dugaboy and Get
 3   Good?
 4        MR. BONDS:  Objection, you're going
 5   far afield from where we're -- this TRO.
 6        MR. MORRIS:  You can take that
 7   position if you want, but I assure you, when I'm
 8   done, you'll understand.
 9        MR. BONDS:  I'm going to instruct the
10   witness not to answer the question.
11        MR. MORRIS:  You're not going to let
12   him answer as to whether or not the UCC wanted
13   the Dugaboy and Get Good financial statements?
14        MR. BONDS:  I can't hear you.
15        MR. MORRIS:  Yeah, I apologize.
16   It's -- it's not me, John.  Let me just ask
17   again.  Are you -- you're going to instruct your
18   witness not to answer the question of whether he
19   knew that the UCC wanted the Dugaboy and Get Good
20   financial statements?
21        MR. BONDS:  I'll let you go one --
22   you can ask that one question.  But anything
23   further into Dugaboy is not something that is for
24   the Court to determine at this point in this
25   case.
```

Page 126

```
1              J. DONDERO
2         MR. MORRIS:  Okay.
3         So you can answer that question, sir.
4      A.  I think there have been several times
5   over the last year that Dugaboy financials have
6   been requested by a variety of entities.  I don't
7   know when or recently or if the UCC requested it
8   recently.
9   BY MR. MORRIS:
10     Q.  You know a number of different
11  parties have asked for the Dugaboy and Get Good
12  financial statements; is that right?
13        MR. BONDS:  I'm going to object to
14  any answer that you may give following up on
15  Dugaboy.  Dugaboy is not subject to the TRO and
16  you're stuck with your adversary proceeding.
17        MR. MORRIS:  John, there is a text
18  message that we're going to get to in a moment,
19  so I'll end the suspense.  Mr. Dondero
20  specifically says:  Don't produce the Dugaboy
21  financial statements without a subpoena.  Those
22  documents were in the debtor's possession.  I
23  will tell you that I personally made at least a
24  half a dozen requests of Mr. Ellington and
25  Mr. Leventon for those documents.
```

Page 127

```
1              J. DONDERO
2         I will tell you that Jim Seery
3   instructed them to provide those documents
4   because they're in the debtor's possession,
5   custody and control.
6         I will tell you that there's no
7   shared services agreement between Dugaboy or Get
8   Good and the debtor, and there is no basis for
9   those -- for Mr. Ellington and Mr. Leventon to
10  have obstructed the debtor's obligation to
11  provide those documents except in Mr. Dondero's
12  hands.
13        MR. BONDS:  I'm going to instruct the
14  witness not to answer the question.
15        MR. MORRIS:  I think that might be a
16  good idea.  On what basis?
17        MR. BONDS:  I don't need to give a
18  basis.  I think that you've gone far, far from
19  what we're here on today, which is --
20        MR. MORRIS:  I believe that it's --
21        MR. BONDS:  -- specifically --
22        MR. MORRIS:  I'm sorry to interrupt.
23  Go ahead, John.
24        MR. BONDS:  Specifically, it's the
25  TRO and the injunction.
```

Page 128

```
1              J. DONDERO
2         MR. MORRIS:  Correct.  And the TRO
3   specifically -- I know Mr. Dondero doesn't know
4   this because he hasn't read the document, but in
5   addition to the things that he mentioned, it also
6   prevents him from interfering with the debtor's
7   business.
8         The debtor is a litigant here.  The
9   debtor has an obligation to provide these
10  documents.  And he interfered with that
11  obligation.
12        Let me ask my questions and you can
13  direct him not to answer every single time if you
14  want, okay?
15        MR. BONDS:  Okay.
16  BY MR. MORRIS:
17     Q.  Do you know a woman named Melissa,
18  Mr. Dondero?
19     A.  Yes.
20     Q.  And who is that?
21     A.  She's my personal accountant.
22     Q.  Does she work at the Highland
23  offices?
24     A.  Yes.
25     Q.  Is she employed by the debtor?
```

Page 129

```
1              J. DONDERO
2      A.  I believe so.
3      Q.  Do you know what her title is?
4      A.  No.
5      Q.  Do you directly or indirectly
6   control -- withdrawn.
7         Do you directly or indirectly own
8   Dugaboy?
9      A.  No.
10     Q.  Who owns Dugaboy?
11        MR. BONDS:  I'm going to instruct the
12  witness not to answer that question.
13        MR. MORRIS:  Are you going to follow
14  your counselor's advice?
15        THE WITNESS:  Yes.
16  BY MR. MORRIS:
17     Q.  Who controls Dugaboy?
18        MR. BONDS:  I'm going to instruct the
19  witness not to answer that question, for the
20  second time.
21        MR. MORRIS:  Are you going to
22  follow -- yeah, we'll do this every time, John,
23  just for the record.
24        MR. BONDS:  That's fine.
25        MR. MORRIS:  So I apologize.  I
```

Page 130

J. DONDERO

1
2 appreciate, you know, you do your job, I'll do
3 mine.
4         Mr. Dondero, are you going to follow
5 your counsel's advice?
6         THE WITNESS: Yes.
7 BY MR. MORRIS:
8         Q. To the best of your knowledge,
9 Dugaboy does not have a shared services agreement
10 with the debtor, correct?
11         You can answer, sir.
12         THE WITNESS: I'm not answering,
13 right? I'm not answering any questions on this
14 subject.
15         MR. MORRIS: Only if your lawyer
16 instructs you to do that, and he hasn't done that
17 for this question.
18         MR. BONDS: I'm going to instruct the
19 witness not to answer the question.
20         MR. MORRIS: You're not going to let
21 him answer whether Dugaboy has a shared services
22 agreement with the debtor?
23         MR. BONDS: I think that you're
24 entitled to that, so Jim, you can answer that
25 question.

Page 131

J. DONDERO

1
2         A. I – I don't know.
3 BY MR. MORRIS:
4         Q. Okay. Are you familiar with an
5 entity called Get Good?
6         A. Yes.
7         Q. Do you directly or indirectly own Get
8 Good?
9         A. No.
10         Q. Do you control, directly or
11 indirectly, Get Good?
12         A. I don't believe so.
13         Q. Who owns Get Good?
14         MR. BONDS: I'm going to instruct the
15 witness not to answer the question.
16         MR. MORRIS: Are you going to follow
17 your counselor's advice?
18         THE WITNESS: Yes.
19 BY MR. MORRIS:
20         Q. Who controls Get Good?
21         MR. BONDS: Instruct the witness not
22 to answer the question.
23         MR. MORRIS: Are you going to follow
24 your counselor's advice, Mr. Dondero?
25         THE WITNESS: I'm going to follow his

Page 132

J. DONDERO

1
2 advice, yes.
3 BY MR. MORRIS:
4         Q. To the best of your knowledge, Get
5 Good does not have a shared services agreement
6 with the debtor, does it?
7         THE WITNESS: Can I answer that or
8 not answer that one?
9         MR. BONDS: Yes, you can.
10         A. I don't know.
11 BY MR. MORRIS:
12         Q. Did you ever discuss the request by
13 any party to produce the financial statements of
14 Get Good and Dugaboy with Scott Ellington?
15         MR. BONDS: I'm going to tell you –
16 advise you not to answer that question.
17         MR. MORRIS: Are you going to follow
18 your counselor's advice?
19         THE WITNESS: Yes.
20 BY MR. MORRIS:
21         Q. Did you ever communicate with
22 Mr. Leventon on the subject matter of whether or
23 not the financial statements for Get Good and
24 Dugaboy needed to be produced by the debtor?
25         MR. BONDS: I'm going to advise the

Page 133

J. DONDERO

1
2 witness not to answer the question.
3         MR. MORRIS: Are you going to follow
4 your counselor's advice?
5         THE WITNESS: Yes.
6 BY MR. MORRIS:
7         Q. Did you ever communicate with anybody
8 at any time who was employed by the debtor
9 regarding the production of the Dugaboy and Get
10 Good financial statements?
11         MR. BONDS: I'm going to instruct the
12 witness not to answer the question.
13         MR. MORRIS: Are you going to follow
14 your counselor's advice?
15         THE WITNESS: Yes.
16 BY MR. MORRIS:
17         Q. Melissa is Melissa Schroth, right?
18         A. Yes.
19         Q. She's an executive accountant
20 employed by the debtor, right?
21         A. Yes.
22         Q. And after December 10th, 2020
23 Ms. Schroth told you that a request had been made
24 for the production of the Dugaboy financial
25 statements, correct?

Page 134

J. DONDERO

1
2     MR. BONDS:  You can answer the
3  question.
4     A.  I don't remember.
5     MR. MORRIS:  Okay.  Can we put up
6  Exhibit 17, please.
7        (Dondero Deposition Exhibit 17
8  marked.)
9     MR. MORRIS:  Can you scroll down a
10  little bit?  I'm sorry.  Scroll up so we can see
11  who this text was sent to.
12  BY MR. MORRIS:
13     Q.  Is that Melissa Schroth?
14     A.  Yes.
15     Q.  And if we scroll back down, do you
16  see that you tell Ms. Schroth on December 16th:
17  No Dugaboy details without a subpoena?
18     A.  Yes.
19     Q.  That's a text that you sent to her on
20  December 16th, correct?
21     A.  I believe so.
22     Q.  What prompted you to send this text?
23     A.  I don't know.
24     Q.  You don't have any recollection as to
25  why you would tell Melissa, quote, no Dugaboy

Page 135

J. DONDERO

1
2  details without a subpoena?
3     A.  No, but that would -- I mean, I stand
4  behind that response, but I don't remember why.
5     Q.  Do you remember who was asking for
6  the documents?
7     A.  Nope.
8     Q.  Do you remember any discussion with
9  any person at any time concerning the production
10  of the Dugaboy or Get Good financial statements?
11     A.  Nope.
12     Q.  Do you have any objection to the
13  debtor producing the Dugaboy and Get Good
14  financial statements?
15     A.  I'm sorry, say that again?
16     Q.  Would you consent to the debtor's
17  production of the Get Good and Dugaboy financial
18  statements?
19     A.  With a subpoena.  I stand by that
20  statement, yeah.
21     Q.  Okay.  Do you know of any reason why
22  Mr. Ellington and Mr. Leventon would have failed
23  to respond to Mr. Seery's instruction to produce
24  the Dugaboy and Get Good financial statements
25  that were requested by the -- (audio

Page 136

J. DONDERO

1
2  malfunction) --
3        (Clarification requested by the
4  stenographer.)
5  BY MR. MORRIS:
6     Q.  -- UCC?
7     A.  I don't want to speculate.
8     Q.  Have you heard of the law firm
9  Baker & McKenzie?
10     A.  Yes.
11     Q.  Does that firm or any lawyer at that
12  firm represent you in your individual capacity?
13     A.  No.
14     Q.  Does that firm or any lawyer at that
15  firm represent any entity in which you have a
16  direct or indirect ownership interest?
17     A.  No.  Not that I'm aware of, no.
18     Q.  I'm sorry, one second.
19        Does that firm or any lawyer at that
20  firm represent any entity that you directly or
21  indirectly control?
22     A.  Not that I'm aware of.
23     Q.  Do you recall asking Isaac Leventon
24  for the contact information for the -- for the
25  lawyers at Baker & McKenzie?

Page 137

J. DONDERO

1
2     A.  I -- I don't -- I don't -- it might
3  have been for part of the shared defense, mutual
4  defense, whatever, agreement, but that's --
5  that's the only reason why I would have asked for
6  it.
7     Q.  Okay.  What's your understanding as
8  to -- (audio malfunction) --
9        (Clarification requested by the
10  stenographer.)
11  BY MR. MORRIS:
12     Q.  -- the parties to that mutual defense
13  agreement that you just referred to, or shared
14  defense?
15     A.  I -- it's what I've testified
16  already, Douglas Draper is coordinating it.
17  I'm -- I'm not sure whether the employees are on
18  it or not, and I'm not sure if there's one
19  employee group or two employee groups, and I'm
20  not sure if one or both of them are part of that
21  agreement or not.
22        But the -- in recent history, my only
23  awareness of Baker McKenzie is with regard to
24  representing the employees.  That's my only
25  awareness of that firm.

Page 138

