D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No. 20-03190** |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

## JAMES DONDERO'S OBJECTION AND RESPONSE TO PLAINTIFF'S MOTION FOR AN ORDER REQUIRING MR. JAMES DONDERO TO SHOW CAUSE

James D. Dondero ("Defendant" or "Dondero"), the defendant in the above-captioned adversary proceeding, hereby files this Objection and Response to *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should not be Held in Civil Contempt for Violating the TRO* [Adv. Dkt. 48]. In support thereof, Defendant respectfully represents as follows:

## **<u>Table of Contents</u>**

I.    Preliminary Statement...................................................................................................2

II.    Argument and Authorities............................................................................................4

    A.  The TRO is not clear and unambiguous. ........................................................5

    B.  Even if the TRO is clear and unambiguous, the vast majority of actions alleged by the Debtor do not violate the TRO....................................................................................10

    C.  Any violation of the TRO was ministerial, the Debtor suffered no harm, and Dondero substantially complied with the order. ......................................................................18

    D.  The Debtor improperly seeks to conduct irrelevant and unauthorized discovery against third parties in connection with the Contempt Motion   ...............................19

    E.  The Debtor improperly seeks damages and to punish Dondero for conduct that could not in good faith violate the TRO and that pre-dated the TRO ..................................20

III.   Admissions/Denials ...................................................................................................21

## Table of Authorities

**Cases**

*Doe v. Bush*, 261 F.3d 1037, 1062 (11th Cir. 2001) ....................................................................11

*Eavenson v. Holtzman*, 775 F.2d 535, 544 (3d Cir. 1985)...............................................................6

*Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007)....................................................5

*Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*,
389 U.S. 64, 76 (1967)....................................................................................................................6

*MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940 F.3d 922, 924 (7th Cir. 2019). ...................5

*Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir.1976).........................................5

*Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 401 (5th Cir. 1987) ..............4

*Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries, Inc.,*
177 F.3d 380, 382 (5th Cir. 1999) .................................................................................................4

*Placid Refining Company v. Terrebonne Fuel and Lube, Inc.,*
108 F.3d 609, 613 (5th Cir. 1997) .................................................................................................4

*Riccard v. Prudential Life Ins. Co.*, 307 F.3d 1277, 1298 (11th Cir. 2002) ..................................4

*Robinson v. Rothwell (In re Robinson)*, 342 Fed. Appx. 235, 2009 U.S. App. LEXIS 19040 (8th
Cir. 2009) .......................................................................................................................................7

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ...............................................................................5

*Travelhost, Inc. v. Blandford,* 68 F.3d 958, 961 (5th Cir. 1995) ...................................................4

*United States Steel Corp. v. United Mine Workers,* 598 F.2d 363, 368 (5th Cir. 1979) ................4

*Williams v. United States*, 402 F.2d 47, 48 (10th Cir. 1967) .........................................................5

**Statutes**

11 U.S.C. § 362 ...............................................................................................................................9

**Rules**

Fed. R. Civ. P. 65.............................................................................................................................5

## I.    **PRELIMINARY STATEMENT**

1.      The Contempt Motion[1] has little to do with a legitimate violation of a court order and resulting damages to the Debtor. The Debtor well knows that the majority of actions complained of in the Contempt Motion do not violate a clear and specific provision of the TRO. Yet, it has brought the motion to further impugn Dondero's reputation before this Court, prevent Dondero and his related entities from being able to exercise and pursue their legal rights and remedies related to this case or their relationship with the Debtor or its business, and to attempt to gain an undue advantage in potential future disputes between the parties.  The evidence will show—contrary to the Debtor's bluster and inuendo at prior hearings—that Dondero substantially complied with the TRO and did not violate any clear and specific provision of the TRO. Accordingly, the Contempt Motion should be denied.

2.      The grounds underlying the Contempt Motion evidence the concern that Dondero expressed to the Court during both the TRO and the Preliminary Injunction hearings that the broad and vague TRO (and later the injunction) does not provide clear notice to Dondero of the acts restrained and allows the Debtor to use the threat of contempt as a weapon to enjoin otherwise lawful conduct.

3.      As can be seen by the Contempt Motion, the Debtor has done just that. Despite not being explicitly restrained by the TRO, the Debtor is seeking to have Dondero found in contempt for a number of actions that cannot reasonably be interpreted to violate the TRO, including (i) Dondero replacing his cell phone and leaving the old phone at Debtor's office; (ii) going into Debtor's empty office space (which Dondero was arguably entitled to do under the shared services

---

[1] As used herein, the term Contempt Motion shall refer to *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should not be Held in Civil Contempt for Violating the TRO* [Adv. Dkt. 48] and the supporting brief [Adv. Dkt. 49], collectively.

agreements) to appear for a deposition noticed by the Debtor; (iii) two letters sent by counsel for third-party entities to Debtor's counsel making certain requests, which requests the Debtor rejected and for which no additional action was taken by Dondero or these third parties after the sending of the letters; and (iv) the filing (and eventual prosecution) of a motion brought by third party entities before the TRO was even entered and which action was explicitly allowed under the TRO. The Contempt Motion does not even attempt to describe how these actions violated the TRO. Nor could it. Under its terms, the TRO simply does not apply to these actions. The Debtor will not be able to satisfy its high burden that these actions violated a clear and specific term of the TRO.