```
1            J. DONDERO
2      Q.  Have you ever spoken with an attorney
3  at Baker McKenzie?
4      A.  No, I have not.
5      MR. MORRIS:  Okay.  Can you put up
6  Exhibit 18, please.
7          (Dondero Deposition Exhibit 18
8  marked.)
9  BY MR. MORRIS:
10     Q.  That's Mr. Leventon.  Do I have that
11  right?
12     A.  Yes.
13     Q.  And you're communicating with him on
14  or around -- after December 10th, right?
15     A.  Yes.
16     Q.  Okay.  And if you could scroll down a
17  little bit, right there, on December 22nd, you
18  asked Mr. Leventon to send you the Baker &
19  McKenzie contact person, right?
20     A.  Yes.
21     Q.  And if you scroll down a little bit.
22  Did he ever send that to you?
23     A.  I'm sorry?
24     Q.  Did he ever send that to you?
25     A.  I don't know.  I don't remember.
```

Page 139

```
1            J. DONDERO
2      Q.  Why did you want the Baker & McKenzie
3  contact information?
4      A.  I was trying to help Draper
5  coordinate the mutual shared defense agreement.
6      Q.  And it was your intent and desire to
7  have the Baker McKenzie firm participate in that
8  agreement, right?
9      A.  No.  I'm not a lawyer.  The
10  appropriateness of who's in that group under what
11  circumstances representing who was a legal
12  decision made by Draper.
13     Q.  So why didn't you just have Draper
14  deal with this?  Why did you deal with it?
15     A.  He was scurrying around, moving
16  quickly, trying to get contact information for
17  potential various defense parties.  I was just
18  helping him get the contact information.
19     Q.  And you --
20     MR. BONDS:  I'm going to instruct you
21  not to say anything relating to this as far as
22  what he and Draper discussed.
23  BY MR. MORRIS:
24     Q.  You were aware at the time that you
25  asked for the Baker & McKenzie contact
```

Page 140

```
1            J. DONDERO
2  information that Baker & McKenzie was a law firm
3  that -- that employees were considering retaining
4  for their personal interests, right?
5      A.  I knew they were involved with the
6  employees.  Whether -- whether or when they were
7  engaged and by which employee group and -- I
8  don't have details like that.  I never did.
9      Q.  But the one thing that you did know,
10  when you asked for the Baker & McKenzie contact
11  information, is that Baker & McKenzie would be
12  representing some group of Highland employees,
13  correct?
14     A.  Or they might be.  Or they were being
15  interviewed at the time.  I think they weren't
16  formally engaged until later.  I don't know these
17  details and never did.
18     MR. BONDS:  I'm going to instruct the
19  witness --
20     THE WITNESS:  I'm sorry, what?
21     MR. BONDS:  You need to stop.
22     THE WITNESS:  Okay.
23     MR. MORRIS:  Why is that?  Please
24  don't interrupt the witness.  Assert the
25  privilege if you want, direct him not to answer,
```

Page 141

```
1            J. DONDERO
2  but don't interrupt his answers.
3  BY MR. MORRIS:
4      Q.  Baker McKenzie was ultimately
5  retained by some group of the debtor's employees,
6  correct?
7      A.  I believe so.
8      Q.  Do you know how Baker McKenzie got
9  their retainer, their retainer money?
10     A.  No idea.
11     Q.  Do you know -- are you familiar with
12  an entity called Gov Re?
13     A.  Yes.
14     Q.  What's Gov Re?
15     A.  It's a Bermuda-based reinsurance
16  company.
17     Q.  Do you have an ownership interest in
18  Gov Re?
19     A.  I don't know.
20     Q.  Do any -- do any entities in which
21  you have an interest have an ownership interest
22  in Gov Re?
23     A.  I don't know.
24     Q.  Do you know who controls Gov Re?
25     A.  I don't know.
```

J. DONDERO

1
2      Q.  Do you make any decisions on behalf
3  of Gov Re?
4      A.  Not recently.  Not in the last year.
5  In prior years, I think I've helped them with
6  investments and some strategy, but not recently.
7      Q.  Do you know whether Gov Re has made
8  any payment to Baker & McKenzie in the last
9  30 days?
10     A.  I have no idea.
11     Q.  Did you ever have a communication
12 with anybody at any time in the last 30 days as
13 to -- (audio malfunction) --
14     (Clarification requested by the
15 stenographer.)
16 BY MR. MORRIS:
17     Q.  -- as to whether Gov Re would pay
18 money to Baker & McKenzie on behalf of some of
19 the debtor's employees?
20     A.  Nope.  No, I have no idea.  I've
21 never heard the daisy chain you're connecting.
22 I've never heard it before.
23     MR. MORRIS:  Let's take a break.  I
24 might be finished.  The time now is 2:32, or 1:32
25 Central.  Let's just come back sharply at 1:45,

J. DONDERO

1
2  or 2:45.
3      THE VIDEOGRAPHER:  1:32 p.m. Central
4  Standard Time.  We're off the record.
5      (Recess taken, 1:32 p.m. to
6  1:50 p.m. CST)
7      THE VIDEOGRAPHER:  1:50 p.m. Central
8  Standard Time.  We're back on the record.
9  BY MR. MORRIS:
10     Q.  I just have a few more minutes here.
11     Going back to Gov Re, Mr. Dondero,
12 are you on the board of that entity?
13     A.  I don't know.
14     Q.  Can you identify any person who sits
15 on that board?
16     A.  No.
17     Q.  Do you know how many people sit on
18 that board?
19     A.  No.
20     Q.  Do you have an understanding as to
21 who makes decisions as to whether or not Gov Re
22 should make -- (audio malfunction) --
23     (Clarification requested by the
24 stenographer.)
25     MR. MORRIS:  Withdrawn.

J. DONDERO

1
2  BY MR. MORRIS:
3      Q.  Mr. Dondero, do you know who makes
4  decisions on behalf of Gov Re as to whether or
5  not to make payments on claims?
6      A.  No.
7      Q.  Did you ever participate in any
8  decisions concerning the payment of claims made
9  under a Gov Re policy?
10     A.  Not in five years.  I think I was
11 more involved five years ago, but I don't
12 remember.
13     Q.  So you don't know if you sit on the
14 board of directors, you don't know who makes
15 decisions to pay claims, and you can't identify
16 any members of the board; is that right?
17     A.  Correct.
18     Q.  Okay.  And you don't know if you have
19 an indirect or direct ownership interest in
20 Gov Re; is that right?
21     A.  Correct.
22     Q.  Okay.  You've spent some time over
23 the last months trying to put together a
24 so-called pot plan; is that right?
25     A.  Yes.

J. DONDERO

1
2      Q.  Since December 10th, 2020, have you
3  had any communications with any employee of the
4  debtor concerning the pot plan?
5      A.  It's been a struggle to put together
6  a pot plan.  There's been an intentional block of
7  any information, even assets, at Highland, so any
8  pot plan is a stab in the dark for me when I put
9  it forward, relative to current assets and likely
10 outcome.
11     But developing the pot plan has been
12 something I think that's been applauded by the
13 judge; at different times it's been encouraged by
14 creditors, you know.  But the only people -- Dave
15 Klos has helped with creating the model so that
16 the model makes sense and adds up and is
17 distributable.  Dave Klos has been the person
18 that I've accessed throughout the year regarding
19 the pot plan.
20     Q.  And is it fair to say that you've
21 communicated with Mr. Klos about the pot plan
22 since December 10th, 2020?
23     A.  Probably.  You know, to the extent
24 that the pot plan has come up, been considered or
25 distributed, yes.

Page 146

J. DONDERO

2  Q. Okay. Can you identify any other

3  employees of the debtor with whom you've

4  discussed the pot plan with since December 10th,

5  2020?

6  A. No.

7  Q. Did you discuss it with

8  Mr. Waterhouse?

9  A. Mr. Waterhouse is Klos' direct

10  supervisor. He probably had an awareness of it

11  from those conversations. I don't recall. I

12  mean, I don't – maybe – I mean, there have

13  been, maybe, peripherally, not significant, I

14  don't think, since the 16th, but I don't recall.

15  Q. Did you ever get any balance sheets

16  or financial information about MultiStrat from

17  Scott Ellington?

18  A. No.

19  Q. Did you ever get any financial

20  information, including balance sheets, concerning

21  MultiStrat, from Isaac Leventon?

22  A. No. They – I wouldn't believe that

23  those guys would have it. I wouldn't even think

24  to ask them for it. It wouldn't be – I don't

25  think it's natural for them to have it. But no,

Page 147

J. DONDERO

2  I never did, no.

3  MR. MORRIS: Okay. I have no further

4  questions, just two points that I'd like to make.

5  John, will you agree on behalf of

6  Mr. Dondero to have him appear at Friday's

7  hearing when the preliminary injunction takes

8  place or do I need to serve a subpoena?

9  MR. BONDS: No, we haven't made that

10  decision yet.

11  MR. MORRIS: Okay. Will you accept a

12  subpoena on behalf of Mr. Dondero?

13  MR. BONDS: Sure.

14  MR. MORRIS: Okay. We'll get that

15  over to you tomorrow.

16  And then lastly, the deposition of

17  Andrew Clubok has been adjourned to a date to be

18  determined.

19  MR. BONDS: Okay.

20  MR. MORRIS: Thank you very much,

21  all.

22  MR. BONDS: Thanks.

23  THE VIDEOGRAPHER: 1:56 p.m. –

24  1:57 p.m. Central Standard Time. We're off the

25  record. This concludes the deposition.

Page 148

J. DONDERO

2  (Time noted: 1:57 p.m. CST)

3

4

5

6

7

8  _____

9  JAMES D. DONDERO

10

11  Subscribed and sworn to before me this _____

12  day of _____, 20____.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 149

2  C E R T I F I C A T E

3

4  I, MICHAEL E. MILLER, FAPR, RDR, CRR,

5  Notary Public in and for the State of Texas, do

6  hereby certify:

7  That JAMES D. DONDERO, the witness

8  whose deposition is hereinbefore set forth, was

9  duly sworn by me and that such deposition is a

10  true record of the testimony given by such

11  witness;

12  That pursuant to FRCP Rule 30,

13  signature of the witness was not requested by the

14  witness or other party before the conclusion of

15  the deposition;

16  I further certify that I am not

17  related to any of the parties to this action by

18  blood or marriage; and that I am in no way

19  interested in the outcome of this matter.

20  IN WITNESS WHEREOF, I have hereunto

21  set my hand on January 5, 2021.

22

23  _____

24  MICHAEL E. MILLER, FAPR, RDR, CRR

25  NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

Page 150

```
1
2     ----------------- I N D E X -----------------
3
4     WITNESS:  JAMES D. DONDERO
5     EXAMINATION:                        PAGE
6     BY MR. MORRIS                        8
7
8
9     ---- LITIGATION SUPPORT INDEX ----    PAGE
10    Instruction Not To Answer           125
11    Instruction Not To Answer           125
12    Instruction Not To Answer           129
13    Instruction Not To Answer           130
14    Instruction Not To Answer           131
15    Instruction Not To Answer           131
16    Instruction Not To Answer           133
17    Instruction Not To Answer           133
18    Instruction Not To Answer           139
19    Instruction Not To Answer           140
20
21
22
23
24
25
```

Page 151

```
1
2          ---- E X H I B I T S ----
3     EXHIBIT                          PAGE
4     Exhibit 1    10/16/20 NexPoint Letter to    31
5          Seery
6     Exhibit 2    11/24/20 NexPoint Letter to    35
7          Seery
8     Exhibit 3    E-mail(s)              39
9     Exhibit 4    Dondero Text Messages        62
10    Exhibit 5    Request for Production of    67
11         Documents
12    Exhibit 6    Dondero Text Messages with    80
13         Jason Rothstein
14         Dondero_000022
15    Exhibit 7    Dondero Text Messages with Tara    81
16         Loiben
17         Dondero_000013
18    Exhibit 8    Skipped in Series
19    Exhibit 9    Temporary Restraining Order    84
20    Exhibit 10   12/23/20 Pachulski Letter to    85
21         Lynn
22    Exhibit 11   E-mail(s)              90
23    Exhibit 12   12/24/20 Pachulski Letter to    93
24         Wright
25
```

Page 152