4.     While Dondero admits that there were certain, extremely limited communications made between him and certain of the Debtor's employees, the evidence will show that all or substantially all of the communications made were allowed and Dondero substantially complied with this provision of the TRO. The limited communications exchanged between Dondero and Debtor employees were either allowed pursuant to the Shared Services Agreements, related to the Pot Plan or other settlement discussions, or were otherwise authorized by the Debtor. Even if certain communications could be found as violating the letter of the TRO, there were no communications made that related to, interfered with, or otherwise impeded the Debtor's business, or that caused harm to the Debtor's business.

5.     For these reasons, the Contempt Motion should be denied. The Debtor will not be able to show by clear and convincing evidence that Dondero violated a clear and specific provision of the TRO. To the extent the Court finds that there were any ministerial violations of the TRO, the Court should refrain from holding Dondero in contempt because (i) he substantially complied with the TRO; (ii) any ministerial communications made and not subject to an exception under the TRO did not relate to, interfere with, or otherwise impede the Debtor's business; and (iii) the

Debtor's business suffered no actual damages or harm as a result of such communications or other potential violation of the TRO.

## II. ARGUMENT AND AUTHORITIES

6. Bankruptcy courts in the Fifth Circuit have the authority to conduct civil contempt proceedings. *Placid Refining Company v. Terrebonne Fuel and Lube, Inc.,* 108 F.3d 609, 613 (5th Cir. 1997). The test for contempt in the Fifth Circuit requires the showing that (1) a court order was in effect; (2) the order required certain conduct; and (3) the respondent failed to comply with the order. *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries, Inc.,* 177 F.3d 380, 382 (5th Cir. 1999). In civil contempt, the burden of proof is clear and convincing, as opposed to preponderance of evidence. *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 401 (5th Cir. 1987). Clear and convincing evidence is "that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford,* 68 F.3d 958, 961 (5th Cir. 1995). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Id.*

7. "A party may avoid a contempt finding where it can show that it has substantially complied with the order, or has made every reasonable effort to comply." *United States Steel Corp. v. United Mine Workers,* 598 F.2d 363, 368 (5th Cir. 1979).

8. "[S]anctions for civil contempt are meant to be wholly remedial and serve to benefit the party who has suffered injury or loss at the hands of the contemnor." *Petroleos Mexicanos,* 826 F.2d at 399. "Compensatory damages awarded as a sanction for violation of a court order are to

"[reimburse] the injured party for the losses and expenses incurred because of his adversary's noncompliance." *Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir.1976).

### A.     The TRO is not clear and unambiguous.

9.     A finding of civil contempt must be supported by clear and convincing evidence that "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007); *Riccard v. Prudential Life Ins. Co.*, 307 F.3d 1277, 1298 (11th Cir. 2002).

10.     Injunctions and Temporary Restraining Orders are required to be definite and specific to be enforceable. Rule 65(d) of the Federal Rules of Civil Procedure provides that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." The specificity requirement "ensures that a party who is restrained by a preliminary injunction knows clearly what conduct is being restrained and why." *MillerCoors LLC v. Anheuser-Busch Cos., LLC*, 940 F.3d 922, 924 (7th Cir. 2019).

11.     The specificity provisions of Rule 65(d) are not mere technical requirements. "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). Accordingly, an injunction "cannot be so general as to leave the party open to the hazard of conducting business in the mistaken belief that it is not prohibited by the injunction and thus make him vulnerable to prosecution for contempt." *Williams v. United States*, 402 F.2d 47, 48 (10th Cir. 1967).

12.     As the Supreme Court has stated,

The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

13.     Two principles must be established to show a civil violation of a court order. "The first of these is that it must be proved that the alleged contemnor had knowledge of the order which he is said to have violated. The corollary of this proposition is that the order which is said to have been violated must be specific and definite."[2]

14.     As to the latter issue, "[a]n order may be so vague or indefinite that, even though the alleged contemnor is chargeable with knowledge of such order, he cannot be punished for doing what he did in view of lack of certainty as to what it prohibited or directed." *Id.* In addition, it is a "long-standing, salutary rule in contempt cases [] that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Id.*

15.     As described in detail below, several provisions of the TRO (and later the Preliminary Injunction) are too broad, vague, nonspecific, and ambiguous as to be enforceable. Given the lack of specificity and ambiguous nature of the order, the Court should err on the side of caution, resolve the ambiguities in Dondero's favor, and deny the Contempt Motion

16.     First, the provision of the TRO that prohibits Dondero from "interfering with or otherwise impeding, directly or indirectly, with the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan" is not clear, definite, and specific because it does not list specific acts that are to be restrained. Rather,

---

[2] *Eavenson v. Holtzman*, 775 F.2d 535, 544 (3d Cir. 1985).

it lists a broad, vaguely-worded category of conduct that could be read to apply to any number of unidentified actions related to this bankruptcy case or Debtor's business. Interpreted broadly, this provision could be read to prevent any action of Dondero or his related entities to assert their individual legal rights in this case or to protect their individual business interests. This provision could also be read to restrict any action that is in disagreement with a decision of the Debtor, such as whether claims are properly treated or classified ("treatment of claims"), whether the Debtor's Plan complies with applicable law ("pursuit of the Plan"), whether Dondero can disagree with any sale of assets owned or controlled by the Debtor ("disposition of assets owned or controlled by the Debtor"), and whether Dondero could attempt to pursue his own alternative plan ("alternative to the Plan"). Further, it is not clear how Dondero, as a former employee of the Debtor, can "interfere" with the "Debtor's decisions" given that he has no standing, decision-making authority, or ability to control the Debtor or its independent decisions, rather than simply to disagree with them or assert his own legal positions that may be adverse to the Debtor.