```
1
2     Exhibit 13   12/24/20 Pachulski Letter to    100
3          Wright
4     Exhibit 14   Skipped in Series
5     Exhibit 15   E-mail(s)              112
6     Exhibit 16   E-mail(s)              115
7     Exhibit 17   Dondero Text Messages with    134
8          Melissa Schroth
9          Dondero_000014
10    Exhibit 18   Dondero Text Messages with    138
11         Isaac Leventon
12         Dondero_000043
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 153

```
1
2     ERRATA SHEET FOR THE TRANSCRIPT OF:
3     Case Name:      IN RE HIGHLAND/HIGHLAND v. DONDERO
4     Dep. Date:      January 5, 2021
5     Deponent:       JAMES D. DONDERO
6     Pg. Ln.   Now Reads    Should Read    Reason
7     ___ ___  _____  _____  _____
8     ___ ___  _____  _____  _____
9     ___ ___  _____  _____  _____
10    ___ ___  _____  _____  _____
11    ___ ___  _____  _____  _____
12    ___ ___  _____  _____  _____
13    ___ ___  _____  _____  _____
14    ___ ___  _____  _____  _____
15    ___ ___  _____  _____  _____
16    ___ ___  _____  _____  _____
17
18
19         _____
20            Signature of Deponent
21    SUBSCRIBED AND SWORN BEFORE ME
22    THIS _____ DAY OF _____, 20____.
23
24    _____
25    (Notary Public) MY COMMISSION EXPIRES: _____
```

**1**

**1** 7:8 30:25 31:2,3 35:5 36:15,24 37:13 44:17

**10** 60:18 85:4,5 87:20 108:23

**10:41** 47:24 48:2

**10th** 12:17 70:15 80:19,24 81:4 84:9 85:16,25 86:16,18 87:3,17 123:16 124:2 133:22 138:14 145:2, 22 146:4

**11** 7:13 90:8,9

**11:16** 48:3,4

**11th** 81:5

**12** 93:22,23

**12:35** 107:24

**12:36** 108:24 109:2

**12:45** 107:25 108:5

**12:49** 109:3,4

**12th** 112:21

**13** 100:5,6

**15** 46:24 47:22 112:15,17

**16** 115:2,3

**16th** 31:18 99:24 111:16 115:9 116:17, 22 117:4 119:2 120:11 134:16,20 146:14

**17** 134:6,7

**18** 138:6,7

**18th** 90:4 91:15 92:14

**19-34054-sgj11** 7:14

**1:30** 108:8,10

**1:32** 142:24 143:3,5

**1:35** 107:22

**1:45** 107:25 142:25

**1:50** 143:6,7

**1:56** 147:23

**1:57** 147:24

**2**

**2** 34:24,25 36:15,25 37:14 44:17

**20** 34:22 108:14

**20-03190-sgj** 7:23

**2020** 9:5 35:10 60:8, 18 69:10,18 70:15 85:16 94:16 133:22 145:2,22 146:5

**2021** 6:4 7:10

**22nd** 88:2 89:23 94:16 138:17

**23rd** 100:12,15

**24** 35:10

**25** 80:3

**27th** 60:24

**2:32** 142:24

**2:45** 143:2

**3**

**3** 38:24 39:2 70:9

**30** 6:22 73:25 80:2 88:16 142:9,12

**300** 76:11

**31st** 9:5 124:21

**35-minute** 108:14

**4**

**4** 62:12,14

**40** 104:18

**5**

**5** 6:4 64:22 67:14,15

**5:26** 62:20,24

**5th** 7:10

**6**

**6** 80:7,9

**6:25** 85:25 87:3

**7**

**7** 81:17,18

**9**

**9** 84:3,5

**9:50** 6:4

**9:52** 7:10

**A**

**a.m.** 6:4 7:10 47:24 48:2,3,4

**ability** 12:12 24:16, 18 26:11

**absolutely** 91:8

**accept** 147:11

**access** 69:8 82:24

**accessed** 145:18

**accommodate** 47:16

**account** 54:3 56:2 75:18 78:11,18

**accountant** 128:21 133:19

**accounts** 56:5

**ACIS** 109:21

**acknowledge** 26:2,9

**acknowledged** 41:3

**acknowledging** 23:20 25:21,23

**Act** 63:5 104:18

**acting** 114:9

**action** 46:5 63:6,23

**actions** 63:22

**active** 111:17

**activities** 63:15

**activity** 46:5

**acts** 101:19 104:7

**acute** 61:2

**acutely** 61:8

**add** 84:23

**addition** 128:5

**address** 39:24 40:3, 4 69:11,12,15,19,20, 22,23,24

**addresses** 39:23

**adds** 145:16

**adhered** 26:6

**adjourned** 147:17

**admissible** 6:20

**admit** 24:7

**advance** 59:13 99:21

**advanced** 99:15,23

**adversary** 7:21 10:7 110:6 126:16

**adverse** 89:17 109:11 110:23

**advice** 92:8 129:14 130:5 131:17,24 132:2,18 133:4,14

**advise** 132:16,25

**advised** 36:23

**Advisers** 63:4

**advisor** 24:14,20,22 25:4 26:7 88:18,20

**advisor's** 26:5

**advisors** 14:14 17:18 18:23 19:5,7,8, 18,22 20:6,7,10,15, 21 22:12,21 23:12 24:10 29:22 35:21 54:18 56:24 58:23 94:9 98:5,10 100:21 102:25 104:20 106:13 107:2 111:24

**Advisors'** 19:24

**advisory** 17:21 18:25

**affect** 12:8

**affirmatively** 24:5 25:21,23

**afield** 125:5

**afternoon** 43:16

**aggressively** 105:25

**agree** 6:24 7:3 17:3 55:3 107:9 110:23 147:5

**agreeing** 23:20

**agreement** 27:4 116:5 117:3,15 118:3,7,11 120:16 122:3 127:7 130:9,22 132:5 137:4,13,21 139:5,8

**agreements** 17:16 27:14 28:7,19 29:12 30:6 101:12

**ahead** 24:3 117:12 127:23

**alert** 36:7 59:16

**allegations** 36:24

**alleged** 15:9,12

**aloud** 89:3

**amalgamation** 97:19

**amounts** 63:19

**analysis** 37:11,15

**Andrew** 147:17

**answering** 130:12, 13

**answers** 141:2

**anticipation** 72:6 74:11 78:21

**anymore** 74:15

**apologize** 19:12 65:11 125:15 129:25

**appearances** 7:17

**appears** 41:21 92:17

**applauded** 145:12

**appropriateness** 139:10

**approval** 9:11

**approved** 95:24

**argue** 25:19

**argument** 99:21,24

**arguments** 99:15 100:2

**articulated** 46:10 50:11 63:11

**Asia** 30:24

**asks** 29:16

**aspect** 13:13 88:25

**Assert** 140:24

**asserted** 124:20

**assertion** 88:14 115:21

**asset** 39:13

**assets** 24:16 39:13 44:7 46:8 50:14 51:25 56:5 63:9 95:12 111:25 145:7,9

**assign** 101:12

**assistant** 68:16 83:19,20

**assistants** 68:10,11

**association** 6:8

**assume** 49:13

**assure** 125:7

**Attached** 94:12

**attention** 79:14 123:9

**attorney** 138:2

**attorney-client** 115:18

**attorneys'** 7:17

**audio** 11:2 16:7 57:6 68:23 82:6 96:7 111:20 116:6 135:25

137:8 142:13 143:22

**authority** 14:3 28:25 34:15

**authorization** 35:25

**authorize** 33:3 35:20 95:16,18

**authorized** 42:6,14 103:18 104:9,14

**Avaya** 89:24 90:15 91:16 92:15

**AVYA** 43:19

**aware** 9:3,13,18 12:7,10,17 13:14 14:17,20,23 17:14 21:13 26:15 27:19,22 35:16 36:2,12 48:9 52:11 53:6 58:24,25 59:11 60:15,25 61:8, 11,14 62:2,4 64:7 67:23 74:17,19 94:19,21 96:5,18,19 98:13 99:13 101:9,11 110:9,18 111:5 124:19 136:17,22 139:24

**awareness** 61:3 113:16 137:23,25 146:10

**B**

**back** 44:11 47:21 48:5,22 54:9,11 83:23 85:12,20 87:19 90:3 100:9 101:13 109:5,14 116:14 122:20 134:15 142:25 143:8,11

**background** 95:4

**bad** 99:8 101:19 104:7

**Baker** 136:9,25 137:23 138:3,18 139:2,7,25 140:2,10, 11 141:4,8 142:8,18

**balance** 146:15,20

**bank** 69:17

**bankruptcy** 7:15 10:7,19 26:5 59:5 95:8 99:16 106:2

**based** 29:20 80:3 88:16 102:12 110:22

**basis** 79:3,8,16,21 88:8,13,25 92:24 127:8,16,18

**basket** 39:23

**beginning** 24:13 88:2 101:13 119:20

**begins** 39:8

**behalf** 9:15 28:5 35:21 56:24,25 58:23 61:12 96:22 98:10 100:21 106:13,18,25 111:20 114:9,10 119:17 142:2,18 144:4 147:5,12

**believed** 95:21

**believes** 33:22

**bell** 90:2 91:15 92:13

**beneficial** 20:5 27:5 28:14,15,18,23 29:11 30:5,10 46:7 50:10 56:3 63:21,24 97:3,9

**benefit** 50:13 73:4 105:21

**Bermuda-based** 141:15

**bit** 41:4 62:17 81:21 82:3 84:12 87:21 90:20 94:17 98:15 99:4 100:18 118:14 134:10 138:17,21

**block** 49:12 145:6

**blocking** 55:22

**board** 13:10 14:13 117:5 143:12,15,18 144:14,16

**bodies** 37:5

**bona** 46:5 89:12

**Bonds** 7:2,20 9:20, 23 10:2,10,16 11:15, 22 13:2 14:5 15:6 16:23 17:10 18:6

21:7 22:24 24:11 25:7 27:16,25 28:8, 21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 51:12 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 67:24 68:10 71:11,20 73:7 75:14 76:4,23 78:5, 12 79:11,18 82:23 86:10 88:10 91:18 92:16 96:14 98:6 99:18 101:2 103:22 105:4,8 106:22 108:6,18 110:2,8 115:12,16 117:16,21 121:13,17,23 122:5,9 123:3,15,19,25 125:4,9,14,21 126:13 127:13,17,21,24 128:15 129:11,18,24 130:18,23 131:14,21 132:9,15,25 133:11 134:2 139:20 140:18, 21 147:9,13,19,22

**bottom** 39:6,8 62:20 90:12,14 115:6 116:14

**bought** 71:25 73:4 74:7 76:21

**breach** 27:4,13 33:22 36:3,6,10 107:7

**breaches** 61:4

**break** 46:19,23 107:23 108:15,17 142:23

**brought** 111:17,19 114:14

**bucket** 40:2

**bunch** 24:17 79:2

**business** 46:8,9,10 50:13 52:19 55:5,25 56:7,14 57:12 58:21 59:20 60:16 63:10 91:3,9 116:2,24 128:7

**businesses** 76:13

**C**

**C-SUITE** 33:25

**calendar** 111:15 112:3

**call** 32:18 47:11 121:21,25 122:7 123:24

**called** 22:7 70:3 111:17 131:5 141:12

**calls** 46:17 48:14 120:20 123:3,15,18 124:5

**canceled** 43:18

**CANTY** 35:3,6

**capabilities** 71:11

**capability** 23:24 24:19 25:16

**capable** 24:23

**capacity** 10:3,6,13, 18 30:3,4 136:12

**Capital** 7:12 8:18 18:22 21:16 22:8 53:15

**capture** 50:18

**care** 15:15 79:5,6

**careful** 62:25

**carefully** 123:11

**cares** 47:18 79:4

**case** 6:23 7:12,13,21 10:19 14:4 40:8 52:22 74:11,12 125:25

**caused** 22:21 24:10

**cease** 106:19 107:2

**ceased** 69:15

**cede** 52:17,18

**Central** 7:10 47:24 107:25 108:8,25 109:5 142:25 143:3,7 147:24

**CEO** 14:21

**cetera** 24:20 99:10

**chain** 142:21

**championed** 95:19

**change** 78:3,6,17

**changed** 78:20 79:10,24

**changing** 77:25

**Chapter** 7:13

**char-** 97:11

**charge** 104:15

**charitable** 97:12

**check** 44:12 121:24

**chief** 33:22,23 34:2, 4,18 37:12,17 53:14 95:19 105:18

**Christmas** 90:24

**circumstances** 104:16 139:11

**circumvented** 29:2

**Civil** 6:22

**claim** 116:3

**claims** 144:5,8,15

**clarification** 11:3 16:9 57:7 68:25 82:7 96:8 111:21 116:7 136:3 137:9 142:14 143:23

**class** 46:5 63:6

**clear** 46:2 56:3 115:22

**CLO** 17:3,9 24:16 25:12 27:13,24 28:7, 19 29:11 30:6 39:12, 13 44:7 51:24 94:23 95:7,11 96:23 97:3, 13,18,24 98:11,20,21 99:14 101:12 102:7, 24 103:21 106:14,21 111:25