17.     This is similar to a broad and sweeping injunction that broadly attempts to enjoin any "interference" with the administration of the Debtor's estate or the Debtor's business, which courts in other circumstances have held is not specific enough to be enforceable. *See, e.g.*, *Robinson v. Rothwell (In re Robinson)*, 342 Fed. Appx. 235, 2009 U.S. App. LEXIS 19040 (8th Cir. 2009) (reversing contempt finding resulting from provision in order preventing "any actions to interfere in any way with administration of these jointly administered bankruptcies," because bankruptcy court's order was neither sufficiently specific to be enforceable, nor clear and unambiguous).

18.     Here, the restrictions in the TRO are similar in that the TRO contains the broad phrase "interfering with or otherwise impeding, directly or indirectly, the Debtor's business"

which is just as non-specific, unclear and ambiguous as the phrase from the case above. Further, it appears the intent of this provision is at least partially to prevent Dondero from supposedly "interfering" with the bankruptcy case as the Debtor then lists a series of general duties of a debtor in possession as being included within this broad and amorphous category of interference. The "treatment of claims," for example, has nothing to do with how the Debtor's business operates. It instead appears the intent of this provision is also to enjoin Dondero and his related entities (and their attorneys) from exercising their legal rights and asserting legal positions that the Debtor simply disagrees with. Accordingly, these alleged restrictions are likewise non-specific, vague, and ambiguous because no specific actions are identified as being restricted. It remains unclear what actions Dondero can or cannot do related to this bankruptcy case or the Debtor's business.

19.     The ambiguity of the TRO is further evidenced by the fact that the Debtor has asserted that attorneys for the Funds and Advisors[3] may not send letters to the Debtor asserting certain legal positions and making certain requests because such actions "interfere" with the Debtor's business, even if no further action was taken after the letters were sent. While the TRO does not say that counsel for certain of Dondero-related entities are prohibited from sending letters to Debtor's counsel to make requests, the Debtor has asserted that these entities sending such letters caused Dondero to violate the TRO as falling under this broad category of "direct or indirect" interference with Debtor's business.[4] Plainly put, if legal requests made by third parties through their counsel can cause Dondero to violate the TRO, neither Dondero nor his related entities have fair notice of the acts allegedly restrained by the TRO.

20.     By way of example, this is probably why the TRO entered against the Funds and

---

[3] As used herein, "Funds and Advisors" shall mean and refer to Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc.

[4] *See* Debtor's Brief in Support of Motion for Order to Show Cause, Adv. Dkt. 49.

Advisors is more specific as to the acts restrained and includes a restriction on the Funds and Advisors "seeking to terminate the portfolio management agreements and/or servicing agreements between the Debtor and the CLOs." The TRO entered against Dondero, however, contains no such restriction. The sending of letters by these attorneys for third parties does not violate the TRO entered against Dondero.

21.     In addition, while Dondero is bound to respect the automatic stay, the provision of the TRO (and later the injunction) that prevents Dondero from "violating section 362(a) of the Bankruptcy Code" is nonspecific, lacking in detail, and too vague as to be enforceable. There are no specific prohibited actions listed, and it is unclear what actions the Debtor may assert violate the automatic stay, particularly as to sections 362(a)(1)-(5) (preventing actions against the Debtor and property of the Debtor's estate). This lack of specificity is material and significant because the Debtor has apparently taken the position (or may later take the position) in this adversary proceeding that any action taken by Dondero or his related entities that *may* impact the property of non-Debtor subsidiaries may violate the automatic stay, despite asserting elsewhere in this bankruptcy case that the property held by these subsidiaries is not property of the estate or subject to the Bankruptcy Court's jurisdiction or oversight.[56] Therefore, this provision of the TRO does not describe in reasonable detail the acts restrained and, in explicit violation of Rule 65(d), makes reference to an outside source.

22.     In sum, the TRO on its face lacks specificity and is unclear and unambiguous. The

---

[5] *See Debtor's Response to Mr. James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1546], Para. 5 ("[T]he assets of a debtor's non-debtor subsidiaries are *not* property of a debtor's estate." and "transactions occurring at non-Debtor entities . . . were otherwise arguably outside of this Court's jurisdiction and oversight.') (emphasis in original).

[6] *Id.* at para. 10 ("Even though the value of the subsidiary's outstanding shares owned by the debtor may be directly affected by the subsidiary's disputes with third parties, Congress did not give the bankruptcy court exclusive jurisdiction over all controversies that in some way affect the debtor's estate.") (citing *Parkview-Gem, Inc.*, 516 F.2d 807, 809 (8th Cir. 1975)) (internal citations and quotations omitted).

Debtor's actions indicate that it has interpreted the TRO so broadly as to make it impossible for Dondero to know what actions he can or cannot take. The Preliminary Injunction is substantially similar to the TRO and identical in the particular areas of concern presented to the Court here. Given how the Debtor has moved for contempt based on the non-specific, broad, and unclear provisions of the TRO, there is an imminent danger that the Debtor will broadly interpret the terms of the Preliminary Injunction the same way, all without fair notice to Dondero. The Court should not hold Dondero in contempt based on an unclear, broad, and non-specific order that can be so broadly interpreted.