**CLO's** 107:16

**CLOS** 16:22 22:22 23:16,21,25 24:9,23 25:17 26:11,16 27:3, 9,23 28:2,6,13,17,20

**29:13 30:7 38:10,14 40:24 50:6 54:5 63:16 90:16 91:17 92:15 93:7,12 100:25 104:12 105:15 107:4, 20**

**closing** 90:2 91:15 92:13

**Clubok** 147:17

**collateralized** 16:18 17:4

**combined** 98:22

**commenced** 110:6

**comment** 36:18

**comments** 50:24

**commercial** 103:11, 12

**commit** 106:17,25

**common** 116:6,9

**communicate** 47:5 132:21 133:7

**communicated** 62:8 145:21

**communicating** 138:13

**communication** 142:11

**communications** 70:10 145:3

**company** 22:2 141:16

**competently** 12:11

**complaint** 110:15

**complete** 71:22 82:25 84:24 124:17

**completed** 70:19

**completeness** 70:25

**complex** 46:12

**compliance** 26:3 33:22,23 34:2,4,8,18, 21 36:4 37:4,12,18 53:14 56:4 61:13 95:20 105:18

**compliant** 68:9

**complicated** 77:16

**computer** 82:24

**concerned** 114:24

**concludes** 147:25

**conclusion** 28:23 29:8,17 30:21 34:17, 20

**conduct** 13:16

**conference** 8:19 123:3,14

**conferred** 121:10,18

**confusing** 98:17

**conjunction** 37:20

**connecting** 142:21

**connection** 10:18, 25 11:8 15:3 59:5 64:18 67:25 94:6

**consent** 9:11 42:22 43:5 75:13 76:22 135:16

**consideration** 102:13

**considerations** 103:24

**considered** 30:10, 13 145:24

**consistent** 35:24 50:4

**constrain** 13:15

**contact** 28:16 113:10 117:6 136:24 138:19 139:3,16,18,25 140:10

**contained** 96:6

**contended** 27:3,13

**contention** 25:14 27:20,22 89:13

**context** 31:14

**continued** 36:2

**contract** 27:24 30:17

**contracts** 17:7,15

**24:8,15 25:12 26:3,4, 16,18,24 102:7,25**

**control** 10:12 18:20 20:7 97:24 127:5 129:6 131:10 136:21

**controlled** 114:11

**controls** 97:7,13 129:17 131:20 141:24

**conversation** 32:16 52:6 57:5,20 58:15 59:9,17

**conversations** 32:13 73:19 111:6 146:11

**conveyed** 58:12

**convinced** 61:14

**coordinate** 114:9 117:7 119:16 120:3 139:5

**coordinating** 137:16

**coordination** 114:12,16,20

**copy** 12:22 41:20 93:14,18

**correct** 9:19 10:3 13:3 14:18,24 18:5, 11 19:2,19 23:17 27:24 28:20 42:15 48:20 51:8,16 56:22 57:3 66:23 67:6 77:5 87:7,8,15,18 89:24 120:14 128:2 130:10 133:25 134:20 140:13 141:6 144:17, 21

**correctly** 113:11 118:23

**counsel** 8:14 32:17 37:21 47:6 65:2,7,12, 22,24 95:20 100:22 120:3,18,20 121:10, 11,17,18 123:3,15 124:16

**counsel's** 130:5

**counselor's** 129:14 131:17,24 132:18 133:4,14

**counteroffer** 103:3, 5

**couple** 46:17 69:9 74:15 90:3 95:5 112:3 120:22

**court** 6:15 7:15,19 13:18 25:20 48:11 59:16,20,23 94:24 95:8,10 99:16,20 106:2 124:21 125:24

**Court's** 14:3,9 48:15 124:9

**courtroom** 6:21

**COVID-19** 6:10

**Covitz** 39:8,11,12 40:22

**Covitz's** 41:11,20,24

**creating** 145:15

**credit** 74:3

**creditors** 145:14

**CRO** 14:21

**CST** 6:4 48:3 109:3 143:6

**current** 145:9

**custody** 127:5

---

**D**

**D.C.** 65:6,7,12

**DAF** 44:5 97:6,7,10, 20,24 98:16,22

**daisy** 142:21

**Dallas** 7:16

**dark** 145:8

**date** 7:9 26:19 82:3,4 85:23 86:5 124:6,7 147:17

**dated** 31:17 35:9 94:16

**Dave** 145:14,17

**day** 41:4 48:14,18 54:11 59:14 60:13 100:12

**days** 52:25 69:9 80:2, 3 90:3,23 99:16 142:9,12

**de** 63:19

**deal** 139:14

**debtor** 7:13 8:15 9:3 12:18 15:15 16:7,17, 21 17:6,7 22:23 23:16,20,22,23,24 24:8 25:6,9,11,15,16 26:17 27:4,13,23 28:20 29:12 30:7 38:10 39:14,16 40:11,18 43:19 50:13 53:16 61:13 63:5 66:4,7,10,13,20,23 67:23 70:11 71:25 73:4 74:8 75:5,20,23 76:21 77:5,7,11,17, 20,22,24 78:22 83:17 95:11 96:11 100:2, 22,24 101:11 102:23 103:20 104:11 105:3, 14 106:20 107:3,16, 19,20 110:6,11,19,24 115:25 122:3 127:8 128:8,9,25 130:10,22 132:6,24 133:8,20 135:13 145:4 146:3

**debtor's** 9:7 11:2,9, 13,20 13:20 14:14,21 15:4,13 42:22 43:5 70:3 75:13 76:22 77:21 93:6,12 102:3 109:12,17,20,24 126:22 127:4,10 128:6 135:16 141:5 142:19

**debtors** 9:15

**decade** 66:8

**December** 9:5 12:17 59:5 60:18 70:15 71:24 80:19,24 81:4, 5 84:9 85:16,25 86:16,18 87:3,17 88:2 89:23 91:15 92:14 94:16 99:24 100:12 101:13 111:16 112:21 115:9 116:17,22 119:2 120:11 123:16 124:2, 21 133:22 134:16,20

**decide** 25:20 45:21 60:23 91:23 102:19 124:16

**decided** 72:8,14,21

**decision** 28:25 73:5, 10,20,22,23 102:2,4, 14 139:12 147:10

**decisions** 142:2 143:21 144:4,8,15

**declaration** 15:2,10, 12,22

**declare** 28:6

**default** 23:23 24:18 25:15 26:4 27:23 28:7

**defending** 9:20

**defense** 111:10 114:15 117:3,14 118:3,6,10,11 120:3, 8,16 122:2,3 137:3,4, 12,14 139:5

**defer** 52:16

**definable** 46:9

**delegate** 68:11

**delegated** 68:9 70:20

**delivered** 70:25 124:13,21

**demand** 102:13

**denied** 94:24 99:17

**depend** 52:23

**depo** 9:9

**deposition** 6:13 7:9, 22 9:16 10:22,25 11:8 31:3 34:25 39:2 47:7,19 48:10 62:14 67:15 77:19 80:9 81:18 84:5 85:5 90:9 92:6 93:23 100:6 108:8 112:17 115:3 134:7 138:7 147:16, 25

**describe** 39:25 76:5

**desire** 60:9 63:8 139:6

**desires** 52:16

**desist** 106:19 107:2

**desk** 49:13 52:8 80:20 81:3,10,14 86:6,20 87:3

**destroy** 72:14 76:25

**destroyed** 72:13

**details** 70:17 95:14 106:4,5 134:17 135:2 140:8,17

**determine** 125:24

**determined** 147:18

**developing** 145:11

**differently** 88:23

**difficult** 31:7 123:9

**direct** 18:3 19:17 28:16 97:2 128:13 136:16 140:25 144:19 146:9

**directed** 33:16 38:4 42:15 43:20 45:24

**direction** 23:3 38:15 40:23 90:15 104:25 114:13,23

**directions** 119:21 120:7

**directly** 13:11 54:4 55:16,19 59:25 96:2 106:4 124:15 129:5,7 131:7,10 136:20

**directors** 144:14

**disagree** 88:15,25

**disagreement** 102:6

**disapproval** 60:20

**disbelieve** 86:8

**discernible** 46:9

**discovery** 82:10,15 113:25 114:5

**discuss** 32:5 34:12 105:12 107:18 118:9 132:12 146:7

**discussed** 31:8 111:3 139:22 146:4

**discussing** 112:7

**discussion** 135:8

**dispose** 72:8 73:5 75:2 85:15

**disposed** 72:5,16,18 74:21 75:6 81:8 86:15 87:10

**disposing** 75:9

**dispute** 88:8,13

**dissuaded** 103:10

**distancing** 6:11

**distributable** 145:17

**distributed** 145:25

**District** 7:15

**Division** 7:16

**document** 31:14,22 32:2,3 58:17 64:17 67:14,20,24 70:3,18 83:3,10,18 84:14 87:23 100:19 107:15 128:4

**documents** 31:10, 11 67:25 68:7 69:5 70:21,24 71:9,18 83:7,14 124:19 126:22,25 127:3,11 128:10 135:6

**dollars** 101:21

**dondero** 7:9 8:1,3,10 9:1 10:1 11:1,7 12:1 13:1 14:1 15:1 16:1, 15 17:1 18:1 19:1 20:1 21:1 22:1 23:1,9 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1, 3,6 32:1 33:1 34:1,25 35:1 36:1 37:1 38:1 39:1,2 40:1 41:1 42:1 43:1 44:1 45:1,3 46:1 47:1,2 48:1,7 49:1 50:1 51:1,16 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,14 63:1

64:1 65:1 66:1 67:1, 10,15,19 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,9 81:1,18 82:1,12 83:1 84:1,5 85:1,5 86:1 87:1 88:1,13 89:1 90:1,9 91:1 92:1,8 93:1,23 94:1 95:1 96:1 97:1 98:1 99:1 100:1,6 101:1 102:1 103:1 104:1 105:1 106:1 107:1,24 108:1,15 109:1,8 110:1 111:1 112:1,17 113:1,24 114:1 115:1,3,18,23 116:1, 10,11 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1,19 127:1 128:1,3,18 129:1 130:1,4 131:1,24 132:1 133:1 134:1,7 135:1 136:1 137:1 138:1,7 139:1 140:1 141:1 142:1 143:1,11 144:1,3 145:1 146:1 147:1,6,12

**Dondero's** 115:24 127:11

**dormant** 69:25

**Douglas** 114:14 115:17 117:2 137:16

**dozen** 126:24

**drafting** 118:2,6

**drafts** 122:8

**Draper** 114:14 115:8, 13,17 116:17,22 117:2 118:12 137:16 139:4,12,13,22

**draw** 28:22

**drawer** 80:20

**drew** 34:18

**drove** 36:4

**drugs** 12:4

**due** 6:10 99:19

**Dugaboy** 125:2,13, 19,23 126:5,11,15,20 127:7 129:8,10,17 130:9,21 132:14,24 133:9,24 134:17,25 135:10,13,17,24

**duly** 8:4

**Dustin** 59:2,8,14,15

**E**

**e-mail** 39:5,8,23 40:3,4,22 41:2,4,11, 19,20,24 42:5,18,23 43:6,23 45:6,12 48:25 50:4 51:9,17 52:2 53:9,11 58:17 60:21 61:10,15 69:8, 11,12,14,16,19,23 85:18 90:14 114:5 115:8 118:25 119:7, 25 120:10 124:8