> **B.      Even if the TRO is clear and unambiguous, the vast majority of actions alleged by the Debtor do not violate the TRO.**

23.      Even if the TRO is clear and unambiguous, the vast majority of actions the Debtor alleges violate the TRO do not do so under any fair reading. Further, the Contempt Motion fails to state a plausible claim for relief for nearly all actions it alleges violated the TRO. Accordingly, the Contempt Motion should be denied.

24.      As described in detail below, despite not being explicitly or even implicitly restrained by the TRO, the Debtor is seeking to have Dondero found in contempt for a number of actions that plainly cannot violate the TRO, including (i) Dondero replacing his cell phone and leaving the old phone at Debtor's office; (ii) Dondero going into Debtor's mostly-empty office space (which Dondero was arguably entitled to do under the shared services agreements) to appear for a deposition noticed by the Debtor; (iii) two letters sent by counsel for third-party entities to Debtor's counsel making certain requests, which the Debtor rejected and for which no additional action was taken by Dondero or these third parties after the Debtor denied the requests made in the letters; and (iv) the filing (and eventual prosecution) of a motion brought by third party entities before the TRO was even entered and which action was explicitly allowed under the TRO. The

Contempt Motion does not even attempt to describe how these actions violated the TRO. Nor could it. Under its terms, the TRO simply does not apply to these actions. Accordingly, the Debtor will not be able to satisfy its high evidentiary burden that these actions violated a clear and specific term of the TRO.

25.     To the extent that the Court finds that any of these actions are *consistent* with an alleged violation (rather than violate a clear and specific term under clear and convincing evidence), the Court should resolve any ambiguities and omissions in the TRO for Dondero's benefit. *See Doe v. Bush*, 261 F.3d 1037, 1062 (11th Cir. 2001) (reversing contempt finding when there were two reasonable, competing interpretations of order, stating that ambiguities should be construed in favor of the alleged contemnor).

     **i.**    **Dondero's alleged "trespass" did not violate the TRO because the TRO contained no restriction on his ability to be in the shared office space and the Debtor did not request he vacate the space until December 23, 2020.**

26.     Dondero's alleged "trespass" of the Debtor's office space was not a violation of the TRO. As the Court is aware, the TRO was entered on December 10, 2020. The Debtor did not request that Dondero cease using his office space until nearly two weeks later, on December 23, 2020. Dondero does not understand how this can be a violation of the TRO, especially when his only reason for entering the office space was to ensure attendance at a deposition requested by the Debtor. Similarly, Dondero, as President and a portfolio manager of NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, LP ("HCMFA"), was entitled to share the Debtor's office space under the shared services agreements between the Debtor NexPoint and HCMFA. Nevertheless, and despite his rights under these shared services agreements, he, after receipt of the Debtor's demand letter, did timely vacate the permanent use of his office space and only returned to attend this deposition. Perhaps that was not the wisest decision, but it did not

violate the TRO, and the Debtor suffered no harm as a result.

ii.     **The request letters sent by counsel for the Funds and Advisors did not violate the TRO, and no subsequent actions were taken that could have impacted the Debtor's business.**

27.     The request letters sent by counsel for the Funds and Advisors do not violate a clear and specific provision of the TRO. First, the letters were not sent by Dondero, but by counsel for third parties, the Funds and Advisors, who made an independent decision to send these letters on behalf of their clients. While Dondero is the President of the Advisors, there is no evidence that he is solely in "control" of either the Funds or Advisors, and the evidence shows that the Funds each have an independent board of directors. At any rate, most of this is beside the point because the letters themselves did nothing. They made requests of the Debtor, which the Debtor rejected. Neither the Funds and Advisors, nor Dondero, took any subsequent action on these requests after they were rejected. There is no clear and specific provision of the TRO preventing counsel for the Funds and Advisors from sending request letters related to the CLOs. Even if there were, no subsequent action was taken and the Debtor suffered no harm.

iii.    **Contrary to the Debtor's assertion, Dondero did not prevent the Debtor from executing any trades.**

28.     Contrary to the Debtor's assertion, Dondero did not prevent the Debtor from executing certain securities transactions.

29.     As Mr. Seery has testified during his deposition, no finalized trades were ultimately prevented from occurring.[7] With respect to the trades of December 22, 2020, at that time the Debtor requested that two non-Debtor employees (Matt Pearson and Joe Sowin), both of whom worked for non-Debtor HCMFA, to settle the trades of AVYA and SKY. These trades were not

---

[7] *See* Seery Deposition Transcript dated January 20, 2021, p. 55:13-14 ("I don't think we had an agreed trade that didn't close.").

"interfered with," as alleged by the Debtor. Rather, the potential trade was simply delayed (meaning simply the Debtor did not execute the trade in the market at the exact moment requested) because the non-Debtor employees of HCMFA wanted to first independently investigate whether the trade should occur based on concerns raised by their compliance department. The Advisors' Chief Compliance Officer, Jason Post, testified at the Funds and Advisors Preliminary Injunction hearing that Dondero did not instruct or pressure him or HCMFA employees not to book Seery's proposed trades. Rather, Dondero merely requested that HCMFA look at the trades from a compliance perspective.[8] After review of the proposed trades by compliance, compliance made the independent decision not to have HCMFA book the trades because they had not been run through its pre-trade compliance process. As an independent entity with no apparent written agreement with the Debtor requiring it to settle these trades, HCMFA was well within its rights to temporarily not book the trades to investigate whether they satisfied its compliance process.[9] There was no agreed trade that was prevented from occurring,[10] and the Debtor appears to have ultimately sold some or all of these securities a short time later.