**e-mails** 40:2 45:8 52:4 64:14 89:9 107:13 117:6

**earlier** 64:3,25 65:19 84:17 99:16 123:21

**early** 71:24

**Eastern** 107:25

**economic** 18:4 19:18 97:3

**effectuate** 53:3,7 55:22 57:13 60:10

**Ellington** 47:4 60:5 65:18,21 66:3,9,22 67:7 74:7 78:3,9,17, 25 79:9,23 83:2,5 111:4 112:8,11 113:8 114:8,17 115:23,24 116:10 117:9 118:2, 18 119:2,8,15 120:10,15,23,25 122:22 123:2,12,14, 19,24 126:24 127:9 132:14 135:22 146:17

**Ellington's** 74:9 122:15 123:6

**Ellis** 9:23 10:2,10,17 67:24 68:10 71:12

**employed** 39:15 66:3,7 68:19 70:11 83:17 128:25 133:8, 20

**employee** 39:15,16 47:4,10 77:4,7,9 107:14,19 120:22 121:3,5,8,11,19 122:4 123:8 137:19 140:7 145:3

**employees** 13:12 25:24 40:18 47:15 68:10 76:14 79:23 89:22 92:25 93:5,10, 15,18 116:25 137:17, 24 140:3,6,12 141:5 142:19 146:3

**employees'** 120:18, 20

**employer** 66:10,13, 23

**encourage** 105:24

**encouraged** 95:19 96:3 145:13

**encouraging** 104:14

**end** 16:12 24:13 54:11 69:10 70:15 91:21 92:5 126:19

**ended** 114:22

**engaged** 117:8 140:7,16

**engaging** 103:8

**enlarge** 90:19

**enter** 9:8

**entered** 13:19 14:10 15:19 111:2 113:14 114:18

**entirety** 58:11

**entities** 20:17 94:22 95:6 99:14,25 103:19 106:18 114:10 119:17 126:6 141:20

**entitled** 115:20 130:24

**entity** 10:11 18:20 20:8 22:7 39:15 65:13 98:22 131:5 136:15,20 141:12 143:12

**entry** 16:6

**equity** 40:15 41:12, 15,17,24

**error** 89:20

**estate** 74:14 101:25

**ethic** 71:10

**events** 16:5

**exact** 21:23 117:11

**EXAMINATION** 8:7

**exchange** 107:13

**execs** 79:2

**execute** 42:5,19,23 61:17 93:2

**executed** 43:20

**executing** 43:10 45:23

**executive** 76:8 133:19

**executives** 34:2 72:25 78:20 104:15 105:17,18

**exhibit** 30:25 31:2,3 34:24,25 35:5 36:15, 24,25 37:13,14 38:24 39:2 44:17 48:22 62:12,14 64:22 67:14,15 80:7,9 81:17,18 84:3,5 85:4, 5 87:20 90:8,9 93:22, 23 94:13 100:5,6,9 112:15,17 115:2,3 134:6,7 138:6,7

**exhibits** 44:10,16

**experience** 88:16

**expertise** 121:8

**explain** 58:20

**explanation** 51:23 57:12

**explicit** 9:10

**expressed** 52:9 60:20 63:8

**extent** 21:7 22:24 31:12 145:23

**external** 37:21

**extort** 102:8

**extra** 61:6

**eyes** 90:18

**F**

**face** 89:20

**faced** 61:18

**facilitation** 102:10

**fact** 38:12 92:21

**facts** 56:11,14 66:18, 21

**factual** 29:20

**failed** 135:22

**fair** 18:20 19:5,9 20:7 33:10 34:19 35:18 40:21 67:5 86:14 98:25 109:10 113:24 145:20

**familiar** 17:19 18:23 22:7 31:21,23 131:4 141:11

**fashion** 26:9

**February** 91:2

**Federal** 6:22

**feel** 61:9

**fees** 101:21,24

**fide** 46:5 89:12

**figure** 49:25 50:22

**file** 109:18

**filed** 94:23 96:20 110:15

**filing** 95:16,18

**financial** 33:24 125:2,13,20 126:12, 21 132:13,23 133:10, 24 135:10,14,17,24 146:16,19

**financials** 126:5

**find** 94:13

**fine** 47:2,13 80:6 129:24

**finished** 19:13 142:24

**firm** 9:23 10:5,10,17 17:19,21 18:23,25 19:4 67:24 71:2 111:20 116:2 124:13 136:8,11,12,14,15, 19,20 137:25 139:7 140:2

**firms** 10:2

**fit** 103:2

**follow** 129:13,22 130:4 131:16,23,25 132:17 133:3,13

**form** 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 24:11 25:7 26:8 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,20 78:5,12 79:11 91:18 92:16 96:15 98:6 99:18 101:2 103:22 106:22 110:2,8

**formal** 102:17

**formally** 48:16 140:16

**forming** 120:7

**forward** 51:2 103:11 108:19 118:18 145:9

**forwarded** 120:10

**forwards** 92:22 115:23

**found** 26:12

**frames** 117:11

**Friday** 90:4 91:15

92:14

**Friday's** 147:6

**front** 91:7

**full** 31:14 69:7 87:25

**fully** 117:8

**functional** 117:9

**functioning** 114:15

**fund** 18:22 19:4,7,18,
21,24 20:6,7,10,15,
21,23 21:2,5,12,17,
20,21 22:3,4,11,15,
18 46:12 103:20
104:12 107:16

**fundamental** 103:9

**funds** 20:11,18,20
21:10 22:21 23:13,15
24:10 29:21 35:21
41:17 49:14 50:12
56:25 58:23 63:5
94:7 98:5,10 100:22
104:23 106:13 107:2
111:24

**future** 101:24

**fuzzy** 90:18

**G**

**garbage** 72:19,22
74:2 76:21 80:16,25
81:11,14 86:15

**Gatekeeper** 39:24
40:5,14

**gatekeeper@
hcmlp.com** 39:18

**Gates** 32:14,17 58:20
94:4,5,14,15 95:7
98:11 100:12,21
106:9,14 111:19
112:5

**gave** 21:25 35:25
42:4,12 58:5 69:8
82:22

**general** 13:7 14:14
18:13,17 19:24 46:14
52:23 65:22 71:3
82:21 95:20

**generally** 18:21
31:23 32:10 33:6
40:15 44:19,23,24
67:19 82:20 92:9
103:17

**gentlemen** 6:7

**girls** 83:23

**give** 24:9 30:21 35:6,
24 41:22 51:23 69:4,
6 75:23 82:18 92:7
101:18 104:25
122:11 126:14
127:17

**giving** 40:22

**Gmail** 69:22,24

**go-between** 60:5
111:7

**good** 6:6 8:10 23:22
24:22 26:10 125:3,
13,19 126:11 127:8,
16 131:5,8,11,13,20
132:5,14,23 133:10
135:10,13,17,24

**gotcha** 31:9

**Gov** 142:12,14,18,22,
24 142:3,7,17
143:11,21 144:4,9,20

**Grant** 97:8

**group** 120:19,22
121:2 123:8 137:19
139:10 140:7,12
141:5

**groups** 120:23,24
121:3,5,9,12,19
137:19

**guess** 65:25 72:12
87:20 111:17

**guided** 108:16

**guiding** 23:5

**guy** 50:21

**guys** 46:16 82:23
108:23 146:23

**H**

**half** 24:5 126:24

**handles** 78:14

**handling** 47:11

**hands** 127:12

**happen** 49:20

**happened** 72:4
87:17 99:9

**happening** 50:2
90:17

**happy** 32:7 46:22
116:12

**Harbourvest** 97:6,
20 98:17 109:24

**hard** 49:22 105:20

**HCLOF** 98:18

**HCMFA** 89:22 92:25
93:5,11,15,19

**HCMLP** 69:11

**head** 63:14 101:18

**hear** 8:11 20:14 48:7
105:9 108:2 109:7
125:14

**heard** 7:5 68:5 136:8
142:21,22

**hearing** 11:13,20
13:20,22,25 147:7

**held** 13:19 39:24
40:23 41:17 53:18

**helped** 142:5 145:15

**helpful** 32:8

**helping** 114:8 139:18

**HFAM** 44:5 54:20

**High-** 39:14

**Highland** 7:12 8:18
9:16 10:7 13:11
18:22 20:21 21:2,5
44:6 47:3,10,14
53:15 65:22 68:21
69:11,19 76:9,12
79:23 102:11 116:25
128:22 140:12 145:7