    **iv.**      **The filing and prosecution of the CLO Motion by the Funds and Advisors does not violate the TRO because the Motion was filed before the TRO was entered, the Motion was not filed by Dondero, and the TRO contains a carve out allowing Dondero to "seek judicial relief" with the Court.**

    30.      While it is unclear whether the Debtor is seeking to hold Dondero in contempt for

---

[8] *See* January 26, 2021 Hearing Transcript, p. 95: 13-15 ("My recollection is I encouraged Compliance to look at those trades") and p. 96: 3-4 ("I never gave instructions not to settle the trades that occurred, but that's a different ball of wax.").

[9] Mr. Seery has testified at his deposition that he is not aware of any written contract or agreement (other than potentially shared services) between the Debtor and HCMFA that would require HCMFA to settle these trades. See January 20, 2021 Seery Deposition Transcript, p. 50: 3-8.

[10] *See* January 26, 2021 Hearing Transcript, p. 96: 3-4 ("I never gave instructions not to settle the trades that occurred, but that's a different ball of wax."); Seery Deposition Transcript, p. 55:13-14 ("I don't think we had an agreed trade that didn't close.").

the filing and prosecution by the Funds and Advisors of the CLO Motion,[11] to the extent Debtor purports to do so it did not violate the TRO and, accordingly, the Debtor should not be granted its attorney fees incurred in connection with the motion as it requests in the Contempt Motion.

31. While Dondero understands that the Court did not find the presentation of the CLO Motion to be persuasive, the motion was filed before the TRO was entered and the TRO, even if it applies to the conduct of the Funds and Advisors, provided a carve-out to allow for "seeking judicial relief upon proper notice." The CLO Motion was a request for relief that was made by the Funds and Advisors upon proper notice. Accordingly, while the Court ultimately denied the motion, the filing and prosecution of the motion by the Funds and Advisors cannot be found to violate the TRO.

32. While the Debtor has presented very limited evidence on the management or ownership structure of the Funds and Advisors, it repeatedly asserts that, because Dondero has ownership or control rights in these entities that these entities do not, and cannot, act independently. But the evidence shows that the Funds have independent boards that meet frequently, have independent counsel, and they make independent decision. The Advisors, while owned by Dondero, are not solely controlled by Dondero. Dondero, of course, has influence with these entities, but they are independent companies that act to protect their independent interests.

33. In any event, to the extent that the filing and prosecution of the CLO Motion by the Funds and Advisors can even be attributed to Dondero, those actions cannot be fairly read to violate a clear and specific provision of the TRO because (i) the motion was filed before the TRO was even entered; and (ii) the filing and prosecution of the CLO Motion fall under the carve out of "seeking judicial relief upon proper notice" as explicitly allowed under the TRO.

---

[11] *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1522] (the "CLO Motion").

34. In addition, like with the sending of letters by counsel for the Funds and Advisors, there was no harm to the Debtor's business as a result of the filing of the CLO Motion. Mr. Seery has testified that no finalized trades were blocked or stopped as a result of the letters or the CLO Motion[12] and that no contracts were terminated or breached as a result of either action.[13]

35. Because the filing and prosecution of the CLO Motion did not violate the TRO, the Debtor should not be granted any attorney's fees or expenses incurred relating to the CLO Motion. Further, the Debtor should also not be granted its attorney's fees because the motion was filed by a separate entity, not Dondero, and other potential remedies existed against those entities if the Debtor desired to recover its attorney's fees. The Court should not allow the Debtor to sidestep proper procedures by making Dondero pay the Debtor for attorney fees related to a motion he did not file, which was filed before the TRO was even entered, and which was specifically authorized to be filed under the TRO.

### v. Dondero's replacement of his cell phone did not violate the TRO because the TRO contained no provision preventing the phone's replacement.

36. Dondero understands that the Court is concerned about the cell phone. And the Debtor certainly made it appear as though Dondero replacing his cell phone was some significant, watershed event. But from Dondero's perspective, it was completely reasonable for him to replace his cell phone. Dondero was no longer an employee of the Debtor as of October 9, 2020—about two months before he replaced his phone. It is worth recalling that, at the time Dondero bought his new cell phone and left his old phone at Highland's offices on December 10th, the Debtor was anticipating terminating all or virtually all employees before December 31, 2020. Given that Dondero was no longer an employee of the Debtor at that time, and the fact that the company in

---

[12] *See* Seery Deposition Transcript, p. 55:13-14 ("I don't think we had an agreed trade that didn't close.").

[13] *See id.* at p. 62.

its then-present form would no longer exist within a few short weeks, it was not only reasonable but expected that Dondero would replace his phone. This is probably why a week before the end of the year the Debtor sent its December 23, 2020 letter stating that Dondero's cell phone plan would be terminated as of December 31, 2020 and requesting that Dondero return his phone.