**Highland's** 76:10

**highlight** 49:23

**historic** 72:10

**historically** 40:6
46:6 65:23 72:9

**history** 137:22

**hitting** 49:12

**hold** 21:4 22:6,17
50:19 88:4 91:19

**Holdco** 94:23 95:7
96:23 97:3,13,18,24
98:11,20,21 99:14
106:14

**holders** 27:5 46:7
50:10

**holding** 22:2 104:6

**hundred** 54:21

**Hunter** 39:8,12 41:23
52:8

**I**

**idea** 32:19,22,23
55:10,14 91:7 114:6
124:23 127:16
141:10 142:10,20

**ideally** 46:20

**identify** 143:14
144:15 146:2

**illegal** 99:8 107:6

**impede** 93:6,11

**implicit** 34:17,20

**Implicitly** 9:9

**implies** 24:22 89:10

**important** 59:19
62:7

**impose** 95:11

**inaccurate** 89:6

**inadvertently** 49:25

**inappropriate** 52:12
61:24,25 63:16 99:9,
21 101:19 102:18
103:10 107:5

**inches** 16:12,13

**included** 40:4 61:14

**including** 47:4
146:20

**Income** 20:21 21:2,5

**incredibly** 63:16

**indemnities** 61:7

**independent** 13:10

**independently** 62:3

**indirect** 18:3 19:17
97:2 136:16 144:19

**indirectly** 55:18
129:5,7 131:7,11
136:21

**individual** 10:3,6,13,
18 56:5 136:12

**individually** 120:25

**individuals** 46:13

**inferred** 26:13

**information** 117:6
136:24 139:3,16,18
140:2,11 145:7
146:16,20

**informed** 37:4 38:11,
13 90:4

**initiate** 103:19
104:11 105:2,13
106:20

**initiating** 100:23

**injunction** 11:10,14,
21 60:3 68:2 84:25
127:25 147:7

**injunctive** 110:16

**input** 54:10

**institutions** 33:24

**instruct** 93:5,10 98:4
106:7,9 125:9,17
127:13 129:11,18
130:18 131:14,21
133:11 139:20
140:18

**instructed** 41:25
44:6 56:23 89:22
92:25 98:11 106:14
127:3

**instructing** 9:4

42:18,22 43:5

**instruction** 41:23
42:4,13 135:23

**instructions** 44:9
49:7,10 68:23 69:4
82:18,21 89:8,15

**instructs** 130:16

**insurance** 61:6

**intend** 11:12,19,20
61:16 108:9

**intended** 45:15

**intent** 50:5,8 51:21
139:6

**intentional** 145:6

**interest** 10:12 18:4
19:18 52:9 88:19
97:22,24 107:8
116:3,9 118:3 119:18
136:16 141:17,21
144:19

**interested** 29:4

**interests** 46:7 50:9
61:5 63:7 89:18
105:23 109:11
110:23 111:11
114:20 116:24 140:4

**interfere** 93:6,11

**interfered** 128:10

**interference** 54:25

**interfering** 128:6

**intermediate** 29:3

**internal** 32:17 65:2,
7,12

**interrupt** 24:2 91:20
127:22 140:24 141:2

**interruption** 41:7

**intervene** 71:12

**intervened** 38:20

**interviewed** 140:15

**invest** 22:22 24:10

**invested** 23:15

**investigated** 36:9

**investment** 20:11,
17,20 24:24 25:22
88:18,20 97:19

**investments** 29:22
142:6

**investors** 50:9,10
52:9,16,20 61:5 63:7
88:19 89:18 101:7
102:9 104:16,17
105:21,23 107:8

**involved** 46:13 71:21
75:8 102:16 104:13
106:4,5 117:10
124:16 140:5 144:11

**involvement** 121:7

**Isaac** 118:5 136:23
146:21

**issue** 107:15 119:24

**issued** 49:11 93:4

**issues** 91:6

---

**J**

**J.P.** 112:12 113:9

**James** 7:9 8:3 14:13

**January** 6:4 7:10
14:18 77:7 91:2

**Jason** 34:5 75:8
78:13 80:12 105:19

**Jason's** 86:22

**Jefferies** 54:4,8,11

**jeopardy** 63:6

**Jerome** 47:10 50:20,
21 51:4

**Jim** 24:24 49:14
67:10 80:5 115:18
117:22 127:2 130:24

**job** 124:18 130:2

**Joe** 40:16,20 52:7
54:10,12 57:18

**John** 8:13 9:20 23:2
35:3 108:7 121:21
125:16 126:17
127:23 129:22 147:5

**joint** 114:15 116:18,
23 117:20 118:3,6,10
119:14 120:15 122:2

**Jones** 8:14

**judge** 91:7,23,25
145:13

**judgment** 52:19

**July** 14:24

**juncture** 45:17 104:2

**justification** 56:14
58:16 60:17

---

**K**

**K&I** 32:14,17 58:20
94:4,5,14,15 95:7
98:11 100:12,21
106:9,14 111:19
112:5

**keeping** 76:10

**Kelly** 83:20,24

**key** 26:6

**kind** 39:23

**Klos** 145:15,17,21

**Klos'** 146:9

**knew** 33:9 35:17
42:13 75:9,10 99:10
125:19 140:5

**knowing** 56:5

**knowledge** 26:19,25
27:12 28:16 36:21
55:20 56:13 64:6
76:22 93:9 98:9
106:12 130:8 132:4

---

**L**

**La** 30:24

**label** 73:10

**ladies** 6:7

**largest** 97:21,23

**lastly** 147:16

**late** 46:18 108:14

**law** 10:5 136:8 140:2

**lawsuit** 110:14

**lawsuits** 63:6

**lawyer** 26:22 67:8
92:4 115:13,25
123:19,25 130:15
136:11,14,19 139:9

**lawyers** 9:4 25:20
68:5 70:25 71:11
114:9 116:23 119:16
136:25

**leadership** 114:8,19
118:22 119:4,9,23
120:2,12 122:17,23

**learn** 54:6 68:4

**learned** 32:2 38:8,20
52:25 91:14 92:13

**learning** 33:15 38:3

**leave** 76:14 98:24
108:15

**led** 16:6

**left** 76:8 80:19 81:3

**legal** 6:8 28:22 29:7,
16 30:21 37:18 92:8
103:24 117:18
139:11

**legally** 104:4

**legwork** 83:24

**length** 55:24

**letter** 9:4 31:17 32:6,
14 33:4,7,9,13,16,17
34:7,13 35:8,13,15,
20 36:4 37:25 38:3,5
85:8 94:3,12,14,15,
18,20 95:6 96:22
98:5,12 99:5 100:11,
15 103:16,19 104:10
106:10,15,18

**letters** 44:24,25
58:22 95:22,25 96:6,
18 103:8

**level** 98:23

**Leventon** 47:5 83:9,
12 118:5 126:25
127:9 132:22 135:22
136:23 138:10,18

**146:21**

**liability** 33:25 44:8
45:13,20,22 46:3,12,
14 61:3,19 105:19

**liar** 86:23

**lift** 26:23

**lights** 50:23

**limited** 70:14

**limits** 106:2

**liquidation** 74:12

**liquidity** 90:23

**list** 113:16 119:14

**listed** 35:22

**listen** 13:22 46:17
91:12 123:11

**litigant** 128:8

**litigation** 103:8
111:3 114:20

**lived** 34:22

**loan** 16:18

**loaning** 17:4

**located** 8:16

**logged** 69:25

**logical** 105:16

**Loiben** 68:13,14,15

**long** 46:23 53:18,20

**longer** 77:4

**looked** 44:11,16
85:18

**lot** 16:3 63:25 99:12

**loud** 44:4 62:24

**LP** 7:13 17:18 18:23

**ludicrous** 76:15

**lunch** 83:23

**Lynn** 112:21,25
113:3 115:18 118:14

---

**M**

**made** 29:22 36:13

55:11 56:3 64:25
73:5 88:14 95:7
101:11 102:2,4,14
126:23 133:23
139:12 142:7 144:8
147:9

**majority** 123:7

**make** 11:19 46:18
55:15 56:15 57:2
59:16 71:14,18 76:17
84:23 91:25 102:20
103:2 115:20 142:2
143:22 144:5 147:4

**makes** 91:8 143:21
144:3,14 145:16

**making** 52:19

**malfunction** 11:2
16:8 57:6 68:24 82:6
96:7 111:20 116:6
136:2 137:8 142:13
143:22

**malicious** 63:17

**man** 26:6

**manage** 16:21 17:8
20:11,17,21 23:13,25
24:9,16 25:17 26:11

**managed** 22:12,22
23:16 38:10

**management** 7:13
18:22 28:7,19 29:12
30:6 93:7,12 101:12,
24 102:24

**Management's** 8:18

**manager** 16:18
20:25 21:6,10,13,15,
25 22:4,16,19 29:21
36:8 46:12 52:14
54:2 100:24 102:7,8
103:20 104:5,6,12,22
105:14 106:21 107:4,
16,20

**manager's** 56:4

**manages** 23:21
39:12

**managing** 24:23

**manifested** 95:22

**manner** 87:10

**marked** 31:4 35:2
39:3 62:15 67:16
80:10 81:19 84:6
85:6 90:10 93:24
100:7 112:18 115:4
134:8 138:8

**market** 102:13

**markets** 90:23

**Matt** 40:13,20 45:17,
19

**matter** 29:20 41:12
59:6 64:18 94:6
132:22

**matters** 36:14 37:13

**Mckenzie** 136:9,25
137:23 138:3,19
139:2,7,25 140:2,10,
11 141:4,8 142:8,18

**means** 89:11

**meant** 49:13

**Media** 7:8

**medication** 12:5

**meeting** 116:18,23
119:14

**meetings** 48:13

**Melissa** 128:17
133:17 134:13,25

**member** 14:13

**members** 144:16

**memorandum**
37:11

**memory** 12:8 113:22

**mentioned** 49:14
64:25 65:18 117:14
128:5

**message** 45:16 62:9
81:23 82:11 126:18

**messages** 70:4
74:20

**microphone** 16:12

**mid** 77:9

**middle** 119:20 120:6

**Mike** 6:15 115:17

**Miller** 6:15

**million** 101:21

**mind** 124:6

**mine** 116:12 130:3

**minimis** 63:19

**minimization** 57:24

**minutes** 46:18,19,24
47:22 108:4,14,23
143:10

**missed** 20:12 43:2

**misunderstood**
51:21

**model** 145:15,16

**moment** 85:2 126:18

**money** 141:9 142:18

**month** 70:16 102:23
103:7

**months** 65:25 66:2
144:23

**morning** 6:6 8:10,16
9:8,12 64:25 113:10

**Morris** 6:25 7:3,5 8:9,
13 11:5,6,16,18,24
13:4 14:7 15:8 16:14,
16,24 17:2,11,13
18:7,9 21:11 23:2,11
24:12 25:2,8 27:18
28:3,10 29:6,9,15,18
30:2,11,14,22,24
31:5 32:11 33:2
34:11,23 35:4,7 36:5,
19 37:7 38:18,24
39:4 41:8,10 42:10,
11 43:8 44:20 46:22,
25 47:13,20,23 48:6,
21,24 49:18 50:15,22
51:2,5,7,14,15 52:13,
24 54:16,17 55:7
56:9,12,19 57:9,16
60:22 62:12,16,18
64:21,23 67:3,13,17
69:3 71:23 73:11
75:16 76:16 77:3
78:7,16 79:15,20
80:7,11 81:16,20,22
82:9 84:3,7 85:3,7,
20,22,24 86:12,13
88:12,21 90:7,11,13

91:11,13,23 92:7,11,
18 93:21 94:2 96:10,
21 98:8 99:22 100:4,
8,10 101:8 104:8
105:6,10,11 106:24
107:22 108:4,11,20
109:6 110:5,10
111:23 112:15,19
114:25 115:5,7,14,20
116:9,16 117:19,23,
24 121:15,16,21,25
122:7,11,13 125:6,
11,15 126:2,9,17
127:15,20,22 128:2,
16 129:13,16,21,25
130:7,15,20 131:3,
16,19,23 132:3,11,
17,20 133:3,6,13,16
134:5,9,12 136:5
137:13,19,20 138:9
139:23 140:23 141:3
142:16,23 143:9,25
144:2 147:3,11,14,20

**motion** 11:2,9,13
15:4,13,23 67:25
94:24 95:8,17 96:19
99:17 111:16,18,19
112:10

**motions** 96:19
111:15 112:3,9,13

**mouth** 16:13

**move** 29:6 30:11
56:9 74:13 80:2
91:11 105:24

**moving** 56:4 104:5
105:22 139:15

**multipage** 37:15

**Multistrat** 146:16,21

**mutual** 117:3,14
118:3,6,10 120:7,16
122:3 137:3,12 139:5

**N**

**nail** 85:13

**named** 128:17

**natural** 146:25

**necessarily** 37:3

**necessity** 32:24

**needed** 114:12,18
132:24

**Nexpoint** 17:18,25
18:4,10,19 19:8 20:3,
10,16 21:16 22:3,7,
10,18 31:18 32:5
33:16 35:9 36:13,22
38:4 65:14 77:13
101:13

**Nexpoint's** 18:13,16

**NHF** 21:21 22:13

**nonfinancial** 29:3

**nonfinancially** 29:3

**noninvestment**
53:25

**nonportfolio** 54:2

**nonsensical** 59:21

**nontrader** 54:2

**normal** 103:11

**Norris** 59:2,8

**Northern** 7:15

**noted** 7:18

**notice** 75:23 80:4
108:7

**notification** 36:12

**notwithstanding**
48:15

**November** 35:10
60:8,24

**NPA** 89:22 92:25
93:5,10,15,18

**number** 75:17 76:9,
11,14 77:25 78:4,6,
10,18 126:10

**numbers** 20:4 79:10,
24

**numerous** 78:20

**nuts** 107:9

**nutty** 90:21 107:10

**O**

**oath** 12:14

**object** 33:12,14 109:23 115:12 126:13

**objected** 96:14 109:20

**objection** 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 23:3 24:11 25:7 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,23 78:5,12 79:11 91:18 92:16 98:6 99:18 101:2 103:22 106:22 110:2,8 117:16 125:4 135:12