37.     Dondero, to prepare for the unwinding of the Debtor's business, purchased a new phone in early December before the TRO was entered and, in accordance with historic company practice, left his prior phone with IT to be recycled or disposed of on or around December 10th. [14]

38.     At the time Dondero replaced his phone, he had not been sent any preservation notice, litigation hold letter, or any discovery requests in this adversary proceeding or in any other matter related to this bankruptcy case.

39.     But whether Dondero followed proper company procedure in replacing the phone is irrelevant to the Contempt Motion because the TRO contains absolutely no restriction on his ability to replace his phone. And without such a clear and definite restriction, he cannot be held in contempt. *See Waste Management of Wash. v Kattler*, 776 F.3d 336, 343 (5th Cir. 2015) (reversing district court's contempt order for party's failure to turn over iPad where no "definite and specific" court order required the same).

40.     In sum, at the time Dondero bought his new cell phone and worked to replace his phone, (i) the TRO either had not been entered or Dondero did not yet have knowledge about its entry;[15] (ii) Dondero was not under any litigation hold or similar letter (the Debtor sent the preservation request letter nearly two weeks *later* on December 23rd along with the sole discovery requests served against Dondero in this case); and (iii) no discovery was pending against Dondero

---

[14] Dondero also testified at his deposition that his phone may have been provided under Shared Services Agreements.

[15] Deposition Transcript of James Dondero, January 5, 2021, p. 71:24-25 – 72:3.

in this adversary proceeding, the bankruptcy case, or in any other adversary proceeding or contested matter. Further, the only discovery that has been sought in this adversary proceeding predominantly asked for documents and communications starting on the date the TRO was entered (December 10, 2020) onward—meaning the replacement of his phone on or around December 10 did not impact his responses to the Debtor's document requests, which Dondero fully and completed complied with. No party in this adversary proceeding or bankruptcy case has requested that Dondero produce documents or communications from before December 10, 2020, with one limited exception under the document requests served by the Debtor in this proceeding on December 23, 2020.[16]

41.     It is worth reiterating the point that, except with respect to the Clubok communications requested in this adversary on December 23, 2020, no party has actually asked Dondero to produce any text messages from any time period prior to December 10, 2020. On December 23, 2020, about 2 weeks after Dondero replaced his phone, the Debtor by letter instead demanded that Dondero *turn over* the cell phone to the Debtor and preserve all communications on the phone, presumably so the Debtor could have unfettered access to all communications Dondero made, in any nature, business-related or not, which would likely include a great deal of privileged communications with his attorneys.

42.     In fact, it was the Debtor's obligation under the Term Sheet[17] to take "reasonable and proportional" steps to preserve discoverable information, including by "notifying employees

---

[16] The document requests propounded by the Debtor in this adversary proceeding on December 23 asked for documents and communications starting on December 10 with the exception of document requests related to Dondero's communications with Andrew Clubok, which period commenced on November 1, 2020, which were not relevant to the claims in this proceeding. After having the opportunity to review emails and documents exchanged between Dondero and Clubok, including settlement discussions and communications related to the Pot Plan, the Debtor later admitted on the record that its alleged concerns were unfounded.

[17] *See* Term Sheet, Dkt. 354, Exhibit C.

possessing relevant information of their obligation to preserve such data."[18] If the Debtor believed that Dondero might possess relevant information, it was the Debtor's obligation under the Term Sheet to notify Dondero. The Debtor did not do so until December 23, 2020. The Debtor's failure to timely do so should not be imputed to Dondero, when Dondero had held his phone for more than a year after this case was filed and only replaced it when it became clear that the company's monetization plan would proceed and nearly all employees would be imminently terminated.

**C.    Any violation of the TRO was ministerial, the Debtor suffered no harm, and Dondero substantially complied with the order.**

43.    While Dondero concedes that he made certain, extremely limited and inconsequential communications with certain of the Debtor's employees, Dondero believed that those communications were allowed for him to pursue his Pot Plan or were otherwise explicitly allowed as a result of the Shared Services Agreements, pursuant to which certain employees of the Debtor (referred to as the "Shared Employees" in those agreements) also provide certain services to NexPoint and HCMFA, including in the areas of information technology, legal and compliance, accounting, telecom (including cell phones), and administrative and secretarial support. As an employee and/or representative of these two entities, it was standard practice for Dondero to confer with these employees under the Shared Services Agreements related to these services.

44.    And even if there were communications made that could be viewed as violating the TRO, the communications themselves were either ministerial in nature or did not in any way relate to trying to interfere with or other impede the Debtor's business. The Debtor will not be able to show these communications interfered with or impeded the Debtor's business or how they caused harm, financial or otherwise, to the Debtor.

---

[18] *Id.* at p. 44 of 62. ("Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data").

45.     The ministerial nature of the communications is evidenced by the communications themselves. One such communication put into evidence by the Debtor was a text message to Isaac Leventon wherein Dondero simply requested the contact information for the Committee's counsel so he could contact them regarding his Pot Plan. Other communications identified by the Debtor are similar in that they do not relate to the Debtor's business or operations or any attempt by Dondero to interfere with the Debtor's business. All or substantially all of the communications made by Dondero to Debtor's employees, which were extremely limited, were made under the Shared Services Agreements, related to the Pot Plan, or were otherwise explicitly authorized by the Debtor or made for settlement purposes.

46.     In this case of communications with Scott Ellington, for example, the evidence will show that the communications between Dondero and Ellington were extremely limited during the applicable period and were made only pursuant to Shared Services or in Ellington's role as "go-between" or "settlement counsel" for Dondero and the Debtor.