**obligation** 16:19 36:7 127:10 128:9,11

**obligations** 17:4 104:18

**obstructed** 127:10

**obtained** 12:18 110:11

**occur** 75:12

**occurred** 124:6

**October** 31:18 77:9 109:15

**offer** 101:12 102:3,5, 15,18,20

**office** 69:9

**officer** 33:22,24 34:3, 4,19 37:12,18 53:14 61:13 95:20 105:18

**offices** 9:11,16 110:20 128:23

**operate** 26:3 88:17

**operating** 56:7 62:3

**opinion** 59:22 61:25

**Opportunities** 22:11

**opportunity** 22:18 102:24

**opposed** 109:17

**opposition** 15:22 16:4

**order** 12:18,22,24 13:6,9,14,19 14:10 15:4,19 26:24 31:14 39:7 48:11,15 49:11 69:5 84:9,18,23 124:9

**orders** 49:12 61:17

**ordinary** 111:18

**organizations** 97:12

**original** 41:20

**outcome** 145:10

**outstanding** 89:19

**overrule** 34:2

**oversee** 68:6

**owned** 38:9,14 114:10

**owner** 30:10 97:3,9

**owners** 20:6 28:14, 15,18,23 29:11 30:5 56:3 63:21,24

**ownership** 10:12 18:4 19:18 74:13 97:21,23 136:16 141:17,21 144:19

**owns** 18:16 129:10 131:13

**P**

**p.m.** 62:20 85:25 87:3 108:24 109:2,3,4 143:3,5,6,7 147:23, 24

**Pachulski** 8:14 101:21

**paid** 71:25 73:4 74:8

**operating** (column 3)

**paragraph** 87:25 88:7,9,14,16 89:2

**part** 23:19 43:2 59:22 69:9 72:5 120:19,23 121:2 137:3,20

**participate** 9:15 11:12 118:2,5 123:2, 18 139:7 144:7

**participated** 123:14

**participating** 123:24

**parties** 6:18 24:14 26:17 28:19 29:11 30:6,16 104:10 106:7 107:14 126:11 137:12 139:17

**partner** 14:14 18:14, 17 19:25

**party** 17:7 24:8,15 29:4 120:15,17 122:4 132:13

**past** 102:23

**pause** 7:4 95:10,11 111:25

**pay** 74:15 79:14 142:17 144:15

**payment** 101:23 142:8 144:8

**payments** 144:5

**Pearson** 40:13,14,17 41:3 43:15 45:18,19, 22

**pending** 6:23

**people** 28:24 42:4 76:12 79:9 105:22 107:11 143:17 145:14

**people's** 117:5

**percent** 54:21

**perfectly** 46:25 80:6

**performance** 88:19

**period** 70:14 76:10

**peripherally** 146:13

**permanent** 110:16

**permission** 9:7 75:21 77:22

**person** 70:10 83:21 135:9 138:19 143:14 145:17

**personal** 33:24 45:20 46:3 55:20 61:3,18 67:8 69:23 75:18 78:10,18 105:19 109:11 110:23 111:11 115:24 128:21 140:4

**personally** 12:21 17:15 38:20 67:11 71:15,17,21 126:23

**petition** 26:19

**phone** 8:25 32:18 60:9,16 69:8 71:24 72:4,6,11 73:3,5,14, 21 74:7,9,10,13,21, 24 75:3,4,6,9,10,17 76:9,11,14,19,20 77:11,12,18,21,25 78:4,6,10,15,18,21 79:10,24 80:15,20 81:10,13 82:24 85:13,15 86:5,15 87:2,10 123:24

**phone's** 81:7

**phones** 72:10,11,24 73:24 77:2 80:2

**picking** 60:8,15

**piece** 119:5,6

**place** 48:10 147:8

**plan** 74:13 109:17 144:24 145:4,6,8,11, 19,21,24 146:4

**planned** 108:9

**play** 83:5,12

**playing** 31:9

**point** 20:12 36:18 63:18 125:24

**points** 13:17 147:4

**policy** 144:9

**portfolio** 16:17 20:25

**permanent** (column 5)

21:5,10,13,15,24 22:4,16,19 29:21 36:8 52:14 100:24 104:22 105:14 107:4, 20

**portion** 45:12

**position** 36:18 40:11 53:19 102:12 103:23 116:12 125:7

**possession** 126:22 127:4

**possibilities** 97:17

**post** 34:5,6,12 105:19 124:7

**post-restructured** 41:16

**pot** 144:24 145:4,6,8, 11,19,21,24 146:4

**potential** 44:7 45:13, 22 46:3,11,14 139:17

**potentially** 72:7

**power** 33:19 105:7

**practice** 6:11

**preferred** 89:14

**preliminary** 11:9,13, 21 68:2 110:16 147:7

**premises** 9:5,8

**prepared** 37:11

**prerequisites** 103:9

**present** 101:23

**president** 18:10,19 19:21 20:6 29:21 104:19

**pressing** 99:25

**prevent** 12:11 49:25 50:5,8

**prevented** 60:8,15 103:7

**prevents** 128:6

**primarily** 39:13 68:13 123:6

**primary** 32:16 97:21

**print** 71:4

**prior** 60:17 94:23
104:7 124:6 142:5

**privilege** 116:11
124:20 140:25

**privileged** 115:19
124:17

**problem** 23:18 43:3

**procedure** 6:22
75:11

**proceed** 7:6 41:9

**proceeding** 7:21
10:8 110:7 126:16

**process** 73:9,23
76:25 100:23 103:19
104:11 105:2,13
106:20 124:15

**produce** 113:21
124:8,24 126:20
132:13 135:23

**produced** 70:22,23
71:8,19 114:4 115:17
124:23 132:24

**producing** 83:6,13
135:13

**production** 70:4,19
83:3,10,18 121:22
122:2 124:12 133:9,
24 135:9,17

**professional** 24:24
25:22 53:25

**prohibition** 101:9

**promise** 47:8

**prompted** 134:22

**prosecution** 111:10

**protect** 101:6

**protocol** 73:9

**provide** 24:16 93:14
102:11 114:19
118:22 119:9 120:12
122:17,23 127:3,11
128:9

**provided** 57:12
93:17 102:23 116:4

**providing** 120:2

**provisions** 26:6

**purpose** 46:8,9,10
50:13 55:5,25 56:7
91:3,9

**pursuant** 26:16
40:22 48:10 116:4

**push** 64:2

**pushed** 95:19

**pushing** 91:4 105:20

**put** 30:25 31:11 34:23
38:24 62:12 64:21
80:7 81:16 84:3 85:3
90:7 92:4 93:21
100:4 103:12 112:15
114:25 117:3 134:5
138:5 144:23 145:5,8

**putting** 63:5 103:10

---

## Q

**question** 19:14
20:13 23:8,18 24:6
27:11 28:12 42:9
46:20 51:13 65:9
74:18 79:19 86:11
88:11 89:5 91:10,12
92:12 94:25 98:2
105:5,9 114:2,24
116:20 121:14
123:11 125:10,18,22
126:3 127:14 129:12,
19 130:17,19,25
131:15,22 132:16
133:2,12 134:3

**questions** 28:13
48:19 58:9 70:23
79:7 84:20 116:13
128:12 130:13 147:4

**quickly** 104:6 139:16

**quote** 45:12 49:12
53:22 134:25

---

## R

**rarely** 60:2,3

**rationale** 50:17
56:15 57:12 58:4,21

**reach** 117:5

**read** 12:21 13:24
14:9 31:13 44:3
49:22 62:23 70:17
84:16 85:11 88:3,7,
10 89:2 99:6 113:11
118:23 128:4

**realizes** 90:22

**reason** 10:16 14:8
63:10 66:18,21 67:4
86:8,25 87:5 90:25
102:22 135:21 137:5

**reasonable** 103:11,
12

**reasons** 52:5 63:3,
11,12 91:6

**recall** 13:18 15:25
16:4 31:25 45:4
58:18,19 65:3 79:13
82:5,11 89:12 90:6
100:14,16,20 107:17,
21 114:4,7 116:21
122:25 123:5,22
124:3,4,7 136:23
146:11,14

**receive** 41:19

**received** 85:11

**recent** 137:22

**recently** 123:22
126:7,8 142:4,6

**recess** 48:2 109:2
143:5

**recipient** 45:15

**recipients** 41:23
42:18,23 43:6

**recollection** 53:19
98:15 113:23 119:15
120:9 123:23 134:24

**record** 6:13 7:18
47:3,25 48:5 50:25
84:24 91:22,25
108:13,25 109:5
129:23 143:4,8
147:25

**recording** 6:19

**recycled** 72:20

**redefined** 65:24

**reduction** 57:24 58:2

**refer** 17:24 19:4,7

**reference** 39:17
44:10 45:11 65:2

**referred** 137:13

**referring** 22:14 25:5
44:13,16 45:2,5 65:5,
15

**refers** 21:17,19 41:15

**reflect** 108:13

**reflected** 58:17

**reflection** 84:23

**refresh** 98:15 113:22
119:14

**refreshed** 124:4

**regard** 137:23

**registered** 24:19
88:17,20

**regulatorily** 99:9

**regulatory** 32:24
33:23 34:7 36:3,6
37:5 61:4 107:7

**reimbursement**
101:20

**reinsurance** 141:15

**reject** 102:2,4,5,15

**rejected** 99:25

**rejection** 102:5,17

**relates** 115:17

**relating** 139:21

**relative** 101:22 145:9

**releases** 101:19

**relief** 110:17

**remedy** 105:16

**remember** 13:17
23:6 60:3 73:17 75:7
84:20 101:14 111:14
112:2,5,6,7,10,11,14
114:21 116:19 119:3,

**recycled** — column continues:

**remembered** 63:14

**remembering** 60:12

**remind** 61:9

**remote** 6:19

**remotely** 6:14,17
31:7

**remove** 103:20
104:11 105:2,14
106:20 107:16

**removed** 110:19

**removing** 100:24
107:19

**repeat** 42:8,25 51:12
76:24 79:18 86:10
105:4 121:13

**replace** 104:5 107:3

**replacement** 72:6

**reported** 54:9

**reporter** 6:15 7:19

**Reporting** 6:9

**reports** 54:7

**represent** 10:11,13
26:9 94:8 116:2
136:12,15,20

**representation**
122:12

**represented** 67:10
95:6

**representing** 103:2
116:23 123:7 137:24
139:11 140:12

**represents** 10:2,6,
17 94:5

**request** 13:20 67:14
70:3,9,14 91:24
132:12 133:23

**requested** 11:3 16:9
57:7 68:25 82:7
95:15 96:8 111:21
116:7 126:6,7 135:25
136:3 137:9 142:14

6,7,12 122:24 134:4
135:4,5,8 138:25
144:12

143:23

**requesting** 47:14

**requests** 64:17
67:24 70:5,8 126:24

**required** 101:20

**reservation** 101:4

**resignation** 109:14

**resigned** 40:11

**respect** 14:3 36:14
37:13 47:6 99:19
114:19

**respond** 135:23

**responded** 43:15,24

**responding** 49:3

**response** 43:13,18
44:3 49:2,8 68:8
118:14 122:15,16
124:9 135:4

**responsibilities**
99:11

**responsibility** 17:8
52:15,18 80:24

**responsible** 104:7

**responsive** 68:7,8
70:5,20 71:8,18,22
82:25 83:6,13 124:17

**rest** 48:18

**restrain** 13:15

**restrained** 84:19

**restraining** 12:18,22
13:14,19 14:10 15:4
84:8

**restrains** 13:6,9

**resume** 107:23,25

**retail** 94:7 104:17

**retain** 76:13

**retained** 141:5

**retainer** 141:9

**retaining** 140:3

**return** 108:3

**returning** 74:3

**reversed** 89:15

**review** 15:2 70:21,24

**reviewing** 83:6,13

**Richey** 6:7

**Rick** 6:7

**rightfully** 63:20

**rights** 28:23 101:4

**rigorously** 95:21
101:6

**risk** 28:24 57:23,24
58:2 63:6

**role** 52:14 65:23
83:5,12 114:15
117:9,10

**room** 6:12,16 8:19,20

**Rothstein** 75:8
78:14 80:12 81:9
85:19 86:4,19 87:6

**Roughly** 12:20

**Rule** 6:21

**rules** 6:22,23

**ruling** 92:2

---

**S**

**sale** 111:25

**sales** 38:13 43:19
93:2

**sanctioning** 26:14

**satisfy** 71:7

**Saturday** 112:21

**Sauter** 65:6,7,12

**schedule** 48:13,16

**scheduled** 48:17

**Schroth** 133:17,23
134:13,16

**scope** 84:25

**Scott** 60:4 65:18 97:8
117:25 132:14
146:17

**screen** 30:25 31:12
48:22

**scroll** 32:7 41:2,18
43:13,23 48:23 53:10
62:16 70:7 81:20
82:2 84:11 87:20
92:19 94:17 100:13,
18 112:24 115:5
118:13,17 134:9,10,
15 138:16,21