47.     For these reasons, although there were certain limited communications made between Dondero and certain of the Debtor's employees, the Court should find that Dondero substantially complied with the TRO because the communications were either subject to an exception under the TRO, related to the Pot Plan, or were otherwise not related to the Debtor's business or any attempt by Dondero to interfere with the Debtor's business. In the event the Court finds that any communications violated the TRO, the sanctions should be limited because the Debtor suffered no harm to its business or operations as a result of these limited communications.

**D.      The Debtor improperly seeks to conduct irrelevant and unauthorized discovery against third parties in connection with the Contempt Motion.**

48.     The Debtor asserts that Dondero violated the TRO by preventing the Debtor from completing its document production related to The Dugaboy Investment Trust and The Get Good

Trust that the Debtor alleges, without support, are hidden on its system. But whether these allegations are true or not is irrelevant to this proceeding because the TRO contained no provision requiring these documents be produced or any provision in any way related to the discovery matters between the Debtor and the Committee. If the Debtor or the Committee believes they are entitled to discovery from Dugaboy or Get Good, they can seek to conduct that discovery. But considering this matter in the context of a contempt proceeding against Dondero individually confuses the issue, wastes the Court's time, and potentially draws the Court into the middle of a discovery dispute between those who aren't even a party to this proceeding. It is also unclear how the Debtor expected or expects Dondero to produce documents on the Debtor's system when he has been prevented from accessing the Debtor's system for quite some time and has not had access to it for months. Further, given that the Committee filed suit against Dugaboy and Get Good in December 2020 and there is now a pending adversary proceeding,[19] it seems that trying to require Dondero (who is not the Trustee of the trusts) to produce these documents may deprive Dugaboy and Get Good of their rights and discovery protections under the Federal and Bankruptcy Rules.[20] The TRO did not contemplate this issue and the Court should not consider it in this context.

49.    Moreover, even if this issue is relevant, the evidence will show that counsel for the Trusts and the Debtor have been engaging in discussions since mid-December and into January 2021 regarding the production of these documents, and the Trusts have been working in good faith with the Debtor to foster the eventual production of these documents.

**E.    The Debtor improperly seeks damages and to punish Dondero for conduct that could not in good faith violate the TRO and that pre-dated the TRO.**

---

[19] *See Official Committee of Unsecured Creditors v. CLO Holdco, Ltd., et al.*, Adv. Proc. No. 20-03195, Amended Complaint at Adv. Dkt. 6.

[20] There are also concerns about production in this context because the Debtor, on January 22, 2021, commenced adversary proceedings against all Dondero-related entities for certain demand notes except for those between the Debtor and Dugaboy and Get Good.

50.     The Court should reject the Debtor's attempt to impose broad damages on Dondero related to actions that could not in good faith be found to violate the TRO. To the extent the Court finds any material violations of the TRO, the damages should be limited to actual damages resulting directly from such actions only, which Dondero believes will be minimal because the Debtor's business suffered no harm. The Debtor is improperly seeking damages resulting from numerous actions and events that have nothing to do with the TRO, pre-dated the TRO, or just are plainly wholly outside the scope of the TRO.

51.     Among these are (i) Dondero's replacement of his cell phone; (ii) Dondero's "trespass" on Debtor's property; (iii) the filing and prosecution of the CLO Motion by the Funds and Advisors; and (iv) the sending of request letters to the Debtor by counsel for the Funds and Advisors. As explained above, none of these actions can be considered violations of the TRO and therefore should not be considered in any damages, compensatory or otherwise, sought by the Debtor, including Debtor's request for attorney's fees and expenses related to the CLO Motion.

### III.     ADMISSIONS/DENIALS[21]

52.     Paragraph 1 of the Contempt Motion asserts a legal conclusion to which no response is required, to the extent a response is required, Dondero denies the allegations.

53.     Dondero admits the allegations in paragraph 2 of the Contempt Motion.

54.     Paragraph 3 of the Contempt Motion asserts a legal conclusion to which no response is required. To the extent a response is required or appropriate, Dondero lacks knowledge upon which to either admit or denial the allegations.

---

[21] Dondero makes these qualified admissions and denials to comply with applicable law and rules, but denies that the allegations in the Contempt Motion, including Sections B, C, and G, and certain of these admissions and denials in response are relevant or admissible in the hearing on the Contempt Motion, particularly as in response to the allegations made in Sections B, C, and G of the Contempt Motion. On February 20, 2021, Dondero filed a motion in limine seeking to exclude irrelevant and prejudicial evidence the Debtor will seek to admit on these matters. Dondero objects to the inclusion of any evidence related to these matters at the Contempt Hearing and reserve all rights.

55.     Paragraphs 4-6 of the Contempt Motion asserts legal conclusions to which no response is required. To the extent a response is required, Dondero denies the allegations.

56.     Dondero denies the allegations in paragraph 7 of the Contempt Motion.

57.     Dondero admits that notice of the Contempt Motion was provided to his counsel as alleged in paragraph 8 of the Contempt Motion.

58.     To the extent necessary, Dondero further responds to the legal assertions and other allegations made in the Debtor's Brief[22] as follows: Dondero admits that on December 10, 2020, the TRO was entered as alleged in paragraph 1 of the Brief. This paragraph is not an exact recitation of the terms of the TRO, and Dondero avers that the terms of the TRO speak for themselves.  To the extent a response is required or appropriate, Dondero denies the allegations because that is not an accurate recitation of the terms of the TRO.