**scurrying** 139:15

**search** 68:6 69:5

**searching** 83:6,13

**sec** 37:5 64:4 88:4

**secret** 76:3,6

**securities** 38:9,14
40:23 53:23 54:4
58:3 63:18 90:5,15,
25 91:4,16

**seek** 42:21 43:4

**seeking** 15:16 38:8

**Seery** 14:13,20 15:3,
9,12 24:24 25:15
31:18 35:9 36:14,23
38:8 41:25 42:6,15,
17 45:23 52:10 53:2,
6,22 54:23 55:5,21
56:7,15,25 57:5,6,11,
23 58:5,9,16 59:9,17,
25 60:9,12,16 61:7,
12,23 62:2,9,20
64:13 80:5 90:5
91:16 92:14 101:19
127:2

**Seery's** 25:22 38:15
59:20,22 60:25 61:17
80:3 90:15 135:23

**sees** 54:10

**self-reporting** 64:4

**self-reports** 37:4

**self-serving** 91:5

**sell** 38:8 40:23 41:24
44:6 50:14 51:24
90:5,15,25 91:16
92:15

**selling** 58:3,10 91:4
95:11

**send** 32:19 118:25
134:22 138:18,22,24

**sending** 33:3,6,12
37:24 99:5 103:15

**senior** 72:25 78:20
79:2

**sense** 13:7 91:8
145:16

**sentence** 43:2
88:15,24 89:2,7,10,
20

**serve** 112:12 147:8

**served** 67:23

**serves** 16:7,17

**services** 77:12 116:4
127:7 130:9,21 132:5

**set** 36:14,24 37:13
54:3

**settle** 89:10

**settlement** 65:24
109:21,24

**settling** 89:19

**severity** 6:10

**Sevilla** 112:12 113:9,
19

**share** 30:25

**shared** 77:12 116:4
127:7 130:9,21 132:5
137:3,13 139:5

**shares** 92:15

**sharply** 142:25

**she'd** 71:4

**She'll** 91:25

**sheets** 146:15,20

**shortly** 78:22

**showed** 108:7

**signatory** 104:10
106:8

**signed** 16:3 17:15
84:9

**significant** 63:21,23
146:13

**signing** 15:25

**similar** 45:10

**simply** 91:14 92:12
123:13

**single** 128:13

**sir** 8:17 33:20 35:11
85:9 94:17 126:3
130:11

**sit** 10:15 55:21 66:19
143:17 144:13

**sits** 143:14

**situation** 105:22

**Sky** 41:12,15,24
42:19,23 43:9,10,19
89:24

**so-called** 144:24

**social** 6:11

**sold** 38:14 46:8 50:11
56:6 63:9,17

**sought** 26:23 103:2
110:11 111:25

**sounded** 21:25

**Sowin** 40:16,17 49:3,
6 51:9,17,20 54:12
57:18,22 58:5,8,12
59:9,17 90:4 92:21

**Sowin's** 50:3,4 58:15

**speak** 32:13 42:17
55:16,18,19 74:6
83:2,9,16

**speaking** 59:25
95:23

**specific** 19:10 73:3

**specifically** 30:15
33:5 35:15 85:10
90:6 96:3 100:16
126:20 127:21,24
128:3

**specifics** 79:14

**speculate** 21:8
22:25 29:5 55:4
68:22 98:21 120:4,5
136:7

**speculating** 55:9

**speculation** 55:4

**speed** 99:3

**spent** 123:6 144:22

**spoken** 57:11 60:4 138:2

**stab** 145:8

**stack** 71:4,5

**staff** 25:24 37:19

**stand** 52:5 135:3,19

**standard** 7:11 47:25 73:9 75:11 108:25 109:5 143:4,8 147:24

**standing** 23:22 24:22 26:11

**standpoint** 36:3

**stands** 17:3

**Stang** 8:14

**start** 7:8 39:6

**started** 108:13 110:14

**starts** 119:21

**state** 6:23 47:2 116:11,12

**statement** 46:15 79:8 87:6 122:16 135:20

**statements** 88:9 125:2,13,20 126:12, 21 132:13,23 133:10, 25 135:10,14,18,24

**States** 7:14

**stay** 26:23 103:25

**stayed** 77:8

**stays** 26:20

**steno** 7:18

**stenographer** 11:4 16:10 57:8 69:2 82:8 96:9,12,16 111:22 116:8 136:4 137:10 142:15 143:24

**stenographic** 50:25

**stepped** 50:20

**steps** 42:21 43:4

71:17 105:2 106:19 107:3

**stick** 66:25 124:5

**stipulate** 6:18

**stop** 38:21 43:9,10, 14 53:11 63:20 89:17,23 140:21

**stopped** 40:7 69:14

**stopping** 42:14

**Strand** 14:14

**Strategic** 22:10,18

**strategist** 111:8,9

**strategy** 111:3 142:6

**strike** 29:6 30:11 56:9 91:11,20,25

**string** 39:5 118:25 119:20,21,25 120:6

**struggle** 145:5

**stuck** 126:16

**stuff** 78:14,15 91:8 99:9

**subject** 24:17,18,19 26:20 41:12 101:22 103:25 104:3 105:25 111:6 126:15 130:14 132:22

**submit** 15:21

**submitted** 15:3

**subpoena** 126:21 134:17 135:2,19 147:8,12

**subsequently** 122:22

**subsidiary** 22:2

**substance** 15:11 32:6 44:25 45:10 50:4 96:6

**substances** 44:24

**suffered** 46:6

**sufficient** 52:6

**suggest** 61:16 102:19

**suggested** 112:12

**suggesting** 64:3

**summary** 101:15

**supersede** 56:2 71:13

**supervise** 71:13

**supervisor** 146:10

**support** 15:12 33:6 37:24 99:25 103:15

**supported** 99:4

**supposed** 124:20

**surface** 76:15

**Surgent** 53:5,13 60:24 61:18

**suspense** 126:19

**swear** 6:16 7:19

**swearing** 6:20

**switched** 69:16

**sworn** 8:4

**symbol** 21:21

**system** 54:9

**systems** 47:11 50:21

---

**T**

**takes** 147:7

**taking** 48:10 106:19 107:3

**talk** 16:5 47:3,9,10, 15,19 59:12,14 60:9 62:5 83:25 117:21

**talked** 20:15,16 23:12 60:12 62:6 98:16

**talking** 13:10,11 73:3

**Tara** 68:13 81:13,24 82:5,14,15 83:17,20, 22

**Tara's** 71:10 80:20 81:3,10 83:19 86:6, 19 87:2

**technical** 50:24

**technology** 78:14

**telephone** 8:23 48:14

**telling** 108:18

**temporary** 12:18,22 13:9,14,19 14:10 15:4 84:8

**ten** 46:18,24 47:21 108:4

**ten-minute** 107:23

**term** 117:18

**terminate** 26:24

**terminated** 25:25 26:18 78:21

**termination** 80:3

**terms** 45:10 64:3 101:16

**testified** 8:5 59:4 99:3 137:15

**testify** 11:20 16:20 23:19,21,23,24 24:5, 14 113:19

**testifying** 12:11 26:10

**testimony** 24:21 35:24 47:16 58:6 59:13 76:24 120:13 124:2

**Texas** 7:16

**text** 62:9,19,23 70:4 74:20 80:18 81:23 82:11 126:17 134:11, 19,22

**texts** 107:14

**Thanksgiving** 38:7 60:13 90:24

**theme** 99:8

**thing** 31:8 103:11 104:15 113:10 120:8 140:9

**things** 16:3 24:17 26:21 61:4 64:2 99:12 106:3 128:5

**thinking** 46:23

**Thomas** 53:5 61:2 62:2,4,6

**thought** 15:18 22:14 52:11 54:24 55:24 59:21 62:2,7 78:24 79:2 96:4 121:8

**threw** 73:12,14 76:19,20 77:18

**throw** 72:21 73:5,20 74:2 80:15,24 81:10, 14

**throwing** 73:17

**thrown** 86:15

**thrust** 99:7

**thumb** 71:4

**time** 7:11 8:19 14:9 19:14 31:8,12 32:3,4 35:14,25 38:19 40:10 42:3,12 45:5 47:25 53:20 57:21 59:24 60:4,11,12 62:9 63:18 70:14 73:24 74:11,13,20 77:5,6, 18 82:16 86:5 88:5 90:3,20 94:20 100:20 103:16 107:12 108:3, 8,25 109:5 117:11 123:6,16,25 124:12 128:13 129:20,22 133:8 135:9 139:24 140:15 142:12,24 143:4,8 144:22 147:24

**times** 23:6 123:22 126:4 145:13

**title** 129:3

**titles** 21:4 22:17

**today** 9:21 10:22 12:8,11 31:9 47:16 48:10,14 84:17 127:19

**today's** 7:9 9:16 10:24 11:8

**told** 25:24 34:16 37:8,20 57:4,23 66:12,15,17 74:23 86:19 100:22 120:11 133:23

tomorrow 103:5,13 147:15

top 63:14 101:18 113:7 115:21,22 122:14

topic 107:19 118:10 119:13

touch 16:11

trade 53:23 54:4,7 89:11

trader 40:15

trades 38:21 42:5,14 50:5,8 53:3,7 54:9, 10,24 55:11,15,22 56:16 57:2 58:17,22 60:17 61:18,24 89:9, 11,17,19,23 101:20

trading 49:13 52:8 72:24

transactions 42:19, 24 43:9,10 45:23 52:19 57:13 60:10 111:18

transcend 99:12

transcript 13:24

transfer 102:7,9,24 104:7

transferred 75:18

transition 50:12 56:2 63:8 72:7 74:12

transitioned 78:10

trial 112:22 113:18

TRO 15:13,16,23 16:6 83:25 93:4,15, 18 110:11 111:2 113:13 114:18 125:5 126:15 127:25 128:2

true 19:22 89:21

trust 71:10,11

TSG 6:9

turn 50:22

tweak 55:6

twisted 26:10

typed 122:20

typical 46:5

**U**

UCC 74:19,23 124:25 125:12,19 126:7 136:6

ultimate 28:25

ultimately 141:4

unawareness 52:8

underlying 44:7 51:25

understand 10:21, 24 11:7 12:14 19:15 25:3 27:7 51:13 60:6 70:13 73:24 76:18 87:22 115:14 125:8

understanding 13:5,8 29:8,10,20 30:5,9 34:21 39:22 41:14 58:21 78:19 79:12,13,17,22,25 84:18,24 88:17 92:4 97:18 102:12 137:7 143:20

understood 42:3 70:2 73:8

unfounded 63:17

unhighlight 49:21

United 7:14

unpaid 77:8

untenable 101:15,17

untrue 87:6

unusual 52:12

up-front 101:23

upgraded 73:24

urgency 90:24

**V**

validity 6:19

variety 126:6

vast 123:7

vehicles 16:19 17:9

versus 72:24

video 6:19

video-recorded 7:8

view 102:17

viewed 32:23

vindictive 90:21 91:5

violating 63:4

virtually 21:10

**W**

Wait 7:20

waited 91:2

waived 116:11

wanted 49:19 55:14, 21 56:15 57:2,13 61:21,23 74:24 76:3 90:5 91:16 92:14 101:23 119:15,22 125:12,19

warning 62:25 63:19 64:9

warnings 64:12

Waterhouse 146:8,9

week 69:17 95:5

weeks 25:25 74:16 112:3

withdraw 33:17 34:7 38:4 98:5,11 106:10, 14

withdrawn 15:10 16:24 28:4 34:13 39:20,21 44:14 45:20 52:17 54:16 55:13 66:20 70:23 71:16 72:15 76:19 78:8 80:5 82:14 86:12 101:10 105:10 106:8 129:6 143:25

woman 128:17

word 25:4

words 122:18

work 39:6 71:10 82:6,10,15,23 128:22

work-around 53:2,7, 23 54:22 61:2,12,25

worked 69:7

working 53:22 119:16 120:19 121:2 123:7

works 40:16 54:14, 18,20 61:20 83:20 92:9

world 36:13

worse 90:19

wrapped 101:16

write 60:23 63:2

writes 113:8

writing 44:6 103:8

writings 44:13,15 45:4

written 37:10,17,18 44:9

wrong 99:20

wrote 51:17,25 53:5, 22 64:8 112:21 113:3

**Y**

year 69:18 123:20,21 126:5 142:4 145:18

years 34:22 41:17 53:20 69:25 72:12 73:25 88:16 142:5 144:10,11

**Z**

Ziehl 8:14