59.     Dondero denies the allegations contained in paragraphs 2-4 of the Brief.

60.     Dondero admits that on December 10, 2020, the TRO was entered as alleged in paragraph 5 of the Brief. This paragraph does not appear to be an exact quotation of the terms of the TRO, and Dondero avers that the terms of the TRO speak for themselves.  Dondero denies the remainder of the allegations contained in paragraph 5 of the Brief.

61.     Dondero denies the allegations contained in the first sentence of paragraph 6 of the Brief. Dondero admits he never reviewed the declaration of Seery. With respect to the remainder of the allegations of paragraph 6, Dondero admits that the bullet points 1, 4, 5, 6 appear to be a generally accurate recitation of Dondero's deposition testimony on January 4. Dondero denies the remainder of the allegations as they are not a complete and accurate portrayal of the facts surrounding Dondero's efforts to review the TRO.

---

[22] *Debtor's Memorandum of Law in Support of Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* [Docket No. 49] (the "Brief").

62.     Dondero denies the allegations contained in paragraph 7 of the Brief.

63.     Dondero lacks knowledge after reasonable inquiry to form a belief as to the allegations in the first and second sentences of paragraph 8 of the Brief, and therefore denies same. Dondero denies the allegations contained in the third sentence of paragraph 8 of the Brief. Dondero admits that during his deposition he could not recall what happened to the phone. Dondero denies the remainder of the allegations of paragraph 8 of the Brief. Dondero has also testified that the phone may have been provided to him for use under the Shared Services Agreements.

64.     Dondero lacks knowledge after reasonable inquiry to form a belief as to the allegations in paragraph 9 of the Brief about the Debtor's demands, and therefore denies same. Dondero denies the remainder of the allegations in paragraph 9 of the Brief.

65.     Dondero admits he has previously communicated by text as alleged in paragraph 10 of the Brief. Dondero denies the remainder of the allegations in this paragraph.

66.     Dondero admits that on or about December 23, 2020, the Debtor demanded that Dondero no longer access the Debtor's office space as alleged in paragraph 11 of the Brief. Dondero denies the remainder of the allegations contained in paragraph 11.

67.     Dondero admits that he was at the Debtor's office on January 5th to attend his deposition, but denies that he was not authorized to access the space and denies that this was a violation of the TRO. Dondero denies the remainder of the allegations in this paragraph.

68.     Dondero admits that he did not seek Debtor's explicit permission to enter the premises as alleged in paragraph 13 of the Brief, but believes no permission was required, because he was only there to attend his deposition and because of the shared services agreements.

69.     Dondero denies the allegations made in the first sentence of paragraph 14 of the Brief, however Dondero admits that he has certain control and/or ownerships rights of certain

funds and financial advisory firms that are not named or identified in this paragraph. Therefore, Dondero lacks knowledge on which to admit or deny the allegations or insinuations made by the Debtor in paragraph 14 of the Brief, and therefore denies same. Dondero denies the remainder of the allegations made in paragraph 14 of the Brief.

70. While Dondero upon information and belief is aware that letters were sent by attorneys for certain funds and financial advisory firms to the Debtor on or around December 22, 23, and 30, 2020, Dondero lacks knowledge after reasonably inquiry sufficient to form a basis to admit or deny the remainder of the allegations of paragraph 15 of the Brief, and therefore denies same. Dondero denies the remainder of any additional allegations made in this paragraph. Dondero denies there were any threats in any letters to the Debtor.

71. Dondero admits that he knew the letters were being sent but denies that he knew the full content of the letters as alleged by the Debtor in paragraph 16 of the Brief. Dondero denies the remainder of the allegations of paragraph 16 of the Brief.

72. In reference to paragraph 17 of the Brief, while Dondero admits that there were certain extremely limited communications made between him and Leventon and Ellington, he believed that those communications were allowed under an exception to the TRO, to pursue his Pot Plan, under the shared services agreements, or with respect to Ellington, due to his role as a "go-between" between him and the Debtor or the Independent Board. Dondero denies the insinuations and allegations made by the Debtor related to the alleged communications in paragraph 17 of the Brief. Dondero denies the remainder of the allegations in paragraph 17.

73. With respect to paragraph 18 of the Brief, Dondero admits he became aware that "several entities" had reportedly been looking for the Dugaboy and Get Good financial documents, but otherwise denies the allegations in paragraph 18 of the Brief. Dondero denies that the

documents of Dugaboy and Get Good are the Debtor's property. Dondero denies the remainder of the allegations of paragraph 18 of the Brief.

74. Paragraphs 19-21 of the Brief contain legal authorities/assertions to which no responses are required. To the extent a response is required or appropriate, Dondero denies the allegations. Dondero denies the allegations contained in paragraph 22 of the Brief.

## CONCLUSION

Defendant respectfully requests that the Court deny the Contempt Motion and grant Defendant such other and further relief to which he may be justly entitled.

Dated: February 21, 2021

Respectfully submitted,

/s/ Bryan C. Assink
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: john.wilson@bondsellis.com
Email: bryan.assink@bondsellis.com

ATTORNEYS FOR DEFENDANT JAMES DONDERO

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on February 21, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Bryan C. Assink
Bryan C. Assink