# EXHIBIT 1

Docket #0046 Date Filed: 1/7/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding |
| vs. | § § | No. 20-3190-sgj11 |
| JAMES D. DONDERO, | § § § | |
| Defendant. | § § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

---



1934054210107000000000002

## DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO EVIDENTIARY HEARING TO BE HELD ON JANUARY 8, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following amended witness and exhibit list with respect to *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Docket No. 2] which the Court has set for hearing at 9:30 a.m. (Central Time) on January 8, 2021 (the "Hearing") in the above-styled adversary proceeding (the "Adversary Proceeding").

A.    **Witnesses:**

        1.    James Dondero

        2.    Scott Ellington

        3.    Isaac Leventon

        4.    Any witness identified by or called by any other party; and

        5.    Any witness necessary for rebuttal.

B.    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| A. | Declaration of Mr. James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order Against Mr. James Dondero [Docket No. 4] | | |
| B. | Letter from NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P to James Seery dated October 16, 2020 [Dondero Deposition Exhibit 1; Docket No. 4-6] | | |
| C. | Letter from NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P to James Seery dated November 24, 2020 [Dondero Deposition Exhibit 2; Docket No. 4-7] | | |
| D. | Email string dated between November 24, 2020 and November 27, 2020 re SKY equity [Dondero Deposition Exhibit 3; Docket No. 4-8] | | |

| Letter | Exhibit | Offered | Admitted |
|:------:|---------|:-------:|:--------:|
| E. | James Dondero text messages dated November 24, 2020 [Dondero Deposition Exhibit 4; Docket No. 4-28] | | |
| F. | Debtor's First Request for the Production of Documents Directed to James Dondero [Dondero Deposition Exhibit 5] | | |
| G. | Text messages between James Dondero and Jason Rothstein (Dondero 000022; Dondero Deposition Exhibit 6] | | |
| H. | Text messages between James Dondero and Tara Loiben (Dondero 000013; Dondero Deposition Exhibit 7] | | |
| I. | Order Resolving James Dondero's Emergency Motion for a Protective Order [Docket No. 38] | | |
| J. | Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero [Dondero Deposition Exhibit 9; Docket No. 10] | | |
| K. | Letter from Pachulski Stang Ziehl & Jones LLP to D. Michael Lynn dated December 23, 2020 [Dondero Deposition Exhibit 10] | | |
| L. | Email string dated December 18, 2020 re Jefferies recap [Dondero Deposition Exhibit 11] | | |
| M. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| N. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| O. | Email string dated December 4, 2020 re Multi Strat summary balance sheet as of October 31, 2020 | | |
| P. | Email string dated December 12, 2020 re possible deal [Dondero Deposition Exhibit 15] | | |
| Q. | Email string dated December 16, 2020 re list for joint meeting [Dondero Deposition Exhibit 16] | | |
| R. | Text messages between James Dondero and Melissa Schroth (Dondero 000014; Dondero Deposition Exhibit 17] | | |
| S. | Text messages between James Dondero and Isaac Leventon (Dondero 000043; Dondero Deposition Exhibit 18] | | |
| T. | Email string dated December 24, 2020 re HarbourVest settlement motion | | |

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| U. | Letter from Bonds Ellis to J. Pomerantz dated December 29, 2020 | | |
| V. | Email string dated between December 7, 2020 and December 8, 2020 re call scheduled by Scott Ellington | | |
| W. | Email string dated December 15, 2020 re The Dugaboy Investment Trust and Get Good Trust Common Interest Agreement | | |
| X. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| Y. | Email string dated December 23, 2020 re Dondero call | | |
| Z. | Any document entered or filed in the Adversary Proceeding, including any exhibits thereto | | |
| AA. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| BB. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| CC. | All exhibits identified by or offered by any other party at the Hearing | | |

Dated: January 7, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § § § § § § § § | |
| Plaintiff, | | Adversary Proceeding No. |
| vs. | | 20-03190-sgj |
| JAMES D. DONDERO, | | |
| Defendant. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**DECLARATION OF MR. JAMES P. SEERY, JR. IN SUPPORT OF THE DEBTOR'S MOTION
FOR A TEMPORARY RESTRAINING ORDER AGAINST MR. JAMES DONDERO**

I, James P. Seery, Jr., pursuant to 28 U.S.C. § 1746(a), declare under penalty of perjury
as follows:

1.      I am a member of the Board of Directors (the "Board") of Strand Advisors, Inc.
("Strand"), the general partner of Highland Capital Management, L.P. (the "Debtor" or
"HCMLP"), and the Debtor's Chief Executive Officer ("CEO") and Chief Restructuring Officer
("CRO").   I submit this Declaration in support of the Debtor's *Motion for a Temporary
Restraining Order and Preliminary Injunction against Mr. James Dondero* (the "Motion"), being
filed concurrently with this declaration.  Unless stated otherwise, this declaration is based on my
personal knowledge, my review of the documents described below, and my communications
with certain of the Debtor's employees, directors, and counsel.

**A.      An Independent Board Is Appointed to Oversee the Debtor's
Affairs; Mr. Dondero's Role Becomes Limited and Subject to the
Board's Oversight; and Mr. Dondero Is Later Forced to Resign**

2.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition
for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of
Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").   On December 4, 2019, the
Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket
No. 186].[2]

3.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for
Approval of Settlement with the Official Committee of Unsecured Creditors Regarding
Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No.

---

[2] All docket numbers refer to the docket maintained by this Court.

281] (the "Settlement Motion"). On January 9, 2019, this Court entered an Order granting the Settlement Motion [Docket No. 339] (the "Settlement Order").

4.      As part of the Settlement Order, this Court also approved a term sheet (the "Term Sheet") [Docket No. 354-1] between the Debtor and the Official Committee of Unsecured Creditors (the "Committee") pursuant to which Mr. John S. Dubel, Mr. Russell Nelms, and I were appointed to the Board (collectively, the "Independent Directors"). A true and correct copy of the Term Sheet is attached as **Exhibit 1**.

5.      As required by the Term Sheet, on January 9, 2020, Mr. James Dondero resigned from his roles as an officer and director of Strand and as the Debtor's President and Chief Executive Officer. True and correct copies of Mr. Dondero's resignation letters dated January 9, 2020, are attached as **Exhibit 2**.

6.      While resigning from those roles, Mr. Dondero remained an unpaid employee of the Debtor and retained his title as portfolio manager for each of the investment vehicles and funds managed by the Debtor. However, pursuant to the Term Sheet, Mr. Dondero's authority was subject to oversight and ultimately termination by the Independent Board:

> Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination.

**Exhibit 1** at 3 of 62.

7.      Although ultimate decision making authority remained with the Board, by resolution passed on January 9, 2020, the Board authorized me to work with the Debtor's traders and Mr. Dondero with respect to certain of the Debtor's assets where Mr. Dondero remained

portfolio manager. A true and correct copy of the Board's January 9, 2020, resolution is attached as **Exhibit 3**.

8.      During the pendency of the Debtor's bankruptcy case, it became apparent that it would be more efficient and lead to better financial results to have a traditional corporate management structure oversee the Debtor's operations and assets. Consequently, after due deliberation, the Board determined that it was in the best interests of the Debtor's estate to appoint me as the Debtor's CEO and CRO. This Court approved my appointment as CEO and CRO on July 16, 2020. [Docket No. 854].

9.      My appointment as CEO and CRO formalized my role and my authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its managed investment vehicles, funds, and subsidiaries, and I routinely carried out such responsibilities, particularly after the seizure by Jefferies, LLC of the Highland Select Equity Fund, L.P. ("Select") prime brokerage account managed by Mr. Dondero as a result of Select's failure to post margin.

10.      On August 12, 2020, the Debtor filed its Plan of Reorganization with this Court [Docket No. 944] (as subsequently amended, the "Plan"). The Plan provides for, among other things, the monetization of the Debtor's assets for the benefit of the Debtor's creditors. Also in August 2020, the Debtor entered into a mediation with certain of its creditors which resulted in, among other things, a settlement with Josh and Jennifer Terry, Acis Capital Management, L.P. ("Acis LP"), and Acis Capital Management GP LLC ("Acis GP" and together with Acis LP, "Acis").

11.      After the Acis settlement was publicly announced, Mr. Dondero voiced his displeasure with not just the terms of the Acis settlement, but that a settlement had been reached

4

at all.  On October 5, 2020, Mr. Dondero objected to the Debtor's motion seeking approval of the Acis settlement, thereby creating an actual conflict with the Board and the Debtor.  [Docket No. 1121].

12.    In addition, the Dugaboy Investment Trust – Mr. Dondero's family trust – continued to press its proof of claim alleging that the Debtor, and by extension the Board and I, had mismanaged Highland Multi Strategy Credit Fund, L.P. ("MSCF") with respect to the sale of the MSCF's assets in May of 2020.  *See, e.g.*, Proof of Claim No. 177; Docket No. 1154.

13.    It was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity while taking positions adverse to the interests of the Debtor's estate.  Thus, on October 2, 2020, I requested that Mr. Dondero resign as a portfolio manager at the Debtor and from any roles that he had at MSCF or he would be removed from the positions in accordance with the Settlement Order.  A true and accurate copy of my October 2, 2020, e-mail to Mr. Dondero is attached as **Exhibit 4**.

14.    After consultation with his counsel and a review of the Settlement Order, Mr. Dondero resigned from his positions with the Debtor.  A true and accurate copy of Mr. Dondero's October 9, 2020, e-mail is attached as **Exhibit 5**.[3]

**B.    Mr. Dondero Interferes with the Debtor's Business and Instructs and Threatens Certain of the Debtor's Employees**

15.    Regrettably, since tendering his resignation, Mr. Dondero has interfered with the Debtor's operations and the management of the assets under its control, and has otherwise acted directly and through entities he controls to improperly exert pressure on certain of the Debtor's employees.

---

[3] Mr. Dondero may still hold certain director positions at some of the Debtor's direct and indirect subsidiaries or managed entities.  The Debtor is in the process of removing Mr. Dondero from those positions where advisable and practicable.

16. The Debtor serves as the servicer, portfolio manager, or equivalent of certain pooled collateralized loan obligation vehicles (collectively, the "CLOs"). The Debtor's sole client in these matters is the CLO issuer, and not any individual shareholder or noteholder of the CLO.

17. NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") are investment advisors directly or indirectly controlled by Mr. Dondero. I understand that the Advisors and certain investment funds advised by the Advisors and/or their affiliates own interests in the CLOs for which the Debtor serves as portfolio manager or servicer.

18. On October 16, 2020, the Advisors wrote to me and, among other things, questioned the Debtor's business judgment and "request[ed] that no CLO assets be sold without prior notice to and prior consent from the Advisors." A true and correct copy of the Advisors's October 16, 2020, letter is attached as **Exhibit 6**. Because the Advisors provided no legal basis for the "request" and I was unaware of any, I did not accede to the Advisors' "request" nor did I otherwise respond to their letter.

19. On November 24, 2020, the Advisors sent another letter where they again questioned the Debtor's business judgment and "re-urge[d] [their] request that no CLO assets be sold without prior notice to and prior consent from the Advisors." A true and correct copy of the Advisors's November 24, 2020, letter is attached as **Exhibit 7**.

20. I am advised that the Debtor has no contractual, legal, or other obligation to provide notice to, or obtain the consent of, the Advisors (or any other holder of interests in the CLOs) before exercising its business judgment to manage and service the CLOs, including in

connection with the sale of the CLOs' assets. Unfortunately, I shortly learned that these "requests" were just a part of Mr. Dondero's attempts to interfere with the Debtor's business.

21.     On November 24, 2020, Mr. Dondero personally intervened to prevent sales of certain CLO assets that he knew I had authorized. Upon learning that the trades I had authorized were being executed, Mr. Dondero sent an e-mail to Mr. Matthew Pearson (with copies to Mr. Hunter Covitz and Mr. Joseph Sowin) in which he said "No…… do not." An hour later, Mr. Pearson cancelled the trades but Mr. Dondero warned Mr. Pearson that "HCMFA and DAF has [sic] instructed Highland in writing not to sell any CLO underlying assets . . . there is potential liability, don't do it again please."

22.     Mr. Dondero's threat had the intended effect as Mr. Sowin (an HCMFA employee, not an employee of the Debtor) responded by saying that "Compliance should never have approved this order then – will coordinate with them Jim [Dondero]. Post: Please block all orders from Hitting the trading desk for the fun[ds] Jim [Dondero] mentioned."

23.     On November 27, 2020, after learning that I had attempted to effectuate the trades, Mr. Dondero continued to interfere with the Debtor's business and engage in threating conduct, this time writing to Thomas Surgent (the Debtor's Chief Compliance Officer) that "I understand Seery is working on a work around to trade these securities anyway. Trades that contradict investor desires and have no business purpose or investment rational. You might want to remind him (and yourself) that the chief compliance officer has personal liability." A true and correct copy of the e-mail string that includes all of the aforementioned communications is attached as **Exhibit 8**.

24.     On December 3, 2020, the Debtor demanded that the Advisors "cease and desist from making or initiating, directly or indirectly, any instructions, requests, or demands to

7

HCMLP regarding the terms, timing, or other aspects of any portfolio transactions of any of the CLOs." A true and correct copy of the Debtor's December 3, 2020, letter to the Advisors' counsel is attached as **Exhibit 9**.

25. The Debtor made the same demand of Mr. Dondero the following day. A true and correct copy of the Debtor's December 4, 2020, letter to Mr. Dondero's counsel is attached as **Exhibit 10**.

**C.** **The Debtor Demands that Mr. Dondero and His Affiliates Satisfy Certain Demand Notes, and Mr. Dondero Issues an Explicit Threat**

26. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), Highland Capital Management Funds Advisors, LP, and Highland Capital Management Services, Inc. (collectively, the "Corporate Obligors") are the makers under a series of promissory notes in favor of the Debtor (collectively, the "Corporate Obligors' Notes").

27. In addition, Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor (collectively, the "Dondero Notes" and together with the Corporate Obligors' Notes, the "Demand Notes").

28. Each of the Demand Notes provides, among other things, that (a) all accrued interest and principal "shall be due and payable upon demand," and that (b) the maker shall pay the holder (*i.e.*, the Debtor) all court costs and costs of collection, including reasonable attorneys' fees and expenses, if, among other things, the Note is "collected through a bankruptcy court." True and correct copies of the Demand Notes are attached as **Exhibits 11 through 23**, respectively.

29. On December 3, 2020, at my instruction, the Debtor's counsel sent letters to representatives of Mr. Dondero and each of the Corporate Obligors demanding payment of all unpaid principal and accrued interest due under the Demand Notes by December 11, 2020

8

(collectively, the "Demand Letters"). True and correct copies of the Demand Letters are attached as **Exhibits 24 through 27**, respectively. These demands were made to collect funds that will be required to fund the reorganized Debtor and the trust under the Plan that is subject to confirmation before this Court in January 2021.

30. Shortly after the Debtor sent the Demand Letters, Mr. Dondero sent a text message to me that stated only: "Be careful what you do – last warning." A true and correct copy of Mr. Dondero's text message is attached as **Exhibit 28**.

31. Mr. Dondero called me the following day, ostensibly to discuss his so-called "pot plan."[4] I immediately expressed my substantial concern regarding Mr. Dondero's text message and told him that his threat was completely unacceptable and likely unlawful. In response, Mr. Dondero suggested that "the lawyers" would address his threatening message and failed to disavow or apologize for the text, saying only (at the end of the conversation) that he did not mean to threaten any physical harm.

32. Later that day on December 4, 2020, at my instruction, Debtor's counsel sent Mr. Dondero's counsel a letter demanding that Mr. Dondero "cease and desist from (a) communicating directly with any Board member without counsel for the Debtor, (b) making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents, or (c) communicating with any of HCMLP's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero." The

---

[4] It is noteworthy that, in an attempt to present potential alternatives to the creditors, I (and the Board) provided material assistance to Mr. Dondero in his efforts to propose a "pot plan" to the creditors. In fact, after Mr. Dondero provided sparse bullet points for his pot plan, I drafted a full term sheet with the assistance of Debtor's counsel. Thereafter, I spent nearly two hours on a Zoom meeting/call with Mr. Dondero and his counsel (Mr. Dondero joined by phone and not video) reviewing my draft term sheet with his material terms. Mr. Dondero's counsel requested that I – and not them – present the term sheet to the Committee, which I subsequently did. After the presentation, I advised Mr. Dondero and his counsel that I had sent the detailed term sheet to the Committee and that I had walked them through the potential terms. There can be no question that I have been supportive of presenting Mr. Dondero's terms to the Committee.

Debtor specifically put Mr. Dondero on notice that the Debtor intended to file this Motion. A true and correct copy of the Debtor's December 4, 2020, letter to Mr. Dondero's counsel is attached as **Exhibit 29**.

**D.     The Debtor's Request for a Temporary Restraining Order**

33.     Mr. Dondero cannot be permitted to directly (or indirectly through his corporate entities or anyone else acting on his behalf) control, interfere with, or even influence the Debtor's business and operations or threaten or intimidate the Debtor or any of its directors, officers, employees, professionals, or agents.

34.     Based on the foregoing, as a member of the Board and as the Debtor's CEO and CRO, I respectfully request that the Court grant the Motion in its entirety and enter the proposed Order in the form affixed to the Motion.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: December 7, 2020.

<div style="text-align:right">

*/s/ James P. Seery, Jr.*
James P. Seery, Jr.

</div>

10

# EXHIBIT 1

## Highland Capital Management, L.P.

### Preliminary Term Sheet

This term sheet ("_Term Sheet_") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "_Debtor_") and the Official Committee of Unsecured Creditors (the "_Committee_") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "_Chapter 11 Case_"), pending in the Bankruptcy Court for the Northern District of Texas (the "_Bankruptcy Court_"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125]. This Term Sheet shall be subject to approval by the Bankruptcy Court.

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "Debtor"). <br><br> The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "Committee"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "Independent Directors"): James Seery, John Dubel, and Judge Russell Nelms. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement). <br><br> The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

| | source of funding, whether directly or via reimbursement, will be the Debtor. |
|---|---|
| | As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "<u>CEO</u>") should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court. |
| | The Committee shall have regular, direct access to the Independent Directors, <u>provided</u>, <u>however</u> that (1) if the communications include FTI Consulting Inc. ("<u>FTI</u>"), Development Specialists Inc. ("<u>DSI</u>") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as President and CEO of the Debtor, and (4) will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities. Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination. Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("<u>CRO</u>") to the |

| | Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**.<br><br>DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
|---|---|
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor other than Mr. Dondero. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by |

| | the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
|---|---|
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **<u>Exhibit D</u>**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "<u>Reporting Requirements</u>"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **<u>Exhibit D</u>** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |
| **Reservation of Rights** | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date. Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |

<u>**Exhibit A**</u>

**Debtor's Corporate Governance Documents**

# WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR

## OF

## STRAND ADVISORS, INC.

### January 9, 2020

---

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

## I.    AMENDMENT OF BYLAWS

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors, and to add certain provisions respecting director qualifications and the removal of directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved, and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

## II.    ELECTION OF DIRECTORS

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and Russell Nelms to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED**, that James Seery, John Dubel, and Russell Nelms, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER**, that any officer of the Company is authorized to take any such actions as

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

RESOLVED FURTHER, that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

RESOLVED FURTHER, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

RESOLVED FURTHER, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

III.   STIPULATION WITH THE BANKRUPTCY COURT

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

WHEREAS, the Company is the general partner for HCMLP;

WHEREAS, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

WHEREAS, the Company and the Stockholder wish to enter into a stipulation (the "Stipulation") with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such Stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by these resolutions to be re-elected upon the expiration of his or her term; (c) upon the death, disability, or resignation of a member of the Board, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and (i) acceptable to the Stockholder and the Committee or (ii) selected by the remaining members of the Board; and (d) not take any action or exercise the voting power of such shares in any way that is inconsistent with the term sheet agreed to by HCMLP and the Committee and any order of the Texas Court approving such agreement and compromise between HCMLP and the Committee;

WHEREAS, for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

WHEREAS, it is in the intent of the parties that the Stipulation will no longer be effective or bind the Company or the Stockholder following the termination of the Bankruptcy Case.

NOW, THEREFORE, BE IT RESOLVED, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**

_____
James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

DOCS_DE:227001.6 36027/002

## First Amendment to Bylaws of
## Strand Advisors, Inc.

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.** Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.** Article III, Section 5, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 5. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Debtor") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11 and reasonably acceptable to the stockholders; (y) nominated by the stockholders and acceptable to the Committee; or (z) selected by the duly appointed independent directors.

**3.** The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Removal of Directors. Once appointed, the independent directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the independent directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the Company has caused this amendment to be signed this 9th day of January, 2020.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

**INSERT STRAND ADVISORS, INC. LETTERHEAD**

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

Re:     **Strand Advisors, Inc. – Director Agreement**

Dear [_____]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

**1.     APPOINTMENT TO THE BOARD OF DIRECTORS.**

a.     Title, Term and Responsibilities.

i.     Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii.     You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b.     Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c.     Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d.     Information Provided by the Company. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification,

on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

2.  **COMPENSATION AND BENEFITS.**

  a.  <u>Retainer</u>. The Company will pay you a retainer for each month you serve on the Board (the "<u>Retainer</u>") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months.  The parties will re-visit the Retainer after the sixth month.  The Company's obligation to pay the Retainer will cease upon the termination of the Term.

  b.  <u>Expense Reimbursement</u>. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

  c.  <u>Invoices; Payment</u>.

   i.  In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided.  Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

   ii.  You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

  d.  <u>Indemnification; D&O Insurance</u>. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated [____], a copy of which is attached hereto as **Appendix A** (the "<u>Indemnification Agreement</u>"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

  e.  <u>Tax Indemnification</u>. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3.  **PROPRIETARY INFORMATION OBLIGATIONS.**

  a.  <u>Proprietary Information</u>. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

   b.   <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

   c.   <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

## 4.   OUTSIDE ACTIVITIES.

   a.   <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

   b.   <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

   c.   <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

## 5.   TERMINATION OF DIRECTORSHIP.

   a.   <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

   b.   <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

   c.   <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

## 6.   GENERAL PROVISIONS.

   a.   <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

        b.       <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

        c.       <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

        d.       <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**


By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

**ACCEPTED AND AGREED:**


_____
[NAME]
Date: _____

# INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware partnership (the "**Debtor**") (solely as to Section 29 hereunder), and [_____] (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company, on its own behalf and for the benefit of the Debtor, to retain and attract as directors the most capable Persons is in the best interests of the Company and the Debtor and that the Company and the Debtor therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in Section 1(g) below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties (including the Debtor solely as to Section 29 hereunder) agree as follows:

1.  Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(a)  "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

    (b)    "**Claim**" means:

        (i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

        (ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

    (c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

    (d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e)     "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f)     "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)     "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)     "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j)     "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)     "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)     "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)     "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)     "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)     References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.     Indemnification.

(a)     Subject to Section 9 and Section 10 of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)     For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3.     Contribution.

(a)     Whether or not the indemnification provided in Section 2 is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4. <u>Advancement of Expenses</u>. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this <u>Section 4</u>, the final sentence of <u>Section 9(b)</u>, or <u>Section 11(b)</u> in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to <u>Section 9</u>, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5. <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with <u>Section 4</u>, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6. <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with <u>Section 9</u> below.

9.    <u>Determination of Right to Indemnification</u>.

     (a)    <u>Mandatory Indemnification; Indemnification as a Witness</u>.

       (i)    To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with <u>Section 2</u>, and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

       (ii)    To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

     (b)    <u>Standard of Conduct</u>. To the extent that the provisions of <u>Section 9(a)</u> are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

       (i)    if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

       (ii)    if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)    <u>Making the Standard of Conduct Determination</u>. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under <u>Section 9(b)</u> to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under <u>Section 9(b)</u> shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to <u>Section 8</u> (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(d)    <u>Payment of Indemnification</u>. If, in regard to any Losses:

(i)    Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

(ii)    no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)    Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)    <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this Section 9(e) to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this Section 9(e) or Indemnitee gives its initial notice pursuant to the second sentence of this Section 9(e), as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to Section 9(b).

(f)     Presumptions and Defenses.

(i)     Indemnitee's Entitlement to Indemnification. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)     Reliance as a Safe Harbor. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)    Defense to Indemnification and Burden of Proof. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    Exclusions from Indemnification. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in Section 4 above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    Remedies of Indemnitee.

(a)    In the event that (i) a determination is made pursuant to Section 9 that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to Section 4, (iii) no determination of entitlement to indemnification is made pursuant to Section 9 within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant Section 9(d), Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 11(a)</u>. The Company shall not oppose Indemnitee's right to seek any such adjudication.

    (b)    In the event that Indemnitee, pursuant to this <u>Section 11</u>, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

    (c)    In the event that a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this <u>Section 11</u> shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under <u>Section 9</u>.

    (d)    If a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this <u>Section 11</u>, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.    <u>Settlement of Claims</u>. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this <u>Section 12</u>, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.    <u>Duration</u>. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.     Other Indemnitors. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 14.

15.     Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.     Liability Insurance. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.    <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.    <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.    <u>Indemnitee Consent.</u> The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.    <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.     Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.     Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

    (a)     if to Indemnitee, to the address set forth on the signature page hereto.

    (b)     if to the Company, to:

            Strand Advisors, Inc.
            Attention:      Isaac Leventon
            Address:        300 Crescent Court, Suite 700
                            Dallas, Texas 75201
            Email:          ileventon@highlandcapital.com

            Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.     Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.     Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.    Enforcement.

(a)    Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.    Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.    Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29.    Guaranty By Debtor. The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**").  If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee.  Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations.  This guaranty by the Debtor is for the full amount of the Guaranteed Obligations.  The Debtor's obligations under this Agreement are continuing.  Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full.  The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor.  The Debtor's liability under this Section 29 is unconditional.  It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name:
Title:

HIGHLAND CAPITAL MANAGEMENT, LP (solely as to <u>Section 29</u> hereunder)

By: _____
Name:
Title:

INDEMNITEE:

_____

Name:    [_____]
Address: _____
          _____
          _____
Email:

**Exhibit B**

**Amended DSI Retention Letter**

January ___, 2020

Attn:  Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX  75201

      Re:    Development Specialists, Inc. ("DSI")
              Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company").  This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019.  However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
3. Mr. Sharp will fulfill such duties as directed by the Independent Directors and/or CEO, if any, of the Company with respect to the Company's restructuring and bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), including implementation and prosecution of the Chapter 11 Case.
4. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:
    a. assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

Highland Capital Management, LP
December ___, 2019
Page 2

    b.   advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

    c.   attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

    d.   providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

    e.   rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel. The individuals are:

Highland Capital Management, LP
December ___, 2019
Page 3

| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company. The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services. As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice. If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time. In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required. If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice. Notwithstanding anything to the contrary contained herein, the Company

Highland Capital Management, LP
December ___, 2019
Page 4

shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication. DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company. DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law. Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies. Any such indemnity shall survive the expiration or termination by either party of this Agreement. Except as provided

Highland Capital Management, LP
December ___, 2019
Page 5

in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination (not subject to further appeal) by a court of competent jurisdiction to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case. Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's professional staff, neither DSI nor its professionals have any known conflicts with the parties in this case. DSI will separately provide its connections to parties in this case and/or their professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business planning and operations. DSI's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of one year subsequent to the completion and/or termination of this Agreement; provided that the Company shall not be prohibited from (x) making general advertisements for employment not specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited requests for employment.

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of DSI employees, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

Highland Capital Management, LP
December ___, 2019
Page 6


This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of this Agreement and supersedes and is intended to nullify any other agreements, understandings or representations relating to the subject of this Agreement. This Agreement may not be amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance by signing an original copy of this Agreement on the signature lines below, then returning one fully-executed Agreement to DSI's office. The Agreement will become effective upon execution by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.


AGREED AND ACKNOWLEDGED:

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner


_____
By: _____, Independent Director
Date: _____

**Exhibit C**

**Document Production Protocol**

## A. Definitions

    a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

## B. Preservation of ESI - Generally

    a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

## C. Preservation of ESI – Specific Forms

    a. For email, Debtor uses Outlook Email on an Exchange server. Veritas Enterprise Vault is used to archive emails. Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email communications have been preserved and are not at risk of deletion due to normal document retention practices. Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b. The file server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c. The Sharepoint server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago. Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva. Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein.

    f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data. Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h. Bloomberg data is archived for five years. Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

    i.   Files may be saved locally on laptops/work computers used by employees of Debtor.  This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere.  Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees.  Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

### D.  Not Reasonably Accessible Documents

    a.   Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost.  The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

        i.   Deleted, slack, fragmented, or other data only accessible by forensics;

        ii.   Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

        iii.   On-line access data such as temporary internet files, history, cache, cookies, and the like.

    b.   To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

### E.  Collection and Search Methodology

    a.   Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than seven (7) days after the Committee requests ESI from the Debtor.  DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates.  Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs).  Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

    b.   The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

c. A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above. Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

## F. Format of Documents Produced

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

f.  For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g.  For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h.  For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i.  The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

    i.  Production Bates begin
    ii.  Production Bates end
    iii.  Production Bates begin attachment
    iv.  Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j.  Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email

thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k. Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

l. To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G. Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a. No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b. Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c. Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d. Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e. Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the | 2 |

| | | |
|---|---|---|
| | document | |
| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

| | | |
|---|---|---|
| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

## Exhibit D

## Reporting Requirements

## I.   **Definitions**

A.   "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.   "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.   "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.   "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.   "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.   "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.   "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.   "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.     "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.     "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

## II.    Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners

A.     **Covered Entities**: N/A (See entities above).

B.     **Operating Requirements**

    1.    Ordinary Course Transactions do not require Court approval (All Stages).

        a)    Stage 1 and Stage 2:  ordinary course determined by the CRO.

        b)    Stage 3: ordinary course determined by the Debtor.

    2.    Related Entity Transactions

        a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        b)    Stage 3:

            (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

    3.    Third Party Transactions (All Stages)

        a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III. **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A. **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

a) Stage 1 and Stage 2: ordinary course determined by the CRO.

b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) Stage 3:

(1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV. Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A. **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

a) Stage 1 and Stage 2: ordinary course determined by the CRO.

b) Stage 3: ordinary course determined by the Debtor.

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

2. Related Entity Transactions

    a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) <u>Stage 3</u>:

        (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages):

    a) Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**V.    Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.    Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VIII.**     **Additional Reporting Requirements – All Stages (to the extent applicable)**

     A.      DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

     B.      The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.**     **Shared Services**

     A.      The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

     B.      The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.**     **Representations and Warranties**

     A.      The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

     B.      The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

     C.      The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

9

## **Schedule B**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

## **Schedule C**

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

11

# EXHIBIT 2

January 9, 2020

**HAND DELIVERY**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:    Resignation of James Dondero

To Whom It May Concern:

I, James Dondero, hereby give notice of my resignation as, and do resign as, the President and Chief Executive Officer of Highland Capital Management, L.P. (the "HCMLP").

My resignation is effective January 9, 2020.

Please ensure that HCMLP's records and any filings with any state or federal authorities are modified as necessary to reflect my resignation.

Sincerely,

James Dondero

January 9, 2020

**HAND DELIVERY**

Strand Advisors, Inc.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:    Resignation of James Dondero

To Whom It May Concern:

I, James Dondero, hereby give notice of my resignation as, and do resign as: (1) an officer of Strand Advisors, Inc. (the "Company"), in any and all capacities now or formerly held by me, including as president, and (2) a director of the Company, including as Chairman of the Board of Directors.

My resignation is effective January 9, 2020.

Please ensure that the Company's records and any filings with any state or federal authorities are modified as necessary to reflect my resignation.

Sincerely,

James Dondero

# EXHIBIT 3

# Minutes of the Meeting of the
# Independent Directors of Strand Advisors, Ltd.

## January 9, 2020 - January 10, 2020

## I.    Meeting on January 9, 2020

At approximately 3:30 p.m. Central Time, the board of directors (the "Board") of Strand Advisors, Ltd. ("Strand") called their first meeting to order.  Directors present in person were John Dubel, James Seery, Jr., and Russell Nelms.  No directors were present telephonically.

Also in attendance on January 9, 2020, were (i) Jeff Pomerantz, Ira Kharasch, John Morris, and Greg Demo of Pachulski Stang Ziehl & Jones ("Pachulski"), (ii) Melissa Hayward of Hayward & Associates ("Hayward"), (iii) Brad Sharp, Fred Caruso, James Romey, and Jack Donoghue of Development Specialists, Inc. ("DSI"), and (iv) Isaac Leventon and David Klos of Highland Capital Management, L.P. ("HCMLP").

### a.  Introductions and Background

The directors commenced the meeting by introducing themselves and welcoming the guests in attendance at the meeting.  Mr. Leventon, in house counsel at HCMLP, then provided a brief background of Strand's corporate governance.  This presentation included a discussion of James Dondero's resignation as an officer and director of Strand in accordance with the settlement approved by the United States Bankruptcy Court for the Northern District of Texas (the "Court") on January 9, 2020, and the stipulation entered into by and among (i) HCMLP, (ii) the official committee of unsecured creditors in HCMLP's bankruptcy proceeding, (iii) Strand, and (iv) James Dondero, which was filed with the Court on January 9, 2020.  The presentation also included an overview of Strand's current officers.

Mr. Leventon then provided a brief overview of HCMLP, HCMLP's employees and management, including Mr. Dondero's prior roles at HCMLP, and HCMLP's status as a registered investment advisor.  The directors asked Mr. Leventon various questions concerning the current management of both HCMLP and Strand and a discussion occurred concerning how both HCMLP and Strand would be managed going forward.  This discussion also included various questions about the funds and entities managed by HCMLP and how those funds are constituted.

### b.  DSI Presentation to the Board

Following this discussion, DSI began their presentation to the Board.  A copy of DSI's presentation is attached to these minutes as Appendix I.  DSI's presentation included, among other things, a detailed overview of HCMLP's balance sheet, cash flows, assets, notes receivable, and HCMLP's valuation process.  During the course of DSI's presentation, the directors asked questions and engaged in lengthy dialogue with DSI concerning HCMLP's operations.  These conversations also included substantial input from both Mr. Klos and Mr. Leventon of HCMLP and the lawyers from Pachulski and Hayward.

As part of this presentation, the Board and the guests present at the meeting also discussed HCMLP's proprietary trading through its and the Select Equity Fund's prime brokerage accounts with Jefferies, LLC (together, the "Prime Accounts"), and the margin requirements for those accounts. For this discussion, the Board invited Joseph Sowin to join the meeting. Mr. Sowin discussed with the Board and the guests present the various trading issues in the Prime Accounts, the margin calls that had been made to date, and how HCMLP had reacted to those margin calls. This discussion also include a discussion about how the protocols implemented in HCMLP's bankruptcy proceeding affected trading.

During this discussion, the Board adjourned the meeting briefly to hold an executive session. Following their return, Mr. Dubel moved to designate James Seery, Jr., as the Board's representative on issues involving trading in the Prime Accounts and to authorize Mr. Seery to approve any trades made in the Prime Accounts. Judge Nelms seconded, and the Board's resolution designating Mr. Seery as the Board's representative on issues involving trading in the Prime Accounts and authorizing Mr. Seery to approve any trades in the Prime Accounts was passed with unanimous approval.

Following this resolution, Mr. Sowin was excused from the meeting.

### c. DSI Engagement

The Board next discussed the engagement of Mr. Sharp and DSI as HCMLP's chief restructuring officer. The Board reviewed DSI's engagement letter and unanimously approved the signing of the DSI engagement letter and the retention of Mr. Sharp and DSI.

### d. Open Items and Next Steps

After the execution of the DSI engagement letter, the Board and the guests present at the meeting discussed, on a high level, the open items that needed to be addressed by the Board. Following this discussion, the Board voted to adjourn the meeting for the evening and to reconvene on January 10, 2020, to review the balance of the open items.

The meeting adjourned for the evening at approximately 6:30 p.m. Central Time.

### II. Meeting on January 10, 2020

At approximately 7:30 a.m. Central Time, on January 10, 2020, the Board reconvened. Directors present in person were John Dubel, James Seery, Jr., and Russell Nelms. No directors were present telephonically.

Also in attendance on January 10, 2020, were (i) Jeff Pomerantz, Ira Kharasch, and Greg Demo of Pachulski, (ii) Brad Sharp, Fred Caruso, James Romey, and Jack Donoghue of DSI, and (iii) David Klos and Brian Collins of HCMLP.

### a. DSI Presentation (Continued)

After the meeting was called to order, the Board asked DSI to continue their presentation. DSI, the Board, and the guests present at the meeting had a lengthy discussion on HCMLP's cash

flows, liquidity, and operating budget. As part of this discussion, Mr. Klos answered a series of questions posed by the Board and there was a lively discussion among all parties concerning HCMLP's operating cash flows, expenses, and liquidity.

### b. Human Resources Presentation

Following this discussion, the Board asked for a presentation from Brian Collins, HCMLP's human resources director on certain employee issues, including employee compensation and bonuses. As part of this presentation, Mr. Collins responded to numerous questions from the Board, from DSI, and from attorneys from Pachulski. At the conclusion of this discussion, the Board requested additional information on employee bonuses, which Mr. Collins and DSI said they would provide.

Mr. Collins and Mr. Klos were excused from the meeting.

### c. Scheduling of Meetings

The Board next briefly discussed with DSI and the attorneys from Pachulski a few additional open items and asked for separate meetings to be scheduled with the persons having pertinent information on such items.

The Board also scheduled their next meeting for Tuesday, January 14, 2020, and invited representatives from DSI and Pachulski to join that meeting.

Mr. Pomerantz, Mr. Kharasch, and Mr. Demo from Pachulski and DSI were excused from the meeting.

### d. Meeting with Senior Management

The Board then had a closed door session with Scott Ellington, HCMLP's general counsel and other members of HMCLP's senior management.

The meeting adjourned at approximately 12:15 p.m. Central Time.

_____
John S. Dubel

_____
James P. Seery, Jr.

_____
Russell F. Nelms

3

flows, liquidity, and operating budget. As part of this discussion, Mr. Klos answered a series of questions posed by the Board and there was a lively discussion among all parties concerning HCMLP's operating cash flows, expenses, and liquidity.

### b. Human Resources Presentation

Following this discussion, the Board asked for a presentation from Brian Collins, HCMLP's human resources director on certain employee issues, including employee compensation and bonuses. As part of this presentation, Mr. Collins responded to numerous questions from the Board, from DSI, and from attorneys from Pachulski. At the conclusion of this discussion, the Board requested additional information on employee bonuses, which Mr. Collins and DSI said they would provide.

Mr. Collins and Mr. Klos were excused from the meeting.

### c. Scheduling of Meetings

The Board next briefly discussed with DSI and the attorneys from Pachulski a few additional open items and asked for separate meetings to be scheduled with the persons having pertinent information on such items.

The Board also scheduled their next meeting for Tuesday, January 14, 2020, and invited representatives from DSI and Pachulski to join that meeting.

Mr. Pomerantz, Mr. Kharasch, and Mr. Demo from Pachulski and DSI were excused from the meeting.

### d. Meeting with Senior Management

The Board then had a closed door session with Scott Ellington, HCMLP's general counsel and other members of HMCLP's senior management.

The meeting adjourned at approximately 12:15 p.m. Central Time.

_____

John S. Dubel

_____

James P. Seery, Jr.

_____

Russell F. Nelms

flows, liquidity, and operating budget. As part of this discussion, Mr. Klos answered a series of questions posed by the Board and there was a lively discussion among all parties concerning HCMLP's operating cash flows, expenses, and liquidity.

### b. Human Resources Presentation

Following this discussion, the Board asked for a presentation from Brian Collins, HCMLP's human resources director on certain employee issues, including employee compensation and bonuses. As part of this presentation, Mr. Collins responded to numerous questions from the Board, from DSI, and from attorneys from Pachulski. At the conclusion of this discussion, the Board requested additional information on employee bonuses, which Mr. Collins and DSI said they would provide.

Mr. Collins and Mr. Klos were excused from the meeting.

### c. Scheduling of Meetings

The Board next briefly discussed with DSI and the attorneys from Pachulski a few additional open items and asked for separate meetings to be scheduled with the persons having pertinent information on such items.

The Board also scheduled their next meeting for Tuesday, January 14, 2020, and invited representatives from DSI and Pachulski to join that meeting.

Mr. Pomerantz, Mr. Kharasch, and Mr. Demo from Pachulski and DSI were excused from the meeting.

### d. Meeting with Senior Management

The Board then had a closed door session with Scott Ellington, HCMLP's general counsel and other members of HMCLP's senior management.

The meeting adjourned at approximately 12:15 p.m. Central Time.

_____
John S. Dubel

_____
James P. Seery, Jr.

_____
Russell F. Nelms

# EXHIBIT 4

**From:** James Seery [mailto:jpseeryjr@gmail.com]
**Sent:** Friday, October 02, 2020 5:52 PM
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Cc:** John Dubel <jdubel@dubel.com>; Russell Nelms <rfargar@yahoo.com>
**Subject:** HCMLP Roles

Jim:

Further to our discussion on September 24, Michael Lynn has advised the Pachulski firm that you or an entity controlled or affiliated with you will be objecting to the HCMLP settlement with Acis and Josh Terry. In addition, one of your trusts has filed a claim against HCMLP related to the management of Multi-Strat.

In light of these facts, we believe it is time for you to resign your portfolio manager position at HCMLP, any remaining roles at Multi-Strat, and certain other positions at entities managed or controlled by HCMLP. As you stated on our call, I agree that over the last few months the PM role has been in title only with most ultimate authority vested in the Board. Nonetheless, it is untenable for you to have a role at the Debtor or the major funds managed by the Debtor while at the same time taking positions in court contrary to what the Board has determined is in the best interest of the estate.

I appreciate your desire to challenge the Acis agreement and obtain final court determination on its reasonableness. Hopefully when that hearing is complete and there is a determination by the court, we will have an opportunity to consider a larger settlement of the case with you. But until the legal fighting is resolved, the Board believes it is in the best interests of the estate, its employees, and all other interested parties that you not be on both sides of the issues, even if in name only.

Please let me know if it preferable to you to resign or if removal by the board at this time is better. Specifically, we would like you to resign or be removed from the portfolio manager role at HCMLP and all roles at the Multi-Strat/Credit Opportunities entities.

I look forward continuing our discussions to resolve the case. If we are unable to do that, I am confident that together we can engineer a smooth and efficient transition that facilitates value maximization for the estate and all of its stakeholders.


Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

# EXHIBIT 5

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**Date:** October 9, 2020 at 4:43:44 PM EDT
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** John Dubel <jdubel@dubel.com>, Russell Nelms <rfargar@yahoo.com>, "D. Lynn (Judge Lynn)" <michael.lynn@bondsellis.com>
**Subject: Re:  HCMLP Roles**

 Counsel has advised me that according to January 9 order, I must at your request resign from Highland. So Therefore, based on your request below I resign.

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com


On Oct 2, 2020, at 5:52 PM, James Seery <jpseeryjr@gmail.com> wrote:


Jim:

Further to our discussion on September 24, Michael Lynn has advised the Pachulski firm that you or an entity controlled or affiliated with you will be objecting to the HCMLP settlement with Acis and Josh Terry.  In addition, one of your trusts has filed a claim against HCMLP related to the management of Multi-Strat.

In light of these facts, we believe it is time for you to resign your portfolio manager position at HCMLP, any remaining roles at Multi-Strat, and certain other positions at entities managed or controlled by HCMLP.  As you stated on our call, I agree that over the last few months the PM role has been in title only with most ultimate authority vested in the Board.  Nonetheless, it is untenable for you to have a role at the Debtor or the major funds managed by the Debtor while at the same time taking positions in court contrary to what the Board has determined is in the best interest of the estate.

I appreciate your desire to challenge the Acis agreement and obtain final court determination on its reasonableness.  Hopefully when that hearing is complete and there is a determination by the court, we will have an opportunity to consider a larger settlement of the case with you.  But until the legal fighting is resolved, the Board believes it is in the best interests of the estate, its employees, and all other interested parties that you not be on both sides of the issues, even if in name only.

Please let me know if it preferable to you to resign or if removal by the board at this time is better.  Specifically, we would like you to resign or be removed from the portfolio manager role at HCMLP and all roles at the Multi-Strat/Credit Opportunities entities.

I look forward continuing our discussions to resolve the case.  If we are unable to do that, I am confident that together we can engineer a smooth and efficient transition that facilitates value maximization for the estate and all of its stakeholders.


Best.  Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# EXHIBIT 6



October 16, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201

Dear Jim:

We are writing to reiterate the concerns we have expressed about the scope and maintenance of quality of the services currently being provided by Highland Capital Management, L.P. ("HCMLP") to NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") under their respective shared services agreements (together, the "Shared Services Agreements" or "Agreements"). As you know, the Shared Services Agreements obligate HCMLP to provide a variety of investment, administrative, legal, and back-office services to the Advisors. These responsibilities on the part of HCMLP are critical to the Advisors' ability to provide top-notch advisory services to the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they have advisory contracts.

In particular, the refusal by HCMLP to allow its employees to work on certain matters that jointly affect HCMLP and the Advisors has resulted in the Advisors incurring additional third-party costs and expenses to procure services that should rightfully be performed by HCMLP under the Shared Services Agreements. These third-party services, for which the Advisors are already compensating HCMLP under the Agreements, represent supplemental costs and expenses that the Advisors should not be obligated to pay.

Additionally, it is our understanding that all HCMLP employees will be given notice that their employment will be terminated effective as of December 31, 2020. If these employees are terminated, or are informed that they will be terminated and elect to resign, HCMLP will no longer be able to carry out its duties and obligations under the Agreements. We would thus like to request assurances from HCMLP that if elects to terminate its employees, it will work in good faith with the Advisors to put in place an orderly transition plan. Such a plan would provide for an effective transfer of services to the Advisors, seek to maximize employee retention, and permit the Advisors (or their affiliates) to hire any and all HCMLP employees, which would ensure the delivery of uninterrupted services previously provided by HCMLP under the Agreements.

Finally, we understand that HCMLP is contemplating the sale of certain assets held in several CLOs, the interests in which are also owned by the Advisors and/or the Funds advised by

NexPoint, HCMFA and/or their affiliates. The sale of such assets has the potential to negatively affect the valuation of the Funds. Specifically, a rush to sell these assets at fire sale prices could result in both the Funds and HCMLP not realizing their full value. Accordingly, we hereby request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

We feel certain that our mutually shared goals are to minimize disruption and costs, to prevent the dislocation of services to the Advisors and the Funds, and to maximize returns for Funds and accounts advised by NexPoint, HCMFA, HCMLP, or any of their affiliates. We believe that through working cooperatively we can achieve these goals.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

# EXHIBIT 7

# NEXPOINT

November 24, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to follow up on our letter dated October 16, 2020 and to reiterate the concerns we have expressed about the sale of certain assets held in several CLOs, the interests in which are also owned by the NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") and/or the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they and their affiliates have advisory contracts.   As we have previously advised, the sale of such assets has the potential to negatively affect the valuation of the Funds, and a rush to sell these assets at fire-sale prices could result in both the Funds and Highland Capital Management, L.P. ("HCMLP") not realizing their full value.  In addition, with recent CLO quarterly payments being made and potential upside for the remaining securities held by the CLOs, sales of these securities at this time could further negatively impact the valuation.   We have previously requested that no CLO assets be sold without prior notice to and prior consent from the Advisors.  We understand that Charitable DAF HoldCo, Ltd. has made a similar request. Accordingly, we hereby re-urge our request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

cc:     Thomas Surgent (tsurgent@highlandcapital.com)
        John Dubel (jdubel@dubel.com)
        Russell Nelms (rfargar@yahoo.com)

# EXHIBIT 8

**From:** Jim Dondero <JDondero@highlandcapital.com>
**Date:** November 27, 2020 at 2:46:35 AM EST
**To:** Thomas Surgent <TSurgent@highlandcapital.com>
**Subject: Fwd: SKY equity**

  I understand Seery is working on a work around to trade these securities anyway.  Trades that contradict investor desires and have no business purpose or investment rational.
You might want to remind him ( and yourself) that the chief compliance officer has personal liability.

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

Begin forwarded message:

> **From:** Joe Sowin <JSowin@highlandcapital.com>
> **Date:** November 24, 2020 at 3:58:24 PM EST
> **To:** Jim Dondero <JDondero@highlandcapital.com>
> **Cc:** Matt Pearson <MPearson@highlandcapital.com>, Hunter Covitz <HCovitz@highlandcapital.com>, Compliance <Compliance@hcmlp.com>
> **Subject: Re: SKY equity**
>
>  + Conpliance
> We did not know that but Understood going forward.
>
> Compliance should never have approved this order then - will coordinate with them Jim
>
> Post: Please block all orders from Hitting the trading desk for the fungus Jim mentioned.
>
> Happy to discuss if needed.
> Joe
>
> > On Nov 24, 2020, at 2:29 PM, Jim Dondero <JDondero@highlandcapital.com> wrote:
> >
> >  HFAM and DAF has instructed Highland in writing  not to sell any CLO underlying assets..... there is potential liability, don't do it again please
> >
> > James Dondero
> > Highland Capital Management
> > 972-628-4100
> > jdondero@highlandcapital.com
> > www.highlandcapital.com

On Nov 24, 2020, at 3:20 PM, Matt Pearson
<MPearson@highlandcapital.com> wrote:


I've cxl'd both SKY and AVYA sales – only completed a small
amount of each

SKY 4.5k @ $32.05
AVYA 2,269 @ $17.81

---

**From:** Jim Dondero
**Sent:** Tuesday, November 24, 2020 2:19 PM
**To:** Matt Pearson <MPearson@HighlandCapital.com>
**Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>;
Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin
<JSowin@HighlandCapital.com>
**Subject:** Re: SKY equity

No...... do not

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com


> On Nov 24, 2020, at 2:20 PM, Matt Pearson
> <MPearson@highlandcapital.com> wrote:
>
>
> ok
>
> ---
>
> **From:** Hunter Covitz
> **Sent:** Tuesday, November 24, 2020 12:40 PM
> **To:** Gatekeeper <Gatekeeper@hcmlp.com>
> **Cc:** Matt Pearson
> <MPearson@HighlandCapital.com>; Joe Sowin
> <JSowin@HighlandCapital.com>; Hunter
> Covitz <HCovitz@HighlandCapital.com>
> **Subject:** SKY equity
>
> Please sell ~half of the positons in Gleneagles
> and Grayson in the current 32+ context.
>
> Please sell ~48,500 shares in each CLO, ~97k
> shares total.
>
>
> **HUNTER COVITZ**  |  HEAD OF STRUCTURED
> PRODUCTS

2

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
 O: 972.628.4124   |   C: 214.394.5510
hcovitz@highlandcapital.com   |   www.highlandcapital.com

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# EXHIBIT 9



**PACHULSKI
STANG
ZIEHL
JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

**LOS ANGELES**
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory V. Demo

December 3, 2020

212-561- 7730
gdemo@pszjlaw.com

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111

Dear James:

Reference is made to the following recent communications (collectively, the "***Communications***"): (i) the letter, dated October 16, 2020, from Dustin Norris of NexPoint Advisors, L.P. ("***NexPoint***") to James Seery of Highland Capital Management, L.P. ("***HCMLP***"), (ii) the letter, dated November 24, 2020, from Dustin Norris of NexPoint to James Seery of HCMLP, and (iii) the email, dated November 25, 2020, at 6:48pm, from you to me.

We understand that each of NexPoint and Highland Capital Management Fund Advisors, L.P. ("***HCMFA***," and together with NexPoint, the "***Advisors***") is an investment adviser directly or indirectly controlled by James Dondero, and that each such Advisor is no longer an affiliate of HCMLP.

According to the Communications, the Advisors and certain investment funds advised by the Advisors and/or their affiliates own interests in pooled collateralized loan obligation vehicles ("***CLOs***") for which HCMLP serves as portfolio manager or servicer.

In each of the Communications, NexPoint or its counsel "requests" that HCMLP refrain from selling any CLO assets without notice and prior consent from the Advisors. This request is based on the Advisors' apparent belief that the sale of assets by the CLOs has the potential to negatively affect the valuation of the funds that hold their interests by causing the CLOs not to realize "their full value".



December 3, 2020
Page 2

The Advisors do not have the right, either under the documents governing the CLOs or applicable law, to instruct HCMLP with respect to specific portfolio management decisions. As portfolio manager or servicer of the CLOs, HCMLP has contractual and fiduciary duties to each CLO as a whole, and not to any investor in any CLO. If you disagree, please provide the authority that supports your position.

Specifically, please note the following:

- HCMLP in its role as servicer, portfolio manager, or equivalent of each CLO has full discretion to make decisions to purchase and sell assets on behalf of the CLO subject only to the terms of its service agreement, indenture, and the trustees/directors of each respective CLO.

- The sole client of HCMLP is the CLO issuer, and not any individual shareholder or noteholder of the CLO.

- All decisions made by HCMLP in its capacity as servicer, portfolio manager, or equivalent of each CLO, including without limitation the timing and execution of any sale transaction, are made by HCMLP taking into account such factors as HCMLP determines to be appropriate and are not subject to the requests or instructions of any investor or other party.

- There is no legal basis pursuant to which the holders of preferred shares or notes in the CLOs may influence the investment decisions of HCMLP or the CLO.

For these reasons, NexPoint, HCMFA, and their affiliates, including Mr. Dondero, are hereby advised to cease and desist from making or initiating, directly or indirectly, any instructions, requests, or demands to HCMLP regarding the terms, timing, or other aspects of any portfolio transactions of any of the CLOs.

HCMLP reserves and does not waive all of its rights at law and in equity.



December 3, 2020
Page 3

Please direct all further questions to me.

Sincerely,

Gregory V. Demo

cc: HCMLP Board of Directors (*by e-mail*)
   Jeffrey Pomerantz (*by e-mail*)
   John Morris (*by e-mail*)

# EXHIBIT 10



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

Jeffrey N. Pomerantz

December 4, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones,
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P O BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

WEB www.pszjlaw.com

Dear Judge Lynn:

As you know, my firm represents Highland Capital Management, L.P. ("**HCMLP**"). HCMLP filed bankruptcy on October 16, 2019, and it is currently under the protection of the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj11.

As you also know, HCMLP is currently managed by the board of independent directors (the "**Board**") at Strand Advisors, Inc., HCMLP's general partner, and James P. Seery, Jr., HCMLP's chief executive officer and chief restructuring officer. Your client, James Dondero, resigned from HCMLP at the direction of the Board in October 2020 and has no authority or oversight over HCMLP or the decisions that HCMLP makes with respect to assets under its management.

On November 24, 2020, Mr. Seery, in his capacity as the chief executive officer of HCMLP, directed Hunter Covitz, an HCMLP employee, to cause the sale of certain assets held by certain pooled collateralized loan obligation vehicles ("**CLOs**") for which HCMLP serves as portfolio manager or servicer. Before such sale could be executed, your client, Mr. Dondero, emailed Mr. Covitz, among others, and directed them to halt the sale and to disobey Mr. Seery's direct order to sell. At your client's direction, Mr. Covitz and others



stopped the sale and refused to comply with Mr. Seery's direction. Copies of the relevant correspondence are attached hereto as Appendix A. HCMLP also received the following letters: (i) the letter, dated October 16, 2020, from Dustin Norris of NexPoint Advisors, L.P. ("**NexPoint**") to James Seery of HCMLP and (ii) the letter, dated November 24, 2020, from Dustin Norris of NexPoint to James Seery of HCMLP. Copies of these letters are attached as Appendix B. These emails and letters are collectively referred to as the "**Communications**".

We understand that each of NexPoint and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**," and together with NexPoint, the "**Advisors**") is an investment adviser directly or indirectly controlled by James Dondero, and that each such Advisor is no longer an affiliate of HCMLP.

According to the Communications, the Advisors and certain investment funds advised by the Advisors and/or their affiliates own interests in certain of the CLOs.

In addition to Mr. Dondero's correspondence nullifying, impeding, and other contradicting Mr. Seery's order, in certain of the Communications, NexPoint or its counsel "requests" that HCMLP refrain from selling any CLO assets without notice and prior consent from the Advisors. This request is based on the Advisors' apparent belief that the sale of assets by the CLOs has the potential to negatively affect the valuation of the funds that hold their interests by causing the CLOs not to realize "their full value".

Neither Mr. Dondero nor the Advisors has the right, either under the documents governing the CLOs or applicable law, to instruct HCMLP with respect to specific portfolio management decisions. As portfolio manager or servicer of the CLOs, HCMLP has contractual and fiduciary duties to each CLO as a whole, and not to any investor in any CLO. If you disagree, please provide the authority that supports your position.

Specifically, please note the following:

- HCMLP in its role as servicer, portfolio manager, or equivalent of each CLO has full discretion to make decisions to purchase and sell assets on behalf of the



December 4, 2020
Page 3

CLO subject only to the terms of its service agreement, indenture, and the trustees/directors of each respective CLO.

- The sole client of HCMLP is the CLO issuer, and not any individual shareholder or noteholder of the CLO.

- All decisions made by HCMLP in its capacity as servicer, portfolio manager, or equivalent of each CLO, including without limitation the timing and execution of any sale transaction, are made by HCMLP taking into account such factors as HCMLP determines to be appropriate and are not subject to the requests or instructions of any investor or other party.

- There is no legal basis pursuant to which the holders of preferred shares or notes in the CLOs may influence the investment decisions of HCMLP or the CLO.

Your client's actions actively interfered with the management of HCMLP's bankruptcy estate and the property of such estate. Your client's actions also violated the Bankruptcy Code and the order entered by Judge Jernigan on January 9, 2020 [Docket No. 339].

For these reasons, Mr. Dondero and his affiliates and related parties, including NexPoint, HCMFA, and their affiliates, are hereby advised to cease and desist from making or initiating, directly or indirectly, any instructions, requests, or demands to HCMLP, its officers, and employees regarding the terms, timing, or other aspects of any portfolio transactions of any of the CLOs.

On December 3, 2020, a letter to the same effect was sent to counsel for the Advisors.

HCMLP reserves and does not waive all of its rights at law and in equity.



December 4, 2020
Page 4

Sincerely,

*J. Pomerantz /gvs*

Jeffrey N. Pomerantz

Enclosures
cc:     HCMLP Board of Directors
        John Morris
        Gregory Demo

# APPENDIX A

## Gregory V. Demo

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Tuesday, November 24, 2020 4:32 PM |
| **To:** | Hunter Covitz |
| **Cc:** | Thomas Surgent; Gregory V. Demo |
| **Subject:** | FW: SKY equity see below from Dondero |

Hunter:

I just received a copy of this email. Jim Dondero has no authority over the HCMLP managed CLOs. The purported direction is inappropriate, violative of the Bankruptcy Court orders, and of no effect.

I am the CEO and CRO of HCMLP. HCMLP has full authority to manage the positions in the CLOs. If I direct you to make a sale, please do so. If you cannot, please advise me immediately and explain why.

I will call you at 9:00am ET tomorrow to discuss this issue.

Jim

**From:** Jim Dondero [mailto:JDondero@HighlandCapital.com]
**Sent:** Tuesday, November 24, 2020 2:19 PM
**To:** Matt Pearson <MPearson@HighlandCapital.com>
**Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>; Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin <JSowin@HighlandCapital.com>
**Subject:** Re: SKY equity

No...... do not

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

> On Nov 24, 2020, at 2:20 PM, Matt Pearson <MPearson@highlandcapital.com> wrote:
>
> ok
>
> ---
>
> **From:** Hunter Covitz
> **Sent:** Tuesday, November 24, 2020 12:40 PM
> **To:** Gatekeeper <Gatekeeper@hcmlp.com>
> **Cc:** Matt Pearson <MPearson@HighlandCapital.com>; Joe Sowin <JSowin@HighlandCapital.com>; Hunter Covitz <HCovitz@HighlandCapital.com>
> **Subject:** SKY equity
>
> Please sell ~half of the positons in Gleneagles and Grayson in the current 32+ context.

Please sell ~48,500 shares in each CLO, ~97k shares total.

**HUNTER COVITZ**  |  HEAD OF STRUCTURED PRODUCTS

<image001.jpg>

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
O: 972.628.4124   |   C: 214.394.5510
hcovitz@highlandcapital.com  |   www.highlandcapital.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

## Gregory V. Demo

| | |
|---|---|
| **From:** | Hunter Covitz <HCovitz@HighlandCapital.com> |
| **Sent:** | Tuesday, November 24, 2020 4:41 PM |
| **To:** | Jim Seery |
| **Cc:** | Thomas Surgent; Gregory V. Demo |
| **Subject:** | RE: AVYA sell-See below comment from Dondero |

We sold the following .. just put pencils on the rest down near the end of the trading day to revisit tomorrow.

SKY 4.5k @ $32.05
AVYA 2,269 @ $17.81

Hunter Covitz
Cell: 214.394.5510

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, November 24, 2020 3:35 PM
**To:** Hunter Covitz <HCovitz@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Greg Demo <gdemo@pszjlaw.com>
**Subject:** FW: AVYA sell-See below comment from Dondero
**Importance:** High

Hunter:

The my prior message applies to this chain as well.

Did you get these and the SKY sales off today?  If so, please provide me with a full report on the prints.

Jim

---

**From:** Jim Dondero [mailto:JDondero@HighlandCapital.com]
**Sent:** Tuesday, November 24, 2020 2:18 PM
**To:** Matt Pearson <MPearson@HighlandCapital.com>
**Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>; Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin <JSowin@HighlandCapital.com>
**Subject:** Re: AVYA sell

Why?  Let's not please

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

On Nov 24, 2020, at 2:20 PM, Matt Pearson <MPearson@highlandcapital.com> wrote:

ok

---

**From:** Hunter Covitz
**Sent:** Tuesday, November 24, 2020 1:19 PM
**To:** Gatekeeper <Gatekeeper@hcmlp.com>
**Cc:** Joe Sowin <JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>;
Hunter Covitz <HCovitz@HighlandCapital.com>
**Subject:** AVYA sell

Please sell 213k shares (~$3.8mm) of Avaya in the high 17/18 current context. Please respond with other interest.

| Fund | CLO |
|------|-----|
| Aberdeen CLO | 4,000 |
| Brentwood CLO Ltd | 20,000 |
| Eastland CLO, Ltd. | 50,000 |
| Grayson CLO, Ltd. | 38,000 |
| Greenbriar CLO LTD | 34,000 |
| Red River CLO, Ltd. | 5,000 |
| Rockwall II | 6,000 |
| South Fork CLO Ltd. | 8,000 |
| Stratford CLO, Ltd. | 23,000 |
| Westchester CLO, Ltd. | 25,000 |
| | 213,000.00 |

**HUNTER COVITZ**  |  HEAD OF STRUCTURED PRODUCTS

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
O: 972.628.4124   |   C: 214.394.5510

hcovitz@highlandcapital.com | www.highlandcapital.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

## Gregory V. Demo

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Friday, November 27, 2020 10:19 AM |
| **To:** | Gregory V. Demo; Jeff Pomerantz |
| **Cc:** | John Dubel; Russell Nelms |
| **Subject:** | FW: SKY equity |



Jim Seery

---

**From:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Date:** Friday, November 27, 2020 at 9:28 AM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Subject:** Fwd: SKY equity

Please see below. We should discuss

Begin forwarded message:

> **From:** Jim Dondero <JDondero@highlandcapital.com>
> **Date:** November 27, 2020 at 2:46:35 AM EST
> **To:** Thomas Surgent <TSurgent@highlandcapital.com>
> **Subject:** Fwd: SKY equity
>
> I understand Seery is working on a work around to trade these securities anyway. Trades that
> contradict investor desires and have no business purpose or investment rational.
> You might want to remind him ( and yourself) that the chief compliance officer has personal liability.
>
> James Dondero
> Highland Capital Management
> 972-628-4100
> jdondero@highlandcapital.com
> www.highlandcapital.com
>
> Begin forwarded message:
>
> > **From:** Joe Sowin <JSowin@highlandcapital.com>
> > **Date:** November 24, 2020 at 3:58:24 PM EST
> > **To:** Jim Dondero <JDondero@highlandcapital.com>

**Cc:** Matt Pearson <MPearson@highlandcapital.com>, Hunter Covitz <HCovitz@highlandcapital.com>, Compliance <Compliance@hcmlp.com>
**Subject: Re: SKY equity**

 + Conpliance
We did not know that but Understood going forward.

Compliance should never have approved this order then - will coordinate with them Jim

Post: Please block all orders from Hitting the trading desk for the fungus Jim mentioned.

Happy to discuss if needed.
Joe

> On Nov 24, 2020, at 2:29 PM, Jim Dondero <JDondero@highlandcapital.com> wrote:
>
>  HFAM and DAF has instructed Highland in writing  not to sell any CLO underlying assets..... there is potential liability, don't do it again please
>
> James Dondero
> Highland Capital Management
> 972-628-4100
> jdondero@highlandcapital.com
> www.highlandcapital.com

>> On Nov 24, 2020, at 3:20 PM, Matt Pearson <MPearson@highlandcapital.com> wrote:
>>
>>
>> I've cxl'd both SKY and AVYA sales – only completed a small amount of each
>>
>> SKY 4.5k @ $32.05
>> AVYA 2,269 @ $17.81
>>
>> **From:** Jim Dondero
>> **Sent:** Tuesday, November 24, 2020 2:19 PM
>> **To:** Matt Pearson <MPearson@HighlandCapital.com>
>> **Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>; Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin <JSowin@HighlandCapital.com>
>> **Subject:** Re: SKY equity
>>
>> No...... do not
>>
>> James Dondero
>> Highland Capital Management
>> 972-628-4100
>> jdondero@highlandcapital.com
>> www.highlandcapital.com

On Nov 24, 2020, at 2:20 PM, Matt Pearson <MPearson@highlandcapital.com> wrote:

ok

---

**From:** Hunter Covitz
**Sent:** Tuesday, November 24, 2020 12:40 PM
**To:** Gatekeeper <Gatekeeper@hcmlp.com>
**Cc:** Matt Pearson <MPearson@HighlandCapital.com>; Joe Sowin <JSowin@HighlandCapital.com>; Hunter Covitz <HCovitz@HighlandCapital.com>
**Subject:** SKY equity

Please sell ~half of the positons in Gleneagles and Grayson in the current 32+ context.

Please sell ~48,500 shares in each CLO, ~97k shares total.

**HUNTER COVITZ  |**   HEAD OF STRUCTURED PRODUCTS

<image001.jpg>

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
 O: 972.628.4124   |   C: 214.394.5510
hcovitz@highlandcapital.com   |   www.highlandcapital.com

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# APPENDIX B



October 16, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201

Dear Jim:

We are writing to reiterate the concerns we have expressed about the scope and maintenance of of quality of the services currently being provided by Highland Capital Management, L.P. ("HCMLP") to NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") under their respective shared services agreements (together, the "Shared Services Agreements" or "Agreements"). As you know, the Shared Services Agreements obligate HCMLP to provide a variety of investment, administrative, legal, and back-office services to the Advisors. These responsibilities on the part of HCMLP are critical to the Advisors' ability to provide top-notch advisory services to the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they have advisory contracts.

In particular, the refusal by HCMLP to allow its employees to work on certain matters that jointly affect HCMLP and the Advisors has resulted in the Advisors incurring additional third-party costs and expenses to procure services that should rightfully be performed by HCMLP under the Shared Services Agreements. These third-party services, for which the Advisors are already compensating HCMLP under the Agreements, represent supplemental costs and expenses that the Advisors should not be obligated to pay.

Additionally, it is our understanding that all HCMLP employees will be given notice that their employment will be terminated effective as of December 31, 2020. If these employees are terminated, or are informed that they will be terminated and elect to resign, HCMLP will no longer be able to carry out its duties and obligations under the Agreements. We would thus like to request assurances from HCMLP that if elects to terminate its employees, it will work in good faith with the Advisors to put in place an orderly transition plan. Such a plan would provide for an effective transfer of services to the Advisors, seek to maximize employee retention, and permit the Advisors (or their affiliates) to hire any and all HCMLP employees, which would ensure the delivery of uninterrupted services previously provided by HCMLP under the Agreements.

Finally, we understand that HCMLP is contemplating the sale of certain assets held in several CLOs, the interests in which are also owned by the Advisors and/or the Funds advised by

308062413.3

NexPoint, HCMFA and/or their affiliates.  The sale of such assets has the potential to negatively affect the valuation of the Funds.  Specifically, a rush to sell these assets at fire sale prices could result in both the Funds and HCMLP not realizing their full value.  Accordingly, we hereby request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

We feel certain that our mutually shared goals are to minimize disruption and costs, to prevent the dislocation of services to the Advisors and the Funds, and to maximize returns for Funds and accounts advised by NexPoint, HCMFA, HCMLP, or any of their affiliates.  We believe that through working cooperatively we can achieve these goals.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

# NEXPOINT

November 24, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to follow up on our letter dated October 16, 2020 and to reiterate the concerns we have expressed about the sale of certain assets held in several CLOs, the interests in which are also owned by the NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") and/or the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they and their affiliates have advisory contracts.   As we have previously advised, the sale of such assets has the potential to negatively affect the valuation of the Funds, and a rush to sell these assets at fire-sale prices could result in both the Funds and Highland Capital Management, L.P. ("HCMLP") not realizing their full value.  In addition, with recent CLO quarterly payments being made and potential upside for the remaining securities held by the CLOs, sales of these securities at this time could further negatively impact the valuation.   We have previously requested that no CLO assets be sold without prior notice to and prior consent from the Advisors.  We understand that Charitable DAF HoldCo, Ltd. has made a similar request. Accordingly, we hereby re-urge our request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

cc:     Thomas Surgent (tsurgent@highlandcapital.com)
        John Dubel (jdubel@dubel.com)
        Russell Nelms (rfargar@yahoo.com)

# EXHIBIT 11

# PROMISSORY NOTE

$100,000                                                    November 27, 2013

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED THOUSAND and 00/100 Dollars ($100,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

# EXHIBIT 12

# PROMISSORY NOTE

$2,500,000                                                                    October 12, 2017

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

# EXHIBIT 13

# PROMISSORY NOTE

$3,825,000                                                                    February 2, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.   Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.   Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.   Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.   Tax Loan.  This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

5.   Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.   Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.   Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

# EXHIBIT 14

## PROMISSORY NOTE

$150,000.00                                                                                                    March 28, 2018

    FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.    <u>Prepayment Allowed: Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

# EXHIBIT 15

# PROMISSORY NOTE

$200,000.00                                                                    June 25, 2018

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. _Limitation on Agreements_. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. _Governing Law_. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.

# EXHIBIT 16

# PROMISSORY NOTE

$2,500,000                                                                                         August 1, 2018

      FOR VALUE RECEIVED, JAMES DONDERO ("**_Maker_**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("**_Payee_**"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "**_Note_**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "**_applicable federal rate_**" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

# EXHIBIT 17

# PROMISSORY NOTE

$2,500,000                                                                    August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

# EXHIBIT 18

# EXHIBIT 19

# PROMISSORY NOTE

$2,400,000.00                                                                                      May 2, 2019

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

     3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

# EXHIBIT 20

# PROMISSORY NOTE

$5,000,000.00                                                                                    May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

# EXHIBIT 21

# PROMISSORY NOTE

$400,000                                                                                                    May 29, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

# EXHIBIT 22

# PROMISSORY NOTE

$150,000                                                                                    June 26, 2019

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

# EXHIBIT 23

# PROMISSORY NOTE

$900,000                                                                September 25, 2019

  FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of NINE HUNDRED THOUSAND and 00/100 Dollars ($900,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

  1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

  2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

  3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

  4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

  5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

  6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

  7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

# EXHIBIT 24

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re: Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       D. Michael Lynn

**Appendix A**

ABA #:           322070381
Bank Name:     East West Bank
Account Name:  Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 25

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Frank Waterhouse, CFO

      Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019. Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021. Payee reserves all rights with respect to such amounts.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

**Appendix A**

ABA #:           322070381
Bank Name:     East West Bank
Account Name:  Highland Capital Management, LP
Account #:     5500014686

# EXHIBIT 26

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
c/o NexPoint Advisors, LP
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Demand on Promissory Notes:

Dear Mr. Dondero,

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 11/27/13 | $100,000 | $171,542.00 | $526.10 | $172,068.10 |
| 10/12/17 | $2,500,000 | $3,149,919.12 | $41,423.60 | $3,191,342.72 |
| 10/15/18 | $750,000 | $874,977.53 | $10,931.23 | $885,908.76 |
| 9/25/19 | $900,000 | $750,279.14 | $12,662.24 | $762,941.38 |
| **TOTALS** | **$4,250,000** | **$4,946,717.79** | **$65,543.17** | **$5,012,260.96** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 27

# HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Services, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

  Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Services, Inc. ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 3/28/18 | $150,000 | $158,776.59 | $3,257.32 | $162,033.91 |
| 6/25/18 | $200,000 | $212,403.27 | $2,999.54 | $215,402.81 |
| 5/29/19 | $400,000 | $409,586.19 | $5,256.62 | $414,842.81 |
| 6/26/19 | $150,000 | $153,564.74 | $1,675.16 | $155,239.90 |
| **TOTALS** | **$900,000** | **$934,330.79** | **$13,188.64** | **$947,519.43** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

# EXHIBIT 28



Jim

office until Monday and will speak with me then.

From Lynn

Tue, Nov 24, 10:39 AM

Update on UBS please

Tue, Nov 24, 1:01 PM

No update. Will let you know if something changes. Assume that you and Lynn are pushing on the Pot plan. Thanks

Tied up this afternoon

Delivered

Today 5:26 PM

Be careful what you do – last warning.

  iMessage 

# EXHIBIT 29



## PACHULSKI
## STANG
## ZIEHL
## JONES

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

L O S   A N G E L E S ,  C A
S A N   F R A N C I S C O ,  C A
W I L M I N G T O N , D E
N E W   Y O R K ,  N Y

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**
FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**
FACSIMILE: 302/652 4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**
FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Jeffrey N. Pomerantz

December 4, 2020

310.772.2336
jpomerantz@pszjlaw.com

**<u>Via E-mail</u>**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones,
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

Dear Judge Lynn:

I write to follow up on our recent communications concerning Mr. Dondero's written threat to Jim Seery and related matters.

As we have informed you, on December 3, just hours after HCMLP sent letters demanding payment on a series of notes tendered by Mr. Dondero and certain of his affiliated entities, Mr. Dondero sent a text message to Mr. Seery that stated "Be careful what you do – last warning." This threat was, and remains, completely unacceptable.

Mr. Dondero called Mr. Seery earlier today, ostensibly to discuss the "pot plan." Early in the call, Mr. Dondero suggested that "the lawyers" would address his threatening message and failed to disavow or apologize for the text, saying only (at the end of the conversation) that he didn't mean to threaten any physical harm.

Mr. Seery and the other members of the Independent Board are disturbed by Mr. Dondero's explicit threat and his lack of contrition. Because Mr. Dondero does not seem to appreciate the seriousness of this matter, the Board has instructed us to prepare an emergency motion seeking injunctive relief, including enjoining Mr. Dondero from communicating directly with any Board member or making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents.



In the interim, the Debtor demands that you instruct Mr. Dondero to cease and desist from (a) communicating directly with any Board member without counsel for the Debtor, (b) making any further threats against HCMLP or any of its directors, officers, employees, professionals, or agents, or (c) communicating with any of HCMLP's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero.

HCMLP reserves and does not waive all of its rights at law and in equity. Please direct all further questions to me.

Sincerely,

Jeffrey N. Pomerantz

cc:     HCMLP Board of Directors (*by e-mail*)
        Jeffrey Pomerantz (*by e-mail*)
        John Morris (*by e-mail*)
        Gregory Demo (*by e-mail*)

# EXHIBIT 3



October 16, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to reiterate the concerns we have expressed about the scope and maintenance of quality of the services currently being provided by Highland Capital Management, L.P. ("HCMLP") to NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") under their respective shared services agreements (together, the "Shared Services Agreements" or "Agreements").  As you know, the Shared Services Agreements obligate HCMLP to provide a variety of investment, administrative, legal, and back-office services to the Advisors.  These responsibilities on the part of HCMLP are critical to the Advisors' ability to provide top-notch advisory services to the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they have advisory contracts.

In particular, the refusal by HCMLP to allow its employees to work on certain matters that jointly affect HCMLP and the Advisors has resulted in the Advisors incurring additional third-party costs and expenses to procure services that should rightfully be performed by HCMLP under the Shared Services Agreements.  These third-party services, for which the Advisors are already compensating HCMLP under the Agreements, represent supplemental costs and expenses that the Advisors should not be obligated to pay.

Additionally, it is our understanding that all HCMLP employees will be given notice that their employment will be terminated effective as of December 31, 2020.  If these employees are terminated, or are informed that they will be terminated and elect to resign, HCMLP will no longer be able to carry out its duties and obligations under the Agreements.  We would thus like to request assurances from HCMLP that if elects to terminate its employees, it will work in good faith with the Advisors to put in place an orderly transition plan.  Such a plan would provide for an effective transfer of services to the Advisors, seek to maximize employee retention, and permit the Advisors (or their affiliates) to hire any and all HCMLP employees, which would ensure the delivery of uninterrupted services previously provided by HCMLP under the Agreements.

Finally, we understand that HCMLP is contemplating the sale of certain assets held in several CLOs, the interests in which are also owned by the Advisors and/or the Funds advised by

NexPoint, HCMFA and/or their affiliates. The sale of such assets has the potential to negatively affect the valuation of the Funds. Specifically, a rush to sell these assets at fire sale prices could result in both the Funds and HCMLP not realizing their full value. Accordingly, we hereby request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

We feel certain that our mutually shared goals are to minimize disruption and costs, to prevent the dislocation of services to the Advisors and the Funds, and to maximize returns for Funds and accounts advised by NexPoint, HCMFA, HCMLP, or any of their affiliates. We believe that through working cooperatively we can achieve these goals.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

# EXHIBIT 4

# NEXPOINT

November 24, 2020

Mr. James Seery
Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX  75201

Dear Jim:

We are writing to follow up on our letter dated October 16, 2020 and to reiterate the concerns we have expressed about the sale of certain assets held in several CLOs, the interests in which are also owned by the NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," and together with NexPoint, the "Advisors") and/or the mutual funds, closed-end funds, and other investment vehicles (collectively, the "Funds") with which they and their affiliates have advisory contracts.   As we have previously advised, the sale of such assets has the potential to negatively affect the valuation of the Funds, and a rush to sell these assets at fire-sale prices could result in both the Funds and Highland Capital Management, L.P. ("HCMLP") not realizing their full value.  In addition, with recent CLO quarterly payments being made and potential upside for the remaining securities held by the CLOs, sales of these securities at this time could further negatively impact the valuation.   We have previously requested that no CLO assets be sold without prior notice to and prior consent from the Advisors.  We understand that Charitable DAF HoldCo, Ltd. has made a similar request. Accordingly, we hereby re-urge our request that no CLO assets be sold without prior notice to and prior consent from the Advisors.

Thank you for your prompt attention to this matter.

Sincerely,

Dustin Norris

cc:    Thomas Surgent (tsurgent@highlandcapital.com)
       John Dubel (jdubel@dubel.com)
       Russell Nelms (rfargar@yahoo.com)

# EXHIBIT 5

**From:** Jim Dondero <JDondero@highlandcapital.com>
**Date:** November 27, 2020 at 2:46:35 AM EST
**To:** Thomas Surgent <TSurgent@highlandcapital.com>
**Subject: Fwd: SKY equity**

 I understand Seery is working on a work around to trade these securities anyway.  Trades that contradict investor desires and have no business purpose or investment rational.
You might want to remind him ( and yourself) that the chief compliance officer has personal liability.

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

Begin forwarded message:

> **From:** Joe Sowin <JSowin@highlandcapital.com>
> **Date:** November 24, 2020 at 3:58:24 PM EST
> **To:** Jim Dondero <JDondero@highlandcapital.com>
> **Cc:** Matt Pearson <MPearson@highlandcapital.com>, Hunter Covitz <HCovitz@highlandcapital.com>, Compliance <Compliance@hcmlp.com>
> **Subject: Re: SKY equity**
>
>  + Conpliance
> We did not know that but Understood going forward.
>
> Compliance should never have approved this order then - will coordinate with them Jim
>
> Post: Please block all orders from Hitting the trading desk for the fungus Jim mentioned.
>
> Happy to discuss if needed.
> Joe
>
>> On Nov 24, 2020, at 2:29 PM, Jim Dondero <JDondero@highlandcapital.com> wrote:
>>
>>  HFAM and DAF has instructed Highland in writing  not to sell any CLO underlying assets..... there is potential liability, don't do it again please
>>
>> James Dondero
>> Highland Capital Management
>> 972-628-4100
>> jdondero@highlandcapital.com
>> www.highlandcapital.com

On Nov 24, 2020, at 3:20 PM, Matt Pearson
<MPearson@highlandcapital.com> wrote:


I've cxl'd both SKY and AVYA sales – only completed a small
amount of each

SKY 4.5k @ $32.05
AVYA 2,269 @ $17.81

---

**From:** Jim Dondero
**Sent:** Tuesday, November 24, 2020 2:19 PM
**To:** Matt Pearson <MPearson@HighlandCapital.com>
**Cc:** Hunter Covitz <HCovitz@HighlandCapital.com>;
Gatekeeper <Gatekeeper@hcmlp.com>; Joe Sowin
<JSowin@HighlandCapital.com>
**Subject:** Re: SKY equity

No...... do not

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com


On Nov 24, 2020, at 2:20 PM, Matt Pearson
<MPearson@highlandcapital.com> wrote:


ok

---

**From:** Hunter Covitz
**Sent:** Tuesday, November 24, 2020 12:40 PM
**To:** Gatekeeper <Gatekeeper@hcmlp.com>
**Cc:** Matt Pearson
<MPearson@HighlandCapital.com>; Joe Sowin
<JSowin@HighlandCapital.com>; Hunter
Covitz <HCovitz@HighlandCapital.com>
**Subject:** SKY equity

Please sell ~half of the positons in Gleneagles
and Grayson in the current 32+ context.

Please sell ~48,500 shares in each CLO, ~97k
shares total.


**HUNTER COVITZ  |**  HEAD OF STRUCTURED
PRODUCTS

2

&lt;image001.jpg&gt;

300 Crescent Court   |   Suite 700   |   Dallas, Texas 75201
 O: 972.628.4124   |   C: 214.394.5510
hcovitz@highlandcapital.com   |   www.highlandcapital.com

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# EXHIBIT 6



Jim

...office until Monday and will speak with me then.

From Lynn

Tue, Nov 24, 10:39 AM

Update on UBS please

Tue, Nov 24, 1:01 PM

No update. Will let you know if something changes. Assume that you and Lynn are pushing on the Pot plan. Thanks

Tied up this afternoon

Delivered

Today 5:26 PM

Be careful what you do – last warning.

iMessage

# EXHIBIT 7

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § § § § § § § | |
| Plaintiff, | | Adversary Proceeding |
| vs. | | No. 20-3190-sgj11 |
| JAMES D. DONDERO, | | |
| Defendant. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## DEBTOR'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS
## DIRECTED TO JAMES DONDERO

**PLEASE TAKE NOTICE** that, pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034, incorporating by reference Federal Rules of Civil Procedure 26 and 36, Highland Capital Management, L.P., the Plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case ("Bankruptcy Case") hereby requests that, in connection with *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Mr. James Dondero* [Docket No. 2] (the "Motion"), James Dondero, the Defendant in the Adversary Proceeding ("Defendant" or "Mr. Dondero") produce for inspection and copying, the documents identified below, on or before **December 28, 2020 by 5:00 p.m. Central Time** (the "Requests").

## INSTRUCTIONS

1.      For each Document (as defined below) withheld by reason of a claim of privilege, provide a privilege log identifying such Document together with:  (a) the date of the Document; (b) the identity of the author or preparer; (c) the identity of each person who was sent or furnished with the Document or who received or had possession or custody of the Document; (d) a description of the Document, including identification of any attachments or appendices; (e) a statement of the basis of the claim of privilege; and (f) the paragraph of these Requests to which the Document is responsive.  In the case of Documents concerning a meeting or conversation, identify all participants in the meeting or conversation.

2.      Each Document shall be produced in a fashion that indicates clearly the file in which it was located.

2

3.     If a Document cannot be produced in full, produce it to the extent possible, identify the portion that cannot be produced, and specify the reasons for Your (as defined below) inability to produce the remainder.

4.     You are required to produce ESI (as defined below) in searchable form on DVDs, CD-ROMs or other media to be mutually agreed by the parties.

5.     Documents may be produced in paper format or electronically.  If Documents are produced electronically, or if any ESI is produced, the following formatting should be used:

- Use .tif format for all Documents that were not originally in Excel format, in which case, use .xls or .xlsx format;

- If possible, without creating undue delay, please produce Documents in Summation-ready DVDs, CD-ROMs or other media to be mutually agreed by the parties with .tif and text format, and with a Summation load file; and

- Transmit electronic Documents or ESI on DVDs, CD-ROMs or other media to be mutually agreed by the parties or use an ftp site upload.

6.     These Requests shall be deemed continuing and supplemental answers shall be required if You directly or indirectly obtain further information after Your initial response as required by Fed. R. Bank. P. 7026(e).

7.     The use of either the singular or plural shall not be deemed a limitation. The use of the singular includes the plural, and vice versa.

8.     Unless noted otherwise, **the requests for documents set forth herein seek Documents and Communications created between December 10, 2020 and December 28, 2020**.

## **DEFINITIONS**

1. "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

2. "Document" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whomever produced, reproduced, disseminated or made. This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information. Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

3. "ESI" has the meaning ascribed to it in Federal Rules of Civil Procedure 16, 26, and 34(a).

4. "Hearing" refers to the hearing described in the *Notice of Hearing* filed at Docket No. 16 in the Adversary Proceeding.

5. "MultiStrat" means Highland Multi Strategy Credit Fund, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.).

6. "You" or "Your" refers to Mr. Dondero.

## DOCUMENT REQUESTS

**Request No. 1**:

For the period August 1, 2020, to the present, all Communications between You and Andrew Clubok.

**Request No. 2**:

For the period August 1, 2020, to the present, all Documents provided to or received from Andrew Clubok.

**Request No. 3**:

All Communications between You and any person employed by the Debtor.

**Request No. 4**:

All Documents provided to or received from any person employed by the Debtor.

**Request No. 5**:

All Documents and Communications concerning MultiStrat.

**Request No. 6**:

All Documents and Communications that You intended to introduce into evidence at the Hearing.

Dated: December 23, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 8



# EXHIBIT 9



ro 000013

# EXHIBIT 10





**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

Signed December 29, 2020

_____
**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | No. 20-3190-sgj11 |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

## ORDER RESOLVING JAMES DONDERO'S EMERGENCY MOTION
## FOR A PROTCTIVE ORDER

Having considered (a) *James Dondero's Emergency Motion for Entry of a Protective*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

*Order* [Adv. Pro. Docket No. 32] (the "Protective Order Motion"); (b) the *Request for Emergency Hearing on James Dondero's Emergency Motion for Entry of a Protective Order* [Adv. Pro. Docket No. 33]; (c) the *Debtor's Objection to James Dondero's Emergency Motion for Entry of a Protective Order* [Adv. Pro. Docket No. 34]; and (d) all prior proceedings relating to this matter; and after due deliberation, it is **HEREBY ORDERED THAT**:

1.      The Protective Order Motion is DENIED in its entirety, except as specifically set forth herein.

2.      The Debtor's document requests concerning Andrew Clubok shall be limited in time to the period from November 1, 2020, through December 28, 2020.

3.      Documents and communications responsive to the Debtor's requests shall be due on December 31, 2020, at 9:30 a.m.  To the extent Mr. Dondero withholds any documents on the basis of privilege, he shall deliver all responsive and allegedly privileged documents to the Court by December 31, 2020 at 9:30 a.m. for an *in camera* review to determine by whether any privilege or immunity applies.  To the extent that the Court determines that no privilege or immunity applies, the Court will notify the parties by email communication via the courtroom deputy and such documents shall be produced to the Debtor.  The Court will notify the parties by the end of the day January 4, 2021, whether the documents or any portion of them are privileged or otherwise subject to protection.

4.      Mr. Dondero and Mr. Clubok shall appear on January 5, 2021, or at such other times as the parties may mutually agree, for depositions.

5.      The hearing on *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] shall be adjourned to January 8, 2021, at 9:30 a.m.

2

6.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

<div align="center">###End of Order###</div>

# EXHIBIT 11



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 10, 2020**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding |
| | § |
| vs. | § |
| | § No. 20-03190-sgj |
| JAMES D. DONDERO, | § |
| | § |
| Defendant. | § |

### ORDER GRANTING DEBTOR'S MOTION
### FOR A TEMPORARY RESTRAINING ORDER AGAINST JAMES DONDERO

Having considered the *Debtor's Motion for a Temporary Restraining Order and*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

*Preliminary Injunction against James Dondero* [Docket No. 6] (the "<u>Motion</u>"), the *Memorandum of Law* (the "<u>Memorandum of Law</u>")[2] in support of the Motion, and the *Declaration of James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order against James Dondero* [Docket No. 4] (the "<u>Seery Declaration</u>"), including the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion and the Memorandum of Law establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      James Dondero is temporarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Memorandum of Law.

employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[3]

3.      James Dondero is further temporarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

4.      All objections to the Motion are overruled in their entirety.

5.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

---

[3] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from seeking judicial relief upon proper notice or from objecting to any motion filed in the above-referenced bankruptcy case.

# EXHIBIT 12



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

Jeffrey N. Pomerantz

December 23, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

**Re:    Termination of James Dondero Access to Office and Services**

Dear Judge Lynn:

As you know, on December 10, 2020, a temporary restraining order was entered against Mr. James Dondero by the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "TRO").  Case No. 20-03190-sgj, Docket No. 10 (Bankr. N.D. Tex. Dec. 10, 2020.

Pursuant to the TRO, Mr. Dondero was, among others things, prohibited from communicating with the employees of Highland Capital Management, L.P. (the "Debtor") (subject to certain limited exceptions) and interfering with or otherwise impeding, directly or indirectly, the Debtor's business.  We have discussed with you several instances in which Mr. Dondero breached the terms of the TRO and will not repeat them here.

As you also know, the Debtor manages certain collateralized loan obligations (the "CLOs").  The Debtor sought to cause the CLOs to sell certain publicly-traded equity securities, including AVYA and SKY (tickers), prior to Thanksgiving.  Mr. Dondero blocked these trades.  That conduct, among other things, caused the TRO to be entered.

These trades were also the subject to the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager,*

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 23, 2020
Page 2

*to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "CLO Motion"), which was filed by, among others, NexPoint Advisors, L.P. ("NPA") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"). At the hearing on December 16, 2020, Judge Jernigan stated both that she agreed that the CLO Motion was brought by "Mr. Dondero, through different entities" and that it was frivolous.

On December 22, 2020, employees of NPA and HCMFA notified the Debtor that they would not settle the CLOs' sale of the AVYA and SKY securities. To justify their conduct, those employees mimicked the frivolous arguments made in the CLO Motion. This conduct violated the TRO, and HCMLP reserves all rights to seek appropriate sanctions with respect to such violation.

As a result of this conduct, among other things, HCMLP has concluded that Mr. Dondero's presence at the HCMLP office suite and his access to all telephonic and information services provided by HCMLP are too disruptive to HCMLP's continued management of its bankruptcy case to continue.

As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.

Further, as of the Termination Date, Mr. Dondero's access to his @highlandcapital.com email account will be revoked, and Mr. Dondero will no longer have access to that email account or any emails, calendars, or contacts associated with that email account.

In addition, Mr. Dondero's access to the HCMLP system and all services maintained on that system, including his Bloomberg terminal, will be revoked as of the Termination Date.

HCMLP will also terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the "Cell Phones"). HCMLP demands that Mr. Dondero immediately turn over the Cell Phones to HCMLP by delivering them to you; we can make arrangements to recover the phones from you at a later date. The Cell Phones and



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 23, 2020
Page 3

the accounts are property of HCMLP.  HCMLP further demands that
Mr. Dondero refrain from deleting or "wiping" any information or
messages on the Cell Phone.  HCMLP, as the owner of the account
and the Cell Phones, intends to recover all information related to the
Cell Phones and the accounts and reserves the right to use the
business-related information.

Any attempt by Mr. Dondero to enter the Office, regardless of
whether he is entering on his own or as a guest, will be viewed as an
act of trespass.  Similarly, any attempts by Mr. Dondero to access
his @highlandcapital.com email account or any other service
previously provided to Mr. Dondero by HCMLP will be viewed as
an act of trespass, theft, and/or an attempted breach of HCMLP's
security protocols.

Finally, HCMLP demands that Mr. Dondero take all steps necessary
to retain and protect from loss, destruction, alteration or defacement
all documents, communications, and information relating to the
Debtor, the Debtor's assets, any assets managed by the Debtor, or
the Debtor's employees.

HCMLP reserves all rights that it may have whether at law, equity,
or in contract, including the right to restrict the access of HCMFA
and NPA employees to the Office and HCMLP-provided services.
Nothing herein will be construed as a waiver of any such rights.

Sincerely,

Jeffrey N. Pomerantz

cc:     Ira Kharasch, Esq.
        John Morris, Esq.
        Gregory Demo, Esq.

# EXHIBIT 13

**From:** Jim Dondero <JDondero@HighlandCapital.com>
     **To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** FW: Jefferies recap
    **Date:** Fri, 18 Dec 2020 16:03:32 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.png

---

**From:** Joe Sowin
**Sent:** Friday, December 18, 2020 3:34 PM
**To:** Jim Dondero ; DC Sauter
**Subject:** FW: Jefferies recap

**JOSEPH R. SOWIN**

**Co-Chief Investment Officer & Global Head of Equity Trading**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.419.4492 | C: 203.912.5935 | F: 972.628.4147

jsowin@highlandcapital.com| www.highlandcapital.com

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Friday, December 18, 2020 3:32 PM
**To:** Steven Haltom <SHaltom@HighlandCapital.com>; Brad Gianiny <bgianiny@jefferies.com>; Cyrus Eftekhari <CEftekhari@HighlandCapital.com>; Christopher A Bianchi <cbianchi@jefferies.com>; James Colasanto <jcolasanto@jefferies.com>; James Romey <jromey@DSIConsulting.com>; Joe Sowin <JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>; NYMO1 <NYMO1@Jefferies.com>; Ronald Wong <rwong@jefferies.com>; R-Settlement <R-Settlement@Highlandfunds.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: Jefferies recap

To be clear, Avaya should be allocated evenly to the 10 CLOs that hold it. NO account sold short. Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery <jpseeryjr@gmail.com>
**Date:** Friday, December 18, 2020 at 4:30 PM
**To:** Steven Haltom <SHaltom@HighlandCapital.com>, Brad Gianiny <bgianiny@jefferies.com>, Cyrus

Eftekhari <CEftekhari@HighlandCapital.com>, Christopher A Bianchi <cbianchi@jefferies.com>, James Colasanto <jcolasanto@jefferies.com>, James Romey <jromey@DSIConsulting.com>, Joseph Sowin <JSowin@HighlandCapital.com>, Matt Pearson <MPearson@HighlandCapital.com>, NYMO1 <NYMO1@Jefferies.com>, Ronald Wong <rwong@jefferies.com>, R-Settlement <R-Settlement@Highlandfunds.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: Jefferies recap

The NXRT is out of the HCMLP internal.

SKY should be allocated evenly across Grayson and Greenbriar CLO

Avaya should be allocated pro rata across all of the CLOS except Acis 7.

Please call me with any questions.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Steven Haltom <SHaltom@HighlandCapital.com>
**Date:** Friday, December 18, 2020 at 4:21 PM
**To:** Brad Gianiny <bgianiny@jefferies.com>, Cyrus Eftekhari <CEftekhari@HighlandCapital.com>, Christopher A Bianchi <cbianchi@jefferies.com>, James Colasanto <jcolasanto@jefferies.com>, Jim Seery <jpseeryjr@gmail.com>, James Romey <jromey@DSIConsulting.com>, Joseph Sowin <JSowin@HighlandCapital.com>, Matt Pearson <MPearson@HighlandCapital.com>, NYMO1 <NYMO1@Jefferies.com>, Ronald Wong <rwong@jefferies.com>, R-Settlement <R-Settlement@Highlandfunds.com>
**Subject:** RE: Jefferies recap

Brad,

What accounts are these in?

**Steven Haltom | Manager, Operations**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

972.628.4178 | shaltom@hcmlp.com | www.hcmlp.com

---

**From:** Brad Gianiny <bgianiny@jefferies.com>
**Sent:** Friday, December 18, 2020 3:02 PM
**To:** Cyrus Eftekhari <CEftekhari@HighlandCapital.com>; Christopher A Bianchi <cbianchi@jefferies.com>; James Colasanto <jcolasanto@jefferies.com>; Jim Seery

<jpseeryjr@gmail.com>; James Romey <jromey@DSHConsulting.com>; Joe Sowin
<JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>; NYMO1
<NYMO1@Jefferies.com>; Ronald Wong <rwong@jefferies.com>; R-Settlement <R-Settlement@Highlandfunds.com>
**Subject:** Jefferies recap

SKY- sld 22k @ 32.2251

NHF- sld 10k @ 10.5461

AVYA- sld 6412 @ 19.7598

Brad Gianiny

Equity Sales Trader

Jefferies LLC

520 Madison Avenue, 2nd Floor

New York, NY 10022

W: 212-284-2291

C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 14



**PACHULSKI STANG ZIEHL JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

LOS ANGELES

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory Demo

December 24, 2020

212-561-7700
gdemo@pszjlaw.com

**Via E-mail** <u>Via E-mail</u>

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

**Re:** ***In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex)**

Dear Counsel:

As you know, we represent Highland Capital Management, L.P. (the "<u>Debtor</u>"), the debtor-in-possession in the above-captioned bankruptcy case.

On December 8, 2020, your firm filed that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "<u>Motion</u>")[1] on behalf of Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "<u>Movants</u>"). After hearing the sworn testimony of the Movants' witness and the arguments made on the Movants' behalf, Judge Jernigan found that the Motion was "a very, very frivolous motion" and that your firm "wasted [her]

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

time." (Transcript, 64:5-12) An order was entered denying the Motion on December 18, 2020 [D.I. 1605].

On December 22, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) re-asserting almost verbatim the frivolous arguments raised in the Motion. Concurrently, we received notice that certain of the Movants' employees would not settle trades on behalf of the CLOs that were authorized by the Debtor acting in its capacity as the CLOs' portfolio manager. The Movants' employees who interfered with the Debtor's directions justified their conduct by asserting – again almost verbatim – the frivolous arguments raised in the Motion.

The Movants have caused the Debtor to incur substantial costs defending itself against the Motion and preparing to defend against the frivolous suits forecasted in the Letter. The Debtor demands that the Movants withdraw the letter by 5:00 p.m. CT on Monday, December 28, 2020, and confirm that the Movants and anyone acting on their behalf will take no further steps to interfere with the Debtor's directions as the CLOs' portfolio manager. If the Movants fail to timely comply with these demands, the Debtor shall seek prompt judicial relief, including seeking sanctions under Federal Rule of Bankruptcy Procedure 9011.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:     Jeffrey Pomerantz, Esq.
        Ira Kharasch, Esq.
        John Morris, Esq.
        John J. Kane, Esq.

# Exhibit A



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308494123.3

December 22, 2020
Page 2

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full. In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders. Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing. While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request. Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act"). As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021. The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

# EXHIBIT 15



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

LOS ANGELES

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory Demo

December 24, 2020

212-561-7700
gdemo@pszjlaw.com

**Via E-mail**

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

   **Re:**   *In re Highland Capital Management, L.P.*, **Case No. 19-34054-sgj (Bankr. N.D. Tex)**

Dear Counsel:

   As you know, we represent Highland Capital Management, L.P. (the "Debtor"), the debtor-in-possession in the above-captioned bankruptcy case.

   On December 8, 2020, your firm filed that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "Motion")[1] on behalf of Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "Movants"). After hearing the sworn testimony of the Movants' witness and the arguments made on the Movants' behalf, Judge Jernigan was convinced that the Movants were in fact Mr. James Dondero seeking to disrupt

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

HCMP's estate by using different controlled entities to accomplish his ends.

On December 23, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) informing us that they were seeking to terminate certain CLO management agreements for "cause." For the reasons set forth herein, among others, such action is sanctionable under the circumstances and is otherwise prohibited by the CLOs' governing documents.

First, the Movants are owned and/or controlled by Mr. Dondero. These facts were disclosed in the Movants' public filings with the Securities and Exchange Commission and confirmed by Mr. Dustin Norris's testimony at the hearing held on December 16, 2020. Consequently, the Movants' attempt to terminate the CLO management agreements violates the order entered on January 9, 2020 [D.I. 339] (the "January Order"), which prohibits Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." A copy of the January Order is attached as Exhibit B.

Second, "cause" does not exist to terminate the CLO management agreements. The Debtor has a duty under the Investment Advisers Act of 1940 to the CLOs, not to any specific investor in the CLOs. *See, e.g., Goldstein v. SEC,* 451 F.3d 873, 881-82 (D.C. Cir. 2006) ("[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . ."). The Debtor has, at all times, fulfilled its statutory and contractual duties to the CLOs and will continue to do so. As counsel, you have a duty to investigate the spurious allegations in your pleadings, but you failed to do so. Your clients' desire to re-assert control over the CLOs is not evidence to the contrary.

Third, the Movants, by their own admission, consider themselves affiliates of the Debtor. Under the management agreements, affiliates of a manager cannot replace a manager, and therefore, are prohibited from removing a manager.

Please confirm to us, in writing, no later than 5:00 p.m. CT on Monday, December 28, 2020, that you are withdrawing the Letter and that the Movants and CLO Holdco, Ltd., commit not to take any



James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 3

actions, either directly or indirectly, to terminate the CLO management agreements. If we do not receive such confirmation, the Debtor will seek immediate relief from the bankruptcy court, including an action for contempt for violating the January Order and sanctions under Federal Rule of Bankruptcy Procedure 9011 or otherwise.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:     Jeffrey Pomerantz, Esq.
        Ira Kharasch, Esq.
        John Morris, Esq.
        John J. Kane, Esq.

# Exhibit A



December 23, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

      I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

      As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

In other cases, such companies in combination with CLO Holdco hold, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full. In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

In pleadings filed with the Bankruptcy Court, you asserted that one or more of the entities identified above lacked the authority to seek a replacement of the Debtor as fund manager because of the alleged affiliate status of the beneficial owners of such entities. We disagree.

Consequently, in addition to our request of yesterday, where appropriate and consistent with the underlying contractual provisions, one or more of the entities above intend to notify the relevant trustees and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United States Bankruptcy Code, including the automatic stay of Section 362. The basis for initiating the process for such removal includes, but is not limited to, the fact that HCMLP's duties, as set forth in the portfolio management agreements of the CLOs, are subject to the requirements of the Investment Advisers Act of 1940 ("Advisers Act"). HCMLP appears to be acting contrary to those duties under the agreements and where HCMLP is not fulfilling its duties under the portfolio management agreement it is therefore violating the Advisers Act. Thus, because HCMLP is (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced, including key investment professionals identified in the transactional documents for those CLOs (generally Mark Okada and Jim Dondero); (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan confirmation; (iii)

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

adding a replacement manager as subadviser prior to January 31, 2021; and (iv) for other cause, the Advisors, Funds, and CLO Holdco have concluded that they have no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so.

Because the process of removal is being initiated, subject to the applicable provisions of the Bankruptcy Code, we respectfully request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing. To the extent there are CLO transactions prior to the confirmation, we intend to fully explore the business justification for doing so, as we do not believe there is any rational business reason to liquidate securities prior to that time.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

# Exhibit B





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 9, 2020**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

### ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
### UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
### AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

*Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2. The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3. The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

DOCS_NY:39973.13 36027/002

4.     The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.     The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.     All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.     Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.     Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.     Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

11.     Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

12.     Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

4

13. The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

# EXHIBIT 16

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**To:** "andrew.clubok@lw.com" <andrew.clubok@lw.com>
**Subject:** Fwd: Multi Strat est balance sheet
**Date:** Fri, 4 Dec 2020 16:31:34 -0600
**Importance:** Normal
**Attachments:** Multi_Strat_est_summary_balance_sheet_as_of_10.31.20.pdf

---

More detail

James Dondero
Highland Capital Management
972-628-4100
jdondero@highlandcapital.com
www.highlandcapital.com

Begin forwarded message:

**From:** Isaac Leventon
**Date:** December 4, 2020 at 5:13:11 PM EST
**To:** Jim Dondero
**Cc:** Scott Ellington
**Subject: FW: Multi Strat est balance sheet**

Subject to Rule 408, created at the request of counsel.

---

**From:** David Klos
**Sent:** Friday, December 4, 2020 3:22 PM
**To:** Isaac Leventon
**Cc:** Scott Ellington ; Frank Waterhouse
**Subject:** Multi Strat est balance sheet

As you requested.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# EXHIBIT 17

**From:** Scott Ellington <SEllington@HighlandCapital.com>

**To:** Michael Lynn <dmljng@gmail.com>

**Cc:** Jim Dondero <JDondero@HighlandCapital.com>, John Bonds <john@bondsellis.com>,
Bryan Assink <bryan.assink@bondsellis.com>, "John Wilson"
<john.wilson@bondsellis.com>

**Subject:** Re: Possible deal

**Date:** Sat, 12 Dec 2020 23:55:16 -0600

**Importance:** Normal

---

It will be JP Sevilla.
I will tell him that he needs to contact you first thing in morning

Sent from my iPhone

On Dec 12, 2020, at 8:44 PM, Michael Lynn wrote:

That said we MUST have a witness NOW.

Sent from my BlackBerry 10 smartphone.

**From:** Michael Lynn
**Sent:** Saturday, December 12, 2020 8:42 PM
**To:** Jim Dondero; John Bonds; Bryan Assink; John Wilson
**Subject:** Possible deal

The possible deal with the debtor went nowhere. It llos like trial.

Sent from my BlackBerry 10 smartphone.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 18

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Subject:** Re: List for joint meeting
**Date:** Wed, 16 Dec 2020 13:42:51 -0600
**Importance:** Normal

---

On it.

Sent from my iPhone


On Dec 16, 2020, at 1:33 PM, Jim Dondero wrote:


I'm going to need you to provide leadership here.

Sent from my iPhone

Begin forwarded message:


**From:** Michael Lynn
**Date:** December 16, 2020 at 1:07:50 PM CST
**To:** Douglas Draper , Jim Dondero
**Subject: Re: List for joint meeting**


I can't think of any others tassuming Zorada is with K&L Gates). I would contact the lawyers I have no opinion on additional contacts.

I had thought you would be representing more entities than the two trusts.

Sent from my BlackBerry 10 smartphone.
Original Message
From: Douglas Draper
Sent: Wednesday, December 16, 2020 11:13 AM
To: Michael Lynn; Jim Dondero
Subject: List for joint meeting


1) Daf john Kane attny 2) highland capital management fund advisors George Zorada 3) nexpoint advisors Laureen Drawhorn 4) highland clo funding Mark Maloney 5) employees David Neier
Do we want to add or delete anybody from the list. Is the best route to have me call the lawyer or have a someone contact the client contact for the lawyer. Please advise
On another matter I think it would be a good idea to have a second client contact for my two clients. Give me your thoughts

Sent from my iPhone
Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.
CONFIDENTIALITY NOTICE:

INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 19

12:17

**Melissa** >

Sat, Dec 12, 2:24 PM

Buyers agreed to <u>February 1st</u> it's a done deal counter has been signed! Very good news.

Ok, thanks....
Has JP reviewed Maplewood

Sat, Dec 12, 7:21 PM

We had him review the lease to make sure we gave proper notice.

Mon, Dec 14, 10:52 AM

Please check your mail for the Acura title. Thanks !

Ok haven't seen it yet...

Wed, Dec 16, 5:18 PM

No dugaboy details without subpoena

Thu, Dec 17, 2:49 PM

iMessage

# EXHIBIT 20



Dondero 000043

# EXHIBIT 21

**From:** Jim Dondero
**Sent:** Thursday, December 24, 2020 7:59 PM
**To:** Scott Ellington
**Subject:** Fwd: Highland's Motion to Compromise Controversy with HarbourVest

Sent from my iPhone

Begin forwarded message:

> **From:** Jim Dondero
> **Date:** December 24, 2020 at 5:55:17 PM MST
> **To:** Michael Lynn
> **Subject: Re: Highland's Motion to Compromise Controversy with HarbourVest**
>
>  Holy bananas..... make sure we object
>
> Sent from my iPhone
>
>
> On Dec 24, 2020, at 3:21 PM, Michael Lynn wrote:
>
>
> Fyi
>
> Sent from my BlackBerry 10 smartphone.
>
> **From:** Bryan Assink
> **Sent:** Thursday, December 24, 2020 4:14 PM
> **To:** Michael Lynn; John Bonds
> **Cc:** John Wilson
> **Subject:** Highland's Motion to Compromise Controversy with HarbourVest
>
> Judge, attached is the 9019 motion filed today by Highland to compromise the HarbourVest claims. The matter has been set at the same time as confirmation (even though that's less than 21 days' notice) on January 13, 2021 at 9:30 a.m. The notice of hearing states that responses to the 9019 motion shall be filed no later than January 11, 2021 at 5:00 p.m.
> The material terms of the settlement as stated in the motion are listed below:
> The Settlement Agreement contains the following material terms, among others:
>   - HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;
>   - HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;
>   - HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

1

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;
- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;
- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and
- The parties shall exchange mutual releases

**Bryan C. Assink, Associate**
**Bonds Ellis Eppich Schafer Jones LLP**
420 Throckmorton St. **|** Suite 1000 **|** Fort Worth, Texas 76102
office 817.779.4297 **|** fax 817.405.6902
bryan.assink@bondsellis.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message. IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter.

# EXHIBIT 22

**BONDS ELLIS EPPICH SCHAFER JONES** LLP

ATTORNEYS & COUNSELORS

D. MICHAEL LYNN  |  D: 817.405.6915  |  MICHAEL.LYNN@BONDSELLIS.COM

December 29, 2020

<u>*Via Email*</u>:
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13<sup>th</sup> Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

      **Re:**    *In re: Highland Capital Management, L.P.* **– Case No. 19-34054**

Dear Jeff:

      I am in receipt of your letter sent via email on the evening of December 23, 2020.

      In response to the Debtor's demand concerning Mr. Dondero's cell phone, it is our understanding that the phone Dondero is currently using was purchased by Dondero several weeks ago and that the Debtor is not paying for the use of that phone. We are at present not sure of the location of the cell phone issued to Mr. Dondero by the Debtor, but we are not prepared to turn it over without ensuring that the privacy of attorney-client communications by text or email is protected. We are, however, willing to have an independent third party review any items that we would designate as privileged. Our office would need to review what is on the phone to determine what we would designate as privileged before it could reach such a person. In that regard, virtually all communications made between myself and other attorneys employed by Bonds Ellis Eppich Schafer Jones LLP have been through that phone and in many cases are preserved either as texts or emails.

      Sincerely,

      */s/ D. Michael Lynn*

      D. Michael Lynn

Cc:    Jim Dondero
       John Bonds

# EXHIBIT 23

**From:** Sarah Goldsmith <SGoldsmith@HighlandCapital.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** FW: Schedule Call
**Date:** Tue, 8 Dec 2020 08:32:05 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Please let me know if I need to send anything to Douglas re org chart

Best,

**SARAH BELL GOLDSMITH | EXECUTIVE ASSISTANT**

O: 972.628.4102 | M: 214.642.3487

---

**From:** Douglas Draper
**Sent:** Tuesday, December 8, 2020 8:14 AM
**To:** Michael Lynn
**Cc:** Sarah Goldsmith
**Subject:** Re: Schedule Call

Please send me the org chart with the list of potential clients.

Sent from my iPhone

On Dec 7, 2020, at 1:00 PM, Michael Lynn <michael.lynn@bondsellis.com> wrote:

6:30 is ok.

Sent from my BlackBerry 10 smartphone.

---

**From:** Sarah Goldsmith

**Sent:** Monday, December 7, 2020 12:26 PM

**To:** Michael Lynn; ddraper@hellerdraper.com

**Subject:** Schedule Call

Judge Lynn and Douglas,

I am reaching out on behalf of Scott Ellington to schedule a call tonight. Please let me know if are available today (12/07) at 6:30pm CT or 7:00pm CT. Once you confirm your availability, I will circulate a calendar invite with a dial-in.

Best,

**SARAH BELL GOLDSMITH | EXECUTIVE ASSISTANT**

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4102 | F: 972.628.4147

sgoldsmith@highlandcapital.com | www.highlandcapital.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.

CONFIDENTIALITY NOTICE:
INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.



# EXHIBIT 24

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Fwd: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement
**Date:** Tue, 15 Dec 2020 15:47:38 -0600
**Importance:** Normal
**Attachments:** Common_Interest_Agreement_-_Dondero_(00374777-2xBDDDE)_(002)_(Bonds_Ellis_comments).docx

---

Sent from my iPhone

Begin forwarded message:

**From:** Bryan Assink
**Date:** December 15, 2020 at 3:42:42 PM CST
**To:** Michael Lynn , Scott Ellington , John Bonds , John Wilson , Douglas Draper
**Subject: RE: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement**

All,

Attached is the Common Interest Agreement with our comments.

Best,
Bryan

---

**From:** Michael Lynn
**Sent:** Tuesday, December 15, 2020 2:53 PM
**To:** Scott Ellington ; John Bonds ; Bryan Assink ; John Wilson
**Subject:** Fw: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement

Bryan or John will review the agreement for us.

Sent from my BlackBerry 10 smartphone.

---

**From:** Deborah Hepting <dhepting@hellerdraper.com>

**Sent:** Tuesday, December 15, 2020 2:16 PM

**To:** 'Jim Dondero'; Michael Lynn

**Subject:** The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement

Please note from Douglas:

Attached please find the form agreement. Please review and advise who I should contact about being a party. Please forward for me to Scott Ellington. As you send me names, we will contact the lawyer to get this moving.

Thanks,

Douglas S. Draper
**Heller, Draper & Horn, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, LA 70130

Office: (504) 299-3300

Direct: (504) 299-3333

Fax: (504) 299-3399

Email: ddraper@hellerdraper.com

Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.

CONFIDENTIALITY NOTICE:
INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 25



R. Charles Miller
202.778.9372
chuck.miller@klgates.com

December 31, 2020

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Re: <u>Termination of Dondero access to office and services</u>

Dear Counsel:

We are writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc. and the other retail funds advised by the Advisors (together, the "Funds").

We have been provided a copy of your December 23, 2020 letter to Mr. Lynn regarding the termination of Mr. Dondero's access to the office and services. We are extremely concerned that the loss of such access by Mr. Dondero could have serious effects for our clients and do unintended damage to their interests. In particular, the Funds, many of which are publicly-listed, registered with and regulated by the Securities and Exchange Commission, and have thousands of shareholders, may be economically disadvantaged to the extent that the Debtor's actions deny Mr. Dondero the access and ability to provide the necessary and contractual services to them.

Mr. Dondero is portfolio manager and/or officer of various entities which occupy space in the premises and have shared access to email accounts, computers and other relevant material pursuant to the terms of various shared services agreements (the "Agreements"), which the Debtor has not rejected and for which such entities pay the Debtor significant fees. We are not aware of any provisions under the Agreements which give the Debtor the power to determine which employees of NexPoint Advisors,

L.P. and other entities may enter the premises or have access to the email and related systems.  If there are, please direct us to those provisions.  The Debtor has given written notice to the Advisors and the Funds that the Agreements will remain in place until January 31, 2021, at which time they will terminate, and our clients have been and are acting in reliance on those written representations from the Debtor.

Mr. Dondero is the lead (and in some cases the sole) portfolio manager for certain of the Funds.  He is intimately involved in the day-to-day operations and investment decisions regarding those Funds and in the operations of the Advisors.  We believe that denying Mr. Dondero access to the premises, email and related systems will materially and adversely affect the function and reputation of the Advisors and the Funds.  We ask that the Debtor reconsider its position refusing Mr. Dondero necessary access to the email, operating systems and building required to serve the Funds and the Advisors.

Sincerely,

*/s R. Charles Miller*

R. Charles Miller

Cc:

D. Michael Lynn (via email)

# EXHIBIT 26

**From:** Grant Scott <gscott@scottlawgroupllc.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** FW: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?
**Date:** Wed, 23 Dec 2020 15:02:50 +0000
**Inline-Images:** image001.jpg

---

FYI, now

**From:** John J. Kane
**Sent:** Wednesday, December 23, 2020 9:58 AM
**To:** Grant Scott ; dsauter@nexpointadvisors.com; A. Lee Hogewood
**Cc:** Brian Clark
**Subject:** Re: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?

866-399-4184

Conf Id: 5549564

Sent from my iPhone

On Dec 23, 2020, at 8:52 AM, Grant Scott <gscott@scottlawgroupllc.com> wrote:

FYI

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Sent:** Wednesday, December 23, 2020 9:51 AM
**To:** Grant Scott <gscott@scottlawgroupllc.com>
**Cc:** Jason Post <JPost@NexpointAdvisors.com>; Hogewood, III, A. Lee <A.Lee.HogewoodIII@klgates.com>
**Subject:** RE: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?

Yes. Copied here. Is there a dial-in?

**D.C. Sauter**

O: 972.628.4117 | C: 469.877.6440

---

**From:** Grant Scott <gscott@scottlawgroupllc.com>
**Sent:** Wednesday, December 23, 2020 8:48 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Subject:** It appears Jim will be available for a 9AM CT call. Can the K&L people make it?

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.



# EXHIBIT 27



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Jeffrey N. Pomerantz

December 23, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

Re:    **Termination of James Dondero Access to Office and Services**

Dear Judge Lynn:

As you know, on December 10, 2020, a temporary restraining order was entered against Mr. James Dondero by the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "TRO"). Case No. 20-03190-sgj, Docket No. 10 (Bankr. N.D. Tex. Dec. 10, 2020.

Pursuant to the TRO, Mr. Dondero was, among others things, prohibited from communicating with the employees of Highland Capital Management, L.P. (the "Debtor") (subject to certain limited exceptions) and interfering with or otherwise impeding, directly or indirectly, the Debtor's business. We have discussed with you several instances in which Mr. Dondero breached the terms of the TRO and will not repeat them here.

As you also know, the Debtor manages certain collateralized loan obligations (the "CLOs"). The Debtor sought to cause the CLOs to sell certain publicly-traded equity securities, including AVYA and SKY (tickers), prior to Thanksgiving. Mr. Dondero blocked these trades. That conduct, among other things, caused the TRO to be entered.

These trades were also the subject to the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager,*



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 23, 2020
Page 2

*to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "CLO Motion"), which was filed by, among others, NexPoint Advisors, L.P. ("NPA") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"). At the hearing on December 16, 2020, Judge Jernigan stated both that she agreed that the CLO Motion was brought by "Mr. Dondero, through different entities" and that it was frivolous.

On December 22, 2020, employees of NPA and HCMFA notified the Debtor that they would not settle the CLOs' sale of the AVYA and SKY securities. To justify their conduct, those employees mimicked the frivolous arguments made in the CLO Motion. This conduct violated the TRO, and HCMLP reserves all rights to seek appropriate sanctions with respect to such violation.

As a result of this conduct, among other things, HCMLP has concluded that Mr. Dondero's presence at the HCMLP office suite and his access to all telephonic and information services provided by HCMLP are too disruptive to HCMLP's continued management of its bankruptcy case to continue.

As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.

Further, as of the Termination Date, Mr. Dondero's access to his @highlandcapital.com email account will be revoked, and Mr. Dondero will no longer have access to that email account or any emails, calendars, or contacts associated with that email account.

In addition, Mr. Dondero's access to the HCMLP system and all services maintained on that system, including his Bloomberg terminal, will be revoked as of the Termination Date.

HCMLP will also terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the "Cell Phones"). HCMLP demands that Mr. Dondero immediately turn over the Cell Phones to HCMLP by delivering them to you; we can make arrangements to recover the phones from you at a later date. The Cell Phones and



December 23, 2020
Page 3

the accounts are property of HCMLP. HCMLP further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone. HCMLP, as the owner of the account and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information.

Any attempt by Mr. Dondero to enter the Office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass. Similarly, any attempts by Mr. Dondero to access his @highlandcapital.com email account or any other service previously provided to Mr. Dondero by HCMLP will be viewed as an act of trespass, theft, and/or an attempted breach of HCMLP's security protocols.

Finally, HCMLP demands that Mr. Dondero take all steps necessary to retain and protect from loss, destruction, alteration or defacement all documents, communications, and information relating to the Debtor, the Debtor's assets, any assets managed by the Debtor, or the Debtor's employees.

HCMLP reserves all rights that it may have whether at law, equity, or in contract, including the right to restrict the access of HCMFA and NPA employees to the Office and HCMLP-provided services. Nothing herein will be construed as a waiver of any such rights.

Sincerely,

*J. Pomerantz/gvn*

Jeffrey N. Pomerantz

cc:    Ira Kharasch, Esq.
       John Morris, Esq.
       Gregory Demo, Esq.

# EXHIBIT 28

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § § § § § § § § | |
| Plaintiff, | | Adversary Proceeding No. |
| vs. | | No. 20-3190-sgj11 |
| JAMES D. DONDERO, | | |
| Defendant. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210107000000000013

**PLAINTIFF'S MOTION FOR AN ORDER REQUIRING MR. JAMES DONDERO TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR <u>VIOLATING THE TRO</u>**

Highland Capital Management, L.P., the plaintiff in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>") and the debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>Highland</u>") in the above-captioned chapter 11 case ("<u>Bankruptcy Case</u>"), by and through its undersigned counsel, files this motion (the "<u>Motion</u>") seeking entry of an order requiring Mr. James Dondero (hereinafter, "<u>Mr. Dondero</u>") to show cause why he should not be held in civil contempt for violating the Court's *Order Granting Debtor's Motion for a Temporary Restraining Order against James Dondero* (Adv. Pro. Docket No. 10) (the "<u>TRO</u>"). In support of the Motion, the Debtor respectfully states the following:

## <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334(b). The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.      The predicates for the relief requested in the Motion are sections 105(a) and 362(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 7065 and 7001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## <u>RELIEF REQUESTED</u>

4.      The Debtor requests that this Court issue the proposed form of order to show cause, attached hereto as **<u>Exhibit A</u>** (the "<u>Proposed Order</u>"), pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Rules 7001 and 7065 of the Bankruptcy Rules.

5.      The evidence and arguments supporting the Motion are set forth in the Debtor's *Memorandum of Law in Support of Its Motion for an Order Requiring Mr. James Dondero to*

2

*Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Memorandum of Law"), and the *Declaration of John A. Morris in Support of the Debtor's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Morris Declaration"), and the exhibits annexed thereto, filed contemporaneously with this Motion. For the reasons set forth the Memorandum of Law, the Debtor requests that the Court (i) find and hold Mr. Dondero in contempt for violating the TRO; (ii) direct Mr. Dondero to produce to the Debtor and the UCC, within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) direct Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion, payable within three calendar days of presentment of an itemized list of expenses; (iv) impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (v) grant the Debtor such other and further relief as the Court deems just and proper under the circumstances.

6.     In accordance with Rule 7007-1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), contemporaneously herewith and in support of this Motion, the Debtor is filing: (a) its Memorandum of Law, (b) the Morris Declaration, and (c) the Debtor's *Motion for Expedited Hearing on Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Motion to Expedite").

7.     Based on the exhibits annexed to the Morris Declaration, and the arguments contained in the Memorandum of Law, the Debtor is entitled to the relief requested herein as set forth in the Proposed Order.

3

8.      Notice of this Motion has been provided to Mr. Dondero.  The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the Proposed Order substantially in the formed annexed hereto as **Exhibit A** granting the relief requested herein, and (ii) grant the Debtor such other and further relief as the Court may deem proper.

4

Dated:  January 7, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § No. 20-3190-sgj11 |
| | § |
| JAMES D. DONDERO, | § |
| | § |
| Defendant. | § |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER REQUIRING MR. JAMES DONDERO TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR VIOLATING THE TRO

Having considered (a) the Debtor's *Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* [Docket No. __] (the "Motion"); [2] (b) the *Debtor's Memorandum of Law in Support of Its Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* [Docket No. __] (the "Memorandum of Law"); (c) the exhibits annexed to the *Declaration of John A. Morris in Support of the Debtor's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* [Docket No. __] (the "Morris Declaration"); and (d) all prior proceedings relating to this matter, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Docket No. 6] (the "TRO Hearing") and the hearing (the "Restriction Motion Hearing") on the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Bankr. Case Docket No. 1528] that was brought by certain financial advisory firms and investment funds that are represented by the law firm K&L Gates (collectively, the "K&L Gates Clients"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that sanctions are warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      Mr. Dondero shall show cause before this Court on **Friday, January 8, 2021 at 9:30 a.m. (Central Time)** why an order should not be granted: (i) finding and holding Mr. Dondero in contempt for violating the TRO; (ii) directing Mr. Dondero to produce to the Debtor and the UCC within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) directing Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion and addressing Mr. Dondero's conduct that lead to the imposition of the TRO and this Motion (*e.g.*, responding to the K&L Gates Clients' frivolous motion and related demands and threats and taking Mr. Dondero's deposition), payable within three (3) calendar days of presentment of an itemized list of expenses, (iv) imposing a penalty of three (3) times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (iv) granting the Debtor such other and further relief as the Court deems just and proper under the circumstances.

3.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

# EXHIBIT 29

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | | Case No. 19-34054-sgj11 |
| Debtor. | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § § § § § § § § | |
| Plaintiff, | | Adversary Proceeding |
| vs. | | No. 20-3190-sgj11 |
| JAMES D. DONDERO, | | |
| Defendant. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210107000000000018

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................3

    A.    The TRO is Entered but Mr. Dondero Does Not Read It or Understand its Terms ................................................................................................................3

    B.    Mr. Dondero Violated the TRO by Throwing Away his Cell Phone after the TRO was entered...........................................................................................4

    C.    Mr. Dondero Violated the TRO by Trespassing on the Debtor's Property ............5

    D.    Mr. Dondero Violated the TRO by Interfering with the Debtor's Trading as Portfolio Manager of Certain CLOs .................................................................6

    E.    Mr. Dondero Violated the TRO by "Pushing and Encouraging" the K&L Gates Clients to Make Further Demands and Threats Against the Debtor.............6

    F.    Mr. Dondero Violated the TRO by Communicating with the Debtor's Employees to Coordinate Their Legal Strategy Against the Debtor ......................7

    G.    Mr. Dondero Violated the TRO by Preventing the Debtor from Completing its Document Production...................................................................7

CONCLUSION.......................................................................................................10

i

# TABLE OF AUTHORITIES

**Cases**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
    228 F.3d 574 (5th Cir. 2000).................................................................... 8, 9

*F.D.I.C. v. LeGrand*,
    43 F.3d 163 (5th Cir. 1995)..................................................................... 8, 9

*In re Bradley*,
    588 F.3d 254 (5th Cir. 2009)..................................................................... 7, 8

*In re SkyPort Global Comm's, Inc.*,
    No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013) ............... 7, 8

*Martin v. Trinity Indus., Inc.*
    959 F.2d 45 (5th Cir.1992)........................................................................ 8

*N.L.R.B. v. Trailways, Inc.*,
    729 F.2d 1013 (5th Cir.1984)..................................................................... 9

*Norman Bridge Drug Co. v. Banner*,
    529 F.2d 822 (5th Cir.1976)..................................................................... 9

*Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),\*
    108 F.3d 609 (5th Cir.1997)..................................................................... 8, 9

**Statutes**

11 U.S.C. § 105................................................................................... 8

11 U.S.C. § 105(a) .............................................................................. 7

**Rules**

Fed. R. Civ. P. 65 .............................................................................. 8

## DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ORDER REQUIRING MR. JAMES DONDERO TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR VIOLATING THE TRO

Highland Capital Management, L.P., the plaintiff in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>"), and the debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>Highland</u>") in the above-captioned chapter 11 case ("<u>Bankruptcy Case</u>"), submits this memorandum of law (the "<u>Memorandum</u>") in support of the *Debtor's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "<u>Motion</u>"), pursuant to sections 105(a) and 362(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for an order requiring Mr. James Dondero (hereinafter "<u>Mr. Dondero</u>") to show cause why he should not be held in civil contempt for violating the Court's *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* (Adv. Pro. Docket No. 10) (the "<u>TRO</u>").  In support of its Motion, the Debtor states as follows:

### <u>PRELIMINARY STATEMENT</u>

1.      On December 10, 2020, this Court issued the TRO temporarily restraining Mr. Dondero from, among other things, (a) communicating with any of the Debtor's employees, (b) interfering with or otherwise impeding the Debtor's operations and management of its assets, and (c) causing or encouraging any entity owned or controlled by Mr. Dondero from, directly or indirectly, interfering with the Debtor's operations and disposition of its assets.

2.      The evidence (including documents and Mr. Dondero's brash admissions made during a deposition earlier this week) demonstrates that Mr. Dondero cavalierly violated the TRO a substantial number of times, and in substantial ways; it also shows that he has no

1

regard for this Court or these proceedings.  Indeed, at least as of the time of his deposition, Mr. Dondero had not even bothered to read the TRO or make any attempt to understand its scope.

3.     In the four short weeks since the TRO was entered, Mr. Dondero (a) "disposed" of (*i.e.*, threw in the garbage) a cell phone bought and paid for by the Debtor in what the Debtor believes was an attempt to evade discovery; (b) trespassed on the Debtor's property after the Debtor evicted him from its offices precisely because he was interfering with its business; (c) interfered with the Debtor's efforts to execute certain transactions in its capacity as portfolio manager of certain CLOs (despite knowing of this Court's ruling just six days earlier in which it denied as "frivolous" a related motion brought by the K&L Gates Clients (as defined below)); (d) otherwise knew of and supported the K&L Gates Clients when they sent three separate letters to the Debtor making further demands and threats; (e) colluded with Scott Ellington and Isaac Leventon (before they were terminated as Debtor's in-house counsel) to coordinate legal strategy against the Debtor; and (f) interfered with the Debtor's obligation to produce certain documents that were requested by the Official Committee of Unsecured Creditors (the "UCC") and that were in the Debtor's possession, custody, and control.[2]

4.     There is ample, admissible evidence to support the Motion.  Based on that evidence, the Debtor requests that the Court (i) find and hold Mr. Dondero in contempt for violating the TRO; (ii) direct Mr. Dondero to produce to the Debtor and the UCC within three days all financial statements and records of Dugaboy and Get Good for the last five years; (iii) direct Mr. Dondero to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this Motion and addressing Mr. Dondero's conduct that lead to the imposition of the TRO and this Motion (*e.g.*, responding to the K&L Gates

---

[2] The Debtor's investigation of Mr. Dondero's conduct, and the roles played by Mr. Ellington and Mr. Leventon, is ongoing and the Debtor reserves the right to identify additional bases to support the Motion and/or to assert claims against anyone who wrongfully acted against the Debtor's interests.

2

Clients' frivolous motion and related demands and threats and taking Mr. Dondero's deposition), payable within three calendar days of presentment of an itemized list of expenses, (iv) impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this Court, and (v) grant the Debtor such other and further relief as the Court deems just and proper under the circumstances.

## FACTUAL BACKGROUND

**A.      The TRO is Entered but Mr. Dondero Does Not Read It or Understand its Terms**

5.      On December 10, 2020, the Court issued the TRO prohibiting Mr. Dondero from engaging in certain conduct with respect to the Debtor's operations in order to prevent irreparable harm to the Debtor pending the hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Docket No. 6], scheduled for January 8, 2021 (the "Hearing").  Specifically, the TRO temporarily enjoined and restrained Mr. Dondero from:

(2)(a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication;

(b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents;

(c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero;

(d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan;
(e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, (a)-(e) constitutes the "Prohibited Conduct"); and

(3) causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

3

*See* **Morris Dec. Exhibit J**.[3]

6.       Mr. Dondero could not care less about the Debtor's request for a temporary restraining order against him, or the Court's issuance of the TRO.   Among other things, Mr. Dondero never (at least as of the time of his deposition on January 4, 2021):

* reviewed the Declaration of James P. Seery, Jr., the Debtor's Chief Executive Officer, in support of the Debtor's motion for the temporary restraining order;

* attempted to learn of the allegations made against him;

* thought about the fact that the Debtor was seeking a restraining order against him;

* listened to the hearing where the Court admitted evidence and heard argument on the Debtor's motion;

* read the transcript of the hearing where the Court granted the Debtor's motion for the TROr;

* read the TRO after it was entered; or

* made any meaningful effort to understand the scope of the TRO.

**Morris Dec. Ex. Z at 12:17-15:14**.

7.       Mr. Dondero's willful ignorance of the TRO, and the evidence supporting the entry of the TRO, is itself contemptible.

**B.       Mr. Dondero Violated the TRO by Throwing Away his Cell Phone after the TRO was entered**

8.       Mr. Dondero had a cell phone that was bought and paid for by the Debtor (the "Debtor's Phone").   The cell phone ATT account to which the phone and number were attached is also the Debtor's property.   In early December, Mr. Dondero had the telephone number associated with the Debtor's Phone transferred to his personal account and – after the TRO was entered – "disposed" of the phone, likely by throwing it in the garbage.   Incredibly, Mr. Dondero could not recall at his deposition (a) who decided to throw the Debtor's Phone

---

[3] "Morris Dec." refers to the Declaration of John A. Morris, duly executed on January 7, 2021, and submitted contemporaneously herewith in support of the Debtor's Motion.

4

away, (b) who actually threw it away; or (c) when, after the TRO was entered, the Debtor's Phone was "disposed" of.

9.      Mr. Dondero was apparently not candid with his own lawyers concerning the whereabouts of the Debtor's Phone.  On December 23, 2020, the Debtor demanded, among other thing, the return of the Debtor's Phone for the express purpose of obtaining the text messages on it.  Mr. Dondero's counsel responded six days later to report that the Debtor's Phone could not be located; no mention was made of it having been "disposed" of.  **Morris Dec. Exs. G, K, U, and Z at 71:24-76:2; 86:4-87:15**.

10.      Mr. Dondero obviously communicates by text message.  Based on his conduct, the Court should find that Mr. Dondero has attempted to spoil evidence and draw a negative inference.

## C.      Mr. Dondero Violated the TRO by Trespassing on the Debtor's Property

11.      On December 23, 2020, the Debtor informed Mr. Dondero that he was being evicted from the Debtor's offices and would not be permitted entry as of December 30, 2020, precisely because the Debtor believed he was interfering with the Debtor's business.

12.      Despite the unambiguous nature of the Debtor's eviction notice, on January 5, 2021, Mr. Dondero walked right into the Debtor's offices and sat down in the Debtor's conference room to give his deposition; he even had the audacity to keep over 20 lawyers waiting while he spent 35 minutes making phone calls from the Debtor's offices.

13.      Mr. Dondero did not seek or obtain the Debtor's permission to enter their premises.  **Morris Dec. Exs. K, Z at 9:3-19**.  And the Debtor has no knowledge as to when he left that day, whether he met with any of the Debtor's employees, and whether he has been in the Debtor's offices at other times.

**D.      Mr. Dondero Violated the TRO by Interfering with the Debtor's
          Trading as Portfolio Manager of Certain CLOs** _____

14.      As this Court may recall from recent hearings, Mr. Dondero owns and/or controls certain financial advisory firms and investment funds that are represented by the law firm K&L Gates (those entities are collectively referred to as the "K&L Gates Clients").  The financial advisory firms owned by Mr. Dondero caused the investment funds controlled by Mr. Dondero to invest in certain CLOs that are managed by the Debtor pursuant to written agreements.  In a repeat of his performance around Thanksgiving, and notwithstanding his knowledge of this Court's dismissal of the "frivolous" motion brought by the K&L Gates Clients, on December 22, 2020, Mr. Dondero personally intervened to prevent the Debtor from executing certain securities transactions authorized by Mr. Dondero.  **Morris Dec. Exs. K, L, Z at 89:21-93:20**.

**E.      Mr. Dondero Violated the TRO by "Pushing and Encouraging" the
          K&L Gates Clients to Make Further Demands and Threats Against
          the Debtor** _____

15.      On December 22, 23, and 30, 2020, the K&L Gates Clients sent letters in which they made various demands and threats including, among other things, threats to take steps to terminate the Debtor's CLO management agreement and to hold the Debtor liable for purported damages arising from the Debtor's decision to evict Mr. Dondero from its offices.  As the court will recall from the testimony of Dustin Norris, Mr. Dondero owns and/or controls each of the K&L Gates Client.

16.      Mr. Dondero knew these letters were being sent and he "pushed" and "encouraged" the K&L Gates Clients to send them, with knowledge of the Court's December 16, 2020, ruling denying as "frivolous" the K&L Gates Clients' related motion.  **Morris Dec. Exs. M, N, X, and Z at 94:19-106:16**.  Indeed, the evidence will show that Mr. Dondero believes that

6

a class action lawsuit against Mr. Seery or a referral to market regulators are among the options available to the K&L Gates Clients. *See*, *e.g.*, **Morris Dec. Ex. Z at 62:19-63:22**.

**F.   Mr. Dondero Violated the TRO by Communicating with the Debtor's Employees to Coordinate Their Legal Strategy Against the Debtor**

17.   The Debtor will never be able to count the number of times that Mr. Dondero violated the TRO by communicating with the Debtor's employees, but the evidence currently available shows that he communicated with Mr. Ellington and Mr. Leventon (after the TRO was entered on December 10, 2020), in at least the following ways:

- On December 12, Mr. Ellington was actively involved in identifying a witness to support Mr. Dondero's interests at the December 16 hearing (**Morris Dec. Ex. P**);

- On December 15, Mr. Ellington and Mr. Leventon collaborated with Mr. Dondero's lawyers in preparing a "common interest" agreement (**Morris Dec. Exs. Q, Z at 116:21-120:14**);

- On December 16, Mr. Dondero solicited Mr. Ellington's help in coordinating all of the lawyers representing Mr. Dondero's interests, telling Mr. Ellington that he needed him to "show leadership" (which Mr. Ellington eagerly agreed to do) (**Morris Dec. Ex. W**);

- On December 23, Scott Ellington and Grant Scott communicated in connection with efforts to schedule a call with Mr. Dondero and K&L Gates (**Morris Dec. Ex. Y**);

- And in late December, Mr. Dondero communicated with Mr. Leventon to obtain the contact information for Mr. Ellington's and Mr. Leventon's new lawyers at Baker & McKenzie for the explicit purpose of advancing the "mutual shared defense agreement." (**Morris Dec. Exs. S, Z at 136:8-139:5**).

**G.   Mr. Dondero Violated the TRO by Preventing the Debtor from Completing its Document Production**

18.   Mr. Dondero knew that several times in the last year "several entities" had requested the Dugaboy financial statements. The documents (and those of Get Good) are on the Debtor's system, apparently in a place few people know about. In keeping with the Debtor's policies, those documents on the Debtor's system are the Debtor's property. After the TRO was

7

entered, Mr. Dondero personally interfered with the Debtor's search for these documents and told one of the Debtor's employees that the records could not be produced without a subpoena. Notably, Mr. Dondero was instructed not to answer questions about whether he had discussed the production of these documents with Mr. Ellington or Mr. Leventon, and he followed his counsel's instructions. **Morris Dec. Exs. R, Z at 124:25-135:11**.[4]

## **ARGUMENT**

19.     "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts." *In re SkyPort Global Comm's, Inc.*, No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013), aff'd., 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley*, 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" and it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir.1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."). A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties. *SkyPort Global*, 2013 WL 4046397, at *1. Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory." *Id.* (internal quotations omitted); *see*

---

[4] As the Court may recall, on August 12, 2020, the Court entered an *Order Resolving Discovery Motions and Objections Thereto* [Docket No., 942] that supposedly addressed issues of shared services and "ownership" arguments made by related parties.

*also Bradley*, 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

20. "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost*, 68 F.3d at 961. Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence: "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir.1992) (same); *Travelhost*, 68 F.3d at 961 (same). "To support a contempt finding in the context of a TRO, the order must delineate 'definite and specific' mandates that the defendants violated." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65). The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Id.* Moreover, "[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order. *Id.* (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir.1984).

21. To that end, judicial sanctions in civil contempt proceedings may be employed for either or both of two purposes: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines,* 228 F.3d at 586 (internal quotations omitted). "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of [their] adversary's noncompliance." *Norman*

*Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir.1976); *see also Travelhost*, 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.*, 43 F.3d 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees). Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding." *Am. Airlines,* 228 F.3d at 585; *see also F.D.I.C., 43 F.3d 168* (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]"). For the reasons that follow, the Debtor shows—clearly and convincingly—that Mr. Dondero committed contempt.

22. The Debtor easily meets the foregoing standards. Based on the evidence, there can be no dispute that Mr. Dondero has wantonly and intentionally violated the TRO on many occasions, in many ways. Mr. Dondero's conduct cannot be justified or explained away and there is no basis to oppose this relief requested herein.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court grant its Motion and enter an Order in the form annexed hereto as Exhibit A, and grant any further relief as the Court deems just and proper.

Dated:  January 7, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

11

# EXHIBIT 30

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding |
| | § |
| vs. | § No. 20-3190-sgj11 |
| | § |
| JAMES D. DONDERO, | § |
| | § |
| Defendant. | § |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210107000000000019

## DECLARATION OF JOHN A. MORRIS
## IN SUPPORT OF THE DEBTOR'S MOTION FOR AN ORDER REQURIING MR. JAMES
## DONDERO TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CIVIL CONTEMPT
## FOR VIOLATING THE TRO

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares as follows:

1.     I am a partner in the law firm Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* (the "Motion") being filed contemporaneously herewith.[2] I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.     Attached as **Exhibit G** is a true and correct copy of certain text messages between James Dondero and Jason Rothstein.[3]

3.     Attached as **Exhibit K** is a true and correct copy of a letter from Pachulski Stang Ziehl & Jones LLP to D. Michael Lynn, dated December 23, 2020.

4.     Attached as **Exhibit L** is a true and correct copy of an e-mail string dated December 18, 2020, concerning certain trading activity.

5.     Attached as **Exhibit M** is a true and correct copy of the Response to K&L Gates LLP, dated December 22, 2020.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[3] Because this Motion is related to the Debtor's motion for a preliminary injunction that will be heard on January 8, 2021, for the convenience of the Court and the parties, the Debtor adopts for this Motion the order of exhibits set forth in the *Debtor's Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held on January 8, 2021.* [Adv. Pro. Docket No. 45], and any amendments thereto.

6.      Attached as **Exhibit N** is a true and correct copy of the Response to K&L Gates LLP, dated December 23, 2020.

7.      Attached as **Exhibit P** is a true and correct copy of an e-mail string dated December 12, 2020, concerning a possible deal.

8.      Attached as **Exhibit Q** is a true and correct copy of an e-mail string dated December 16, 2020 regarding list for joint meeting.

9.      Attached as **Exhibit R** is a true and correct copy of certain text messages between James Dondero and Melissa Schroth

10.     Attached as **Exhibit S** is a true and correct copy of certain text messages between James Dondero and Isaac Leventon.

11.     Attached as **Exhibit U** is a true and correct copy of a letter from Bonds Ellis to J. Pomerantz, dated December 29, 2020.

12.     Attached as **Exhibit W** is a true and correct copy of an e-mail string dated December 15, 2020, concerning The Dugaboy Investment Trust and Get Good Trust Common Interest Agreement.

13.     Attached as **Exhibit X** is a true and correct copy of a letter dated December 30, 2020, from K&L Gates to Pachulski Stang Ziehl and Jones.

14.     Attached as **Exhibit Y** is a true and correct copy of an e-mail between Grant Scott and Scott Ellington dated December 23, 2020.

15.     Attached as **Exhibit Z** is a true and correct copy of the transcript of the deposition of Mr. James Dondero, dated January 5, 2021.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: January 7, 2021.

/s/ John A. Morris
John A. Morris

# EXHIBIT G



# EXHIBIT K



**PACHULSKI**

**STANG**

**ZIEHL**

**JONES**

L A W   O F F I C E S
LIMITED LIABILITY PARTNERSHIP

L O S   A N G E L E S ,   C A
S A N   F R A N C I S C O ,   C A
W I L M I N G T O N , D E
N E W   Y O R K ,   N Y

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

Jeffrey N. Pomerantz

December 23, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

  **Re: Termination of James Dondero Access to Office and Services**

Dear Judge Lynn:

As you know, on December 10, 2020, a temporary restraining order was entered against Mr. James Dondero by the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "TRO"). Case No. 20-03190-sgj, Docket No. 10 (Bankr. N.D. Tex. Dec. 10, 2020.

Pursuant to the TRO, Mr. Dondero was, among others things, prohibited from communicating with the employees of Highland Capital Management, L.P. (the "Debtor") (subject to certain limited exceptions) and interfering with or otherwise impeding, directly or indirectly, the Debtor's business. We have discussed with you several instances in which Mr. Dondero breached the terms of the TRO and will not repeat them here.

As you also know, the Debtor manages certain collateralized loan obligations (the "CLOs"). The Debtor sought to cause the CLOs to sell certain publicly-traded equity securities, including AVYA and SKY (tickers), prior to Thanksgiving. Mr. Dondero blocked these trades. That conduct, among other things, caused the TRO to be entered.

These trades were also the subject to the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager,*

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 23, 2020
Page 2

*to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "CLO Motion"), which was filed by, among others, NexPoint Advisors, L.P. ("NPA") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"). At the hearing on December 16, 2020, Judge Jernigan stated both that she agreed that the CLO Motion was brought by "Mr. Dondero, through different entities" and that it was frivolous.

On December 22, 2020, employees of NPA and HCMFA notified the Debtor that they would not settle the CLOs' sale of the AVYA and SKY securities. To justify their conduct, those employees mimicked the frivolous arguments made in the CLO Motion. This conduct violated the TRO, and HCMLP reserves all rights to seek appropriate sanctions with respect to such violation.

As a result of this conduct, among other things, HCMLP has concluded that Mr. Dondero's presence at the HCMLP office suite and his access to all telephonic and information services provided by HCMLP are too disruptive to HCMLP's continued management of its bankruptcy case to continue.

As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.

Further, as of the Termination Date, Mr. Dondero's access to his @highlandcapital.com email account will be revoked, and Mr. Dondero will no longer have access to that email account or any emails, calendars, or contacts associated with that email account.

In addition, Mr. Dondero's access to the HCMLP system and all services maintained on that system, including his Bloomberg terminal, will be revoked as of the Termination Date.

HCMLP will also terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the "Cell Phones"). HCMLP demands that Mr. Dondero immediately turn over the Cell Phones to HCMLP by delivering them to you; we can make arrangements to recover the phones from you at a later date. The Cell Phones and



December 23, 2020
Page 3

the accounts are property of HCMLP. HCMLP further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone. HCMLP, as the owner of the account and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information.

Any attempt by Mr. Dondero to enter the Office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass. Similarly, any attempts by Mr. Dondero to access his @highlandcapital.com email account or any other service previously provided to Mr. Dondero by HCMLP will be viewed as an act of trespass, theft, and/or an attempted breach of HCMLP's security protocols.

Finally, HCMLP demands that Mr. Dondero take all steps necessary to retain and protect from loss, destruction, alteration or defacement all documents, communications, and information relating to the Debtor, the Debtor's assets, any assets managed by the Debtor, or the Debtor's employees.

HCMLP reserves all rights that it may have whether at law, equity, or in contract, including the right to restrict the access of HCMFA and NPA employees to the Office and HCMLP-provided services. Nothing herein will be construed as a waiver of any such rights.

Sincerely,

*J. Pomerantz/jvp*

Jeffrey N. Pomerantz

cc:     Ira Kharasch, Esq.
        John Morris, Esq.
        Gregory Demo, Esq.

# EXHIBIT L

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** FW: Jefferies recap
**Date:** Fri, 18 Dec 2020 16:03:32 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.png

---

**From:** Joe Sowin
**Sent:** Friday, December 18, 2020 3:34 PM
**To:** Jim Dondero ; DC Sauter
**Subject:** FW: Jefferies recap

**JOSEPH R. SOWIN**

**Co-Chief Investment Officer & Global Head of Equity Trading**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.419.4492 | C: 203.912.5935 | F: 972.628.4147

jsowin@highlandcapital.com| www.highlandcapital.com

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Friday, December 18, 2020 3:32 PM
**To:** Steven Haltom <SHaltom@HighlandCapital.com>; Brad Gianiny <bgianiny@jefferies.com>; Cyrus Eftekhari <CEftekhari@HighlandCapital.com>; Christopher A Bianchi <cbianchi@jefferies.com>; James Colasanto <jcolasanto@jefferies.com>; James Romey <jromey@DSIConsulting.com>; Joe Sowin <JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>; NYMO1 <NYMO1@Jefferies.com>; Ronald Wong <rwong@jefferies.com>; R-Settlement <R-Settlement@Highlandfunds.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: Jefferies recap

To be clear, Avaya should be allocated evenly to the 10 CLOs that hold it. NO account sold short. Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Jim Seery <jpseeryjr@gmail.com>
**Date:** Friday, December 18, 2020 at 4:30 PM
**To:** Steven Haltom <SHaltom@HighlandCapital.com>, Brad Gianiny <bgianiny@jefferies.com>, Cyrus

Eftekhari <CEftekhari@HighlandCapital.com>, Christopher A Bianchi <cbianchi@jefferies.com>, James Colasanto <jcolasanto@jefferies.com>, James Romey <jromey@DSIConsulting.com>, Joseph Sowin <JSowin@HighlandCapital.com>, Matt Pearson <MPearson@HighlandCapital.com>, NYMO1 <NYMO1@Jefferies.com>, Ronald Wong <rwong@jefferies.com>, R-Settlement <R-Settlement@Highlandfunds.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Subject:** Re: Jefferies recap

The NXRT is out of the HCMLP internal.

SKY should be allocated evenly across Grayson and Greenbriar CLO

Avaya should be allocated pro rata across all of the CLOS except Acis 7.

Please call me with any questions.

Thanks

Best. Jim

Jim Seery

631-804-2049

jpseeryjr@gmail.com

---

**From:** Steven Haltom <SHaltom@HighlandCapital.com>
**Date:** Friday, December 18, 2020 at 4:21 PM
**To:** Brad Gianiny <bgianiny@jefferies.com>, Cyrus Eftekhari <CEftekhari@HighlandCapital.com>, Christopher A Bianchi <cbianchi@jefferies.com>, James Colasanto <jcolasanto@jefferies.com>, Jim Seery <jpseeryjr@gmail.com>, James Romey <jromey@DSIConsulting.com>, Joseph Sowin <JSowin@HighlandCapital.com>, Matt Pearson <MPearson@HighlandCapital.com>, NYMO1 <NYMO1@Jefferies.com>, Ronald Wong <rwong@jefferies.com>, R-Settlement <R-Settlement@Highlandfunds.com>
**Subject:** RE: Jefferies recap

Brad,

What accounts are these in?

**Steven Haltom | Manager, Operations**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

972.628.4178 | shaltom@hcmlp.com | www.hcmlp.com

---

**From:** Brad Gianiny <bgianiny@jefferies.com>
**Sent:** Friday, December 18, 2020 3:02 PM
**To:** Cyrus Eftekhari <CEftekhari@HighlandCapital.com>; Christopher A Bianchi <cbianchi@jefferies.com>; James Colasanto <jcolasanto@jefferies.com>; Jim Seery

<jpseeryjr@gmail.com>; James Romey <jromey@DSICconsulting.com>; Joe Sowin <JSowin@HighlandCapital.com>; Matt Pearson <MPearson@HighlandCapital.com>; NYMO1 <NYMO1@Jefferies.com>; Ronald Wong <rwong@jefferies.com>; R-Settlement <R-Settlement@Highlandfunds.com>

**Subject:** Jefferies recap

SKY- sld 22k @ 32.2251

NHF- sld 10k @ 10.5461

AVYA- sld 6412 @ 19.7598

Brad Gianiny

Equity Sales Trader

Jefferies LLC

520 Madison Avenue, 2nd Floor

New York, NY 10022

W: 212-284-2291

C: 770-366-6253

http://www.jefferies.com/salesandtradingdisclaimer/
http://extwebdev.qa.jefco.com/europeandasiasalesandtradingdisclaimer/

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT M



**PACHULSKI**
**STANG**
**ZIEHL**
**&**
**JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

Gregory Demo

**LOS ANGELES**
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

December 24, 2020

212-561-7700
gdemo@pszjlaw.com

<u>Via E-mail</u>

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

> **Re:** ***In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex)**

Dear Counsel:

As you know, we represent Highland Capital Management, L.P. (the "<u>Debtor</u>"), the debtor-in-possession in the above-captioned bankruptcy case.

On December 8, 2020, your firm filed that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "<u>Motion</u>")[1] on behalf of Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "<u>Movants</u>"). After hearing the sworn testimony of the Movants' witness and the arguments made on the Movants' behalf, Judge Jernigan found that the Motion was "a very, very frivolous motion" and that your firm "wasted [her]

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.



**PACHULSKI**

**STANG**

**ZIEHL**

**JONES**

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

time." (Transcript, 64:5-12)  An order was entered denying the Motion on December 18, 2020 [D.I. 1605].

On December 22, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) re-asserting almost verbatim the frivolous arguments raised in the Motion. Concurrently, we received notice that certain of the Movants' employees would not settle trades on behalf of the CLOs that were authorized by the Debtor acting in its capacity as the CLOs' portfolio manager.  The Movants' employees who interfered with the Debtor's directions justified their conduct by asserting – again almost verbatim – the frivolous arguments raised in the Motion.

The Movants have caused the Debtor to incur substantial costs defending itself against the Motion and preparing to defend against the frivolous suits forecasted in the Letter.  The Debtor demands that the Movants withdraw the letter by 5:00 p.m. CT on Monday, December 28, 2020, and confirm that the Movants and anyone acting on their behalf will take no further steps to interfere with the Debtor's directions as the CLOs' portfolio manager.  If the Movants fail to timely comply with these demands, the Debtor shall seek prompt judicial relief, including seeking sanctions under Federal Rule of Bankruptcy Procedure 9011.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:    Jeffrey Pomerantz, Esq.
        Ira Kharasch, Esq.
        John Morris, Esq.
        John J. Kane, Esq.

# Exhibit A



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full. In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders. Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing. While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request. Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act"). As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021. The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

308494123.3

# EXHIBIT N



**PACHULSKI**
**STANG**
**ZIEHL**
**JONES**

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

**LOS ANGELES**
10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory Demo                December 24, 2020                212-561-7700
                                                           gdemo@pszjlaw.com

**Via E-mail**

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

> **Re:** ***In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex)**

Dear Counsel:

As you know, we represent Highland Capital Management, L.P. (the "<u>Debtor</u>"), the debtor-in-possession in the above-captioned bankruptcy case.

On December 8, 2020, your firm filed that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "<u>Motion</u>")[1] on behalf of Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "<u>Movants</u>"). After hearing the sworn testimony of the Movants' witness and the arguments made on the Movants' behalf, Judge Jernigan was convinced that the Movants were in fact Mr. James Dondero seeking to disrupt

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

HCMP's estate by using different controlled entities to accomplish his ends.

On December 23, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) informing us that they were seeking to terminate certain CLO management agreements for "cause." For the reasons set forth herein, among others, such action is sanctionable under the circumstances and is otherwise prohibited by the CLOs' governing documents.

First, the Movants are owned and/or controlled by Mr. Dondero. These facts were disclosed in the Movants' public filings with the Securities and Exchange Commission and confirmed by Mr. Dustin Norris's testimony at the hearing held on December 16, 2020. Consequently, the Movants' attempt to terminate the CLO management agreements violates the order entered on January 9, 2020 [D.I. 339] (the "January Order"), which prohibits Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." A copy of the January Order is attached as Exhibit B.

Second, "cause" does not exist to terminate the CLO management agreements. The Debtor has a duty under the Investment Advisers Act of 1940 to the CLOs, not to any specific investor in the CLOs. *See, e.g., Goldstein v. SEC,* 451 F.3d 873, 881-82 (D.C. Cir. 2006) ("[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . ."). The Debtor has, at all times, fulfilled its statutory and contractual duties to the CLOs and will continue to do so. As counsel, you have a duty to investigate the spurious allegations in your pleadings, but you failed to do so. Your clients' desire to re-assert control over the CLOs is not evidence to the contrary.

Third, the Movants, by their own admission, consider themselves affiliates of the Debtor. Under the management agreements, affiliates of a manager cannot replace a manager, and therefore, are prohibited from removing a manager.

Please confirm to us, in writing, no later than 5:00 p.m. CT on Monday, December 28, 2020, that you are withdrawing the Letter and that the Movants and CLO Holdco, Ltd., commit not to take any



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 3

actions, either directly or indirectly, to terminate the CLO management agreements. If we do not receive such confirmation, the Debtor will seek immediate relief from the bankruptcy court, including an action for contempt for violating the January Order and sanctions under Federal Rule of Bankruptcy Procedure 9011 or otherwise.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:     Jeffrey Pomerantz, Esq.
        Ira Kharasch, Esq.
        John Morris, Esq.
        John J. Kane, Esq.

# Exhibit A



December 23, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HMCFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HMCFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

In other cases, such companies in combination with CLO Holdco hold, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

In pleadings filed with the Bankruptcy Court, you asserted that one or more of the entities identified above lacked the authority to seek a replacement of the Debtor as fund manager because of the alleged affiliate status of the beneficial owners of such entities.  We disagree.

Consequently, in addition to our request of yesterday, where appropriate and consistent with the underlying contractual provisions, one or more of the entities above intend to notify the relevant trustees and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United States Bankruptcy Code, including the automatic stay of Section 362. The basis for initiating the process for such removal includes, but is not limited to, the fact that HCMLP's duties, as set forth in the portfolio management agreements of the CLOs, are subject to the requirements of the Investment Advisers Act of 1940 ("Advisers Act"). HCMLP appears to be acting contrary to those duties under the agreements and where HCMLP is not fulfilling its duties under the portfolio management agreement it is therefore violating the Advisers Act. Thus, because HCMLP is (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced, including key investment professionals identified in the transactional documents for those CLOs (generally Mark Okada and Jim Dondero); (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan confirmation;  (iii)

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

adding a replacement manager as subadviser prior to January 31, 2021; and (iv) for other cause, the Advisors, Funds, and CLO Holdco have concluded that they have no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so.

Because the process of removal is being initiated, subject to the applicable provisions of the Bankruptcy Code, we respectfully request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing. To the extent there are CLO transactions prior to the confirmation, we intend to fully explore the business justification for doing so, as we do not believe there is any rational business reason to liquidate securities prior to that time.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

# Exhibit B

Case 20-03190-sgj Doc 155-5 Filed 04/06/21 Entered 04/06/21 18:06:05 Page 332 of 4
Case 19-34054-sgj11 Doc 935 Filed 01/09/20 Entered 01/09/20 18:04:05 Page 1 of 5
1674



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 9, 2020**



**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

### ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Case 20-03190-sgj Doc 555-1 Filed 04/26/21 Entered 04/26/21 18:03:05 Page 333 of
1674
Case 19-34054-sgj11 Doc 935 Filed 01/05/20 Entered 01/05/20 18:01:05 Page 38 of 5

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under

the circumstances and no other or further notice is required; and having determined that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

having determined that the relief sought in the Motion is in the best interests of the Debtor and its

estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED on the terms and conditions set forth herein, and

the United States Trustee's objection to the Motion is OVERRULED.

2.     The Term Sheet is approved and the Debtor is authorized to take such steps

as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not

limited to: (i) implementing the Document Production Protocol; and (ii) implementing the

Protocols.

3.     The Debtor is authorized (A) to compensate the Independent Directors for

their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of

the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of

the following six months, provided that the parties will re-visit the director compensation after the

sixth month and (B) to reimburse each Independent Director for all reasonable travel or other

expenses, including expenses of counsel, incurred by such Independent Director in connection

with its service as an Independent Director in accordance with the Debtor's expense

reimbursement policy as in effect from time to time.

2

Case 20-03190-sgj Doc 155-5 Filed 04/26/21 Entered 04/26/21 08:06:05 Page 334 of
Case 19-34054-sgj11 Doc 935 Filed 01/09/20 Entered 01/09/20 16:01:35 Page 3 of 5
1674

4.     The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.     The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.     All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.     Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.     Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.     Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

3

Case 20-03190-sgj Doc 155-1 Filed 04/26/21 Entered 04/26/21 18:30:05 Page 335 of 4
Case 19-34054-sgj11 Doc 935 Filed 01/09/20 Entered 01/09/20 15:01:55 Page 336 of 5
1674

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

11. Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

12. Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

4

Case 20-03190-sgj Doc 155 Filed 04/07/21 Entered 04/07/21 08:03:05 Page 336 of
1674
Case 19-34054-sgj11 Doc 935 Filed 01/09/20 Entered 01/09/20 18:04:35 Page 5 of 5

13. The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

DOCS_NY:39973.13 36027/002

# EXHIBIT P

**From:** Scott Ellington <SEllington@HighlandCapital.com>

**To:** Michael Lynn <dmljng@gmail.com>

**Cc:** Jim Dondero <JDondero@HighlandCapital.com>, John Bonds <john@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>, "John Wilson" <john.wilson@bondsellis.com>

**Subject:** Re: Possible deal

**Date:** Sat, 12 Dec 2020 23:55:16 -0600

**Importance:** Normal

---

It will be JP Sevilla.
I will tell him that he needs to contact you first thing in morning

Sent from my iPhone

On Dec 12, 2020, at 8:44 PM, Michael Lynn wrote:

That said we MUST have a witness NOW.

Sent from my BlackBerry 10 smartphone.

**From:** Michael Lynn
**Sent:** Saturday, December 12, 2020 8:42 PM
**To:** Jim Dondero; John Bonds; Bryan Assink; John Wilson
**Subject:** Possible deal

The possible deal with the debtor went nowhere. It llos like trial.

Sent from my BlackBerry 10 smartphone.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT Q

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Subject:** Re: List for joint meeting
**Date:** Wed, 16 Dec 2020 13:42:51 -0600
**Importance:** Normal

---

On it.

Sent from my iPhone

On Dec 16, 2020, at 1:33 PM, Jim Dondero wrote:

I'm going to need you to provide leadership here.

Sent from my iPhone

Begin forwarded message:

**From:** Michael Lynn
**Date:** December 16, 2020 at 1:07:50 PM CST
**To:** Douglas Draper , Jim Dondero
**Subject: Re: List for joint meeting**

I can't think of any others tassuming Zorada is with K&L Gates). I would contact the lawyers I have no opinion on additional contacts.

I had thought you would be representing more entities than the two trusts.

Sent from my BlackBerry 10 smartphone.
Original Message
From: Douglas Draper
Sent: Wednesday, December 16, 2020 11:13 AM
To: Michael Lynn; Jim Dondero
Subject: List for joint meeting

1) Daf john Kane attny 2) highland capital management fund advisors George Zorada 3) nexpoint advisors Laureen Drawhorn 4) highland clo funding Mark Maloney 5) employees David Neier
Do we want to add or delete anybody from the list. Is the best route to have me call the lawyer or have a someone contact the client contact for the lawyer. Please advise
On another matter I think it would be a good idea to have a second client contact for my two clients. Give me your thoughts

Sent from my iPhone
Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.
CONFIDENTIALITY NOTICE:

INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT R

12:17   .ıll 5G E 🔋

‹ 53

Melissa ›

Sat, Dec 12, 2:24 PM

Buyers agreed to February 1st it's a done deal counter has been signed!  Very good news.

Ok, thanks....
Has JP reviewed Maplewood

Sat, Dec 12, 7:21 PM

We had him review the lease to make sure we gave proper notice.

Mon, Dec 14, 10:52 AM

Please check your mail for the Acura title.  Thanks !

Ok haven't seen it yet...

Wed, Dec 16, 5:18 PM

No dugaboy details without subpoena

Thu, Dec 17, 2:49 PM

iMessage

ero 000014

# EXHIBIT S



# EXHIBIT U

## BONDS ELLIS EPPICH SCHAFER JONES LLP

### ATTORNEYS & COUNSELORS

D. MICHAEL LYNN  |  D: 817.405.6915  |  MICHAEL.LYNN@BONDSELLIS.COM

December 29, 2020

*Via Email*:
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

**Re:**    *In re: Highland Capital Management, L.P.* **– Case No. 19-34054**

Dear Jeff:

I am in receipt of your letter sent via email on the evening of December 23, 2020.

In response to the Debtor's demand concerning Mr. Dondero's cell phone, it is our understanding that the phone Dondero is currently using was purchased by Dondero several weeks ago and that the Debtor is not paying for the use of that phone. We are at present not sure of the location of the cell phone issued to Mr. Dondero by the Debtor, but we are not prepared to turn it over without ensuring that the privacy of attorney-client communications by text or email is protected. We are, however, willing to have an independent third party review any items that we would designate as privileged. Our office would need to review what is on the phone to determine what we would designate as privileged before it could reach such a person. In that regard, virtually all communications made between myself and other attorneys employed by Bonds Ellis Eppich Schafer Jones LLP have been through that phone and in many cases are preserved either as texts or emails.

Sincerely,

*/s/ D. Michael Lynn*

D. Michael Lynn

Cc:    Jim Dondero
       John Bonds

# EXHIBIT W

**From:** Scott Ellington <SEllington@HighlandCapital.com>
**To:** Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Fwd: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement
**Date:** Tue, 15 Dec 2020 15:47:38 -0600
**Importance:** Normal
**Attachments:** Common_Interest_Agreement_-_Dondero_(00374777-
2xBDDDE)_(002)_(Bonds_Ellis_comments).docx

---

Sent from my iPhone

Begin forwarded message:

**From:** Bryan Assink
**Date:** December 15, 2020 at 3:42:42 PM CST
**To:** Michael Lynn , Scott Ellington , John Bonds , John Wilson , Douglas Draper
**Subject: RE: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement**

All,

Attached is the Common Interest Agreement with our comments.

Best,
Bryan

---

**From:** Michael Lynn
**Sent:** Tuesday, December 15, 2020 2:53 PM
**To:** Scott Ellington ; John Bonds ; Bryan Assink ; John Wilson
**Subject:** Fw: The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement

Bryan or John will review the agreement for us.

Sent from my BlackBerry 10 smartphone.

---

**From:** Deborah Hepting <dhepting@hellerdraper.com>

**Sent:** Tuesday, December 15, 2020 2:16 PM

**To:** 'Jim Dondero'; Michael Lynn

**Subject:** The Dugaboy Investment Trust and Get Good Trust - Common Interest Agreement

Please note from Douglas:

Attached please find the form agreement. Please review and advise who I should contact about being a party. Please forward for me to Scott Ellington. As you send me names, we will contact the lawyer to get this moving.

Thanks,

Douglas S. Draper
**Heller, Draper & Horn, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, LA 70130

Office: (504) 299-3300

Direct: (504) 299-3333

Fax: (504) 299-3399

Email: ddraper@hellerdraper.com

Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.

CONFIDENTIALITY NOTICE:
INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT X



R. Charles Miller
202.778.9372
chuck.miller@klgates.com

December 31, 2020

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Re: Termination of Dondero access to office and services

Dear Counsel:

We are writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc. and the other retail funds advised by the Advisors (together, the "Funds").

We have been provided a copy of your December 23, 2020 letter to Mr. Lynn regarding the termination of Mr. Dondero's access to the office and services. We are extremely concerned that the loss of such access by Mr. Dondero could have serious effects for our clients and do unintended damage to their interests. In particular, the Funds, many of which are publicly-listed, registered with and regulated by the Securities and Exchange Commission, and have thousands of shareholders, may be economically disadvantaged to the extent that the Debtor's actions deny Mr. Dondero the access and ability to provide the necessary and contractual services to them.

Mr. Dondero is portfolio manager and/or officer of various entities which occupy space in the premises and have shared access to email accounts, computers and other relevant material pursuant to the terms of various shared services agreements (the "Agreements"), which the Debtor has not rejected and for which such entities pay the Debtor significant fees. We are not aware of any provisions under the Agreements which give the Debtor the power to determine which employees of NexPoint Advisors,

December 30, 2020
Page 2

L.P. and other entities may enter the premises or have access to the email and related systems. If there are, please direct us to those provisions. The Debtor has given written notice to the Advisors and the Funds that the Agreements will remain in place until January 31, 2021, at which time they will terminate, and our clients have been and are acting in reliance on those written representations from the Debtor.

Mr. Dondero is the lead (and in some cases the sole) portfolio manager for certain of the Funds. He is intimately involved in the day-to-day operations and investment decisions regarding those Funds and in the operations of the Advisors. We believe that denying Mr. Dondero access to the premises, email and related systems will materially and adversely affect the function and reputation of the Advisors and the Funds. We ask that the Debtor reconsider its position refusing Mr. Dondero necessary access to the email, operating systems and building required to serve the Funds and the Advisors.

Sincerely,

*/s R. Charles Miller*

R. Charles Miller

Cc:

D. Michael Lynn (via email)

308572964.2

# EXHIBIT Y

**From:** Grant Scott <gscott@scottlawgroupllc.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** FW: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?
**Date:** Wed, 23 Dec 2020 15:02:50 +0000
**Inline-Images:** image001.jpg

---

FYI, now

**From:** John J. Kane
**Sent:** Wednesday, December 23, 2020 9:58 AM
**To:** Grant Scott ; dsauter@nexpointadvisors.com; A. Lee Hogewood
**Cc:** Brian Clark
**Subject:** Re: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?


866-399-4184

Conf Id: 5549564

Sent from my iPhone



On Dec 23, 2020, at 8:52 AM, Grant Scott <gscott@scottlawgroupllc.com> wrote:


FYI

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Sent:** Wednesday, December 23, 2020 9:51 AM
**To:** Grant Scott <gscott@scottlawgroupllc.com>
**Cc:** Jason Post <JPost@NexpointAdvisors.com>; Hogewood, III, A. Lee
<A.Lee.HogewoodIII@klgates.com>
**Subject:** RE: It appears Jim will be available for a 9AM CT call. Can the K&L people make it?

Yes. Copied here. Is there a dial-in?

**D.C. Sauter**

O: 972.628.4117 | C: 469.877.6440

---

**From:** Grant Scott <gscott@scottlawgroupllc.com>
**Sent:** Wednesday, December 23, 2020 8:48 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Subject:** It appears Jim will be available for a 9AM CT call. Can the K&L people make it?

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.



# EXHIBIT Z

1

2       IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
   IN RE:                )
4                        ) CHAPTER 11
   HIGHLAND CAPITAL          )
5   MANAGEMENT, L.P.,        ) CASE NO.
                        ) 19-34054-sgj11
6         Debtor.          )
   _____ )
7
   HIGHLAND CAPITAL          )
8   MANAGEMENT, L.P.,        )
                        ) Adversary Proceeding
9         Plaintiff,    ) No. 20-3190-sgj11
                        )
10   v.                     )
                        )
11   JAMES D. DONDERO,          )
                        )
12         Defendant.       )
   _____ )
13

14       REMOTE VIDEO-RECORDED DEPOSITION OF

15              JAMES D. DONDERO

16           TUESDAY, JANUARY 5, 2021

17

18

19

20

21

22

23   REPORTED BY:

24   MICHAEL E. MILLER, FAPR, RDR, CRR

25   JOB NO. 188154

Page 2

1
2
3
4
5          Tuesday, January 5, 2021
6              9:50 a.m. CST
7
8
9        REMOTE ORAL VIDEO-RECORDED DEPOSITION
10  OF JAMES D. DONDERO, held via Zoom conference
11  pursuant to the Federal Rules of Civil Procedure
12  before Michael E. Miller, Fellow of the Academy
13  of Professional Reporters, Registered Diplomate
14  Reporter, Certified Realtime Reporter and Notary
15  Public in and for the State of Texas.
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  REMOTE APPEARANCES:
3    PACHULSKI STANG ZIEHL & JONES
4    Attorneys for Debtor
5    780 Third Avenue
6    New York, NY 10017
7    BY:   JOHN MORRIS, ESQ.
8         HAYLEY WINOGRAD, ESQ.
9         JEFFREY POMERANTZ, ESQ.
10        GREGORY DEMO, ESQ.
11        IRA KHARASCH, ESQ.
12
13    LATHAM & WATKINS
14    Attorney For UBS
15    885 Third Avenue
16    New York, NY 10022
17    BY:   SHANNON MCLAUGHLIN, ESQ.
18        ZACHARY PROULX, ESQ.
19
20    JENNER & BLOCK
21    Attorney for Redeemer Committee
22    353 North Clark Street
23    Chicago, IL 60654
24    BY:   TERRI MASCHERIN, ESQ.
25

Page 4

1
2  REMOTE APPEARANCES:
3    SIDLEY AUSTIN
4    Attorneys For the Creditors Committee
5    2021 McKinney Avenue
6    Dallas, TX 75201
7    BY:   PENNY REID, ESQ.
8        PAIGE MONTGOMERY, ESQ.
9        MATTHEW CLEMENTE, ESQ.
10        ALYSSA RUSSELL, ESQ.
11
12    KING & SPALDING
13    Attorney for Highland CLO Funding, Ltd.
14    500 West 2nd Street
15    Austin, TX 78701
16    BY:   REBECCA MATSUMURA, ESQ.
17
18    BONDS ELLIS EPPICH SCHAFER JONES
19    Attorneys for James Dondero
20    420 Throckmorton Street
21    Fort Worth, TX 76102
22    BY:   JOHN BONDS, ESQ.
23        BRYAN ASSINK, ESQ.
24
25

Page 5

1
2  REMOTE APPEARANCES:
3    DEBEVOISE & PLIMPTON
4    Attorneys for HarbourVest Partners
5    919 Third Avenue
6    New York, NY 10022
7    BY:   ERICA WEISGERBER, ESQ.
8
9    CARLYON CICA CHARTERED
10    Attorneys for Integrated Financial
11    Associates Inc.
12    265 East Warm Springs Road
13    Las Vegas, NV 89119
14    BY:   CANDACE CARLYON, ESQ.
15
16    ALSO PRESENT:
17    La Asia Canty, Paralegal
18    Pachulski Stang Ziehl & Jones LLP
19
20    VIDEOGRAPHER:
21    Rick Richey, TSG Reporting Inc.
22
23
24
25

Page 6

```
1
2       ------------
3       P R O C E E D I N G S
4       January 5, 2021, 9:50 a.m. CST
5       ------------
6       THE VIDEOGRAPHER:  Good morning,
7   ladies and gentlemen.  My name is Rick Richey.
8   I'm a legal videographer in association with
9   TSG Reporting Inc.
10      Due to the severity of the COVID-19
11  and following the practice of social distancing,
12  I will not be in the same room with the witness.
13  Instead, I will record this videotaped deposition
14  remotely.
15      The court reporter, Mike Miller, also
16  will not be in the same room and will swear the
17  witness remotely.
18      Do all parties stipulate to the
19  validity of this video recording and remote
20  swearing and that it will be admissible in the
21  courtroom as if it had been taken following Rule
22  30 of the Federal Rules of Civil Procedure and
23  the state rules where the case is pending?
24      Do all agree?
25      MR. MORRIS:  Yes.
```

Page 7

```
1
2       MR. BONDS:  Yes.
3       MR. MORRIS:  Does anyone not agree?
4       (Pause.)
5       MR. MORRIS:  Having heard nothing,
6   let's proceed.  Thank you.
7       THE VIDEOGRAPHER:  This will be the
8   start of Media No. 1 in the video-recorded
9   deposition of James Dondero.  Today's date is
10  January 5th, 2021.  It's 9:52 a.m. Central
11  Standard Time.
12      The case is In re Highland Capital
13  Management LP, Debtor, Chapter 11, Case
14  No. 19-34054-sgj11 in the United States
15  Bankruptcy Court for the Northern District of
16  Texas, Dallas Division.
17      The attorneys' appearances have
18  already been noted on the steno record, so would
19  the court reporter please swear the witness.
20      MR. BONDS:  Wait just one second.
21  There's an adversary proceeding that this case is
22  actually -- or this deposition is actually being
23  taken in.  It's 20-03190-sgj.  Thank you.
24      ///
25      ///
```

Page 8

```
1           J. DONDERO
2       ------------
3       JAMES D. DONDERO,
4       having been duly sworn,
5       testified as follows:
6       ------------
7       EXAMINATION
8       ------------
9   BY MR. MORRIS:
10      Q.  Good morning, Mr. Dondero.  Can you
11  hear me okay?
12      A.  Yes.
13      Q.  Okay.  My name is John Morris from
14  Pachulski Stang Ziehl & Jones, counsel for the
15  debtor.
16      Where are you located this morning,
17  sir?
18      A.  Highland Capital Management's
19  conference room, same as last time.
20      Q.  Is there anybody in the room with you
21  right now?
22      A.  No.
23      Q.  Do you have a telephone with you?
24      A.  Yes.
25      Q.  Is the phone off?
```

Page 9

```
1           J. DONDERO
2       A.  Yes.
3       Q.  Are you aware that the debtor sent a
4   letter to your lawyers instructing you not to be
5   on the premises after December 31st, 2020?
6       A.  Yes.
7       Q.  Did you get the debtor's permission
8   to enter the premises this morning?
9       A.  Implicitly for this depo, I believe.
10      Q.  Okay.  Did you get any explicit
11  consent or approval for you to be in the offices
12  this morning?
13      A.  Not that I'm aware of.
14      Q.  Did you ask or did anybody on your
15  behalf ask the debtors if you could participate
16  in today's deposition at the Highland offices?
17      A.  I don't know.
18      Q.  You're not aware of that, right?
19      A.  Correct.
20      Q.  Okay.  John Bonds is defending you
21  today; is that right?
22      A.  Yes.
23      Q.  And he's at the Bonds Ellis firm,
24  right?
25      A.  Yes.
```

Page 10

```
 1            J. DONDERO
 2      Q. And the Bonds Ellis firms represents
 3  you in your individual capacity, correct?
 4      A. Yes.
 5      Q. Is there any other law firm that
 6  represents you in your individual capacity in the
 7  Highland bankruptcy or in the adversary
 8  proceeding?
 9      A. I don't believe so.
10      Q. Okay.  Does the Bonds Ellis firm
11  represent any entity in which you have an
12  ownership or control interest, or do they just
13  represent you in your individual capacity?
14      A. I don't know for sure.
15      Q. Okay.  But as you sit here right now,
16  do you have any reason to believe that the Bonds
17  Ellis firm represents anybody other than you in
18  your individual capacity in connection with the
19  bankruptcy case?
20      A. I don't know.
21      Q. Okay.  You understand that we're here
22  today for your deposition, right?
23      A. Yes.
24      Q. And do you understand that today's
25  deposition is being taken in connection with the
```

Page 11

```
 1            J. DONDERO
 2  debtor's motion for -- (audio malfunction) --
 3        (Clarification requested by the
 4  stenographer.)
 5      MR. MORRIS:  I'll ask it again.
 6  BY MR. MORRIS:
 7      Q. Mr. Dondero, do you understand that
 8  today's deposition is being taken in connection
 9  with the debtor's motion for preliminary
10  injunction against you?
11      A. Yes.
12      Q. Do you intend to participate in the
13  hearing on the debtor's motion for preliminary
14  injunction?
15      MR. BONDS:  Objection, form.
16      MR. MORRIS:  You can answer.
17      A. I don't know.
18  BY MR. MORRIS:
19      Q. Do you intend to make -- do you
20  intend to testify at the debtor's hearing for
21  preliminary injunction?
22      MR. BONDS:  Objection, form.
23      A. I don't know.
24  BY MR. MORRIS:
25      Q. You may or you may not; is that
```

Page 12

```
 1            J. DONDERO
 2  right?
 3      A. Yes.
 4      Q. Okay.  Are you on any drugs or any
 5  medication right now?
 6      A. No.
 7      Q. Is there anything that you're aware
 8  of that might affect your memory today?
 9      A. No.
10      Q. Are you aware of anything that would
11  prevent you from testifying competently today to
12  the best of your ability?
13      A. No.
14      Q. You understand that you're under oath
15  right now?
16      A. Yes.
17      Q. Are you aware that on December 10th
18  the debtor obtained a temporary restraining order
19  against you?
20      A. Roughly.
21      Q. Okay.  Did you ever personally read a
22  copy of the temporary restraining order?
23      A. No.
24      Q. So you've never seen the order
25  itself; is that right?
```

Page 13

```
 1            J. DONDERO
 2      MR. BONDS:  Objection, form.
 3      A. Correct.
 4  BY MR. MORRIS:
 5      Q. Do you have an understanding of what
 6  the order restrains you from doing?
 7      A. Just in the most general sense.
 8      Q. Tell me your understanding of what
 9  the temporary order restrains you from doing.
10      A. Talking to the independent board
11  directly or talking directly to Highland
12  employees.
13      Q. Is there any other aspect of the
14  temporary restraining order that you're aware of
15  that would otherwise constrain or restrain your
16  conduct?
17      A. Those are the points I remember.
18      Q. Do you recall that before the Court
19  entered the temporary restraining order, it held
20  a hearing to consider the debtor's request?
21      A. I -- I don't know.
22      Q. Did you listen to the hearing?
23      A. No.
24      Q. Did you read a transcript of the
25  hearing?
```

Page 14

```
1              J. DONDERO
2      A.  No.
3      Q.  Do you respect the Court's authority
4  in this case?
5          MR. BONDS:  Objection, form.
6      A.  Yes.
7  BY MR. MORRIS:
8      Q.  Is there any particular reason why
9  you didn't take the time to read the Court's
10 temporary restraining order that was entered
11 against you?
12     A.  No.
13     Q.  James Seery is a member of the board
14 of Strand Advisors, the debtor's general partner,
15 right?
16     A.  Yes.
17     Q.  And you've been aware of that since
18 at least last January, correct?
19     A.  Yes.
20     Q.  And you're also aware that Mr. Seery
21 is the debtor's CEO and CRO, right?
22     A.  Yes.
23     Q.  And you've been aware of that since
24 last July, correct?
25     A.  Yes.
```

Page 15

```
1              J. DONDERO
2      Q.  Did you ever review the declaration
3  that Mr. Seery submitted in connection with the
4  debtor's motion for a temporary restraining order
5  against you?
6          MR. BONDS:  Objection, form.
7      A.  No.
8  BY MR. MORRIS:
9      Q.  Do you know what Mr. Seery alleged in
10 his declaration -- withdrawn.
11         Do you know the substance of what
12 Mr. Seery alleged in his declaration in support
13 of the debtor's motion for the TRO?
14     A.  No.
15     Q.  Did you care that the debtor was
16 seeking a TRO against you?
17     A.  I didn't think about it.
18     Q.  Have you thought about it since the
19 order was entered?
20     A.  Not really.
21     Q.  Okay.  You didn't submit a
22 declaration of your own in opposition of the
23 motion for TRO, right?
24     A.  I don't know.
25     Q.  You don't recall signing anything, do
```

Page 16

```
1              J. DONDERO
2  you?
3      A.  I've signed a lot of things, but
4  I'm -- I don't recall an opposition.
5      Q.  Let's talk about some of the events
6  that led to the entry of the TRO.
7          The debtor serves -- (audio
8  malfunction) --
9          (Clarification requested by the
10 stenographer.)
11         THE WITNESS:  I didn't touch the
12 microphone at this end and it's six inches or
13 eight inches from my mouth.
14         MR. MORRIS:  Yeah, let's try again,
15 Mr. Dondero.  Thank you.
16 BY MR. MORRIS:
17     Q.  The debtor serves as the portfolio
18 manager for certain collateralized loan
19 obligation vehicles; isn't that right?
20     A.  I don't want to testify to that.
21     Q.  Does the -- does the debtor manage
22 CLOs?
23         MR. BONDS:  Objection, form.
24         MR. MORRIS:  Withdrawn.
25         ///
```

Page 17

```
1              J. DONDERO
2  BY MR. MORRIS:
3      Q.  Can we agree that CLO stands for
4  collateralized loaning obligations?
5      A.  Yes.
6      Q.  Okay.  And does the debtor -- is the
7  debtor party to certain contracts that gives it
8  the right and responsibility to manage certain
9  CLO vehicles?
10         MR. BONDS:  Objection, form.
11         MR. MORRIS:  You can answer.
12     A.  Yes.
13 BY MR. MORRIS:
14     Q.  And you're aware of that because you
15 personally signed some of those contracts and
16 agreements, right?
17     A.  I don't know.
18     Q.  Okay.  NexPoint Advisors LP, are you
19 familiar with that firm?
20     A.  Yes.
21     Q.  That's an advisory firm; is that
22 right?
23     A.  Yes.
24     Q.  And we'll just refer to that as
25 NexPoint; is that okay?
```

Page 18

1          J. DONDERO
2     A.   Yes.
3     Q.   You have a direct or indirect
4   economic or ownership interest in NexPoint,
5   correct?
6          MR. BONDS:  Objection, form.
7          MR. MORRIS:  You can answer.
8     A.   Yes.
9   BY MR. MORRIS:
10    Q.   You're the president of NexPoint,
11  correct?
12    A.   I believe so.
13    Q.   And you own NexPoint's general
14  partner; is that right?
15    A.   I don't know.
16    Q.   Do you know who owns NexPoint's
17  general partner?
18    A.   No.
19    Q.   As the president of NexPoint, is it
20  fair to say that you control that entity?
21    A.   Generally.
22    Q.   Highland Capital Management Fund
23  Advisors LP, are you familiar with that firm?
24    A.   Yes.
25    Q.   And that's also an advisory firm,

Page 19

1          J. DONDERO
2   correct?
3     A.   Yes.
4     Q.   And we'll refer to that firm as Fund
5   Advisors; is that fair?
6     A.   Sure.
7     Q.   And we'll refer to Fund Advisors and
8   NexPoint together just as "the advisors"; is that
9   fair?
10    A.   I think you should be more specific
11  than that, but --
12    Q.   Okay.  I apologize.  Are you
13  finished?
14         If at any time I ask a question and
15  you don't understand, will you let me know that?
16    A.   Yes.
17    Q.   Okay.  You have a direct or indirect
18  economic or ownership interest in Fund Advisors,
19  correct?
20    A.   Yes.
21    Q.   You're the president of Fund
22  Advisors; is that true?
23    A.   I believe so.
24    Q.   And you own Fund Advisors' general
25  partner; is that right?

Page 20

1          J. DONDERO
2     A.   I don't believe I own as much of it
3   as I own of NexPoint, but I don't know the
4   numbers.
5     Q.   Okay.  As one of the two beneficial
6   owners of Fund Advisors and as the president of
7   Fund Advisors, is it fair to say that you control
8   that entity?
9     A.   Yes.
10    Q.   Okay.  And Fund Advisors and NexPoint
11  manage certain investment funds; is that right?
12    A.   I'm sorry, I missed the point of that
13  question.
14    Q.   Didn't hear?  Okay.
15         Fund Advisors, which we've talked
16  about, and NexPoint, which we've talked about,
17  those two entities manage certain investment
18  funds; is that right?
19    A.   Yes.
20    Q.   And one of the investment funds that
21  the advisors manage is Highland Income Fund.  Do
22  I have that right?
23    A.   Yes.  I'm not sure which fund that
24  is, but yes, that's -- that's one of them.
25    Q.   Are you the portfolio manager of the

Page 21

1          J. DONDERO
2   Highland Income Fund?
3     A.   I believe so.
4     Q.   Do you hold any titles at the
5   Highland Income Fund other than portfolio
6   manager?
7          MR. BONDS:  To the extent you know.
8   Don't speculate.
9     A.   I don't -- I don't know.  I know I'm
10  portfolio manager on virtually all of the funds.
11  BY MR. MORRIS:
12    Q.   Is there any fund that you're not the
13  portfolio manager for that you're aware of?
14    A.   I don't know.
15    Q.   Are you the portfolio manager of
16  NexPoint Capital Inc.?
17    A.   If that name refers to a fund, I
18  believe so.
19    Q.   Okay.  You're not sure if that refers
20  to a fund?
21    A.   There's a fund with the symbol NHF.
22  If that's the name -- which I don't think you
23  have the exact name.  If that's the name of it,
24  then I believe -- I believe I'm the portfolio
25  manager.  The name that you just gave sounded

Page 22

1         J. DONDERO
2   more like a holding company name or a subsidiary
3   name for NexPoint. If it's not a fund, I'm not
4   the portfolio manager. If it is a fund, I
5   believe I am.
6       Q. Okay. Do you hold -- are you
7   familiar with an entity called NexPoint
8   Capital Inc.?
9       A. No.
10      Q. Okay. How about NexPoint Strategic
11  Opportunities Fund, is that a fund that is
12  managed by one of the advisors?
13      A. I believe that's the name for NHF.
14  That's what I thought you were referring to.
15  That's the one that's a fund, and that's the one
16  that I'm portfolio manager on.
17      Q. Okay. Do you hold any titles at
18  NexPoint Strategic Opportunity Fund other than
19  portfolio manager?
20      A. I don't know.
21      Q. The advisors caused each of the funds
22  to invest in certain CLOs that are managed by the
23  debtor, right?
24      MR. BONDS: To the extent you know.
25  Don't speculate.

Page 23

1         J. DONDERO
2       MR. MORRIS: John, if there's an
3   objection, I welcome it. If there's a direction
4   not to answer, I welcome it. But what I don't
5   welcome is guiding the witness. If he doesn't
6   remember, he's done this so many times, he knows
7   what he's doing.
8       You want me to ask the question
9   again, Mr. Dondero?
10      THE WITNESS: Please.
11  BY MR. MORRIS:
12      Q. The two advisors that we talked
13  about, they manage funds, right?
14      A. Yes.
15      Q. And those funds have invested in
16  certain CLOs that are managed by the debtor,
17  correct?
18      A. The problem I have with that question
19  and the part that I don't want to testify as
20  agreeing to or acknowledging is that the debtor
21  manages those CLOs, because I won't testify to
22  the debtor being in good standing, and I won't
23  testify to the debtor not being in default, and I
24  won't testify to the debtor having the capability
25  to manage those CLOs --

Page 24

1         J. DONDERO
2       Q. Will you -- I'm sorry to interrupt.
3   Go ahead.
4       A. No, I mean, that's -- so I won't -- I
5   won't testify affirmatively to the second half of
6   that question.
7       Q. Okay. But you will admit, won't you,
8   that the debtor has -- is party to contracts that
9   give it the right to manage CLOs in which the
10  advisors caused the funds to invest, right?
11      MR. BONDS: Objection, form.
12      MR. MORRIS: You can answer.
13      A. The beginning and end of what I want
14  to testify to is that the advisor is parties --
15  party to contracts. The contracts have --
16  provide the ability to manage assets in the CLO
17  subject to a bunch of different things, subject
18  to not being in default, subject to the ability,
19  subject to the capability and being registered
20  advisor, et cetera, et cetera.
21      I don't want to have any testimony
22  that implies that the advisor is in good standing
23  or able of managing those CLOs or that
24  Jim Seery is even an investment professional.
25      ///

Page 25

1         J. DONDERO
2   BY MR. MORRIS:
3       Q. Okay. I think I understand.
4       When you used the word "advisor" in
5   your last answer, you were referring to the
6   debtor; is that right?
7       MR. BONDS: Objection, form.
8   BY MR. MORRIS:
9       Q. It's the debtor that has -- let me
10  try again.
11      It's the debtor that has the
12  contracts with the CLO, right?
13      A. Yes.
14      Q. But it's your contention that the
15  debtor is in default and that Mr. Seery and the
16  debtor otherwise don't have the capability to
17  manage the CLOs. That's what you're saying,
18  right?
19      A. I don't want to argue, and it's for
20  the lawyers and the Court to decide, but I don't
21  want to be affirmatively acknowledging that
22  Seery's an investment professional. I don't want
23  to be affirmatively acknowledging that he has any
24  employees and staff when he's told them all
25  they're being terminated in the next few weeks.

Page 26

J. DONDERO

1  I don't want to acknowledge that he
2  is in compliance and can operate those contracts
3  if I believe those contracts are in default
4  because, A, the advisor's in bankruptcy, and B,
5  none of the key man provisions are being adhered
6  to by the advisor.
7      I don't want to in any form or
8  fashion acknowledge or represent or somehow be
9  twisted into testifying that he is in good
10  standing or has the ability to manage those CLOs.
11  It may be found by somebody that he is, but I
12  don't want to be in any way inferred to be
13  sanctioning it.
14     Q.  Okay.  Are you aware -- have any of
15  the contracts pursuant to which the CLOs and the
16  debtor are the parties, have any of those
17  contracts been terminated, to the best of your
18  knowledge, since the petition date?
19     A.  I believe they're subject to stays,
20  among other things, but I'm not -- I'm not a
21  lawyer.
22     Q.  Has anybody sought to lift the stay
23  in order to terminate the contracts, to the best
24  of your knowledge?
25

Page 27

J. DONDERO

1      A.  I don't know where -- I don't know.
2      Q.  Has any of the CLOs ever contended
3  that the debtor was in breach in their agreement?
4      A.  I believe the beneficial holders
5  have.
6      Q.  I understand that --
7      A.  But I don't know -- I don't know if
8  the CLOs have.
9      Q.  Okay.  I'm asking you a different
10  question, and just answer my question.
11     To the best of your knowledge, has
12  any CLO contended that the debtor is in breach of
13  any of the agreements that they have between
14  them?
15     MR. BONDS:  Objection, form.
16     A.  I don't know.
17  BY MR. MORRIS:
18     Q.  You're not aware of any such
19  contention, right?
20     A.  I don't know.
21     Q.  You're not aware of any contention by
22  the CLOs that the debtor is in default under any
23  CLO contract, correct?
24     MR. BONDS:  Objection, form.
25

Page 28

J. DONDERO

1      A.  I don't know regarding the CLOs.
2  BY MR. MORRIS:
3      Q.  Did you ever ask them?  Withdrawn.
4      Did you ever ask anybody on behalf of
5  the CLOs whether they were going to declare a
6  default under the CLO management agreements?
7      MR. BONDS:  Objection, form.
8      A.  I don't know.
9  BY MR. MORRIS:
10     Q.  You don't know if you asked?  I'm
11  just asking you if you ever asked the question.
12     A.  Not of the CLOs.  Those questions
13  were asked regarding the beneficial owners, and I
14  think the beneficial owners did that, but I
15  didn't have direct knowledge or contact with the
16  CLOs.
17     Q.  Okay.  And the beneficial owners are
18  not parties to the CLO management agreements
19  between the CLOs and the debtor, correct?
20     MR. BONDS:  Objection, form.
21     A.  I don't want to draw a legal
22  conclusion of the rights of the beneficial owners
23  and the people who have the risk and the people
24  who have the ultimate decision authority whether
25

Page 29

J. DONDERO

1  or not they can be circumvented or ignored by an
2  intermediate nonfinancial -- nonfinancially
3  interested party.  I don't want to -- I don't
4  want to speculate on that.
5      MR. MORRIS:  Okay.  I move to strike.
6      And I'm not asking for a legal
7  conclusion; I'm asking for your understanding.
8  BY MR. MORRIS:
9      Q.  Is it your understanding that
10  beneficial owners are parties to the CLO
11  management agreements between the debtor and the
12  CLOs?
13     MR. BONDS:  Objection to form.
14     MR. MORRIS:  You can answer.
15     A.  I think that asks for a legal
16  conclusion.
17  BY MR. MORRIS:
18     Q.  It does not.  I'm asking you as a
19  factual matter based on your understanding as the
20  portfolio manager of the funds and the president
21  of the advisors who made these investments.  I'm
22  asking you --
23     MR. BONDS:  Objection, form.
24     ///
25

Page 30

1           J. DONDERO
2  BY MR. MORRIS:
3      Q.  -- in that capacity.
4          In that capacity, do you have any
5  understanding that the beneficial owners are
6  parties to the CLO management agreements between
7  the debtor and the CLOs?
8          MR. BONDS:  Objection, form.
9      A.  My understanding is that the
10 beneficial owner should always be considered.
11         MR. MORRIS:  Okay.  I move to strike.
12 I'm not asking you whether they should be
13 considered.
14 BY MR. MORRIS:
15     Q.  I'm asking you very specifically
16 whether you believe that they are parties to the
17 contract.
18         MR. BONDS:  Objection, form, asked
19 and answered.
20     A.  Yeah, I believe you're asking me for
21 a legal conclusion, and I won't give one.
22 BY MR. MORRIS:
23     Q.  Okay.
24         MR. MORRIS:  La Asia, can we please
25 put up Exhibit 1.  Let's share the screen and put

Page 31

1           J. DONDERO
2  up Exhibit 1.
3          (Dondero Deposition Exhibit 1
4  marked.)
5  BY MR. MORRIS:
6      Q.  Mr. Dondero, I appreciate that it's
7  difficult to do this remotely, and as we
8  discussed last time, the one thing that I'm
9  certainly not doing today is playing gotcha with
10 documents.
11         So I'm going to put documents up on
12 the screen from time to time, and to the extent
13 that you think you need to read more of the
14 document in order to have full context, will you
15 let me know that?
16     A.  Sure.
17     Q.  Okay.  This is a letter dated
18 October 16th from NexPoint to Mr. Seery.
19         Do you see that?
20     A.  Yep.
21     Q.  Are you familiar with this
22 document?  Have you ever seen it before?
23     A.  Generally.  I'm generally familiar
24 with it, but I haven't seen it before.
25     Q.  Okay.  Do you recall when you first

Page 32

1           J. DONDERO
2  learned that this document was sent?  Was it at
3  or around the time the document was sent?
4      A.  It was at or around the time, yes.
5      Q.  Did you discuss with NexPoint any of
6  the substance that is in this letter?  And again,
7  I'm happy to scroll through it if that would be
8  helpful.
9          MR. BONDS:  Objection, form.
10     A.  Just generally.
11 BY MR. MORRIS:
12     Q.  Did you -- I don't want to know about
13 any conversations, but did you speak with anybody
14 at K&L Gates about this particular letter, just
15 yes or no?
16     A.  My primary conversation was with
17 internal counsel.  K&L Gates might have been on
18 some phone call or two.
19     Q.  Okay.  Whose idea was it to send this
20 out?
21         MR. BONDS:  Objection, form.
22     A.  Whose idea?  I -- I don't think
23 anybody viewed it as an idea as much as a
24 regulatory necessity.
25         ///

Page 33

1           J. DONDERO
2  BY MR. MORRIS:
3      Q.  And did you authorize the sending of
4  this particular letter?
5      A.  Not specifically.
6      Q.  Did you generally support the sending
7  of the letter?
8      A.  Yes.
9      Q.  And you knew the letter was being
10 sent; is that fair?
11     A.  Yes.
12     Q.  And you didn't object to the sending
13 of this letter, right?
14     A.  I did not object.
15     Q.  Okay.  And since learning that the
16 letter was sent, have you ever directed NexPoint
17 to withdraw the letter?
18     A.  No.
19     Q.  You have the power to do that, don't
20 you, sir?
21     A.  I -- I don't believe so.  When the
22 chief compliance officer believes it's a breach
23 of regulatory compliance, the chief compliance
24 officer in financial institutions has personal
25 liability, and I don't believe that other C-suite

Page 34

1          J. DONDERO
2  executives can overrule the chief compliance
3  officer.
4      Q.  Who is the chief compliance officer?
5      A.  Jason Post.
6      Q.  Did Mr. Post ever say that he would
7  not withdraw the letter because of regulatory
8  compliance?
9          MR. BONDS:  Objection, form.
10     A.  I -- not that I know of.
11  BY MR. MORRIS:
12     Q.  Did you ever discuss with Mr. Post
13  whether or not this letter should be withdrawn?
14     A.  Again, I didn't believe I had the
15  authority to.
16     Q.  Okay.  And he never told you that he
17  couldn't; that's just the implicit conclusion
18  that you drew because he was the chief compliance
19  officer; is that fair?
20     A.  Implicit conclusion?  It's more the
21  understanding I have of compliance from having
22  lived it the last 20 years.
23         MR. MORRIS:  Okay.  Let's put up
24  Exhibit 2, please.
25         (Dondero Deposition Exhibit 2

Page 35

1          J. DONDERO
2  marked.)
3         MS. CANTY:  Do you see it, John?
4         MR. MORRIS:  I think we still have
5  Exhibit 1.
6         MS. CANTY:  Okay.  Give me a second.
7  BY MR. MORRIS:
8      Q.  Okay.  This is another letter that
9  was sent by NexPoint to Mr. Seery, this one dated
10  November 24, 2020.
11         Do you see that, sir?
12     A.  Yes.
13     Q.  And you saw this letter at or around
14  the time it was sent, right?
15     A.  I didn't see the letter specifically,
16  but I'm aware of it.
17     Q.  And you knew it was going to be sent;
18  is that fair?
19     A.  Yes.
20     Q.  And did you authorize this letter to
21  be sent on behalf of the advisors and the funds
22  that are listed there?
23         MR. BONDS:  Objection, form.
24     A.  Let me give the consistent testimony
25  I gave last time.  It wasn't an authorization.  I

Page 36

1          J. DONDERO
2  was aware of it.  It was, I believe, a continued
3  regulatory breach from the standpoint of the --
4  of compliance that drove the letter.
5  BY MR. MORRIS:
6      Q.  When there's a regulatory breach, is
7  there an obligation to alert anybody other than
8  the portfolio manager?
9      A.  I know that's being investigated.  I
10  don't know the answer regarding a breach like
11  this.
12     Q.  Are you aware of any notification
13  that NexPoint made to anybody in the world, other
14  than Mr. Seery, with respect to the matters set
15  forth in Exhibit 1 and Exhibit 2?
16         MR. BONDS:  Objection, form.
17     A.  I don't know, and I'm not in a
18  position to comment at this point.
19  BY MR. MORRIS:
20     Q.  I'm just asking you if you know
21  whether -- I'm asking for your knowledge.
22         Do you know whether NexPoint ever
23  advised anybody, other than Mr. Seery, of the
24  allegations that are set forth in Exhibit 1 and
25  Exhibit 2?

Page 37

1          J. DONDERO
2         MR. BONDS:  Objection, form.
3      A.  I don't know, nor would I necessarily
4  be informed if compliance self-reports this to
5  the SEC or other regulatory bodies.  But I do not
6  know.
7  BY MR. MORRIS:
8      Q.  And nobody told you that, right?
9      A.  I don't know.
10     Q.  Is there -- did you see any written
11  analysis or memorandum that was prepared by
12  your -- by the chief compliance officer with
13  respect to the matters set forth in Exhibit 1 and
14  Exhibit 2?
15     A.  I know there was a multipage analysis
16  that was done, but I've never seen it.
17     Q.  And was it written by the chief
18  compliance officer or was it written by legal
19  staff?
20     A.  I was told he did it in conjunction
21  with external counsel.
22     Q.  But you've never seen it?
23     A.  I've never seen it.
24     Q.  Did you support the sending of this
25  letter?

J. DONDERO

2    A. Yes.

3    Q. Since learning that this letter was

4  sent, have you directed NexPoint to withdraw this

5  letter?

6    A. No, I have not.

7    Q. Okay. Around Thanksgiving you

8  learned that Mr. Seery was seeking to sell

9  certain securities that were owned by certain

10  CLOs managed by the debtor, right?

11    A. I believe I was informed after the

12  fact.

13    Q. You were informed that certain sales

14  of securities owned by the CLOs were being sold

15  at Mr. Seery's direction, right?

16    A. Yes.

17    MR. BONDS: Objection, form.

18  BY MR. MORRIS:

19    Q. Okay. And at around that time, once

20  you learned that, you personally intervened to

21  stop those trades, right?

22    MR. BONDS: Objection, form.

23    A. Yes.

24    MR. MORRIS: Can we put up Exhibit 3,

25  please.

J. DONDERO

2    (Dondero Deposition Exhibit 3

3  marked.)

4  BY MR. MORRIS:

5    Q. This is an e-mail string. We're

6  going to start at the bottom and work up, just so

7  we can get it in order. And you'll see the

8  bottom begins with an e-mail from Hunter Covitz.

9    Do you see that?

10    A. Yes.

11    Q. Who is Mr. Covitz?

12    A. Covitz, Hunter Covitz manages our CLO

13  asset -- or our CLO assets, primarily.

14    Q. Is he a High-- is he a debtor

15  employee or is he employed by any other entity?

16    A. I believe he's a debtor employee.

17    Q. Okay. Do you see there's a reference

18  there to gatekeeper@hcmlp.com?

19    A. Yes.

20    Q. Are you -- withdrawn.

21    Is that -- withdrawn.

22    Is it your understanding that that's

23  kind of a basket of different e-mail addresses

24  that are held together by the Gatekeeper address?

25    A. I wouldn't describe it that way, but

J. DONDERO

2  it is a bucket of e-mails.

3    Q. Okay. And is your e-mail address or

4  was your e-mail address included within

5  Gatekeeper?

6    A. Historically, it was.

7    Q. And do you know when that stopped

8  being the case?

9    A. I do not know.

10    Q. Was it after the time that you

11  resigned from your position at the debtor?

12    A. I do not know.

13    Q. Okay. Matt Pearson is below

14  Gatekeeper. Do you know who Mr. Pearson is?

15    A. He is a -- generally an equity trader

16  that works for Joe Sowin.

17    Q. And are Mr. Pearson and Mr. Sowin

18  employees of the debtor?

19    A. I don't believe so. I don't believe

20  Joe is. I don't know if Matt is. I don't know.

21    Q. Okay. But is it fair to say that

22  pursuant to this e-mail, Mr. Covitz is giving

23  direction to sell certain securities held by the

24  CLOs?

25    A. Yes.

J. DONDERO

2    Q. Can we scroll to the e-mail above

3  that, please. And then Mr. Pearson acknowledged

4  that e-mail a little bit later in the day, right?

5    A. Yes.

6    Q. Okay. And if we can --

7    (Interruption by the videographer.)

8    MR. MORRIS: It's okay. Let's

9  proceed and we'll do the best we can.

10  BY MR. MORRIS:

11    Q. Mr. Covitz's e-mail was the -- do you

12  see the subject matter is Sky Equity?

13    A. Yes.

14    Q. And do you have an understanding of

15  what Sky Equity refers to?

16    A. It's a -- it's a post-restructured

17  equity that the funds have held for years.

18    Q. Okay. So if we could scroll up to

19  your e-mail that's right there, did you receive a

20  copy of Mr. Covitz's original e-mail?

21    A. It appears so.

22    Q. Okay. And did you give the

23  instruction to the recipients of Mr. Hunter

24  Covitz's e-mail not to sell the Sky Equity as had

25  been instructed by Mr. Seery?

Page 42

1              J. DONDERO
2       A.  Yes.
3       Q.  And you understood at the time that
4   you gave the instruction to the people on this
5   e-mail that they were trying to execute trades
6   that Mr. Seery had authorized, right?
7          MR. BONDS:  Objection, form.
8          THE WITNESS:  Can you repeat the
9   question, please.
10         MR. MORRIS:  Sure.
11  BY MR. MORRIS:
12      Q.  At the time that you gave the
13  instruction, no, do not, you knew that you were
14  stopping trades that had been authorized and
15  directed by Mr. Seery, correct?
16      A.  Yes.
17      Q.  Did you speak with Mr. Seery before
18  instructing the recipients of your e-mail not to
19  execute the SKY transactions?
20      A.  No, I did not.
21      Q.  Did you take any steps to seek the
22  debtor's consent before instructing the
23  recipients of this e-mail not to execute the SKY
24  transactions?
25      A.  I'm sorry, please repeat that again.

Page 43

1              J. DONDERO
2   The -- I missed the first part of the sentence.
3       Q.  No problem.
4          Did you take any steps to seek the
5   debtor's consent before instructing the
6   recipients of your e-mail --
7          MR. BONDS:  Objection, form.
8   BY MR. MORRIS:
9       Q.  -- to stop the SKY transactions, to
10  stop executing the SKY transactions?
11      A.  No.
12      Q.  Thank you.
13         Can we scroll up to the response.
14  Okay.  Stop there.
15         Mr. Pearson responded later that
16  afternoon.  Do you see that?
17      A.  Yes.
18      Q.  And in response, he canceled all of
19  the SKY and AVYA sales that the debtor had
20  directed but which had not yet been executed,
21  right?
22      A.  Yes.
23      Q.  And if we can scroll up to the e-mail
24  above that, you responded to that as well, didn't
25  you?

Page 44

1              J. DONDERO
2       A.  Yep.
3       Q.  Can you please read your response out
4   loud.
5       A.  HFAM and DAF -- or HFAM and DAF has
6   instructed Highland in writing not to sell any
7   CLO underlying assets.  There is potential
8   liability.  Don't do it again, please.
9       Q.  All right.  The written instructions,
10  is that a reference to the first two exhibits
11  that we looked at?  And if you want to go back
12  and check them out, we can, but I'm trying to --
13  I want to know what writings you're referring to.
14  Withdrawn.
15         Are the writings that you're
16  referring to the two exhibits that we just looked
17  at, Exhibit 1 and Exhibit 2?
18         MR. BONDS:  Objection, form.
19      A.  Generally, yes.
20  BY MR. MORRIS:
21      Q.  Are you --
22      A.  I don't know if -- I don't know if
23  there were more than those two, but generally,
24  letters of those substances -- well, generally,
25  letters of those substance -- of that substance

Page 45

1              J. DONDERO
2   is what I'm referring to.
3       Q.  I appreciate that, Mr. Dondero.
4          Do you recall any other writings that
5   you were referring to at the time you sent this
6   e-mail?
7       A.  I'm just saying I don't know if there
8   were others or if there were other e-mails.  I
9   don't know.  But there were -- they would have
10  been similar in terms of substance as those two.
11      Q.  Okay.  Do you see the reference there
12  in the latter portion of your e-mail, quote,
13  there is potential liability, don't do it again?
14      A.  Yes.
15      Q.  Who was the intended recipient of
16  that message?
17      A.  At this juncture, it's to Matt
18  Pearson, I believe.
19      Q.  And why would Matt Pearson have
20  personal liability -- withdrawn.
21         Why did you decide to tell
22  Mr. Pearson that he had potential liability for
23  executing the transactions that Mr. Seery had
24  directed?
25         MR. BONDS:  Objection, form.

Page 46

| | |
|---|---|
| 1 | J. DONDERO |
| 2 | A. Yeah, to be clear, it doesn't say |
| 3 | personal liability. I said potential liability. |
| 4 | I believe this is -- I believe what was done here |
| 5 | is bona fide typical class action activity that |
| 6 | we've suffered from historically, when the |
| 7 | interests of beneficial holders are ignored when |
| 8 | assets are sold for no business purpose. No |
| 9 | business purpose. No definable, discernible, |
| 10 | articulated business purpose. |
| 11 | There's -- I think there's potential |
| 12 | liability for the manager, the fund complex, you |
| 13 | know, and sometimes for the individuals involved. |
| 14 | But my potential liability was a general |
| 15 | statement. |
| 16 | THE WITNESS: You know what, guys, |
| 17 | listen. I've got a couple of calls I've got to |
| 18 | make that I'm ten minutes late for, so we're |
| 19 | going to need to take a break for a few minutes |
| 20 | here, ideally now, or after the next question, |
| 21 | please. |
| 22 | MR. MORRIS: I'm happy to take a |
| 23 | break now. How long are you thinking, though? |
| 24 | THE WITNESS: Ten or 15 minutes. |
| 25 | MR. MORRIS: Yeah, that's perfectly |

Page 47

| | |
|---|---|
| 1 | J. DONDERO |
| 2 | fine, Mr. Dondero. Can you just state on the |
| 3 | record that you will not talk to any Highland |
| 4 | employee, including Mr. Ellington or |
| 5 | Mr. Leventon, you will not communicate with them |
| 6 | or their counsel in any way with respect to this |
| 7 | deposition? |
| 8 | THE WITNESS: Yeah, I promise. I |
| 9 | haven't -- yeah. I will not talk to them. The |
| 10 | only Highland employee I might talk to is Jerome, |
| 11 | who's handling the systems for this call, and |
| 12 | that's it. |
| 13 | MR. MORRIS: I'm fine with that, but |
| 14 | really, I'm requesting not only Highland |
| 15 | employees but not to talk to anybody about the |
| 16 | testimony today. I'm going to accommodate you |
| 17 | and -- |
| 18 | THE WITNESS: I won't. Nobody cares |
| 19 | about this deposition. I won't talk to anybody. |
| 20 | MR. MORRIS: Okay. |
| 21 | THE WITNESS: I'll be back in ten or |
| 22 | 15 minutes, okay? |
| 23 | MR. MORRIS: Okay. |
| 24 | THE VIDEOGRAPHER: 10:41 a.m. Central |
| 25 | Standard Time, we're off the record. |

Page 48

| | |
|---|---|
| 1 | J. DONDERO |
| 2 | (Recess taken, 10:41 a.m. to |
| 3 | 11:16 a.m. CST) |
| 4 | THE VIDEOGRAPHER: 11:16 a.m., we're |
| 5 | back on the record. |
| 6 | BY MR. MORRIS: |
| 7 | Q. Mr. Dondero, can you hear me? |
| 8 | A. Yes. |
| 9 | Q. Okay. Are you aware that the |
| 10 | deposition taking place today is pursuant to |
| 11 | Court order? |
| 12 | A. Yes. |
| 13 | Q. Did you schedule meetings and |
| 14 | telephone calls during the day today, |
| 15 | notwithstanding the Court's order? |
| 16 | A. I didn't formally schedule anything. |
| 17 | Q. Okay. So you have nothing scheduled |
| 18 | for the rest of the day; is that right? You're |
| 19 | here to answer questions? |
| 20 | A. Correct. |
| 21 | MR. MORRIS: Okay. Can we get the |
| 22 | last exhibit back up on the screen, please. |
| 23 | Okay. Can we scroll -- |
| 24 | BY MR. MORRIS: |
| 25 | Q. We were last looking at your e-mail. |

Page 49

| | |
|---|---|
| 1 | J. DONDERO |
| 2 | Can we see the response above that, please? |
| 3 | Okay. And that's Mr. Sowin responding. |
| 4 | Do you see that? |
| 5 | A. Yes. |
| 6 | Q. And Mr. Sowin was following your |
| 7 | instructions; is that right? |
| 8 | A. His response is what it is. I'm |
| 9 | not -- what do you mean by following my |
| 10 | instructions? |
| 11 | Q. Well, he issued an order -- it says, |
| 12 | quote: Please block all orders from hitting the |
| 13 | trading desk for the -- I assume he meant |
| 14 | funds -- Jim mentioned. |
| 15 | Do you see that? |
| 16 | A. Yes. |
| 17 | MR. BONDS: Objection, form. |
| 18 | BY MR. MORRIS: |
| 19 | Q. And that's exactly what you wanted to |
| 20 | happen, right? |
| 21 | A. I'm sorry, could you unhighlight |
| 22 | that? It's hard for me to read with the |
| 23 | highlight. Okay. Thank you. |
| 24 | Yeah, they -- I think he tried to |
| 25 | figure out a way to prevent it from inadvertently |

Page 50

1          J. DONDERO
2 happening.
3     Q.   Okay.  And Mr. Sowin's -- the
4 substance of Mr. Sowin's e-mail is consistent
5 with your intent to prevent any further trades
6 from the CLOs, right?
7     MR. BONDS:  Objection, form.
8     A.   My intent was to prevent trades that
9 weren't in the best interests of investors, that
10 investors -- the beneficial holders had
11 articulated they didn't want sold while these
12 funds were in transition, and that the -- there
13 was no business purpose or benefit to the debtor
14 to sell these assets.
15 BY MR. MORRIS:
16     Q.   That --
17     A.   So that's -- that was the rationale I
18 was trying to capture.
19     THE WITNESS:  Hold on for me one
20 second.  Jerome just stepped in.  What does the
21 systems guy want Jerome to do?
22     MR. MORRIS:  Figure out a way to turn
23 the lights on.
24     (Technical comments off the
25 stenographic record.)

Page 51

1          J. DONDERO
2     MR. MORRIS:  Let's go forward.
3     THE WITNESS:  So we're okay with
4 Jerome?  That's it for now?
5     MR. MORRIS:  Yeah.
6     THE WITNESS:  All right.  Thank you.
7 BY MR. MORRIS:
8     Q.   You didn't correct anything that
9 Mr. Sowin did -- said in this e-mail, did you?
10     A.   No.
11     Q.   You didn't tell --
12     MR. BONDS:  Can you repeat the
13 question?  I didn't understand it.
14     MR. MORRIS:  That's okay.
15 BY MR. MORRIS:
16     Q.   Mr. Dondero, you didn't correct
17 anything that Mr. Sowin wrote in this e-mail, did
18 you?
19     A.   No.
20     Q.   You didn't tell Mr. Sowin that he
21 misunderstood your intent, did you?
22     A.   I don't believe so.
23     Q.   And you didn't give any explanation
24 to him as to why you did not want to sell any CLO
25 underlying assets except for what you wrote in

Page 52

1          J. DONDERO
2 that e-mail below, right?
3     MR. BONDS:  Objection, form.
4     A.   I -- I believe I -- well, the e-mails
5 stand on their own.  I think the reasons below
6 are sufficient.  I think I had a conversation
7 with Joe besides that, and there was an
8 unawareness on the trading desk and with Hunter
9 that the interest of investors had been expressed
10 and ignored by Seery, you know, so -- they
11 weren't aware of that.  They thought that was
12 unusual and inappropriate.
13 BY MR. MORRIS:
14     Q.   In your role as portfolio manager, is
15 it -- do you believe it's your responsibility to
16 always defer to the desires of your investors?
17 Do you cede -- do you cede -- withdrawn.
18     Do you cede responsibility and your
19 business judgment for making transactions to your
20 investors?
21     MR. BONDS:  Objection, form.
22     A.   In this case, it would be
23 appropriate.  In general, it would depend.
24 BY MR. MORRIS:
25     Q.   Okay.  A few days later, you learned

Page 53

1          J. DONDERO
2 that Mr. Seery was trying a work-around to
3 effectuate the trades anyway, right?
4     A.   Yes.
5     Q.   And you wrote to Thomas Surgent to
6 let him know that you were aware that Seery was
7 trying a work-around to effectuate the trades,
8 right?
9     A.   I believe there was such an e-mail.
10     Q.   Okay.  Can you just scroll up and see
11 that e-mail, please.  All right.  Stop right
12 there.
13     Who is Mr. Surgent?
14     A.   He's the chief compliance officer of
15 Highland Capital.
16     Q.   The debtor?
17     A.   Yes.
18     Q.   Okay.  And how long has he held that
19 position to the best of your recollection?
20     A.   A long time.  More than five years.
21     Q.   What does it mean to -- when you
22 wrote that Mr. Seery was, quote, working on a
23 work-around to trade these securities?  What does
24 that mean?
25     A.   As a noninvestment professional and

Page 54

```
1              J. DONDERO
2    as a nontrader and as a nonportfolio manager, he
3    set up an account for himself, I believe,
4    directly with Jefferies to trade the securities
5    in the CLOs.
6        Q.  How did you learn that?
7        A.  I think we still get trade reports
8    from Jefferies, or Jefferies -- the Jefferies
9    trades get reported back into the system and have
10   to be input by Joe, and so Joe sees the trades
11   come back from Jefferies at the end of the day.
12       Q.  And Joe is Joe Sowin?
13       A.  Yes.
14       Q.  And he works for you; is that right?
15           MR. BONDS:  Objection, form.
16           MR. MORRIS:  Withdrawn.
17   BY MR. MORRIS:
18       Q.  He works for one of the advisors; is
19   that right?
20       A.  I believe he works for HFAM, but I'm
21   not a hundred percent certain.
22       Q.  And the work-around was -- is that
23   another way of saying that Mr. Seery tried to do
24   the trades that he thought were appropriate
25   without your interference?
```

Page 55

```
1              J. DONDERO
2           MR. BONDS:  Objection, form.
3        A.  I'm not going to agree with that
4    speculation.  If you want me to speculate, I
5    think Seery had no business purpose and he was
6    doing it to tweak myself and everybody else.
7    BY MR. MORRIS:
8        Q.  Did he tell you that?
9        A.  No.  I'm speculating.
10       Q.  Okay.  Do you have any idea why he
11   made the trades?
12       A.  He -- he had no --
13       Q.  Withdrawn.  I'm sorry.
14           Do you have any idea why he wanted to
15   make the trades?
16       A.  I didn't speak to him directly.
17       Q.  Okay.
18       A.  Indirectly -- I didn't speak to him.
19   I didn't speak to him directly.  It was --
20       Q.  Do you have any personal knowledge as
21   you sit here right now as to why Mr. Seery wanted
22   to effectuate the trades that you were blocking?
23           MR. BONDS:  Objection, form.
24       A.  I've thought about it at length.  I
25   can't come up with a business purpose that would
```

Page 56

```
1              J. DONDERO
2    supersede an account that's in transition and the
3    beneficial owners have made it clear that the
4    manager's not in compliance, they're moving the
5    accounts, and knowing the individual assets that
6    were sold, I can't -- I couldn't think of a
7    business purpose that Seery would be operating
8    under.
9            MR. MORRIS:  Okay.  I move to strike.
10   I'm not asking you for what you think.  I'm
11   asking you for facts.
12   BY MR. MORRIS:
13       Q.  Do you have any knowledge of any
14   facts as to the business justification or
15   rationale for why Mr. Seery wanted to make these
16   trades?
17           MR. BONDS:  Objection, form.
18       A.  No, I don't believe there are any.
19   BY MR. MORRIS:
20       Q.  And you never asked him; is that
21   right?
22       A.  Correct.
23       Q.  And you never instructed anybody on
24   your behalf or on behalf of the advisors or on
25   behalf of the funds to ask Mr. Seery why he
```

Page 57

```
1              J. DONDERO
2    wanted to make these trades, right?
3        A.  That's not correct.
4        Q.  Nobody ever told you that they'd had
5    a conversation with Mr. Seery in which
6    Mr. Seery -- (audio malfunction) --
7            (Clarification requested by the
8    stenographer.)
9    BY MR. MORRIS:
10       Q.  Did anybody ever tell you that they
11   had spoken with Mr. Seery and Mr. Seery had
12   provided an explanation, a business rationale for
13   the transactions that he wanted to effectuate?
14           MR. BONDS:  Objection, form.
15       A.  Yes.  Yes.
16   BY MR. MORRIS:
17       Q.  Who was that?
18       A.  Joe Sowin.
19       Q.  When did he tell you about this
20   conversation?
21       A.  It was at or about this time in...
22       Q.  And what did Mr. Sowin tell you?
23       A.  Seery told him it was for risk
24   minimization or risk reduction.
25       Q.  Did he tell him anything else?
```

Page 58

J. DONDERO

2  A.  No.  He said risk reduction was why
3  he was selling the securities.
4  Q.  That's the only rationale that
5  Mr. Seery gave to Mr. Sowin; is that your
6  testimony?
7  A.  Yes.
8  Q.  Okay.  Did Mr. Sowin tell you that he
9  asked any questions of Mr. Seery?
10  A.  He asked him why he was selling them.
11  Q.  And you've given me the entirety of
12  the answer as conveyed by Mr. Sowin to you; is
13  that right?
14  A.  Yes.
15  Q.  Is Mr. Sowin's conversation with
16  Mr. Seery about the justification for these
17  trades reflected in any document or any e-mail
18  anywhere that you can recall?
19  A.  Not that I recall.
20  Q.  Did K&L Gates explain their
21  understanding of the business rationale of these
22  trades in any of the letters that they sent on
23  behalf of the funds or any of the advisors?
24  A.  Not that I'm aware of.  I'm not
25  aware.

Page 59

J. DONDERO

2  Q.  Do you know Dustin Norris?
3  A.  Yes.
4  Q.  Do you know that he testified in
5  December in connection with this bankruptcy
6  matter?
7  A.  Yes.
8  Q.  Did you ever tell Dustin Norris about
9  the conversation Mr. Sowin had with Mr. Seery
10  that you've described here?
11  A.  I believe he was aware of it.
12  Q.  Do you know -- did you talk to him in
13  advance of his testimony?
14  A.  I talk to Dustin most every day.
15  Q.  And did you tell Dustin that he
16  should make sure to alert the Court about this
17  conversation with Mr. Sowin and Mr. Seery?
18  A.  No.
19  Q.  Did you think it was important that
20  the Court know Mr. Seery's business rationale?
21  A.  I thought it was a nonsensical answer
22  on Seery's part.  I didn't have an opinion on
23  whether or not the Court should know.
24  Q.  Now, you -- at the time, you were
25  speaking to Mr. Seery directly; isn't that right?

Page 60

J. DONDERO

2  A.  Rarely.  I didn't -- since the
3  injunction or since -- rarely.  I can't remember
4  the last time I've spoken to him.  Scott
5  Ellington has been the appropriate go-between as
6  far as I understand it.
7  Q.  Okay.  Was there anything that
8  prevented you in November 2020 from picking up
9  the phone to talk to Mr. Seery about his desire
10  to effectuate these transactions?
11  A.  No.  The last time I -- yeah, I'm
12  remembering, the last time I talked to Seery was
13  the day after Thanksgiving.
14  Q.  Okay.  Is there anything that you're
15  aware of that prevented you from picking up the
16  phone and asking Mr. Seery for his business
17  justification for these trades prior to
18  December 10, 2020?
19  MR. BONDS:  Objection, form.
20  A.  No.  I expressed my disapproval via
21  e-mail.
22  BY MR. MORRIS:
23  Q.  Okay.  Why did you decide to write to
24  Mr. Surgent on November 27th?
25  A.  I wasn't sure he was aware of Seery's

Page 61

J. DONDERO

2  work-around, and I know Thomas has an acute
3  awareness of his personal liability for
4  regulatory breaches or doing things that aren't
5  in the best interests of investors, and I don't
6  believe he has the extra insurance and
7  indemnities that Seery has.
8  Q.  If he was acutely aware of it, why
9  did you feel the need to remind him of that in
10  your e-mail to him?
11  A.  Because I don't think he was aware
12  that Seery was doing a work-around on behalf of
13  the debtor that he was compliance officer of.  I
14  wasn't convinced he was aware, so I included him
15  on the e-mail.
16  Q.  Did you intend to suggest that by
17  following Mr. Seery's orders to execute the
18  trades, that Mr. Surgent faced personal
19  liability?
20  A.  That's the way it works.
21  Q.  Okay.  And you wanted him to know
22  that, right?
23  A.  I wanted him to know that Seery was
24  doing inappropriate trades and doing
25  inappropriate work-around, in my opinion.  I

Page 62

J. DONDERO

1 didn't think Thomas was aware. I thought Seery
2 was operating independently.
3        Thomas might have been aware, but I
4 didn't think so. I don't talk to -- I haven't
5 talked to Thomas in I don't know when, so I
6 thought it was important for him to know.
7     Q. Okay. You have communicated with
8 Mr. Seery from time to time via text message,
9 right?
10    A. Yes.
11        MR. MORRIS: Can we put up Exhibit 4,
12 please.
13        (Dondero Deposition Exhibit 4
14 marked.)
15        MR. MORRIS: And if we can scroll
16 down a little bit. Okay.
17 BY MR. MORRIS:
18    Q. This is a text that you sent at the
19 bottom there at 5:26 p.m. to Mr. Seery; is that
20 right?
21    A. Yes.
22    Q. Can you just read that text, that
23 5:26 out loud?
24    A. Be careful what you do, last warning.

Page 63

J. DONDERO

1     Q. Why did you write that?
2     A. Because all the reasons we just went
3 over. And I think he's violating the Advisers
4 Act. He's putting the funds and the debtor at
5 risk, in jeopardy of class action lawsuits, and
6 he's going against the interests of investors
7 that are in transition, and expressed a desire to
8 not have their assets sold, especially when
9 there's no business reason.
10        And for all the reasons articulated
11 below -- I mean, for all the reasons we just went
12 over, and there are a few reasons I probably
13 haven't remembered off the top of my head, but
14 it's -- I think it's -- I think his activities
15 regarding the CLOs is incredibly inappropriate,
16 unfounded and malicious, and he hadn't sold that
17 many securities at that point in time, somewhat
18 de minimis amounts, but it was a warning to tell
19 him to stop; otherwise, rightfully, the
20 beneficial owners would take more significant
21 actions, which I think they should and they will.
22    Q. What significant action are the
23 beneficial owners going to take?
24    A. I don't know. But there's a lot more

Page 64

J. DONDERO

1 things that they can push on, like you were
2 suggesting earlier, asking earlier in terms of
3 self-reporting to the SEC.
4     Q. But you haven't done that yet, to the
5 best of your knowledge; is that right?
6     A. I'm not aware.
7     Q. You wrote there that it's the last
8 warning.
9        Do you see that?
10    A. Yes.
11    Q. How many other warnings have you
12 given Mr. Seery?
13    A. All the e-mails we just went over.
14    Q. Anything else?
15    A. No.
16    Q. Okay. You got document requests in
17 this -- in connection with this matter; isn't
18 that right?
19    A. Yes.
20        MR. MORRIS: Okay. Can we put up
21 Exhibit 5, please.
22 BY MR. MORRIS:
23    Q. You know, before we look at that,
24 earlier this morning you mentioned -- you made a

Page 65

J. DONDERO

1 reference to internal counsel.
2        Do you recall that?
3     A. Yes.
4     Q. Okay. Who were you referring to?
5     A. D.C. Sauter.
6     Q. And D.C. Sauter is internal counsel
7 for who?
8     A. I'm sorry, was there a question
9 there?
10    Q. Yes. I apologize.
11        D.C. Sauter is internal counsel for
12 who, for which entity?
13    A. NexPoint.
14    Q. Okay. Were you referring to anybody
15 else?
16    A. No.
17    Q. Okay. You mentioned Scott Ellington
18 earlier, right?
19    A. Yes.
20    Q. And who is Mr. Ellington?
21    A. He's general counsel at Highland
22 historically. I think his role has been
23 redefined as settlement counsel, that's how it
24 was described to me, I guess, six, nine months

Page 66

1              J. DONDERO
2    ago, six months ago.
3        Q.  Mr. Ellington is employed by the
4    debtor, right?
5        A.  Yes.
6        Q.  And do you know when he first became
7    employed by the debtor?
8        A.  Over a decade ago.
9        Q.  Do you know whether Mr. Ellington has
10   any employer other than the debtor?
11       A.  I don't know.
12       Q.  He never told you that he had an
13   employer other than the debtor, did he?
14       A.  I don't know.
15       Q.  You know if he told you or not,
16   right?  Did he ever tell you that?
17       A.  He never told me that he did, no.
18       Q.  And you have no facts or reason to
19   believe, as you sit here right now, that the
20   debtor is -- withdrawn.
21           You have no facts or reason to
22   believe right now that Mr. Ellington has any
23   employer other than the debtor, correct?
24           MR. BONDS:  Objection, form.
25       A.  I'd like to stick with:  I don't

Page 67

1              J. DONDERO
2    know.
3    BY MR. MORRIS:
4        Q.  You have no reason to believe that;
5    is that fair?
6        A.  Correct, I don't know.
7        Q.  Okay.  He's not -- Mr. Ellington is
8    not your personal lawyer, right?
9        A.  No.
10       Q.  He's never represented Jim Dondero
11   personally; is that right?
12       A.  No.
13           MR. MORRIS:  Let's look at the
14   document request, please, Exhibit 5.
15           (Dondero Deposition Exhibit 5
16   marked.)
17   BY MR. MORRIS:
18       Q.  If we could go -- let me just ask you
19   generally, Mr. Dondero.
20           Have you ever seen this document
21   before?
22       A.  No.
23       Q.  Are you aware that the debtor served
24   document requests on the Bonds Ellis firm for
25   documents in connection with its motion for a

Page 68

1              J. DONDERO
2    preliminary injunction?
3        A.  Yes.
4        Q.  How did you learn that?
5        A.  I heard about it from my lawyers.
6        Q.  Okay.  Did you oversee the search for
7    responsive documents?
8        A.  Response -- I know we were responsive
9    and compliant, but I delegated it to my
10   assistants and the employees at Bonds Ellis.
11       Q.  Which assistants did you delegate
12   this to?
13       A.  Tara Loiben.  I think primarily Tara
14   Loiben.
15       Q.  And who is Ms. Loiben?
16       A.  She's my assistant.
17       Q.  And who is she --
18       A.  I'm sorry?
19       Q.  Who is she employed by?
20       A.  I -- I don't know for sure.  I think
21   Highland, but I don't know.  I don't want to
22   speculate.
23       Q.  What instructions -- (audio
24   malfunction) --
25           (Clarification requested by the

Page 69

1              J. DONDERO
2    stenographer.)
3    BY MR. MORRIS:
4        Q.  What instructions did you give her in
5    order to search for documents?
6        A.  I didn't -- I didn't give her any.
7    She worked with that and she had -- she has full
8    access to my e-mail, and I gave her my phone for
9    the better part of a couple days in the office.
10       Q.  You -- until the end of 2020, you had
11   an e-mail address with an HCMLP or a Highland
12   e-mail address, right?
13       A.  Yes.
14       Q.  Have you stopped -- has that e-mail
15   address ceased to be in use?
16       A.  I've switched to an e-mail at the
17   bank as of -- whatever it was, last week or...
18       Q.  In the year 2020, did you use any
19   e-mail address other than the Highland e-mail
20   address?
21       A.  No.
22       Q.  You don't have a Gmail address or any
23   other personal e-mail address?
24       A.  I have an old Gmail address, but it's
25   dormant.  I haven't logged on to it in years.

Page 70

```
 1              J. DONDERO
 2      Q.  Okay.  And you understood that the
 3  debtor's document request called for the
 4  production of all text messages that were
 5  responsive to the requests, right?
 6      A.  Yes.
 7      Q.  Can we just scroll down to the
 8  requests themselves?  Right there.
 9          Do you see Request No. 3 is for all
10  communications between you and any person
11  employed by the debtor?
12      A.  Yes.
13      Q.  And did you understand that the
14  request was limited to the time period of, I
15  think, December 10th, 2020 to the end of the
16  month?
17      A.  I didn't read the details of this.  I
18  didn't get into it.  I didn't do the document
19  production that I believe was completed and
20  responsive.  I delegated that.
21      Q.  Did you review the documents before
22  they were produced?  Do you know what was
23  produced?  Withdrawn.  Two different questions.
24          Did you review the documents for
25  completeness before your lawyers delivered them
```

Page 71

```
 1              J. DONDERO
 2  to my firm?
 3      A.  Only in the most general -- when
 4  she'd print out a stack of them, I'd just thumb
 5  through the stack of them, and that was it.  But
 6  other than that, no.
 7      Q.  Did you do anything to satisfy
 8  yourself that you had produced all responsive
 9  documents?
10      A.  I trust Tara's work ethic and
11  capabilities, and I trust the lawyers at Bonds
12  Ellis, so I didn't -- I didn't intervene or
13  supersede or supervise.
14      Q.  So you didn't do anything to make
15  sure -- you didn't do anything personally --
16  withdrawn.
17          You didn't take any steps personally
18  to make sure that all responsive documents had
19  been produced, right?
20      MR. BONDS:  Objection, form.
21      A.  I wasn't involved personally, but I
22  do believe it was responsive and complete.
23  BY MR. MORRIS:
24      Q.  Until early December, you had a phone
25  that was bought and paid for by the debtor,
```

Page 72

```
 1              J. DONDERO
 2  right?
 3      A.  Yes.
 4      Q.  What happened to that phone?
 5      A.  It was disposed of as part of getting
 6  a replacement phone in anticipation of
 7  potentially a transition.
 8      Q.  Who decided to dispose of it?
 9      A.  That's historically what we've done
10  with all of our historic phones, when we've
11  gotten new phones.  I've gotten a new phone, I
12  guess, every four or five years, and the old ones
13  have always been destroyed.
14      Q.  Who decided to destroy this --
15  withdrawn.
16          When you say it was disposed of, what
17  does that mean?
18      A.  As far as I know, it was disposed of
19  in the garbage, but I don't know if it was
20  recycled or whatever.
21      Q.  And who decided to throw it in the
22  garbage?
23      A.  We've always -- we've always done
24  that when we've gotten new phones, versus trading
25  them in, for the senior executives.
```

Page 73

```
 1              J. DONDERO
 2      Q.  I appreciate that, but I'm just
 3  talking about the very specific phone that the
 4  debtor bought and paid for for your benefit.  Who
 5  made the decision to dispose and throw that phone
 6  away?
 7      MR. BONDS:  Objection, form.
 8      A.  I -- like I said, I understood it to
 9  be our standard process and protocol.  I don't
10  know.  I can't label anybody with the decision.
11  BY MR. MORRIS:
12      Q.  Well, who threw it away?
13      A.  I don't know.
14      Q.  You don't know if you threw the phone
15  away?
16      A.  No, I -- I don't know.  No, I don't
17  remember throwing it away, but I don't know who
18  did.
19      Q.  Did you have conversations with
20  anybody about the decision to throw away the
21  phone?
22      A.  Like I said, it wasn't a decision or
23  a new decision.  It's been the process, as far as
24  I understand it, every time we've upgraded phones
25  over the last 30 years.
```

Page 74

J. DONDERO

1    Q. You just throw it in the garbage?
2    You don't try to get a credit for it by returning
3    it?
4    A. No.
5    Q. Okay. Did you ever speak with
6    Mr. Ellington about your phone that was bought
7    and paid for by the debtor?
8    A. I think Ellington's phone and my
9    phone and I think -- I think right around the
10   same time, in anticipation, in case there was a
11   transition or in case there was a liquidation
12   plan, it was time to move the phone ownership
13   away from the estate. The estate wasn't going to
14   pay for it anymore anyway in another couple of
15   weeks so, I --
16   Q. Were you aware --
17   A. I'm sorry, what's your question?
18   Q. Are you aware that the UCC had asked
19   for your text messages before the time that you
20   disposed of your phone?
21   A. No.
22   Q. Nobody ever told you that the UCC
23   wanted your phone?
24   A. No.

Page 75

J. DONDERO

1    Q. When exactly did you dispose of your
2    phone?
3    A. On or about when I got my new phone.
4    Q. Who at the debtor did you tell that
5    you disposed of your phone?
6    A. I don't -- I don't remember who. Was
7    it Jason Rothstein was involved in getting my new
8    phone and knew that I was disposing of my old
9    phone? I don't know who else knew. But again,
10   it was standard procedure.
11   Q. Did it ever occur to you to get the
12   debtor's consent before doing this?
13   MR. BONDS: Objection, form.
14   A. No.
15   BY MR. MORRIS:
16   Q. Did you have the phone number
17   transferred to your personal account?
18   A. Yes.
19   Q. Did you ever ask the debtor for its
20   permission to do that?
21   A. No.
22   Q. Did you ever give the debtor notice
23   that you were doing that?
24   A. I didn't believe it was necessary or

Page 76

J. DONDERO

1    appropriate.
2    Q. So you wanted it to be a secret?
3    MR. BONDS: Objection, form.
4    A. No. No, I wouldn't describe it as a
5    secret. I would say I didn't think it was
6    necessary or appropriate.
7    Every executive that's ever left
8    Highland has always kept their phone number,
9    period. Highland's never said, no, we're keeping
10   the phone number, ever, out of the two or 300
11   people that have come through Highland. And I
12   don't believe most businesses try and retain the
13   phone number of employees when they leave. It's
14   ludicrous on its surface.
15   BY MR. MORRIS:
16   Q. Okay. So let me just make sure that
17   I understand this.
18   You threw the phone -- withdrawn.
19   Somebody threw the phone that the
20   debtor bought and paid for in the garbage without
21   the debtor's knowledge or consent; is that right?
22   MR. BONDS: Objection, form.
23   A. I'd just repeat my testimony, that
24   it's always been our process to destroy old

Page 77

J. DONDERO

1    phones when we get new phones.
2    BY MR. MORRIS:
3    Q. You were no longer an employee of the
4    debtor at the time, correct?
5    A. At the time? I believe I was an
6    employee of the debtor since January.
7    Q. Well, you stayed on as an unpaid
8    employee until mid October; isn't that right?
9    A. Right, but I -- but I don't even
10   think my phone was paid for by the debtor. I
11   think my phone was paid for by shared services by
12   NexPoint. I -- I don't know what you're -- I
13   don't know what you're getting at or what
14   you're -- you're asking me.
15   Q. It's not complicated.
16   Did you tell the debtor that you
17   threw away your phone at any time until this
18   deposition?
19   A. Did I tell the debtor? Like I said,
20   I didn't think it was the debtor's phone. No, I
21   did not tell the debtor or get permission. No, I
22   did not.
23   Q. And did you tell the debtor that you
24   were changing the phone number?

Page 78

```
1              J. DONDERO
2       A.  No.
3       Q.  And did Mr. Ellington help you change
4   the phone number?
5           MR. BONDS:  Objection, form.
6       A.  I didn't change the phone number.
7   BY MR. MORRIS:
8       Q.  Withdrawn.
9           Did Mr. Ellington help you have the
10  phone number transitioned to your personal
11  account?
12          MR. BONDS:  Objection, form.
13      A.  No.  No.  It was Jason -- Jason
14  Rothstein handles the technology stuff and the
15  phone stuff.
16  BY MR. MORRIS:
17      Q.  Did Mr. Ellington also change his
18  phone number to his own personal account?
19      A.  My understanding was there was
20  numerous senior executives that changed their
21  phone in anticipation of being terminated by the
22  debtor shortly.
23      Q.  Who else did it?
24      A.  I don't know.  I thought it was -- I
25  didn't think it was just Ellington and I.  I
```

Page 79

```
1              J. DONDERO
2   thought it was a bunch of senior execs.  But --
3       Q.  What's the basis --
4       A.  -- who cares?  Who cares?  I didn't
5   care.  I don't know.  I mean --
6       Q.  I don't care if you care or not.  I'm
7   asking you questions.
8           What is the basis for your statement
9   that other people besides you and Mr. Ellington
10  changed the phone numbers?
11          MR. BONDS:  Objection, form.
12      A.  That was my understanding.  That was
13  my understanding.  But I don't -- I don't recall
14  specifics.  I didn't pay attention.
15  BY MR. MORRIS:
16      Q.  What is the basis for the
17  understanding?  Did somebody tell you that?
18          MR. BONDS:  Can you repeat the
19  question?
20  BY MR. MORRIS:
21      Q.  What is the basis for your
22  understanding?  Did somebody tell you that
23  employees of Highland other than Mr. Ellington
24  had changed the phone numbers?
25      A.  Yes.  My understanding was everybody
```

Page 80

```
1              J. DONDERO
2   had to move their phones in the next 30 days or
3   next 25 days, based on Seery's termination
4   notice.
5       Q.  Did Jim Seery -- withdrawn.  I'm
6   perfectly fine.
7           MR. MORRIS:  Can we put up Exhibit 6,
8   please.
9           (Dondero Deposition Exhibit 6
10  marked.)
11  BY MR. MORRIS:
12      Q.  That's Jason Rothstein.
13          Do you see that?
14      A.  Yes.
15      Q.  He didn't throw the phone in the
16  garbage, did he?
17      A.  I don't know.
18      Q.  Well, according to the text that he
19  sent you on December 10th, he left your own --
20  old phone in the drawer of Tara's desk.
21          Do you see that?
22      A.  Yes.
23      Q.  So he didn't think that it was his
24  responsibility as of December 10th to throw it in
25  the garbage, did he?
```

Page 81

```
1              J. DONDERO
2       A.  I don't know.
3       Q.  He left in Tara's desk, didn't he?
4       A.  On December 10th.  But I don't know
5   what he did on December 11th.
6       Q.  Did you tell him to do anything?
7       A.  I don't -- all I know is the phone's
8   been disposed of.  That's all I know.
9       Q.  Okay.  Did you tell Mr. Rothstein to
10  take the phone out of Tara's desk and throw it in
11  the garbage?
12      A.  I did not.
13      Q.  Did you tell Tara to take the phone
14  out of her desk and throw it in the garbage?
15      A.  I did not.
16          MR. MORRIS:  Okay.  Can we put up
17  Exhibit 7, please.
18          (Dondero Deposition Exhibit 7
19  marked.)
20          MR. MORRIS:  Can we just scroll down
21  a little bit.
22  BY MR. MORRIS:
23      Q.  Is this a text message from you to
24  Tara?
25      A.  Yep.
```

Page 82

```
1              J. DONDERO
2      Q.  If we could scroll up just a little
3   bit so we can see the date.
4          Well, it doesn't have a date, but do
5   you recall when you asked Tara to come in to
6   work -- (audio malfunction) --
7          (Clarification requested by the
8   stenographer.)
9   BY MR. MORRIS:
10     Q.  -- to come in to work on discovery.
11  Do you recall when you sent this text message,
12  Mr. Dondero?
13     A.  No.
14     Q.  Do you know how Tara -- withdrawn.
15         Did Tara come in to work on discovery
16  at any time?
17     A.  Yes.
18     Q.  And did you give her any instructions
19  on what to do?
20     A.  Again, just generally.
21     Q.  What were the general instructions
22  that you gave her?
23     A.  Work with the Bonds Ellis guys.
24  Here's the access to my computer and my phone.
25  Be complete and be responsive.
```

Page 83

```
1              J. DONDERO
2      Q.  Did you ever speak with Mr. Ellington
3   about your document production?
4      A.  No.
5      Q.  Did Mr. Ellington play any role in
6   searching for, reviewing or producing responsive
7   documents?
8      A.  Nope.
9      Q.  Did you ever speak with Mr. Leventon
10  about your document production?
11     A.  Nope.
12     Q.  Did Mr. Leventon play any role in
13  searching for, reviewing or producing responsive
14  documents?
15     A.  Nope.
16     Q.  Did you ever speak with anybody
17  employed by the debtor, other than Tara, about
18  your document production?
19     A.  Tara's got an assistant, or my other
20  assistant that works with Tara, Kelly, would have
21  been the only other person.
22         She might have been -- Tara had to go
23  back and see her girls during lunch, so I think
24  she used Kelly to do some of the legwork.
25     Q.  Let's talk about the TRO for a
```

Page 84

```
1              J. DONDERO
2   second.
3      MR. MORRIS:  Can we put up Exhibit 9,
4   please.
5          (Dondero Deposition Exhibit 9
6   marked.)
7   BY MR. MORRIS:
8      Q.  This is the temporary restraining
9   order that was signed on December 10th.
10         Do you see that?
11         If we could scroll down just a little
12  bit.  Yeah.
13     A.  Okay.
14     Q.  You've never seen this document
15  before, right?
16     A.  Yes, I haven't read it.
17     Q.  And I know I asked you earlier today
18  what your understanding was of how this order
19  restrained you.
20         Do you remember those questions?
21     A.  Yes.
22     Q.  Okay.  Is there anything, upon
23  reflection, that you need to add in order to make
24  the record complete as to your understanding of
25  the scope of the injunction?
```

Page 85

```
1              J. DONDERO
2      A.  Not at this moment.
3      MR. MORRIS:  Can you put up
4   Exhibit 10, please.
5          (Dondero Deposition Exhibit 10
6   marked.)
7   BY MR. MORRIS:
8      Q.  All right.  Have you seen this letter
9   before, sir?
10     A.  No.  I mean, not specifically.  I
11  probably received it, but I haven't read it.
12     Q.  All right.  I just want to go back to
13  the phone for a second to see if I can nail this
14  down.
15         Did you dispose of the phone
16  somewhere around December 10th, 2020?
17     A.  I -- I don't know.  Probably.
18     Q.  Well, we just looked at that e-mail,
19  right, that was from Mr. Rothstein.
20     MR. MORRIS:  Can we get that back?
21     A.  Yes.
22     MR. MORRIS:  I just want to see what
23  the date of that was.  Yes.  Okay.
24  BY MR. MORRIS:
25     Q.  So that's December 10th at 6:25 p.m.,
```

Page 86

1         J. DONDERO
2  right?
3      A.  Yes.
4      Q.  Okay.  So according to Mr. Rothstein,
5  as of that date at that time, your phone was in
6  Tara's desk, right?
7      A.  Yes.
8      Q.  You have no reason to disbelieve
9  that, do you?
10     MR. BONDS:  Can you repeat the
11  question?  I'm sorry.
12     MR. MORRIS:  Withdrawn.
13  BY MR. MORRIS:
14     Q.  So is it fair to say, then, that the
15  phone was disposed of and thrown in the garbage
16  sometime after December 10th?
17     A.  I don't know.
18     Q.  Well, as of December 10th,
19  Mr. Rothstein told you that it was in Tara's
20  desk, right?
21     A.  Yes.
22     Q.  Okay.  So if he -- Jason's not a
23  liar, is he?
24     A.  No.
25     Q.  Do you have any reason to believe

Page 87

1         J. DONDERO
2  that the phone was anywhere other than Tara's
3  desk at 6:25 p.m. on December 10th?
4      A.  I don't know.
5      Q.  You have no reason to believe that
6  that statement by Mr. Rothstein is untrue,
7  correct?
8      A.  Correct.
9      Q.  Do you know how it came to be that
10  the phone was disposed of in the manner that
11  you've described?
12     A.  Nope.
13     Q.  You can't tell me who did it; is that
14  right?
15     A.  Correct.
16     Q.  And you can't tell me when, after
17  December 10th, that happened, right?
18     A.  Correct.
19     Q.  Okay.  Thank you.  Let's go back to,
20  I guess, Exhibit 10.  If we can just scroll down
21  a little bit.
22         I understand that you haven't seen
23  this document before.  Go to the next page,
24  please -- no.  Yeah, next page.
25         Do you see the first full paragraph

Page 88

1         J. DONDERO
2  there beginning "On December 22nd"?
3      A.  I'm going to have to get up and read
4  that.  Just hold on a sec.
5      Q.  Okay.  Take your time.
6      A.  Yes, I see that.
7      Q.  Okay.  Having read that paragraph, do
8  you have any basis to dispute any of the
9  statements in that paragraph?
10     MR. BONDS:  I'm sorry.  Can you read
11  it again or can you ask your question again?
12     MR. MORRIS:  Sure.  I'd like to know
13  if Mr. Dondero has any basis to dispute any
14  assertion made in that paragraph.
15     A.  I disagree with every sentence in
16  that paragraph based on my 30 years of experience
17  and understanding how to operate a registered
18  investment advisor and how to do it in the
19  interest of performance, investors and a
20  registered investment advisor.
21  BY MR. MORRIS:
22     Q.  All right.  Let's try this
23  differently.  I shouldn't have done that.
24         The first sentence, do you have any
25  basis to disagree with any aspect of the first

Page 89

1         J. DONDERO
2  sentence of that paragraph?  And let me just read
3  it aloud, if I may.
4      A.  That -- all right.  What's your
5  question?
6      Q.  Is there anything inaccurate about
7  the first sentence?
8      A.  I believe my instructions in the
9  e-mails we went over were to not do the trades.
10  You know, that sentence implies not settle the
11  trade, which means to not do the trades once they
12  were already bona fide.  I -- I don't recall that
13  ever being my contention.
14         I would have preferred they be
15  reversed, but my instructions, I believe, in
16  everything we went over were to not do the
17  trades, stop doing trades that are adverse to the
18  interests of investors, but it wasn't regarding
19  settling outstanding trades.  So I think that
20  sentence on its face is in error.
21     Q.  Okay.  So but it's true, then, that
22  you instructed employees of NPA and HCMFA on or
23  around December 22nd to stop doing the trades of
24  Avaya and Sky, correct?
25     A.  Yes.

Page 90

1            J. DONDERO
2        Q.  Near the closing bell on -- we're
3    going to go back in time just a couple of days --
4    on Friday the 18th, Mr. Sowin informed you that
5    Seery wanted to sell these securities, right?
6        A.  I don't recall that specifically.
7        MR. MORRIS:  Okay.  Can we put up
8    Exhibit 11, please.
9        (Dondero Deposition Exhibit 11
10    marked.)
11        MR. MORRIS:  Okay.  And if we can
12    just go down to the bottom of it.  Yeah.
13    BY MR. MORRIS:
14        Q.  So that e-mail at the bottom, that's
15    Mr. Seery's direction to sell Avaya securities
16    from the CLOs, right?
17        A.  I don't know what's happening here.
18    I don't know if this is fuzzy or my eyes are
19    getting worse, but can we enlarge these a little
20    bit, or I'm going to have to get up each time.
21        Yeah.  This is nutty and vindictive.
22    I think everybody realizes that there's no
23    liquidity in the markets the three days before
24    Thanksgiving and Christmas.  There's no urgency
25    or reason to sell any of these securities that

Page 91

1            J. DONDERO
2    couldn't have waited until January or February.
3        There's no business purpose in
4    selling any of those securities, yet he's pushing
5    them through for self-serving or vindictive
6    reasons.  I -- or maybe trying to get more issues
7    in front of the judge.  I have no idea, but
8    this -- this stuff makes absolutely no sense and
9    no business purpose.
10        But I'm sorry, what's your question?
11        MR. MORRIS:  Okay.  I move to strike
12    and I'd ask you to listen to my question.
13    BY MR. MORRIS:
14        Q.  It's simply that you learned, just
15    before the closing bell on Friday, December 18th,
16    that Mr. Seery wanted to sell Avaya securities
17    out of the CLOs?
18        MR. BONDS:  Objection, form.
19        THE WITNESS:  Yeah, hold on.  I need
20    to interrupt for a second.  When you strike
21    something, does that mean it doesn't end up in
22    the record?
23        MR. MORRIS:  The judge will decide
24    whether or not it does.  It's my request that the
25    judge strike it from the record.  She'll make the

Page 92

1            J. DONDERO
2    ruling.
3        THE WITNESS:  Okay.  But then my
4    lawyer can ask to put it in as my understanding
5    of something at the end or something of the
6    deposition or...
7        MR. MORRIS:  I don't want to give you
8    legal advice, Mr. Dondero, but yes, that's
9    generally how it works.
10        THE WITNESS:  Okay.  Thank you.
11    BY MR. MORRIS:
12        Q.  So again, the question is simply
13    whether you learned near the closing bell on
14    Friday, December 18th, that Mr. Seery wanted to
15    sell Avaya shares out of the CLOs?
16        MR. BONDS:  Objection, form.
17        A.  It appears so.
18    BY MR. MORRIS:
19        Q.  Okay.  And can you just scroll up
20    above that, please.  And -- okay.
21        Do you see that Mr. Sowin, in fact,
22    forwards this right to you?
23        A.  Yes.
24        Q.  And it was on the basis of this that
25    you instructed the NPA and HCMFA employees not to

Page 93

1            J. DONDERO
2    execute these sales?
3        A.  Yes.
4        Q.  After the TRO was issued, did you
5    ever instruct any employees of NPA or HCMFA not
6    to interfere or impede with the debtor's
7    management of the CLOs?
8        A.  No.
9        Q.  To the best of your knowledge, did
10    anyone ever instruct the employees of NPA and
11    HCMFA not to interfere or impede with the
12    debtor's management of the CLOs?
13        A.  No.
14        Q.  Did you ever provide a copy of the
15    TRO to any employees of NPA and HCMFA?
16        A.  I did not.
17        Q.  Do you know if anybody ever provided
18    a copy of the TRO to any of the employees of NPA
19    and HCMFA?
20        A.  I do not know.
21        MR. MORRIS:  Okay.  Can we put up
22    Exhibit 12, please.
23        (Dondero Deposition Exhibit 12
24    marked.)
25        ///

Page 94

```
 1              J. DONDERO
 2  BY MR. MORRIS:
 3      Q.  Okay.  This is a letter that was sent
 4  to K&L Gates.
 5          Do you know who K&L Gates represents
 6  in connection with this matter?
 7      A.  Some of the retail funds.
 8      Q.  And do they also represent the two
 9  advisors?
10      A.  Yes.  I believe they're one of --
11  yes.
12      Q.  Attached to this letter, there's an
13  Exhibit A, if we can go down, and we'll find a
14  letter from K&L Gates there.  Okay.
15          This is another letter from K&L Gates
16  dated December 22nd, 2020.  Are you able to see
17  that, sir?  Can we scroll down a little bit?
18      A.  Yes.  Yes, I can see the letter.
19      Q.  Okay.  Were you aware that this
20  letter was sent at the time that it was?
21      A.  I was aware, yes.
22      Q.  And these are the same entities,
23  except for CLO Holdco, that had filed the prior
24  motion that was denied by the Court, right?
25      A.  I'm sorry, ask that question again.
```

Page 95

```
 1              J. DONDERO
 2  These were --
 3      Q.  Yeah, let me just do a little
 4  background.
 5          A couple of -- about a week before
 6  this letter was sent, the entities represented by
 7  K&L Gates, except for CLO Holdco, had made a
 8  motion in the bankruptcy court, right?
 9      A.  Yes.
10      Q.  They had asked the Court to pause, to
11  impose a pause on the debtor from selling any CLO
12  assets; is that right?
13      A.  I don't -- I don't know what
14  exactly -- I don't know the details of what they
15  requested.
16      Q.  Okay.  Did you authorize the filing
17  of that motion?
18      A.  Authorize the filing?  I
19  championed -- I pushed and encouraged the chief
20  compliance officer and the general counsel to do
21  what they believed was right as rigorously as
22  possible, and it manifested itself in the letters
23  that you're speaking of.
24      Q.  And you -- and you approved of these
25  letters, right?
```

Page 96

```
 1              J. DONDERO
 2      A.  I -- not directly and not
 3  specifically, but I encouraged them to do what
 4  they thought was right.
 5      Q.  Okay.  And you were aware that
 6  letters with the substance contained in them were
 7  going to be sent -- (audio malfunction) --
 8          (Clarification requested by the
 9  stenographer.)
10  BY MR. MORRIS:
11      Q.  -- to the debtor?
12          THE STENOGRAPHER:  And the answer
13  again, please?
14          MR. BONDS:  And I objected as to
15  form.
16          THE STENOGRAPHER:  And the answer
17  again, please?
18      A.  I was aware that letters were being
19  sent, and I was aware that motions -- or a motion
20  was being filed.
21  BY MR. MORRIS:
22      Q.  This letter was also sent on behalf
23  of CLO Holdco, Ltd.
24          Do you see that?
25      A.  Yes.
```

Page 97

```
 1              J. DONDERO
 2      Q.  Are you the direct or indirect
 3  economic or beneficial owner of CLO Holdco, Ltd.?
 4      A.  No.
 5      Q.  Who is?
 6      A.  I believe the DAF and HarbourVest.
 7      Q.  And who controls the DAF?
 8      A.  Grant Scott.
 9      Q.  Who is the beneficial owner of the
10  DAF?
11      A.  Three char- -- three or four
12  charitable organizations.
13      Q.  And who controls CLO Holdco?
14      A.  I don't know exactly.
15      Q.  Do you?
16      A.  No.
17      Q.  And who are the possibilities?
18      A.  CLO Holdco, my understanding is it
19  was a -- it was an investment amalgamation
20  between HarbourVest and the DAF, so with the DAF
21  having the primary -- or the largest ownership
22  interest.
23      Q.  And with that largest ownership
24  interest, is the DAF able to control CLO Holdco?
25      A.  I don't know.  Maybe.
```

Page 98

J. DONDERO

2 Q. You've never asked that question?

3 A. Nope.

4 Q. Did you ever instruct any of the

5 advisors or funds to withdraw this letter?

6 MR. BONDS: Objection, form.

7 A. No.

8 BY MR. MORRIS:

9 Q. To the best of your knowledge, has

10 anyone on behalf of the advisors, the funds or

11 CLO Holdco ever instructed K&L Gates to withdraw

12 this letter?

13 A. Not that I'm aware of.

14 Q. Okay. I want to just see if I can

15 refresh your recollection a bit.

16 When you talked about the DAF and

17 HarbourVest, is it possible that you're confusing

18 that with HCLOF?

19 A. You know, you're right. It could be.

20 Maybe it is CLO Holdco -- you know what, let me

21 just -- let me not speculate. But the CLO Holdco

22 might just be the DAF, and the combined entity

23 might be the level above that. I -- I don't know

24 exactly. Let me leave it at that.

25 Q. Okay. That's fair.

Page 99

J. DONDERO

2 This is the -- I think you've

3 testified -- I'm trying to speed this up a little

4 bit, believe it or not -- that you supported the

5 sending of this particular letter, right? And if

6 you need to read more of it, let me know.

7 A. No, I -- again, the thrust of it, the

8 theme of it, the -- when you think bad or illegal

9 or regulatorily inappropriate stuff has happened,

10 what did you do, when you knew it, et cetera.

11 And I think the responsibilities of that

12 transcend a lot of things, you know.

13 Q. But you are aware that these very

14 same entities, except for CLO Holdco, had

15 advanced the very same arguments to the

16 bankruptcy court just six days earlier and their

17 motion is denied, right?

18 MR. BONDS: Objection, form.

19 A. Yes. And with all due respect to the

20 Court, it doesn't mean that it was wrong or

21 inappropriate to advance the argument.

22 BY MR. MORRIS:

23 Q. Okay. But having advanced the

24 argument on December 16th and having had it

25 rejected, you support these entities pressing the

Page 100

J. DONDERO

2 same arguments again against the debtor, right?

3 A. We try and do what's right.

4 MR. MORRIS: Okay. Can we put up

5 Exhibit 13, please.

6 (Dondero Deposition Exhibit 13

7 marked.)

8 MR. MORRIS: And if we can go to

9 Exhibit A on the back. Thanks.

10 BY MR. MORRIS:

11 Q. This is another letter sent the next

12 day, right, on December 23rd, from K&L Gates?

13 And we can scroll down further, again.

14 Do you recall that there was yet

15 another letter sent on the 23rd?

16 A. Yeah, I don't recall specifically,

17 but...

18 Q. Can we scroll down a little bit

19 further in this document.

20 Do you recall that there came a time

21 when K&L Gates, on behalf of the advisors and the

22 funds, told the debtor and its counsel that it

23 was considering initiating the process for

24 removing the debtor as portfolio manager of the

25 CLOs?

Page 101

J. DONDERO

2 MR. BONDS: Objection, form.

3 A. I believe they -- I don't know if

4 you're asking me a reservation of rights or

5 whatever, but I think they should do everything

6 as rigorously as possible to try and protect the

7 investors.

8 BY MR. MORRIS:

9 Q. Are you aware of any prohibition of

10 doing what you're -- withdrawn.

11 Are you aware that the debtor made an

12 offer to assign the CLO management agreements to

13 NexPoint back in the beginning of December?

14 A. I -- I do remember that, and I did

15 get a summary of it, and it was untenable in

16 terms of what it was wrapped in.

17 Q. What was untenable about it?

18 A. Off the top of my head, it would give

19 Seery releases for bad acts or inappropriate

20 trades. It required a reimbursement for, I

21 think, a million dollars of Pachulski fees

22 relative to this subject, and I think it also

23 wanted an up-front payment for the present value

24 of the future management fees to be paid to the

25 estate.

Page 102

J. DONDERO

2    Q. And who made the decision to reject

3  the debtor's offer?

4    A. Made a decision to reject the --

5  reject the -- it wasn't a rejection of the offer

6  as much as a disagreement that that is the way

7  CLO contracts transfer, that the manager doesn't

8  have the right to extort from the next manager

9  when the investors want to transfer.

10     So there's a facilitation that

11  Highland could provide, but Highland is not in a

12  position, based on our understanding of the

13  market, to demand consideration.

14    Q. Okay. Who made the decision to

15  reject the offer?

16    A. I was involved in that. It wasn't a

17  formal rejection, but it was a view that it was

18  an inappropriate offer.

19    Q. Did anybody decide or suggest that

20  maybe we should make an appropriate offer?

21    A. Not yet.

22    Q. Was there any reason why, for the

23  past month, when the debtor has provided an

24  opportunity to transfer these CLO management

25  contracts, that none of the advisors or anybody

Page 103

J. DONDERO

2  representing them has sought fit to make an

3  appropriate counteroffer?

4    A. We can get an appropriate

5  counteroffer out tomorrow.

6    Q. Okay. Is there anything that's

7  prevented that over the last month instead of

8  writing letters and engaging in this litigation?

9    A. The fundamental prerequisites were so

10  inappropriate that it dissuaded us from putting a

11  normal, commercial, reasonable thing forward.

12  But we'll put something commercial, reasonable

13  and appropriate through tomorrow, and we'll see

14  how far it goes.

15    Q. Did you support the sending of this

16  particular letter at the time it was sent?

17    A. I -- generally, yes.

18    Q. Okay. Have you authorized any of the

19  entities on this letter to initiate the process

20  to remove the debtor as the fund manager of any

21  CLO?

22    MR. BONDS: Objection, form.

23    A. That's not my position, and it's not

24  without legal considerations regarding what's

25  subject to a stay and what's appropriate at this

Page 104

J. DONDERO

2  juncture.

3    But -- but I believe, subject to

4  whatever is legally appropriate, they should and

5  they will be moving to replace the manager as

6  quickly as possible and holding the manager

7  responsible for bad acts prior to transfer.

8  BY MR. MORRIS:

9    Q. Have you authorized any of the

10  parties that are signatory to this letter to

11  initiate the process to remove the debtor as the

12  fund manager for the CLOs?

13    A. I am not that involved. I haven't

14  authorized it per se. Again, I'm encouraging the

15  executives in charge to do the right thing, given

16  the circumstances and what's best for investors,

17  especially their retail investors and their

18  obligations under the '40 Act.

19    Q. You're the president of the two

20  advisors, right?

21    A. Yes.

22    Q. And you're the portfolio manager of

23  the funds, right?

24    A. Yes.

25    Q. Couldn't you give the direction to

Page 105

J. DONDERO

2  take steps to initiate the process to remove the

3  debtor?

4    MR. BONDS: I'm sorry, can you repeat

5  the question?

6  BY MR. MORRIS:

7    Q. Don't you have the power to do that?

8    MR. BONDS: I'm sorry. I couldn't

9  hear your question.

10    MR. MORRIS: Withdrawn.

11  BY MR. MORRIS:

12    Q. Did you ever discuss with any -- with

13  anybody about whether to initiate the process to

14  remove the debtor as the portfolio manager of the

15  CLOs?

16    A. I think it's a logical remedy, and I

17  believe the executives, and particularly like the

18  executives -- the chief compliance officer always

19  has personal liability, and I think Jason Post

20  knows that, and I think he's pushing as hard as

21  he can for the benefit of investors in a

22  situation where people are moving against the

23  best interests of investors.

24    And I encourage him to move as

25  aggressively as possible subject to whatever the

Page 106

1           J. DONDERO
2  limits of bankruptcy court, but I can't be --
3  I've got too many other things to do to be
4  directly involved in the details, so I'm not
5  involved in the details.
6      Q.  I see.
7          Did you ever instruct the parties
8  that are signatory -- withdrawn.
9          Did you ever instruct K&L Gates to
10 withdraw this letter?
11     A.  No.
12     Q.  To the best of your knowledge, has
13 anybody on behalf of the advisors, the funds or
14 CLO Holdco ever instructed K&L Gates to withdraw
15 this letter?
16     A.  No.
17     Q.  Will you commit that each of the
18 entities on whose behalf this letter was sent
19 will cease and desist from taking any steps to
20 initiate the process to remove the debtor as the
21 CLO manager?
22         MR. BONDS:  Objection, form.
23     A.  Say that again.
24 BY MR. MORRIS:
25     Q.  Will you commit on behalf of each of

Page 107

1           J. DONDERO
2  the funds and the advisors to cease and desist
3  from taking any steps to replace the debtor as
4  the portfolio manager of the CLOs?
5      A.  That would be inappropriate.  I'm not
6  sure it would be illegal, but I think it would be
7  a regulatory breach, and I think it would not be
8  in the best interest of investors if we were to
9  agree to anything like that.  I think that's nuts
10 and it's nutty to ask that.
11     Q.  People say that about me all the
12 time.
13         Did you ever exchange any e-mails or
14 texts with any employee of the parties on this
15 document, on the issue of whether or how to
16 remove the debtor as the CLO's fund manager?
17     A.  Not that I recall.
18     Q.  Did you ever discuss with any
19 employee of the debtor the topic of removing the
20 debtor as the portfolio manager of the CLOs?
21     A.  Not that I recall.
22         MR. MORRIS:  Okay.  It's 1:35.  Can
23 we just take a ten-minute break and resume -- is
24 it 12:35 where you are, Mr. Dondero?  We'll
25 resume at 1:45 Eastern, 12:45 Central.

Page 108

1           J. DONDERO
2          THE WITNESS:  I'm sorry, I can't hear
3  you.  We return at what time?
4          MR. MORRIS:  In ten minutes, at
5  12:45.
6          MR. BONDS:  And I want to say too,
7  John, that your notice showed that there was a
8  1:30 deposition Central Time of somebody else,
9  and we intend -- I mean, we planned on that, so
10 we're going to need to be through at 1:30.
11         MR. MORRIS:  Yeah, you can do that if
12 you want.  You can do that if you want, but the
13 record will also reflect that we started at least
14 20 minutes late and we took at least a 35-minute
15 break for Mr. Dondero.  So you leave whenever you
16 want, but be guided by that.
17         Let's take a break.
18         MR. BONDS:  Well, I'm telling you
19 that if you want to go forward, you can.
20         MR. MORRIS:  I will.  Thank you.  I
21 appreciate that.
22         THE WITNESS:  All right.  See you
23 guys in 10 minutes.
24         THE VIDEOGRAPHER:  12:36 p.m.,
25 Central Standard Time.  We're off the record.

Page 109

1           J. DONDERO
2          (Recess taken, 12:36 p.m. to
3  12:49 p.m. CST)
4          THE VIDEOGRAPHER:  12:49 p.m.,
5  Central Standard Time.  We're back on the record.
6  BY MR. MORRIS:
7      Q.  All right.  Can you hear me,
8  Mr. Dondero?
9      A.  Yes.
10     Q.  Is it fair -- do you think it's fair
11 to say that your personal interests are adverse
12 to the debtor's?
13     A.  No.
14     Q.  They asked for your resignation back
15 in October, right?
16     A.  Yes.
17     Q.  And you opposed the debtor's plan on
18 file, right?
19     A.  Yes.
20     Q.  And you objected to the debtor's
21 settlement with ACIS; is that right?
22     A.  Yes.
23     Q.  And you're going to object to the
24 debtor's settlement with HarbourVest; is that
25 right?

Page 110

J. DONDERO

1       MR. BONDS: Objection, form.
2       A. I don't know for sure. I believe so.
3   I don't know.
4   BY MR. MORRIS:
5       Q. And the debtor commenced an adversary
6   proceeding against you; is that right?
7       MR. BONDS: Objection, form.
8       A. I'm not aware of that in particular.
9   BY MR. MORRIS:
10      Q. The debtor sought and obtained a TRO
11  against you; isn't that right?
12      A. Oh. Okay, yes.
13      Q. And they also started a lawsuit?
14  They filed a complaint against you -- is that
15  right -- for preliminary and permanent injunctive
16  relief?
17      A. I'm aware of it, yes.
18      Q. And the debtor has removed you from
19  its offices, right?
20      A. Yes.
21      Q. And based on all of that, would you
22  agree that your personal interests are adverse to
23  the debtor?
24      A. No.

Page 111

J. DONDERO

1       Q. Okay. Since the TRO was entered,
2   have you ever discussed your litigation strategy
3   with Mr. Ellington?
4       A. Not -- no. Not that I'm aware of.
5   That's not the subject of our conversations.
6   He's more of a go-between, and he's more of an
7   overall strategist.
8       Q. And he's a strategist for your -- you
9   know, for the defense and prosecution of your
10  personal interests, right?
11      A. No.
12      Q. No?
13      Do you remember that there were
14  actually two motions on the calendar on
15  December 16th? There was the motion that you
16  brought that was called, I guess, the active
17  ordinary course transactions motion, and then
18  there was the motion brought by the K&L Gates
19  firm on behalf of -- (audio malfunction) --
20      (Clarification requested by the
21  stenographer.)
22  BY MR. MORRIS:
23      Q. -- the advisors and the funds, where
24  they sought the pause of the sale of CLO assets.

Page 112

J. DONDERO

1       Do you remember that those two
2   motions were on the calendar a couple of weeks
3   ago?
4       A. I remember that K&L Gates one. The
5   first one, I don't remember.
6       Q. Do you remember discussing with
7   Mr. Ellington the need for a witness for one of
8   those motions?
9       A. No. I don't remember the motion.
10      Q. Do you remember that Mr. Ellington
11  suggested that J.P. Sevilla serve as a witness
12  for one of those motions?
13      A. I don't remember that.
14      MR. MORRIS: Put up Exhibit 15,
15  please.
16      (Dondero Deposition Exhibit 15
17  marked.)
18  BY MR. MORRIS:
19      Q. If we can go down here, do you see
20  that on Saturday, December 12th, Mr. Lynn wrote
21  to you and said: It looks like a trial?
22      A. Yes.
23      Q. Can you scroll up above that, please.
24  Keep going. And then Mr. Lynn -- I'm sorry, not

Page 113

J. DONDERO

1   so much.
2       And then Mr. Lynn wrote: That said,
3   we must have a witness now.
4       Do you see that?
5       A. Yes.
6       Q. Now, go up to the top, and
7   Mr. Ellington writes to you and to others: It
8   will be J.P. Sevilla. I will tell him that he
9   needs to contact you first thing in the morning.
10      Have I read that correctly?
11      A. Yes.
12      Q. Now, this is after the TRO is
13  entered, right?
14      A. Like I said, I'm not -- I see my name
15  on the cc list. I don't have an awareness of
16  what this is about, so...
17      Q. Okay. Do you know what trial
18  Mr. Sevilla was going to testify at?
19      A. No.
20      Q. You didn't produce --
21      A. You can refresh my memory, but I
22  don't have a recollection from this.
23      Q. To be fair, Mr. Dondero, I don't
24  know. This is discovery, and I'm just asking a

Page 114

J. DONDERO

1       J. DONDERO
2   question, if you know.
3       A. Okay.
4       Q. Do you recall if you produced this
5   e-mail in discovery?
6       A. I have no idea.
7       Q. Do you recall looking to
8   Mr. Ellington for leadership in helping to
9   coordinate all the lawyers acting on your behalf
10  and on behalf of the entities owned and
11  controlled by you?
12      A. I know I needed some coordination,
13  but I think I went in a different direction, and
14  that's why I brought on Douglas Draper, and he's
15  been functioning in that role of joint defense
16  and coordination.
17      Q. But you did tell Mr. Ellington, after
18  the TRO was entered, that you needed him to
19  provide leadership with respect to the
20  coordination of your litigation interests, right?
21      A. I -- I don't -- I don't remember.
22  Like I said, I ended up going in a different
23  direction, but I -- I don't -- I don't know as
24  far as your question is concerned.
25      MR. MORRIS: Okay. Can we put up

Page 115

1       J. DONDERO
2   Exhibit 16, please.
3       (Dondero Deposition Exhibit 16
4   marked.)
5       MR. MORRIS: Scroll down to the
6   bottom. Not that far. Right there.
7   BY MR. MORRIS:
8       Q. So this is an e-mail from Mr. Draper
9   to you on December 16th.
10      Do you see that?
11      A. Yes.
12      MR. BONDS: I'm going to object.
13  Mr. Draper is a lawyer.
14      MR. MORRIS: He is. I understand
15  that.
16      MR. BONDS: Anything that was
17  produced that relates to Douglas Draper and Mike
18  Lynn and Jim Dondero is attorney-client
19  privileged.
20      MR. MORRIS: You're entitled to make
21  that assertion, but if we just look at the top so
22  we can clear this up. All the way to the top.
23  Mr. Dondero forwards this to Mr. Ellington.
24  Mr. Ellington is not Mr. Dondero's personal
25  lawyer. He is the lawyer for the debtor, and

Page 116

1       J. DONDERO
2   your firm doesn't represent any business
3   interest, so there's no claim that this is
4   somehow provided pursuant to a shared services
5   agreement. Unless you can tell me that there's a
6   common -- (audio malfunction) --
7       (Clarification requested by the
8   stenographer.)
9       MR. MORRIS: -- a common interest
10  between Mr. Ellington and Mr. Dondero,
11  Mr. Dondero has waived the privilege. State your
12  position, and I'm happy to state mine, but I need
13  to ask questions.
14      Can we go back down to the bottom,
15  please. All right.
16  BY MR. MORRIS:
17      Q. So on December 16th, Mr. Draper is
18  looking to get a joint meeting together, right?
19      Do you remember that?
20      A. I'm sorry, what's the question?
21      Q. Do you recall that on or around
22  December 16th, Mr. Draper was looking to get a
23  joint meeting among all the lawyers representing
24  you and your business interests as well as the
25  employees for Highland?

Page 117

1       J. DONDERO
2       A. What I do know is Douglas Draper has
3   put together a mutual defense agreement, and I
4   think the 16th is right about when he came on
5   board. He had to reach out and get people's
6   e-mails and contact information and be able to
7   coordinate that.
8       But he's now fully engaged and fully
9   functional in that role. Ellington is not
10  involved in that role at all. Can you -- but I
11  don't know exact time frames or exactly who said
12  what to who when, but go ahead, ask me whatever
13  you want.
14      Q. You mentioned a mutual defense
15  agreement. Do I have that right?
16      MR. BONDS: Objection --
17      A. I don't know what -- I don't know
18  what the legal term is.
19  BY MR. MORRIS:
20      Q. Okay. But there's a joint --
21      MR. BONDS: Don't talk about that,
22  Jim.
23      MR. MORRIS: Okay.
24  BY MR. MORRIS:
25      Q. Let me ask you this: Did Scott

Page 118

J. DONDERO

1  
2  Ellington participate in the drafting of the
3  joint interest or mutual defense agreement?
4      A. No.
5      Q. Did Isaac Leventon participate in the
6  drafting of a joint defense or mutual defense
7  agreement?
8      A. No.
9      Q. Did you ever discuss with either of
10 them the topic of a joint defense or a mutual
11 defense agreement?
12     A. That was entirely with Draper.
13     Q. Okay. Let's scroll up the page a
14 little bit. There's a response from Mr. Lynn.
15         Do you see that?
16     A. Yes.
17     Q. And then if we scroll up a little
18 further, you forward it to Mr. Ellington, right?
19 If we can go to the --
20     A. Yes.
21     Q. And you said: I'm going to need you
22 to provide leadership here.
23         Have I read that correctly?
24     A. Yes.
25     Q. Why did you send this e-mail string

Page 119

J. DONDERO

1  
2  to Mr. Ellington on December 16th?
3      A. I don't remember.
4      Q. What leadership were you looking for?
5      A. I can't piece it together from here.
6  I don't remember. I can't piece it together from
7  the e-mail, and I don't remember.
8      Q. Why did you need Mr. Ellington to
9  provide leadership?
10     A. I don't know.
11     Q. Does --
12     A. I don't remember.
13     Q. Okay. Does looking at the topic, a
14 list for a joint meeting, refresh your
15 recollection that you wanted Mr. Ellington to
16 coordinate all of the lawyers working on your
17 behalf and on behalf of the entities in which you
18 own an interest?
19     A. No. I mean, because that was the
20 beginning of the string, but the middle of the
21 string starts going in different directions. I
22 can't say -- I can't say what I wanted him to
23 have leadership with.
24     Q. Can you think of any -- any issue at
25 all, looking at this e-mail string, as to what he

Page 120

J. DONDERO

1  
2  would be providing leadership for if it's not to
3  coordinate your defense counsel?
4      A. I don't want to speculate, but
5  again -- I don't want to speculate, but again,
6  the middle of the string looks like it goes in
7  different directions than just forming the mutual
8  defense thing.
9      Q. Okay. So you have no recollection
10 why you forwarded this e-mail to Mr. Ellington on
11 December 16th and why you told him that you need
12 him to provide leadership here; is that your
13 testimony?
14     A. Correct.
15     Q. Is Mr. Ellington a party to any joint
16 defense or mutual defense agreement that you're a
17 party to?
18     A. I believe the employees' counsel is
19 part of the working group, although I've been on
20 calls when the employees' counsel has been on and
21 when it hasn't. But I don't even -- I think the
22 employee group is divided into a couple different
23 groups, and I don't know if Ellington is part of
24 both groups.
25         But I -- Ellington individually is

Page 121

J. DONDERO

1  
2  not part of the working group, and I'm not sure
3  which, if one or both, of the employee groups
4  he's in.
5      Q. So there's two employee groups; is
6  that right?
7      A. I'm beyond my involvement and
8  expertise, but I thought there were two employee
9  groups, but I don't even know that for sure.
10     Q. And has your counsel conferred with
11 counsel for either or both of the employee
12 groups?
13         MR. BONDS: I'm sorry, can you repeat
14 the question?
15         MR. MORRIS: Yes.
16 BY MR. MORRIS:
17     Q. Has your counsel at Bonds Ellis
18 conferred with counsel for either or both of the
19 employee groups?
20     A. I don't know.
21         MR. MORRIS: John, I would call for
22 the immediate production of any --
23         MR. BONDS: I don't think we have it,
24 but I can check on that.
25         MR. MORRIS: I would call for the

Page 122

J. DONDERO

1           J. DONDERO
2  immediate production of any joint defense or
3  mutual defense agreement to which any debtor
4  employee is a party --
5        MR. BONDS:  I don't think that there
6  are any.
7        MR. MORRIS:  And I would call for any
8  drafts, okay?
9        MR. BONDS:  Again, I don't think
10  there are any.
11        MR. MORRIS:  Okay.  You can give me
12  that representation.
13  BY MR. MORRIS:
14      Q.  Let's look at the top, at
15  Mr. Ellington's response.  And what did he tell
16  you in response to your statement that you need
17  him to provide leadership?
18      A.  You mean the two words there?
19      Q.  Yep.
20      A.  It looks like he typed back:  On it.
21      Q.  Yeah.
22        Did Mr. Ellington subsequently
23  provide leadership, as you had asked?
24      A.  I don't remember.  Nothing I can
25  recall.

Page 123

J. DONDERO

1           J. DONDERO
2      Q.  Did Mr. Ellington ever participate in
3  any conference calls with your counsel at Bonds
4  Ellis?
5      A.  Not that -- not that I recall.
6  Ellington's time has been spent primarily, the
7  vast majority, representing and working with the
8  employee group.  I know that.  It's been
9  difficult to get his attention on anything else
10  so --
11      Q.  Listen carefully to my question.  I'm
12  not asking you to tell me what Mr. Ellington
13  does.  I'm simply asking whether you know that
14  Mr. Ellington has participated in conference
15  calls with your counsel at Bonds Ellis at any
16  time after December 10th.
17      A.  I don't know.
18      Q.  Did you ever participate in any calls
19  with Mr. Ellington and any lawyer at Bonds Ellis?
20      A.  Over the year, for sure.  There have
21  been -- earlier in the year there were several
22  times, but I can't recall one recently.
23      Q.  So you have no recollection of ever
24  participating in a phone call with Mr. Ellington
25  and any lawyer at Bonds Ellis at any time since

Page 124

J. DONDERO

1           J. DONDERO
2  December 10th; is that your testimony?
3      A.  I -- I can't recall.  I'm willing to
4  be refreshed.  I can't recall.  There were --
5  there were -- some of the calls that stick out in
6  my mind I believe occurred prior to that date, so
7  I can't -- I can't recall any post that date.
8      Q.  Okay.  You didn't produce this e-mail
9  in response to the Court's order, did you?
10      A.  I don't know.
11      Q.  And that's because you didn't take
12  the time to look at the production before it was
13  delivered to my firm, right?
14      A.  I -- I believe the -- yeah, I mean,
15  it's a process I don't -- I don't get directly
16  involved in.  Counsel has to decide what's
17  responsive, what's privileged, what's complete,
18  what's appropriate.  That's not my job.
19      Q.  Are you aware that any documents for
20  which a privilege was asserted were supposed to
21  be delivered to the Court last December 31st?
22      A.  I'm not saying that's what -- I have
23  no idea whether we produced this or didn't
24  produce it.  And if we didn't, I don't know why.
25      Q.  Do you know that the UCC has asked

Page 125

J. DONDERO

1           J. DONDERO
2  for the financial statements for Dugaboy and Get
3  Good?
4        MR. BONDS:  Objection, you're going
5  far afield from where we're -- this TRO.
6        MR. MORRIS:  You can take that
7  position if you want, but I assure you, when I'm
8  done, you'll understand.
9        MR. BONDS:  I'm going to instruct the
10  witness not to answer the question.
11        MR. MORRIS:  You're not going to let
12  him answer as to whether or not the UCC wanted
13  the Dugaboy and Get Good financial statements?
14        MR. BONDS:  I can't hear you.
15        MR. MORRIS:  Yeah, I apologize.
16  It's -- it's not me, John.  Let me just ask
17  again.  Are you -- you're going to instruct your
18  witness not to answer the question of whether he
19  knew that the UCC wanted the Dugaboy and Get Good
20  financial statements?
21        MR. BONDS:  I'll let you go one --
22  you can ask that one question.  But anything
23  further into Dugaboy is not something that is for
24  the Court to determine at this point in this
25  case.

Page 126

J. DONDERO

1    MR. MORRIS: Okay.
2    So you can answer that question, sir.
3    A. I think there have been several times
4    over the last year that Dugaboy financials have
5    been requested by a variety of entities. I don't
6    know when or recently or if the UCC requested it
7    recently.
8    BY MR. MORRIS:
9    Q. You know a number of different
10   parties have asked for the Dugaboy and Get Good
11   financial statements; is that right?
12   MR. BONDS: I'm going to object to
13   any answer that you may give following up on
14   Dugaboy. Dugaboy is not subject to the TRO and
15   you're stuck with your adversary proceeding.
16   MR. MORRIS: John, there is a text
17   message that we're going to get to in a moment,
18   so I'll end the suspense. Mr. Dondero
19   specifically says: Don't produce the Dugaboy
20   financial statements without a subpoena. Those
21   documents were in the debtor's possession. I
22   will tell you that I personally made at least a
23   half a dozen requests of Mr. Ellington and
24   Mr. Leventon for those documents.

Page 127

J. DONDERO

1    I will tell you that Jim Seery
2    instructed them to provide those documents
3    because they're in the debtor's possession,
4    custody and control.
5    I will tell you that there's no
6    shared services agreement between Dugaboy or Get
7    Good and the debtor, and there is no basis for
8    those -- for Mr. Ellington and Mr. Leventon to
9    have obstructed the debtor's obligation to
10   provide those documents except in Mr. Dondero's
11   hands.
12   MR. BONDS: I'm going to instruct the
13   witness not to answer the question.
14   MR. MORRIS: I think that might be a
15   good idea. On what basis?
16   MR. BONDS: I don't need to give a
17   basis. I think that you've gone far, far from
18   what we're here on today, which is --
19   MR. MORRIS: I believe that it's --
20   MR. BONDS: -- specifically --
21   MR. MORRIS: I'm sorry to interrupt.
22   Go ahead, John.
23   MR. BONDS: Specifically, it's the
24   TRO and the injunction.

Page 128

J. DONDERO

1    MR. MORRIS: Correct. And the TRO
2    specifically -- I know Mr. Dondero doesn't know
3    this because he hasn't read the document, but in
4    addition to the things that he mentioned, it also
5    prevents him from interfering with the debtor's
6    business.
7    The debtor is a litigant here. The
8    debtor has an obligation to provide these
9    documents. And he interfered with that
10   obligation.
11   Let me ask my questions and you can
12   direct him not to answer every single time if you
13   want, okay?
14   MR. BONDS: Okay.
15   BY MR. MORRIS:
16   Q. Do you know a woman named Melissa,
17   Mr. Dondero?
18   A. Yes.
19   Q. And who is that?
20   A. She's my personal accountant.
21   Q. Does she work at the Highland
22   offices?
23   A. Yes.
24   Q. Is she employed by the debtor?

Page 129

J. DONDERO

1    A. I believe so.
2    Q. Do you know what her title is?
3    A. No.
4    Q. Do you directly or indirectly
5    control -- withdrawn.
6    Do you directly or indirectly own
7    Dugaboy?
8    A. No.
9    Q. Who owns Dugaboy?
10   MR. BONDS: I'm going to instruct the
11   witness not to answer that question.
12   MR. MORRIS: Are you going to follow
13   your counselor's advice?
14   THE WITNESS: Yes.
15   BY MR. MORRIS:
16   Q. Who controls Dugaboy?
17   MR. BONDS: I'm going to instruct the
18   witness not to answer that question, for the
19   second time.
20   MR. MORRIS: Are you going to
21   follow -- yeah, we'll do this every time, John,
22   just for the record.
23   MR. BONDS: That's fine.
24   MR. MORRIS: So I apologize. I

Page 130

```
1              J. DONDERO
2    appreciate, you know, you do your job, I'll do
3    mine.
4         Mr. Dondero, are you going to follow
5    your counsel's advice?
6         THE WITNESS:  Yes.
7    BY MR. MORRIS:
8         Q.  To the best of your knowledge,
9    Dugaboy does not have a shared services agreement
10   with the debtor, correct?
11        You can answer, sir.
12        THE WITNESS:  I'm not answering,
13   right?  I'm not answering any questions on this
14   subject.
15        MR. MORRIS:  Only if your lawyer
16   instructs you to do that, and he hasn't done that
17   for this question.
18        MR. BONDS:  I'm going to instruct the
19   witness not to answer the question.
20        MR. MORRIS:  You're not going to let
21   him answer whether Dugaboy has a shared services
22   agreement with the debtor?
23        MR. BONDS:  I think that you're
24   entitled to that, so Jim, you can answer that
25   question.
```

Page 131

```
1              J. DONDERO
2         A.  I -- I don't know.
3    BY MR. MORRIS:
4         Q.  Okay.  Are you familiar with an
5    entity called Get Good?
6         A.  Yes.
7         Q.  Do you directly or indirectly own Get
8    Good?
9         A.  No.
10        Q.  Do you control, directly or
11   indirectly, Get Good?
12        A.  I don't believe so.
13        Q.  Who owns Get Good?
14        MR. BONDS:  I'm going to instruct the
15   witness not to answer the question.
16        MR. MORRIS:  Are you going to follow
17   your counsel's advice?
18        THE WITNESS:  Yes.
19   BY MR. MORRIS:
20        Q.  Who controls Get Good?
21        MR. BONDS:  Instruct the witness not
22   to answer the question.
23        MR. MORRIS:  Are you going to follow
24   your counselor's advice, Mr. Dondero?
25        THE WITNESS:  I'm going to follow his
```

Page 132

```
1              J. DONDERO
2    advice, yes.
3    BY MR. MORRIS:
4         Q.  To the best of your knowledge, Get
5    Good does not have a shared services agreement
6    with the debtor, does it?
7         THE WITNESS:  Can I answer that or
8    not answer that one?
9         MR. BONDS:  Yes, you can.
10        A.  I don't know.
11   BY MR. MORRIS:
12        Q.  Did you ever discuss the request by
13   any party to produce the financial statements of
14   Get Good and Dugaboy with Scott Ellington?
15        MR. BONDS:  I'm going to tell you --
16   advise you not to answer the question.
17        MR. MORRIS:  Are you going to follow
18   your counselor's advice?
19        THE WITNESS:  Yes.
20   BY MR. MORRIS:
21        Q.  Did you ever communicate with
22   Mr. Leventon on the subject matter of whether or
23   not the financial statements for Get Good and
24   Dugaboy needed to be produced by the debtor?
25        MR. BONDS:  I'm going to advise the
```

Page 133

```
1              J. DONDERO
2    witness not to answer the question.
3         MR. MORRIS:  Are you going to follow
4    your counselor's advice?
5         THE WITNESS:  Yes.
6    BY MR. MORRIS:
7         Q.  Did you ever communicate with anybody
8    at any time who was employed by the debtor
9    regarding the production of the Dugaboy and Get
10   Good financial statements?
11        MR. BONDS:  I'm going to instruct the
12   witness not to answer the question.
13        MR. MORRIS:  Are you going to follow
14   your counselor's advice?
15        THE WITNESS:  Yes.
16   BY MR. MORRIS:
17        Q.  Melissa is Melissa Schroth, right?
18        A.  Yes.
19        Q.  She's an executive accountant
20   employed by the debtor, right?
21        A.  Yes.
22        Q.  And after December 10th, 2020
23   Ms. Schroth told you that a request had been made
24   for the production of the Dugaboy financial
25   statements, correct?
```

Page 134

1           J. DONDERO
2           MR. BONDS:  You can answer the
3  question.
4      A.  I don't remember.
5           MR. MORRIS:  Okay.  Can we put up
6  Exhibit 17, please.
7           (Dondero Deposition Exhibit 17
8  marked.)
9           MR. MORRIS:  Can you scroll down a
10 little bit?  I'm sorry.  Scroll up so we can see
11 who this text was sent to.
12 BY MR. MORRIS:
13     Q.  Is that Melissa Schroth?
14     A.  Yes.
15     Q.  And if we scroll back down, do you
16 see that you tell Ms. Schroth on December 16th:
17 No Dugaboy details without a subpoena?
18     A.  Yes.
19     Q.  That's a text that you sent to her on
20 December 16th, correct?
21     A.  I believe so.
22     Q.  What prompted you to send this text?
23     A.  I don't know.
24     Q.  You don't have any recollection as to
25 why you would tell Melissa, quote, no Dugaboy

Page 135

1           J. DONDERO
2  details without a subpoena?
3      A.  No, but that would -- I mean, I stand
4  behind that response, but I don't remember why.
5      Q.  Do you remember who was asking for
6  the documents?
7      A.  Nope.
8      Q.  Do you remember any discussion with
9  any person at any time concerning the production
10 of the Dugaboy or Get Good financial statements?
11     A.  Nope.
12     Q.  Do you have any objection to the
13 debtor producing the Dugaboy and Get Good
14 financial statements?
15     A.  I'm sorry, say that again?
16     Q.  Would you consent to the debtor's
17 production of the Get Good and Dugaboy financial
18 statements?
19     A.  With a subpoena.  I stand by that
20 statement, yeah.
21     Q.  Okay.  Do you know of any reason why
22 Mr. Ellington and Mr. Leventon would have failed
23 to respond to Mr. Seery's instruction to produce
24 the Dugaboy and Get Good financial statements
25 that were requested by the -- (audio

Page 136

1           J. DONDERO
2  malfunction) --
3           (Clarification requested by the
4  stenographer.)
5  BY MR. MORRIS:
6      Q.  -- UCC?
7      A.  I don't want to speculate.
8      Q.  Have you heard of the law firm
9  Baker & McKenzie?
10     A.  Yes.
11     Q.  Does that firm or any lawyer at that
12 firm represent you in your individual capacity?
13     A.  No.
14     Q.  Does that firm or any lawyer at that
15 firm represent any entity in which you have a
16 direct or indirect ownership interest?
17     A.  No.  Not that I'm aware of, no.
18     Q.  I'm sorry, one second.
19          Does that firm or any lawyer at that
20 firm represent any entity that you directly or
21 indirectly control?
22     A.  Not that I'm aware of.
23     Q.  Do you recall asking Isaac Leventon
24 for the contact information for the -- for the
25 lawyers at Baker & McKenzie?

Page 137

1           J. DONDERO
2      A.  I -- I don't -- I don't -- it might
3  have been for part of the shared defense, mutual
4  defense, whatever, agreement, but that's --
5  that's the only reason why I would have asked for
6  it.
7      Q.  Okay.  What's your understanding as
8  to -- (audio malfunction) --
9           (Clarification requested by the
10 stenographer.)
11 BY MR. MORRIS:
12     Q.  -- the parties to that mutual defense
13 agreement that you just referred to, or shared
14 defense?
15     A.  I -- it's what I've testified
16 already, Douglas Draper is coordinating it.
17 I'm -- I'm not sure whether the employees are on
18 it or not, and I'm not sure if there's one
19 employee group or two employee groups, and I'm
20 not sure if one or both of them are part of that
21 agreement or not.
22          But the -- in recent history, my only
23 awareness of Baker McKenzie is with regard to
24 representing the employees.  That's my only
25 awareness of that firm.

Page 138

```
1              J. DONDERO
2      Q.  Have you ever spoken with an attorney
3  at Baker McKenzie?
4      A.  No, I have not.
5      MR. MORRIS:  Okay.  Can you put up
6  Exhibit 18, please.
7          (Dondero Deposition Exhibit 18
8  marked.)
9  BY MR. MORRIS:
10     Q.  That's Mr. Leventon.  Do I have that
11 right?
12     A.  Yes.
13     Q.  And you're communicating with him on
14 or around -- after December 10th, right?
15     A.  Yes.
16     Q.  Okay.  And if you could scroll down a
17 little bit, right there, on December 22nd, you
18 asked Mr. Leventon to send you the Baker &
19 McKenzie contact person, right?
20     A.  Yes.
21     Q.  And if you scroll down a little bit.
22 Did he ever send that to you?
23     A.  I'm sorry?
24     Q.  Did he ever send that to you?
25     A.  I don't know.  I don't remember.
```

Page 139

```
1              J. DONDERO
2      Q.  Why did you want the Baker & McKenzie
3  contact information?
4      A.  I was trying to help Draper
5  coordinate the mutual shared defense agreement.
6      Q.  And it was your intent and desire to
7  have the Baker McKenzie firm participate in that
8  agreement, right?
9      A.  No.  I'm not a lawyer.  The
10 appropriateness of who's in that group under what
11 circumstances representing who was a legal
12 decision made by Draper.
13     Q.  So why didn't you just have Draper
14 deal with this?  Why did you deal with it?
15     A.  He was scurrying around, moving
16 quickly, trying to get contact information for
17 potential various different parties.  I was just
18 helping him get the contact information.
19     Q.  And you --
20     MR. BONDS:  I'm going to instruct you
21 not to say anything relating to this as far as
22 what he and Draper discussed.
23 BY MR. MORRIS:
24     Q.  You were aware at the time that you
25 asked for the Baker & McKenzie contact
```

Page 140

```
1              J. DONDERO
2  information that Baker & McKenzie was a law firm
3  that -- that employees were considering retaining
4  for their personal interests, right?
5      A.  I knew they were involved with the
6  employees.  Whether -- whether or when they were
7  engaged and by which employee group and -- I
8  don't have details like that.  I never did.
9      Q.  But the one thing that you did know,
10 when you asked for the Baker & McKenzie contact
11 information, is that Baker & McKenzie would be
12 representing some group of Highland employees,
13 correct?
14     A.  Or they might be.  Or they were being
15 interviewed at the time.  I think they weren't
16 formally engaged until later.  I don't know these
17 details and never did.
18     MR. BONDS:  I'm going to instruct the
19 witness --
20     THE WITNESS:  I'm sorry, what?
21     MR. BONDS:  You need to stop.
22     THE WITNESS:  Okay.
23     MR. MORRIS:  Why is that?  Please
24 don't interrupt the witness.  Assert the
25 privilege if you want, direct him not to answer,
```

Page 141

```
1              J. DONDERO
2  but don't interrupt his answers.
3  BY MR. MORRIS:
4      Q.  Baker McKenzie was ultimately
5  retained by some group of the debtor's employees,
6  correct?
7      A.  I believe so.
8      Q.  Do you know how Baker McKenzie got
9  their retainer, their retainer money?
10     A.  No idea.
11     Q.  Do you know -- are you familiar with
12 an entity called Gov Re?
13     A.  Yes.
14     Q.  What's Gov Re?
15     A.  It's a Bermuda-based reinsurance
16 company.
17     Q.  Do you have an ownership interest in
18 Gov Re?
19     A.  I don't know.
20     Q.  Do any -- do any entities in which
21 you have an interest have an ownership interest
22 in Gov Re?
23     A.  I don't know.
24     Q.  Do you know who controls Gov Re?
25     A.  I don't know.
```

Page 142

J. DONDERO

2      Q. Do you make any decisions on behalf
3 of Gov Re?
4      A. Not recently. Not in the last year.
5 In prior years, I think I've helped them with
6 investments and some strategy, but not recently.
7      Q. Do you know whether Gov Re has made
8 any payment to Baker & McKenzie in the last
9 30 days?
10      A. I have no idea.
11      Q. Did you ever have a communication
12 with anybody at any time in the last 30 days as
13 to -- (audio malfunction) --
14      (Clarification requested by the
15 stenographer.)
16 BY MR. MORRIS:
17      Q. -- as to whether Gov Re would pay
18 money to Baker & McKenzie on behalf of some of
19 the debtor's employees?
20      A. Nope. No, I have no idea. I've
21 never heard the daisy chain you're connecting.
22 I've never heard it before.
23      MR. MORRIS: Let's take a break. I
24 might be finished. The time now is 2:32, or 1:32
25 Central. Let's just come back sharply at 1:45,

Page 143

J. DONDERO

2 or 2:45.
3      THE VIDEOGRAPHER: 1:32 p.m. Central
4 Standard Time. We're off the record.
5      (Recess taken, 1:32 p.m. to
6 1:50 p.m. CST)
7      THE VIDEOGRAPHER: 1:50 p.m. Central
8 Standard Time. We're back on the record.
9 BY MR. MORRIS:
10      Q. I just have a few more minutes here.
11      Going back to Gov Re, Mr. Dondero,
12 are you on the board of that entity?
13      A. I don't know.
14      Q. Can you identify any person who sits
15 on that board?
16      A. No.
17      Q. Do you know how many people sit on
18 that board?
19      A. No.
20      Q. Do you have an understanding as to
21 who makes decisions as to whether or not Gov Re
22 should make -- (audio malfunction) --
23      (Clarification requested by the
24 stenographer.)
25      MR. MORRIS: Withdrawn.

Page 144

J. DONDERO

2 BY MR. MORRIS:
3      Q. Mr. Dondero, do you know who makes
4 decisions on behalf of Gov Re as to whether or
5 not to make payments on claims?
6      A. No.
7      Q. Did you ever participate in any
8 decisions concerning the payment of claims made
9 under a Gov Re policy?
10      A. Not in five years. I think I was
11 more involved five years ago, but I don't
12 remember.
13      Q. So you don't know if you sit on the
14 board of directors, you don't know who makes
15 decisions to pay claims, and you can't identify
16 any members of the board; is that right?
17      A. Correct.
18      Q. Okay. And you don't know if you have
19 an indirect or direct ownership interest in
20 Gov Re; is that right?
21      A. Correct.
22      Q. Okay. You've spent some time over
23 the last months trying to put together a
24 so-called pot plan; is that right?
25      A. Yes.

Page 145

J. DONDERO

2      Q. Since December 10th, 2020, have you
3 had any communications with any employee of the
4 debtor concerning the pot plan?
5      A. It's been a struggle to put together
6 a pot plan. There's been an intentional block of
7 any information, even assets, at Highland, so any
8 pot plan is a stab in the dark for me when I put
9 it forward, relative to current assets and likely
10 outcome.
11      But developing the pot plan has been
12 something I think that's been applauded by the
13 judge; at different times it's been encouraged by
14 creditors, you know. But the only people -- Dave
15 Klos has helped with creating the model so that
16 the model makes sense and adds up and is
17 distributable. Dave Klos has been the person
18 that I've accessed throughout the year regarding
19 the pot plan.
20      Q. And is it fair to say that you've
21 communicated with Mr. Klos about the pot plan
22 since December 10th, 2020?
23      A. Probably. You know, to the extent
24 that the pot plan has come up, been considered or
25 distributed, yes.

Page 146

1         J. DONDERO

2    Q. Okay. Can you identify any other

3 employees of the debtor with whom you've

4 discussed the pot plan with since December 10th,

5 2020?

6    A. No.

7    Q. Did you discuss it with

8 Mr. Waterhouse?

9    A. Mr. Waterhouse is Klos' direct

10 supervisor. He probably had an awareness of it

11 from those conversations. I don't recall. I

12 mean, I don't -- maybe -- I mean, there have

13 been, maybe, peripherally, not significant, I

14 don't think, since the 16th, but I don't recall.

15    Q. Did you ever get any balance sheets

16 or financial information about MultiStrat from

17 Scott Ellington?

18    A. No.

19    Q. Did you ever get any financial

20 information, including balance sheets, concerning

21 MultiStrat, from Isaac Leventon?

22    A. No. They -- I wouldn't believe that

23 those guys would have it. I wouldn't even think

24 to ask them for it. It wouldn't be -- I don't

25 think it's natural for them to have it. But no,

Page 147

1         J. DONDERO

2 I never did, no.

3    MR. MORRIS: Okay. I have no further

4 questions, just two points that I'd like to make.

5    John, will you agree on behalf of

6 Mr. Dondero to have him appear at Friday's

7 hearing when the preliminary injunction takes

8 place or do I need to serve a subpoena?

9    MR. BONDS: No, we haven't made that

10 decision yet.

11    MR. MORRIS: Okay. Will you accept a

12 subpoena on behalf of Mr. Dondero?

13    MR. BONDS: Sure.

14    MR. MORRIS: Okay. We'll get that

15 over to you tomorrow.

16    And then lastly, the deposition of

17 Andrew Clubok has been adjourned to a date to be

18 determined.

19    MR. BONDS: Okay.

20    MR. MORRIS: Thank you very much,

21 all.

22    MR. BONDS: Thanks.

23    THE VIDEOGRAPHER: 1:56 p.m. --

24 1:57 p.m. Central Standard Time. We're off the

25 record. This concludes the deposition.

Page 148

1         J. DONDERO

2    (Time noted: 1:57 p.m. CST)

3

4

5

6

7

8   _____

9    JAMES D. DONDERO

10

11 Subscribed and sworn to before me this _____

12 day of _____, 20____.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 149

1

2    C E R T I F I C A T E

3

4    I, MICHAEL E. MILLER, FAPR, RDR, CRR,

5 Notary Public in and for the State of Texas, do

6 hereby certify:

7    That JAMES D. DONDERO, the witness

8 whose deposition is hereinbefore set forth, was

9 duly sworn by me and that such deposition is a

10 true record of the testimony given by such

11 witness;

12    That pursuant to FRCP Rule 30,

13 signature of the witness was not requested by the

14 witness or other party before the conclusion of

15 the deposition;

16    I further certify that I am not

17 related to any of the parties to this action by

18 blood or marriage; and that I am in no way

19 interested in the outcome of this matter.

20    IN WITNESS WHEREOF, I have hereunto

21 set my hand on January 5, 2021.

22

23   _____

24 MICHAEL E. MILLER, FAPR, RDR, CRR

25 NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

Page 150

1

2  ----------------- I N D E X -----------------

3

4  WITNESS:  JAMES D. DONDERO

5  EXAMINATION:                          PAGE

6  BY MR. MORRIS                          8

7

8

9  ---- LITIGATION SUPPORT INDEX ----   PAGE

10 Instruction Not To Answer            125

11 Instruction Not To Answer            125

12 Instruction Not To Answer            129

13 Instruction Not To Answer            130

14 Instruction Not To Answer            131

15 Instruction Not To Answer            131

16 Instruction Not To Answer            133

17 Instruction Not To Answer            133

18 Instruction Not To Answer            139

19 Instruction Not To Answer            140

20

21

22

23

24

25

Page 151

1

2  ---- E X H I B I T S ----

3  EXHIBIT                                PAGE

4  Exhibit 1    10/16/20 NexPoint Letter to    31

5      Seery

6  Exhibit 2    11/24/20 NexPoint Letter to    35

7      Seery

8  Exhibit 3    E-mail(s)                 39

9  Exhibit 4    Dondero Text Messages      62

10 Exhibit 5    Request for Production of   67

11     Documents

12 Exhibit 6    Dondero Text Messages with  80

13     Jason Rothstein

14     Dondero_000022

15 Exhibit 7    Dondero Text Messages with Tara  81

16     Loiben

17     Dondero_000013

18 Exhibit 8    Skipped in Series

19 Exhibit 9    Temporary Restraining Order  84

20 Exhibit 10   12/23/20 Pachulski Letter to  85

21     Lynn

22 Exhibit 11   E-mail(s)                  90

23 Exhibit 12   12/24/20 Pachulski Letter to  93

24     Wright

25

Page 152

1

2  Exhibit 13   12/24/20 Pachulski Letter to   100

3      Wright

4  Exhibit 14   Skipped in Series

5  Exhibit 15   E-mail(s)                 112

6  Exhibit 16   E-mail(s)                 115

7  Exhibit 17   Dondero Text Messages with   134

8      Melissa Schroth

9      Dondero_000014

10 Exhibit 18   Dondero Text Messages with   138

11     Isaac Leventon

12     Dondero_000043

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 153

1

2  ERRATA SHEET FOR THE TRANSCRIPT OF:

3  Case Name:     IN RE HIGHLAND/HIGHLAND v. DONDERO

4  Dep. Date:     January 5, 2021

5  Deponent:      JAMES D. DONDERO

6  Pg. Ln.   Now Reads    Should Read    Reason

7  ___ ___  _____  _____  _____

8  ___ ___  _____  _____  _____

9  ___ ___  _____  _____  _____

10 ___ ___  _____  _____  _____

11 ___ ___  _____  _____  _____

12 ___ ___  _____  _____  _____

13 ___ ___  _____  _____  _____

14 ___ ___  _____  _____  _____

15 ___ ___  _____  _____  _____

16 ___ ___  _____  _____  _____

17

18

19      _____

20      Signature of Deponent

21 SUBSCRIBED AND SWORN BEFORE ME

22 THIS _____ DAY OF _____, 20_____.

23

24 _____

25 (Notary Public) MY COMMISSION EXPIRES: _____

**1**

**1** 7:8 30:25 31:2,3 35:5 36:15,24 37:13 44:17

**10** 60:18 85:4,5 87:20 108:23

**10:41** 47:24 48:2

**10th** 12:17 70:15 80:19,24 81:4 84:9 85:16,25 86:16,18 87:3,17 123:16 124:2 133:22 138:14 145:2, 22 146:4

**11** 7:13 90:8,9

**11:16** 48:3,4

**11th** 81:5

**12** 93:22,23

**12:35** 107:24

**12:36** 108:24 109:2

**12:45** 107:25 108:5

**12:49** 109:3,4

**12th** 112:21

**13** 100:5,6

**15** 46:24 47:22 112:15,17

**16** 115:2,3

**16th** 31:18 99:24 111:16 115:9 116:17, 22 117:4 119:2 120:11 134:16,20 146:14

**17** 134:6,7

**18** 138:6,7

**18th** 90:4 91:15 92:14

**19-34054-sgj11** 7:14

**1:30** 108:8,10

**1:32** 142:24 143:3,5

**1:35** 107:22

**1:45** 107:25 142:25

**1:50** 143:6,7

**1:56** 147:23

**1:57** 147:24

**2**

**2** 34:24,25 36:15,25 37:14 44:17

**20** 34:22 108:14

**20-03190-sgj** 7:23

**2020** 9:5 35:10 60:8, 18 69:10,18 70:15 85:16 94:16 133:22 145:2,22 146:5

**2021** 6:4 7:10

**22nd** 88:2 89:23 94:16 138:17

**23rd** 100:12,15

**24** 35:10

**25** 80:3

**27th** 60:24

**2:32** 142:24

**2:45** 143:2

**3**

**3** 38:24 39:2 70:9

**30** 6:22 73:25 80:2 88:16 142:9,12

**300** 76:11

**31st** 9:5 124:21

**35-minute** 108:14

**4**

**4** 62:12,14

**40** 104:18

**5**

**5** 6:4 64:22 67:14,15

**5:26** 62:20,24

**5th** 7:10

**6**

**6** 80:7,9

**6:25** 85:25 87:3

**7**

**7** 81:17,18

**9**

**9** 84:3,5

**9:50** 6:4

**9:52** 7:10

**A**

**a.m.** 6:4 7:10 47:24 48:2,3,4

**ability** 12:12 24:16, 18 26:11

**absolutely** 91:8

**accept** 147:11

**access** 69:8 82:24

**accessed** 145:18

**accommodate** 47:16

**account** 54:3 56:2 75:18 78:11,18

**accountant** 128:21 133:19

**accounts** 56:5

**ACIS** 109:21

**acknowledge** 26:2,9

**acknowledged** 41:3

**acknowledging** 23:20 25:21,23

**Act** 63:5 104:18

**acting** 114:9

**action** 46:5 63:6,23

**actions** 63:22

**active** 111:17

**activities** 63:15

**activity** 46:5

**acts** 101:19 104:7

**acute** 61:2

**acutely** 61:8

**add** 84:23

**addition** 128:5

**address** 39:24 40:3, 4 69:11,12,15,19,20, 22,23,24

**addresses** 39:23

**adds** 145:16

**adhered** 26:6

**adjourned** 147:17

**admissible** 6:20

**admit** 24:7

**advance** 59:13 99:21

**advanced** 99:15,23

**adversary** 7:21 10:7 110:6 126:16

**adverse** 89:17 109:11 110:23

**advice** 92:8 129:14 130:5 131:17,24 132:2,18 133:4,14

**advise** 132:16,25

**advised** 36:23

**Advisers** 63:4

**advisor** 24:14,20,22 25:4 26:7 88:18,20

**advisor's** 26:5

**advisors** 14:14 17:18 18:23 19:5,7,8, 18,22 20:6,7,10,15, 21 22:12,21 23:12 24:10 29:22 35:21 54:18 56:24 58:23 94:9 98:5,10 100:21 102:25 104:20 106:13 107:2 111:24

**Advisors'** 19:24

**advisory** 17:21 18:25

**affect** 12:8

**affirmatively** 24:5 25:21,23

**afield** 125:5

**afternoon** 43:16

**aggressively** 105:25

**agree** 6:24 7:3 17:3 55:3 107:9 110:23 147:5

**agreeing** 23:20

**agreement** 27:4 116:5 117:3,15 118:3,7,11 120:16 122:3 127:7 130:9,22 132:5 137:4,13,21 139:5,8

**agreements** 17:16 27:14 28:7,19 29:12 30:6 101:12

**ahead** 24:3 117:12 127:23

**alert** 36:7 59:16

**allegations** 36:24

**alleged** 15:9,12

**aloud** 89:3

**amalgamation** 97:19

**amounts** 63:19

**analysis** 37:11,15

**Andrew** 147:17

**answering** 130:12, 13

**answers** 141:2

**anticipation** 72:6 74:11 78:21

**anymore** 74:15

**apologize** 19:12 65:11 125:15 129:25

**appearances** 7:17

**appears** 41:21 92:17

**applauded** 145:12

**appropriateness** 139:10

**approval** 9:11

**approved** 95:24

**argue** 25:19

**argument** 99:21,24

**arguments** 99:15 100:2

**articulated** 46:10 50:11 63:11

**Asia** 30:24

**asks** 29:16

**aspect** 13:13 88:25

**Assert** 140:24

**asserted** 124:20

**assertion** 88:14 115:21

**asset** 39:13

**assets** 24:16 39:13 44:7 46:8 50:14 51:25 56:5 63:9 95:12 111:25 145:7,9

**assign** 101:12

**assistant** 68:16 83:19,20

**assistants** 68:10,11

**association** 6:8

**assume** 49:13

**assure** 125:7

**Attached** 94:12

**attention** 79:14 123:9

**attorney** 138:2

**attorney-client** 115:18

**attorneys'** 7:17

**audio** 11:2 16:7 57:6 68:23 82:6 96:7 111:20 116:6 135:25

**authority** 14:3 28:25 34:15

**authorization** 35:25

**authorize** 33:3 35:20 95:16,18

**authorized** 42:6,14 103:18 104:9,14

**Avaya** 89:24 90:15 91:16 92:15

**AVYA** 43:19

**aware** 9:3,13,18 12:7,10,17 13:14 14:17,20,23 17:14 21:13 26:15 27:19,22 35:16 36:2,12 48:9 52:11 53:6 58:24,25 59:11 60:15,25 61:8, 11,14 62:2,4 64:7 67:23 74:17,19 94:19,21 96:5,18,19 98:13 99:13 101:9,11 110:9,18 111:5 124:19 136:17,22 139:24

**awareness** 61:3 113:16 137:23,25 146:10

**B**

**back** 44:11 47:21 48:5,22 54:9,11 83:23 85:12,20 87:19 90:3 100:9 101:13 109:5,14 116:14 122:20 134:15 142:25 143:8,11

**background** 95:4

**bad** 99:8 101:19 104:7

**Baker** 136:9,25 137:23 138:3,18 139:2,7,25 140:2,10, 11 141:4,8 142:8,18

**balance** 146:15,20

**bank** 69:17

**bankruptcy** 7:15 10:7,19 26:5 59:5 95:8 99:16 106:2

**based** 29:20 80:3 88:16 102:12 110:22

**basis** 79:3,8,16,21 88:8,13,25 92:24 127:8,16,18

**basket** 39:23

**beginning** 24:13 88:2 101:13 119:20

**begins** 39:8

**behalf** 9:15 28:5 35:21 56:24,25 58:23 61:12 96:22 98:10 100:21 106:13,18,25 111:20 114:9,10 119:17 142:2,18 144:4 147:5,12

**believed** 95:21

**believes** 33:22

**bell** 90:2 91:15 92:13

**beneficial** 20:5 27:5 28:14,15,18,23 29:11 30:5,10 46:7 50:10 56:3 63:21,24 97:3,9

**benefit** 50:13 73:4 105:21

**Bermuda-based** 141:15

**bit** 41:4 62:17 81:21 82:3 84:12 87:21 90:20 94:17 98:15 99:4 100:18 118:14 134:10 138:17,21

**block** 49:12 145:6

**blocking** 55:22

**board** 13:10 14:13 117:5 143:12,15,18 144:14,16

**bodies** 37:5

**bona** 46:5 89:12

**Bonds** 7:2,20 9:20, 23 10:2,10,16 11:15, 22 13:2 14:5 15:6 16:23 17:10 18:6

21:7 22:24 24:11 25:7 27:16,25 28:8, 21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 51:12 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 67:24 68:10 71:11,20 73:7 75:14 76:4,23 78:5, 12 79:11,18 82:23 86:10 88:10 91:18 92:16 96:14 98:6 99:18 101:2 103:22 105:4,8 106:22 108:6,18 110:2,8 115:12,16 117:16,21 121:13,17,23 122:5,9 123:3,15,19,25 125:4,9,14,21 126:13 127:13,17,21,24 128:15 129:11,18,24 130:18,23 131:14,21 132:9,15,25 133:11 134:2 139:20 140:18, 21 147:9,13,19,22

**bottom** 39:6,8 62:20 90:12,14 115:6 116:14

**bought** 71:25 73:4 74:7 76:21

**breach** 27:4,13 33:22 36:3,6,10 107:7

**breaches** 61:4

**break** 46:19,23 107:23 108:15,17 142:23

**brought** 111:17,19 114:14

**bucket** 40:2

**bunch** 24:17 79:2

**business** 46:8,9,10 50:13 52:19 55:5,25 56:7,14 57:12 58:21 59:20 60:16 63:10 91:3,9 116:2,24 128:7

**businesses** 76:13

**C**

**C-SUITE** 33:25

**calendar** 111:15 112:3

**call** 32:18 47:11 121:21,25 122:7 123:24

**called** 22:7 70:3 111:17 131:5 141:12

**calls** 46:17 48:14 120:20 123:3,15,18 124:5

**canceled** 43:18

**CANTY** 35:3,6

**capabilities** 71:11

**capability** 23:24 24:19 25:16

**capable** 24:23

**capacity** 10:3,6,13, 18 30:3,4 136:12

**Capital** 7:12 8:18 18:22 21:16 22:8 53:15

**capture** 50:18

**care** 15:15 79:5,6

**careful** 62:25

**carefully** 123:11

**cares** 47:18 79:4

**case** 6:23 7:12,13,21 10:19 14:4 40:8 52:22 74:11,12 125:25

**caused** 22:21 24:10

**cease** 106:19 107:2

**ceased** 69:15

**cede** 52:17,18

**Central** 7:10 47:24 107:25 108:8,25 109:5 142:25 143:3,7 147:24

**CEO** 14:21

cetera 24:20 99:10

chain 142:21

championed 95:19

change 78:3,6,17

changed 78:20
79:10,24

changing 77:25

Chapter 7:13

char- 97:11

charge 104:15

charitable 97:12

check 44:12 121:24

chief 33:22,23 34:2,
4,18 37:12,17 53:14
95:19 105:18

Christmas 90:24

circumstances
104:16 139:11

circumvented 29:2

Civil 6:22

claim 116:3

claims 144:5,8,15

clarification 11:3
16:9 57:7 68:25 82:7
96:8 111:21 116:7
136:3 137:9 142:14
143:23

class 46:5 63:6

clear 46:2 56:3
115:22

CLO 17:3,9 24:16
25:12 27:13,24 28:7,
19 29:11 30:6 39:12,
13 44:7 51:24 94:23
95:7,11 96:23 97:3,
13,18,24 98:11,20,21
99:14 101:12 102:7,
24 103:21 106:14,21
111:25

CLO's 107:16

CLOS 16:22 22:22
23:16,21,25 24:9,23
25:17 26:11,16 27:3,
9,23 28:2,6,13,17,20

29:13 30:7 38:10,14
40:24 50:6 54:5
63:16 90:16 91:17
92:15 93:7,12 100:25
104:12 105:15 107:4,
20

closing 90:2 91:15
92:13

Clubok 147:17

collateralized 16:18
17:4

combined 98:22

commenced 110:6

comment 36:18

comments 50:24

commercial 103:11,
12

commit 106:17,25

common 116:6,9

communicate 47:5
132:21 133:7

communicated 62:8
145:21

communicating
138:13

communication
142:11

communications
70:10 145:3

company 22:2
141:16

competently 12:11

complaint 110:15

complete 71:22
82:25 84:24 124:17

completed 70:19

completeness
70:25

complex 46:12

compliance 26:3
33:22,23 34:2,4,8,18,
21 36:4 37:4,12,18
53:14 56:4 61:13
95:20 105:18

compliant 68:9

complicated 77:16

computer 82:24

concerned 114:24

concludes 147:25

conclusion 28:23
29:8,17 30:21 34:17,
20

conduct 13:16

conference 8:19
123:3,14

conferred 121:10,18

confusing 98:17

conjunction 37:20

connecting 142:21

connection 10:18,
25 11:8 15:3 59:5
64:18 67:25 94:6

consent 9:11 42:22
43:5 75:13 76:22
135:16

consideration
102:13

considerations
103:24

considered 30:10,
13 145:24

consistent 35:24
50:4

constrain 13:15

contact 28:16 113:10
117:6 136:24 138:19
139:3,16,18,25
140:10

contained 96:6

contended 27:3,13

contention 25:14
27:20,22 89:13

context 31:14

continued 36:2

contract 27:24 30:17

contracts 17:7,15

24:8,15 25:12 26:3,4,
16,18,24 102:7,25

control 10:12 18:20
20:7 97:24 127:5
129:6 131:10 136:21

controlled 114:11

controls 97:7,13
129:17 131:20
141:24

conversation 32:16
52:6 57:5,20 58:15
59:9,17

conversations
32:13 73:19 111:6
146:11

conveyed 58:12

convinced 61:14

coordinate 114:9
117:7 119:16 120:3
139:5

coordinating 137:16

coordination
114:12,16,20

copy 12:22 41:20
93:14,18

correct 9:19 10:3
13:3 14:18,24 18:5,
11 19:2,19 23:17
27:24 28:20 42:15
48:20 51:8,16 56:22
57:3 66:23 67:6 77:5
87:7,8,15,18 89:24
120:14 128:2 130:10
133:25 134:20
140:13 141:6 144:17,
21

correctly 113:11
118:23

counsel 8:14 32:17
37:21 47:6 65:2,7,12,
22,24 95:20 100:22
120:3,18,20 121:10,
11,17,18 123:3,15
124:16

counsel's 130:5

counselor's 129:14
131:17,24 132:18
133:4,14

counteroffer 103:3,
5

couple 46:17 69:9
74:15 90:3 95:5
112:3 120:22

court 6:15 7:15,19
13:18 25:20 48:11
59:16,20,23 94:24
95:8,10 99:16,20
106:2 124:21 125:24

Court's 14:3,9 48:15
124:9

courtroom 6:21

COVID-19 6:10

Covitz 39:8,11,12
40:22

Covitz's 41:11,20,24

creating 145:15

credit 74:3

creditors 145:14

CRO 14:21

CST 6:4 48:3 109:3
143:6

current 145:9

custody 127:5

D

D.C. 65:6,7,12

DAF 44:5 97:6,7,10,
20,24 98:16,22

daisy 142:21

Dallas 7:16

dark 145:8

date 7:9 26:19 82:3,4
85:23 86:5 124:6,7
147:17

dated 31:17 35:9
94:16

Dave 145:14,17

day 41:4 48:14,18
54:11 59:14 60:13
100:12

**days** 52:25 69:9 80:2, 3 90:3,23 99:16 142:9,12

**de** 63:19

**deal** 139:14

**debtor** 7:13 8:15 9:3 12:18 15:15 16:7,17, 21 17:6,7 22:23 23:16,20,22,23,24 24:8 25:6,9,11,15,16 26:17 27:4,13,23 28:20 29:12 30:7 38:10 39:14,16 40:11,18 43:19 50:13 53:16 61:13 63:5 66:4,7,10,13,20,23 67:23 70:11 71:25 73:4 74:8 75:5,20,23 76:21 77:5,7,11,17, 20,22,24 78:22 83:17 95:11 96:11 100:2, 22,24 101:11 102:23 103:20 104:11 105:3, 14 106:20 107:3,16, 19,20 110:6,11,19,24 115:25 122:3 127:8 128:8,9,25 130:10,22 132:6,24 133:8,20 135:13 145:4 146:3

**debtor's** 9:7 11:2,9, 13,20 13:20 14:14,21 15:4,13 42:22 43:5 70:3 75:13 76:22 77:21 93:6,12 102:3 109:12,17,20,24 126:22 127:4,10 128:6 135:16 141:5 142:19

**debtors** 9:15

**decade** 66:8

**December** 9:5 12:17 59:5 60:18 70:15 71:24 80:19,24 81:4, 5 84:9 85:16,25 86:16,18 87:3,17 88:2 89:23 91:15 92:14 94:16 99:24 100:12 101:13 111:16 112:21 115:9 116:17,22 119:2 120:11 123:16 124:2, 21 133:22 134:16,20

**decide** 25:20 45:21 60:23 91:23 102:19 124:16

**decided** 72:8,14,21

**decision** 28:25 73:5, 10,20,22,23 102:2,4, 14 139:12 147:10

**decisions** 142:2 143:21 144:4,8,15

**declaration** 15:2,10, 12,22

**declare** 28:6

**default** 23:23 24:18 25:15 26:4 27:23 28:7

**defending** 9:20

**defense** 111:10 114:15 117:3,14 118:3,6,10,11 120:3, 8,16 122:2,3 137:3,4, 12,14 139:5

**defer** 52:16

**definable** 46:9

**delegate** 68:11

**delegated** 68:9 70:20

**delivered** 70:25 124:13,21

**demand** 102:13

**denied** 94:24 99:17

**depend** 52:23

**depo** 9:9

**deposition** 6:13 7:9, 22 9:16 10:22,25 11:8 31:3 34:25 39:2 47:7,19 48:10 62:14 67:15 77:19 80:9 81:18 84:5 85:5 90:9 92:6 93:23 100:6 108:8 112:17 115:3 134:7 138:7 147:16, 25

**describe** 39:25 76:5

**desire** 60:9 63:8 139:6

**desires** 52:16

**desist** 106:19 107:2

**desk** 49:13 52:8 80:20 81:3,10,14 86:6,20 87:3

**destroy** 72:14 76:25

**destroyed** 72:13

**details** 70:17 95:14 106:4,5 134:17 135:2 140:8,17

**determine** 125:24

**determined** 147:18

**developing** 145:11

**differently** 88:23

**difficult** 31:7 123:9

**direct** 18:3 19:17 28:16 97:2 128:13 136:16 140:25 144:19 146:9

**directed** 33:16 38:4 42:15 43:20 45:24

**direction** 23:3 38:15 40:23 90:15 104:25 114:13,23

**directions** 119:21 120:7

**directly** 13:11 54:4 55:16,19 59:25 96:2 106:4 124:15 129:5,7 131:7,10 136:20

**directors** 144:14

**disagree** 88:15,25

**disagreement** 102:6

**disapproval** 60:20

**disbelieve** 86:8

**discernible** 46:9

**discovery** 82:10,15 113:25 114:5

**discuss** 32:5 34:12 105:12 107:18 118:9 132:12 146:7

**discussed** 31:8 111:3 139:22 146:4

**discussing** 112:7

**discussion** 135:8

**dispose** 72:8 73:5 75:2 85:15

**disposed** 72:5,16,18 74:21 75:6 81:8 86:15 87:10

**disposing** 75:9

**dispute** 88:8,13

**dissuaded** 103:10

**distancing** 6:11

**distributable** 145:17

**distributed** 145:25

**District** 7:15

**divided** 120:22

**Division** 7:16

**document** 31:14,22 32:2,3 58:17 64:17 67:14,20,24 70:3,18 83:3,10,18 84:14 87:23 100:19 107:15 128:4

**documents** 31:10, 11 67:25 68:7 69:5 70:21,24 71:9,18 83:7,14 124:19 126:22,25 127:3,11 128:10 135:6

**dollars** 101:21

**dondero** 7:9 8:1,3,10 9:1 10:1 11:1,7 12:1 13:1 14:1 15:1 16:1, 15 17:1 18:1 19:1 20:1 21:1 22:1 23:1,9 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1, 3,6 32:1 33:1 34:1,25 35:1 36:1 37:1 38:1 39:1,2 40:1 41:1 42:1 43:1 44:1 45:1,3 46:1 47:1,2 48:1,7 49:1 50:1 51:1,16 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,14 63:1

**desire** 60:9 63:8

64:1 65:1 66:1 67:1, 10,15,19 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,9 81:1,18 82:1,12 83:1 84:1,5 85:1,5 86:1 87:1 88:1,13 89:1 90:1,9 91:1 92:1,8 93:1,23 94:1 95:1 96:1 97:1 98:1 99:1 100:1,6 101:1 102:1 103:1 104:1 105:1 106:1 107:1,24 108:1,15 109:1,8 110:1 111:1 112:1,17 113:1,24 114:1 115:1,3,18,23 116:1, 10,11 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1,19 127:1 128:1,3,18 129:1 130:1,4 131:1,24 132:1 133:1 134:1,7 135:1 136:1 137:1 138:1,7 139:1 140:1 141:1 142:1 143:1,11 144:1,3 145:1 146:1 147:1,6,12

**Dondero's** 115:24 127:11

**dormant** 69:25

**Douglas** 114:14 115:17 117:2 137:16

**dozen** 126:24

**drafting** 118:2,6

**drafts** 122:8

**Draper** 114:14 115:8, 13,17 116:17,22 117:2 118:12 137:16 139:4,12,13,22

**draw** 28:22

**drawer** 80:20

**drew** 34:18

**drove** 36:4

**drugs** 12:4

**due** 6:10 99:19

**Dugaboy** 125:2,13, 19,23 126:5,11,15,20 127:7 129:8,10,17 130:9,21 132:14,24 133:9,24 134:17,25 135:10,13,17,24

**duly** 8:4

**Dustin** 59:2,8,14,15

**E**

**e-mail** 39:5,8,23 40:3,4,22 41:2,4,11, 19,20,24 42:5,18,23 43:6,23 45:6,12 48:25 50:4 51:9,17 52:2 53:9,11 58:17 60:21 61:10,15 69:8, 11,12,14,16,19,23 85:18 90:14 114:5 115:8 118:25 119:7, 25 120:10 124:8

**e-mails** 40:2 45:8 52:4 64:14 89:9 107:13 117:6

**earlier** 64:3,25 65:19 84:17 99:16 123:21

**early** 71:24

**Eastern** 107:25

**economic** 18:4 19:18 97:3

**effectuate** 53:3,7 55:22 57:13 60:10

**Ellington** 47:4 60:5 65:18,21 66:3,9,22 67:7 74:7 78:3,9,17, 25 79:9,23 83:2,5 111:4 112:8,11 113:8 114:8,17 115:23,24 116:10 117:9 118:2, 18 119:2,8,15 120:10,15,23,25 122:22 123:2,12,14, 19,24 126:24 127:9 132:14 135:22 146:17

**Ellington's** 74:9 122:15 123:6

**Ellis** 9:23 10:2,10,17 67:24 68:10 71:12

**employed** 39:15 66:3,7 68:19 70:11 83:17 128:25 133:8, 20

**employee** 39:15,16 47:4,10 77:4,7,9 107:14,19 120:22 121:3,5,8,11,19 122:4 123:8 137:19 140:7 145:3

**employees** 13:12 25:24 40:18 47:15 68:10 76:14 79:23 89:22 92:25 93:5,10, 15,18 116:25 137:17, 24 140:3,6,12 141:5 142:19 146:3

**employees'** 120:18, 20

**employer** 66:10,13, 23

**encourage** 105:24

**encouraged** 95:19 96:3 145:13

**encouraging** 104:14

**end** 16:12 24:13 54:11 69:10 70:15 91:21 92:5 126:19

**ended** 114:22

**engaged** 117:8 140:7,16

**engaging** 103:8

**enlarge** 90:19

**enter** 9:8

**entered** 13:19 14:10 15:19 111:2 113:14 114:18

**entirety** 58:11

**entities** 20:17 94:22 95:6 99:14,25 103:19 106:18 114:10 119:17 126:6 141:20

**entitled** 115:20 130:24

**entity** 10:11 18:20 20:8 22:7 39:15 65:13 98:22 131:5 136:15,20 141:12 143:12

**entry** 16:6

**equity** 40:15 41:12, 15,17,24

**error** 89:20

**estate** 74:14 101:25

**ethic** 71:10

**events** 16:5

**exact** 21:23 117:11

**EXAMINATION** 8:7

**exchange** 107:13

**execs** 79:2

**execute** 42:5,19,23 61:17 93:2

**executed** 43:20

**executing** 43:10 45:23

**executive** 76:8 133:19

**executives** 34:2 72:25 78:20 104:15 105:17,18

**exhibit** 30:25 31:2,3 34:24,25 35:5 36:15, 24,25 37:13,14 38:24 39:2 44:17 48:22 62:12,14 64:22 67:14,15 80:7,9 81:17,18 84:3,5 85:4, 5 87:20 90:8,9 93:22, 23 94:13 100:5,6,9 112:15,17 115:2,3 134:6,7 138:6,7

**exhibits** 44:10,16

**experience** 88:16

**expertise** 121:8

**explain** 58:20

**explanation** 51:23 57:12

**explicit** 9:10

**expressed** 52:9 60:20 63:8

**extent** 21:7 22:24 31:12 145:23

**external** 37:21

**extort** 102:8

**extra** 61:6

**eyes** 90:18

**F**

**face** 89:20

**faced** 61:18

**facilitation** 102:10

**fact** 38:12 92:21

**facts** 56:11,14 66:18, 21

**factual** 29:20

**failed** 135:22

**fair** 18:20 19:5,9 20:7 33:10 34:19 35:18 40:21 67:5 86:14 98:25 109:10 113:24 145:20

**familiar** 17:19 18:23 22:7 31:21,23 131:4 141:11

**fashion** 26:9

**February** 91:2

**Federal** 6:22

**feel** 61:9

**fees** 101:21,24

**fide** 46:5 89:12

**figure** 49:25 50:22

**file** 109:18

**filed** 94:23 96:20 110:15

**filing** 95:16,18

**financial** 33:24 125:2,13,20 126:12, 21 132:13,23 133:10, 24 135:10,14,17,24 146:16,19

**financials** 126:5

**find** 94:13

**fine** 47:2,13 80:6 129:24

**finished** 19:13 142:24

**firm** 9:23 10:5,10,17 17:19,21 18:23,25 19:4 67:24 71:2 111:20 116:2 124:13 136:8,11,12,14,15, 19,20 137:25 139:7 140:2

**firms** 10:2

**fit** 103:2

**follow** 129:13,22 130:4 131:16,23,25 132:17 133:3,13

**form** 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 24:11 25:7 26:8 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,23 78:5,12 79:11 91:18 92:16 96:15 98:6 99:18 101:2 103:22 106:22 110:2,8

**formal** 102:17

**formally** 48:16 140:16

**forming** 120:7

**forward** 51:2 103:11 108:19 118:18 145:9

**forwarded** 120:10

**forwards** 92:22 115:23

**found** 26:12

**frames** 117:11

**Friday** 90:4 91:15

92:14

**Friday's** 147:6

**front** 91:7

**full** 31:14 69:7 87:25

**fully** 117:8

**functional** 117:9

**functioning** 114:15

**fund** 18:22 19:4,7,18, 21,24 20:6,7,10,15, 21,23 21:2,5,12,17, 20,21 22:3,4,11,15, 18 46:12 103:20 104:12 107:16

**fundamental** 103:9

**funds** 20:11,18,20 21:10 22:21 23:13,15 24:10 29:21 35:21 41:17 49:14 50:12 56:25 58:23 63:5 94:7 98:5,10 100:22 104:23 106:13 107:2 111:24

**future** 101:24

**fuzzy** 90:18

**G**

**garbage** 72:19,22 74:2 76:21 80:16,25 81:11,14 86:15

**Gatekeeper** 39:24 40:5,14

**gatekeeper@ hcmlp.com** 39:18

**Gates** 32:14,17 58:20 94:4,5,14,15 95:7 98:11 100:12,21 106:9,14 111:19 112:5

**gave** 21:25 35:25 42:4,12 58:5 69:8 82:22

**general** 13:7 14:14 18:13,17 19:24 46:14 52:23 65:22 71:3 82:21 95:20

**generally** 18:21 31:23 32:10 33:6 40:15 44:19,23,24 67:19 82:20 92:9 103:17

**gentlemen** 6:7

**girls** 83:23

**give** 24:9 30:21 35:6, 24 41:22 51:23 69:4, 6 75:23 82:18 92:7 101:18 104:25 122:11 126:14 127:17

**giving** 40:22

**Gmail** 69:22,24

**go-between** 60:5 111:7

**good** 6:6 8:10 23:22 24:22 26:10 125:3, 13,19 126:11 127:8, 16 131:5,8,11,13,20 132:5,14,23 133:10 135:10,13,17,24

**gotcha** 31:9

**Gov** 141:12,14,18,22, 24 142:3,7,17 143:11,21 144:4,9,20

**Grant** 97:8

**group** 120:19,22 121:2 123:8 137:19 139:10 140:7,12 141:5

**groups** 120:23,24 121:3,5,9,12,19 137:19

**guess** 65:25 72:12 87:20 111:17

**guided** 108:16

**guiding** 23:5

**guy** 50:21

**guys** 46:16 82:23 108:23 146:23

**H**

**half** 24:5 126:24

**handles** 78:14

**handling** 47:11

**hands** 127:12

**happen** 49:20

**happened** 72:4 87:17 99:9

**happening** 50:2 90:17

**happy** 32:7 46:22 116:12

**Harbourvest** 97:6, 20 98:17 109:24

**hard** 49:22 105:20

**HCLOF** 98:18

**HCMFA** 89:22 92:25 93:5,11,15,19

**HCMLP** 69:11

**head** 63:14 101:18

**hear** 8:11 20:14 48:7 105:9 108:2 109:7 125:14

**heard** 7:5 68:5 136:8 142:21,22

**hearing** 11:13,20 13:20,22,25 147:7

**held** 13:19 39:24 40:23 41:17 53:18

**helped** 142:5 145:15

**helpful** 32:8

**helping** 114:8 139:18

**HFAM** 44:5 54:20

**High-** 39:14

**Highland** 7:12 8:18 9:16 10:7 13:11 18:22 20:21 21:2,5 44:6 47:3,10,14 53:15 65:22 68:21 69:11,19 76:9,12 79:23 102:11 116:25 128:22 140:12 145:7

**Highland's** 76:10

**highlight** 49:23

**historic** 72:10

**historically** 40:6 46:6 65:23 72:9

**history** 137:22

**hitting** 49:12

**hold** 21:4 22:6,17 50:19 88:4 91:19

**Holdco** 94:23 95:7 96:23 97:3,13,18,24 98:11,20,21 99:14 106:14

**holders** 27:5 46:7 50:10

**holding** 22:2 104:6

**hundred** 54:21

**Hunter** 39:8,12 41:23 52:8

**I**

**idea** 32:19,22,23 55:10,14 91:7 114:6 124:23 127:16 141:10 142:10,20

**ideally** 46:20

**identify** 143:14 144:15 146:2

**illegal** 99:8 107:6

**impede** 93:6,11

**implicit** 34:17,20

**Implicitly** 9:9

**implies** 24:22 89:10

**important** 59:19 62:7

**impose** 95:11

**inaccurate** 89:6

**inadvertently** 49:25

**inappropriate** 52:12 61:24,25 63:16 99:9, 21 101:19 102:18 103:10 107:5

**inches** 16:12,13

**included** 40:4 61:14

**including** 47:4 146:20

**Income** 20:21 21:2,5

**incredibly** 63:16

**indemnities** 61:7

**independent** 13:10

**independently** 62:3

**indirect** 18:3 19:17 97:2 136:16 144:19

**indirectly** 55:18 129:5,7 131:7,11 136:21

**individual** 10:3,6,13, 18 56:5 136:12

**individually** 120:25

**individuals** 46:13

**inferred** 26:13

**information** 117:6 136:24 139:3,16,18 140:2,11 145:7 146:16,20

**informed** 37:4 38:11, 13 90:4

**initiate** 103:19 104:11 105:2,13 106:20

**initiating** 100:23

**injunction** 11:10,14, 21 60:3 68:22 84:25 127:25 147:7

**injunctive** 110:16

**input** 54:10

**institutions** 33:24

**instruct** 93:5,10 98:4 106:7,9 125:9,17 127:13 129:11,18 130:18 131:14,21 133:11 139:20 140:18

**instructed** 41:25 44:6 56:23 89:22 92:25 98:11 106:14 127:3

**instructing** 9:4

42:18,22 43:5

**instruction** 41:23 42:4,13 135:23

**instructions** 44:9 49:7,10 68:23 69:4 82:18,21 89:8,15

**instructs** 130:16

**insurance** 61:6

**intend** 11:12,19,20 61:16 108:9

**intended** 45:15

**intent** 50:5,8 51:21 139:6

**intentional** 145:6

**interest** 10:12 18:4 19:18 52:9 88:19 97:22,24 107:8 116:3,9 118:3 119:18 136:16 141:17,21 144:19

**interested** 29:4

**interests** 46:7 50:9 61:5 63:7 89:18 105:23 109:11 110:23 111:11 114:20 116:24 140:4

**interfere** 93:6,11

**interfered** 128:10

**interference** 54:25

**interfering** 128:6

**intermediate** 29:3

**internal** 32:17 65:2, 7,12

**interrupt** 24:2 91:20 127:22 140:24 141:2

**interruption** 41:7

**intervene** 71:12

**intervened** 38:20

**interviewed** 140:15

**invest** 22:22 24:10

**invested** 23:15

**investigated** 36:9

**investment** 20:11, 17,20 24:24 25:22 88:18,20 97:19

**investments** 29:22 142:6

**investors** 50:9,10 52:9,16,20 61:5 63:7 88:19 89:18 101:7 102:9 104:16,17 105:21,23 107:8

**involved** 46:13 71:21 75:8 102:16 104:13 106:4,5 117:10 124:16 140:5 144:11

**involvement** 121:7

**Isaac** 118:5 136:23 146:21

**issue** 107:15 119:24

**issued** 49:11 93:4

**issues** 91:6

**J**

**J.P.** 112:12 113:9

**James** 7:9 8:3 14:13

**January** 6:4 7:10 14:18 77:7 91:2

**Jason** 34:5 75:8 78:13 80:12 105:19

**Jason's** 86:22

**Jefferies** 54:4,8,11

**jeopardy** 63:6

**Jerome** 47:10 50:20, 21 51:4

**Jim** 24:24 49:14 67:10 80:5 115:18 117:22 127:2 130:24

**job** 124:18 130:2

**Joe** 40:16,20 52:7 54:10,12 57:18

**John** 8:13 9:20 23:2 35:3 108:7 121:21 125:16 126:17 127:23 129:22 147:5

**joint** 114:15 116:18, 23 117:20 118:3,6,10 119:14 120:15 122:2

**Jones** 8:14

**judge** 91:7,23,25 145:13

**judgment** 52:19

**July** 14:24

**juncture** 45:17 104:2

**justification** 56:14 58:16 60:17

**K**

**K&I** 32:14,17 58:20 94:4,5,14,15 95:7 98:11 100:12,21 106:9,14 111:19 112:5

**keeping** 76:10

**Kelly** 83:20,24

**key** 26:6

**kind** 39:23

**Klos** 145:15,17,21

**Klos'** 146:9

**knew** 33:9 35:17 42:13 75:9,10 99:10 125:19 140:5

**knowing** 56:5

**knowledge** 26:19,25 27:12 28:16 36:21 55:20 56:13 64:6 76:22 93:9 98:9 106:12 130:8 132:4

**L**

**La** 30:24

**label** 73:10

**ladies** 6:7

**largest** 97:21,23

**lastly** 147:16

**late** 46:18 108:14

**law** 10:5 136:8 140:2

**lawsuit** 110:14

**lawsuits** 63:6

**lawyer** 26:22 67:8 92:4 115:13,25 123:19,25 130:15 136:11,14,19 139:9

**lawyers** 9:4 25:20 68:5 70:25 71:11 114:9 116:23 119:16 136:25

**leadership** 114:8,19 118:22 119:4,9,23 120:2,12 122:17,23

**learn** 54:6 68:4

**learned** 32:2 38:8,20 52:25 91:14 92:13

**learning** 33:15 38:3

**leave** 76:14 98:24 108:15

**led** 16:6

**left** 76:8 80:19 81:3

**legal** 6:8 28:22 29:7, 16 30:21 37:18 92:8 103:24 117:18 139:11

**legally** 104:4

**legwork** 83:24

**length** 55:24

**letter** 9:4 31:17 32:6, 14 33:4,7,9,13,16,17 34:7,13 35:8,13,15, 20 36:4 37:25 38:3,5 85:8 94:3,12,14,15, 18,20 95:6 96:22 98:5,12 99:5 100:11, 15 103:16,19 104:10 106:10,15,18

**letters** 44:24,25 58:22 95:22,25 96:6, 18 103:8

**level** 98:23

**Leventon** 47:5 83:9, 12 118:5 126:25 127:9 132:22 135:22 136:23 138:10,18

**liability** 33:25 44:8 45:13,20,22 46:3,12, 14 61:3,19 105:19

**liar** 86:23

**lift** 26:23

**lights** 50:23

**limited** 70:14

**limits** 106:2

**liquidation** 74:12

**liquidity** 90:23

**list** 113:16 119:14

**listed** 35:22

**listen** 13:22 46:17 91:12 123:11

**litigant** 128:8

**litigation** 103:8 111:3 114:20

**lived** 34:22

**loan** 16:18

**loaning** 17:4

**located** 8:16

**logged** 69:25

**logical** 105:16

**Loiben** 68:13,14,15

**long** 46:23 53:18,20

**longer** 77:4

**looked** 44:11,16 85:18

**lot** 16:3 63:25 99:12

**loud** 44:4 62:24

**LP** 7:13 17:18 18:23

**ludicrous** 76:15

**lunch** 83:23

**Lynn** 112:21,25 113:3 115:18 118:14

**M**

**made** 29:22 36:13

55:11 56:3 64:25
73:5 88:14 95:7
101:11 102:2,4,14
126:23 133:23
139:12 142:7 144:8
147:9

**majority** 123:7

**make** 11:19 46:18
55:15 56:15 57:2
59:16 71:14,18 76:17
84:23 91:25 102:20
103:2 115:20 142:2
143:22 144:5 147:4

**makes** 91:8 143:21
144:3,14 145:16

**making** 52:19

**malfunction** 11:2
16:8 57:6 68:24 82:6
96:7 111:20 116:6
136:2 137:8 142:13
143:22

**malicious** 63:17

**man** 26:6

**manage** 16:21 17:8
20:11,17,21 23:13,25
24:9,16 25:17 26:11

**managed** 22:12,22
23:16 38:10

**management** 7:13
18:22 28:7,19 29:12
30:6 93:7,12 101:12,
24 102:24

**Management's** 8:18

**manager** 16:18
20:25 21:6,10,13,15,
25 22:4,16,19 29:21
36:8 46:12 52:14
54:2 100:24 102:7,8
103:20 104:5,6,12,22
105:14 106:21 107:4,
16,20

**manager's** 56:4

**manages** 23:21
39:12

**managing** 24:23

**manifested** 95:22

**manner** 87:10

**marked** 31:4 35:2
39:3 62:15 67:16
80:10 81:19 84:6
85:6 90:10 93:24
100:7 112:18 115:4
134:8 138:8

**market** 102:13

**markets** 90:23

**Matt** 40:13,20 45:17,
19

**matter** 29:20 41:12
59:6 64:18 94:6
132:22

**matters** 36:14 37:13

**Mckenzie** 136:9,25
137:23 138:3,19
139:2,7,25 140:2,10,
11 141:4,8 142:8,18

**means** 89:11

**meant** 49:13

**Media** 7:8

**medication** 12:5

**meeting** 116:18,23
119:14

**meetings** 48:13

**Melissa** 128:17
133:17 134:13,25

**member** 14:13

**members** 144:16

**memorandum**
37:11

**memory** 12:8 113:22

**mentioned** 49:14
64:25 65:18 117:14
128:5

**message** 45:16 62:9
81:23 82:11 126:18

**messages** 70:4
74:20

**microphone** 16:12

**mid** 77:9

**middle** 119:20 120:6

**Mike** 6:15 115:17

**Miller** 6:15

**million** 101:21

**mind** 124:6

**mine** 116:12 130:3

**minimis** 63:19

**minimization** 57:24

**minutes** 46:18,19,24
47:22 108:4,14,23
143:10

**missed** 20:12 43:2

**misunderstood**
51:21

**model** 145:15,16

**moment** 85:2 126:18

**money** 141:9 142:18

**month** 70:16 102:23
103:7

**months** 65:25 66:2
144:23

**morning** 6:6 8:10,16
9:8,12 64:25 113:10

**Morris** 6:25 7:3,5 8:9,
13 11:5,6,16,18,24
13:4 14:7 15:8 16:14,
16,24 17:2,11,13
18:7,9 21:11 23:2,11
24:12 25:2,8 27:18
28:3,10 29:6,9,15,18
30:2,11,14,22,24
31:5 32:11 33:2
34:11,23 35:4,7 36:5,
19 37:7 38:18,24
39:4 41:8,10 42:10,
11 43:8 44:20 46:22,
25 47:13,20,23 48:6,
21,24 49:18 50:15,22
51:2,5,7,14,15 52:13,
24 54:16,17 55:7
56:9,12,19 57:9,16
60:22 62:12,16,18
64:21,23 67:3,13,17
69:3 71:23 73:11
75:16 76:16 77:3
78:7,16 79:15,20
80:7,11 81:16,20,22
82:9 84:3,7 85:3,7,
20,22,24 86:12,13
88:12,21 90:7,11,13

91:11,13,23 92:7,11,
18 93:21 94:2 96:10,
21 98:8 99:22 100:4,
8,10 101:8 104:8
105:6,10,11 106:24
107:22 108:4,11,20
109:6 110:5,10
111:23 112:15,19
114:25 115:5,7,14,20
116:9,16 117:19,23,
24 121:15,16,21,25
122:7,11,13 125:6,
11,15 126:2,9,17
127:15,20,22 128:2,
16 129:13,16,21,25
130:7,15,20 131:3,
16,19,23 132:3,11,
17,20 133:3,6,13,16
134:5,9,12 136:5
137:11 138:5,9
139:23 140:23 141:3
142:16,23 143:9,25
144:2 147:3,11,14,20

**motion** 11:2,9,13
15:4,13,23 67:25
94:24 95:8,17 96:19
99:17 111:16,18,19
112:10

**motions** 96:19
111:15 112:3,9,13

**mouth** 16:13

**move** 29:6 30:11
56:9 74:13 80:2
91:11 105:24

**moving** 56:4 104:5
105:22 139:15

**multipage** 37:15

**Multistrat** 146:16,21

**mutual** 117:3,14
118:3,6,10 120:7,16
122:3 137:3,12 139:5

**N**

**nail** 85:13

**named** 128:17

**natural** 146:25

**necessarily** 37:3

**necessity** 32:24

**needed** 114:12,18
132:24

**Nexpoint** 17:18,25
18:4,10,19 19:8 20:3,
10,16 21:16 22:3,7,
10,18 31:18 32:5
33:16 35:9 36:13,22
38:4 65:14 77:13
101:13

**Nexpoint's** 18:13,16

**NHF** 21:21 22:13

**nonfinancial** 29:3

**nonfinancially** 29:3

**noninvestment**
53:25

**nonportfolio** 54:2

**nonsensical** 59:21

**nontrader** 54:2

**normal** 103:11

**Norris** 59:2,8

**Northern** 7:15

**noted** 7:18

**notice** 75:23 80:4
108:7

**notification** 36:12

**notwithstanding**
48:15

**November** 35:10
60:8,24

**NPA** 89:22 92:25
93:5,10,15,18

**number** 75:17 76:9,
11,14 77:25 78:4,6,
10,18 126:10

**numbers** 20:4 79:10,
24

**numerous** 78:20

**nuts** 107:9

**nutty** 90:21 107:10

**O**

**oath** 12:14

**object** 33:12,14 109:23 115:12 126:13

**objected** 96:14 109:20

**objection** 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 23:3 24:11 25:7 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,23 78:5,12 79:11 91:18 92:16 98:6 99:18 101:2 103:22 106:22 110:2,8 117:16 125:4 135:12

**obligation** 16:19 36:7 127:10 128:9,11

**obligations** 17:4 104:18

**obstructed** 127:10

**obtained** 12:18 110:11

**occur** 75:12

**occurred** 124:6

**October** 31:18 77:9 109:15

**offer** 101:12 102:3,5, 15,18,20

**office** 69:9

**officer** 33:22,24 34:3, 4,19 37:12,18 53:14 61:13 95:20 105:18

**offices** 9:11,16 110:20 128:23

**operate** 26:3 88:17

**operating** 56:7 62:3

**opinion** 59:22 61:25

**Opportunities** 22:11

**opportunity** 22:18 102:24

**opposed** 109:17

**opposition** 15:22 16:4

**order** 12:18,22,24 13:6,9,14,19 14:10 15:4,19 26:24 31:14 39:7 48:11,15 49:11 69:5 84:9,18,23 124:9

**orders** 49:12 61:17

**ordinary** 111:18

**organizations** 97:12

**original** 41:20

**outcome** 145:10

**outstanding** 89:19

**overrule** 34:2

**oversee** 68:6

**owned** 38:9,14 114:10

**owner** 30:10 97:3,9

**owners** 20:6 28:14, 15,18,23 29:11 30:5 56:3 63:21,24

**ownership** 10:12 18:4 19:18 74:13 97:21,23 136:16 141:17,21 144:19

**owns** 18:16 129:10 131:13

**P**

**p.m.** 62:20 85:25 87:3 108:24 109:2,3,4 143:3,5,6,7 147:23, 24

**Pachulski** 8:14 101:21

**paid** 71:25 73:4 74:8

**76:21 77:11,12 101:24**

**paragraph** 87:25 88:7,9,14,16 89:2

**part** 23:19 43:2 59:22 69:9 72:5 120:19,23 121:2 137:3,20

**participate** 9:15 11:12 118:2,5 123:2, 18 139:7 144:7

**participated** 123:14

**participating** 123:24

**parties** 6:18 24:14 26:17 28:19 29:11 30:6,16 104:10 106:7 107:14 126:11 137:12 139:17

**partner** 14:14 18:14, 17 19:25

**party** 17:7 24:8,15 29:4 120:15,17 122:4 132:13

**past** 102:23

**pause** 7:4 95:10,11 111:25

**pay** 74:15 79:14 142:17 144:15

**payment** 101:23 142:8 144:8

**payments** 144:5

**Pearson** 40:13,14,17 41:3 43:15 45:18,19, 22

**pending** 6:23

**people** 28:24 42:4 76:12 79:9 105:22 107:11 143:17 145:14

**people's** 117:5

**percent** 54:21

**perfectly** 46:25 80:6

**performance** 88:19

**period** 70:14 76:10

**peripherally** 146:13

**permanent** 110:16

**permission** 9:7 75:21 77:22

**person** 70:10 83:21 135:9 138:19 143:14 145:17

**personal** 33:24 45:20 46:3 55:20 61:3,18 67:8 69:23 75:18 78:10,18 105:19 109:11 110:23 111:11 115:24 128:21 140:4

**personally** 12:21 17:15 38:20 67:11 71:15,17,21 126:23

**petition** 26:19

**phone** 8:25 32:18 60:9,16 69:8 71:24 72:4,6,11 73:3,5,14, 21 74:7,9,10,13,21, 24 75:3,4,6,9,10,17 76:9,11,14,19,20 77:11,12,18,21,25 78:4,6,10,15,18,21 79:10,24 80:15,20 81:10,13 82:24 85:13,15 86:5,15 87:2,10 123:24

**phone's** 81:7

**phones** 72:10,11,24 73:24 77:2 80:2

**picking** 60:8,15

**piece** 119:5,6

**place** 48:10 147:8

**plan** 74:13 109:17 144:24 145:4,6,8,11, 19,21,24 146:4

**planned** 108:9

**play** 83:5,12

**playing** 31:9

**point** 20:12 36:18 63:18 125:24

**points** 13:17 147:4

**policy** 144:9

**portfolio** 16:17 20:25

**permanent** 110:16

**21:5,10,13,15,24 22:4,16,19 29:21 36:8 52:14 100:24 104:22 105:14 107:4, 20**

**portion** 45:12

**position** 36:18 40:11 53:19 102:12 103:23 116:12 125:7

**possession** 126:22 127:4

**possibilities** 97:17

**post** 34:5,6,12 105:19 124:7

**post-restructured** 41:16

**pot** 144:24 145:4,6,8, 11,19,21,24 146:4

**potential** 44:7 45:13, 22 46:3,11,14 139:17

**potentially** 72:7

**power** 33:19 105:7

**practice** 6:11

**preferred** 89:14

**preliminary** 11:9,13, 21 68:2 110:16 147:7

**premises** 9:5,8

**prepared** 37:11

**prerequisites** 103:9

**present** 101:23

**president** 18:10,19 19:21 20:6 29:21 104:19

**pressing** 99:25

**prevent** 12:11 49:25 50:5,8

**prevented** 60:8,15 103:7

**prevents** 128:6

**primarily** 39:13 68:13 123:6

**primary** 32:16 97:21

**print** 71:4

**prior** 60:17 94:23 104:7 124:6 142:5

**privilege** 116:11 124:20 140:25

**privileged** 115:19 124:17

**problem** 23:18 43:3

**procedure** 6:22 75:11

**proceed** 7:6 41:9

**proceeding** 7:21 10:8 110:7 126:16

**process** 73:9,23 76:25 100:23 103:19 104:11 105:2,13 106:20 124:15

**produce** 113:21 124:8,24 126:20 132:13 135:23

**produced** 70:22,23 71:8,19 114:4 115:17 124:23 132:24

**producing** 83:6,13 135:13

**production** 70:4,19 83:3,10,18 121:22 122:2 124:12 133:9, 24 135:9,17

**professional** 24:24 25:22 53:25

**prohibition** 101:9

**promise** 47:8

**prompted** 134:22

**prosecution** 111:10

**protect** 101:6

**protocol** 73:9

**provide** 24:16 93:14 102:11 114:19 118:22 119:9 120:12 122:17,23 127:3,11 128:9

**provided** 57:12 93:17 102:23 116:4

**providing** 120:2

**provisions** 26:6

**purpose** 46:8,9,10 50:13 55:5,25 56:7 91:3,9

**pursuant** 26:16 40:22 48:10 116:4

**push** 64:2

**pushed** 95:19

**pushing** 91:4 105:20

**put** 30:25 31:11 34:23 38:24 62:12 64:21 80:7 81:16 84:3 85:3 90:7 92:4 93:21 100:4 103:12 112:15 114:25 117:3 134:5 138:5 144:23 145:5,8

**putting** 63:5 103:10

---

**Q**

**question** 19:14 20:13 23:8,18 24:6 27:11 28:12 42:9 46:20 51:13 65:9 74:18 79:19 86:11 88:11 89:5 91:10,12 92:12 94:25 98:2 105:5,9 114:2,24 116:20 121:14 123:11 125:10,18,22 126:3 127:14 129:12, 19 130:17,19,25 131:15,22 132:16 133:2,12 134:3

**questions** 28:13 48:19 58:9 70:23 79:7 84:20 116:13 128:12 130:13 147:4

**quickly** 104:6 139:16

**quote** 45:12 49:12 53:22 134:25

---

**R**

**rarely** 60:2,3

**rationale** 50:17 56:15 57:12 58:4,21

**reach** 117:5

**read** 12:21 13:24 14:9 31:13 44:3 49:22 62:23 70:17 84:16 85:11 88:3,7, 10 89:2 99:6 113:11 118:23 128:4

**realizes** 90:22

**reason** 10:16 14:8 63:10 66:18,21 67:4 86:8,25 87:5 90:25 102:22 135:21 137:5

**reasonable** 103:11, 12

**reasons** 52:5 63:3, 11,12 91:6

**recall** 13:18 15:25 16:4 31:25 45:4 58:18,19 65:3 79:13 82:5,11 89:12 90:6 100:14,16,20 107:17, 21 114:4,7 116:21 122:25 123:5,22 124:3,4,7 136:23 146:11,14

**receive** 41:19

**received** 85:11

**recent** 137:22

**recently** 123:22 126:7,8 142:4,6

**recess** 48:2 109:2 143:5

**recipient** 45:15

**recipients** 41:23 42:18,23 43:6

**recollection** 53:19 98:15 113:23 119:15 120:9 123:23 134:24

**record** 6:13 7:18 47:3,25 48:5 50:25 84:24 91:22,25 108:13,25 109:5 129:23 143:4,8 147:25

**recording** 6:19

**recycled** 72:20

**redefined** 65:24

**reduction** 57:24 58:2

**refer** 17:24 19:4,7

**reference** 39:17 44:10 45:11 65:2

**referred** 137:13

**referring** 22:14 25:5 44:13,16 45:2,5 65:5, 15

**refers** 21:17,19 41:15

**reflect** 108:13

**reflected** 58:17

**reflection** 84:23

**refresh** 98:15 113:22 119:14

**refreshed** 124:4

**regard** 137:23

**registered** 24:19 88:17,20

**regulatorily** 99:9

**regulatory** 32:24 33:23 34:7 36:3,6 37:5 61:4 107:7

**reimbursement** 101:20

**reinsurance** 141:15

**reject** 102:2,4,5,15

**rejected** 99:25

**rejection** 102:5,17

**relates** 115:17

**relating** 139:21

**relative** 101:22 145:9

**releases** 101:19

**relief** 110:17

**remedy** 105:16

**remember** 13:17 23:6 60:3 73:17 75:7 84:20 101:14 111:14 112:2,5,6,7,10,11,14 114:21 116:19 119:3,

**recycled** ...

**remembered** 63:14

**remembering** 60:12

**remind** 61:9

**remote** 6:19

**remotely** 6:14,17 31:7

**remove** 103:20 104:11 105:2,14 106:20 107:16

**removed** 110:19

**removing** 100:24 107:19

**repeat** 42:8,25 51:12 76:24 79:18 86:10 105:4 121:13

**replace** 104:5 107:3

**replacement** 72:6

**reported** 54:9

**reporter** 6:15 7:19

**Reporting** 6:9

**reports** 54:7

**represent** 10:11,13 26:9 94:8 116:2 136:12,15,20

**representation** 122:12

**represented** 67:10 95:6

**representing** 103:2 116:23 123:7 137:24 139:11 140:12

**represents** 10:2,6, 17 94:5

**request** 13:20 67:14 70:3,9,14 91:24 132:12 133:23

**requested** 11:3 16:9 57:7 68:25 82:7 95:15 96:8 111:21 116:7 126:6,7 135:25 136:3 137:9 142:14

**6,7,12** 122:24 134:4 135:4,5,8 138:25 144:12

143:23

**requesting** 47:14

**requests** 64:17 67:24 70:5,8 126:24

**required** 101:20

**reservation** 101:4

**resignation** 109:14

**resigned** 40:11

**respect** 14:3 36:14 37:13 47:6 99:19 114:19

**respond** 135:23

**responded** 43:15,24

**responding** 49:3

**response** 43:13,18 44:3 49:2,8 68:8 118:14 122:15,16 124:9 135:4

**responsibilities** 99:11

**responsibility** 17:8 52:15,18 80:24

**responsible** 104:7

**responsive** 68:7,8 70:5,20 71:8,18,22 82:25 83:6,13 124:17

**rest** 48:18

**restrain** 13:15

**restrained** 84:19

**restraining** 12:18,22 13:14,19 14:10 15:4 84:8

**restrains** 13:6,9

**resume** 107:23,25

**retail** 94:7 104:17

**retain** 76:13

**retained** 141:5

**retainer** 141:9

**retaining** 140:3

**return** 108:3

**returning** 74:3

**reversed** 89:15

**review** 15:2 70:21,24

**reviewing** 83:6,13

**Richey** 6:7

**Rick** 6:7

**rightfully** 63:20

**rights** 28:23 101:4

**rigorously** 95:21 101:6

**risk** 28:24 57:23,24 58:2 63:6

**role** 52:14 65:23 83:5,12 114:15 117:9,10

**room** 6:12,16 8:19,20

**Rothstein** 75:8 78:14 80:12 81:9 85:19 86:4,19 87:6

**Roughly** 12:20

**Rule** 6:21

**rules** 6:22,23

**ruling** 92:2

— **S** —

**sale** 111:25

**sales** 38:13 43:19 93:2

**sanctioning** 26:14

**satisfy** 71:7

**Saturday** 112:21

**Sauter** 65:6,7,12

**schedule** 48:13,16

**scheduled** 48:17

**Schroth** 133:17,23 134:13,16

**scope** 84:25

**Scott** 60:4 65:18 97:8 117:25 132:14 146:17

**screen** 30:25 31:12 48:22

**scroll** 32:7 41:2,18 43:13,23 48:23 53:10 62:16 70:7 81:20 82:2 84:11 87:20 92:19 94:17 100:13, 18 112:24 115:5 118:13,17 134:9,10, 15 138:16,21

**scurrying** 139:15

**search** 68:6 69:5

**searching** 83:6,13

**sec** 37:5 64:4 88:4

**secret** 76:3,6

**securities** 38:9,14 40:23 53:23 54:4 58:3 63:18 90:5,15, 25 91:4,16

**seek** 42:21 43:4

**seeking** 15:16 38:8

**Seery** 14:13,20 15:3, 9,12 24:24 25:15 31:18 35:9 36:14,23 38:8 41:25 42:6,15, 17 45:23 52:10 53:2, 6,22 54:23 55:5,21 56:7,15,25 57:5,6,11, 23 58:5,9,16 59:9,17, 25 60:9,12,16 61:7, 12,23 62:2,9,20 64:13 80:5 90:5 91:16 92:14 101:19 127:2

**Seery's** 25:22 38:15 59:20,22 60:25 61:17 80:3 90:15 135:23

**sees** 54:10

**self-reporting** 64:4

**self-reports** 37:4

**self-serving** 91:5

**sell** 38:8 40:23 41:24 44:6 50:14 51:24 90:5,15,25 91:16 92:15

**selling** 58:3,10 91:4 95:11

**send** 32:19 118:25 134:22 138:18,22,24

**sending** 33:3,6,12 37:24 99:5 103:15

**senior** 72:25 78:20 79:2

**sense** 13:7 91:8 145:16

**sentence** 43:2 88:15,24 89:2,7,10, 20

**serve** 112:12 147:8

**served** 67:23

**serves** 16:7,17

**services** 77:12 116:4 127:7 130:9,21 132:5

**set** 36:14,24 37:13 54:3

**settle** 89:10

**settlement** 65:24 109:21,24

**settling** 89:19

**severity** 6:10

**Sevilla** 112:12 113:9, 19

**share** 30:25

**shared** 77:12 116:4 127:7 130:9,21 132:5 137:3,13 139:5

**shares** 92:15

**sharply** 142:25

**she'd** 71:4

**She'll** 91:25

**sheets** 146:15,20

**shortly** 78:22

**showed** 108:7

**signatory** 104:10 106:8

**signed** 16:3 17:15 84:9

**significant** 63:21,23 146:13

**signing** 15:25

**similar** 45:10

**simply** 91:14 92:12 123:13

**single** 128:13

**sir** 8:17 33:20 35:11 85:9 94:17 126:3 130:11

**sit** 10:15 55:21 66:19 143:17 144:13

**sits** 143:14

**situation** 105:22

**Sky** 41:12,15,24 42:19,23 43:9,10,19 89:24

**so-called** 144:24

**social** 6:11

**sold** 38:14 46:8 50:11 56:6 63:9,17

**sought** 26:23 103:2 110:11 111:25

**sounded** 21:25

**Sowin** 40:16,17 49:3, 6 51:9,17,20 54:12 57:18,22 58:5,8,12 59:9,17 90:4 92:21

**Sowin's** 50:3,4 58:15

**speak** 32:13 42:17 55:16,18,19 74:6 83:2,9,16

**speaking** 59:25 95:23

**specific** 19:10 73:3

**specifically** 30:15 33:5 35:15 85:10 90:6 96:3 100:16 126:20 127:21,24 128:3

**specifics** 79:14

**speculate** 21:8 22:25 29:5 55:4 68:22 98:21 120:4,5 136:7

**speculating** 55:9

**speculation** 55:4

**speed** 99:3

**spent** 123:6 144:22

**spoken** 57:11 60:4
138:2

**stab** 145:8

**stack** 71:4,5

**staff** 25:24 37:19

**stand** 52:5 135:3,19

**standard** 7:11 47:25
73:9 75:11 108:25
109:5 143:4,8 147:24

**standing** 23:22
24:22 26:11

**standpoint** 36:3

**stands** 17:3

**Stang** 8:14

**start** 7:8 39:6

**started** 108:13
110:14

**starts** 119:21

**state** 6:23 47:2
116:11,12

**statement** 46:15
79:8 87:6 122:16
135:20

**statements** 88:9
125:2,13,20 126:12,
21 132:13,23 133:10,
25 135:10,14,18,24

**States** 7:14

**stay** 26:23 103:25

**stayed** 77:8

**stays** 26:20

**steno** 7:18

**stenographer** 11:4
16:10 57:8 69:2 82:8
96:9,12,16 111:22
116:8 136:4 137:10
142:15 143:24

**stenographic** 50:25

**stepped** 50:20

**steps** 42:21 43:4

71:17 105:2 106:19
107:3

**stick** 66:25 124:5

**stipulate** 6:18

**stop** 38:21 43:9,10,
14 53:11 63:20
89:17,23 140:21

**stopped** 40:7 69:14

**stopping** 42:14

**Strand** 14:14

**Strategic** 22:10,18

**strategist** 111:8,9

**strategy** 111:3 142:6

**strike** 29:6 30:11
56:9 91:11,20,25

**string** 39:5 118:25
119:20,21,25 120:6

**struggle** 145:5

**stuck** 126:16

**stuff** 78:14,15 91:8
99:9

**subject** 24:17,18,19
26:20 41:12 101:22
103:25 104:3 105:25
111:6 126:15 130:14
132:22

**submit** 15:21

**submitted** 15:3

**subpoena** 126:21
134:17 135:2,19
147:8,12

**subsequently**
122:22

**subsidiary** 22:2

**substance** 15:11
32:6 44:25 45:10
50:4 96:6

**substances** 44:24

**suffered** 46:6

**sufficient** 52:6

**suggest** 61:16
102:19

**suggested** 112:12

**suggesting** 64:3

**summary** 101:15

**supersede** 56:2
71:13

**supervise** 71:13

**supervisor** 146:10

**support** 15:12 33:6
37:24 99:25 103:15

**supported** 99:4

**supposed** 124:20

**surface** 76:15

**Surgent** 53:5,13
60:24 61:18

**suspense** 126:19

**swear** 6:16 7:19

**swearing** 6:20

**switched** 69:16

**sworn** 8:4

**symbol** 21:21

**system** 54:9

**systems** 47:11 50:21

---

**T**

**takes** 147:7

**taking** 48:10 106:19
107:3

**talk** 16:5 47:3,9,10,
15,19 59:12,14 60:9
62:5 83:25 117:21

**talked** 20:15,16
23:12 60:12 62:6
98:16

**talking** 13:10,11 73:3

**Tara** 68:13 81:13,24
82:5,14,15 83:17,20,
22

**Tara's** 71:10 80:20
81:3,10 83:19 86:6,
19 87:2

**technical** 50:24

**technology** 78:14

**telephone** 8:23
48:14

**telling** 108:18

**temporary** 12:18,22
13:9,14,19 14:10
15:4 84:8

**ten** 46:18,24 47:21
108:4

**ten-minute** 107:23

**term** 117:18

**terminate** 26:24

**terminated** 25:25
26:18 78:21

**termination** 80:3

**terms** 45:10 64:3
101:16

**testified** 8:5 59:4
99:3 137:15

**testify** 11:20 16:20
23:19,21,23,24 24:5,
14 113:19

**testifying** 12:11
26:10

**testimony** 24:21
35:24 47:16 58:6
59:13 76:24 120:13
124:2

**Texas** 7:16

**text** 62:9,19,23 70:4
74:20 80:18 81:23
82:11 126:17 134:11,
19,22

**texts** 107:14

**Thanksgiving** 38:7
60:13 90:24

**theme** 99:8

**thing** 31:8 103:11
104:15 113:10 120:8
140:9

**things** 16:3 24:17
26:21 61:4 64:2
99:12 106:3 128:5

**thinking** 46:23

**Thomas** 53:5 61:2
62:2,4,6

**thought** 15:18 22:14
52:11 54:24 55:24
59:21 62:2,7 78:24
79:2 96:4 121:8

**threw** 73:12,14
76:19,20 77:18

**throw** 72:21 73:5,20
74:2 80:15,24 81:10,
14

**throwing** 73:17

**thrown** 86:15

**thrust** 99:7

**thumb** 71:4

**time** 7:11 8:19 14:9
19:14 31:8,12 32:3,4
35:14,25 38:19 40:10
42:3,12 45:5 47:25
53:20 57:21 59:24
60:4,11,12 62:9
63:18 70:14 73:24
74:11,13,20 77:5,6,
18 82:16 86:5 88:5
90:3,20 94:20 100:20
103:16 107:12 108:3,
8,25 109:5 117:11
123:6,16,25 124:12
128:13 129:20,22
133:8 135:9 139:24
140:15 142:12,24
143:4,8 144:22
147:24

**times** 23:6 123:22
126:4 145:13

**title** 129:3

**titles** 21:4 22:17

**today** 9:21 10:22
12:8,11 31:9 47:16
48:10,14 84:17
127:19

**today's** 7:9 9:16
10:24 11:8

**told** 25:24 34:16
37:8,20 57:4,23
66:12,15,17 74:23
86:19 100:22 120:11
133:23

**tomorrow** 103:5,13
147:15

**top** 63:14 101:18
113:7 115:21,22
122:14

**topic** 107:19 118:10
119:13

**touch** 16:11

**trade** 53:23 54:4,7
89:11

**trader** 40:15

**trades** 38:21 42:5,14
50:5,8 53:3,7 54:9,
10,24 55:11,15,22
56:16 57:2 58:17,22
60:17 61:18,24 89:9,
11,17,19,23 101:20

**trading** 49:13 52:8
72:24

**transactions** 42:19,
24 43:9,10 45:23
52:19 57:13 60:10
111:18

**transcend** 99:12

**transcript** 13:24

**transfer** 102:7,9,24
104:7

**transferred** 75:18

**transition** 50:12 56:2
63:8 72:7 74:12

**transitioned** 78:10

**trial** 112:22 113:18

**TRO** 15:13,16,23
16:6 83:25 93:4,15,
18 110:11 111:2
113:13 114:18 125:5
126:15 127:25 128:2

**true** 19:22 89:21

**trust** 71:10,11

**TSG** 6:9

**turn** 50:22

**tweak** 55:6

**twisted** 26:10

**typed** 122:20

**typical** 46:5

---

**U**

**UCC** 74:19,23 124:25
125:12,19 126:7
136:6

**ultimate** 28:25

**ultimately** 141:4

**unawareness** 52:8

**underlying** 44:7
51:25

**understand** 10:21,
24 11:7 12:14 19:15
25:3 27:7 51:13 60:6
70:13 73:24 76:18
87:22 115:14 125:8

**understanding**
13:5,8 29:8,10,20
30:5,9 34:21 39:22
41:14 58:21 78:19
79:12,13,17,22,25
84:18,24 88:17 92:4
97:18 102:12 137:7
143:20

**understood** 42:3
70:2 73:8

**unfounded** 63:17

**unhighlight** 49:21

**United** 7:14

**unpaid** 77:8

**untenable** 101:15,17

**untrue** 87:6

**unusual** 52:12

**up-front** 101:23

**upgraded** 73:24

**urgency** 90:24

---

**V**

**validity** 6:19

**variety** 126:6

**vast** 123:7

**vehicles** 16:19 17:9

**versus** 72:24

**video** 6:19

**video-recorded** 7:8

**view** 102:17

**viewed** 32:23

**vindictive** 90:21
91:5

**violating** 63:4

**virtually** 21:10

---

**W**

**Wait** 7:20

**waited** 91:2

**waived** 116:11

**wanted** 49:19 55:14,
21 56:15 57:2,13
61:21,23 74:24 76:3
90:5 91:16 92:14
101:23 119:15,22
125:12,19

**warning** 62:25 63:19
64:9

**warnings** 64:12

**Waterhouse** 146:8,9

**week** 69:17 95:5

**weeks** 25:25 74:16
112:3

**withdraw** 33:17 34:7
38:4 98:5,11 106:10,
14

**withdrawn** 15:10
16:24 28:4 34:13
39:20,21 44:14 45:20
52:17 54:16 55:13
66:20 70:23 71:16
72:15 76:19 78:8
80:5 82:14 86:12
101:10 105:10 106:8
129:6 143:25

**woman** 128:17

**word** 25:4

**words** 122:18

**work** 39:6 71:10
82:6,10,15,23 128:22

**work-around** 53:2,7,
23 54:22 61:2,12,25

**worked** 69:7

**working** 53:22
119:16 120:19 121:2
123:7

**works** 40:16 54:14,
18,20 61:20 83:20
92:9

**world** 36:13

**worse** 90:19

**wrapped** 101:16

**write** 60:23 63:2

**writes** 113:8

**writing** 44:6 103:8

**writings** 44:13,15
45:4

**written** 37:10,17,18
44:9

**wrong** 99:20

**wrote** 51:17,25 53:5,
22 64:8 112:21 113:3

---

**Y**

**year** 69:18 123:20,21
126:5 142:4 145:18

**years** 34:22 41:17
53:20 69:25 72:12
73:25 88:16 142:5
144:10,11

---

**Z**

**Ziehl** 8:14

# EXHIBIT 31

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-12239 (CSS) |
| Debtor. | |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
### EXPEDITED REQUESTS FOR PRODUCTION OF DOCUMENTS TO HIGHLAND

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure as made applicable by Rules 9014, 7026, and 7034 of the Federal Rules of Bankruptcy Procedure, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee") hereby serves the following expedited requests for production of documents to Highland Capital Management, L.P. ("Request(s)").

### DEFINITIONS

1.      "BBVA" means BBVA USA and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including without limitation Account No. 342, as referenced in the First Day Declaration.

2.      "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

or in draft, and all Documents concerning or memorializing such written or oral communications.

3.      "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests.  A request for documents "concerning" a specified subject matter always shall include communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

4.      "Debtor," "You," and "Your" means Highland Capital Management, L.P.

5.      "Debtor's Application for Retention of Foley" means the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* filed with the Bankruptcy Court on October 29, 2019 [Docket No. 69].

6.      "Debtor's Application for Retention of Lynn Pinker" means the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* filed with the Bankruptcy Court on October 29, 2019 [Docket No. 70].

7.      "Debtor's Ordinary Course of Business Motion" means *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* filed with the Bankruptcy Court on October 29, 2019 [Docket No. 77].

8.      "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however

produced or reproduced, of any type or description, regardless of origin or location, including without limitation all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

9. "<u>Dondero</u>" means James D. Dondero.

10. "<u>First Day Declaration</u>" means the *Declaration of Frank Waterhouse in Support of First Day Motions* filed with the Bankruptcy Court on the Petition Date [Docket No. 9].

11. "<u>Frontier Bank</u>" means Frontier State Bank and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

12. "<u>HCM Korea</u>" means Highland Capital Management Korea Limited any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

13. "<u>HCM Latin America</u>" means Highland Capital Management Latin America, L.P. any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors,

attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

14.     "HCM Singapore" means Highland Capital Management (Singapore) Pte Ltd. any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

15.     "Highland Entity" and "Highland Entities" means the Debtor and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including without limitation the entities referenced in the First Day Declaration, paragraphs five and six.

16.     "Highland Multi Strategy Credit Fund, L.P." means Highland Multi Strategy Credit Fund, L.P. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

17.     "Highland Select Equity Fund, L.P." means Highland Select Equity Fund, L.P. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including Highland Select Equity Fund GP, L.P.

18.     "Hunter Mountain Trust" means Hunter Mountain Trust and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including Crown Global Investments.

19.     "Identify" means to state, to the extent known (or, if not known, to so state,) the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

20.     "Intercompany Transactions" means any transaction between the Debtor and other Highland Entities, including without limitation transactions between the Debtor and any or all of Highland Multi Strategy Credit Fund, L.P., HCM Korea, HCM Latin America, and HCM Singapore, as referenced in the First Day Declaration, paragraph 59(a) through 59(d), as well as transactions between Highland Entities and each or all of Highland Entities' owners, partners, shareholders, and/or principals, including transactions between Highland Entities and Dondero and Okada.

21.     "Jefferies" means Jefferies, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

22.     "NexBank" means NexBank, SSB and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including without

limitation NexBank Account No. 130, Account No. 513, Account No. 891, Account No. 735, and Account No. 668, as referenced in the First Day Declaration.

23.     "Okada" means Mark Okada.

24.     "Petition Date" means October 16, 2019.

25.     "Prime Account" means the prime brokerage account the Debtor maintains with Jefferies, as referenced in the First Day Declaration, paragraph 11.

26.     "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests.  A request for documents "relating to" a specified subject matter always shall include communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

## **INSTRUCTIONS**

1.     The Committee requests production of the following documents and information on an immediate, expeditious, and rolling basis, with all documents to be received by November 12, 2019.

2.     Unless otherwise indicated, all documents shall be produced for the relevant time period, which shall be the last five years prior to the Petition Date, including any documents having an earlier origin, if in use during the relevant time period.

3.     The obligation to produce documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to product any documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the Chapter 11 Case.

4.      You are requested to produce not only those documents in Your physical possession, but also those documents within Your custody and control, including, without limitation, documents in the possession of Your agents, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

5.      If You have no documents responsive to a particular Request, or if for some other reason You are unable to produce responsive documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain documents that are responsive to a Request, but believe that additional documents not now available to You would also be responsive, You should provide the documents You now have and specifically state when the remainder of the documents will be provided.

6.      Where an objection is made to any document request, the objection shall state with specificity all grounds for objection.

7.      Where a claim of privilege is asserted in objecting to the production of any document and a document called for by these Requests is withheld on the basis of such assertion, the objecting party shall identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by state law, indicate the state's privilege being invoked.  In addition, the objecting party shall provide the following information with respect to any document so withheld: (i) the type of document, e.g. letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; (iv) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addresses of the document, and any other recipients shown in the

document, and, where not apparent, the relationship of the author, addresses, and recipients to each other.

8.    In the event that a requested document has been lost, destroyed, discarded and/or otherwise disposed of; the parties will identify the document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the document request or requests to which the document is responsive.

9.    Produce all responsive documents as they are kept in the usual course of business, or organize and label them to correspond with the request to which they are responsive.

10.    With respect to Electronically Stored Information, the producing party shall confer with the Committee to develop parameters, including custodians and search terms, to identify responsive documents.  This shall be done in accordance with Rule 7026-3 in the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

## **DOCUMENTS REQUESTED**

1.    Provide the Debtor's and any Highland Entity's current "Legal Entities List" and the "Legal Entities List" from the five years prior, including any and all Documents or Communications relating to these "Legal Entities Lists."

2.    Any and all Documents or Communications relating to any organizational charts of the Debtor and Highland Entities, including without limitation Highland Entities owned or managed in whole or in part by affiliate entities, Dondero, or Okada.

3.    Any and all Documents or Communications relating to ownership of each Highland Entity, including who is responsible for managing each entity.

4.      Any and all Documents or Communications relating to the Debtor's financial statements and financial statements for each Highland Entity, including without limitation detailed calculations of all management fees for the past five years.

5.      Any and all Documents or Communications relating to Debtor's monthly closing packages or operating reports.

6.      Any and all Documents or Communications relating to Intercompany Transactions, including without limitation any and all Documents and Communications relating to Highland Multi Strategy Credit Fund, L.P., HCM Korea, HCM Latin America, and HCM Singapore, as referenced in the First Day Declaration, paragraphs 59 through 66 and Debtor's Ordinary Course of Business Motion, paragraphs 39 through 42.

7.      Any and all Documents or Communications evidencing or relating to any fees received and expenses incurred by Debtor for shared services, including without limitation any and all shared services agreements and calculations of shared services allocation.

8.      Any and all Documents or Communications relating to Hunter Mountain Trust, including without limitation Documents and Communications relating any notes owed to Hunter Mountain Trust by the Debtor, any agreements between or among Hunter Mountain, the Hunter Mountain Trustee, Dondero, and Okada, and Hunter Mountain's ownership structure.

9.      Any and all Documents or Communications relating to bank accounts that the Debtor, Dondero, or Okada have a direct or indirect interest in, including without limitation Documents or Communications relating to the Highland Select Equity Fund, L.P. bank or brokerage accounts, NexBank bank accounts, and BBVA bank accounts.

10. Any and all Documents or Communications relating to Frontier Bank, including without limitation all Documents and Communications relating to any loan agreements or amended loan agreements, as referenced in the First Day Declaration, paragraphs 13 through 15.

11. Any and all Documents or Communications relating to the ordinary course operations of Highland Select Equity Fund, L.P. and Highland Select Equity Fund GP, L.P. by the Debtor.

12. Any and all disbursements and transactions effectuated by the Debtor since the Chapter 11 Petition Date.

13. Any and all Documents or Communications relating to the Debtor's critical vendor list, including without limitation the identity of the Debtor's critical vendors, whether such critical vendors are affiliated with Debtor or any Highland Entity, and all Documents and Communications related to determining the designation of such vendor as a critical vendor.

14. Any and All Documents or Communications relating to Debtor's periodic payment summary statements, including without limitation the amount of compensation paid to Debtor's clients, entities, or affiliates and the amount reimbursed by such clients, entities, or affiliates.

15. Any and all Documents or Communications relating to payment of Debtor's employee Workforce Compensation, Benefit Programs, and bonus plans, as defined and referenced in the First Day Declaration, paragraphs 67 through 99.

16. Any and all Documents or Communications identifying Debtor's involvement in any current or prior litigation, including without limitation any Documents and Communications relating to any proposed or retained representation.

17.     Any and all Documents or Communications relating to representation for which you seek the retention and employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, as referenced in Debtor's Application for Retention of Lynn Pinker, including without limitation any prior and proposed engagement letters and bills.

18.     Any and all Documents or Communications relating to representation for which you seek the retention and employment of Foley Gardere, Foley & Lardner LLP as Special Texas Litigation Counsel, as referenced in Debtor's Application for Retention of Foley, including without limitation any prior and proposed engagement letters and bills.

19.     Any and all Documents or Communications relating to any redemption notices proposed and issued to the Debtor, including without limitation the name of the entity proposing and issuing the notices, in the one year prior to the Petition Date.

20.     Any and all Documents or Communications evidencing or relating to any transactions or proposed transactions where the Debtor, any Highland Entities, Dondero, or Okada have offered to buyout investors of any Highland Entity or affiliates.

21.     Any and all Documents or Communications evidencing or relating to securities, interests, holdings, debt, positions, or contracts, sold, transferred, novated, assigned, or purchased by Debtor in the one year prior to the Petition Date.

22.     Any and all Documents or Communications relating to transfers made by or to Debtor to or from any Highland Entity or any Highland Entity affiliates, including without limitation the transfer of any assets, contracts, responsibilities, rights, or obligations.

23.     Any and all Documents or Communications relating to any obligation of Debtor or any indebtedness of Debtor to any Highland Entity or any Highland Entity affiliates in the five

years prior to the Petition Date, including without limitation intercompany reimbursement agreements.

24. Any and all Documents or Communications relating to any debt owed to Debtor by any of its principals or affiliates.

25. Any and all Documents or Communications relating to any guarantee of debt owed to Debtor by any of its principals or affiliates and of any principals or affiliates guaranteed by Debtor.

26. Any and all Documents or Communications evidencing or relating to fees received and expenses incurred by Debtor from money management and advisory services in the five years prior to the Petition Date, as referenced in the First Day Declaration, paragraph 8.

27. Any and all Documents or Communications evidencing or relating to funds received by Debtor through the sale of non-debtor subsidiaries.

28. Any and all Documents or Communications relating to account statements from Jefferies, including without limitation the Prime Account.

29.     Debtor's governing documents and the governing documents of any Highland

Entity and Highland Entity affiliates in existence in the last five years.

| | |
|---|---|
| Date: November 10, 2019<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP |

*/s/ Kevin A. Guerke*
Sean M. Beach, Esq. (No. 4070)
Kevin A. Guerke,  Esq. (No. 4096)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600

-and-

Bojan Guzina, Esq.
Matthew Clemente, Esq.
Alyssa Russell, Esq.
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone:  (312) 853-7000

- and –

Jessica Boelter, Esq.
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 839-5300

*Proposed Counsel for the Official Committee of Unsecured Creditors*

25572616.1

# EXHIBIT 32

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

</div>

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

<div align="center">

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS**

</div>

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Rule 7034 of the Federal Rules of Bankruptcy Procedure, and the Amended Term Sheet, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee") hereby serves the following requests for production of documents to Highland Capital Management, L.P. ("Request(s)"). These requests are made pursuant to the Amended Term Sheet to which the Committee and Highland Capital Management, L.P., have agreed (Dkts. 354, 354-1) ("Term Sheet").

<div align="center">

**DEFINITIONS**

</div>

1.      "Atlas IDF" means Atlas IDF, LP, Atlas IDF GP, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

2.      "Beacon Mountain" means Beacon Mountain, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

3.      "<u>Boyce</u>" means Patrick Boyce.

4.      "<u>Communication(s)</u>" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

5.      "<u>Concerning</u>" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests.  A request for documents "concerning" a specified subject matter always shall include communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

6.      "<u>Crown Global Insurance Company</u>" means Crown Global Insurance Company and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

7.       "<u>Debtor</u>," "<u>You</u>," and "<u>Your</u>" means Highland Capital Management, L.P.

8.      "<u>Document(s)</u>" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including

without limitation all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

9. "Document Production Protocol" means the protocols agreed to and described in Exhibit C of Final Term Sheet, Docket 354-1.

10. "Dolomiti, LLC" means Dolomiti, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

11. "Dondero" means James D. Dondero.

12. "Due from Affiliates Chart" means the document Bates stamped as Highland_PEO-010365 – Highland_PEO-010365 and produced by the Debtor.

13. "Dugaboy" means Dugaboy Investment Trust and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all trustees, officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

14. "Ellington" means Scott B. Ellington.

15. "HCRE Partners, LLC" means the HCRE Partners, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any

and all officers, directors, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including without limitation NexPoint Real Estate Partners, LLC.

16.    "Highland Capital Management Korea Limited" means Highland Capital Management Korea Limited and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing

17.    "Highland Capital Management Fund Advisors, L.P." means Highland Capital Management Fund Advisors, L.P. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

18.    "Highland Capital Management Services" means Highland Capital Management Services, Inc. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

19.    "Highland Entity" and "Highland Entities" means the Debtor and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, owners,

partners, principals, shareholders, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

20. "Hunter Mountain Secured Promissory Note" means the document Bates stamped Highland010645 – Highland010651 and produced by the Debtor, also referenced in Exhibit A.

21. "Hunter Mountain Trust" means Hunter Mountain Trust and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing, including Crown Global Investments.

22. "Highland Multi Strategy Credit Fund, L.P." means Highland Multi Strategy Credit Fund, L.P. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

23. "Identify" means to state, to the extent known (or, if not known, to so state,) the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

24. "Klos" means David Klos.

25. "Leventon" means Isaac Leventon.

26. "Loans Receivable Chart" means the document Bates stamped Highland_PEO-010366 – Highland_PEO-010366 and produced by the Debtor.

27. "Parker" means Trey Parker.

28. "NexPoint Advisors, L.P." means NexPoint Advisors, L.P. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

29. "Okada" means Mark Okada.

30. "Okada Family Trusts" means Mark and Pamela Okada Family Trusts and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

31. "Petition Date" means October 16, 2019.

32. "Rand PE Fund I, L.P." means Rand PE Fund I, L.P. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

33. "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for documents "relating to" a specified subject matter always shall include communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

34. "Siepe, LLC" means Siepe, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers,

directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

35. "SSP Holding, LLC" means SSP Holding, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

36. "Surgent" means Tom Surgent.

37. "Trussway Holdings, LLC" means Trussway Holdings, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on their behalf of any of the foregoing.

38. "Waterhouse" means Frank Waterhouse.

## INSTRUCTIONS

1. The Committee requests production of the following documents and information pursuant to the Term Sheet and Document Production Protocol contained therein as Exhibit C.

2. The Committee requests production of the following documents and information on an immediate and rolling basis. Pursuant to the Term Sheet, Debtor shall search for emails at the earliest opportunity and in no event no later than seven days after the date of these Requests.

3. Unless otherwise indicated, all documents shall be produced for the relevant time period, which shall be the five years before the Petition Date, including any documents having an earlier origin, if in use during the relevant time period.

4. The obligation to produce documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to product any documents

requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Case.

5.      Pursuant to the Term Sheet's Document Production Protocol, the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control to the extent they are responsive to these requests.

## DOCUMENTS REQUESTED

1.      Any and all Documents or Communications relating to any employment or severance agreements with current or former executives, officers, or directors of the Debtor and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of the Debtor, including without limitation agreements with Boyce, Dondero, Ellington, Klos, Leventon, Okada, Parker, Surgent, and Waterhouse.

2.      Any and all Documents or Communications, including without limitation proof of payment and business purpose justification, relating to payments, distributions, or withdrawals credited or given to insiders by the Debtor in the one year prior to the Petition Date, as included in Statement 30 of the Statement of Financial Affairs for Highland Capital Management, L.P. (Dkt. 248) ("SOFA").

3.      Any and all Documents or Communications, including without limitation proof of payment and business purpose justification, relating to payments or transfers to creditors by the Debtor, including without limitation payments made by the Debtor to any Highland Entities or any Highland Entity affiliates, in the ninety days prior to the Petition Date, as included in Statement 3 of the SOFA.

4.      Any and all Documents or Communications, including proof of payment and business purpose justification, relating to payments or other transfers of property made by the

Debtor in the one year prior to the Petition Date that benefited any insider, as included in Statement 4 of the SOFA.

5. Any and all Documents or Communications relating to any debt owed to the Debtor by any of its principals or affiliates, including the notes specified in Exhibit A.

6. Any and all Documents or Communications, including business purpose justifications, relating to transactions giving rise to loans made by the Debtor to any Highland Entities or Highland Entity affiliates, including without limitation those identified in Exhibit A.

7. Any and all Documents or Communications relating to negotiations regarding the terms of loans made by the Debtor to any Highland Entities or Highland Entity affiliates, including without limitation those identified in Exhibit A.

8. Any and all Documents or Communications relating to the determination of and business purpose justifications for the principal amounts and interest rates of loans made by the Debtor to any Highland Entities or Highland Entity affiliates, including without limitation those provided in Exhibit A.

9. Any and all Documents or Communications relating to the holders of the notes provided in Exhibit A, including without limitation all Documents and Communications supporting schedules of amortization, relating to financial support acknowledgment, and acting as security to principal and interest payable.

10. Any and all Documents or Communications relating to any debt owed to the Debtor by any of the following entities:

 a. Atlas IDF,

 b. Beacon Mountain,

 c. Crown Global Insurance Company,

      d.        Dolomiti, LLC,

      e.        Dugaboy,

      f.        Hunter Mountain Trust,

      g.        HCRE Partners, LLC,

      h.        Highland Capital Management Fund Advisors,

      i.        Highland Capital Management Korea Limited,

      j.        Highland Capital Management Services, Inc.,

      k.        Highland Multi Strategy Credit Fund, L.P.

      l.        Okada Family Trusts,

      m.        Rand PE Fund I, L.P.,

      n.        Siepe, LLC,

      o.        SSP Holdings, LLC,

      p.        Trussway Holdings, LLC, and

      q.        Any other Highland Entity.

11.     Any and all Documents or Communications sufficient to identify the complete management structure of:

      a.        Atlas IDF,

      b.        Beacon Mountain,

      c.        Crown Global Insurance Company,

      d.        Dolomiti, LLC,

      e.        Dugaboy,

      f.        HCRE Partners, LLC,

      g.        Highland Capital Management Fund Advisors,

      h.     Highland Capital Management Services, Inc.,

      i.     Hunter Mountain Trust,

      j.     Okada Family Trusts,

      k.     Rand PE Fund I, L.P.,

      l.     Siepe, LLC,

      m.     SSP Holdings, LLC, and

      n.     Trussway Holdings, LLC.

12.     Any and all Documents or Communications sufficient to identify any and all owners or beneficiaries of:

      a.     Atlas IDF,

      b.     Beacon Mountain,

      c.     Crown Global Insurance Company,

      d.     Dolomiti, LLC,

      e.     Dugaboy,

      f.     HCRE Partners, LLC,

      g.     Highland Capital Management Fund Advisors,

      h.     Highland Capital Management Korea Limited,

      i.     Highland Capital Management Services, Inc.,

      j.     Highland Multi Strategy Credit Fund, L.P.,

      k.     Hunter Mountain Trust,

      l.     Okada Family Trusts,

      m.     Rand PE Fund I, L.P.,

      n.     Siepe, LLC,

o.       SSP Holdings, LLC, and

p.       Trussway Holdings, LLC.

13.       Any and all Documents or Communications relating to any debt owed to Debtor by Hunter Mountain Trust, including without limitation all Documents or Communications relating to business purpose justifications, the Contribution Agreement referenced in the Hunter Mountain Secured Promissory Note, and any other evidence or valuation of collateral.

14.       Any and all Documents or Communications relating to debt, including without limitation any unsecured claims, owed by the Debtor to any current or former executives, officers, or directors of the Debtor, Highland Entity, or Highland Entity affiliate, aside from salary and bonus compensation to be paid in the ordinary course, or to any Highland Entity, or Highland Entity affiliate, including without limitation any payment schedules, business purpose justifications, and related correspondence.

15.       Any and all Documents or Communications relating to any redemption notices proposed and issued to the Debtor since the Chapter 11 Petition Date and not yet produced by the Debtor.

16.       Any and all disbursements and transactions effectuated by the Debtor since the Chapter 11 Petition Date and not yet produced by the Debtor.

17.       A current and updated Loans Receivable Chart.

18.       A current and updated Due from Affiliates Chart.

19.       Any and all documents, including but not limited to emails, containing the following search terms, as well as those terms to which the Committee and Debtor previously agreed (*see* Nov. 29, 2019 Email from P. Foley to J. Morris (addressing email search parameters)):

"Atlas IDF"
"Beacon Mountain"

"Crown Global"
Crown
Dolomiti
Dugaboy
"Highland Capital Management Fund Advisors"
"HCMFA"
"HCM Fund Advisors"
"HCRE"
"Highland Capital Management Korea"
"Highland Capital Management Services"
"HCM Services"
"Hunter Mountain"
"NexPoint"
Nex w/5 Point
"Okada Family Trust*"
Promissory w/5 note*
Rand
Honis
"SSP Holdings"
"Siepe"
"Trussway"

Dated: February 3, 2020

/s/ Penny P. Reid
Penny P. Reid
Sidley Austin LLP
2021 McKinney Ave., Suite 2000
Dallas TX, 75201
(214) 961-3300
pried@sidley.com

# EXHIBIT 33

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) |
| | ) Case No. 19-34054-sgj11 |
| Debtor. | ) |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Rule 7034 of the Federal Rules of Bankruptcy Procedure, and the Amended Term Sheet, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee") hereby serves the following requests for production of documents to Highland Capital Management, L.P. ("Request(s)"). These requests are made pursuant to the Amended Term Sheet to which the Committee and Highland Capital Management, L.P., have agreed (Dkts. 354, 354-1) ("Term Sheet").

## DEFINITIONS

1.    "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

2.      "<u>Concerning</u>" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for documents "concerning" a specified subject matter always shall include communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

3.      "<u>Debtor</u>," "<u>You</u>," and "<u>Your</u>" means Highland Capital Management, L.P.

4.      "<u>Document(s)</u>" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained. The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

5.      "<u>Document Production Protocol</u>" means the protocols agreed to and described in Exhibit C of Final Term Sheet, Docket 354-1.

6.      "<u>Relating to</u>" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for documents "relating to" a specified subject matter always shall include

communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

## **INSTRUCTIONS**

1.      The Committee requests production of the following documents and information pursuant to the Term Sheet and Document Production Protocol contained therein as Exhibit C.

2.      The Committee requests production of the following documents and information on an immediate and rolling basis.  Pursuant to the Term Sheet, Debtor shall search for emails at the earliest opportunity and in no event no later than seven days after the date of these Requests.

3.      Unless otherwise indicated, all documents shall be produced for the relevant time period, which shall be the five years before the Petition Date, including any documents having an earlier origin, if in use during the relevant time period.

4.      The obligation to produce documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to product any documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Case.

5.      Pursuant to the Term Sheet's Document Production Protocol, the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control to the extent they are responsive to these requests.

## **DOCUMENTS REQUESTED**

1.      Any and all Communications relating to or concerning a list of trading activity, and containing the phrase "Previous Day Trades," or a variant of such phrase, within the subject line of the email.

2.      Any and all Communications relating to or concerning a list of movements of assets within a particular fund and their values, including, without limitation, email communications that

contain the term "Highwire," or a variant of such term, within the subject line of the email. For the avoidance of doubt, an email containing the subject line "Crusader Highwire," for example, would be responsive to this request.

Dated: February 24, 2020

/s/ Penny P. Reid

Penny P. Reid
Sidley Austin LLP
2021 McKinney Ave., Suite 2000
Dallas TX, 75201
(214) 961-3300
pried@sidley.com

# EXHIBIT 34

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## FOURTH REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Rule 7034 of the Federal Rules of Bankruptcy Procedure, and the Amended Term Sheet, the Official Committee of Unsecured Creditors in the above captioned bankruptcy case (the "Committee") hereby serves the following requests for production of documents to Highland Capital Management, L.P. ("Request(s)"). The Requests are made pursuant to the Amended Term Sheet to which the Committee and Highland Capital Management, L.P., have agreed (Dkts. 354, 354-1) (the "Final Term Sheet") and which the Court has entered through an Order (Dkt. 339). Moreover, because this is the fourth formal request for production, preceded by three prior formal requests as well as informal discussion among the parties that have not been fulfilled, and the Court has requested that the Committee file certain adversary proceedings within 90 days of its order dated January 9, 2020, any Documents or Communications responsive to these Requests should be included in the production subject to the *Unsecured Creditors' Motion to Compel Production of the Debtor*, filed on July 8, 2020.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1

## DEFINITIONS

1. "Atlas IDF GP" means Atlas IDF GP, LLC, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

2. "Atlas IDF, LP" means Atlas IDF, LP and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

3. "Beacon Mountain" means Beacon Mountain, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

4. "Charitable DAF Fund" means Charitable DAF Fund, LP, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5. "Charitable DAF GP" means Charitable DAF GP, LLC, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents,

2

advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

6. "Charitable DAF HoldCo" means Charitable DAF HoldCo, Ltd., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

7. "Class A Limited Partners" means the limited partners of the Debtor, as identified in Exhibit A of the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (Bates numbers Highland/PEO-003550 – Highland/PEO-003585).

8. "Class B Limited Partnership Interests" means the partnership interests held by Class B Limited Partners, as identified in Exhibit A of the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (Bates numbers Highland/PEO-003550 – Highland/PEO-003585).

9. "CLO HoldCo" means CLO HoldCo, Ltd. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

10. "CLO HoldCo Transaction" means a series of transactions executed on December 28, 2016, in which the following transfers occurred, upon information and belief:

    a. The transfer of approximately a 97.6835% interest in a $24 million promissory note with Dugaboy (the "Dugaboy Note") from Get Good to the Debtor, and the transfer of the Transferred Interests (defined below) from the Debtor to Get Good, pursuant

3

to the Purchase and Sale Agreement (Bates numbers Highland/PEO-032722 – Highland/PEO-032737 (the "Purchase and Sale Agreement")) amended by the Amendment to Purchase and Sale Agreement (Bates numbers Highland/PEO-032712 – Highland/PEO-032721 (the "Amended Purchase and Sale Agreement")), or any other Document, Communication, or agreement (the "Debtor/Get Good Transfer");

b.  The transfer of the Transferred Interests from Get Good to Highland Dallas Foundation, pursuant to the Exercise of Discretion by Trustee with Respect to Distribution to Charitable Beneficiary (Bates numbers Highland/PEO-032707 – Highland/PEO-032711 (the "Exercise of Discretion")) and the Donative Assignment of Interests (Bates numbers Highland/PEO-032698 – Highland/PEO-032702 (the "Donative Assignment of Interests")), or any other Document, Communication, or agreement (the "Get Good/Highland Dallas Foundation Transfer");

c.  The transfer of the Transferred Interests from Highland Dallas Foundation to Charitable DAF HoldCo, pursuant to the Unanimous Written Consent of Directors in Lieu of Meeting (Bates numbers Highland/PEO-032603 – Highland/PEO-032608 (the "Unanimous Consent")), or any other Document, Communication, or agreement (the "Highland Dallas Foundation/Charitable DAF Transfer"); and

d.  The transfer of the Transferred Interests from Charitable DAF HoldCo to Charitable DAF Fund, and then to CLO HoldCo, pursuant to the Omnibus Assignment Agreement (Bates numbers Highland/PEO-032686 – Highland/PEO-032692 (the "Omnibus Assignment Agreement")) and by written resolutions executed by

4

Charitable DAF HoldCo, Charitable DAF GP, and CLO HoldCo (Bates numbers respectively Highland/PEO-032822 – Highland/PEO-032827, Highland/PEO-032810 – Highland/PEO-032815, and Highland/PEO-032816 – Highland/PEO-032821 (collectively, the "Written Resolutions")), or any other Document, Communication, or agreement (the "Charitable DAF/CLO HoldCo Transfer").

11.     "Communication(s)" means any written or oral communication of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or voice messages, audio recordings, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic and telex communications or transmittals of Documents, whether such communication was sent, received, or created, in final or in draft, and all Documents concerning or memorializing such written or oral communications.

12.     "Concerning" means consisting of, reflecting, referring to, regarding, related to, involving, evidencing, constituting, or having any legal, logical, evidential, or factual connection with (whether to support or rebut) the subject matter designated in any of these Requests. A request for documents "concerning" a specified subject matter always shall include communications, notes, and memoranda (whenever prepared) relating to the subject matter of the request.

13.     "Contribution Agreement" means the Contribution Agreement between the Debtor and Hunter Mountain Investment Trust, dated as of December 21, 2015.

14.     "Crown Global" means Crown Global Insurance Company and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

5

15.     "Debtor," "You," and "Your" means the Highland Capital Management, L.P., the Debtor in the above-captioned case, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

16.     "Document(s)" means, without limitation, the original and all copies, prior drafts, and translation of information in any written, typed, printed, recorded or graphic form, however produced or reproduced, of any type or description, regardless of origin or location, including without limitation, all Electronically Stored Information, Communications, records, tables, charts, analyses, graphs, schedules, reports, memoranda, notes, lists, calendar and diary entries, letters (sent or received), contracts, statements, bills, checks, vouchers, video tapes, photographs, tape recordings, other mechanical records, transcripts or logs of any such recordings, and all other data compilations from which information can be obtained.  The term "Document(s)" is intended to be at least as broad in meaning and scope as the usage of the term in or pursuant to the Federal Rules of Civil Procedure.

17.     "Dondero" means James Dondero and all entities under his control, including without limitation, Dugaboy, Get Good, and the Get Better Trust.

18.     "Dugaboy" means Dugaboy Investment Trust, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, beneficiaries, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

6

19. "Dynamic Income CLO HoldCo Side Letter" means the letter agreement dated January 10, 2017 (Bates numbers Highland/PEO-032703 – Highland/PEO-032705).

20. "Dynamic Income Fund" means Highland Dynamic Income Fund, L.P., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

21. "Eames Ltd." means Eames Ltd., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

22. "Empower Dallas Foundation" means Empower Dallas Foundation, created in February 2015 as a tier one supporting organization to the Dallas Foundation.

23. "Get Better Trust" means The Get Better Trust, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, beneficiaries and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

24. "Get Good" means The Get Good Nonexempt Trust, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, beneficiaries, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

7

25.     "<u>Guaranty Agreements</u>" means the various guaranty agreements executed by Rand PE Fund I, L.P. as part of the Hunter Mountain Transaction, including without limitation, the guaranty agreement between Hunter Mountain Trust, the Debtor, and Rand PE Fund I, L.P. dated December 21, 2015; the guaranty agreement between Hunter Mountain Trust, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and Rand PE Fund I, L.P. dated  December 24, 2015; the guaranty agreement between Hunter Mountain Trust, The Mark and Pamela Okada Family Trust – Exempt Trust #2, and Rand PE Fund I, L.P. dated December 24, 2015; the guaranty agreement between Hunter Mountain Trust, Mark K. Okada, and Rand PE Fund I, L.P. dated December 24, 2015; and the guaranty agreement between Hunter Mountain Trust, The Dugaboy Investment Trust, and Rand PE Fund I, L.P. dated December 24, 2015.

26.     "<u>Highland Capital Loan Fund</u>" means Highland Capital Loan Fund, L.P., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

27.     "<u>Highland Capital Loan Fund GP</u>" means Highland Capital Loan Fund GP, LLC, any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

28.     "<u>Highland Dallas Foundation</u>" means Highland Dallas Foundation, Inc., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees, representatives, agents,

8

advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

29. "Highland Entity" and "Highland Entities" means the Debtor and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

30. "Highland Kansas City Foundation" means the Highland Kansas City Foundation, Inc. listed as a "Supporting Organization" in the DAF/CLO HoldCo Structure Chart (Bates number Highland/PEO-002398).

31. "Highland Loan Fund" means Highland Loan Fund, Ltd., a party signatory to Dynamic Income CLO HoldCo Side Letter, of which Trey Parker was a director in January 2017 and signed on behalf of the Highland Loan Fund in the Dynamic Income CLO HoldCo Side Letter.

32. "Highland Loan Master Fund" means Highland Loan Master Fund, L.P., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, owners, partners, principals, shareholders, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

33. "Highland Santa Barbara Foundation" means Highland Santa Barbara, Inc. listed as a "Supporting Organization" in the DAF/CLO HoldCo Structure Chart (Bates number Highland/PEO-002398).

34.    "Honis" means John Honis, who as of December 2015 was the sole member of Atlas IDF GP, LLC, and the sole member of Rand PE Fund Management, LLC, among other entities with which he is involved.

35.    "Hunter Mountain Trust" means Hunter Mountain Investment Trust and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, trustees, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, beneficiaries, and all other persons and entities acting or purporting to act on behalf of any of the foregoing, including Crown Global Insurance.

36.    "Hunter Mountain Transaction" means the transactions between Debtor and Hunter Mountain Trust on December 21, 2015, whereby Hunter Mountain Trust entered into a Contribution Agreement with Debtor to receive 55% of the limited partnership interest in Debtor, and on December 24, 2015, whereby Hunter Mountain Trust received an additional 44.5% limited partnership interest in the Debtor by cash purchase and notes payable to the Limited Partners.

37.    "Identify" means to state, to the extent known (or, if not know, to so state,) the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s).

38.    "Jalonick" means Mary Jalonick, who as of December 2016 was a director of Highland Dallas Foundation, among other entities with which she is and/or was involved.

39.    "Limited Partner" or "Limited Partners" means the limited partners in the Debtor prior to the Hunter Mountain Transaction, including Mark Okada, The Mark and Pamela Okada Family Trust  - Exempt Trust #1 ("Okada Family Trust #1"), The Mark and Pamela Okada Family Trust – Exempt Trust # 2 ("Okada Family Trust #2"), and Dugaboy.

10

40. "<u>Multi Strat</u>" means Highland Multi Strategy Credit Fund, L.P., any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

41. "<u>Okada</u>" means Mark Okada and any entities under his control, including without limitation, Okada Family Trust #1 and Okada Family Trust #2.

42. "<u>Okada Family Foundation</u>" means the Okada Family Foundation, Inc., created in February 2015 as a tier one supporting organization to the Dallas Foundation.

43. "<u>Petition Date</u>" means October 16, 2019.

44. "<u>Rand Advisors</u>" means Rand Advisors, LLC, of which John Honis is the investment manager, and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

45. "<u>Rand PE Fund I, L.P.</u>" means Rand PE Fund, I, L.P. and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all partners, officers, directors, shareholders, members, employees, representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

46. "<u>Rand PE Fund Management, LLC</u>" means Rand PE Fund Management, LLC and any direct or indirect predecessors or successors in interest, parents, subsidiaries or affiliates of any of them, and any and all officers, directors, shareholders, members, employees,

11

representatives, agents, advisors, attorneys, and all other persons and entities acting or purporting to act on behalf of any of the foregoing.

47. "Relating to" means consisting of, reflecting, referring to, regarding, concerning, involving, evidencing, constituting, or having any legal, logical, evidential, or factual contention with (whether to support or to rebut) the subject matter designated in any of these Requests. A request for documents "relating to" a specified subject matter always shall include communications, notes and memoranda (whenever prepared) relating to the subject matter of the request.

48. "Scott" means Grant James Scott, who as of December 2016 was the trustee of Get Good, a director of CLO HoldCo, the managing member of Charitable DAF GP, and a director of Charitable DAF HoldCo, among other entities with which he is and/or was involved.

49. "Transferred Interests" means the $2,032,183.24 (based on 11/30/16 NAV) Series A Interests of Highland Capital Loan Fund (the "Series A Interests"), any ownership and/or participation interest in the call options of American Airlines Group, Inc. (the "American Airlines Call Options"), the participation interests in certain shares of Highland Crusader Fund, L.P. and Highland Crusader Fund II, Ltd. and tracking interests in certain participating shares of Highland Crusader Fund L.P. (the "Participation and Tracking Interests"), as defined in the Purchase and Sale Agreement and Amended Purchase and Sale Agreement, transferred on December 28, 2016 from the Debtor to Get Good, to Highland Dallas Foundation, to Charitable DAF HoldCo, to Charitable DAF Fund, and to CLO HoldCo.

## INSTRUCTIONS

1. The Committee requests production of the following documents and information pursuant to the Final Term Sheet and Document Production Protocol contained therein as Exhibit C.

12

2.      The Committee requests production of the following documents and information on an immediate and rolling basis.  Pursuant to the Final Term Sheet, the Debtor shall search for ESI at the earliest opportunity and, in no event, later than seven days after the date of these Requests.

3.      Unless otherwise indicated, all documents shall be produced for the relevant time period, which shall be the five years before the Petition Date, including any documents having an earlier origin, if in use during the relevant time period.

4.      The obligation to produce documents responsive to these Requests shall be continuing in nature, and a producing party is required promptly to produce any documents requested herein that it locates or obtains after responding to these Requests, up to the conclusion of the above-captioned Chapter 11 Cases.

5.      Pursuant to the Final Term Sheet's Document Production Protocol, the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control to the extent they are responsive to these requests.

6.      You are requested to produce not only those documents in Your physical possession, but also those documents within Your custody and control, including, without limitation, documents in the possession of Your agents, partners, shareholders, members, employees, affiliates, advisors, or consultants and any other person or entity acting on Your behalf.

7.      If You have no documents responsive to a particular Request, or if for some other reason You are unable to produce responsive documents, Your response to that Request should specifically so state.  Accordingly, You should respond to each and every Request herein.  If You have certain documents that are responsive to a Request, but believe that additional documents not

13

now available to You would also be responsive, You should provide the documents You now have and specifically state when the remainder of the documents will be provided.

8. Where an objection is made to any document request, the objection shall state with specificity all grounds for objection.

9. In the event that a requested document has been lost, destroyed, discarded and/or otherwise disposed of; You will identify the document by identifying: (i) its author or preparer; (ii) all persons to whom distributed or shown; (iii) date; (iv) subject matter; (v) attachments or appendices; (vi) date, manner, and reason for destruction or other disposition; (vii) person authorizing destruction or other disposition; (viii) the document request or requests to which the document is responsive.

## DOCUMENTS REQUESTED

1. Any and all Documents or Communications, including without limitation, accounting-level information in Oracle, bank statements, accounting statements, journals, or ledgers documenting transactions, relating to cash transfers into, out of, or on behalf of the Debtor from 2014 to present. For the avoidance of doubt, this Request includes any Chart of Accounts, Receivables and Payables sub-ledgers, Cash Receipts and Disbursements sub-ledgers, Data Dictionary, and Filed Value Lookup Tables providing definitions for coded field values.

2. Any and all spreadsheets or other Documents used and listed in the source field of the general ledger printout previously produced by Debtor.

3. Any and all Vendor Master Files or control files that contain basic information about vendors including address, date added, contact information, and other similar data.

4. Any and all Documents or Communications, including without limitation, accounting-level information in Oracle, bank statements, accounting statements, journals, or ledgers documenting transactions relating to cash transfers into, out of, or on behalf of Hunter

14

Mountain Trust, Beacon Mountain, Rand PE Fund I, L.P., Rand PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC. For the avoidance of doubt, this Request includes any Chart of Accounts, Receivables and Payables sub-ledgers, Cash Receipts and Disbursements sub-ledgers, Data Dictionary, and Filed Value Lookup Tables providing definitions for coded field values.

5. Any and all Documents or Communications relating to the Hunter Mountain Transaction, including without limitation, the following:

    a. any and all Documents or Communications relating to the creation of Hunter Mountain Trust,

    b. any basis or purposes for the Hunter Mountain Transaction,

    c. the valuation of the Debtor's limited partnership interests at the time of the Hunter Mountain Transaction, and

    d. the source of funds used by Hunter Mountain Trust to purchase the Debtor's limited partnership interests as part of the Hunter Mountain Transaction.

6. Any and all Documents or Communications relating to the ownership and management structure of Hunter Mountain Trust, including without limitation, governance documents for Hunter Mountain Trust, Beacon Mountain, Rand PE Fund I, L.P., Rand PE Fund Management, LLC, Atlas IDF, LP, Atlas IDF GP, LLC, and Crown Global.

7. Any and all Documents or Communications relating to the negotiations of the terms of the Hunter Mountain Transaction, including without limitation, the negotiations of the terms of the Contribution Agreement between Hunter Mountain Trust and the Debtor, and the notes payable executed by Hunter Mountain to the Debtor and to the Limited Partners as part of the Hunter Mountain Transaction.

8.      Any and all Documents or Communications relating to the determination of and any basis or purposes for the principal amounts, interest rates, and payment schedules of the notes payable from Hunter Mountain Trust to the Debtor and to the Limited Partners as part of the Hunter Mountain Transaction.

9.      Any and all Documents or Communications relating to the determination and calculation of any distributions (regardless of currency or categorization) from the Debtor to Hunter Mountain Trust, including without limitation, distributions of equity or for tax purposes.

10.     Any and all Documents or Communications relating to any subsequent transfer of the limited partnership interest in the Debtor that Hunter Mountain Trust received as part of the Hunter Mountain Transaction, including without limitation, the negotiations relating to the terms of any said transfers, the value received by Hunter Mountain Trust as part of any said transfer, and any basis or purposes of any said transfer.

11.     Any and all Documents or Communications relating to financial statements, accounting, budgets or audits of the Debtor from 2014 to present, including without limitation,

    a.  any and all audited and unaudited financial statements of the Debtor (including any consolidating financial statements at year-end);

    b.  any representation letters provided to independent auditors;

    c.  any engagement letters with outside accounting firms (including for audit services);

    d.  any lawyers' letters provided to auditors in connection with their audits;

    e.  any workpapers or packages prepared for audits/auditors;

    f.  any projections, forecasts, budgets prepared during this period; and

    g.  any valuations of the Debtor or any of the Debtor's assets, including investments, for the year ended December 31, 2014 through present.

16

12.     Any and all management reports from 2014 to present of the Debtor, including without limitation,

     a.   any asset management reports;

     b.   any cash reports;

     c.   any financing reports;

     d.   any strategic planning reports; and

     e.   any variance reports.

13.     Any and all Documents or Communications relating to the Guaranty Agreements.

14.     Any and all Documents or Communications relating to any participation agreements, subscription agreements, and/or governance documents (e.g., bylaws, articles of incorporation, or any other governance documents), between Crown Global and Atlas IDF, LP, including without limitation, the participation and subscription agreements, insurance policies, private placement memoranda, any basis or purposes for the agreements, and negotiations relating to the terms of the agreements.

15.     Any and all Documents or Communications relating to any subscription agreements, governance documents (e.g., bylaws, articles of incorporation, or any other governance documents), and/or partnership agreements between Atlas IDF, LP and Rand PE Fund I, LP, including without limitation, the subscription and partnership agreements, any basis or purposes for the agreements, and negotiations relating to the terms of the agreements.

16.     Any and all Documents or Communications relating to any subscription agreements, governance documents (e.g., bylaws, articles of incorporation, or any other governance documents), and/or partnership agreements between Rand PE Fund I, LP, and Beacon

17

Mountain, LLC, including without limitation, the subscription and partnership agreements, any basis or purposes for the agreements, and negotiations relating to the terms of the agreements.

17.    Any and all Documents or Communications relating to any subscription agreements, governance documents (e.g., bylaws, articles of incorporation, or any other governance documents), and/or partnership agreements relating to Atlas IDF GP, LLC and Rand PE Fund Management, LLC including without limitation, the subscription and partnership agreements, any basis or purposes for the agreements, and negotiations relating to the terms of the agreements.

18.    Any and all Documents or Communications between Rand Advisors and the Debtor in the Debtor's role as the documented administrator of Rand PE Fund I, L.P.

19.    Any and all Documents or Communications relating to valuation of collateral concerning any debt owed to the Debtor by Hunter Mountain Trust.

20.    Any and all Documents or Communications relating to payments, distributions, investments, transfers, or the remittance of anything of value from the Debtor to Hunter Mountain Trust, any Limited Partner, Beacon Mountain, Rand PE Fund I, L.P., Rand PE Fund Management, LLC, Atlas IDF, LP, Atlas IDF GP, LLC, Crown Global, Honis, Empower Dallas Foundation, or Okada Family Foundation from 2014 to present, including without limitation, the amount of the payments, distributions, or value, the date of the transfers, and any basis or purposes for the transfers.

21.    Any and all Documents or Communications relating to payments, distributions, investments, transfers, or the remittance of anything of value to the Debtor from Hunter Mountain Trust, any Limited Partner, Beacon Mountain, Rand PE Fund I, L.P., Rand PE Fund Management,

18

LLC, Atlas IDF, LP, Atlas IDF GP, LLC, Crown Global, Honis, Empower Dallas Foundation, or Okada Family Foundation from 2014 to present.

22.     Any and all Documents or Communications relating to any position held by or compensation received by Honis in any transactions involving the Debtor, Hunter Mountain Trust, Beacon Mountain, Rand PE Fund I, L.P., Rand PE Fund Management, LLC, Atlas IDF, LP, Atlas IDF GP, LLC, Crown Global, Empower Dallas Foundation, or Okada Family Foundation, including without limitation, Honis's role as the sole member of the Atlas IDF GP, LLC, as sole member of Rand PE Fund Management, LLC, and as administrator of Hunter Mountain Trust.

23.     Any and all Documents or Communications relating to the creation, governance, and funding of Empower Dallas Foundation and Okada Family Foundation, including without limitation, bylaws, articles of incorporation, financial statements, investment management agreements, tax returns and related tax work papers, and any agreements with Crown Global Insurance.

24.     Any and all Documents or Communications relating to any tax treatment, any tax benefits and/or any tax planning process of the Debtor, Dondero, or Okada in connection with the Hunter Mountain Transaction.

25.     Any and all Documents or Communications, including without limitation, internal and external email and memorandum and work papers, addressing the amount of tax distributions made by the Debtor to any of the Limited Partners for tax years 2015 to present.

26.     Any and all Documents or Communications relating to any changes in year-to-date tax distributions for the Debtor's 2015 tax year for the benefit of the Debtor's Class A Limited Partners.

19

27.     Any and all Documents or Communications, including without limitation, internal and external email and memorandum, addressing whether the Debtor experienced a technical termination of the partnership in 2015 under then applicable federal tax law as a result of the Hunter Mountain Transaction.

28.     Any and all Documents or Communications relating to the issuance of Class B Limited Partnership Interests.

29.     Any and all Documents or Communications relating to tax planning for the Debtor from 2011 to present, including without limitation,

   a.   any tax planning memos;

   b.   any engagements with third parties;

   c.   any work papers;

   d.   any tax returns; and

   e.   any engagement letters with outside firms relating to tax services.

30.     Any and all Documents or Communications relating to the CLO HoldCo Transaction, including without limitation, any negotiations of the terms of the CLO HoldCo Transaction, any Communications between or among the Debtor, Get Good, Highland Dallas Foundation, Charitable DAF HoldCo, Charitable DAF Fund, CLO HoldCo, Dondero, Okada, Scott, and Jalonick, and any basis or purposes for the CLO HoldCo Transaction, including without limitation, any Documents or Communications explaining why there were separate transfers, the rationale for each transfer, and any tax considerations for the various transfers.

31.     Any and all Documents or Communications relating to the Debtor/Get Good Transfer, including without limitation, any Documents or Communications relating to the negotiation of the terms of the transfer, valuation of the Series A Interests, valuation of the

20

American Airlines Call Options, valuation of the Participation and Tracking Interests, and any basis or purpose for the transfer.

32.     Any and all Documents or Communications relating to the Purchase and Sale Agreement between the Debtor and Get Good, including without limitation, certain documents discussed therein the Purchase and Sale Agreement such as the Joint Plan of Distribution of the Crusader Funds, the Scheme of Arrangement between the Offshore Crusader Fund and its Scheme Creditors, and any Documents or Communications relating to Eames Ltd.'s ownership of the Participation and Tracking Interests, as referenced and defined in the Purchase and Sale Agreement.

33.     Any and all Documents or Communications relating to the Dugaboy Note, including without limitation, the original Dugaboy Note, dated June 29, 2001, any amendments to the Dugaboy Note, any negotiation of the Dugaboy Note terms, original business purpose and value received for the original Dugaboy Note, any basis for paydowns on the Dugaboy Note any basis or purposes for the transfer of the Dugaboy Note from Get Good to the Debtor, any Documents or Communications explaining the basis or purposes of transferring only a portion (approximately 97.6835%) of the Dugaboy Note to the Debtor, any underwriting or investigation of the Dugaboy Note performed by the Debtor or Get Good, and any Documents or Communications evidencing Dugaboy's ability to pay the Dugaboy Note.

34.     Any and all Documents or Communications relating to the creation or ownership and management structure of Highland Capital Loan Fund, including without limitation, the Limited Partnership Agreement of Highland Capital Loan Fund, as referenced in the Purchase and Sale Agreement, any amended Limited Partnership Agreement of Highland Capital Loan Fund,

21

any revised Limited Partnership Agreement executed after Highland Capital Loan Fund changed its name to Dynamic Income Fund, and any other governance documents.

35.     Any and all Documents or Communications relating to the creation or ownership and management structure of Get Good, including without limitation, The Get Good Nonexempt Trust Agreement, dated June 29, 2001, as referenced in the Exercise of Discretion, and any other governance documents.

36.     Any and all Documents or Communications relating to the Get Good/Highland Dallas Foundation Transfer, including without limitation, any and all Documents or Communications relating to the Exercise of Discretion, the Donative Assignment of Interests, negotiations of the terms of the transfer, any basis or purposes for the transfer, any claims of a charitable deduction for tax purposes or otherwise, and the Amended Purchase and Sale Agreement.

37.     Any and all Documents or Communications relating to the Highland Dallas Foundation/Charitable DAF Transfer, including without limitation, any and all Documents or Communications relating to the Unanimous Consent, any negotiations of the terms of the transfer, and any basis or purpose for the transfer.

38.     Any and all Documents or Communications relating to the Charitable DAF/CLO HoldCo Transfer, including without limitation, any and all Documents or Communications relating to the Omnibus Assignment Agreement, the Written Resolutions, any basis or purposes for the transfer, and any negotiations of the terms of the transfers, including without limitation, the decision to bind the parties by the terms of the Multi Strat Governing Documents, as defined and referenced in the Omnibus Assignment Agreement.

22

39.     Any and all Documents or Communications relating to the Dynamic Income CLO HoldCo Side Letter, including without limitation, any negotiations of the terms of the letter, any basis or purposes for the letter, and Highland Capital Loan Fund's Confidential Private Placement Memorandum, as defined and referenced in the Dynamic Income CLO HoldCo Side Letter.

40.     Any and all Documents or Communications relating to the approximately $42.3 million received by Highland Dallas Foundation in 2016 and/or the approximately $5.1 million received by Highland Dallas Foundation in 2018.

41.     Any and all Documents or Communications relating to the creation, ownership, management structure, or governing documents of Dugaboy; Highland Dallas Foundation; Charitable DAF HoldCo; Charitable DAF Fund; CLO HoldCo; Dynamic Income Fund; Highland Loan Fund, Ltd.; Highland Capital Loan Fund GP; Highland Loan Master Fund; Eames, Ltd.; and Multi Strat.

42.     Any and all Documents or Communications relating to any transfers between or among the Debtor, Get Good, Highland Dallas Foundation, Charitable DAF HoldCo, Charitable DAF Fund, and CLO HoldCo since the inception of Charitable DAF GP, Charitable DAF HoldCo, Charitable DAF Fund, and CLO HoldCo, including without limitation, any agreements or related documents pertaining to the separately managed account that HCMLP managed on behalf of the Charitable DAF Fund LP.

43.     Any and all Documents or Communications relating to any investments or ownership interests that CLO HoldCo has made in any funds or business entities relating to the Debtor, Dondero, or any related parties, including without limitation, a complete list of transactions, financial statements, communications to control persons, supporting foundations or any other relevant stakeholder, books and records (including general ledger details).

23

44.        Any and all Documents or Communications relating to financial reporting and financial statements for Get Good, Dugaboy, and the Get Better Trust.

45.        Any and all Documents or Communications relating to investment management agreements between the Highland Dallas Foundation, the Highland Kansas City Foundation, and/or the Highland Santa Barbara Foundation, and the Charitable DAF Fund, Charitable DAF GP, and/or Charitable DAF HoldCo.

50.        Any and all Documents or Communications relating to the creation, ownership, management structure, or governing documents of all entities connected to the DAF/CLO Holdco Structure (Bates number Highland/PEO-002398).

51.        Any and all Documents or Communications relating to payments, distributions, investments, transfers, or the remittance of anything of value to, from or between the Debtor, Hunter Mountain Trust, any Limited Partner, Beacon Mountain, Rand PE Fund I, L.P., Rand PE Fund Management, LLC, Atlas IDF, LP, Atlas IDF GP, LLC, Crown Global, Honis, Empower Dallas Foundation, Okada Family Foundation, and any of the entities connected to the DAF/CLO Holdco Structure (Bates number Highland/PEO-002398) since the inception of Charitable DAF GP, Charitable DAF HoldCo, Charitable DAF Fund, and CLO HoldCo.

Dated: July 8, 2020                          Respectfully submitted,

                                             /s/ Mustafa Abdul-Jabbar

24

# EXHIBIT 35

Docket #0808 Date Filed: 07/08/2020

SIDLEY AUSTIN LLP
Penny P. Reid
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Bojan Guzina (admitted pro hac vice)
Matthew A. Clemente (admitted pro hac vice)
Dennis M. Twomey (admitted pro hac vice)
Alyssa Russell (admitted pro hac vice)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for the Official Committee of Unsecured Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |
| | ) | |
| | ) | |

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## EMERGENCY MOTION TO COMPEL PRODUCTION BY THE DEBTOR

---

[1]   The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054200708000000000001

1.      Pursuant to Rule 37 of the Federal Rules of Civil Procedure, made applicable by
Rules 7037 and 9014 of the Federal Rules of Bankruptcy Procedure, and 11 U.S.C. § 105(a), the
Official Committee of Unsecured Creditors (the "Committee") in the above-captioned bankruptcy
case moves to compel production of certain electronic information by Highland Capital
Management, L.P., the debtor and debtor-in-possession (the "Debtor").

2.      Pursuant to the Final Term Sheet,[2] attached as Exhibit A to the *Notice of Final Term
Sheet* [Dkt. No. 354-1], outlining the principal terms of a proposed settlement between the Debtor
and the Committee, the Committee has sought discovery related to defined Estate Claims and other
potential claims against third parties for the benefit of the Debtor's estate.  For approximately eight
months, the Committee has attempted to work cooperatively with Debtor to obtain documents and
communications needed to investigate those claims, with the understanding that a turbulent market
and pandemic have presented unique challenges.  Despite the Committee's efforts, the Debtor has
not yet provided the Committee with the electronically stored information ("ESI") it has requested.

3.      Debtor's failure to produce email communications or other ESI has significantly
hindered the Committee's ability properly to investigate the Estate Claims that it has explicit
standing to investigate and pursue on behalf of the Debtor.  In consideration of repeated failed
negotiations, time constraints,[3] and a depletion of the Debtor's estate resources that is bound to
continue without court intervention, the Committee moves to compel production of the Debtor's

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Final Term Sheet.

[3] On June 30, 2020, this Court held a hearing related to CLO Holdco Ltd.'s ("CLO Holdco") motion to release
certain funds held in the court registry.  The Court held that the Committee must submit any complaint against CLO
Holdco within 90 days of that ruling.  Without access to the Debtor's documents, the Committee cannot properly
investigate and bring any claims against CLO Holdco.

<u>**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' EMERGENCY MOTION TO COMPEL**</u>      2

documents and communications of nine custodians pursuant to the protocol proposed by the Committee to the Debtor on June 25, 2020 (the "Proposed Protocol").[4]

## ADDITIONAL BACKGROUND

4.        On January 14, 2020, the Debtor and the Committee entered into the Final Term Sheet, which explicitly granted the Committee standing to pursue the Estate Claims, defined as "any and all estate claims and causes of actions against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities,[5] including promissory notes held by any of the foregoing."  (Dkt. 354-1, at 4.)  The parties also agreed that the Committee would receive any privileged documents or communications that relate to the Estate Claims so that the Committee could bring those claims.  In short, the Committee stands in Debtors' shoes with respect to the Estate Claims.

5.        The Final Term Sheet deferred any disputes relating to documents' relevance or with regard to any attorney–client protection unrelated to the Estate Claims.  (*See* Dkt. 354-1, at 48 ("Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.").)

---

[4] The Proposed Protocol is fully defined *infra*, at Paragraph 10.

[5] The Final Term Sheet defines "Related Entities," as, collectively, "(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis . . . has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis . . . ; (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative . . . of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, . . .; and (viii) to the extent not included in [the above], any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing")." (Dkt. 354-1, at 52.)  The Related Entities Listing lists thousands of entities related to the Debtor.  CLO Holdco in a shareholder and limited partner of various entities on the Related Entities Listing.

6.     Shortly after the Final Term Sheet was completed and entered by the Court, the Committee began requesting documents and communications from the Debtor necessary to investigate the Estate Claims.[6]  In particular, the Committee has spent a considerable amount of time attempting to obtain any production of emails, chats, texts, or other ESI or communications from the Debtor.  In November 2019, the Committee further provided the Debtor with search terms to run across various platforms, and provided an updated search term list on February 3, 2020, in an attempt to jump-start at least some production (the "<u>Search Term Requests</u>").  To date, the Committee has not received any documents responsive to the Search Term Requests.

7.     Since November 2019, the Committee has attempted to work cooperatively with the Debtor to obtain communications that are necessary to investigate the Estate Claims.  Indeed, on November 10, 2019, February 3, 2020, and February 24, 2020, the Committee served the Debtor with Requests for Production of Documents, including categories of documents related to certain Estate Claims.  Unfortunately, despite the considerable time that has gone by and the number of communications the parties have had on the topic, no actual production of emails, chats, or other ESI has occurred.  After months of discussion and negotiation, on June 2, 2020, the Debtor provided the Committee with a proposed review protocol for the Search Term Requests contemplating unduly stringent relevance and privilege reviews.

---

[6] On February 3, 2020, the Committee served the Debtor with the *Official Committee of Unsecured Creditors' Second Request for Production of Documents*, requesting documents related to various promissory notes held by and among the Debtor and Related Entities.  On February 24, 2020, the Committee served the Debtor with the *Official Committee of Unsecured Creditors' Third Request for Production of Documents*, requesting certain ESI production related to the Estate Claims.  The Committee has only received partial responses to the February 3 request and has not received any responses to the February 24 request, despite representations from the Debtor's counsel that production related to the February 24 requests would begin the week of April 6, 2020.

<u>OFFICIAL COMMITTEE OF UNSECURED CREDITORS' EMERGENCY MOTION TO COMPEL</u>     **4**

8.      Under the Debtor's protocol, the Debtor would use continuous machine learning only on documents responsive to a list of specified search terms,[7] and then have contract attorneys, previously unfamiliar with the Debtor, this bankruptcy case, or the thousands of Related Entities, review those documents for "relevance."  Then, if a document were determined to be relevant, it would be subject to a privilege review.

9.      The Committee strongly believes that this type of relevance and privilege review significantly increases the likelihood that documents related to the Estate Claims will not be produced because relevance is not readily apparent from the face of the document, especially in light of the Debtor's deliberately convoluted affiliate structure and the complexity of its transactions.  Moreover, it adds unnecessary time and expense to the review process by doubling the review of "relevant documents"—once by the Debtor and then by the Committee—and requires iterative discovery requests as the nature and focuses of the investigation shift with time.

10.     Given its concerns about the risks of stonewalling and increased expense, on June 25, 2020, the Committee spoke with Debtor's counsel and also sent the Debtor the following Proposed Protocol to facilitate the Committee's investigation of the Estate Claims and preserve estate resources:

      a.      all custodial data for nine identified custodians[8] would be provided to the e-discovery vendor for inclusion in its repository workspace;

      b.      a set of mutually agreeable privilege terms (those likely to identify attorney-client privileged communications or attorney work product) would be run across that workspace, with any

---

[7] Ordinarily, continuous machine learning is applied to *all* custodial files such that anything the program determines is relevant for review would be queued for review even if it did not include a search term.

[8] These nine custodians are Patrick Boyce, Jim Dondero, Scott Ellington, David Klos, Isaac Leventon, Mark Okada, Trey Parker, Tom Surgent, and Frank Waterhouse.  For avoidance of doubt, the Committee is requesting all ESI for the nine custodians, including without limitation, email, chat, text, Bloomberg messaging, or any other ESI attributable to the custodians.

disagreements regarding those terms to be determined by a special master or other third-party neutral;[9]

c.    any document not including one of the agreed privilege terms would be produced to the Committee for review, subject to the Agreed Protective Order's provisions on "No Waiver" and "Claw Back of Inadvertently Produced Protected Materials" (Dkt. 382), thus protecting the Debtor from any inadvertent production or subject-matter waiver; and

d.    all documents including any such privilege term would then be isolated for review by Debtor's contract attorneys.

(i)    Non-privileged documents and privileged documents related to the Estate Claims would be produced to the Committee on a rolling basis.

(ii)    Documents that are privileged and unrelated to the Estate Claims would be listed on a privilege log so that the Committee can probe those claims of privilege as needed.[10]

11.    The Debtor did not respond to the Committee's proposal. On July 1, 2020, the Committee again requested a response, informing the Debtor it would file this motion to compel to seek the Court's assistance if the parties could not agree on review protocols in a timely fashion. On July 2, 2020, the Debtor informed the Committee that it would respond shortly and requested that the Committee not file a motion to compel until the parties could confer. On July 3, 2020, the Debtor responded with a proposal that would still limit any production of documents to those containing search terms. After discussion that day, the Debtor notified the Committee that it would consider production of all ESI for the agreed custodians and let the Committee know of its decision. On July 7, 2020, having heard nothing with regard to the open issues, the Committee once again let the Debtor know that time was of the essence and that it had no choice but to seek relief from the Court. Late on July 7, 2020, after repeated requests and indications that the

---

[9] This provision is consistent with the Final Term Sheet. (Dkt. 354-1, at 4).

[10] Pursuant to the Final Term Sheet, any disputes regarding withheld documents will be determined by a special master or other third-party neutral agreed to by the parties. (Dkt. 354-1, at 4).

Committee would seek relief from the Court, Debtor circulated a draft motion purporting to address amicably the issues raised in this Motion. Instead, that draft motion merely retained the so-called "relevance" review that the Committee believes will unnecessarily tax the remaining assets of the estate.

12.     Time is running out. The Committee cannot keep waiting for the Debtor to provide it with the data that is required for the Committee to do its work. As a result, the Committee has brought this issue to the Court for resolution. The Committee strongly believes the Proposed Protocol is the most fair, efficient, and cost effective proposal, and allows the Committee the ability properly to investigate and pursue Estate Claims. Accordingly, the Committee respectfully requests that this Court compel the Debtor to produce documents pursuant to the Committee's Proposed Protocol.

## **ARGUMENT AND AUTHORITIES**

13.     The Committee respectfully submits that sufficient cause exists for the Court to compel the Debtor to produce documents pursuant to the Proposed Protocol so that the Committee can properly investigate potential Estate Claims. The Debtor previously agreed that the Estate Claims will be prosecuted by the Committee and that the Committee is entitled even to privileged documents related to those Estate Claims. The range of the Committee's investigation is necessarily broad in light of Debtor's structure and operations, as is the scope of potential Estate Claims that may be brought on Debtor's behalf. The Debtor's continued arguments regarding "relevance" are a red herring—the Committee stands in the Debtor's shoes with regard to the Estate Claims and is best able to determine whether a document is relevant to its investigation

given that it has no incentive to obfuscate or hide evidence of possible wrongdoing by current or former employees of the Debtor.[11]

## I.     The Court Should Compel Discovery Because the Documents Are Relevant to the Estate Claims Investigation.

14.     Rule 37, made applicable by Bankruptcy Rule 7037, allows "[a] party seeking discovery [to] move for an order compelling . . . production. . . . [if] a party fails to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a)(3)(B). "A party resisting discovery is swimming against a strong upstream policy current. The policy underlying the discovery rules encourages *more* rather than less discovery, and discourages obstructionist tactics." *In re Tex. Bumper Exch., Inc.*, 333 B.R. 135, 139–40 (Bankr. W.D. Tex. 2005) (emphasis in original). Rule 7037 ensures that this policy is enforced. *Id.* at 140.

15.     Courts have "broad discretion in discovery matters." *Hamilton v. First Am. Title Ins. Co.*, No. 3:07-CV-1442-G, 2010 WL 791421, at *4 (N.D. Tex. Mar. 8, 2010) (quoting *Winfun v. Daimler Chrysler Corp.*, 255 F. App'x 772, 773 (5th Cir. 2007) (per curiam). Rule 26 of the Federal Rules of Civil Procedure, applicable through Bankruptcy Rule 7026, facilitates broad-ranging discovery, allowing discovery of any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the" investigation. Fed. R. Civ. P. 26(b)(1). Relevance "is broadly construed, especially in the context of discovery requests, which should be considered relevant if there is *any possibility* that the information sought may be relevant to the claim or defense." *In re Adkins Supply, Inc.*, 555 B.R. 579, 589 (Bankr. N.D. Tex. 2016) (emphasis in original). "Information sought only fails the relevance test if it is clear that it could have no possible bearing on the claim." *Id.* Indeed, "[i]nformation within this scope of discovery need not

---

[11] This is specifically a matter of concern given that one of the ESI custodians has himself been heavily involved in the discussions regarding the terms of the ESI production.

be admissible in evidence to be discoverable," and the party resisting discovery bears the burden of showing that the discovery sought is irrelevant or non-proportional. *See Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 504–06 (N.D. Tex. 2016).

16.     The documents sought from the nine custodians proposed under the Proposed Protocol are relevant to the Committee's investigation and potential Estate Claims. This investigation encompasses, among other claims and causes of action, potential fraudulent transfers, preferential transfers, breaches of fiduciary duties, usurpation of corporate opportunities, misappropriation of assets, and abuses of the corporate form by and among insiders—which include certain of the proposed custodians—and Related Entities. Their documents are therefore relevant to the subject matter of the Estate Claims. Fed. R. Civ. P. 26(b)(1).

17.     Moreover, the Committee is not seeking privileged documents to which it is not already entitled under the Final Term Sheet. The Final Term Sheet explicitly grants the Committee access to privileged documents and communications in the Debtor's possession, custody, or control specifically related to the investigation and pursuit of the Estate Claims. (Dkt. 354-1, at 4.) The Committee's Proposed Protocol allows the Debtor to withhold documents responsive to agreed-upon privilege terms and review those presumptively privileged documents before turning them over to the Committee. The Proposed Protocol requires the Debtor produce only those documents that are non-privileged, or privileged and related to the Estate Claims, and provides that a third-party neutral will resolve any privilege disputes as originally agreed upon under the Final Term Sheet. There is therefore no issue regarding privilege waiver.[12]

---

[12] The Proposed Protocol also recognizes the Agreed Protective Order's "No Waiver" and "Claw Back of Inadvertently Produced Protected Materials" (Dkt. 382) provisions, which provide additional privilege protections to the Debtor.

## II.    The Proposed Protocol is Necessary to the Committee's Investigation of the Estate Claims.

18.    Further, section 105(a) of the Bankruptcy Code empowers this Court to "issue an order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

19.    Implementation of the Proposed Protocol is necessary for the Committee to fulfil its statutory mandates under section 1103(c) of the Bankruptcy Code.  As fiduciary for all unsecured creditors, the Committee is granted broad statutory powers to, among other things, "investigate the acts, conduct, assets, and liabilities and financial condition of the debtor, . . . and any other matters relevant to the case or to the formulation of a plan." *Id.* at § 1103(c)(2); *see also* Dkt. 354-1, at 4 (granting the Committee standing to investigate and pursue Estate Claims on behalf of the Debtor).  Ordering the Debtor to turn over all documents of the nine custodians, subject to a limited privilege review, is necessary for the Committee properly to carry out this mandate.

20.    To date, the Debtor has not produced any documents or communications in response to the February 24 requests or the Search Term Requests, despite extended negotiations to facilitate such productions.  This has impeded the Committee's ability to exercise its duty to investigate the acts and conduct of the Debtor.  An order compelling production is therefore necessary for the Committee sufficiently to carry out its Estate Claim investigation.

21.    The Proposed Protocol is the most cost effective and efficient way to obtain documents relevant to the Estate Claims, avoiding the cost, delay, and risk of false negatives associated with contract attorneys' relevance review.  Rather than use estate resources to conduct a double relevance review proposed by the Debtor—reviewed once by the Debtor and again by the Committee—the Committee's Proposed Protocol calls for only one round of privilege review and

the targeted searches for relevant documents that the Committee will conduct as it carries out its investigation. The Proposed Protocol also obviates the need for additional document requests and repeated negotiations with the Debtor about additional collection and review for the specified custodians. The Committee's investigation will necessarily evolve, and the Proposed Protocol would allow the Committee to run search terms on data already collected and contained within the e-discovery vendor's repository with minimal additional cost. It further ensures that all documents will be preserved in the interim.

22.    An order by this Court implementing the Proposed Protocol is necessary to "preserve a right elsewhere provided in the [Bankruptcy] Code." *See In re Royce Homes, LP,* No. 09-32467-H4-7, 2009 WL 3052439, at *4–5 (Bankr. S.D. Tex. Sept. 22, 2009) (compelling a debtor's production under 11 U.S.C. § 105(a) to allow the trustee to perform its duties under the Bankruptcy Code). The Proposed Protocol will allow the Committee access to documents and communications relevant to the Estate Claims without fear that the Debtor will withhold relevant documents pursuant to an unduly broad relevance review. Considering the circumstances of this case and the history of the Debtor, the Proposed Protocol is necessary for the Committee to fulfill its duty to investigate the Estate Claims.

## **CONCLUSION**

23.    For the reasons set forth above, the Committee respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A,** (a) compelling the Debtor to produce documents under the Proposed Protocol, and (b) granting such other and further relief as the Court may deem just and proper.

*[Signature Page Follows]*

Dated: July 8, 2020  
        Dallas, Texas

SIDLEY AUSTIN LLP  
_/s/ Paige Holden Montgomery_  
Paige Holden Montgomery  
Penny P. Reid  
Juliana L. Hoffman  
2021 McKinney Avenue  
Suite 2000  
Dallas, Texas 74201  
Telephone: (214) 981-3300  
Facsimile: (214) 981-3400

-and-

Bojan Guzina (admitted _pro hac vice_)  
Matthew A. Clemente (admitted _pro hac vice_)  
Dennis M. Twomey (admitted _pro hac vice_)  
Alyssa Russell (admitted _pro hac vice_)  
One South Dearborn Street  
Chicago, Illinois 60603  
Telephone:  (312) 853-7000  
Facsimile:  (312) 853-7036

COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**Exhibit A**

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., [1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## ORDER COMPELLING THE DEBTOR TO PRODUCE DOCUMENTS

Upon the consideration of the *Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor* (the "Motion), it is hereby **ORDERED** that:

1.   The Motion is GRANTED as set forth herein.

2.   The Debtor must produce all ESI, without limitation, for the custodians Patrick Boyce, Jim Dondero, Scott Ellington, David Klos, Isaac Leventon, Mark Okada, Trey Parker, Tom Surgent, and Frank Waterhouse (collectively, the "Custodian Data") to the e-discovery vendor in this matter no later than seven days after the entry of this Order.

---

[1]   The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

3.     The Parties must meet and confer regarding a set of mutually agreeable privilege terms within 7 days of the date of this Order.  Any disagreements regarding those terms will be determined by a special master or other third-party neutral within 21 days of the date of this order;

4.     Within 7 days of the finalization of the privilege terms, any Custodian Data not including one of the agreed privilege terms will be produced to the Committee for review, subject to the Agreed Protective Order's provisions on "No Waiver" and "Claw Back of Inadvertently Produced Protected Materials" (Dkt. 382);

5.     Any Custodian Data including any such privilege term will be reviewed by Debtor's contract attorneys.

   a.     Non-privileged documents and privileged documents related to the Estate Claims will be produced to the Committee on a rolling basis.

   b.     Documents that are privileged and unrelated to the Estate Claims will be listed on a privilege log provided to the committee within 45 days of this Order.

6.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

<p style="text-align:center"># # # End of Order # # #</p>

## <u>CERTIFICATION OF GOOD FAITH CONFERENCE</u>

The undersigned counsel to the Committee hereby certifies that the Committee's counsel has attempted in good faith to confer with the Debtor's counsel in an effort to resolve the dispute without court action.

<u>/s/ *Paige Holden Montgomery*</u>
Paige Holden Montgomery
SIDLEY AUSTIN LLP

*Counsel for the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I, Paige Holden Montgomery, hereby certify that on the 8th day of July 2020, a true and correct copy of the foregoing *Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor* was sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case, and by first-class mail to the Debtor, attention James Seery.

*/s/ Paige Holden Montgomery*
Paige Holden Montgomery
SIDLEY AUSTIN LLP

*Counsel for the Official Committee*
*of Unsecured Creditors*

# EXHIBIT 36

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## DEBTOR'S MOTION FOR ENTRY OF (I) A PROTECTIVE ORDER, OR, IN THE ALTERNATIVE, (II) AN ORDER DIRECTING THE DEBTOR TO COMPLY WITH CERTAIN DISCOVERY DEMANDS TENDERED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO FEDERAL RULES OF BANKRUPTCY PROCEDURE 7026 AND 7034

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200709000000000001

Highland Capital Management, L.P. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Case"), hereby moves this Court (the "Motion"), pursuant to Federal Rules of Civil Procedure 26(b), 26(c), and 34, made applicable herein pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034, the for the entry of (I) a protective order, or, in the alternative (II) an order directing the Debtor to comply with certain of the discovery demands tendered by the Official Committee of Unsecured Creditors (the "Committee").  In support of the Motion, the Debtor respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.    On July 8, 2020, the Committee filed its *Emergency Motion to Compel Production by the Debtor.*  Docket No. 808.  Despite the adversarial nature of this case, this was the *first* discovery motion filed against the Debtor, and it is regrettable.  There is one issue that the parties have been unable to resolve, an issue that was raised by the Committee for the first time on June 26, 2020; the Committee knew that the Debtor intended to seek a judicial determination to resolve the issue and even provided the Committee with a copy of this Motion. Yet, for reasons that remain unclear, the Committee went ahead with its own motion.

2.    The Debtor brings this Motion to have the Court resolve two conflicting obligations arising from the Committee's request for e-mail discovery:  (1) the obligation to comply with certain confidentiality agreements on the one hand, and (2) the obligation to provide discovery to the Committee on the other hand.  Resolution of these conflicting obligations will allow the Debtor to complete the last part of discovery requested by the Committee to date.[2]

3.    In January 2020, the Debtor and the Committee reached an agreement pursuant to which the Committee was granted standing to pursue Estate Claims (as that term is

---

[2]  As discussed below, the Debtor informed the Committee in mid-April 2020 that it was "substantially complete" with the production of all documents except for the e-mails.

defined in the Term Sheet (as defined below)). The Committee thereafter served discovery demands seeking certain documents and e-mails relating to Estate and non-Estate Claims.

4. To the best of its knowledge, the Debtor completed the production of all non-privileged, non-email documents responsive to the Committee's requests by mid-April, regardless of whether the documents related to Estate Claims or non-Estate Claims. For reasons discussed below, however, the review and production of e-mails has proved more difficult; nevertheless, the Debtor believed it was on the verge of reviewing and producing the e-mails but for one issue: it has written confidentiality obligations that, if adhered to, will take time to address and increase the cost of production.

5. This issue crystallized near the end of June when the Committee demanded that the Debtor dispense with any process that would allow it to comply with its confidentiality obligations. The Committee had reserved its right to object to the Debtor's proposed approach to document review; while the demand came late in the process, the Debtor understands the Committee's desire to move this process forward but has been placed in an untenable position with conflicting obligations. Thus, so that issue is properly joined, the Debtor has given notice of this Motion to all contract parties with whom it believes it has written confidentiality obligations.

6. By this Motion, the Debtor asks the Court to resolve these competing obligations by either (a) entering a protective order that will enable the Debtor to comply with its written contractual confidentiality obligations, or (b) enter an order directing the Debtor to comply with the Committee's demands notwithstanding its contractual confidentiality obligations.

## II.    **RELIEF REQUESTED**

7.      By this Motion, the Debtor seeks the entry of (I) a protective order, or, in
the alternative (II) an order directing the Debtor to comply with certain of the discovery demands
tendered by the Committee, thereby clearing the way for the Debtor to complete the review and
production of e-mails identified utilizing the Committee's search parameters.[3]

## III.    **JURISDICTION AND VENUE**

8.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.
§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this
matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates
for the relief requested in this Motion are section 105(a) of title 11 of the United States
Code  (the "Bankruptcy Code") and Rules 7026 and 7034 of the Federal Rules of Bankruptcy
Procedure (the "Bankruptcy Rules").

## IV.    **BACKGROUND**

9.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary
petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the
District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

10.     On October 29, 2019, the Official Committee of Unsecured Creditors (the
"Committee") was appointed by the U.S. Trustee in the Delaware Court.  On December 4, 2019,
the Delaware Court entered an order transferring venue of the Debtor's Case to this Court
[Docket No. 186].[4]

11.     The Debtor has continued in the possession of its property and has
continued to operate and manage its business as a debtor-in-possession pursuant to sections

---

[3]  The Committee has reserved the right to seek further e-mail discovery using different search criteria.

[4]  All docket numbers refer to the docket maintained by this Court.

4

1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 Case.

12.     On January 9, 2020, the Court held a hearing on that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] during which the Debtor presented a Term Sheet (the "Term Sheet").

13.     The final version of the Term Sheet [Docket No. 354] provided, among other things, that (a) the Committee was granted standing to pursue Estate Claims; (b) the Committee would be entitled to privileged communications concerning Estate Claims; and (c) that the Debtor's document management, preservation, and production would be governed by an agreed-upon set of "Document Production Protocols" (the "Protocols").  Docket No. 354-1.

14.     The Protocols provide, among other things, that (a) the Debtor's production of e-mails is "subject to completion of any review for privilege or other purposes contemplated by this Agreement," and (b) that nothing in the Protocols impacts the Debtor's right to, among other things, (i) object to the production, discoverability, and confidentiality of documents and ESI, (ii) assert any privilege or other protection from discovery, or (iii) "limit a Producing Parties [sic] right and ability to review documents for responsiveness" prior to production.  *See* Docket No. 354-1, Protocols ¶¶ E.b, G.b-d.

15.     In short, the Debtor and the Committee agreed that the Committee would have broad discovery rights with respect to Estate Claims, including the right to obtain privileged communications related to Estate Claims, but that the Debtor otherwise reserved its rights with respect to discovery unrelated to Estate claims. That dichotomy made sense since the Committee

5

was only granted standing to pursue "Estate Claims" on behalf of the Debtor, as that term was

specifically defined in the Term Sheet.

## V.    RELEVANT FACTS

### A.    The Committee Seeks Broad Discovery of E-mails

16.    In early February, the Committee served *The Official Committee of*

*Unsecured Creditors' Second Requests for Production of Documents to Highland* (the

"Requests").  The Committee's requests included nineteen separate requests for documents and

information that covered Estate Claims and non-estate claims.

17.    Request No. 19 sought "[a]ny and all Documents, including emails,

contain[ing]" approximately 23 separate search terms (the "E-mail Requests").  The search terms

for the E-mail Requests included broad terms such as "Beacon Mountain, "Crown," "HCMFA,"

"Hunter Mountain," "NexPoint," "Promissory w/5 Note" and "Trussway."

18.    On or around March 5, 2020, the Debtor timely served its written

responses and objections to the Committee's Requests.  Morris Ex. A.  With respect to the E-

mail Requests, the Debtor proffered the following response and objection:

> The Debtor objects to each Request to the extent it calls for the production of
> "[a]ny and all . . . Communications" on the grounds that such Requests are overly
> broad, unduly burdensome, and fail to comply with Federal Rule of Civil
> Procedure 26(b).  At the Committee's specific requests, the Debtor has conducted
> multiple searches for e-mails responsive to Request No. 19.  Each search has
> yielded over 1,200,000 unique e-mail "hits" (a number that potentially could
> double if attachments were included in the searches) and the parties continue to
> confer on ways to limit the e-mails searches in a manner that will be efficient and
> not wasteful of estate resources.  The Debtor has also offered to begin searching
> for e-mails related to transactions already known to the Committee, such as the
> so-called insider loans, that constitute Estate Claims (as that term is defined in the
> Term sheet).  The Committee has thus far declined the Debtor's offer, choosing
> instead to focus on the broadest searches contained in the Requests (i.e., Request
> No. 19), even though Request No. 19 does not appear to be related to any Estate
> Claim for which the Committee has standing to pursue.  Nevertheless, the Debtor
> has informed the Committee that it will (a) create searches for transactions
> identified as potential Estate Claims, and (b) use historic data to identify asset

> transfers to or from the Debtor to or from James Dondero, Mark Okada or any
> Related Entity during the last five years as potential Estate Claims

Ex. A, General Objection No. 5.

19.     The Committee has never taken issue with this objection or asked for the targeted e-mails searches related to Estate Claims that the Debtor offered to provide.  In addition, the Committee never proposed any targeted searches limited to Estate Claims despite the Debtor's requests.  Instead, over time, the parties worked together on various versions of the search terms and time periods until the number of "hits" approached approximately 800,000 in early May (the approximately 800,000 e-mails identified by deploying the Committee's modified search terms and time period are collectively referred to as the "E-mails").

20.     To be clear, while the Debtor believes that targeted searches focused on known transactions constituting Estate Claims would have been more efficient, the Debtor acknowledges the Committee's right to proceed in any manner it sees fit and has never objected to the production of documents or e-mails on the ground that the Requests went beyond Estate Claims.

**B.      The Debtor's Written Confidentiality Obligations**

21.     The Debtor is a service provider and in that capacity has entered into various agreements that, among other things, obligate it to maintain certain information in confidence or otherwise concern the ownership of documents and information.  Specifically, as of the Petition Date, the Debtor was party to the following shared services agreements (collectively, the "Shared Services Agreements"):

- *Third Amended and Restated Shared Services Agreement*, dated September 26, 2017 and effective September 1, 2017, between HCMLP on the one hand and NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., NexBank SSB on the other hand (the "NexBank Agreement," a copy of which is annexed hereto as Morris Ex. B);

7

- *Amended and Restated Shared Services Agreement*, effective January 1, 2018, between HCMLP and NexPoint Advisors, L.P. (the "NexPoint Agreement," a copy of which is annexed hereto as Morris Ex. C);

- *Second Amended and Restated Shared Services Agreement*, effective January 1, 2017, between HCMLP on the one hand, and Charitable DAF Fund, L.P. and Charitable DAF GP, LLC, on the other hand (the "DAF SSA," a copy of which is annexed hereto as Morris Ex. D); and

- *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013, between HCMLP and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P. (the "Fund Advisors Agreement," a copy of which is annexed hereto as Morris Ex. E, and together with the NexBank Agreement, the NexPoint Agreement, the DAF SSA, and the DAF IAA, the "Shared Services Agreements").

22.     The Debtor is obligated under the Shared Services Agreements to maintain certain information in confidence or has otherwise entered agreements concerning the ownership of certain information.  *See* NexBank Agreement ¶¶ 3.1(a), (b), (c)(iii), and 3.2(a); NexPoint Agreement ¶ 5.02; DAF SSA ¶ 4.02; and Fund Advisors Agreement ¶ 6.02 (collectively, the "Debtor's Confidentiality Obligations").

23.     As previously explained to the Committee, the Debtor complied with its Confidentiality Obligations with respect to the production of non-e-mail discovery utilizing the following process (the "Compliance Process"):  if the Debtor identified a responsive, non-privileged document that was subject to a Confidentiality Obligation, it gave written notice to the counter-party of the Debtor's intention to produce the document absent the counter-party's objection.

24.     The Debtor utilized the Compliance Process on a handful of occasions but, as previously explained to the Committee, never withheld any non-e-mail document subject to the Confidentiality Obligations because no counter-party ever objected.

8

**C.      The Debtor Confers with the Committee on Its Document Review
Guidelines and Prepares to Seek Court Approval to Retain a Third-
Party Vendor to Review Documents and Begin Production**

25.      The Debtor has been cooperative and has put extensive effort towards
negotiating an agreed email search and production protocol with the Committee.  The proposals
exchanged from February through June 25 were premised on the ideas that the Debtor (a) would
gather emails from its server based on key word searches provided by the Committee, (b) review
the resulting email "hits" for relevance and privilege, and (c) then produce the responsive, non-
privileged emails.  The Committee's June 25 proposal was the first time that Committee sought
blanket access, subject only to privilege review, for the nine custodian's entire email files.  Just
as the Committee and the Debtor were on the precipice of finalizing a deal on email discovery,
the Committee completely changed the proposed terms.

26.      The Committee's Requests served on February 3 proposed that the Debtor
search key custodian's emails for specific search terms.   After Debtor expressed concern about
the breadth of the search terms, the Committee sent narrowed proposed terms to the Debtor on
February 26.   Debtor reran all of its searches using these revised terms, and informed the
Committee on March 3 that the terms still returned over 1.5 million emails.  On March 5, the
Committee responded that the Debtor should consider sending the 1.5 million emails to a third-
party vendor to apply further limits to the number of documents to be reviewed.  The next day,
March 6, Debtor responded that the Committee's additional search terms would expand the
review set beyond the initial 1.5 emails and also asked the Committee to confirm that the outside
vendor would be used "to greatly reduce the number of emails that will actually have to be
reviewed and ultimately produced."

27.      As of mid-March, the momentum on discovery negotiations slowed.  On
March 17, the Committee responded to the Debtor's March 5 communication.  Notably, this

included the Committee standing that it understood the Debtor would produce documents "found

to be responsive."  Again, the Debtor had to rerun all of its searches based on new search

parameters from the Committee, which was completed by March 30.  Debtor followed up with

additional information regarding the search results on April 3 and the parties had a meet-and-

confer call on April 10.  With the final search parameters still undefined, the Committee went

silent until mid-May.

       28.     In mid-May, the parties agreed to final search parameters.  After culling

the e-mails using the Committee's final search parameters, and with the Committee's knowledge

and approval, the Debtor retained Meta-E to serve as the host for the production of the Debtor's

e-mails.  Shortly thereafter, the Debtor delivered copies of all of the culled emails to Meta-E.

       29.     As discussed with the Committee, the Debtor intended to hire an outside,

third-party vendor who would provide contract attorneys to undertake a "first line" review of the

e-mails.  The Committee was supportive of this concept.  Thereafter, the Debtor solicited bids

from three third-party vendors.

       30.     While soliciting the vendors, and again with the Committee's knowledge

and understanding, the Debtor was also working on a memorandum (the "Document Review

Memorandum") that would be used by the contract attorneys to identify the relevant players

(including the "Related Parties" who would be subject to "Estate Claims," as those terms are

defined in the Protocols) and issues concerning confidentiality and privilege.  The Document

Review Memorandum was intended to (a) assist the contract attorneys in their review of

documents, (b) provide a mechanism for the Debtor to comply with its confidentiality obligations

under the Shared Services Agreements (the confidentiality review), and (c) to complete the

review and production of the e-mails, whether or not they concerned "Estate Claims," as quickly
and efficiently as possible.

31.     To be transparent, on June 2, 2020, the Debtor shared an initial draft of the
Document Review Memorandum together with a comprehensive list of attorneys and law firms
that would have to be checked for privilege purposes.[5]  The Document Review Memorandum
included, among other things, mechanisms for performing a review designed to enable the
Debtor to comply with the confidentiality obligations under the Shared Services Agreements;
once e-mails subject to the Confidentiality Obligations were identified, the Debtor expected to
use the same Compliance Process that it had effectively used with respect to non-e-mail
document production.

32.     The Committee provided certain comments to the Debtor via e-mail and in
the form of a mark-up of the draft Document Review Memorandum while reserving its right to
object to the Debtor's method of reviewing the e-mails.  The Debtor incorporated nearly all of
the Committee's specific changes that it requested with respect to the Document Review
Memorandum, and provided a detailed explanation for the one change it did not accept.  Morris
Ex. F.

33.     At around the same time, the Independent Directors considered the bids
for the provision of contract attorneys and exercised their business judgment to retain Robert
Half Legal, a business division of Robert Half International Inc. ("RHL"), to conduct the initial
review of documents.

---

[5]  The Committee has not objected to, or otherwise provided any comments with respect to, the list of lawyers and
law firms created for this purpose.

34. On June 19, the Debtor informed the Committee of this decision and presented a form of notice pursuant to which the Debtor intended to seek court approval to retain RHL as an ordinary course professional (the "OCP Notice").

35. Thus, as of June 19, 2020, the Debtor believed that its receipt of the Committee's comments the OCP Notice, if any, was the last step before commencing the review and production of e-mails.

### D. The Committee Asks the Debtor to Dispense with a Confidentiality Review Thereby Putting the Debtor in an Untenable Position

36. However, on June 25, the Committee informed the Debtor that it wanted to take a different approach to the review and production of e-mails. Morris Ex. G. The most problematic demand was that the Debtor forego the confidentiality review described in the Document Review Memorandum. On July 3, 2020, the Debtor explained to the Committee why it could not comply with this demand and proposed to file this Motion. *Id.*

37. The Debtor understands the Committee's desire to dispense with the confidentiality review, but cannot unilaterally comply with that request without creating potential liability. Specifically, the Committee's demand would leave the Debtor with no ability to comply with its confidentiality obligations under the Shared Services Agreements.

## VI. ARGUMENT

### A. The Court Could Enter a Protective Order so the Debtor Can Comply with Its Confidentiality Obligations

38. Federal Rule of Civil Procedure 26(c)(1), made applicable to the Committee's Requests pursuant to Bankruptcy Rule 7026, provides, among other things, that a court may issue a protective order upon "good cause" shown and may fashion such protective order to fit the needs of the case. FED. R. CIV. P. 26(c)(1). As pertinent here, a court may require that confidential information be "revealed only in a specified way." FED. R. CIV. P. 26(c)(1)(G).

12

39.     To enable the Debtor to comply with its Confidentiality Obligations, the Court should enter a protective order authorizing the Debtor to (a) engage in the confidentiality review set forth in Document Review Memorandum, and, with the documents identified from such review, (b) effectuate the Compliance Process described above.  Such a protective order would provide the counterparties to the Shared Services Agreements with specific notice of production and an opportunity to object if they choose.

40.     Good cause exists for the Court to enter such an order.  The Debtor has binding, written Confidentiality Obligations which, if ignored, could subject it to litigation and potential liability, all to the detriment of the Debtor's creditors.

## B.     Alternatively, the Court Could Deny the Debtor's Request for a Protective Order and Direct the Debtor to Comply with the Committee's E-mail Requests

41.     If the Court declines to enter a protective order that would enable the Debtor to comply with its Confidentiality Obligations, the Court should direct the Debtor to produce the e-mails while providing the Debtor with protection from any claims that such production will violate any of the Shared Services Agreements.

42.     The rules provide for such an order.  In particular, Federal Rule of Civil Procedure 26(c)(2), made applicable to the Committee's Requests pursuant to Bankruptcy Rule 7026, provides, among other things, that if a court denies a motion for the entry of a protective order, in whole or in part, the court "may, on just terms, order that any party or person provide or permit discovery." FED. R. CIV. P. 26(c)(2).

43.     Thus, if the court declines to enter a protective order as described above, it may order the Debtor to produce the e-mails on "just terms."  Here, if the Court declines to enter the protective order, the Debtor respectfully requests that any order directing it to produce the E-Mails to the Committee specifically state that compliance is (a) mandatory, (b) pursuant to this

13

Court's order, (c) not in violation of the Confidentiality Obligations or any other agreed-upon restriction on production; but (d) with such production remaining subject to the attorney-client privilege and related protections to the extent the E-Mails are unrelated to Estate Claims.

## VII.  NOTICE

44.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.

## VIII.  PRAYER

WHEREFORE, the Debtor respectfully requests the entry of (I) a protective order, or, in the alternative (II) an order directing the Debtor to comply with the Committee's E-Mail Requests on the "just terms" described above.

*[Remainder of Page Intentionally Left Blank]*

Dated: July 9, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# EXHIBIT 37

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

```
IN RE:                          ) Case No. 19-34054-sgj11
                                ) Chapter 11
                                )
HIGHLAND CAPITAL                ) Courtroom 1
MANAGEMENT, L.P.,               ) 1100 Commerce Street
                                ) Dallas, Texas 75242-1496
                                )
                                ) July 21, 2020
                                ) 1:38 p.m.
```

TRANSCRIPT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
EMERGENCY MOTION TO COMPEL PRODUCTION BY THE
DEBTOR (808); DEBTORS MOTION FOR ENTRY OF (I) A PROTECTIVE
ORDER, OR, IN THE ALTERNATIVE, (II) AN ORDER DIRECTING THE
DEBTOR TO COMPLY WITH CERTAIN DISCOVERY DEMANDS TENDERED BY THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO FEDERAL
RULES OF BANKRUPTCY PROCEDURE 7026 AND 7034 (810)
BEFORE HONORABLE JUDGE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA WEBEX:

For the Debtor:            Pachulski Stang Ziehl & Jones LLPL
                          By:  IRA D. KHARASCH, ESQ.
                          10100 Santa Monica Boulevard
                          13th Floor
                          Los Angeles, California 90067

                          Pachulski Stang Ziehl & Jones, LLP
                          By:  JOHN A. MORRIS, ESQ.
                          780 Third Avenue, 34th Floor
                          New York, New York 10017-2024


ECRO:                      Michael Edmond

**TRANSCRIPTION SERVICE:**     **TRANSCRIPTS PLUS, INC.**
                               **435 Riverview Circle**
                               **New Hope, Pennsylvania 18938**
                               **Telephone:  215-862-1115**
                               email CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

APPEARANCES VIA WEBEX:
(Continued)


For the Debtor:                Hayward & Associates PLLC
                               By:  MELISSA S. HAYWARD, ESQ.
                                    ZACHERY Z. ANNABLE, ESQ.
                               10501 N. Central Expressway
                               Suite 106
                               Dallas, Texas 75231


For the Unsecured             Sidley Austin LLP
Creditors' Committee:         By:  MATTHEW A. CLEMENTE, ESQ.
                               One South Dearborn
                               Chicago, Illinois 60603


                               Sidley Austin LLP
                               By:  PAIGE HOLDEN MONTGOMERY, ESQ.
                               2021 McKinney Avenue, Suite 2000
                               Dallas, Texas 75201


For James Dondero:             Bonds Ellis Eppich Schafer Jones LLP
                               By:  JOHN BONDS, ESQ.
                                    MICHAEL LYNN, ESQ.
                               420 Throckmorton Street, Suite 1000
                               Fort Worth, Texas 76102


For Atlas IDF, GP,             Rochelle McCullough, LLP
et al.:                        By:  E. P. KEIFFER, ESQ.
                               325 North St. Paul Street
                               Suite 4500
                               Dallas, Texas 75201


For H.C. and Fund              K&L Gates LLP
Advisors:                      By:  JAMES WRIGHT, ESQ.
                                    STEPHEN TOPETZES, ESQ.
                               1601 King Street, N.W.
                               Washington, DC  20006


For CCS Medical:               Jones Day
                               By:  TRACY K. STRATFORD, ESQ.
                               North Point, 901 Lakeside Avenue
                               Cleveland, Ohio 44114-1163

3

APPEARANCES VIA WEBEX:
(Continued)


For CLO Holdco, Ltd:        Kane Russell Coleman Logan PC
                            By:  JOHN J. KANE, ESQ.
                            901 Main Street
                            Suite 5200
                            Dallas, Texas 75202

For NexPoint:               Wick Phillips
                            By:  LAUREN DRAWHORN, ESQ.
                            100 Throckmorton Street, Suite 1500
                            Fort Worth, Texas 76102

For HCLOF:                  King & Spalding
                            By:  REBECCA T. MATSUMURA, ESQ.
                            500 W. 2nd Street, Suite 1800
                            Austin, Texas 78701

                            King & Spalding
                            By:  MARK M. MALONEY, ESQ.
                            1925 Monroe Drive NE
                            Atlanta, Georgia 30324

For Redeemer Committee      Jenner & Block LLP
of the Highland             By:  TERRI L. MASCHERIN, ESQ.
Crusader Fund:              353 N. Clark Street
                            Chicago, Illinois 60654-3456

                            Jenner & Block LLP
                            By:  MARC B. HANKIN, ESQ.
                            919 Third Avenue
                            New York, New York 10022-3098

For NexBank Capital:        Alston & Bird
                            By:  JARED M. SLADE, ESQ.
                                 JONATHAN T. EDWARDS, ESQ.
                            Chase Tower
                            2200 Ross Avenue
                            Suite 2300
                            Dallas, Texas 75201

4

APPEARANCES VIA WEBEX:
(Continued)


For UBS Securities:          Latham & Watkins LLP
                             By:  ANDREW CLUBOK, ESQ.
                             555 Eleventh Street, N.W.
                             Suite 1000
                             Washington, DC 20004

                             Latham & Watkins LLP
                             By:  KIMBERLY A. POSIN, ESQ.
                             355 South Grand Avenue
                             Los Angeles, California 90071-1560

For Acis Capital            Winstead PC
Management L.P.:            By:  RAKHEE V. PATEL, ESQ.
                                   ANNMARIE CHIARELLO, ESQ.
                             2728 N. Harwood Street
                             Suite 500
                             Dallas, Texas 75201

For Ellington, et al.:      Winston & Strawn LLP
                             By:  KATHERINE PRESTON, ESQ.
                             800 Capitol Street, Suite 2400
                             Houston, Texas 77002

                                   * * *

5

1    **(IN INSTANCES WHERE CONNECTION IS FADING IN AND OUT, AN**

2    **INAUDIBLE RESULTED DUE TO THE LACK OF AUDIBILITY.    IN INSTANCES**

3    **OF MUFFLED VOICES OR REVERBERATION OF THE TELEPHONIC**

4    **PARTICIPANTS ON CHANNEL 2, AN INDISCERNIBLE RESULTED)**

5    THE COURT:  This is Judge Jernigan, and we are ready

6  to start a hearing today in Highland.  Before I take

7  appearances, let me just kind of say where I think we are.

8    We have a document production dispute on the calendar

9  today, primarily between the Unsecured Creditors' Committee and

10  the debtor.  Basically it's an ESI protocol dispute, as I

11  understand it.

12    We have had eight other parties in interest weigh in

13  on the dispute with pleadings.  So I'll do a roll call.

14    (The Court engaged in off-the-record unrelated colloquy)

15    THE COURT:  I'm a little hamstrung here because I

16  don't have my glasses, but my law clerk is working on that.  I

17  guess I do have a magnifying glass here.

18    All right, well, why don't we do a roll call while

19  he's getting my glasses, of the different parties in interest.

20  I'm going to call parties one-by-one to avoid talking overlap.

21    For the Committee, it looks like we have Mr.

22  Clemente, is that correct?

23    (No audible response heard)

24    THE COURT:  Oh, you're on mute.

25    MR. CLEMENTE:  My apologies, Your Honor.  Matt

6

1  Clemente from Sidley on behalf of the Committee.  My partner,

2  Paige Montgomery, is also here with me, and she will be

3  addressing the Court today, as well.

4          THE COURT:  Okay.  Very good.  For the debtor, who do

5  we have participating today?

6          MR. KHARASCH:  Good morning, Your Honor.  It's Ira

7  Kharasch of Pachulski Stang, and we also have John Morris from

8  Pachulski Stang, as well.

9          THE COURT:  Okay; good afternoon.

10          All right.  Mr. Dondero's counsel weighed in.  Who do

11  we have appearing for Mr. Dondero this afternoon?

12          MR. LYNN:  Yes, Your Honor.  Michael Lynn and John

13  Bonds for Jim Dondero.

14          THE COURT:  Okay, very good.

15          Now I'm going to go through the seven other parties

16  that have weighed in.  For the party Atlas, do we have Paul

17  Keiffer or some other lawyer participating?

18          MR. KEIFFER:  Yes, Your Honor, Paul Keiffer here.

19          THE COURT:  All right; good afternoon.

20          For H.C. and Fund Advisors, who do we have appearing?

21          MR. WRIGHT: Good afternoon, Your Honor.  You have

22  James Wright and Steve Topetzes at K&L Gates.

23          THE COURT:  Okay; very good.

24          All right, CCS Medical, who do we have appearing?

25          MS. STRATFORD:  Your Honor, it's Tracy Stratford from

7

1 Jones Day.

2          THE COURT:  Okay; thank you.

3          MS. STRATFORD:  Thank you.

4          THE COURT:  CLO Holding, who do we have?

5          MR. KANE:  Your Honor, John Kane for CLO Holdco,

6 Limited.

7          THE COURT:  Okay, Holdco, excuse me; thank you.

8          What about NexPoint?

9               (No audible response heard)

10          THE COURT:  Anyone appearing for NexPoint?  Jason

11 Rudd, Lauren Drawhorn perhaps?

12               (No audible response heard)

13          MR. WRIGHT:  Your Honor, this is James Wright again

14 at K&L Gates.  We represent one of the NexPoint entities,

15 NexPoint Advisors.  But I understand there are some other

16 NexPoint entities that we don't represent, and they may have a

17 separate objection, just to be clear.

18          THE COURT:  Okay.  Yes, there was a separate

19 objection.  The same firm, Wick Phillips, filed an objection by

20 MGM.

21          So, again, I'll ask, is there anyone on the phone for

22 those clients?

23               (No audible response heard)

24          THE COURT:  All right, well, we may -- oh, I see

25 Lauren Drawhorn on the video; are you muted, Ms. Drawhorn?  Ms.

8

1 Drawhorn, we can see you but we can't hear you. Cannot hear

2 you. We definitely see you.

3          If we can't -- yes, if you could call on your cell

4 phone, we can hear you that way, and you can keep your visual

5 on, as well.

6          Okay, I'll go on. What about HCLOF, do we have

7 someone from King & Spalding?

8                    (No audible response heard)

9          THE COURT: Okay. I'm not hearing anyone from King &

10 Spalding.

11          MR. MALONE: Your Honor, this is Mark Malone. I'm

12 not sure if you can hear me, I'm only dialed in on my phone.

13          THE COURT: Okay, I --

14          MR. MALONE: Can you hear me?

15          THE COURT: I do hear you, Mr. Malone; thank you.

16          MR. MALONE: Yes, and Rebecca Matsumura is trying --

17 I suspect feverishly, I don't have the video. I know she's

18 plugged in on the video. She'll be handling any argument,

19 assuming we can get her on. If not, I'm happy to handle it.

20 But we are here, Your Honor; thank you.

21          THE COURT: All right, thank you.

22          MS. MATSUMURA: Can y'all hear me now?

23          THE COURT: Yes. Who is that?

24          MS. MATSUMURA: This is --

25          THE COURT: Was that Ms. Matsumura?

9

1          MS. MATSUMURA:  This is Rebecca Matsumura; sorry

2   about that.

3          THE COURT:  Okay, we hear you and we see you; very

4   good.

5          All right.  I'll go back to Ms. Drawhorn, do we have

6   you on the phone yet?

7                    (No audible response heard)

8          THE COURT:  All right.  Well, hopefully -- hopefully

9   we can get whatever technical difficulties there worked out.

10         I'll ask, for the record, are there any other parties

11  in interest wishing to make an appearance?  And I'm going to

12  forewarn you that I'm not going to be inclined to let any other

13  party make an argument today unless you give me a reason I

14  should that absolutely knocks my socks off.  So I assume we

15  might have people wanting to appear, but who are not going to

16  make an argument.  If so, go ahead.

17         MR. ANNABLE:  Your Honor, this is Zachary Annable and

18  Melissa Hayward of Hayward & Associates, local counsel for the

19  debtor.  We just wanted to let you know we're here, too.

20         THE COURT:  All right; thank you.

21         Anyone else?

22         MS. MASCHERIN:  Yes, Your Honor.  Terri Mascherin and

23  Marc Hankin from Jenner & Block on behalf of the Redeemer

24  Committee of the Highland Crusader Fund.

25         THE COURT:  All right; thank you, Ms. Mascherin.

10

1        MR. SLADE:  Your Honor, it's Jared Slade and Jonathan

2   Edwards of Alston & Bird.  We're here on behalf of NexBank.

3   And I'm not sure if it's going to knock your socks off, but we

4   were engaged just this week by NexBank as a party in interest,

5   the issue about the ESI disclosures.  We have been negotiating

6   with the Creditors' Committee about the issues, and we hope to

7   have an opportunity to present a minute or two at the end about

8   why we were differently situated than some of the other

9   objectors, if the Court entertains it.

10        THE COURT:  Okay.

11        MR. SLADE:  Thank you.

12        THE COURT:  Thank you.

13        MR. CLUBOK:  And, Your Honor, Andrew Clubok and

14   Kimberly Posin for UBS.

15        THE COURT:  Okay; thank you.

16        MS. PATEL:  Good afternoon, Your Honor.  Rakhee Patel

17   and Annmarie Chiarello on behalf of Acis Capital Management,

18   but we don't intend on making any presentation, Your Honor,

19   unless anyone specifically asks to address things.  Our matters

20   are after this.

21        THE COURT:  Okay, correct.

22        Anyone else?

23             (No audible response heard)

24        THE COURT:  All right.  Well, let's talk --

25        MS. DRAWHORN:  Your Honor?

1          THE COURT: Oh, go ahead.

2          MS. DRAWHORN: This is Lauren Drawhorn, I got my --

3   I'm sorry, I got the audio -- the speaking to work.

4          THE COURT: Okay.

5          MS. DRAWHORN: I'm appearing on behalf of the

6   NexPoint Real Estate entities, there's 15 of them. I can go

7   through them, if you want, or -- they're listed on Docket 847.

8          And then I'm also appearing on behalf of MGM

9   Holdings, Inc.

10         THE COURT: Okay, thank you, Ms. Drawhorn. We've got

11  you loud and clear now.

12         All right, well, I want to talk for a moment about

13  how we are going to proceed here today, and I'm hoping we don't

14  go late, late, late with ten or so parties wanting to weigh in

15  on document production because we do have the Acis status

16  conference regarding the September 10th setting on the

17  objection to Acis's proof of claim, I want to make sure we get

18  to that today.

19         And then I do want to talk a little bit about where

20  we stand on getting the mediation going.

21         So for everyone's benefit, I'm just going to let you

22  know that I think I have a handle on the primary disputes

23  between the Committee and the debtor. There's a lot of finger-

24  pointing that is going on in the papers.

25         The UCC is suggesting that the debtor has been

1  dragging its heels; and the debtor saying no, it hasn't.

2          I really don't want to get bogged down by that today.
3  I really just want to focus on the handful of things that seem
4  to be in dispute between the Committee and the debtor, and so
5  we're going to obviously start with the Committee and the
6  debtor.  I want to hear about are we going to have evidence
7  today.  I know there were a couple of declarations filed.

8          And then I'm inclined to, thereafter, just give these
9  eight or nine other parties five or ten minutes each to present
10 any arguments that they think I need to hear.

11         But I'll tell you, I closely read the Committee's
12 pleadings, I closely read the debtor's pleadings, Mr. Dondero's
13 pleading.

14         And then, frankly, I skimmed very rapidly the other
15 seven or so pleadings because of being pressed for time, but I
16 do think I get the gist of them.  And I think a lot of them
17 kind of have the same theme.

18         But before turning to the debtor and the Committee,
19 let me just tell you what my understanding is that we're going
20 to primarily focus on:

21         We're obviously talking about emails of nine
22 different custodians of the debtor, three of which I understand
23 to be in-house lawyers.  And whether it's the Committee's
24 protocol that should be ordered here, or the debtor's protocol,
25 and the way I see the two protocols differing is the debtor

13

1 wants independent contract -- or contract attorneys for the

2 debtor to do a relevance review. UCC says no, that's going to

3 be time-consuming, and strangers can't meaningfully do that.

4        It looks like there's a dispute about the search term

5 request. Committee thinks what debtor is wanting is too

6 stringent.

7        And then, of course, we have some competing views

8 about how the privilege review process would work, and the

9 debtor has obviously this overriding concern about

10 confidentiality obligations it has, either contractually and/or

11 shared services agreements, or through other law.

12        So now I will, at long last, turn -- I'm going to, I

13 guess, start with the Committee because it is first in time

14 with its pleading the motion to compel. And then, of course,

15 the debtor came quickly behind that pleading with its own

16 motion for protective order.

17        And so -- I don't know, Mr. Montgomery, or Mr.

18 Clemente, let me hear from you on how you --

19        MR. MORRIS: Your Honor?

20        THE COURT: -- want to go forward today.

21        MR. MORRIS: Your Honor, this is John Morris from

22 Pachulski. I greatly apologize for interrupting, but I have a

23 slightly different suggestion.

24        We had made a proposal to try to resolve our disputes

25 with the Committee a few days ago. The Committee responded

14

1  with its own proposal about an hour before this hearing, and

2  we'd like an opportunity to confer with them.  But under --

3  even under the -- even if we were to reach an agreement, I

4  think the Court needs to rule on the other objections.

5          So my suggestion, subject to the Committee's

6  acceptance and Your Honor's acceptance, of course, is that we

7  allow the Committee to proceed and let the --

8                  (Technical interference)

9          THE COURT:  Okay.

10         MR. MORRIS:  Let the other objectors be heard.

11         And then after the conclusion, and the resolution of

12 those objections, some of which I understand may have been

13 resolved already, we take a short break, and allow me to confer

14 with Ms. Montgomery to see if we can resolve the balance of the

15 issues, that's my suggestion.

16         THE COURT:  Okay.  So start with the Committee, hear

17 their argument, and then any objectors who haven't otherwise

18 been taken care of through agreements, hear from them, all

19 right.  Well, I am perfectly happy to go forward this way,

20 especially if it means that we'll save some time in court, and

21 the debtor and Committee can get on the same page without the

22 Court ordering something.

23         So will it be Ms. Montgomery or Mr. Clemente?  Which

24 one of you wants to start us off?

25         MR. CLEMENTE:  Your Honor, it's Matt Clemente.  My

15

1 colleague, Ms. Montgomery, will be handling it.  So I'll turn

2 it over to her, please.

3          THE COURT:  All right.  Ms. Montgomery?

4                    (Pause)

5          MS. MONTGOMERY:  ... the objection that the debtor

6 has filed --

7          THE COURT:  All right.  Ms. Montgomery, I'm going to

8 ask you to start from the beginning, we missed the first few

9 seconds, okay?

10          MS. MONTGOMERY:  Sure.  Can you hear me now?

11          THE COURT:  Yes.

12          MS. MONTGOMERY:  So consistent with the proposal that

13 Mr. Morris laid out, I plan to reserve any arguments with

14 regard to the dispute between the Committee and the debtors for

15 now in the hopes that we can get those resolved at the

16 conclusion, and we'll just focus on the objections, if that

17 works for the Court.

18          THE COURT:  Okay, that's fine.

19          MS. MONTGOMERY:  We've been working diligently with

20 all of the objectors that Your Honor is aware of, as well as a

21 few that did not file objections over the last week or so in an

22 attempt to resolve as many of their concerns as possible before

23 today's hearing.

24          And we're happy to tell the Court that we have

25 resolved some of those objections.  We were able to negotiate

16

1  an out-of-court resolution with regard to an entity called

2  Omnimax International, Inc. without them filing an objection.

3         And we have resolved the objection of Highland CLO

4  Funding Ltd.  And pursuant to that agreement with Highland CLO

5  Funding, Highland CLO Funding has requested that the Court

6  order, at the end of today's argument, include a statement that

7  any documents that they produce pursuant to joint privilege

8  aren't subject to a privilege waiver by virtue of their

9  production to the Committee.

10        THE COURT:  Okay.

11        MS. MONTGOMERY:  And if I missed anything there, I'm

12 sure that counsel for Highland CLO will correct me at the end.

13        THE COURT:  Okay.

14        MS. MONTGOMERY:  We also have an agreement in

15 principle with Highland Capital Management Fund Advisors, LP

16 and the remaining entities that submitted their objections at

17 Docket 841.

18        Pursuant to that agreement in principle, we have no

19 objection to those entities being treated as parties to a

20 protective order or to having certain data being isolated from

21 review as a preliminary matter subject to reservation of

22 rights.

23        What we don't have an agreement on, Your Honor, is

24 how those documents will be isolated.  And we intend to

25 continue working with Highland Capital Management Fund Advisors

17

1 and K&L Gates to try to knock out the details of that in the

2 coming days. We preliminarily don't believe that it's

3 necessary for you to hear the details of that objection for

4 today.

5           THE COURT: Okay.

6           MS. MONTGOMERY: So with regard to the remaining

7 objections -- my apologies, Your Honor.

8           There are essentially three categories of documents

9 that make up the assorted objections -- the issues that are set

10 forth in the objections. There are some documents that are

11 allegedly confidential, and I think that Your Honor has

12 probably read quite a bit about that in the pleadings that have

13 been submitted to the Court.

14           It's our position, Your Honor, that there's a very

15 strong protective order in place in this case. And that the

16 protective order should be sufficient to handle any

17 confidentiality concerns that have arisen pursuant to the

18 objections.

19           We also believe, Your Honor, that a number of the

20 documents at issue are subject to a joint privilege, and we've

21 briefed this, and it sounds like Your Honor is very familiar

22 with the materials that we've submitted to the Court. And as a

23 result of that joint privilege, we believe that many of the

24 documents that are included in the ESI that we've requested

25 should be made available to the Committee.

18

1          As you know, Your Honor, there are thousands of

2    companies that have been identified as affiliates of the

3    debtor.  Many of those affiliates have shared service

4    agreements with the debtor, in which the debtor provided

5    business functions for these purportedly separate entities.

6          And if you look at my briefing, there isn't any

7    segregation of employees of the debtor that represent each of

8    these affiliates.  And instead, the debtor maintains a

9    centralized pool, and whoever can perform the service for the

10   affiliate does so.

11         The basis for most of the remaining objections that

12   we're talking about here today is that these shared service

13   agreements include provision of legal services.  And in some

14   instances, for shared IT -- like shared service servers for

15   emails and other documents.

16         Under those shared service agreements, the debtor's

17   in-house legal department provides legal advice to these

18   thousands of entities on as-needed basis.  And you're going to

19   hear from the objectors in a moment some of those separate

20   companies are objecting to production of their documents by the

21   debtor, even though those documents are on the debtor's

22   servers, in the debtor's employees' files, and generally

23   available to debtor personnel.

24         We wanted to begin, Your Honor, with the objections

25   to NexPoint Real Estate Advisors.  We previously -- we

19

1  previously discussed NexPoint Advisors and its affiliates,

2  represented by K&L Gates, but obviously there's also a separate

3  objection for NexPoint Real Estate Advisors and affiliated

4  entities.

5          NexPoint Real Estate Advisors argues that it would be

6  unduly burdened if the debtor were to produce documents related

7  to it to the Committee.  It's unclear, however, how NexPoint

8  would be burdened by the debtor producing documents, nor is it

9  clear what expense NexPoint would incur as a result of that

10 production.

11         In fact, it appears that NexPoint is attempting to

12 raise defenses that belong to the debtor instead.  This may be

13 because NexPoint shares many things with the debtor under the

14 shared services agreement:

15         First, they have shared employees who are employed

16 both by the debtor and NexPoint Real Estate.  Although pursuant

17 to the shared service agreement, only the debtor pays the

18 salaries of those shared employees.  It shares back- and

19 middle-office services, it shares administrative services,

20 including cohabitating in the same office space on information

21 and belief, and it also shares IT services, possibly including

22 servers, and in-house counsel that provide assistance with

23 advice with respect to legal issues.

24         Despite all of the shared services, NexPoint is

25 arguing that it should be given a separate and independent

1 opportunity to review all documents possibly related to it, and

2 to decide what it relevant, responsive, and privileged.

3        Your Honor, it's the Committee's position that

4 NexPoint chose to commingle its data with that of the debtor;

5 to share in-house counsel with the debtor; to co-office with

6 the debtor; to share employees with the debtor; and to

7 generally allow the debtor to provide many of its services.

8 But now it believes it has a separate ability to review

9 documents in the debtor's possession before they're produced to

10 the Committee. And this is the sort of gamesmanship that we've

11 been trying to avoid through the motion to compel.

12        NexPoint may very well be the subject of estate

13 claims, it's impossible for us to know at this point because we

14 don't have access to the data that's necessary for us to

15 determine what estate claims might exist. And we don't believe

16 that NexPoint should also have the ability to dictate to the

17 estate which documents the estate -- that the estate already

18 possesses and needs to investigate those claims.

19        With regard to the various Rand entities and Atlas, I

20 believe Your Honor referenced Atlas when we began. Essentially

21 the same argument appears to apply with Rand, although to a

22 somewhat lesser extent.

23        The objection for Rand is slightly different in that

24 it focuses on the shared IT infrastructure with the debtor, and

25 not necessarily the custodial data for nine individuals that

1  were the subject of the motion to compel.

2          Unlike with NexPoint, it doesn't appear that Rand has

3  legal services provided by the debtor.

4          And their objection primarily focuses on the

5  potential that there is Rand data on servers that are

6  accessible by the debtor which, in itself is an indication that

7  the data may not have been maintained separately as to Rand

8  and, therefore, confidentially.  And as such, any privilege

9  related to data contained on that server as to Rand would be

10 waived.

11         That said, we are amenable to their request to be

12 made party to the protective order.  And that all data related

13 to them be produced as highly confidential as a preliminary

14 matter, subject, of course, to our ability to request a de-

15 designation of that data where the default designation appears

16 to be improper.

17         The next objection is CLO Holdco.  CLO Holdco also

18 argues that there may be data among that of the nine

19 custodians, all of whom are employees of the debtor, that

20 relate to a privilege held exclusively by CLO Holdco.  We don't

21 believe that that position is tenable.

22         The briefing on this particular objection, Your

23 Honor, includes some back and forth with regard to Teleglobe,

24 and related cases.

25         Teleglobe is one of the foundational cases on the

1  issue of privilege with regard to business affiliates.  And it

2  provides that communications between affiliates can maintain

3  privilege because the members of a corporate family are joint

4  clients, and this reflects both the separateness of the entity

5  and the reality that they are all represented by the same in-

6  house counsel.

7         We don't believe that <u>Teleglobe</u> stands for the

8  position that there can be completely separate privileges held

9  by affiliates with the in-house counsel that is employed by the

10  parent company, or any other member of an affiliate family.

11         As a result, either the communications are subject to

12  a joint privilege, and the debtor having access to the

13  communications isn't a waiver of confidentiality requirements

14  of privilege, or there is no common interest.  There is no

15  joint client interest, and the debtor having access to the

16  documents is a waiver.  But either way, the Committee should be

17  provided with the documents under the terms of the final term

18  sheet because the Committee is standing in the debtor's shoes

19  with regard to those estate claims, and the debtor has

20  conceded, and the Court has, you know, ordered that those

21  documents should be -- that the privilege isn't waived.  The

22  privilege should be shared with the Committee, it's not

23  waived.

24         Separately, CLO Holdco has argued that it should be

25  able to conduct an independent review of the documents.  As you

23

1  know, and I think we referenced in our hearing last week, the

2  impetus for the motion to compel is specifically the need for

3  expedited access to documents related to CLO Holdco so that we

4  can comply with the Court's 90-day deadline.

5          CLO Holdco entered into the shared service agreement,

6  it agreed to allow the debtor have access to this material, the

7  debtor has that data.  And we don't think they can now seek to

8  claw back access to the ESI that's in the debtor's possession.

9          The remaining objectors, Your Honor, stand in a

10 slightly different position.  CCS Medical and MGM, in

11 particular, are bringing objections, not based on the shared

12 service agreement, but based upon the facts that there are

13 employees of the debtor that have served in board positions for

14 each of those entities.

15         But, you know, based on the information that we have

16 to date, we understand that that -- that those board positions

17 were obtained pursuant to investments or other relationships

18 with the debtor, and that the debtor has or had relationship

19 with those entities outside of the board position.  And those

20 additional relationships that are separate from board

21 membership make it very difficult to craft searches that would

22 exclude only outside information related to board service.

23         And so while the Committee doesn't necessarily have

24 an objection to attempts to isolate the communications that are

25 truly related to board service, we've had difficulty

1 negotiating the terms of what that would look like with MGM, at

2 least. We haven't had an opportunity to speak with CCS Medical

3 because -- because of its overlap, Your Honor.

4 We also think -- and this is set forth in our

5 documents -- that it's possible that the documents that were

6 shared with the debtor are -- have been waived, to the extent

7 that there was any privilege associated with it because of the

8 way that the debtor maintains its email servers.

9 And then I believe finally, the last objection that

10 has been filed with the Court for today is from Mr. Dondero.

11 And he argues that any data related to information that's being

12 produced under the protocols should not be made available to

13 Josh Terry, Acis Capital Management GP LLC, or Acis Capital

14 Management LP.

15 But there's nowhere in Dondero's briefing that sets

16 forth a basis of law for a categorical restriction of that

17 nature. And as you know, Mr. Dondero and his affiliated

18 entities are at the center of the Committee's investigation of

19 the estate claims. And we believe imposing a categorical

20 confidentiality ban against one member of a Committee would

21 considerably complicate and impede that investigation.

22 We understand a desire to have any documents that are

23 created in connection with pending litigation between Acis and

24 the debtor, Dondero, and other Dondero-related parties, that

25 that information be marked as attorneys' eyes only, highly

25

1 confidential so that only outside counsel has access to it, but

2 that's not really the basis for Mr. Dondero's objection, and as

3 a result, we don't believe that objection has value.

4 And then, Your Honor, I don't know to the extent you

5 intend to hear from NexBank Capital and its affiliates, and so

6 if -- I would like to reserve any sort of response to them --

7 THE COURT: Okay.

8 MS. MONTGOMERY: -- to the extent that you allow them

9 to speak.

10 But, you know, in concluding, Your Honor, the debtor

11 and its affiliates have interwoven so much of their operations,

12 their legal services, and even their data storage, that it's

13 incredibly difficult to try to pick apart the data, with the

14 exception of MGM and CCS, the objectors here today agreed to

15 those shared services, and now they want to argue that what was

16 shared was actually separate.

17 The Committee has been tasked with investigating the

18 estate's claims against the very affiliates that now seek to

19 unwind their information and said that unnecessary burdens to

20 production. And as a result, we request that those objections

21 be overturned, that the motion be granted, and that the ESI

22 subject to the motion to compel be produced to the Committee.

23 THE COURT: All right. Well, let me -- I'm just

24 going to go down the list of objectors.

25 Let me start with the two that Ms. Montgomery

26

1  announced have been resolved:  Highland CLO Funding Limited.

2  Matsumura, were you going to be the one to weigh in on

3  confirming that?

4        MS. MATSUMURA:  Yes, Your Honor.  I can confirm we've

5  reached an agreement with the Committee that the documents that

6  are -- contain confidential and privileged information of HCLOF

7  will be produced on a highly confidential designation under the

8  protective order, so that will be only the Committee's

9  professionals.

10       And that as Ms. Montgomery stated, any of the

11  documents produced by the debtor pursuant to this agreement

12  will not be construed as a waiver of any privilege that the

13  funds share of those documents.

14       THE COURT:  Okay; thank you.

15       All right, what about HMC Fund Advisors?  I

16  understand that your issues have been resolved, you're still

17  working out a couple of things, but who wants to weigh in on

18  that to confirm that?

19       MR. WRIGHT:  Good afternoon, Your Honor.  It's James

20  Wright at K&L Gates for -- actually a number of entities that

21  are all at Docket 841.  There was an objection at 841 that's

22  HMC Fund Advisors, NexPoint Advisors, and then a number of

23  individual funds, and I will not burden the record with listing

24  each of them out.

25       THE COURT:  Thank you.

27

1          MR. WRIGHT:  I agree with the Committee's summary,

2  that we have made a lot of progress.

3          There are some technical things that we're still

4  working out, but I think that we're -- you know, we've been --

5  we've made a lot of progress, we've been working in good faith,

6  and -- get there -- but we just need a minute to -- we were on

7  the phone with them, frankly, ten minutes before this hearing

8  started, I think we just need a little bit more time.

9          THE COURT:  Okay; thank you.

10          All right.  Well, why don't we start with Mr.

11  Dondero, and your objection which I understand deals mostly

12  with Acis and Josh Terry.

13          Go ahead.

14          MR. LYNN:  Thank you, Your Honor.

15          As you've gathered, our concerns are somewhat

16  different from the other parties who are objecting.  Mr.

17  Dondero agreed to the arrangement involving shared privilege in

18  allowing the Committee the kind of discovery that they're

19  seeking here.

20          And accordingly, we would (indiscernible) object to

21  what they're doing.

22          But as I understand the Committee's response to the

23  Dondero response to the motion to compel, (indiscernible)

24  because, first, there is no basis in law (indiscernible) Acis

25  and Mr. Terry (indiscernible) and participate (indiscernible)

28

1  in consideration of the estate claims.

2          And second, (indiscernible) and I quote,

3  "considerably complicate and impede the Committee's

4  investigation."

5          Even assuming for a minute that Acis and Mr. Terry

6  are so central to the investigation that their absence from it

7  could not be tolerated by a Committee, just as there may be

8  nothing in the statute that permits the Court specifically to

9  restrict Mr. Terry and Acis's access to information so, too,

10 there's nothing in the Bankruptcy Code or the Bankruptcy Rules

11 that prevents the Court from doing so.

12         There is (indiscernible) the authority for the

13 Bankruptcy Court to grant what Mr. Dondero asks, which is that

14 Acis and Mr. Terry be excluded from the information gained by

15 the Committee during the course of its investigation.  Section

16 105, as this Court is acutely aware, is the problem-solving

17 section of the Bankruptcy Code that allows the Court to fashion

18 results that may be necessary to fill in gaps that the Code

19 leaves open.

20         There was nothing in the law that authorized it, even

21 before the passage of Section (indiscernible) of the Code, it

22 was common for (indiscernible) representatives are

23 (indiscernible).  And, indeed, (indiscernible) representatives

24 are also (indiscernible) in other (indiscernible).

25         Similarly, I know of nothing in the Code or the Rules

1 that provides for the retention of a Chief Restructuring

2 Officer. Yet, Section 105 has allowed for that necessary post,

3 as is true (indiscernible) which are also not provided for in

4 the law.

5 In this case, (indiscernible) Section 105 has been

6 used to justify an independent board, and to justify the very

7 same privilege that is at the root of the disputes. Section

8 105 (indiscernible) to justify the removal by a court of a

9 member of the Creditors' Committee. That's in the <u>First</u>

10 <u>Republic Bank Corporation</u> case, Judge Felsenthal determined

11 that he had the authority to remove, and he chose to remove, a

12 member of the Creditors' Committee. A similar result was

13 reached in the <u>MAP International</u> case out of the Eastern

14 District of Pennsylvania, and a similar result (indiscernible)

15 following Judge Felsenthal was reached by the Bankruptcy Court

16 for the District of Arizona in <u>In Re America West Airlines.</u>

17 If the Bankruptcy Court has authority pursuant to

18 Section 105 to remove a Committee member, clearly Section 105

19 gives authority to the Court to eliminate a member's access to

20 and involvement in an investigation that will give that

21 Committee member a leg-up in discovery in another case.

22 In the litigation commenced by Acis is, indeed, in

23 another case, not in this case, and the litigation is intended

24 to provide a benefit -- a windfall to Mr. Terry, not to provide

25 (indiscernible) who he is supposed to be representing as a

30

1 member of the Creditors' Committee.

2          As pointed out in an article in The Review of Banking

3 and Financial Services in October of 2016, "Members of a

4 Creditors' Committee may not use their positions as Committee

5 members to advance their individual interests."  And I'm

6 quoting there the MAP International case.  Similarly, that

7 fight has been made by Collier in Paragraph 1102.05[3] of the

8 Collier treatise.

9          Indeed, the Acis litigation may not only drain assets

10 from Highland, it may reduce the (indiscernible) Dondero and

11 other potential defendants in the same causes of action as to

12 their ability to (indiscernible) any judgment that defendants

13 may manage to obtain.

14          Under those circumstances, unsecured creditors

15 represented by Acis and Mr. Terry will have their recovery

16 reduced by virtue of those judgments.

17          It is clear that the Bankruptcy Court may restrict a

18 committee member's access to information, as Collier points

19 out, where a member of a committee is a competitor of the

20 debtor, as, indeed, Acis is, the member may be restricted as to

21 the information that the member gets so it does not obtain

22 competitive advantage.

23          I recognize that the same claims may be, indeed, a

24 central concern of the Committee, (indiscernible) with Acis and

25 Mr. Terry creates serious problems, perhaps Mr. Terry should

31

1  resign from the Committee or be removed.

2          In fact, in this case, when UBS filed the motion for

3  relief from stay in order to pursue litigation in New York,

4  very properly, UBS excluded itself -- recused itself from

5  discussion of the motion for relief from stay. And Mr. Terry,

6  I respectfully submit, should do the same here.

7          Further, as far as complicating and repeating the

8  Committee's investigation, and the Committee did not elucidate

9  how that would happen, whatever trouble or cost (indiscernible)

10 Acis and Mr. Terry may cost is nothing compared to the trouble

11 and cost to the debtor of complying with a request for millions

12 and millions of communications.

13         In conclusion, Your Honor, in litigation such as that

14 being pursued by Acis in the Acis case, as courts have said,

15 the Federal Rules were designed to create, quote, "a level

16 playing field," end quote.

17         A couple of those cases, the Hillsborough Holding

18 decision of the Bankruptcy Court out of the Middle District of

19 Florida; Allstate Insurance versus Electrolux out of the

20 Northern District of Illinois; and Passlogix, Inc. versus 2FA

21 Tech out of the Southern District of New York.

22         Yet the motion to compel is brought without

23 protection from (indiscernible) that Acis seeks, there clearly

24 will be no level playing field in that litigation. And the

25 commitment of this Court (indiscernible) in general to

32

1  (indiscernible) litigation processes will be undermined.

2          Your Honor, if anybody wants cites to any of these

3  authorities that I provided to the Court, I'll be happy to

4  provide them.

5          THE COURT:  All right.  Thank you, I appreciate

6  that.

7          I'm going to go next to --

8          MR. LYNN:  Your Honor, I didn't hear you.

9          THE COURT:  Pardon?  I thanked you for your argument,

10  and I do not need those case cites.

11          I'm going to go next to CLO Holdco.  Mr. Kane, will

12  you be making the argument there?

13          MR. KANE:  Yes, Your Honor, I will; thank you for the

14  time. This is John Kane for CLO Holdco, for the record.

15          And first, I want to start by kind of acknowledging

16  that we really did take to heart what you said previously in

17  attempts to avoid unnecessary litigation.  I've been working

18  with Ms. Montgomery for over a week now in an effort to try and

19  resolve some of our concerns about the discovery requests, at

20  the same time trying to be mindful of what I believe to be my

21  client's privileges and our right (indiscernible) the party

22  that reviews documents and produces them.

23          We are -- CLO Holdco is subject to a request for

24  production of documents from the Committee.  We are working to

25  prepare a review, to obtain all of the requisite documents to

33

1 have a fulsome production to the Committee. And Ms. Montgomery

2 and I have had conversations about how that production will

3 take place. While we acknowledge that there are obviously some

4 timing concerns here given the 90 days relating to that

5 registry order that was relatively recently entered.

6 So we've mindful of all of those issues, and our

7 dispute here is about whether we're giving up privileged

8 documents or whether we aren't.

9 It's our position that since that request for

10 production of documents to CLO Holdco, CLO Holdco has a right

11 to review those documents, and to produce documents in

12 accordance with the Federal Rules. And that the request by the

13 Committee to have all ESI produced by these various custodians

14 basically provides an end around to the request for production

15 of documents delivered to CLO Holdco. And it does look through

16 the guise of this joint client privilege exception to the

17 general privilege rules.

18 But we've got a fundamental misunderstanding of the

19 law by the Committee as the exception applies to the general

20 rule of privilege. And it basically breaks down to a simple

21 analogy, one we can apply to the case of law. The analogy

22 would be like if our firm, Kane Russell Coleman and Logan,

23 represented Texas Capital Bank and Wells Fargo on a bunch of

24 separate matters, and then because we had a great relationship

25 with both, we are going to represent Texas Capital Bank in a

34

1 merger with Wells Fargo, and we are going to be retained as

2 kind of a mutual third party counsel by both sides to help

3 manage this merger.

4        Now if that merger representation turned into a later

5 dispute between the parties, the correspondence between Wells

6 Fargo and Kane Russell Coleman and Logan, and the

7 correspondence between Texas Capital Bank and Kane Russell

8 Coleman and Logan would not be precluded from production to

9 either party as long as it were (indiscernible) representation.

10 They have the same counsel for the same representation.  So

11 that this idea of privilege doesn't really apply the same way.

12 Those documents pass back and forth, I have a duty to both of

13 those clients equally.

14        But what they wouldn't be able to obtain is, let's

15 say, Texas Capital Bank's request for production of documents

16 to me, counsel, seeking all correspondence that I have ever had

17 with Wells Fargo on any other matter, regardless of whether it

18 was -- it was related to or unrelated to a joint

19 representation.  And really, that's what the Committee is

20 trying to do here, they want all ESI, there are no parameters.

21 So it doesn't matter if there's a joint representation on a

22 specific matter between CLO Holdco and the debtor, what the

23 Committee is asserting is because they use the same counsel,

24 that all matters or all correspondence between counsel for the

25 debtor, all internal counsel, and counsel for CLO Holdco, since

1  it was essentially the same person, the same people, all of

2  that is subject to production.

3         So here's an example of how this plays out, Your

4  Honor. At our last hearing, you heard a bunch of testimony

5  about a transfer of Highland, the debtor's interest in the

6  Dynamic fund, and how on December 28, 2016, with one document,

7  we can trace -- I'm sorry -- we can trace this trail of

8  transfers from Highland to CLO Holdco, and we know that

9  Highland's internal counsel was representing both sides of the

10 deal. They were representing the debtor, they were also

11 representing CLO Holdco as the creation of those documents was

12 done for both parties by the same entity and the same

13 transaction, that's critical.

14        So do I have an assertion of privilege for CLO Holdco

15 in that situation? No, I don't believe that I do. I think

16 that joint client exception that's addressed in Teleglobe, and

17 Nguyen, and in the Nester decision that's cited by the

18 Committee in their pleadings precludes me from stopping the --

19 or the disclosure of documents that were between internal

20 counsel and CLO Holdco as they're related to that dynamic

21 transaction because internal counsel at Highland represented

22 both sides of the deal.

23        But there are other representations taken up by

24 internal counsel for Highland under the shared services

25 agreement between CLO Holdco and Highland that really don't

36

1 have anything to do with Highland. So much (indiscernible)

2 litigation, we'll say, between CLO Holdco and some other party

3 like U.S. Bank that does not have Highland Capital Management

4 as a party to that litigation, and could not have Highland

5 Capital Management as a party to that litigation.

6 (Indiscernible) under this joint client privilege

7 exception that the Committee is asserting should control this

8 entire deal. So in a situation like that, I would still be

9 able to review and withhold documents that were privileged,

10 attorney-client communications, or work product communications

11 without having to disclose those to the Committee even though

12 the Committee stands in the debtor's shoes. Because there is

13 this isolation, Highland is not a party that is jointly

14 represented in that transaction.

15 So all of the documents that have been exchanged

16 between CLO Holdco and the debtor in representations where the

17 debtor is not an active participant as a party in a joint

18 representation, all of that documentation is the sole property

19 of CLO Holdco. It shouldn't be subject to disclosure simply

20 because one of these custodians engaged in correspondence with

21 CLO Holdco.

22 So, for instance, the Argentina Bank, let's say, if

23 Highland is not being represented in a transaction with CLO

24 Holdco related to the Argentina Bank, and Grant Scott, as

25 trustee of CLO Holdco, inquires internally about a -- let's say

37

1 a NAV statement related to its interest, that's not necessarily

2 a document that would have to be produced to the Committee

3 because it is a potentially privileged communication if it was

4 with one of the attorneys in-house.

5       Now that doesn't mean that everything is going to be

6 privilege, or that there aren't going to be a significant

7 number of these joint client privilege exceptions where we have

8 to disclose attorney-client communications because Highland was

9 on the other side of the transaction, but that's something that

10 I should be reviewing as CLO Holdco's attorney, and identifying

11 documents for a privilege log, and then having a conversation

12 with the Committee's counsel about whether these are subject to

13 the joint client privilege exception, or whether they are truly

14 privileged documents or not.

15       So we've already got a request for production out

16 there.  I mean presumably, Your Honor, this is already -- you

17 know, this is already underway.  What we just want to do is try

18 and protect the documents that are actually privileged

19 communications or work product communications from disclosure

20 to the Committee.

21       THE COURT:  All right; thank you, Mr. Kane.

22       Let me hear next from NexPoint Real Estate Financial.

23             (No audible response heard)

24       THE COURT:  All right.  I can't hear you.  Is this

25 Ms. Drawhorn who will be addressing this one?

38

1          MS. DRAWHORN:  Can you hear me -- can you --

2          THE COURT:  Yes.

3          MS. DRAWHORN:  Can you hear me now?

4          THE COURT:  I can.

5          MS. DRAWHORN:  Okay.  I had to unmute both my phone

6    and the -- and the computer, okay.

7          Lauren Drawhorn on behalf of NexPoint Real Estate

8    Finance and the 15 related entities and -- that are listed on

9    Docket 847, I won't go through them all.

10          So our -- one of the -- we've got a couple issues

11   with the motion to compel relative to our shared services

12   agreement with the debtor, and largely because of the breadth

13   of the request wanting ESI from all nine of these custodians.

14   And we have concerns that because there are no limits on that

15   request, that we've got our confidentiality and privilege

16   issues that are concerned about.

17          The real estate entities are -- NexPoint Real

18   Estate entities are typically traded, and there are some

19   regulatory constraints that we have on the dissemination of

20   information and it being public.  And so obviously we need to

21   protect those interests and try and prohibit the disclosure of

22   information.

23          While there -- while the NexPoint Real Estate

24   entities do -- did have a shared services agreement, it is the

25   businesses unrelated to and separate from Highland, except for

1 the occasional times when they co-invested.

2           So generally speaking, they were separate businesses.
3 Any use of services from Highland employees under the shared
4 services would be for separate deals.  And so because they're
5 separate, we believe that it's unlikely that they would be
6 relevant to the estate claims.

7           In other words, the request should be narrowed to
8 limit the amount of information that's not related to the
9 Committee's estate claims, (indiscernible) related to NexPoint
10 Real Estate entities' deals and confidential information and
11 business information.

12          The other issue we have in connection with
13 confidentiality is in connection with NexPoint Real Estate's
14 entities business operations.  They continue to receive
15 information electronically from third parties that have been
16 the subject -- that information was provided subject to
17 confidentiality agreements there.  So under those agreements
18 with other parties, there are requirements and obligations for
19 NexPoint Real Estate entities to notify those parties and
20 provide them an opportunity to object.

21          So we are wanting the additional protections and
22 limits on the discovery to protect this confidential
23 information and our obligations to other parties, and to
24 regulatory entities.

25          We also have concerns on the privilege -- any

40

1  privilege information, again, since these custodians were

2  counsel, and provided -- occasionally provided legal advice in

3  connection with NexPoint Real Estate entities' deals that,

4  again, were unrelated to Highland and separate from the debtor.

5  That information will be -- would be privileged and

6  (indiscernible) NexPoint Real Estate entities' privilege

7  (indiscernible) position you just heard, and the Committee's

8  response is that that was waived or part of this joint client,

9  and we disagree with that. Where the legal advice was given on

10 a separate matter, there would be no joint privilege between

11 the NexPoint Real Estate entities and the debtor. We think

12 that that privilege should be protected, and the privileged

13 documents should be withheld from the production.

14         The Committee responded by their -- that we -- that

15 NexPoint Real Estate entities are not burden. We did argue in

16 our objection that this request, under 26(b) (indiscernible)

17 because it was also an undue burden because it's so broad -- so

18 broad. And that burden (indiscernible), as you know, isn't

19 required to be the physical burden of us going through and

20 producing documents. An undue burden encompasses the invasion

21 of confidential information and privilege concerns. So we

22 think that there is a good basis to limit the information that

23 is being produced to protect NexPoint Real Estate entities'

24 confidential information and business information.

25         So what we're requesting we suggested in our

1 objection was to allow NexPoint -- the NexPoint Real Estate

2 entities to have input on the search terms that would narrow

3 the production and potentially exclude the NexPoint Real Estate

4 entities' confidential information, information that would be

5 unrelated to the Committee's estate claims.

6 　　　　We also requested that NexPoint be given an

7 opportunity to review the documents -- the NexPoint documents

8 before produced -- and this is similar to what is my

9 understanding the debtor would -- for all of the -- the

10 previous production that was provided. So it is my

11 understanding that before the debtor produced any document that

12 instituted the shared services agreement, confidentiality

13 privileges, they contacted that party and said "Here's this

14 document that we're going to produce, are you okay with it?

15 Are you okay with it, is there any objection?"

16 　　　　And so that's all we're requesting is an opportunity

17 that the NexPoint documents that -- that are potentially giving

18 -- to make sure that they're designated correctly under the

19 protective order, so as highly confidential versus

20 confidential, again, because of those confidentiality concerns

21 that I mentioned earlier. And then also to confirm the

22 privilege designation and to make sure anything privileged is

23 not being produced.

24 　　　　And then the last request we have is just to make

25 NexPoint a party to the protective order so that we are able to

42

1  obtain those protections as the highly confidential and

2  confidential designations.

3          THE COURT:  All right; thank you, Ms. Drawhorn.

4          All right, let's see.  How about we hear from Atlas

5  IDF GP next.

6          MR. KEIFFER:  Thank you, Your Honor.  Paul Keiffer

7  for the Atlas IDF entities and parties located at -- or I

8  should say named at Docket Number 837, I won't burden the

9  Court, as others have not done, as well, with the full list of

10 parties.

11         And also taking in mind -- or keeping in mind what

12 the Committee has done as far as discussing issues, I want to -

13 - I have just a few points:

14         First off is that my clients don't have a specific

15 concern with the ESI request.  The shared privileges and the

16 joint privilege is supposed to hold, we want that to hold as it

17 has been requested for everybody else, and I think that was the

18 intent of the Committee in regard to that point.

19         It's also, as the Committee indicated, between the

20 debtor and the -- I'm sorry -- between the Committee and the

21 Rand Advisors' related entities that they want to be expressly

22 involved or brought into the agreed protective order.  Lots of

23 documents are being requested, not so much through the

24 electronic -- the ESI, but through the fourth production of

25 documents request that we got that -- which we received on the

43

1 9th of July that gave us six days to respond to, and that's why

2 we started talking and having discussions with the Committee

3 about this.

4         But there -- there there's all these document

5 requests, and we have our own fiduciary duties, we -- either

6 contractually, statutorily, or regulatorily.  And as the

7 Committee noted, they'd be perfectly fine with having us being

8 brought into (indiscernible) -- whatever you want to call the

9 right under the coverage of agreed protective order.  We're not

10 expressly under it because we're -- we're not a specific party

11 to it, but we need to be -- we feel it's the most appropriate

12 for us, too, in this context, and they've acknowledged that

13 it's a reasonable step to be added to the agreed protective

14 order, so we're happy with that.

15         As far as the documents being produced, the only --

16 the principal attached -- the principal issue for Rand Advisors

17 there is that it's principally its email server issue.  Rand

18 Advisors, and the others, have their on documents on its own

19 servers, as best as I understand.  And so it's really more

20 documents that would be appended to emails and discussions

21 between the parties, either in the context of  (indiscernible)

22 some of the nine individuals that are custodians, that they're

23 described as custodians or otherwise.

24         But the UCC has agreed to let whatever documents are

25 produced in that context, both through the ESI and through the

44

1 request for production that's outlined there, that we're having

2 to respond to under the shared services agreement with the

3 debtor. But those would also be subject to highly confidential

4 status, subject to the Committee seeking to downgrade to

5 confidential, or not confidential at all.

6 Now the other issue is the attorney-client privilege

7 where Rand Advisors and the others were generally using

8 RandAdvisors.com suffix, would have negotiations and

9 discussions with its own private counsels. And the question

10 here, we don't -- I'm not sure whether or not the shared -- I

11 mean the servers are or are not sufficiently silo'd or

12 otherwise.

13 But we really don't have that hard of an issue here -

14 - that difficult of an issue here as we only -- there's only

15 three defined suffixes that are out there that would be of

16 concern to the Rand Advisor entities, and those are suffixes

17 such as romclaw.com, our law firm, we didn't realize that that

18 was the case. Also, there would be maybe Sadis -- Sadis or --

19 another law firm, maybe three or five suffixes we need to have

20 set aside for attorney-client privilege review. And if we have

21 those, I think that the Rand Advisor group has gotten what they

22 -- what they think is reasonably appropriate under the

23 circumstances.

24 And we're not asking the Court to, you know -- well,

25 we don't see this as truly a request for production, it's kind

45

1  of a hybrid kind of a (indiscernible).  But under the shared

2  services and the final term sheet, and that allows access, lets

3  the Committee be the debtor and get to many things, but yet

4  they use request for productions as a methodology to say what

5  they're looking for, but they're not really requests for

6  production, per se, because it's -- I've already got it now,

7  this is (indiscernible) debtor, it's what we can look at.

8         And so we're wanting to make sure that we have under

9  our side of this relationship under the shared service

10  agreement some modicum of protection for its specific attorney-

11  client issues that it has.  We recognize the joint privilege

12  issue, that's going to (indiscernible).  But there are three to

13  five very simple suffixes as we can give to the Committee for

14  doing its search (indiscernible) romclaw.com, that's my law

15  firm, it would know not to go -- you know, set those aside.

16  There's one or two other law firms that they deal with

17  specifically, and if they go through the next step, and it

18  turns out that there's three or four other people on the email

19  that aren't part of Rand Advisor that's something with the

20  debtor or some third party altogether, then sure, there's no

21  privilege there.

22         But if it's the discussions between Rand Advisor

23  entities and its counsels specifically, then it should be

24  something that's set aside and reviewed in a different manner.

25  And I don't think it's really even close to burdensome in the

46

1 context of how much is going on in this case, and how many

2 documents are going to be reviewed.

3      That's principally our concern. We are -- that's

4 another suggested solution to deal with the two elements that

5 we raised in our response on Pages 6 and 8 to a likely

6 solution, which is to basically deal with attorney-client

7 privileges, subpart C, is just to have these exclusion --

8 exclusionary suffixes to address that, very simple.

9      The rest of this, as far as having a log to keep

10 produced items in its context, to be able to (indiscernible)

11 what documents were produced, well, that's probably a bridge

12 too far. We don't need to have that, we don't think that's

13 (indiscernible) concern for us.

14      So keeping up with the few things, the agreed

15 protective order being made expressly applicable to us so that

16 for our purposes, when we have to deal with issues of

17 confidentiality regarding our clients contractually,

18 statutorily, or regulatorily, that's the (indiscernible) I

19 think there's always a legal process (indiscernible).

20      Two, that everything gets a highly confidential

21 status initially, and subject to being downgraded, obviously

22 with notice and opportunity to object.

23      And then lastly, just that the three suffixes be

24 added to the review standard so that -- three to five suffixes,

25 and I'll have those easily enough in the next few days to give

1  to the Committee to allow me to preserve its attorney-client

2  privilege without having to go into the issue of whether or not

3  this is a means by which Rule 34, or the other appropriate

4  discovery rules, are really being invoked or not in this

5  context, or whether this is just "I'm standing in the debtor's

6  shoes, and I should be able to do these things."  It's --

7  that's an odd -- we can bypass that oddity by dealing with

8  those requested suffixes being set aside.

9          THE COURT:  Okay; thank you.

10          All right, let's hear from CCS, please.

11          MS. STRATFORD:  Good afternoon, Your Honor.  This is

12  Tracy Stratford from Jones Day on behalf of CCS Medical.

13          THE COURT:  Okay.

14          MS. STRATFORD:  Our concern is relatively narrow and

15  unique.  CCS is one of the country's leading providers of home

16  delivery medical services.  And so they deliver things like

17  insulin pumps and orthotics to people in their homes.

18          Two of Highland's employees, Mr. Parker and Mr.

19  Dondero, were directors of CCS Medical.  And so CCS Medical

20  sent information to them, sensitive business information about

21  the strategic direction of the business, about pricing, about

22  what the business would be doing or wouldn't be doing, about

23  decision-making that would happen within CCS Medical.  That

24  sensitive information was sent to the director, including these

25  two individuals who were employed by Highland at their Highland

48

1  email addresses.

2         All we're asking is for the ability to look through

3  these emails first so that we can identify anything that is

4  competitively sensitive, so that we can identify anything that

5  is privileged, and talk to the Committee about it separately.

6         We don't know, frankly, what the claims are that the

7  Committee is looking to press, so I can't say that none of it

8  is relevant, although it doesn't seem to be particularly

9  relevant to what's being discussed today.

10         But to the extent that some of those documents might

11  be relevant, the non-privileged ones, but commercially

12  sensitive ones, we want to have that discussion.  We would like

13  the ability to look at those documents first, and that would be

14  at our cost, so there's no cost to the estate.  We don't think

15  it would take particularly long.

16         And we would have offered the solution directly to

17  the Committee, but they wouldn't return our phone calls.  So

18  we've sent emails, we've called them, and heard nothing back.

19  We would have loved to have negotiated this, but that didn't

20  happen.

21         The only argument that the Committee makes in

22  response to our suggestion, which were laid out pretty clearly

23  in our very short objection, is that there's a privilege waiver

24  here, or a waiver of confidentiality because we sent this

25  information to these two board members who were employed by

49

1 Highland. (Inaudible) as a matter of law. And the very case

2 that they cite in their papers explains that.

3       If you take a look at the In Re Royce Homes case that

4 they cite in their response to the objection, what they say is

5 that once you send confidential information to another

6 corporation, the privilege is automatically waived. That's not

7 the case.

8       In fact, if you look at that case, it's very lengthy

9 because the Court looks at a number of factors. And amongst

10 those factors is the expectation that the sender has that the

11 recipient will be able to maintain the information as

12 confidential or protected.

13       Here we have two executives at Highland who were

14 receiving information as members of the board of directors,

15 they controlled the company, they had the ability to control

16 who reviewed their email, and CCS Medical had every reason to

17 believe that those two directors would preserve their duty of

18 loyalty to the company and maintain their individual emails as

19 confidential. There's no waiver under that circumstance.

20       But to the extent that this issue is one that needs

21 to be decided, it can't be decided on these papers because none

22 of those facts are before the Court. None of the factors that

23 are discussed in the In Re Royce Homes case are -- have been

24 briefed.

25       And so to the extent that we're going to discuss a

50

1  waiver, we would like the opportunity to do that.  We don't

2  think the Court ever needs to reach this issue because we think

3  that we can, in a very efficient and effective way, screen the

4  emails by just having the vendor search for particular domains,

5  review them ourselves, identify what's privileged.  And what's

6  not privileged, we can turn over.

7          To the extent there's any dispute later on, we can

8  bring it before the Court at that time, but we think this is an

9  easy problem to solve, Your Honor.

10          THE COURT:  Thank you.

11          MS. STRATFORD:  Thank you.

12          THE COURT:  All right.

13          Well, let's see who I missed.  Ms. Drawhorn, did you

14  have a separate argument for MGM?

15          MS. DRAWHORN:  Yes, Your Honor.

16          THE COURT:  Okay, go ahead.

17          MS. DRAWHORN:  I do.

18          THE COURT:  All right.

19          MS. DRAWHORN:  And so MGM is in a similar situation

20  to the party you just heard.  And the only reason that MGM is

21  being pulled into the discovery dispute is because Mr. Dondero

22  served as a director on the -- on the board of directors for

23  MGM.

24          So we also believe -- and we have been in discussions

25  with the Committee about potentially pulling out or excluding

1 certain MGM information just by providing a list of the emails,

2 the dot-com of the other executives, or executive assistants,

3 or other board of directors members who would be sending

4 confidential information that was circulated just because --

5 for purposes of the board of directors of MGM and for MGM

6 business matters.

7 　　　　　So we -- we agree and -- or disagree with the

8 Committee, and agree with the position you just heard. The

9 Committee's response to our -- to MGM's objection is that we

10 waived by sending confidential MGM information to Mr. Dondero's

11 account at Highland, that waived conference or privilege, and

12 we disagree with that. We -- we just heard that sending to an

13 employer's email account in and of itself is not sufficient to

14 waive privilege or confidentiality. There are a multitude of

15 factors that need to be considered, including the expectation

16 of privacy in considering the fiduciary duties of board of

17 directors under California law, which is where MGM operates.

18 That that confidentiality is one of the fiduciary duties.

19 　　　　　We would expect that sending information to our

20 directors would remain confidential. And just the mere fact

21 that he utilized his -- Mr. Dondero utilized his Highland email

22 account would not be sufficient to waive any confidentiality or

23 any privilege.

24 　　　　　And then I -- I -- it is hard to believe that

25 anything MGM-related would be extremely relevant to the

52

1 Committee's claims, but regardless, I think there's an easy way

2 to pull that information and make sure that nothing is being

3 disclosed, which would be by providing these specific email

4 addresses of outside counsel to MGM's board of directors.

5 We've got, you know, two -- two counsels that would not have

6 provided any services to the debtor, that we can say anything

7 at those email addresses should get excluded from production.

8        Same with the outside advisors to the MGM board, we

9 can easily provide that email address and have that information

10 excluded.

11       And then as to the other confidential MGM

12 information, we have a list of the executives and their

13 assistants, we would have provided -- and other board members,

14 we would have provided that. I just think it should be fairly

15 easy to give those email addresses and exclude them from the

16 production, and make sure that that confidentiality and

17 privilege is maintained and protected.

18       THE COURT: All right; thank you, Ms. Drawhorn.

19       Okay, NexBank's counsel, you were going to try to

20 knock my socks off with a reason why I should hear your

21 argument today when you didn't file an objection. So, Counsel,

22 now's your chance.

23       MR. SLADE: I appreciate it, Your Honor; thank you

24 very much. Jared Slade of Alston & Bird for NexBank.

25       NexBank advances the same arguments about concern of

53

1  counterparty confidential information, as well as attorney-

2  client privilege concerns.  And to that end, it's requested

3  some preview time to be able to review the documents and

4  provide the appropriate search terms.

5      I think there are three things which will happen in

6  the next 50 seconds that make us differently situated:

7      The first is unlike the other objectors, our shared

8  services agreement provides expressly that debtor shall take

9  all options, legal or otherwise, that are necessary to prevent

10 the disclosure of confidential information by the receiving

11 party or any of its representatives.  So we have a different

12 legal basis that was addressed in part in the debtor's motion

13 originally on this issue.

14      The reason we have that is because we're a bank, and

15 we have two other categories of information that are

16 particularly sensitive and we're concerned about being

17 disclosed:

18      The first are bank examination materials.  Privilege

19 is a part of those, and we are very concerned about an issue or

20 problem with our regulators in connection with the fact that we

21 have, in fact, taken appropriate steps to try to protect those

22 and treat those as privileged and confidential information.

23      The other category of information is consumer

24 information.  We're talking about things protected by

25 (indiscernible) and other consumer information which are

54

1 protected in the statutes.

2          Again, we're willing to go through the effort and

3 expense to be given an opportunity to be able to review that

4 because (indiscernible) that any of that is going to be

5 relevant to what the Creditors' Committee is looking at, that

6 we understand where we are.  And provided that we are able to

7 do that, and are also afforded an opportunity by the Court to

8 be a party to the protective orders so we can take advantage of

9 the designations and not be prohibited from the (indiscernible)

10 third party beneficiary provision, we should be able to meet

11 our obligation.

12          Thank you, Your Honor.

13          THE COURT:  All right; thank you.

14          All right, Ms. Montgomery, I'm going to turn back to

15 you.  And let me make sure I understand entirely your position

16 on all of these objectors.

17          You have said -- correct me if I'm wrong -- the

18 Committee has no problem with making all of these objectors

19 subject to the protective order that was negotiated with the

20 debtor way back when in January, or did I overspeak -- overstep

21 on that one?

22          (No audible response heard)

23          THE COURT:  Ms. Montgomery, I can't hear you.

24          (No audible response heard)

25          THE COURT:  Ms. Montgomery, you must be on mute.

1          Michael, is she still on there?

2          ECRO:  (Inaudible).

3          THE COURT:  Okay.  Ms. Montgomery, we're showing

4 you're on mute.  There you are, okay.

5          MS. MONTGOMERY:  Can you -- can you understand me

6 now?

7          THE COURT:  Yes.

8          MS. MONTGOMERY:  Okay.  I don't know what happened, I

9 didn't touch anything.

10         THE COURT:  That's okay.

11         MS. MONTGOMERY:  Technology.

12         No, Your Honor, you're accurate -- that is accurate.

13 We don't have any problem with any of the objectors being made

14 parties to the protective order for purposes of, you know, for

15 their clients to be subject to the same -- the same

16 protections.

17         THE COURT:  All right.  And then my next thing I

18 wanted to confirm is that protective order, is it already

19 worded that it's UCC professionals' eyes only or no?

20         MS. MONTGOMERY:  So the current -- the current

21 protective order has two tiers.

22         THE COURT:  Okay.

23         MS. MONTGOMERY  And the highly confidential tier has

24 a very -- a much more limited disclosure group, it includes the

25 Court, it includes the outside professionals, so I guess it

1  would be also FTI, etc.

2          And then, you know, other parties that would be, you

3  know, fundamentally necessary for us to use those -- that data,

4  like court reporters.  It does not include the members of the

5  Committee.

6          THE COURT:  All right, so you said it's two tiers.

7  You mean like there's highly confidential, that's professionals

8  and those people you named only; and then there's a second

9  tier, confidential, then the Committee members, the actual

10 businesspeople could see it?

11         MS. MONTGOMERY:  That's absolutely right, but the

12 confidential data would still be subject to protection.  So we

13 think it's a strong protective order, and should meet the needs

14 of all of the objectors.

15         THE COURT:  Okay.  Let me -- I'm giving you the last

16 word.  You can respond in any way you want to all of these

17 eight or so separate arguments, but I would like you to start

18 first with CCS Medical and MGM.  I think you acknowledged at

19 the beginning they're in a little bit different category, but

20 now that you've heard their lawyers articulate how they are

21 different, do you think that at least with these two, their

22 ability to first review anything you produce, or the debtor is

23 going to produce, relating to CCS Medical and MGM might be

24 reasonable?

25         MS. MONTGOMERY:  Yes, Your Honor.

57

1            I'd even go a step further.  I mean we were working

2    to negotiate with MGM, and my apologies to Ms. Stratford

3    because I must have missed her communications, it was not

4    intentional; we would have happily negotiated the same with

5    regard to her.  That those documents might even just be

6    excluded from the review subject to some specific, you know,

7    protections so that we can make sure that things aren't being

8    overly included.

9            So I think that the UCC would be open to a limited

10   review.  The devil's in the details with all ESI, Your Honor,

11   so it would really just be determining to make that as targeted

12   as possible so it's not -- you know, it's not including

13   documents that don't have anything to do with the board's

14   service.

15           THE COURT:  Okay.  It's -- let me ponder what you

16   just said.

17           It would exclude anything not having to do with their

18   board service, Dondero or Trey Parker's board service.

19           MS. MONTGOMERY:  Yes.  So we believe that because the

20   debtor has separate relationships potentially with these other

21   entities, we understand the concern with regard to the data

22   that's related to their role as a director.

23           But, for example, if there is communications between

24   Mr. Dondero and someone else at the debtor that just says like,

25   you know, "MGM stock is trending up," I don't know that that's

58

1  necessarily related to his status as a director as I don't know

2  that it's related to an estate claim. It's perhaps a bad

3  example, but the concept remains, Your Honor, we think that

4  there has to be a way to slice that so that all the parties are

5  getting the protection that they need for their confidential

6  board communications without overly dipping into the data

7  that's otherwise in the debtor's position.

8         THE COURT: All right.

9         Well, let me -- let me go to Mr. Keiffer's client.

10 I'd like to hear your specific rebuttal to his idea that maybe

11 you can come up with three or five categories, suffix as he

12 called them, to just, at the outset, carve them out from the

13 possibility of Committee review.

14        MS. MONTGOMERY: So I'm not entirely certain that I

15 completely understood the proposal, Your Honor, and my

16 apologies for that. But I don't know that Mr. Keiffer is

17 suggesting that those categories be excluded from these nine

18 custodians that are the subject to the motion to compel, or if

19 he was requesting that there be some sort of exclusion that

20 applies to data that's otherwise produced related to his client

21 by the debtor, so maybe it's not in the nine custodians' data.

22        In any case, Your Honor, we're open to discussions to

23 try to resolve any of these objections. I don't know that

24 we've specifically discussed that with Mr. Keiffer, but we're

25 happy to do so. If it's limited in nature, and it's not going

59

1 to unnecessarily slow down production, you know, we're open to

2 talking about it.

3     THE COURT: Okay. Well, let me -- let me make sure I

4 understand -- and I know this is subject to discussion with the

5 debtor when we break, but the UCC's proposed protocol here was

6 -- let me go through a couple of mechanics.

7     All the files of the nine custodians would be

8 provided to this E discovery vendor to put in a repository.

9 And then hopefully the debtor and the Creditors' Committee

10 would come up with a set of mutually agreeable privilege terms

11 to hopefully identify what would -- you agree be attorney-

12 client privilege or work product privilege so that the search

13 terms don't get to that privileged information.

14     If you have disputes, you're going to have a third

15 party neutral, you've discussed, to resolve the disputes about

16 those search terms.

17     And then all documents, not including those agreed

18 privilege terms, would get produced to the Committee, obviously

19 subject to the earlier agreed upon protective order, and then

20 the debtors contract attorneys would review the held back files

21 to see if they're really privileged, or not. And if not,

22 they'd be produced. And if they are, they would -- if they

23 think they are, a privilege log would be produced, and then any

24 disputes could be resolved by this neutral third party.

25     I don't know if that's still your protocol on the

1  table, but that's how I understood it to work from your papers.

2          I guess what I'm getting at is -- I'm pondering Mr.

3  Keiffer's argument, and really a few others.  I mean if this is

4  what you're still holding fast to, I mean there's a lot of

5  opportunities along the way to protect attorney-client

6  privilege information of these affiliated entities, right?

7  You're going to first try to craft appropriate search terms so

8  as not to get at privileged information.  If you can't get

9  agreements on those, you'll have the third party neutral weigh

10 in.

11         And then the documents that are turned up ultimately

12 through the search, the debtor's going to get a chance to

13 review for privilege and hold back.

14         I guess -- I guess the thought is the debtor's only

15 going to be looking towards its own privileged information,

16 not necessarily NexPoint, or Highland, CLO Funding, and the

17 others.

18         So -- I mean if you could address -- first off, is

19 that the protocol that's still on the table?  Did I correctly

20 described the Creditors' Committee's proposed protocol?

21         MS. MONTGOMERY:  Sorry.  Yes, Your Honor, that's

22 what's set forth in our motion.  We've been working with the

23 debtors to try to make that more functional; we haven't reached

24 an agreement yet.  Perhaps we'll be able to do that when we

25 take a break in just a moment.

1      But, you know, we've been trying to figure out, Your

2 Honor, if there are ways that we can further limit the

3 production based on search terms in some way so that we can

4 limit the privilege logging and review that has to occur. But

5 like I said, that's -- that's outstanding at the moment, and I

6 don't know that the parties have an agreement or would be able

7 to reach an agreement. We're hopeful, but I'm not entirely

8 certain.

9      But otherwise, yes, Your Honor, I think you've pretty

10 well explained the protocol, with one exception, which is that

11 the privilege review that was proposed, that review would be to

12 determine whether or not the documents that were being produced

13 -- that were, you know, presumptively privileged were related

14 to estate claims. And if they were related to estate claims,

15 then those would be produced to the Committee under the terms

16 of the final term sheet.

17      If they are attorney-client privileged, and not

18 related to estate claims, then those would be withheld and

19 logged.

20      THE COURT: All right.

21      Well, let's go back to Mr. Keiffer's suggestion. I

22 mean if he -- okay. I was confused; I think Ms. Montgomery was

23 confused, too.

24      Mr. Keiffer, you had talked about these three or four

25 suffixes, and one of them would be your law firm if -- I think

62

1   what I was understanding, communications that went between

2   Atlas and your law firm; communications that went between Atlas

3   and one or two other outside counsel.  Is that encapsulating

4   what you think could be crafted in here --

5           MR. KEIFFER:  Yes, Your Honor.

6           THE COURT:  -- and excluded?

7           MR. KEIFFER:  Yes, Your Honor, that's exactly what

8   we're talking about.

9           The reason I used "suffixes" just as a term because

10  after the act.  So it's ROMCLAW.com is the suffix.  And so if

11  you look for that -- if that is the part of the search terms

12  and, you know, you see that, and that means set aside, you see

13  my law firm's suffix on the email somewhere in that, then you

14  know that that's something you need to set aside, as well as

15  another law firm that they had would be SGLawyers.com, those

16  are the -- that's what was referencing, it's just an easy way.

17          We don't have a lot in our specific circumstance --

18  and I think it was also some of the more attenuating parties

19  that come in and -- complaining have been -- would be looking

20  for something like that, so if they had a -- maybe that's the

21  same thing that they're kind of looking for.  But for us, it is

22  very simple terms, it's what the law firm email addresses are.

23  And when they show up, that's the search term that pushes them

24  aside.

25          THE COURT:  All right.

63

1       MR. KEIFFER:  Because that would okay, it's probably

2  something -- because before we even knew what was going on, we

3  were working on putting that proof of claim together that we

4  filed, we would have emails out there concerning circumstances

5  between myself and my client.  And those would -- those

6  ostensibly would be available under the -- under the -- if it

7  were (indiscernible) litigated, and the Committee won that

8  issue, those would be available.

9       But we think the easier thing to do is just set them

10 side, let's not go down that road.

11      The other -- we think there's very few of those, and

12 we'll be happy to give them -- the suffixes in a few days.

13 I'll make sure Mr. Honis -- that my client representative gives

14 me all of those.

15      THE COURT:  All right.

16      Well, Ms. Montgomery, again, I'm just looking through

17 my notes of your early comments.  I mean you had put Mr.

18 Keiffer's client in a little bit of a separate category, right?

19 Saying it didn't appear that Atlas or Rand entities -- they're

20 one in the same, right?  Or -- well, same group of clients or

21 same group of entities:  Rand, Atlas --

22      MR. KEIFFER:  They are, Your Honor, that's all --

23 they're all in my group.

24      THE COURT:  Okay.  So you had made the comment, Ms.

25 Montgomery, that they did not appear to share legal counsel.

64

1          MS. MONTGOMERY:  I did.

2          THE COURT:  In other words, the three in-house

3 lawyers that are custodians, right?

4          MS. MONTGOMERY:  That's right, Your Honor.  And I

5 think that our position would be because they don't share legal

6 counsel, if there were communications essentially from these

7 three law -- like law firm email addresses that are in these

8 nine custodial data, then those documents might not be

9 privileged.

10         If what Mr. Keiffer's concerned about is

11 communications not to these nine custodians that involve those

12 three or four addresses where there isn't sort of a debtor

13 representative involved, then I think that's a separate

14 situation, and we'd be more than willing to reach an agreement

15 regarding how those documents should be treated, whether it's

16 by review by Mr. Keiffer in logging or just exclusion from

17 review.

18         MR. KEIFFER:  Your Honor, may I ask for one quick

19 clarification.  We still want to maintain that to the extent I

20 don't know for sure whether -- what extent legal services were

21 or were not provided.

22         And to the extent that their joint privileges waived,

23 a way around those things, that's the better way of doing it

24 than to say that they've been waived and things.  So let's just

25 let the joint client privilege point, which we previously

65

1  discussed, be the main means by which those go through.  There

2  might be (indiscernible) discussions with one of the nine folks

3  that -- when Highland was involved in the transaction.  There

4  may be a common interest privilege, etc.  I think it has to

5  stay at that highly confidential level just because it's

6  (indiscernible) had it lowered in its tier -- I mean a tier --

7  or possible references, whether it's confidential, highly

8  confidential, confidential or not confidential at all.

9          THE COURT:  Okay.  I just --

10         MR. KEIFFER:  That's the only --

11         THE COURT:  I just got very confused.  I think we

12 were discussing if -- if there are --

13         MR. KEIFFER:  May I, Your Honor?

14         THE COURT:  Yeah, I -- I -- well, if there are

15 communications from folks at Highland to these three or so law

16 firms that Atlas uses, then there could be an agreement those

17 are cut out -- carved out.

18         But if there is -- if there are communications from

19 the six other custodians who are not lawyers to Rand entity --

20 or -- or these law firms --

21         MR. KEIFFER:  No, Your Honor --

22         THE COURT:  I -- I --

23         MR. KEIFFER:  Pardon me, Your Honor.  The law firms

24 aren't really the issue here.  Only the issue with regard to

25 seeking things through what is the shared server circumstance

66

1  in the email server.

2          An example may be that when there's an email that
3  comes in from Isaac to my client saying "You've got some
4  production requirements," and I'm on that email, I would
5  initially show up on that email, but that wouldn't be one that
6  would be as part of a shared services type of potential legal
7  discussions about current circumstances and telling me, "Oh, by
8  the way, we've been requested for this information under a
9  shared services agreement, you have X days to produce."

10         If, on the other hand, it's -- some years ago, back
11 when things were happening, not current, but years ago when
12 things were going on, that there was -- that there was an email
13 between my client's counsel and the debtor's counsel, there
14 would be the shared privilege or the joint privilege element
15 that would keep it at a different level, even though there may
16 be some other issues in regard to the shared services related
17 to privilege.

18         What we mentioned earlier -- and I think the
19 Committee's okay with this -- with the joint client privilege
20 is not affected by the process.  And so that -- the only thing
21 that's really, really out here that adds to the circumstance is
22 where emails show the three to five dot-com addresses.  That
23 they get set aside to go through a different -- go through a
24 process of review, you know, to see if they're attorney client
25 between myself and my client, or between previous counsels and

67

1 my clients, just as between them.

2          THE COURT:  All right.

3          MR. KEIFFER:  That's all we're really looking for in

4 that.

5          THE COURT:  Okay.

6          Ms. Montgomery, again, I'm giving you the last word

7 in rebuttal to any of this you want to say at this point.  But

8 I do hope you'll address one more thing as part of that, and

9 that is Mr. Dondero's arguments about Acis.  I just want to

10 clarify I understand where you stand on that.

11          MS. MONTGOMERY:  Yes, Your Honor.  With regard to Mr.

12 Dondero's arguments regarding Acis, we have no qualms with the

13 position that communications that are related to the Acis

14 litigation should be treated as outside counsel or highly

15 confidential -- at the highly confidential level, right?  That

16 makes sense, Your Honor, and we're not trying to bypass

17 discovery on behalf of any of the members of the Committee, or

18 anything of that nature.

19          Our concern with the objection was that's not what's

20 being asked for.  If Mr. Dondero had asked that communications

21 or documents that relate to the underlying litigation be not

22 provided to the members of the Committee, and held at only the

23 lawyers' eyes only, we wouldn't have had a problem with that.

24          Instead, what he's asking is that all documents not

25 be shared with one of the members of the Committee, and we

1 think that's overly broad.  And, frankly, I'm unclear as to why

2 that would be necessary.

3          THE COURT:  Okay; all right.  Anything else you want

4 to say?

5          MS. MONTGOMERY:  Only to the extent that you have

6 questions about any of the arguments that they made, Your

7 Honor.  We don't want to take up more of your time than

8 necessary.

9          THE COURT:  All right.  Well, I'm going to carve out

10 three specific areas, and then I'll just give you the more

11 broad ruling.

12          With regard to CCS Medical and MGM, I think they have

13 shown themselves to be in a more unique -- a unique situation

14 in contrast to the others since we certainly don't have any

15 issues of shared in-house lawyers, shared IT, and whatnot.  We

16 just have the board connection to Mr. Dondero and Trey Parker

17 on CCS Medical, and with regard to Mr. Dondero and MGM.

18          So I do think these objectors should have the

19 independent ability to review before disclosure to the

20 Creditors' Committee, at their own cost, any information

21 pertaining to those two entities to make sure there's not any

22 privileged information they want to argue should be held back

23 or commercially sensitive information.

24          So, again, hopefully you all can amicably work out

25 the wording of that, but that is the concept of the ruling of

69

1 the Court.

2          Second, with regard to the Atlas/Rand parties, I

3 think that they should be entitled to a separate review of any

4 items that involve those dot-com law firm names to weigh in on

5 whether those are privileged.

6          And, of course, these are all subject to further

7 Court review and litigation before the Court if people cannot

8 agree on that. I say that, or the third party neutral, I guess

9 that would hopefully be the first step before any of this comes

10 to the Court.

11          So that is the special category as to Atlas/Rand.

12          As far as the Dondero argument, I do like the

13 suggestion, Ms. Montgomery, that you made that if there is any

14 documentation relating to Acis litigation that is produced to

15 the Committee, that it should be considered in that first

16 category that it's highly confidential, so it's for

17 professional eyes only; Mr. Terry or Acis businesspeople cannot

18 see that. But that it -- that's just a special category of

19 documents, any ESI that pertains to the Acis litigation,

20 wherever that litigation is pending, this Court, Guernsey,

21 State Court, wherever.

22          So all other objections are overruled except --

23 obviously I do think it's important to do, Ms. Montgomery, what

24 you said you would do, and make all of these objectors

25 expressly parties who are subject to the original agreed

1  protective order.  Okay, so I think that gives them some level

2  of protection.  But I have been strongly persuaded in

3  everything I've heard today that there is a very strong chance

4  with regard to most of these entities that share legal counsel

5  with Highland, and share IT, and servers that we have had a

6  waiver of privilege, we have common interest privilege, joint

7  privilege, something of that regard to have impaired their

8  privilege arguments.  So I'm just throwing that out there for

9  the benefit of everyone as far as future disputes that there

10  might be.

11          All right, Ms. Montgomery, do you have any questions

12  about that ruling?

13              MS. MONTGOMERY:  (No audible response heard).

14              THE COURT:  No?  All right.

15              MS. MATSUMURA:  Your Honor, may I make one brief

16  comment?  This is Rebecca Matsumura for Highland CLO Funding.

17              THE COURT:  Yes.

18              MS. MATSUMURA:  I just wanted to clarify, we didn't

19  make it as an explicit part of our deal with the Committee that

20  we also be made party to the protective order.  But we'd also

21  ask for that relief, as well as, you know, such being given to

22  all of the objectors.

23              THE COURT:  Okay, the Court grants that request.

24          All right, Ms. Montgomery, anything else?

25              MS. MONTGOMERY:  (No audible response heard).

1          THE COURT:  Shall we break now to let the Committee

2   counsel and debtor counsel talk about their remaining

3   unresolved issues?  How long of a break, Ms. Montgomery, do you

4   think you will need?

5          MS. MONTGOMERY:  (No audible response heard).

6          THE COURT:  Okay.  I think you're on mute.

7          MR. MORRIS:  Your Honor, this is John Morris from

8   Pachulski on behalf of the debtor.

9          THE COURT:  Oh, okay.

10         MR. MORRIS:  I just -- yeah, I just need to put some

11  -- a couple of bells and whistles, it will probably take me two

12  minutes to finish-up an email from Ms. Montgomery.  And then if

13  we could just -- I would suggest give us until -- 45 -- until I

14  guess 3:45 --

15         THE COURT:  All right.

16         MR. MORRIS:  -- local time.

17         THE COURT:  All right.  Well --

18         MR. MORRIS:  And then see -- hopefully we'll know --

19  at least narrow the issues, if not reached a complete

20  agreement, by that time.

21         THE COURT:  Okay.  I'll come back at 3:45.

22         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

23             (Recess 3:23 p.m./Reconvene 3:46 p.m.)

24         THE COURT:  All right.  This is Judge Jernigan again.

25  I'm going back on the record in Highland Capital.  Do we have

72

1  at least Mr. Morris and Ms. Montgomery available from their

2  session?

3       MS. MONTGOMERY:  Can you guys -- can you hear me,

4  Your Honor?

5       THE COURT:  I can hear you now; thank you.

6       MS. MONTGOMERY:  Okay, I have no idea why it keeps

7  muting, so my apologies for that.

8       We just briefly met.  We need just a few more

9  minutes, Your Honor, to run one issue past our client, but we

10  do believe we're going to have at least one matter outstanding

11  for the Court to consider hopefully, but we've managed to

12  resolve everything else.

13       THE COURT:  Okay.  So do you literally mean one

14  minute, or were you being general?  Do we need five minutes

15  or --

16       MS. MONTGOMERY:  I think five would be sufficient,

17  Your Honor.

18       THE COURT:  All right.  Well, I'll take another

19  break.  I'll be back in five minutes.

20       MS. MONTGOMERY:  My apologies.

21       THE COURT:  Okay; no problem.

22            (Recess 3:47 p.m./Reconvene 3:59 p.m.)

23       THE COURT:  All right.  This is Judge Jernigan, we're

24  back on the record in Highland after a break.

25       Mr. Morris, I see you there.  And do we have positive

73

1 news to report?

2      MR. MORRIS:  I think we do.  We haven't completely

3 resolved every single issue, there is still one remaining one

4 that we'd like to present to the Court.

5      THE COURT:  Okay.

6      MR. MORRIS:  But we have otherwise, I think, reached

7 an agreement with respect to all other matters.

8      Ms. Montgomery, I don't know if you want to share

9 with the Court or -- I don't even know if Your Honor wants us

10 to present the agreement to her or we'll just submit it in a

11 proposed order later.

12      THE COURT:  Well, if you could just hit the

13 highlights so we have it on the record that we have an

14 agreement, and the pertinent points.

15      MR. MORRIS:  Okay.  So I'll just -- I'm just reading

16 from the email.

17      The Requested ESI will be securely delivered to

18 Meta-e.  Meta-e is a third-party service provider,

19 (indiscernible) the Committee.  So the requested ESI for the

20 nine custodians will be delivered to Meta-e.

21      Number two, the debtor will proceed with the

22 production of the 800,000 e-mails previously identified by use

23 of agreed search terms, subject to the Court's prior rulings

24 with respect to the third party objections, and subject further

25 to a privilege review using terms agreed by the parties, with

74

1  the resolution of any disputes on those privileged terms

2  resolved on an expedited basis in accordance with the

3  Committee's proposal in their motion to compel.  And that

4  really is just longhand, I guess, for a special master.

5       If and when the UCC wants to conduct further searches

6  on the requested e-mails, it will give the debtor with three

7  business days to consent to the search terms, with such consent

8  not to be unreasonably withheld.  In the absence of any

9  objection, the e-mails will be produced subject to the Court's

10 rulings on the third-party objections, as well as privilege

11 review previously described.  Search terms need not necessarily

12 be tied to formal requests for production, and may be provided

13 to the debtor on a rolling basis.

14      If debtor does not consent to search terms, it must

15 lodge an objection with the Committee.  The parties shall

16 confer in good faith and if no resolution is reached within two

17 business days, the debtor may seek judicial review on an

18 expedited basis.  It will be debtor's burden to establish that

19 the search terms are not reasonably designed to identify data

20 relevant to Estate Claims.  Initial caps because the "Estate

21 Claims" is from the governance settlement back in January.

22      All ESI containing search terms not subject to

23 objection will be produced to the Committee pending

24 determinations on those terms, if any, as to which there is

25 disagreement.

75

1         Next, Your Honor, taking into account the speed with

2   which the parties intend to proceed and the volume of

3   documents, all ESI produced that is not subject to the

4   privilege term search shall be produced on a "highly

5   confidential" basis under the protective order, and the debtor

6   shall respond within two business days to any designation

7   challenge by the UCC.  Documents that have been reviewed for

8   privilege will be categorized by debtor in the first instance

9   as either highly confidential, confidential, or not subject to

10  confidentiality.

11        Next, all persons or entities who objected to the

12  UCC's motion to compel or who are otherwise identified in the

13  debtor's motion for a protective order shall be deemed to be

14  parties to the court-ordered protective order that was entered

15  in January.

16        All documents from any custodian -- any of the non-

17  custodians that are related to or otherwise concern the pending

18  Acis litigation shall be marked "highly confidential" and not

19  subject to privilege challenge.

20        And finally, any disputes regarding the privilege

21  review process will be resolved by the special master and both

22  parties expressly reserve their rights thereto.

23        So there's one last issue --

24        THE COURT:  Can I -- before we --

25        MR. MORRIS:  Of course.

1          THE COURT:  -- go on and I forget, can we call this

2   human being a third party neutral instead of a special master?

3   And I'm -- I'm splitting hairs on that because there is a rule

4   somewhere -- is it -- is it in 105 or is it a rule that says a

5   bankruptcy judge can't appoint a special master?

6          MR. MORRIS:  I don't know, but let's just call him or

7   her a third party neutral.

8          THE COURT:  Yeah, I'm not crazy, isn't that -- I

9   think it's in one of the 9000 rules.

10         MR. MORRIS:  I'm sure you're right.,

11         THE COURT:  I'm not sure how different this third

12  party neutral is in substance from a special master, but it

13  will just make me feel better.

14         MR. MORRIS:  Yeah, it's just somebody who can --

15         THE COURT:  If the Fifth Circuit ever looks at it --

16         MR. MORRIS:  Yeah, it's just somebody who can help us

17  resolve either issues of creating these privilege terms or

18  resolving any other disputes so that we don't have to burden

19  the Court with such issues.

20         THE COURT:  Okay; very good.

21         Well, let's hear the unresolved issue then.

22         MR. MORRIS:  Okay.  So the last issue, Your Honor, is

23  as Your Honor knows -- Your Honor, I need to, if I may, just

24  provide some perspective here because these issues are very,

25  very important to the debtor.  I take personal responsibility

77

1  for all discovery matters in this case. I've had the support

2  of the independent board, and of all of Highland's employees

3  who have worked very hard to get these documents in this case.

4        We produced -- really we were substantially complete

5  with all (indiscernible), and we did it with the following

6  principles in mind: We wanted to, of course, eliminate or at

7  least limit any potential liability exposure to the debtor, and

8  that's what prompted us to make the motion to compel. And as

9  Your Honor saw, there were eight separate objections brought by

10 40 or 50 different parties, and it's exactly for that reason

11 that we were seeking the ability to do the review initially

12 because we have -- you know, we may have wound up disagreeing

13 with some third parties as to the scope of their obligations,

14 but we knew there were obligations that existed and the board

15 was very specific in instructing me to make sure that we

16 (indiscernible) liability (indiscernible). So I'm really

17 pleased that the objecting party stepped up, and that the Court

18 issued its rulings. But that was really one of our

19 (indiscernible) principles.

20       Another one is to make sure that we protect the

21 privilege to non-estate claims. We negotiated very

22 (indiscernible) term sheet with the Committee. We gave the

23 Committee standing to pursue estate claims. We gave the

24 Committee a shared privilege to all privileged communications

25 of estate claims.

78

1          But what we did not do, what we did not agree to was
2   to waive the privilege with respect to non-estate claims.  So
3   that's the second principle that we've been trying to protect
4   because the board and (indiscernible) we have an obligation to
5   the estate and to the Committee, so we're trying to protect the
6   estate's privilege for non-estate claims.

7          And the third thing is just to make sure this process
8   runs as efficiently as it could.  You know, I don't know that
9   going from 800,000 emails to eight million is -- can be
10  categorized as a success, but that's what the Committee's
11  wanted to do, and the board has been very specific not to be
12  obstructionist here, but just to be guided by the principles
13  that I've articulated.  And that's kind of how we got here.

14         And so the last issue here, Your Honor, touches on
15  the principles that I just described, and that is the nine
16  custodians at issue, three of them are lawyers:  Scott
17  Ellington, Isaac Leventon, and Mr. Surgent.  They're all
18  lawyers, they're all licensed to practice law, they all give
19  legal advice, they give legal advice to the board, they give
20  legal advice on countless issues that are completely unrelated
21  to estate claims for which the Committee does not have standing
22  to pursue, and for which the Committee does not have a shared
23  privilege.

24         So the third issue, Your Honor, is just to say that
25  for those three out of nine custodians, we actually do a real

1 privilege review on a document-by-document basis.

2          Now I'll just leave it at that, that's what the issue

3 is.  And the Committee, I think -- I'll let them speak for

4 itself.

5          THE COURT:  Okay.  I -- I didn't know there was any

6 disagreement about debtor lawyers or debtor contract lawyers

7 doing a privilege review.  I thought it was just a -- you know,

8 the two-tier, first a relevance review and then a privilege

9 review.

10          MR. MORRIS:  It's in our objection, Your Honor.

11          THE COURT:  Pardon?

12          MR. MORRIS:  We did raise it -- we did raise the

13 issue in our objection.

14          THE COURT:  Oh.

15          MR. MORRIS:  This isn't the first time I --

16          THE COURT:  Well, no, no, no, no, I thought --

17          MR. MORRIS:  Maybe I'm mistaken.

18          THE COURT:  I thought it was already part of the

19 UCC's proposed protocol that there be a privilege review by

20 debtor's lawyers.

21          MR. MORRIS:  That's right, and that's just using kind

22 of garden variety search terms.  What I'm saying is that when

23 it comes to -- and that's fine to take the six non-lawyers,

24 that's fine for Mr. Dondero, that's fine, you know, for Mr.

25 Waterhouse, and for the other non-lawyers.  But for a lawyer,

80

1 Your Honor, I think -- I think -- I mean this is of such vital

2 importance, and is -- almost everything they do is -- not

3 everything; I overstated.  Sometimes they're engaged in

4 business advice.  But for the most part, they're practicing

5 lawyers.

6        And I think we just need a heightened standard of

7 protection for those individuals, and it's just the three of

8 the nine.  I mean it's for three of the nine who are licensed

9 lawyers, and we're asking for a wholesale privilege review for

10 those three people, not just searching to see if their email

11 says they privilege or work product, you know, there are other

12 search terms that may come up.

13        THE COURT:  Okay.  Ms. Montgomery, elaborate on where

14 the difference is on your proposed procedure versus the

15 debtor's, all right?

16        MS. MONTGOMERY:  Yes, Your Honor.

17        The proposal that is before the Court, you're

18 correct, does provide for a privilege review.  We've never

19 argued that there shouldn't be a privilege review.  We

20 understand that the creditors stand only in the shoes of the

21 debtor with regard to the estate claims, and not more broadly.

22        The dispute really here, Your Honor, is on the nature

23 of the search when it comes down to these three custodians that

24 are attorneys.  And Mr. Morris is suggesting that all of the

25 documents -- every document that has a custodial file, is in

81

1 their custodian file should be touched by the debtor so that

2 they could look at it and determine whether or not it is

3 privileged. And if it is privileged, whether or not it's

4 related to an estate claim.

5          And our position, Your Honor, is that that's

6 unnecessary, and that it's going to cost a lot of money, and

7 also slow down the review process.

8          And the basis, Your Honor, for our position is that

9 this sort of assumption stands on the ground that every

10 document a lawyer touches can be -- you know, is automatically

11 privileged. And as a general rule, we all know that that's not

12 the case. Not every document a lawyer touches is protectable.

13 And that's particularly true with regard to in-house counsel.

14 Their roles by their nature involve providing both legal advice

15 and business advice, and only the legal advice is protectable.

16          Several courts have held that the presumption might -

17 - regarding privilege that might exist for law firm counsel is

18 not the same presumption that should be held with regard to in-

19 house counsel. In fact, the presumption should be that the

20 advice is business advice, unless it's establishing legal

21 advice.

22          And of the three custodians that the debtor

23 discussed, two of them -- they're all, in fact, licensed

24 attorneys. But one of them is not in the legal department, he

25 is acting as the head of compliance. And as you know, the case

1 | law on compliance is fairly well-settled that there isn't a

2 | presumption of privilege with regard to the compliance issues.

3 | And so as a result, we think it's most appropriate to

4 | use robust privilege terms. You know, think of things like

5 | privilege, lawyer, attorney-client, work product, etc., and

6 | we've proposed a list of those terms to the debtor, and we're

7 | willing to continue to work that out with this third party

8 | neutral.

9 | But we don't believe that it's appropriate for every

10 | single document that is related to these three custodians be

11 | reviewed for privilege purposes, that's just excessive and

12 | expensive.

13 | MR. MORRIS: Your Honor, if I may?

14 | THE COURT: You may.

15 | MR. MORRIS: I dare say that not ten percent of what

16 | I write has the word "privilege," "attorney-client," "work

17 | product" in my emails. That is -- you will never be able to

18 | create a list that's sufficient to protect a lawyer from

19 | producing privileged communications.

20 | There's no dispute here that the Committee's rights

21 | extend no further than estate claims. And I might feel

22 | differently here, Your Honor, and maybe there's some wiggle

23 | room here, but they can create six terms that are actually

24 | designed to elicit information relating to estate claims,

25 | right? And we've asked them to do that for many months. And

83

1  if they're -- if I thought that they were actually looking for

2  information that related to estate claims for which the debtor

3  has agreed the Committee would share the privilege, my concerns

4  would be much more modest in scope.

5       But here, you have individuals who have been acting

6  as lawyers for five years.  To expect them to write the word

7  "lawyer," or "privilege," or "work product" in every email, or

8  to suggest that if they haven't done that, then it's fair game.

9  Even if you have no idea if it relates to an estate claim is

10 just -- it's just (indiscernible).  It's just -- it's not

11 right.

12      They're getting the emails of six custodians.

13 They're getting the emails using the search terms with the six

14 custodians.  It is costly, it will slow it down for three of

15 the nine people, but that's because they haven't given us --

16 they haven't given us search terms that are designed to elicit

17 estate claims.  They're just -- they're asking for everything.

18 And I've never ever seen anybody -- any court allow, you know,

19 the unfettered access subject to only search terms that may or

20 may not be sufficient.  I just -- we feel very, very strongly

21 about this.  They're getting six out of nine custodians, and

22 we're not even saying that they won't get the lawyers in these

23 three custodians' emails.  We'll give them whatever relates to

24 estate claims.

25      MS. MONTGOMERY:  Very briefly.  I think what Mr.

84

1 Morris has raised is dealt with by virtue of the agreement that

2 we just told you about, which is that we're going to be using

3 search terms that are aimed at identifying estate claims. And

4 that the review and the production process to us would be only

5 of the documents that contained that search term, and the

6 privilege would be for the subset of documents that contain

7 that search term and also contain a privilege term.

8 　　　　　And it's not limited to just privilege, Your Honor.

9 There are things in there like "lawsuit," or "litigation," or

10 "claim," or -- and we're open to continue to discuss those.

11 　　　　　Like I said, we only object to a wholesale review of

12 every document, we don't really think that that's necessary.

13 　　　　　MR. MORRIS: We're -- we're -- and I just want to

14 clarify, we're not talking about reviewing every document.

15 We're only talking about the documents that would come up using

16 whatever search terms the Committee devises.

17 　　　　　So by our count, there's between one point five and

18 two million emails from the three lawyers. We're not

19 suggesting that we would look at every one of them, there would

20 be no need to do that.

21 　　　　　But what we would do is review the emails that are

22 the subject of search terms to make sure there (indiscernible).

23 　　　　　THE COURT: Okay. Let me -- at the risk of repeating

24 myself -- go through the explicit protocol the UCC had in its

25 pleading:

85

1          Number one, all files of the nine custodians,

2 including those three lawyers, would be provided over to the E-

3 discovery vendor to put in a repository.

4          Then you come up with this robust list of privilege

5 terms to ferret out what might be privileged.  You try to agree

6 on that robust set of privilege terms.  If you can't, you get

7 the third party neutral to work out your disagreement,

8 hopefully.

9          So you get that resolved, and the search protocol is

10 executed, and all documents, not including one of those

11 robustly created privilege terms, get produced to the Committee

12 subject to that agreed protective order from January, 2020

13 where there's carve out and, you know, ability to pull back,

14 right, if there's inadvertent production of privilege, right?

15 That's an essential term, right?  If something accidentally

16 gets produced that shouldn't, then there's always a mechanism

17 to pull it back.

18          And then the debtor's contract attorneys would review

19 all of the held back documents, the documents held back, you

20 know, because the privilege terms were triggered, and they were

21 held back, to determine if they are really privileged.  If not,

22 then they get produced.

23          But if you decide they are, in fact, privilege, then

24 you create a privilege log, and that gets shared with the

25 Committee.  And if there are disputes about that, then you go

1   to the third party neutral to resolve those.

2           Okay, is there anything I misstated about what the

3   Committee has proposed?

4                   (No audible response heard)

5           THE COURT:  Is there anything I've misstated?  Ms.

6   Montgomery's shaking her head no.

7           MS. MONTGOMERY:  No, Your Honor, I don't believe so.

8           MR. MORRIS:  So --

9           THE COURT:  So I really am -- if that's the case, I'm

10  not getting, Mr. Morris, why --

11          MR. MORRIS:  Let me try one more time, because --

12          THE COURT:  You're going to get your chance to review

13  stuff that's --

14          MR. MORRIS:  No, but -- but we're not, and here's --

15  here's the gap in what you have just described.  Everything you

16  have just described is perfectly fine for the six non-lawyers.

17          Our concern is if you don't have -- if -- there's no

18  question that the lawyers have engaged in the provision of

19  legal services, there's no question that the provision of legal

20  services extended beyond estate claims.

21          And the concern is no matter how hard you devise

22  search terms, and this is just a matter of practice in my

23  experience, you're always going to get documents that don't get

24  captured by the search terms.

25          And so what you've described works very well if the

1 document -- if the search terms actually work.

2          What our concern is for lawyers only, that that's not

3 sufficient.  That we will lose too many documents that will not

4 be captured using the search terms for which, you know,

5 clawback -- clawback issues are just -- we're talking about

6 millions of documents that are going to be reviewed and

7 produced.  Under these circumstances, more than any other, Your

8 Honor, these lawyers privileged communications that do not

9 relate to estate claims should be subject to protection.  They

10 should be subject to more protection than non-lawyers are

11 getting.

12          THE COURT:  The clawback --

13          MR. MORRIS:  And given --

14          THE COURT:  The clawback isn't enough.  The clawback

15 isn't enough.

16          MR. MORRIS:  It's not enough.  You can't unring the

17 bell, Your Honor.

18          And given the massive amount of information that the

19 Committee is seeking that we are willing to provide, frankly, I

20 don't think it's unreasonable to say, yeah, no, we're going to

21 treat lawyers like lawyers.

22          THE COURT:  So balance is you think, you know, those

23 lawyer eyes that can't unsee what they see, okay, if they get

24 it, yeah, you can claw it back, but they can't unsee it.  And

25 so somehow, it's going to, you know, be harmful.

88

1          But the flip side of that is -- well --

2          MR. MORRIS:  I did try to create a little more --

3          THE COURT:  A great delay and expense, right, for you

4 all to first go through the gazillion documents, and then, you

5 know, there's a privilege log that might be --

6          MR. MORRIS:  I --

7          THE COURT:  -- much larger than --

8          MR. MORRIS:  I did --

9          THE COURT:  Go ahead.

10          MR. MORRIS:  I did try to create a little space for

11 Your Honor, a little comfort zone, and that is that the

12 Committee actually use search terms that was designed to get

13 communications related to estate claims, right?  Because these

14 lawyers have countless emails, for example, relating to the

15 board's deliberations on settlement with UBS, or with the

16 Redeemer Committee, or with Acis, these things have been going

17 on for months.  That shouldn't be subject to clawback, they

18 should never be produced.

19          And so if there's -- you know, if the Committee were

20 to devise actual search terms that were intended to get estate

21 claim information, like I said before, that may make more --

22 that might provide a little bit more comfort.  But to allow

23 them to just use, you know, regular search terms on those

24 emails when you have non-estate claim information, and they

25 have -- I'm telling Your Honor, just countless emails over the

1  last six months with the board, responding to board inquiries,

2  responding to claims dispute resolutions, responding to all

3  kinds of things.

4        You know, at a minimum, I would want -- I would want

5  it to stop as of the petition date.  But I think -- but I think

6  even beyond that, they're lawyers, they're licensed

7  practitioners who are rendering legal advice, and they're doing

8  so in the kind of context that have nothing to do with estate

9  claims.  And you have six other custodians, six, with whom the

10  Committee's proposal is completely acceptable.

11        THE COURT:  Well, this is a hard one.  This is a very

12  hard one, Ms. Montgomery.  What -- I mean what do you have to

13  offer me other than delay/expense?  And that's -- you know,

14  those are not small considerations, but that's really what it

15  boils down to, right?

16        MS. MONTGOMERY:  Well, there's delay, there's

17  expense, and then there's the protections that are already put

18  forth in the protective order, Your Honor, which we think are,

19  as we've said already today, robust.

20        We understand their concern with regard to clawback.

21  They have an attorneys' eyes only highly confidential

22  designation that they can use, and that will be used under the

23  agreement we've reached with regard to any document that they

24  haven't looked at.  So those will only be going to outside

25  counsel and the Committee's professionals.

90

1      And I just don't know -- you know, I think the

2  protections are there, and that the cost, you know, when

3  balanced against what we're really asking them to do and the

4  protections that are in place for them, just -- they don't --

5  they don't balance out, Your Honor.

6      MR. MORRIS:  Your Honor, with all due respect, it's a

7  little -- it's a little difficult for me to listen to cost

8  being a concern when you have a Committee who's asked for the

9  emails of nine custodians over a five-year period.  Actually

10 they've asked for ESI, the eight million number is just emails.

11 So it's not -- it's emails and attachments.

12     So the notion that cost is now an impediment while

13 we've gone from 800,000 emails to eight million doesn't

14 (indiscernible) with me.

15     THE COURT:  All right.  Well, again, I don't find

16 this to be at all easy.  But I am going to sustain the debtor's

17 objection on this, if that's the right way to say it.  I'm

18 going to accept the position, and order that these three

19 custodians, Scott Ellington, Isaac Leventon, and Tom Surgent,

20 that before any production, those three individuals' files can

21 go through, will go through separate review by the debtor.  So

22 they're carved out of the rest of these protocols, and

23 presumably as promptly as possible, there will be rolling

24 production.  Debtor will produce non-privileged files and will

25 create a privilege log.

91

1          And if there are disputes about that privilege log,

2 either the third party neutral will work them out or I guess

3 I'm the ultimate arbiter, if need be.  I don't know exactly how

4 you have those mechanics.  Maybe you don't have the judge

5 involved; I don't know.

6          Why don't you tell me so I can know whether to be

7 expecting a request to weigh in.  Do you have it set up where

8 the third party neutral's the final say on things like whether

9 something belongs on a privilege log or if it's really

10 privileged?

11          MR. MORRIS:  I don't think we've addressed that, Your

12 Honor.

13          THE COURT:  Okay.

14          MR. MORRIS:  But I'm sure we can --

15          MS. MONTGOMERY:  I think it may be already be covered

16 in the protective order, Your Honor; I'm just checking to see.

17          THE COURT:  Okay.  And I just want to say that I

18 understand very well from my months working on the Acis

19 bankruptcy that these in-house lawyers -- I'm inclined to say

20 they wear many hats.  I don't know if that's the right way -- I

21 had Mr. Ellington on the witness stand once; I had Mr. Leventon

22 on the witness stand many times.  And I will tell you the

23 Court's impression is that they are both businesspeople, as

24 well as lawyers.  And I never had Surgent, the compliance

25 fellow, in here.

1          But I'm just letting you know I hope there aren't,

2    you know, umpteen disputes about things held back as privilege.

3    The way I view it, there may be things that are privileged, and

4    things that absolutely were not -- are not.  I know we've got

5    privilege related to estate causes of action versus attorney-

6    client privilege or work product that doesn't relate to causes

7    of action.  And I'm already bracing myself for how hard is that

8    going to be to ferret out is it related to an estate cause of

9    action or not.

10          I'm really -- while I feel good that we've worked out

11   a lot today, I am really bracing myself because I don't think

12   this is the last discovery dispute I'm going to see.  I just

13   don't.  We have a lot of things that kind of sound good when

14   you say them fast, but just -- you know my view.  Well, you

15   know my views.  I've seen two of these in-house lawyers on the

16   witness stand before.  And, again, part businessperson, part

17   lawyer, and I know what the case law says.  If it's really a

18   communication that is about rendering legal advice, that's one

19   thing.

20          But if it has nothing to do with that, or little to

21   do with that, it's mainly in their role as a business

22   consultant, or other capacities, there might not be a

23   privilege.

24          MR. PATEL:  Your Honor, this is --

25          THE COURT:  Go ahead.

93

1          MS. PATEL:  Your Honor, this is Rakhee Patel.  If I

2  can briefly be heard on a point of clarification on the

3  agreement.

4          THE COURT:  Well, okay, what are you talking about on

5  the agreement?

6          MS. PATEL:  Well, Your Honor, what I heard as part of

7  the agreement reached between the Committee and the debtor is

8  that all Acis information will be designated as highly

9  confidential determination, and certainly --

10          THE COURT:  Okay.  Acis litigation.  If it's related

11  to Acis litigation.  If they misspoke, that's what I ordered

12  earlier.  You didn't misspeak, right?

13          MR. MORRIS:  I don't believe so, Your Honor.  I think

14  that's --

15          THE COURT:  Okay.

16          MR. MORRIS:   That's what was --

17          THE COURT:  Okay.

18          MR. MORRIS:  I think it was relating to or concerning

19  the Acis litigation matters.

20          THE COURT:  Is that --

21          MS. PATEL:  Understood, Your Honor.  Yeah, and I just

22  wanted to clarify because what I heard, and apologies if I

23  caught a bit of it, but is that Acis litigation will be

24  designated as highly confidential, and that it is not subject

25  to further review.  And I wrote that down because I wanted to

94

1 just, again, clarify what "not subject to further review"

2 means.

3      My concerns, Your Honor, are kind of twofold:

4      Number one is that certain documentation, as Your

5 Honor just referenced, and you'll recall Mr. Ellington and Mr.

6 Leventon testify during the Acis bankruptcy case that during

7 the involuntary and then during the case in chief, were

8 generally testifying as fact witnesses. And my concern is is

9 that there are other things, for example, in Acis's bankruptcy

10 case, the original schedules were signed by Mr. Leventon.

11      THE COURT: Right.

12      MS. PATEL: Well, some of these are Acis's documents

13 or Acis's information, and Acis is the holder of the privilege

14 on those.

15      So to say that they're highly confidential and

16 they're privileged, that they're -- it's our privilege, I

17 should be allowed to assert my own privilege with respect to

18 those documents, and waive my own privilege -- my client's

19 privilege with respect to that even though --

20      THE COURT: Okay. Can I cut this off? I -- I --

21 what I believe is the deal, someone correct me if I'm wrong, is

22 that with regard to documents produced, ESI produced to the

23 Committee, if it pertains to Acis litigation matters, okay,

24 litigation between Acis and any Highland -- Highland or

25 Highland affiliate or Highland insiders, that is going to be

95

1 designated as highly confidential, meaning only professionals

2 for the Committee get to see it, not Committee

3 members/businesspeople. That's the whole agreement with regard

4 to Acis, right?

5 　　　　MR. MORRIS: Yes.

6 　　　　MS. PATEL: And that was going to be my only point,

7 Your Honor, was that we can -- Acis is obviously going to be

8 able to go get it if necessary. In other words, we -- this

9 isn't about prejudice to Acis's rights to even get it because

10 it is our privileged information anyway; or, number two, we can

11 get it in the ordinary discovery process.

12 　　　　Obviously we've got a claim objection that may go to

13 trial, and we may need to seek these documents separately.

14 　　　　THE COURT: Right. That -- this doesn't mean -- this

15 does not mean Acis never gets to see it.

16 　　　　MS. PATEL: Okay.

17 　　　　THE COURT: If Acis requests something in discovery

18 with regard to the claim objection or other litigation, then

19 that's subject to a whole different agreement or order, right,

20 Mr. Morris?

21 　　　　MR. MORRIS: Yes. Yes, Your Honor.

22 　　　　THE COURT: Okay.

23 　　　　MS. PATEL: Thank you, Your Honor.

24 　　　　THE COURT: All right. Well, I -- I kind of lost my

25 train of thought, but I guess I'm trying to signal, for

96

1 whatever it's worth, that if there are disputes down the road

2 regarding files from these three individuals -- Ellington,

3 Leventon, Surgent -- and the debtor is saying they're

4 privileged, you know, and not related to estate causes of

5 action, and the Committee is disagreeing, be prepared to make

6 your best argument. Because I am expecting that some

7 communications, even if they're unrelated to estate causes of

8 action, may very well be in the nature of business type

9 communications because I've seen with my two eyes that they

10 fulfill different roles in that organization.

11        So I hope we don't get bogged down because of my

12 ruling on this today.

13        The other thing I wanted you to kind of keep dangling

14 in your mind is as I was reading the pleadings, preparing for

15 this afternoon, I was very much fixated on -- we had this

16 protocol and a compromise worked out with the Committee way

17 back, at the end of last year, finalized in January and, you

18 know, the agreement was that the Committee would have standing

19 to pursue the estate causes of action, and would get privileged

20 documents related -- you know, communications related to these

21 estate causes of action. And that was to avoid a Chapter 11

22 trustee, which we all know under case law, Weintraub would

23 inherit all privileges, all attorney-client privilege

24 information.

25        So I guess what I'm getting at is I thought -- I

97

1 thought we had an agreement last January, and that we were

2 going to be smoothly going down this road of document

3 production.  And here we are in mid-July, and we're having this

4 fight.  That doesn't make me very happy because I was happy not

5 to appoint a Chapter 11 trustee last January because I thought,

6 okay, we have this major compromise with the Committee, they're

7 going to go forward, and evaluate estate causes of action,

8 they're going to get documents that are subject to attorney-

9 client privilege.  And, you know, it just -- again, I said

10 earlier I didn't want to get into the he said and she said, but

11 the facts speak for themselves that were in July, and just now

12 finalizing this protocol.

13        And I guess the one more thing I will say on that is

14 I know I gave a 90-day deadline for the Committee to either

15 bring causes of action against CLO Holdco -- and I forget the

16 other entity -- or the money in the registry of the Court would

17 be released.

18        I didn't know we still had so far to go with document

19 production when I ruled that.  So if someone asks for an

20 extension after today, I think I'd probably be inclined to give

21 an extension.  Not a huge, huge, huge extension, but I was a

22 little bit -- not appreciating where the Committee was with

23 regard to getting documents when I said that that day.

24        All right.  So I'll be looking for your form of

25 order, hopefully in the next day or two on this.

98

1          Is there anything further on this topic?  Or shall we

2   go to the Acis status conference?

3          MR. MORRIS:  Your Honor, just a couple of things.

4          THE COURT:  Yes?

5          MR. MORRIS:  Number one, I do want to give the Court

6   some comfort of knowing that while Mr. Surgent is the Chief

7   Compliance Officer, he's also the Deputy General Counsel at

8   Highland, so he is -- he is (indiscernible).

9          Number two, as you may have seen from our papers, the

10  board considered three outside vendors to do the document

11  review, and ultimately selected one, and we had prepared a

12  stipulation.  The Court should expect to see, hopefully in the

13  next day or two, a stipulation pursuant to which the debtor

14  seeks its authority to retain a third party vendor named Robert

15  Hass (phonetic) to assist with the document review.  This has

16  all been discussed with the Committee, the Committee has

17  consented to the theory of the retention, but I would ask them

18  to go back perhaps and look at the stipulation so we can get

19  that signed up and get people to work as quickly as possible.

20         THE COURT:  Okay, very good.

21         Now what about the third party neutral, do you have

22  that person identified?

23         MR. MORRIS:  No, we haven't talked about that.  I'm

24  sure we can get that resolved as we're discussing the form of

25  order.

99

1          THE COURT:  Okay, very good.

2          All right, well, if there's nothing further, again,
3    let's roll to Acis.

4          And I guess actually -- maybe we should briefly talk
5    about mediation, where things stand, in case there are people
6    on the call who don't want to stick around for the Acis
7    discussion.  I don't know, maybe everyone wants to hear the
8    whole hearing today.

9          So let me just tell you where things stand:  We have
10   -- my courtroom deputy reached out to you all late last week,
11   and let you all know that both Sylvia Mayer from Houston, as
12   well as retired Bankruptcy Judge Allan Gropper, are interested
13   in being co-mediators on this, and that was subject to doing
14   their conflicts review.

15         And then the next thing after that, they were going
16   to reach out to the lawyer contacts, and give their, quote,
17   "initial disclosures."

18         I emailed about 9:30 last night with Sylvia Mayer,
19   and she was making sure she had all the right contact people.
20   I gave her lawyers for the debtor, for the Committee, for Acis,
21   for UBS, for Dondero, and the Redeemer Committee -- Crusader
22   Redeemer Committee.

23         Right now, it's my view that that is the universe of
24   parties to participate, although I can see the co-mediators
25   rolling in more people.  Like someone suggested Mark Okada, and

1  -- I think probably it would be premature in the beginning, but
2  maybe he'll be rolled in.  You know, if the UBS proof of claim
3  is resolved in mediation, and the Acis -- and/or the Acis proof
4  of claim are resolved in mediation, and then -- you know, I
5  think those are kind of the highest priorities here of the
6  mediation, then certainly he might be brought in, but right
7  now, I'm not going to order that.
8          So about 9:30 last night, I sent Sylvia Mayer the
9  lawyer people to email, the co-mediators' disclosures.  And she
10 was going to be in a mediation all day today, but I would
11 suspect probably tonight, if y'all haven't gotten anything yet
12 -- I haven't looked at my email during this hearing, but I
13 would suspect maybe tonight or tomorrow you're probably going
14 to get that communication from Sylvia Mayer with whatever their
15 disclosures are for the parties to consider.  And, you know,
16 assuming everyone gets comfortable with that, then the
17 administrative people at the triple A, the American Arbitration
18 Association, we're going to get going with, you know, the
19 administrative side of this, and you all would talk about
20 scheduling.
21         So all this to say I hope here in the next few days
22 there is an active effort to get things scheduled and get the
23 dialogue going with those co-mediators.
24         The only other thing I would add is I don't
25 necessarily anticipate that Sylvia Mayer would mediate the,

1 say, Acis proof of claim, and Judge Gropper would mediate, say,

2 the UBS proof of claim. I think -- I don't think it

3 necessarily breaks down that way. I think you would probably

4 just have co-mediators doing the whole ball of wax here

5 because, among other things, the plan treatment discussion is

6 probably going to roll into proof of claim allowance

7 discussions.

8 So that is, I think, what this would shape up to be.

9 That you would have co-mediators working on all of this.

10 So any questions at this point?

11 (No audible response heard)

12 THE COURT: Again, I know -- if you haven't gotten an

13 email by the end of today, it's surely going to be in the next

14 day or two that you'll get their email reaching out about their

15 disclosures. Okay?

16 UNIDENTIFIED ATTORNEY: Yes, Your Honor.

17 MR. CLUBOK: Your Honor --

18 MS. MASCHERIN: Your Honor, this is Terri Mascherin

19 on behalf of the Redeemer Committee.

20 Just a quick question: Did I hear correctly that you

21 have given the mediators our contact information? Because we

22 have not been copied on the email -- the emails that have gone

23 around.

24 In fact, we haven't been copied on any of the emails

25 that have gone around about the mediation.

1          THE COURT:  Okay; thank you, Ms. Mascherin.

2          Let me make sure you're completely in the loop.  So I

3 did have my courtroom deputy reach out to debtor, Committee,

4 Dondero, UBS, and Acis last week, their counsel, regarding the

5 interest of both Sylvia Mayer and former Judge Gropper.

6          And at the time she did that, I was thinking since

7 the Redeemer Committee had an agreement with the debtor, you

8 all have announced at the last hearing or two you had an

9 agreement that perhaps you all would not be participating.

10          And I actually did have some lawyers respond to my

11 courtroom deputy that, no, we think they very much need to be

12 involved.

13          So that was just a missed step, I would say, on my

14 part, not having that email go out to you originally.  So I

15 will make sure when we get out of this hearing that my

16 courtroom deputy forwards to you the little bit of email

17 traffic there was.  There were not a lot of emails, but maybe

18 her email and three or four responses of other lawyers.

19          So the co-mediators have been given your name.  If

20 others, besides you, want to be on her contact list, you know,

21 certainly Mr. Hankin or Mr. Platt, you can let her know when

22 you get the initial -- her, Sylvia Mayer, know when you get the

23 initial email from her.  But you're on the list now, and I --

24 again, it was just a mistaken belief on my part that maybe you

25 wouldn't be part of the mediation since your claim had been

1   agreed to with the debtor, so --

2           MS. MASCHERIN:  Okay.  I appreciate it, and thank you

3   for clarifying, Your Honor.

4           THE COURT:  Okay; thank you.

5           MR. CLUBOK:  Your Honor --

6           THE COURT:  All right --

7           MR. CLUBOK:  Your Honor, this is -- Your Honor, may I

8   speak briefly?

9           THE COURT:  Certainly.

10          MR. CLUBOK:  Thank you, Your Honor.  This is Andrew

11  Clubok on behalf of UBS.

12          And I apologize if you did not see the email that we

13  sent to Ms. Ellison this morning.  But we -- our position is we

14  very much are fine with Crusader, or frankly any other major

15  creditor, involving the overall mediation.

16          But the issue of reaching an overall plan, the so

17  call grand bargain that Mr. (indiscernible) talked about.  What

18  we don't -- and we just want to be sure that no one takes it

19  that you're ordering this or thinks it's appropriate, because

20  in the first instance to have a productive discussion on our

21  specific claim with the debtor, it's not going to be helpful

22  and productive -- in fact, it would be counterproductive -- to

23  have other creditors in our class sitting in listening to that,

24  weighing in.  You know, obviously their position will all be

25  make it as low as possible.  It's not helpful to have a whole

1  nother set of lawyers doing that, and I just want to make sure

2  people don't come away thinking that you've ordered -- I hope

3  you have not ordered that, and if you have, I would like to

4  speak to that.

5         But just like we wouldn't be sitting in -- we were

6  not permitted to sit in when the debtor spoke with Crusader

7  about setting their claim, we're not -- we have not been part

8  of the discussion with Acis and if the debtors have discussions

9  -- with Acis.  The other parties, we were actually told before

10 they would not be involved in (indiscernible) first instance.

11        There is a time -- an appropriate time for a creditor

12 to object, but we don't even know what the settlement is with

13 Redeemer.  Once we hear it, we may have an objection; hopefully

14 not.  Hopefully it will be perfectly fine.

15        And we understand that once we reach an agreement

16 with the debtor, that's subject to an objection process, and

17 everyone is going to have a chance to weigh in.  It's just not,

18 we think, going to be effective, and I set this out in an email

19 that I sent earlier but -- just today.  And so I just want to

20 make sure that, you know, people aren't taking from what you

21 said that Crusader is just going to be able to sit in our

22 (indiscernible), Acis does or does not (indiscernible)

23 specifically their claim, etc.

24        THE COURT:  All right.  Well, let me tell you how I

25 usually do this, and how I expect to do it here.

105

1          Once everything is nailed down with the mediators,

2   and I say that because they're going to send you their

3   disclosures, and hopefully everybody's going to be fine with

4   everything.  When I get the green light that, yes, we're going

5   to go forward, I have a standard form of mediation order.  And

6   it pretty much gives discretion to the mediators to run this

7   the way they want to.  And, for example, if they want

8   participants to submit a white paper, you know, no more than 25

9   pages in length, or whatever, you know, the mediators can

10  instruct that.

11         And it has all of the usual bells and whistles about

12  confidentiality that nobody can subpoena the mediators, or

13  compel them to testify.  And I'm not going to talk to them

14  about the substance.

15         I just want a report, either things settled or not.

16  People negotiated in good faith or not.

17         And so I don't think there will be any ambiguity

18  about the rules of the road, it's just what I think is a fairly

19  normal mediation order.

20         And, therefore, you know, I think the confidentiality

21  that you're concerned about will be built into that order, and

22  will be kind of the usual -- what I think is the usual

23  protocol.  That if you want the mediator to keep something

24  confidential, and not share it with another party, then it's --

25  that's the way it's going to be.

1          MR. CLUBOK:  Okay.  I believe -- we certainly agree

2    the mediators will different roles.  We just -- I just -- and

3    the mediator may have different sessions, different breakout

4    sessions.  But we just believe that if our claim, or any

5    creditor's claim, with the debtor in the first instance, to

6    have a productive mediation, settlement should be done the way

7    the (indiscernible) claim is (indiscernible), which is directly

8    with the debtor.  And that we'd have a chance to see if that --

9    if that gets somewhere and results in something.  We're --

10   we're -- that's our input about about meeting our specific

11   claim to maximize the chance of avoiding litigation and

12   resolving it.

13          THE COURT:  Well, again, I fully suspect they're

14   going to reach out to all of you all and get all of your ideas

15   about the sequence of the mediation, you know, whether it's all

16   together with people in separate rooms on day one, or hey,

17   let's start with UBS, let's start with Acis.  I mean it would

18   be expected that the co-mediators will reach out to you all

19   from day one with everybody's ideas about what would be the

20   most productive format.  So I hope that answers your question.

21          You know, to a large extent, this is to be

22   determined.  But, you know, the ground rules I'm giving them is

23   let's try to get this UBS proof of claim resolved.  Let's try

24   to get the Acis proof of claim resolved.  Let's try to get to a

25   grand bargain on what a plan looks like, and the treatment of

1 all the unsecured creditors.

2      So I think these are extremely experienced people who

3 will be pretty skilled at how to proceed.

4      MR. CLUBOK:  That does answer our question; thank

5 you, Your Honor.

6      THE COURT:  Okay.

7      MR. CLUBOK:  That's all I wanted to clarify.  That

8 you weren't directing them to do anything in terms of how they

9 proceed, and we'll pick it up with them.

10      THE COURT:  Okay; very good.

11      MR. CLUBOK:  Thank you.

12      THE COURT:  Anyone else want to say anything about

13 this?

14           (No audible response heard)

15      THE COURT:  All right.  Well, let's turn then to the

16 status conference that both the debtor and Acis wanted to have

17 today.  Back on the 14th, I guess it was, Mr. Pomerantz, I

18 think, raised the issue that the Acis proof of claim, which at

19 that point the debtor had objected to, and now Mr. Dondero has

20 objected to, was set for hearing, I think, August 6th.  But

21 there had been a discussion about continuing that hearing to

22 September 10th to hopefully focus primarily on mediation.

23      But then we wanted to have a status conference today

24 to kind of talk about what the September 10th hearing would

25 look like.  We don't want it to just be a status conference.

1           And, Mr. Pomerantz, I don't know if you're on the

2    line, but you said there were legal issues as well as factual

3    issues.  And so my brain was kind of going down the trail of

4    are you suggesting motions for summary judgment might be a

5    first step on September 10th?  I have no idea what you had in

6    mind.

7           So who -- is it going to be Mr. Morris taking the

8    lead on this --

9           MR. KHARASCH:  Your Honor --

10          THE COURT:  -- or Mr. Pomerantz?

11          MR. KHARASCH:  Your Honor, it's Mr. Kharasch.

12          THE COURT:  Oh.

13          MR. KHARASCH:  It's Ira Kharasch.

14          THE COURT:  Oh, Mr. Kharasch.

15          MR. KHARASCH:  Yeah.

16          THE COURT:  Okay, there you are.

17          MR. KHARASCH:  I --

18          THE COURT:  You appeared earlier.

19          MR. KHARASCH:  I did.  I did.  So two things, Your

20   Honor:

21          First, Mr. Pomerantz wanted me to express to Your

22   Honor that he would have loved to have been here today, as he's

23   been here in the past, however, he is in the hospital with a

24   medical condition, we think things will work out just fine,

25   but --

1           THE COURT:  I'm sorry to hear that.

2           MR. KHARASCH:  Thank you, Your Honor.

3           THE COURT:  Please express my best wishes.

4           MR. KHARASCH:  Absolutely.  But he just wanted to let

5  you know why he's not here.

6           So, number two, I think, Your Honor, at the last

7  week, I think we mentioned that the continued hearing on the

8  claim objection would be September 17.  There's a little

9  confusion about that versus September 10.  I don't know if Ms.

10 Patel is in agreement about that.  I think we're both in

11 agreement that it was September 17th, but I'm not completely

12 sure of the different dates.

13          THE COURT:  Okay.  I did not run that date by my

14 courtroom deputy.  I just -- I looked at the transcript from

15 the hearing.  Y'all said September 10th, but maybe someone

16 misspoke.

17          What do you think, Ms. Patel?

18          MS. PATEL:  Your Honor, I think the confusion might

19 be -- I believe the original hearing was August the 10th, and

20 that's what's getting moved off.  And so September 17th is --

21 I've seen a September 19th date, as well, but I think that's a

22 Sunday or --

23          MR. KHARASCH:  It's a Saturday.  I think it's a

24 Saturday.

25          MS. PATEL:  Saturday.  So I think September 17th is

1 the day that Acis is amenable to -- to -- the process we're

2 about to discuss with the date being the 17th of September.

3     THE COURT: Okay; very good.

4     MR. KHARASCH: Thank you, Your Honor.

5     THE COURT: Okay.

6     MR. KHARASCH: And --

7     THE COURT: So 17th, okay.

8     MR. KHARASCH: Yeah. And, Your Honor, I think the

9 good news here is the debtor and Acis's counsels are in

10 agreement subject to your blessing of that agreement as to how

11 we want to approach things.

12     Again, we did continue the hearing to today and the

13 purpose, Your Honor, is to give us a chance to discuss with the

14 Acis team how we both thought -- how to proceed in a manageable

15 way to make this September 17th hearing date a productive

16 hearing, and manageable, and easily understandable, and easy

17 for the Court to deal with, because we're dealing with a

18 massive claim, and a very big claim objection.

19     So what we come up with is the following way that we

20 think should be a productive way to handle it. We would like

21 to have another status conference on or about August 14, which

22 is, I think, just after Ms. Patel's vacation. If it has to be

23 a few days later, that's fine.

24     And during that time, we'll also be seeing a draft

25 response to our claim objection. But the purpose is before

1  that status conference on the 14th, Your Honor, we would

2  propose the following:

3        That a few days before, we file a joint statement

4  that would propose the following to the Court:  We would come

5  up come up with respect to the September 17 hearing date, that

6  we would come up with a list of issues for summary adjudication

7  that both parties would like to deal with by summary

8  adjudication on the September 17 hearing date.  We would set

9  those forth in the joint statement for the Court to review.

10        We'd also set out a list of issues that are not

11  subject -- we don't believe are not subject to summary

12  adjudication.  That would be dealt with later, if not through a

13  trial or otherwise, if not dealt with by the summary

14  adjudication proceeding, depending on how that goes.

15        We would also propose for that status conference,

16  that joint statement, Your Honor, a proposed discovery and

17  pretrial schedule that would occur after the September 17

18  summary adjudication, and a proposed trial date.

19        Just for the record, both parties do want to move as

20  quickly as possible after the September 17th hearing date in

21  terms of discovery, and get to a trial as quickly as possible,

22  maybe even before plan confirmation.  But this would be part of

23  the greater discussion, then we'd starting pinning down

24  proposed dates for Your Honor to talk about at the next status

25  conference here, Your Honor, on or about August 14th.

112

1          We'd also address the Acis request that the debtor

2   file an answer to the Acis second amended complaint in the Acis

3   case.  We had talked about that, that was a new topic of

4   discussion.

5          And that's really the -- that's what we would propose

6   to get before the Court.  We'd file it -- it's August 14, we'd

7   file it two days before the hearing because that's soon after

8   Ms. Patel's vacation.  If it's a few days later, we'd give the

9   Court -- we would file it a few days earlier to give the Court

10  more time to look at the joint statement.

11         To the extent we can't agree on all of these issues

12  that I just enumerated in the joint statement, the joint

13  statement would address those issues that we haven't agreed on,

14  and the unilateral position of the parties to be discussed

15  before the Court at the continued status conference.

16         So we think in that way, Your Honor, we can make

17  everyone's life easier to go forward and get something done at

18  the September 17 claim objection date.

19         THE COURT:  All right.  Well, Ms. Patel, do you agree

20  with everything you just heard?

21         MS. PATEL:  Yes, generally speaking, Your Honor.

22  Just a couple of things.

23         THE COURT:  All right.  Mr. Bonds, I'm going to ask

24  you to put your phone on mute.  I think we're getting some

25  disruption from your end.

113

1          MR. BONDS:  It is on mute; I'm sorry.

2          THE COURT:  Okay.  Well, Mike, I don't know where

3  that's coming from.

4          ECRO:  I think it's Mr. Ira's phone.  He's on mute

5  now.

6          THE COURT:  Okay.

7          ECRO:  That's where it's coming from.

8          THE COURT:  Ms. Patel, go ahead.

9          MS. PATEL:  Thank you, Your Honor.

10         Just a couple of things, again, so the Court -- just

11  so I can set the Court's expectations a little bit on where

12  we're going to head, and these were discussions we had with Mr.

13  Kharasch over the (indiscernible) yesterday.  But I wanted to,

14  again, reiterate the parties' expectation is that if we're

15  going to go down this path -- a double (indiscernible) path

16  while we're doing things by summary adjudication at the

17  September 17th hearing which issues -- you know, we'll decide

18  which buckets of issues are appropriate for September 17th,

19  that nevertheless, that there would be an expeditious trial

20  setting, and that's what I think the parties are anticipating

21  coming back to the Court and asking for in August.

22         And that that trial setting would be at some

23  juncture, preferably before plan confirmation.  But if it has

24  to go to trial, that's certainly no (inaudible), so make that

25  simultaneous with the plan confirmation.

114

1    But just -- that's just a little bit of

2 foreshadowing, I suppose, Your Honor, more than anything else.

3    We also requested that basically we would just go

4 through one -- what we'll call summary adjudication process.

5 And Your Honor hit on a great question of is this a motion for

6 summary judgment?  I'm not sure that we really necessarily

7 defined it as a motion for summary judgment, as much as this is

8 intended to be a "there's not going to be anymore motions to

9 dismiss or motions for (indiscernible) pleading, etc."  The

10 September 17th hearing is intended to be the full shot of

11 "let's go through all the issues that can be determined on

12 September 17th by agreement, and then that's it, other than

13 that, we're going to be talking about trial."

14    The other point that I would just raise again just to

15 enlighten the Court, this isn't -- the summary adjudication

16 would not just be issues that Highland has raised in its

17 objection to Acis's claim, but it could also be summary

18 adjudication with respect to Acis's affirmative claims as

19 against the estate.  So it's a two-way street with respect to

20 that.

21    And then finally, Your Honor, Acis just requested

22 that we at least have a discussion with respect to the Highland

23 Capital Management filing an answer with respect to Acis's

24 complaint.  And as Your Honor recalls, the proof of claim that

25 Acis filed is -- attaches the second amended complaint that's

1  pending in the adversary.  That complaint has never had an

2  answer filed with respect to it, so we need an answer really as

3  kind of a responsive pleading.  And the hope was that that

4  would help streamline the issues so -- and, frankly, I think it

5  would be helpful from my perspective to decide what are the

6  appropriate issues for the summary adjudication basket to be

7  heard on September 17th, and what are the appropriate -- what's

8  the appropriate basket that is going to have to go trial.

9       And that was -- that was my thinking with respect to

10 that.  But we'll continue to have those discussions, and foster

11 that.

12      But beyond that, that's just some things that I

13 wanted to sort of foreshadow, I guess, for the Court, just to

14 (indiscernible) the Court's expectations as to what's going to

15 happen at the August hearing, and where things are headed.

16      THE COURT:  All right.  Well, just a couple of things

17 I'll throw in.

18      Before we get off, I'll make sure September 17th is

19 available.

20      (The Court engaged in off-the-record colloquy)

21      THE COURT:  So we'll circle back and make sure that's

22 good.

23      As far as this process, I like everything I heard.

24      As far as getting the summary adjudication on certain

25 issues, I kind of like the idea of not cross-motions for

116

1  summary judgment, no, please.  Maybe instead, you just come up

2  with a set of stipulated facts, and then based on these

3  stipulated facts, we think you can rule as a matter of law on

4  A, B, and C, and then the other side disagrees that you can

5  based on A, B, and C.

6          But on the other hand, you think we can -- you can

7  rule in front of us because of D, E, F.  And then the other

8  side -- so I guess what I'm saying is -- hmmm, I'm trying to

9  avoid the whole cumbersome summary judgment process, but -- can

10 we --

11         MR. KHARASCH:  Your Honor, can --

12         THE COURT:  Mr. Kharasch, do you have an idea?

13         MR. KHARASCH:  Yes.  We've been thinking about that

14 very point, Your Honor, and that's something I'm going to talk

15 to Ms. Patel about, you know, prior to that status conference

16 hearing.

17         We agree with you, we don't want to recreate the

18 wheel on a bunch of paper that's already before the Court.  We

19 might come up with a proposal, Your Honor, where we just submit

20 a short statement of why we think -- you know, before the

21 September hearing date, here's what's going to be argued on

22 summary adjudication, we'll cross-reference what's already in

23 front of the Court in terms of our claim objection, point you

24 to different parts of it, rather than me filing things.

25 Hopefully stipulate to certain facts to make your life easier,

1 and to, you know, just make sure everything's easily directed.

2        But that's the kind of thing we'd like -- I think

3 we're going to be talking about to make things easier and more

4 streamlined.

5        THE COURT: Okay. Ms. Patel, you agree that's a goal

6 to shoot for? Rather than cross motions for summary judgment,

7 and responses, and replies, and giant appendixes, just have

8 something like a set of stipulated facts, and here are the

9 contested issues of law?

10        MS. PATEL: Yes, Your Honor. I think that would be

11 sort of the general goal.

12        THE COURT: Okay, all right. Well, that -- that

13 sounds like a good game plan.

14        So I like this overall idea, we'll kind of check in

15 on August 14th. A few days before that, you'll file the joint

16 statement of what you think the list of issues of law are that

17 would be argued on the 17th.

18        And then as far as the answer to the Acis adversary

19 proceeding, that adversary proceeding is technically subject to

20 the automatic stay, and there are other parties in the

21 litigation. So as I've mentioned before, we have drafted back

22 in chambers a giant report and recommendation on a motion to

23 withdraw the reference that was filed way long ago by -- I

24 think it was jointly by Highland and HCLOF. But I may be

25 wrong, it may have only been HCLOF, it's been so long since

1 I've looked at it.

2          But my point is it's stayed. So I mean as a

3 technical matter, if you want to agree that Highland will file

4 an answer, I mean I guess you'll have to do an agreed order

5 lifting the stay, maybe just for the limited purpose of

6 allowing Highland to do an answer with you all agreeing it's

7 not going to go any further than that at this juncture. Or --

8 I mean I'm just asking, frankly, because we've got other

9 parties involved who want to know the answer to that question

10 maybe.

11          And then I've got a report and recommendation that

12 I've got to dust off, and finalize, and send in to the District

13 Court if we're lifting the stay for all purposes.

14          I assume you just want to do a limited lifting the

15 stay to let them file an answer, but everything else is still

16 on hold?

17          MS. PATEL: Your Honor, I think that would be the

18 general concept. And to be fair, it's a concept that I was,

19 you know, late in the day yesterday with Mr. Kharasch, and so

20 we haven't really quite formulated exactly how we Proceed

21 forward with it. So I don't -- I'm not trying to ambush him on

22 the issue.

23          But I think we can either craft something that to the

24 extent that it is an answer, a very traditional answer, you

25 know, concept in the adversary proceeding, then, yes, I agree

119

1 that I think it would be appropriate to do a very limited

2 agreed order lifting the stay for the limited purpose of filing

3 the answer, and that's it. Again, just so we have the

4 pleading.

5 Or if we -- that perhaps maybe Mr. Kharasch and I can

6 come and put our creative brains together and see if we can

7 come up with something that acts an awful lot like an answer,

8 but is here and filed in the Highland bankruptcy case that kind

9 of functions similarly.

10 THE COURT: Okay.

11 MR. KHARASCH: Yeah, just to be clear, Your Honor, we

12 haven't agreed to anything; we heard about this concept

13 yesterday. I have not really had a chance to think it through.

14 I'm not -- I'm not saying absolutely no, we have to discuss it

15 with our client. (Indiscernible) but we have an open mind, and

16 will continue our discussions.

17 One thing, Your Honor, do we definitely have the

18 August 14 date as a status conference? And if so, at what

19 time?

20 THE COURT: It is available. Let's do it at 9:30,

21 and I'm not going to give you a ton of time that day because I

22 have a bear of a trial that next week that I'm going to need to

23 be in mostly hibernation preparing for. So let's say 9:30 on

24 Friday, August 14th.

25 MR. KHARASCH: That's fine, Your Honor; thank you

1 very much.

2          THE COURT: And then I -- on September 17th at 9:30,

3 I also have available.

4          MR. KHARASCH: That's great.

5          THE COURT: The morning only, I've got a full

6 afternoon.

7          All right, so I was going to ask you to do sort of

8 like a mini scheduling order, reflective of what we discussed

9 today. And it sounds like you'll have a few things to iron out

10 after we get off the phone, but I think we've got enough here

11 to kind of have a partial scheduling order, or something to

12 that effect, dealing with objections to Acis's proof of claim.

13          Mr. Bonds, you're on there, I see now, for Mr.

14 Dondero. I think you've joined in the -- I don't know if you

15 call it a joint, or you filed your separate objection to the

16 Acis proof of claim, correct?

17          MR. BONDS: (No verbal response).

18          THE COURT: Okay. You're on mute, if you could

19 unmute yourself.

20          MR. BONDS: Your Honor --

21          THE COURT: We're getting some echo, but is there

22 anything you want to add to this discussion?

23          MR. BONDS: Your Honor, there is. We believe that we

24 are entitled to participate in the Acis claim of because it's

25 so intertwined with the underlying lawsuit -- Your Honor, I'm

1 sorry.

2          THE COURT:  All right.  Well, I understand you filed

3 an objection.  Is there any -- is there any -- well, is there

4 any objection to the Dondero -- I don't know if he's going to

5 say anything separate from the debtor, but Dondero being

6 involved as an objecting party.

7          MR. BONDS:  (Indiscernible).  I'm sorry.

8          THE COURT:  Okay.  We're having real terrible --

9          (The Court engaged in off-the-record colloquy)

10          THE COURT:  Okay.  We have two feeds that say D.

11 Michael Lynn, and that's causing a feedback loop, according to

12 the younger smarter people here behind me.  Like maybe you have

13 a phone and a computer?  All right, well, I've actually turned

14 to Mr. Kharasch and Ms. Patel, do you all have any problem with

15 Dondero kind of joining in, and -- I haven't reviewed his

16 objection to see how it differs from the debtor's.

17          MR. KHARASCH:  Yeah, frankly, Your Honor -- Ira

18 Kharasch.  We have not spent time reviewing that objection, as

19 well, so we haven't really thought about it.

20          I mean it's out there, I'm not sure I see the problem

21 with it.  But we would like some time to see how -- what it

22 looks like, and how it plays into it.  I'm not -- I'd be

23 surprised if -- well, I'm not even going to say anything as to

24 what's in it because I just haven't read it.

25          THE COURT:  Okay, all right.  Ms. Patel?

1          MS. PATEL:  Your Honor, from Acis's perspective,

2   same.  I, frankly, have not given it enough consideration.  And

3   just out of the gate, I think one of the issues is going to be

4   Mr. Dondero's standing to kind of join in on the claim

5   objection, but it's something that, frankly, I just truly

6   haven't spent enough time thinking that issue through, or

7   whether there's going to be an issue.  So I'm just not sure.

8          THE COURT:  All right.  Well, I'll try one more time.

9   Mr. Bonds, do you have a good connection now?

10          MR. BONDS:  (No audible response heard).

11          THE COURT:  All right.  I'm just going to direct you

12   all to visit with Mr. Bonds or Mr. Lynn, and see if you can

13   come up with any agreements.  And if you can't, then maybe Mr.

14   Dondero's counsel can request a status conference.  I'm not

15   inclined to want to do another one before August 14, but maybe

16   we can just hear what they have to say on August 14th about the

17   process.

18          MR. KHARASCH:  I think that makes sense, Your Honor.

19   And we'll -- and we'll talk to them.

20          THE COURT:  Okay.

21          MR. KHARASCH:  We'll talk to them beforehand.

22          THE COURT:  Okay, all right.

23          MS. PRESTON:  Your Honor, may I briefly be heard?

24          THE COURT:  Who is this?

25          MS. PRESTON:  This is Katherine Preston from Winston

1 & Strawn, I represent Mr. Ellington, Mr. Leventon, and some of

2 the other Highland employees.

3          THE COURT: Okay.

4          MS. PRESTON: And I apologize, I tried to appear

5 earlier and had some technical difficulties.

6          THE COURT: Okay.

7          MS. PRESTON: We just wanted to ask regarding

8 mediation. We've discussed with some of the parties to that

9 mediation dissipating, and so we just wanted to be included, as

10 well, in any of those discussions and communications.

11          THE COURT: All right. And I guess the party in

12 interest status would be that you've been sued by Acis, is

13 that -- is there any --

14          MS. PRESTON: That's correct.

15          THE COURT: Okay. Well, I think what I'm going to do

16 is think about that one a bit.

17          I almost put that one in the same category as Mark

18 Okada. I'm just trying to be as productive as possible in the

19 way this goes forward where the primary issues are the UBS

20 proof of claim and the Acis proof of claim. And granted,

21 there's a lot of satellite litigation out there, and -- and

22 that might be a factor as far as -- let me think about that

23 one, okay?

24          Your request is duly noted, and I'm going to think

25 about that, and I'll let you all know through my courtroom

1 deputy what I decide on that.  But I'm leaning towards that

2 might be a second stage of mediation if we have wonderful

3 breakthroughs on the Acis and UBS proof of claim sides, so

4 that's my answer on that.

5          MS. PRESTON:  Thank you.

6          THE COURT:  Uh-huh.  Anything else?

7          MS. PRESTON:  Thank you, Your Honor.

8          THE COURT:  All right.  Well, it's a little bit late,

9 it's 5:19 central time, and if there's nothing further, we're

10 adjourned, and we'll look for all the orders to be

11 electronically submitted.

12          Thank you.

13          MULTIPLE SPEAKERS:  Thank you.

14      (Whereupon, at 5:20 p.m., the hearing was adjourned.)

15

16

17

18

19

20

21

22

23

24

25

125

1

2

3                    <u>CERTIFICATE OF TRANSCRIBER</u>

4        I, KAREN HARTMANN, a certified Electronic Court

5   Transcriber, certify that the foregoing is a correct transcript

6   from the electronic sound recording of the proceedings in the

7   above-entitled matter.

8

9   *Karen Hartmann*

10

11  Karen Hartmann, AAERT CET**D0475    Date: July 24, 2020

12  Transcripts Plus, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 38

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
| | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Friday, January 8, 2021 |
| | ) | 9:30 a.m. Docket |
| Debtor. | ) | |
| | ) | |
| HIGHLAND CAPITAL | ) | **Adversary Proceeding 20-3190-sgj** |
| MANAGEMENT, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | PRELIMINARY INJUNCTION |
| | ) | HEARING [#2] |
| v. | ) | |
| | ) | |
| JAMES D. DONDERO, | ) | |
| | ) | |
| Defendant. | ) | |

<div align="center">

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

</div>

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor/Plaintiff:    John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

```
 1    APPEARANCES, cont'd.:

 2    For James Dondero,           D. Michael Lynn
      Defendant:                   John Y. Bonds, III
 3                                 Bryan C. Assink
                                   BONDS ELLIS EPPICH SCHAFER
 4                                   JONES, LLP
                                   420 Throckmorton Street,
 5                                   Suite 1000
                                   Fort Worth, TX  76102
 6                                 (817) 405-6900

 7    For the Official Committee   Matthew A. Clemente
      of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 8                                 One South Dearborn Street
                                   Chicago, IL  60603
 9                                 (312) 853-7539

10    For the Funds and            Davor Rukavina
      Advisors:                    MUNSCH HARDT KOPF & HARR, P.C.
11                                 500 N. Akard Street, Suite 3800
                                   Dallas, TX  75201-6659
12                                 (214) 855-7554

13    For Certain Employees:       Frances A. Smith
                                   ROSS & SMITH, P.C.
14                                 Plaza of the Americas
                                   700 N. Pearl Street, Suite 1610
15                                 Dallas, TX  75201
                                   (214) 593-4976
16
      Recorded by:                 Michael F. Edmond, Sr.
17                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
18                                 Dallas, TX  75242
                                   (214) 753-2062
19
      Transcribed by:              Kathy Rehling
20                                 311 Paradise Cove
                                   Shady Shores, TX  76208
21                                 (972) 786-3063

22

23

24
             Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

| | |
|---|---|
| 1 | <u>DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.</u> |
| 2 | THE COURT:  All right.  We are here for Highland |
| 3 | Capital Management, L.P. versus James Dondero, a preliminary |
| 4 | injunction hearing.  This is Adversary 20-3190. |
| 5 | All right.  Let's start out by getting appearances from |
| 6 | counsel.  First, for the Plaintiff/Debtor, who do we have |
| 7 | appearing? |
| 8 | MR. MORRIS:  Your Honor, John Morris; Pachulski Stang |
| 9 | Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and |
| 10 | others. |
| 11 | THE COURT:  All right.  Good morning.  All right. |
| 12 | For Mr. Dondero, who do we have appearing? |
| 13 | MR. LYNN:  Michael Lynn, together with John Bonds, |
| 14 | for Mr. Dondero. |
| 15 | THE COURT:  Good morning. |
| 16 | All right.  I know we have a lot of parties in interest |
| 17 | represented on the video or phone today.  I'm not going to go |
| 18 | through a roll call, other than I'll see if we have the |
| 19 | Committee, the Unsecured Creditors' Committee counsel on the |
| 20 | line.  Do we have anyone appearing for them? |
| 21 | MR. CLEMENTE:  Yes, good morning, Your Honor. |
| 22 | Matthew Clemente from Sidley Austin on behalf of the |
| 23 | Committee. |
| 24 | THE COURT:  Okay.  Thank you.  All right. |
| 25 | MR. CLEMENTE:  Thank you, Your Honor. |

4

1        THE COURT:  Well, as I said, I'm not going to do a

2   roll call.  I don't think we had any specific parties in

3   interest, you know, file a pleading, or any other parties

4   other than the Debtor and Mr. Dondero in this adversary.  So

5   I'll just let the others kind of listen in without appearing.

6      All right.  Mr. Morris, are you going to start us off this

7   morning with, I don't know, an opening statement or any

8   housekeeping matters?

9        MR. MORRIS:  I have both an opening statement and

10  housekeeping matters.  I just wanted to see if Mr. Pomerantz

11  has anything he wants to convey to the Court before I begin.

12        MR. POMERANTZ:  (garbled)

13        THE COURT:  Mr. Pomerantz, if you could take your

14  device off mute, please.

15        THE CLERK:  He's off mute.  I don't know what --

16        THE COURT:  Okay.  Well, we're showing you're not on

17  mute, but we can't hear you.  What now?

18        THE CLERK:  He's not on mute now.  He's --

19        THE COURT:  Okay.  Go ahead, Mr. Pomerantz.

20      (Pause.)

21        THE CLERK:  He's not coming through.

22        THE COURT:  We're -- you're not coming through, and

23  we're not sure what the problem is.  We're not showing you on

24  mute.

25      (Pause.)

5

1          THE COURT:  All right.  Should we have him call back

2   in on his phone?  All right.  If you could, if you have a

3   phone, maybe you can try calling in on your phone and speak

4   through your phone, not your computer.

5          MR. MORRIS:  You know what, Your Honor?  I'm going to

6   proceed, and Mr. Pomerantz will address the Court at the

7   conclusion of the hearing on the motion.

8          THE COURT:  Okay.  Very good.  We usually hear him

9   loud and clear, so I don't know what's going on this morning.

10  Go ahead, Mr. Morris.

11          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12          MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13  John Morris; Pachulski Stang; for the Debtor.

14     We are here this morning, Your Honor, on the Debtor's

15  motion for preliminary injunction against Mr. Dondero.  We

16  filed last night also an emergency motion for an order to show

17  cause as to why this Court should not hold Mr. Dondero in

18  contempt of court --

19          THE COURT:  All right.

20          MR. MORRIS:  -- for violating a previously-issued

21  TRO.

22          THE COURT:  Yes.  Let me just interject, in case

23  there's any confusion by anyone.  I am not going to hear the

24  motion for show cause order this morning.  While I understand

25  you think there might be some efficiency and overlap in

6

1    evidence, it's not enough notice.  So we'll talk about

2    scheduling that at the end of the presentations this morning.

3    All right?

4              MR. MORRIS:  Thank you for addressing that, Your

5    Honor.

6              THE COURT:  Okay.

7              MR. MORRIS:  Your Honor, then let's just proceed

8    right to the preliminary injunction motion.  There is ample

9    evidence to support the Debtor's motion for a preliminary

10   injunction.  There would have been substantial evidence to

11   support it based on the conduct that occurred prior to the

12   issuance of the TRO, but the conduct that did occur following

13   the TRO only emphasizes the urgent need for an injunction in

14   this case.

15       I want to begin by just telling Your Honor what evidence

16   we intend to introduce here today.  We filed at Docket 46 in

17   the adversary proceeding our witness and exhibit list.  The

18   exhibit list contains Exhibits A through Y.  And at the

19   appropriate time, I will move for the admission into evidence

20   of those exhibits.

21       The exhibit list and the witness list also identifies

22   three witnesses for today.  Mr. Dondero.  Mr. Dondero is here

23   today.  Notwithstanding Your Honor's comments on December 10th

24   and on December 16th, when I deposed him on Tuesday he was

25   unsure whether he was going to come here today to testify.

1    And he will inform Your Honor of that on cross-examination.

2    And so the Debtor was forced to prepare and serve a subpoena

3    to make sure that he was here today.  But Mr. Dondero is here

4    today.

5        Following the conclusion of Mr. Dondero's deposition on

6    Tuesday, and based in part on the evidence adduced during that

7    deposition, the Debtor terminated for cause Scott Ellington

8    and Isaac Leventon.  We had asked counsel for those former

9    employees to accept service of a trial subpoena so that they

10    would appear today.  We were told that they would do so if we

11    gave them a copy of the transcript of Mr. Dondero's

12    deposition.

13        We thought that was inappropriate and we declined to do

14    so, and they declined to accept service of the subpoenas.  We

15    have spent two days with a professional process server

16    attempting to effectuate service of the trial subpoenas for

17    Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18    doing that.  So we'll only have one witness today, unless we

19    have cause to call anybody on rebuttal, and that witness will

20    be Mr. Dondero.

21        I want to talk for a few moments as to what Mr. Dondero

22    will testify to and what the evidence will show.  Mr. Dondero

23    will testify that he never read the TRO, Your Honor.  He will

24    testify that he didn't participate in the motion on the

25    hearing for the TRO, that he never read Mr. Seery's

1   declaration in support of the Debtor's motion for the TRO,

2   that he never bothered to read the transcript of the

3   proceedings on December 10th so that he could understand the

4   evidence that was being used against him.  He had no knowledge

5   of the terms of the TRO when he was deposed on Tuesday.

6       And that's the backdrop of what we're doing here today,

7   because he didn't know what he was enjoined from doing, other

8   than speaking to employees.  He actually did testify and he

9   will testify that he knew he wasn't supposed to speak with the

10  Debtor's employees, but he spoke with the Debtor's employees

11  in all kinds of ways, as the evidence will show.

12      The evidence will also show that Mr. Dondero violated the

13  TRO by throwing away the cell phone that the company bought

14  and paid for after the TRO was entered into.  He's going to be

15  unable to tell you who threw it away.  He's going to be unable

16  to tell you who gave the order to throw it away.  He's going

17  to be unable to tell you when after the TRO was entered the

18  phone was thrown away.

19      But we do have as one fact and as I believe one violation

20  of the TRO --

21          MR. POMERANTZ:  So, I'm on a WebEx.

22          MR. MORRIS:  Jeff, --

23          THE COURT:  Mr. Pomerantz, we heard you.  We heard

24  you say something.  So, apparently, you got your audio

25  working.

1        All right.  Mr. Morris, continue.

2            MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3   you, Your Honor, is that it's really Mr. Seery's fault that

4   the phone got thrown away, because Mr. Seery announced that

5   all of the employees were going to be terminated at the end of

6   January, and because Mr. Seery did that, he and I believe Mr.

7   Ellington thought it was appropriate to just throw their

8   phones away, without getting the Debtor's consent, without

9   informing the Debtor, and switching the phone numbers that

10  were in the Debtor's account to their own personal names.  So

11  that's Item No. 1.

12      Item No. 2 -- and this is in no particular order, Your

13  Honor.  I don't want you to think that I'm bringing these

14  things up in terms of priority.  But they're just the order in

15  which they came up in the deposition, and so I'm just

16  following it as well.

17      Item No. 2 is trespass.  On December 22nd, you will hear

18  evidence that Mr. Dondero personally intervened to yet again

19  stop trades that Mr. Seery was trying to effectuate in his

20  capacity as portfolio managers of the CLOs.  He did that just

21  six days after Your Honor dismissed as frivolous a motion

22  brought by the very Advisors and Funds that he owns and

23  controls.

24      Therefore, the very next day, the Debtor sent him a

25  letter, sent through counsel a letter, evicting him from the

1  premises, demanding the return of the phone, and telling him

2  that he had to be out by December 30th.

3      I was stunned, Your Honor, stunned, when I took his

4  deposition on Tuesday and he was sitting in Highland's

5  offices.  He hadn't asked for permission to be there.  He

6  hadn't obtained consent to be there.  But he just doesn't care

7  what the Debtor has to say here.  He just doesn't.

8      I don't know when he got there or when he left.  I don't

9  know if he spoke to anybody while he was there.  But he just

10  took it upon himself to show up in the Debtor's office,

11  notwithstanding the very explicit eviction notice that he got

12  on December 23rd.

13      Mr. Dondero, as I mentioned, clearly violated the TRO by

14  knowingly and intentionally and purposely interfering with the

15  Debtor's trading as the portfolio manager of the CLOs.  This

16  has just gone on too long.  There have been multiple hearings

17  on this matter, but he doesn't care.  So he gave the order to

18  stop trades that Mr. Seery had effectuated.  That's a clear

19  violation of the TRO, and it certainly supports the imposition

20  of a preliminary injunction.

21      Mr. Seery -- Mr. Dondero is going to testify that multiple

22  letters -- that I'm going to refer to them, Your Honor, as the

23  K&L Gates Parties, and those are the two Advisors and the

24  three investment funds and CLO Holdco that are all owned and/

25  or controlled by Mr. Dondero -- after that hearing on the

1    16th, K&L Gates, the K&L Gates Parties sent not one, not two,

2    but three separate letters.  They said they may take steps to

3    terminate the CLO management agreements.  After we evicted Mr.

4    Dondero, sent a letter suggesting that we would be held liable

5    for damages because we were interfering with their business.

6         And Mr. Dondero is going to tell you, Your Honor, that he

7    encouraged the sending of those letters, that he approved of

8    those letters, that he thought those letters were the right

9    things to send to the Debtor, even after -- even with the

10   knowledge of what happened on December 16th.

11        He's going to tell you he knew about that hearing and he

12   still, he still approves of those letters, and never bothered

13   to exercise his control to have those letters withdrawn upon

14   the Debtor's request.  We asked them to withdraw it, and when

15   they wouldn't do it, Your Honor, that's what prompted the

16   filing of yet another adversary proceeding.  And we're going

17   to have another TRO hearing next Wednesday because they won't

18   stop.

19        Next, a preliminary injunction should issue because Mr.

20   Dondero violated the TRO by communicating with the Debtor's

21   employees to coordinate their legal strategy against the

22   Debtor.  The evidence will show, in documents and in

23   testimony, that on December 12th, while he was prohibited from

24   speaking to any employee except in the context of shared

25   services, you're going to see the documents and you're going

1 to hear the evidence that on December 12th Scott Ellington was

2 actively involved in identifying a witness to support Mr.

3 Dondero's interests at the December 16th hearing.

4   You will receive evidence that on December 15th Mr.

5 Ellington and Mr. Leventon collaborated with Mr. Dondero's

6 lawyers to prepare a common interest agreement.

7   You will hear evidence that on the next day, December

8 16th, the day of that hearing, that Mr. Dondero solicited Mr.

9 Ellington's help to coordinate all of the lawyers representing

10 Mr. Dondero's interests, telling Mr. Ellington that he needed

11 to show leadership, and Mr. Ellington readily agreed to do

12 just that.

13   You will hear evidence that on December 23rd Mr. Ellington

14 and Grant Scott communicated in connection with calls that

15 were being scheduled with Mr. Dondero and with K&L Gates, the

16 very K&L Gates Clients who filed the frivolous motion that was

17 heard on December 16th and that persisted in sending multiple

18 letters threatening the Debtor thereafter.

19   You will hear evidence that late in December Mr. Dondero

20 sought contact information for Mr. Ellington and Mr.

21 Leventon's lawyer, and he will tell you that he did it for the

22 explicit purpose of advancing their mutual shared interest

23 agreement, while they were employed by the Debtor.  While they

24 were employed by the Debtor.

25   Finally, you will hear evidence, and it will not be

1 disputed, you will see the evidence, it's on the documents,

2 that Mr. Dondero personally intervened to stop the Debtor from

3 producing the financial statements of Get Good and Dugaboy,

4 two entities that he controls, that the U.C.C. had been asking

5 for for some time, that the Debtor had been asking of its

6 employees for some time to produce. And it was only when we

7 got, frankly, the discovery from Mr. Dondero when there's a

8 text message that says, Not without a subpoena.

9 The documents are on the Debtor's system. We just don't

10 know where they are because they're hidden someplace. But Mr.

11 Dondero knows where they are. He can certainly force -- he

12 can certainly get them produced. And one of the things we'll

13 be asking for when we seek the contempt motion is the

14 production of those very documents.

15 So, Your Honor, that's what the evidence is going to show.

16 I don't think there's going to be any question that a

17 preliminary injunction ought to issue. But I do want to spend

18 just a few minutes rebutting some of the assertions made in

19 the filing by Mr. Dondero last night.

20 Of course, they offer no evidence. There is no

21 declaration. There is no document. There is merely argument.

22 It's been that way throughout this case. For a year, Mr.

23 Dondero has never stood before Your Honor to tell you why

24 something was wrong being done to him, why -- he hasn't

25 offered to be here at all, and he's here today, again, only

 1   because he got a subpoena.  That's the only reason we know

 2   he's here today.

 3        So let's just spend a few minutes talking about the

 4   assertions made in the document last night.  Mr. Dondero

 5   complains about the scope of the injunction, and I say to

 6   myself, in all seriousness, Are you kidding me?  You didn't

 7   even read the TRO and you're going to be concerned about what

 8   the scope of the injunction is?  You didn't even have enough

 9   respect for the Court to read the TRO and we're going to worry

10   about the scope of some future injunction?  Doesn't make any

11   sense to me.

12        But let's talk about the specific arguments that they

13   make.

14        Third parties.  They're concerned that somehow third

15   parties don't have notice of the injunction.  Your Honor,

16   third parties are not impacted by the injunction.  The only

17   third parties that are impacted by the injunction are those

18   that are owned and/or controlled by Mr. Dondero.  If he

19   doesn't tell them, that's his breach of duty.  He created the

20   Byzantine empire of over 2,000 entities, and he wants the

21   Debtor to have the burden of notifying all of them so that

22   they can all come in here and make 2,000 arguments as to why

23   they shouldn't be enjoined?

24        He owns and controls them.  They are the only third

25   parties who are impacted by this proposed preliminary

1    injunction, and he has the responsibility, he has the duty to

2    inform them, because he owns and controls them.

3        We know of the K&L Gates Parties.  We know Get Good and

4    Dugaboy are in this courtroom.  We know CLO Holdco.  So many

5    of these parties have been so -- they're on the phone now.

6    They don't have notice?  It is insulting, frankly, to suggest

7    that the Debtor somehow has some obligation to figure out who

8    Mr. Dondero owns and controls.  He should know that.  That's

9    number one.

10       Number two, there is a statement in there about employees

11   and how he should be able to speak with them about personal

12   and routine matters.  As to that, Your Honor, he has forfeited

13   that opportunity.  He cannot be trusted.  There cannot be any

14   communication because nobody can police it.  And so we think a

15   complete bar to any discussion with any employee, except as it

16   relates to shared services -- because we do have a contractual

17   obligation; that's what was in it -- ought to be barred.

18   That's number one.

19       Number two, there's a reference in the objection to Mr.

20   Dondero's personal assistant.  I'd like to know who that is,

21   Your Honor.  I wasn't aware that he still was using a personal

22   assistant at the Debtor.  I want to know specifically who that

23   is.  I don't know that they -- you know, I just -- we need to

24   cut that off.  And he should not be communicating with any

25   employee.  The Debtor should not be paying for his personal

1   assistant.

2       It's offensive to think that he's still doing that,

3   particularly after he was terminated or his resignation was

4   requested back in October precisely because his interests were

5   adverse to the Debtor.

6       Number three, he's concerned that the Debtor is somehow

7   preventing him from speaking to former employees.  We now

8   know, Your Honor, that that's a, I'm sure, a very specific

9   reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10  a green light to be able to do that.  And you know, I'll leave

11  it to Your Honor as to whether that's appropriate.  I'll leave

12  it to their counsel as to whether, going forward, colluding

13  together against the Debtor at this point in time is in

14  anybody's best interest.  But I will -- what I will demand in

15  the preliminary injunction is a very explicit statement that

16  Mr. Ellington and Mr. Leventon are not to share any

17  confidential or privileged information that they received in

18  their capacity as general counsel and assistant general

19  counsel of the Debtor.

20      The pot plan.  He's afraid somehow the order is going to

21  prevent him from pursuing the pot plan.  He's had over a year

22  to pursue this pot plan, Your Honor.  Frankly, I don't, you

23  know, I don't know what to say.  He has never made a proposal

24  that has gotten any traction with the only people who matter.

25  And it's not the Debtor.  It's the creditors.  It's the

1   Creditors' Committee.

2       If you want to put in an exception that he can call Matt

3   Clemente, I don't mean to put this on Mr. Clemente, he can

4   decide whether or not that's appropriate, but the creditors

5   are the only ones who matter here.  Your Honor, it's not the

6   Debtor.

7       And I'll let Mr. Dondero's counsel explain to Your Honor

8   why he thinks he still needs to pursue a pot plan, and Your

9   Honor can decide.  I trust Your Honor to decide what

10  boundaries and what guardrails might be appropriate for him to

11  continue to pursue his pot plan.

12      That's all I have, Your Honor.  Not much.

13              THE COURT:  All right.

14              MR. MORRIS:  But I think there's going to be --

15  there's going to be an awful lot of evidence.  This is going

16  to be a lengthy examination.  I ask the Court for your

17  patience.

18              THE COURT:  I've got --

19              MR. MORRIS:  But that's all I have.

20              THE COURT:  I've got all day, if we need it.

21              MR. MORRIS:  Okay.

22              THE COURT:  I hope we don't, but I've got all day if

23  we need it.  All right.

24              MR. MORRIS:  That's what I have, Your Honor.

25              THE COURT:  All right.  Mr. Dondero's counsel, your

1  opening statement?

2          MR. BONDS:  Your Honor, I would reserve my opening

3  statement to the end of the hearing.

4      I would also point out that anything that Mr. Morris just

5  said was not evidence, and we think that the evidence will

6  show completely differently than argued or articulated by Mr.

7  Morris.

8          THE COURT:  All right.

9          MR. BONDS:  That's all.

10          THE COURT:  Thank you, Mr. Bonds.

11      Mr. Morris, you may call your witness.

12          MR. MORRIS:  The Debtor calls James Dondero.

13          THE COURT:  All right.  Mr. Dondero, this is Judge

14  Jernigan.  I would ask you to say, "Testing, one, two," so we

15  pick up your video so I can swear you in.

16      All right.  Mr. Dondero, if you're speaking up, we're not

17  hearing you, so please make sure you're unmuted and have your

18  video --

19      (Echoing.)

20          MR. DONDERO:  Hello.  One, two.

21          THE COURT:  Okay.  We got you.

22          MR. DONDERO:  One, two three.

23          THE COURT:  We got you now.

24          JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

Dondero - Direct                          19

1          Mr. Morris, go ahead.

2               MR. MORRIS:  Thank you, Your Honor.

3          (Echoing.)

4               THE COURT:  I'm going to ask everyone except Mr.

5     Dondero and Mr. Morris to put your device on mute.  We're

6     getting a little distortion.

7          All right.  Go ahead.

8                         DIRECT EXAMINATION

9     BY MR. MORRIS:

10    Q    Good morning, Mr. Dondero.  Can you hear me?

11    A    Yes.

12         (Echoing.)

13              THE COURT:  Ooh.  Okay.  We're having a little echo

14    when you speak, Mr. Dondero.  Do you have -- well, first, you

15    have headphones.  That always helps.

16         (Echoing.)

17              THE COURT:  Okay.  That may help as well.

18         (Pause.)

19              THE COURT:  Okay.  Let's try again.  If you could

20    say, "Testing, one, two."

21              THE WITNESS:  Is that better?

22              THE COURT:  That is better, yes.

23         All right.  Go ahead.

24              THE WITNESS:  Okay.  Great.

25              MR. MORRIS:  Thank you.

1  BY MR. MORRIS:

2  Q    Can you hear me, Mr. Dondero?

3  A    You're a bit faint.  Give me one second.  Okay.  Got you.

4  Q    Okay.  Thank you.  Who is in the room with you right now?

5  A    Bonds, Lynn, and a tech.

6          A VOICE:  Bryan Assink.

7          THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm

8  sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

9  BY MR. MORRIS:

10  Q   Okay.  You're testifying today pursuant to a subpoena,

11  correct?

12  A    Yes.

13  Q    Okay.

14          MR. MORRIS:  And Your Honor, that subpoena can be

15  found at Docket No. 44 in the adversary proceeding.

16          THE COURT:  All right.

17  BY MR. MORRIS:

18  Q    In the absence of a subpoena, in the absence of a

19  subpoena, you didn't know if you would show up to testify at

20  this hearing; is that right?

21  A    I -- I do what my counsel directs me to do, and I didn't

22  know at that time whether they would direct me to come or not.

23  Q    Okay.  And when I -- when I deposed you earlier this week,

24  you agreed that you may or may not testify; is that right?

25  A    It depends on what counsel instructs me to do, correct.  I

1   didn't know at the time.

2   Q    Okay.  And you didn't mention anything about counsel when

3   I asked you the questions earlier this week, correct?

4   A    That was the undertone in almost all my answers, that I

5   relied on counsel.

6          MR. MORRIS:  Your Honor, I move to strike.  I'm

7   asking very specific questions.  And if I need to go to the

8   deposition transcript, I'm happy to do that.

9          THE COURT:  All --

10          MR. MORRIS:  Just going forward, Your Honor, this is

11  cross-examination.  It's really yes or no at this point.

12  That's what I would request, anyway.

13          THE COURT:  All right.  Mr. Dondero, do you

14  understand --

15      (Echoing.)

16          THE COURT:  Do you understand what Mr. Morris was

17  raising there?  We really need you to give specific answers --

18  and usually they're going to be yes or no answers -- to Mr.

19  Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20  go ahead.

21          THE WITNESS:  Yeah.

22  BY MR. MORRIS:

23  Q    Mr. Dondero, you're aware that Judge Jernigan granted the

24  Debtor's request for a TRO against you on December 10th,

25  correct?

1    A    Yes.

2    Q    But you never reviewed the declaration that Mr. Seery

3    filed in support of the Debtor's motion for a TRO, correct?

4    A    I relied on counsel.

5    Q    Sir, you never reviewed the declaration that Mr. Seery

6    filed in support of the Debtor's motion for a TRO, correct?

7    A    Correct.

8    Q    You didn't even know the substance of what Mr. Seery

9    alleged in his declaration at the time that I deposed you on

10   Tuesday, correct?

11   A    Correct.

12   Q    And that's because you didn't even think about the fact

13   that the Debtor was seeking a TRO against you; isn't that

14   right?

15   A    No.

16   Q    That's not right?

17   A    No.

18   Q    All right.

19          MR. MORRIS:  Your Honor, could I ask my assistant,

20   Ms. Canty, to put up on the screen what had been designated as

21   the Debtor's Exhibit Z in connection with the motion for

22   contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23          THE COURT:  All right.

24          MR. MORRIS:  And I would like to -- I'd like to

25   cross-examine Mr. Dondero on his testimony on Tuesday.

1          THE COURT:  All right.  You may.

2          MR. MORRIS:  Can we put up Page 15, please?  And go

3   to Lines 15 through 17.

4   BY MR. MORRIS:

5   Q    Sir, you recall being deposed on Tuesday by my -- by me,

6   correct?

7   A    Yes.

8   Q    Okay.  Did you hear this question and did you hear this

9   answer?

10         "Q   Did you care that the Debtor was seeking a TRO

11         against you?

12         "A   I didn't think about it."

13  Q    Is that -- is that your testimony from the other day?

14  A    Yes.

15  Q    You didn't dial in to the hearing when the Court

16  considered the Debtor's motion for a TRO against you, did you?

17  A    I -- I don't recall.  I don't think so.

18  Q    You never read the transcript in order to understand what

19  took place in this courtroom when Judge Jernigan decided to

20  enter a TRO against you; isn't that right?

21  A    I relied on counsel, which has been my testimony all

22  along.

23         MR. MORRIS:  Can we go to Page 13 of the transcript,

24  please?  Beginning at Line 24.

25  BY MR. MORRIS:

 1  Q    (reading)

 2       "Q   Did you read a transcript of the hearing?

 3       "A   No."

 4  Q    Did you testify on Tuesday that you did not read a

 5  transcript of the hearing?

 6  A    Yes.

 7  Q    In fact, as of at least last Tuesday, you hadn't even

 8  bothered to read the TRO that this Court entered against you.

 9  Isn't that right?

10       MR. BONDS:  Your Honor, I'm going to object.

11    (Echoing.)

12       THE COURT:  Okay.  We're getting that echo from you

13  now, Mr. Bonds.  So maybe you need to turn your volume down a

14  little.  But what is the basis for your objection?

15    (Echoing.)

16       MR. BONDS:  Leading and rhetorical.

17       MR. MORRIS:  I think it's because they're in the same

18  room.

19       THE COURT:  Okay.  Do you have -- I don't know what

20  you're doing.  I guess you're moving to a different room?

21       MR. BONDS:  I am, Your Honor.

22       THE COURT:  Okay.

23    (Echoing.)

24       THE COURT:  Okay.  I'm waiting for the objection

25  basis.

Dondero - Direct                          25

1          MR. BONDS:  The basis of the objection, Your Honor,

2     is that --

3        (Echoing.)

4          THE COURT:  Okay.  We're going to have to do

5     something different here.  We can't have this issue for the

6     entire hearing.  Do you need to get a tech person in there, or

7     maybe call in on your phone?  I don't know.

8          MR. BONDS:  Your Honor, I'm going into the conference

9     room.

10       (Pause.)

11         THE COURT:  Okay.  Are we going to try again here?

12         MR. BONDS:  Yes.  Is this working?

13         THE COURT:  Yes.

14         MR. BONDS:  Perfect.  Your Honor, my objection is

15    that Mr. Dondero has already testified that he relied on his

16    lawyers.  I don't know where Mr. Morris is going with this,

17    but it's pretty clear that Mr. Dondero simply relies on his

18    lawyers to tell him what happened.  I don't know that that's

19    that different than any other layperson.

20         MR. MORRIS:  Your Honor, if this is --

21         THE COURT:  Well, --

22         MR. MORRIS:  If I may?

23         THE COURT:  Yes.

24         MR. MORRIS:  I believe it's terribly relevant to know

25    how seriously Mr. Dondero takes this Court and this Court's

Dondero - Direct                    26

1   proceedings and this Court's orders.  If the Court decides

2   that it doesn't matter whether or not he read the transcript,

3   you're the fact-finder and you'll make that decision.  But I

4   believe it's at least relevant.

5          THE COURT:  Okay.  I agree and I overrule the

6   objection.

7      Go ahead.

8   BY MR. MORRIS:

9   Q   Mr. Dondero, as of at least Tuesday, you never bothered to

10  read the TRO that was entered against you, correct?

11  A   I'm sorry.  We're dealing with some tech stuff here for a

12  second.  Can you repeat the question?

13  Q   Yes.

14     (Echoing.)

15  Q   As of Tuesday, you had not bothered to read the TRO that

16  was entered against you?

17     (Echoing.)

18          MR. MORRIS:  Your Honor, can we take a break?  I

19  can't do this.  I just --

20          THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21  do we need to do to fix these technical problems?  Do I need

22  to get my IT guy in here and help you?  This is terrible.

23  This connection is terrible.  And I understand people have

24  technical problems sometimes, but we've been doing these video

25  hearings since March, so --

1           MR. BONDS:  Your Honor, I have simply gone to another

2    conference room.  The Debtor (garbled) I think that Mr.

3    Dondero should be fine.

4           THE COURT:  Okay.  I don't know what you said except

5    that you think Mr. Dondero should be fine.  I --

6           MR. MORRIS:  Is there anybody in that room with a

7    cell phone on, Mr. Dondero?

8           THE WITNESS:  No.

9           MR. BONDS:  And I'm completely over in --

10          THE COURT:  Okay.

11          MR. MORRIS:  Can I try and proceed?

12          THE COURT:  Try to proceed.

13          MR. MORRIS:  Okay.

14      (Echoing.)

15   BY MR. MORRIS:

16   Q   Mr. Dondero, as of Tuesday you only had a general view of

17   what this Court restrained you from doing; is that correct?

18      (Echoing.)

19          MR. MORRIS:  I'd still -- I -- there's too much

20   noise, Your Honor.  I can't do it.

21          THE COURT:  Okay.  We're going to take a five-minute

22   break.  Mr. Bonds, can you get a technical person there to

23   work through these problems?

24      And Mike, let's get Bruce up here to --

25          THE CLERK:  It's because they're in the same room.

1  That's the problem.

2         THE COURT:  They're -- they're --

3         THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

4  on his way up there.

5         THE COURT:  Thank you.

6     Mike, explain it to me, because I don't understand.

7  You're saying if they have two devices on in the same room?

8         THE CLERK:  The same -- that's the problem.  They're

9  so close.  And they're trying to use the same device, give it

10 back to you.

11        A VOICE:  He has a phone on in the room.

12        MR. MORRIS:  I asked that question.

13        THE COURT:  Okay.

14        MR. MORRIS:  Please instruct the witness to exclude

15 everybody from the room, to turn off all electronic devices

16 except the device that's being used for this (garbled).  At

17 least have --

18        THE COURT:  All right.  So, the consensus of more

19 technical people than me is you've got two devices on in the

20 same room and that's what's causing the distortion and echo.

21 So I don't know if it's somebody's phone that needs to be

22 turned off or if you have two iPads or laptops.

23     (Court confers with Clerk.)

24     (Pause.)

25        MR. BONDS:  I think I'm unmuted.  Can people hear me?

Dondero - Direct                    29

1          THE WITNESS:  Yes.

2       (Pause.)

3          THE COURT:  Okay.  Bruce, can you walk their office

4   through?  They have, I think, two devices in the same room.

5   It's a horrible echo.  So, Mr. Bonds or some --

6          MR. BONDS:  Yes, Your Honor.

7          THE COURT:  We have a lawyer and the lawyer's client

8   who is testifying right now in the same room.

9          I.T. STAFF:  Uh-huh.

10          THE COURT:  And --

11          I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-

12   in user on a telephone?

13          THE COURT:  I don't know.  I don't --

14          I.T. STAFF:  Yeah.  Whatever's coming -- the audio is

15   feeding back in.  They need to separate if they're both on.

16   Or just use one and the attorney can slide over and the client

17   can --

18          THE COURT:  Okay.

19          I.T. STAFF:  -- go in his place.  Just use one --

20          THE COURT:  Our IT person is confirming what everyone

21   else has been saying, that you really can only have one device

22   in the same room.  It's just unavoidable, the echoing.

23          I.T. STAFF:  Unless everybody has --

24          THE COURT:  Unless everyone has headphones on.

25          I.T. STAFF:  Right.

Dondero - Direct                    30

1          THE COURT:  So we either need everyone to have

2    headphones on, or one device in the room.  And you all,

3    awkward as it is, just have to share.  Or I guess you could

4    have two laptops, but one person has to --

5          I.T. STAFF:  Has to have a headset.

6          THE COURT:  Has to --

7          I.T. STAFF:  Because the other one, the audio is

8    going to be feeing into the microphone of the other one.

9          THE COURT:  Okay.  So, Mr. Bonds, I don't know if

10   you've heard any of that, but --

11         THE CLERK:  He needs to unmute himself.

12         THE COURT:  You're on mute, Mr. Bonds.

13         MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit

14   next to Mr. Dondero and answer any questions that may come up.

15         THE COURT:  Okay.

16         MR. BONDS:  If any objections --

17         THE COURT:  Okay.  So we're going to have one device?

18         MR. BONDS:  Yes.

19         THE COURT:  Okay.  Let's try again.

20      Okay.  Go ahead, Mr. Morris.

21   BY MR. MORRIS:

22   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

23         THE COURT:  I didn't hear you, Mr. Morris.  What?

24   BY MR. MORRIS:

25   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

Dondero - Direct                                    31

1   A    I have no idea.

2   Q    Is Mr. Leventon listening to this hearing?

3   A    I have no idea.  I haven't spoken with him.

4   Q    Okay.  So let's try again.  At least as of today, you

5   never bothered to read the TRO that was entered against you,

6   correct?

7   A    Correct.

8   Q    As of Tuesday, you only had a general understanding of

9   what the Court restrained you from doing, correct?

10       (Echoing.)

11  A    I had an adequate understanding.

12  Q    You had a what?

13  A    Adequate understanding.

14  Q    Your understanding --

15           A VOICE:  Your Honor?

16  BY MR. MORRIS:

17  Q    -- was that you were prohibited from speaking to the

18  Debtor's board without counsel and from speaking to the

19  Debtor's employees; is that right?

20  A    No.

21  Q    Okay.

22           MR. MORRIS:  Can we go to Page 13, Line 8, please?

23  BY MR. MORRIS:

24  Q    Were you asked this question and did you give this answer?

25       "Q    Tell me your understanding of what the temporary

1    restraining order restrains you from doing.

2    "A    To talk to Independent Board directly or talking

3    directly with employees.

4    "Q    Is there any other aspect of the temporary

5    restraining order that you're aware of that would

6    otherwise constrain or restrain your conduct?

7    "A    Those are the points I (garbled)."

8    Q    Did you give those answers to the questions that I asked?

9    A    Yes.

10   Q    And even with that general understanding, you went ahead

11   and communicated directly (garbled) employees many, many, many

12   times after the TRO was entered?

13   A    Only with regard to shared services, pot plan, and

14   Ellington, the settlement counsel.

15   Q    Does the restraining order permit you to speak with

16   Debtor's employees about the pot plan?

17       (Echoing.)

18          THE COURT:  Mr. Morris, let me stop.

19          MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20          THE COURT:  Even --

21          MR. MORRIS:  It's not working.

22          THE COURT:  Even your sound is not coming through

23   clearly.  And I think it's the echo coming out of their

24   speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25   conclude that, would you turn off your video and ask your

1   question again and see if it's any better, just to confirm

2   it's not a bandwidth issue on your end?  I doubt it is, but --

3   okay.  So, try asking your question again, and I'm going to

4   see if it's still distorted.

5   BY MR. MORRIS:

6   Q    There's nothing in the TRO that permitted you to speak

7   with Debtor employees about the pot plan, correct?

8          THE COURT:  Okay.  Mr. Morris, it's not at your end.

9   It's -- it's their end.  Okay.  So you can turn your video

10  back on.

11     Mr. Bonds?

12         MR. BONDS:  Yes, ma'am.

13         THE COURT:  You all are going to have to use earbuds,

14  apparently.  We're getting -- we're getting a feedback loop,

15  okay?  Whenever Mr. Morris talks or I talk, we're hearing

16  ourselves echo through your speakers.

17         MR. BONDS:  Can you check right now to see if it's

18  true, if we're experiencing the same problem?

19         THE WITNESS:  In other words, is this better?  We

20  unplugged the cord here.

21         THE COURT:  Well, when you all speak, it's -- it's

22  better now.  But when --

23         MR. MORRIS:  It is better.

24         THE COURT:  But when Mr. Morris asks a question, it's

25  echoing through your speakers.  But I don't hear myself

1   echoing through your speakers.

2            I.T. STAFF:  Can Mr. Morris say something, please?

3            THE COURT:  Mr. Morris, say something.

4            MR. MORRIS:  They may have solved the problem.  They

5   may have solved the problem.  How's that?

6            THE COURT:  Okay.  I think the problem is solved,

7   whatever you did, so let's try once again.

8         Go ahead, Mr. Morris.  Repeat your last question.  I

9   didn't hear it.

10  BY MR. MORRIS:

11  Q   Mr. Dondero, the temporary restraining order doesn't

12  permit you to speak with the Debtor's employees about a pot

13  plan; isn't that right?

14  A    There was a presentation on the pot plan given to the

15  Independent Board after the restraining order was put in

16  place.  What are you implying, that that wasn't proper?

17           MR. MORRIS:  Your Honor, I move to strike.  It's a

18  very simple question.

19           THE COURT:  Okay.  Sustained.  If you could just

20  answer the specific question, Mr. Dondero.

21           THE WITNESS:  I don't know.

22  BY MR. MORRIS:

23  Q    Fair enough.  Sir, let's talk about some of the events

24  that led up to the imposition of the TRO.  I appreciate the

25  fact that you hadn't read Mr. Seery's declaration or any of

Dondero - Direct                                        35

1  the evidence that was submitted in connection with the TRO, so

2  let's spend some time talking about that now.  CLO stands for

3  Collateralized Loan Obligation, correct?

4  A    Yes.

5  Q    And the Debtor is party to certain contracts that give it

6  the exclusive right and responsibility to manage certain CLOs,

7  correct?

8  A    Yes.

9  Q    NexPoint Advisors, LP is an advisory firm.  Do I have that

10  right?

11  A    Yes.

12  Q    And we can refer to that, that firm, as NexPoint; is that

13  fair?

14  A    Yes.

15  Q    You have a direct or indirect ownership interest in

16  NexPoint, correct?

17  A    Yes.

18  Q    You're the president of NexPoint; isn't that right?

19  A    Yes.

20  Q    And as the president of NexPoint, it's fair to say that

21  you control that entity, correct?

22  A    To a certain extent.

23  Q    Sir, as the president of NexPoint, it's fair to say that

24  you control that entity, correct?

25  A    To a certain extent.

1    MR. MORRIS:  Can we go to Page 18 of the transcript,

2  please?  Lines 19 and 21.

3  BY MR. MORRIS:

4  Q    Were you asked this question and did you give this answer?

5        "Q    As the president of NexPoint, it's fair to say

6        that you control that entity?

7        "A    Generally."

8  Q    Is that the right answer that you gave the other day?

9  A    I think it's similar to what I just said, yeah, yeah.

10  Q    Sir, you're familiar with Highland Capital Management Fund

11  Advisors, LP; is that right?

12  A    Yes.

13  Q    And we'll call that Fund Advisors; is that fair?

14  A    Yes.

15  Q    And we'll refer to Fund Advisors and NexPoint together as

16  the Advisors; is that okay?

17  A    Yes.

18  Q    Fund Advisors is also an advisory firm, correct?

19  A    Yes.

20  Q    You have a direct or indirect ownership interest in Fund

21  Advisors, correct?

22  A    Yes.

23  Q    You're the president of Fund Advisors, correct?

24  A    Yes.

25  Q    And you also have an ownership interest in the general

1  partner of Fund Advisors; isn't that right?

2  A    I believe so.

3  Q    It's fair to say that you control Fund Advisors, correct?

4  A    Generally.

5  Q    NexPoint and Fund Advisors manage certain investments

6  funds; is that right?

7  A    Yes.

8  Q    Among the funds that they manage are High Point Income

9  Fund; is that right?

10  A    I don't think that's a name that we manage.

11  Q    Let's put it this way.  There are three funds that are

12  represented by K&L Gates that are managed by the Advisors,

13  correct?

14  A    I don't know.

15  Q    Okay.  You're the portfolio manager of the investment

16  funds advised by NexPoint and Fund Advisors, correct?

17  A    Largely.

18  Q    And NexPoint and Fund Advisors caused the investment funds

19  that they manage to invest in CLOs that are managed by the

20  Debtors, correct?

21  A    Years ago, they bought the equity interests, if that -- if

22  that's what you're asking me, in various CLOs.

23  Q    The two Advisors that you own and control caused the

24  investment funds to purchase interests in CLOs that are

25  managed by the Debtor, correct?

1    A    Not recently.  Not recently.  Years ago.  Yes.

2    Q    And they still hold those interests today, correct?

3    A    Yes.

4    Q    And K&L Gates represents all of those entities, correct?

5    A    Yes.

6    Q    And we'll call those the K&L Gates Clients; is that fair?

7    A    Yes.

8    Q    Before the TRO was entered, the K&L Gates Clients sent two

9    letters to the Debtor concerning the Debtor's management of

10   certain CLOs, right?

11   A    Yes.

12   Q    Okay.

13            MR. MORRIS:  Your Honor, I just want to take a moment

14   now, because we're going to start to look at some documents.

15   The Debtor would respectfully move into evidence Exhibits A

16   through Y that are on their exhibit list.

17            THE COURT:  All right.

18            MR. BONDS:  Your Honor, we have no objection.

19            THE COURT:  A through Y are admitted.  And for the

20   record, these appear at Docket No. 46 in this adversary.

21        (Plaintiff's Exhibits A through Y are received into

22   evidence.)

23            MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24   in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25   us know.

Dondero - Direct                                39

1          MS. CANTY:  Yeah.  I'm pulling it up right now.

2          MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3  down just a bit?

4  BY MR. MORRIS:

5  Q    All right.  Can you see this letter was sent on October

6  16th?

7  A    Yes.

8  Q    And we see the entities that are reflected on this letter.

9  We've got Highland Capital Management, LP.  That's the

10  question that they're asking.  And the questions and the

11  statements are being asserted on behalf of NexPoint Advisors,

12  LP.  Do you see that?

13  A    Yes.

14  Q    And Highland Capital Management Fund Advisors, LP.  Those

15  are the two Advisors that you own and control, correct?

16  A    Control to a large extent.

17  Q    Okay.

18          MR. MORRIS:  And can we put up Exhibit C, please?

19  BY MR. MORRIS:

20  Q    This is a second letter sent by NexPoint on November 24th.

21  Do you see that?

22  A    Yes.

23  Q    Okay.  And you're familiar with the substance of these

24  letters, correct?

25  A    Yes.

Dondero - Direct                              40

1   Q    And you were familiar -- you were aware of these letters

2   before they were sent.  Is that correct?

3   A    Yes.

4   Q    And you generally discussed the substance of these letters

5   with NexPoint; is that right?

6   A    Generally, yes.

7   Q    And you discussed the substance of the letters with the

8   Advisors' internal counsel; is that right?

9   A    Yes.

10  Q    That's D.C. Sauter?

11  A    Yes.

12  Q    And you have been on some calls with K&L Gates about these

13  letters, right?

14  A    I believe so.

15  Q    And you knew these letters were being sent, correct?

16  A    Yeah, they're -- they're reported.

17  Q    You knew these letters for being sent; isn't that right,

18  sir?

19  A    Yes.

20  Q    And you didn't object to the sending of these letters,

21  correct?

22  A    No.

23  Q    In fact, you supported the sending of these letters.  Is

24  that right?

25  A    Yes.

 1  Q    And you have never directed NexPoint to withdraw these

 2  letters, correct?

 3  A    No.

 4  Q    Around Thanksgiving, you learned that Mr. Seery had given

 5  a direction to sell certain securities owned by the CLOs

 6  managed by the Debtors, correct?

 7  A    Yes.

 8  Q    And when you learned that, you personally intervened to

 9  stop the trades, correct?

10  A    Yes.  I believe they were inappropriate.

11         MR. MORRIS:  I move to strike the latter part of the

12  answer, Your Honor.

13         THE COURT:  It's stricken.

14         MR. MORRIS:  Can we put up Exhibit D, please?

15  BY MR. MORRIS:

16  Q    We looked at this email string the other day.  Do you

17  recall that?

18  A    Yes.

19         MR. MORRIS:  Can we start at the bottom, please?

20  BY MR. MORRIS:

21  Q    There's an email from Hunter Covitz.  Do you see that?

22  A    Yes.

23  Q    Now, this is November 24th.  It's before the TRO.  Is that

24  fair?

25  A    Yes.

1   Q    Mr. Covitz is an employee of the Debtor, right?

2   A    I believe so.

3   Q    And Mr. Covitz helps manage the CLOs on behalf of the

4   Debtor.  Is that your understanding?

5   A    Yes.

6   Q    And Mr. Covitz in this email is giving directions to Matt

7   Pearson and Joe Sowin to sell certain securities held by the

8   CLOs.  Is that correct?

9   A    No.  He's giving Jim Seery's direction.

10          MR. BONDS:  And Your Honor, I'm going to object.

11  This is all before the TRO was ever entered.  It doesn't have

12  anything to do with today's hearing.

13          THE COURT:  Overruled.

14          MR. MORRIS:  May I respond, Your Honor?

15          THE COURT:  I --

16          MR. MORRIS:  Okay.  Thank you.

17          THE COURT:  I think it's relevant.  Go ahead.

18          MR. MORRIS:  Thank you.  Okay.

19  BY MR. MORRIS:

20  Q    Mr. Seery is the CEO of the Debtor; is that right?

21  A    Yes.

22  Q    And the Debtor is the contractual party with the CLOs

23  charged with the exclusive responsibility of managing the

24  CLOs, correct?

25  A    I don't believe so.  The Debtor is in default of the

Dondero - Direct                                    43

1    agreements.

2              MR. MORRIS:  I move to strike, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. MORRIS:

5    Q    Sir, the Debtor has the exclusive contractual right and

6    obligation to manage the CLOs, correct?

7    A    I don't agree with that.

8    Q    Okay.

9              MR. MORRIS:  Can we scroll up to the -- just --

10   BY MR. MORRIS:

11   Q    Do you see that Mr. Pearson acknowledges receipt of Mr.

12   Covitz's email?

13   A    Yes.

14   Q    And you received a copy of Mr. Covitz's email, did you --

15   did you not?

16   A    Yes.

17             MR. MORRIS:  Can you scroll up a little bit, please?

18   BY MR. MORRIS:

19   Q    And can you just read for Judge Jernigan your response

20   that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21   November 24th?

22   A    (reading)  No, do not.

23   Q    You instructed the recipients of Mr. Covitz's email not to

24   sell the SKY securities as had been specifically instructed by

25   Mr. Seery, correct?

Dondero - Direct                              44

1   A    Yes.

2   Q    And you understood when you gave that instruction that the

3   people on the email were trying to execute trades that Mr.

4   Seery had authorized, correct?

5   A    No.  I -- no, that isn't how I would describe it.

6            MR. MORRIS:  A second, Your Honor?

7            THE COURT:  Okay.

8        (Pause.)

9   BY MR. MORRIS:

10  Q    Sir, when you gave the instruction reflected in this

11  email, you knew that you were stopping trades that were

12  authorized and directed by Mr. Seery, correct?

13  A    I don't think -- I -- I wasn't -- I wasn't sure at the

14  moment I did that.  I didn't find out until later that it was

15  Seery who directed it.

16           MR. MORRIS:  Can we please go back to the deposition

17  transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20       "Q    At the time that you gave the instruction, "No, do

21       not," you knew that you were stopping trades that had

22       been authorized and directed by Mr. Seery, correct?

23       "A    Yes."

24  Q    Did you give that answer to my question on Tuesday?

25  A    I'd like to clarify it, but yes, I did give that answer.

Dondero - Direct                          45

1  Q    Okay.  You didn't speak with Mr. Seery before sending your

2  instructions interfering with his trade, the trades that he

3  had authorized, correct?

4  A    No, I did not.

5  Q    And you took no steps to seek the Debtor's consent before

6  instructing the recipients of your email to stop executing the

7  SKY transactions that had been authorized by Mr. Seery,

8  correct?

9  A    I'm sorry.  Can you repeat the question?

10  Q    You took no steps to seek the Debtor's consent before

11  stepping in to stop the trades that Mr. Seery had authorized,

12  correct?

13  A    I took other actions instead.

14  Q    Okay.  But you didn't seek the Debtor's consent?  That's

15  not one of the actions you took, right?

16  A    No, I educated the traders as to why it was inappropriate.

17         MR. MORRIS:  I move to strike, Your Honor.

18         THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    Sir, did you seek the Debtor's consent before stepping in

21  to stop the trades that Mr. Seery had authorized?

22  A    No, I did not seek consent.

23  Q    In response to your instruction, Mr. Pearson canceled all

24  of the trades that Mr. Seery had authorized, correct?

25  A    Yes.

Dondero - Direct                          46

1          MR. MORRIS:  Can we go back to the exhibit, please?

2    And if we could just scroll -- stop right there.

3    BY MR. MORRIS:

4    Q    That's -- that's Mr. Pearson's response to your email,

5    confirming that he had canceled both the SKY and the AVAYA

6    trades that had not yet been executed, correct?

7    A    Yes.

8          MR. MORRIS:  Can we scroll to the response to that?

9    BY MR. MORRIS:

10   Q    Is this your response?

11   A    Yes.

12   Q    Can you read that aloud, please?

13   A    (reading)  HFAM and DAF have instructed Highland in

14   writing not to sell any CLO underlying assets.  There is

15   potential liability.  Don't do it again, please.

16   Q    The writings that you're referring to are the two letters

17   from NexPoint, Exhibits B and C that we just looked at,

18   correct?

19   A    Yeah.  There might have been a third letter.  I don't

20   know.  But, yes, generally, those letters.

21   Q    Okay.  And at this juncture, the reference to potential

22   liability was a statement intended for Mr. Pearson.  Is that

23   correct?

24   A    Um, I -- no.  Pearson wouldn't have had any personal

25   liability.  It was -- it was meant for the -- there was

Dondero - Direct                              47

1  potential liability to the Debtor or to the compliance

2  officers at the Debtor.

3          MR. MORRIS:  Can we go to Page 45 of the deposition

4  transcript, please?  Line -- beginning at Line 11, through 18.

5  BY MR. MORRIS:

6  Q   Did I ask these questions and did you give these answers?

7       "Q   Do  you  see  the  reference  there  in  the  latter

8       portion  of  your  email,  'There  is  potential  liability.

9       Don't do it again'?

10      "A   Yes.

11      "Q   Who  was  the  intended  recipient  of  that  message?

12      "A   At this juncture, it's Matt Pearson, I believe."

13  Q   Did you give those answers to my questions on Tuesday?

14  A   Yeah.  That's not inconsistent.

15         MR. MORRIS:  Let's go back to the email, please.

16  BY MR. MORRIS:

17  Q   Mr. Sowin responded to your email; is that right?

18         MR. MORRIS:  Can we scroll up?

19  BY MR. MORRIS:

20  Q   Okay.  Who's Mr. Sowin?

21  A   He's the head trader.

22  Q   Who's he employed by?

23  A   I believe he's employed by HFAM but not the Debtor.

24  Q   Okay.  So he's -- he's somebody who's employed by one of

25  the Advisors; is that right?

1    A    I believe so.

2    Q    And Mr. Sowin responded to your email and he indicated

3    that he would follow your instructions.  Is that right?

4    A    Yeah.  He understands that it's inappropriate.  That's

5    what he's reflecting.  Yes.

6            MR. MORRIS:  I move to strike, Your Honor.

7            THE COURT:  Sustained.

8    BY MR. MORRIS:

9    Q    Sir, Mr. Sowin responded and indicated that he would

10   follow your instructions, correct?

11   A    (no audible response)

12   Q    Did you answer?  I'm sorry.

13   A    No, I didn't answer.  It's -- I don't know if you could

14   expressly say that from that email.  Maybe we should read the

15   email.

16           MR. MORRIS:  Let's just move on, Your Honor.

17           THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q    A few days later, you learned -- you learned that Mr.

20   Seery was trying a workaround to effectuate the trades anyway,

21   correct?

22   A    I believe so.

23   Q    Uh-huh.  And when you learned that, you wrote to Thomas

24   Surgent; is that right?

25   A    I -- I believe so.

1  Q    I don't -- I don't mean to -- this is not a test here.

2          MR. MORRIS:  Can we just scroll up to the next email,

3  please?  Okay.  Stop right there.

4  BY MR. MORRIS:

5  Q    When you -- when you learned that Mr. Seery was trying a

6  workaround, you wrote to Mr. Surgent when you learned that,

7  right?

8  A    Yes.

9  Q    And Mr. Surgent is an employee of the Debtor; is that

10 correct?

11 A    I believe he's still the chief compliance officer of the

12 Debtor.

13 Q    Okay.  Now, as a factual matter, you never asked Mr. Seery

14 why he wanted to make these trades; isn't that right?

15 A    I -- I did not.

16 Q    Okay.  And before the TRO was entered, there was nothing

17 that prevented you from picking up the phone and asking Mr.

18 Seery why he wanted to make these trades, correct?

19 A    That's not true.

20          MR. MORRIS:  One second, please, Your Honor.

21          THE COURT:  Okay.

22      (Pause.)

23          MR. MORRIS:  Can we go to Page 60 of the transcript?

24 Mr. Bonds says -- beginning at Line 14.  There is an objection

25 there, Your Honor, and I would ask that the Court rule on the

Dondero - Direct                          50

1   objection before I read from the transcript.

2            THE COURT:  Okay.

3            MR. MORRIS:  There you go.

4            THE COURT:  (sotto voce)  (reading)  Is there

5   anything that you're aware of that prevented you from picking

6   up the phone and asking Mr. Seery for his business

7   justification for these trades prior to December 10.

8   Objection, form.

9        I overrule the objection to the form of that question.

10            MR. MORRIS:  Okay.

11   BY MR. MORRIS:

12   Q   Mr. Dondero, were you asked this question and did you give

13   this answer?

14        "Q   Is  there  anything  that  you're  aware  of  that

15        prevented  you  from  picking  up  the  phone  and  asking  Mr.

16        Seery  for  his  business  justification  for  these  trades

17        prior  to  December 10, 2010?

18        "A   No.  I expressed my disapproval via email."

19   Q   Is that right?

20   A   I'd like to adjust that answer to the answer I just gave.

21   Q   Okay.

22            MR. MORRIS:  And I move to strike.

23   BY MR. MORRIS:

24   Q   I'm just asking you if that's the answer you gave on

25   Tuesday.

1          THE COURT:  Sustained.

2          THE WITNESS:  Yes.

3    BY MR. MORRIS:

4    Q    Thank you.  Now, you wrote to Mr. Surgent because you

5    wanted to remind him of his personal liability for regulatory

6    breaches and for doing things that aren't in the best interest

7    of investors, correct?

8    A    Yes.

9    Q    And you actually thought about this and you -- because you

10   didn't believe that Mr. Surgent had extra insurance and

11   indemnities like Mr. Seery, right?

12   A    No.

13   Q    Didn't you testify to that the other day?

14   A    I don't remember, but that isn't the only reason.

15   Q    I didn't ask you if it was the only reason.  Listen

16   carefully to my question.  Did you send this email because you

17   -- because you wanted to remind him of his personal liability

18   for regulatory breaches and for doing things that aren't in

19   the -- I apologize.  Withdrawn.

20        You did not believe at the time that you sent this email

21   that he, Mr. Surgent, had insurance and indemnities like Mr.

22   Seery, correct?

23   A    Yes.

24   Q    Okay.

25          MR. MORRIS:  Can we go back to the email, please?

Dondero - Direct                                 52

1    BY MR. MORRIS:

2    Q   Can you just read the entirety of your email to Mr.

3    Surgent out loud?

4    A    (reading)  I understand Seery is working on a workaround

5    to trade these securities anyway, trades that contradict

6    investor desires and have no business purpose or investment

7    rationale.  You might want to remind him and yourself that the

8    chief compliance officer has personal liability.

9    Q   Okay.  That's -- that's the message you wanted to convey

10   to Mr. Surgent, right?

11   A    Yes.

12   Q   And, again, you never bothered to ask Mr. Seery what his

13   businessperson -- purpose or investment rationale was,

14   correct?

15   A    I -- I didn't believe I could talk to him directly.

16   Q    This is before the --

17   A    That's why I never picked up the phone.

18   Q   Okay.  You intended to convey the message to Mr. Surgent

19   that, by following Mr. Seery's orders to execute the trades,

20   that Mr. Surgent faced personal liability, correct?

21   A    Yes, he does.

22   Q   And that's the message you wanted to send to him, right?

23   A    It's a true and accurate message, yes.

24   Q   Okay.  Just a few days earlier, you also threatened Mr.

25   Seery, right?

Dondero - Direct                         53

1   A    I wouldn't use the word "threatened."

2   Q    Okay.  Let's let -- let's let it speak for itself.

3         MR. MORRIS:  Can we go to Exhibit E, please?  Keep

4   scrolling down just a bit.

5   BY MR. MORRIS:

6   Q    This is an email that you sent to Mr. Seery on November

7   24th.  And as always, Mr. Dondero -- this is the third time

8   we're meeting -- if there's something in the document that you

9   need to see, please just let me know, because I don't -- I

10  don't mean to test your memory if the document can help

11  refresh your recollection.

12        MR. MORRIS:  Can we just scroll up a little bit

13  further to the top to see the date?

14  BY MR. MORRIS:

15  Q    Okay.  So, Jim, there, JD, who is that?

16  A    That's me.

17  Q    Okay.  And can you tell by the substance of the email, of

18  the text messages, this is communications between you and Mr.

19  Seery, right?

20  A    Yes.

21  Q    Okay.  And you see that it's dated November 24th there?

22  A    Yes.  Right after we were discussing the pipeline.  Or

23  right when we were working on the pipeline.

24  Q    Okay.

25        MR. MORRIS:  Can you scroll down a little bit,

Dondero - Direct                                    54

1    please?

2    BY MR. MORRIS:

3    Q    At 5:26 p.m., you sent Mr. Seery a text, correct?

4    A    Yes.

5    Q    Can you read that, please?

6    A    (reading)  Be careful what you do.  Last warning.

7    Q    Okay.  This was a warning telling Mr. Seery to stop

8    selling assets out of the CLOs or the beneficial owners would

9    take more significant action against him, correct?

10   A    It was a general statement that what he was doing was

11   regulatorily inappropriate and ethically inappropriate and he

12   was in breach of the contracts he was operating.

13   Q    Neither you nor any entity owned or controlled by you are

14   parties to the contracts you just referred to; isn't that

15   correct?

16   A    I believe they're indirectly parties to those contracts,

17   especially when they're in default.

18   Q    Neither you nor any entity owned or controlled by you is a

19   signatory to any CLO management contract pursuant to which the

20   Debtor is a party, correct?

21   A    I -- I don't know and I don't want to make legal

22   conclusions on that.

23   Q    Okay.  At the deposition the other day, some of the things

24   that you suggested the beneficial owners of the CLO interests

25   might do against Mr. Seery and the Debtor are class action

1  lawsuits.  Is that right?

2  A    I -- I did not suggest the entities I control would do

3  that.  If anybody on this call were to call a class action

4  lawsuit -- a class action law firm and tell them what's been

5  going on with the CLOs, I think a class action law firm would

6  file it on their own regard, not on the behalf of my entities.

7            MR. MORRIS:  I move to strike, Your Honor.

8            THE COURT:  Sustained.

9  BY MR. MORRIS:

10  Q    Let's talk about that cell phone.  Okay?  Until at least

11  December 10th, the day the TRO was entered, you had a cell

12  phone that was bought and paid by the Debtor, right?

13  A    Yes.

14  Q    But sometime after December 10th, your phone was disposed

15  of or thrown in the garbage; is that right?

16  A    Yes.

17  Q    And you don't know when after December 10th the cell phone

18  that was the Debtor's property was disposed of, right?

19  A    I don't believe at that point it was the Debtor's

20  property.  I think I paid it off in full and the Debtor had

21  announced that they were canceling everybody's cell phones so

22  it was appropriate for me to get another one.

23            MR. MORRIS:  I move to strike, Your Honor.

24            THE COURT:  Sustained.

25            MR. BONDS:  Your Honor, at some point, I mean, Mr.

Dondero - Direct                              56

1   Morris just ought to go on and testify.

2           MR. MORRIS:  No, this is Mr. Dondero's testimony,

3   Your Honor.  He gave it the other day.  I'm just asking him to

4   confirm it, basically.

5           THE COURT:  Okay.  I overrule the objection, if any

6   there was, on the part of Mr. Bonds.

7   BY MR. MORRIS:

8   Q    Sometime after December 10th, the cell phone that prior to

9   that time had been owned and paid for by the Debtor was thrown

10  in the garbage or otherwise disposed of, correct?

11  A    Yes.

12  Q    And you don't know when after December 10th that was --

13  the phone was disposed of, correct?

14  A    It was on or about that date, I'm sure.

15  Q    Well, we know it was after December 10th, right?

16  A    Okay.  Or about that date.

17  Q    You testified the other day that you just don't know who

18  made the decision to throw your phone away, right?

19  A    I could find out, but I don't know.  I would have to talk

20  to employees.

21  Q    Did you make any request of the Debtor since your

22  deposition to try to find out the answer as to who made the

23  decision to throw your phone away?

24  A    No.

25  Q    How did you learn that your phone was thrown away?

1  A    As I testified, it's standard operating procedures every

2  time a senior executive gets a new phone.

3  Q    Hmm.  You don't know exactly who threw the phone away; is

4  that right?

5  A    No, but I can find out.

6  Q    Okay.  I'm just asking -- I'm not asking you to find out.

7  I'm just asking you if you know.  Do you know who threw your

8  phone away?

9  A    No.

10  Q    Do you know who made the decision to throw your phone

11  away?

12  A    It -- there wasn't a decision.  It was standard operating

13  procedure.

14          MR. MORRIS:  I move to strike.

15          THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    You and Mr. Ellington disposed of your phones at the same

18  time, correct?

19  A    I don't have specific awareness regarding what Mr.

20  Ellington did with his phone.

21  Q    It never occurred to you to get the Debtor's consent

22  before throwing the phone that they had purchased away, right?

23  A    I'm not permitted to talk to the Debtor.

24  Q    Sir, it never occurred to you to get the Debtor's consent

25  before throwing the phone away, correct?

1  A    I'm going to stick with the answer I just gave.

2           MR. MORRIS:  Can we go to Page 75 of the transcript?

3  Lines 12 through 15.  There is an objection there, Your Honor.

4  I would respectfully request that the Court rule on the

5  objection before I read the testimony.

6           THE COURT:  Okay.  Starting at Line 12?

7           MR. MORRIS:  12.

8           THE COURT:  (sotto voce)  (reading)  Did it ever

9  occur to you to get the Debtor's consent before doing this?

10  Objection, form.

11      That objection is overruled.

12  BY MR. MORRIS:

13  Q    All right.  Mr. Dondero, did you give this answer to my

14  question on Tuesday?

15      "Q    Did it ever  occur  to  you  to  get  the  Debtor's

16      consent before doing this?

17      "A    No."

18  A    Yes, I gave that testimony.

19  Q    Okay.  And you also had the phone number changed from the

20  Debtor's account to your own personal account; is that right?

21  A    The phone number changed?  The phone number stayed the

22  same.

23  Q    But you had the number changed from the Debtor's account

24  to your own personal account, correct?

25  A    The Debtor said they wouldn't pay for it anymore.  Who

Dondero - Direct                                      59

1   else could I change it to?

2          MR. MORRIS:  Your Honor, I move to strike.  It's a

3   very simple question.

4          THE COURT:  Sustained.

5   BY MR. MORRIS:

6   Q   I'll ask it one more time, Mr. Dondero.  You had the phone

7   number changed from the Debtor's account to your personal

8   account, correct?

9   A   I didn't change the number.  I had the billing changed to

10  my personal account versus the company account.

11  Q   And you never asked the Debtor for permission to do that,

12  correct?

13  A   No.

14  Q   And you never told Debtor you were doing that, correct?

15  A   No.

16  Q   And nobody ever told Mr. Seery or anybody at my firm that

17  the phone was being thrown in the garbage, correct?

18  A   Well, --

19          MR. BONDS:  To the extent he knows.

20          THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21  BY MR. MORRIS:

22  Q   You didn't believe it was necessary to give the Debtor

23  notice that you were taking the phone number for your own

24  personal account and throwing the phone in the garbage,

25  correct?

Dondero - Direct                    60

1  A    Correct.

2  Q    The phone --

3          MR. BONDS:  Your Honor, I'm going to object.  He --

4  Mr. Dondero did not testify he personally threw the phone in

5  the garbage.

6          MR. MORRIS:  Withdrawn.

7          THE COURT:  Okay.

8  BY MR. MORRIS:

9  Q    Mr. Dondero, the phone was in Highland's offices on

10 December 10th, the date the TRO was in effect, correct?

11 A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12 know.  It's -- I remember going over to -- well, anyway, I --

13 I don't know.  We'll leave it at that.

14         MR. MORRIS:  Can we go to Exhibit G, please?

15 BY MR. MORRIS:

16 Q    Who's Jason Rothstein, while we wait?

17 A    Jason, Jason is our -- is the Highland head of technology.

18 Q    Okay.  And did you text with him from time to time?  On or

19 about December 10th?

20 A    Yes.

21 Q    Okay.

22         MR. MORRIS:  Can we just scroll up a little bit?

23 BY MR. MORRIS:

24 Q    Is that Mr. Rothstein there?

25 A    Yes.  Yeah.

Dondero - Direct                              61

1  Q    Okay.  And do you see that there's a text message that you

2  sent to him on December 10th, right at the top?  Can you read

3  -- can you read the text message Mr. Rothstein --

4  A    He sent that to me.  At the top.

5  Q    I apologize.  Thank you for the correction.  Can you read

6  what Mr. Rothstein told you on December 10th?

7  A    That my old phone is in the top drawer of Tara's desk.

8  Q    And who's Tara?

9  A    My assistant.

10 Q    Is she still your assistant today?

11 A    Yes.

12 Q    And has she been serving as your assistant since the TRO

13 was entered into on December 10th?

14 A    Yes.

15 Q    Okay.  Is it fair to say that you were informed on

16 December 10th that the phone was not thrown in the garbage,

17 had not been disposed of, but was instead sitting in Tara's

18 desk?

19 A    As of that moment, yes.

20 Q    Okay.  And it's also fair to say that, as of December

21 10th, Mr. Rothstein didn't take it upon himself to throw your

22 old phone in the garbage, right?

23 A    Not as of that moment.  But like I said, I can find out

24 how it was disposed of.

25 Q    If you were curious to do that, would you have done that

1  before today?

2  A    I haven't been curious.

3  Q    Thank you very much.  Someone you can't identify made the

4  decision after December 10th to throw the phone in the garbage

5  without asking the Debtor for permission or seeking the

6  Debtor's consent, correct?

7        MR. BONDS:  I'm going to object, Your Honor.  To the

8  extent that the witness knows, he can answer.

9        THE COURT:  I -- I didn't hear --

10        THE WITNESS:  I don't know.

11        THE COURT:  I didn't hear what your objection was,

12  Mr. Bonds.  Repeat.

13        MR. BONDS:  Your Honor, my objection was along the

14  lines of to the extent that the witness knows, he could

15  testify, but if he doesn't know, he doesn't need to speculate.

16        THE COURT:  All right.  Well, I don't hear an

17  objection there, but go ahead, Mr. Dondero, if you have

18  knowledge and can answer the question.

19        THE WITNESS:  I don't know.

20  BY MR. MORRIS:

21  Q    Do you recall that the Debtor subsequently gave notice to

22  you to vacate its offices and to return its cell phone?

23  A    I don't know.

24  Q    Did you ever --

25  A    I know I -- I know I was told to vacate the offices.  I

 1   didn't see the specific --

 2   Q   Uh-huh.  Your lawyer -- your lawyers never told that

 3   Debtor that the cell phone had been disposed of or thrown in

 4   the garbage, consistent with company practice, right?

 5   A   I don't know.

 6             MR. MORRIS:  Can we put up Exhibit K, please?

 7   BY MR. MORRIS:

 8   Q   This is the letter that my firm sent to your lawyer on

 9   December 23rd.  Do you see that?

10   A   Yeah, I see it.

11   Q   Okay.

12             MR. MORRIS:  Can we scroll down a little bit?  Keep

13   going.  Okay.  Stop right there.

14   BY MR. MORRIS:

15   Q   Do you see that it says that, as a result of the conduct

16   described above, that the Debtor "has concluded that Mr.

17   Dondero's presence at the HCMLP office suite and his access to

18   all telephonic and information services provided by HCMLP are

19   too disruptive"?

20   A   Yeah, I see it.

21   Q   And this is the letter that gave you notice that you had

22   to vacate the premises by December 30th, correct?

23   A   I believe so.

24             MR. MORRIS:  Can we scroll down a little bit?

25   BY MR. MORRIS:

1    Q    You see at the bottom there's a reference to a defined

2    term of "cell phones"?

3    A    Yes.

4    Q    And it says that the Debtor "will also terminate Mr.

5    Dondero's cell phone plan and those cell phone plans

6    associated with parties providing personal services to Mr.

7    Dondero."  Do you see that?

8    A    Yes.  Yeah.

9    Q    Have I read that accurately?

10   A    Yes.

11   Q    And then my colleagues went on to write, "HCMLP demands

12   that Mr. Dondero immediately turn over the cell phones to

13   HCMLP by delivering them to you, Mr. Lynn."  Do you see that?

14   A    Yes.

15   Q    Have I read that accurately?

16   A    Yes.

17   Q    The last sentence on the page begins, "The cell phones

18   and."

19            MR. MORRIS:  And let's scroll down further.

20   BY MR. MORRIS:

21   Q    "The cell phones and the accounts are property of HCMLP.

22   HCMLP further demands that Mr. Dondero refrain from deleting

23   or wiping any information or messages on the cell phone.

24   HCMLP, as the owner of the account and cell phones, intends to

25   recover all information related to the cell phones and

1  accounts, and reserves the right to use the business-related

2  information."  Have I read that accurately?

3  A    Yes.

4  Q    Okay.  We were a couple of weeks too late, huh?

5  A    It sounds like it.

6  Q    Yeah.  Because the phones were already in the garbage,

7  right?

8  A    Yes.

9  Q    Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10  your behalf, right?

11  A    I don't know.

12  Q    Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13  said.

14          MR. MORRIS:  Can we go to Exhibit U, please?

15  BY MR. MORRIS:

16  Q    It took Mr. Lynn six days to write a one-paragraph letter

17  in response, right?  December 29th, he responded?

18          MR. MORRIS:  Can we scroll down a bit?

19  BY MR. MORRIS:

20  Q    Let me read beginning with the second sentence of the

21  first substantive paragraph.  "We are at present not sure of

22  the location of the cell phone issued to Mr. Dondero by the

23  Debtor, but we are not prepared to turn it over without

24  ensuring the privacy of the attorney-client communications."

25  And then he goes on.

Dondero - Direct                          66

1       Have I read that correctly?

2   A   Yes.

3   Q   Okay.  So Mr. Lynn didn't say anything about the phone

4   being thrown in the garbage, right?

5   A   No.

6   Q   He didn't say that it was disposed of, did he?

7   A   No.

8   Q   He didn't refer to any company practice or policy, right?

9   A   No.

10  Q   Mr. Lynn's not a liar, is he?

11  A   No, he's not.

12  Q   He's a decent and honest professional.  Wouldn't you agree

13  with that?

14  A   Yes.

15  Q   And is it fair to say that he conveyed only the

16  information that he had at the time?

17  A   I don't know.

18  Q   Do you have any reason to believe that Mr. Lynn would

19  withhold from the Debtor the information that the cell phone

20  had been thrown in the garbage, consistent with company

21  practice?

22  A   No, I don't believe he would withhold whatever he knew.

23  Q   All right.  Let's talk about -- let's talk about other

24  matters.  You do know, sir, do you not, that the Debtor is

25  subject to the Bankruptcy Court's jurisdiction?

Dondero - Direct                                    67

1   A    Yes.

2   Q    Okay.  And we just saw in the December 23rd letter that

3   the Debtor demanded that you vacate their offices a week

4   later, right?

5   A    Yes.

6   Q    And you knew that at or around the time the letter was

7   sent on December 23rd, correct?

8   A    I -- I don't remember when I knew.

9   Q    Well, in fact, in fact, you or through counsel asked for

10  an accommodation and asked for an extension of time to

11  December 31st; isn't that right?

12  A    I had to pack up 30 years of stuff in three days.  I -- I

13  know we asked for some forbearance.  I don't think we got any.

14  I don't remember the details.  I don't understand why it's

15  important.

16  Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17  gave you seven days' notice, right?  They sent the letter on

18  December 23rd and asked you to vacate on December 30th,

19  correct?

20  A    I don't -- I don't remember.  But, again, I think the

21  initial response was it was inconsistent with shared services

22  agreement.  No Highland employees are coming into the office

23  anyway.  So kicking me out of my office was -- seemed

24  vindictive and overreaching.  And we tried to get some, you

25  know, forbearance.

Dondero - Direct                    68

1  Q   Okay.

2          MR. MORRIS:  I move to strike, Your Honor.

3          THE COURT:  Sustained.

4  BY MR. MORRIS:

5  Q   Mr. Dondero, you were given seven days' notice before --

6  before you were going to be barred from the Debtor's office,

7  correct?

8  A   I don't know.

9  Q   Okay.

10         MR. MORRIS:  Can we go back to Exhibit K, please?

11 Oh, actually, it's okay.

12 BY MR. MORRIS:

13 Q   We just read, actually, the piece from the Debtor's letter

14 of December 23rd barring you from the Debtor's office.  Do you

15 remember that?  And we can go back and look at it if you want.

16 A   Yes.

17 Q   Was there anything ambiguous that you recall about the

18 Debtor's demand that you not enter their offices after

19 December 30th?

20 A   Ambiguous?  I can tell you what my understanding was or I

21 can tell you what the letter says.  What would you like to

22 know?

23 Q   I'd just like to know if, as you sit here right now, you

24 believe there was anything ambiguous about the Debtor's demand

25 that you vacate the offices as of December 30th?

Dondero - Direct                                    69

1   A    I mean, I did vacate the offices as of December 30th.

2   Q    Correct.  And you knew that -- and you were complying with

3   the Debtor's demand you do that, right?

4   A    Well, with the Court's demand, I guess.

5   Q    Okay.  And it's your understanding that you would not be

6   permitted in the Debtor's offices after that time, correct?

7   A    Um, (pause), uh, I don't know how to answer that question.

8   I knew I wouldn't be residing in the offices anymore.  But for

9   legitimate business purposes, to visit the people at NexPoint

10  who were in the office, since there are no Highland people in

11  the office, or to handle a deposition, you know, there was

12  nothing I thought inappropriate about that.

13  Q    Did the Debtor tell you that they would allow you to enter

14  the offices any time you just believed that it would be

15  appropriate to do that?

16  A    I used my business judgment.

17       MR. MORRIS:  I move to strike.

18  BY MR. MORRIS:

19  Q    I'm asking you a very --

20       THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q    -- specific question, sir.  Did the Debtor ever tell you

23  that they -- that you would be permitted to enter their

24  offices after December 30th if you, in your own personal

25  discretion, believed it to be appropriate?

1    A    No.

2    Q    Did the Debtor provide you any exception to their demand

3    that you vacate the offices, without access, by and after

4    December 30th?

5    A    I always do what I think is appropriate and in the best

6    interests.  I don't know.  I didn't know the specifics of the

7    Debtor's -- okay, yeah, what the specifics of the Debtor was.

8    Q    Despite the unambiguous nature of the Debtor's demands

9    letter, on Tuesday you just walked right into the Debtor's

10   office and sat for the deposition, correct?

11   A    I believe that was reasonable, yes.

12   Q    Okay.  But you didn't -- you didn't have the Debtor's

13   approval to do that, correct?

14   A    We didn't have technology to do it anywhere else, so if

15   the deposition was going to occur, it had to occur there.

16   Q    Sir, --

17            MR. MORRIS:  Move to strike.

18            THE COURT:  Sustained.

19   BY MR. MORRIS:

20   Q    And I ask you to just listen very carefully.  And if it's

21   not clear to you, please let me know.  You did not have the

22   Debtor's approval to enter their offices on Tuesday to give

23   your deposition, correct?

24   A    No.

25   Q    And you did not even bother to ask the Debtor for

1  permission, correct?

2  A    I'm prohibited from contacting them, so no, I did not.

3  Q    Okay.  Let's talk about other events that occurred after

4  the entry of the TRO.  We talked earlier about how you

5  interfered with Mr. Seery's trading activities on behalf of

6  the CLOs around Thanksgiving.  Do you remember that?

7  A    Yes.

8  Q    But after the TRO was entered, the K&L Gates Clients also

9  interfered with the Debtor's trading activities, correct?

10 A    No.

11         MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12 start at the first page?  And scroll down just a bit.

13 BY MR. MORRIS:

14 Q    Do you see there's an explanation there about the Debtor's

15 management of CLOs?

16 A    Yes.

17 Q    And there's a recitation of the history that we talked

18 about earlier, where around Thanksgiving you intervened to

19 block those trades?

20 A    Yes.

21 Q    And then the next paragraph refers to the prior motion

22 that was brought by the CLO entities?  I mean, the K&L Gates

23 entities, right?

24 A    Yes.

25 Q    And you were aware of that motion at the time it was made,

1    right?

2    A    Yes.

3    Q    And you were supportive of the making of that motion,

4    right?

5    A    Supportive?  Yes.

6          MR. MORRIS:  And scroll down to the next paragraph,

7    please.

8    BY MR. MORRIS:

9    Q    Okay.  So, my colleague wrote that, "On December 22nd,

10   2020, employees of NPA and HCMFA notified the Debtor that they

11   would not settle the CLO sale of the AVAYA and SKY

12   securities."  Have I read that right?

13   A    Yes.

14   Q    And that took place six days after the motion that the

15   Court characterized as frivolous was denied on December 16th?

16   A    Yes.  I wasn't aware of that, for what that's worth.

17   Q    Okay.  You personally instructed the employees --

18   withdrawn.  NPA -- that refers to NexPoint, correct?

19   A    Yes.

20   Q    That's an entity you own and control, right?

21   A    I -- largely.

22   Q    And that's one of the Advisors we defined earlier, right?

23   A    Yes.

24   Q    And HCMFA, that's Fund Advisors, another advisory firm

25   that you own and control, correct?

Dondero - Direct                                73

1    A    Yes.

2    Q    And you personally instructed, on or about December 22nd,

3    2020, employees of those Advisors to stop doing the trades

4    that Mr. Seery had authorized with respect SKY and AVAYA,

5    right?

6    A    Yeah.  Maybe we're splitting hairs here, but I instructed

7    them not to trade them.  I never gave instructions not to

8    settle trades that occurred.  But that's a different ball of

9    wax.

10   Q    Okay.  But you did instruct them not to execute trades

11   that had not been made yet, right?

12   A    Yeah.  Trades that I thought were inappropriate, for no

13   business purpose, I -- I told them not to execute.

14   Q    Okay.  You actually learned that Mr. Seery wanted to

15   effectuate these trades the Friday before, right?

16   A    I don't know, but what did I do?  When did I know it?

17   What did I do?  When I knew things are inappropriate, I

18   reacted immediately.  I don't -- I don't -- whenever --

19   whenever I found out about inappropriate things, I reacted to

20   the best of my ability.

21   Q    Okay.

22        MR. MORRIS:  I move to strike, Your Honor.

23        THE COURT:  Sustained.

24       Mr. Dondero, I'm going to -- I'm going to interject some

25   instructions once again here.  Remember we talked about early

1  on, and I know you've testified before, but I'll repeat it:

2  You need to just give direct yes or no answers.

3      And let me just say that we see witnesses all the time do

4  what you're doing here, and that is they feel they need to say

5  more than yes or no.  They feel the need to clarify or

6  supplement the yes or no answer they give.  And just to remind

7  you how this works, your lawyer, Mr. Bonds, is going to be

8  given the opportunity when Mr. Morris is through to ask you

9  all the questions he wants, and that will be your chance to

10  clarify yes and no answers to the extent he asks you to

11  revisit certain of these questions and answers.  Okay?

12      So I'm going to remind you once again:  yes or no or

13  direct -- you know, other appropriate direct answers.  Mr.

14  Bonds can let you clarify later.  All right?

15      Mr. Morris, continue.

16          MR. MORRIS:  Okay.  Thank you, Your Honor.

17      Can we please put up on the screen Exhibit L?  And at the,

18  I guess, the bottom of Page 1.

19  BY MR. MORRIS:

20  Q   This is an email string.  And --

21          MR. MORRIS:  Go to the email below that, please.

22  Yeah.  Okay.  Right there.

23  BY MR. MORRIS:

24  Q   This is an email from Mr. Seery dated December 18th at

25  (garbled) :30 p.m.  Do you see that?

1    A    Yes.

2    Q    And in the substantive portion of his email, continuing on

3    to the next page, he's giving instructions to sell certain SKY

4    and AVAYA securities that are held by CLOs, correct?

5    A    Yes.

6    Q    And Mr. Sowin forwarded this email to you, right?

7    A    Yes.

8              MR. MORRIS:   If we can scroll up.

9    BY MR. MORRIS:

10   Q    And you forwarded it to Mr. Ellington, right?  I'm sorry.

11   Let's just give Ms. Canty a chance.

12             MR. MORRIS:   Keep scrolling up.

13   BY MR. MORRIS:

14   Q    So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15   that?

16   A    Yes.

17   Q    And if we scroll up, you turn around and give it to Mr.

18   Ellington a few minutes later, right?

19   A    Yes.

20   Q    So that you and Mr. Ellington and Mr. Sowin are all aware

21   that Mr. Seery wants to sell AVAYA and SKY securities on

22   behalf of the CLOs, right?

23   A    Yes.

24   Q    Why did you decide to forward this email to Mr. Ellington?

25   A    Ellington's role has been of settlement counsel that

1  supposedly everybody is able to talk to to try and bridge some

2  kind of settlement.  Ellington, I thought, should be aware of

3  things that would make settlement more difficult or create

4  liabilities for the Debtor.  And so I thought it was

5  appropriate for him to know.

6  Q   Okay.  This is the email that caused you to put a stop to

7  the trades that Mr. Seery wanted to effectuate, correct?

8  A   This is the -- I'm sorry.  Ask the question again.  This

9  is the email that what?

10  Q   This is -- this is how you learned that Mr. Seery wanted

11  to effectuate rates in AVAYA and SKY securities, right?

12  A   I -- I learned about it pretty early on of him trading it.

13  I don't know if it was this email or -- or one of the others.

14  But yes, it was from -- it was from Joe Sowin.

15  Q   And you would agree with me, would you not, that you

16  personally instructed the employees of the Advisors not to

17  execute the very trades that Mr. Seery identifies in this

18  email, correct?

19  A   Yes.

20  Q   At no time after December 10th, when the TRO was entered

21  into, did you instruct the employees of the Funds that you own

22  and control not to interfere or impede the Debtor's management

23  of the CLOs, correct?

24          MR. BONDS:  Can you repeat the question?  I'm sorry.

25  BY MR. MORRIS:

Dondero - Direct                              77

1    Q    At no time after December 10th, when the TRO was entered,

2    did Mr. Dondero instruct any employee of either of the

3    Advisors that he owns and controls not to interfere or impede

4    with the Debtor's business and management of the CLOs,

5    correct?

6    A    I did not.

7    Q    Okay.  Neither you nor anybody that you know of ever

8    provided a copy of the TRO to the employees of the Advisors

9    that you own and control, correct?

10   A    I don't know.

11   Q    Okay.  After the TRO was entered, the K -- after the TRO

12   was entered, and after the hearing on December 16th, the K&L

13   Gates Clients sent three more letters to the Debtor, right?

14   A    Yes.

15   Q    Okay.

16         MR. MORRIS:  Your Honor, those are Exhibits M as in

17   Mary, N as in Nancy, and X as in x-ray.

18         THE COURT:  Okay.

19         MR. MORRIS:  Unless the witness thinks there is a

20   need to look at them specifically -- oh, let me just ask a

21   couple of questions.

22   BY MR. MORRIS:

23   Q    Mr. Dondero, in those letters, it's your understanding

24   that the K&L Gates Clients again requested that the Debtor not

25   trade any securities on behalf of the CLOs, right?

1   A    Yes.

2   Q    And it's your understanding that in those letters the K&L

3   Gates Clients suggested that they might seek to terminate the

4   CLO management agreements to which the Debtor was a party,

5   correct?

6   A    I don't know specifically, but that wouldn't surprise me.

7   Q    Okay.

8   A    So, --

9   Q    Is it your understanding that the K&L Gates Clients also

10  sent the letter a Debtor -- the Debtor a letter in which they

11  asserted that your eviction from the offices might cause them

12  damages and harm?

13  A    I know there was objections to me -- I assume so.  I don't

14  know specifically.

15  Q    And you were aware of these letters at the time that they

16  were being sent, right?

17  A    I'm sorry, what?

18  Q    You were aware of these letters at the time they were

19  being sent by the K&L Gates Clients, right?

20  A    Generally, yes.

21  Q    And you were generally supportive of the sending of those

22  letters, right?

23  A    I'm always supportive of doing what we believe is the

24  right thing, yes.

25  Q    And in this case, you were supportive of the sending of

1    these three letters, correct?

2    A    I -- yes.

3    Q    In fact, you pushed and encouraged the chief compliance

4    officer and the general counsel to send these letters, right?

5    A    I push them to do the right thing.  I didn't push them

6    specifically.

7    Q    Okay.  At the time the letters were sent, you were aware

8    that the K&L Gates Clients had filed that motion that was

9    heard on the 16th of December, correct?

10   A    Yes.

11   Q    And you were aware that they advanced the very same --

12   withdrawn.  You're aware that in the letters they advance some

13   of the very same arguments that Judge Jernigan had dismissed

14   as frivolous just six days earlier, right?

15   A    I wasn't at the hearing.  I don't know if it was the same

16   arguments or similar arguments.  I -- I can't -- I can't

17   corroborate the similarity or contrast the differences between

18   the two.

19   Q    All right.  So it's fair to say, then, that you were

20   supportive of the sending of these letters, you were aware of

21   the December 16 argument, but you didn't take the time to see

22   whether or not any of the arguments being advanced in the

23   letters were consistent or any different from the arguments

24   that were made at the December 16th hearing, correct?

25   A    Correct.  I wasn't directly involved, but still believed

1  that fundamentally Seery's behavior was wrong.

2  Q   You never instructed the K&L Gates Clients to withdraw the

3  three letters that were sent after December 10th, correct?

4  A   No.

5  Q   And you're aware that the Debtor had demanded that those

6  letters be withdrawn or it would seek a temporary restraining

7  order against the K&L Gates Clients, correct?

8  A   I'm not aware of the back and forth.

9  Q   Okay.  Let's talk about your communications with Mr.

10 Ellington and Mr. Leventon.  You communicated with them on

11 numerous occasions after December 16th, correct?

12 A   No.

13 Q   No, you didn't communicate with them many times after

14 December 10th?

15 A   You're lumping in Ellington and Isaac, and numerous times

16 is a bad clarifier, so the answer is no.

17 Q   I appreciate that.  You communicated many times with Mr.

18 Ellington after December 10th, right?

19 A   Not -- not outside shared services, pot plan, and him

20 being the go-between between me and Seery.  I would say

21 virtually none.

22 Q   Okay.  On Saturday, December 12th, two days after the

23 temporary restraining order was entered against you, Mr.

24 Ellington was involved in discussions with your personal

25 counsel about who would serve as a witness at the upcoming

1  December 16th hearing, correct?

2  A    I don't -- I don't remember.

3  Q    Let's see if we can refresh your recollection.

4          MR. MORRIS:  Can we please put up Exhibit P?  Can we

5  scroll down?  Okay.

6  BY MR. MORRIS:

7  Q    Do you see where Mr. Lynn writes you an email on Saturday,

8  December 12th, and he says, among other things, it looks like

9  trial?

10 A    Yes.

11 Q    And then if we scroll up a little bit, he wrote further,

12 "That said, we must have a witness now."  Have I read that

13 accurately?

14 A    Yes.

15 Q    Okay.

16         MR. MORRIS:  Can we scroll back up?

17 BY MR. MORRIS:

18 Q    And this is Mr. Ellington's response, right?

19 A    Yes.

20 Q    Can you read Mr. Ellington's response for Judge Jernigan?

21 A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22 needs to contact you first thing in the morning.

23 Q    Is it your testimony that this email relates to --

24 withdrawn.  Mr. Ellington is not your personal lawyer, right?

25 A    No.  Mr. Ellington has been functioning as settlement

Dondero - Direct                                        82

1  counsel, trying to bridge settlement, --

2  Q    Okay.

3  A    -- which is what this email looks like to me.

4  Q    Okay.  I'll let -- I'll let the judge --

5          MR. MORRIS:  I move to strike, Your Honor.

6          THE COURT:  Sustained.

7  BY MR. MORRIS:

8  Q    So, after the TRO was entered, you and Mr. Ellington not

9  only communicated but Mr. Ellington was actively involved in

10 identifying witnesses to testify on behalf of your interests

11 at the December 16th hearing, correct?

12 A    I -- I don't know what the witness was for, but I believe

13 Ellington was doing his job as settlement counsel, trying to

14 facilitate settlement.  I don't -- I have no reason to think

15 this was anything more nefarious.

16 Q    Okay.  You looked to Mr. Ellington for leadership in

17 coordinating with all of the lawyers who were working for you

18 and your personal interests, right?

19 A    I'm not agreeing with that.

20 Q    No?  All right.

21         MR. MORRIS:  Let's look at the next exhibit.  I think

22 it's Exhibit Q.  And if we could stop right there.

23 BY MR. MORRIS:

24 Q    There's an email from Douglas Draper, do you see that, on

25 December 16th?

Dondero - Direct                              83

1   A    Yes.

2   Q    So this is after the TRO was entered into, right?

3   A    I believe so.

4   Q    And Mr. Draper represents Get Good and Dugaboy; is that

5   right?

6   A    I believe so.

7   Q    And he was new to the case at that moment in time, right?

8   A    On or about, I believe so.

9   Q    And he was looking to -- he was looking for a joint

10  meeting among all of the lawyers representing your personal

11  interests, right?

12  A    No.  I think he was trying to coordinate -- coordinate or

13  understand whatever.  But not everybody -- he doesn't just

14  talk to lawyers around my interests.  I mean, and he hasn't

15  sought agreements with just lawyers reflecting my interests.

16  Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17  A    Yes.

18  Q    But you can't remember why you did that, right, or at

19  least -- withdrawn.  You couldn't remember as of Tuesday's

20  deposition why you forwarded this email to Mr. Ellington,

21  right?

22  A    Not specifically.  But, again, Ellington is settlement

23  counsel.

24          MR. MORRIS:  I move to strike, Your Honor, after the

25  initial phrase "Not specifically."

1              THE COURT:  Sustained.

2              MR. MORRIS:  Can we scroll up a little bit, please?

3    BY MR. MORRIS:

4    Q    Mr. Lynn responded initially with a reference to the

5    assumption that a particular lawyer was with K&L Gates, right?

6    A    Yes.

7              MR. MORRIS:  And if we could scroll up a little bit.

8    BY MR. MORRIS:

9    Q    That's where you forward this email to Mr. Ellington,

10   right?

11   A    Yes.

12   Q    And can you read to Judge Jernigan what you wrote at 1:33

13   p.m.?

14   A    (reading)  I'm going to need you to provide leadership

15   here.

16   Q    But at least as of Tuesday's deposition, you couldn't

17   remember why you needed Mr. Ellington to provide leadership,

18   right?

19   A    Correct.  Nor if he did.

20             MR. MORRIS:  I move to strike the latter portion of

21   the answer, Your Honor.

22             THE COURT:  Sustained.

23   BY MR. MORRIS:

24   Q    So you have no --

25        (Echoing.)

1          MR. MORRIS:  We're getting --

2          THE WITNESS:  Can I -- can I hold -- can I hold on

3  for one second here?  Can I just put you guys on mute, please?

4          MR. MORRIS:  Sure.

5      (Pause.)

6          THE COURT:  All right.

7          THE CLERK:  John, there's some feedback again.  I'm

8  sorry.

9          MR. MORRIS:  That's okay.

10         THE COURT:  Mr. Bonds, --

11         MR. MORRIS:  We lost Mr. --

12         THE COURT:  Mr. Bonds, what's going on?

13         MR. MORRIS:  We've lost -- the screen --

14         THE COURT:  You know you can't counsel your client in

15  the middle of court testimony.  I thought maybe Mr. Dondero

16  had some non-legal thing going on in the background.  Mr.

17  Bonds?

18         MR. BONDS:  Your Honor, I -- I did not in any way

19  counsel Mr. Dondero.

20         THE COURT:  Okay.  Well, I'll take your

21  representation on that.  Are we ready to go forward?

22         MR. MORRIS:  I'll readily accept Mr. Bonds'

23  representation as well, Your Honor.

24         THE COURT:  Okay.

25         MR. MORRIS:  But I'd ask that it not happen again.

1           THE COURT:  Well, fair enough.  I think Mr. Bonds

2   understands.

3   BY MR. MORRIS:

4   Q   Mr. Dondero, you have no recollection of why you forwarded

5   this email to Mr. Ellington and why you told him you needed

6   him to provide leadership, correct?

7   A   Correct.

8           MR. MORRIS:  And if we can scroll up, can we just see

9   how Mr. Ellington responded?

10  BY MR. MORRIS:

11  Q   All right.  And can you just read for Judge Jernigan what

12  Mr. Ellington said on December 16th in response to your

13  statement that you're going to need him to provide leadership

14  here?

15  A   (reading)  On it.

16  Q   Thank you.  In your deposition, you testified without

17  qualification that Scott Ellington and Isaac Leventon did not

18  participate in the drafting of a joint interest or mutual

19  defense agreement.  Do you recall that testimony?

20  A   Yes, as far as I knew.

21  Q   And you also testified that you never discussed with

22  either of them the topic of a joint defense or mutual defense

23  agreement; is that right?

24  A   Correct.  That was Draper.

25  Q   Okay.

1        MR. MORRIS:  Can we put up Exhibit 11, please?  I

2   apologize.  It's Exhibit W.  Okay.  Can we stop right there?

3   BY MR. MORRIS:

4   Q    This is an email between some of your counsel and Mr.

5   Ellington.  Do you see that?

6   A    Yes.

7   Q    And a common interest agreement is attached to the

8   communication.  Is that a fair reading of the portion of the

9   exhibit that's on the screen?

10  A    Yes.

11       MR. MORRIS:  And can we scroll to the top of the

12  exhibit, please?

13  BY MR. MORRIS:

14  Q    And do you see that there is an email exchange between Mr.

15  Ellington and Mr. Leventon concerning the common interest

16  agreement?

17  A    Yes.

18  Q    Okay.  So it's your testimony that this email may exist

19  but you had no idea that Mr. Ellington and Mr. Leventon were

20  working with your lawyers to draft a common interest

21  agreement?  Is that your testimony?

22  A    I wasn't part of this.  It looks to me like they were just

23  included in a -- a final draft.  And, again, Ellington is

24  settlement counsel.  I -- but I don't want to speculate why or

25  what they were doing.

Dondero - Direct                                88

1    Q    Do you remember that I asked you a few questions the other

2    day about Multi-Strat financial statements and whether or not

3    you'd ever given -- you'd ever received any of those documents

4    from Mr. Ellington and Mr. Leventon?

5    A    Yes.

6    Q    Okay.  And you testified under oath that you never got any

7    financial information, including balance sheets, concerning

8    Multi-Strat from either of those lawyers, correct?

9    A    I -- hmm.  I -- I don't remember.  Yeah, I don't remember.

10   I may have to clarify that, but I don't remember.

11   Q    You testified under oath the other day that you wouldn't

12   even think to ask them for financial information relating to

13   Multi-Strat because it's not natural for them to have it,

14   right?

15   A    I -- I'm sorry.

16         THE WITNESS:  Your Honor, do I just have to answer

17   these questions yes or no, or is that the -- can I clarify at

18   all, or can I --

19         THE COURT:  Well, I mean, if the question simply

20   directs a yes or no answer, that's correct, you just answer

21   yes or no.  And I think this one did.

22      Again, your lawyer is going to have the chance to do

23   follow-up examination later.

24   BY MR. MORRIS:

25   Q    So let me try again.  During your deposition, you

Dondero - Direct                    89

1    testified under oath without qualification that you never got

2    any financial information, including balance sheets,

3    concerning Multi-Strat from Scott Ellington or Isaac Leventon,

4    correct?

5    A    I believe I might have misspoken there.

6    Q    Okay.  But that was your testimony the other day, right?

7    A    Yes.

8    Q    And today, you believe you might have gotten that

9    information from them, right?

10   A    Only because Ellington was supposed to be the go-between

11   and I couldn't go directly to somebody.  But he wouldn't

12   normally have that information, which is what I was saying.

13           MR. MORRIS:  Your Honor, I have an exhibit that's not

14   on the Debtor's exhibit list, and I was going to use it for

15   impeachment purposes to establish the fact that Mr. Ellington

16   and Mr. Leventon in fact gave to Mr. Dondero, after December

17   10th, financial information concerning Multi-Strat, which Mr.

18   Dondero had previously denied receiving.  May I -- may I use

19   that document to impeach Mr. Dondero?

20           THE COURT:  You may.

21           MR. BONDS:  Your Honor, I'm going to object.  This is

22   pretty clearly something that should have been disclosed and

23   it wasn't.

24           THE COURT:  Well, he says it's purely to impeach the

25   testimony that Mr. Dondero just now gave.  So we'll -- we'll

1   see the document and, you know, I'll either agree with that

2   being impeachment or not.  So, he may proceed.

3           MR. BONDS:  Your Honor, I think that the testimony

4   -- Your Honor, I'm sorry.  I think that the testimony that was

5   (inaudible) given was that he thought that he may have talked

6   to Scott or Isaac, not that he did not.

7           MR. MORRIS:  Your Honor, if I may, the testimony the

8   other day was unequivocal and unambiguous that not only didn't

9   he get this information from the two lawyers, but that he had

10  no reason to believe he would ever get the information from

11  those two lawyers.

12      I appreciate the fact that Mr. Dondero today is suggesting

13  that he may have, but I -- I would still like to use this

14  document to refresh his recollection and to impeach even the

15  possibility that he's giving this qualified testimony that he

16  may have.

17          THE COURT:  All right.

18          MR. MORRIS:  There's no doubt that he did.

19          THE COURT:  I overrule the objection.  You can go

20  forward.

21          MR. MORRIS:  Can we please put up on the screen -- I

22  believe it's Debtor's Exhibit AA.  And if we can scroll down,

23  please.  And just stop, yeah, towards the top.  All right.

24  Stop right there.

25  BY MR. MORRIS:

1    Q    Do you see in the first email Mr. Klos -- he's an employee

2    of the Debtor, right?

3    A    Yes.

4    Q    And he provides Multi-Strat balance sheet and financial

5    information to Mr. Leventon, Mr. Ellington, and Mr.

6    Waterhouse.  Do you see that?

7    A    Yes.  He's the person I would normally go to.

8    Q    Okay.  And they're all Debtor employees, right?

9    A    Yes.

10   Q    Okay.  And then Mr. Leventon sends it to you and Mr.

11   Ellington on February 4th, 2020; is that correct?

12   A    Yes.

13   Q    And this is confidential information; is that fair?

14   A    No.

15   Q    Okay.  Let's -- let's talk about the next --

16   A    No, it's not -- wait, wait, hold on a second.  Judge, I

17   need to clarify this.  I -- it's not confidential information.

18   It's available to every investor, of which I was one of them.

19   Okay?  So, let's -- let's not mischaracterize this as some

20   corporate secret.

21   Q    Okay.  You interfered with the Debtor's production of

22   documents; isn't that right?

23   A    No.

24   Q    Several times in the last year, various entities have

25   requested that Dugaboy produce its financial statements,

1   correct?

2   A    Dugaboy is my personal trust.  It's not an entity of the

3   Debtor in any form or fashion.

4   Q    Sir, you're aware that several times in the last year

5   various entities requested that the Debtor produce Dugaboy

6   financial information, correct?

7   A    The Debtor is not in a position to do it.  I -- I don't

8   know if it's been several times or whatever, but it's not

9   appropriate.

10            MR. MORRIS:  I move to strike, Your Honor.

11            THE COURT:  Sustained.

12   BY MR. MORRIS:

13   Q    I'll try one more time.  If we need to go to the

14   transcript, we can.  It's a very simple question.  You knew

15   and you know that several times in the last year various

16   entities have requested that the Debtor produce Dugaboy

17   financial statements, correct?

18   A    Yes.

19   Q    Do you recall at the deposition the other day I asked you

20   whether you had ever discussed with Mr. Ellington and Mr.

21   Leventon whether or not the Dugaboy financial statements

22   needed to be produced, and you were directed not to answer the

23   question by counsel and you followed those directions?

24   A    Yes.

25   Q    But you communicated with at least one employee concerning

Dondero - Direct                                    93

1    the production of the Dugaboy financial statements, correct?

2    A    Yes.

3    Q    And that's Melissa Schroth; is that right?

4    A    Yes.

5    Q    She's an executive accountant employed by the Debtor,

6    right?

7    A    Yes.

8    Q    And on December 16th, after the TRO was entered into, you

9    instructed Ms. Schroth not to produce the Dugaboy financials

10   without a subpoena, correct?

11   A    That was the advice I had gotten from counsel, yes.

12   Q    Okay.  The Dugaboy and Get Good financial statements are

13   on the Debtor's platform, correct?

14   A    I do not know.

15   Q    There is no shared services agreement between Dugaboy or

16   Get Good and the Debtor, correct?

17   A    I don't know.

18   Q    You're not aware of any; is that fair?

19   A    Yes.

20   Q    Okay.

21          MR. MORRIS:  Can we put on the screen Exhibit R?  And

22   can you scroll down a bit?

23   BY MR. MORRIS:

24   Q    Okay.  That's Melissa Schroth at the top there; is that

25   right?

1    A    Yes.

2    Q    And these are texts that you exchanged with her after the

3    TRO was entered into, correct?

4    A    Yes.

5         MR. MORRIS:  Can we scroll down a little bit?

6    BY MR. MORRIS:

7    Q    And do you see on December 16th you sent Ms. Schroth an

8    email -- I apologize -- a text that says, "No Dugaboy details

9    without subpoena"?

10   A    Yeah.

11   Q    But you can't remember why you sent this text, correct?

12   At least you couldn't as of Tuesday?

13   A    I believe it was on advice of counsel.

14   Q    But that's not what you said on Tuesday, correct?

15   A    I don't remember.

16   Q    You sent this text even though you knew that various

17   entities had requested the Dugaboy financials, but you have no

18   recollection of ever talking to anyone at any time about the

19   production of those documents, right?

20   A    Can you repeat the question?

21   Q    I'll move on.  Let me just -- last topic, and then I'm

22   going to respectfully request that we just take a short break.

23   You're familiar with the law firm of Baker & McKenzie; is that

24   right?

25        (Echoing.)

Dondero - Direct                                95

1    A    I'm sorry.  You broke up on us there.

2    Q    No problem.  You're familiar with the law firm Baker &

3    McKenzie, correct?

4    A    Yes.

5    Q    That firm has never -- never represented you or any entity

6    in which you have an ownership interest, correct?

7    A    Correct.

8    Q    But in December, the Employee Group, of which Mr. Leventon

9    and Mr. Ellington was a part, was considering changing counsel

10   from Winston & Strawn to Baker & McKenzie, right?

11   A    I believe so.

12   Q    And you asked -- and because of that, you specifically

13   asked Mr. Leventon for the contact information for the lawyers

14   at Baker & McKenzie, right?

15   A    I believe so.

16   Q    Okay.

17        MR. MORRIS:  Can we put up Exhibit S, please?

18   BY MR. MORRIS:

19   Q    And who is that email sent from?  I apologize.  Withdrawn.

20   Who is that text message exchange with?

21   A    Isaac Leventon.

22   Q    Okay.  And Mr. Leventon was an employee of the Debtor

23   after December 10th, correct?

24   A    Yes.

25        MR. MORRIS:  Can we scroll down a little bit?

Dondero - Direct                                96

1   BY MR. MORRIS:

2   Q    And on December 22nd, you asked Mr. Leventon for the

3   contact information at Baker & McKenzie, correct?

4   A    Yes.

5   Q    And the reason you asked Mr. Leventon for the contact

6   information, that was in connection with the shared defense or

7   mutual defense agreement, right?

8   A    I -- I don't remember why.  It might have just been for my

9   records.  I don't know.

10  Q    The only reason that you could think of for asking for

11  this information was for the shared defense or mutual defense

12  agreement, correct?

13  A    I -- no, it -- I don't know and I don't want to speculate.

14  I don't want to -- I don't want to speculate.  I -- did -- I

15  don't think I ever got -- I don't know what your point is.

16          MR. MORRIS:  May we please go back to the transcript

17  at Page 136?  At the bottom, Line 23.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20       "Q   Do  you  recall  asking  Isaac  Leventon  for  the

21       contact  information  for  the  --  for  the  lawyers  at

22       Bakers & McKenzie?

23       "A   I -- I don't -- I don't -- it might have been for

24       part  of  the  shared  defense,  mutual  defense  whatever

25       agreement, but that's -- that's the only reason I would

1    have asked for it."

2  Q    Did you give that answer to my question?

3  A    Yeah.  I shouldn't have speculated.

4  Q    Okay.  But that's the answer you gave the other day; is

5  that right?

6  A    I shouldn't have speculated.  That's my answer today.

7  Q    And today -- withdrawn.  In fact, you wanted the Baker

8  contact information in order to help Mr. Draper coordinate the

9  mutual defense agreement, correct?

10  A    I don't want to speculate.

11         MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12  to 5.

13  BY MR. MORRIS:

14  Q    Did you -- did you hear this question and did you give

15  this answer on Tuesday?

16         "Q    Why did you want the Baker & McKenzie contact

17         information?

18         "A    I was trying to help Draper coordinate the mutual

19         shared defense agreement, period."

20  Q    Did you give that answer to my question on Tuesday?

21  A    Yes.

22         MR. MORRIS:  Your Honor, I'd respectfully request a

23  short break to see if I've got anything more.

24         THE COURT:  All right.  Well, I was going to ask you

25  how much more do you think you have.  We've been going almost

1  two hours.

2      So we'll take a break.  Let's make it a ten-minute break.

3  And then, depending on how much more you have and how much Mr.

4  Bonds is going to have, we'll figure out are we going to need

5  a lunch break in just a bit.

6      All right.  So it's 12:00 noon Central.  We'll come back

7  at 12:10.  Ten minutes.

8          MR. MORRIS:  Your Honor, may I have an instruction of

9  the witness not to check his phone for any purposes, not to

10  make -- not to communicate with anybody until -- until his

11  testimony is completed?

12          THE COURT:  All right.  Any -- any --

13          MR. BONDS:  Your Honor, he's going to speak with me.

14          THE COURT:  Pardon?

15          MR. BONDS:  I assumed he will speak to me about just

16  general events.  I mean, I don't want to be in breach of some

17  order.

18          MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19  for -- you know, it's not -- he's on the stand.  He's still on

20  the stand.

21          THE COURT:  Yeah.  He --

22          MR. MORRIS:  He shouldn't be conferring with counsel,

23  either.  No disrespect to Mr. Bonds at all.

24          THE COURT:  Exactly.  I mean, you all can talk about,

25  you know, the national champion football game or whatever, but

Dondero - Direct                              99

1    it would be counseling your client in the middle of testimony

2    if you -- if you talk about this case at the moment.  So, you

3    know, --

4            MR. BONDS:  I understand, Your Honor.

5            THE COURT:  All right.

6            MR. BONDS:  I just didn't want to be --

7            THE COURT:  All right.  So now we'll come back at

8    12:11.

9            THE CLERK:  All rise.

10           MR. MORRIS:  Thank you, Your Honor.

11      (A recess ensued from 12:01 p.m. until 12:12 p.m.

12           THE CLERK:  All rise.

13           THE COURT:  Please be seated.  This is Judge

14   Jernigan.  We're going back on the record in Highland Capital

15   versus Dondero.  We have taken an 11-minute break.  It looks

16   like we have Mr. Dondero and counsel back.  And Mr. Morris,

17   are you out there, ready to proceed?

18           MR. MORRIS:  I am, Your Honor.  And I do have just a

19   few more questions.

20           THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21   there in the room with Mr. Dondero.  Now, did you want to --

22           MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23   the restroom.

24           THE COURT:  Okay.  All right.  Everyone ready to

25   proceed?

Dondero - Direct                                    100

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Morris, go ahead.

3          MR. MORRIS:  Thank you, Your Honor.

4                    DIRECT EXAMINATION, RESUMED

5    BY MR. MORRIS:

6    Q    Can you hear me, Mr. Dondero?

7    A    Yes.

8    Q    Did you ever discuss the request of any party to produce

9    the financial statements of Get Good and Dugaboy with Scott

10   Ellington?

11   A    Not that I recall.

12   Q    Did you ever communicate with Mr. Leventon on the subject

13   matter of whether or not the financial statements for Get Good

14   and Dugaboy needed to be produced by the Debtor?

15   A    No.

16   Q    Those are the two questions that you were directed not to

17   answer the other day, right?

18   A    I don't remember.

19   Q    Okay.  You mentioned that Mr. Ellington serves in some

20   capacity as settlement counsel.  Do I have that right?

21   A    Yes.

22   Q    Do you know if there's any exception in the TRO that

23   permits you to communicate directly with Mr. Ellington in his

24   so-called capacity as settlement counsel?

25   A    There was no change in his status in the TRO.  It's -- and

1   I think he was still used by both the Debtor and by me in that

2   function.

3   Q    You said that -- you testified earlier that you understood

4   that you were prohibited from speaking with the Debtor's

5   employees, correct?

6   A    Except for -- except for with regard to the pot plan,

7   shared services, and Ellington as settlement counsel.  But I

8   continued to talk to employees about the pot plan as recently

9   as the end of the year, and I continued to talk to employees

10  about shared services based on the shared services proposal

11  that was sent to Ellington and forwarded to me as recently as

12  two days ago.

13  Q    You never -- you never read the TRO, right?

14  A    No.

15           MR. MORRIS:  Can we have it put up on the screen?  I

16  don't know the exhibit number, Ms. Canty, but hopefully it's

17  clear on the exhibit list.

18           MS. CANTY:  I'm sorry, John.  Can you repeat what

19  you're looking for?

20           MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21  to Paragraph 2, please?  Okay.

22  BY MR. MORRIS:

23  Q    I appreciate the fact that you've never seen this before,

24  Mr. Dondero, but let me know if I'm reading Section 2(c)

25  correctly.  "James Dondero is temporarily enjoined and

1  refrained from" -- subparagraph (c) -- "communicating with any

2  of the Debtor's employees, except for specifically -- except

3  as it specifically relates to shared services currently

4  provided to affiliates owned or controlled by Mr. Dondero."

5      Have I read that correctly?

6  A   Yes.

7  Q   Does that provide for any exceptions concerning the pot

8  plan?

9  A   The Independent Board requested a meeting on the pot plan.

10 Q   Okay. But does it -- I appreciate that, and we'll talk

11 about that in a moment, but my question is very specifically

12 looking at the order. And I, again, appreciate that you've

13 never seen it before. But looking at the order now, is there

14 any exception for you to communicate with the Debtor's

15 employees concerning the pot plan?

16 A   I would think the pot plan would fall under that, since

17 some of the pot plan value is coming from affiliated entities

18 that are subject to the shared services agreement. I would

19 think that would be reasonable, again, plus the -- well, it

20 was the subject of a meeting with the Independent Board at the

21 end of the month.

22 Q   Okay.

23 A   I still think it's the best alternative for this estate.

24 Q   Okay. Did you -- did you ever -- did you ever ask

25 anybody, on your behalf, have asked the Debtors whether they

1    agreed with what you believed was a reasonable interpretation

2    of the restraining order?

3    A    I did not.

4    Q    Okay.  And let's just deal with the notion of settlement

5    counsel.  Do you see anywhere in this TRO -- and if you want

6    to read anything more, please let me know -- do you see

7    anything in this TRO that would permit you to speak with Mr.

8    Ellington in his so-called role as settlement counsel?

9    A    Well, I would say, more importantly, I don't see anything

10   that takes away his role as settlement counsel, which was

11   formally done six months ago.

12   Q    Okay.  I did read Section 2(c) correctly, right?

13   A    Yes.

14   Q    And the only exception that's in Judge Jernigan's

15   restraining order that she entered against you relates to

16   shared services.  Have I read that correctly?

17   A    Yes.

18   Q    Okay.  Let's talk about the pot plan for a moment.  After

19   the TRO was entered, you were interested in continuing to

20   pursue the pot plan; is that right?

21   A    I still believe it's the best possible result for this

22   estate.

23   Q    And you sought a forum with the Debtor's board, correct?

24   A    Yes.

25   Q    And you knew that you couldn't speak directly with any

Dondero - Direct                           104

1   member of the Debtor's board unless your counsel and the

2   Debtor's counsel was -- was present at the same time.

3   Correct?

4   A    Yeah.  As a matter of fact, I didn't go.  I just had

5   counsel go.

6   Q    And the Debtor's board gave Mr. Lynn a forum for him to

7   present your pot plan after the TRO was entered.  Isn't that

8   right?

9   A    I believe so.

10  Q    And are you aware that the Debtor's board spent more than

11  an hour and a half with Mr. Lynn talking about your pot plan

12  after the TRO was entered?

13  A    Yes.

14  Q    And is it fair to say that, notwithstanding Mr. Lynn's

15  goodwill and Mr. Lynn's efforts to try to get to a successful

16  resolution here, the terms on which the pot plan were offered

17  were unacceptable to the Debtor?

18  A    I wasn't there.  I -- I don't know.

19  Q    The Debtor never made a counteroffer, did it?

20  A    Not that I heard.

21  Q    You'll admit, will you not, that over the last year you or

22  others acting on behalf -- on your behalf have made various

23  pot plan proposals to the Official Committee of Unsecured

24  Creditors?

25  A    Quite generous pot plans that I think will exceed any

1  other recoveries.

2  Q   Okay.  So you're aware that your pot plan was delivered

3  either by you or on your behalf to the U.C.C., correct?

4  A   I -- some were.  Some, I don't know.

5  Q   Okay.  Has the U.C.C. ever made a counterproposal to you?

6  A   Nope.

7         MR. MORRIS:  I have no further questions, Your Honor.

8         THE COURT:  All right.  Pass the witness.

9      Mr. Bonds, do you have any time estimate for me,

10  guesstimate?

11        MR. BONDS:  My guess is, Your Honor, it'll be about

12  an hour.  I would hope that we could take some type of a

13  break, just because I'm a diabetic and need to have some --

14        THE COURT:  All right.  Well, --

15        MR. MORRIS:  I have no objection, Your Honor.

16  Whatever suits the Court.  I'm willing to accommodate Mr.

17  Bonds always.

18        THE COURT:  Okay.  Let's take a 45-minute break.

19  Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20  minutes after 1:00 Central time.

21      All right.  We're in recess.

22        THE CLERK:  All rise.

23     (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24        THE CLERK:  All rise.

25        THE COURT:  Please be seated.  This is Judge

1  Jernigan.  We are going back on the record in Highland Capital

2  Management versus Dondero.  We took a lunch break.  And when

3  we broke, Mr. Bonds was going to have the chance to examine

4  Mr. Dondero.

5      Let me just make sure we have, first, Mr. Dondero and Mr.

6  Bonds.  Are you there?

7           MR. BONDS:  Yes, we are.

8           THE COURT:  All right.  Very good.  I don't see your

9  video yet, but -- there you are.  All right.  Mr. Morris, are

10 you there?

11          MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12          THE COURT:  I can.  All right.

13          MR. MORRIS:  Thank you.

14          THE COURT:  Well, we've got lots of other people, but

15 that's all I'll make sure we have at this moment.  All right.

16 Mr. Bonds, you may proceed.

17      And, Mr. Dondero, I know you know this, but I'm required

18 to remind you you're still under oath.

19      Okay, go ahead.

20                        CROSS-EXAMINATION

21 BY MR. BONDS:

22 Q    Before you resigned as portfolio manager, how long had you

23 had with Highland Capital Management?

24 A    Since inception in 1994.

25 Q    Okay.  And how long have your offices been at the

1    Crescent?

2    A    Eight years.

3    Q    Okay.  Before you resigned as portfolio manager, did you

4    spend a lot of time in the office?

5    A    Yes.  I spent every business day this -- or 2020,

6    including COVID, in the office.

7    Q    Okay.  And this is the first time that you are not in the

8    office, is that right, in decades?

9    A    Yes.

10   Q    Can you tell us about the shared services agreement that

11   exists between the Debtor and the other entities in which you

12   have an interest?

13   A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14   what other entities paid.  Shared services, which is typical

15   in finance, for centralized tax, accounting, RICO function, so

16   that we don't have to have redundant, multiple high-paid

17   people in different entities.  We'd have them centralized and

18   with collective experience and collective functionality.  And

19   so, historically and recently, they pay Highland for those --

20   fees for those services.  And I, as a non-paid employee, or a

21   non-employee of Highland but a paid employee of NexBank -- of

22   NexPoint, was -- and my occupancy and support were part of

23   those shared services agreement.

24   Q    What do those agreements allow those entities to do?

25   A    Would it allow those entities to do?  Well, to access the

Dondero - Cross                              108

1   Highland functionality as appropriate, because most of those

2   entities, as is typical in finance, did not have their own

3   functionality, legal, tax, and -- legal, tax, and accounting,

4   but although they've been -- they've been building it lately

5   in anticipation of the pot plan not going through at Highland.

6   Q   Okay.  Do those agreements allow you to share office space

7   with --

8              MR. MORRIS:  Objection --

9              THE WITNESS:  Yes.

10             MR. MORRIS:  -- to the form of the question, Your

11  Honor.  I think the exhibits and the agreements themselves

12  would be the best evidence.  They're not in evidence.  They

13  haven't been offered in evidence.  I have no way to challenge

14  the witness on anything he's saying.  And on that basis, I'd

15  -- it's not fair to the Plaintiff.

16             THE COURT:  All right.  Mr. Bonds, can I ask you to

17  repeat your question?  It was muffled and I was about to ask

18  you to repeat it before I got the objection.  So, repeat the

19  question so I can --

20             MR. BONDS:  Okay.  I'm going to repeat it and amend

21  it.

22             THE COURT:  Okay.

23  BY MR. BONDS:

24  Q   Is it your understanding that those agreements allow you

25  to share office space with the Debtor?

Dondero - Cross                                    109

1   A    Yes.  Virtually all of NexPoint's employees share the

2   Highland office space as part of a shared services agreement.

3   Q    Do those agreements allow you to share -- I'm sorry,

4   excuse me.  Strike that.  What else do they allow?

5   A    Typically is used in coordination of systems, servers,

6   software, cloud software, Internet software, office software,

7   tax, accounting, and legal functionality are all part of the

8   shared services agreement, although, you know, much of -- much

9   of that was stripped, you know, four or five months ago,

10  especially legal functionality and the accounting

11  functionality, without the concurrent adjustment in the

12  building.

13  Q    Okay.  And you previously testified that you generally

14  control NexPoint; is that correct?

15  A    Generally.  And the distinction I was trying to make is,

16  you know, following the financial crisis in '08, compliance

17  and the chief compliance officer has personal liability. along

18  with the rest of the C Suite, and operates independently, with

19  primary loyalty to the regulatory bodies.  And they're --

20  they're not controlled, bamboozled, or segued away from their

21  responsibility.  And at all times, they're supposed to be

22  doing what they believe is right, regulatorily-compliant, and

23  in the best interest of investors.

24       So that was the distinction I was drawing between, A, what

25  I was trying to remind Thomas of, that he should be

Dondero - Cross                                    110

1   independent of Seery, in terms of following what he believes

2   is correct and regulatory-compliant.  And I don't have to push

3   the NexPoint compliance people and general counsel to do

4   anything specific, nor could I.  They are supposed to do what

5   is right from a regulatory investor standpoint, and I believe

6   that's what they've done.

7   Q   All right.  And what do you mean by the term or the usage

8   of the word "generally"?

9   A   Well, that's the distinction I was just drawing.  I mean,

10  generally, on regular business strategy, you know, major

11  investments, you know, other business items, I'm in control of

12  those entities.  But in terms of the content and allegations,

13  regulatory opinions that come from compliance and the general

14  counsel, that is their best views on their own, knowing they

15  have compliance obligations and personal liability.

16  Q   Do you believe that NexPoint and its other owners and

17  interest holders have rights independent from your own in this

18  case?

19  A   Right, yes, and obligations, and responsibilities to

20  investors.  I believe the attempt by the Debtor or Seery to

21  hide behind contracts that the Debtor has with the CLOs are --

22  are a spurious, incomplete argument.  You know, they're not in

23  compliance with those contracts.  Bankruptcy alone is an event

24  of default.  Not having the key man -- the key men, the

25  required requisite professionals that they're obligated to

Dondero - Cross                    111

1  contractually have working at the Debtor is a clear breach, in

2  violation of those CLO contracts.  Not having adequate staff

3  or investment professionals to analyze, evaluate, or follow

4  the investments in the portfolio is a clear violation.  And

5  specifically telling investors in the marketplace that you

6  plan to terminate all employees, a date certain January 24th,

7  is a proclamation that you're not going to be in any form able

8  to be a qualified registered investment advisor or qualified

9  in any which way to manage the portfolio or be in compliance

10 with the CLO contracts.

11      I would -- I would further add that the selling of the

12 securities, and the SKY securities, represent incomplete

13 intentional incurring of loss against the investors.  You have

14 securities that are less liquid with, you know, restructured

15 securities that have been owned for ten years, and they were

16 sold during the most illiquid weeks of the year, the couple

17 days before and after Thanksgiving, couple days before and

18 after Christmas, where the investors could have gotten 10 or

19 15 percent more on their monies if they were just sold in a

20 normal week.  It's -- it's preposterous to me.  It's

21 consistent with Seery not being an investment (garbled).

22      But it's preposterous to me that -- that this treatment of

23 investors is allowed or being camouflaged as some kind of

24 contractual obligation, when the investors have said these

25 funds are clearly in transition and the manager clearly is

Dondero - Cross                                112

1   incapable of managing them.  You know, please don't transact

2   until the transition is complete.  But Jim Seery has traded

3   every day, including -- I don't know about today, but every

4   day this week, selling securities for no investment rationale

5   and no business purpose.

6   Q    Are you also portfolio manager for NexPoint?

7   A    Yeah, I'm a portfolio manager for the closed-end retail

8   funds, which do have a higher fiduciary obligation than

9   anything on the institutional side.  I'm a portfolio manager

10  for those '40 Act funds that are the primary owners of the

11  CLOs that Seery is selling securities in for some unknown

12  reason.

13  Q    And what shared service agreements exist between NexPoint

14  and the Debtor?

15  A    Those are the shared service agreements I spoke of.  I

16  don't want to repeat myself.

17  Q    And I'm going to call Highland Capital Management Fund

18  Advisors, LP just Fund Advisors.  Is that okay with you?

19  A    Yes.

20  Q    Okay.  And you testified generally -- that you generally

21  control Fund Advisors; is that correct?

22  A    Yes.

23  Q    Do you believe that Fund Advisors and its owners and

24  interest holders have rights independent from your own in this

25  case?

1   A    Yes.

2   Q    Are you the portfolio manager for Fund Advisors?

3   A    Yes.

4   Q    What shared services agreements exist between Fund

5   Advisors and the Debtor?

6         MR. MORRIS:  Objection, Your Honor.  The agreements

7   themselves are the best evidence of the existence in terms of

8   any agreement between the Debtor and these entities.

9         MR. BONDS:  Your Honor, I can fix that.

10        THE COURT:  Okay.

11  BY MR. BONDS:

12  Q    I'm just asking:  What is your understanding, Mr. Dondero,

13  of the shared service agreements between the Debtor and Fund

14  Advisors?

15  A    It's similar to the agreement I mentioned earlier.  It

16  covers a broad range of centralized services historically

17  provided by Highland, but now those, while still paying

18  smaller than historic fees, those entities now have been

19  required to incur the expenses of duplicating those functions.

20  Q    Okay.  Do you recall the email string dated November 24th

21  regarding SKY equity that the Debtor talked about?

22  A    Yes.

23  Q    What did you mean when you sent that email about the

24  trade?  What did you mean, I'm sorry?

25  A    I was trying to inform the traders, and once they knew --

Dondero - Cross                               114

1   they weren't willing to do the trades anymore once they knew

2   that the underlying investors had requested that their

3   accounts not being traded until the transition be -- until the

4   transition of the CLOs was effectuated.

5       It's -- it's standard by, you know, statute or

6   understanding, in the money and management business, when

7   you're moving accounts from one asset manager to another, and

8   someone requests that you don't do anything to their account,

9   you don't trade it whimsically. And so I was -- I was making

10  sure the traders knew that the underlying investors had

11  requested that no trades occur in their accounts.

12      And then I believed it was a clear violation of the

13  Registered Investment Adviser's Act. I believe that people

14  involved at a senior level or at a compliance level could have

15  material liability, and could create material liability for

16  the Debtor. And I think if, as I said before, I think if

17  anybody on this call were to call the SEC, they would start on

18  audit on this.

19          MR. MORRIS: Your Honor, I move to strike the first

20  portion of the answer prior to when he started to describe

21  what he believes and what he thinks. The first portion of the

22  answer was devoted to testifying about what is in the

23  knowledge of the people who he was communicating with.

24  There's no evidence. Mr. Dondero, of course, was free to call

25  any witness he wanted. He could have called the chief

1  compliance officer.  He could have called the general counsel.

2  He could have called all the people he's now testifying on

3  behalf of, and he did not.

4     So I move to strike anything in the record that purports

5  to reflect or suggest the knowledge on behalf of any party

6  other than Mr. Dondero.

7              THE COURT:  Okay.  I'm --

8              MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9  to rephrase the question.

10              THE COURT:  Okay.  Very well.

11              MR. BONDS:  I'm sorry.

12              THE COURT:  So the motion to strike is granted.  If

13  you're going to rephrase, go ahead.

14              MR. BONDS:  Okay.

15  BY MR. BONDS:

16  Q    Mr. Dondero, what did you mean when you said -- that the

17  emails about the trade?

18  A    Okay.  I'll give my intention by sending emails to stop

19  the trade and my basis for those emails.  My intentions were

20  to inform the traders and to inform the compliance people that

21  I believe there was a trade that wasn't in the best interest

22  of the employees that had no business purpose for its

23  occurring.  And the people involved weren't aware that the

24  investors had sent over requests not to trade their accounts

25  while they were in transition.

1          So I made the traders aware of that.  I made compliance

2    aware of that also.  And it's my belief, based on 30 years'

3    experience in the industry, that it is entirely inappropriate

4    to trade the accounts of investors that are in transition, and

5    especially when you're not -- you're not contractually -- you

6    are contractually in default with that client, to trade their

7    account whimsically, for no business purpose.  And I thought

8    it was a clear breach of both regulatory, ethical, and

9    fairness with regard to the investors.

10          So I -- what did you know, when did you know it, what did

11   you do?  I did what I felt was the right thing, which I try

12   and do every day, and made all the relevant parties aware of

13   what was going on.

14   Q    Mr. Dondero, do you recall the text message you sent to

15   Mr. Seery in which you said, "Be careful what you do"?

16   A    Yes.

17   Q    What did you mean by that message?

18   A    It's -- I even said, Last warning.  I mean, I -- he's

19   doing things against the interests of investors.  He's

20   purposely incurring losses by trading in days and weeks and

21   time of the year, the day before and after Thanksgiving, where

22   any novice knows the markets are illiquid and anybody who can

23   read a computer screen can see you get ten percent less --

24   five or ten percent less than you would the week before or the

25   week after.  And with as much professional umbrage as

1   possible, I was recommending that he stop.

2   Q    Did you intend to personally threaten Mr. Seery in any

3   way?

4   A    No.  It was bad -- bad intentional professional acts

5   against the interests of investors that flow through to '40

6   Act retail mom-and-pop investors.  I was trying to prevent

7   those losses and those bad acts from occurring.  And I believe

8   everybody who's -- everybody around that issue should be

9   ashamed of themselves, in my opinion.

10  Q    Do you now regret sending the text?

11  A    No.  No, I mean, I could have worded it differently.  I

12  was angry on behalf of the investors.

13  Q    And Mr. Dondero, you have management ownership interest in

14  that entity; is that right?

15  A    Yes.

16  Q    Do you believe the interests or other entities in which

17  you are involved are independent from your personal rights in

18  this case?

19  A    Yes.

20  Q    And do you believe you caused anyone to violate the TRO?

21  A    No.  I've been -- I've been very conscious to just try and

22  champion the thing that -- things that I think are important

23  and the things that I've been tasked to do, like an attractive

24  pot plan to help resolve this case.  I spend time on that.

25  But every once in a while, do I have to access, let's say,

Dondero - Cross                                    118

1   David Klos, who is the person who put the model together, who

2   has been working on it for six or nine months, and no one else

3 S has a copy of?  Yes.  Yeah, I have to -- I have to access

4   him.  I don't believe that's the -- inappropriate or in any

5   way violating the spirit of the TRO.

6        I believe settlement in this case is only going to happen

7   with somebody fostering communication.  And Ellington's role,

8   which I thought was a good one and I thought he was performing

9   well as settlement counsel, was an important role.  And I used

10  him for things like -- and Seery also used him for things.  As

11  recently as two days before Ellington was fired, Seery gave

12  him a shared services proposal to negotiate with me.

13  Ellington has always been the go-between from a settlement and

14  a legal standpoint.  I think his role there was -- it was

15  valued.  To try to honor the TRO was things like Multi-Strat,

16  that I didn't remember correctly.  Ninety percent of the time

17  or for the last 20 years I would have gone directly to

18  Accounting and Dave Klos for it, but I purposely went to

19  settlement counsel in terms of Ellington in order to get the

20  Multi-Strat information which we needed in order to put the

21  pot plan together that we went to the Independent Board with

22  at the end of December.

23  Q    (faintly)  And do you recall the questions that Debtor's

24  counsel had regarding the letters sent by K&L Gates to clients

25  of the Debtor?

1          MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2    hearing that question.

3          THE COURT:  Please repeat.

4          MR. BONDS:  Sure.

5    BY MR. BONDS:

6    Q    Do you recall the questions Debtor's counsel had regarding

7    the letters sent by K&L Gates to the clients of the Debtor --

8    to the Debtor?

9    A    Yes.

10   Q    You testified on direct that the letters were sent to do

11   the right thing; is that correct?

12   A    Yes.

13   Q    What did you mean by that?

14   A    I don't want to repeat too much of what I just said, but

15   the Debtor has a contract to manage the CLOs, which in no way

16   is it not in default of.  It doesn't have the staff.  It

17   doesn't have the expertise.  Seery has no historic knowledge

18   on the investments.  The investment staff of Highland has been

19   gutted, with me being gone, with Mark Okada being gone, with

20   Trey Parker being gone, with John Poglitsch being gone.

21       And there's -- there's a couple analysts that are a year

22   or two out of school.  The overall portfolio is in no way

23   being understood, managed, or monitored.  And for it to be

24   amateur hour, incurring losses for no business purpose, when

25   the investors have requested numerous times for their account

Dondero - Cross                                    120

1   not to be traded, is crazy to me.  Where the investors say, We

2   just want our account left alone.  We just want to keep the

3   exposure.  And Jim Seery decides no, there's -- I'm going to

4   turn it into cash for no reason.  I'm just going to sell your

5   assets and turn them to cash and incur losses by doing it the

6   week of Thanksgiving and the week of Christmas.  I think it's

7   -- it's shameful.  I'm glad the compliance people and the

8   general counsel at HFAM and NexPoint saw it the same way.  I

9   didn't edit their letters, proof their letters, tell them how

10  to craft their letters.  They did that themselves, with

11  regulatory counsel and personal liability.  They put forward

12  those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14  Mr. Dondero just gave about these people saw it.  They're not

15  here to testify how they saw it.  We know that Mr. Dondero

16  personally saw and approved the letters before they went out.

17  He can testify what he thinks, what he believes.  I have no

18  problem with that.  But there should be no evidence in the

19  record of what the compliance people thought, believed,

20  understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24  lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25  response?

1          MR. BONDS:  Your Honor, my response would be that

2    there are several exhibits the Debtor introduced today that

3    stand for the proposition that the compliance officers were

4    concerned.  So I think there is ample evidence of that in the

5    record.

6          THE COURT:  I didn't --

7          MR. MORRIS:  Your Honor, the letter --

8          THE COURT:  I did not understand what you said is in

9    the record.  Say again.

10         MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11   -- there are references that are replete in the record that

12   have to do with the compliance officers' understanding of the

13   transactions.

14         THE COURT:  I don't know what you're referring to.

15         THE WITNESS:  Your Honor?

16         THE COURT:  I've got a lot of exhibits.  You're going

17   to have to point out what you think --

18         THE WITNESS:  Can I -- can I -- can I -- can I answer

19   for -- that for a second?  The letters that were signed by the

20   compliance people or by the businesspeople at NexPoint and

21   HFAM objecting to the transactions, those letters were their

22   beliefs, their researched beliefs.  They weren't --

23         THE COURT:  Okay.

24         THE WITNESS:  -- micromanaged by me.  You know, they

25   weren't -- I agree with them, but those weren't my beliefs

Dondero - Cross                              122

1   that they've stated.  Those were their own beliefs and their

2   own research, --

3           THE COURT:  All right.

4           THE WITNESS:  -- and the record should reflect --

5           THE COURT:  This is clearly hearsay.  I mean, it's

6   one thing to have a letter, but to go behind the letter and

7   say, you know, what the beliefs inherent in the words were is

8   inadmissible.  All right?  So I strike that.

9           THE WITNESS:  Maybe ask your question again.

10  BY MR. BONDS:

11  Q   Yeah.  What is your understanding of the rights that these

12  parties had and what do you believe that was intended to be

13  conveyed by the compliance officers?

14          MR. MORRIS:  Objection.  Calls -- calls for Mr.

15  Dondero to divine the intent of third parties.  Hearsay.

16          THE COURT:  I sustain.

17          MR. BONDS:  Your Honor, --

18          MR. MORRIS:  No foundation.

19          MR. BONDS:  -- I don't agree.  I think that this is

20  asking Mr. Dondero what he thinks.

21          MR. MORRIS:  The letters speak for themselves, Your

22  Honor.

23          THE COURT:  Okay.  I sustain --

24          MR. MORRIS:  And Mr. --

25          THE COURT:  I sustain the objection.

1           MR. MORRIS:  All right.  Thank you.

2           THE WITNESS:  Ask me what I know.  Or ask me what my

3   concerns --

4   BY MR. BONDS:

5   Q    Let me ask you this.  What were your concerns relating to

6   the compliance officers' exhibit?

7   A    My concerns regarding the transaction, the transactions,

8   which may repeat what I've said before, but I do want to make

9   sure it gets in the record.  So if we have to make a -- these

10  were my concerns, whether or not they were the compliance

11  people's concerns.  I believe they were, and I believe they

12  were similar, but I'm just going to say these are -- these

13  were my concerns.

14       The Debtor, with its contractual -- with its contract with

15  the CLOs, were in no way -- was in no way compliant with that

16  contract or not in default of that contract.  Bankruptcy is a

17  reason for default.  Not having the key men specified in the

18  contract currently employed by the Advisor is a violation.

19  Not having adequate investment staff to manage the portfolio

20  is a violation of that contract.  Announcing that you're

21  laying off everybody and will no longer be a registered

22  investment advisor is proclaiming that you, if you even have

23  any -- any -- pretend that you're qualified or in compliance

24  with the contract now, you're broadcasting that you won't be

25  in three weeks, are -- are all mean that you're not in good

Dondero - Cross                                    124

1    standing.  Okay?  Number one.

2         Number two, when the investors know that it's in

3    transition, you're not in compliance as a manager, you're not

4    going to be an RIA in three weeks, the accounts are going to

5    have to transition to somebody else in three weeks, and the

6    investors ask you, Please don't trade my accounts between now

7    and then, that is -- that is a -- if it's not a *per se*, it's

8    an ethical and a spirit violation of any relationship between

9    an investor and an asset manager.

10        To then sell assets -- not replace assets, just sell

11   assets for cash -- and purposely do it on the least liquid

12   days of the year -- the day before Thanksgiving, the day after

13   Thanksgiving, the week of Christmas, this past week, whatever

14   -- to purposely incur losses so that the investors suffer ten

15   or fifteen percent losses that other -- on each of those sales

16   that they wouldn't otherwise have to incur, and for no stated

17   business purpose, for no investment rationale, with no staff

18   to even say whether the investment is potentially going up or

19   down, is -- is -- is -- I've never seen anything else like it.

20        And I will stand up and say it every day:  I'm glad the

21   letters went out from HFAM and from NexPoint.  I would never

22   recommend they get retracted.  And I believe everybody who

23   signed those letters meant everything in those letters.  And I

24   believe the letters are correct.  And I believe the whole

25   selling of CLO assets is a travesty.

Dondero - Cross                         125

1      My personal opinion, we need an examiner or somebody here

2   to look at this junk and look at some of the junk that

3   occurred earlier this year.  This -- this stuff is

4   unbelievable to me.

5   Q    Generally, who holds interests in the CLOs?

6   A    A vast majority of the CLOs that we're speaking of that

7   Seery has been selling the assets of are owned by the two

8   mutual funds, the two '40 Act -- the two '40 Act mutual funds

9   and the DAF.  Between them, I think out of -- eleven out of

10  the sixteen CLOs, they own a vast majority, and then I think,

11  whatever, two or three they own a hundred percent, and I think

12  two or three they own a significant minority.

13     And just because they don't own a hundred percent doesn't

14  somehow allow a registered investment advisor to take

15  advantage of an investor.  And I -- I've never understood that

16  defense.  I wouldn't be able -- in my role of 30 years, I

17  wouldn't be able to tell that to an investor, that, hey, you

18  had a contract with us, we did something that wasn't in your

19  best interest, but we got away with it because you didn't own

20  a hundred percent, you only owned eighty percent.

21         MR. MORRIS:  Your Honor, I move to strike.  There's

22  no contract between the Debtor and Mr. Dondero's -- and the

23  entities that he owns and controls for purposes of the CLO.

24  The only contract is between the Debtor and the CLOs

25  themselves.

1          THE COURT:  All right.  Well, I overrule whatever

2    objection that is.  Again, if you want to bring something out

3    on cross-examination or through Mr. Seery, you know, you're

4    entitled to do that.

5          All right.  Please continue.

6    BY MR. BONDS:

7    Q    Do you believe these letters were sent by the Funds to the

8    Advisors because they are trying to protect the independent

9    entities?

10   A    They're trying to protect their investors.  They were

11   trying to protect their regulatory liability for activities

12   they see that are not in the best interests of investors.

13          MR. MORRIS:  Objection, Your Honor.  I move to

14   strike.  He's again testifying as to the intent of the people

15   who sent the letters who are not here to testify today.

16          THE COURT:  Sustained.

17   BY MR. BONDS:

18   Q    Mr. Dondero, what is your belief as to the letters that

19   were sent by the Funds and Advisor?  Is -- are they trying to

20   protect their independent interests?

21          MR. MORRIS:  Objection, Your Honor.  Asked and

22   answered.

23          THE COURT:  Sustained.

24          THE WITNESS:  Ask me --

25   BY MR. BONDS:

1 | Q    What is your understanding of why the letters were sent?

2 |         MR. MORRIS:  Objection, Your Honor.  Asked and

3 | answered.

4 |         THE COURT:  Sustained.

5 | BY MR. BONDS:

6 | Q    Mr. Dondero, would you have sent the letters?

7 | A    I would have sent the letters exactly or very similar or

8 | probably even more strongly than the letters were stated, for

9 | the purposes of protecting investors, to protecting mom-and-

10 | pop mutual fund investors from incurring unnecessary losses by

11 | an entity that was no longer in compliance with their -- with

12 | their asset management contract and because the investors had

13 | requested that their account just be frozen until it was

14 | transitioned.

15 |     That's why I would have sent the letter.  That's why I

16 | believe the letter should be sent.  That's why I'm happy they

17 | were sent.  That's why we've never retracted.

18 | Q    Mr. Dondero, who is Jason Rothstein?

19 |         THE COURT:  I did not hear the question.

20 |         THE WITNESS:  Jason -- Jason --

21 |         MR. BONDS:  Who --

22 |         THE COURT:  Please repeat.

23 |         MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24 | Rothstein was.

25 |         THE WITNESS:  Jason Rothstein heads up our systems

1  department at Highland Capital.

2  BY MR. BONDS:

3  Q    Can you explain what your text message to Mr. Rothstein

4  was about?

5  A    Which text message?  The one where it was in the drawer?

6  Q    Yeah.

7  A    Uh, --

8  Q    And that was actually from him, not you.

9  A    Yeah.  That was from him.  I think he transferred icons or

10 set up personal stuff to the new phone, and he was just saying

11 that the old phone was in Tara's drawer.

12 Q    And you don't know whether -- what's happened to the

13 phones, do you?

14 A    No.  Like I said, I believe they've been destroyed, but I

15 -- I can find out.  I mean, I can query and find out who

16 destroyed it, if that's important.

17 Q    And you understood that you were not supposed to talk to

18 the Debtor's employees; is that correct?

19 A    Like I said, except for my roles regarding shared

20 services, the pot plan, and trying to reach some type of

21 settlement, I've had painfully few conversations with the

22 Debtor's employees.

23 Q    When you talked to certain employees, did you think it was

24 an -- under an exception to the TRO, like shared services,

25 related to the pot plan, or settlement communications?

1   A    Yes.

2           MR. MORRIS:  Your Honor, I move to strike.  Mr.

3   Dondero never read the TRO.  He's got no basis to say what the

4   TRO required and didn't require.

5           MR. BONDS:  That wasn't the -- that wasn't the

6   question.

7           THE COURT:  Okay.

8           MR. BONDS:  I'm sorry.

9           THE COURT:  Okay.  Rephrase the question, please.

10          MR. BONDS:  Okay.  I'm sorry.

11  BY MR. BONDS:

12  Q    When you talked to these -- to certain employees, did you

13  think it was under an exception to the TRO, like shared

14  services, relating to the pot plan, or settlement

15  communications?

16  A    Yes.  Absolutely.

17          MR. MORRIS:  I object.  No foundation.

18          THE COURT:  Sustained.

19  BY MR. BONDS:

20  Q    Mr. Dondero, do you understand -- did your lawyers explain

21  to you the TRO?

22  A    Yes.

23  Q    And who was the lawyer that explained the TRO to you?

24          MR. MORRIS:  Your Honor, I don't know if we're

25  getting into a waiver of privilege, but I just want to tell

Dondero - Cross                                    130

1   you that my antenna are up very high.

2            THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3   you about to waive the privilege?

4            MR. BONDS:  No, Your Honor, I am not.

5            THE COURT:  Okay.  Well, it sounded like perhaps we

6   were about to have the witness testify about conversations he

7   had with lawyers.

8            MR. BONDS:  I'm sorry, Your Honor.  That was not my

9   intention.  Again, I'm asking Mr. Dondero to explain for us

10  his contact with -- or, his impression of the TRO.

11  BY MR. BONDS:

12  Q    What did the TRO mean to you?

13  A    The TRO meant to me that I was precluded from talking to

14  Highland employees -- which, again, very few, if any, were

15  coming into the office.  I was not talking to Highland

16  employees with any regularity anyway.  But there was an

17  exception with regard to Scott Ellington regard -- Scott

18  Ellington in terms of him functioning as settlement attorney

19  to try and bridge the U.C.C., the Independent Board, Jim

20  Seery, other people, and things that impacted me or other

21  entities.

22       I also viewed that there was an exception for the pot

23  plan, which had been presented and gone over as recently as

24  December 18th and 20th.  And -- or December 18th, I think, was

25  the date.

1      And you know what, I want to clarify a characterization of

2   the pot plan.  I still believe it's the best and most likely

3   alternative for this estate in the long run.  I think what

4   we've proposed numerous times is more generous than what

5   anyone will receive in a liquidation and in a more timely

6   fashion.

7      And the last time we presented it to the Independent

8   Board, the Independent Board thought it was attractive and

9   thought we should go forward with it to the U.C.C. and other

10  parties.

11          MR. MORRIS:  Your Honor, I move to strike the last

12  portion of the answer that purports to describe what the

13  Independent Board thought.

14          THE COURT:  Well, --

15          MR. MORRIS:  No foundation.  Hearsay.

16          THE COURT:  What is your response to the hearsay

17  objection, Mr. Bonds?

18          MR. BONDS:  Your Honor, I don't have one.

19          THE COURT:  Okay.  I sustain.

20  BY MR. BONDS:

21  Q   What exceptions did you believe there were for

22  communications with employees?

23  A   Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24  Ellington and settlement counsel.  I covered the pot plan.

25  Q   Okay.

Dondero - Cross                                    132

1   A    My -- my view of the pot plan as -- my view of the pot

2   plan was that it was very attractive, and I had received

3   encouragement to go forward with it as something that should

4   be workable.  That's my testimony on that.

5        And then -- and we talk about negotiating shared services.

6   So, there's shared services in terms of overlap in

7   functionality, but there's also, in terms of negotiating the

8   shared services agreement, which, as I said, was something

9   that Ellington was put in charge of three or four days ago by

10  Jim Seery to negotiate with us.  And he reached out to me to

11  negotiate it.  And I think the Pachulski deadline on it was

12  three days later.  That whole process was something that I

13  viewed as separate from the TRO, especially since it was

14  initiated by Jim Seery, DSI, et cetera, and consistent with

15  what Scott Ellington's role had been for the last six, nine

16  months.

17  Q    As to the Debtor's request that you vacate the office

18  space, did you comply with this request?

19  A    Yes.

20  Q    What did you think that vacating meant?

21  A    I moved out all my -- my personal items to a new office at

22  NexBank.

23  Q    (faintly)  And, in fact, did you work on the last day over

24  to 3:00 a.m.?

25  A    Yes.  4:00.

1            THE COURT:  Mr. Bonds, I didn't hear your question.

2    I didn't hear your question.

3            MR. BONDS:  Okay.  I'm sorry.

4    BY MR. BONDS:

5    Q   Did -- isn't it true that you worked through the night, to

6    3:00 or 4:00 a.m., to vacate the premises?

7    A   Yes.  Until 4:00 a.m. on the last day, to organize and

8    pack up all my stuff, yes.

9    Q   Did you think your presence in the office, with no other

10   employees there, violated the spirit of the TRO?

11   A   No.  I thought it was over the top and meant to tweak me,

12   but, yeah, there's no -- there's not Debtor employees coming

13   in since COVID.

14   Q   (faintly)  Okay.  And you thought you could talk to Mr.

15   Ellington and -- as settlement counsel; is that correct?

16           MR. MORRIS:  I'm having trouble hearing it, Your

17   Honor.

18           THE WITNESS:  Yes.

19           THE COURT:  Yeah.  We're -- Mr. Bonds, please make

20   sure you speak into the device.

21           MR. BONDS:  I'm sorry.  I'll try to get closer.

22   Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.

23   Dondero if he thought he could talk to Ellington as a go-

24   between or settlement counsel.  And I asked him if that was

25   correct.

1          THE WITNESS:  Yes.  For settlement, shared services,

2    the pot plan.  Nothing that interrupts or affects the Debtor,

3    but for those purposes, as has consistently occurred for the

4    last six months.

5    BY MR. BONDS:

6    Q    Okay.  And you saw the texts and emails presented by the

7    Debtor between you and Mr. Leventon; is that correct?

8    A    The one regarding Multi-Strat?

9    Q    Yes.

10   A    Yes.

11   Q    In your understanding, did you believe those

12   communications were allowed under the TRO?

13   A    Well, yes.  And, again, to clarify my -- my contrasting

14   testimony, I would never typically have gone to them for that

15   kind of information, but to be compliant with the TRO, for

16   Multi-Strat information, which I needed in order to put

17   together the pot plan that the Independent Board audienced on

18   December 18, I needed the information on Multi-Strat, and I

19   requested it as appropriate through settlement counsel

20   Ellington.  And I think Ellington requested it from Isaac, who

21   requested it from David Klos.

22        The whole purpose, I believe -- my belief is the whole

23   purpose of this TRO is to make it impossible for us to get

24   information to come up with alternatives other than a -- the

25   plan proposed by Jim Seery.  It's our -- if -- if -- without

1  Ellington in the go-between, which he's now no longer an

2  employee, I assume the only way we get any information,

3  balance sheet or anything from Highland Capital, is with a

4  subpoena.

5     And as much as I've tried to engage or make an attractive

6  pot plan for everybody, each one of them has been a complete

7  shot in the dark, without even knowing the assets and

8  liabilities of Highland, but just estimating where they were

9  or were likely to be.

10 Q   Do you believe your text message with Leventon caused any

11 harm to the Debtor's business?

12 A   No.  It potentially fostered a pot plan, because, you have

13 to know, the pot plan needed -- one of the aspects of the pot

14 plan was the --

15 Q   Do you still want to advocate for your pot plan?

16 A   I think that's eventually where we ultimately end up.  Or

17 -- or should end up.  Otherwise, I fear it's going to be an

18 extended, drawn-out process.

19 Q   And how much did you initially propose to pay creditors in

20 this case?

21 A   The most recent -- the most recent pot plan?

22 Q   No.  The -- initially.

23 A   The initial pot plan, I believe, was $160 million.

24 Q   And what about the notes?

25 A   There was $90 [million] of cash and I believe $70

Dondero - Cross                                        136

1    [million] of notes.

2    Q    And what is Multi-Strat?

3    A    Multi-Strat is a fund that's managed by Highland.  They

4    used to have $40 or $50 million in value.  It used to contain

5    a lot of life settlement policies.  And I believe now has $5

6    or $6 million of value, after assets have been sold.

7    Q    Do you recall the email Debtor's counsel presented

8    regarding the balance sheet today?

9    A    The balance sheet of Multi-Strat?

10   Q    Correct.

11   A    Yes.

12   Q    Do you believe you were entitled to see that document?

13   A    Yes.  It's just -- again, for the pot plan, I needed it.

14   But also I'm an investor in that fund and I'm entitled to it.

15   It's -- there was nothing in there that was improper or

16   untoward or in any way damaged the Debtor.

17   Q    And you recall the request for documents sent by the

18   Debtor; is that correct?

19   A    On my -- my personal estate plan?

20   Q    No, on Multi-Strat.

21   A    The Debtor's request on -- I'm sorry.  What was that?

22   Q    The Debtor sent you a request for Multi-Strat.  For Duga

23   -- I'm sorry.

24   A    For Dugaboy?  Okay.

25   Q    Dugaboy.

 1  A    Yeah.  There's -- there's personal estate planning trusts.

 2  Some are active.  Some are inactive.  Some have been around

 3  for 15 years.  But they're -- they're not assets or anything

 4  that's related to the estate.  And that was -- that was my

 5  text to Melissa that said, you know, Not without a subpoena.

 6  Q    Mr. Dondero, if you remember back on Exhibit K, there was

 7  some request that you terminate your offices at the Crescent,

 8  and I think you were given seven days' notice to do that.  Do

 9  you know if Christmas occurred during that time?

10  A    I believe it did.

11  Q    So, if Christmas and Christmas Eve are both holidays, how

12  many days, business days, did they give you to terminate or to

13  get out of the space?

14  A    There would have been three business days.  It was Monday

15  through Wednesday that I moved out.

16           MR. BONDS:  Your Honor, I'll pass the witness.

17           THE COURT:  All right.  Mr. Morris?

18           THE WITNESS:  Take a break.  I hope.

19           MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

20  minute break?  I think that I'm going to be through, but I

21  don't know.

22           THE COURT:  All right.  I'll give you a ten-minute

23  break.

24           MR. BONDS:  All right.  Thank you, Your Honor.

25           THE COURT:  We're coming back at 2:15.

1          THE CLERK:  All rise.

2       (A recess ensued from 2:06 p.m. until 2:16 p.m.)

3          THE CLERK:  All rise.

4          THE COURT:  All right.  Please be seated.  We're back

5    on the record in Highland versus Dondero.  Mr. Bonds, do you

6    have more examination?

7          MR. BONDS:  Your Honor, I have one question.

8          THE COURT:  Okay.

9          MR. BONDS:  And that's --

10          MR. LYNN:  And one more witness.

11          MR. BONDS:  And one more witness.

12                    CROSS-EXAMINATION, RESUMED

13    BY MR. BONDS:

14    Q    Do you think that Scott Ellington and Isaac Leventon were

15    treated appropriately by the Debtor?

16    A    No, I do not.  I don't think they've been treated fairly,

17    nor do I think other senior employees have been treated

18    fairly.  I've never seen a bankruptcy like this where, during

19    complex unwinding of 20 years of various different entities

20    and structures, relying on the staff, working them hard,

21    working overtime, a lot of investment professionals like

22    lawyers and DSI just putting their name on the work of stuff

23    that was done by internal employees, getting to the end of the

24    year, trying to pay people zero bonuses and retract prior

25    years' bonuses, and try and come up with legal charges against

Dondero - Cross                              139

1  those people is unusual to this case and my experience, in the

2  bankruptcies we've been involved in, where typically

3  management teams get paid multiples of current salary to stay

4  on and be the experts.

5      I also think they were put in difficult spots from the

6  very beginning.  It was Jim Seery that made Scott Ellington

7  the settlement counsel six, seven months ago.  It was a

8  broadly-defined role that was never retracted, never adjusted,

9  never modified, yet somehow he and Isaac violated it.  I don't

10  know.  I haven't spoken to them since they've been terminated.

11  They aren't allowed to speak to me, from what I hear.  But I

12  wish them luck in their claims.

13          THE COURT:  Okay.  You pass the witness?

14          MR. BONDS:  Yes, Your Honor.

15          THE COURT:  All right.  Mr. Morris, do you have

16  further examination?

17          MR. MORRIS:  Just a few questions.

18                    REDIRECT EXAMINATION

19  BY MR. BONDS:

20  Q   Mr. Dondero, you knew about this hearing for some time,

21  right?

22  A   No.

23  Q   When did you first learn this hearing was going to take

24  place?

25  A   Two days ago.

1  Q   Two days ago?

2  A   When was the depo, three days ago?  Whatever.

3  Q   And you didn't know prior to the deposition that we would

4  be having a hearing today on the Debtor's motion for a

5  preliminary injunction?

6  A   No.  I thought it was going to be postponed or canceled.

7  I was waiting for the text last night.

8  Q   You had an opportunity to call any witness in the world

9  you wanted to today, right?

10 A   I guess.

11 Q   You could have called -- you could have called the chief

12 compliance officer at the Advisors if you thought the Court

13 should hear from him as to the compliance issues that you've

14 testified to, right?

15 A   I think their letters stand on their own.

16 Q   Okay.  So you didn't think that it was important for the

17 Court to hear from Mr. Sowin directly, correct?

18 A   Sowin is a trader.

19 Q   I'm sorry.  Who's the chief compliance officer of the

20 Advisors?

21 A   Jason Post, as far as NexPoint is concerned.  He's the one

22 that would have been behind the K&L -- K&L letters.

23 Q   And he is not here today to testify, right?

24 A   I think his letters stand on their own and I think

25 everybody should read them, make sure they read them.

1    Q    Okay.  But Mr. Post is not here to answer any questions;

2    is that right?

3    A    I don't know if there are any questions beyond what's

4    obviously stated in the letters.  You should read the letters

5    carefully.  They're -- they're -- they talk about clear

6    violations.

7            MR. MORRIS:  Your Honor, I move to strike.  It's a

8    very simple question.

9            THE COURT:  Sustained.  That was another yes or no

10   answer, Mr. Dondero.   Go ahead.

11           THE WITNESS:  I'm sorry.

12   BY MR. MORRIS:

13   Q    Mr. Dondero, Mr. Post is not here to testify in order to

14   explain to the Court what he thinks the regulatory issues are,

15   correct?

16   A    He's not here today.

17   Q    And you could have called him as a witness, correct?

18   A    Yes.

19   Q    And you thought Mr. Ellington and Mr. Leventon were

20   treated unfairly, right?

21   A    Yes.

22   Q    And there's no reason why they couldn't have come today to

23   testify, correct?

24   A    I guess they could have.

25   Q    And there's no reason why anybody on behalf of the K&L

1    Gates clients couldn't have been here to testify, correct?

2    A    I didn't deem it necessary, I guess.

3    Q    Okay.  You could have offered into evidence, at least

4    offered into evidence, any document you wanted, right?

5    A    Yes.

6    Q    And you could have offered the judge, for example, the

7    shared services agreement, the shared services agreements for

8    which you gave the Court your understanding, right?

9    A    Which shared services, the one that Seery gave Ellington

10   three days ago or the original one from years ago?

11   Q    Any of the ones -- any of the ones that you have referred

12   to today.  You could have given any of them to the judge,

13   right?

14   A    Correct.

15   Q    And you didn't, right?

16   A    I did not.

17   Q    In fact, there's not a single piece of evidence in the

18   record that corroborates anything you say; isn't that right?

19   A    I -- I believe all those documents are in the record.

20   They're just not in the record of this TRO.  But they're all

21   --

22   Q    Oh.

23   A    They're all in the record.

24   Q    Do you remember that there was a hearing on December 16th?

25   I think you -- you testified that you're fully aware of that

1    hearing that was brought by the K&L Gates Clients.  Do you

2    remember that?

3    A    Yes.

4    Q    Who testified at that hearing on behalf of the K&L Gates

5    Clients?  Dustin Norris?

6    A    I believe -- I believe Dustin Norris testified.

7    Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?

8    A    He's one of the senior managers.

9    Q    Is he a compliance officer?

10   A    No.

11   Q    Is he a trader?

12   A    No.  But he's one of the senior managers.

13   Q    Okay.  They could have called anybody they wanted, to the

14   best of your understanding, right?

15   A    I don't think they got a chance to.  Wasn't it an

16   abbreviated hearing?

17   Q    They offered Mr. Norris as a witness.  Do you understand

18   that?

19   A    I -- all I -- I wasn't there.  I didn't attend virtually.

20   I -- but I did know that Norris testified.  But I don't know

21   who else was called, wasn't called, was going to be called,

22   was on the witness list.  I have no awareness.

23   Q    Okay.  You were pretty critical of the trades that Mr.

24   Seery wanted to make that you interfered to stop, right?

25   A    I think he's subsequently done most of those trades.

1  Q   And you called them preposterous because he wanted to do

2  it around Thanksgiving or around Christmas, at least based on

3  your testimony, correct?

4  A   That's when it did occur.

5  Q   And is it your testimony -- is it your testimony that

6  every single person in the world who trades securities near a

7  holiday is making a preposterous trade?

8  A   I think it's amateur and not what an investment

9  professional would do.

10  Q   So you never trade on holidays; is that your testimony?

11  You've never done it once in your life?

12  A   Very rarely, unless there's another overriding reason.

13  And there was no overriding reasons, period.

14  Q   How would you know that when you didn't even ask Mr. Seery

15  why he wanted to make the trades?

16  A   I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin

17  said that Jim Seery just said for risk reduction.

18       MR. MORRIS:  I move to strike on the grounds that

19  it's hearsay, Your Honor.

20       THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q   You never asked Mr. Seery why he wanted to make the

23  trades, correct?

24  A   I'm not allowed to talk to Mr. Seery.

25  Q   You certainly were around Thanksgiving; isn't that right?

1   A    I don't know.

2   Q    There was no TRO in place at that time, correct?

3   A    That's true.

4   Q    You're pretty critical of Mr. Seery and his capabilities;

5   is that right?

6   A    He's a lawyer.  He's not an investment professional.

7   Q    Did you object to his appointment as the CEO of the

8   Debtor?

9   A    No.

10  Q    Have you made any motion to the Court to have him removed

11  as unqualified?

12  A    Not yet.

13  Q    Okay.  But with all the knowledge of all the preposterous

14  things that he's been doing for months now, you haven't done

15  it, right?

16  A    No.

17  Q    When you -- when -- before you threw the phone in the

18  garbage, did you back it up?

19  A    No.

20  Q    Did it occur to you that maybe you should save the data?

21  A    No.

22  Q    You said that the only way you think you might be able to

23  get information going forward is through a subpoena.  Do I

24  have that right?

25  A    I mean, that's how it seems.  I mean, it seems at every

1    turn -- and now with Scott Ellington being gone and Isaac

2    being gone -- I have no idea how the Debtor is ever going to

3    defend against UBS.

4                THE COURT:  I did not --

5                THE WITNESS:  I have no idea how --

6                THE COURT:  I didn't hear the answer after with

7    Ellington and Leventon being gone.  I didn't hear the rest of

8    the answer.  Could you repeat?

9                THE WITNESS:  I said I have no idea how the Debtor is

10   ever going to defend itself against UBS.  But I also have no

11   idea how we're ever going to get any information or ever push

12   forward any kind of settlement without having any access to

13   information or anybody to talk to.

14   BY MR. MORRIS:

15   Q    Do you trust Judge Lynn?

16        (Echoing.)

17   A    Yes.

18   Q    Is he a good advocate?

19   A    Yes.  If anybody returns his phone calls.

20   Q    Do you recall that on October 24th Judge Lynn specifically

21   asked my law firm to provide information on your behalf in

22   connection with the Debtor's financial information, their

23   assets and their liabilities?

24   A    Yes.

25   Q    Do you recall that the Debtor simply asked that you

1    acknowledge in an email between and among counsel that you

2    would abide by the confidentiality agreement that was entered

3    by the Court?

4    A    I wasn't involved in those details.

5    Q    Didn't you send an email in which you agreed to receive

6    the financial information subject to the protective order that

7    this Court entered?

8    A    I'm sure I would.  I just don't remember.

9    Q    That was a condition that the Debtors made.  That doesn't

10   refresh your recollection?

11   A    I'm not denying it.  I just don't remember, and --

12   Q    Okay.  And --

13   A    (overspoken)

14   Q    I'm sorry, I don't mean to cut you off.  And in fact, on

15   December 30th, the day you were supposed to vacate the office,

16   the Debtor voluntarily provided to Judge Lynn all of the

17   information that had been requested on your behalf without the

18   need for a subpoena, right?

19   A    Yeah.  It took a week.  It's 40,000 pages of mixed

20   gobbledygook that we're -- we're going through.  But it should

21   provide enough information for us to negotiate a pot plan if

22   anybody so chose.

23   Q    So you didn't need to (echoing) the 40,000 pages of

24   financial information from the Debtor; all you needed was an

25   agreement that you would abide by the protective order.

1 | Correct?

2 | A    I think that was the first thing that was ever produced on

3 | request that I can remember.  But yes.

4 | Q    And it was just a week ago, right?

5 | A    Yes.

6 |          MR. MORRIS:  I have no further questions, Your Honor.

7 |          THE COURT:  All right.  Mr. Bonds, do you have

8 | anything else?

9 |          MR. BONDS:  I do not, Your Honor, as to this witness.

10 | I have one other witness.

11 |          THE COURT:  All right.

12 |          MR. MORRIS:  Your Honor, I don't know who they plan

13 | on calling, but he's not on the witness list.

14 |          THE COURT:  All right.  Well, --

15 |          MR. BONDS:  Your Honor, this other witness --

16 |          THE COURT:  Just a moment.  This concludes, for the

17 | record, Mr. Dondero's testimony.  But, obviously, stick

18 | around, because we're going to have a lot to talk about when

19 | this is finished as far as the evidence.

20 |      All right.  Now, who are you wanting to call that you did

21 | not identify?

22 |          MR. BONDS:  I'd like to call Mike Lynn for the

23 | purpose -- or, to -- as a rebuttal witness.

24 |          THE COURT:  Lawyer as witness?

25 |          MR. MORRIS:  Your Honor?

1          THE COURT:  Well, you know, first off, rebuttal of

2     what?  Rebuttal --

3          MR. MORRIS:  Exactly.  He's going to rebut his own

4     client, Your Honor?  He's going to rebut his own client?

5     There's only been one witness to testify here.  He was on

6     their exhibit list.  How do they call a witness to rebut their

7     own client?

8          THE COURT:  Yes.  What -- I don't --

9          MR. BONDS:  Your Honor?

10          THE COURT:  Go ahead.

11          MR. BONDS:  Mr. Morris testified or attempted to

12     testify that the pot plan didn't gain any traction.  We will

13     submit Mike Lynn on that issue.

14          THE COURT:  No.

15          MR. MORRIS:  Your Honor?

16          THE COURT:  I'm not going to allow a lawyer to

17     testify to rebut lawyer argument.  That's very inappropriate,

18     in my view.  So, not going to happen.

19          MR. LYNN:  (garbled)

20          MR. BONDS:  Your Honor, he would be a fact witness to

21     discussions with the other side.

22          MR. MORRIS:  Your Honor, I strenuously object.

23     They're -- he's only rebutting -- my questions are not

24     evidence.  The only evidence in the record is Mr. Dondero's

25     testimony.  Mr. Dondero is their client.  Mr. Dondero was on

1  their witness list.  They should not be permitted to call any

2  witness, with all due respect to Mr. Lynn, to rebut their own

3  witness.

4          THE COURT:  All right.

5          MR. BONDS:  Your Honor, we're not rebutting our

6  witness.  We are rebutting the testimony that Mr. Morris gave.

7          THE COURT:  Mr. Morris is a lawyer.  He makes

8  argument.  He asks questions.  He was not a witness today.

9  Okay?

10     So if you want to say whatever you want to say as lawyers

11  in closing arguments, then obviously you can do that.  But I'm

12  not going to allow a lawyer to be a witness to rebut something

13  another lawyer said in argument or in a question.  I -- it's

14  -- so, I disallow that.

15     Anything else, then?

16          MR. BONDS:  No.

17          THE COURT:  Okay.  And while we're talking about

18  procedure, actually, Mr. Morris, it's the Debtor's motion, and

19  I'm not even sure that's all of your evidence.  So, do you

20  have any more evidence as Movant?

21          MR. MORRIS:  No, Your Honor.  The Plaintiff and the

22  Debtor rest.

23          THE COURT:  All right.  So, at the risk of repeating,

24  now that the Movant has rested, it would be Mr. Dondero's

25  chance to put on supplemental evidence.  But what I'm hearing

1  from Mr. Morris is there were no witnesses identified on your

2  witness list?

3          MR. BONDS:  Other than Mr. Dondero, Your Honor.

4          THE COURT:  Okay.  All right.  Well, was there any

5  stipulated documentary evidence that -- that you had --

6          MR. BONDS:  No, Your Honor.

7          THE COURT:  All right.  Well, I guess we're done with

8  evidence.

9      Mr. Morris, your closing argument?

10         MR. MORRIS:  All right.  Before I get to that, Your

11  Honor, I just want to make a very brief statement.  When the

12  Debtor objected to Mr. Dondero's emergency motion for a

13  protective order, the Debtor stated that it sought discovery

14  from Mr. Dondero to determine whether Mr. Dondero may have

15  violated the TRO by interfering and impeding the Debtor's

16  business, including by potentially colluding with UBS.  After

17  that motion was decided, both Mr. Dondero and UBS produced

18  documents to the Debtor.

19      Based on the review of that information, the Debtor found

20  no evidence that Mr. Dondero and UBS colluded to purchase

21  redeemed limited partnership interests of Multi-Strat, nor any

22  inappropriate conduct by UBS or its counsel.

23      The Debtor appreciates the opportunity to clear that part

24  of the record.

25         THE COURT:  All right.

1        CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

2        MR. MORRIS:  Now, with respect to the motion at hand

3   today, Your Honor, I want to take you back just about a month

4   ago to December 10th, 2020.  At that time, we had a hearing on

5   the Debtor's motion for a TRO.  The motion had been filed in

6   advance.  Mr. Dondero had filed an objection.  He had concerns

7   about the scope and the language of the terms of the proposed

8   TRO.

9        And at that hearing, Your Honor, if you'll recall, you

10  listened carefully to the arguments that were made on behalf

11  of Mr. Dondero.  You heard carefully -- you listened carefully

12  to the proposed changes that he sought to make.  And you went

13  through that proposed TRO word by word, Paragraph 2 and 3, and

14  you read them out loud, and you made decisions at that time as

15  to whether the Court believed any portion of that was

16  ambiguous or whether it was clear.  You made determinations at

17  that time whether or not the provisions were reasonable.

18      Mr. Dondero wasn't there.  He didn't read the transcript.

19  He has no idea what you said.  But his lawyers were there, and

20  they had an opportunity to object and they had an opportunity

21  to make comments, and the order is what the order is.  And for

22  whatever reason, Mr. Dondero chose not to read it, or,

23  frankly, even understand it, based on his testimony.

24      The fact is, Your Honor, the one thing that the evidence

25  shows very clearly here is that Mr. Dondero thinks that he is

1  the judge.  He believes that he is the decider.  He believes

2  that he decides what the TRO means, even though he never read

3  it.  He believes that he decides what exceptions exist in the

4  TRO, even though he never read it.

5      He believes that he decides that it's okay to ditch the

6  Debtor's cell phone without even seeking, let alone obtaining,

7  the Debtor's consent.  I guess he decides that he can ditch

8  the phone and trash it without seeking to back it up or

9  informing the Debtor.

10      Mr. Dondero believes that he gets to decide that it's okay

11 to take a deposition from the Debtor's office, even when the

12 Debtor specifically says you're evicted and you're not allowed

13 to have access.

14      Mr. Dondero believes that he gets to decide that Mr. Seery

15 has no justification for making trades, even though he

16 couldn't take the time to pick up the phone or otherwise

17 inquire as to why Mr. Seery wanted to do that.

18      Mr. Seery -- Mr. Dondero believes that he is the arbiter

19 and the decision-maker and gets to decide to stop trades,

20 notwithstanding the TRO, notwithstanding the CLO agreements

21 that he is not a party to, that his entities are not a party

22 to.

23      Mr. Dondero thinks that he gets to decide that the Debtor

24 has breached the agreements with the CLOs.  He gets to decide

25 that the Debtor is in default under those agreements.  He gets

1   to decide that it's perfectly fine for Ellington and Leventon

2   to support his interests while they have obvious duties of

3   loyalty to the Debtor.

4       It is not right, Your Honor.  It is not right.  I stood

5   here, I sat here, about four hours ago, five hours ago, and

6   told the Court what the evidence was going to show, and it

7   showed every single thing that I expected it to show and

8   everything I just described for the Court about Mr. Dondero's

9   belief that he's the decider.

10      He's not the decider, Your Honor.  You are.  And you made

11  a decision on June -- on December 10th that he ignored.

12      There is ample evidence in the record to support the

13  imposition of a preliminary injunction.  And Your Honor, I'm

14  putting everybody on notice now that we're amending our

15  complaint momentarily to add all of the post-petition parties,

16  because this has to stop.  The threats have to stop.  The

17  interference has to stop.  Mr. Dondero can always make a

18  proposal if he thinks that there's something that will capture

19  the imagination and the approval -- more importantly, the

20  approval -- of the Debtor's creditors.  We have no interest in

21  stopping him from doing that.  He's got very able and

22  honorable counsel, and he can go to them and through them any

23  time he wants.

24      But the record is crystal clear here that, notwithstanding

25  Your Honor's order, one entered after serious deliberation, is

1  of no meaning to him.  And we'll be back at the Court's

2  convenience on the Debtor's motion to hold him in contempt.

3  It'll just be a repeat of what we've heard today, because,

4  frankly, the evidence is exactly the same.

5      With that, Your Honor, unless you have any questions, the

6  Debtor rests.

7          THE COURT:  All right.  I do not.

8      Mr. Bonds?

9          MR. BONDS:  Your Honor, we would like to divide our

10  time between Mike Lynn and myself.  Is that a problem?

11          THE COURT:  That's fine.  Go ahead.

12          MR. LYNN:  Are we on mute?

13          MR. BONDS:  No.

14           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15          MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16  Phelan's book.  I happened to read the confirmation hearing in

17  the *Acis* case regarding what was referred to as Clients A, B,

18  and C.  And Mr. Phelan, who testified, really gave an oral

19  argument to the Court which was very persuasive and very

20  thorough.  So I'm going to sort of do the reverse, because I

21  hope that the Court would find useful some information

22  regarding the pot plan about which you've heard many words

23  spoken but very little to do with what that plan was or how it

24  came about.

25      The pot plan was proposed by Mr. Dondero for the first

1    time in September of 2020, shortly after the conclusion of the

2    first round of mediations.  Though there had been versions of

3    it before, and lesser versions, the pot plan was finally in

4    the form that would more or less survive it in September.

5    Under the pot plan, Mr. Dondero proposed to come up with $90

6    million of cash and $70 million in promissory notes, and that

7    was to form a pot which creditors would share in.

8        The proposal was provided to the Debtor and then shared

9    with the Committee.  Mr. Seery responded with a degree, a

10   degree only, of enthusiasm to the pot plan, and indeed

11   provided a counter-term sheet to the pot plan.  He also, so he

12   said, and I believe him, approached the Committee and said

13   this is a proposal to be taken seriously.

14       He proposed some improvements in his view to the pot plan.

15   No response was received from the Creditors' Committee at that

16   time.

17       After going back and forth with the Debtor -- and Mr.

18   Seery, not unreasonably, was unwilling to propose the pot plan

19   without some support on the Creditors' Committee -- I

20   contacted Matt Clemente.  We had a nice conversation.  And at

21   that time, Mr. Clemente raised two particular concerns.  The

22   $160 million, which creditors did not think was enough, was

23   not enough, in part, because that included no consideration

24   for the acquisition of promissory notes executed some by Mr.

25   Dondero and some by entities controlled by Mr. Dondero, which

1    notes total approximately $90 million.

2        The second concern was that Mr. Dondero would get a

3    release under the plan.  During that call, I said the issue of

4    the notes is subject to negotiation and might well result in a

5    transfer of those notes, possibly with some amendments, to the

6    pot, and that Mr. Dondero was prepared, in all likelihood, to

7    forego a release.

8        Mr. Clemente agreed to get back to me.  He did.  And he

9    said to me, I have talked to the Committee about this and they

10   would like you to go to or they want you to go first to Mr.

11   Seery, work off of his revised timesheet -- or term sheet,

12   sorry -- and after you have reached an agreement with him,

13   come to us, come to the Committee, and we'll negotiate with

14   you.

15       Now, I might have agreed that that was a reasonable

16   approach if there were a possibility that Mr. Seery would

17   propose a plan without the agreement of creditors.  But the

18   way I took it was that the Committee was saying go make a deal

19   with Seery and then we'll start negotiating, and we know,

20   correctly, that Mr. Seery will not propose a plan that does

21   not have our support.

22       So, effectively, we get to go through two rounds of

23   negotiations, even though effectively everything that is in

24   the estate, everything -- causes of action against Mr.

25   Dondero, promissory notes from Mr. Dondero -- everything that

1   they would get under a plan or under a liquidation, they would

2   get under the pot plan.

3        Now, I wanted you to know that, Your Honor, not because

4   I'm now trying to get you or anyone else to sell the pot plan.

5   But I think it's important that Your Honor know that Mr.

6   Dondero's approach in this case has not been a hostile

7   approach.

8        I know the Court had what it found to be an unsatisfactory

9   experience with Mr. Dondero in the *Acis* case.  But from the

10  time I became involved in this case and Mr. Bonds became

11  involved, we have been quiet, we have said nothing, and we've

12  done virtually nothing in the case, up until the time after

13  the mediation, when negotiations regarding a pot plan broke

14  down.

15       Since that time, regrettably, there has been a good deal

16  of hostility, and it's spreading.  I would like to see it stop

17  spreading.  I will do what I can to make it stop spreading.

18  But I need others to help me on that.  And it's my hope that I

19  can count on the Pachulski law firm, the Sidley law firm, and

20  the firms representing the major creditors to help make that

21  happen.

22       I do not think, and I would submit that it is not to the

23  benefit of the estate, it is not to the likely workout of this

24  case, that it would be best served by entering a preliminary

25  injunction, which it appears to me prevents Mr. Dondero from

1   saying good morning to one of the employees of the Debtor that

2   he knows.

3       It seems to me, Your Honor, that the injunction, by its

4   terms, as Mr. Morris would have it, is an injunction that

5   would prevent Mr. Dondero from discussing politics with Mr.

6   Ellington.  And it seems to me that an injunction that broad,

7   that extensive, and one which lasts, as far as I can tell,

8   until infinity, that such an injunction is not the right thing

9   to do, given, if nothing else, the First Amendment to the

10  United States Constitution.

11      That will conclude my presentation, and I will turn it

12  over to the wiser and better-spoken colleague, John Bonds.

13  Thank you, Your Honor.

14          THE COURT:  Thank you.  Mr. Bonds, what else do you

15  have to say?

16          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17          MR. BONDS:  Your Honor, has the Debtor met the

18  requirements for the issuance of a preliminary injunction?  We

19  submit that they have not.  And the Fifth Circuit's rules are

20  fairly clear as to the awarding of a preliminary injunction.

21      First, let's look at the type of preliminary injunction

22  that the Debtor would like you to enter today.  It provides

23  that Mr. Dondero cannot talk to any employee, regardless of

24  what is being communicated.  Mr. Dondero can pass an employee

25  on the street, but he can't acknowledge the employee, with

1   whom he may have worked for years.  Nor can he talk to his

2   personal assistants, again, which he has worked with for

3   years.  Does that violate the First Amendment of the

4   Constitution?

5       What about the shared services agreement?  What about the

6   pot plan which he is advocating as a means of reorganizing the

7   Debtor?  Not the liquidation proposed by the Debtor.  Can Mr.

8   Dondero communicate with creditors about the pot plan and the

9   other proposals without violating the TRO or the preliminary

10  injunction which deals with interfering with the Debtor's

11  business?

12      Your Honor, I think it's important to note that a

13  preliminary injunction is an extraordinary remedy that may

14  only be awarded upon a clear showing that the Plaintiff is

15  entitled to such relief.  Plaintiffs are entitled to a

16  preliminary injunction if they show, one, a substantial

17  likelihood that they will prevail on the merits of their

18  claims; two, a substantial threat that they will suffer an

19  irreparable injury if the injunction is not granted; three,

20  their threatened injury outweighs the harm to the estate or

21  the other party; and four, the public interest will not be

22  disserved, misserved, if the preliminary injunction is

23  granted.

24      The party seeking the preliminary injunction bears the

25  burden of persuasion on all four requirements.  We believe

1   that the Debtor today has failed to carry its burden of

2   persuasion of proof with regard to the second element, which

3   I'm going to refer to as the irreparable injury requirement.

4   In order to show irreparable harm to the Court, the Plaintiff

5   must prove that if the District Court denied the grant of a

6   preliminary injunction, irreparable harm would be the result.

7   Injuries are irreparable only when they cannot be undone

8   through monetary remedies.  There is no evidence before the

9   Court today that Mr. Dondero cannot respond to any judgment

10  that is rendered against him by this Court.

11       Your Honor, this preliminary injunction does not involve

12  real property.  Unlike the *Saldana* case, this request for the

13  issuance of a preliminary injunction involves personal

14  property only.  The request that Mr. Dondero cease and desist

15  all contact with employees is just wrong and may violate the

16  First Amendment of the Constitution, as I previously stated.

17       We have other concerns regarding the issuance of a

18  preliminary injunction.  We feel that the preliminary

19  injunction is too broad.  It lacks a beginning and an end.

20  When does the preliminary injunction terminate?  What about

21  the former employees?  Once they are terminated, can Mr.

22  Dondero speak to them?  What about the pot plan?  Is it gone

23  forever?  Can Mr. Dondero talk with the mediators about the

24  pot plan?  Can Mr. Dondero speak with the members of the

25  U.C.C.?

162

1    It is easy to criticize Mr. Dondero.  Did he violate the

2  TRO?  We submit that he didn't and the Debtor says that he

3  did.  What matters going forward is the lack of evidence of

4  irreparable harm.

5    Mr. Seery sure wants to keep Mr. Dondero from talking to

6  anyone in this case.  Why is that?  Does Mr. Seery believe

7  that the only way to get his liquidation plan confirmed is to

8  keep Mr. Dondero from talking to anyone?  How will the

9  preliminary injunction help the Debtor's creditors?  Does

10  keeping Mr. Dondero from talking with anyone mean that there

11  will be a greater return to the creditor body?  Does

12  precluding Mr. Dondero from talking about his pot plan mean

13  that the creditors will take home more money on their claims,

14  or does it eliminate the possibility that they may take home

15  more money on their claims?

16    Your Honor, what we are seeing here today is an attempt by

17  a group to destroy what Mr. Dondero has built over the last

18  few years.  That isn't the way Chapter 11 should work.

19    Just one last thing to keep in mind, Your Honor.  Mr.

20  Seery's plan is a liquidation of the Debtor.  Mr. Dondero's

21  pot plan is a reorganization of the Debtor.

22    Thank you, Your Honor.

23      THE COURT:  All right.  Mr. Morris, you get the last

24  word.  Anything in rebuttal?

25      MR. MORRIS:  I would just point out, Your Honor, that

1  nobody here has objected to the Debtor's motion for the entry

2  of a preliminary injunction except Mr. Dondero.  While I

3  appreciate that this is an adversary proceeding, anybody who

4  felt strongly about the matter certainly could have moved to

5  intervene.  The Creditors' Committee could have moved to

6  intervene.  Mr. Clemente could have stood at the podium and

7  begged Your Honor not to impose the injunction because he

8  thought it was in the best interest of creditors to allow Mr.

9  Dondero to interfere with the Debtor's business and to speak

10 with their employees.  Nobody has done that, Your Honor.

11 Nobody's here speaking on behalf of Mr. Dondero.  Nobody's

12 here to testify on his behalf.  Nobody's -- there's no

13 evidence in the record that supports or corroborates anything

14 that he said at all, Your Honor.

15     Unless Your Honor has any specific questions, the Debtor

16 is prepared to rest.

17         THE COURT:  All right.  I do not have any follow-up

18 questions.

19     All right.  I have a lot to say.  I'm sorry, I apologize

20 in advance, but I've got a heck of a lot to say right now.

21 I'm going to give you a ruling on the motion before me, but

22 I've got a lot to add onto that, so I hope all the key parties

23 in interest are listening carefully.  Mr. Bonds, in the video,

24 I can only see you.  I hope Mr. Dondero is just right there

25 out of the video camera view.  Okay, there you are.  I wanted

1   to make sure you didn't wander off to take a bathroom break or

2   anything.  So, again, I have a whole lot to say here today.

3      First, I'm going to rule on the motion.  The Court does

4   find there is sufficient compelling evidence to grant a

5   preliminary injunction that is completely consistent with the

6   prior TRO.  Okay?  So, specifically, the Court today is going

7   to continue to prevent Mr. Dondero from (a) communicating in

8   any way, directly or indirectly, with any of the Debtor's

9   board members -- I think that's really Strand board members --

10   unless Mr. Dondero's counsel and counsel for the Debtor are

11   included.  Okay.  I'm saying those words slowly and carefully.

12   There is no bar on Mr. Dondero talking to the board about a

13   pot plan or anything else in the universe Mr. Dondero wants to

14   talk to them about.  There's just a preclusion from him doing

15   it without his counsel and the Debtor's counsel present.

16   Okay?

17      I did that before and I'm doing it now because I've seen

18   concerning evidence that some communications to Mr. Seery and

19   others had an intimidating tone, a threatening tone one or two

20   times, an interfering tone.  So, guess what, we're just going

21   to have lawyers involved if any more conversations happen.

22   Okay.

23      So (b) the preliminary injunction, just as the TRO did, is

24   going to prevent Mr. Dondero from making any threats of any

25   nature against the Debtor or any of its directors, officers,

1  employees, professionals, or agents.  Okay.  It's almost

2  embarrassing having to say that or order that with regard to

3  such an accomplished and sophisticated person, but, you know,

4  I saw the evidence.  I've got to do what I've got to do.  You

5  know, words in a text like, Don't do it, this is your last

6  warning, and some of the other things, that has a threatening

7  tone, so I'm going to order this.

8      Third, the preliminary injunction will prevent Mr. Dondero

9  from communicating with any of the Debtor's employees except

10  as it specifically relates to shared services provided to

11  affiliates owned or controlled by Mr. Dondero.

12      Now, I'm going to elaborate in a couple of ways here.  I

13  think in closing argument there was a suggestion that he can't

14  even talk to his friend, Mr. Ellington, about anything.  Well,

15  I heard today that Mr. Ellington and Mr. Leventon are no

16  longer employees of the Debtor, so actually that's not an

17  issue.  But while this is very restrictive, while this

18  prevents Mr. Dondero from engaging in small talk with Debtor

19  employees about the weather or the football game or whatever,

20  it's regrettable, but I feel like I'm forced to order this

21  now, because, again, the communications that were put in the

22  record.  Okay?  We just can't take any chances, as far as I'm

23  concerned, with regard to there being potential interference

24  with the Debtor's operations that might be harmful or contrary

25  to creditors' interests.

1    Fourth, the preliminary injunction, just like the TRO,

2    will prevent Mr. Dondero from interfering with or otherwise

3    impeding the Debtor's business, including but not limited to

4    the Debtor's decisions concerning its operations, management,

5    treatment of claims, disposition of assets owned or controlled

6    by the Debtor, and pursuit of any plan or alternative to the

7    plan.

8    Now, I understand the argument that this is pretty broad

9    and might be, I don't know, subject to some disputes regarding

10   was it interference, did it impede the Debtor's business or

11   not?  You know what, if you follow the other prongs of the

12   preliminary injunction, that you don't talk to the board

13   without your counsel, Mr. Dondero, and the Debtor's counsel,

14   and you don't talk to Debtor's employees except with regard to

15   matters pertaining to the shared services agreement, and,

16   bottom line, if you just run everything by your attorneys,

17   you'll be okay.  We won't have this ambiguous, vague,

18   problematic territory.

19   Fifth, I will go ahead and, for good measure, belts and

20   suspenders, whatever you want to call it, prevent Mr. Dondero

21   from otherwise violating Section 362(a) of the Bankruptcy

22   Code.

23   Now, I read the response filed at 9:30 last night by Mr.

24   Dondero's counsel.  It's a good response.  It makes legal

25   arguments about that being, you know, it just being too vague.

1  Well, to the contrary, it just restates what's already in the

2  Bankruptcy Code, right?  Persons are prohibited from violating

3  Section 362(a) of the Bankruptcy Code.  If anything, it's the

4  sky is blue, right, just stating what is true.  But I

5  understand Debtor wanting some clarity in an order, because we

6  want you to take this seriously, Mr. Dondero, and not just do

7  something and then say, well, you didn't know what was in the

8  Code.  You know, you need to consult with your lawyer.  That's

9  going to be in there.

10      Bottom line, I want that language in there because, Mr.

11  Dondero, I want you to see an order that this Court expects

12  you to comply with the Bankruptcy Code.  And again, if you

13  don't understand, if you're unsure whether you can take action

14  $x$ or $y$, consult with your very capable lawyers.

15      I note that if you listened carefully to these words,

16  there was nothing in here that stopped Mr. Dondero from

17  talking to the Creditors' Committee about a pot plan.  Nothing

18  in this injunction, nothing in the previous TRO, ever

19  prohibited that.

20      Last, with regard to the ruling -- and again, I've got a

21  lot more to say when I'm done -- I am going to further enjoin

22  Mr. Dondero from what we said in the TRO:  causing,

23  encouraging, or conspiring with any entity controlled by him

24  and/or any person or entity acting on his behalf from directly

25  or indirectly engaging in any of the aforementioned items.

1  This is not an injunction as to nonparties to the adversary

2  proceeding.  It is an injunction as to Mr. Dondero from doing

3  the various enjoined acts that I previously listed under the

4  guise of another entity or a person that he controls.

5      Again, if you're dealing with and through your attorneys,

6  Mr. Dondero, I don't think this will be hard to maneuver.

7      I guess I'm actually not through with my ruling yet.  I do

8  want to add that the Court rules that the injunction shall

9  last through the time of confirmation of a plan in this case

10 unless otherwise ordered by this Court.

11     And as to the legal standards, I want to be clear for the

12 record that the Court believes this injunction is necessary to

13 avoid immediate and irreparable harm to the Debtor's estate

14 and to its reorganization prospects.  I believe that there's a

15 strong likelihood the Debtor will succeed in a trial on the

16 merits of this adversary proceeding.  I believe the public

17 interest strongly favors this injunction.  And I believe the

18 balance of harms weighs in favor of the Debtor on all of these

19 various issues.

20     Again, I want to reiterate, the intimidation and

21 interference that came through in some of these email and text

22 communications was concerning to the Court and is a motivation

23 for this preliminary injunction.

24     Now, I'm going to add on a couple of things today.  The

25 first thing I'm going to add on -- and I want this, Mr.

1   Morris, in the order you submit.  You didn't ask me for this,

2   but I'm going to do it.  I'm going to order you, Mr. Dondero,

3   to attend all future hearings in this bankruptcy case unless

4   and until this Court orders otherwise.  And I'm doing this --

5   it's not really that unusual a thing for me to do.  I

6   sometimes order this in cases when I'm concerned about, you

7   know, is the businessperson paying attention to what's going

8   on in the case and is he engaged, is he invested, is he

9   available when we need him?

10       In this case in particular, the evidence was that you

11  didn't read the TRO.  You were not aware of its basic terms

12  and you didn't read it.  Okay?  So that was what sent me over

13  the edge as far as requiring this new element that you're

14  going to attend every hearing.  Obviously, we're doing video

15  court, so that's not that much of a burden or imposition.  You

16  can pretty much be anywhere in the world and patch in by

17  video, since we're in the pandemic and not doing live court.

18  But I think it's necessary so I know you hear what I rule and

19  what goes on in this case.

20       I will tell you that I was having a real hard time during

21  your testimony deciding if I believe you didn't read the TRO

22  or know about the different things that were prohibited.  You

23  know, I was thinking maybe you're not being candid to help

24  yourself in a future contempt hearing, or actually maybe

25  you're being a hundred percent honest and candid but you're

1   kind of hiding behind your lawyers so that you can argue the

2   old plausible deniability when it suits you.

3        But no more.  No more.  I'm not going to risk this

4   situation again of you not knowing what's in an order that

5   affects you.  So you must be in court by video until I order

6   otherwise.

7        Second, and I regret having to do this, but I want it

8   explicit in the preliminary injunction that Mr. Dondero shall

9   not enter Highland Capital Management's offices, regardless of

10  whether there are subleases or agreements of Highland

11  affiliates or Dondero-controlled entities to occupy the

12  office, unless Mr. Dondero has explicit written permission

13  that comes from Highland's bankruptcy counsel to Dondero's

14  bankruptcy counsel.  Okay?  If he does, it will be regarded as

15  trespassing.

16       And, I don't know, are there security guards on the

17  premises?  I mean, gosh, I hate to be getting into this

18  minutia, but -- well, I just want it explicit in the order

19  that Mr. Dondero, I'm sorry, but you can't go to these offices

20  without written permission.  And again, that can only be given

21  from Debtor's counsel to Mr. Dondero's counsel.  Okay?  So

22  it's going to be trespassing.  You know, someone can call the

23  Dallas Police Department and have you escorted out.  Again, I

24  hate having to do that.  It's just, it's embarrassing for me.

25  I think it's embarrassing for everyone.  But I'm backed up in

1   that corner.

2       Next, I am going to ask that it be clear that Mr. Dondero

3   can deal with the Unsecured Creditors' Committee and its

4   professionals with regard to talking about a pot plan.

5       And next, I'm going to add -- and I think, Mr. Morris, you

6   requested this at some point today in oral argument -- Mr.

7   Ellington and Mr. Leventon shall not share any confidential

8   information that they received as general counsel, assistant

9   general counsel for the Debtor, without Debtor's counsel's

10  explicit written permission.  Okay?  So we've got that in

11  writing.

12      And, you know, that's a little awkward because they're not

13  here, they weren't parties to the injunction, but they were

14  Debtor employees until recently.  If they want to risk

15  violating that and come back to the Court and argue about

16  whether they got notice and whatnot of that, they can argue

17  that, but I want it in the order regardless.

18      So that is the ruling.  And now I want to kind of talk

19  about a few other things.  And before we're done here, Mr.

20  Morris, I'll ask do you have questions, does Mr. Bonds have

21  questions, does anyone have questions about the ruling.  But I

22  want to talk about a couple of things.  And again, I hope that

23  I'm coming through loud and clear, Mr. Bonds, in your office

24  for Mr. Dondero to hear this.  It's really, really important

25  that he heard what I'm about to say.  I'm going to say some

1 kind of unpleasant things and then I'm going to say some

2 hopeful things, okay?

3     Mr. Dondero?  Okay.  Mr. Dondero, I'm going to -- Mr.

4 Morris, you've got your hands on your head.  Did I miss

5 something?

6         MR. MORRIS:  No.  I was just surprised to see Mr.

7 Dondero on his phone.  I apologize, Your Honor.

8         THE COURT:  Oh, my goodness.  Were you on your phone,

9 Mr. Dondero?

10         MR. DONDERO:  No, I was not.

11         THE COURT:  Okay.  I want you to listen to this

12 really closely, and then I promise I'm going to have something

13 hopeful to say after this very unpleasant stuff.  You know, I

14 keep a whiteboard up at my bench.  I don't know if you can

15 read it.  But sometimes I hear something in a hearing and I

16 think, okay, this is one of my major takeaways from what I

17 heard today.  And I've got two, I've got two big takeaways

18 here.  Number one on my whiteboard is Dondero's spoliated

19 evidence.  Game-changer for all future litigation.  Okay.

20         MR. DONDERO:  I'm sorry.  I didn't hear that.  I

21 didn't hear that.  Could you repeat that, please?

22         THE COURT:  Mr. Dondero, spoliated evidence, game-

23 changer in future litigation.

24     Okay.  Let me tell you, the throwing away of the phone,

25 that was the worst thing I heard all day.  That was far and

1   away the worst thing I heard all today.  I don't know what I'm

2   going to hear down the road to fix this, but if it's really

3   gone, let me tell you how bad this is.  We have all sorts of

4   Federal Rules of Civil Procedure that talk about this being a

5   bad thing, but I wrote an opinion a couple years ago dealing

6   with spoliation of electronic evidence, and I think it might

7   be helpful for everyone to read.  It was called *In re Correra*,

8   C-O-R-R-E-R-A.  I have no idea what the cite on it is.  But in

9   this case, *Correra*, we had a debtor who had a laptop, and he

10  gave the laptop to his personal assistant, who took it away to

11  another state.  And at some point during the case, parties

12  discovered, oh, there's a laptop that may have a treasure

13  trove of information.  Who knows?  Maybe it does; maybe it

14  doesn't.  But there's a laptop that we just now learned about

15  that the personal assistant has.

16      And so I issued an order that she turn it over, and there

17  were subpoenas and depositions, blah, blah, blah.  Long story

18  short, the evidence ended up being that she deleted everything

19  on the laptop, and then -- this would almost be funny if it

20  wasn't so serious -- she downloaded thousands of pictures of

21  cats onto the laptop.  I kid you not, cats.  Meow, meow, cats.

22  And she downloaded a hundred-something full-length movies.

23  And we had two days of forensic experts come in and take the

24  witness stand and tell me about how, okay, this is like an

25  amateurish -- you've talked about amateur hour today -- this

1 is kind of an amateurish way of deleting data, right. You

2 first delete all the files on the laptop and then you cover

3 over all the space to make sure the information is not

4 retrievable. You know, this genius ended up retrieving some

5 of the information.

6 But the long story short is I sanctioned the debtor and

7 his assistant jointly and severally. You'll have to go back

8 and look at the opinion. I'm pretty sure it was over a

9 million dollars. And I can't remember if that was attorneys'

10 fee-shifting only, or monetary, like penalty on top of the

11 attorneys' fees-shifting. I just can't remember. But maybe

12 poor Tara needs to be advised of that opinion, too. I mean,

13 --

14 But the other reason I put game-changer in future

15 litigation is, in my *Correra* case, it wasn't just the monetary

16 million-dollar sanction or whatever it was; it was a game-

17 changer in future litigation because the adverse party to the

18 debtor ended up arguing -- and it was the state of New Mexico,

19 by the way -- they ended up saying, in all future litigation,

20 we want you -- some adversaries, we want you to make an

21 adverse inference. In other words, for all of these elements

22 that we're trying to prove in our fraudulent transfer

23 litigation and whatever else was going on, we want you to make

24 an adverse inference that there would have been evidence there

25 on that laptop that would have supported some of our causes of

1  action and it was destroyed to keep us from having that

2  evidence.

3      And they brought forth all kinds of case law. It's a hard

4  area. It's a really, really hard area. But I ended up --

5  again, it's not in the main opinion. It was in subsequent

6  orders. I ended up saying, yeah, I think you've met the

7  standard here to draw adverse inferences.

8      So, again, this is a very unpleasant message for me to

9  deliver today. But the destruction of the phone is my biggest

10 takeaway of concern today, how that might have ramifications.

11 You know, there are other bad things, too, about that. I'm

12 not even going to go there right now. But the, you know,

13 Title 18, you can ask your lawyer what that means, but okay.

14     My second big takeaway before we get to the hopeful stuff

15 is -- and this is kind of harsh, what I'm about to say -- but

16 Ellington and Leventon maybe care more about you, Mr. Dondero,

17 than their law license. You know, I guess it's great to have

18 people in your life who are very, very loyal to you. I mean,

19 loyalty is a wonderful thing. But I am just so worried about

20 things I've heard. Again, the phone and in-house lawyers.

21 The biggest concerns in my brains right now. I have worried

22 about them for a while.

23     You all will -- well, Mr. Dondero, you might not know

24 this. But we had a hearing a few months ago, maybe September,

25 October, where the Creditors' Committee was trying to get

1  discovery of documents.  And we had some sort of hearing,

2  maybe a motion to compel production.  And we had many, many

3  entities that you control file objections:  NexPoint, NexBank.

4  I can't even remember.  We just had a whole slew.  CLO Holdco.

5  Many, many of these entities objected.  And I was trying to

6  figure out that day who was instructing them.  And oh my

7  goodness, I hope the in-house layers are not involved in this

8  document discovery dispute, because, you know, they have

9  fiduciary duties.  And are -- you know, is it -- it feels like

10  it's breaching a duty to the bankruptcy estate when it's in

11  the bankruptcy estate's best interest to get these documents

12  if you're meanwhile hiring lawyers for these other entities,

13  Holdco, et cetera, and saying, Fight this.

14      I never really pressed it very hard back then, but I

15  raised the issue and I said, I'm really, really concerned

16  about this.  And I continue to be concerned about it.  I had

17  experiences with Mr. Ellington in the *Acis* case where he

18  testified on the witness stand, and later it looked a heck of

19  a lot like he might have committed perjury.  I hate to use

20  such blunt terms.  But I let it go.  I'm just like, you know,

21  I'm not going to -- you know, I'm going to just hope for the

22  best that he misspoke.

23      But I'm getting a really bad taste in my mouth about

24  Ellington and Leventon, and I hope that they will be careful

25  and you will be careful, Mr. Dondero, in future actions.

1      Is Mr. -- I can't see Mr. Dondero.  I want to make sure

2   he's not on the phone.  Okay.  Okay.  Thank you.

3      So where was I going to head next?  I guess I want to say

4   a couple of things now that I would describe as a little bit

5   more hopeful, and that is pertaining to this whole pot plan

6   thing.

7      You know, I tend to think, without knowing what's being

8   said outside the courtroom, that a pot plan would be the best

9   of all worlds, okay, because the plan that we have set for

10  confirmation next week, I understand we have a lot of

11  objections, and if I approve it, if I confirm the plan, we're

12  going to have a lot of appeals and motions for stay pending

13  appeal, and no matter how that turns out, we're going to have

14  a lot of litigation.  Okay?  You know, we're going to have

15  adversaries.  And we have a not-very-workable situation here

16  where we have these Dondero-controlled affiliates questioning

17  Mr. Seery's every move.

18     I would love to have a pot plan that would involve, Mr.

19  Dondero, you getting to keep your baby, okay?  I acknowledge,

20  everyone here acknowledges, you are the founder of this

21  company.  This is your baby.  You created a multi-billion-

22  dollar empire, okay?  I would be shocked if you didn't want to

23  keep your baby.  Okay?  If there was a reasonable pot plan, I

24  would love it.

25     But I'm telling you, the numbers I heard didn't impress me

1    a heck of a lot.  I'm not an economic stakeholder.  It's not

2    my claim that would be getting paid.  But I can see where

3    these Creditor Committee members, they're not going to think

4    $160 million -- $90 million in cash, $70 million in notes, or

5    vive-versa -- is nearly enough.  Okay?

6        So I am going -- what just happened?  What just happened?

7    I lost Mr. Dondero.  Okay.  This is getting kind of humorous,

8    almost.

9        Okay.  I am going to order that between now and the end of

10    the day Tuesday there be good-faith, and I'll say face-to-face

11    -- Zoom, WebEx, whatever -- negotiations between Mr. Dondero

12    and his counsel and at least the Committee and its

13    professionals regarding this pot plan.

14        Now, the train is leaving the station next Wednesday,

15    okay?  If we don't have Creditors' Committee and Debtor and

16    Dondero rushing in here saying, Please continue the

17    confirmation hearing next Wednesday, if we don't have like

18    unanimous sentiment to do that, you know, this is a 15-month-

19    old case, I'm going to go forward with the plan that's on

20    file.

21        And it's been a long, expensive case.  I had great

22    mediators try to give it their best shot to get a grand

23    compromise.  I just, I'm not going to drag this out unless you

24    all tell me Wednesday morning, We want you to continue this a

25    week or two.

1     And let me tell you -- this may be the stars lining up, or

2   it may not be -- I was supposed to have a seven-day trial

3   starting the week after next, and then I was supposed to have

4   a four- or five-day day trial starting immediately after that.

5   And all of those lawyers came in and asked for a continuance

6   because of COVID.  They wanted a face-to-face trial, and so

7   I've put them off until April.

8     So if you wanted to postpone the confirmation hearing to

9   the following week or even the following week, I have the gift

10  of time to give you.  But I'm not going to do it lightly.

11  I'm, again, I'm just going to order face-to-face meetings.

12  And I said Dondero and his counsel and the Committee and its

13  professionals.  You know, if -- I'm not slighting the Debtor

14  here or Mr. Seery, but I'm kind of taking a cue from what Mr.

15  Morris, I think I heard you say, that at this point it's the

16  Committee, it's the Committee's money, and I think that's the

17  starting place.  And if they want to join the Debtor in at the

18  beginning or midway through, you know, wonderful, but I think

19  it needs --

20        MR. POMERANTZ:  Your Honor, this is Jeff -- this is

21  Jeff Pomerantz.  I hate to interrupt, and I never do that to a

22  judge, but I did have something to say in my comments about a

23  continuance that we've talked about with the Committee and

24  some other developments in the case.

25        THE COURT:  Oh.

1          MR. POMERANTZ:  I'm happy to wait.  But it has -- it

2    has nothing to do with the comments you said, although, as I

3    think you've heard from me before, the Debtor has been a

4    supporter, a supporter of a pot plan.  Mr. Seery has done a

5    tremendous amount of work working with Mr. Dondero, working

6    with Mr. Lynn, to try to make that happen.  And if the

7    Committee is willing to engage in a pot plan, we would

8    definitely support that.  Because we do agree with Your Honor

9    that, absent a pot plan, we are looking at a lot of

10   litigation.

11        Some of the issues you're going to have to deal with at

12   the confirmation hearing if we do not have a peace-in-the-

13   valley settlement is exculpations, releases, moratoriums on

14   litigation, extensions of your January 9th order --

15          THE COURT:  Uh-huh.

16          MR. POMERANTZ:  -- with respect to pursuing certain

17   people.

18        So, we get it, and we've gotten it from the beginning.

19   And Mr. Seery, sometimes even at a fault, has been

20   singlehandedly focused on trying to get that done.  It's just

21   unfortunate where we are here.

22        But having said that, I wanted to first apprise the Court

23   of a recent major development in the case.  I'm pleased to

24   report that the Debtor and UBS have reached a settlement in

25   principle which will resolve all of UBS's claims against the

1    estate, all of UBS's claims against Multi-Strat.  The parties

2    are working on documentation.  The settlement is subject to

3    internal approvals from UBS, but we've been led to believe

4    those approvals will occur, and we would hope to file a Rule

5    9019 motion in the near future.

6        I'm sure Your Honor is quite pleased to hear that.  The

7    UBS matters have taken a substantial amount of time.  And with

8    the settlement of UBS's claims, the only material unresolved

9    claim, unrelated to Mr. Dondero or the employees, are Mr.

10   Daugherty.  And Mr. Seery will continue to work with Mr.

11   Daugherty to try to settle that.

12            THE COURT:  Okay.

13            MR. POMERANTZ:  With respect to the scheduling, with

14   respect to the scheduling, Your Honor, there are three

15   significant matters on for hearing on the 13th.  The first is

16   the Debtor's motion to approve a settlement with HarbourVest,

17   which Mr. Dondero is contesting.  Depositions are being

18   conducted on Monday, and we anticipate an evidentiary hearing

19   in connection therewith.

20       The Debtors, as Mr. Morris indicated earlier on in the

21   hearing, have also filed a complaint and a motion for a

22   temporary restraining order against certain of the Advisors

23   and Funds owned and controlled by Mr. Dondero which relate to

24   the CLO management agreements for which Your Honor has heard a

25   lot of testimony today.  We also expect that TRO to be

1   contested and for the Court to have an evidentiary hearing.

2       And as Your Honor mentioned, the confirmation of the plan

3   was scheduled for Wednesday, and there were 15 objections.  I

4   would point out, Your Honor, all but four of which were Mr.

5   Dondero, his related entities that he owns or controls, and

6   employees or former employees.

7       The Court previously gave us time on the 13th and the

8   14th, I think anticipating that we would have a lot and it may

9   be necessary to go into two days.  However, Your Honor, those

10  two days are not going to be enough to deal with all the

11  issues that we have before Your Honor.

12      So what we suggest, and we've spoken to the Committee and

13  the Committee is supportive, that we continue confirmation to

14  a day around January 27th.  This will enable the Debtor to not

15  only -- and the Committee -- not only to take Your Honor up on

16  what you'd like to see accomplished in the next few days.  I'm

17  sure the Debtor is supportive and will be supportive, and we

18  hope the Committee will engage in good-faith negotiations, and

19  if there's a way to do a pot plan, we are all for it.  It'll

20  give time for that to happen.

21      But at the same time, and I think what you'll hear from

22  Mr. Clemente, that we're willing to give a continuance, we all

23  know that if there is not a settlement to be had, if there is

24  not a pot plan to be had, this case has to confirm, it has to

25  exit bankruptcy, and at least from the Debtor's perspective, a

1  lot of protections will have to be in place that basically

2  this has not just been a pit stop in Bankruptcy Court and we

3  return to the litigation ways that Highland is involved in.

4      So, Your Honor, we believe that the two evidentiary

5  hearings on for next week probably will fill up both days.  We

6  would suggest that the first day be the complaint and the TRO

7  against the Advisors and the Funds for the 13th, and the 14th

8  be the HarbourVest.

9      We also recognized as we were preparing for today, Your

10  Honor, looking ahead, that we thought it was not fair for us,

11  although we know Your Honor works tirelessly and as hard as

12  anyone on this hearing and that Your Honor would be prepared

13  for confirmation and would be prepared for each of those

14  trials, given the gravity of these issues, the extensive

15  pleadings, pleadings that you would get in confirmation on

16  Monday from the Debtor, that it made sense to continue the

17  hearing.

18      So, again, fully supportive of Your Honor's mandate to try

19  to see if we could work things out, fully supportive of a

20  continuance until the 27th, if that date works for Your Honor,

21  but we believe we do need to go ahead with the two matters

22  that are on for calendar next week.

23          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

24  May I be heard briefly?

25          THE COURT:  Oh my goodness.  Who do you represent,

 1    Mr. Rukavina?

 2            MR. RUKAVINA:  And I apologize -- Your Honor, I am

 3    the new counsel who will be representing the Funds and

 4    Advisors.  I will probably be taking the laboring oar at

 5    confirmation.

 6        I apologize I'm not wearing a suit and tie.  I did not

 7    anticipate speaking right now.

 8        I support -- to the extent that that's an oral motion for

 9    continuance by Mr. Pomerantz, I certainly support that.  I

10    would suggest that the Court give us an understanding of that

11    today, because we do have depositions and discovery lined up

12    which we can then push if the hearing on confirmation is

13    pushed to the 27th.  And we have no problem going forward on

14    the other matters on the 13th.

15        So, I am co-counsel to K&L Gates, Your Honor, so whoever

16    the K&L Clients are, they're now my clients as well.  I just

17    wanted to be heard briefly that we support the recommendation

18    by Mr. Pomerantz and just urge that the Court give us finality

19    on that issue today so that we're not burning the midnight

20    oil, many sets of lawyers preparing for confirmation on the

21    13th.

22        Thank you for hearing me, Your Honor.

23            THE COURT:  All right.  So, just to be clear, the

24    proposal is that we go forward next Wednesday on the newest

25    request for a TRO with regard to -- is -- the CLO Funds and

1   the Advisors.  I'm forgetting the exact names.  And then that

2   would take likely the whole day, but whether it does or does

3   not, we would roll over to Wednesday of next week -- that'd be

4   the 14th -- to do the HarbourVest.  It's a compromise motion,

5   right?  Is there anything else?

6           MR. POMERANTZ:  No, correct, it's the compromise

7   motion, Your Honor.  There are two pending objections on this

8   and discovery scheduled for Monday.

9           THE COURT:  All right.  Well, as far as --

10          MR. CLEMENTE:  Your Honor?

11          THE COURT:  Yes, who is that?

12          MR. CLEMENTE:  Oh, Your Honor, it's Matt Clemente at

13  Sidley on behalf of the Committee.  I'm here, and I thought

14  maybe I'd offer just a couple of comments at this point, but

15  I'm happy to hold them.

16          THE COURT:  Well, --

17          MS. SMITH:  And Your Honor, this is Frances Smith.  I

18  would also like to be heard before you wrap up.

19          THE COURT:  Okay.  Well, I guess generally I want to

20  know, does anyone have any objection -- I can't imagine they

21  would -- but any objection to pushing confirmation out to

22  around the 27th?  I'm going to say that because I have an

23  issue middle of the day the 28th.  If we do it the 27th, I

24  could only go a day and a half, okay?  I have to go out of

25  town the evening of the 28th, and I would be out the 29th as

1　well.  That's Thursday and Friday.  So we'll talk about that.

2　But anyone, Mr. Clemente or anyone else, want to say anything

3　about continuing the confirmation?

4　　　　　MR. CLEMENTE:  Your Honor, it's Matt Clemente at

5　Sidley.  No, Your Honor, we're supportive of that schedule.

6　　　And Your Honor, just briefly, I heard my name discussed

7　quite a bit at this hearing as well as the Committee.  I'm not

8　going to get into it unless Your Honor would like me to, but

9　let me be very clear:  The committee has taken very seriously

10　the pot plan proposals that Mr. Dondero has presented, and

11　there's much more to the discussion other than what Mr. Lynn

12　suggested in his remarks.

13　　　So I'm not going to get into all that unless Your Honor

14　thinks it's necessary.  I think it's of no moment here.  But I

15　did want Your Honor to know that we have carefully considered

16　the pot plan proposals and have communicated a variety of

17　issues about that to Mr. Lynn and will continue to take the

18　direction of Your Honor and engage on a pot plan, Your Honor.

19　But I did not want there to be any suggestion that we did not

20　take it seriously and that there was much, much more

21　consideration and discussion about it than what was suggested.

22　　　　　THE COURT:  Uh-huh.

23　　　　　MR. CLEMENTE:  Thank you, Your Honor.

24　　　　　THE COURT:  All right.

25　　　　　MS. SMITH:  Your Honor, this is Frances Smith.

1          THE COURT:  Who do you represent, Ms. Smith?

2          MS. SMITH:  Your Honor, we were recently retained by

3  the four senior employees:  Tom Surgent, Frank Waterhouse,

4  Scott Ellington, Isaac Leventon, along with Baker & McKenzie,

5  and I believe we have the Baker & McKenzie lawyers Deb

6  Dandeneau and Michelle Hartmann on the line.

7      Your Honor, we have listened to the whole hearing.  And I

8  was not going to make an appearance.  I was following your

9  instructions and listening carefully.  But Your Honor, I --

10  first of all, we hate to be before you for the first time in a

11  discovery dispute.  We did file a very limited objection to

12  the plan because of the disparate treatment of our clients,

13  which we are not arguing today, of course.  We received -- it

14  is our usual practice, Your Honor -- you've known me for a

15  long time -- to cooperate on having witnesses appear.  We got

16  -- we were notified very late Tuesday that the Debtor's

17  counsel would like two of our clients to appear.  We made what

18  we thought was a reasonable request for a copy of the

19  transcript from the deposition.  We were invited to the

20  deposition and then told we could not attend, or our clients

21  could not attend.  When we offered to make it lawyers-only,

22  they said no.  So we did not produce our clients without a

23  subpoena.

24      Our clients have not been evading service.  As far as we

25  know, they were each attempted service one time, late

1  Wednesday, when they were -- around dinnertime.  Mr. Leventon

2  was home all day today.  Didn't go any -- or yesterday.

3  Didn't go anywhere.  Was not served.  Wasn't served this

4  morning.  The same, as far as we know, with Mr. Ellenton.

5      Your Honor, on the order that you just entered, I am a

6  little unclear of where your findings of fact stopped.  First

7  of all, I do not think that you can enjoin Mr. Ellenton and

8  Mr. Leventon.  They are not parties to the adversary

9  proceeding.

10     You know, we did some very quick research.  There's a

11  Seventh Circuit case, a district court may not enjoin

12  nonparties who are not either acting in concert with an

13  enjoined party nor in the capacity of agents, employees,

14  officers of the enjoined party.  Mr. Ellington and Mr.

15  Leventon are not agents, employees, officers of Mr. Dondero.

16  So I think that, Your Honor, you cannot make that ruling.

17     Of course, you can rule that Mr. Dondero cannot talk to

18  Mr. Leventon and Mr. Ellington.  That might be a way to fix

19  that one part.  But as nonparties, I don't believe that you

20  can enjoin them.

21     Also, Your Honor, there was just no evidence against them

22  to support that.  Out of more than two dozen exhibits, there

23  was one mention of Mr. Leventon, where all he did was give Mr.

24  Dondero Matt Clemente's phone number.  And you yourself ruled,

25  Your Honor, that Mr. Dondero could speak with the Committee,

1   so that wouldn't even have been a violation of your orders.

2   There's three related to Mr. Ellington, but no evidence of

3   confidential information.

4        And, Your Honor, I'm very concerned about the comments

5   that you made about Mr. Ellington and perjury.  I just want to

6   make sure that it's clear on the record that those were not

7   findings of fact.  That did not -- there was no evidence about

8   that today.  And I understand Your Honor's frustration.  I was

9   -- but I just want to be very clear on the record that those

10  were not findings of fact that you were making during that

11  part of your comments.  I was a little unclear about where the

12  ruling exactly stopped when you said you wanted to add onto

13  the order and then you were going to make a few more comments.

14       So that's all I have, Your Honor.

15            THE COURT:  Okay.

16            MS. SMITH:  Thank you for listening and --

17            THE COURT:  Thank you.  Fair comments, one and all.

18  I'm first going to tweak.  I was concerned.  You heard me

19  express concern about, you know, Ellington and Leventon aren't

20  parties to this adversary.  Not here.  So here's -- Mr.

21  Morris, I assume you're the scrivener.  Let's change what I

22  said earlier and have the injunction read that Mr. Dondero

23  shall not request that Mr. Ellington or Mr. Leventon share any

24  confidential information they received as general counsel or

25  assistant general counsel for the Debtor without Debtor's

1  counsel's explicit written permission, nor accept any

2  confidential information that the two of them may have

3  received as general counsel or assistant general counsel for

4  the Debtor.  Okay?  So the injunction is --

5        MR. MORRIS:  Your Honor, if I may, --

6        THE COURT:  Who?

7        MR. MORRIS:  Your Honor, if I may, that is not

8  sufficient for us, because that means that they can actually

9  share it with him as long as he doesn't request it.  I'm a

10 little surprised --

11       THE COURT:  No.  You didn't hear the accept -- the

12 last part.

13       MR. MORRIS:  Okay.

14       THE COURT:  I added on at the end, nor shall Mr.

15 Dondero accept any confidential information.  They -- he shall

16 not request that they share it, nor shall he accept it.  Okay?

17 I --

18       MR. MORRIS:  So, but that -- my concern is that that

19 makes Mr. Dondero the arbiter of what's confidential and

20 what's privileged.  And I think that's improper.  I think it's

21 really reasonable, and I'm surprised -- you know, we're all

22 advocates here, so I take no issue with counsel, but the order

23 was going to be pretty simple:  Don't disclose privileged or

24 confidential information.  If they don't like that, that's

25 fine.  Just bar Mr. Dondero from speaking to either one of

them, period, full stop.  Because we should not be in a

position where he doesn't request it but somehow they send it

to him.  It is confidential.

I mean, who's deciding what's confidential here?  Mr.

Ellington?  Mr. Leventon?  Mr. Dondero?  Just stop their

communication.  Mr. Dondero is subject to the Court's order.

He's the one who's subject to this motion.  Bar him from

speaking to either one of them.  It's a very -- very simple

solution.

MR. BONDS:  Your Honor, I agree that it's a simple

solution.  It's, I mean, not correct to assume that Mr.

Dondero is in any way going to breach his obligations to the

Court or to Mr. Ellington and Mr. Leventon.  I don't see where

-- what we're talking about.

MS. SMITH:  Also, Your Honor, I have to object to him

disparaging my clients that way.  There's been no evidence

that they improperly shared any information.  They are

licensed lawyers and they know the Rules of Professional --

they know the rules of professionalism, so --

THE COURT:  Okay.  I, you know, I didn't make a

finding earlier when I held out my two giant takeaways, to get

to your later question, no findings.  But I really hope you

share with them everything I said, the concerns I expressed.

Maybe get the transcript.

MS. SMITH:  Absolutely, Your Honor.

1            THE COURT:  Because I have huge concerns about

2    conflicts of interest here.  Okay?  Huge, huge concerns.  I

3    had them back when we had the discovery fight, Committee

4    wanting documents, and, you know, and I still have them.  You

5    know, did Ellington know about the TRO?

6            MS. SMITH:  Understood, Your Honor.

7            THE COURT:  Okay.  So let me backtrack.  We already

8    had a TRO that prevented Mr. Dondero from talking to any

9    employees of the Debtor unless it was about shared services

10   agreement.

11       So, Mr. Bonds, I'm going to flip it back to you on this

12   one.  Why shouldn't I at this point just say, okay, guess

13   what, no talking to Mr. Leventon or Ellington for the time

14   being?  Why --

15           MR. BONDS:  First of all, --

16           MS. SMITH:  Your Honor, that's acceptable to us.

17           THE COURT:  Okay.  What's wrong with that, Mr. Bonds?

18           MR. BONDS:  Your Honor, we don't believe that Mr.

19   Dondero has violated the TRO.

20       And secondly and more importantly, we don't believe that

21   there's any way that you can enter an order that singles out

22   two former employees.  I mean, that's bizarre.

23           THE COURT:  If I'm concerned that it's thwarting the

24   reorganization efforts and there are conflicts of interest

25   here, why can't I?

1          You know, this is -- I hate to say it, but I feel like

2     I've been in the role of a divorce judge today.  We have very

3     much a corporate divorce that has been in the works, unless we

4     get this pot plan on track, okay, and I'm a judge having to

5     enter interim orders keeping one spouse away from the other,

6     keeping one spouse out of the house, keeping one spouse away

7     from the kids.  It's not pleasant at all.  But I don't -- the

8     more I think about it, the more I have authority to do it just

9     to protect, to protect the nest egg here.

10          MS. SMITH:  Your Honor, we are perfectly fine with

11     you enjoining Mr. Dondero from speaking to our clients, and we

12     will convey that to our clients.

13          THE COURT:  Okay.  Mr. Bonds, I can't hear you.

14          MR. BONDS:  I'm sorry, Your Honor.  What evidence is

15     there of irreparable harm as to Mr. Dondero talking with

16     either Mr. Leventon or Mr. Ellington?

17          THE COURT:  Okay.  Do I need to parse through the

18     communications I saw?  Do I need to parse-

19          MR. BONDS:  Yeah, I think so.  I mean, I don't

20     understand.

21          THE COURT:  Okay.  I never authorized Mr. Ellington

22     to be the settlement lawyer or whatever, okay?  I never would

23     have, okay?  And maybe Mr. Seery, you know, said something to

24     -- early on in the case to make him think he had that

25     authority, but no, we're done.  Okay?  And I feel like it's

1    causing more harm than good right now.  Okay?

2        I don't know who instructed all of these Dondero-

3    controlled entities to hire lawyers.  I don't know if

4    Ellington and Leventon have been giving instructions to these

5    entities.  But we've got conflicts everywhere now.  Okay?

6    We've got -- and by the way, I'm just going to list them now.

7    We have, of course, Bonds Ellis representing Dondero.  We have

8    Doug Draper, Heller Draper, now representing these trusts, Get

9    Good Trust, Dugaboy Investment Trust.  We have K&L Gates and

10   now Munsch Hardt also representing the Advisors, NexPoint and

11   the various CLO or other Funds.  We have CLO Holdco

12   represented by Kane Russell Coleman Logan.  We have NexPoint

13   Real Estate represented by Wick Phillips.  Who have I left --

14   and, of course, the employees, Baker & McKenzie and Ms. Smith.

15   We have Spencer Fane in there for other current or former

16   employees.  We have Loewinsohn Flegle in there for certain

17   former or current employees.

18       I mean, the proliferation of lawyers.  And again, I don't

19   know if Mr. Ellington and Mr. Leventon have had a role in

20   hiring counsel, wearing their hat for these other entities or

21   not.  Can anyone tell me?  Maybe I'm worried about something I

22   shouldn't be worried about.

23           MR. DONDERO:  You're worried about something you

24   shouldn't worry about, Your Honor.

25           THE COURT:  Okay.  So Ellington --

1          MR. MORRIS:  Your Honor, I would just point to the

2    evidence that's in the record, Your Honor.  You have Mr.

3    Dondero asking Mr. Ellington to show leadership in

4    coordinating all of the lawyers you just mentioned.  It's in

5    the record.

6          THE COURT:  Yes.  I'm just going to, until otherwise

7    ordered, no conversations between Dondero and Ellington and

8    Leventon, and that's just going to be my ruling until further

9    order.  That's what I feel best about.

10        Now, let me ask you, knowing that I could only give you a

11   half a day on the 28th of January, if we start the

12   confirmation hearing on whatever the plan looks like on

13   January 27th, I mean, do people want to go with that, --

14         MR. POMERANTZ:  Your --

15         THE COURT:  -- even knowing we might not finish that

16   day, or no?

17         MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

18   Maybe if we could start on the 26th, have the 26th, 27th, and

19   then maybe half of the 28th.  I would think two and a half

20   days should be enough, notwithstanding the volume of

21   objections, because I think you'll find that, while there may

22   be some evidence, I think the majority of the objections are

23   really legal in nature.

24         THE COURT:  All right.  Traci, are you out there in

25   video-land?

1        THE CLERK:  Yes, I'm here.

2        THE COURT:  Okay.  Have I overcommitted the 26th?  If

3   we start the 26th at 9:30 in the morning, can we do that?  Or

4   --

5        MR. BONDS:  Your Honor?

6        THE CLERK:  That'd be fine.

7        THE COURT:  Okay.

8        THE CLERK:  Just remember that you have an

9   appointment at lunchtime that day at noon on the 26th.

10       THE COURT:  Okay.  I --

11       THE CLERK:  You don't have any court hearings.

12       THE COURT:  Okay.

13       MR. BONDS:  Your Honor, I'm sorry.

14       THE COURT:  Go ahead.

15       MR. BONDS:  Your Honor, I'm sorry.  This is John

16   Bonds.  I have a hearing on the 26th that I can't miss.

17       THE COURT:  Well, can someone else --

18       MR. POMERANTZ:  Your Honor, we would request, right,

19   that Mr. Lynn lead the confirmation hearing.  There's a lot of

20   lawyers.  If we try to look at everyone's calendar, we're

21   never going to be able --

22       THE COURT:  Yes.

23       MR. POMERANTZ:  -- to get something that's good for

24   everyone.

25       THE COURT:  Okay.  Yes.  Well, Mr. Lynn or Mr. Assink

1  can handle it, Mr. Bonds.

2      So we're going to start the 26th at 9:30.  We'll go all

3  day, except I have something at lunchtime, apparently.  And

4  then we'll go all day on the 27th, and then I can give you

5  half a day on the 28th.

6      So you'll upload immediately a notice to that effect, Mr.

7  Pomerantz.

8          MR. POMERANTZ:  Yes, we would.

9      Your Honor, in terms of our documents in support of

10  confirmation, we want to make it convenient with the Court.

11  We know your Court would at least need one business day, so we

12  would prefer to file, say, by 2:00 Central on the 24th, on a

13  Sunday.  Everyone will have it, and have one business day.  I

14  mean, the old order only had one business day in advance as

15  well.  So that's what we would propose for our confirmation

16  documents to be filed.

17          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

18  An important issue here is how the creditors have voted, and I

19  have no idea how they have voted.  The voting deadline has

20  expired.  So I have no problem with what Mr. Pomerantz

21  suggests, but I do think that the Debtor should file its

22  tabulation of votes sooner rather than later so we all know

23  one of the central elements for the hearing that we'll have.

24          THE COURT:  Okay.

25          MR. POMERANTZ:  That's fair, Your Honor.  We're

1    prepared to file the summary of voting and tabulation by the

2    15th of January.

3           THE COURT: Okay. Very good.

4      So, backing up, Mr. Pomerantz, you asked that I approve

5    you filing any plan modifications by noon on Sunday, the 24th?

6    Is that what you said?

7           MR. POMERANTZ: Yeah. So, there's a couple of

8    things. There's our confirmation brief.

9           THE COURT: Uh-huh.

10           MR. POMERANTZ: There is our -- any evidence we would

11    submit, although I suspect we are likely to provide live

12    testimony, as opposed to a declaration. There was our summary

13    of ballots, which we will now do on the 15th. And to the

14    extent we have any modifications, we would provide them on

15    Sunday by 12:00 noon Central time as well. Yes.

16           THE COURT: All right.

17           MR. RUKAVINA: Well, Your Honor, this is Davor

18    Rukavina. Does that mean the witness and exhibit lists also

19    will not be due until Sunday at noon? Because I would request

20    that we have the normal period of time to exchange exhibits

21    and witnesses.

22           MR. BONDS: Your Honor, I think that the normal time

23    period is also important in this case.

24           THE COURT: Okay. I'm going to --

25           MR. POMERANTZ: Your Honor, we could -- if everyone

1  agrees on witness lists, we could do those by 5:00 p.m.

2  Central on the 22nd.

3          THE COURT:  Okay.  Let's do that.  Okay.

4          MR. POMERANTZ:  But that -- but that needs to be for

5  everybody.

6          THE COURT:  Oh, it will be for everyone.

7          MR. RUKAVINA:  Your Honor, no problem.

8          THE COURT:  Okay.  Let's --

9          MR. POMERANTZ:  5:00 p.m. Central Standard Time.

10          THE COURT:  No more discussions.  That'll be the

11  ruling, okay?  Everything is going to be due by 5:00 p.m.

12  Central time on Friday, the 22nd.  All right.

13          MR. POMERANTZ:  Your Honor, is that our brief as

14  well, or --

15          THE COURT:  Yes.

16          MR. POMERANTZ:  -- was that just the witness list?

17          THE COURT:  Everything.  Brief, witness list, and --

18          MR. POMERANTZ:  Okay.

19          THE COURT:  -- plan mods.

20      Let me look through my notes and see if there's anything

21  else I want to say.  You know, let me do some quick math here.

22  I know there was one other thing I wanted to say that involves

23  math.  Okay.  I think my math is right here.  Okay.  You know,

24  I mentioned the proliferation of lawyers.  And let me just say

25  this.  We had -- we've had about 90 people on the -- showing

 1   up on the video screen today -- 89, 90, 91, 92.  A few, a

 2   little over 90.  Okay?  So let's say 90.  It's been up to 95

 3   earlier.  But let's pretend that 60 of those are lawyers

 4   billing by the hour.  That's very conservative.  Probably many

 5   more than 60.  And let's assume conservatively that the

 6   average billing rate is $700 an hour.  That's probably very

 7   low, right?  We probably don't have many baby lawyers on the

 8   phone.  So that's a very low average.  So, 60 lawyers times

 9   $700 an hour, $42,000 an hour this hearing has cost.  And then

10   we've been going over seven hours.  So let's say seven,

11   conservatively, times $42,000.  This hearing has cost $294,000

12   today.  A preliminary injunction hearing.  I mean, no one

13   thinks that's chump change.  I don't know, maybe some people

14   do.  This just seems like a ridiculous way to spend resources.

15   No offense to all the wonderful lawyers, but this is just --

16   it's crazy-town, right?  It is crazy-town.  So I implore you,

17   okay, how about I use that word, I implore you to have these

18   good-faith discussions on a pot plan.

19       Please, Mr. Dondero, I mean, don't waste people's time.

20   $160 million, I know that's not going to cut it.  Okay?  So

21   it's going to have to be more meaningful.  I just know that in

22   my gut.

23       But having said that, I mean, I honestly mean I think a

24   pot plan -- I think you getting your baby back is the best

25   thing for everyone.  Okay?  I think it's the best thing for

1   everyone.  So I want you all to --

2         MR. DONDERO:  Judge, I -- Judge, I just need to

3   interject for a second, because no one follows the big

4   picture.  We filed for bankruptcy with $450 million of assets.

5   $360 million of third-party net assets, $90 million of

6   affiliated notes.  The third-party assets are down to $130

7   million and falling fast.

8         MR. POMERANTZ:  Your Honor, I hate to interrupt Mr.

9   Dondero, but that is not the purpose of this hearing.

10         THE COURT:  Well, --

11         MR. POMERANTZ:  Mr. Dondero's statement of the assets

12   and value is just not something that the Debtors would agree

13   and support.  I'm sure it's not something the creditors -- I

14   think we understand what Your Honor is saying.  I think the

15   Committee understands.  And Your Honor knows that the Debtor

16   and the Committee are close to the asset values.  And Mr.

17   Dondero should be making his argument to the Debtor and the

18   Committee, not Your Honor, in this open forum.

19         THE COURT:  Okay.

20         MR. POMERANTZ:  It's just not appropriate.

21         THE COURT:  And I understand where you're both coming

22   from.  And he's saying that because I made the comment I made

23   about $160 million not being enough.

24      I've seen the evidence.  I've heard the evidence at prior

25   hearings, Mr. Dondero.  We've had a lot of hearings.  And I

1　remember writing that down.  Wow, why did that happen?  Seeing

2　the dissipation of value.  I couldn't remember the exact

3　numbers, but I thought it was like $500 million something and

4　then $300 million or whatever.  And I remember Multi-Strat,

5　that being sold, and blah, blah, blah, blah.

6　　But having said that, there are a lot of causes of action

7　that have been hinted at by the Creditors' Committee and

8　others.  So, causes of action is one of the things they are

9　looking at when they start thinking about what's appropriate

10　value.

11　　So I just, I get where everyone is coming from.  I get

12　where everyone is coming from.  But, again, let's take one

13　more stab at this, please.  Okay?

14　　　　MR. POMERANTZ:  Yeah.  And Your Honor, my last

15　comment.  We're commercial people.  The creditors are

16　commercial people.  I think we've done a tremendous job in

17　being able to resolve most every one of the significant

18　claims.  I think the Court should trust the process.  Mr.

19　Dondero should trust the process.

20　　And again, if there's a commercial deal to be worked out,

21　I don't think there's anyone more than of course the Debtor

22　and the people on the Committee, who have been litigating in

23　many cases with Mr. Dondero and Highland for ten years, I

24　don't think it's anyone's desire.  So if there's a reasonable,

25　rational proposal that the creditors can get behind and want

1    to engage, then there'll be a discussion.  If they don't

2    believe it's a reasonable, rational proposal, they won't.

3         THE COURT:  Yes.  All right.  Well, I do feel very

4    good about what I've heard about the UBS issues being worked

5    out.  I mean, we have come a long way in 15 months, even

6    though it's frustrating to me and others.  But, again, I know

7    you all are going to do what you need to do.  And I'll look

8    for the form of order.  I'm going to see you all, Mr. Dondero,

9    including you, next Wednesday.  And if there's nothing else,

10   we stand adjourned.

11        MS. SMITH:  Your Honor, I'd like to review the form

12   of order as it regards my clients before it's submitted.

13        THE COURT:  Okay.

14        MS. SMITH:  If I could have a courtesy copy, please.

15        THE COURT:  Yes.  Well, yes.  I'm not going to

16   require 90 lawyers to get the order, but I will ask Mr.

17   Pomerantz, Mr. Morris, make sure Ms. Smith gets it and

18   obviously Mr. Dondero's counsel gets it.  And I probably won't

19   get it until Monday, it sounds like, but --

20        MR. POMERANTZ:  That's likely.

21        THE COURT:  But I'll be on the lookout for it.  Okay.

22   Thank you.  We stand adjourned.

23        MS. SMITH:  Thank you, Your Honor.

24        THE CLERK:  All rise.

25        MR. MORRIS:  Thank you, Your Honor.

204

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 4:09 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    CERTIFICATE

19       I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
20  above-entitled matter.

21    **/s/ Kathy Rehling**                          **01/11/2021**

22  _____    _____
    Kathy Rehling, CETD-444                          Date
23  Certified Electronic Court Transcriber

24

25

205

INDEX

1

PROCEEDINGS                                            3

2

OPENING STATEMENTS

3

- By Mr. Morris                                       5

4

WITNESSES

5

Plaintiff's Witnesses

6

James D. Dondero

7

- Direct Examination by Mr. Morris                   19
- Cross-Examination by Mr. Bonds                    106
8
- Redirect Examination by Mr. Morris               139

9

EXHIBITS

10

Plaintiff's Exhibits A through Y          Received 38

11

CLOSING ARGUMENTS

12

- By Mr. Morris                                     152
13
- By Mr. Lynn                                       155
- By Mr. Bonds                                      159
14

RULINGS                                        163/189

15

END OF PROCEEDINGS                                  204

16

INDEX                                               205

17

18

19

20

21

22

23

24

25

# EXHIBIT 39

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION

                              )    Case No. 19-34054-sgj-11
In Re:                        )    Chapter 11
                              )
HIGHLAND CAPITAL              )    Dallas, Texas
MANAGEMENT, L.P.,             )    Tuesday, January 26, 2021
                              )    9:30 a.m. Docket
          Debtor.            )
                              )    MOTION FOR ENTRY OF ORDER
                              )    AUTHORIZING DEBTOR TO
                              )    IMPLEMENT KEY EMPLOYEE
                              )    PLAN [1777]
_____)
                              )
HIGHLAND CAPITAL              )    Adversary Proceeding 21-3000-sjg
MANAGEMENT, L.P.,             )
                              )
                              )
          Plaintiff,          )
                              )
v.                            )    PLAINTIFF'S MOTION FOR A
                              )    PRELIMINARY INJUNCTION AGAINST
HIGHLAND CAPITAL              )    CERTAIN ENTITIES OWNED AND/OR
MANAGEMENT FUND ADVISORS,     )    CONTROLLED BY MR. JAMES
L.P., et al.                  )    DONDERO [5]
                              )
          Defendants.         )
_____)
```

                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:          Jeffrey Nathan Pomerantz
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd.,
                          13th Floor
                         Los Angeles, CA  90067-4003
                         (310) 277-6910

For the Debtor:          John A. Morris
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 3                                One South Dearborn Street
                                  Chicago, IL  60603
 4                                (312) 853-7539

 5   For CLO Holdco, Ltd.:        John J. Kane
                                  KANE RUSSELL COLEMAN LOGAN, P.C.
 6                                901 Main Street, Suite 5200
                                  Dallas, TX  75202
 7                                (214) 777-4261

 8   For Certain Defendants:      Davor Rukavina
                                  Julian Vasek
 9                                MUNSCH, HARDT, KOPF & HARR
                                  500 N. Akard Street, Suite 3800
10                                Dallas, TX  75201-6659
                                  (214) 855-7587
11
     For Certain Defendants:      A. Lee Hogewood, III
12                                Emily Mather
                                  K&L GATES, LLP
13                                4350 Lassiter at North Hills
                                    Avenue, Suite 300
14                                Raleigh, NC  27609
                                  (919) 743-7306
15
     For James D. Dondero:        John T. Wilson
16                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
17                                420 Throckmorton Street,
                                    Suite 1000
18                                Fort Worth, TX  76102
                                  (817) 405-6900
19
     For the U.S. Trustee:        Lisa L. Lambert
20                                OFFICE OF THE UNITED STATES
                                    TRUSTEE
21                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
22                                (214) 767-8967

23   Recorded by:                 Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
24                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
25                                (214) 753-2062
```

3

1 Transcribed by:   Kathy Rehling
             311 Paradise Cove
2            Shady Shores, TX   76208
             (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

4

<u>DALLAS, TEXAS - JANUARY 26, 2021 - 9:40 A.M.</u>

1
 

2        THE COURT:  All right.  We have Highland settings

3 this morning:  a Motion for Approval of a KERP, which I didn't

4 see objections to, and then a Preliminary Injunction hearing.

5 Let me get appearances from the parties who have filed

6 pleadings.

7    For the Debtor team, I see Mr. Morris.  Who do we have

8 appearing?

9        MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

10 Pomerantz and John Morris appearing on behalf of the Debtor.

11 I will handle the KERP motion, which we'll propose goes first

12 and quickly, and then Mr. Morris will handle the adversary

13 proceeding.

14        THE COURT:  All right.  Very good.

15    All right.  Let me get appearances from the Defendants in

16 the preliminary injunction matter.  Do we have Mr. Kane or

17 someone for CLO Holdco?

18        MR. KANE:  Yes, Your Honor.  John Kane for CLO

19 Holdco, Ltd.

20        THE COURT:  All right.  What about for the Funds and

21 Advisors?  I guess we have a couple of law firms involved.

22 Who do we have appearing for the K&L Gates firm?

23        MR. HOGEWOOD:  Good morning, Your Honor.  This is Lee

24 Hogewood with K&L Gates, and also with our firm appearing

25 today is Emily Mather.

5

1          THE COURT:  Okay.  I didn't get Emily's last name.

2   Could you repeat that?

3          MR. HOGEWOOD:  I'm sorry, Your Honor.  Emily Mather,

4   M-A-T-H-E-R.

5          THE COURT:  Thank you.

6      All right.  For the Munsch Hardt team, do we have Mr.

7   Rukavina or someone else appearing?

8          MR. RUKAVINA:  Your Honor, good morning.  This is

9   Davor Rukavina.  I represent all of the Defendants in the

10   adversary except CLO Holdco.

11      Pursuant to the Court's instructions, Mr. Dondero is also

12   present here in my conference room, so he is here.  He is not

13   on the camera, but he is here.

14          THE COURT:  Okay.  All right.  And does Mr. Dondero

15   have counsel, his individual counsel appearing today?

16          MR. WILSON:  Your Honor, John Wilson for Jim Dondero.

17          THE COURT:  Okay.  Thank you.  Do we have Creditors'

18   Committee lawyers on the phone today?

19          MR. CLEMENTE:  Yes, Your Honor.  Good morning.

20   Matthew Clemente; Sidley Austin; on behalf of the Official

21   Committee of Unsecured Creditors.

22          THE COURT:  All right.  Thank you.

23      All right.  Well, obviously, if any other lawyer is dying

24   to chime in at some point today, I will consider letting that

25   happen.  But, again, I think we've got the parties who have

1    filed pleadings having appeared at this point.  So, let's turn

2    to the KERP motion.  Mr. Pomerantz?

3              MR. POMERANTZ:  Yes, Your Honor.  Good morning again.

4    On January 19th, the Debtor filed its motion for approval of a

5    Key Employee Retention Program which would substitute out its

6    annual bonus plan.

7        We have not received any opposition to the motion,

8    although the United States Trustee did ask some questions

9    which we are prepared to address in connection with the

10   proposed proffer of Mr. Seery's testimony.  I'm happy to make

11   a full presentation of the motion to Your Honor, if you would

12   like, or I could just present Mr. Seery's proffer, which I

13   should -- which I believe will establish the factual predicate

14   and the evidence to support the motion.

15             THE COURT:  All right.  Let's just go straight to the

16   proffer, please.

17             MR. POMERANTZ:  Okay.  Thank you, Your Honor.

18               PROFFER OF TESTIMONY OF JAMES P. SEERY

19             MR. POMERANTZ:  Mr. Seery is on the video today, and

20   if he was called to testify he would testify that his name is

21   James P. Seery, Jr. and that he is the chief executive officer

22   and chief restructuring officer of Highland Capital

23   Management.

24       He would also testify that he was one of the independent

25   directors appointed to the Court on January 9th, 2020.

1   Because of his role with the Debtor, he is familiar with the

2   company's day-to-day operations, including its -- the

3   company's employee and wage benefit and bonus plans relating

4   to the employees.

5       He would testify that he has been involved in the

6   negotiation and drafting of the company's plan of

7   reorganization, and is familiar with the expected operation of

8   the Claimant Trust and Reorganized Debtor post-confirmation in

9   connection with the plan.

10      He would testify that the plan generally provides for the

11  monetization of the company's assets for the benefit of

12  creditors and stakeholders, and he would testify that, as part

13  of the plan process, he worked closely with DSI, the company's

14  financial advisor, to assess both the costs of the Debtor's

15  current employee base and the projected cost of operations in

16  connection with the Reorganized Debtor and Claimant Trust

17  following the effective date.

18      He would testify that, to ensure the continued smooth

19  operation of the company in connection with the continuation

20  and consummation of the plan for the benefit of all

21  stakeholders, that he worked with DSI to determine the

22  appropriate staffing needs necessary for the company's

23  remaining operations.

24      He would testify that he analyzed the current employees to

25  determine which, if any, would need to be continued to be

retained by the Debtor and operate during the Reorganized Debtor and Claimant Trust period following the effective date of the plan.

He would testify as part of that analysis he reviewed the roles and functions of the non-insider employees with respect to the services that they needed, and he reviewed the wages, benefits, and bonuses for those remaining non-insider employees necessary for those functions.

He would testify, that based upon his review, the company determined that it was in the best interests of the estate to terminate the existing annual bonus plan, as it was no longer necessary to effectively incentivize the remaining non-insider employees who would be terminated prior to being entitled to any further payments under the annual bonus plan.

He would testify that, instead, the company developed a new retention plan that was designed to incentivize the non-insider employees to remain with the company for as long as they are needed to assist in the effectuation of the plan.

He would testify that Mr. Waterhouse and Surgent, arguably two insiders of the Debtor, are not eligible for the retention plan, and that's not because there is any concern regarding their loyalty, but the Debtor is looking at ways to appropriately incentivize and compensate those people as appropriate in the future.

He would testify that there are a few persons on the list

1   of people who are part of the retention plan with a title that

2   includes director or manager; however, he would testify that

3   none of those individuals are corporate officers or directors

4   of the Debtors -- the Debtor, and that the titles are for

5   convenience only.  He would testify that the individuals who

6   are employed in these roles do not have any authority

7   whatsoever to make any decisions on behalf of the Debtor.

8       He would testify that in connection with the new retention

9   plan, the non-insider employees may be offered the opportunity

10  to enter into a termination agreement with the company that

11  will provide specified benefits and payments in return for the

12  non-insider employee remaining as an employee in good standing

13  with the company through the separation date.

14      He would testify that a key component of the retention

15  plan is that non-insider employees will be entitled to the

16  specific bonus payments provided that they do not voluntarily

17  terminate their employment with the Debtor prior to the

18  separation date and are not terminated for cause.

19      He would testify that that is in contrast to the existing

20  or the prior annual bonus plan, which provided that non-

21  insider employees would not receive their bonus payments if

22  they were not employed by the Debtor on the vesting date for

23  any reason except on account of disability, including

24  termination without cause.

25      Mr. Seery would further testify that the retention plan is

1   being offered to approximately 53 employees, and the projected

2   aggregate amount of payments under the retention plan is

3   approximately $1,481,000, which is $32,000 approximately less

4   than the amount that would have been paid to such employees

5   under the annual bonus plan.

6       He would testify that the retention plan includes 20

7   employees who are not entitled to benefits under the annual

8   bonus plan.  Fourteen employees are entitled to receive more

9   under the retention plan than they would have received under

10  the annual bonus plan.

11      With respect to the 20 employees I've previously mentioned

12  who are not otherwise entitled to receive anything under the

13  annual bonus plan, the vast majority of those -- 18 -- will be

14  entitled to payments of $2,500 each, and the other two

15  entitled to payments of $10,000 and $7,500, respectively.

16      Mr. Seery would testify that he believes that these

17  additional payments are reasonable in light of the current

18  status of the company and the value to be added to the estate

19  through the retention of these employees, and that this plan

20  is more accurately and narrowly-tailored to achieve the

21  company's reorganization goals.

22      On this basis, Your Honor, Mr. Seery would testify that he

23  presented the proposed retention plan to the independent

24  directors and they agreed with Mr. Seery's assessment that

25  entry into the retention plan was in the best interests of the

1  estate and its creditors.

2     He would also testify that he had negotiations with the

3  Creditors' Committee and its advisors regarding the retention

4  plan and that the Committee is supportive of the retention

5  plan.

6     And that would conclude my proffer of testimony from Mr.

7  Seery, Your Honor.

8          THE COURT:  All right.  Mr. Seery, if you could say

9  "Testing, one, two" so we can catch your audio and video,

10 please?

11         MR. SEERY:  Testing, one, two, Your Honor.

12         THE COURT:  All right.  There you are.  Please raise

13 your right hand.

14            JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

15         THE COURT:  All right.  Thank you.  Is there anyone

16 who has questions at this time for Mr. Seery?

17    (No response.0

18         THE COURT:  All right.  Well, I'll just double-check

19 with the Committee.  It's been represented that you all are in

20 support of this.  Mr. Clemente, if you could confirm that on

21 the record?

22         MR. CLEMENTE:  That's correct, Your Honor.  The

23 Committee has no objection to the motion, so Mr. Pomerantz's

24 statements are accurate.

25         THE COURT:  All right.  Anyone else?

1          MS. LAMBERT:  This is Lisa Lambert for the United

2     States Trustee.  The U.S. Trustee has reviewed the actual data

3     about the comparatives, and the U.S. Trustee, based on the

4     stipulations, has no objection.

5          THE COURT:  All right.  Thank you.  Anyone else?

6       All right.  Well, the Court will approve this motion.

7     First, while the notice was expedited, the Court finds that it

8     was sufficient under the circumstances.  We are many months

9     into the case, it's been vetted by the Committee, and the

10    Court is satisfied with the level of notice here.

11      The Court finds that this is a KERP that is justified by

12    all the facts and circumstance of this case, to use the

13    wording of Section 503(c)(3) of the Bankruptcy Code.  There

14    also appears to be a very sound business purpose justifying

15    the proposed KERP.  It appears to be reasonable in all ways,

16    and fair under the circumstances, so I do approve it.

17      All right.  So if you all will get the order uploaded

18    electronically, I will promise to sign it promptly.

19          MR. POMERANTZ:  We will do so, Your Honor.  Thank

20    you.

21          THE COURT:  All right.  So, the preliminary

22    injunction.  Mr. Morris, I heard you were going to be taking

23    the lead on that, so go ahead.

24          MR. MORRIS:  Indeed.  Good morning, Your Honor.  John

25    Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

1           THE COURT:  Good morning.

2           MR. MORRIS:  A few items before I give what I hope

3   will be an informative opening statement.  I trust that Your

4   Honor has not had the opportunity, because it was just filed a

5   moment ago, to see that the Debtor filed on the docket notice

6   of a settlement with CLO Holdco, Ltd., one of the Defendants

7   here today.

8           THE COURT:  I have not seen that.  Okay.

9           MR. MORRIS:  Right.  So you'll find that at Docket

10  1838.

11          THE COURT:  Okay.

12          MR. MORRIS:  It really is a very simple settlement,

13  Your Honor.  In exchange for the withdrawal of CLO Holdco's

14  objection to the Debtor's plan of reorganization, the Debtor

15  is dismissing CLO Holdco from this adversary proceeding with

16  prejudice.  There are, you know, some other bells and whistles

17  there, the most important of which to the Debtor is simply

18  that, under the CLO management agreements, most of them but

19  not all of them require that a level of cause be established

20  before the contracts can be terminated, and CLO Holdco has

21  agreed that, before it seeks to terminate a contract for

22  cause, there will be a gating provision or a gatekeeping

23  provision that requires them to come to this Court to simply

24  establish whether or not there is a colorable claim -- not for

25  a determination on the merits, but simply to protect the

1  Debtor from frivolous lawsuits.

2      So that's really the sum and substance of it.  Mr. Kane is

3  on the line now, and if I've either inaccurately or

4  incompletely characterized the settlement, I'm sure he'll take

5  the opportunity to supplement the record.  But we don't see

6  any need, really, to go through a full 9019 motion here.

7  There's no releases.  There's no exchange of money.  It's the

8  withdrawal of a plan objection in consideration for the

9  dismissal of an injunctive proceeding.

10     So we did want to alert you to that.  And as a result,

11  there was one witness that we intended to call today, Grant

12  Scott.  Mr. Scott is the director of CLO Holdco.  And with the

13  resolution of the issues between the Debtor and CLO Holdco, we

14  have no intention of calling Mr. Scott today.  But I'd like to

15  give Mr. Kane an opportunity to be heard just in case he's got

16  anything to add.

17         THE COURT:  All right.  Mr. Kane, can you confirm?

18  Do you have anything to change about what you heard?

19         MR. KANE:  Your Honor, I do not.  The settlement

20  agreement speaks for itself.  We did reach an agreement with

21  Debtor's counsel and the Debtor yesterday evening, fairly late

22  in the evening.  Mr. Morris's synopsis of the proposed

23  settlement is accurate.  The Debtor has agreed to dismiss CLO

24  Holdco from the preliminary injunction adversary proceeding

25  with prejudice.

1            THE COURT:  All right.  Well, thank you.  I've pulled

2   it up on my screen.  It's very short and to the point.  And I

3   agree with the comment of Mr. Morris that I don't think a

4   formal 9019 motion is required here, given no consideration is

5   going back and forth, or releases.  It's just exactly as you

6   described orally.  So, I appreciate that.  It simplifies a

7   little bit what we have set today.  And we will accept this

8   settlement as being in place as we roll forward.  All right?

9   Thank you.

10           MR. MORRIS:  Thank you, Your Honor.

11        So, before I get to the substance of the argument, I would

12  like to take care of some housekeeping items relative to

13  today's proceedings.

14           THE COURT:  Okay.

15           MR. MORRIS:  You know, this has been a bit of a

16  challenge for me personally, and it's going to be a little bit

17  of a challenge today for Ms. Canty, my assistant, in part

18  because it's almost like Groundhog's Day.  This is, I think,

19  the third time that we're covering some of the same issues.

20  We had covered them the first time on December 16th in

21  connection with what I'll now just simply refer to as the

22  Defendants, the Defendants' motion to try to limit the Debtor

23  from trading the CLO assets.  We heard a lot of what we're

24  going to hear today again on January 8th in connection with

25  the preliminary injunction motion against Mr. Dondero.  And so

1    there's already a ton of evidence in the record.  We do

2    believe that we need to present our evidence today, but one of

3    the challenges that we'll face, and I think we'll be able to

4    do it efficiently, Your Honor, is there may just be some back

5    and forth between various documents.  But everything's gone

6    pretty smoothly, and I'm optimistic we'll get through that

7    part of it today.

8         So I want to deal with the exhibits themselves, Your

9    Honor.  As you may have seen, there have been a number of

10   different filings relating to the Debtor's exhibits for this

11   particular motion, and I just want to go through the exhibits

12   and make sure that we're all on the same page here.  I want to

13   tell the Court exactly what happened and why and where we are

14   today.

15        The Debtor timely filed its original witness and exhibit

16   list on January 22nd.  They filed that witness and exhibit

17   list at Docket 39 in this Adversary Proceeding 21-3000.  The

18   exhibit list referenced Exhibits A through I'll just say

19   AAAAA.  It was a lot of exhibits, and somebody had the wise

20   idea to convert them to numbers, but it wasn't me, so I can't

21   take credit.  But we're left with letters, and they go from A

22   through AAAAA.

23        After filing that initial exhibit list, we realized that

24   --

25        (Interruption.)

1              THE COURT:  All right.  Does someone have their

2     device unmuted?  Okay.  It went away.  Go ahead, Mr. Morris.

3              MR. MORRIS:  Thank you.  So, shortly after filing

4     that initial exhibit list, we realized that we forgot to file

5     among the exhibits AAAAA.  So at Docket #40 in the adversary

6     proceeding, the Court can find Debtor's Exhibit AAAAA.

7          And then we're going to -- I'm going to refer in a few

8     minutes -- I'm going to use in a few minutes some

9     demonstrative exhibits, and I'm going to use them again with

10    Mr. Seery.  And these exhibits concern trading in AVYA and SKY

11    securities that you've heard about previously.

12         But I'm pointing that out now because I'm kind of old

13    school, Your Honor, and I won't use a demonstrative exhibit if

14    it doesn't have the evidence in the record.  And what we

15    realized, Your Honor, is we made two additional mistakes on

16    Friday with all the papers that we filed.  The backup for

17    these demonstratives was mistakenly included on the exhibit

18    list for the confirmation hearing as opposed to the

19    preliminary injunction hearing.  That was error number one.

20    And error number two, we hadn't redacted the information to

21    show only the SKY and AVYA.

22         And that's why, Your Honor, at Docket #48, you will find

23    our amended exhibit list that includes what we have identified

24    as Exhibits BBBBB as in boy through SSSSS as in Sam.  And

25    those exhibits, Your Honor, are the backup to the

1  demonstrative exhibits.  I don't expect to use them at all,

2  but I do believe strongly that one should not use a

3  demonstrative exhibit unless the evidence is in the record to

4  support it, and now it is.

5      So that's why, Your Honor, I do appreciate your court

6  staff.  I do appreciate Your Honor.  I think you either had

7  before you and you may have signed an order on redacting.

8  This is what it was all about.  It was just to make sure we

9  had the proper evidence in the record, so I appreciate that.

10     At this time, Your Honor, I think, just because I'll be

11 referring to it in the opening, the Debtor would move for the

12 admission into evidence of Exhibits A through SSSSS.

13         THE COURT:  All right.  Is there any objection?

14         MR. RUKAVINA:  Your Honor, there is.  Your Honor, I

15 object to UUUU.  I'll object to VVVV as in Victor.  I object

16 to AAAAA.  That's it, Your Honor.

17     I will note that there are several exhibits in here of

18 relevance to CLO Holdco that may not be relevant to my

19 clients, but those are my limited objections for now.

20         THE COURT:  All right.  Before we ask the nature of

21 your objection, let me ask Mr. Morris:  Shall we just --

22         MR. MORRIS:  Yeah.

23         THE COURT:  -- carve these out for now, and then if

24 you want to offer them the old-fashioned way, we'll hear the

25 objection then?

1          MR. MORRIS:  Yes, although I can make it very clear

2     that UUUU should not be in there precisely because it's

3     demonstrative.  We had talked that yesterday and I agreed; I

4     just forgot that.  UUUU should not be part of the record.

5          THE COURT:  Okay.  And so you'll just decide later do

6     you want to offer VVVV and AAAAA the old-fashioned way?

7          MR. MORRIS:  Correct.

8          THE COURT:  All right.  So, for the record, I am

9     admitting by stipulation -- with three exceptions I'll note --

10    all of the exhibits of the Debtor that appear at Exhibits 39

11    and, well, and 48.  And we're carving out of that admission

12    UUUU, VVVV, and AAAAA, which actually appears at Exhibit --

13    Docket Entry 40.  Those are not admitted at this time.

14       (Debtor's Exhibits A through SSSSS, exclusive of Exhibits

15    UUUU, VVVV, and AAAAA, are received into evidence.)

16         THE COURT:  All right.  Go ahead, Mr. Morris.

17         MR. MORRIS:  Yes.

18         MR. RUKAVINA:  Well, Your Honor, while we're talking

19    about housekeeping -- Mr. Morris, I apologize.  Is there more

20    housekeeping?

21         MR. MORRIS:  I'd like to continue.  I was going to

22    describe the witnesses.

23              OPENING STATEMENT ON BEHALF OF THE DEBTOR

24         MR. MORRIS:  So, Your Honor, the Debtor is going to

25    call three witnesses today.  The first witness will be Mr.

1   Dondero, the second will be Jason Post, and then the third

2   will be Mr. Seery.

3       Obviously, Mr. Dondero and Mr. Seery are very familiar to

4   the Court and they will cover much but not all of the same

5   ground that you've heard previously.

6       Mr. Post, I believe, is a new witness appearing in this

7   court for the first time. I understand that he is the chief

8   compliance officer of each of the Debtors [sic]. He had

9   worked at Highland Capital Management, the Debtor, for more

10   than a decade, I believe, but moved over to NexPoint to work

11   with Mr. Dondero shortly after Mr. Dondero resigned from

12   Highland Capital on or about October 10th last year.

13       So those are the three witnesses that we plan to present

14   today, and I'd like to describe briefly kind of what we think

15   the evidence will show.

16       The theme from our perspective here, Your Honor, is that

17   this is a case that is about power and not rights. The Debtor

18   brings this motion for preliminary injunction in order to

19   protect itself from the interference of Mr. Dondero and the

20   Defendants, entities that there will be no dispute he owns and

21   controls.

22       You may have read in the papers, and I suspect you will

23   hear today from the Defendants, the clarion call for

24   contractual rights and the need for this Court to protect

25   their contractual rights. This is a red herring, Your Honor.

1    There are no contractual rights at issue here.  What Mr.

2    Dondero and the Defendants really want is to maintain control,

3    or at least to deny Mr. Seery from exercising the Debtor's

4    valuable contractual rights.  If there are any contractual

5    rights at issue here, it is the Debtor's.  The Debtor is the

6    party to the CLO management agreements, and it's those very

7    rights that are being infringed upon.

8        This was supposed to have been resolved 53 or 54 weeks ago

9    now, Your Honor, when Mr. Dondero agreed and this Court

10   ordered that Mr. Dondero could not use related entities to

11   terminate any of the Debtor's agreements.  There is no dispute

12   that each of the Defendants is a related entity for purposes

13   of the January 9th order, since Mr. Dondero and Mr. Norris

14   have already testified that the Defendants are owned and/or

15   controlled by Mr. Dondero.

16       Notwithstanding the plain language of the January 9th

17   order, which Mr. Dondero not only agreed to, but it may be one

18   of the very few orders in this case that he hasn't appealed,

19   notwithstanding the plain language, Your Honor, he persists,

20   and that is why we are here.

21       How do we know that this is about power and not rights?

22   How do we know that everything that's going to be described

23   for you, what the evidence is going to show that this is about

24   power and not rights, is very simple.  Mr. Dondero and Mr.

25   Post will testify -- I'm just going to give four, five, six

1 examples here -- are going to testify that Mr. Seery's AVYA

2 trades were not in the Funds' best interests. It's an

3 irrelevant point, Your Honor. There is no contractual right

4 that gives them the ability to terminate because they don't

5 like trades that are being made. They can sell. If they

6 don't like it, they can sell. That's what's really funny

7 about this.

8 But what's -- what makes it even more clear that this is

9 about power and not rights is the evidence is going to show

10 that Mr. Dondero sold AVYA shares throughout 2020. He sold

11 those shares right up until the day he resigned. And yet six

12 days after resigning, NexPoint sends a letter saying, Don't

13 sell any assets.

14 Ms. Canty, can we put up Exhibit number -- Demonstrative

15 Exhibit 1, please?

16 Okay, Your Honor. We have redacted this to shield from

17 public disclosure the name of each fund that's trading, but

18 the backup, as I alluded to earlier, in Exhibits BBBBB through

19 SSSSS, some portion of those documents, that's where these

20 demonstrative figures come from.

21 And as you can see, beginning on January 29, 2000,

22 continuing through the bottom of the page, October 9th, 2020,

23 when Mr. Dondero left Highland Capital, he traded millions and

24 millions and millions of dollars in AVYA stock.

25 Can we go to Demonstrative Exhibit #2, please?

1      This chart is really -- no, I apologize if I -- the other

2   one.  The AVYA trading activity chart.  Yeah.

3      This one is really interesting, Your Honor, because it

4   shows the trading throughout the year of AVYA stock, and you

5   can see the brown bars there represent Mr. Dondero's trades.

6   And you can see just how many trades there are.  There are

7   over a million shares, I think, if you added it up.  They're

8   represented by the brown bars.  You can see him selling AVYA

9   stock throughout the period, sometimes at a price really near

10  its bottom.

11     And then Mr. Seery tries and actually does sell some stock

12  toward the end of the year.  That's the green bars on the

13  right.  A very, very tiny amount compared to Mr. Dondero.  And

14  he sells it at a substantially greater price than Mr. Dondero

15  sold the AVYA stock.  And yet they're here telling you, Your

16  Honor, that somehow Mr. Seery is mismanaging the CLOs and they

17  disagree with what he's doing and he's not acting in the best

18  interests of the investors.  That's what they want -- but this

19  is what the evidence shows, Your Honor.

20     With respect to SKY, if we could go to the next slide,

21  please.

22     So this is SKY.  Now, Mr. Dondero did not trade any SKY

23  securities, but Mr. Seery did.  And this was another security

24  -- and we'll get to the evidence in a moment -- that Mr.

25  Dondero interfered with and tried to stop.  So Mr. Seery

1    succeeded sometimes and he was stopped sometimes, but the

2    point is, Your Honor, look at the price that Mr. Seery sold.

3         And remember, you heard this before and you're going to

4    hear it again.  Nobody from the Defendants ever asked Mr.

5    Seery, Why do you want to trade this?  Not that they even had

6    to.  Not that Mr. Seery needs to defend himself, frankly.

7    He's got the authority under the management contracts to act

8    in the way that he thinks is in the best interest.  But look

9    at this chart.  He made these sales, Your Honor, at more than

10   twice the price of the bottom.

11        How can they have any credibility?  How can Mr. Dondero

12   and Mr. Post come into this courtroom and assert that Mr.

13   Seery is doing anything other than a fabulous job?  He is

14   selling at the top of the market.  Because they think that

15   some high -- in the future, it's going to go higher?  It's

16   prudent, Your Honor.

17        Mr. Seery is going to tell you the work that he did.  He

18   is going to give you the rationale for his decisions.  And the

19   only conclusion that I hope and believe the Court will be able

20   to reach is that these were not only rational decisions but

21   they were prudent, taking some money off the table when the

22   stock was near its high.

23        That's how we know, this is more evidence how we know this

24   is about power.  It's not about rights.  It's not about

25   justice.  It's not about anything having to do with anything

1  other than Mr. Dondero wanting to maintain control.

2      How else do we know?  What other evidence is there that

3  this is about power and not rights?  Again, the timing.  The

4  calendar here is going to be very, very important.  The first

5  demand from NexPoint from the Defendants that Mr. Seery stop

6  trading came on October 16th.  It was less than a week after

7  Mr. Dondero -- like, where does this come from?  There's no

8  right to demand stopping of trading.  You don't get to do it.

9  And they're going to minimize it.  They're going to spend the

10  whole day, Your Honor, either -- either focusing on the law or

11  trying to minimize.  And they'll say, well, it was just a

12  request, Your Honor.  And if it was a third-party request, I

13  bet Mr. Seery -- Mr. Seery is going to tell you, if it was a

14  third party, he wouldn't care.  But when you put all of this

15  together, it is oppressive.  It is an exertion -- it's an

16  attempt at exertion of control.  That's how it's perceived and

17  that's actually what happened.

18      Do you need more evidence?  Again, they'll talk about

19  termination for cause and how they have the right and the

20  Court -- you, Your Honor, don't have the power to infringe

21  upon their contractual rights.  But there will be no evidence.

22  Absolutely none.  Mr. Post is going to tell you, in fact, that

23  he has no evidence of any breach, of any default, of any

24  reason whatsoever that cause might exist for the termination

25  of these contracts.  That's how you know this is about power

1    and not rights.

2        Last point on the issue of power versus rights:  Who were

3    the counterparties to the CLO agreements?  Did the CLO Issuers

4    -- where are they?  They're not here.  They're not here to

5    tell the Court that Mr. Seery is breaching his duty.  They're

6    not here to tell the Court that the Debtor is in default.  In

7    fact, what Mr. Seery is going to tell you, and it won't be

8    rebutted, is that the CLO Issuers are close to finalizing a

9    deal that will permit the Debtor to assume the CLO management

10    contracts.

11        Mr. Post or Mr. Dondero might get up on the stand today

12    and say, oh, because people have left the firm, that somehow

13    they don't have the ability to service the contracts anymore.

14    You know who doesn't believe that?  The contractual

15    counterparty, the Issuers.  It's about power, Your Honor.

16    It's not about rights.

17        There is substantial evidence that warrants the imposition

18    of a preliminary injunction, substantial evidence, much of

19    which you've heard already.

20        The October and November letters demanding or requesting

21    that the Debtor halt trades.  There's no right to that.

22        Mr. Dondero's interference with the support of Joe Sowin,

23    the Advisors' trader, around Thanksgiving, when they actively

24    moved in.  And it's in the emails.  It's in the record.  We'll

25    put in the record again.

1    And then he made the threat to Thomas Surgent -- Mr.

2  Dondero made the threat to Thomas Surgent about potential

3  personal liability.

4    The ridiculous -- remember the ridiculous motion that was

5  heard on December 16th, a motion so devoid of factual or legal

6  basis that the Court granted the Debtor a directed verdict and

7  dismissed the motion as frivolous?  Notably, neither Mr.

8  Dondero nor Mr. Post testified at that hearing.  Yet, within a

9  week, Your Honor -- the hearing was on a Wednesday.  The

10  hearing was on Wednesday, December 16th.  The Court entered

11  the order on Friday, December 18th.  On Monday, December 21st,

12  the next business day, Mr. Dondero and Mr. Post and the

13  lawyers for the Defendants held conference calls to figure out

14  what to do next.

15    And the very next day, the evidence is going to show --

16  it's already in the record -- Mr. Dondero again actively

17  stopped Mr. Seery's trades from being effectuated.  They sent

18  their first letter.  This is less than a week after that

19  hearing, Your Honor.  They sent another letter asking the

20  Debtor -- again, they requested -- minimize -- this is what

21  you're going to hear:  Well, we just sent a letter requesting

22  no more trading.

23    What happened the next day, December 23rd?  They send

24  another letter and they say, We're thinking about terminating

25  the contracts.  Now we think we're going to terminate the

1 contracts.  And we just want to let you know we're thinking

2 about terminating the contracts.

3     And we call them -- and Mr. Seery is going to testify to

4 this -- we say, What are you doing?  Every time we just said,

5 Please withdraw your letter.  There's no basis for doing this.

6 Leave us alone and let us do our job.  They wouldn't -- they

7 refused to withdraw the letter.

8     And finally -- again, Mr. Seery will testify to this -- we

9 told them, If you think you really have a basis for

10 terminating the contract, make your motion to lift the stay.

11 And if you don't, the Debtor will file the motion that brings

12 us here today.

13     And that's how we got here, because they continued to

14 interfere with the trading.  They continued to send these

15 specious letters that are implicit threats.  Mr. Seery is

16 going to tell you that every one of these, he -- is an

17 implicit threat.  We asked them, Just withdraw the letters and

18 stop it.  We asked them to make their own motion if you think

19 so strongly of it.  They wouldn't do that, either.  They just

20 want it hanging out there.  They just want it all hanging out

21 there over Mr. Seery's head so that he knows somebody's --

22 somebody's watching and somebody's planning, you know, to take

23 action.

24     It's not right, Your Honor.  They have no right to any of

25 this.  There's nothing in the contract that allows them to

1 make even a good-faith -- to make any claim that they have

2 cause to terminate the contract. They have no right under any

3 circumstances to stop Mr. Seery from trading.

4   What they are going to tell you is there's no agreement

5 between the Advisors and the Debtor that requires the Advisors

6 to execute the trades. And they're right about that. They're

7 actually right about that. But here's the thing, Your Honor.

8 What Mr. Seery is going to tell you is that Advisors has the

9 trading desk. For more than a decade, they executed the

10 trades. Through the entirety of this bankruptcy case, until

11 Mr. Dondero left Highland, they executed the trades. Even

12 after Mr. Dondero left Highland in October, they continued to

13 execute the trades. And on December 22nd, they fold their

14 hands and they say, Nope, I don't care about the course of

15 dealing, I don't care what impact it has, you can't make me do

16 it. So Mr. Seery has tried end-arounds, and that'll be in the

17 record, too, and that's when the threats to Surgent come.

18 That's when the threat to Surgent come, when we try to do the

19 workaround. Cannot do it.

20   This is just not right, Your Honor. It's just not right.

21 There's order -- there's the January 9th order. There was the

22 TRO that was in effect that we're going to hear about again,

23 because that TRO not only applied to Mr. Dondero, it prevented

24 him from conspiring with or even encouraging a related entity

25 from engaging in prohibited conduct. And that prohibited

1   conduct, as Your Honor knows, because it's your order, is

2   plain and as unambiguous as can possibly be:  Don't interfere

3   with the Debtor's business.  It's all we're asking for.  It's

4   the only reason we're here today.

5       Interestingly, Your Honor, probably the best piece of

6   evidence that I'll put in front of you today are going to be

7   the words out of Mr. Post's mouth, because basically what he's

8   going to tell you is that, as chief compliance officer, he has

9   never once in the history of his employment told Mr. Dondero

10  to stop.  In fact, what he's going to tell you is that he

11  defers to the investment professionals, and that but for the

12  TRO that is consensually in place today, it would depend on

13  the facts and circumstances as to whether or not he actually

14  does anything as chief compliance officer to stop this

15  conduct.  Depends on the -- maybe he can explain to Your Honor

16  what facts and circumstances he thinks, as chief compliance

17  officer, would allow the Advisors to interfere with the

18  Debtor's business.  It'll be interesting to hear him answer

19  that question.

20      That's all I have, Your Honor.  I look forward to

21  presenting the evidence today.  I'd like this done once and

22  for all.  It's time to move on.  And the Debtor -- the Debtor

23  is in bankruptcy.  Your Honor, I think, has every power, every

24  right, and frankly, you know -- I feel very strongly about

25  this, obviously, Your Honor -- the Debtor needs the breathing

1   space and to be left alone so it can do its job.  And we'll

2   respectfully request at the end of this that the Court enter

3   an order allowing it to do so.

4        Thank you, Your Honor.

5            THE COURT:  All right.  We were hearing some

6   distortion there, I'm not sure where it was coming from, but

7   we'll try to keep it reined in.

8        Mr. Rukavina, your opening statement.

9            MR. RUKAVINA:  Your Honor, thank you.  Can the Court

10  hear me?

11           THE COURT:  Yes.

12         OPENING STATEMENT ON BEHALF OF CERTAIN DEFENDANTS

13           MR. RUKAVINA:  Your Honor, I think it's important

14  first to note a few obvious things.  One, what we're talking

15  about today is enjoining future rights, future rights under a

16  contract.  Hearing Mr. Morris's opening, it sounds like we're

17  trying a breach of contract case.  There is no declaratory

18  relief sought for whether there is grounds for a breach of

19  contract case.  And prior to assumption and prior to

20  confirmation, the automatic stay applies.

21       So let me be clear that what they're asking the Court to

22  do today is to excise from these contracts our rights in the

23  future, effectively for all time, as I'll explain.

24       The second thing that merits real consideration is that it

25  is the Funds, Your Honor, not the Advisors, it is the Funds

1  that have the right to remove the Debtor as manager.

2        Those Funds, as you will hear, have independent boards.

3  Mr. Dondero doesn't own those Funds.  He's not on those

4  boards.  He doesn't control them.

5        When Mr. Morris talks about Mr. Norris's prior testimony,

6  that testimony was limited to the Advisors.  And yes, Mr.

7  Dondero does own the Advisors, and Mr. Dondero, while I won't

8  say controls the Advisors, certainly has a lot of input.  That

9  is not the case for the Funds, which are the ones with the

10  contractual powers here to remove the Debtor.

11        You will hear that those -- that that board or those

12  boards meet frequently, they have independent counsel, and

13  they take separate actions, including very recently where they

14  did not do something that was advised and acted independently.

15        And the third thing that makes this case different and

16  that all of us should bear in mind is that we're talking today

17  about other people's money.  There's more than one billion

18  dollars of investment funds, retirement funds, pension funds,

19  firefighter funds, school funds, wealthy individuals, having

20  nothing in the world to do with Mr. Dondero or anyone in this

21  case.

22        So what we're talking about here today, Your Honor, is

23  that if my retirement manager files bankruptcy, that I for all

24  time would be effectively enjoined from removing him, no

25  matter what he may do in the future, just because he needs

1  that revenue.

2      That is an absolutely inappropriate use of a preliminary

3  injunction.  It is the modification of a contract that the

4  Debtor seeks to assume, and there is going to be no evidence

5  on the underlying elements that the Court must consider.

6      I say that, Your Honor, because I'm new to -- I'm late to

7  this case but I have studied in detail what Your Honor did in

8  the *Acis* case.  And I think that we have to qualitatively

9  differentiate today from *Acis*.  In *Acis*, there were

10  allegations of fraudulent transfer.  When Your Honor enjoined

11  future actions, I believe in part it was because the

12  legitimate owner of those rights might not have been having

13  those rights.

14      So that was a very important difference.  Here, there's no

15  question that we have more than billion dollars of other

16  people's funds at issue.

17      Also in *Acis*, as confirmed by the District Court, there

18  was the exercise of an optional redemption right, which could

19  have very well been used as a weapon to strip the manager of

20  its rights.  That's not the case here today.  We are talking

21  about removing the Debtor in the future -- not today, not

22  prior to assumption, in the future -- for such things as if

23  the Debtor commits fraud, if Mr. Seery is indicted for

24  felonies, if the Debtor absconds with our funds.  We are

25  talking about potential hypothetical actions in the future

1   that are not even ripe based on the Debtor's potential

2   wrongful actions, not based anything on our motivations or our

3   intentions.

4       So this is a different case than Your Honor has heard so

5   far in these cases.  And what it boils down to, Your Honor, is

6   will the Court give judicial immunity to the post-assumption,

7   post-confirmation Debtor over the next two or three years as

8   it manages and liquidates more than a billion dollars of other

9   people's funds?  It is their money at issue.

10      So, in order to do this, the Debtor first has to tell Your

11  Honor that it has a likelihood of merits on the success [sic]

12  of some claim.  The Debtor cannot just come to you -- because

13  the Debtor knows Your Honor's opinion on 105(a) and the

14  Supreme Court law -- and the Debtor cannot just say, Judge,

15  please give us an injunction because it's convenient or

16  because we don't want to comply with our obligations.  So they

17  concoct a tortious interference claim.  They argue that there

18  is an automatic stay violation, which, as Your Honor knows,

19  all of us bankruptcy lawyers take most seriously.  And they

20  argue that, well, whatever Mr. Dondero has been enjoined from

21  doing, somehow we *a priori* are also enjoined.  Basically, an

22  alter ego with no facts, law, trial, or due process.

23      On the tortious interference, Your Honor will hear

24  absolute evidence that cannot be refuted that all that we did,

25  all that we did was we refused, our employees refused to make

a ministerial entry into a computer program of two trades that Mr. Seery authorized. Those trades closed exactly as Mr. Seery wanted. Those trades closed, were executed, before Mr. Seery asked our employees to do his bidding. And the reason why our employees were instructed not to do what Mr. Seery wanted was because our chief compliance officer looked at it, those employees looked at it, and they all said, What is this? Our internal protocols were not followed. We don't know anything about these trades. We have fiduciary duties, we have SEC obligations, and Mr. Seery has his own employees whom he can instruct to enter these two trades into the computer and our employees aren't going to do it. It's as simple as that.

Mr. Dondero did not command that decision. Mr. Dondero did not instruct that decision.

Our employees not doing what Mr. Seery requested of them is not tortious interference. It is not interference as a matter of law. There was no breach of contract as a result.

So the two elements -- two of the elements required for tortious interference, there will be zero evidence on. But in the bigger picture, what they're talking about again is restraining our rights in the future. And whether -- whether we are party to these contracts or a third-party beneficiary, it doesn't matter, because we are not a stranger to these contracts. These contracts expressly give us rights. And a

1  party exercising their right under a contract, it could be

2  breaching that contract, but it cannot be tortious

3  interference as a matter of law.

4      And if Your Honor is concerned about us tortiously

5  interfering in the future, then the Court should enjoin us

6  from tortious interference in the future, not excise from the

7  contract the remedies that the Debtor must accept if it wants

8  to assume these contracts.

9      Moving to the automatic stay issue, the sole and exclusive

10 argument for why we violated the stay is because our counsel,

11 a seasoned, gentlemanly bankruptcy lawyer of many years'

12 experience, sent two letters to seasoned veteran bankruptcy

13 lawyers for the Debtor.  Communications.  Communications

14 amongst counsel.

15     The first, the December 22nd letter, is a request:  Okay,

16 we lost in front of Judge Jernigan, Judge Jernigan called our

17 motion frivolous, we get that, but we ask you to please stop

18 trading until the plan is confirmed.  A request which the

19 Debtor ignored.  Or that's not true, didn't ignore:  refused

20 to comply with.

21     The second letter, a day later, after various

22 communications, was:  Okay, we are going to initiate the

23 process of terminating you as the servicer.

24     Mr. Dondero had nothing in the world to do with these

25 letters.  Mr. Dondero did not direct these letters.  This was

1   professional advice from outside counsel and the independent

2   boards of the Advisors believing that their fiduciary duty

3   compelled that.

4       And guess what, that letter even said:  subject to the

5   automatic stay.  You heard from Mr. Morris that they basically

6   said, File your stay motion.

7       Our follow-up letter clarified anything that we might do

8   is subject to the automatic stay.  We never said we're going

9   to act in a way that the stay doesn't permit.  We said we're

10  going to come to this Court first.

11      But even all that, all those communications, while it may

12  be interesting, are irrelevant, because we never took any

13  action.  You will hear that we never communicated with the

14  CLOs, the Trustees, or the Issuers, anything like we went over

15  with the Debtor, anything like, Please start the process of

16  removing the Debtor.  We have done nothing of the sort, we

17  will do nothing of the sort, precisely because of the

18  automatic stay.

19      So I equate this, Your Honor, to your average home lender

20  whose lawyer sends a letter to the borrower saying, You don't

21  have insurance; we're going to start the process of

22  foreclosure.  You're past due on your post-petition adequate

23  protection payments; we're going to start the foreclosure

24  process; we're going to go seek a list of stay.  That is not

25  actionable.  It is not a stay violation.  Those are

1   communications, not actions.  And that is precisely what

2   seasoned professional counsel should be doing.

3       And now, Your Honor, we move to the Mr. Dondero issue.

4   The argument is, well, on January the 9th, Mr. Dondero,

5   apparently for all time, in perpetuity, agreed that he will

6   not cause the related entities to terminate these agreements.

7   And then the argument is, well, the Court entered a TRO

8   against Mr. Dondero and the Court entered a preliminary

9   injunction against Mr. Dondero.  Okay?

10      I don't see where the problem is.  Mr. Dondero is

11  prohibited from causing us to terminate these agreements.

12  There are many ways, with independent boards, that Mr. Dondero

13  has nothing to do with that.  And he will have nothing to do

14  with that in the future.  So if the concern is enjoining us

15  because of an injunction against Mr. Dondero, enjoin Mr.

16  Dondero.  Just like if the concern is that we're going to

17  tortiously interfere, you enjoin us from tortious

18  interference.  Or if we're going to violate the stay, enjoin

19  us from violating the stay.  But do not for all time assume

20  that any right that we may exercise in the future will

21  necessarily be tainted and the corrupt product of Mr.

22  Dondero's instructions.  You will see today on the evidence

23  that that has not happened and it will not happen.

24      And whatever Mr. Dondero may have agreed to, we are

25  separate entities.  Again, the Funds have -- are not

controlled or owned, and Mr. Dondero is not on the board.  So

whatever he may have agreed to is between the Court and the

Debtor and him, but he never agreed to that on behalf of the

Funds.  He never agreed to that on behalf of the Advisors, who

have their own independent fiduciary duties and duties under

the law.

So, Your Honor, there will be no substantial likelihood of

success on the merits.  There will be no likelihood of success

on the merits.  And I'm talking about the post-assumption,

post-confirmation time frame.  The issue is fundamentally

different pre-assumption and pre-confirmation.  But post-

assumption and post-confirmation, the Debtor will not show a

likelihood of success on the merits.  The Debtor will not show

any irreparable injury.  None.

Mr. Seery will testify that managing these agreements for

the coming couple or three years will have some value to the

Debtor.  He doesn't know what the profitability of that is to

the Debtor.  You will hear that, in fact, managing these

contracts for the next two years does not bring any

profitability to the Debtor.  The Debtor will lose money

managing of them.  But whatever damages there are are monetary

damages, and monetary damages are not an irreparable injury as

a matter of law.

Now, the Debtor says, well, the Court can enter an

injunction in the aid of restructuring, but this injunction

1  will happen after restructuring.

2      On the balance of harm and public interest, Your Honor, I

3  think we're dealing with more than a billion dollars of clean,

4  innocent third-party funds.  The balance of harm here weighs

5  against granting this injunction.  If we try to do anything in

6  the post-confirmation world, the Debtor has all of its rights

7  and remedies to contest what we do.  If we do it wrong, we're

8  liable in contract or in tort, there's monetary damages, and

9  the Debtor has already successfully organized.

10      But if the Debtor does something wrong in the future and

11  we cannot take action to stop a gross mismanagement or a

12  denution [sic] of the Debtor or an abscondence with funds,

13  then think about the harm to the innocent investors here.

14  Because if we even go to court, your Court, any court, we will

15  be in violation of a federal court injunction.

16      Your Honor, this is not the appropriate purpose of an

17  injunction for the preservation of the status quo.  The status

18  quo, by definition, cannot extend post-assumption or post-

19  confirmation.  This is not a proper exercise of equity.  We

20  have done nothing wrong, we have threatened to do nothing

21  wrong, and we will do nothing wrong to justify forever being

22  prejudiced and enjoined from exercising our contractual and

23  statutory rights.

24      Your Honor, this TRO extends through February the 15th.

25  We asked the Debtor to continue this hearing.  We asked the

1    Debtor to go to our independent boards and seek approval of

2    the same settlement that the Debtor has with CLO Holdco, which

3    we learned about last night.  We simply haven't had the time

4    to get those boards aligned up and present a settlement to

5    them.  We're trying to put together a competing plan.

6        Your Honor, there is no reason to go forward today except,

7    like Mr. Morris said, power.  Power.  Mr. Seery's power, Your

8    Honor.  Not ours.  Mr. Seery's power in perpetuity or for

9    judicial immunity, get out of jail free card.  Thank you.

10           THE COURT:  All right.  Mr. Morris, you may call your

11   witness.

12           MR. MORRIS:  Yeah.  I just want to make a motion to

13   strike the notion of a get out of jail free card.  I

14   appreciated everything counsel had to say, but I think that's

15   a little -- a little over the top.

16       We call Mr. James Dondero, please.

17           THE COURT:  Mr. Dondero, --

18           MR. RUKAVINA:  Your Honor, bear with me.

19           THE COURT:  Okay.

20           MR. RUKAVINA:  Your Honor, bear with me.  I'm going

21   to get out of this chair.  Mr. Dondero will get in this chair.

22   And so that there's no reverberation, I will be sitting next

23   to Mr. Dondero in case I have to make any objections.

24           THE COURT:  Okay.  All right.  Good morning, Mr.

25   Dondero.

1         MR. DONDERO:  Good morning.

2         THE COURT:  Please raise your right hand.

3            JAMES DONDERO, DEBTOR'S WITNESS, SWORN

4         THE COURT:  Thank you.  Mr. Morris, go ahead.

5         MR. MORRIS:  May I proceed, Your Honor?

6         THE COURT:  Yes.

7                    DIRECT EXAMINATION

8    BY MR. MORRIS:

9    Q    Good morning, Mr. Dondero.  Okay.  John Morris; Pachulski,

10   Stang, Ziehl & Jones; for the Debtor.  Can you hear me okay,

11   sir?

12   A    Yes.

13   Q    There are no board members here on behalf of any of the

14   Funds to testify or offer any evidence; isn't that right?

15   A    Not that I'm aware of.

16   Q    Okay.  And you knew the hearing was going to be today on

17   the preliminary injunction, right?

18   A    Yes.

19   Q    And you had an opportunity to confer with the boards of

20   the Funds in advance of this hearing, right?

21   A    No.

22   Q    There's no -- there's no -- no board member is expected to

23   testify, fair?

24   A    Correct.

25   Q    So the Court isn't going to hear any evidence as to the

Dondero - Direct                          43

1   board's perception of what's happening here, right?

2   A    Not that I'm aware of.

3   Q    Okay.  Until January 9th, 2020, you controlled the debtor

4   Highland Capital Management, LP; isn't that right?

5   A    I don't remember exactly when these -- when the

6   independent board was put in place, but up until around that

7   time, I believe.

8   Q    Okay.  So, January 2020?

9   A    Yes.

10  Q    And during that month, you completed an agreement with the

11  Creditors' Committee where you ceded control of the Debtor

12  pursuant to a court order, right?

13  A    Pursuant to a court ...?  I thought it was pursuant to a

14  negotiation where they would have fiduciary responsibility to

15  the estate in my absence.  That's -- that's what I think the

16  (garbled).

17  Q    Okay.  You're aware -- so you entered into an agreement

18  with the Creditors' Committee pursuant to which you ceded

19  control of the Debtor, right?

20        MR. RUKAVINA:  Your Honor, I'll object.  That

21  agreement speaks for itself.  And if Mr. Morris wants to

22  present it to Mr. Dondero, he can.

23        THE COURT:  Um, --

24        MR. MORRIS:  Sure.  Ms. Canty, can we please put up

25  --

1          THE COURT:  All right.  Well, I --

2          MR. MORRIS:  I'm happy to put it up, Your Honor.

3          THE COURT:  I overrule that objection.  You can ask.

4    And then if he's not sure, you can present the agreement.  All

5    right?  Go ahead.

6          MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Mr. Dondero, is there any doubt in your mind that in

9    January of 2020 you gave up control of Highland in favor of an

10   independent board at the Strand Advisors level?

11   A    No.  I -- yes, I agree with that.

12   Q    Okay.  And do you recall that, in connection with that

13   agreement, the Court entered an order?

14   A    Several orders.  Which one?

15   Q    Okay.

16         MR. MORRIS:  Can we please put up Docket No. 339?

17         MS. CANTY:  Sure, just one second.

18         MR. RUKAVINA:  And you have it here.

19   John, I have the order if just want Mr. Dondero to review

20   it.

21         MR. MORRIS:  I think -- I think everybody should have

22   the benefit of seeing it.  But thank you very much.

23   Your Honor, while we take this moment, can you just remind

24   me of when the Court needs to take a break today, so that I'm

25   mindful of that and respectful of your time?

Dondero - Direct                              45

1          THE COURT:  11:30.

2          MR. MORRIS:  Okay.  And what time will we reconvene?

3          THE COURT:  Well, I have said 1:00.  I hope it can be

4    a little sooner, but let's just plan on 1:00, okay, so there's

5    no confusion.

6          MR. MORRIS:  Okay.  All right.  All right.  So, on

7    the screen here, we have Exhibit OOOO, which is in the record.

8    BY MR. MORRIS:

9    Q   This is an order that was entered by the Court on January

10   9th, 2020.  Do you see that, sir?

11   A   Yes.

12         MR. MORRIS:  Can we scroll down to Paragraph 9,

13   please?  (Pause.)  Are you having problems, Ms. Canty?

14         MS. CANTY:  It's on the screen.  You can't see it?

15         MR. MORRIS:  Yeah.  Can you scroll down to Paragraph

16   9?

17         MS. CANTY:  It's on Paragraph --

18         MR. MORRIS:  That's on Page 2, I believe.

19         MS. CANTY:  Yeah, I have it up.  I'm not sure what

20   the disconnect is, because I can see it on my screen.  I'm

21   going to stop it and reshare it.

22         MR. MORRIS:  Thank you very much.

23      (Pause.)

24         MS. CANTY:  Do you see it now?

25         MR. MORRIS:  Okay.  Beautiful.

Dondero - Direct                              46

1   BY MR. MORRIS:

2   Q    Mr. Dondero, if you'd just read Paragraph 9 out loud.

3   A    (reading)  Mr. Dondero shall not cause any related entity

4   to terminate any agreements with the Debtor.

5   Q    Okay.  So you understood, as part of the corporate

6   governance settlement pursuant to which you avoided the

7   imposition of a trustee, that you agreed that you wouldn't

8   cause any related entity to terminate any agreements with the

9   Debtor, right?

10  A    Uh, --

11  Q    Is that correct?  You understood that paragraph?

12  A    Yes.

13  Q    Okay.  And you didn't appeal this particular order, did

14  you, sir?

15  A    I -- I believe I've refuted -- I've adhered to that order

16  entirely.

17  Q    Okay.  NexPoint Advisors LP, is one of the defendants in

18  this matter, right?

19  A    Yes.

20       (Pause.)

21  Q    Can you hear me, sir?

22  A    Yes.  Yes, I said, "Yes."

23            MR. NICHOLSON:  Well, John, did you -- did you ask a

24  question?  Because you went offline for a few seconds there.

25            MR. MORRIS:  I asked whether NexPoint Advisors, LP

1  was an advisory firm.

2            THE WITNESS:  Yes.

3  BY MR. MORRIS:

4  Q    And you have a direct or indirect ownership interest in

5  NexPoint Advisors, LP, correct?

6  A    Yes.

7  Q    And you understand that, based on that direct or indirect

8  ownership interest, NexPoint Advisors, LP is a related entity

9  under Paragraph 9 of this order, right?

10 A    Yes.

11 Q    Okay.  Highland Capital Management Fund Advisors, LP is

12 one of the other defendants in this case, right?

13 A    Yes.

14 Q    And we'll refer to that entity as Fund Advisors; is that

15 fair?

16 A    Yes.

17 Q    And we'll refer to Fund Advisors together with NexPoint

18 Advisors, LP as the Advisors; is that fair?

19 A    Yes.

20 Q    Okay.  Fund Advisors is also an advisory firm; is that

21 (audio gap)?

22 A    I missed that last question.

23            MR. RUKAVINA:  John, you're freezing up on us.  Is it

24 on our end, Your Honor, or is it on Mr. Morris's end?

25            MR. MORRIS:  Just let me know -- just let me know

Dondero - Direct                                    48

1   when it happens.

2              THE COURT:  Yes.  I'm hearing him.  But go ahead, Mr.

3   Morris.  Let's try again.

4              MR. MORRIS:  Okay.

5   BY MR. MORRIS:

6   Q    You have a direct or indirect ownership interest in Fund

7   Advisors, correct, sir?

8   A    Yes.

9   Q    (audio garbled)  And based on that direct or indirect

10  interest, you would agree that Fund Advisors is a related

11  entity for purposes of this order, correct?

12  A    Yes.

13  Q    In addition to your ownership interest, you're also the

14  president of Fund Advisors; is that (audio gap)?

15             THE COURT:  All right.  Now --

16             THE WITNESS:  I believe so.

17             THE COURT:  Yes.  Now I'm starting to have some

18  trouble, Mr. Morris.  Every once in a while, you're freezing

19  towards the end of a sentence.  So I don't know what can be

20  done, but it's --

21             MR. MORRIS:  All right.  Let me know if that

22  continues.

23             THE COURT:  Okay.

24  BY MR. MORRIS:

25  Q    To use your words -- to use your words, Mr. Dondero, it's

Dondero - Direct                                49

1   fair to say that you generally control Fund Advisors, right?

2   A    Yes.

3   Q    And based on that, you acknowledge that Fund Advisors is a

4   related entity under the Court's order, correct?

5   A    Yes.

6   Q    And together, the Advisors that you own and control manage

7   certain investment funds, correct?

8   A    Yes.

9   Q    And three of those funds are defendants in this case,

10  correct?

11  A    Yes.

12  Q    And you are the portfolio manager of each of those funds;

13  is that right?

14  A    I believe so.

15  Q    Okay.  Let's talk about the events that led to this

16  matter.  CLO stands for Collateralized Loan Obligations,

17  correct?

18  A    I'm sorry.  Repeat that, please?

19  Q    Sure.  CLO stands for Collateralized Loan Obligations,

20  correct?

21  A    Yes.

22  Q    Years ago, the Advisors that you own and control caused

23  the investment funds that they manage to buy the interests in

24  CLOs that are managed by the Debtor, correct?

25  A    Yes.  Yes.

Dondero - Direct                    50

1  Q    Okay.  And those Funds still hold an equity interest

2  today, correct?

3  A    Yes.

4  Q    And K&L Gates is one of the law firms that represents the

5  Advisors and the Funds that are managed by the Advisors,

6  correct?

7  A    Yes.

8  Q    You would agree that the Debtor is party to certain

9  contracts that give it the right and the responsibility to

10  manage certain CLO assets, right?

11  A    Yes.

12  Q    And you recall that --

13        MR. RUKAVINA:  Your Honor, Mr. Morris is frozen on

14  our end.

15        THE COURT:  Yes.  Mr. Morris, you just froze.

16        MR. RUKAVINA:  We heard nothing, Mr. Morris.

17        THE COURT:  Yes.

18        MR. MORRIS:  Okay.

19  BY MR. MORRIS:

20  Q    Sir, do you recall that you resigned from the Debtor on or

21  around October 10th, 2020?

22  A    Yes.

23  Q    Okay.  And shortly thereafter, K&L Gates sent a couple of

24  letters to the Debtor on behalf of the Advisors and the Funds,

25  correct?

1  A    Yes.

2  Q    Okay.

3           MR. MORRIS:  Can we take a look at these?  These are

4  documents that were admitted into evidence in a different

5  matter, but they're actually referred to in his prior

6  testimony, which is in evidence in this case.  So I would just

7  ask Ms. Canty to go to Trial Exhibit B, which was filed in the

8  Adversary Proceeding 20-3190 at Docket 46.  And for the

9  record, it's PDF Page #184 out of 270.  I just want to take a

10 look at these two letters.

11 BY MR. MORRIS:

12 Q    Okay.  Do you see this letter, sir?

13 A    Yes.

14 Q    And NexPoint is one of the defendants here; is that right?

15 A    Yes.

16 Q    And that's one of the Advisors that you own and generally

17 control, correct?

18 A    Yes.

19 Q    And so this letter is sent less than a week after you've

20 left Highland Capital Management, right?

21 A    Yes.

22 Q    Do you recall this particular letter?

23 A    No.

24 Q    Can -- you're familiar with the substance of this letter

25 and the other one that was sent in November, correct?

Dondero - Direct                              52

1    A    Could you pull it a little higher and let me read it?

2    Q    Yes.  Sure.

3           MR. RUKAVINA:  If this is an exhibit, I can show it

4    to him as an exhibit, Mr. Morris.

5           MR. MORRIS:  I don't know that this is one of the

6    marked exhibits.  It's one of the exhibits that's used within

7    his prior testimony.  So, but I want to give Mr. Dondero a

8    chance to review it.  And please let us know if you need to

9    scroll further down.

10          (Pause.)

11          MR. RUKAVINA:  You're going to have to scroll down.

12          THE WITNESS:  Scroll down a little further, please.

13          (Pause.)

14          MR. RUKAVINA:  Mr. Morris, can you please scroll

15   down?  Neither Mr. Dondero nor I can read the balance.

16   BY MR. MORRIS:

17   Q    There you go.  (Pause.)  So, you see at the top of the

18   page there there is a reference to the sale of assets and a,

19   quote, "a rush to sell these assets at fire sale prices."  Is

20   that what you think -- did you think that Mr. Seery was

21   selling (audio garbled) CLO assets at fire sale prices in

22   October 2020, --

23          MR. RUKAVINA:  Your Honor, --

24          MR. MORRIS:  -- less than a week after --

25          MR. RUKAVINA:  Your Honor, I'll object.  We did not

1  hear Mr. Morris's question.

2              THE COURT:  All right.  Could you repeat the

3  question?

4              MR. MORRIS:  Okay.  Yes, Your Honor.

5  BY MR. MORRIS:

6  Q   Mr. Dondero, on or about October 16th, did you personally

7  believe that Mr. Seery was in a rush to sell CLO assets at

8  fire sale prices?

9  A   I believe he had no business purpose to sell any of the

10  assets, which I believe he stated that to Joe Sowin, our

11  trader.  I -- I -- there was no business purpose stated or

12  ever given or obvious from the sales.  And --

13  Q   Okay.

14  A   -- I (indecipherable) draft this letter.

15  Q   Okay.

16              MR. MORRIS:  I move to strike, Your Honor.  It's a

17  very simple question --

18              THE COURT:  Sustained.

19              MR. MORRIS:  -- and it has to do solely with Mr.

20  Dondero's state of mind.

21  BY MR. MORRIS:

22  Q   Mr. Dondero, on or about October 16th, did you personally

23  believe that Mr. Seery was in a rush to sell CLO assets at

24  fire sale prices?

25  A   He was in a rush to sell them for some reason with no

1  business purpose.  I don't know the reason.

2              THE COURT:  All right.  Can you --

3  BY MR. MORRIS:

4  Q    Okay.  And you never asked him, right?

5              THE COURT:  Yes.  Yes or no answer, Mr. Dondero.

6              THE WITNESS:  Never asked him.

7              MR. MORRIS:  Okay.  Can we turn to the next exhibit,

8  which is Exhibit C on that same docket?

9       (Pause.)

10  BY MR. MORRIS:

11  Q    While we're waiting, can you just read the last sentence

12  of the paragraph that ends at the top of the page, Mr.

13  Dondero, beginning, "Accordingly"?

14  A    (reading)  Accordingly, we hereby request that no CLO

15  assets be sold without prior notice and prior consent from the

16  Advisors.

17  Q    Are you aware of any contractual provision pursuant to

18  which the Funds or the Advisors can -- can expect that the

19  Debtor will refrain from any -- selling any assets without

20  giving prior notice and obtaining prior consent from those

21  entities?

22  A    I think the documents have an overall good-faith/fair-

23  dealing clause which would cover something like this, I

24  believe.

25  Q    Your -- is it your testimony, sir, that the duty of good

1  faith and fair dealing requires the Debtor to give notice to

2  the Advisors and to obtain the Advisors' prior consent before

3  they can sell any CLO assets?

4  A    Well, I think -- yes, I do.  I think --

5  Q    All right.

6  A    Yes.  Yeah.

7  Q    Okay.  And then the next month, another letter was sent by

8  NexPoint to Mr. Seery.  Do you recall that?

9  A    Not specifically.  If you bring it up, we can talk about

10 it.

11      MR. MORRIS:  Can we scroll down a little bit?

12      (Pause.)

13      MS. CANTY:  John, are you talking to me?  I was

14 frozen out.  I just got back on.  I apologize.

15      MR. MORRIS:  That's okay.  Can we just scroll down so

16 Mr. Dondero can see more of this particular letter?

17      MS. CANTY:  Okay.

18      MR. MORRIS:  Okay.

19 BY MR. MORRIS:

20 Q    Can you just read out loud, Mr. Dondero, out loud the last

21 two sentences, please, beginning with, "We understand"?

22 A    (reading)  We understand that Charitable DAF Holdco, Ltd.

23 has made a similar request.  Accordingly, we hereby re-urge

24 our request that no CLO assets be sold without prior notice to

25 and prior consent from the Advisors.

1  Q    What's the Charitable DAF Holdco, Ltd.?

2  A    I think that's who you settled with yesterday.

3  Q    Do you have an interest in that entity?

4  A    No.  It's a bona fide charity.  It was one of the largest

5  in Dallas before it got cut in half by Acis.

6  Q    Does -- are you familiar with the Get Good and the Dugaboy

7  Investment Trusts?

8            MR. RUKAVINA:  Your Honor, at this time I would

9  object to relevance.  I don't see what this has to do with

10  tortious interference and stay violation on December 22nd and

11  December 23rd, 2020.

12            THE COURT:  Response?

13            MR. MORRIS:  Your Honor, I'm trying to establish that

14  Charitable DAF Holdco, Ltd. is another entity in which Mr.

15  Dondero holds a beneficial interest.

16            THE COURT:  Okay.  Overrule the objection.

17            MR. RUKAVINA:  John, you're not only frozen, now

18  you're off.

19            MR. MORRIS:  Yeah, I can see myself.  You can't hear

20  me?

21            MR. RUKAVINA:  We can now, but Your Honor, we lost

22  Mr. Morris for a bit there.

23            THE COURT:  All right.  I think we were --

24            MR. MORRIS:  Okay.

25            THE COURT:  -- waiting on an answer from Mr. Dondero,

1  actually.

2              THE WITNESS:  We didn't hear the question at --

3  BY MR. MORRIS:

4  Q    Sure.  Are you familiar with the Get Good and Dugaboy

5  Investment Trusts?

6  A    Yes.

7  Q    Are you the beneficiary of those trusts?

8              MR. RUKAVINA:  Your Honor, again, objection to

9  relevance.  These are non-parties, and what his personal

10 interests are has no relevance to this.

11             THE COURT:  Overruled.

12             THE WITNESS:  The Get Good Trust, Get -- I believe

13 those are defective grantor trusts.  I don't believe I have

14 any interest whatsoever in those.  Dugaboy is a perpetual

15 Delaware trust.  I don't know how that's set up, but I believe

16 I do have an interest there until I pass.

17 BY MR. MORRIS:

18 Q    In fact, you're -- you're the sole beneficiary of the

19 Dugaboy Investment Trust, right?

20 A    Until I pass.  It's a -- it's a estate planning trust.

21 Q    I appreciate that.  And the Dugaboy and the Get Good

22 Trusts are the owners of the Charitable DAF Holdco Ltd.,

23 correct?

24 A    No.  Not as far as I know.

25 Q    Okay.

1    A    (garbled) time at all.

2    Q    All right.  So we just looked at these two letters, sir.

3    And you were familiar with the substance of the letters before

4    they were sent, right?

5    A    Uh, just --

6            MR. MORRIS:  You can take it down, Ms. Canty.

7            THE WITNESS:  Just generally.  Again, I wasn't

8    involved directly with the letters.

9    BY MR. MORRIS:

10   Q    You were aware of the letters before they were sent,

11   right?

12   A    Yes.

13   Q    And you discussed the substance of the letters with

14   NexPoint, correct?

15   A    Not the substance of the letters, just the substance of

16   the issue.

17   Q    You actually discussed the substance of the letters with

18   NexPoint, correct?

19   A    I -- Again, I remember it being the substance of the

20   issue.  Generally, at most, the substance of the letters.

21   Q    And you discussed the substance of the letters with the

22   Advisors' internal counsel, too, right?

23   A    The sub -- generally, the substance, yes, but more the

24   issue than the letter.

25   Q    Okay.  If I pull up your transcript from the TRO hearing,

Dondero - Direct                          59

1   would that refresh your recollection that you discussed the

2   substance of these letters with NexPoint and with the

3   Advisors' internal counsel?

4   A    I'd like to clarify with the testimony I just gave.

5   Q    Okay.  Would you -- do you have any reason to believe that

6   you did not previously testify that you discussed the

7   substance of the letters with NexPoint and with NexPoint

8   Advisors' internal counsel?

9   A    I repeat the same testimony.  Generally.  Like, those

10  letters that you put on the screen, I have no recollection of

11  those specifically.

12          MR. MORRIS:  Ms. Canty, can we please call up on the

13  screen Exhibit NNNN, which was the transcript from the January

14  8th, 2021 preliminary injunction hearing?

15          MR. RUKAVINA:  Mr. Morris, just one sec.  I'm trying

16  to find it on paper.

17          MR. MORRIS:  Yeah.  It's four Ns.

18          MR. RUKAVINA:  One, two, three, four.  (inaudible)

19  put that on the screen.

20          MS. CANTY:  John, I'm not sure what's going on, but

21  it won't come up on the screen.  I've tried three times.  I'm

22  going to keep trying.

23          MR. MORRIS:  All right.  I have it in front of me.

24  Do you have it, too?

25          MR. RUKAVINA:  Yes, the witness has it --

1          MR. MORRIS:  Okay.

2          MR. RUKAVINA:  -- in front of him.  This is NNNN,

3   just to confirm?

4          MR. MORRIS:  Yes.  And it is the January 8th

5   transcript.

6   BY MR. MORRIS:

7   Q   Mr. Dondero, were you asked these questions and did you

8   give these answers?  Question:  Are you familiar with --

9          MR. RUKAVINA:  Where are you, John?  Where are you?

10  Where are you?  We -- we -- we --

11         MR. MORRIS:  I apologize.  Page 40.  I'm going to

12  read Page 40, Lines 1 through 14.

13         MR. RUKAVINA:  Okay.  He has it in front of him, if

14  you just want him to read it.

15  BY MR. MORRIS:

16  Q   Did you give these answers at Page 40, beginning Line 1:

17      "Q   And were you -- and you were familiar, you were

18      aware of these letters before they were sent; is that

19      correct?

20      "A   Yes.

21      "Q   And you generally discussed the substance of these

22      letters with NexPoint; is that right?

23      "A   Generally, yes.

24      "Q   You discussed the letters with the internal

25      counsel; is that right?

1    "A    Yes.

2    "Q    That's D.C. Sauter?

3    "A    Yes.

4    "Q    And you have been on some calls with K&L Gates

5    about these letters, right?

6    "A    I believe so.

7    "Q    And you knew these letters were being sent,

8    correct?

9    "A    Yeah.  They're -- they're reported.

10   Q    Did you give those answers to those questions at the prior

11   hearing?

12   A    I -- I believe it's what I -- it's almost exactly what I

13   just said, but yes.

14   Q    And you supported the sending of the letters; isn't that

15   right?

16   A    Absolutely.

17   Q    And you encouraged the sending of the letters, right?

18   A    Absolutely.

19   Q    Around Thanksgiving, you learned that Mr. Seery had given

20   a direction to sell certain securities owned by CLOs managed

21   by the Debtor, correct?

22   A    Yes.

23   Q    And when you learned that, you personally intervened to

24   stop the trades, correct?

25   A    Yes.

1  Q    Let's -- I want to look at that email string that we

2  looked at once before.  It can be found at Trial Exhibit D

3  found on Docket No. 46 in the adversary proceeding. It's PDF

4  Number -- it's PDF Page 189 of two (garbled).

5            MR. RUKAVINA:  Did you catch that?

6            THE COURT:  Which -- which exhibit number -- letter

7  is it?

8            MR. MORRIS:  It's on the docket in the Adversary

9  Proceeding 20-3190.  And in that adversary proceeding, at

10 Docket No. 46, you've got the Debtor's exhibit list.  And

11 Exhibit D, which can be found at PDF Page 189 of 270, is the

12 email string I'm looking for.

13    I apologize, Your Honor.  It wasn't until I was reading

14 the transcript yesterday that I realized I needed these

15 documents.  But they are in the record.  Obviously, they're

16 referred to in the transcript that is in the record.

17            THE COURT:  Okay.

18            MR. RUKAVINA:  Your Honor, I would like to interject

19 for the record here that this is the first time my clients

20 have been sued.  They have a right to be confronted with the

21 witnesses and testimony and evidence against them.  So if Mr.

22 Morris wants to introduce this as an exhibit here today,

23 that's one thing, but I object to any notion that there's a

24 prior record that is going to tie my clients' hands.  It might

25 tie Mr. Dondero's hands, but not my clients' hands.

Dondero - Direct                    63

1          MR. MORRIS:  I'd move for the introduction into

2  evidence of this document that has emails not only from Mr.

3  Dondero, but from Joe Sowin, the head trader of the

4  Defendants.

5          MR. RUKAVINA:  And Your Honor, I have no problem with

6  that admission.  I just want to make it clear that we're not

7  conceding that whatever happened in this case previous to this

8  is a part of today's record.  That's all.  So I do not have a

9  problem with the admission of this.  I would, however, ask

10 you, Mr. Morris, to have someone email it to us so that I can

11 use it today if I need to.

12         THE COURT:  All right.

13         MR. MORRIS:  Okay.  Will do.

14         THE COURT:  So, I'll --

15         MR. MORRIS:  We'll do that at the --

16         THE COURT:  I'll admit it into evidence.  You'll need

17 to not only email it Mr. Rukavina, but you'll need to file a

18 supplement to your exhibit and witness list after the hearing

19 showing the admission of --

20         MR. RUKAVINA:  And Mr. Morris, if you could email it

21 to Mr. -- if you could email it to Mr. Vasek as well, because

22 obviously I can't get to it now.  Thank you.

23         MR. MORRIS:  Sure.

24         THE COURT:  All right.  So this --

25         MR. MORRIS:  Okay.  So, --

1          THE COURT:  For the record, let's just be clear what

2   the record is -- this is going to be called on the record.  I

3   think you are up to SSSSS, so this would be TTTTT when you

4   file it on the record.  All right?  Go ahead.

5          MR. MORRIS:  Thank you very much, Your Honor.

6       (Debtor's Exhibit TTTTT is received into evidence.)

7   BY MR. MORRIS:

8   Q   Mr. Dondero, you recall looking at this email string at

9   the last hearing, right?

10  A   Yes.

11  Q   Let's start at the bottom, please, with Mr. Covitz's

12  email.

13      (Pause.)

14          MR. RUKAVINA:  Hey, John, real quick, now we've lost

15  you.  We've lost you and we're not seeing anything from your

16  assistant.  Do you have the email, Mr. Vasek?

17          MR. MORRIS:  I'm here.  Can you hear me?

18          MS. CANTY:  I'm here.  (garbled) on the screen.

19          MR. MORRIS:  Yeah.  Can we scroll down to the bottom?

20          MS. CANTY: I did.  I don't know why it's not showing

21  on you guys' screen.

22          MR. MORRIS:  Hopefully this gets fixed.  Yeah.  We've

23  never had this problem before, Your Honor.  I'm not sure what

24  the issue is, but I do apologize.

25          THE COURT:  All right.  Well, I can hear you, but we

1  don't see movement of the exhibit.

2           MR. MORRIS:  Yeah.  When I began earlier today by

3  suggesting that this was going to be challenging, this was not

4  one of the challenges I anticipated.

5           THE COURT:  Okay.  All right.

6           MR. RUKAVINA:  Do you have the email yet?

7           MS. CANTY: I'm sorry.  I don't know what's happening

8  on this end.  I have three streams of Internet going, and I

9  don't think it's the Internet.  I don't know what's going on.

10          MR. MORRIS:  Hmm.

11          MR. RUKAVINA:  Yeah, John, what I'm suggesting is

12 that you have an associate email it to Mr. Vasek immediately

13 and then we can present it to Mr. Dondero.

14          MR. MORRIS:  I'll tell you what.  While that -- one

15 more try.

16          MR. CANTY:  Can you see it now?

17          MR. MORRIS:  Okay.  Yes.

18 BY MR. MORRIS:

19 Q   All right.  Mr. Dondero, Hunter Covitz is an employee of

20 the Debtor, right?

21          MR. RUKAVINA:  Hold on a sec.  Hold on a sec.

22     Your Honor, I believe that I have the right to see the

23 full email here.  I believe that Mr. Dondero does.  And we've

24 just seen the first little bit and now some middle piece.

25          THE COURT:  All right.  So are you saying --

1        MR. MORRIS:  And in the order that --

2        THE COURT:  -- you want to see the whole string?

3        MR. RUKAVINA:  Well, I think -- Mr. Dondero, do you

4   need to see the whole string?  I don't know what this is, but

5   maybe you do.

6        MR. DONDERO:  It depends on what the question is.  I

7   can answer some questions off of this email.

8        THE COURT:  Okay, let's go.

9        MR. MORRIS:  Yeah.

10  BY MR. MORRIS:

11  Q   All right.  So, for the moment, Mr. Covitz is an employee

12  of the Debtor, correct?

13  A   Yes.

14  Q   And he's the author of this email in front of us, correct?

15  A   Yes.

16  Q   And Mr. Covitz helps to manage the CLO assets on behalf of

17  the Debtor, correct?

18  A   Yes.

19  Q   Mr. Covitz is giving directions to Matt Pearson and Joe

20  Sowin to sell certain securities held by the CLOs, correct?

21  A   Yes.

22  Q   And if we can scroll up, I think we can see that you

23  received a copy of this email?

24      (Pause, 11:15 a.m.)

25        MR. MORRIS:  What I would like to do instead, we'll

Dondero - Direct                            67

1  take a break in about 15 or 20 (audio gap).  When we

2  disconnect, we'll get a better connection after the break.

3  And in the interim, I've got testimony that I would like

4  that's already been admitted into the record but there's

5  portions of which I would like to read into the record from

6  Dustin Norris, who is the executive vice president for each of

7  the Defendants.  And maybe it would be easiest for me to do

8  that.

9          THE COURT:  Okay.

10          MR. MORRIS:  All right.  On Docket No. 39.

11          MR. RUKAVINA:  Your Honor, I apologize.  Your Honor,

12  I apologize.  We did not hear --

13          MR. MORRIS:  I'm going to read into the record a

14  portion of Mr. Norris' testimony from the December 16th

15  hearing.

16          MR. RUKAVINA:  Your Honor, I do not see that

17  transcript in the exhibits.  If Mr. Morris could give me an

18  exhibit.

19          MR. MORRIS:  Exhibit B as in boy.

20          MR. RUKAVINA:  Thank you.

21          MR. MORRIS:  All right.  Instead of putting it on the

22  screen, if we could take the exhibit down, Ms. Canty.  He can

23  just follow along.  Beginning at Page 38, Line 7 through  -- 7

24  through 17.

25      Are you there, Mr. Rukavina?

1          MR. RUKAVINA:  I am.  Thank you.  I have it in front

2   of Mr. Dondero.

3          MR. MORRIS:  Okay.  Page 38, Lines 7 through 17:

4      "Q   I think you testified that you're one of the

5      executive vice presidents at NexPoint Advisors, one of

6      the Movants.  Is that right?

7      "A   That's right.

8      "Q   Who is the president of NexPoint Advisors, LP?

9      "A   Mr. Dondero.

10     "Q   And you report directly to him; is that right?

11     "A   I do.

12     "Q   You're also the executive vice president of Fund

13     Advisors, another Movant; is that right?

14     "A   Correct."

15         MR. MORRIS:  Beginning on Page 38, Line 25:

16     "Q   You're also the executive vice president (audio

17     gap) that are managed by the Advisors here, right?

18     "A   Yes.  That is correct."

19         MR. MORRIS:  Then going back to Page 35, beginning at

20   Line 15:

21     "Q   To be clear here, there are five moving parties;

22     is that right?

23     "A   That's correct.  The two Advisors and the three

24     Funds.

25     "Q   And one of the advisory firms is Highland Capital

1    Management Fund Advisors, LP; is that right?

2    "A    That's correct.

3    "Q    And I'll refer to that as Fund Advisors; is that

4    okay?

5    "A    That's great.

6    "Q    James Dondero and Mark Okada are the beneficial

7    owners of Fund Advisors, correct?

8    "A    That is my understanding.

9    "Q    And your understanding is that Mr. Dondero

10   controls Fund Advisors, correct?

11   "A    That's correct.

12   "Q    And the other advisory firm that brought the

13   motion is NexPoint Advisors, LP; is that right?

14   "A    That is correct.

15   "Q    And Mr. Dondero is the beneficial owner of

16   NexPoint; is that right?

17   "A    A family trust where Jim is the sole beneficiary,

18   I believe, controls or owns NexPoint Advisors.

19   "Q    Okay.  And Mr. Dondero --

20   "A    Or 99 percent of NexPoint Advisors.

21   "Q    Mr. Dondero controls NexPoint; is that right?

22   "A    Correct."

23        MR. MORRIS:  Continuing at Line 16 on Page 36:

24   "Q    All right.  And I'm going to refer to Fund

25   Advisors and NexPoint as the Advisors going forward; is

1    that fair?

2    "A    That's fair.

3    "Q    Each of the Advisors manages certain funds; is

4    that right?

5    "A    That is correct.

6    "Q    And three of those funds that are managed by the

7    Advisors are Movants on this motion, correct?

8    "A    Correct.

9    "Q    All right.  The Advisors caused these three Funds

10    to invest in CLOs that are managed by the Debtor; is

11    that right?"

12    "A    --"

13        MR. RUKAVINA:  Your Honor, I object.  Is there a

14    question at the end of this?  I mean, Mr. Dondero can't

15    possibly remember all this and then be asked a question.

16        MR. MORRIS:  He doesn't have to answer any questions.

17    I'm just reading the evidence into the record.

18        THE COURT:  Okay.

19        MR. RUKAVINA:  Your Honor?

20        MR. MORRIS:  Since we're having difficulty --

21        MR. RUKAVINA:  Your Honor, that's a matter for

22    summation.  That's -- this is a question and answer, I submit.

23        THE COURT:  Well, I overrule.

24        MR. MORRIS:  Your Honor, here's -- here's --

25        THE COURT:  This has been admitted into --

Dondero - Direct                              71

1              MR. MORRIS:  Yeah.

2              THE COURT:  -- evidence.  And if he wants to

3       highlight to the Court portions of the evidence, he can.

4         Go ahead.

5              MR. MORRIS:  Thank you, Your Honor.

6         "A   The portfolio managers working for the Advisors

7         did.  That's correct.

8         "Q   And Mr. Dondero is the portfolio manager of the

9         Highland Income Fund; is that right?

10        "A   He is one of the portfolio managers for that Fund.

11        "Q   And he's also --

12        "A   I believe there are two.

13        "Q   And he's also a portfolio manager of NexPoint

14        Capital, Inc., one of the Movants here, right?

15        "A   That is correct.

16        "Q   And he's also the portfolio manager of NexPoint

17        Strategic Opportunities Fund, another Movant; is that

18        right?

19        "A   Yes.  That is correct."

20             MR. MORRIS:  Going to Line -- Page 41, Lines 6

21        through 9:

22        "Q   The whole idea for this motion initiated with Mr.

23        Dondero; isn't that right?

24        "A   The concern, yes, the concern originated, and his

25        concern was voiced to our legal and compliance team."

Dondero - Direct                                72

1          MR. MORRIS:  Page 42, Lines 4 through 11:

2     "Q   None of the Movants are parties to the agreements

3     between the Debtor and each of the Debtors pursuant --

4     each of the CLOs pursuant to which the Debtor serves as

5     portfolio manager; is that correct?

6     "A   I  believe  that  is  correct.   One,  I  think,

7     important -- even though they're not (audio gap), they

8     are the -- they have the economic ownership of each of

9     these CLOs.

10    "Q   But they're not party to the agreement; is that

11    right?

12    "A   Not that I am aware of."

13         MR. MORRIS:  Page 42, Line 25:

14    "Q   Okay.   It's  your  understanding,  in  fact,  that

15    nobody  other  than  the  Debtor  has  the  right  or  the

16    authority to buy and sell assets on behalf of the CLOs

17    listed on Exhibit B, correct?

18    "A   That is my understanding.

19    "Q   Okay.   And  it's  also  your  understanding,  your

20    specific  understanding,  that  holders  of  preferred

21    shares  do  not  make  investment  decisions  on  behalf  of

22    the CLO; is that right?

23    "A   (audio gap)

24    "Q   And that's something the Advisors knew when they

25    decided  to  invest  in  the  CLOs  on  behalf  of  the  Movant

1   Funds; is that fair?

2   "A   That's right.  And at that time, the knowledge in

3   the purchase was with Highland Capital Management, LP

4   and the portfolio management team at the time.

5   "Q   And it's still with Highland Capital Management,

6   LP; isn't that right?

7   "A   That's correct.  I'm not sure that the portfolio

8   management team looks the same, but it was HCMLP."

9        MR. MORRIS:  Moving on to Page 46, Line 22:

10  "Q   The only holders of preferred shares that are

11  pursuing this motion are the three Funds managed by the

12  Advisors, right?

13  "A   In this motion, yes.

14  "Q   You're not aware of any holder of preferred shares

15  pursuing this motion other than the three Funds managed

16  by the Advisors, correct?

17  "A   No, I'm not aware of any others.

18  "Q   You didn't personally inform any holder of

19  preferred shares, other than the Funds that are the

20  Movants, that this  motion would be filed, did you?

21  "A   No, I did not.

22  "Q   You're not aware of any steps taken by either of

23  the Advisors to provide notice to holders of preferred

24  shares that this motion was going to be filed, are you?

25  "A   I'm not, no.

Dondero - Direct                    74

1     "Q   And you're not aware of any attempt that was made

2     to obtain the consent of all of the noteholder -- of

3     all the holders of the preferred shares to seek the

4     relief that is sought in this motion, correct?

5     "A   That's correct.

6     "Q   You don't have any personal knowledge, personal

7     knowledge, as to whether any holder of preferred shares

8     other than the Funds managed by the Advisors wants the

9     relief sought in this motion, correct?

10    "A   Correct.

11    "Q   You don't have any personal knowledge as to

12    whether any of the CLOs that are subject to the

13    contracts that you described want the relief that's

14    being requested in this motion, right?

15    "A   That's correct.  I have not spoken or been

16    involved at all directly with the CLOs.  I'm

17    representing the Funds."

18        MR. MORRIS:  Moving to Page 49.  I just have a bit

19    more, Your Honor.  Page 49, Line 9.  And this is the reference

20    to his declaration.

21    "Q   And Paragraph 9 refers to a transaction involving

22    SSP Holdings, LLC; do I have that right?

23    "A   That's correct.

24    "Q   Do you know what SSP stands for?

25    "A   See if we say it in there.  SSP Holdings, LLC.

1     "Q    Right.  Do you know what SSP stands for?

2     "A    I don't.  Something Steel Products.  I --

3     "Q    Okay.  You don't need to guess.  These are the

4     only two transactions that the Movants question; is

5     that right?

6     "A    These   transactions,   as   well   as   certain

7     transactions around Thanksgiving time.

8     "Q    Okay.   We'll  talk  about  those.    But  those

9     transactions about -- around Thanksgiving time aren't

10    in your (audio gap)?

11    "A    Not specifically mentioned by name.

12    "Q    Okay.  Let's talk about the two that are mentioned

13    by name, Trussway and SSP.  The Movants do not contend

14    that either transaction was the product of fraudulent

15    conduct, do they?

16    "A    No.

17    "Q    The   Movants  do  not  contend  that  the  Debtor

18    breached   any   agreement   by   effectuating   these

19    transactions, do they?

20    "A    I don't believe so.

21    "Q    In  fact,  the  Movants  do  not  contend  that  the

22    Debtor  violated  any  agreement  at  any  time  in  the

23    management  of  the  CLOs  listed  on  Exhibit  B;  is  that

24    right?

25    "A    That's right.

Dondero - Direct                              76

1       "Q   The  Movants  don't  even  question  the  Debtor's

2       business judgment, only the results of the trans -- of

3       these two transactions.  Is that right?

4       "A   That's right.  And the results is the key here,

5       and the approach."

6            MR. MORRIS:  Moving on to Page 51, Line 8:

7       "Q   Sir, you never asked the Debtor what factors it

8       considered in making these trades, right?

9       "A   I did not.

10      "Q   And you have no reason to believe that anyone on

11      behalf  of  the  Movants  ever  asked  the  Debtor  why  it

12      executed these (audio gap), right?

13      "A   I don't have any knowledge.  There could have been

14      somebody from (audio gap) Movants.  But I do not."

15           MR. MORRIS:  Page 54, Line 19:

16      "Q   Let's  just  talk  briefly  about  the  transactions

17      that  occurred  (garbled)  Thanksgiving.  They're  not

18      specifically referred to in your declaration; is that

19      right?

20      "A   That's correct.

21      "Q   And you have no knowledge about any transaction

22      that Mr. Seery wanted to execute around Thanksgiving;

23      is that right?

24      "A   I  know  there  were  transactions  and  there  were

25      concerns from our management team, but I'm not aware of

Dondero - Direct                    77

1    what those transactions were.

2    "Q   In fact, you can't even identify the assets that

3    Mr. Seery wanted to sell around Thanksgiving, or at

4    least you couldn't at the time of your deposition

5    yesterday.  Is that right?

6    "A   That's correct.

7    "Q   And you have no knowledge as to why Mr. Seery

8    wanted to make particular trades around Thanksgiving?

9    "A   No, I don't.

10   "Q   And in fact, you don't even know if the

11   transactions that Mr. Seery wanted to close around

12   Thanksgiving ever in fact closed.  Is that fair?

13   "A   Correct."

14       MR. MORRIS:  Last one.  Page 56, Line 1:

15   "Q   Okay.  To the best of your knowledge, does this

16   document accurately reflect the composition of the

17   boards of each of the three Movant Funds?

18   "A   Yes, it does.

19   "Q   Okay.  John Honis, I think you mentioned him

20   earlier.  He's on all three boards.  Is that right?

21   "A   Yeah, that's correct.  And the reason we're --

22   we're being -- we have a unitary board structure, so --

23   which is very common in '40 Act Fund land, where the

24   board sits, for efficiency purposes, on multiple fund

25   boards, and there's a lot of economies of scale from an

1    operating standpoint.  So, yes, they sit on multiple

2    boards.

3    "Q   Okay.  And for purposes of the '40 Act, Mr. Honis

4    has been deemed to be an interested trustee.  Is that

5    right?

6    "A   That's correct.

7    "Q   Okay.  But you don't specifically know what (audio

8    gap) caused that designation; you only know that the

9    designation exists.  Right?

10   "A   That's right.  And I know they are disclosed in

11   the proxy -- or, in the -- the relative filings related

12   to those Funds.

13   "Q   Okay.  Three other people are common to all three

14   Movant Funds.  I think you've got Dr. Froehlich, Ethan

15   Powell, --

16       MR. MORRIS:  I think he -- pronunciation.

17   "A   Froehlich.

18   "Q   Ethan Powell and Bryan Ward.  Right?

19   "A   That is correct.

20   "Q   Okay.  All three of those individuals actually

21   serve on the 11 or 12 boards that you mentioned earlier

22   that are managed by the Advisors, right?

23   "A   That is correct.

24   "Q   And they're the same Funds for which you serve as

25   the executive vice president, right?

1    "A   This is correct -- yes.  That's correct.

2    "Q   So, for all of the Funds that are managed by the

3    Advisors, you serve as executive vice president and all

4    four of these directors -- trustees serve as trustees

5    on the boards, right?

6    "A   Yes, that's correct.

7    "Q   Okay.  In exchange for serving on all of these

8    boards, the three individuals -- Dr. Froehlich, Mr.

9    Ward, and Mr. Powell  -- each receive $150,000 a year

10   for services across the Highland complex; is that

11   right?

12   "A   That's correct.

13   "Q   Dr. Froehlich has been serving as a board member

14   across the Highland complex for seven or eight years

15   now; is that right?

16   "A   That's correct.

17   "Q   Mr. --

18   "A   I believe it's about seven or eight years.

19   "Q   Mr. Powell, he actually was employed by Highland

20   related -- Highland or related entities from about 2007

21   or 2008 until 2015, right?

22   "A   That's correct.

23   "Q   And Mr. Ward, the third of the independent

24   trustees, he's been serving on a board or various of --

25   on various Highland-related funds on a continuous basis

1      since about 2004.  Do I have that right?

2      "A    Yeah, I believe that's correct."

3           MR. MORRIS:  Your Honor, that concludes the reading

4  of the portions of Mr. Norris's testimony that I wanted to

5  present to the Court.

6      I know it's 11:30 now, and I would respectfully request

7  that we simply adjourn and let Your Honor tend to your

8  business.

9           THE COURT:  Okay.

10           MR. MORRIS:  And hopefully when we come back at 1:00

11  o'clock, we'll have a better connection.

12           THE COURT:  All right.  So, we are going to go into

13  recess until 1:00 o'clock Central.  Mike, can people just stay

14  connected, or should they --

15           THE CLERK:  Yes.  They can stay.  Yes.

16           THE COURT:  You can stay or reconnect, whichever you

17  want.  But we'll see you at 1:00.

18           MR. MORRIS:  Thank you, Your Honor.

19           THE CLERK:  All rise.

20      (A luncheon recess ensued from 11:33 a.m. until 1:37 p.m.)

21           THE CLERK:  All rise.  The United States Bankruptcy

22  Court for the Northern District of Texas, Dallas Division, is

23  now in session, the Honorable Stacey Jernigan presiding.

24           THE COURT:  Good afternoon.  Please be seated.

25  Apologies.  I was a little ambitious in my time estimate.  So,

Dondero - Direct                    81

1    anyway, I didn't have any control over getting in and out of

2    Parkland Hospital, so I'm just grateful to be here.

3        All right.  We were in the middle of direct examination of

4    Mr. Dondero.  Mr. Morris, are you ready to proceed?

5            MR. MORRIS:  I am, Your Honor, and I'm hopeful that

6    the computer issues have resolved themselves.  It remains to

7    be seen once we try.  If problems arise again, I plan on just

8    putting this on mute and dialing in through the telephone,

9    kind of the other alternative.

10           THE COURT:  All right.

11           MR. MORRIS:  So (garbled) and I apologize to Mr.

12   Dondero, too.  I know I'm testing his patience.  But it's not

13   for any reason other than technological.

14           THE COURT:  All right.

15           MR. MORRIS:  And Your Honor, you don't have to

16   apologize for keeping us waiting.  That's okay.

17           THE COURT:  Okay.

18           MR. MORRIS:  But thank you.

19           THE COURT:  All right.  Mr. Dondero, --

20           MR. MORRIS:  All right.  So, --

21           THE WITNESS:  Yeah.

22           THE COURT:  I was just going to remind you, I have to

23   remind you you're still under oath.

24       Are you ready, Mr. Morris?

25           MR. MORRIS:  I am, Your Honor.

Dondero - Direct                              82

1              THE COURT:  All right.  You may proceed.

2              MR. MORRIS:  And we're going to begin with the

3    document that we had difficulty scrolling through earlier,

4    which we have now sent to counsel, and that would be what was

5    marked as Exhibit D on Docket No. 46.

6              THE COURT:  All right.

7              MR. MORRIS:  That's the email string that we had seen

8    earlier that I think Your Honor admitted into evidence.  Do I

9    have that right?

10             THE COURT:  Yes.

11             MR. MORRIS:  Okay.

12                    DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q    So, let's just start at the bottom and see if we can do

15   this more easily, Mr. Dondero.  And again, I apologize for

16   keeping you waiting before.  Starting at the bottom, that's an

17   email from Hunter Covitz.  Do you see that?

18   A    Yeah, I see it.

19   Q    And he's an employee of the Debtor, right?

20   A    Yes.

21   Q    And your understanding is that Mr. Covitz actually helps

22   the Debtor manage the CLO assets, right?

23   A    Yes.

24   Q    And in this email, Mr. Covitz is giving directions to Matt

25   Pearson and Joe Sowin regarding certain securities held by the

1  CLOs, right?

2  A    Yes.

3  Q    And if we could scroll up, hopefully, we can see that you

4  received a copy of this email.

5         MR. MORRIS:  Yeah.  Right there.

6  BY MR. MORRIS:

7  Q    Do you see that?

8  A    Yes.

9  Q    And then -- and then you instructed the recipients of Mr.

10  Covitz's email not to sell the SKY securities as had been

11  instructed by Mr. Seery, correct?

12  A    Yes.

13  Q    And you understood when you gave that instruction that the

14  people on the email were trying to execute trades that Mr.

15  Seery had authorized, correct?

16  A    Incorrect.

17  Q    You didn't know that, sir?

18  A    What I knew was that Seery had not authorized the trade,

19  he had orchestrated the trade.  Hunter is not an analyst with

20  any particular knowledge.  I called Hunter, why would he sell

21  those?  And he said Seery told him to sell those.  So it

22  wasn't that Seery authorized Hunter trading it.  It was Seery

23  told Hunter to trade it, which is -- which is a material

24  difference in my mind.

25  Q    Okay.  So I'll ask you again.  At the time you gave the

Dondero - Direct                                84

1   instruction, "No, do not," you knew that you were stopping

2   trades that had been authorized and directed by Mr. Seery,

3   correct?

4   A    Yes.

5   Q    You didn't speak with Mr. Seery before sending this email,

6   did you?

7   A    No.

8   Q    And you took no steps to seek the Debtor's consent before

9   instructing the recipients of this email to stop executing the

10  SKY transactions.  Is that right?

11  A    I'm sorry.  I missed the first part of that question.

12  Q    Okay.  You took no steps to seek the Debtor's consent

13  before instructing the recipients of this email to stop

14  executing the SKY transactions that were authorized by Mr.

15  Seery, correct?

16  A    I don't -- I'm not sure I was permitted to talk to Seery

17  at this point, but I don't recall specifically, no.

18  Q    You didn't seek consent, did you, before stopping these

19  trades?

20  A    No.

21  Q    Okay.  In response to your instruction --

22       MR. MORRIS:  If we could scroll up to the next

23  response.

24  BY MR. MORRIS:

25  Q    You see the response from Mr. Pearson?

Dondero - Direct                          85

1  A    Yes.

2  Q    And in response to your instructions, Mr. Pearson canceled

3  all of the SKY and AVYA sales that the Debtor had directed but

4  which had not yet been executed, right?

5  A    Yes.

6  Q    Okay.

7          MR. MORRIS:  Can we scroll up to the next email,

8  please?

9  BY MR. MORRIS:

10 Q    And you responded again, right?  That's your response?

11 A    Yes.

12 Q    Can you read your response out loud, please?

13 A    (reading) HFAM and DAF have instructed Highland in writing

14 not to sell any CLO underlying assets.  There is potential

15 liability.  Don't do it again, please.

16 Q    And the writings that you refer to there are the two

17 letters that we looked at earlier, the October 16 and the

18 November 24 letter, right?

19 A    I believe so.  If not, if there's a third or fourth

20 letter, all the letters in aggregate.

21 Q    All right.  And you, you interpreted those letters not as

22 requests but, as you tell the recipients of your email here,

23 that they were actually instructions, right?

24 A    That was -- that was my choice of words.  I don't know if

25 I thought about it that clearly.

1  Q    Okay.  But the reci... you have no reason to believe that

2  the recipient of this email wouldn't understand that you

3  believed that Highland had been instructed not to do these

4  trades, right?

5  A    I'm sorry.  Can you ask that again?  I had no reason to

6  believe what?

7  Q    That's okay.  I'll move on.  At this juncture, the

8  reference to potential liability was intended for Mr. Pearson,

9  right?

10  A    Frankly, when you violate the Advisers Act, the CFO has

11  liability.  I mean, I'm sorry, the chief compliance officer

12  has liability, and anybody who has an awareness that it

13  violates the Advisers Act has potential liability also.

14  Q    And is it -- is it your testimony and your position that

15  Mr. Pearson had potential liability under the Advisers Act for

16  carrying out Mr. Seery's trade requests?

17  A    Yes, once he was informed that the underlying investors

18  didn't want assets sold and Seery had stated he had no

19  business purpose in selling those assets.

20          MR. MORRIS:  I move to strike the latter part of the

21  answer, Your Honor.  Mr. Dondero has testified repeatedly

22  multiple times that he has never communicated with Mr. Seery

23  about why he wanted to make these transactions.

24          THE COURT:  I grant that.

25  BY MR. MORRIS:

1  Q   Mr. Sowin responded and indicated that he would follow
2  your instructions, right, if we scroll to the next email?
3  A   I'm sorry.  What part are you saying, or what part are you
4  referring to?
5  Q   Mr. Sowin.  Who is Mr. Sowin?
6  A   He's Matt Pearson's boss.  He's the head trader.
7  Q   And he works for the Advisors, right?
8  A   Yes.
9  Q   He's one of your employees, right?
10  A   Yes.
11  Q   Mr. Sowin followed your instructions as set forth in this
12  email, right?
13  A   He did a bunch of things, but, yes, I believe -- yes,
14  that's a fair way to characterize.
15  Q   And the only information that you know of that he's
16  relying upon to state that Compliance should never have
17  approved this order was your email that preceded it, right?
18  A   No.
19  Q   No?  There's nothing else on this email other than your
20  email that preceded it, correct?
21  A   Correct.
22  Q   Okay.  A few days later, you learned that Mr. Seery was
23  trying a workaround to effectuate the trades anyway, right?
24  A   I believe so.
25         MR. MORRIS:  Can we scroll up to the next email?

1   BY MR. MORRIS:

2   Q    This is your response to Mr. Surgent, right?

3   A    Yes.

4   Q    Now, Mr. Surgent hasn't written anything.  He is not part

5   of this conversation, is he?

6   A    No.

7   Q    But you bring him into the conversation, right?

8   A    Because he's the chief compliance officer at Highland,

9   yes.

10  Q    He's not -- he's not the chief compliance officer for the

11  Advisors.  He's the chief compliance officer for a company

12  that you no longer work for, right?

13  A    Correct, but he has personal liability for violations of

14  the Advisers Act.

15  Q    Okay.  And you thought it was your responsibility to

16  remind him of that, right?

17  A    It was my view of the situation, and at least he could

18  evaluate it himself if I reminded him of it, yes.

19  Q    Uh-huh.  What does it mean to do a workaround?  What did

20  you mean by that?

21  A    There's a concept in compliance called you can't do

22  something indirectly that you can't do directly, and that's

23  what I was referring to there.

24  Q    Does that mean that he was trying to effectuate the trade

25  without the assistance of the Advisors?

1   A    I believed he was trying to do it without compliance and

2   without proper regard for investors, so that's why I described

3   it as a workaround.

4            MR. MORRIS:  I move to strike.

5            THE COURT:  Sustained.

6   BY MR. MORRIS:

7   Q    I'm asking you a very specific question.

8            MR. MORRIS:  Can I have a ruling, Your Honor?  Thank

9   you.

10           THE COURT:  Yes.

11  BY MR. MORRIS:

12  Q    Did you, when you used the phrase workaround, did you mean

13  that he was trying to effectuate the trade without relying on

14  the Advisors' employees?

15  A    No.

16  Q    Okay.  But you found out about the trade and you thought

17  it was a good idea to send Mr. Surgent this email, right?

18  A    Yes.

19  Q    Can you read the last line of your email?

20  A    (reading)  You might want to remind him and yourself that

21  the chief compliance officer has personal liability.

22  Q    Personal liability for effectuating a trade that Mr. Seery

23  had authorized, correct?

24  A    For violating the Advisers Act, is what I meant.

25  Q    Uh-huh.  Did you report anybody to the SEC?

1    A    I would be happy to if it's permitted by the Court.

2    Q    But you didn't -- you never asked the Court to do that,

3    right?

4    A    No.

5    Q    It didn't seem important enough for you to take that step,

6    right?  But you wanted -- you had to make sure that you told

7    Mr. Surgent that he might be personally liable, right?  That

8    was what you needed to do?

9    A    Could you repeat that question, please?

10   Q    You needed to make sure that Mr. Surgent knew that you

11   were threatening him with personal liability if he followed

12   Mr. Seery's instructions, right?

13   A    No.

14   Q    As a factual matter, you never asked Mr. Seery why he

15   wanted to make these trades, right?

16   A    I asked Joe Sowin to ask him.

17   Q    As a factual matter, you never asked Mr. Seery why he

18   wanted to make these trades, correct?

19   A    I believe I wasn't permitted to talk to him.

20   Q    In November 2020?  What would have prevented that?

21   A    I believe Scott Ellington was the go-between at that

22   point in time.

23   Q    Is it your testimony that you never spoke with Jim Seery

24   in November 2020?

25   A    I believe in an unauthorized fashion, the day after

1   Thanksgiving I talked to him, but that's the only day I can

2   remember.

3   Q    Should we call up the email where you threatened him not

4   to do it again?

5   A    That was an email.

6   Q    Ah.  So you could communicate by email?  Did you ever send

7   Mr. Seery an email and say, Why do you want to do these

8   trades?

9   A    No.

10  Q    But somehow you thought you couldn't even speak to him?

11  You couldn't speak to him but you can send him emails?  That's

12  the world that you live in, right?  That's what you think?

13  A    I have no comment on that.

14  Q    All right.  So, after this exchange, --

15          MR. MORRIS:  And this is what I read out-of-order

16  before, Your Honor.  We moved to the December 16th hearing.

17  BY MR. MORRIS:

18  Q    And you remember, Mr. Dondero, that the Defendants made

19  that motion that asked the Court to stop the Debtor from

20  trading in the CLO assets?  Do you remember that?

21  A    I'm sorry.  You're asking me do I remember letters were

22  sent?  Yes.

23  Q    No.  Do you remember that there was a hearing in mid-

24  December?

25  A    Yes.

1  Q    Okay.

2           MR. MORRIS:  And Your Honor, for the record, Exhibit

3  A is the Debtor -- is the Defendants' motion.  Exhibit B is

4  the transcript that we had looked at earlier or that I had

5  read portions of earlier.

6           THE COURT:  Okay.

7           MR. MORRIS:  And Exhibit C is the order that the

8  Court entered denying the Defendants' motion.

9      Can we call up Exhibit C, please?

10 BY MR. MORRIS:

11 Q    All right.  Do you see --

12           MR. MORRIS:  If we could scroll to the very top,

13 please.  All right.

14 BY MR. MORRIS:

15 Q    Do you see this document is dated December 18th, sir?

16 A    Yes.

17 Q    And if we scroll down, this is the order denying the

18 motion of the Advisors and the Funds for an order trying to

19 temporarily restrict the Debtor's ability as portfolio manager

20 from initiating sales.  Do you see that?

21 A    Yes.

22 Q    Okay.  So, this is December 18th.  And if you'll recall,

23 the TRO was issued against you on December 10th.  Do you

24 remember that?

25 A    I don't believe it was the 10th.

Dondero - Direct                              93

1    Q    Okay.  It was in December, and it was just before this.

2    Is that fair?

3    A    I believe there was an intent, and then the actual filing

4    I think was much later.  I don't have -- I don't have the

5    knowledge.  I don't have the knowledge of when the TRO was put

6    in place.

7    Q    Okay.  (Pause.)  Okay.  We talked earlier about how you

8    interfered with Mr. Seery's trading activities around

9    Thanksgiving.  Do you remember that?

10   A    Yes, I do.  I do remember the trading then, also.

11   Q    Okay.  And do you remember that just before Christmas you

12   interfered with Mr. Seery's tradings again?

13   A    Yes.

14   Q    Okay.

15            MR. MORRIS:  If we can call up Exhibit K from Docket

16   No. 46, which I have shared with counsel?

17            THE WITNESS:  You know what?

18   BY MR. MORRIS:

19   Q    Yeah.

20   A    Let's handle these each incident one at a time.  And I

21   don't want to use the word "interfering" or accept the word

22   "interfering" as an answer because I think my participation in

23   each situation was very different.

24            MR. MORRIS:  All right.  Can we scroll down?

25   BY MR. MORRIS:

Dondero - Direct                          94

1    Q    This is a letter that my firm wrote to Mr. Lynn.  Mr. Lynn

2    is your lawyer.  Is that right?

3    A    Yes.

4         MR. MORRIS:  And if we could start down at the first

5    page.  We've seen these letter before.  A little further.

6    BY MR. MORRIS:

7    Q    Do you see there is a reference there to the Debtor's

8    management of CLOs?

9    A    Yes.

10   Q    And there is a recitation of the history that we talked

11   about a bit earlier.  If we -- if we look further in that

12   paragraph to around Thanksgiving, when you intervened to block

13   the trades.

14   A    Yes, I see that sentence.

15   Q    Okay.

16        MR. MORRIS:  And then if we can go to the next page,

17   the next paragraph.  Yeah, that's where.

18   BY MR. MORRIS:

19   Q    Then we referred to the December 16th hearing, right?  And

20   then the next paragraph says, "On December 22, 2020" --

21        MR. MORRIS:  Can you scroll down just a little bit?

22   Nope, the other way.  Yeah, right there.

23   BY MR. MORRIS:

24   Q    "On December 22, 2020, employees of NPA and HCMFA" --

25   those are the Advisors, right?

Dondero - Direct                                        95

1   A    Yes.

2   Q    -- "notified the Debtor that they would not settle the

3   CLO's sale of the AVYA and SKY security."  Have I read that

4   correctly?

5   A    Yes.

6   Q    All right.  On or about December 22nd, you personally

7   instructed employees of the Advisors not to trade the SKY and

8   AVYA securities that Mr. Seery had authorized.  Is that right?

9   A    No.

10  Q    You personally instructed, on or about December 22, 2020,

11  employees of those Advisors to stop doing the trades that Mr.

12  Seery had authorized with respect to SKY and AVYA, right?

13  A    No.  You know, we need to look at source documents.  My

14  recollection is I encouraged Compliance to look at those

15  trades.  But I'm willing to be -- I'm willing to be -- get

16  source documents again, if you'd like.

17  Q    All right.  My source document is your prior testimony.

18          MR. MORRIS:  Can we please call up Exhibit NNNN at

19  Page 73?  Beginning at Line 2?  Okay.

20  BY MR. MORRIS:

21  Q    Page 73, beginning at Line 2, did you give the following

22  answer to my question?

23      "Q    And  you  personally  instructed,  on  or  about

24      December 22nd, 2020, employees of those Advisors to

25      stop  doing  the  trades  that  Mr.  Seery  had  authorized

1    with respect to SKY and AVYA, right?

2        "A    Yeah.    Maybe we're splitting hairs here, but I

3        instructed them not to trade them.    I never gave

4        instructions not to settle the trades that occurred,

5        but that's a different ball of wax."

6    Q    Did you give that answer, sir?

7    A    I believe I confused dates or misspoke there, but I did

8    give that answer.

9    Q    Okay.  Thank you.  Stated a different way, you personally

10   instructed the Advisors' employees not to execute the trades

11   that Mr. Seery had authorized but which had not yet been made,

12   right?

13   A    No.  Not -- not on December 22nd.  That was in November.

14   November 22nd, I did not do that.

15   Q    Okay.

16           MR. MORRIS:  Can we go to Page 76, please?  Line 15.

17   BY MR. MORRIS:

18   Q    Did you give this answer to my question?

19       "Q    And you would agree with me, would you not, that

20       you instructed the employees of the Advisors not to

21       execute the very trades that Mr. Seery identifies in

22       this email, correct?

23       "A    Yes."

24   Q    Did you give that answer, sir?

25   A    Well, like I said, I -- I confused the Thanksgiving

1  trades, the week of Thanksgiving, with my more nuanced

2  responses to later trades.

3          MR. MORRIS:  I move to strike, Your Honor.  It's a

4  very simple question.

5          THE COURT:  Granted.

6  BY MR. MORRIS:

7  Q    Did you give that answer to my question, sir?

8  A    I -- yes, I did.

9  Q    Thank you.  Now, all of this is just a week after that

10 December 16th hearing, right?

11 A    Yes.

12 Q    And right after that hearing, the K&L Gates firm sent, on

13 behalf of the Defendants, more letters to the Debtors, right?

14 A    Yes.

15         MR. MORRIS:  Can we please pull up the first letter?

16 It's Exhibit DDDD.  And if we can go not to our response but

17 to the original letter that was sent that's attached to this.

18 I think it is Exhibit A.  Right there.

19 BY MR. MORRIS:

20 Q    That's the first of the letters, December 22, 2020.  Do

21 you see that?

22 A    Yes.

23         MR. MORRIS:  And can we scroll down to the end of the

24 letter to see what the request is here?  Right there.

25 BY MR. MORRIS:

1    Q    Can you read the end of that letter right there, sir?

2    A    (reading)  Sincerely, A. Lee Hogewood, III.

3    Q    Nice.  I meant the actual substance.

4    A    (reading)  For the foregoing and other reasons, we request

5    that no further CLO transactions occur, at least until the

6    issues raised by and addressed in the Debtor's plan are

7    resolved at the confirmation hearing.

8    Q    Okay.  And that's similar in substance to the letter that

9    was sent on behalf of the Defendants on October 16th that you

10   saw and approved, right?

11   A    I did not see and approve.

12   Q    All right.  The record will speak for itself.  And it's

13   similar in substance to the letter that was sent on November

14   24th by the K&L Gates clients on behalf of the Defendants,

15   right?

16   A    I don't know.

17   Q    We looked at it before.  Should we get it again?

18   A    It's a -- all the letters, as far as I understand, were

19   similar in requesting that the -- the beneficial owners of the

20   CLOs were requesting that no wholesale liquidation of their

21   assets occur.  That's how I understand it.

22   Q    And that's --

23   A    You asked my understanding.  That's my understanding.

24   Q    Okay.  And notwithstanding the request in this letter,

25   when you were -- when you were talking to the traders at your

1  shop, you actually told them that the Debtor was instructed

2  not to do these trades, right?

3  A    Are you parsing "instructed" versus "requested"?  I don't

4  understand the question.

5  Q    I am, in fact.  You used a very different phrase when

6  speaking to your employees than you did -- then your lawyers

7  did when they wrote to the Debtor, right?

8  A    It seems to be a difference, yes.

9  Q    Okay.  So, this is on December 22nd.  Now, the night

10  before, you participated in a meeting with Grant Scott and

11  with the lawyers for the Defendants, right, to talk about what

12  you guys were going to do with respect to the Debtor's

13  management of the CLOs.  Isn't that right?

14  A    I don't remember specifically.

15  Q    Okay.  But is it fair to say it's true, is it not, that

16  during the week leading up to Christmas you participated in

17  several phone calls with the K&L Gates firm and with other

18  members of the Defendants' -- the Advisors, Mr. Sowin or Mr.

19  Post or Mr. Sauter, and the lawyers, right?  You were all

20  together talking about these issues during the week before

21  Christmas, right?

22          MR. RUKAVINA:  Your Honor, I'm going to object.  If

23  counsel is asking what was discussed with counsel present for

24  the purpose of legal advice, that is an inappropriate

25  question.

1           THE COURT:  Okay.

2           MR. MORRIS:  I'm certainly not.  I'm asking if the

3    conversations took place.

4           MR. RUKAVINA:  And the conversations -- the question

5    was, did they discuss what to do with respect to the CLOs?

6    That would be privileged, Your Honor.  If they discussed

7    football, that's not privileged, but what to do with the CLO

8    management agreements is privileged.

9           THE COURT:  Okay.  I sustain.

10          MR. MORRIS:  Can we please call up Exhibit TT?  I'm

11   sorry, TTT.  Nope, TTTT.  TTTT.  Can you scroll down a bit?

12   Right there.

13   BY MR. MORRIS:

14   Q    Do you see -- this is an email from Grant Scott to Scott

15   Ellington; do you see that?

16   A    Yes.

17   Q    And at this point, Mr. Ellington is still working for the

18   Debtor, right?

19   A    Yes.  I believe he was settlement counsel.

20   Q    Uh-huh.  And do you see that this is an email that refers

21   to your availability for a 9:00 a.m. call?

22   A    Yes.

23   Q    And do you see that there's a question as to whether the

24   K&L people can make it?

25   A    Yes.

1  Q    And you understand that refers to K&L Gates, right?

2  A    I -- I guess so.

3  Q    And so does this refresh your recollection that at or

4  around Christmas, or in the days leading up to Christmas, you

5  participated in calls with Mr. Scott, with Scott Ellington,

6  and with the K&L Gates folks?

7  A    I -- I don't know.  I don't know if -- if I actually did

8  or not.  But I was highly concerned with inappropriate

9  behavior.

10 Q    And you were available -- and did you tell somebody that

11 you were available for this call on the morning of the 23rd?

12 A    I don't know.

13 Q    This is the day after you stopped the trades, right?

14 A    Again, I didn't stop the trades on the 23rd.

15 Q    You stopped them on the 22nd, right?

16 A    No, I stopped them on the week of Thanksgiving.

17        MR. MORRIS:  Can we go back to Exhibit NNNN, the

18 transcript?  Page 73?

19 BY MR. MORRIS:

20 Q    Let me see if I can refresh your recollection.  Tab 2.

21 Did you give this answer to this question:

22     "Q    And    you    personally    instructed,    on    or    about

23     December 22, 2020, employees of those Advisors to stop

24     doing    the    trades    that    Mr. Seery    had    authorized    with

25     respect to SKY and AVYA, right?

1      "A   Yeah.   Maybe we're splitting hairs here, but I

2      instructed them not to trade them."

3  Q    Did you give that answer to the question?

4  A    Yes.

5  Q    Okay.

6  A    But we -- we corrected.

7  Q    All right.  You didn't correct it at the preliminary

8  injunction hearing, did you?

9  A    No, I did not.

10  Q    Okay.  So as far as the Court knows as of this moment,

11  that's the only testimony that you've ever given on the topic,

12  right?

13  A    I'm trying to give some now.

14  Q    Okay.  And on December 22nd, that's the date that the

15  first letter was also sent, right, we just looked at?

16  A    All right.  Okay.

17  Q    You agree with that, right?

18  A    I don't remember the date on the letter.  If you want to

19  pull it up, I'll say it is the 22nd or the 23rd, whatever it

20  says.  I don't know.

21  Q    Sure.

22          MR. MORRIS:  Let's go back to DDDD, please.  And if

23  we can just go to the top of the letter.  Thank you.

24  BY MR. MORRIS:

25  Q    K&L Gates.  December 22nd.  That's the letter, right?

1    A    Yes.

2    Q    And according to the testimony that you gave at the

3    preliminary injunction hearing on January 8th, that's the day

4    that you also stopped AVYA and SKY trades, right?

5    A    I'm not agreeing to that testimony.  I am changing the

6    testimony.

7    Q    Okay.  And then we just saw that other exhibit where they

8    were trying to arrange a phone call with you, the K&L Gates

9    lawyers, and Mr. Ellington and Grant Scott for the 23rd.  Do

10   you remember that one we just looked at?

11   A    Yes.

12   Q    And then later on the day on the 23rd, K&L Gates sends

13   another letter, right?

14            MR. MORRIS:  Can we call up EEEE?  And can we scroll

15   to the Exhibit A, to our response?  Right there.

16   BY MR. MORRIS:

17   Q    That's the 23rd.  Do you see that letter?

18   A    Yes.

19   Q    Again, this is one week after the hearing, right?

20   A    Yes.

21   Q    Okay.  And this is a letter where K&L Gates states on

22   behalf of the Defendants that they are contemplating taking

23   steps to terminate the CLO management agreements, right?

24   A    I don't know.  Can you scroll down, if you want to ask me

25   --

1   Q    Sure.

2          MR. MORRIS:  Can we flip to the next page, please?

3   Keep going.  Right there.

4   BY MR. MORRIS:

5   Q    Can you read the first sentence of the paragraph

6   beginning, "Consequently"?

7   A    (reading)  Consequently, in addition to our request of

8   yesterday, where appropriate and consistent with the

9   underlying contractual provisions, one or more of the entities

10  above intend to notify the relevant Trustees and/or Issuers

11  that the process of removing the Debtor as fund manager should

12  be initiated, subject to and with due deference to the

13  applicable provisions of the United States Bankruptcy Code,

14  including the automatic stay of Section 362.

15  Q    Okay.  So, on December 23rd, the Defendants told the

16  Debtor that they intended to notify the relevant Trustees

17  and/or the Issuers that the process of removing the Debtor as

18  the fund manager should be initiated, right?

19  A    That's what it says.

20  Q    And then the K&L Gates firm sent yet another letter to the

21  Debtor, right?  Do you remember that?

22  A    No.

23         MR. MORRIS:  Can we get up FFFF, please?

24  BY MR. MORRIS:

25  Q    This is dated December 31st.  Do you see that?

1  A    Yes.

2          MR. MORRIS:  Can we scroll down a bit?

3  BY MR. MORRIS:

4  Q    Do you recall this is the letter where they claim that

5  they've been damaged by the Debtor's eviction of you from the

6  Highland offices?

7  A    I don't remember specifically, but that's true.

8  Q    Okay.  So we just saw these three letters, in addition to

9  your -- the -- at least the testimony you gave regarding your

10  conduct on the 22nd of December.  You were aware that all of

11  these letters were being sent by K&L Gates, correct?

12  A    Yes, generally.

13  Q    And you were supportive of the sending of these letters,

14  right?

15  A    Absolutely.  They were appropriate.

16  Q    And you pushed and encouraged the chief compliance officer

17  and the general counsel to send these letters, right?

18  A    I'd like to think that they believed and they acted

19  largely on their own judgment, but I strongly believed it was

20  a violation of the Advisers Act, and stated that numerous

21  times.

22  Q    Sir, you pushed and encouraged the chief compliance

23  officer and the general counsel to send these letters,

24  correct?

25  A    No, I wouldn't use those words.

Dondero - Direct                          106

1   Q    Do you understand that the Debtor demanded that the K&L

2   Gates clients or the Defendants withdraw these letters?

3   A    I believe they requested it.  I didn't -- I didn't know

4   the former, what you mean by demand, but --

5   Q    Well, it's fair to say you never instructed the K&L Gates

6   clients or the Defendants to withdraw these letters, right?

7   A    No.  I still believe they are appropriate and accurate.  I

8   wouldn't withdraw them today.

9   Q    Okay.  Sir, throughout 2020, when you were still the

10  portfolio manager at Highland Capital Management, it's true

11  that you sold AVYA shares on numerous occasions on behalf of

12  both the CLOs and on behalf of the Funds outside of the

13  holdings of the CLOs?

14  A    Always with a business purpose, yes.  That is still a

15  small percentage of our total AVYA holdings, and we still

16  liked AVYA.

17  Q    Sir, I'm going to ask you just one more time.  In 2020,

18  you sold AVYA stock many times on behalf of the CLOs and on

19  behalf of the Funds?

20  A    Yes.

21  Q    Thank you.

22          MR. MORRIS:  No further questions, Your Honor.

23          THE COURT:  All right.  Mr. Rukavina?

24          MR. RUKAVINA:  Your Honor, I will reserve my

25  questions to my case in chief, and I would request a very

1 | short restroom break.

2 |         THE COURT:  All right.  Mr. Dondero, we're --

3 |         MR. RUKAVINA:  And I do mean short.  I will --

4 |         THE COURT:  I'm sorry.  What?

5 |         MR. RUKAVINA:  And I do mean short, Your Honor.  I

6 | just need to run and be back -- I can be back in three

7 | minutes.

8 |         MR. MORRIS:  No problem, Your Honor.

9 |         THE COURT:  Okay.  You're finished for now, Mr.

10 | Dondero, but you're going to be recalled, so hang tight.

11 |    Your next witness, Mr. Morris?

12 |         MR. MORRIS:  The Debtor calls Jason Post.

13 |         MR. RUKAVINA:  Your Honor, may I be excused to run to

14 | the restroom and Mr. Vasek take over for a few minutes?

15 |         THE COURT:  Oh.  Okay.  I'm sorry.  If you made that

16 | request, I didn't hear you.  So that's fine.

17 |    All right.  Mr. Post, --

18 |         MR. MORRIS:  Your Honor, can we just -- I apologize

19 | for interrupting.  Can we just direct Mr. Dondero not to speak

20 | with anybody about anything at any time?  Not by phone, not by

21 | text, not by email, not by meeting, not by anything?  Because

22 | he's still on the stand.

23 |         MR. RUKAVINA:  Well, Your Honor, anything at any

24 | time.  I think I know that Mr. Morris is being facetious, but

25 | if he's trying to get the rule invoked, that's different.

1          MR. MORRIS:  Okay.  I'm trying to get the rule

2    invoked.

3          THE COURT:  Okay.  All right.  I'm not going to make

4    that instruction.  All right.  So, --

5          MR. RUKAVINA:  I've got to run to the restroom.  I'll

6    be -- listen for the instructions.

7          THE COURT:  Jason Post, you've been called to the

8    witness stand.  Could you say, "Testing, one, two"?

9          MR. POST:  (Indiscernible.)

10         THE COURT:  All right.  Please raise --

11         MR. POST:  Testing, one, two.

12         THE COURT:  Thank you.  Please raise your right hand.

13              JASON POST, DEBTOR'S WITNESS, SWORN

14         THE COURT:  All right.  Mr. Morris, go ahead.

15                       DIRECT EXAMINATION

16   BY MR. MORRIS:

17   Q    Good afternoon, Mr. Post.  We met the other day.  Do you

18   remember that?

19   A    I do.

20   Q    Okay.  So, again, just to remind you, my name is John

21   Morris.  I'm an attorney at Pachulski, Stang, Ziehl & Jones.

22   We represent the Debtor here.  You're the chief compliance

23   officer for each of the Defendants; is that right?

24   A    I am.

25   Q    And in your role as the chief compliance officer, your job

1    is to act as a liaison between regulatory bodies and internal

2    working groups with respect to the rules and regulations for

3    the funds advised by the Advisors; is that correct?

4    A    Correct, that's -- that's the (inaudible).   Correct.

5    Q    All right.  And internally, you report to Mr. Dondero.

6    Isn't that right?

7    A    Correct.

8    Q    And you've been working with Mr. Dondero since 2008 when

9    you joined Highland Capital Management, correct?

10   A    I worked at Mr. Dondero's firm since 2008, but I reported

11   to other direct reports during that time outside of Mr.

12   Dondero.  I started to report to him directly in October of

13   2020.

14   Q    Okay.

15   A    (overspoken)

16   Q    But you've -- you've worked at Highland -- you worked at

17   Highland since 2008, fair?

18   A    Yes.

19   Q    Okay.  And you were employed by Highland up until October

20   2020, correct?

21   A    Yes.

22   Q    Okay.  And at that time, Mr. Dondero left and he went to

23   NexPoint and you went to NexPoint.  Is that right?

24   A    Shortly after Mr. Dondero left Highland, I transitioned

25   over to NexPoint.

1   Q    And that's where Mr. Dondero is, right?

2   A    Correct.

3   Q    Okay.  You joined Highland in 2008, and in around 2011 you

4   joined Highland's internal legal and compliance team, correct?

5   A    That's correct.

6   Q    And in 2015, while still employed by Highland, Mr. Dondero

7   appointed you as the chief compliance officer of the Advisors

8   and the Funds, right?

9   A    Technically, the retail board appointed me the CCO of the

10  Funds, and then I was appointed internally.  I believe Mr.

11  Dondero was part of that decision for the Advisors.

12  Q    Had you ever worked with the retail boards before that?

13  A    There was about -- I worked with them for about a year

14  prior to that.

15  Q    Okay.  And you've served as the CCO, the chief compliance

16  officer, of each of the Advisors and each of the Funds since

17  September 2015 on a continuous basis, right?

18  A    That is correct.

19  Q    You know Thomas Surgent; is that right?

20  A    I do.

21  Q    Mr. Surgent has been the Debtor's chief compliance officer

22  since around 2013 or 2014; is that right?

23  A    I believe -- uh -- I -- I think that's correct.  It may be

24  a year or two off.  He took the role after the former CO

25  resigned, which I don't know if that was 2011 or 2012.  I

1  can't recall specifically.

2  Q    Okay.  But he's been -- he's been in that position for a

3  long time, right?  Fair enough?

4  A    Yes, that's fair.

5  Q    And during the whole time that you were employed by

6  Highland and serving as the chief compliance officer for the

7  Funds and the Advisors, you reported to Mr. Surgent?

8  A    Internally.  Yes, that's correct.

9  Q    Yeah.  And you respect Mr. Surgent; isn't that right?

10  A    During the time I reported to him, yes.

11  Q    Yeah.  And you believed that he did his job well, right?

12  A    As far as I could see, yes.

13  Q    You viewed it as -- you viewed him as a mentor, did you

14  not?

15  A    Yes.  I mean, when I joined the legal compliance team, you

16  know, he was there.  He was a senior member on the team.  And

17  he, you know, helped educate me, along with other, you know,

18  external sources, et cetera, on the compliance function.

19  Q    Uh-huh.  He trained you for the work you're doing now,

20  right?

21  A    With respect to the on-the-job training, yes.

22  Q    Uh-huh.  Despite all of that, throughout all the

23  proceedings, the court hearings, all of the issues that we're

24  talking about in this case, you never, ever stopped to discuss

25  any of these issues with your former mentor, Mr. Surgent; is

1  that right?

2  A    The -- with respect to, for example, the trade (garbled)

3  that you were talking about earlier?

4  Q    Let's do it this way.  From the time that you left

5  Highland until today, you've never discussed with Mr. Surgent

6  Mr. Seery's trades; is that right?

7  A    I believe there was a discussion after -- I can't recall

8  exactly the context.  There was a discussion after the trades

9  in the November time frame.  And then I believe there was a --

10  I responded to an email exchange in the December time frame

11  regarding booking of the trades.

12  Q    Sir, you -- you've never spoken with Mr. Surgent about any

13  issue concerning the Debtor's management of the CLOs, correct?

14  A    I don't recall directly, no.

15  Q    In fact, you're not aware of anyone acting on behalf of

16  the Advisors or the Funds who has reached out to Mr. Surgent

17  to get his views on any of the issues related to this motion.

18  Isn't that right?

19  A    I believe previously there's correspondence that Mr.

20  Dondero had with Surgent.  But aside from that, I'm not aware

21  of any.

22  Q    Is that the email where he reminded him of his personal

23  liability?  Is that the one you're thinking of?

24  A    Correct.

25  Q    Yeah.  Do you know of any other communication -- do you

1    know of any other communication that any of the Defendants had

2    with Mr. Surgent concerning the Debtor's management of the

3    CLOs?

4    A    With Mr. Surgent directly, I don't -- I don't -- I don't

5    believe so.

6    Q    Yeah.  You graduated from Baylor; is that right?

7    A    Correct.

8    Q    But you don't have any certifications or licenses

9    applicable to your work, correct?

10   A    Correct.

11   Q    You don't have any specialized training or education

12   that's relevant to your work as a chief compliance officer,

13   correct?

14   A    Correct.

15   Q    Your job -- your training is limited to on-the-job

16   training; isn't that right?

17   A    That is correct.

18   Q    You've never spoken at any conferences on compliance

19   matters, have you?

20   A    Spoken, no.  Attended, yes.

21   Q    You don't recall presenting any papers at any compliance-

22   related conferences, do you?

23   A    That is correct.

24   Q    You've never published anything in connection with your

25   work as a compliance officer; isn't that right?

1    A    Not that I can recall.

2    Q    Let's talk about the CLO management agreements briefly.

3    You're aware that the Debtor is party to certain management

4    agreements pursuant to which it serves as the portfolio

5    manager for certain CLOs, correct?

6    A    Correct.

7    Q    And until your lawyers recently asked you to review them,

8    you last had reason to review a CLO management agreement about

9    five or six years ago; isn't that right?

10   A    I believe that's correct.

11   Q    And the request from your lawyers to look at the CLO

12   management agreements, that request came in late November/

13   early December; isn't that right?

14   A    I believe that's around the right time frame.

15   Q    And the portions of the management agreements that you

16   read were the portions that your counsel asked you to read;

17   isn't that right?

18   A    Correct.

19   Q    And other than the general recollection of having read

20   something about the rights of preference shareholders, you

21   don't recall much about the agreements at all; isn't that

22   right?

23   A    I mean, the agreements are very lengthy in nature.  You

24   know, I think it was probably rights that the preference

25   shareholders had, and, you know, possibly indemnification

 1  provisions.  But aside from that, I don't recall anything else

 2  specifically right now.

 3  Q   As the chief compliance officer of the Advisors and the

 4  Funds, you don't know whether any of them are party to the CLO

 5  management agreements between the Debtors and -- between the

 6  Debtor and the Issuers, correct?

 7          MR. RUKAVINA:  And Your Honor, I would just object to

 8  the extent that that calls for a legal conclusion.  This

 9  witness is not a lawyer.

10          THE COURT:  Overruled.

11          THE WITNESS:  I'm sorry.  Can you repeat the

12  question, please?

13  BY MR. MORRIS:

14  Q   Sure.  As the chief compliance officer for each of the

15  Defendants, you don't know whether any of them are party to

16  the CLO management agreements between the Debtor and the

17  Issuers, correct?

18  A   They're not the named collateral manager, but they're a

19  security holder of the CLOs, so they should be entitled to,

20  you know, the rights that those security holders are afforded

21  under those agreements.

22          MR. MORRIS:  I move to strike, Your Honor.

23          THE COURT:  Granted.

24  BY MR. MORRIS:

25  Q   All right.  So, now, Mr. Post, I know this is difficult,

Post - Direct                              116

1    and I do appreciate that it's difficult just to focus on the

2    question.  Your counsel will have the opportunity to ask you

3    whatever he wants.  But I would respectfully request that you

4    listen to my question and only answer my question.  It really

5    is very likely to require just a yes or no answer.

6        So, let me try again.  As the chief compliance officer of

7    the Advisors and the Funds, you don't know whether any of them

8    are a party to the CLO management agreements between the

9    Debtor and the Issuers, correct?

10   A    I don't believe they are, correct.

11   Q    Okay.  Let's talk about that prior hearing.  Now, by the

12   way, Mr. Post, did you listen in to Mr. Dondero's testimony

13   earlier?

14           MR. RUKAVINA:  Mr. Post was here with me --

15           MR. MORRIS:  Yeah.

16           MR. RUKAVINA:  -- as my representative..

17           MR. MORRIS:  Okay.  I -- there's no problem.  I just

18   -- I just -- that way there's some background and he has some

19   context.  That's the only reason I asked.

20   BY MR. MORRIS:

21   Q    You're aware that the Funds and the Advisors previously

22   filed a motion in the Bankruptcy Court asking the Court to

23   institute a pause in the Debtor's ability to sell CLO assets,

24   correct?

25   A    Correct.

1  Q    And you recall that that happened in mid-December, around

2  December 16th; is that right?

3  A    That sounds correct.

4  Q    And in connection with that motion, you provided

5  information to counsel that they requested from you, right?

6  A    Yes.  I was part of the working -- internal working group,

7  with internal and external counsel.

8  Q    Other than providing that information, you generally

9  agreed with the position being taken that it wasn't in the

10 best interest of the Funds involved for Highland to make any

11 trades; isn't that right?

12 A    Yes.  And that was based off of discussions with the

13 investment professionals.

14 Q    And the investment professionals are Mr. Sowin and Mr.

15 Dondero, correct?

16 A    Correct.

17 Q    Okay.  So you're the chief compliance officer, and they

18 made a motion that was based on the idea that the fund

19 manager, Highland Capital Management, shouldn't trade any

20 assets in the CLOs.  Do I have that right?

21 A    I believe that's what the motion contained.

22 Q    But you don't even remember who authorized the filing of

23 the motion; isn't that right?

24 A    I believe it was pursuant to discussions internally and

25 with external counsel, and I believe Mr. Norris signed the

1    filing, if I -- if I recall correctly.

2    Q    Sir, you don't remember who authorized the filing of the

3    motion, correct?

4    A    It -- it was pursuant to a discussion with the investment

5    professionals and counsel, and it was in the best interest of

6    the Funds to make the filing.  So I think it was a

7    collaborative determination.

8              MR. MORRIS:  I move to strike, Your Honor.

9              THE COURT:  Granted.

10             MR. MORRIS:  Ms. Canty, can we please pull up Mr.

11   Post's deposition transcript?  And let's go to Page 35.  Line

12   21.  Okay.

13   BY MR. MORRIS:

14   Q    Do you remember giving the following answer to the

15   following question:

16        "Q   Who authorized the filing of this motion?

17        "A   I can't recall specifically who authorized it."

18   Q    Did you give that answer to my question just the other

19   day?

20   A    That's -- that's what it says there, yes.

21   Q    And it says that because that's, in fact, what you

22   testified to under oath the other day, right?

23   A    Correct.

24   Q    Okay.  And the one thing that you know for certain is that

25   you didn't authorize the filing of the motion; isn't that

1    right?

2    A    I didn't sign anything in connection with the filing.

3    Q    All right.  Listen carefully to my question.  The one

4    thing that you're certain of is that you did not authorize the

5    filing of the motion as the chief compliance officer of the

6    Debtors, correct?

7    A    Correct.

8    Q    Okay.  But you did participate in conversations with Mr.

9    Dondero and counsel concerning the motion; is that fair?

10    A    There were conversations with Mr. Dondero initially, and

11    then the conversations were then more so with internal and

12    external counsel in terms of the filing.

13    Q    Okay.  So they started just with Mr. Dondero, and then

14    they moved on to counsel.  Is that what you're saying?

15    A    I can't recall specifically.  It may have been part of a

16    discussion internally with internal counsel and Mr. Dondero.

17    I just -- I can't recall the specifics.

18    Q    Okay.  But Mr. Dondero certainly supported the filing of

19    the motion, right?

20    A    Yes.  From an investment perspective, it was in the best

21    interest of the Funds in terms of the sales that were

22    occurring.

23    Q    Okay.

24         MR. MORRIS:  I move to strike.

25         THE COURT:  Granted.

1    BY MR. MORRIS:

2    Q    It's a very simple question.  Mr. Dondero supported the

3    filing of the motion; is that correct?

4    A    Yes.

5    Q    You did not file a declaration in support of the motion;

6    is that correct?

7    A    Me personally, no.

8    Q    Okay.  So you're the chief compliance officer of the

9    Defendants; is that right?

10    A    Correct.

11    Q    But instead of you filing a declaration, Mr. Norris filed

12    the declaration.  Do I have that right?

13    A    Correct.  My understanding is one person needs to sign the

14    declaration.

15    Q    And remind me, what is Mr. Norris's position?  He's the

16    executive vice president, right?

17    A    Correct.

18    Q    What responsibilities does he have?  Does he have trading

19    responsibility?

20    A    He does not.

21    Q    Does he have compliance responsibility?

22    A    Not directly, no.

23    Q    Does he have investment responsibility?

24    A    He's familiar with the composition of the portfolios in

25    his role as a product strategy team member.

1    Q    Does he have investment responsibility, sir?

2    A    He is not making direct investments for the -- for the

3    Funds.

4    Q    Okay.  So he doesn't -- and he's not a compliance person,

5    right?

6    A    Correct.

7    Q    And he's not a lawyer, right?

8    A    Correct.

9    Q    But nevertheless, as the chief compliance officer, you

10   believed that Mr. Norris's declaration contained all of the

11   information that was relevant to support the motion, right?

12   A    It was a determin... or a collaborative determination in

13   conjunction with counsel.  But I, you know, I don't -- yeah,

14   it was -- it was a collaborative determination.  There were

15   multiple elements that went into that -- the letter.

16   Q    Okay.  You believed that the motion and Mr. Norris's

17   declaration contained all the relevant facts that supported

18   the Advisors and the Funds' requests to the Court, correct?

19   A    Yes.

20   Q    In fact, you believed that Mr. Norris was the most

21   knowledgeable person to testify on behalf of the Movants;

22   isn't that right?

23   A    I think it was -- he was identified pursuant to

24   discussions with counsel to be the most knowledgeable.

25   Q    I'm going to ask you just about you and not counsel.  You

1    believed at the time that Mr. Norris was the most

2    knowledgeable witness to testify on behalf of the Movants;

3    isn't that right?

4    A    Yes.

5    Q    And you didn't testify -- not only didn't you submit a

6    declaration, but you didn't testify at the hearing, did you?

7    A    Correct on both.

8    Q    Okay.  And you listened to parts of the hearing, but not

9    all of it, because you were busy doing other stuff, right?

10   A    Correct.

11   Q    You didn't listen to Mr. Norris's testimony at all, right?

12   A    I don't believe I did.

13   Q    You didn't listen to the Court when the Court rendered its

14   decision, did you?

15   A    I don't -- I don't believe I did.

16   Q    And you didn't read the transcript from the hearing, did

17   you?

18   A    I don't -- correct.  I did not.

19   Q    Okay.  So in your capacity as the chief compliance

20   officer, you didn't believe that you should take the time to

21   review the transcript, did you?

22   A    Correct.  I mean, just it was filed based off of the

23   belief that the -- that the trades weren't in the best

24   interest, and I -- and no, I didn't read it personally.

25   Q    And you didn't believe, in -- that in your capacity as the

1   CCO, the chief compliance officer, that it was in the scope of

2   your responsibility to listen to the hearing, correct?

3   A   I was -- I wasn't asked to listen, and quite frankly, I

4   don't -- I don't recall if I remember the timing, but I did

5   not listen.

6   Q   Okay.  And in your capacity as the chief compliance

7   officer, you didn't believe that it was in the scope of your

8   responsibilities to listen to the hearing; isn't that right?

9   A   Correct.

10  Q   And because you didn't listen to the hearing or review the

11  transcript, you were unaware of what the Court said or how

12  Judge Jernigan described the motion or the people involved in

13  presenting the case on behalf of the Defendants, right?

14  A   Correct, but I -- I believe I probably would have received

15  some guidance from counsel who attended or listened to the

16  hearing.

17  Q   Well, after the hearing was over, you did speak to Mr.

18  Norris, right?

19  A   Very briefly.

20  Q   In fact, --

21  A   Very --

22  Q   In fact, the only thing you can remember about your

23  conversation with Mr. Norris following the hearing was

24  discussing with him how long the hearing took.  Isn't that

25  right?

1   A    Correct, because I -- I believe I heard it was a short

2   hearing.

3   Q    And that's -- that's all -- that's all you asked Mr.

4   Norris about, about the hearing, right?  That's all you

5   remember talking to him about?

6   A    I believe so, correct.

7   Q    You don't recall discussing with Mr. Norris any other

8   aspect of the hearing other than the length of time it took to

9   conduct, correct?

10   A    I don't recall specifically.

11   Q    And you have no recollection of ever discussing with Mr.

12   Dondero what happened at the hearing, right?

13   A    I don't think I talked with Jim, Jim Dondero about that.

14   Q    Nor did you talk to Mr. Dondero about the Court's ruling;

15   isn't that right?

16   A    Correct.

17   Q    Okay.  Let's talk about the events that occurred after the

18   hearing, in the two weeks following the hearing.  The

19   Defendants for which you serve as the chief compliance officer

20   sent three separate letters to the Defendant [sic], correct?

21   A    If you could bring them up, I can confirm.

22   Q    Sure.

23          MR. MORRIS:  Let's start with DDDD, please.  Okay.

24   Okay.  Can we scroll to the attachment, please?

25   BY MR. MORRIS:

1  Q    All right.  So this is the first letter, Mr. Post.  Do you

2  recall, on or about December 22nd, the K&L Gates firm sent, on

3  behalf of the Advisors and Funds for which you serve as the

4  chief compliance officer, a letter to the Debtors?

5  A    Yes.

6  Q    Okay.

7         MR. MORRIS:  And can we call the next exhibit?  I

8  guess it's EEEE.

9       And I don't mean to be quick about these.  If there's any

10 reason that you want to read them, I wasn't planning on asking

11 any questions about the substance of the letters of this

12 witness.

13 BY MR. MORRIS:

14 Q    But Mr. Post, I don't mean to be quick here.  So if you

15 think there's a benefit to you to reading the letters, please

16 let me know.

17      Do you see, December 23rd, the next day, another letter

18 was sent by K&L Gates?

19 A    Yes.

20 Q    Okay.  And do you recall generally that the Advisors and

21 Funds for which you serve as chief compliance officer told the

22 -- told the Debtor that they were going to begin the process

23 of seeking to terminate the CLO management agreements?

24 A    I believe -- I believe that was contained in the letter,

25 so long as it was done in compliance with the Court.

Post - Direct 126

1  Q    Uh-huh.  And do you remember there was a third letter that

2  was sent?

3  A    If you wouldn't mind pulling it up.

4  Q    Yeah, not at all.

5        MR. MORRIS:  Can we get the December 31st letter?  I

6  think it might be -- yeah.

7  BY MR. MORRIS:

8  Q    Now, here's the December 31st letter.  Do you remember the

9  December 31st letter was the one where K&L Gates suggested

10 that the Advisors and the Funds had suffered damages because

11 the Debtor evicted Mr. Dondero from the Highland suite of

12 offices?

13 A    I -- I had heard of that letter being drafted, but I don't

14 recall -- I obviously don't recall a specific date.  But if it

15 says December 31st, --

16 Q    Okay.  Mr. Dondero was one of the main voices in the

17 decision to send these letters, correct?

18 A    He was part of the preliminary conversation and expressed

19 his opinion, and then myself and others internally, and with

20 external counsel, then worked to draft the letters.

21       THE COURT:  All right.  Mr. Post, I am going to

22 interject.  I have heard Mr. Morris give you this instruction

23 many times.  Maybe it's time for me to.  Maybe it's past time

24 for me to.

25    Most of his questions simply require a yes or no answer.

1 | If you feel like there are other things that you want to

2 | supplement your testimony with, Mr. Rukavina is going to have

3 | a chance to question you, and that would be the situation

4 | where maybe you could give more fulsome answers.  But please

5 | listen to the question.  If it's a yes or no answer, that's

6 | all we want you to give right now.  Okay?  Got it?

7 |          THE WITNESS:  Understood.

8 |          THE COURT:  Okay.

9 |          MR. MORRIS:  Thank you, Your Honor.

10 | BY MR. MORRIS:

11 | Q   Mr. Post, Mr. Dondero was one of the main voices in the

12 | decision to send the letters; isn't that correct?

13 | A   He was a voice.

14 |          THE COURT:  That was not a yes --

15 | BY MR. MORRIS:

16 | A   And he was -- he --

17 |          THE COURT:  Okay.

18 |          THE WITNESS:  I'm --

19 |          THE COURT:  Please, just a yes or no answer, okay?

20 |          THE WITNESS:  No.

21 |          MR. MORRIS:  Okay.  Can we go to Mr. Post's

22 | transcript, please, Page 47?  Line 22?

23 |      And Your Honor, when we pull it up on the screen, there is

24 | an objection, and I would respectfully request that the Court

25 | rule on the objection before I read the question and the

1   answer.

2              THE COURT:  All right.

3              MR. MORRIS:  So if we could just call up Page 47

4   beginning at Line 22.

5              MR. RUKAVINA:  Page 47, Line 22.

6              THE COURT:  Okay.

7              MR. MORRIS:  One moment.  Give her a moment.  She's

8   not there.

9              MR. RUKAVINA:  Do you remember what exhibit this is?

10             MR. MORRIS:  Yeah.  There it is.  Beginning at Line

11  22, "Do you know?"  And there is Mr. Rukavina's objection.

12             MR. RUKAVINA:  Your Honor, it's very simple.  He

13  can't go into Mr. Dondero's head.  But he -- but if Mr.

14  Dondero told him something, that's different.  So I think

15  counsel can rephrase the question and it's perfectly fine, but

16  he can't go into Mr. Dondero's state of mind.

17             MR. MORRIS:  Your Honor, I'm not asking for Mr.

18  Dondero's state of mind.  I'm asking for Mr. Post's knowledge.

19  "Do you know?"

20             THE COURT:  Okay.  I'll overrule the objection.  He

21  can answer.

22  BY MR. MORRIS:

23  Q    All right.  So, Mr. Post, do you remember giving this

24  answer to the following question:

25       "Q    Do  you  know  whether  Mr.  Dondero  supported  the

1    sending of each of these three letters?

2    "A   I don't -- I don't recall specifically.  I think

3    he had his views on certain of the transactions that

4    were occurring, and he wasn't in agreement with those

5    transactions, as one of the main voices."

6  Q   Do you see that?

7  A   I do.

8  Q   Does that refresh your recollection that Mr. -- that you

9  testified that Mr. Dondero was one of the main voices?

10 A   Yes.

11 Q   Okay.  Mr. Dondero --

12       MR. MORRIS:  You can take that down now for the

13 moment, please.

14 BY MR. MORRIS:

15 Q   Mr. Dondero had his views on certain of the transactions

16 that were occurring, and he wasn't in agreement with those

17 transactions.  Isn't that right?

18 A   Yes.

19 Q   All right.  Going back to the letters that we just looked

20 at quickly, you recall the Debtor responded to each of those

21 letters, but as the chief compliance officer, you couldn't

22 really recall what the Debtor said in response.  Is that fair?

23 A   I'm -- I believe they -- I'm sorry.  I can't recall

24 specifically without seeing the letters.

25 Q   Okay.  So you don't recall that, in response, the Debtor

1  requested that the Advisors and the Funds withdraw the

2  letters, right?

3  A    I believe that was requested in the letters.

4  Q    Okay.  But the Funds and the Advisors didn't comply with

5  that request, right?

6  A    To my knowledge, they have not withdrawn the letters.

7  Q    You do recall that the Debtor specifically asked the

8  Defendants to file their lift stay motion so that they could

9  finally resolve the issue of whether or not the Advisors and

10 the Funds could actually terminate the agreement, right?

11 A    I -- I'm sorry.  Can you repeat that question, please?

12 Q    Do you recall that the Funds and the Advisors informed the

13 Debtor that they were going to initiate steps to terminate the

14 CLO management agreements, including moving to lift the stay?

15 A    I think they indicated that they were going to take steps,

16 but it would be pursuant to what was permitted in the court.

17 Q    And do you remember that the Debtor specifically asked the

18 Defendants to do exactly that, to bring this matter to a

19 conclusion, to file the motion so that the Court could resolve

20 the issue of whether or not they had a right to terminate the

21 agreement?  You remember that, right?

22         MR. RUKAVINA:  Objection, compound, Your Honor.

23         THE WITNESS:  I can't --

24         THE COURT:  I'm sorry.

25         MR. MORRIS:  I can't recall.

1          THE COURT:  Was there an objection?

2          MR. RUKAVINA:  Yes, Your Honor.  That's four

3    questions in one.  That's compound.

4          MR. MORRIS:  I'll rephrase, Your Honor.

5          THE COURT:  Okay.  And let me interject a minute.

6    Mr. Post, you have this habit of not looking squarely at the

7    camera but looking over to your right.  And in a normal

8    courtroom setting, that might be fine, but I have no way of

9    knowing if some lawyer or some other person is -- you're

10   looking at them and they're somehow instructing you.  I would

11   certainly hope that's not what's going on, but it just kind of

12   leaves room for me to wonder when you're not looking squarely

13   at the camera.  So can you start looking squarely at the

14   camera, please?

15         MR. RUKAVINA:  Your Honor, I can explain that, and

16   certainly there's no funny business going on.  There are two

17   cameras on Mr. Post.  One is on a laptop.  We're looking at

18   the Court on the big camera.  I'm sitting behind Mr. Post.  So

19   if the Court would prefer that Mr. Post look directly into the

20   laptop, then that's what he'll do, or if the Court would

21   prefer that he look into the big camera.

22         THE COURT:  Okay.  Well, I prefer he look into the

23   big camera just because it --

24         MR. RUKAVINA:  So keep looking there?  Yeah.

25         THE COURT:  No, no, no, no.  Okay.  I don't know what

1 -- I thought -- okay.  Do you see what I'm seeing?  I don't

2 know if you can see what I'm seeing.

3          MR. MORRIS:  Yes.

4          THE COURT:  I'm seeing the left side of his face.

5          THE WITNESS:  I'm sorry.  I'll just look at the

6 laptop.  Sorry.  I was -- I was looking at who was speaking to

7 me.

8          THE COURT:  Okay.  Well, I don't --

9          MR. MORRIS:  Okay.

10          THE COURT:  I don't know the setup, so it was

11 confusing to me.

12      All right.  This is better.  Thank you.

13          THE WITNESS:  Yeah.  I apologize.

14          MR. RUKAVINA:  We'll focus on the laptop, Judge.

15 BY MR. MORRIS:

16 Q   All right.  So the question, Mr. Post, is:  You do recall

17 that the Debtor specifically asked the Defendants to file

18 their motion to lift the stay so that the issue could finally

19 be resolved; isn't that right?

20 A   I can't recall that specifically.

21 Q   You believe that may be one of the options that the Debtor

22 specifically proposed, right?

23 A   It -- yes.

24 Q   Okay.  But the Defendants never filed their lift stay

25 motion to terminate the agreements; isn't that right?

1    A    I don't believe so.

2    Q    Right.  So the Debtor filed its complaint and its request

3    for the injunction, right?

4    A    Correct.

5    Q    As the CO -- as the CCO, you may have reviewed the

6    Debtor's complaint and motion, but you can't recall, given all

7    the documentation that's involved, right?

8    A    Correct.

9    Q    You can't recall any facts that the Debtor asserted in

10   support of its motion; isn't that right?

11   A    I can't recall specifically.  Correct.

12   Q    But the one thing you do know is that the Debtor's motion

13   is based on its entitlement to transact business pursuant to

14   their arrangement with the CLOs as collateral manager,

15   correct?

16   A    Yes.

17   Q    Now, you heard that there was supposed to be an initial

18   hearing on the Debtor's motion for a temporary restraining

19   order against the Defendants, right?

20   A    Correct.

21   Q    But you don't believe the motion for the TRO got heard,

22   and you presume it got resolved, right?

23   A    I don't believe it was heard.

24   Q    Okay.  And you understand that there is a TRO in place

25   now, pursuant to which the Advisors and the Funds are

1    prevented from interfering with the Debtor's execution of its

2    rights under the CLO management agreements, right?

3    A    Correct.

4    Q    Before the TRO was resolved, you weren't personally

5    involved in the process of deciding what witnesses would be

6    called and what exhibits would be offered into evidence; is

7    that right?

8    A    No.

9          MR. MORRIS:   During the deposition, Your Honor,

10   subject to correction from Mr. Rukavina, I believe that the

11   Defendants and the Debtor reached the following two

12   stipulations.

13        First, the Defendants and the Debtor stipulate that Mr.

14   Post was not going to be called as a witness at the TRO

15   hearing.

16        MR. RUKAVINA:   That is correct.

17        MR. MORRIS:   And second, the Defendants and the

18   Debtor stipulate that the Defendants were not going to offer

19   into evidence any exhibits other than those specifically

20   listed on their witness and exhibit list.

21        MR. RUKAVINA:   That being the witness and exhibit

22   list filed before the TRO.   That is correct.

23        MR. MORRIS:   Okay.

24   BY MR. MORRIS:

25   Q    Let's talk about Mr. Seery for a minute.   You know who Mr.

1  Seery is, correct?

2  A    Correct.

3  Q    You understand he's an independent director and the CEO of

4  the Debtor, right?

5  A    Correct.

6  Q    And you also understand that his -- in his capacity as the

7  Debtor's CEO, Mr. Seery is authorized to sell certain

8  securities and assets that are owned by the CLOs, correct?

9  A    Correct.

10  Q    In your opinion as the CCO, the chief compliance officer

11  of the Advisors and the Funds, Mr. Seery has the knowledge and

12  experience to trade securities on behalf of the CLOs, correct?

13  A    Correct.

14  Q    But you don't believe that it's in the Funds' best

15  interest for Mr. Seery to sell SKY and AVYA securities, right?

16  A    Correct.

17  Q    But even though you reached that decision about Mr. Seery,

18  you have no knowledge as to whether Mr. Dondero ever traded

19  either of those securities before he resigned from Highland;

20  isn't that right?

21  A    I saw some trades that were shown on the screen earlier.

22  I don't think I recalled at the time I was asked on Friday.

23  Q    As of the time -- as of Friday, you had no knowledge as to

24  whether Mr. Dondero had traded in AVYA securities prior to his

25  departure from Highland, correct?

1   A    Correct.

2   Q    And before, before forming your view as the chief

3   compliance officer that Mr. Seery's trading of AVYA was not in

4   the best interest of the Funds, you made no effort to see if

5   Mr. Dondero had sold the exact same securities Mr. Seery was

6   selling, correct?

7   A    Correct.

8   Q    And the sole source of information that you relied upon to

9   reach your opinion that the trades weren't in the best

10  interest of the Funds is Jim Dondero and Joe Sowin, correct?

11  A    I'm sorry.  Can you repeat that?  You kind of cut out at

12  the beginning.

13  Q    Sure.  And please, any time that happens, let me know.  We

14  had some problems this morning.

15       The sole source of information that you relied upon to

16  reach your opinion that the trades weren't in the best

17  interest of the funds is Jim Dondero and Joe Sowin; isn't that

18  correct?

19  A    Correct.  They're the investment professionals, yes.

20  Q    And you have no understanding as to why Mr. Seery wanted

21  to sell the AVYA and SKY securities, do you?

22  A    I was told that -- I don't know why he wanted to sell them

23  personally, correct.

24  Q    Okay.  In fact, before reaching your conclusion as the CCO

25  that Mr. Seery's trades were not in the best interest of the

1  Fund, you did not undertake any investigation of any kind to

2  try to determine why Mr. Seery wanted to sell AVYA or SKY

3  stock, correct?

4  A    Correct.  I didn't reach out to Mr. Seery.

5  Q    All right.  You believe that Mr. Dondero and Mr. Sowin's

6  opinion that Mr. Seery's trades aren't in the Funds' best

7  interest should be heard pursuant to the Advisers Act, right?

8  A    Correct.

9  Q    Specifically, Section 2000 -- 206 of the Advisers Act,

10  right?

11  A    Correct.

12  Q    Have you ever read Section 206 of the Advisers Act?

13  A    Yes.

14  Q    Okay.

15         MR. MORRIS:  Ms. Canty, can you please put up the

16  demonstrative for Section 206 of the Advisers Act?

17         MR. RUKAVINA:  Your Honor, the witness just asked me

18  for water.  Nothing more.

19         THE COURT:  Okay.

20         MR. MORRIS:  Yeah.  No problem.

21  BY MR. MORRIS:

22  Q    I've put on the screen Section 206 of the Advisers Act,

23  Mr. Post.  Can you please tell the Court what provision of 206

24  you believe Mr. Seery allegedly breached when he sought to

25  sell AVYA and SKY securities?

1   A    It would be Number 4.

2   Q    Do you believe that Mr. Seery engaged in fraudulent,

3   deceptive, or manipulative practices by trying to trade AVYA

4   and SKY securities?

5   A    The -- as collateral manager for the CLOs, they're

6   supposed to maximize returns for the preference shares, which

7   we didn't believe the sales reflected that, and so they

8   weren't acting, --

9              THE COURT:  Okay.

10             THE WITNESS:  -- you know, pursuant to their duties

11  --

12             THE COURT:  Here I -- here I go --

13             THE WITNESS:  -- under the collateral management --

14             THE COURT:  Here I go again.  Here you go again.

15             THE WITNESS:  I'm sorry.

16             THE COURT:  It really was a yes or no question.  All

17  right?

18  BY MR. MORRIS:

19  Q    You're the -- you're the chief compliance officer, right?

20  A    Yes.

21  Q    And this is the provision in Section 4 that you cite to as

22  the provision that Mr. Seery violated when he attempted to

23  sell SKY and AVYA securities, correct?

24  A    Yes.

25  Q    Did Mr. Seery engage in an act, practice, or course of

1  business which was fraudulent when he looked to sell those

2  securities?

3  A    No.

4  Q    Do you believe that Mr. Seery engaged in an act, a

5  practice, or a course of business which was deceptive when he

6  went to sell the SKY and the AVYA securities?

7  A    Yes.

8  Q    Who did he deceive?

9  A    The investors of the CLOs, --

10 Q    How?

11 A    -- the preference shareholders.

12 Q    How?

13 A    By selling securities that the preference shareholder

14 investors believed had further upside to them.

15 Q    Did he lie to them?

16 A    I don't believe he talked to the investors.

17 Q    But you're putting your reputation on the line here and

18 you're swearing under oath that Mr. Seery deceptively tried to

19 sell SKY and AVYA securities?

20 A    I believe that based off of a review and discussion with

21 counsel.

22 Q    Do you think he was manipulative?

23 A    No.

24 Q    Did you -- did you check in with the SEC to tell them that

25 you had a bad actor here?

1    A    No.

2    Q    You first formed your view that the Debtor violated

3    Section 206 of the Advisers Act after the sales started to

4    occur in the CLOs, correct?

5    A    Correct.

6    Q    But you don't know when the sales actually started, right?

7    A    I believe there were sales --

8    Q    And I assume, since you were the chief compliance officer

9    since 2015, you don't believe that Mr. Dondero's sale of AVYA

10   stock was deceptive, right?

11   A    You would have to ask Mr. Dondero that, but I believe he

12   was selling for cash, cash needs for other funds.

13            MR. MORRIS:  Okay.  I move to strike.  I'm asking him

14   not --

15            THE COURT:  Sustained.

16   BY MR. MORRIS:

17   Q    I'm asking about you.  I'm asking about you.  You're the

18   chief compliance officer, right?

19   A    Yes.

20   Q    And you don't believe that when Mr. Dondero sold AVYA

21   stock that he was engaged in deceptive practices, do you?

22   A    No.

23   Q    And that's because you don't even know whether he sold

24   AVYA stock; isn't that right?

25   A    On Friday, I -- that is correct.

1    Q    In fact, the only reason you learned that Mr. Seery wanted

2    to sell AVYA and SKY stock is because Mr. Dondero told you;

3    isn't that right?

4    A    I believe I was forwarded the email after -- after there

5    was communications on the sales.

6    Q    And that's the email where Mr. Dondero told Mr. Surgent

7    that he had personal liability, correct?

8    A    I -- I believe it was an email prior to that about were

9    trades being requested and Mr. Dondero responding.

10   Q    You're familiar with the email where Mr. Dondero

11   interfered with Mr. Seery's trades?

12   A    Yes.

13   Q    Okay.  And you're aware that Mr. Dondero told Mr. Surgent

14   that he faced potential liability if he continued to follow

15   Mr. Seery's instructions, correct?

16   A    Correct.  Based off of Mr. Dondero's view.

17   Q    Notwithstanding all of that, in your capacity as the chief

18   compliance officer, you don't believe it's ever appropriate

19   for an investor to step in and impede transactions that have

20   been authorized by the portfolio manager unless the contract

21   permits the investor to step in; isn't that right?

22   A    I believe -- I'm sorry, can you repeat that, please?

23   There was a lot of question.

24   Q    Sure.  Sure.  In your capacity as the chief compliance

25   officer, you don't believe it's ever appropriate for an

1  investor to step in and impede transactions that were

2  authorized by the portfolio manager unless the contract

3  permits the investor to do so; isn't that correct?  Isn't that

4  correct?

5  A    Yes.

6  Q    Okay.  I know you're not a lawyer, but you are the chief

7  compliance officer of the Funds; isn't that right?

8  A    Correct.

9  Q    And you can't point to anything in any contract that gives

10 Mr. Dondero the right to step in and impede transactions that

11 have been authorized by Mr. Seery; isn't that correct?

12 A    He's entitled rights as preference shareholders for the --

13 for the Funds that hold those preference shareholders.  So,

14 indirectly, he should be afforded those rights as portfolio

15 manager for those Funds.

16 Q    Sir, you can't point to anything in any contract that

17 gives Mr. Dondero the right to step in and impede transactions

18 that have been authorized by Mr. Seery; isn't that correct?

19 A    Correct.

20 Q    Okay.  But yet you have never told Mr. Dondero that he

21 should not interfere with Mr. Seery's trades; isn't that a

22 fact?

23 A    Correct.

24 Q    In fact, you never personally took any steps at any time

25 to make sure that there would be no further interference with

1  the Debtor's trading activities; isn't that correct?

2  A    Correct.

3  Q    And that's because you believe, as the chief compliance

4  officer of the Funds, that Mr. Dondero should have the leeway

5  to make the determination as to whether or not the

6  transactions are appropriate; isn't that correct?

7  A    He should be able to be heard in the transactions that are

8  being made, correct.

9  Q    Sir, not to be heard, but to make the determination.  Let

10  me ask the question again.  You believe, as the CO -- CCO of

11  the Funds, that Mr. Dondero should have the leeway to make the

12  determination as to whether or not the transactions are

13  appropriate; isn't that correct?

14  A    Yes.

15  Q    Okay.  And you completely deferred to Mr. Dondero; isn't

16  that right?

17  A    For the investment determination, yes.

18  Q    And based on that deference, you never took any steps at

19  any time to make sure no one on behalf of the Advisors or the

20  Funds impeded or stopped transactions authorized by Mr. Seery,

21  correct?

22  A    Correct.

23  Q    You understand there's a TRO in place today that prevents

24  Mr. Dondero and the Advisors and the Funds from interfering

25  with Mr. Seery's trading activities; isn't that right?

1          MR. RUKAVINA:  I'm going to object to that, Your

2    Honor, to the extent that calls for a legal conclusion.  And I

3    do think it mischaracterizes the testimony.  I'm sorry.  The

4    TRO.

5          THE COURT:  Overruled.

6    BY MR. MORRIS:

7    Q    You can answer, sir.  Would you like me to repeat the

8    question?

9    A    Yes, please.

10   Q    You understand that there is a TRO in place -- TRO in

11   place today that prevents Mr. Dondero, the Advisors, and the

12   Funds from interfering with Mr. Seery's trading activities on

13   behalf of the CLOs, correct?

14   A    Correct.

15   Q    But in the absence of the TRO, in your view, whether you

16   tell Mr. Dondero not to interfere with Mr. Seery's trades

17   depends on the facts and circumstances that exist at the time,

18   right?

19   A    Correct.  From a -- yes.

20   Q    Okay.  And up until this point, there have been no facts

21   and circumstances that have caused you to tell Mr. Dondero not

22   to interfere with Mr. Seery's trades on behalf of the CLOs,

23   correct?

24   A    He can't because of the TRO.

25   Q    Correct.  But if the TRO wasn't in place, it's possible

1  that you wouldn't take any steps to stop Mr. Dondero from

2  impeding Mr. Seery's trades; isn't that right?

3  A    I mean, if Mr. Dondero or other investment professionals

4  have a view, that they should be -- they should have a right

5  to be heard as preference shareholders of the CLOs.

6  Q    Okay.  But if the TRO wasn't in place, you wouldn't act to

7  stop Mr. Dondero from interfering or impeding the Debtor's

8  trades on behalf of the CLO; isn't that right?

9  A    He would -- if he would be permitted to talk to Mr. Seery.

10 Q    Okay.  Prior to the imposition of the TRO, you took no

11 steps to stop Mr. Dondero from interfering with Mr. Seery's

12 trades, correct?

13 A    Correct.

14 Q    And if the TRO wasn't in place, it's possible you wouldn't

15 take any steps to stop Mr. Dondero from impeding -- impeding

16 Mr. Seery's trades again; isn't that right?

17 A    If there's an investment rationale as to why they feel the

18 trades shouldn't be done, I -- again, I feel like Mr. Dondero

19 or the other investment professionals should be able to raise

20 those points with Mr. Seery.

21 Q    Do you think they should be able to stop the trades?

22 A    I -- I -- I think they should be able to question the

23 trades.  But flat-out stop them, I'd probably say no.

24 Q    Then why didn't you do anything before the TRO was

25 entered?

1  A    Um, I'm sorry, can you repeat the -- do anything in -- in

2  what manner?

3  Q    Why didn't you take any steps before the TRO was entered

4  to stop Mr. Dondero from interfering and stopping and impeding

5  the Debtor's trades?

6  A    I think, as I recall, there was only one -- one set of

7  trades in question that he stepped in on.

8  Q    So, one is okay?  How about two?

9  A    Or, sorry.  There were two trades on one day that -- that,

10  you know, he questioned.  Or stepped in on.  I don't -- I

11  don't recall him stopping any other trades thereafter.

12  Q    That's all you know about, right?

13  A    Correct.

14  Q    And with that knowledge, it never occurred to you to tell

15  Mr. Dondero to knock it off, did it?

16  A    He believed the trades weren't in the best interest for

17  the investors, so I did not.

18  Q    And that's what you mean by deferring to him; isn't that

19  right?

20  A    From the investment perspective, yes.

21  Q    Thank you for your -- thank you for your honesty.  As the

22  CCO, you have never communicated with the Issuers about the

23  Debtor's performance under the CLO management agreements;

24  isn't that right?

25  A    Correct.

1  Q   And that's because you didn't believe it was in your

2  responsibility as the CCO to check with the Issuers to see if

3  the Issuers believed that the Debtor was in compliance with

4  the CLO management agreements, correct?

5  A   That communication would have involved counsel and that

6  communication didn't occur.  I wouldn't have reached out to

7  them directly.

8  Q   Yeah.  You didn't believe it was within your

9  responsibility as the chief compliance officer to communicate

10  with the Issuers to see if they had any views as to Mr.

11  Seery's performance as portfolio manager, correct?

12  A   Correct, because it would have involved me working with

13  counsel and there was never direction to do that.

14  Q   As the chief compliance officer of the Defendants, you

15  have no idea if anyone on behalf of the Advisors or the Funds

16  ever asked the Issuers whether they believed the Debtor was in

17  default under the CLO management agreements, correct?

18  A   Correct.

19  Q   As the CCO, you have no idea if anyone on behalf of the

20  Advisors or the Funds ever asked the Issuers whether they

21  believed was in breach under the CLO management agreements,

22  correct?

23  A   Correct.  I believe there was a call that I wasn't a part

24  of, that it was just involving lawyers, that I don't know what

25  was discussed on the call.  So, correct.

1  Q    As the CCO, you have no idea if anyone on behalf of the

2  Advisors or Funds ever asked the Issuers whether they believed

3  it was appropriate to try to take steps to terminate the CLO

4  management agreements; isn't that right?

5  A    Correct.

6  Q    None of the Issuers joined any of the letters that were

7  sent on behalf of the Funds and the Advisors, right?

8  A    I didn't -- I don't recall seeing their names listed.

9  Q    As the CCO, you don't have any understanding as to what

10  the standard is for terminating the CLO management agreements

11  unless you get legal advice; isn't that right?

12  A    Yes.  It was -- it would be a discussion with counsel,

13  given the complexity of the agreements.

14  Q    But as a factual matter, you're not aware of any facts

15  that would support the termination of the CLO management

16  agreements except that there were trades that Mr. Dondero

17  didn't think were in the best interests of the Funds; isn't

18  that right?

19  A    Yes.  And because the belief was those trades weren't

20  maximizing value for the preference shareholders.

21          MR. MORRIS:  I move to strike everything after the

22  word yes, Your Honor.

23          THE COURT:  Granted.

24          MR. MORRIS:  I have no further questions.

25          THE COURT:  All right.  Mr. Rukavina?

1          MR. RUKAVINA:  Your Honor, I'll reserve my questions

2     for my case in chief.

3          THE COURT:  All right.  Mr. Post, that concludes your

4     testimony for now.  Stick around.

5        Mr. Morris?

6          MR. MORRIS:  Your Honor, last witness, and I hope

7     it's rather brief, actually.  The Debtor calls James Seery.

8          MR. RUKAVINA:  Your Honor, may we have a brief

9     restroom break, all of us in this room, before we start the

10    next witness?

11         THE COURT:  All right.  We'll take a five-minute

12    restroom break.  I know part of the long day is because of my

13    commitment at the lunch hour, but you all did estimate three

14    or four hours for this hearing, right?  That's what I recall.

15         MR. MORRIS:  We did.

16         MR. RUKAVINA:  Your Honor, I was never consulted on a

17    time estimate.  I had no idea that someone said three to four

18    hours.

19         THE COURT:  All right.

20         MR. MORRIS:  And part -- part of that is my fault and

21    the technological problems we had this morning, so I take

22    responsibility for that, Your Honor, and I sincerely

23    apologize.

24         THE COURT:  Okay.  Well, just so you know, we cannot

25    come back tomorrow.  I've got two -- too booked today tomorrow

1   to come back, so --

2          MR. MORRIS:  I don't expect Mr. Seery to be more than

3   about 15 minutes.

4          THE COURT:  Okay.  We'll take a five-minute break.

5          THE CLERK:  All rise.

6      (A recess ensued from 3:22 p.m. until 3:32 p.m.)

7          THE CLERK:  All rise.

8          THE COURT:  All right.  Please be seated.  I wanted

9   to clarify one thing I said, just so no one is confused.  I

10  know that originally you had today, Wednesday, and Thursday,

11  26th, 27th, and 28th, for confirmation.  So if anyone thought,

12  oh, we're coming back tomorrow on this if we don't finish,

13  because originally you had all three of those days, you know,

14  as soon as we continued the confirmation hearing, we started

15  filling in Wednesday.  So we have three different Chapter 11

16  case matters set tomorrow.  And so it was, you know, you give

17  up time and we have people usually wanting to get that time,

18  so that's what happened.

19      But anyway, people, we'll talk fast and we'll get it done

20  today, right?

21          MR. RUKAVINA:  Your Honor, my -- Your Honor?  Oh,

22  wait.  I need to --

23          THE COURT:  Ooh, it sounds like you're in a cave.

24  Let's get those headphones on.

25          MR. MORRIS:  I promise to be as quick as I can, Your

1  Honor.

2           THE COURT:  Okay.  Mr. Rukavina, were you trying to

3  say something?

4           MR. RUKAVINA:  I was, Your Honor.  Can you hear me?

5           THE COURT:  Yes.

6           MR. RUKAVINA:  This darn video.  Too many -- Your

7  Honor, we have an agreed TRO that goes through February the

8  15th.  And I'm certainly not suggesting taking any more of the

9  Court's time than is necessary, but I cannot commit to

10 finishing today, especially because Mr. Morris has taken so

11 much time.  So I think we will do our best, but I just want

12 the Court to know that there's no urgency to this, and if we

13 have to come back at some point after Tuesday or Wednesday,

14 there's no possible harm to the Debtor.

15          MR. MORRIS:  Your Honor, it's my hope that we can get

16 this done, and I think the sooner we begin the better.

17          THE COURT:  Okay.  Well, we're going to try to get it

18 done.  All right, Mr. Seery.  You've called Mr. Seery to the

19 stand now?

20          MR. MORRIS:  Yes, Your Honor.  The Debtor calls James

21 Seery.

22          THE COURT:  All right.  Mr. Seery, please raise your

23 right hand.

24              JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

1          MR. MORRIS:  May I proceed?

2          THE COURT:  You may.

3          MR. MORRIS:  Thank you, Your Honor.

4                       DIRECT EXAMINATION

5    BY MR. MORRIS:

6    Q    Good afternoon, Mr. Seery.  Can you hear me okay?

7    A    I can, yes.

8    Q    Okay.  Let's just cut to the chase here.  You're the CEO

9    of the Debtor; is that right?

10   A    That's correct.

11   Q    And in that capacity, do you understand that the Debtor is

12   party to contracts pursuant to which it manages certain CLO

13   assets?

14   A    Yes.

15   Q    And are you personally involved in the management of those

16   assets?

17   A    Yes.

18   Q    Do you have any prior experience managing other people's

19   money or other people's assets?

20   A    Yes.

21   Q    Can you please explain to the Court your experience and

22   your knowledge as to investing other people's money?

23   A    Yes.  I was a finance lawyer -- I'll go quickly, if it's

24   okay.  I can fill in later, if you like.  I was a finance and

25   bankruptcy lawyer for ten years before I went to Lehman on the

Seery - Direct                                   153

1  business side in 1999.

2       In that role, I started immediately in distressed

3  investing.  I worked as part of a team of analysts and traders

4  to build distressed positions in prop (phonetic) business,

5  trading Lehman Brothers balance sheet at the time.  This was

6  in 1999 and 2000.  We were one of the most significant

7  investors on the Street, and I was part of that team, and a

8  leading part of the team, putting on significant investments

9  of our balance sheet, which was Lehman's money, into different

10 kinds of stressed, distressed, high yield investments.  That

11 included bonds, that included loans, unsecured, subordinated.

12 Sometimes equity.  Typically, we stayed in credit, but a lot

13 of this was very distressed credit, which often ended up as

14 reorg equity.

15      After that, I began running different teams for making

16 distressed loans to companies that no one else would lend

17 money to.  These investments were significant, anywhere from

18 fifty to a billion dollars.  Some of the largest transactions

19 in the world at the time were transactions I ran, like a

20 rescue loan to PG&E for a billion dollars.  That was in 2000.

21      After that, I continued to grow my career there, running

22 distressed investments.  In 2005, I took over the loan

23 business at Lehman.  That included all high-grade loans, high-

24 yield loans, trading and sales of those loans; managing that

25 portfolio, which was in excess of $10 or $20 billion,

Seery - Direct                                    154

1   depending on the time; exposure both in committed transactions

2   as well as funded loans; the hedging of that portfolio;

3   traders and salespeople working for me.  In addition, I had

4   significant responsibility for the distressed book, as well as

5   all restructuring business at Lehman.

6        After Lehman, I -- and I was one of the people who sold

7   Lehman -- I became a senior investing partner at RiverBirch

8   Capital.  We were about a billion and a half dollar long/short

9   investor, mostly stressed and distressed, but a lot of high-

10  grade trades as well, particularly in preferred stocks.  That

11  was a global business, but primarily U.S., Europe, some Asian

12  investments as well.

13       Since then, I've gotten to Highland.  I've been

14  responsible for Highland's investments.  After the first

15  quarter, when the performance managed by Mr. Dondero was

16  absolutely disastrous -- we lost about $80 million in equity

17  securities, positions that he managed, about $50 million in

18  the Select Equity Fund, and about $30 million in the -- in the

19  Highland internal account.  After Jefferies seized the Select

20  account, I took over the --

21            A VOICE:  I think Mr. Seery has sort of gone beyond

22  the question of his background.

23            THE WITNESS:  He's asked me if I was experienced in

24  investing other people's money.  I was giving that background.

25  But we -- I can stop or I can keep going, if you like.

1          THE COURT:  Okay.  If that was an objection, --

2          MR. MORRIS:  Let's --

3          THE COURT:  -- I overrule it.  Go ahead.

4          THE WITNESS:  I've been managing that portfolio.  In

5    addition, after Mr. Dondero left, but I actually started

6    looking at it before that, started taking over the CLO

7    portfolio, or taking a look at it, frankly.  We have a -- we

8    have an experienced professional sitting on top of it, Hunter

9    Covitz, who manages the day-to-day exposure.  But those

10   portfolios -- we call them CLOs, Your Honor, but I think

11   you've heard testimony before, they're not really.  Acis 7 is

12   a CLO.  The 1.0 CLOs are very old investment vehicles that are

13   primarily structured as, right now, closed-end investment

14   funds.  They don't have the typical diverse portfolio of loans

15   that a CLO has.  They have mostly reorg equity or positions in

16   real estate and in MGM.  So the -- the securities we've been

17   talking about in these trades are publicly-traded liquid

18   securities that Highland took as post-reorganization equity.

19   Q    Thank you, Mr. Seery.  Let's cut to the chase on the AVYA

20   and the SKY.  Nobody seems to have asked you this question,

21   but did you -- have you looked to sell AVYA and SKY securities

22   since the time that Mr. Dondero left in October?

23   A    I have, yes.

24   Q    Can you please explain to the Court your investment

25   rationale, the reason why you wanted to sell -- let's just

Seery - Direct                                    156

1  take them one at a time.  Let's start with AVYA.  In the last

2  couple of months, why have you wanted to sell AVYA?

3  A    Well, the original impetus to sell AVYA came from Mr.

4  Covitz when it started moving up as a post-reorg security in

5  the communications space that had -- had really performed

6  extremely poorly post its Chapter 11.  Mr. Covitz over the

7  summer felt we should start lightening up on that position.  I

8  agreed.  He did that.  And Mr. Dondero eventually cut him off.

9       As it got to the fall, what I did was I got Mr. Covitz, as

10 well as then the analyst -- the analyst on that is Kunal

11 Sachdev.  That's the Highland analyst on the position -- as

12 well as Joe Sowin and Matthew Gray, who's another senior

13 analyst.  And I looked at all of the equity positions in the

14 CLOs and wondered why we had them.  What was the view?  Were

15 they worth keeping?

16      Primarily, the ones we looked at were four of the post-

17 reorg equities that were liquid.  A company called Vistra, a

18 company called Arch Coal.  Vistra is the old TXU, a well-known

19 bankruptcy.  Arch Coal, another well-known bankruptcy.  Avaya,

20 a bankruptcy; and Sky Champion, a less -- less-known

21 bankruptcy but came out of there.

22      Mr. Gray is the analyst on Vistra and Arch.  We

23 determined, based upon his recommendations, not to sell those.

24 Mr. Sachdev was the analyst on Avaya, and he believed that it

25 had reached its peak, and even though it could continue to go

Seery - Direct                                157

1    up or down -- stocks often do that -- he did not think that

2    the value was there.  His recommendation was to sell.

3        Mr. Sowin was in those meetings.  Prior testimony to the

4    contrary or any statements that were said before are

5    completely false, they're completely made up, so I know it's

6    frustrating and I apologize for -- for being frustrated.

7        So we decided that we would sell the Sky Champion.  A

8    pretty simple answer.  Highland didn't have an analyst.

9    Literally didn't have an analyst.  Nobody had a view as to

10   what the stock was.  It just sat in there, in two CLOs,

11   without anybody paying any attention to it.

12       I had Matthew Gray take a look.  He felt that it was at

13   fair value.  I did my own work on it, felt it was at fair

14   value, notwithstanding some good tailwinds in -- secular

15   tailwinds in the home building space, and determined that that

16   CLO should sell those securities.

17   Q    Thank you, sir.  Prior to his departure at Highland, did

18   Mr. Dondero have responsibility over the management of any of

19   the CLO assets?

20   A    He did, yes.

21   Q    And do you understand, do you know whether Mr. Dondero

22   sold AVYA securities on behalf of the CLOs and on behalf of

23   the Funds during the time that he was employed as the

24   portfolio manager from January until October 2020?

25   A    I do.  And he did sell those securities.  The chart you

Seery - Direct                              158

1  put up, based upon our business record, is accurate, and he

2  engaged in significant sales of those securities throughout

3  the year.

4  Q    Okay.

5         MR. MORRIS:  Can we please put upon Demonstrative #1?

6  BY MR. MORRIS:

7  Q    Okay.  And can you just explain to the Court what this

8  document is?

9  A    It's a trade report, one of Highland's -- this shows the

10 whole platform, so it's the aggregate sales.  The name of the

11 email -- I apologize, I forgot the system; it just left my

12 mind.  But the email you saw before is anybody on the platform

13 used for various trades if they're part of a trading group.

14 And that's to make sure that, across the portfolio, in its

15 corporate platform, you aren't running into either compliance

16 problems or allocation problems that could lead to a

17 compliance problem.

18 Q    So this shows sales of Avaya on these particular dates.

19 The trade is -- the trade symbol is AVYA.  This is a liquid

20 security.  Trades in, you know, liquid equity markets.  I

21 believe its average trading volume is somewhere about a

22 million and a half a day, approximately.  So you have a trade

23 date.  You have the type of transaction.  It could be a buy or

24 a sell.  These are all sales.  The quantity.  And then the

25 price.  And then it would have the Fund, and then the

Seery - Direct                                    159

1   aggregate dollars, which is simply multiplying the price times

2   the quantity.

3   Q    And if we just scroll down to the end of the document,

4   October 9th, is that around the time that Mr. Dondero left

5   Highland?

6   A    Right around that time.  This was coming into a number of

7   hearings that we thought it was most important to have Mr.

8   Dondero depart, particularly in light of some of the positions

9   that he and his companies were taking vis-à-vis the Debtor.

10          MR. MORRIS:  Can we put up Demonstrative Exhibit #2,

11  please?

12  BY MR. MORRIS:

13  Q    Can you explain to the Court what this is?

14  A    Uh, --

15          MR. MORRIS:  And again, just for -- just for the

16  record -- sorry to interrupt, Mr. Seery -- the backup for this

17  information can be found at Debtor's Exhibits BBBBB to SSSSS

18  BY MR. MORRIS:

19  Q    Go ahead, sir.  Could you explain to the Court what this

20  is?

21  A    Yeah.  This is just a pretty straightforward chart showing

22  the bars being sales and the lines being the -- the closing

23  sale price of a buy on that day.  And so you can see, you

24  know, with the market fallout in the early part of the year,

25  AVYA hit a low, but like most of the securities in the market,

Seery - Direct                                    160

1   it has come back very strongly.  And you see Mr. Dondero's

2   trades earlier in the year, the rest of it during the middle

3   part of the year, sales in the third quarter, and then, when

4   he's gone, I began selling in November and December.

5   Q    Now, so is it fair to say that Mr. Dondero and the

6   Defendants didn't completely impede and stop the Debtor from

7   selling AVYA shares?

8   A    That's fair.  What -- there's a little bit of confusion.

9   The way the trading desk worked previously is that you have

10  these separate companies but they're not really separate

11  companies.  HCFMA is populated by about seven employees.  Many

12  of them have functions across a number of different companies.

13  HCFMA exists solely because Highland funds it.  They haven't

14  paid fees of about three million bucks this year.  They owe

15  $10 million related to a disastrous bailout of what was an

16  open-end fund called Global Al a couple years ago where the

17  SEC, you know, came in and took significant action, almost

18  shut significant parts of Highland down.  And these traders do

19  the trading of all the equities across the platform.

20       So I typically would call them, and this is how we worked

21  in the spring when I took over the internal account after the

22  seizure by Jefferies of Mr. Dondero's management of the Select

23  Equity account.  I would work with Joe Sowin as the trader,

24  make decisions on what we wanted to do for the day, he would

25  execute those trades by going out in the market with a broker,

Seery - Direct                          161

1  selling them to -- to the dealer on the other side, run it

2  through our automated system, and then the trades get closed

3  with the back office.

4      So there's the trade, which is your agreement to buy or

5  sell at a particular dollar price.  That gets inputted into

6  the OMS system, and then from there it's the back office takes

7  over, and then ultimately securities are delivered versus

8  payment to the counterparty.

9  Q   Okay.  And can you just describe, you know, in one or two

10 sentences, your interpretation of this chart and how your

11 sales and the green bars compare to Mr. Dondero's sales and

12 the brown bars?

13 A   Well, the two simple obvious answers are, one, they're

14 smaller, and two, they're at higher prices.

15 Q   Okay.  You also traded, since Mr. Dondero's departure,

16 securities known as SKY; is that right?

17 A   That's correct.  It's Sky Champion Corp.  The ticker is

18 SKY.

19 Q   And did Mr. -- to the best of your knowledge, Dr. Mr.

20 Dondero trade in SKY securities prior to his departure?

21 A   I don't believe so.  As I said earlier, we didn't appear

22 to have an analyst on that for some time.  I don't even know

23 how far back it goes.  It was a bit of an orphan security

24 sitting in the portfolio.  It's only -- it was only in two of

25 the CLOs.

1   Q    Okay.

2           MR. MORRIS:   Can we please put up Demonstrative #3,

3   please?  Okay.

4   BY MR. MORRIS:

5   Q    And can you just explain to the judge what's depicted on

6   this page?

7   A    Again, similar to the last chart, you have the dollar

8   price of the security at the close each day, throughout the

9   year, and then the green bar showing where we began to sell

10  securities for those CLOs.

11  Q    And so, again, is it fair to say that Mr. Dondero and the

12  Defendants haven't completely stopped the Debtor from engaging

13  in SKY transactions?

14  A    That's correct.  What we did was the so-called workaround

15  previously mentioned, was that we decided that I would have to

16  do the trading directly.  So I'd literally look at the stock

17  each day, talk to the broker at Jefferies, determine what

18  level to sell at, communicate with him throughout the day,

19  work through transactions.  Then he reports in whether he's

20  been able to sell and execute on our behalf.  When he's done

21  that, then we have the back office manually enter the trades,

22  as opposed to doing it from the automated trading desk, and

23  then have those trades close.  So, so far, knock on wood, we

24  haven't failed on any trades.

25  Q    Okay.

1          MR. MORRIS:  We can the demonstrative down, please.

2     BY MR. MORRIS:

3     Q    Just two more topics here, sir.  Can we talk briefly about

4     what efforts, if any, the Debtors have made to avoid this

5     litigation?  I'll just ask them one at a time.  Has the Debtor

6     made any attempt to transfer the CLO management agreements to

7     the Defendants or to others?

8     A    Well, our original construct of our plan was to do that.

9     We've since determined, when we tried to do that, we got

10    virtually no response from the Dondero interests.  The

11    structure of the original thought of the plan was if we didn't

12    get a grand bargain we would effectively transition a

13    significant part of the business to Dondero entities, they

14    would assume employee responsibilities and the operations, and

15    then assure that the third-party funds were not impacted.

16         As I think I testified on the -- I can't recall if it was

17    the deposition or my prior testimony in court -- Mr. Dondero,

18    true to his word, told me that would be very difficult, he

19    would not agree, and he has made that very difficult.

20         So we examined it.  We've determined that we're going to

21    maintain the CLOs and assume them.  But we originally tried to

22    contemplate a way to assign those management agreements.

23    We've had --

24    Q    All right.

25    A    -- significant discussions with the CLO Issuers, and

1   they're supportive of us retaining them.

2   Q    Okay.  You were on the -- you've been participating or

3   listening in to the hearing throughout the day; is that right?

4   A    I have, yes.  I apologize.  I didn't leave the screen on

5   because I didn't want to suck up bandwidth.

6   Q    Are you familiar with all of the K&L Gates letters that

7   that were reviewed today?

8   A    I am, yes.

9   Q    Did the Debtor request that the Defendants withdraw those

10  letters?

11  A    Yes, we did.

12  Q    Had the Defendants withdrawn those letters, might that

13  have avoided this whole litigation?

14  A    I think it would have.  What we wanted to have here is a

15  withdrawal of the letters and an agreement by the clients for

16  the -- the K&L Gates clients that they wouldn't interfere with

17  the operations of the Debtor and our drive towards a plan.

18  They could take their legal positions and object to the plan,

19  if they like, but interfering on a day-to-day basis was

20  unacceptable to us in terms of trying to operate this business

21  in the most efficient manner.

22      We specifically requested that they do that.  This is, I

23  don't think, lost on anybody, certainly not on me in my

24  experience here for years:  These entities are all dominated

25  and controlled by Mr. Dondero, and each of these attacks is

1   specifically coordinated for the purpose of diverting the

2   Debtor, causing confusion, and forcing us to spend estate

3   resources.

4   Q    Do you know if the Debtor also asked the Defendants to

5   avoid this whole injunction proceeding by simply filing their

6   motion to lift the stay and see if they could actually win a

7   motion to terminate the contract?

8   A    Well, what we did was we contemplated the best, most

9   efficient way out, and it was either withdrawing the

10  agreement; if they didn't agree, then we'd said you should

11  file your stay motion immediately and let's have this

12  determined.  We told them, short of that, if they weren't

13  willing to do that, then we would have to put this in front of

14  the Court to try to make sure that we could operate the

15  business.

16  Q    All right.  So, just to summarize, you attempted to sell

17  the CLO management agreements, but were unable to do so; is

18  that right?

19  A    I would say assign.  We would have looked for a payment,

20  there is a cure payment that we have to make, but we didn't

21  we didn't conduct an auction for the CLO assets.

22  Q    And to the best of your knowledge, the Defendants never

23  withdrew the letters; is that right?

24  A    They did not.

25  Q    And to the best of your knowledge, the Debtors -- the

Seery - Direct                              166

1   Defendants never brought their contemplated lift stay motion,

2   right?

3   A    They have not, no.

4   Q    And so why did the Debtor bring this action?

5   A    Well, quite clearly, to try to prevent the managers and

6   Mr. Dondero and the Funds from interfering with the way that

7   we operate the business.  We intend to continue to manage the

8   CLOs, we intend to assume those contracts, we intend to manage

9   them post-confirmation, after exit from bankruptcy.  And

10  causing confusion among the employees, preventing the Debtor

11  from consummating trades in the ordinary course, deferring

12  those transactions, we thought put the estate at significant

13  risk, in addition to the cost.

14  Q    Did you hear Mr. Rukavina in the opening suggest that

15  these might, in fact, be money-losing contracts?

16  A    I did, yes.

17  Q    Why would the Debtor want to assume money-losing

18  contracts?

19  A    They're not money losing contracts.

20  Q    And why, why do you say that?

21  A    They generate fee income.  So the fees on each of these

22  CLOs get paid to the Debtor.  Now, not all of these CLOs, as I

23  mentioned earlier, are -- none of them are ordinary CLOs,

24  other than Acis 7.  But not all -- because they don't all have

25  liquid assets that are able to pay their fees each quarter,

1   some are deferred.  There are some CLOs that will probably

2   never pay any deferred fee because they are underwater.  Those

3   are not CLOs that Mr. Dondero or the Funds own any of.  That's

4   not really a surprise.  But we will continue to manage those

5   and look for ways to exit for those investors who are

6   noteholders who are underwater in those CLOs.

7   Q   Okay.  Can you describe for the Court the Debtor's

8   contentions as to how the conduct that has been adduced

9   through today's evidence, how is the Debtor harmed by Mr.

10  Dondero's interference in the trades and the sending of these

11  letters?

12  A   I think it's clear in terms of operational risk.  Being

13  forced to construct a workaround to consummate trades that we

14  think are in the best interest of the Funds.

15      It's telling not only that neither Mr. Dondero nor Mr.

16  Sowin nor -- Mr. Sowin was on the calls and agreed to the

17  analyst view, by the way -- nor anybody from MHF ever asked me

18  a question, their lawyers in the deposition never asked me why

19  we were selling these securities.  They simply want to get in

20  the way, cause additional risk to the estate, and cause

21  additional exposure with respect to legal fees, divert our

22  attention from trying to consummate the case.  I think that's,

23  in my opinion, that's pretty clear.

24  Q   Is there any concern on the part of the Debtor that

25  that Mr. Dondero's emails and conduct is creating uncertainty

Seery - Direct                                    168

1  among the staff as to who's in charge?

2  A    I think they did initially, and if they continued, they

3  would.  Right now, the workaround is working pretty well.  We

4  still do keep Mr. Sowin on the emails to make sure that, you

5  know, from a compliance perspective, that our sales, he knows

6  about; that we're not stepping on each other's markets, if you

7  will; that we're not getting in the way that -- in the way if

8  he wants to sell assets from a different MHF other managed

9  asset holding, but we do have a workaround that works right

10 now.

11      I think the biggest risk is, because it's much more

12 manual, you have risk of so-called fat-finger trades, where

13 you think you're selling a thousand and you sell 10,000, you

14 think you're executing a sale and you're executing a buy, you

15 think you're executing from an account that has the securities

16 and end up selling short from an account that doesn't.  So

17 we've got to be very careful of that, but the team is doing

18 that now.  There certainly was confusion at the start.

19 Q    And can you just explain to the Court your view as to how

20 the Debtor is able to -- how the Debtor will be able to

21 service the contract on a go-forward basis?

22 A    The CLO contracts?

23 Q    Yes.

24 A    We'll have a team of folks able to manage these assets

25 with professionals that are experienced credit analysts,

Seery - Direct                                 169

1  equity analysts.  I think we'll be able to manage this --

2  these assets in a pretty straightforward manner.  It's not

3  going to be very difficult.

4  Q   Has the Debtor been harmed through the diversion of your

5  personal attention as CEO in responding to all of this?

6  A   I like to think that I can juggle a lot of different

7  things.  I would prefer not to have to be looking at the

8  securities levels each day and feeding out securities that we

9  determine to sell through the broker at Jefferies, who,

10  notwithstanding, is doing a great job.  It's the job of the

11  trader to actually do that and day-to-day -- throughout the

12  day monitor the markets and look for the best place to sell.

13      So do I think I'm getting the best execution?  I think the

14  trader at Jefferies is excellent.  Do I think if a trader on

15  the Highland side was involved every step of the way, I think

16  it would be better.

17  Q   Have the Debtor's professionals' attention and resources

18  been diverted to deal with all of this stuff?

19  A   That -- I think that's -- that's quite clear as well.

20  It's a significant expense.

21  Q   Okay.

22      MR. MORRIS:  Your Honor, I have no further questions

23  of this witness.

24      THE COURT:  All right.  Mr. Rukavina?

25      MR. HOGEWOOD:  Your Honor, if you please, Lee

Seery - Cross                      170

1    Hogewood from North Carolina.  You've admitted me *pro hac*

2    *vice*.  If I may do cross-examination, I would appreciate it.

3              THE COURT:  All right.  Go ahead.

4              MR. HOGEWOOD:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6    BY MR. HOGEWOOD:

7    Q   Mr. Seery, let me ask you about the letters that came from

8    our firm, and especially from me, beginning on December 22nd.

9    I think you spoke about those generally.  If you need them to

10   be called up, I think my questions will be crisp as to the

11   letters generally, but we could certainly look at them

12   specifically, if need be.

13        There was initially a letter dated December 22nd, 2020,

14   that's Debtor's Exhibit DDDD, at Docket 39.  I take it you've

15   read that letter?

16   A   I have, yes.

17   Q   And it's fair to say that was a request you had seen

18   before?

19   A   I don't think that's fair to say, no.

20   Q   You had not seen a request to discontinue trades until the

21   confirmation hearing?

22   A   I don't believe so, no.

23   Q   Okay.  So that, that was the first time a request had been

24   made not to trade in the CLO securities prior to confirmation?

25             MR. MORRIS:  Objection to the form of the question.

Seery - Cross                               171

1              THE COURT:  Overruled.

2              THE WITNESS:  I --

3              THE COURT:  Go ahead.  You can answer.

4              THE WITNESS:  I don't recall you sending me a letter

5    before that, but I -- if you have, then I apologize.  I

6    thought I was pretty familiar with them, but I don't recall

7    you sending me that request previously.

8    BY MR. HOGEWOOD:

9    Q    Okay.  I'm sorry.  That was the first request you had

10   received from me, is that -- that's correct?

11   A    Yes.

12   Q    But there had been prior requests of a similar nature?

13   A    Not to my recollection.  Is there a letter?

14   Q    All right.  Well, let me -- let me move on.  You

15   weren't intimidated by my letter, were you?

16   A    Was I intimidated by your letter?  No, I was not

17   intimidated.

18   Q    And it didn't cause -- the letter itself did not cause you

19   or the Debtor to alter your investment strategy?

20   A    It did not, no.

21   Q    And it did not cause you or the Debtor to refrain from

22   operating the company in the manner that you perceived to be

23   in its best interest?

24   A    It did not.

25   Q    It did not cause you to change any of your trading

1    decisions?

2    A    No.

3    Q    You and your counsel responded -- or, your counsel

4    responded to the letter a couple of days later; isn't that

5    correct?

6    A    Yes.

7    Q    And the response rejected the request that had been made

8    and demanded that the letter be withdrawn; is that right?

9    A    Yes.

10   Q    So the range of communication is a set of lawyers

11   representing adverse parties asserting their respective

12   positions?  Is that a fair characterization of that set of

13   communications?

14   A    No.

15   Q    Okay.  Would you characterize it differently?

16   A    Yes.

17   Q    All right.  How so?

18   A    I believe you sent a letter with no good-faith basis,

19   knowing what the contracts say as an experienced lawyer,

20   knowing there was not cause, yet still making the same

21   threats, basically couching them as a request.  But I don't

22   think there was any good-faith exchange of ideas.  No one even

23   asked me why I was making the trades.  I think you were aware

24   of that.

25   Q    You -- but you testified that, nonetheless, the letter did

Seery - Cross                                    173

1  not cause you to conduct yourself in any other manner than you

2  would have conducted had you not received the letter; isn't

3  that right?

4  A    That's correct.

5  Q    So I think there's some confusion, then, and I just want

6  to clear this up.  There was earlier testimony, both at your

7  deposition, that -- that my clients actually interfered with

8  and caused trades not to occur on or around December 22nd and

9  23rd of 2020.  And that's not correct.

10         MR. MORRIS:  Objection.  Your Honor, the evidence is

11  in the record.

12         MR. HOGEWOOD:  Okay.  Well, let me --

13         THE COURT:  All right.  You're going to have to

14  rephrase.

15  BY MR. HOGEWOOD:

16  Q    Yeah.  Let me -- let me say it differently.  Focusing

17  solely on December of 2020, every trade that you initiated

18  closed; isn't that correct?

19  A    Every trade.  Yes.  We did not fail one trade.

20  Q    Okay.  And so the issue that you have raised in your

21  pleading is that there were -- there was an expectation that

22  employees of my clients would book trades, which is

23  essentially a backroom operation, after the trade has closed.

24  Isn't that right?

25  A    That's incorrect.

Seery - Cross                                174

1    Q    Okay.  So, once again, let me just get -- there were no

2    trades that you initiated that failed to close; is that right?

3    A    That's correct.

4    Q    And nothing that was done by the Defendants resulted in a

5    trade that you wished to make in December of 2020 to fail to

6    occur or fail to close; isn't that right?

7    A    That incorrect.

8    Q    So you initiated a trade that did not close?

9    A    Yes.

10   Q    In December of 2020?  And when was that?

11   A    I believe that's the case, yes.

12   Q    And specifically what trade did not close that you

13   initiated?

14   A    I'd have to check the notes, but the specific trades were

15   my attempt to initiate the trade with the desk.  Then the

16   trading desk goes into the market and makes the sale.  Once

17   it's inputted into the order management system, referred to as

18   an OMS, then it gets processed for closing.  In November and

19   in December, Mr. Dondero instructed those employees not to

20   initiate those trades.  So there was never an agreement.  When

21   I initiated a trade, which was the workaround you saw referred

22   to, I quite simply called Jefferies directly and I had the

23   back-office folks manually input it instead of the trading

24   desk.

25        Sorry.  I just wanted to make sure we cleared that up.

1  Q   No, just -- that -- that's helpful to understand.  But I

2  think, focusing again solely on December, every trade you

3  initiated closed?

4  A   Every trade that I actually went and made in the market

5  closed.

6  Q   And indeed, if --

7          MR. HOGEWOOD:  I observed your demonstrative

8  exhibits, and if I could ask that the one related to the Avaya

9  trades be called up, Mr. Morris.  is that possible?

10         MR. MORRIS:  Yeah, sure.  Is that the first one with

11 Mr. Dondero's trades, or do you want the chart?

12         MR. HOGEWOOD:  The -- the -- I think it was your

13 Demonstrative #2 that showed the timeline of the trades.

14         MR. MORRIS:  Yeah.  You bet.

15    (Pause.)

16         MR. HOGEWOOD:  Thank you.  Thank you very much.

17 BY MR. HOGEWOOD:

18 Q   So, just so I understand this document, the bottom axis is

19 the passage of time, and when we get into the period between

20 November of 2020 and the end of 2020, 12/31/2020, there are --

21 there's a green bar that has the numbers 50,000 at the top of

22 it.  That reflects what, Mr. Seery?  The number of shares or

23 the dollar amount of the trades?

24 A   Number of shares.

25 Q   And while this is not date-specific, do you know when

1  those sets of $50,000 trades happened?  Or --

2  A    I don't --

3  Q    -- 50,000 shares trades happened?

4  A    I don't know the specific dates off the top of my head,

5  no.

6  Q    But looking at it just in comparison to the calendar, that

7  -- that's awfully close to December 22nd and 23rd, is it not?

8  A    It appears to be, yes.

9          MR. HOGEWOOD:  And Mr. Morris, if the I guess it's

10 the SKY document could be pulled up as well?  I just want to

11 be clear --

12         MR. MORRIS:  Demonstrative #3, please.

13         MR. HOGEWOOD:  Yes.  Thank you.

14 BY MR. HOGEWOOD:

15 Q    The  timeline on this demonstrative is similar, is it not?

16 A    Yes, it is.

17 Q    It's showing trades by day throughout the course of the

18 year?

19 A    That's correct.

20 Q    And again, there are a significant number of trades in SKY

21 on what looks awfully close to the few days before Christmas

22 of 2020; is that right?

23 A    That's correct.

24 Q    Okay.  And this is the period of time that we're talking

25 about there being interference by the Defendants' employees;

1   is that right?

2   A    Yes.

3   Q    Okay.  I'll move on.  So, the next letter in question was

4   one that came the day after, on December 23rd.  Again, that

5   was a letter from me to your counsel.  Do you recall that

6   letter?

7   A    Yes.

8   Q    And the letter of the 23rd, if we need to look at it, is

9   the EEEE, Docket 39.  You read that letter as well?

10  A    Yes.

11  Q    And you disagreed with the position taken in the letter?

12  A    I'm trying to remember the specific position in that one.

13  Was that the one threatening to try to terminate the CLOs

14  without having checked whether there's cause?  I just don't

15  recall.

16  Q    Why don't we call it up, if we can?

17         MR. HOGEWOOD:  Mr. Morris, if you could help us,

18  because it's one of your exhibits, that would be great.  But

19  Ms. Mather has got it up, so that's great.

20  BY MR. HOGEWOOD:

21  Q    Mr. Seery, can you see the December 23rd letter?

22  A    I can, yes.

23  Q    And I think you referred to it as a threat to terminate

24  the portfolio management contracts?

25  A    I wasn't sure.  That's why I was just asking if this was

1   that one.  I don't -- I don't recall.

2   Q    Right.  And if you review the first page and the second

3   page, does that confirm your recollection that that is the one

4   related to portfolio management contracts?

5   A    I can't see the second page.  I believe it is.  I'm not

6   trying to --

7   Q    Yeah, no, --

8   A    If you represent, I'll accept it.

9   Q    Take your time.

10  A    (Pause.)  Yes.

11  Q    Okay.  And I think you already said this:  You strenuously

12  disagreed with the positions stated in the letter?

13  A    Yes.

14  Q    But again, you were not intimidated by the letter?

15  A    Intimidated?  No.

16  Q    The letter didn't cause you to change your investment

17  strategy?

18  A    No.

19  Q    It didn't cause you to trade or not trade in a particular

20  manner?

21  A    No.

22  Q    You continued to function the Debtor's operations as you

23  deemed appropriate?

24  A    Yes.

25  Q    To your knowledge, no CLO or Issuer has taken any steps to

Seery - Cross                                179

1   remove the Debtor as the portfolio manager?

2   A    The CLO or the Issuers?

3   Q    Yeah.  No one's -- no one's taken a position that you

4   should -- that the Debtor should be removed as a portfolio

5   manager?

6   A    Not -- not from the Issuers, no.

7   Q    And -- or, I'm sorry.  And so when you -- when you brought

8   a distinction between the Issuer and the CLO, are you -- are

9   you referring to CLO Holdco?

10  A    No.

11  Q    Okay.  Has a CLO taken steps to remove the Debtor as a

12  portfolio manager?

13  A    The CLO is the Issuer.

14  Q    Okay.

15  A    So the answer is no.

16  Q    Okay.  So no one has -- no one has acted to take any -- to

17  do anything as it relates to the removal of the Debtor as the

18  portfolio manager?

19          MR. MORRIS:  Objection to the form of the question.

20          THE COURT:  Overruled.

21          THE WITNESS:  I'm quite sure the CLO Issuers haven't,

22  as they agreed and we've been working with them on an

23  assumption.  With respect to what your clients have done, I

24  don't know.

25  BY MR. HOGEWOOD:

Seery - Cross                                        180

1  Q    But you don't have any evidence that my clients have taken

2  any action in violation of the automatic stay to -- to move or

3  encourage the removal of the Debtor as the portfolio manager,

4  do you?

5  A    Other than the letter?  No.

6  Q    Other than the letter between me and your counsel?

7  A    Correct.

8  Q    All right.  So, and that letter expressly states that any

9  of those actions that would be taken are subject to the

10  automatic stay and the Bankruptcy Code; is that right?

11  A    That's correct.

12  Q    And as we sit here today, the Debtor is not in breach of

13  any contract with any of the Issuers; is that right?

14  A    That's correct.

15  Q    And the letter didn't cause the Debtor to breach any

16  contract with any Issuer, did it?

17  A    Did not.

18  Q    And I think you've already testified today and you also

19  testified in deposition that you anticipate that the -- all of

20  the CLOs will consent to the assumption of the portfolio

21  management agreements in the context of confirmation; is that

22  right?

23  A    Yes.

24  Q    And the plan supplement that you recently filed, you

25  provide a mechanism by which the issue of for-cause

1   termination is to be resolved, do you not?

2   A    I don't recall if there's a specific provision in the plan

3   supplement.  We certainly have, either in the plan or in the

4   plan supplement, a provision related to the gatekeeper

5   function.

6   Q    And that's similar to the settlement that you entered into

7   with CLO Holdco in terms of resolving both their objection to

8   confirmation and the lawsuit against them today; is that

9   right?

10  A    I believe it's similar.

11  Q    Okay.  And the gatekeeper is the Bankruptcy Court to

12  determine, short of a full-blown trial, that if cause exists,

13  isn't that correct, under the plan?

14  A    Among other functions, yes.

15  Q    So if the Court confirms the plan, then the concerns that

16  you have are resolved by the gatekeeper function that is the

17  subject of this motion; is that right?

18  A    I think it depends on the contents of the confirmation

19  order.

20  Q    And if the Court denies confirmation, then the stay

21  remains in effect and the letter related to the removal of the

22  portfolio manager was expressly subject to the stay; isn't

23  that right?

24  A    If the letter says it's subject to the stay?  It does say

25  that, but it says other false things as well, so I'm not sure

1   -- I don't know exactly what you're asking me there.

2   Q   All right.  It wasn't a very good question, frankly.

3       Your counsel responded to the December 23rd letter as well

4   and demanded a retraction; isn't that right?

5   A   Yes.

6   Q   And that was sort of a separate (audio gap) with counsel?

7   A   I'm sorry.  You broke up for a second there, sir.  I'm

8   sorry.

9   Q   I'm sorry.  That -- that' -- let's just skip that.  You

10  had testified that neither letter was withdrawn?

11  A   I believe that's correct, yes.

12  Q   Are you familiar -- and -- are you familiar with the fact

13  that, in the response letters, your counsel insisted that

14  there be a response and withdrawal by not later than, I

15  believe, 5:00 on December 28th?  Do you recall that?

16  A   I don't recall that specifically, but I accept your

17  representation.

18  Q   And do you know whether or not there was a response dated

19  December 28th?

20  A   I don't believe there was a written response.  I don't --

21  I don't recall.

22  Q   All right.

23          MR. HOGEWOOD:  Ms. Mather, can you call up

24  Defendant's Exhibit 84, which is at Docket 45, please?  Thank

25  you.

Seery - Cross                                    183

1   BY MR. HOGEWOOD:

2   Q    So, Mr. Seery, have you ever seen this letter dated

3   December 28?

4   A    I believe I have, yes.

5   Q    And this letter was not attached to the complaint nor your

6   declaration nor the request for a TRO or preliminary

7   injunction, was it?

8   A    If you say it wasn't.  I don't recall specifically.

9   Q    Okay.  So, you, by seeing this, you realize now there was

10  a response by the 28th.  Is that right?

11  A    Yes.

12  Q    And in the -- let me just direct your attention to the

13  final sentence of the first paragraph.  It says -- it makes

14  once again clear that the -- any efforts to remove the Debtor

15  as manager would be subject to applicable orders of the

16  pending bankruptcy case, provisions of the Bankruptcy Code,

17  and specifically, the automatic stay.  Do you see that?

18  A    I apologize.  I don't see it.  Which paragraph?

19  Q    I'm at the very last sentence of the first paragraph.

20  There's a sentence that --

21  A    (reading)  Subject to applicable orders in the pending

22  bankruptcy case, provisions of the Bankruptcy Code,

23  specifically, the automatic stay.

24       I read that, yes.

25  Q    Yes.  Okay.  There was some testimony about the letter

Seery - Cross                                184

1  related to Mr. Dondero's eviction.  I don't intend to belabor

2  that.  But once again, that was a letter between counsel, was

3  it not?

4  A    I believe it -- I believe it was.  I don't recall

5  specifically now.  I assume -- I assume all of these were

6  directed to counsel.

7  Q    Right.  And again, the fact that counsel wrote a letter

8  requesting that the eviction not occur did not change your

9  process and you proceeded with the eviction, did you not?

10  A    I think the letter came after Mr. Dondero was no longer

11  permitted.  Eviction is an odd word.  He was no longer an

12  employee, so employee not being able to come into the office

13  and hang around and disrupt business isn't exactly an

14  eviction.  So I disagree with your characterization there.

15  Q    Okay.  Well, so I'll just leave that.  I mean, the --

16  since this exchange of letters, are you aware -- I mean, there

17  was some testimony about the Debtors presenting the Defendants

18  with the choice of either filing a motion for relief from stay

19  or this injunction proceeding would be brought.  Isn't that

20  right?

21  A    Yes.

22  Q    And no motion for relief from stay was filed, and

23  therefore this injection proceeding was brought.  Is that

24  correct?

25  A    Yes.

1    Q    So the other thing that you know was filed by the

2    Defendants was an objection to confirmation, which was due on

3    January 5th of 2020, correct?

4    A    I'm sorry, Mr. Hogewood.  You broke up.  Did you say the

5    other paper or pleading that was filed?

6    Q    The pleading that was filed by the -- these who are

7    Defendants as well as other parties to this case was an

8    objection to confirmation, the deadline for which was January

9    5, 2020.  Are you familiar that an objection to confirmation

10   was filed?

11   A    I'm familiar that one was filed, yes.

12   Q    And so the objection to confirmation raised many of these

13   same issues regarding the circumstances under which the

14   various CLO agreements could be assumed; isn't that right?

15   A    I'm not aware of the specifics of the objection.

16   Q    Okay.  But nonetheless, my client was under no obligation

17   to initiate yet another motion or lawsuit or pleading against

18   the Debtor beyond objecting to confirmation, was it?

19   A    An obligation?  No.

20   Q    And since the objection to confirmation has been filed,

21   there have been a number of pleadings filed in the case.  We

22   obviously were required to respond to the motion for

23   preliminary injunction, and it says there's been an objection

24   filed to that.  Are you aware of that?

25   A    That -- that you objected to the preliminary injunction?

Seery - Cross                                186

1    Q    Yes.

2    A    Yes, yes, I'm aware of that.

3    Q    And --

4    A    I'm very aware.

5    Q    And you're aware that there was a proposed settlement with

6    HarbourVest; is that correct?

7    A    We have an approved settlement with HarbourVest.

8    Q    Right.  And there were objections filed to that particular

9    -- or, to that particular settlement agreement, were there

10   not?

11   A    Yes.

12   Q    But none of my clients participated in that objection, did

13   they?

14   A    I don't recall the specifics of your clients versus the

15   other Dondero entities, but I'm certain Mr. Dondero

16   participated.

17   Q    But the De... the parties that we represent did not object

18   to the settlement?

19   A    I don't recall specifically.

20   Q    Okay.  And another motion that was filed was for an

21   examiner.  Isn't that correct?

22   A    I believe that's the case, yes.

23   Q    Yeah.  And my clients didn't join that motion, either?

24   A    No.  It's a bit of whack-a-mole, but they did not -- they

25   did not -- I don't -- I don't know.  To be honest, I don't

1  know if they did or not.

2  Q    All right.  Toward the end of your testimony, you were

3  giving some information about the value of these management

4  contracts in terms of income over the course of the coming

5  year or two.  What is the projected revenue with respect to

6  these management contracts?

7  A    Do you mean the CLO 1.0 management contracts?

8  Q    Yes.

9  A    They generate about four-and-a-half to five million

10  dollars a year, depending on the asset base in total, but

11  that's accrual, as I mentioned earlier.  It doesn't all come

12  in in cash.  It depends on the waterfall.  Expect about two-

13  and-a-half to 2.7 million to come in per year during the

14  course of the projected time period.

15      (Echoing.)

16  Q    Have you done any sort of profitability analysis on the

17  management contracts?

18  A    Not specifically on those contracts, no.  We look at the

19  --

20  Q    Okay.

21  A    -- aggregate of the Debtor's receipts versus its costs.

22  Q    Can you -- so, --

23          MR. HOGEWOOD:  Ms. Mather, can you call up the

24  disclosure statement?  This is Docket 1473.  And in

25  particular, Page 176.

Seery - Cross                                   188

1   BY MR. HOGEWOOD:

2   Q    So, I'm, Mr. Seery, I'm trying to square the 779 for the

3   month ended -- month period ended in March '21 and no further

4   revenue coming in on management fees with what you just said.

5   A    I'm not -- I'm not sure why.  This should -- certainly

6   should have the management fees according to the CLOs if this

7   was included in the assumption of those.  We have revenue,

8   they do generate revenue, they currently generate and they

9   will continue to generate.

10  Q    But this is the disclosure statement approved by the

11  Court, right?

12  A    Yes.  I'll have to come back and check why that for the

13  year doesn't have it, unless we were assuming that we wouldn't

14  receive any into the -- into this vehicle.  I just, I don't

15  know the answer.

16          MR. HOGEWOOD:  Your Honor, that's all the questions I

17  have.  Thank you very much.

18          THE COURT:  All right.  Redirect?

19          MR. MORRIS:  Can we just leave this up on the screen

20  for a second, very quickly, for Mr. Seery?  Can we put the

21  document back?

22                      REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Mr. Seery, do you recall that the disclosure statement was

25  approved back in November?

1  A    Yes.

2              THE COURT:  Could you repeat the question?  I

3  couldn't hear it.

4              MR. MORRIS:  Yeah.  That is -- I don't know if

5  somebody's phone is not on mute.

6              THE COURT:  Yes.  Please put your device on mute if

7  you're not the one talking.  Okay.  Someone did.  Go ahead.

8              MR. MORRIS:  Thank you.

9  BY MR. MORRIS:

10  Q    Mr. Seery, do you recall that this disclosure statement

11  was approved back in November?

12  A    Yeah.  What I'd said earlier was that I'm not sure if the

13  -- this plan projection conforms with our decision to maintain

14  the CLO management contracts, and so there certainly should be

15  revenue, while it comes in quarterly on the management fee,

16  the base management fee.  And it's not always -- each CLO is

17  not always able to pay it in cash.  It will depend on our

18  ability to monetize assets, because they don't -- a lot of the

19  assets are not cash-generative.  Some are.  For example, the

20  Trussway loan is cash generative.  The CCS loan is not.

21        But I'm just not sure why this doesn't show the management

22  fees at all.  At least for the whole year, we certainly will

23  have them, unless this is prior to the determination to assume

24  those agreements.

25  Q    Okay.  So if the assumption in November was that the

Seery - Redirect                                    190

1    agreements would be assigned, there would be no revenue shown.

2    Is that fair?

3    A    That would have been the assumption prior to us

4    determining that we wanted to assume them, yes.

5    Q    Okay.  And do you recall whether the Debtor became more

6    convinced that it would assume the contracts rather than

7    assign them before or after the disclosure statement was

8    approved?

9    A    I don't recall the specific timing, but a number of things

10   happened around this time.  First, the Dondero entities were

11   unwilling to even engage on assignment because they were on a

12   much more aggressive, quote, blow up the place strategy.

13   That's Mr. Dondero's quote.

14       Number two, we settled with HarbourVest, and that

15   significantly increased the value of maintaining the CLO

16   management.  The HarbourVest --  or the HCLOF entities own

17   significant preferred shares in the 1.0 CLO structures, and

18   having management of those and being able to monetize those in

19   accordance with the agreement, maximizing value for the

20   benefit of HCLOF, would be far, far better for the estate than

21   letting these assets just sit.  We're not trying to drive the

22   price down, because we wouldn't be in the business of trying

23   to buy back those securities on the cheap.  We're in the

24   business of trying to maximize value.

25   Q    All right.

Seery - Examination by the Court                 191

1          MR. MORRIS:  I have nothing further, Your Honor.

2          THE COURT:  Any recross on that redirect?

3          MR. HOGEWOOD:  No, thank you, Your Honor.  Appreciate

4     the opportunity to appear before you.

5          THE COURT:  All right.  Thank you.

6     Mr. Seery, before we let you go, I have a couple of

7     follow-up questions.

8                     EXAMINATION BY THE COURT

9          THE COURT:  These CLOs, I mean, you've said a couple

10    of times they're not really traditional CLOs, except for the

11    Acis 7 one.  But I have this question.  I've learned back in

12    the Acis case most of what I know about CLOs, I suppose.  And

13    what the witnesses told me there were they typically had a 12-

14    year life, and then, yeah, there was some period, you know,

15    the first five years, seven years, something like that, where

16    it was in a reinvestment/refinancing phase, but then after

17    that, you know, we couldn't do that anymore and it was kind of

18    heading towards wind-down.

19    Anyway, my long-winded question is:  Do these CLOs work

20    generally like that or not?  Because you said they're

21    atypical.

22         THE WITNESS:  They -- they --

23         THE COURT:  Go ahead.

24         THE WITNESS:  They used to.

25         THE COURT:  Okay.

Seery - Examination by the Court                    192

1          THE WITNESS:  So these are extremely old.  These go

2    back to 2006, '07, '08.  These are very old CLOs.  So they're

3    far beyond their investment periods.  Some of them are coming

4    up on their maturities on their debt.  Many of them don't have

5    any debt at all.

6        So you'll recall, Your Honor, that a CLO is a vehicle

7    where you take x-hundred million -- we'll use 400 for fun --

8    million dollars.  You ramp up $400 million of assets.  You

9    sell off, for our purposes, $350 million of securities.  You

10   have the AAA securities, the AAs, all the way down.  And then

11   you have these preference shares.

12       During a period of time, as cash is generated in the CLO,

13   the CLO is entitled to reinvest it.  And that keeps it going.

14   And then it gets beyond its reinvestment period and it's in

15   what folks usually refer to as its harvest period.  That's

16   when oftentimes, depending on where rates are, depending on

17   asset value, the rates for the debt obligations or the rate

18   you can receive on your assets, you may see refinancings or

19   resets.  Otherwise, the CLOs begin to wind down.  They have --

20   they don't have a life, like a partnership with a final date,

21   but there's maturities on the debt and then there's an

22   expectation that they would wind down.

23       These CLOs -- which typically CLOs only invest in

24   performing loans, and oftentimes, particularly Highland -- and

25   I could regale you with stories how Highland would take

Seery - Examination by the Court                    193

1    virtually non-interest-bearing, seventh lien debt -- that's a

2    bit of an exaggeration -- but just to keep the fees going, and

3    not actually convert to equity.  A lot of these, that wasn't

4    an option, so they've converted to equity.  So I just have one

5    that I happen to have on my screen, Your Honor, Gleneagles.

6    The assets in Gleneagles (echoing) are 16 -- MGMs.

7            THE COURT:  Okay.  Someone needs to put their phone

8    on mute.  All right.  I'm sorry.

9            THE WITNESS:  So it has -- it has -- the specifics

10   aren't particularly important, but its assets are -- just this

11   one I just pulled up; they're all a little different, and --

12   but mostly the same -- MGM stock.  This is MGM Studios, which

13   you read about with James Bond, a very valuable asset.  Across

14   the Highland platform, there's roughly $500 million worth of

15   stock.  It doesn't pay off any income.  So if it had debt --

16   and I'm not sure if Gleneagles still has any; I'd have to

17   switch screens; I don't believe it does; if it does, it's

18   small -- it wouldn't get any income-generating -- that's not

19   income generating asset.

20       Vistra, which is the TXU stock I talked about before, is

21   the next biggest asset.  Skyline Corporation, which was the

22   one we were selling.  That's no longer in there.  TCI

23   portfolio, which is a Dondero real estate asset it has, it's

24   an old Las Vegas and Phoenix, Arizona real estate

25   developments.  Not income-generating.  Not that they don't

Seery - Examination by the Court                                194

1   have value, but this is much more like what would be referred

2   to as a closed-end fund.  It's not going to go out and buy

3   anything.  It can't.  It can only generate cash by selling

4   assets, give that cash to the trustee, and then the trustee

5   pays it through the waterfall.  And that's the way all of

6   these CLOs work.

7        Now, some of them do have debt.  And some of them have a

8   lot of debt, and the preferred shares will never be worth any

9   money, so we refer to those as being underwater.  No surprise,

10  the Dondero-related entities don't own any of those junior

11  securities.

12       The -- some do have debt.  A lot of that debt is going to

13  get paid off in the first half of the year because there'll be

14  refinancings at Trussway and a refinancing at Cornerstone.

15  They own debt, and that'll generate cash.  It'll go to the

16  CLOs, go to the trustee.  First it goes to pay the obligations

17  for the outstanding debt of the CLO, and then the asset

18  dollars, they get put through the waterfall to pay the more

19  junior securities.

20            THE COURT:  Okay.  And --

21            THE WITNESS:  And I --

22            THE COURT:  The --

23            THE WITNESS:  I was going to give you -- I contrast

24  that to a more typical CLO, which is whether it's beyond its

25  investment period or not, will have something like 150 to 250,

1   sometimes more, loans in it.  150 would be on the loan side.

2   It'll own -- own those in smaller amounts.  It has

3   requirements as to what its concentrations are in different

4   buckets of types of assets.  It has to return -- it has to

5   have an income-generating ability to satisfy certain covenants

6   in its debt obligations and in the indenture.  And then it

7   will, once it gets past its investment period, it will start

8   to harvest those assets.

9       There are different ways for the CLO manager to swap

10  assets, to stay in compliance, to extend out the tenure, but

11  usually markets start to move and there's some reason for the

12  CLO manager to do something like a reset or a refinancing or

13  to call the CLO.

14      So you'll see a number -- there was one this week, and

15  there'll be a number because of the conditions in the market

16  -- of CLOs called by the, effectively, the equity, saying,

17  Great time to sell, I don't need the short income, call the

18  CLO, do a BWIC or some other way to get dollars for all of the

19  assets, pay off all of my debt, and give me the balance of the

20  proceeds.

21          THE COURT:  Okay.  All right.  And the plan

22  contemplates that these will all be wound down over a two-year

23  period, correct?

24          THE WITNESS:  It's not a hard -- it's not a hard

25  period.

1          THE COURT:  Okay.

2          THE WITNESS:  So it's not a two-year period.  We're

3    going to -- we're going to manage these assets, as any asset

4    manager would, and we've had direct discussions with some of

5    the underlying holders, including one of the biggest investors

6    in the world who's an investor in the CLO but also has a

7    couple separate accounts which they want us to manage, and

8    we'll look for opportunities, depending on the market.  We're

9    not going to -- we're not going to just sell.  It's not a

10   liquidation.  We're going to find opportunities where, if we

11   believe it's the right value, we'll sell.  That doesn't mean

12   we'll sell it all in a big chunk.  We may manage pieces.  We

13   may hold on to some.

14       Some of them may perform -- some of the assets may

15   actually do things differently than others.  For example,

16   Cornerstone, for unknown reasons, has $60 million of MGM

17   stock, not an asset that you'd think you'd stuff into a

18   healthcare business, but this is Highland.  That may be sold

19   before, for example, Gleneagles sells its MGM.  It'll just

20   depend on, you know, market and the need of the specific

21   investor.

22         THE COURT:  All right.  Thank you.  That's all the

23   questions I have.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  All right.  So, Mr. Seery, I think we're

Seery - Examination by the Court                    197

1    done with you, but we hope you'll stick around for however

2    longer this goes.

3              THE WITNESS:  I will indeed.

4              THE COURT:  Okay.

5              THE WITNESS:  Thank you.

6              THE COURT:  Does the Debtor rest, Mr. Morris?

7              MR. MORRIS:  Yes, Your Honor.  There were those

8    couple of documents that we had used from the different docket

9    that we'll certainly put on the docket with the supplement

10   witness and exhibit list.  I just wanted to point that out.

11   And I, you know, I don't recall, frankly, if I moved into

12   evidence each of those extras, and I'm happy to go through it,

13   but it's very important to me that those documents be part of

14   the record.  So --

15             THE COURT:  Okay.  I think what you added was TTTTT,

16   and I think I admitted it.  You moved to admit it, and I said

17   yes, but you're going to have to file it on the docket --

18             MR. MORRIS:  Yeah.

19             THE COURT:  -- as a supplemental exhibit.

20             MR. MORRIS:  Right.  And then there were the couple

21   from the other -- let me see if I can get them.

22             THE COURT:  I admitted everything else that you filed

23   on the docket except UUUU, VVVV, and AAAAA.

24             MR. HOGEWOOD:  Yeah.  And that's fine.

25        Can we, Ms. Canty, going from Docket No. 46, can we just

1   call up Exhibit K to make sure that that's in evidence?

2   Docket 46 from the Dondero adversary proceeding.

3       Okay.  So this was the letter, Your Honor, that I used

4   earlier today with Mr. Dondero.  If you scroll down, where I

5   examined him on the trading.  This is what led into the

6   December 22nd trading, if you go to the next page.  So if it's

7   not in evidence, I would respectfully request that this

8   document be admitted into evidence, Your Honor.

9           MR. RUKAVINA:  Your Honor, I object.  This document

10  is hearsay of Mr. Pomerantz.

11          THE COURT:  Okay.

12          MR. MORRIS:  Mr. Dondero has already -- I'm sorry,

13  Your Honor.

14          THE COURT:  Okay.  So this is -- I wholesale-admitted

15  all of your exhibits with those three carved out that I

16  mentioned.  So you're saying I've not admitted this one yet?

17          MR. MORRIS:  I just don't recall, because this wasn't

18  on the exhibit list. I will point out that we had no objection

19  to the entry into the evidence of all of K&L Gates letters,

20  and I'm really a little surprised, having heard the testimony

21  from Mr. Dondero on this particular letter, that there would

22  be an objection.  But I would respectfully request that it be

23  admitted as an exception to the hearsay rule.

24          THE COURT:  All right.  Well, I'm going to overrule

25  the objection.  I'll admit it.

1      So, again, it has to be supplemented on the docket.

2          (Debtor's Exhibit K is received into evidence)

3          MR. MORRIS:  Yes.  And there's just one other

4    document, Your Honor, from that same docket.  It's Exhibit D,

5    Ms. Canty.  I just want to make sure that's in the record as

6    well.  And I do apologize again, Your Honor.

7          THE COURT:  Okay.

8          MR. MORRIS:  I didn't realize until I was reading --

9          THE COURT:  We're getting terrible distortion.   I

10   don't know where it's coming from, but --

11         MR. MORRIS:  Okay.  And this is, this is the email

12   that I -- it's Mr. Dondero's own statement, so it's not even

13   hearsay, but I just want to make sure this is part of the

14   evidentiary record, Your Honor.  So I move for the admission

15   of this document as well to our exhibit list.

16         MR. RUKAVINA:  I believe this document has been

17   admitted.  I believe -- I believe --

18       (Echoing.)

19         MR. RUKAVINA:  Is that us?  Testing.

20         THE COURT:  All right.  Mike, where is that coming

21   from?

22       (Clerk advises.)

23         THE COURT:  Okay.  Mike thinks it's Mr. Morris, but

24   -- so put yourself on mute.

25       Mr. Rukavina, go ahead.

1          MR. RUKAVINA:  Your Honor, I think this exhibit is in

2   already.  If it's not, no objection.

3          THE COURT:  All right.  So it will be admitted, and

4   again, you need to file it as a supplement, Mr. Morris.

5        (Debtor's Exhibit D is received into evidence)

6          MR. MORRIS:  Yeah.  Thank you, Your Honor.  The

7   Debtor rests.

8          THE COURT:  All right.  Mr. Rukavina, I want to go a

9   while longer, so let's at least -- do you have Mr. Dondero as

10  well as Mr. Post?

11         MR. RUKAVINA:  I do, Your Honor.  I have both.

12         THE COURT:  Okay.  Well, let's go.  You may call your

13  witness.

14         MR. RUKAVINA:  Your Honor, we'll call Jason Post.

15         THE COURT:  All right.  Mr. Post, I swore you in

16  earlier and I consider you still under oath.  Do you

17  understand that?

18         MR. POST:  I do.

19         THE COURT:  All right.  Go ahead.

20      JASON POST, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

21         MR. RUKAVINA:  Oh, turn on the video.  Can you see

22  how to do that?  Is Jason on the video?  Okay.  All right.

23  Mr. Post?  Hold on a second.  I'm hearing myself.

24         THE WITNESS:  I'm hearing the same.

25         MR. RUKAVINA:  Let me turn down my volume.  Testing.

1  Okay.  Mr. Post, can you hear me?

2            THE WITNESS:  Yes.

3            MR. RUKAVINA:  Okay.

4                    DIRECT EXAMINATION

5  BY MR. RUKAVINA:

6  Q    You were asked about some of your background and

7  qualifications.  Just so that the record is clear, you are the

8  chief compliance officer for both two Advisors and each of the

9  Funds, correct?

10 A    Correct.

11 Q    And I think we refer to these three defendant funds as

12 retail funds; is that correct?

13 A    Correct.

14 Q    Describe what we mean or what you mean by a retail fund.

15 A    I look at it two ways.  There's private funds, which are

16 institutional in nature, and retail funds, which are comprised

17 of open-end funds, closed-end funds, BDCs, ETFs, and that

18 constitutes the suite of funds that are advised by Highland

19 Capital Management Fund Advisors and NexPoint Advisors.  And

20 they generally have a broad swath of investors, including

21 institutional investors, but also, you know, just regular mom-

22 and-pop investors.

23 Q    Okay.  So, for the Highland -- I'm sorry, for the three

24 retail funds, how much in ballpark investments do they have in

25 the CLOs that are at issue today?  Ballpark.

1  A    Maybe call it a hundred million, ballpark.  Or a hundred

2  million, give or take.

3  Q    Okay.  And for all of the CLOs that Highland manages that

4  the Advisors and other Funds have an interest in, do you have

5  an estimate of how much it manages of CLO assets?

6  A    I believe it's approximately a billion, a little over a

7  billion that HCMLP manages for its CLO assets.

8  Q    Do you have an estimate of how many individual investors

9  there are in the three retail funds?

10  A    I -- thousands.  I don't have an exact number.

11  Q    Okay.  And I think you mentioned some of the types.  Do

12  you have any names of the types of investors that Her Honor

13  might know or have heard of before?

14  A    Off the top of my head, I do not, just -- but they're

15  generally constituted or characterized of the investor types

16  that I mentioned earlier.

17  Q    Okay.  Now, these three retail funds, do they own voting

18  preference shares in any of the CLOs that the Debtor manages?

19  A    Yes.

20  Q    Okay.  Do they own a majority in any of those CLOs' voting

21  preference shares?

22  A    In aggregate, across the three, they would.

23  Q    Okay.

24  A    With other CLOs.

25  Q    What are those three CLOs, sir?

 1   A    I believe it's Greenbrier, Graceland, and Stratford, if I

 2   recall correctly.

 3              MR. RUKAVINA:  Your Honor, have you received a

 4   couriered binder of our exhibits?

 5              THE COURT:  I have.  I've got them right here.

 6              MR. RUKAVINA:  Now I can't hear the judge.  What's

 7   she saying?

 8              THE COURT:  Yes.  I've got them.

 9              MR. RUKAVINA:  I think you're on mute, Judge.

10              MR. VASEK:  No, you turned your volume down.

11              MR. RUKAVINA:  Oh.  I apologize, Your Honor.

12         So, Mr. Vasek, if you'll please put Exhibit 2 up.

13   BY MR. RUKAVINA:

14   Q    Mr. Post, are you the custodian of records for the Funds

15   and Advisors?

16   A    Yes.  We're required to keep records of ownership and

17   trades for the Funds involved.

18   Q    And you are an actual officer of these Funds and Advisors,

19   correct?

20   A    Correct.

21   Q    Okay.  Are you familiar with this Exhibit 2?

22   A    I am.

23   Q    Did you participate in pulling together the underlying

24   information with others to prepare Exhibit 2?

25   A    I did.

1    Q    Does Exhibit 2 accurately reflect the current ownership of

2    the various CLOs by the three retail funds that are --

3    A    At the time it was put together, I believe it did.

4    Q    And approximately when was that?

5    A    I believe it was in the November time frame, middle of

6    November, end of November.

7    Q    Do you have reason to believe that the numbers we're

8    referring to would be materially different today?

9    A    I don't believe they would be materially different.

10            MR. RUKAVINA:  Your Honor, I move for the admission

11    of Exhibit 2 as a summary of underlying data.

12            THE COURT:  All right.  Any objection?

13            MR. MORRIS:  Yes, Your Honor.  It's hearsay.  I

14    understand that the witness has testified to it, but just as I

15    put in the backup for my demonstrative, where's the backup?

16    We're just supposed to take his word for it?  There's no

17    ability to check this.  This is not evidence.  It's a

18    demonstrative.

19            THE COURT:  All right.  Mr. Rukavina, do you have

20    backup?

21            MR. RUKAVINA:  Let me ask the witness a couple more

22    questions.

23    BY MR. RUKAVINA:

24    Q    What would be the backup for this Exhibit 2?

25    A    We'd have to pull the holdings from the intranet and that

1  would identify the quantity that's held by each of the

2  respective funds and then an aggregate that, over the

3  preference shares outstanding, would give you the percentages

4  that are outlined in this exhibit.

5  Q    Okay.  And is that a database that you have personal

6  access and authority over?

7  A    I have personal access to it.  Yes.

8  Q    Okay.

9        MR. MORRIS:  Your Honor, *voir dire*?

10 BY MR. RUKAVINA:

11 Q    Can you easily take that data from a computer and show it

12 to the Court here today?

13 A    Yes.  It would just require the CUSIPs for each of the

14 preference shares and then plug it into the intranet and then

15 that would provide a screenshot of the ownership of the CLOs.

16 Q    And is this what that is, basically?

17 A    This is an aggregation -- or, this is a percentage of the

18 shares outstanding, the preference shares.  So what would be

19 shown on the intranet would be the quantity and then you'd

20 have to tie that back to the shares outstanding and that would

21 give you the percentages that are shown on this exhibit.

22       MR. MORRIS:  *Voir dire*, Your Honor?

23       THE COURT:  I'm sorry?

24       MR. MORRIS:  May I inquire before this --

25       THE COURT:  Mr. Morris, is that you?  Okay.  You want

1    to take him on *voir dire*?

2              MR. MORRIS:  Yes.

3              THE COURT:  Go ahead.  Uh-huh.

4                    VOIR DIRE EXAMINATION

5    BY MR. MORRIS:

6    Q    Yes.  Mr. Post, did you prepare this document?

7    A    I provided information and the document was ultimately

8    prepared by counsel.

9    Q    So you didn't personally prepare this, right?

10   A    I didn't personally put this chart together.

11   Q    And you didn't personally make the calculations on this

12   chart, right?

13   A    I would have supplied or assisted in supplying the

14   holdings with reference to the shares outstanding and then

15   they would have done the math to place the percentages.

16   Q    I'm asking a very specific question.  You didn't do the

17   calculations necessary to come up with the percentages on this

18   chart, right?

19   A    Me personally, no, I did not.

20   Q    And you can't verify that this chart is accurate, can you?

21   A    I provided, provided the information.  Then it's a

22   mathematical calculation.

23   Q    Okay.  You didn't take any steps to determine the accuracy

24   of this chart, right?   You relied on others?

25   A    There's a -- I would have cross -- you know, maybe cross-

Post - Voir Dire                                    207

 1 | referenced some of the percentages against another spreadsheet

 2 | that was -- that we had internally.

 3 | Q   Sir, I didn't want to know what you would have done.  You

 4 | didn't do anything to confirm the accuracy of all of the

 5 | numbers on this page, correct?

 6 | A   I believe I may have spot-checked a couple of them.  I

 7 | can't recall specifically.

 8 |         MR. MORRIS:  Your Honor, not only don't we have the

 9 | backup, but this witness isn't even competent to testify to

10 | the accuracy of the chart.  I renew my objection.

11 |         THE COURT:  All right.  I sustain the objection.

12 |         MR. RUKAVINA:  Your Honor, I'll --

13 |         THE COURT:  It's not allowed.

14 |         MR. RUKAVINA:  Going back to the -- take that down.

15 |         THE COURT:  All right.  Mr. Rukavina, we're -- our

16 | connection to your office is suddenly not very good.  Both you

17 | and Mr. Post are very hard to hear.  So let's see what we can

18 | to improve.

19 |         MR. RUKAVINA:  Is it a question of loudness or

20 | quality?

21 |         THE COURT:  Quality.  And I heard you fine just then,

22 | but -- so let's try again.

23 |                 DIRECT EXAMINATION, RESUMED

24 | BY MR. RUKAVINA:

25 | Q   Mr. Post, let's go back to those retail funds.  How are

1   those funds managed at the top level?

2   A    They're overseen by a board of trustees.

3   Q    Okay.  Do you interact with that board of trustees

4   periodically?

5   A    I do.

6   Q    Okay.  Approximately how often?

7   A    At least quarterly, and generally intervening periods.

8   I'd probably say anywhere from every five to six weeks, if not

9   more frequent.

10  Q    Have you been communicating with them more frequently

11  recently?

12  A    Yes.

13  Q    As the CCO of the funds, who do you ultimately report to?

14  A    The board.

15  Q    Is Mr. Dondero on any of those boards?

16  A    He is not.

17  Q    Okay.  Are those boards capable, to your experience, of

18  making independent decisions?

19          MR. MORRIS:  Objection to the form of the question.

20          THE COURT:  Overruled.

21          THE WITNESS:  I think the question, is are they

22  capable of making independent determinations?  Yes.

23  BY MR. RUKAVINA:

24  Q    Okay.  Explain the interaction between the Fund Advisors

25  and the retail funds.  What -- what does the one do for the

1    other, if you will?

2    A    I'm sorry.  Can you repeat that?  I didn't -- I didn't

3    hear the question.

4    Q    So, we have the three retail funds.

5    A    Yes.

6    Q    What relationship, if any, is there between the two

7    Advisor defendants and any retail fund defendants?

8    A    So, there's an investment advisory agreement that the

9    Funds have entered into with the investment advisor, and the

10   investment advisor performs investment functions on behalf of

11   those Funds, along with other noninvestment functions.

12   Q    Okay.  So is it fair to conclude that, for investment

13   purposes, the Advisors make pretty much all, if not all,

14   decisions for the three Funds?

15   A    Yes.

16   Q    Okay.  What about other matters that the board might

17   consider?  Do the Funds make -- I'm sorry.  Do the Advisors

18   make other decisions for the Funds, or is it an advisory role?

19   A    The Advisors may make other decisions or recommendations,

20   which they then set forth to the board for their approval, if

21   needed.

22   Q    Okay.  Does the board have independent counsel?

23   A    They do.

24   Q    Okay.  Have you interacted before?

25   A    I have.

1   Q    And is it fair to conclude that the board not only is

2   capable of making independent decisions but has made

3   independent decisions recently?

4            MR. MORRIS:  Objection.  Leading.

5            THE COURT:  Sustained.

6            THE WITNESS:  They have.

7            MR. RUKAVINA:  Okay.

8            THE COURT:  That was --

9            MR. RUKAVINA:  And we'll get --

10           THE COURT:  You don't answer.

11           MR. RUKAVINA:  Go into that in another bit.

12           THE WITNESS:  Oh.  Sorry.

13           MR. RUKAVINA:  Okay.

14  BY MR. RUKAVINA:

15  Q    Explain to the Court what your role as the chief

16  compliance officer for the Advisors and the Funds is.

17  A    I think, as you mentioned earlier, it's interaction with

18  the board.  Also with regulatory bodies to the extent

19  examinations occur.  It could be to ensure oversight and

20  compliance with a fund's prospectus and SAI limitations, and

21  then it's establishing policies and procedures and ensuring

22  that those policies and procedures are adequate to detect any

23  sort of violations that could occur by the Funds.

24  Q    And are you an attorney?

25  A    I am not.

1   Q    Do you frequently work with attorneys?

2   A    I do.

3   Q    Both in-house and external?

4   A    Yes.

5   Q    Good.  And do you frequently rely on the advice of

6   counsel?

7   A    I do.  At times will present, you know, if there is a

8   question or an issue, present the background to either

9   internal or external counsel and then request their advice on

10  certain matters.

11  Q    So when counsel was asking about why you wouldn't appear

12  at a hearing or listen to a hearing or read a transcript of a

13  hearing, are those the kinds of things that you would rely on

14  counsel?

15  A    Yes.  If counsel were to tell me to, you know, attend the

16  hearing, I would have attended the hearing.

17  Q    Okay.  Does -- do the Funds and Advisors also have in-

18  house counsel?

19  A    Yes.

20  Q    I think we established that's D.C. Sauter?

21  A    He's been the primary point of in-house counsel more

22  recently, I'd say, within the past three to four months.

23  Q    Okay.  And would you expect that perhaps he would be

24  attending hearings and reading transcripts instead of you for

25  some of these litigated matters?

1          MR. MORRIS:  Objection to the form of the question.

2          THE COURT:  Overruled.

3          MR. MORRIS:  Leading.

4          THE COURT:  Overruled.

5          THE WITNESS:  I believe he would be.

6  BY MR. RUKAVINA:

7  Q   Okay.  Well, the implication was made, Mr. Post, that

8  somehow you were negligent as CCO by not following the

9  December 16th hearing.  I'd like to know, --

10         THE COURT:  Okay.  Could you -- could you repeat --

11 BY MR. RUKAVINA:

12 Q   -- Did you have counsel at the hearing and did you hear

13 from --

14         THE COURT:  Mr. Rukavina, start over with your

15 question.  It was a little hard to hear.

16         MR. RUKAVINA:  Okay.

17 BY MR. RUKAVINA:

18 Q   Mr. Post, the implication had been made that, because you

19 weren't at the December 16th hearing and because you had not

20 read the transcript, that you were somehow deficient as a CCO.

21 I'd like to know, Did you have the benefit of outside

22 counsel's views both before and after that hearing as to that

23 hearing and what happened?

24 A   Yes.

25 Q   It's not that you put your head in the sand and ignored

1    what's happening, is it?

2    A    That is correct.

3    Q    Okay.  And is it fair to say that when you deal with

4    compliance, you deal with complicated statutes and

5    regulations?

6    A    That is correct.

7    Q    Okay.

8         MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

9    (garbled).

10        (Pause.)

11   BY MR. RUKAVINA:

12   Q    Okay.  Taking you back to Mr. Morris's questions, do you

13   recall Mr. Morris asking you whether you believe that any of

14   the trades that were being discussed were deceptive?

15        MR. MORRIS:  Hold on one second, Your Honor.  What

16   exhibit is this?

17        THE COURT:  I don't know.  What is it?

18        MR. RUKAVINA:  Can you hear me, Mr. Post?

19        THE WITNESS:  They're asking a question as to what

20   exhibit this is.

21        MR. RUKAVINA:  Your Honor, this is not an exhibit.

22   This is a Commission Interpreting Regarding Standard of

23   Conduct for Investment Advisors, an SEC regulation in

24   conjunction with 17 CFR 276.

25        THE COURT:  Okay.  How are we --

Post - Direct                              214

1          MR. RUKAVINA:  So, Your Honor, these are the actual

2   regulations.

3          THE COURT:  I mean, it's -- okay.  The answer to the

4   question is it's not an exhibit.  You have pulled up 17 CFR

5   part 276.  Is that what the answer is?

6          MR. RUKAVINA:  Yes, Your Honor.  And I haven't

7   offered this as an exhibit.

8          THE COURT:  All right.

9          MR. MORRIS:  You have -- Your Honor, I don't know why

10  this is being put up on the screen now.  It's not an exhibit.

11  It's not in the record like a couple of those that I had.  I

12  used the statute that he relied on to cross-examine him with

13  the 206.  I don't know what this is.  I don't know if it's

14  accurate.  I don't know anything about it.

15         MR. RUKAVINA:  Your Honor, this is a rule and

16  regulation.  This is not an exhibit.  If it is an exhibit, I

17  haven't moved to admit it yet.  I'm going to use this to

18  refresh his memory and explain why he believed that the

19  actions were deceptive, a door opened solely by Mr. Morris.

20         MR. MORRIS:  His recollection hasn't -- there's no

21  need to refresh it yet.  He hasn't even answered a question

22  where he says, "I don't remember."

23         THE COURT:  Okay.  I sustain the objection here.  I

24  mean, you can ask him a question, but, again, it's kind of

25  hard for us to tell what this is, actually.  I mean,

1    Commission Interpretation Regarding Standard of Conduct for

2    Investment Advisors.  I mean, is this actually a -- I mean,

3    it's not a statute.  I'm not even sure it's a reg.  It's --

4              MR. MORRIS:  Okay.

5              THE COURT:  I don't know what it is.  So, --

6              MR. RUKAVINA:  Your Honor, we'll lay a predicate

7    later.  First, let me ask some other questions.

8    BY MR. RUKAVINA:

9    Q    Again, you recall that you were asked whether, pursuant to

10   Section 206 of the Advisers Act, you believed the trades that

11   have been discussed were deceptive.  Do you recall?

12   A    Yes.

13   Q    Okay.  And you answered that you believed that they were

14   deceptive?

15   A    Correct.  I did.

16   Q    As the CCO, do you have an understanding of what role, if

17   any, conflicts of interest play in an advisor's duties under

18   the Advisers Act?

19   A    Yes.

20   Q    Okay.  What is your understanding?

21   A    All -- all known material conflicts of interests need to

22   be disclosed -- need to be disclosed by the advisor to the

23   underlying investors.

24   Q    Okay.  And why, why do those conflicts of interests have

25   to be disclosed?

1   A    Because an advisor could have a view that may deviate from

2   the underlying investors' view of how the portfolio could be

3   managed and in contradiction to it.

4   Q    And do you have an understanding as to whether, pursuant

5   to your experience as the CEO [sic], the Advisers Act and the

6   SEC regulations (garbled) it require an advisor to adopt the

7   principal's goals as opposed to his or her own goals?

8           MR. MORRIS:  Objection to the form of the question.

9   Your Honor, he has not been offered as an expert.  He

10  shouldn't be permitted to provide -- this is -- this would be,

11  at best, expert testimony.  I asked him 30 different questions

12  about his background.  He's got no training.  He's got no

13  licenses.  He's taken no special courses.  He doesn't have

14  anything except on-the-job training.  This is not right.

15          MR. RUKAVINA:  Your Honor, Mr. Morris got to ask yes-

16  and-no questions all day, leading questions, and the witness

17  was told that he could explain his answers.  The Court told

18  him that.  And I am trying to explain his answer as to why he

19  believed that these transactions were deceptive, especially

20  because the allegation is that we willfully and intentionally

21  violated the stay by sending letters that this witness

22  authorized.  So understanding his understanding is very

23  important to Your Honor's determination of the actual --

24          THE COURT:  Well, I sustain the objection.

25          MR. RUKAVINA:  And Mr. Morris opened this door.

Post - Direct                                             217

1          THE COURT:  You can ask him why he thought the

2     actions were deceptive, but he's starting to go into what may

3     or may not be CFRs and conflicts of interest.  No.  This is

4     going well beyond asking him, Why do you think it was

5     deceptive?  And I agree:  It's straying into expert testimony.

6     BY MR. RUKAVINA:

7     Q    Mr. Post, you are familiar with the December 22nd AVYA

8     and SKY sales and transactions which you were asked about by

9     Mr. Morris and that you previously have testified about,

10    correct?

11    A    Correct.

12    Q    Okay.  How are you familiar with those sales and

13    transactions as they were occurring?  How did you learn about

14    them?

15    A    There was some internal email correspondence.  If I recall

16    from memory, at the bottom it provided fill information that

17    Jefferies provided to, I believe, Mr. Seery and others on the

18    email.  And then it kind of worked its way up to get the

19    trades that had been executed administratively booked into the

20    OMS.

21    Q    Why did you get involved with those transactions?

22    A    They were requesting that employees of HCMFA book those --

23    I'm sorry, Highland Capital Management Fund Advisors -- book

24    those into the system.  And those employees were not a party

25    to the trade.  I don't believe --

1  Q    Well, let me pause you.  Let me pause you.  Those two

2  employees, who were they?

3  A    Joe Sowin and Matt Pearson.

4  Q    Were they at that time employees of the Debtor?

5  A    They were not.

6  Q    Okay.  So, how did you come to learn about this ask that

7  those two employees book -- book it?

8  A    I believe there was an email that was sent to me, or I was

9  on it.  I can't recall specifically.

10  Q    Okay.  And did you undertake any review as to whether

11  those two employees should or should not do what was being

12  asked of them?

13  A    Once it was brought to my attention, I discussed with -- I

14  looked at it.  It looked like, pursuant to prior

15  correspondence with -- that Joe Sowin made, he wasn't aware of

16  the trades.

17       You know, I also had a discussion with K&L based off of --

18  our legal counsel based off of a prior letter that was sent,

19  and just it didn't -- it didn't look right that they would be

20  booking trades on behalf of the two Advisors that are named in

21  the letters when they had nothing to do with it and weren't --

22  weren't a part of any of the pre-trade compliance checks, et

23  cetera.

24  Q    What is a pre-trade compliance check?

25  A    Well, there's an electronic system, a -- or a management

1   system we have, the OMS, which is called Verda (phonetic).

2   And generally, trades are entered into the system by the

3   portfolio manager, and they then go through pre-trade

4   compliance checks.  And once those compliance checks are

5   passed, they're then routed to the trading desk for direction

6   or execution, where the executing brokers and the trading desk

7   will then monitor that execution over the course of the day.

8   And at the conclusion of the trading day, those trades, if

9   they weren't already allocated, would be allocated, and then a

10  trade would be sent to custodian prime brokers to identify the

11  trades that occurred in the respective Funds for those -- or,

12  on that day, and then they would then be dropped into the

13  database and our -- the settlement team would kind of work to

14  settle those trades or ensure that those trades were settled

15  based off of the stipulated time frame for settlement on the

16  trades.

17  Q   So, in all that course of a transaction, what exactly was

18  it that those two employees of the Advisors were being asked

19  to do on behalf of the Debtor?  What exactly were they being

20  asked to do?

21  A   To just book them in the system because they are trades

22  that already have been executed.

23  Q   Did you stop that?

24  A   I believe I responded and said, you know, it -- they're

25  employees of, if I recall, employees of one of the named

Post - Direct                                          220

1  Advisors, and believe those trades are in the best interest of

2  those Advisors, and separately, you know, the Debtor has

3  designated operators/traders that should be able to enter

4  those trades as well, aside from Mr. Sowin and Matt Pearson.

5  Q    So can you think of any reason why Mr. Seery would ask

6  your employees, as with his own employees, to book these

7  trades?

8  A    I believe based off of past practice.

9  Q    Okay.  But nevertheless, those two trades did not comply

10 with internal compliance?

11 A    They weren't run through the OMS.  We try and route trades

12 through the order management system because there's pre-trade

13 compliance checks that can be performed, and it reduces any

14 sort of back-end reallocation or trade errors that may occur

15 as a result of, you know, trades being entered after the fact,

16 because quantities could be, you know, referenced incorrectly

17 or funds could be identified incorrectly.

18 Q    Based on prior practices, have these internal policies

19 been followed when perhaps employees of the Debtor asked

20 employees of the Advisors to take a particular action in the

21 course of a transaction?

22 A    Yes.

23 Q    When internal practices are not followed, what is your

24 job?  What are you supposed to do?

25 A    When internal practices are followed, --

1    Q    Are not followed.

2    A    Oh.  Not followed?  To the extent that they're not

3    followed, we would question, you know, number one, why weren't

4    they followed?  You know, we -- we try and have all trades

5    booked in the OMS so that the necessary checks could be

6    performed, and as I mentioned earlier, to avoid any

7    reallocation or trade errors.  So I would then question, you

8    know, why was this done outside of the system?

9    Q    And if you did not get an appropriate response back to

10   your question, what are you supposed to do?

11   A    If I didn't get an appropriate response, would, you know,

12   research it further and elevate it to senior management and/or

13   any of the board if it was ultimately an issue.

14   Q    Are you supposed to stop trades or stop the process if you

15   see something that you believe is not compliant with your

16   obligations and the fiduciary obligations of the Advisors?

17   A    Yes.

18   Q    Have you done that in the past?

19   A    Yes.

20   Q    Have you done that frequently, or infrequently?

21   A    I would say it's -- it's infrequent, but they do occur.

22   For example, if a fund is trading in a security that it's not

23   permitted to invest in based off of a prospectus limitation,

24   it would get flagged in the OMS and we would then not permit

25   the trade to go forward because it could cause the breach to

1  go further offsides or it could cause it to go offsides.

2  Q   Okay.  And these December 22nd trades, were they the type

3  of, in your past experience, problematic trades like you have

4  interfered or stopped or intervened to stop in other

5  situations in the past?  Do you understand my question?  That

6  was an inartful question.  Do you understand it?

7  A   If the question is because they were done outside of the

8  system?

9  Q   Yes.

10  A   And repeatedly?

11  Q   Yes.

12  A   I would have raised the question with the trading desk or

13  the portfolio manager as to why that's being done, because it

14  was not in -- not consistent with how we instruct trades be

15  booked.

16  Q   Did Mr. Dondero, for these December 22nd transactions,

17  tell these two employees not to book the trades?

18       THE COURT:  Okay.  Please repeat the question.  It

19  was garbled.

20       MR. RUKAVINA:  Thank you, Your Honor.

21  BY MR. RUKAVINA:

22  Q   For these December 22nd trades, did Mr. Dondero tell those

23  two employees not to book the trades?

24       MR. MORRIS:  I object, Your Honor.  No foundation.

25  This witness has no personal knowledge to testify to this --

1  to answer this question.

2          THE COURT:  Overruled.  If he knows.

3          THE WITNESS:  I do not know.

4  BY MR. RUKAVINA:

5  Q   Okay.  Do you have a reason to believe that he did?

6  A   I don't know.  I just saw the email traffic and Mr. Sowin,

7  I believe, was questioning the trades, you know, more in the

8  sense that he wasn't aware of them.  So, I don't -- I don't

9  know what kind of conversations, what happened in the

10 background, just that he -- he didn't recognized that rates.

11 Q   Let me try it this way.  You determined that these trade

12 would have violated the Advisors' policies and procedures,

13 correct?

14 A   Yes, because they were done outside of the OMS.

15 Q   Did Mr. Dondero tell you to come to that conclusion?

16 A   He did not.

17 Q   Did Mr. Dondero pressure you to come to that conclusion?

18 A   He did not.  He had indicated that there -- there are

19 these trades, and you should take a look at it from a legal

20 compliance perspective, which I did.

21 Q   And you talked to K&L Gates?

22 A   Correct.

23 Q   And when Mr. Dondero told you to look at these trades, did

24 he suggest to you in any way, shape, or form what you should

25 conclude or decide to do, if anything, with respect to these

1   trades?

2   A    I don't believe so.

3   Q    Okay.  Let's go back to that question about your view that

4   some of what Mr. Seery was doing was deceptive under the 1940

5   Investors Act.  When did you form that view?

6   A    I believe it was after it was identified that there was

7   not (inaudible) on certain of the trades that were entered

8   into at the end of the November time frame, the SKY and AVYA

9   trades.

10  Q    And why did you form the opinion that those trades that

11  Mr. Seery was attempting to do or had done were deceptive

12  under the statute that Mr. Morris asked you about?

13  A    It was pursuant to reviewing them and supplemental

14  discussion.  A review with the portfolio managers and then

15  supplemental discussion with K&L be it from a (inaudible)

16  perspective, through, you know, perform in the best interest

17  of your clients, it was expressed that, at least with respect

18  to preference shareholders, they were supposed to maximize

19  value, and those sales, they're not really maximizing value.

20      And it was also identified that the Debtor was planning to

21  liquidate the CLOs based off of a filing within the Court

22  within a few-year period.  And the investors -- or, the Funds

23  that invested and the preference shareholders, or preference

24  shares, had a longer-time view in those assets.

25      So the sales, coupled with the short duration, or the

1  anticipated, you know, two-year duration, didn't line up with

2  the investment objective that they were seeking to maximize

3  returns.

4  Q   To your understanding and your experience, does the

5  servicer of the CLOs owe fiduciary duties to anyone?

6          THE COURT:  Okay.  I cannot -- someone is flipping

7  paper.  Please stop flipping paper.  Okay.  Repeat your

8  question, Mr. Rukavina.

9          MR. RUKAVINA:  Thank you, Your Honor.

10  BY MR. RUKAVINA:

11  Q   In your experience and in your knowledge, does the

12  servicer of the CLOs owe fiduciary duties to anyone?

13  A   They should, yeah, the underlying investors in the CLO,

14  whether it be the Debtor or the equity holders.

15  Q   Do the Advisors owe fiduciary duties to anyone?

16          MR. MORRIS:  Your Honor, I'm sorry, I apologize.  I

17  really do move to strike.  He's not a lawyer.  There is no

18  foundation.  He's not here as an expert.  There's no basis for

19  this witness to be talking about who owes who fiduciary

20  duties.  I don't even think that's the law, what's just been

21  stated.

22          THE COURT:  Okay.  I sustain.

23          MR. RUKAVINA:  Okay.

24  BY MR. RUKAVINA:

25  Q   Well, let me make it very easy, then.  Do you have an

1  understanding as to whether Advisors subject to the 1940 Act

2  owe a fiduciary duty?

3  A    Yes.

4  Q    Do you have an understanding of how a conflict of interest

5  plays into a fiduciary duty?

6  A    Yes.

7  Q    What is your understanding?

8  A    If there's a material conflict of interest, it should be

9  disclosed.

10 Q    And what did you conclude with respect to Mr. Seery and

11 the Debtor once the Debtor stated that it will liquidate

12 within two years?

13 A    That's not the investment horizon that the underlying

14 preference shareholders have, especially with respect to the

15 underlying assets held in those CLOs.  More or less, you're --

16 they're now put on a clock, and those preference shareholders

17 may have a longer-term view on the underlying assets of those

18 CLOs.

19 Q    Let's move on to those December 22nd and December twenty

20 -- well, let me strike that.  You heard Mr. Seery testify that

21 those December 22nd trades closed, correct?

22 A    I did.

23 Q    And did you independently look at whether that's true?

24 A    I did.

25 Q    And what did you conclude?

1   A    They showed a sale in the -- on the intranet.

2   Q    Okay.  Let's move on to the December 22nd and December

3   23rd letters.  Are you familiar with those letters from K&L

4   Gates to counsel for the Debtor?

5   A    I am.

6   Q    And did you participate in preparing those letters?

7   A    I did.

8   Q    Okay.  And I think Mr. Morris asked you and I think you

9   testified you supported or agreed with the sending of those

10  letters.  Is that generally accurate?

11  A    Yes.

12  Q    Why?  Why did you support sending those letters?

13  A    It wasn't in the best interest of the Funds pursuant to

14  discussions with the portfolio managers and the investment

15  objectives that they were looking to seek any of those

16  investment in the preference -- preference securities and

17  CLOs.

18  Q    Was that a purpose that you were trying to achieve by

19  sending those?

20          THE COURT:  Repeat the question.

21          THE WITNESS:  Ah, --

22          THE COURT:  Repeat the question.

23  BY MR. RUKAVINA:

24  Q    Was that a purpose that you were trying to achieve by

25  sending those letters?

Post - Direct                                228

1   A   Yes.  I believe there was something towards the end of one

2   or both letters that said, to the extent, you know,

3   transactions occur, if, for lack of better words, a courtesy

4   heads up could be given to the Funds and the Advisor.

5   Q   Did you intend in any way to intimidate the Debtor by

6   authorizing or supporting the sending of those letters?

7   A   No.

8   Q   Did you intend in any way to violate the automatic stay by

9   sending those letters?

10  A   No.

11  Q   Were you trying to engage the Debtor in a dialogue at that

12  time as to what to do with these CLO management agreements?

13  A   Yes.  I believe that was stated at one -- at the end of

14  one or both of the letters.

15  Q   And I think Mr. Morris discussed with you that the Debtor

16  sent back letters asking you to withdraw these two letters.

17  Do you recall that discussion?

18  A   Yes.

19  Q   And do you recall saying that we never withdrew these

20  letters, right?

21  A   Correct.

22  Q   Why did we not withdraw these letters?

23  A   Because we don't believe that the trades that are being

24  entered into are in the best interest of the shareholders --

25  *i.e.*, the Funds.

Post - Direct                                229

1   Q    To your knowledge, did we ever, or did you ever,

2   communicate to the Trustees or Issuers anything in the nature

3   of instructing them to terminate the CLO management agreements

4   with the Debtor?

5   A    I did not.

6   Q    To your knowledge, did anyone, for the Funds or Advisors?

7   A    I don't believe so.

8   Q    Did you or anyone to your knowledge communicate to the

9   Issuers or Trustees that the process of removing the Debtor as

10  manager should commence?

11  A    I don't believe so.

12  Q    Okay.  To your knowledge, have any of the Issuers or

13  Trustees undertaken any steps to remove the Debtor or

14  terminate these contracts?

15       MR. MORRIS:  Objection to the extent it calls for the

16  conduct or knowledge of the Issuers.

17       THE COURT:  Overruled.  He can answer if he knows.

18       THE WITNESS:  I don't believe so.

19  BY MR. RUKAVINA:

20  Q    Had they, is that something that you would have expected

21  them to inform the Funds of?

22  A    Yes.  The Funds would have received some type of

23  notification if there was a new Advisor on the CLOs.

24  Q    So, other than these two letters -- let me stop there.

25  Did any discussion of trying to terminate these contracts

1  basically cease with the sending of these two letters and the

2  Debtor's responsive letters?

3  A    That's my understanding, yes.

4  Q    Okay.  And we never did file a motion for lift stay.  Can

5  you explain to the judge why we didn't file a motion for

6  relief from the stay?

7  A    It's my understanding that the intent was that the

8  management of the CLOs was going to be heard in conjunction

9  with the confirmation hearing.

10 Q    And do you recall when that confirmation hearing was

11 originally set for?

12 A    I believe it was supposed to start today.  Or tomorrow.

13 Q    Well, wasn't it earlier in January?  Around January 11th?

14 A    Uh, I -- I don't recall specifically.

15         MR. RUKAVINA:  Mr. Vasek, if we could pull up the

16 Form CLO agreement.  What exhibit is that?

17    (Pause.  Counsel confer.)

18         MR. RUKAVINA:  No, that's not.

19         THE COURT:  Can I ask what we're about to start

20 doing?

21         MR. RUKAVINA:  Eight.

22         THE COURT:  Can I ask what we are about to start

23 doing?

24         MR. RUKAVINA:  Your Honor, I apologize.  I'm trying

25 to find one of the CLO portfolio management agreements.  I'm

1    trying to pull it up for you.

2              THE COURT:  Okay.

3              MR. RUKAVINA:  It should be in your binder.

4              THE COURT: All right.  Well, --

5              MR. RUKAVINA:  Where is it, Julian?

6              MR. VASEK:  It should be 8.

7              MR. RUKAVINA:  I'm sorry?

8              MR. VASEK:  8.

9              MR. RUKAVINA:  Your Honor, it's Exhibit 8 in your

10   binder.

11             THE COURT:  Exhibit --

12   BY MR. RUKAVINA:

13   Q    And Mr. Post, you have that in front of you, right?

14             MR. RUKAVINA:  Mr. Vasek, if you'll go to Page 14,

15   please.  Section 14.  Termination by the Issuer for Cause.

16             MR. VASEK:  Okay.

17             MR. RUKAVINA:  Your Honor, the contract speaks for

18   itself, and I'm not about to read the contract to the Court.

19   The Court can read.  I want to ask him certain questions about

20   this.  And you'll note that the contract gives the requisite

21   holders of voting preference shares certain rights.

22             MR. MORRIS:  Your Honor, respectfully, the witness

23   has testified that he hadn't seen any of these contracts for

24   five or six years, until the lawyers asked him to look at it,

25   and they told him which specific provisions to look at.

1      The document does speak for itself.  Counsel should just

2  make it part of his closing argument.  There's no evidence

3  that there's a quote/unquote Form CLO Management Agreement.

4  And I would just respectfully suggest that this is better

5  saved for closing argument.

6          THE COURT:  Yes.  What are we going to do here?  He

7  did not seem like he was an expert on these CLOs in his

8  earlier testimony.  He hadn't read much of them until

9  recently.  So where are we going with this?

10         MR. RUKAVINA:  Well, Your Honor, the question, again,

11  is -- can you hear me?  The question again is, Are we going to

12  be enjoined from exercising any rights in the future, so I

13  would like to take the witness through the importance from a

14  regulatory perspective and a fiduciary perspective of some of

15  these rights.  If Your Honor thinks that that's for closing

16  argument, that's fine.  But I will note that that Your Honor

17  allowed Mr. Morris for some forty minutes to read prior

18  testimony into the record.

19         MR. MORRIS:  I'm happy to respond if Your Honor needs

20  me to.

21         THE COURT:  Go ahead.

22         MR. MORRIS:  There is a complete difference, Your

23  Honor.  To read statements against interest, to read defense's

24  own sworn statements that they made at a prior proceeding, as

25  opposed to trying to get a witness who has admitted that he's

 1   not familiar with these documents, to try to convince the

 2   Court that they said something that the witness doesn't have

 3   any personal knowledge or expertise about.  It's completely

 4   different.

 5             THE COURT:  All right.  I sustain the objection.  You

 6   can make whatever argument you want in the closing arguments

 7   about whatever provisions of whichever CLO agreements justify

 8   actions.  I guess that's where we're going.

 9             MR. RUKAVINA:  Then, if you could pull up Exhibit 78,

10   and if Your Honor could turn to Exhibit 78.

11             THE COURT:  All right.

12             MR. RUKAVINA:  Is this a confidential -- Julian, what

13   does it mean, it's confidential?  78.  Is this confidential?

14             MR. VASEK:  It says confidential on the --

15             MR. RUKAVINA:  Your Honor, apparently this is a

16   confidential document, so how does the Court want to proceed

17   on this WebEx?

18             THE COURT:  All right.  We're stopping.  We're

19   stopping.  We have protocols in place in this case, and people

20   usually file motions to present things under seal or

21   redactions.  My patience is shot, so we're going to stop.

22   Let's talk about where we go from here.

23             MR. MORRIS:  If I may, Your Honor?

24             THE COURT:  Yes.

25             MR. MORRIS:  John Morris from Pachulski Stang --

1           THE COURT:  Uh-huh.

2           MR. MORRIS:  -- for the Debtor.

3           MR. RUKAVINA:  We filed this under seal, right?

4           MR. MORRIS:  We were --

5           MR. RUKAVINA:  Oh, I thought we had.

6           MR. MORRIS:  -- hoping that we would get this

7    finished today, Your Honor, and the Debtor was really hoping

8    to get a ruling before confirmation.  But given all that's in

9    front of us, including the contempt hearing next Friday, just

10   a couple of days after the confirmation hearing, I think the

11   Debtor at this point is prepared to agree, if it's okay with

12   the Defendants' counsel, to push this to the following week,

13   since the -- you know, with the understanding that everybody

14   stipulate on the record that the TRO stays in place.  And if

15   we could have this particular motion heard, I guess, somewhere

16   -- it's the week of February 8th, the Debtor would consent to

17   that.

18           THE COURT:  All right.  Do we already have a --

19           MR. RUKAVINA:  Your Honor, can the Court --

20           THE COURT:  -- setting that week?  Because I know we

21   have confirmation, what, are we set for the 2nd, 3rd, and 4th?

22   Three days next week.

23           MR. MORRIS:  I believe -- yeah.  I think it's just

24   two, Your Honor.  I think --

25           THE COURT:  Okay.

1            MR. MORRIS:  -- confirmation is the 2nd and the 3rd,

2   and then I think the 5th is the contempt hearing.  I'm not

3   aware, but I don't -- I don't profess to know the entirety of

4   the calendar.  I'm not aware of anything that's on for the

5   following week.

6            THE COURT:  Does it make sense to continue this to

7   the 5th?  Because the issues are so overlapping here.  I feel

8   like it's been a contempt hearing half of today, actually.

9            MR. MORRIS:  Yeah.

10            THE COURT:  So, shall we just set it for -- is it

11   Friday, the 5th?

12            MR. MORRIS:  It is.

13            THE COURT:  At 9:30?

14            MR. MORRIS:  And I think that's a great idea, yeah.

15   Yeah.

16            THE COURT:  What do you want to say about that, Mr.

17   Rukavina?

18            MR. RUKAVINA:  Thank you, Your Honor.  We're fine

19   with that.

20        Let me just point out, so that if the Court is impatient

21   or frustrated, we did move Exhibit 78 to be filed under seal.

22   The Court did enter an order allowing it to be filed under

23   seal.  So that the Court doesn't think that somehow we were

24   negligent in that.

25        But February the 5th works for us.

1          THE COURT:  Okay.  All right.  So I have an

2   unredacted clean copy up here, which, if and when I admit it,

3   we will put it under seal in our exhibit room, or I guess our

4   electronic exhibit room.

5       So, we'll come back on the 5th at 9:30.  But I am not -- I

6   am not done.  Yes, I am frustrated.  Yes, I'm impatient.  I

7   have asked myself "Why are we here?" so many times today.  Why

8   are we here?  I mean, I've had this conversation before.  I

9   mean, we had a, as you know, a very lengthy hearing on the

10  motion for a TRO or preliminary injunction against Mr. Dondero

11  personally.  And I think it was Mr. Morris who said, it's a

12  little bit like Groundhog Day.  You know, that was actually a

13  more flattering way of describing it than I might have.  I

14  might have said this is reminding me of Albert Einstein's

15  definition of insanity.  You all know what I'm talking about?

16  When you're doing the same thing over and over again and

17  expecting a different result.

18      And, you know, no offense, Mr. Dondero, if you're still

19  there listening, but that's what it feels like to me.  I mean,

20  it is -- it's the same thing over and over again.  And we've

21  spent very, very, very little time talking about the January

22  9th, 2020 corporate governance settlement agreement.  Of

23  course, it was mentioned extensively in the pleadings, at

24  least by the Debtor.  But, you know, I've heard all of this

25  evidence today, and I'm going to hear more evidence,

1   apparently, on the 5th.  But Paragraph -- was it 9? --

2   Paragraph 9 of the January 9th, 2020 settlement agreement.

3   The order directed Mr. Dondero not to "cause any related

4   entity to terminate any agreements with the Debtor."

5        And, you know, I thought to myself as I was reading,

6   preparing for this hearing, that, you know, I seem to remember

7   those words meant so, so much to me.  And then this reply

8   brief was filed by the Debtor at 6:00 or 7:00 o'clock last

9   night, and it gave an excerpt of the transcript, the hearing

10  where I approved this corporate governance settlement

11  agreement, and I said, that language is so important to me

12  because of my history in the *Acis* case, I want it in the

13  order.  I don't even -- I don't want it merely in the term

14  sheet, and then, of course, the order cross-references,

15  approves the term sheet.  I want that in the order.  Because,

16  you know, I knew, even with this highly-qualified independent

17  board of directors, and even with this very sophisticated

18  Creditors' Committee with very sophisticated professionals

19  monitoring everything that happened, and having not just the

20  monitoring rights but the standing to pursue things, I knew,

21  even with this great system that had been negotiated in the

22  January term sheet, there was the possibility of things

23  happening through Dondero-controlled entities indirectly.  And

24  so that's why we had that Paragraph 9.  So, --

25       (Interruption.)

1            THE COURT:  I don't know what that was I just heard,

2   but someone needs to put me on mute.

3        So, I mean, we've heard a lot.  We've heard a lot, but --

4            MR. DONDERO:  Hello?  Your Honor?  Your Honor?

5            THE COURT:  Okay.  I --

6            MR. DONDERO:  Hi.  Jim Dondero.

7            THE COURT:  Oh, okay.  I'm still talking.  I'm still

8   talking.  But I --

9            MR. DONDERO:  Okay.

10            THE COURT:  But I said --

11            MR. DONDERO:  I'm sorry.

12            THE COURT:  I said at the hearing on the preliminary

13   injunction as to Mr. Dondero personally, do you remember what

14   I said, I said life changed when you put your company in

15   Chapter 11.  And, you know, even if you had stayed on as

16   president of the Debtor, life changed.  Okay?  Because you're

17   a debtor-in-possession.  You have to say, "Mother, may I?" to

18   the Court.  Creditors get to object to things.  So things

19   changed.

20        But things really, really, really changed, you know, they

21   changed in October 2019, and then they changed dramatically in

22   January 2020, when independent board members were put in place

23   and you were taken out of management.

24        So, the reason I'm coming back to that concept is this:

25   I've heard a lot about the preferred shareholders didn't like

239

1    the trades Mr. Seery was implementing, the sale of AVYA, the

2    sale of SKY.  They didn't like it.  Well, I mean, I hate to

3    say something flippant like tough luck, but really:  Tough

4    luck.  Okay?  We all know that with a company like this, with

5    a company like Acis, it's complicated, right?  Because you've

6    got a fiduciary duty to your creditors to maximize value of

7    the estate so creditors get paid in Chapter 11, right?  But

8    meanwhile, you know, you've got to have fiduciary duties, I

9    don't know if it's directly to preferred shareholders or just

10   to the CLOs.  But whatever it is, you know, there may be

11   differing views that individual preferred shareholders have.

12   But Mr. Seery is in charge.  The Debtor is in charge.  You

13   don't like it, I'm sorry, but he's in charge.

14       So, you know, I thought, am I going to come in here today

15   and see all kinds of specific contractual references, where, I

16   don't know, somehow you have an argument that you can control

17   buys and sells?  Of course, in this case, it would just be

18   sells at this point.  You know, no.  I knew I wasn't going to

19   see that.  And I haven't.

20       So I don't know what I'm going to hear more on the 5th

21   that is going to tilt me a different way, but right now, if I

22   had to rule right now, this would be a total no-brainer to

23   issue this preliminary injunction.  Okay?  I feel like it's

24   been teed up almost like find Dondero in contempt, find these

25   entities in contempt.  What I'm here on today is whether I

1  should issue a preliminary injunction, and the December

2  letters, the emails, the communications, they lead me to

3  believe that this preliminary injunction is needed because

4  someone doesn't understand that Mr. Seery is in charge and the

5  preferred shareholders, the Funds, the Advisors, they don't

6  have the ability to interfere with what he's doing in running

7  the company.

8      And the threats of we're going to, you know, direct -- we

9  may direct the CLO Issuer to terminate the Debtor:  I mean,

10  it's just -- there's no sound business justification for that.

11  Okay?  I don't know what we're doing, where we're going.

12      Mr. Dondero, I said to you in December, you know, I really

13  wanted to encourage good-faith negotiations on your possible

14  pot plan because I thought you wanted to save your baby.  But

15  the more I hear, the more I feel you're just trying to burn

16  the house down.  Okay?  Maybe it's an either/or proposition

17  with you:  I'll either get my company back or I'll burn the

18  house down.  That's what it feels like.  And I have no choice

19  but to enter preliminary injunctions with this kind of

20  behavior.

21      So, I'm very frustrated.  I'm very frustrated.  I don't

22  know if anyone wants to say anything or we just end it on this

23  frustrating note.

24      Mr. Rukavina, did you want to let your client speak, or

25  no?

1           MR. RUKAVINA:  Your Honor?

2           THE COURT:  Not your client.

3           MR. RUKAVINA:  No, but --

4           THE COURT:  The client representative.

5           MR. RUKAVINA:  Your Honor, I take issue with what the

6    Court has said, but we did file a motion yesterday to file a

7    plan under seal.  It is -- Mr. Dondero, can you mute your

8    phone?  The Court should have seen that by now.  It is a pot

9    plan with much more cash consideration.  We have discussed it

10   with the Debtor and the Committee.  We are in earnest

11   negotiations.  I have no reason to believe or disbelieve that

12   we're close to a settlement.

13      But recall what I said at the beginning.  We asked the

14   Debtor to continue this hearing.  We said, You have a TRO that

15   ends February the 15th.  Why are you doing this?  Well, the

16   Debtor did it to smear Mr. Dondero on a very carefully crafted

17   record, without telling you the other half of it.  And when I

18   tried to have Mr. Post explain it, opposing counsel won't let

19   me even tell you our views.  So there is a competing plan.  We

20   want to try --

21          THE COURT:  You tried to get him to testify about

22   comments to CFRs when he has shown no expertise whatsoever --

23          MR. RUKAVINA:  That's fine.

24          THE COURT:  -- to permit that.

25          MR. RUKAVINA:  And I understand, Your Honor.  I don't

242

1  want -- Your Honor has made her evidentiary rulings.  I'm not

2  here to second-guess them.

3      I'm telling you that Mr. Dondero -- and more importantly,

4  the other companies, *i.e.*, NexPoint -- we heard you loud and

5  clear.  We did not just send forward some cocktail-napkin term

6  sheet.  I spent the weekend and Friday preparing a

7  comprehensive plan and disclosure statement.  I hope that the

8  Court will allow it to be filed under seal.  Exclusivity has

9  expired.  I am asking to file it under seal only.

10      THE COURT:  Tell me what utility that has.  What

11  utility does that have if you don't have one plan supporter?

12  I mean, where are we going with this?  I have invited, I have

13  encouraged, I have directed good-faith negotiations with the

14  Committee.  If you don't have the Committee on board, what

15  utility is there in allowing you to file a plan under seal?

16      MR. RUKAVINA:  Well, if it's filed under seal, Your

17  Honor, then, really, no one is going to be prejudiced or hurt.

18  But we have not been told --

19      THE COURT:  Then why --

20      MR. RUKAVINA:  -- from the Committee --

21      THE COURT:  Then why are we doing it?  Help me to

22  understand the strategy.  Maybe I'm just naïve.

23      MR. RUKAVINA:  Your Honor, there is no strategy and

24  the Court is not naïve.  Pursuant to an agreement of the

25  Committee and the Debtor, I sent that draft plan to them over

1   the weekend, and they agree it's not solicitation.  It has not

2   gone to the creditors.  No one has seen it.

3       The reason why we sent it to the Committee and the Debtor

4   was to foster ongoing negotiations.  We had negotiations last

5   night.  The Committee and the Debtor had negotiations last

6   night.  We've been promised a response in the next couple of

7   days, and we have a follow-up meeting scheduled for Thursday.

8       The reason why I wanted the plan filed under seal is so

9   that there is a record of what is being discussed so the U.S.

10  Trustee can see it, if she wants to, and so that other key

11  constituents, if they want to or have a reason to, can see it.

12      But I agree with you:  That plan ain't going nowhere if we

13  don't have some material creditor support.  We won't know that

14  for a couple more days.

15      So my only point in saying this to Your Honor is that we

16  are working earnestly, we are increasing our consideration, we

17  have heard you loud and clear, and all the parties are

18  negotiating.

19      Again, we did not want this hearing to happen today

20  because it's a step backwards from negotiations, not a step

21  forward.  Thank you.

22          MR. POMERANTZ:  Your Honor, may I be heard?

23          THE COURT:  Go ahead, Mr. Pomerantz.  Go ahead.

24          MR. POMERANTZ:  Mr. Rukavina sent us over the plan,

25  and we had no problem with it being sent to the Committee.  He

 1   then sent us over the motion.  Now, aside from the fact that

 2   the motion contains some statements which the Debtor strongly

 3   disagrees with, with respect to the ability of administrative

 4   claims or other claims to be assumed, but putting that aside,

 5   we were concerned that the filing of a plan on the docket,

 6   unsealed, would be a distraction.

 7        Having said that, we also saw utility in the plan being

 8   put in the hands of the largest creditors so that they can

 9   evaluate what was being proposed.

10        We told Mr. Rukavina we have no problem if the plan was

11   filed under seal, stayed under seal until after confirmation,

12   and then, in exchange, we would agree to something that we

13   don't think we had to agree:  That he could send the plan to

14   UBS, to Acis, to Redeemer, to Meta-e, to HarbourVest, and

15   Daugherty.  Essentially, all the players in the case.  Mr.

16   Rukavina said he would consider that, and then just filed his

17   motion.

18        We don't have any problem with him doing that still,

19   sending it to the six creditors so they can look at it.  We

20   don't think it should be unsealed on the docket.

21        And the discussion of status of negotiations, Your Honor,

22   as we've told you many times before, we would love there to be

23   a plan.  We would love there to be support of a plan.  Mr.

24   Dondero asked to approach the board and speak to the board

25   yesterday.  We heard him out.  The plan essentially is the

1   same document and the same term sheet, I think, that has been

2   floating around for several weeks.

3       Having said that, we said, We are not going to stand in

4   the way of Mr. Dondero and the Creditors' Committee.  And if

5   the Creditors' Committee and Mr. Dondero have a meeting of the

6   minds, if there's any desire of them to have more time, we

7   would be supportive of it.  I'll let Mr. Clemente respond as

8   to whether there's any negotiation -- (echoing.)  But when Mr.

9   Rukavina said that last night there were negotiations between

10  the Debtor and Mr. Dondero, that's just not accurate.  We, we

11  look at ourselves as the honest broker.  But at the end of the

12  day, as Your Honor has remarked many times throughout this

13  case and just remarked a few moments ago, unless the

14  Creditors' Committee supports this plan, it is DOA.  And we

15  have communicated that several times to Mr. Dondero and his

16  team.

17      So, I just wanted to speak to correct the record.  We're,

18  again, supportive of a plan if there can be one.  But at this

19  point, we haven't seen anything, the parties coming any closer

20  or any more negotiations, and we just have to get confirmed

21  sooner rather than later (echoing), prepared to go forward.

22          MR. CLEMENTE:  Your Honor, it's Matt Clemente at

23  Sidley.  I'm happy to make some comments to Your Honor, --

24          THE COURT:  Okay.

25          MR. CLEMENTE:  -- if you -- if you wish.

1          THE COURT:  Please do.

2          MR. CLEMENTE:  I think it's fair to say that the

3   Committee believes the plan needs to go forward next week,

4   Your Honor.  We have, of course, taken your direction very

5   seriously, and we very seriously consider all of the

6   communications we get from Mr. Dondero.  There exists still a

7   material value gap in what is being offered under Mr.

8   Dondero's plan, as well as a quality of the value.

9      So, Your Honor, while we continue to consider the plan and

10  what we receive from Mr. Dondero, I do not want to leave Your

11  Honor with the impression that the Committee feels like we are

12  close to an agreement, and we anticipate going forward with

13  the plan next week.

14      That being said, we of course will respond to Mr. Dondero

15  as we review the plan, but as I sit here today, I don't

16  believe that we are close.  But, again, the Committee will

17  continue to review it, and we should anticipate going forward

18  with confirmation next week.

19          THE COURT:  All right.  So, you don't have any

20  problem with the plan being filed under seal?

21          MR. CLEMENTE:  Your Honor, we -- the Committee does

22  have the plan, and I guess I'm not sure I'd see the point of

23  having it filed it under seal.  I think it serves to confuse

24  issues.  But, you know, hearing what Your Honor said earlier,

25  I don't think we need to continue to bring different fights in

1   front of Your Honor, so I'm not sure that I see necessarily

2   the harm in a plan being filed under seal, again, with the

3   idea that, you know, why bring -- continue to bring fights to

4   Your Honor if we don't need to?

5           THE COURT:  All right.

6           MR. CLEMENTE:  But what I do think is clear, Your

7   Honor, that I do want to express to you is that the

8   representations in that motion the Committee do not believe

9   are accurate.  We do not believe that there's been a

10  significant value increase.  We do not believe that we are

11  close.  That would be the point that I would make in

12  connection with a response to that motion.  So, but in terms

13  of filing it under seal, I'm not sure the Committee has a

14  strong feeling that that should not happen.

15          THE COURT:  Yes.

16          MR. RUKAVINA:  And Your Honor, very quickly, --

17          THE COURT:  The words --

18          MR. RUKAVINA:  -- I never represented that we're

19  close.

20          THE COURT:  The words I remember in the motion were

21  significant value increase, something to that effect.  But

22  also more recovery than the plan that's on file.

23      (Echoing.)

24          THE COURT:  So I was kind of darn curious to see it

25  just for that.

1          MR. RUKAVINA:  And Your Honor, obviously, because

2    there's many people on this call, I don't want to run afoul of

3    any kind of procedures.  I'd be happy to walk Your Honor

4    through, but I can't, not with 90 people on the call.

5          THE COURT:  Right.

6          MR. RUKAVINA:  I did not represent that we're close

7    to a settlement in that motion, and I did not send the plan to

8    those people that Mr. Pomerantz mentioned.

9       So, right now, the Committee, the Debtor, and the

10   employees, because they requested it after Mr. Pomerantz

11   approved it, have what I would like to file under seal.  I'm

12   not suggesting here today that it go any farther than being

13   filed under seal, but at least it be there for some record.

14         THE COURT:  Well, didn't you -- did I dream this? --

15   didn't you say that there would be something like 48 hours for

16   people to object or then it would be filed not under seal?

17   Did I dream that?

18         MR. RUKAVINA:  Your Honor, that was my proposal, and

19   Your Honor can certainly reject that.  Mr. Pomerantz asked

20   that the plan should never be unsealed pending confirmation of

21   the Debtor's plan.  I have a different proposal.  Your Honor

22   will rule and we'll comply with Your Honor's ruling.

23         MR. DONDERO:  Jim Dondero here.  Can I have two --

24   two quick minutes and just say two quick things?

25         THE COURT:  Well, only if your counsel permits it.  I

1   don't want to get in --

2          MR. RUKAVINA:  I just don't -- yeah.  Mr. Dondero, if

3   you would please just not describe the substance, the economic

4   substance of our proposed plan, not with so many people on the

5   line.

6          MR. DONDERO:  Sure.  I just want to make two quick

7   points.  I couldn't apologize more for taking the Court's time

8   today.  It wasn't our 'druthers.  You heard, I think, at least

9   five or six hours from the Debtor.  You never once heard them

10  say that their activities didn't violate the Advisers Act.

11  And they never once said that violating the Advisers Act

12  wasn't a big deal.  You know, they never said that.

13      What they tried to say, oh, we have these other contracts.

14  Let's try and turn this into an injunction against Dondero

15  interfering.  But they never -- they never denied that Dondero

16  and the NexPoint team was trying to do what was in the best

17  interest of investors and that they had violated the Advisers

18  Act.

19      I think, in normal course, each side would have had an

20  expert and you could have opined on whether it was a violation

21  of the Advisers Act, but they know they did something wrong so

22  they're trying to make it an injunction against me.  Okay.

23  That's all I have to say about that point.

24      As far as the alternative plan, Your Honor, we heard you

25  loud and clear.  And the economics that we put forward, I

 1　can't talk them about specifically, but they're at least 20

 2　percent better than what the Debtor has put forward as far as

 3　a plan.  And what we put forward is elegant, it's simpler, it

 4　treats the employees fairly, it gives the business continuity,

 5　it gives investors continuity, and it's not just a harsh,

 6　punitive liquidation that's going to end up in a myriad of

 7　litigation.

 8　　　We're paying a premium, it's a capitulation price, to try

 9　and get to some kind of settlement.  And I encourage you to

10　look at it.  It's elegant.  It's straightforward.  It's

11　simple.  And now that you've encouraged and gotten us up to a

12　number that's well in excess of the Debtor, maybe a little

13　pressure on other people to treat employees fairly, maybe not

14　liquidate a business that's important in Dallas, that has been

15　a big business for a number of years, doing enormous good

16　things for a lot of people.

17　　　You know, we went into bankruptcy with $450 million of

18　assets and almost no debt.  And we've been driven into the

19　ground by the process.  And then the plan is to just harshly

20　liquidate going forward.  I -- I -- it's crazy.  I don't know

21　what else to do to stop the train other than what we've

22　offered.

23　　　　　THE COURT:  All right.  Well, I hear what you're

24　saying, and I do, just because -- I don't know if you left the

25　room or not, but we did have discussion of Section 206 of the

1   Investment Advisers Act today.  It was put on the screen.  Mr.

2   Post was asked what was unlawful as far as what had happened

3   here, what was going on here, what was fraudulent, deceptive,

4   or manipulative, in parsing through the words of the statute.

5   And he said Mr. Seery engaged in deceptive acts because he

6   wasn't trying to maximize value.  Okay?  I'm not an expert on

7   the Investment Advisers Act, but I know that that was not a

8   deceptive act.

9        And so I'll allow the plan to be filed under seal, but

10  it's not going to be unsealed absent an order of the Court.

11  Okay?  So we'll just leave it at that for now.  And while I

12  still encourage good-faith negotiations here, I've said it

13  umpteen times, where you're tired of the cliché, probably:

14  The train is leaving the station.  And if you want the Court

15  to have patience in the process and if you want the parties to

16  cooperate in good faith, it might help if we didn't have

17  things like Dugaboy and Get Good Trust filing a motion for an

18  examiner 15 months into the case.

19       I mean, it feels to me, Mr. Dondero, whether I'm right or

20  wrong, that it's like you've got a twofold approach here:  I

21  either get the company back or I burn the house down.  And I'm

22  telling you right now, if we don't have agreements, --

23            MR. DONDERO:  That's not true.

24            THE COURT:  -- if we don't have agreements and we

25  come back on the 5th for a continuation of this hearing and a

1  motion to hold you in contempt, you know, I'm leaning right

2  now, based on what I've heard so far, and I know I haven't

3  heard everything, but I'm leaning right now towards finding

4  contempt and shifting a whole bundle of attorneys' fees.

5  That, to me, seems like the likely place we're heading.

6      I mean, I commented at the December hearing on the

7  preliminary injunction against you personally that it had been

8  like a $250,000 hearing, I figured, okay, just guesstimating

9  everybody's billable rate times the hours we spent.  Well,

10  here we were again, and I know we've got all this time outside

11  the courtroom preparing, taking depositions.  I mean, what

12  else is a judge to think except, by God, let's drive up

13  administrative expenses as much as we can; if we can't win,

14  we're going to go down fighting?  That's what this looks like.

15  Okay?  So if it's not really what's going on, then you've got

16  to work hard to change my perceptions at this point.

17          MR. RUKAVINA:  Your Honor, I hear everything what

18  you're saying, and I'm going to discuss it very bluntly with

19  my clients.  But we're being asked not to exercise contract

20  rights in the future.  This is not a contempt hearing.  And

21  Your Honor, we did ask and offered the estate a million

22  dollars, found money, plus to waive almost all our plan

23  objections, if they would just put this case on pause for 30

24  days.

25      So we are trying.  We are trying creative solutions here.

1   We know that the train is leaving.  We've put our money where

2   our mouth is.  We will continue trying.  But Your Honor, this

3   is not a contempt proceeding, and my clients are not Mr.

4   Dondero.  You've heard they're independent boards.

5        MR. POMERANTZ:  I can't leave that last comment

6   without a response.  Yes, there was an offer of a million

7   dollars, by an entity that owes the estate multiples of that.

8   So they are offering to pay us something that they already owe

9   us.  So Mr. Rukavina continues try to do this.  We will not

10  stand for it.

11       MR. RUKAVINA:  That is not a fair statement, sir.  I

12  misrepresented nothing.  We were offering you a million

13  dollars, with no conditions, earned upon receipt, with no

14  credit, no deduction for any of our liability.  So you're free

15  to say no, sir, but you're not going to tell the judge that I

16  misrepresented something.

17       THE COURT:  All right.

18       MR. POMERANTZ:  Should tell the Court --

19       THE COURT:  You know what?

20       MR. POMERANTZ:  -- that that entity owed the Debtor.

21       THE COURT:  You know what?  You know what?  I am more

22  focused on, Mr. Rukavina, your comment that this Court can't

23  enjoin your clients from exercising contractual rights when,

24  again, in January of 2020, the representation was made and it

25  was ordered, "Mr. Dondero shall not cause any related entity

1   to terminate any agreements with the Debtor." Okay? That was

2   -- go back and look at the transcript. That was so meaningful

3   to me.

4      We were facing a possible trustee. And that's what I did

5   in the *Acis* case. Okay? I had a Chapter 11 trustee. And it

6   was not a perfect fit, to be sure. But it is where we were

7   heading in this case, had the lawyers and parties not

8   negotiated what they did. That was a very important

9   provision, convincing me that, you know what, I think the

10   structure they've got will be better than a trustee. And it

11   has, for the most part. But the fees have gone out the roof,

12   and I lay that at the feet of Mr. Dondero, for the most part.

13   Okay? We have a bomb thrown every five minutes by either him

14   personally or the Dugaboy or the Get Good Trust or the Funds

15   or the Advisors or I don't know who else. Okay?

16      So the train is leaving the station, unless you all come

17   to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18   -- grand solution here. Okay? If you get there in the next

19   few days, wonderful. Okay? But I don't know what else to say

20   except I'm tired of the carpet-bombing, and if I had to rule

21   this minute, there would be a huge amount of fee-shifting for

22   what we went through today, for what we went through in

23   December, for the restriction motion that, after I called it

24   frivolous, the lawyers were sending letters pretty much

25   regurgitating the same arguments. All right. So, not a happy

1   camper.

2        But upload your order on the motion to seal the plan.

3   And, again, it's not going to be unsealed absent a further

4   order of the Court.  And if you all come to me next week and

5   say, hey, we've got something in the works here, okay, I'll

6   consider unsealing it and letting you go down a different

7   path.  But I'm not naïve.  I feel like this is just more

8   burning the house down, maybe.  I don't know.  I hope I'm

9   wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11          MR. POMERANTZ:  Thank you, Your Honor.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  All right.  We're adjourned.

14          MR. RUKAVINA:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 6:08 p.m.)

17                          --oOo--

18

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                          **01/28/2021**

24  _____      _____

25  Kathy Rehling, CETD-444                          Date
    Certified Electronic Court Transcriber

256

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

- By Mr. Morris                                              19
- By Mr. Rukavina                                           31

WITNESSES

Debtor's Witnesses

James P. Seery
- Proffer of Direct Testimony by Mr. Pomerantz               6

James D. Dondero
- Direct Examination by Mr. Morris                          42

Jason Post
- Direct Examination by Mr. Morris                         108

James P. Seery, Recalled
- Direct Examination by Mr. Morris                         152
- Cross-Examination by Mr. Hogewood                        170
- Redirect Examination by Mr. Morris                       188
- Examination by the Court                                 191

Defendants' Witnesses

Jason Post
- Direct Examination by Mr. Rukavina                       201
  *Voir Dire* Examination by Mr. Morris                    206
  Direct Examination, Resumed, by Mr. Rukavina             207

EXHIBITS

Debtor's Exhibits A through SSSSS *(exclusive of    Received  19
  Exhibits UUUU, VVVV, and AAAAA)*
Debtor's Exhibit D (Email)                       Received 200
Debtor's Exhibit K (Letter)                      Received 198
Debtor's Exhibit TTTTT                           Received  64

257

INDEX
Page 2

RULINGS

19-34054-sgj11 - Highland Capital Management, L.P.

    Motion of the Debtor for Entry of an Order       12
    Authorizing the Debtor to Implement a Key Employee
    Retention Plan with Non-Insider Employees and
    Granting Related Relief filed by Debtor Highland
    Capital Management, L.P. (1777) - *Granted*


21-03000-sgj - Highland Capital Management, L.P. v.
Highland Capital Management Fund Advisors, L.P. et al.

    Agreed Settlement with CLO Holdco, Ltd.       15

    Plaintiff's Motion for a Preliminary Injunction    233
    against Certain Entities Owned and/or Controlled
    by Mr. James Dondero (5) - *Continued*

END OF PROCEEDINGS    255

INDEX    256-257

# EXHIBIT 40

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
In Re:                              )    Chapter 11
                                    )
HIGHLAND CAPITAL                    )    Dallas, Texas
MANAGEMENT, L.P.,                   )    Monday, March 22, 2021
                                    )    9:30 a.m. Docket
         Debtor.                    )
_____     )
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,                   )
                                    )
         Plaintiff,                 )    PLAINTIFF'S MOTION FOR ORDER
                                    )    REQUIRING JAMES DONDERO TO
v.                                  )    SHOW CAUSE WHY HE SHOULD NOT
                                    )    BE HELD IN CIVIL CONTEMPT FOR
JAMES D. DONDERO,                   )    VIOLATING THE TRO [48]
                                    )
         Defendant.                 )
_____     )


                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor/Plaintiff:   John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For Defendant James D.      John T. Wilson
Dondero:                    Bryan C. Assink
                            BONDS ELLIS EPPICH SCHAFER
                              JONES, LLP
                            420 Throckmorton Street,
                              Suite 1000
                            Fort Worth, TX  76102
                            (817) 405-6900
```

2

```
 1
      APPEARANCES, cont'd.:
 2
      For Scott Ellington and      Debra A. Dandeneau
 3    Isaac Leventon:              BAKER & MCKENZIE, LLP
                                   452 Fifth Avenue
 4                                 New York, NY 10018
                                   (212) 626-4875
 5
      For Scott Ellington and      Michelle Hartmann
 6    Isaac Leventon:              BAKER & MCKENZIE, LLP
                                   1900 North Pearl Street,
 7                                   Suite 1500
                                   Dallas, TX  75201
 8                                 (214) 978-3421

 9    For Scott Ellington and      Frances A. Smith
      Isaac Leventon:              ROSS & SMITH, P.C.
10                                 Plaza of the Americas
                                   700 N. Pearl Street, Suite 1610
11                                 Dallas, TX  75201
                                   (214) 593-4976
12
      Recorded by:                 Michael F. Edmond, Sr.
13                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
14                                 Dallas, TX  75242
                                   (214) 753-2062
15
      Transcribed by:              Kathy Rehling
16                                 311 Paradise Cove
                                   Shady Shores, TX  76208
17                                 (972) 786-3063

18

19

20

21

22

23

24
                Proceedings recorded by electronic sound recording;
25                 transcript produced by transcription service.
```

1     <u>DALLAS, TEXAS - MARCH 22, 2021 - 9:39 A.M.</u>

2    THE COURT:  We have a setting in Highland Capital

3 Management, Case No. 20-3190.  It's an adversary.  We have

4 Plaintiff's Motion to Hold Mr. James Dondero in Civil Contempt

5 of Court.

6   Let's get lawyer appearances to start out with.  Who do we

7 have appearing for Highland this morning?

8    MR. MORRIS:  Good morning, Your Honor.  It's John

9 Morris from Pachulski Stang Ziehl & Jones on behalf of the

10 Debtor.

11    THE COURT:  Good morning.  All right.  And who is

12 appearing for Mr. Dondero's legal team?

13    MR. WILSON:  This is John Wilson, Bonds Ellis Eppich

14 Schafer Jones, for Mr. Dondero.

15    THE COURT:  All right.  I know we have lots of other

16 observers on the video, but those are the only appearances I

17 will take for this matter.

18   All right.  Well, let's talk about some housekeeping

19 matters before we get underway.  Just to be clear, the motion

20 --

21    MS. SMITH:  I can't hear.

22    THE COURT:  Who says they can't hear?  All right.

23 Can everyone hear me?

24    MR. MORRIS:  Yes, Your Honor.

25    THE COURT:  Okay.  Mr. Wilson, you can hear me okay?

4

1              MS. DANDENEAU:  Excuse me, Your Honor.  This is Debra

2    Dandeneau from Baker McKenzie.  I believe that our local --

3    our co-counsel, Ms. Smith, wanted to make an appearance

4    because we will be participating in this hearing, and I

5    believe she's the one who's having the audio issues.  Sorry to

6    interrupt.

7              THE COURT:  All right.  Now, well, first, Ms. Smith,

8    can you hear me okay?

9         (No response.)

10             THE COURT:  All right.  Ms. Dandeneau, remind me who

11   your clients are and what their role is in this matter.

12             MS. DANDENEAU:  Your Honor, our clients are Mr.

13   Leventon and Mr. Ellington, at least in this matter.  And they

14   have been -- they've -- they were requested to appear as

15   witnesses at this hearing.  And so we are appearing to

16   represent them in connection with this hearing.  By agreement

17   with the Pachulski firm, we're voluntarily producing them.  We

18   are appearing -- I'm here.  My partner, Michelle Hartmann from

19   Baker McKenzie, is here.  Ms. Smith is here -- unfortunately,

20   without audio.

21        And we do have an agreement with the Debtor that, among

22   other things, they are -- they are not parties to this

23   proceeding.  We are producing them voluntarily.  But we do

24   have an agreement with the Pachulski firm that we will be

25   permitted to at least ask questions on redirect of these

5

1  witnesses, and just wanted to make that clear, why we are here

2  and why our -- and Mr. Ellington and Mr. Leventon are

3  appearing voluntarily in this matter.

4            THE COURT:  All right.  Well, thank you, Ms.

5  Dandeneau.  Hopefully, Ms. Smith will get her audio working

6  here shortly.

7       So I guess I should ask at this point, are there any other

8  attorneys in a similar posture that want to make an appearance

9  before we get started?

10      All right.  Well, then let me get going with some

11  preliminary housekeeping matters.  I'm noting for the record

12  that this motion asking the Court to hold Mr. Dondero in

13  contempt of court was filed January 7, 2021, and the order

14  that Mr. Dondero is alleged to have violated is a December 10,

15  2020 TRO the Court issued in this adversary proceeding, a

16  short three-page order.

17      So what I want to clarify at the outset is this.  There's

18  been a lot of activity in the adversary.  For example, on the

19  very day after this motion to hold Mr. Dondero in contempt was

20  filed, the Court issued a preliminary injunction, okay, in

21  other words, the follow-up to the TRO, on January 8th.  So

22  sort of a weird posture, you might say.  We're having a

23  hearing now, over two months later, on a motion to hold Mr.

24  Dondero in contempt of the TRO from December 10th, even though

25  we've subsequently had a preliminary injunction.

6

1      I'm just clarifying that point to make sure our evidence

2   is carefully tailored here today.  I think it would only be

3   evidence for activity between December 10, 2020 and January 7,

4   2021, because, again, you know, order entered December 10th,

5   motion to hold Mr. Dondero in contempt filed January 7th.  So

6   this doesn't pertain to any alleged violations of the

7   preliminary injunction after it was issued on January 8th.

8      So, with that, I will allow opening statements.  And if

9   you have anything to clarify about what the Court just said,

10  if someone views this any differently, please let me know in

11  your opening statements.

12     All right.  Mr. Morris, you may proceed.

13                OPENING STATEMENT ON BEHALF OF THE DEBTOR

14     MR. MORRIS:  Good morning, Your Honor.  John Morris;

15  Pachulski Stang Ziehl & Jones; for the Debtor.  Let me begin

16  by saying you have it exactly right.

17          THE COURT:  Okay.

18          MR. MORRIS:  We are only going to put forth evidence

19  of violations of the TRO that took place between December 10th

20  and the day that the preliminary injunction was issued on

21  January 8th.  So it's a very short 29-period -- 29-day period,

22  and that really is what we're focused on here today.

23     As Your Honor just alluded to, on December 10th the Debtor

24  obtained a TRO against Mr. Dondero.  The TRO was based on

25  uncontroverted testimony, including written threats to Mr.

1  Seery and Mr. Surgent.  It included evidence of interference

2  with Mr. Seery's trading activities as the CLO manager.  And

3  so that happened on December 10th.

4      The TRO, Your Honor, is very clear.  It is completely

5  unambiguous.  If Your Honor will recall, on December 10th you

6  actually read out word for word of the operative portion of

7  the TRO and you made assessments with respect to every

8  provision in it as to whether or not it was clear and

9  unambiguous and whether or not it was reasonable.  And after

10  that painstaking analysis, Your Honor signed the order.

11      In their opposition, Mr. Dondero now asserts -- and this

12  is said several times -- the exact opposite.  He claims not to

13  know what conduct was prohibited.  This is just not credible.

14  We are going to go through the TRO as applicable to the

15  violations that the Debtor is alleging here and we will show

16  that there is no room for debate as to what the TRO provided

17  and how his conduct was in violation of those very clear and

18  unambiguous provisions.

19      Mr. Dondero makes much in his opposition papers of the

20  clear and convincing evidence standard, Your Honor, and they

21  suggest that it's such a high hurdle we can't possibly meet

22  that here.  Your Honor, the evidence that we will present

23  today doesn't prove that Mr. Dondero violated the TRO by clear

24  and convincing evidence.  It proves it, not that we have to,

25  beyond reasonable doubt.  Okay?  There is no doubt that he

1    violated the TRO in more than a dozen ways, and we're going to

2    prove that to you today.

3        Again, we don't have to meet that high standard, but clear

4    and convincing evidence is easy.  Why is it easy?  It's easy

5    for two very simple reasons.  Mr. Dondero has already admitted

6    to certain of the violations, and you are going to see

7    documents today that say what they say, their meaning is

8    unambiguous, you will see the parties to the communications,

9    you will see the interference with the business, you will see

10   -- there is just no room for debate.  It is not clear and

11   convincing.  It's to a certainty that he violated the TRO more

12   than a dozen times.

13       Mr. Dondero claims repeatedly in his papers that he

14   substantially complied with the TRO.  I don't know of any law,

15   any case that says that the Court is supposed to overlook

16   violations of a TRO if the person against whom it was entered

17   is otherwise in substantial compliance, but it's really

18   irrelevant.  He did not substantially comply with anything.

19   The fact is that, despite being in place for only 29 days, we

20   are going to present evidence today of 17 specific violations

21   that are beyond dispute.  Seventeen violations in just 29

22   days.  The notion that he was in substantial compliance is not

23   credible.

24       I've got a short deck, Your Honor, that I just want to go

25   through with the Court so that I can preview the evidence that

1  we're going to present today.  And if Ms. Canty can just put

2  up the first page of the deck.

3      So, I don't know that the evidence is going to come in so

4  exactly this order, but the TRO states in Section 2(c) that

5  Mr. Dondero is enjoined, quote, from communicating with any of

6  the Debtor's employees except as it specifically relates to

7  shared services.  It is a blanket prohibition on communicating

8  with the Debtor's employees unless it relates to shared

9  services.  Not ambiguous.  Pretty clear.  The conduct couldn't

10  -- right?  Put yourself in Mr. Dondero's position.  You have

11  been ordered by a court of law not to communicate with the

12  Debtor's employees unless it relates to shared services.

13      And so if you read the opposition, you'll see all the

14  different kinds of excuses as to these communications.  You'll

15  see that they talked about the pot plan.  There's nothing in

16  the TRO that allowed Mr. Dondero to speak with any of the

17  Debtor's employees about the pot plan.  And he knew that and

18  his lawyers knew that.  And how do you know they knew that?

19  Because on December 16th, just six days after the TRO was

20  entered into, they filed a motion at Docket 24 seeking to

21  modify the TRO to allow Mr. Dondero to speak directly with the

22  independent board about a pot plan.  Right?  He knew he

23  couldn't speak to anybody about the pot plan.  He wanted to

24  speak with the board about the pot plan.

25      If he thought that the TRO allowed him to speak with the

1  Debtor's employees about the pot plan, why didn't he think

2  that it was -- allowed him to talk to the independent board

3  about the pot plan?

4      He withdrew that motion, Your Honor, but that's -- that

5  was his state of mind.  He knew he couldn't do that.

6      But here's the thing, Your Honor.  None of the

7  communications that we're going to be -- put before you today

8  have anything to do with the pot plan.  So not only is

9  discussion about the pot plan not permitted, it's not even --

10 it's not even relevant to today's discussion.  But it's in

11 their papers.

12     They also put in their papers that somehow these

13 communications were authorized.  Other than what Mr. Dondero

14 may say, there will be no evidence of any kind that the Debtor

15 authorized any of the communications.  In fact, Mr. Seery is

16 going to testify and he will tell Your Honor that he did not

17 only not know of these communications, but had he known of

18 them, whether there was a TRO or not, he would have fired the

19 employees on the spot.  And we're going to see the

20 communications, and Your Honor can form your own judgment as

21 to whether or not an employer, particularly an employer in

22 bankruptcy, should tolerate the communications that we're

23 about to look at.

24     Shared services.  You might hear, oh, oh, these

25 communications were about shared services.  They will never be

1    able to prove that because they have not put on their exhibit

2    list any shared services agreement.  And why don't they have a

3    shared services agreement on their exhibit list?  Because Mr.

4    Dondero is not party to one.  He is not party to one.  The

5    lawyers at Bonds Ellis do not represent an entity that was

6    party to a shared services agreement.  Doug Draper, who you

7    will see on some of these emails, does not represent an entity

8    who was party to any shared services agreements.  There is no

9    exception in the TRO for the communications that we will look

10   at.

11        Can you go to the next slide, please?

12        Here are 13 separate communications that we're going to go

13   through today that included Mr. Dondero and one of the

14   Debtor's employees or Mr. Dondero's lawyers and one or more of

15   the Debtor's employees.  They cover topics.  The first three

16   relate to the Bonds Ellis firm's request of Mr. Ellington to

17   provide a witness who was going to testify on behalf of Mr.

18   Dondero against the Debtor.  There's communications about a

19   common interest agreement that was going to be between and

20   among, among others, Mr. Dondero and certain of the Debtor's

21   employees.  There's communications about the UBS appeal of the

22   Redeemer 9019 settlement and the HarbourVest settlement.

23   There's -- there is communications where Mr. Dondero asks Mr.

24   Ellington to provide leadership in the coordination of all of

25   the lawyers representing Mr. Dondero's interests.

1     There's more.  We're going to go through these in detail,

2  Your Honor, but there's 13 different communications that took

3  place in just the two weeks after the TRO was entered into.

4  Every single one of them -- these are not technical

5  violations.  This is not Mr. Dondero saying hello to an

6  employee in the hallway.  This is not Mr. Dondero asking about

7  somebody's, you know, family.  Every single one of these

8  communications is adverse to the Debtor.  Adverse to the

9  Debtor's interests.  And the Debtor knew about none of them.

10     Go back to the first slide, please.

11     The automatic stay.  Section 2(e) of the TRO prohibits Mr.

12  Dondero from otherwise violating Section 362(a) of the

13  Bankruptcy Code.  Section 362(a)(3) states that the filing of

14  a bankruptcy acts as, quote, to prevent any act to exercise

15  control over the property of the estate.  There can't be

16  anything ambiguous about a TRO that says don't violate the

17  automatic stay.  If there's an ambiguity in that provision,

18  there must be an ambiguity in Section 362(a).  And I submit,

19  Your Honor, there's no ambiguity in Section 362(a)(3) that

20  says you are prohibited from exercising control over property

21  of the estate.  But that's exactly what Mr. Dondero did, not

22  once, not twice, but three times in the short 29-day period

23  following the entry of the TRO.

24     Can we go to the third slide, please?

25     As Your Honor may recall from the preliminary injunction

1    hearing, Mr. Dondero's cell phone that he admitted was the

2    company's property was thrown in the garbage.  So that's stay

3    violation one.  I remember Mr. Lynn kind of flippantly saying

4    he offered to pay the $500, but he completed missed the point

5    then and I think they continue to miss the point now.  Because

6    the second stay violation was the tossing in the garbage of

7    the Debtor's text messages.

8         The Debtor, for years, right -- Mr. Dondero, this is his

9    baby, he ran this company -- they had an employee handbook.

10   The employee handbook were the company's policies that guided

11   and dictated the conduct of its employees.  And they have a

12   provision in there, and we're going to look at it carefully

13   with Mr. Dondero.  They had an option where the company might

14   subsidize some of the phone bill if employees participated.

15   But importantly, Your Honor, on this slide is an excerpt from

16   Page 13 of the handbook.  It'll be Debtor's Exhibit 55.  And

17   it says, regardless of whether the employee chooses to

18   participate in the policy, right -- this is for people who had

19   their own phone, not even ones that were paid by the company

20   -- this says specifically all text messages, quote, sent and/

21   or received related to company business remain the property of

22   Highland.

23        There's that word property again, right out of 362(a)(3).

24   Property.  Do not control the Debtor's property.  All

25   employees, including Mr. Dondero, were told that text messages

14

1  related to company business shall remain the property of

2  Highland.

3      Mr. Dondero knew this.  How do we know that Mr. Dondero

4  knew this?

5      Let's go to the next slide, please.

6      Mr. Dondero is going to tell you, because it's going to be

7  in evidence, that periodically each year Mr. Surgent, as the

8  chief compliance officer, had certain senior employees fill

9  out certifications.  On the screen is an excerpt from Mr.

10  Dondero's certification done in early 2020.  And in that

11  certification, he says, among other things, quote, I have

12  received, have access to, and have read a copy of the employee

13  handbook and I am in compliance with the obligations

14  applicable to employees set forth therein.

15      So this is his certification that he understands that text

16  messages are the Debtor's property -- to the extent that they

17  relate to company business, admittedly.  And he knew long ago

18  that the U.C.C. wanted his text messages.  How do we know

19  that?  Because he filed a pleading and he told Your Honor

20  that.

21      If we can go to the next slide, please.

22      If Your Honor will recall, last summer the U.C.C. made a

23  motion to compel the production of documents.  They sought to

24  get emails and ESI from nine custodians.  Mr. Dondero's

25  lawyers filed a response to that motion.  On the screen now is

1  Paragraph 3 from Docket No. 942, which is Debtor's Exhibit 40

2  for this purpose.  And in Mr. Dondero's own pleading to the

3  Court, he tells the Court the Committee seeks the ESI from

4  nine different custodians, who include the Dondero.  The

5  Committee has requested all ESI for the nine custodians,

6  including text messages.

7      So, so Mr. Dondero knew.  Certainly, his lawyers knew.  He

8  knew in July that the U.C.C. wanted the text messages.  The

9  employee handbook provided that they're the Debtor's property.

10 He certified that he understood that.  He told the Court that

11 he was aware the U.C.C. wanted Mr. Dondero's text messages.

12     The TRO is entered into, is entered by the Court during

13 the afternoon of December 10th, and later in the evening we

14 know the phone still exists.  How do we know that?  Again, not

15 clear and convincing evidence, beyond a reasonable doubt,

16 because if we go to the next slide, certainty.  Forget beyond

17 a reasonable doubt.  Certainty.  At 6:25 p.m., Mr. Dondero is

18 told, on the day that the TRO is entered into, that the phone

19 exists.

20     The phone doesn't exist now.  It was thrown in the

21 garbage.  Mr. Dondero doesn't know how, why, who, when, what.

22 He had the phone.  He knew it was -- it contained the Debtor's

23 text messages.  He knew the U.C.C. wanted them.  And the phone

24 doesn't exist today.

25     Call it spoliation.  Call it a violation of 362(a).

1   There's no question that this is a violation of the TRO.

2       The third way he violated the TRO, Section 2(e) under

3   362(a)(3), is by entering the Debtor's premises without

4   permission.  Now, I will admit and Mr. Seery will probably

5   tell Your Honor that if this was the only thing that Mr.

6   Dondero did, you know, maybe it wouldn't be a big deal.  But

7   it's not, and it's consistent -- we're seeking to hold him in

8   contempt today, Your Honor, but here's the thing.  He holds

9   the Debtor in contempt.  He holds this Court in contempt.  He

10  could not care less what anybody has to say.  He will do what

11  he wants.  And how do we know that?  How do we know that, that

12  this is not a gotcha thing?  Because we sent a letter to him.

13      Can we go to the next slide, please?

14      This is going to be in evidence.  It's going to be at

15  Exhibit 12.  You will see the letter that we sent on December

16  23rd, while the TRO is in effect, where we gave him seven days

17  before we were evicting him.  We were evicting him because the

18  Debtor believed he was interfering with the business, but the

19  Debtor didn't need a reason, frankly.  But they gave notice.

20  Not only did they give notice of eviction, look at what they

21  told Mr. Dondero.  Any attempt by Mr. Dondero to enter the

22  office, regardless of whether he is entering on his own or as

23  a guest, will be viewed as an act of trespass.

24      We told him.  He knew that.  And yet what does he do?  He

25  waltzes right into the Debtor's offices right after the new

1 year to give a deposition.  If you read carefully Mr.

2 Dondero's response to the Debtor's motion here, he says, well,

3 there was nobody in the office, like -- he says he used his

4 judgment.  He thought it was okay.  They even make the

5 argument that maybe the shared services allowed this, the

6 shared services agreement.

7     Again, there's no shared services agreement.  Mr.

8 Dondero's not a party to a shared services agreement.  But

9 let's remember what the purpose of the exercise was.  He went

10 to the office to give a deposition in connection with a motion

11 for a preliminary injunction against him personally.  How

12 could this -- every time you hear this shared services,

13 remember -- ask yourself, where is the agreement, how do I

14 know, and how could this possibly relate to shared services?

15     And Mr. Seery is going to tell you he's not going to be

16 able to say, oh, I need $10 or $100 or I can quantify the

17 damage.  He's going to tell you, Your Honor, that this and all

18 of the communications that we looked at, he just completely

19 undermined his authority.  They undermined the Debtor.  They

20 created -- because everybody knows that Mr. Dondero was

21 evicted from the office.  But he walks right in.  And he's

22 creating -- this is what Mr. Seery will tell you --

23 noneconomic harm that the Debtor has suffered by Mr. Dondero's

24 unmitigated arrogance and contempt that he has for the Debtor.

25     The Debtor is a company in bankruptcy.  They have -- they

1  have asked for your resignation.  They have sought and

2  obtained a TRO.  They have evicted you from the offices.  They

3  told you that if you come back we will treat it as trespass.

4  He is in contempt of the Debtor, of the TRO, of this Court.

5  He could not care less, Your Honor.  And that's really why --

6  that's why we're here.  That's what all of this shows.

7      Contempt.  I've got more.

8      Can we go back to the first page, please?

9      Section 3(a) of the TRO enjoins Mr. Dondero from causing,

10  encouraging, or conspiring with any entity owned or controlled

11  by him to engage in any of the prohibited conduct.  And the

12  prohibited conduct includes interfering or otherwise impeding

13  the Debtor's business.

14      Now, you remember, when we got the TRO, one of the things

15  that happened -- and I'm not saying that this is a violation

16  of the TRO, I'm just trying to provide some context, and

17  you'll hear it from Mr. Dondero himself -- one of the reasons

18  we got the TRO is, remember about Thanksgiving, he interfered

19  with Mr. Seery's attempt to sell AVYA and SKY stock on behalf

20  of the CLOs, right?  And that's where he made the threat to

21  Mr. Surgent, right?  So, --

22      And go to the last slide here.

23      He does the exact same thing on December 22nd.  He engages

24  in the exact same conduct that formed the basis of the TRO

25  just 12 days after the TRO was entered.  And he admits to it,

1  Your Honor.  This is not can I meet a clear and convincing?

2  It is not even beyond a reasonable doubt.  There is no doubt.

3  There is a certainty.  Because he admitted to it right here at

4  the preliminary injunction hearing.

5       Question, "And you personally instructed, on or about

6  December 22nd, employees of those Advisors to stop doing the

7  trades that Mr. Seery had authorized, right?"  Answer, "Yeah.

8  Maybe we're splitting hairs here, but I instructed them not to

9  trade them.  I never gave instructions not to settle the

10  trades that occurred, but that's a different ball of wax."

11       And later on, question, "And you would agree with me,

12  would you not, that you personally instructed the employees of

13  the Advisors not to execute the very trades that Mr. Seery

14  identifies in this email, correct?"  Answer, "Yes."

15       You know, certainty, Your Honor.  Not clear and

16  convincing.  Not beyond a reasonable doubt.  Certainty,

17  because he has admitted to it.

18       So there you have it, Your Honor.  We're going to present

19  evidence today of -- I think I've got 17 separate violations

20  in just a 29-day period.  Mr. Seery will testify, hopefully

21  quite briefly, that he never authorized any of this, that he

22  had no knowledge of this, that if he knew any of this was

23  occurring he would have fired these people immediately,

24  whether or not there was a TRO in place.

25       We're going to put evidence before the Court as to the

1  fees that my firm has charged the Debtor's estate dealing with

2  all of this.  Mr. Seery will testify that those fees don't

3  begin to adequately compensate the Debtor because they don't

4  include the fees that are incurred by the Creditors' Committee

5  or FTI or DSI.  Mr. Seery will testify that the Debtor went

6  out and hired Kasowitz Benson because they needed some very

7  technical advice on the CLOs.  Another $70,000.

8      He's going to testify that there's noneconomic harm here.

9  The undermining of his authority.  The -- just the contempt

10  with which all of the employees clearly saw Mr. Dondero

11  treating the Debtor with.  And all of that is really

12  problematic.

13      So, at the end of the day, Your Honor, I don't know what

14  Mr. Dondero's excuses are going to be here, but I want to be

15  really, really clear:  These provisions could not be more

16  clear.  They're going to have to explain away 17 different

17  things.  There is no pot plan exception, there is no

18  settlement exception, although there will be no communications

19  that relate to either topic.  There will be no shared services

20  exception because nobody party to these communications are

21  party to a shared services agreement, and there will be no

22  shared services agreement in the record.

23      The Debtor is tired of this.  I'm tired of it, personally.

24  I've really gone through this way too much.  I know this

25  record better than I should, to be honest with you.  But we're

1 going to do it today, and I'm glad we're going to do it today,

2 and I assure you, Your Honor, that I will do my very best to

3 make sure this hearing is concluded today.

4  Thank you very much.

5  THE COURT:  All right.  A couple of follow-up

6 questions on that point, concluding today.  I know that at one

7 point there was some back-and-forth through my courtroom

8 deputy about putting limitations on the time this hearing

9 would take.  And I never weighed in, I don't think, on that.

10 How many witnesses and how much time do you expect your case

11 in chief to take?  You've mentioned Seery and we've heard

12 about Leventon and Ellington.

13  MR. MORRIS:  Yeah.  Well, I'll just -- I'll just put

14 it out there right now, Your Honor.  We made a decision

15 yesterday, because we are so desirous of getting this done

16 today, I don't think we're going to call Mr. Leventon and Mr.

17 Ellington today.  I think that they have information that

18 corroborates some of the allegations and some of the facts

19 that we'll be adducing, but I think, between the documents and

20 Mr. Dondero himself, you know, we thought long and hard about

21 it, but I'm prepared to try to limit -- I don't know how long

22 I took on the opening, but I offered to do this with Mr.

23 Dondero and say three-and-a-half hours each, and that way we

24 get done today.  And I'm still prepared to do that.

25  And so now, you know, now the cat's out of the bag.  I'm

1  not going to call Mr. -- I mean, I'll cross them if -- because

2  they're on -- they're on Mr. Dondero's list, too.  I mean, you

3  know, I heard counsel talk about agreements with the Debtor

4  and all of that.  I don't know what agreement she has with Mr.

5  Dondero.  But he's on their list, too, so that, you know, Mr.

6  Dondero may call them, and if they do, I'll certainly cross

7  them then.  But I want to get this case done today.  I'm going

8  to call Mr. Dondero, I'm going to call Mr. Seery, and I'm

9  going to rest.  So there's no surprises.

10            THE COURT:  All right.  Well, it sounds like you're

11  not committing a hundred percent to no Leventon and no

12  Ellington.

13            MR. MORRIS:  No, I am, in fact.  I'm committing a

14  hundred percent --

15            THE COURT:  You're just saying --

16            MR. MORRIS:  -- to my case in chief.

17            THE COURT:  Okay.

18            MR. MORRIS:  To my case in chief.  If Mr. --

19            THE COURT:  You're just saying if --

20            MR. MORRIS:  If Mr. Dondero chooses to call them, --

21            THE COURT:  If Dondero calls them, --

22            MR. MORRIS:  -- I'll cross them.

23            THE COURT:  -- you'll cross them?

24            MR. MORRIS:  Yeah.

25            THE COURT:  Okay.

1          MS. DANDENEAU:  Your Honor, this is Debra Dandeneau.

2  In light of what we just heard from Mr. Morris, which we have

3  not heard up until now, may Mr. Ellington and Mr. Leventon be

4  excused?  We have no agreement with any other party to produce

5  Mr. Ellington and Mr. Leventon for this hearing.

6          THE COURT:  All right.  Mr. Wilson, --

7          MR. WILSON:  Yes, Your Honor.

8          THE COURT:  -- do you have anything to say on this?

9          MR. WILSON:  Yes.  I was planning to ask some

10  questions, not a whole lot, but I did want to ask questions of

11  both Mr. Ellington and Mr. Leventon.  They are on our witness

12  list as well.

13          MS. DANDENEAU:  Okay.  Thank you.

14          THE COURT:  All right.  Let's have them stick around.

15          MS. DANDENEAU:  I tried, Mr. Morris.

16          THE COURT:  Okay.

17          MR. MORRIS:  And I tried for you.

18          THE COURT:  All right.  Well, Mr. Wilson, let me hear

19  from you on how many witnesses and how long you think your

20  case will take.

21          MR. WILSON:  Your Honor, I am planning to conclude my

22  presentation in the time that we've agreed to.  I don't have

23  any additional witnesses that I plan on calling except those

24  that have been mentioned already.

25      There is a reference to Jason Post on our exhibit list,

 1  but he will not be called today.

 2           THE COURT:  All right.  So you expect to have

 3  questions of Seery, Dondero, and Leventon and Ellington.  Is

 4  that correct?

 5           MR. WILSON:  That's correct, Your Honor.

 6           THE COURT:  All right.  Well, can we talk about

 7  mechanics?  Rather than recalling them, I mean, can we just

 8  all agree that any cross can go beyond the scope of direct so

 9  we can --

10           MR. MORRIS:  Yes, Your Honor.

11           THE COURT:  -- only call them one time?  Everyone

12  agree?  Mr. Morris says yes.

13           MR. MORRIS:  Yes.

14           THE COURT:  Can you agree?

15           MR. WILSON:  Yes, I agree to that.

16           THE COURT:  Okay.  All right.  Well, do you agree to

17  three-and-a-half hours total for your case?

18           MR. WILSON:  Are you speaking to me, Your Honor?  If

19  so, yes, I do.

20           THE COURT:  Okay.  Very good.

21       Well, Nate, we've got the time parameters to work within.

22       Mr. Wilson, the one other housekeeping matter I had was I

23  see on the docket that I never specifically entered an order

24  on your motion *in limine*.  I did remember telling you all at

25  one point in open court right after it was filed that I was

1  not inclined to grant it, but I want you to know that I'm not

2  going to grant that.

3      As you know, there's no jury. And as we judges tend to

4  say in this context, we can weed out what is relevant versus

5  irrelevant. And so I think we need to go ahead and sustain

6  the objection on that and allow the full amount of testimony

7  and evidence that Movant seeks to put in.

8      All right. So, with that, you may make your opening

9  statement.

10        MR. WILSON: All right. Thank you, Your Honor. May

11  it please the Court?

12        THE COURT: Go ahead.

13      OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

14        MR. WILSON: The Fifth Circuit instructs that a party

15  commits contempt when he violates a definite and specific

16  order of the court requiring him to perform or refrain from

17  performing a particular act or acts with knowledge of the

18  court's order. And we know that from a variety of Fifth

19  Circuit cases, but the one I was just quoting from is

20  *Travelhost v. Blandford*, 68 F.3rd 958.

21      We also know that in a civil contempt proceeding the

22  burden of proof, as Mr. Morris alluded to, is clear and

23  convincing evidence. And the Fifth Circuit in the *Travelhost*

24  case defines clear and convincing evidence as that weight of

25  proof which produces in the mind of the trier of fact a firm

1   belief or conviction as to the truth of the allegations sought

2   to be established, evidence so clear, direct and weighty and

3   convincing as to enable the factfinder to come to a clear

4   conviction without hesitancy of the truth of the precise facts

5   of the case.

6        And I submit to you, Your Honor, that the evidence that

7   you will hear today does not rise to the level of clear and

8   convincing that Mr. Dondero violated a definite and specific

9   order of the Court.

10       In fact, I think the evidence will demonstrate just the

11  opposite.  Mr. Dondero recognized why the Court entered the

12  temporary restraining order, and he's going to talk to you

13  about that.  He took the Court's order seriously.  He

14  discussed it with his counsel and he even had follow-up

15  discussions with his counsel to ask specific questions about

16  what the order allowed him and did not allow him to do.  And

17  then, accordingly, he tried to shape his behavior so that he

18  would not run afoul of the order.

19       But unfortunately, the Debtor interprets the order much

20  more broadly than Mr. Dondero and his counsel did, and therein

21  lies the problem.  If the Debtor is correct and Mr. Dondero

22  getting a new phone or appearing at the Highland office to

23  give his deposition or attempting to ensure that the proper

24  procedures for discovery are followed violates the TRO, it is

25  simply too broad and too vague to be enforceable.

1    In reality, what the Debtor wants to do is hold Mr.

2 Dondero in contempt for violating not the TRO but a letter

3 that the Debtor's counsel sent to Mr. Dondero's counsel two

4 weeks after the TRO was entered.  You're going to see that

5 letter today.

6    The prohibitions against communications in the order are

7 confusing and problematic.  There's a nonspecific carve-out

8 for communications regarding shared services.  And by the way,

9 contrary to what Mr. Morris told you, Mr. Dondero has both the

10 shared services agreements on his exhibit list today, Exhibits

11 1 and 2.

12    The only two Highland employees that the Debtor alleges

13 that Mr. Dondero communicated with are two lawyers who are

14 covered by the shared services agreement.  Moreover, Mr.

15 Ellington was also tasked -- and you'll hear about this -- as

16 being a go-between between Mr. Seery and Mr. Dondero from the

17 inception of the independent board and continuing through Mr.

18 Seery becoming the CEO and until the day Mr. Ellington was

19 terminated in January.

20    Mr. Seery never told Mr. Ellington that he was to stop

21 performing his go-between role with Mr. Dondero, even after

22 the December 10th TRO was entered.  In fact, he instructed Mr.

23 Ellington to take Mr. Dondero's calls, and he continued to

24 send messages to Mr. Dondero through Mr. Ellington up until

25 the day before Mr. Ellington was terminated.

1      The footnote in the TRO is equally confusing because the

2  footnote states that, for the avoidance of doubt, this order

3  does not enjoin or restrain Mr. Dondero from seeking judicial

4  relief upon proper notice or from objecting to motions filed

5  in the above-referenced bankruptcy case.  However, the Debtor

6  now says that Mr. Lynn, Mr. Dondero's attorney, sending emails

7  to Mr. Ellington seeking to identify a witness for a hearing

8  violates the TRO.  This is true even though Mr. Seery

9  instructed Mr. Ellington that he could talk to Mr. Lynn as

10  much as he wanted to.

11      The evidence will further reveal that the meaning of the

12  words "interference" and "threat" are subject to varying

13  interpretations.  And you'll hear evidence of what the Debtor

14  contends are threats and interference, and you'll hear

15  testimony from Mr. Seery about how he was impeded, if at all,

16  in his conduct running the Debtor.

17      Now, Mr. Dondero has conceded that the events that led to

18  the TRO in the first place were inappropriate, and he will

19  testify about that today.  He sent emails and texts that

20  ultimately led to the TRO.  But he changed his behavior.  He

21  conscientiously tried to avoid doing any like thing after the

22  entry of the TRO.

23      I think Mr. Seery will testify today that no trades were

24  stopped, he has not changed his investment strategies or any

25  other aspect of his responsibility since the entry of the TRO.

1   And so therefore, even if Mr. Morris is going to argue that

2   the violations of the TRO by Mr. Dondero impeded the Debtor, I

3   think the evidence will reflect otherwise.  At most, it could

4   be considered a technical violation, but I believe that Mr.

5   Dondero tried his best to do nothing to violate this TRO and

6   only operate -- tried to operate within its bounds.

7        Now, the Supreme Court has stated in a case called

8   *Longshoremen Association v. Philadelphia Marine Trade*, 389

9   U.S. 64, that the judicial contempt power is a potent weapon.

10  When it's founded upon a decree too vague to be understood, it

11  can be a deadly one.  Congress responded to that danger by

12  requiring that a federal court frame its orders so that those

13  who obey them will know what the court intends to require and

14  what it means to forbid.

15       The evidence today is going to show that Mr. Dondero did

16  not understand that the items that the Debtor contends violate

17  the TRO were, in fact, violations of the TRO.  Because as

18  you'll see when you look at the language of the TRO and

19  compare it to the allegations made by the Debtor, that there's

20  no violation of a clear and specific provision of the TRO.

21       Thank you.

22            THE COURT:  All right.  Thank you.

23       Mr. Morris, you may call your first witness.

24            MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

25  Mr. James Dondero.

1          THE COURT:  All right.  Mr. Dondero, could you speak

2    up and say, "Testing, one, two" so I can pick up your --

3          MR. DONDERO:  Testing, one, two.

4          THE COURT:  All right.  I hear you but I don't see

5    you yet.  Is your video turned on?

6          MR. DONDERO:  Here we go.

7          THE COURT:  Okay.  Gotcha.  Please raise your right

8    hand.

9       (The witness is sworn.)

10         THE COURT:  All right.  Thank you.

11      Mr. Morris, go ahead.

12         MR. MORRIS:  Thank you, Your Honor.

13            JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

14                       DIRECT EXAMINATION

15   BY MR. MORRIS:

16   Q   Good morning, Mr. Dondero.  You're aware, sir, are you

17   not, that Judge Jernigan entered a TRO against you on December

18   10th, correct?

19   A   Yes.

20   Q   But you never reviewed the declaration that Mr. Seery

21   filed in support of the Debtor's motion for the TRO, correct?

22   A   I don't believe so.

23   Q   You didn't even know the substance of what Mr. Seery

24   alleged in his declaration, correct?

25   A   I discussed the TRO itself and I guess, broadly, the

1  supporting documents with counsel.

2          MR. MORRIS:  Just one moment, Your Honor.

3          THE COURT:  Okay.

4      (Pause.)

5  BY MR. MORRIS:

6  Q   I'll ask the question again.  You didn't even know the

7  substance of what Mr. Seery alleged in his declaration,

8  correct?

9  A   As far as I know, it hinged on the trades in the week of

10 Thanksgiving.

11 Q   Okay.  As of the time of the preliminary -- withdrawn.  Do

12 you recall that you testified at the preliminary injunction

13 hearing on January 8th?

14 A   Yes.

15 Q   Okay.  And do you recall, as of that time, you did not

16 even know the substance of what Mr. Seery alleged in his

17 declaration?

18 A   I don't recall what I said then.

19 Q   That's because you didn't even think about the fact that

20 the Debtor was seeking a TRO against you; isn't that right?

21 A   That I don't -- what do you mean by that?

22 Q   You didn't even think about the fact that the Debtor was

23 obtaining a TRO against you when you put yourself back in

24 December; isn't that right?

25 A   When the TRO was put in, I changed my behavior materially,

1  and I -- I got enough of an understanding of it from my

2  counsel.

3            MR. MORRIS:  Move to strike, Your Honor.

4            THE COURT:  Sustained.

5  BY MR. MORRIS:

6  Q    You did not care that the Debtor was seeking a TRO against

7  you; isn't that right?

8  A    I wouldn't describe it like that, no.

9            MR. MORRIS:  Can we go to -- you know what?  Before I

10 do that, Your Honor, in order to just make this easier, I'd

11 like to move into evidence the Debtor's exhibits at one time,

12 now that we have Your Honor's ruling on the motion *in limine*.

13 The Debtor has Exhibits 1 through 37 that were lodged at

14 Adversary Proceeding Docker No. 80 on February 1st.  I guess

15 let's just do them one at a time.  And the Debtor would

16 respectfully request that those documents be admitted into

17 evidence.

18           THE COURT:  All right.  Mr. Wilson, any objection?

19 (Pause.)  You're on mute.  Mr. Wilson, you're on mute.

20           MR. WILSON:  I didn't understand the request.  Did he

21 say all of his evidence?

22           THE COURT:  Well, he's got --

23           MR. MORRIS:  We're --

24           THE COURT:  -- a couple of different batches on the

25 docket.  He's asked for 1 through 37 at Docket Entry No. 80 to

1   be admitted at this time.

2          MR. WILSON:  Okay.  I do have some objections to some

3   of those items.

4          THE COURT:  Okay.  Do you want to go through which

5   ones you want to object to?

6          MR. WILSON:  Yeah.  I would object to 3, 4, 5, 6, 16,

7   23, 29, 30, 31, 32, 33, 34, and 35.

8          THE COURT:  Well, so shall we just let you offer

9   those the old-fashioned way, Mr. Morris, as you want a witness

10  to testify about them?  Or do you have a response right now?

11  I haven't really heard the substance of the objection, but it

12  probably makes more sense to just admit what's not objected to

13  now and you can --

14         MR. MORRIS:  Yeah.  Let's start, let's start with

15  that.

16         THE COURT:  All right.

17         MR. MORRIS:  Let's start with that.

18         THE COURT:  All right.  So the Court is admitting 1,

19  2, 7 through 15, 17 through 22, 24 through 28, and then 36 and

20  37 at this time.  All right?

21     (Debtor's Exhibits 1, 2, 7 through 15, 17 through 22, 24

22  through 28, 36, and 37 are received into evidence.)

23         MR. MORRIS:  All right.  And next we have, Your

24  Honor, Exhibits 40 through 59 that can be found at Adversary

25  Proceeding Docket No. 101 that was filed on February 19th.

1        THE COURT: All right. You're offering all of those?

2        MR. MORRIS: Yes.

3        THE COURT: All right. Mr. Wilson, any objection?

4        MR. WILSON: Yes. I object to 40 through 46 and then

5    56 through 69.

6        THE COURT: All right. Well, so I will admit 47

7    through 55, and then we'll let Mr. Morris offer the others the

8    old-fashioned way if he wants to.

9      (Debtor's Exhibits 47 through 55 are received into

10   evidence.)

11       MR. MORRIS: Okay. And just to make this easy for

12   the Court, the Debtor will withdraw Exhibits 41 through 46 --

13       THE COURT: Okay.

14       MR. MORRIS: -- and 58 and 59.

15       THE COURT: All right.

16     (Debtor's Exhibits 41 through 46 and Exhibits 58 and 59

17   are withdrawn.)

18       MR. MORRIS: All right. So if we go back now,

19   Exhibit 36 is in evidence. Exhibit 36 is the transcript from

20   the preliminary injunction hearing on January 8th. And I

21   would ask Ms. Canty to put up Page 23, Lines 10 through 12.

22   BY MR. MORRIS:

23   Q   Mr. Dondero, were you asked this question and did you give

24   this answer? Actually, beginning at Line 8. Question, "You

25   didn't even know the substance of what Mr. Seery alleged in

Dondero - Direct                              35

1  his declaration at the time I deposed you on Tuesday,

2  correct?"  Answer, "Correct."

3      And that's because --

4  A    I'm sorry, what page are you on?

5  Q    Yeah, it's Page -- I apologize -- 23.

6          MR. MORRIS:  And then you can see, Your Honor, we

7  read from his deposition transcript and I ask the following

8  question and get the following answer beginning at Line 10.

9  BY MR. MORRIS:

10  Q    (reading)  Question, "Did you care that the Debtor was

11  seeking a TRO against you?"  Answer, "I didn't think about

12  it."

13      That was the testimony that you gave at your deposition

14  and that you affirmed at the hearing on January 8th.  Isn't

15  that right, Mr. Dondero?

16  A    Yes.

17  Q    Okay.

18          MR. MORRIS:  Can we take this down, please?

19  BY MR. MORRIS:

20  Q    You didn't listen to the hearing where the Court

21  considered the Debtor's motion for the TRO, correct?

22  A    Correct.

23  Q    You never read the transcript in order to understand what

24  took place in the courtroom when Judge Jernigan decided to

25  enter the TRO against you, correct?

1  A    Correct.  I relied on counsel.

2            MR. MORRIS:  I move to strike the latter portion of

3  the answer.

4            THE COURT:  Overruled.

5  BY MR. MORRIS:

6  Q    Mr. Dondero, at least as of the preliminary injunction

7  hearing on January 8th, you never bothered to read the TRO

8  that was entered against you, correct?

9  A    Again, I relied on counsel.  I don't -- I don't remember

10  exactly when I read it.  But I -- I think you're correct.

11  Q    Okay.  Let's talk about the cell phone for a bit.  How

12  long were you the CEO of Highland Capital Management?

13  A    Since 1994.

14  Q    And Highland had an employee handbook; isn't that right?

15  A    Yes.

16  Q    And they had that handbook during the period of time that

17  you were the CEO, right?

18  A    I'm not sure we had one for the first half-dozen years,

19  but more recently, for sure, we've had a handbook.

20  Q    Is it fair to say that you had the handbook for at least

21  ten years prior to the petition date?

22  A    Yes.

23  Q    Okay.  And as the CEO of Highland Capital Management, you

24  knew that the purpose of maintaining the handbook was to

25  inform Highland's employees of Highland's policies and

1  practices, correct?

2  A    Yes.

3  Q    Okay.  And you personally reviewed the handbook, right?

4  A    Once a year, in compliance training, we go over the

5  compliance manual or any major changes for about half an hour.

6  Q    Can you describe for the Court the compliance training

7  that you just referred to?

8  A    Usually, senior executives would meet with Thomas Surgent

9  for -- one-on-one for about half an hour to go over any

10  changes or anything different on the regulatory front that

11  affect the manual.

12  Q    And that included both the compliance manual and the

13  employee handbook, correct?

14  A    I -- I believe so.  Mainly the compliance manual, but --

15  yeah, I believe so.

16  Q    And you actually completed certifications on an annual

17  basis with respect to your compliance with the compliance

18  policies and the employee handbook, right?

19  A    When the meeting is concluded, yes, we sign what was gone

20  over in the meeting.  But that paper would probably explain

21  what was gone over in the meeting.  I don't remember exactly

22  what was gone over.

23  Q    Okay.  That's fair.

24          MR. MORRIS:  Can we -- let's take a look at Exhibit

25  55, if we could.  That's a copy of the employee handbook, and

1   that's been admitted into evidence.

2   BY MR. MORRIS:

3   Q   Do you recall that one of the --

4           MR. MORRIS:  If we could just go to the first page of

5   the document.  Yeah.

6   BY MR. MORRIS:

7   Q   Do you recall that one of the policies in the handbook

8   pertained to a cell phone benefit that HCMLP made available to

9   employees?

10  A   No.

11          MR. MORRIS:  Okay.  Can we go to Page 12, please?

12  Scroll down just a little bit.

13  BY MR. MORRIS:

14  Q   You see there's a cell phone benefit there?  And do you

15  recall that under the cell phone benefit employees could

16  obtain up to a hundred dollars a month towards the cost of

17  their own cell phone if they -- if they complied with the

18  policy?

19  A   Yes, I see that.

20  Q   Yeah.  And participation in the cell phone benefit, that

21  was voluntary, right?  Nobody was required to do that?

22  A   I -- I -- I don't know.

23          MR. MORRIS:  All right.  Let's go to the next page,

24  Page 13.

25  BY MR. MORRIS:

1  Q    Do you see the first sentence of the first full paragraph,

2  "Participation in this policy is entirely voluntary"?  Do you

3  see that?

4  A    Yes.

5  Q    So does that refresh your recollection that the cell phone

6  benefit policy was voluntary?

7  A    We can go through the manual.  I don't have a detailed

8  memory of the employee manual.  It says what it says.  I --

9  Q    Okay.

10  A    I don't know.

11  Q    Okay.

12       MR. MORRIS:  Let's just scroll down a little bit.

13  Right there.

14  BY MR. MORRIS:

15  Q    Do you see the paragraph beginning, Employees?

16  A    Yes.

17  Q    And about halfway through that paragraph, there's a

18  sentence that begins, "Further."  Can you just read that

19  sentence out loud?

20  A    (reading)  Further, regardless of whether employees choose

21  to participate in this policy, all email, voicemail, text

22  messages, graphics, and other electronic data composed, sent,

23  and/or received related to company business remain the

24  property of Highland.

25  Q    So that was the company's policy, correct?

Dondero - Direct                                40

1    A    Yes.

2    Q    And that was --

3    A    It appears so.

4    Q    And that was the company's policy that applied to all

5    employees, correct?

6    A    As far as I know, although didn't we just establish it's

7    voluntary, the participation, or no?

8    Q    Voluntary to participate in the -- in the cell phone

9    benefit.  But what you just read says, quote, Further,

10   regardless of whether the employees choose to participate in

11   this policy, all --

12   A    Okay.

13   Q    And then it goes on.  So will you agree with me that it

14   applies to all employees?

15   A    Yes.

16   Q    Okay.  The compliance group was responsible for making

17   sure that all of its -- all of Highland's employees were in

18   compliance with the various firm policies, correct?

19   A    Yes.

20   Q    And for a number of years prior to the petition date,

21   Thomas Surgent served as the chief compliance officer,

22   correct?

23   A    Yes.

24   Q    And I think, as you just alluded to, at least on an annual

25   basis, Mr. Surgent sat down with senior executives to go over

1    the compliance in the -- the compliance policies in the

2    employee handbook, correct?

3    A    Yes.

4    Q    And you personally participated in those meetings, right?

5    A    Yes.  And I believe I followed it to the letter.

6    Q    Okay.  And as part of the process, you certified that you

7    were in compliance with the obligations applicable as set

8    forth in the employee handbook, correct?

9    A    Yes, and I believe I have been.

10          MR. MORRIS:  Can we put up Exhibit 56, please?

11   BY MR. MORRIS:

12   Q    And is this the certification --

13          MR. MORRIS:  And we can scroll down.

14   BY MR. MORRIS:

15   Q    Again, this is the first like real document we're looking

16   at here, Mr. Dondero.  The same rule always applies:  If

17   there's anything that you think you need to see in the

18   document, just let me know.  We've taken pains to redact all

19   of your personal information.

20          MR. MORRIS:  If we go down.

21   BY MR. MORRIS:

22   Q    But this is the form that was completed for you in 2020

23   with respect --

24          MR. MORRIS:  If we go to the top.

25   BY MR. MORRIS:

Dondero - Direct                          42

1   Q    This is the Annual Certification and Conflicts of Interest

2   Disclosure in 2019.  This is the firm you were referring to

3   earlier, right?

4   A    Can you show me the part that talks about the employee

5   manual?  Because I didn't see that.

6   Q    Sure.

7           MR. MORRIS:  Let's go to the last page, please.

8   BY MR. MORRIS:

9   Q    Do you see Notes there?

10  A    Yes.

11  Q    All right.  And about five lines down -- and I'm just

12  going to read from it -- it says, quote, I have received, have

13  access to, and have a -- and have read a copy of the employee

14  handbook, and I am in compliance with the obligations

15  applicable to employees set forth therein.

16      Have I read that correctly?

17  A    Yes.

18  Q    So this is your compliance certification in which, among

19  other things, you certify that you had access to and had read

20  and were in compliance with the employee handbook, right?

21  A    Yes.

22  Q    Okay.

23  A    I believe I was, within my tenure at Highland, compliant

24  with it.

25  Q    Okay.

1              MR. MORRIS:  Can we go to Exhibit 57, please?

2     BY MR. MORRIS:

3     Q    And this is a Q3 2020 questionnaire and transaction

4     certification from you effective as of October 7th.  Do you

5     see that?

6     A    Yes.

7     Q    And is this just another periodic compliance certification

8     that Mr. Surgent and the compliance group obtained from senior

9     employees?

10    A    I'm not aware of this one.  I mean, I -- I don't remember

11    these questions being part of a --

12         (Echoing.)

13    Q    Okay.

14              MR. MORRIS:  Let's look to the bottom of the

15    document, Page 8 of 8.

16    BY MR. MORRIS:

17    Q    Again, we've tried to redact everything that's personal to

18    you, sir.  You'll see that there's another certification that

19    you had, quote, received, have access to, and are otherwise in

20    compliance with the handbook.  Do you see that?

21    A    Yes.

22    Q    And was that a true statement in October 2020?

23    A    Yes.

24    Q    Okay.

25              MR. MORRIS:  Your Honor, these two exhibits, 56 and

Dondero - Direct                          44

1   57, are two exhibits that Mr. Dondero's counsel had objected

2   to, so I move for their admission into evidence.

3           THE COURT:  All right.  Mr. Wilson, your objection?

4           MR. WILSON:  I'm sorry, Your Honor, were you asking

5   for a response from me?

6           THE COURT:  Yes.  Earlier you had objected to 56 and

7   57 --

8       (Echoing.)

9           MR. WILSON:  I'm getting a lot of feedback.  I'm

10  having trouble hearing.

11          THE COURT:  Yes.  Mr. Dondero, your past few answers

12  have had some distortion.  So I don't know if you've got

13  anyone there to kind of help you make some adjustments.  I'm

14  not sure what --

15      It's coming from Mr. Dondero, correct?

16          THE WITNESS:  I'm sorry, are you saying it's on my

17  end, the distortion?

18          THE COURT:  Yes.  Right now you're loud and clear,

19  but your -- a few answers previously, it's been distorted.

20      All right.  So let's just turn to Mr. Wilson.  You had

21  earlier objected to Exhibits 56 and 57.  They are now being

22  offered.  Do you have an objection still?

23          MR. WILSON:  Well, I do, Your Honor.  I don't believe

24  that Mr. Dondero has authenticated these exhibits.  He wasn't

25  familiar with them.  They're not signed by him.  I think that

Dondero - Direct                          45

1  -- I think they're also hearsay.

2      Without -- without more confirmation by Mr. Dondero as to

3  what's in these, that he actually made these statements and he

4  signed them, I don't think that they qualify as competent

5  evidence.

6              THE COURT:  Mr. Morris?

7              MR. MORRIS:  If I may, Your Honor.

8              THE COURT:  Uh-huh.

9              MR. MORRIS:  Number one, Mr. Dondero testified

10  unambiguously that each year he -- he completed this form.

11  Particularly as it relates to Exhibit 56, he specifically

12  acknowledged that that was the form that was prepared for him

13  at that time as of the date.

14      It is true that he did say that with respect to 57 he

15  didn't specifically recall it, but he did testify that he was

16  in compliance and that he understood and agreed with the

17  statement that's in the note itself.  And that's the only

18  reason that we're offering the document.  So, based on his

19  testimony, I'd respectfully request that both documents be

20  admitted into evidence.

21              THE COURT:  All right.  I'll overrule the objections.

22  56 and 57 are admitted.

23      (Debtor's Exhibits 56 and 57 are received into evidence.)

24              THE COURT:  All right.  Mr. Morris, --

25              MR. MORRIS:  Mr. Dondero?

Dondero - Direct                          46

1          THE COURT:  -- you may continue.

2          MR. MORRIS:  Yes.

3   BY MR. MORRIS:

4   Q   Mr. Dondero, you knew no later than July 2020 that the

5   U.C.C. wanted your text messages; isn't that right?

6   A   I heard your opening but I was not specifically aware or

7   noticed, nor did I -- nor did I believe getting a new phone

8   changed any of that.

9          MR. MORRIS:  I move to strike, Your Honor.

10          THE COURT:  Sustained.

11  BY MR. MORRIS:

12  Q   Mr. Dondero, you knew no later than July 2020 that the

13  U.C.C. wanted your text messages, correct?

14  A   No.

15  Q   In fact, this Court and all parties in interest were

16  explicitly told in July that you knew the U.C.C. wanted your

17  text messages; isn't that correct?

18  A   I was not specifically aware.

19  Q   Okay.  Do you remember last summer that the Creditors'

20  Committee made a motion to compel?

21  A   I have no recollection of that.

22  Q   Okay.

23          MR. MORRIS:  Can we put up Exhibit 34, please?

24          Okay.  Your Honor, this is a copy of the Creditors'

25  Committee Emergency Motion to Compel Production by the Debtor

Dondero - Direct                               47

1    dated -- I'm not sure of the date.

2         Can we just go up to the top?

3         Dated July 8th, 2020, that was lodged at Docket No. 808.

4    And I'd like to offer this into the record simply to establish

5    that a request was publicly made by the U.C.C. for Mr.

6    Dondero's text messages.

7              THE COURT:  All right.  Mr. Wilson, you had an

8    objection earlier.  What would you like to say?

9              MR. WILSON:  Yes.  Yes, Your Honor.  My objection is

10   just primarily relevance.  As you stated in your opening

11   remarks, the time period we're concerned with is December 10th

12   through January 7th, I believe, and the Debtor is trying to

13   use a document from July of 2020 to impute some knowledge to

14   Mr. Dondero and tie it into that time period six months later.

15   I don't believe that's proper and I would object.

16             MR. MORRIS:  If I may, Your Honor?

17             THE COURT:  You may.

18             MR. MORRIS:  This is -- this is a very simple

19   connect-the-dots.  Mr. Dondero was the CEO of Highland Capital

20   Management.  Highland Capital Management had an employee

21   handbook.  The employee handbook specifically said that text

22   messages related to the company's business were the company's

23   property.  Mr. Dondero certified in the exhibits that were

24   just admitted into evidence that he was familiar with the

25   company's employee handbook and that he was in compliance

1   thereof.

2       This document establishes that the Debtor -- that the

3   Creditors' Committee wanted Mr. Dondero's text messages.  The

4   next document that we're going to look at is from Mr.

5   Dondero's own lawyers where he acknowledges that he

6   understands that the Creditors' Committee wants his text

7   messages.  And all of that is directly relevant to why, when

8   the phone gets thrown away after the TRO is entered into, the

9   damage that is caused the Debtor.  The Debtor has lost its

10  property, in violation of 362(a)(3) of the Bankruptcy Code.

11  It's property that Mr. Dondero knew was the Debtor's property.

12  It's property that Mr. Dondero's -- at least his lawyers knew

13  the U.C.C. wanted.

14      So I'm not charging that anything that happened in July

15  2020 was a violation of the TRO.  What I am saying, though,

16  and what the evidence clearly shows, is that when that phone

17  was disposed of after the TRO was entered, it was disposed of

18  at a time when Mr. Dondero knew that these text messages were

19  the company's property and that the U.C.C. wanted them.

20          THE COURT:  All right.  I overrule the objection.  33

21  is admitted.

22      (Debtor's Exhibit 33 is received into evidence.)

23          MR. MORRIS:  Go to Paragraph 6, please, just to make

24  it clear.

25  BY MR. MORRIS:

1  Q    Okay.  In Paragraph 6 there, there is a sentence that

2  says, quote, In particular, the Committee has spent a

3  considerable amount of time attempting to obtain any

4  production of emails, chats, texts, or ESI communications from

5  the Debtor.

6       Do you see that?

7  A    Yes.

8  Q    And the U.C.C. specifically identified you as one of the

9  custodians from whom it was seeking this information.  Do you

10 recall that?

11 A    Vaguely.

12 Q    All right.  Let's just go to Paragraph 10 and Footnote 8.

13 There's a reference to nine identified custodians.  Do you see

14 Footnote 8?  You're among the custodians that the U.C.C.

15 identified as folks from whom they wanted text messages and

16 other ESI.  Right?

17 A    Yes.

18 Q    And your lawyers certainly knew that the U.C.C. wanted

19 your text messages, right?

20 A    Why didn't they just get them from the phone company?

21 Just, if they were trying that hard, why -- why did they --

22 why did they not get them from -- directly from the phone

23 company?

24            MR. MORRIS:  I move to strike, Your Honor.

25            THE COURT:  Sustained.

Dondero - Direct                              50

1  BY MR. MORRIS:

2  Q   Mr. Dondero, your lawyers knew that the U.C.C. wanted your

3  text messages.  Isn't that correct?

4  A   I don't know.

5  Q   Do you recall that your lawyers filed a response to the

6  U.C.C.'s motion?

7  A   (no immediate response)

8  Q   Do you recall that your lawyers filed a response to the

9  U.C.C.'s motion?

10 A   I -- I do not.  I hope they said, just get all the texts

11 you want from the phone company.  I hope that's what they

12 said.

13         MR. MORRIS:  Okay.  Can we put up -- I move to

14 strike, Your Honor.

15         THE COURT:  Overruled.

16         MR. MORRIS:  Can we put up Exhibit 40, please?

17 BY MR. MORRIS:

18 Q   And this document is in evidence.  Do you see that this is

19 your response or the response that was filed on your behalf?

20 A   Yes.

21         MR. MORRIS:  Can we go to Paragraph 3, please?

22 BY MR. MORRIS:

23 Q   Can you just read that paragraph out loud?

24 A   (reading)  Accordingly, the proposed protocol of the

25 Committee seeks, among other things, documents, emails, and

Dondero - Direct                                51

1   other electronically-stored information, ESI, exchanged from

2   or between nine different custodians, to include Dondero.  The

3   Committee has requested all the ESI for the nine custodians,

4   including, without limitation, email, chat, and text,

5   Bloomberg Messaging, or any other ESI attributable to the

6   custodians.

7   Q    So, on July 14th, your lawyers told the Court on your

8   behalf that it knew -- that they knew that you were on one of

9   nine custodians from whom the Committee wanted text messages.

10  Correct?

11  A    That's what it says.

12  Q    Okay.  And are you aware that the Court subsequently

13  entered an order giving the Committee the relief that it

14  sought?

15  A    Okay.  No, I'm not specifically aware.

16  Q    Okay.  Until -- until at least December 10th, the day that

17  the TRO was entered into, you had a cell phone that was bought

18  and paid for by the Debtor.  Correct?

19  A    Yes.

20  Q    And that cell phone had text messages on it.  Correct?

21  A    Yes.

22  Q    And from time to time, you use your phone to exchange text

23  messages concerning company business.  Correct?

24  A    Very rarely.  But yes.

25  Q    But you do.  Correct?

Dondero - Direct                         52

1   A    Yes.

2   Q    And in fact, in fact, we're going to look at certain text

3   messages that were sent to you or that were sent by you on

4   your new phone concerning company business.  Correct?

5   A    Yes, we will.

6   Q    And we know that the cell phone existed after the TRO was

7   entered, correct?

8   A    I don't -- maybe a day or two, but it -- it -- I don't

9   know if it's fair to say it existed.  I followed protocol.  I

10  gave my old phone to the tech group.  They got me a new phone.

11  They handled it according to the manual and the protocol.

12  When it was put back in Tara's drawer, I don't know if it had

13  any information on it at that point in time.  But, again, you

14  could have gotten all the texts you want from the phone

15  company.

16           MR. MORRIS:  I move to strike, Your Honor.

17           THE COURT:  Sustained.

18           MR. WILSON:  Your Honor, can Mr. Morris state the

19  objection that he has to that testimony?

20           MR. MORRIS:  It's not responsive to the question.

21  It's a speaking -- it's just -- it's what he wants to say.

22  I'm asking a leading question, Your Honor, that's a yes or no

23  answer, and he's giving me the answer that he wants, --

24           THE COURT:  All right.  I agree --

25           MR. MORRIS:  -- not the answer that I've asked for.

1

2            THE COURT:  I agree.  It was nonresponsive.

3            MR. MORRIS:  Your Honor, I forgot in my -- in going

4    over the exhibits.  Last night, we filed a notice of a

5    replacement of certain exhibits.  That could be found at

6    Docket No. 128.  And among the three exhibits that were

7    replaced was Exhibit 11.

8        Exhibit 11 is a copy of the TRO.  The reason that we

9    replaced it is because the version that was on Docket No. 80

10   had -- I guess there was typing along the top so you couldn't

11   see the date and time of the entry.

12       But I would ask Ms. Canty just to put up onto the screen

13   the version of Exhibit 11 that was attached to Document 128

14   last night.

15           THE COURT:  Okay.

16   BY MR. MORRIS:

17   Q   And so here, you can see -- you see this is the TRO, Mr.

18   Dondero?  We can scroll down a little bit if that's helpful.

19   All right.  This is the TRO, right?

20   A   Yep.

21   Q   And if you go to the top, you can see that it's entered on

22   December 10th at 1:31 in the afternoon.  Am I reading that

23   correctly?

24   A   Yes.

25   Q   Okay.  And later that night, you were told that your own

1  -- your old phone was in the top of Tara's desk drawer.

2  Correct?

3  A    Yes.

4  Q    Okay.

5          MR. MORRIS:  Can we just put up Exhibit 8, please?

6  BY MR. MORRIS:

7  Q    And this is the text message that Mr. Rothstein sent to

8  you on December 10th at 6:25 p.m. at night.  Right?

9  A    Yes.

10 Q    And so your phone existed after the TRO was put into

11 effect, correct?

12 A    Again, I have to answer that question by saying that the

13 process for getting a new phone started two weeks earlier.

14 The technology group, Jason and crew, could have saved or done

15 whatever with the phone, but they followed protocol and they

16 wiped the phone exactly as Thomas Surgent and the employee

17 manual says, and the phone that was put back on my desk, the

18 old phone, had nothing on it.

19          MR. MORRIS:  I move to strike, Your Honor.

20          THE COURT:  Okay.  Sustained.

21          MR. MORRIS:  It's a very simple question.

22          THE COURT:  Mr. Dondero, I'm going to --

23          MR. MORRIS:  Sir, --

24          THE COURT:  I'm going to remind you of the rules.

25 You need to give direct answers to the questions, and most of

Dondero - Direct                    55

1  these questions are yes or no answers.  And then when Mr.

2  Wilson has the chance to examine you, presumably he will ask

3  follow-up questions that allow you to give some of these

4  answers that I guess you're wanting to give.  Okay?  So

5  please, please listen carefully and just directly answer the

6  questions.

7      All right.  Mr. Morris, go ahead.

8          THE WITNESS:  I'll do the best -- Your Honor, listen,

9  I'll do the best I can.  In all due respect, I will do the

10  best I can.  But if I don't believe I can give an honest or

11  not misleading answer with a yes/no, I need to give a more

12  detailed answer or I need to say I can't answer the question

13  that you've put forward.

14          THE COURT:  Okay.  I understand why it's difficult,

15  but, again, that's why we allow direct, cross, redirect,

16  recross, because it is your own lawyer's responsibility, in

17  cooperation with you, to ask questions that allow you to give

18  the fulsome answers that you think the Court needs to hear.

19  But at this juncture, please just try to directly answer the

20  question yes or no when that's all it is aimed at asking.

21      All right, Mr. Morris.  Go ahead.

22          MR. MORRIS:  Thank you, Your Honor.

23  BY MR. MORRIS:

24  Q   On December 10th at 6:25 p.m., after the TRO was entered

25  into, Mr. Rothstein told you that your old phone was in the

1   top of Tara's desk.  Correct?

2   A    Yes.

3   Q    Okay.  And Mr. Rothstein is not going to testify in this

4   proceeding, is he?  You're not calling him to testify on your

5   behalf, right?

6   A    I don't know.

7   Q    Mr. Surgent is not being called to testify in connection

8   with this proceeding, correct?

9   A    I -- I don't -- I didn't hear him mentioned earlier.  I

10  don't think so.

11  Q    Okay.  Tara was still serving as your assistant as of

12  January 8, 2021, right?

13  A    Yes.

14  Q    So it's fair to say that you were informed on December

15  10th that the phone, the old phone, was not thrown in the

16  garbage, had not been disposed of, but was instead sitting in

17  Tara's desk.  Correct?

18  A    Yes.

19  Q    And it's also fair to say that, as of December 10th, Mr.

20  Rothstein didn't take it upon himself to throw your old cell

21  phone away.  Correct?

22  A    I don't know.

23  Q    So it's fair to say that you were informed on December

24  10th that the phone was not thrown in the garbage --

25  withdrawn.  It's also fair to say that, as of December 10th,

Dondero - Direct                           57

1   Mr. Rothstein didn't take it upon himself to throw your old

2   phone in the garbage.  Right?

3   A    I don't know what happened to the phone.  I don't know

4   what Jason did or did not do.

5         MR. MORRIS:  Can we pull up Page 61 from the

6   transcript of the preliminary injunction proceeding?  And if

7   we can go down to Line 20 to 23?

8   BY MR. MORRIS:

9   Q    Were you asked this question and did you give this answer:

10  "And it's also fair to say that, as of December 10th, Mr.

11  Rothstein didn't take it upon himself to throw your old phone

12  in the garbage, right?"  Answer, "Not as that moment, but like

13  I said, I can find out how it was disposed of."

14        Did you give that answer to that question at that time?

15  A    Yes.

16  Q    Okay.  But you don't know who threw your phone away,

17  right?

18  A    No.

19  Q    It never occurred to you to get the Debtor's consent

20  before the phone was thrown away, correct?

21  A    I -- everything I did with regard to the phone was with

22  the Debtor's consent and process.  If that answers your

23  question.

24  Q    Sir, you never -- you never asked the Debtor for

25  permission to throw your phone away, did you?

Dondero - Direct                              58

1  A    I -- I didn't have to because I handled it according to

2  the employee manual by giving it to the tech group.

3  Q    Does the employee manual tell you that you're allowed to

4  throw away a phone with the Debtor's property on it when a

5  party to a litigation has asked for the text messages?

6  A    There were no text messages on the phone by that point in

7  time.

8  Q    So, so you -- so you allowed the text messages to be

9  erased, even though your lawyers told the Court that the --

10  that they understood that the U.C.C. wanted your text

11  messages, and in fact, the Court entered an order in order to

12  get those text messages?

13  A    No, that is not correct.  I gave it to the tech group,

14  which was part of the Debtor, and they handled it in any which

15  way they could have, but in compliance with the manual.  And

16  they wiped the old phone as they got me a new phone.  And the

17  Debtor at that point in time could have downloaded, copied, or

18  got from the phone company whatever text messages they wanted.

19  Q    But Mr. Seery didn't even know you were doing this; isn't

20  that right?

21  A    I have no idea.

22  Q    You have no reason to believe that Mr. Seery had any

23  knowledge that you were trading out your phone, correct?

24  A    I believe he knew because he had told all employees to get

25  new phones within the next 30 days.  So it wasn't -- it wasn't

Dondero - Direct                                59

1    a surprise, I don't think, to him or anybody else.  And I

2    don't under -- this -- I don't understand the brouhaha over

3    what's really nonsense.

4    Q    Do you think it's nonsense that text messages that are the

5    company's property were disposed of even though they were

6    specifically requested by the U.C.C. and ordered by the Court

7    to be produced?  That's what you describe as nonsense?

8    A    I describe it as nonsense when everybody was told to get

9    new phones and everybody got new phones and everybody went

10   through the protocol of giving them to the tech group.  The

11   tech group ordered the new phones, got rid of the old phones

12   to protect client data, et cetera, like they've always done.

13   And the Debtor could have made as much copies of anything,

14   knowing that everybody had to get new phones because they were

15   canceling everybody's cell phone in the next 30 days.  The

16   Debtor could have done whatever it wanted with the material.

17   And just because the tech group went through the normal

18   historic process, you're trying to hold me and other people on

19   that list somehow accountable, and it's craziness.

20   Q    Okay.  It never occurred to you to get the Debtor's

21   consent before you did this, right?

22   A    By not doing it on my own, by not ordering my own phone, I

23   didn't think it was necessary to get Debtor consent because I

24   gave the phone to the Debtor as part of getting a new phone.

25          MR. MORRIS:  Can we get Exhibit -- go to Page 58,

Dondero - Direct                          60

1  please, Line 15?

2  BY MR. MORRIS:

3  Q   Were you asked this question and did you give this answer?

4        MR. MORRIS:  If we can scroll down to Line 15.

5  BY MR. MORRIS:

6  Q   Question, "Did it ever occur to you to get the Debtor's

7  consent before doing this?"  Answer, "No."

8      Did you give that testimony, sir?

9  A   Yes.  Because I gave the Debtor my phone.  When I got a

10 new phone, I gave them my old phone.  The Debtor wiped the

11 phone and gave it back to me.

12       THE COURT:  Is it --

13       MR. MORRIS:  I move to strike every -- after -- after

14 he confirms that he gave that answer to his prior testimony.

15       THE COURT:  Sustained.

16       MR. MORRIS:  Sir, --

17       MR. WILSON:  Your Honor, I'll object that Mr. Morris

18 has asked and answered these questions several times.  At this

19 point, he's badgering the witness.

20       THE COURT:  Overruled.

21 BY MR. MORRIS:

22 Q   Sir, you had the billing changed from the company account

23 to your personal account, correct?

24 A   As did everybody, at the direction of Seery.

25 Q   Sir, you had your account changed; isn't that correct?

Dondero - Direct                            61

1   A    I -- I handled my personal -- or, I had my assistant

2   handle my own personal phone based on the notice that Seery

3   had given everybody.

4   Q    Do you have a copy of that notice?  Are we going to have

5   that in evidence today?

6   A    I don't think Seery would deny it.  He's not -- hasn't --

7   well, whatever.  No, I don't have a -- I don't have a copy of

8   a memo.

9   Q    So you're telling me that Mr. Seery gave an instruction

10  for everybody to throw the cell phones away that had been

11  asked for by the U.C.C., and he didn't even do that in

12  writing?  That's your testimony, is that -- is that he gave

13  that instruction to throw cell phones away that had been

14  specifically requested by the U.C.C., and he didn't even do

15  that in writing?

16         MR. WILSON:  Objection, Your Honor.  Mr. Morris is

17  mischaracterizing the testimony.

18         THE WITNESS:  He's -- he's horribly mischaracterizing

19  it.

20         THE COURT:  Okay.

21         THE WITNESS:  I'm saying he told everybody and he

22  stopped paying everybody's cell phone bill at the end of

23  January and he told everybody to get new phones.  And to be as

24  compliant as possible, I gave it to the Debtor's employees to

25  handle buying a new phone and handling the old phone according

1  to the manual and whatever else the Debtor needed to do with

2  the phone.

3           THE COURT:  Okay.  Let's try to --

4           THE WITNESS:  So the Debtor --

5           THE COURT:  -- get back on track.

6           THE WITNESS:  -- wiped the phone.

7           THE COURT:  Let's try to get back on track --

8           MR. MORRIS:  So, so you --

9           THE COURT:  -- with the instruction --

10          MR. MORRIS:  Go ahead.

11          THE COURT:  -- of giving yes and no answers.  Again,

12  Mr. Wilson is going to get all the time he needs to follow up

13  with his own questions.  All right?

14      Go ahead, Mr. Morris.

15          MR. MORRIS:  Sir, -- thank you, Your Honor.

16  BY MR. MORRIS:

17  Q   Sir, you never asked the Debtor for permission to change

18  the phone from its account to your personal account.  Correct?

19  A   As I've stated, I gave the Debtor my phone.  No, I did not

20  ask specific permission.  That would be ridiculously

21  redundant.

22          MR. MORRIS:  I move to strike, Your Honor.  It's a

23  really simple question.  Either he -- either he -- either he

24  asked for permission or he did not.  The commentary really

25  needs to stop.

1           THE COURT:  Sustained.

2       Yes or no?  Permission or not?

3   BY MR. MORRIS:

4   Q   I'll ask the question again.  Sir, you never asked the

5   Debtor for permission to change the phone from its account to

6   your personal account, correct?

7   A   I believe I implicitly did by giving them the phone, so

8   I'm going to say yes.

9           MR. MORRIS:  Go to Page 59, please, Line -- Line 11.

10  BY MR. MORRIS:

11  Q   Were you asked this question and did you give this answer?

12  Question, "And you never asked the Debtor for permission to do

13  that.  Correct?"  Answer, "No."

14      Did you give that testimony on January 8th?

15  A   Yes.  But I'd like to correct it as I just said.

16  Q   Sir, you never even told the Debtor you were doing what

17  you did.  You never even told the Debtor that you were

18  changing, let alone -- withdrawn.  Not only didn't you obtain

19  their consent, you never told the Debtor that you were

20  changing the account from its account to your personal

21  account.  Correct?

22  A   We were required to move our phones, so no, I didn't tell

23  them that we were honoring their request.

24  Q   This notion of being required to do that, did your lawyers

25  mention that in their papers in opposition to this motion

Dondero - Direct                    64

1    today, that Mr. Seery had required all of this?  Do you recall

2    reading the papers?  Is there anything in there about that?

3    A    It's the truth.  I -- I don't -- in the papers.  I don't

4    know.

5    Q    Okay.  Let's look at Line 14, since it's just still on the

6    screen, and I'll ask it again.  Were you asked this question

7    and did you give this answer?  "You never told the Debtor you

8    were doing that.  Correct?"  Answer, "No."

9         Was that the testimony you gave then?

10   A    Again, yes, but I'd like to --

11   Q    Okay.

12   A    -- clarify with what I just said.

13   Q    And you never told Mr. Seery or anybody at my firm that

14   the phone was being thrown in the garbage, correct?

15   A    They knew what the protocol was.  You knew what the

16   protocol was.  I didn't think there was a reason to.

17   Q    Sir, you never told anybody at my firm or Mr. Seery that

18   you were throwing -- that the phone was being thrown in the

19   garbage, correct?

20   A    No, I did not.

21   Q    Okay.  That's all I'm asking.  You didn't believe it was

22   necessary to give the Debtor notice that you were taking the

23   phone number for your own personal account and throwing the

24   phone in the garbage, correct?

25   A    I'm sorry.  Can you repeat that question?

Dondero - Direct                          65

1   Q    You didn't believe it was necessary to give the Debtor

2   notice that you were taking the phone number for your own

3   personal account and throwing the phone in the garbage.

4   Correct?

5   A    I didn't think -- correct.  I didn't think I needed to do

6   anything other than what I did.

7          MR. MORRIS:  I move to strike after the word

8   "Correct," Your Honor.

9          THE COURT:  Overruled.

10  BY MR. MORRIS:

11  Q    Do you remember, a couple of weeks after Mr. Rothstein

12  told you that your own -- old phone was in Tara's drawer, that

13  the Debtor sent a letter to your lawyers in which it gave

14  notice to you to vacate the offices and return its cell phone?

15  A    I believe, yeah, I believe that was the end of December.

16         MR. MORRIS:  Can we look at that document, please?

17  It's Exhibit 27.

18      This document is in evidence, Your Honor.

19      And if we can go to the bottom of the second page.

20  BY MR. MORRIS:

21  Q    This is a letter from my firm to your lawyers, right?

22  A    Yes.

23  Q    You want to read the first sentence of that last paragraph

24  out loud?  "HCMLP."

25  A    (reading)  HCMLP will also terminate Mr. Dondero's cell

1   phone plan and those cell phone plans associated with parties

2   providing personal services to Mr. Dondero -- collectively,

3   the cell phones.  HCMLP demands that Mr. Dondero immediately

4   turn over the cell phones to HCMLP by delivering them to you.

5   We can make arrangements to recover the phones from you at a

6   later date.

7            MR. MORRIS:  Okay.  Can we just scroll back --

8            MR. WILSON:  Your Honor?

9            MR. MORRIS:  -- to see the

10           MR. WILSON:  Can I -- can I make a request that the

11   rule of optional completeness be invoked and the date of the

12   letter be shown?

13           MR. MORRIS:  Yeah.  I was just about to get there,

14   sir.  I join.

15           THE COURT:  All right.  Fair enough.

16           MR. MORRIS:  It's December 23rd.

17   BY MR. MORRIS:

18   Q    Do you see that, sir?

19   A    Yes.

20   Q    So, if we can go back to what you just read down at the

21   bottom there.  So, on December 23rd, my firm, on behalf of the

22   Debtor, is informing your lawyers that it will terminate your

23   cell phone plan.  Isn't that right?

24   A    Yes.

25   Q    Can you think of any reason why they would be informing

Dondero - Direct                              67

1    your lawyers of that on December 23rd if they had already told

2    you that?

3            MR. WILSON:  Objection, Your Honor.  He has no

4    knowledge of what the Debtor's lawyers were thinking when they

5    wrote this letter.

6            THE COURT:  Overruled.  He can answer if he has an

7    answer.

8            THE WITNESS:  I have -- I have no idea.

9    BY MR. MORRIS:

10   Q    Okay.  But it's true that, on December 23rd, my firm, on

11   behalf of the Debtor, informed your lawyer of its intent to

12   terminate the phone plan of which you were a part.  Correct?

13   A    Again, no.  I believe the notice happened much sooner, and

14   that's why a whole bunch of people changed their phones at or

15   around the time I did.

16   Q    Who else had phones that were paid for by the Debtor?

17   A    I believe a significant majority of the firm.

18   Q    Isn't it true that only you and Mr. Ellington had phones

19   that were paid for by the Debtor?  I'm not talking about the

20   $100 policy that we looked at before.  But isn't it true that

21   you and Scott Ellington were the only people in the whole firm

22   who had phones that were paid for by the Debtor?

23   A    I did not know that.

24   Q    Okay.  All right.  So do you see later on in that

25   paragraph, at the top of Page 3 -- I'll just read it.  Quote,

Dondero - Direct                                    68

1  HCMLP further demands --

2          MR. MORRIS:  Oh, no.  I'm sorry.  Can we go back up a

3  little bit?  I'm having trouble.  Yeah.  Right there.

4  BY MR. MORRIS:

5  Q   (reading)  The cell phones and the accounts are property

6  of HCMLP.  HCMLP further demands that Mr. Dondero refrain from

7  deleting or wiping any information or messages on the cell

8  phone.  HCMLP, as the owner of the account and the cell

9  phones, intends to recover all information relating to the

10 cell phones and the accounts and reserves the right to use the

11 business-related information.

12         Have I read that correctly?

13 A    Yes.

14 Q   And that's what your -- that's what -- that's what the

15 Debtor told your lawyers on December 23rd.  Correct?

16 A    Yes.

17 Q   But the Debtor was a couple of weeks too late in making

18 these demands.  Correct?

19 A   Because the Debtor wiped my phone.  I never wiped my

20 phone.

21 Q   Sir, the Debtor was a couple of weeks too late in making

22 these demands.  Correct?

23 A    No.

24         MR. MORRIS:  Page 65 of the transcript, please.  Line

25 4 through 5.

Dondero - Direct                                    69

1   BY MR. MORRIS:

2   Q   (reading)  "We were a couple of weeks too late, huh?"

3   Answer, "It sounds like it."

4       Did you give that answer back on January 8th?

5   A   Yes.

6   Q   And that's because the phones were already in the garbage.

7   Correct?

8   A   No, it -- the phones were already wiped by the Debtor's

9   personnel.

10  Q   Look at Line 6 and Line -- through Line 8 and see if you

11  gave this testimony on January 8th.  Question, "Because the

12  phones were already in the garbage; isn't that right?"

13  Answer, "Yes."

14      Did you give that answer back on January 8th?

15  A   Yes.

16  Q   And that's not -- but that's not what Mr. Lynn told the

17  Debtor in response to the Debtor's letter of January 20 --

18  December 23rd.  Correct?

19  A   I don't know.

20  Q   Well, let's see.

21          MR. MORRIS:  Can we go to Exhibit 22, please?

22  BY MR. MORRIS:

23  Q   This is your lawyer's response to the December 23rd letter

24  that we just saw.  Do you see that?

25  A   Yep.

Dondero - Direct                           70

1  Q    Mr. Lynn doesn't say anything about the cell phone being

2  thrown in the garbage, right?

3  A    He doesn't know what happened to the phone.  Neither do I.

4  Q    Sir, Mr. Lynn doesn't say anything about the cell phone

5  being thrown in the garbage, does he?

6  A    No.

7  Q    And Mr. Lynn doesn't say that the phone was disposed of,

8  correct?

9  A    (no immediate response)

10 Q    Mr. Lynn didn't say that the phone was disposed of, did

11 he?

12 A    No, I don't see it in that paragraph.

13 Q    Okay.  Mr. Lynn didn't describe any company or policy

14 whereby old cell phones are to be thrown in the garbage or

15 otherwise disposed of, correct?

16 A    I don't know if he would have awareness of that, but no,

17 he doesn't mention it.

18 Q    Mr. Lynn doesn't cite to anything Mr. Seery said with

19 respect to the wiping of phones, right?

20 A    No.

21 Q    Mr. Seery -- Mr. Lynn doesn't reference Mr. Seery at all

22 in this letter response to my colleague, correct?

23 A    Nope.

24 Q    He doesn't cite to any policy in the employee handbook to

25 justify the loss of the cell phone, correct?

1    A    No.

2    Q    And you have no reason to believe that Mr. Lynn would

3    withhold from the Debtor the information that the cell phone

4    had been thrown in the garbage consistent with company

5    practice, correct?

6    A    No.

7    Q    Let's talk about the trespass issue for a moment.  Where

8    are the Debtor's offices located, to the best of your

9    knowledge?

10   A    300 Crescent Court, Suite 700.

11   Q    And how long have they --

12   A    Dallas, Texas.

13   Q    And they're a tenant in that space; is that correct?

14   A    Yes.

15   Q    And they're a tenant pursuant to a lease; is that right?

16   A    Yes.

17   Q    And to the best of your knowledge, Suite 300, the Debtor

18   is the sole tenant under the lease for that space.  Correct?

19   A    I -- yeah, I bel... I don't know.  I -- the building has

20   rules for subleases.  I don't know if it -- affiliates are on

21   the lease or not.  I -- I don't -- I don't have an awareness

22   of the lease.

23   Q    So, but you don't have any reason to believe that

24   anybody's on the lease other than the Debtor.  Is that fair?

25   A    I -- I just don't know.  But it -- I don't -- when it

1  started, when the lease started ten years ago or eight and a

2  half years ago, I'm sure it had just Highland, but I don't

3  know who's on it now.

4  Q   Okay.  Okay.  To the best -- you understand the Debtor is

5  subject to the bankruptcy court's jurisdiction, correct?

6  A   Yes.

7  Q   And in that December 23rd letter that we just looked at,

8  the Debtor demanded that you vacate their offices.  Correct?

9  A   Yes.

10        MR. MORRIS:  Okay.  Let's just look at a little bit

11  of that letter, if we can call back Exhibit 27, please.

12  BY MR. MORRIS:

13  Q   On the second page, do you see that there's a statement,

14  the paragraph beginning, "As a consequence."  That's the

15  paragraph where the Debtor informed your lawyers that your

16  access, quote, will be revoked effective Wednesday, December

17  30, 2020.  Do you see that?

18  A   Yes.

19  Q   And the Debtor informed your lawyers that it was taking

20  steps to revoke your access to the offices because the Debtor

21  believed that you were interfering with the Debtor's business.

22  Right?

23  A   It doesn't say that here, but --

24  Q   Well, look at the paragraph above, if we can.  And I don't

25  mean to -- I don't mean to, you know, play games, but the

Dondero - Direct                          73

1  paragraph above says specifically that, as a result of the

2  conduct, your presence at the offices is being revoked because

3  it's too disruptive to continued management.  Do you see that?

4  A   Yes.

5  Q   So I'm not asking you if you agree with it, but there's no

6  question that, on December 23rd, the Debtor told your lawyers

7  that your access was being revoked as of December 30th because

8  the Debtor believed that you were being a disruptive force in

9  the offices.  Right?

10 A   Yes.

11 Q   Okay.

12         MR. MORRIS:  And if we can go to the last page,

13 please.  If we could just push it down a little bit, because I

14 have this in the upper right corner.  No, the other way.  I'm

15 sorry.  Yeah.  Right there.

16 BY MR. MORRIS:

17 Q   And the Debtor told your lawyers, quote, any attempt by

18 Mr. Dondero to enter the office, regardless of whether he is

19 entering on his own or as a guest, will be viewed as an act of

20 trespass.  Do you see that?

21 A   Yes.

22 Q   So the Debtor's position was very, very, very clear to

23 your lawyers as of January -- as of December 23rd.  Is that

24 fair?

25 A   No.

Dondero - Direct                              74

1  Q   The Debtor never -- no, you think -- is it -- are you

2  aware of any exception that Debtor made in this letter that

3  would allow you entry into the offices without protest by the

4  Debtor?

5  A   As I've stated before, my belief was, for the deposition

6  on the 4th, I had no other way to electronically appear, I

7  would have had to cancel, other than coming back to the main

8  conference room at Highland.  It looks like there's four days'

9  difference, but with New Year's and the holiday and days off,

10 there's really one business day difference between when I got

11 kicked out and the deposition.  I wouldn't have been able to

12 attend the deposition otherwise if -- I didn't -- I still

13 don't believe attending the deposition that you required was a

14 trespass.

15 Q   The Debtor never told you that you would be permitted to

16 enter their offices after December 30th if you, in your own

17 personal discretion, believed it was appropriate.  Correct?

18       MR. WILSON:  Objection, Your Honor.  I'm going to

19 object to this line of questioning because this doesn't have

20 anything to do with the TRO and instead it's a letter dated

21 December 23rd, 2020 from the Debtor's counsel.

22       THE COURT:  Your response?

23       MR. MORRIS:  Yeah.  This is just so simple, Your

24 Honor.  The TRO prevents Mr. Dondero from violating the

25 automatic stay.  The automatic stay says that Mr. Dondero

1  cannot take any steps to control the Debtor's property.

2      The evidence is now in the record that the Debtor is a

3  lease -- is the leaseholder on this space.  The Debtor told

4  Mr. Dondero not to enter the space because he was a disruptive

5  force, and the Debtor told Mr. Dondero that if he attempted to

6  enter the space for any purpose, that they would be viewing it

7  as an act of trespass.

8      So, by entering into the Debtor's premises, by entering

9  into the Debtor's property without the Debtor's consent, is a

10 violation of the automatic stay.

11     As I said at the beginning of this, if this were the only

12 thing, Your Honor, I probably wouldn't belabor the point.  But

13 it's -- it is just more evidence of his complete contempt for

14 the Debtor and for the automatic stay and for the TRO.  And I

15 believe it's completely relevant.

16         THE COURT:  All right.  I'm going to --

17         MR. WILSON:  Your Honor, my response to that is that

18 he's now got the TRO and trying to invoke two different

19 documents, one of which being 362 itself and the other being

20 this letter, but Rule 65(d) states that a restraining order

21 must describe in reasonable detail, and not by referring to

22 the complaint or other document, the act or acts restrained or

23 required.

24         THE COURT:  Okay.  I'm going to sustain the

25 objection.  Let's move on.

Dondero - Direct                          76

1          MR. MORRIS:  Okay.

2     BY MR. MORRIS:

3     Q    During the first week of January, you just walked right

4     into the Debtor's office and sat for the deposition.  Correct?

5     A    Yes.

6     Q    And you didn't have the Debtor's approval to enter their

7     offices at any time in the year 2021.  Correct?

8     A    Not explicitly.

9     Q    You didn't have the Debtor's approval to enter their

10    offices to give a deposition.  Correct?

11    A    Not explicitly.  Correct.

12    Q    Now, --

13         MR. WILSON:  Your Honor, I believe you sustained my

14    objection, and I would renew it to the extent that Mr. Morris

15    is trying to establish that entering the Debtor's property on

16    January 4th was a violation of the temporary restraining

17    order.

18         THE COURT:  All right.  Well, I think we have a

19    legitimate issue whether the so-called trespass, the entry of

20    Mr. Dondero onto the premises in early January, violated the

21    explicit terms of the TRO, so I'm going to sustain the

22    objection, and move on, please.

23         MR. MORRIS:  Okay.

24    BY MR. MORRIS:

25    Q    Mr. Dondero, in December, after the TRO was entered into,

1  you interfered with the Debtor's business, correct?

2  A    No, I did not.

3  Q    Well, one of the reasons that the Debtor evicted you is

4  precisely because you were interfering with their business.

5  Correct?

6  A    No, I did not.

7              MR. MORRIS:  Can we go back to Exhibit 27, please?

8  BY MR. MORRIS:

9  Q    Do you see on the first page, at the bottom, there is an

10  explanation about the Debtor's management of the CLOs?

11  A    Yes.

12  Q    And there's a recitation of the history where, around

13  Thanksgiving, you intervened to block those trades?

14  A    Yes.

15  Q    And if we can continue, the next paragraph refers to a

16  prior motion that was brought by K&L Gates on behalf of the

17  Advisors and certain funds managed by the Advisors?

18              MR. MORRIS:  If we keep going.  Yeah.

19              THE WITNESS:  Yes.

20  BY MR. MORRIS:

21  Q    You were aware of that motion when it was filed, correct?

22  A    Yes.

23  Q    And you were -- you were supportive of making that motion.

24  Right?

25  A    Yes.  Generally.

1  Q    Okay.

2          MR. MORRIS:  And just scroll down, down to the next

3  paragraph.

4  BY MR. MORRIS:

5  Q    The next paragraph says, quote, on December 22, 2020,

6  employees of NPA and HCMFA.

7          MR. MORRIS:  I'm sorry.  I can't read it.  If we can

8  just push the language down.  Let me try again.

9  BY MR. MORRIS:

10 Q    (reading)  On December 22, 2020, employees of NPA and

11 HCMFA notified the Debtor that they would not settle the CLOs'

12 sale of AVYA and SKY securities.  Have I read that correctly?

13 A    Yes.

14 Q    NPA refers to NexPoint, right?

15 A    Yes.

16 Q    That's an entity that you largely own and control,

17 correct?

18 A    Yes.

19 Q    And HCMFA refers to Fund Advisors, another advisory firm

20 that you own and control.  Correct?

21 A    Yes.

22 Q    On or about December 22, 2020, you personally instructed

23 employees of the Advisors not to execute trades that Mr. Seery

24 had authorized with respect to SKY and AVYA, correct?

25 A    No.  That's absolutely not true.  I've corrected that

Dondero - Direct                                79

1  several times now.

2  Q    Sir, you personally instructed employees of the Advisors

3  not to execute the very trades that Mr. Seery wanted executed.

4  Correct?

5  A    Not on December 22nd.  The week before Thanksgiving, yes.

6  I respected the -- I respected the TRO and the week of

7  Christmas trades that also gave a multimillion dollar loss to

8  the Funds.  I just asked Jason Post to look at the trades.

9        MR. MORRIS:  Can we go to Page 76 of the transcript,

10  please?  Line 15 through Line 19.

11  BY MR. MORRIS:

12  Q    Did you give this answer to this question?  Question, "And

13  you would agree with me, would you not, that you personally

14  instructed the employees of the Advisors not to execute the

15  very trades that Mr. Seery identifies in this email, correct?"

16  Answer, "Yes."

17        Is that the answer you gave back on January 8th?

18  A    I have corrected this half a dozen times.

19  Q    Okay.  When you said you corrected it, let me ask you

20  this, is that because instead of saying that the letter

21  shouldn't have referred to the refusal to settle trades, that

22  -- that it would be more appropriate that you instructed

23  Advisors' employees not to execute the trades?

24  A    No, that is not correct.

25        MR. MORRIS:  Can we go to Page 73, please?

1   BY MR. MORRIS:

2   Q    Were you asked these questions and did you give these

3   answers?  Question, "And you personally instructed, on or

4   about December 22, 2020, employees of the Advisors to stop

5   doing the trades that Mr. Seery had authorized with respect to

6   SKY and AVYA.  Right?"  Answer, "Yeah.  Maybe we're splitting

7   hairs here, but I instructed them not to trade them.  I never

8   gave instructions to settle trades that occurred, but that's a

9   different ball of wax."  "Okay."  Question, "But you did

10  instruct them not to execute trades that had not yet been

11  made.  Right?"  Answer, "Yeah.  Trades that I thought were

12  inappropriate for no business purpose, I -- I told them not to

13  execute."

14      Was that truthful testimony at the time you gave it?

15  A    No.  It's -- this is part of the -- this is part of the

16  clarification from 6 or 8 lines ago or 10 or 15 lines ago.

17  It's all the same.  I was in a truly emotional disapproving

18  state during this part of the deposition.  I believed it was

19  against the Advisers' Act and Seery was intentionally causing

20  harm to the CLOs.  And I stopped the trades around

21  Thanksgiving.  I called the traders.  I specifically stopped

22  them.

23      Once the TRO was in effect, I respected the TRO.  I

24  respected the Court.  I did not call anybody.  There's no

25  evidence of me calling anybody.  No one said I called anybody.

1   I just sent one email to Jason Post, a non-Highland employee,

2   that he should look at the trades.  And all this gobbledygook

3   is -- is  -- for the last 10 or 15 lines is the same question

4   that I've clarified half a dozen times.

5   Q   Okay.  That's fine.  Let's talk about some of your

6   communications with the Debtor's employees.

7           MR. MORRIS:  I apologize.  Before I -- I'm going to

8   move to the next and last topic, Your Honor, but this will be

9   a little bit -- while longer, and I just wanted to check and

10  make sure, I don't know if the Court wanted to take a short

11  break.  I'm okay.  Or if the witness did.  We've been going

12  for a while.

13          THE COURT:  All right.  Let's take a ten-minute

14  break.  It's 11:40 Central time.  We'll come back at 11:50.

15          MR. MORRIS:  Okay.  Thank you, Your Honor.

16          THE CLERK:  All rise.

17      (A recess ensued from 11:40 a.m. until 11:52 a.m.)

18          THE CLERK:  All rise.

19          THE COURT:  Please be seated.  All right.  We are

20  going back on the record in the Highland matter.

21      Mr. Morris, are you ready?

22          MR. MORRIS:  I am, Your Honor.

23          THE COURT:  All right.  Mr. Dondero, are you ready to

24  go forward?  (No response.)  Mr. Dondero, are you there?

25          MR. WILSON:  Mr. Dondero will be on his line

Dondero - Direct                    82

1   momentarily.  He's attending from a different room so we don't

2   have feedback issues.

3           THE COURT:  All right.

4       (Pause.)

5           THE COURT:  All right.  Are we almost ready, Mr.

6   Wilson?  You're on mute.

7           MR. WILSON:  I believe so, Your Honor.  He -- he

8   walked out of our room right before you came on and said he

9   was going to run to the restroom and go back to his room.  So

10  I think it should just be a second.

11      (Pause.)

12          THE WITNESS:  I'm back.

13          THE COURT:  All right.  Mr. Dondero, you're still

14  under oath.

15      Mr. Morris, you may proceed.  (Pause.)  Mr. Morris, now

16  you're on mute.

17          MR. MORRIS:  Thanks for letting me know.

18                  DIRECT EXAMINATION, RESUMED

19  BY MR. MORRIS:

20  Q   Mr. Dondero, you understand that the TRO prevented you

21  from communicating with any of the Debtor's employees except

22  as it specifically related to shared services to affiliates

23  owned or controlled by you.  Correct?

24  A   Well, shared services broadly, as I would -- I would

25  describe it.  And -- yes.  But -- but the -- the proposal for

1    quite a while, for months, was shared services partly to

2    affiliates but partly to a new entity also.

3              MR. MORRIS:  Okay.  Can we pull up Exhibit 11,

4    please, from the Docket No. 128?  And if we can go to Page --

5    the bottom of Page 2, just to make sure that we're on the same

6    point here.

7    BY MR. MORRIS:

8    Q    Paragraph 2 says, James Dondero is temporarily enjoined

9    and refrained from, little (c) at the bottom, communicating

10   with any of the Debtor's employees except as it specifically

11   relates to shared services currently provided to affiliates

12   owned or controlled by Mr. Dondero.

13        Do you see that?

14   A    Okay.  That's correct as far as it goes, but yes.

15   Q    Okay.  And there's nothing ambiguous to you about the

16   language that's in the order, correct?

17   A    That's correct.  That -- yes.

18   Q    And you personally don't have a shared services agreement

19   with the Debtor, do you?

20   A    Not at this -- no -- with the Debtor.  No, I don't.  Not

21   with the Debtor.

22   Q    Okay.

23   A    No.

24   Q    And the Bonds Ellis firm only represents you in your

25   individual capacity in the bankruptcy case, right?

1  A    Yes.

2  Q    The Bonds Ellis firm doesn't represent any entity that is

3  owned or controlled by you.  Right?

4  A    Correct.

5  Q    So the Bonds Ellis firm doesn't represent any entity owned

6  or controlled by you that's party to a shared services

7  agreement with the Debtor.  Correct?

8  A    I believe that's correct.

9  Q    Okay.  And Douglas Draper is a lawyer who represents the

10 Get Good and Dugaboy Investment Trusts.  Right?

11 A    Yes.

12 Q    And you're a lifetime beneficiary of each of those trusts,

13 correct?

14 A    For Dugaboy, yes.  For Get Good, I'm not sure.

15 Q    Okay.  To the best of your knowledge, neither the Get Good

16 nor the Dugaboy Investment Trust ever had a shared services

17 agreement with the Debtor, correct?

18 A    No.  They didn't have a formal agreement.

19 Q    Okay.  And Scott Ellington is not your personal lawyer.

20 Is that right?

21 A    Not in this bankruptcy.

22 Q    Okay.  He was not your personal lawyer in December 2020,

23 correct?

24 A    No.

25 Q    He never represented you personally.  Scott Ellington, as

1   a human being, never represented Jim Dondero as a human being

2   at any time after the petition date.  Fair?

3   A    I don't know how to answer that with regard to settlement

4   counsel.  I -- in his role as settlement counsel, I'm not a

5   lawyer, who does he work for when he's been tasked with being

6   settlement counsel and he can talk to all parties on behalf of

7   all parties in order to get a deal done?  I don't know -- I

8   don't know how to describe that role.

9   Q    To the best of your knowledge, has Mr. Ellington ever been

10  employed by anybody after the petition date other than the

11  Debtor?

12  A    I don't believe so.

13  Q    Did you ever retain Mr. Ellington to represent you?

14  A    Not -- not formally, but in his role as settlement

15  counsel, I believe he was in some ways trying to represent all

16  parties to try and kick a deal to the altar, so to speak.

17  Q    Did he owe you a duty?

18  A    I don't think in a classic -- I don't -- that -- I don't

19  know.  That's a legal -- I don't want to make a legal

20  interpretation.

21  Q    You've represented -- you've retained and engaged lots of

22  lawyers and law firms over time.  Is that fair?

23  A    Yes.

24  Q    Did you engage or retain Mr. Ellington at any time after

25  the petition date?

1  A    Well, I mean, very recently, he's heading up our shared

2  services group or our shared services entity.  But again, I

3  don't know how to answer.  The role of settlement counsel was

4  an in-between role that I don't think it was documented

5  formally, so I don't know how to -- I don't know how to answer

6  that.

7  Q    When did -- have you -- has Mr. Ellington been hired by

8  you or any company you own or control since the time that he

9  was terminated in early January?

10 A    No.  But he's the owner of the entity that houses a lot of

11 the employees that migrated over.

12 Q    Okay.  So I want to -- I want to try to clear this up.

13 I'm not asking you about settlement counsel.  It's a very,

14 very specific question.  Did James Dondero ever retain or

15 engage Scott Ellington to represent him?  Did you ever engage

16 or retain Scott Ellington for the purpose of providing legal

17 advice to you?

18 A    And that's the question I'm struggling with, because I

19 believe, as settlement counsel, he was representing -- trying

20 to represent multiple parties to strike a deal.

21 Q    Did you ever pay him any money for services rendered to

22 you in your individual capacity?

23 A    No.

24 Q    Did you ever give him anything of value in exchange for

25 legal services rendered by him to you in your individual

1    capacity?

2    A    No.

3    Q    Did you ever sign an engagement letter with Scott

4    Ellington pursuant to which he provided legal services to you

5    in your individual capacity?

6    A    No.

7    Q    How about Isaac Leventon?  Did Isaac Leventon ever

8    represent you in your individual capacity?

9    A    You mean since the advent of the bankruptcy, right?  Yeah,

10   no.

11   Q    Okay.  Let's say after the TRO was in place.  Did Mr. --

12   did you ever retain or engage Mr. Leventon to provide legal

13   services to you in your individual capacity?

14   A    No.

15   Q    Between December 10, 2020, the date the TRO was entered,

16   and January 8, 2021, excuse me, the date the TRO was converted

17   to a preliminary injunction, you communicated with certain of

18   the Debtor's employees about matters that did not concern

19   shared services, correct?

20   A    No.

21   Q    No, it's your testimony that all of your communications

22   concerned shared services?

23   A    Yes.  Yeah, and shared services or the pot plan or in his

24   go-between role where he would be used as a messenger by Seery

25   or by me to get to Seery because I hadn't communicated

1  directly with Seery in six or seven months other than that

2  interaction around Thanksgiving.

3  Q    Sir, between the time the TRO was entered and the

4  preliminary injunction was entered, you communicated with

5  certain of the Debtor's employees about matters that were

6  adverse to the Debtor's interests, correct?

7  A    Absolutely not.  I respectfully disagree with that

8  characterization whenever it occurs.

9  Q    Okay.  After the TRO was entered, you and your lawyers at

10 Bonds Ellis worked with Scott Ellington to identify a witness

11 who would testify on your behalf in support of a motion

12 against the Debtor, correct?

13 A    I don't know what the witness was for.  I know there was

14 -- I know there was some back and forth on the witness, but I

15 don't remember what the witness was for.

16 Q    All right.  Let's just see if we can get through this

17 quickly.

18          MR. MORRIS:  Can we put up Exhibit 48, please?

19 BY MR. MORRIS:

20 Q    So this is December 11th.  Do you see that?

21 A    Yes.

22 Q    The day after the TRO was entered into, correct?

23 A    Yes.

24 Q    It's sent from Mr. Lynn to Mr. Ellington and is entitled

25 "Testimony," correct?

1    A    Yes.

2    Q    Mr. Ellington was the Debtor's general counsel at the

3    time, correct?

4    A    Among other things, yes.

5    Q    In fact, Mr. Ellington was the Debtor's general counsel

6    throughout the month of December 2020, to the best of your

7    knowledge, correct?

8    A    Yes, but not solely, yeah.

9    Q    Was he -- was he a general counsel for somebody else?

10   A    No, but he was also settlement counsel and he was also the

11   go-between with Seery.

12   Q    Sir, really, I respectfully ask that you listen to my

13   question.  To the best of your knowledge, Mr. Ellington was

14   the Debtor's general counsel throughout the month of December

15   2020, correct?

16   A    Yes.

17   Q    Can you please read Mr. Lynn's email out loud?

18   A    (reading)  Scott, you are going to talk with John Wilson

19   of our firm or have JP do so.  He needs to speak today so we

20   know who to put on the witness and exhibit list and will be

21   waiting for a call.  Thanks.

22   Q    Now, again, the Bonds Ellis firm doesn't represent any

23   party to a shared services agreement, correct?

24   A    Well, they represent me and I'm on the other side of the

25   shared services agreement we were trying to put together.

1    Q    You're not a party to shared services agreements, are you,

2    sir?

3    A    No, but the solution that everybody was negotiating that

4    fell apart that we had a hearing on a couple weeks ago,

5    everybody was trying hard in good faith until negotiations

6    failed to migrate the shared services in a way that would have

7    resulted in $3 or $5 million to the Debtor.  But the

8    negotiations fell apart.

9    Q    Sir, in this email from Mr. Lynn in which you're copied to

10   the Debtor's general counsel the day after the TRO is entered,

11   your lawyer is asking the Debtor's general counsel to have a

12   conversation about a witness and exhibit list that your

13   lawyers were putting together.  Fair?

14   A    That appears to be what it's about.

15   Q    Okay.  And the next day, the topic of identifying a

16   witness who would testify on your behalf continued, correct?

17   A    I don't know.

18          MR. MORRIS:  Can we go to Exhibit 49, please?

19   BY MR. MORRIS:

20   Q    This is an email string from Saturday evening, December

21   12th, in which the Bonds Ellis firm's -- firm brings you and

22   Mr. Ellington into the discussion about identifying a witness

23   who would testify on your behalf at the upcoming hearing,

24   correct?

25   A    Yeah, but I -- okay.  I have no idea what this refers to,

1  though, or what this is in regard.

2  Q    Well, if you look at Mr. Assink's email at the bottom

3  dated December 12, do you see the subject is "Witnesses for

4  Hearing"?  Do you see that?

5  A    Yes.

6  Q    And he asks Mr. Wilson whether Mr. Wilson had heard from

7  Ellington or Sevilla yet.  Do you see that?

8  A    Yes.

9  Q    And he -- he says that he needs to let the other side know

10 if you're going to call one of them as a witness.  Isn't that

11 right?

12 A    Yes.  I can read all that.  But again, I don't know -- I

13 don't know -- I have no idea what witness for what, if it

14 represents -- and what the witness would represent and if it

15 is in any way adverse to the Debtor.  I have no idea.

16 Q    Well, you're adverse to the Debtor, are you not?

17 A    Well, I do not believe so.  I mean, I -- I've been doing

18 everything possible to try and preserve this estate as it's

19 getting run into the ground.  But no, I mean, I've -- I've

20 done everything to try and maximize value.

21 Q    Well, Mr. Lynn brings you and Mr. Ellington in the

22 conversation on Saturday, December 20th, on the topic of

23 witnesses for a hearing, right?  That's -- that's what's

24 happening at the top of the page?  You and Mr. Ellington are

25 now included, correct?

1    A    Okay.

2    Q    It's true; isn't that right?

3    A    Right.

4    Q    Okay.  And this is the debate over whether to include Mr.

5    Ellington or Mr. Sevilla on your witness list, correct?

6    A    Again, I don't know with regard to what or for, you know

7    -- I don't know if it's background context.  I don't know if

8    it's corporate rep.  I don't know -- I don't know -- I have no

9    idea what this is about.

10   Q    Okay.  Do you recall that the issue of identifying a

11   witness who would testify on your behalf was resolved later

12   that night?

13   A    No.

14            MR. MORRIS:  Can we go to Exhibit 17, please?

15   BY MR. MORRIS:

16   Q    And if we start at the bottom, you'll see there's an email

17   from Mr. Lynn to you and other lawyers at Bonds Ellis where he

18   says the possible deal with the Debtor went nowhere, and I

19   think he meant to say it looks like trial.  Is that a fair

20   reading of Mr. Lynn's email to you on the evening of December

21   12th?

22   A    Yes.

23   Q    And then if we scroll up he says, quote, that said, we

24   must have a witness now.

25       Do you see that?

1   A    Yes.

2   Q    And the "we" there refers to you and the Bond Ellis firm,

3   right?  You guys needed a witness now.  Is that fair?

4   A    I don't know.

5   Q    Well, if you look -- if you look up at the top, Mr.

6   Ellington responds.  So this is an email from Mr. Ellington to

7   you and your personal lawyers at Bonds Ellis.  Do I have that

8   right?

9   A    Yes.

10  Q    And in that email, Mr. Ellington responds to Mr. Lynn's

11  request for a witness and he identifies Mr. Sevilla, correct?

12  A    Yes.

13  Q    And Mr. Ellington told your lawyers that he would instruct

14  Mr. Sevilla to contact them the first thing in the morning,

15  correct?

16  A    That seems to be what it says.

17  Q    Okay.  Is there any exception in the TRO that we looked at

18  that you're aware of that would allow you and your lawyers to

19  communicate with Mr. Ellington for the purpose of having Mr.

20  Ellington identify a witness who would testify on your behalf

21  against the Debtor?

22  A    Again, I go back to his role as settlement counsel and go-

23  between with Seery.  If you look at the subject line here, it

24  says "Possible Deal."  I -- I think this is all perfectly

25  within the scope and not adverse to the Debtor, but I'm

Dondero - Direct                              94

1   willing to be educated if you think otherwise.

2   Q   Sure.  I'll try.  Let's go back to Mr. Lynn's email at the

3   bottom.  The email is titled, Possible Deal, and what he says

4   is, quote, the possible deal with the Debtor went nowhere.  It

5   looks like trial.

6       Does that refresh your recollection that this string of

7   communications had nothing to do with a deal, but it had to do

8   with a trial, and it specifically had to do with your lawyers

9   communicating with Mr. Ellington to identify a witness who

10  would testify on your behalf against the Debtors?

11  A   That's not how I view this and that's not how I view

12  Ellington's role.

13  Q   Okay.  I'm going to ask you again.  Very simple.  And I'll

14  put it back up on the screen if you want.

15          MR. MORRIS:  In fact, let's do that.  Let's go back

16  to Exhibit 11.  And let's look at Paragraph 2(c).

17  BY MR. MORRIS:

18  Q   And if you can tell me, right, Paragraph 2(c) prohibited

19  you from communicating with any of the Debtor's employees

20  except as it specifically relates to shared services currently

21  provided to affiliates owned or controlled by you.  Do you see

22  that?

23  A   Yes.

24  Q   Okay.  Does that provision authorize you and your lawyers

25  to communicate with the Debtor's general counsel for the

1  purpose of identifying a witness who would testify on your

2  behalf, your personal behalf, against the Debtor?

3  A    Again, we haven't established that it's on my behalf

4  against the Debtor, so I can't say -- I can't say yes to that.

5  And again, you know, Scott Ellington, up until the day he was

6  terminated, was settlement counsel and go-between for Seery,

7  and that role never changed, even after the TRO was put into

8  place.  And Seery even acknowledged it after the TRO was put

9  in place and continued to use Ellington as a go-between.

10 Q    So, so the Bonds Ellis --

11          THE COURT:  All right.  All right.  Let me just

12 interject again,--

13          MR. MORRIS:  -- firm represents --

14          THE COURT:  -- because here we go again with the

15 narrative answer way beyond yes or no.  Here is a big, big

16 concern I have.  You both estimated three and a half hours,

17 but if I continue to get the long narrative answers, I don't

18 think it's fair to count all of this against Mr. Morris.

19 Okay?  So, Mr. Wilson, what can we do about this?  We've had

20 this witness on the stand since 10:24 minus 14 minutes, so

21 we're getting close to two hours.  But again, you know, I've

22 been, I think, extremely overly-patient with allowing these

23 narrative answers.

24     So, Mr. Wilson, can you help us out here and -- I mean, I

25 don't know how many more times I can say it, that yes, no, and

1   then when it's Mr. Wilson's time to cross-examine you, to

2   examine you, Mr. Dondero, that's when you can give all of

3   these more fulsome answers.  All right?  We're going to be

4   here much beyond today if we don't get this under control.

5   All right?

6        So, Mr. Wilson, --

7            MR. MORRIS:  I appreciate --

8            THE COURT:  Mr. Wilson, please make sure your client

9   understands this.  Can you add to this?  Can you let him know

10  you're going to examine him later?

11           MR. WILSON:  Yeah, I agree -- I agree with that, Your

12  Honor, but I also would just state that a lot of Mr. Morris's

13  questions don't call for a simple yes or no answer, and I

14  think Mr. Dondero maybe needs to change his response to "I

15  can't answer that yes or no."

16           THE COURT:  Well, you can't coach your client like

17  that.  Okay?

18           MR. MORRIS:  Your Honor?  Your Honor, with all due

19  respect, every single question I'm asking is a leading

20  question.  When it ends "Is that correct?" or "Is that right?"

21  he either says yes, it is, or no, it's not.

22           THE COURT:  All right.

23           MR. MORRIS:  Then I'll have the decision as to what

24  to do at that point.  Every single question I'm asking is

25  leading.

1          THE COURT:  All right.  Well, I tend to agree with

2     that, Mr. Wilson.  All right?

3        So, Mr. Dondero, you've heard us say it a few times now.

4     Yes.  No.  I understand you want to say more in many

5     situations, but Mr. Wilson can get at that later when he

6     examines you.  Okay?

7        Continue, Mr. Morris.

8          MR. MORRIS:  Thank you, Your Honor.

9     BY MR. MORRIS:

10    Q    On this series of emails that we've looked at, these last

11    three exhibits that are to and from the Bonds Ellis firm, the

12    Bonds Ellis firm only represents you in your individual

13    capacity, correct?

14    A    Correct.

15    Q    And the Bonds Ellis firm was communicating with Mr.

16    Ellington in order to have Mr. Ellington identify a witness

17    for their witness and exhibit list, correct?

18    A    Yes.

19    Q    Okay.  At the same time you and your lawyers were

20    communicating with Mr. Ellington about identifying a witness

21    who would testify on your behalf, you and your lawyers were

22    also engaged in discussions about entering into a common

23    interest agreement among you, certain entities in which you

24    have an interest, and certain of the Debtor's then-employees,

25    correct?

Dondero - Direct                              98

1   A    I have no idea -- conversations like that happened.  I

2   don't know when they occurred.

3   Q    Okay.  Let's see if we can put a time on it.

4             MR. MORRIS:  Can we please put up Exhibit 24?

5   BY MR. MORRIS:

6   Q    And starting at the bottom, you'll see there's an email

7   string from Deborah Heckin (phonetic) on behalf of Douglas

8   Draper.  Do you see that?

9   A    Yes.

10  Q    And this email string is dated December 15th, right after

11  the TRO was entered into?

12  A    Why isn't this privileged?

13  Q    We'll talk about that in a moment, but --

14  A    What was your question?

15  Q    -- be that as it may, this email string is dated December

16  15th, after the TRO was entered into, correct?

17  A    Yes.

18  Q    Okay.  And you'll see that Mr. Draper, or at least on his

19  behalf, attaches a form of a common interest agreement.  Do

20  you see the reference to that in his email?

21  A    Yes.

22  Q    Okay.  And Mr. Lynn responds, if we scroll up, and he

23  includes Scott Ellington on this email, right?

24  A    Yes.

25  Q    And Mr. Lynn informs Mr. Ellington and his colleagues that

1   Bryan or John would review the agreement.  Is that -- is that

2   right?

3   A    Yes.

4   Q    And if we scroll up, Mr. Assink then later that day sends

5   your lawyer's comments -- sends your lawyer's comments to his

6   colleagues and to Mr. Ellington, right?

7   A    Yes.

8   Q    And Mr. Ellington then forwards the revised common

9   interest agreement to Mr. Leventon, right?

10  A    Yes.

11  Q    As contemplated at that time, you and the Get Good Trust

12  and the Dugaboy Investment Trust and certain of the Debtor's

13  then-employees were engaged in discussions about entering into

14  a common interest agreement, correct?

15  A    Yes.

16  Q    And those discussions continued for a while in December;

17  isn't that right?

18  A    I believe so.

19  Q    You're familiar with the law firm Baker & McKenzie,

20  correct?

21  A    Generally.

22  Q    That firm has never represented you or any entity in which

23  you have an ownership interest, correct?

24  A    Boy, I don't know.  It depends on how far back you went,

25  but I don't know.

Dondero - Direct                        100

1    Q    To the best of your knowledge, Baker and McKenzie has

2    never represented you or any entity in which you have an

3    ownership interest, correct?

4    A    Don't know.

5    Q    Okay.  In December, there was an employee group.  There

6    was a group of Debtor employees that were known as the

7    Employee Group; is that right?

8    A    I believe there was a general employee group and then

9    there was a senior management group.

10   Q    Okay.

11   A    I don't know what they were called.

12   Q    And Mr. Ellington and Mr. Leventon were part of the group

13   who were considering in December changing their counsel from

14   Winston & Strawn to Baker & McKenzie, correct?

15   A    I -- I only have -- I don't know for sure.  That sounds

16   correct, but I don't know for sure.

17   Q    All right.  But that was your belief at the time, right?

18   A    I don't remember.

19   Q    Well, because of that, you specifically asked Mr. Leventon

20   for the contact information for the lawyers at Baker &

21   McKenzie, right?

22   A    I remember asking Isaac for Clemente's number.  I may have

23   asked -- yeah, yeah, I think I -- I needed to speak to

24   somebody at some point over there, so I did ask -- I asked

25   somebody for the number.  If I asked Isaac, it could have

Dondero - Direct                          101

1    been.

2    Q    Okay.

3             MR. MORRIS:  Can we put up Exhibit 20, please?

4    BY MR. MORRIS:

5    Q    And this is -- that's Mr. Leventon at the top.  Is that

6    right?

7    A    Yes.

8    Q    And on December 22nd, you specifically asked him to send

9    you Mr. Clemente's contact information as well as the Baker &

10   McKenzie contact information, correct?

11   A    Yes.

12   Q    And this was a week after the -- after your lawyers

13   provided their comments to the common interest agreement and

14   Mr. Leventon -- Mr. Ellington forwarded the draft agreement to

15   Mr. Leventon, right?  That was December 15th, so this is a

16   week later?

17   A    Yes.

18   Q    And Mr. Leventon was an employee of the Debtor at the

19   time, correct?

20   A    Yes, I believe so.

21   Q    And you specifically wanted the contact information from

22   Baker & McKenzie in order to help Mr. Draper coordinate the

23   mutual shared defense agreement that was the subject of the

24   December 15th email, right?

25   A    I don't know if that was the purpose.

1           MR. MORRIS:  Can we go back to the transcript line,

2     Line -- Page 97, please?  Down at Line 16.  To be clear, I'm

3     reading at the January 8th hearing from the deposition

4     transcript.

5     BY MR. MORRIS:

6     Q    But can you confirm for me, sir, that when asked the

7     following question, you gave the following answer?  Question,

8     "Why did you want the Baker & McKenzie contact information?"

9     Answer, "I was trying to help Draper coordinate the mutual

10    shared defense agreement, period."

11          Is that your -- was that the answer that you gave in your

12    deposition?

13    A    Yes.

14    Q    And is that the answer that you confirmed at the

15    preliminary injunction hearing on January 8th?

16    A    I don't remember.

17    Q    Are you aware of any exception in the TRO that would

18    permit you and your lawyers to communicate with the Debtor's

19    employees about entering into a common interest agreement?

20    A    To the extent Scott Ellington was continuing as settlement

21    counsel, I -- I viewed these types of things as very

22    appropriate.

23    Q    The only exception in the TRO was for shared services,

24    right?

25    A    Shared services, yes, but shared services broadly

Dondero - Direct                                      103

1   incorporates a lot of things, in my opinion.

2   Q   And in your opinion, it's perfectly appropriate for you to

3   be discussing, after a TRO is entered that prohibits you from

4   discussing anything with any of the Debtor's employees except

5   for shared services, in your opinion, it's perfectly

6   appropriate for you and your lawyers to be engaged in

7   conversation with the Debtor's employees about possibly

8   entering into a common interest agreement?  That's your

9   testimony?

10  A   Yes.

11  Q   Okay.  Let's go back in time, December 15th.  Do you

12  recall writing to Mr. Lynn and Mr. Draper and Mr. Ellington

13  about a conversation you had with Mr. Clubok, UBS's counsel?

14  A   I don't remember, but I'm willing to be refreshed.

15  Q   Okay.

16          MR. MORRIS:  Let's do that, and put up Exhibit 50,

17  please.  Five zero.

18  BY MR. MORRIS:

19  Q   This is an email that you wrote, correct?

20  A   (no immediate response)

21  Q   This is your email, sir?

22  A   Yes.

23  Q   Okay.  Why did you decide to -- this is an email about a

24  conversation that you had with Mr. Clubok, right?

25  A   Yes.

Dondero - Direct                                    104

1   Q    And you understood at the time that Mr. Clubok represented

2   UBS, right?

3   A    Yes.

4   Q    And at the time, you knew that UBS was going to appeal the

5   settlement that had been entered into between the Debtor and

6   Acis, correct?  I'm sorry, between the Debtor and the Redeemer

7   Committee?

8   A    Yes.

9   Q    Okay.  And so the Debtor had entered into a -- you knew

10  that the Debtor entered into a settlement with the Redeemer

11  Committee, right?

12  A    Yes.

13  Q    And that settlement was approved by the Court, correct?

14  A    I don't remember if it was ever scrutinized at all.  It

15  wasn't -- I don't know if it was approved.

16  Q    Well, this email is about the appeal of the approved

17  order, the order approving the settlement, right?

18  A    Appears to be.

19  Q    Okay.  And so UBS was challenging the very agreement that

20  the Debtor wanted to enter into, right?

21  A    Yes.

22  Q    And you -- and you decided, after the TRO was entered

23  into, to bring Scott Ellington into the discussion between you

24  and your lawyers about supporting UBS and otherwise getting

25  evidence against Mr. Seery.  Is that right?

1   A    We already had the evidence against Seery not seeking

2   court approval, being inept in asset sales.  We already had

3   all that evidence.

4   Q    But you're bringing -- you voluntarily brought Mr.

5   Ellington into this discussion; isn't that right?

6   A    Because Ellington was settlement counsel.  We were trying

7   to push -- he was trying to push all parties to some kind of

8   reasonable settlement before the estate got wiped out by

9   tripling everybody's claims.

10  Q    And you thought it would be helpful to bring Mr. Ellington

11  into a conversation where you're discussing with your lawyers

12  supporting UBS in their objection to the Debtor's settlement

13  and to -- and to give him evidence of Seery's ineptitude and

14  improper asset sales?  You think that was going to advance the

15  cause of the settlement, right?

16  A    Yes.

17  Q    Okay.  And again, there's no -- there's no exception in

18  the TRO for settlement, right?  That's just your own thinking,

19  fair?

20  A    Since the summertime, more than a few people have

21  testified Scott Ellington was settlement counsel.

22          MR. MORRIS:  I move to strike.

23          THE COURT:  Sustained.

24  BY MR. MORRIS:

25  Q    Is there anything in TRO that you are aware of that

1    authorizes you to speak with Mr. Ellington in his capacity as

2    so-called settlement counsel?

3            MR. WILSON:  Objection to the extent it calls for a

4    legal conclusion.

5            THE COURT:  Overruled.

6            MR. MORRIS:  I'll reframe the question.  I'll reframe

7    the question, Your Honor.

8            THE COURT:  Okay.

9    BY MR. MORRIS:

10   Q    Do you have any -- is there anything that you are aware of

11   in the TRO that would permit you to speak with Mr. Ellington

12   as settlement counsel?

13   A    I think it's trickery to try and say it takes that away.

14   That's my opinion.

15   Q    Okay.  But other than your opinion, you can't point to

16   anything in the TRO that you're relying upon that would permit

17   you to speak with Mr. Ellington as settlement counsel.  Fair?

18   A    Other than broadly, settlement or not settlement all

19   filters into shared services and whether or not we buy the

20   employees, don't buy the employees, etc.

21   Q    Okay.  This email has absolutely nothing to with shared

22   services, right?

23   A    It's one step removed but ultimately leads into it.

24   Q    The settlement between the Debtor and the Redeemer

25   Committee has nothing to do with shared services, correct?

1  A    Ultimately, the settlement with Redeemer and Clubok had

2  everything to do with shared settlement.  With shared

3  services.

4  Q    All right.  Maybe your lawyer will put that up on the

5  screen later.

6      After the TRO was entered, you also communicated with one

7  or -- one of the Debtor's employees to make sure that she

8  didn't produce the Dugaboy financial statements to the U.C.C.,

9  correct?

10  A    Yeah.  They weren't properly requested, and they weren't

11  requested of me.

12  Q    Sir, you communicated with one of the Debtor's employees

13  to make sure she did not produce the Dugaboy financial

14  statements to the U.C.C. without a subpoena, correct?

15  A    That was my -- the advice of counsel to say exactly that

16  in response, and I think ultimately -- I think ultimately

17  counsel was okay with it.  They just wanted to review the

18  documents first.

19  Q    Dugaboy's financial statements were maintained on the

20  Debtor's server, correct?

21  A    Yeah, and I think most of them weren't even password-

22  protected.

23  Q    You communicated with at least one employee concerning the

24  production of the Dugaboy financial statements, correct?

25  A    Under advice of counsel, yes.

1  Q    And that's Melissa Schrath, right?

2  A    Yes.

3  Q    Ms. Schrath was employed by the Debtor as an executive

4  accountant in December 2020, correct?

5  A    Yes, solely working on mine and Mark Okada's financials.

6  Q    She's the one -- she's the Debtor employee who maintained

7  the Dugaboy financial statements, right?

8  A    Yes.

9  Q    And on December 16th, after the TRO was entered, you

10 communicated with Ms. Schrath for the very specific purpose of

11 instructing her not to produce the Dugaboy financials without

12 a subpoena, correct?

13 A    I gave her a legal response that came directly from my

14 lawyers from an improper -- what my lawyers viewed as an

15 improper request improperly done.

16 Q    Dugaboy had their own lawyer, right?  Mr. Draper?

17 A    I -- uh, I believe -- I believe he was coming on board or

18 up to speed around that time.

19 Q    Yeah.  Why didn't Mr. Draper take a hold of this issue?

20 Why did you do that?

21 A    I think, again, I think he was just coming up to speed at

22 that point.  I think ultimately he was okay with it; he just

23 said he wanted to review the documents first.  But I think he

24 was agreeable in trying to work with you guys.

25 Q    He was, in fact.  So why did you, instead of letting him

Dondero - Direct                                        109

1  do his job on behalf of his client, the Dugaboy Investment

2  Trust, why did you, after the TRO was entered, communicate

3  with the Debtor's employees to give instructions not to

4  produce the Dugaboy financial statements without a subpoena?

5  Why did you do that?

6  A    Those words and requiring a subpoena were the specific

7  legal advice I got from counsel at Bonds Ellis before Draper

8  was up to speed on the issue.  And then when Draper got up to

9  speed on the issue, which I think was only a couple days

10 later, he tried hard to work with you guys.

11 Q    And he never asked for a subpoena, did he?

12 A    I -- I don't believe he did.  I think he asked to just

13 review stuff first.

14 Q    Did you ever tell him that you had made a demand for a

15 subpoena, that -- withdrawn.  Did you ever tell Mr. Draper

16 that you had instructed one of the Debtor's employees not to

17 produce the documents without a subpoena?

18 A    I -- I think Draper was fully -- fully informed of

19 everything that happened with regard to the Dugaboy financials

20 before he got involved.  Yes.

21 Q    So, so for all of the communications that occur after the

22 time that you instruct Ms. Schrath not to produce the

23 documents without a subpoena, would it surprise you to learn

24 that Mr. Draper never once mentions the subpoena?  Never once

25 mentions that the documents shouldn't be produced without a

Dondero - Direct                              110

1   subpoena?

2   A    Different -- different lawyers have different views at

3   different times.  I don't know what else to tell you.

4   Q    All right.  Let's just confirm for the record.

5            MR. MORRIS:  Can we please put up Exhibit 19?

6   BY MR. MORRIS:

7   Q    And that's Ms. Schrath at the top; is that right?

8   A    Yes.

9   Q    And this is, if we scroll down a bit, this is where you

10  give her the instruction after the -- you communicate with her

11  -- withdrawn.  This text messages show that you communicated

12  with Ms. Schrath, one of the Debtor's employees, after the TRO

13  was entered into, for the purpose of instructing her not to

14  provide the Dugaboy details without a subpoena, correct?

15  A    Yes.

16  Q    There is no exception in the TRO that you are aware of

17  that permits you to communicate with any of the Debtor's

18  employees about the production of documents, right?

19  A    Regarding a personal entity that's not in bankruptcy and

20  not subject to the estate, it -- this -- I believe this was

21  appropriate.  And again, the advice I got from counsel.

22  Q    Sir, are you aware of anything in the TRO that permits you

23  -- is there any exception in the TRO that permits you to give

24  instructions to one of the Debtor's employees about whether

25  and how to produce documents that are on the Debtor's system?

1          MR. WILSON:  Objection.  It calls for a legal

2   conclusion.

3          THE COURT:  Overruled.

4          THE WITNESS:  I don't know.

5   BY MR. MORRIS:

6   Q    Okay.  You can't point to anything as we sit here right

7   now, right?

8   A    Don't know.

9   Q    And again, Dugaboy is not party to a shared services

10  agreement, correct?

11  A    Not formally.  It is -- I think -- I believe it is now.

12  Q    On the same day that you were instructing Ms. Schrath not

13  to produce Dugaboy financials without a subpoena, you were

14  also communicating with Mr. Ellington about providing

15  leadership with respect to the coordination of counsel for you

16  and the various entities owned and controlled by you,

17  correct?

18  A    I don't -- I think that may be a mischaracterization of

19  the leadership email.  Let's go to that, please.

20  Q    Okay.

21         MR. MORRIS:  Exhibit 18, please.

22  BY MR. MORRIS:

23  Q    On December -- December 16th, Mr. Draper wrote to you, at

24  the bottom of the exhibit, Mr. Draper wrote to you and to Mr.

25  Lynn, correct?

1   A    Yep.

2   Q    And again, Mr. Draper represents Dugaboy and Get Good,

3   right?

4   A    Yep.

5   Q    And the subject matter of his email is a List for a Joint

6   Meeting.  Do you see that?

7   A    Yes.

8   Q    And Mr. Draper proceeded to list a number of lawyers and

9   entities, correct?

10  A    Yes.

11  Q    And first is John Kane, counsel to the DAF, right?

12  A    Yes.

13  Q    And then you have George Zarate (phonetic), who was

14  counsel to HCM Advisor, correct?

15  A    Yes, sir.

16  Q    And third is Lauren Drawhorn, counsel to NexPoint,

17  correct?

18  A    Yes.

19  Q    Fourth is Mark Maloney, counsel to CLO Funding, correct?

20  A    Yes.

21  Q    And last is David Neier, who was then counsel to certain

22  of the Debtor's employees, correct?

23  A    Yes.

24  Q    And Mr. Draper specifically asked you and Mr. Lynn whether

25  anyone should be added or removed from the list, correct?

1    A    Yes.

2    Q    And neither you nor Mr. Lynn identified anyone to be added

3    or removed, correct?

4    A    No.

5    Q    And then you, you forwarded the email string to Mr.

6    Leventon -- Ellington, correct?

7    A    Yes.

8    Q    And so you're the one who's sharing your attorney-client

9    communications with Mr. Ellington, right, in this email?

10   A    Yes.

11   Q    Okay.  And he's not your lawyer, right?

12   A    He's settlement counsel.

13   Q    Yeah.  Okay.  Why don't you read what you wrote to Mr.

14   Ellington?

15   A    (reading)  I'm going to need you to provide leadership

16   here.

17   Q    But reviewing this email, at least as of the January 8th

18   hearing, you had no recollection of why you forwarded the

19   email string to Mr. Ellington and why you told him you needed

20   him to provide leadership, correct?

21   A    Correct.

22   Q    But Mr. Ellington did respond; isn't that right?

23   A    Yeah.  I think he just said "I'm on it" or "I'll handle

24   it" or something.

25   Q    Okay.  Are you aware of any exception in the TRO that

Dondero - Direct                                114

1   would permit you to ask Mr. Leventon -- Ellington to provide

2   leadership in the context of working on a joint meeting that

3   would include lawyers for you and any entities -- and various

4   entities owned or controlled by you?

5   A    I -- I don't know.  I don't have any answers other than

6   some of the narrative ones I've given before.

7   Q    Okay.  And again, there's no lawyer on this whole email

8   string that represents any entity that's subject to a shared

9   services agreement, right?

10  A    That's not true.

11  Q    I apologize.  Let me rephrase the question.  There's no

12  lawyer who sent, received, or were copied on any of these

13  emails who represents an entity that was subject to a shared

14  services agreement, correct?

15  A    That's not true.

16  Q    Well, does Mr. Lynn or Mr. Draper represent an entity

17  who's subject to a shared services agreement?

18  A    No, but the other lawyers referenced in the text of the

19  email, almost all of them are.

20  Q    Right.  I'm just -- I'm asking you very specifically just

21  about the people to whom this email string was sent or

22  received from.  Right?  Sent to or received from.  And they

23  only include Mr. Draper and Mr. Lynn, right?  They're the only

24  ones who were --

25  A    Yes.

Dondero - Direct                                    115

1   Q    Right?

2   A    Yes.

3   Q    And neither one of them represents a party to a shared

4   services agreement, right?

5   A    Not a formal one, correct.

6   Q    Right.  So there's nobody on this email string where

7   you're asking Mr. Ellington to provide leadership, there's

8   nobody who's sending or receiving this email string that

9   represents a party to a shared services agreement, right?

10  A    No formal -- yes.  Those three people, there's no formal

11  shared services agreement.

12  Q    Later on in December is when you learn that Mr. Seery was

13  again seeking to trade in certain securities held in the CLOs,

14  correct?

15  A    Yes.

16  Q    And as soon as you learned that Mr. Seery was again

17  seeking to trade in certain securities, you sent an email to

18  Mr. Ellington letting him know that, right?

19  A    Oh, yes.  Yes.

20  Q    And this is the information that caused you to personally

21  instruct employees of the Advisors not to execute the trades

22  that Mr. Seery had authorized, correct?

23  A    No.  We've gone through this before.  I did nothing in the

24  December 20th trades to do anything to interrupt or speak with

25  any Highland employees.  I sent one email to Jason Post to say

Dondero - Direct                           116

1   you should look into this.  It was -- it was a completely

2   different interaction.  It was respectful of the TRO.  It was

3   completely different than the November trades.

4        But the trades were the same.  He handed a couple million-

5   dollar lawsuits to the Funds, he sold things during the least

6   liquid week of the year, the day before Thanksgiving and the

7   day before Christmas, and he was purposely trying to push

8   losses to investors.

9            MR. MORRIS:  I move to strike, Your Honor.

10           THE COURT:  Sustained.  And I'm just letting you know

11  it's 12:50.  We're taking a break at 1:00 o'clock.

12           MR. MORRIS:  Yeah, that's fine.  I think I should be

13  done right there, Your Honor.

14  BY MR. MORRIS:

15  Q    The next day, on December 23rd, you had a call among you,

16  Scott Ellington, Grant Scott, and certain lawyers representing

17  various entities you own and control, correct?

18  A    Yeah.  I don't remember specifically, but yeah, I remember

19  a couple conference calls.

20  Q    Yeah.

21           MR. MORRIS:  Can we go to Exhibit 26, please?

22  BY MR. MORRIS:

23  Q    You'll see the subject matter is "It appears Jim will be

24  available for a 9:00 a.m. Central time conference call."

25        Do you see that?

1   A   Yes.

2   Q   Okay.  And this email string is between and among

3   employees of the Advisors, Grant Scott, Scott Ellington, and

4   outside counsel to the Advisors, correct?

5   A   Can you scroll up or down?  I mean, I --

6   Q   Sure.

7   A   What was the question again regarding the people?

8   Q   Yeah.  The folks on this email string are employees of the

9   Advisors, outside counsel to the Advisors, and Scott

10  Ellington, right?

11  A   I'm sorry.  I'm struggling to see Ellington on this one.

12  Q   Oh, it's at the top.  There you go.

13  A   Okay.

14  Q   And Mr. -- and Grant Scott, right?

15  A   Yes.

16  Q   And Grant Scott is the director of the DAF, correct?

17  A   Yes.

18  Q   And this is the exact same time that K&L Gates are sending

19  the letters to the Debtor concerning the CLOs, correct?

20  A   I believe it's around that same time.

21      (Interruption.)

22          MR. MORRIS:  Your Honor, somebody's not on mute.

23          THE COURT:  Yeah, who is that, Mike?  Can you tell?

24          THE CLERK:  It was one of the call-ins.  I just muted

25  them.

1          THE COURT:  Okay.  It was one of the call-ins.  We've

2    muted them.

3          MR. MORRIS:  Okay.  Yeah.

4    BY MR. MORRIS:

5    Q    It's your understanding that those letters -- in those

6    letters, the Advisors and Funds represented by K&L Gates asked

7    that the Debtor not trade in securities on behalf of the CLOs,

8    correct?

9    A    Yes.

10   Q    And this was just days after the Court dismissed as

11   frivolous the motion that they brought seeking the exact same

12   relief?

13   A    I believe it was about that same time frame, yes.

14   Q    Okay.  So, all in this same time frame, December 22nd,

15   December 23rd, K&L Gates is sending those letters and Mr. --

16   and Mr. Ellington is participating in conversations with you

17   and lawyers for the Advisors and Mr. Scott, right?  This is

18   all happening in the same two or three days?

19   A    I continue to struggle to see the issue, but yes.

20   Q    Okay.  You were aware of the letters that K&L Gates sent

21   at the time they sent them, correct?

22   A    Yes.

23   Q    Okay.  And despite the outcome at the December 16th

24   hearing, you were supportive of the sending of those letters,

25   right?

1  A   I still believe they are bona fide.  I still believe we

2  just -- maybe not as good a presentation to make the Court

3  understand.  But yes, I still believe they're bona fide and

4  were done in good faith.

5  Q   Okay.  And so you think it was a problem with presentation

6  at that hearing; is that right?

7  A   Yeah.  I mean, you have -- yes.  I believe you have no

8  business purpose booking losses for investors that asked that

9  their accounts not be traded while they were being migrated,

10 and instead they were handed a bunch of losses and then

11 they've been, they've, in a backdoor way, lost control by the

12 Advisor buying assets without court approval to block the DAF

13 and the retail funds' rights.  I mean, it's craziness.

14 Q   And then you brought Mr. Ellington into the discussion

15 about these letters specifically; isn't that right?

16 A   No.  I -- I remember my main --

17         MR. MORRIS:  Your Honor, it's a --

18         THE COURT:  Okay.

19         THE WITNESS:  Well, the answer is no.

20         THE COURT:  It's a yes or no, a yes or no question.

21         THE WITNESS:  No.  The answer is no.

22         MR. MORRIS:  Okay.  Can we go to Exhibit 52, please?

23 BY MR. MORRIS:

24 Q   And if we look at the bottom and scroll up, the email

25 string begins with some back and forth between your lawyers

1   and my colleague, Mr. Pomerantz.  Do you see that?  And they

2   discuss specifically the K&L Gates letters.

3   A    Yep.

4   Q    Okay.  And then they're forwarded to you and you respond

5   to Mr. Lynn and to your lawyers, right?

6   A    Yep.

7        MR. MORRIS:  Can we scroll up just a bit more?

8   BY MR. MORRIS:

9   Q    And you write to your lawyers -- now, this is -- this is

10  at this time a very private conversation between you and your

11  lawyers, right?  And -- and --

12  A    Yeah.

13  Q    And you could share whatever view you had at the time with

14  your lawyers, because at least as of December 24th at 5:53,

15  you thought that that would be a protected conversation and

16  communication, correct?

17  A    I don't know what I thought then.

18  Q    Well, you told Mr. Lynn, "Who knows how Jernigan reacts."

19  Do you see that?

20  A    Yes.

21  Q    And that's because you were unsure of how Judge Jernigan

22  was going to react; is that right?

23  A    Yes.

24  Q    You didn't express the view to your lawyer on December

25  24th that Judge Jernigan was going to rule against you because

Dondero - Direct                         121

1    she was biased, did you?

2    A    I don't know if that's in this email chain.

3    Q    I'm happy to look at it from top to bottom.

4    A    I -- but I -- I don't know.

5    Q    And it's certainly not in this email, right?  You didn't

6    -- you didn't tell -- you didn't tell your lawyers in this

7    private conversation that you had any concerns about Judge

8    Jernigan's bias, right?

9    A    Not -- not here.

10   Q    And you didn't -- you didn't say anything in this email on

11   December 24th that you thought Ms. -- that you thought Judge

12   Jernigan was anything but partial, right?

13   A    The issue is not addressed in this email.

14   Q    In fact, you told -- you told your lawyers just the

15   opposite, didn't you?  Isn't that right?

16   A    No.

17   Q    You told your lawyers "Who knows how Judge Jernigan is

18   going to react;" isn't that right?

19   A    Yes.

20   Q    Okay.  And then you forward your private communications

21   with your lawyers to Mr. Ellington, correct?

22   A    Yes.

23   Q    And in your communications with Mr. Ellington, you

24   included the K&L Gates letters, correct?

25   A    Yes.

Dondero - Direct                          122

1    Q    Are you aware of anything in the TRO that would allow you

2    to communicate with Mr. Ellington concerning the letters

3    between the Debtor and the K&L Gates clients?

4    A    I don't know.  Goes back to settlement counsel.

5    Q    Okay.  You had other communications with Mr. Ellington on

6    Christmas Eve, didn't you?

7    A    I did.

8    Q    And in fact, you communicated with Mr. Ellington about

9    your decision to object to the Debtor's settlement with

10   HarbourVest; isn't that right?

11   A    Yes.

12   Q    Okay.

13          MR. MORRIS:  Can we just see that for the record,

14   Exhibit 21?

15   BY MR. MORRIS:

16   Q    You recall that, in late December, the Debtor filed notice

17   of a settlement it reached with HarbourVest, correct?

18   A    Yeah.

19   Q    And in this email string, Mr. Assink, one of your personal

20   lawyers, purported to summarize the terms of the settlement

21   for Mr. Lynn and other attorneys at Bonds Ellis.  Do you see

22   that at the bottom?

23          MR. MORRIS:  Yep, right there.

24          THE WITNESS:  Yes.

25   BY MR. MORRIS:

Dondero - Direct                        123

1   Q    And then Mr. Lynn forwarded Mr. Assink's email to you,

2   correct?

3   A    Yep.

4   Q    And you responded to your lawyers and told him to make

5   sure that you objected, correct?

6   A    Yes.

7   Q    You didn't like the terms of the deal; isn't that right?

8   A    Well, at the time -- at the time, we didn't realize that

9   -- yeah.  And -- yes.  It was -- it was a ridiculous way of

10  destroying the estate, in our opinion.

11  Q    Okay.  So, so you were adverse to the Debtor at this

12  moment in time with respect to the Debtor's decision to enter

13  into the HarbourVest settlement, correct?

14  A    We disagreed with the HarbourVest settlement is as far as

15  I want to answer that question.

16  Q    And you wanted to challenge the Debtor's decision to reach

17  an agreement on the terms set forth in Mr. Assink's email,

18  correct?

19  A    Yes.

20  Q    And you decided to forward your communications with your

21  lawyers on the topic of your decision to object to the

22  HarbourVest settlement to Mr. Ellington on Christmas Eve,

23  correct?

24  A    Yes.

25  Q    Okay.  Can you identify anything in the TRO that would

Dondero - Direct                    124

1   authorize you to communicate with the Debtor's employees after

2   the TRO was entered into about your decision to object to the

3   HarbourVest settlement that the Debtor was seeking to enter

4   into?

5   A    I don't know.  I was relying on Ellington's role as

6   settlement counsel.

7   Q    Okay.

8          THE COURT:  All right.  We're going to have to stop.

9   Are you almost through, Mr. Morris?

10         MR. MORRIS:  I have one more document.

11         THE COURT:  Okay.

12         MR. MORRIS:  Literally three -- two or three minutes.

13         THE COURT:  Okay.

14  BY MR. MORRIS:

15  Q    You had one more communication on Christmas Eve with Mr.

16  Ellington; isn't that right?

17  A    Uh-huh.

18  Q    Okay.  And this is -- this is where you told him about the

19  Debtor's letter evicting you from the offices and about their

20  demand for your cell phone, right?

21  A    I -- please refresh me.

22  Q    Okay.

23         MR. MORRIS:  Exhibit 53, please.

24  BY MR. MORRIS:

25  Q    On December 23rd, the Debtor sent your lawyers that letter

Dondero - Direct                              125

1   that we looked at earlier giving notice of eviction and

2   demanding the return of your cell phones, correct?

3   A    Yep.

4   Q    And then the next day, on December 24th, Mr. Lynn

5   forwarded the letter to you, correct?

6   A    Yep.

7   Q    And Mr. Lynn forwards that to you and he provides advice

8   about the contents of the cell phone, correct?

9   A    Yes.

10  Q    And you pass this advice, along with the letter, to Mr.

11  Ellington, correct?

12  A    Yes.

13  Q    This email string and the letter have nothing to do with

14  shared services, correct?

15  A    Okay.  Broadly, shared services includes everything trying

16  to get to a settlement of what to do with the employees.  And

17  so I, again, I view it broadly as yes.

18  Q    Okay.  Mr. Lynn's advice that you're passing along to Mr.

19  Ellington is limited to the cell phone, correct?

20  A    I think he has the same view that I do regarding Ellington

21  as settlement counsel should be -- should be restricted and

22  not open up a window into all legal communication with me and

23  my lawyers.  But obviously you're taking a different view.

24          MR. MORRIS:  I move to strike.  Real simple.  Last

25  question, Your Honor.

1          THE COURT:  Sustained.

2   BY MR. MORRIS:

3   Q   Mr. Dondero, you forwarded -- the email that you forwarded

4   to Mr. Ellington included the advice from your lawyer about

5   your cell phone and the letter that evicted you from the

6   Debtor's offices and made the demand for the cell phones back,

7   correct?

8   A   Yes.

9   Q   Okay.

10          MR. MORRIS:  I have no further questions, Your Honor.

11          THE COURT:  All right.  It's --

12          MS. SMITH:  Your Honor, this is Frances Smith.

13   Before we go on break, I just wanted to give Your Honor one

14   piece of good news that might help save you some time this

15   afternoon.

16          THE COURT:  Okay.

17          MS. SMITH:  We now have an agreement with Mr.

18   Dondero's counsel that they will not be calling Mr. Leventon,

19   and the Debtor has already agreed that they would not be

20   calling Mr. Leventon.  So if we could please release Mr.

21   Leventon for the rest of the afternoon, we would appreciate

22   that, Your Honor.

23          THE COURT:  All right.  Mr. Wilson, you confirm?

24          MR. WILSON:  Yes, Your Honor.

25          THE COURT:  All right.  Well, Mr. Leventon is

Dondero - Cross                                127

1   excused.  Thank you for that.

2              MS. SMITH:  Thank you, Your Honor.

3              THE COURT:  All right.  It's 1:06.  We're going to

4   take a 30-minute break.  We'll come back at 1:36.

5              THE CLERK:  All rise.

6              MR. MORRIS:  Thank you, Your Honor.

7        (A luncheon recess ensued from 1:06 p.m. until 1:42 p.m.)

8              THE CLERK:  All rise.

9              THE COURT:  All right.  Please be seated.  All right.

10  We are going back on the record, a few minutes late, 1:42, in

11  Highland Capital Management.

12       Mr. Morris had just passed the witness, Mr. Dondero, to

13  Mr. Wilson.  And remember, we were clear earlier on that this

14  can be both cross as well as direct, beyond the scope of Mr.

15  Morris's direct, so that we can hopefully be more efficient

16  with our time.

17       All right.  So, Mr. Dondero, you're still under oath.  Mr.

18  Wilson, you may go ahead.  (Pause.)  All right.  Mr. Wilson,

19  can you hear me?

20             MR. WILSON:  I apologize, Judge.  I forgot to unmute.

21             THE COURT:  All right.  You may proceed.

22             MR. WILSON:  All right.

23                         CROSS-EXAMINATION

24  BY MR. WILSON:

25  Q    Mr. Dondero, when did you learn that the Debtor was

1   seeking a TRO against you?

2   A    On or about the time they filed it.

3   Q    And did anyone at that time explain to you the relief the

4   Debtor was seeking?

5   A    Shortly thereafter, counsel went over it with me.

6   Q    And did they -- your counsel explain the relief to you?

7   A    Yes.

8   Q    And did you end up attending the hearing on the TRO?

9   A    No.

10  Q    And why did you not attend the hearing on the TRO?

11  A    Well, all of these hearings tend to start with a diatribe

12  of what I think are untruthful, hurtful, and insulting

13  comments about me that seem to go on for hours.  And I -- I

14  don't know, what's the expression, twisted by knaves to make a

15  trap for fools, but I hate -- I hate hearing it, so I -- I've

16  done nothing but try and help the estate and buy the estate in

17  good faith, but people are moving to different agendas, and I

18  think we've been betrayed by Seery morphing from a Chapter 11

19  to a Chapter 7 trustee for his own benefit.

20  Q    After the hearing, did you learn that there was a TRO

21  entered against you?

22  A    Yes.

23  Q    And how did you learn that a TRO had been entered against

24  you?

25  A    From counsel.

Dondero - Cross                                    129

1  Q   And how long after the hearing did you learn about that?

2  A   Shortly thereafter.  I'm not sure exactly when.

3  Q   And did your counsel provide you a copy of the TRO?

4  A   Yes.

5  Q   And did anyone explain to you what the TRO meant?

6  A   Yeah, I -- again, I take seriously anything that comes

7  from the Court, and I did adjust my behavior, but the overall

8  theme, that somehow I was doing something to hurt the creditor

9  or hurt the Debtor or hurt investors I viewed as incongruent

10 with any of my behavior.  So I didn't think it was going to

11 require much adjustment.  I -- I -- yes.  So, anyway.  But I

12 paid attention.  I listened.  I understood that we're still

13 moving forward with pot plan activities.  I understood we were

14 still moving forward on trying to migrate the employees

15 peacefully under a shared services agreement.  And I

16 understood that we were still trying to figure a settlement,

17 either individually with different creditors or globally with

18 different creditors.

19 Q   Okay.  Did you -- you said that your counsel provided you

20 a copy of the TRO and you discussed the TRO with your counsel.

21 Did you -- did you form an understanding of what you could and

22 could not do under the TRO?

23 A   Yeah, I -- again, like I -- like I just said, I thought

24 the spirit was to make sure I didn't do anything that could be

25 interpreted as moving against the Debtor, but still

Dondero - Cross                                    130

1   nonetheless trying to preserve value and reach a settlement.

2   And, you know, the -- the employees have been treated more

3   shoddy than in any bankruptcy we've ever been involved in, and

4   so I was also wanting to make sure that shared services went

5   as smoothly as possible.

6   Q    Did you have an opportunity to ask your counsel questions

7   about the TRO?

8   A    Yes.

9   Q    And did you rely on your counsel to explain to you what

10  the TRO meant?

11  A    Yes.

12  Q    And in the weeks that followed the entry of the TRO, did

13  you continue to seek advice from your counsel regarding what

14  you could and could not do under the TRO?

15  A    Yes.

16  Q    And why did you do that?

17  A    Again, to stay compliant, not -- to stay compliant and

18  avoid any specific tripwires or any trickery that might have

19  been in the agreement.

20  Q    Did you -- why do you believe that the TRO was entered

21  against you?

22  A    It goes back to the trades that were done for no business

23  purpose the week of Thanksgiving, two days before

24  Thanksgiving, I think, actually, the Friday after

25  Thanksgiving, when only five percent of the people on Wall

1    Street are actually in the office, selling securities for no

2    business purpose at a 10 percent loss to where they were

3    trading and a 50 percent loss to where they were trading a

4    month later.

5    Q    Well, did you interfere with Mr. Seery's trading

6    activities?

7    A    I've been as clear as I can be.  I take much umbrage in

8    capricious, wanton destruction of investor value.  And I

9    interfered with the trades around Thanksgiving directly by

10   telling the traders that they shouldn't put the trades

11   through, there's no business purpose, there's no rationale,

12   that the investors that control a vast majority of the CLOs

13   are going to move the contracts and they don't want the

14   securities traded.  So, yes, I objected strenuously in the

15   November Thanksgiving time frame.

16       As far as December 20th is concerned -- I know I've

17   corrected this testimony three or four times -- there is no

18   evidence of me talking to anybody other than sending one email

19   to Jason Post, who is a NexPoint employee, not a Highland

20   employee, and just saying, you know, Jason, you need to look

21   at these trades.  Because I couldn't believe they would pass

22   through compliance when they were against the specific

23   interests of investors.

24   Q    Well, Mr. Dondero, did you rethink your actions around

25   Thanksgiving, after the filing of the TRO motion by the

Dondero - Cross                              132

1   Debtors?

2   A    Yeah.  I mean, yes.  I mean, just to repeat, again, I did

3   nothing regarding the December 20th trades except for one

4   email to Jason Post saying you should take a look at it.  I

5   never followed up with him.  I never knew what he was doing.

6   It wasn't until he testified a month later that he looked at

7   it with outside counsel, agreed that the trades were improper,

8   so he wouldn't put them through the order management system,

9   so Seery and Highland had to come up with their own workaround

10  to do trades that I still believe are improper.

11  Q    Did you respect the Court's authority to enter a TRO

12  against you?

13  A    Yes.  I mean, like I said, I didn't interfere directly or

14  -- and I think Seery has testified twice that he had his own

15  workarounds, he did what he wanted to do, regardless of

16  investor thoughts or compliance, and no one stopped him or

17  slowed him down anyway.  So there's no -- there was no harm

18  whatsoever regarding the December trades.

19  Q    So you took the TRO seriously?

20  A    Absolutely.

21  Q    And the TRO was important to you?

22  A    Well, I -- yes.  I mean, I understood, I respected, you

23  know, I modified my direct behavior, but I still had my views

24  on what's proper for the estate and what's proper for

25  investors, so I have to reflect those, you know, differently

Dondero - Cross                          133

1  or indirectly.

2  Q    So I guess a fair characterization of what you just said

3  is that you may have had differing opinions on the actions the

4  Debtor was taking but you changed the way that you reacted to

5  those actions?

6          MR. MORRIS:  Objection to the form of the question.

7  Leading.

8          THE COURT:  Sustained.

9  BY MR. WILSON:

10 Q    Well, Mr. Dondero, did you -- did you agree with

11 everything Mr. Seery did after December 10, 2021?  I'm sorry,

12 2020?

13 A    No.

14 Q    Did you take any action -- did you take any action after

15 December 10, 2020 to -- that you understood might violate the

16 TRO?

17 A    No.  And, again, with the goal of trying to transition

18 employees fairly, make up to them the fact that their 401(k)

19 contributions were canceled, their 2019 bonuses were canceled,

20 their 2020 bonuses were canceled.  You know, I tried to do

21 what was best and fair for everybody, but not in a way that

22 disrupted the Debtor or even contacted, you know, people

23 directly.

24 Q    And so were you aware on December 10th that you were

25 restrained from communicating, whether orally, in writing, or

1   otherwise, directly or indirectly, with any board member

2   unless Mr. Dondero's counsel and counsel for the Debtor are

3   included in any such communication?

4   A   Yes.  And that's how we handled it.  We had a meeting with

5   -- or, in fact, I wasn't even at the meeting, but Judge Lynn

6   had a meeting with the independent board members to discuss

7   the pot plan towards the end of the month of December.

8   Q   And in your understanding, did you ever do anything to

9   violate that provision of the TRO?

10  A   No.

11  Q   Were you aware that on December 10th you were restrained

12  from making any express or implied threats of any nature

13  against the Debtor or any of its directors, officers,

14  employees, professionals, or agents?

15  A   Yes.

16  Q   And did you do, in your understanding, did you do anything

17  after December 10th to violate that provision of the TRO?

18  A   No.  I mean, that's -- I had very -- very little, if any,

19  contact with any Highland employees or board members, or

20  Seery, other than the day after Thanksgiving, in that period

21  of time whatsoever.  So I never -- I never threatened anybody

22  -- I'm going to say period -- but even during the injunction

23  period, for sure.

24  Q   Were you aware that on December 10th you were restrained

25  from communicating with any of the Debtor's employees except

Dondero - Cross                              135

1  as it specifically relates to shared services currently

2  provided to affiliates owned or controlled by Mr. Dondero?

3  A    Yes.

4  Q    And did you knowingly do anything to violate this

5  provision of the TRO?

6  A    No.  I said this before, probably not in the right format,

7  on whatever it was, cross or direct earlier, but shared

8  services was a broad, multifaceted discussion that a lot of

9  people were involved in and moving towards for three or four

10 months.  It included systems, it included accounting

11 personnel, it included what was going to happen to 40-odd

12 employees, which asset management contracts were potentially

13 going to move or not move.  At one point, the CLOs were, and

14 then those CLOs weren't.  You know, whatever.

15     So, there was -- it was not just about moving back office.

16 It was also about front office and valuation and whether or

17 not there was going to be an overall settlement, whether or

18 not the pot plan was going to work out, whether or not there

19 was going to be an ability to buy out individual creditors.

20 All those things were being explored, as you saw in the emails

21 earlier, like with Clubok.  There was a -- exploring buying

22 out his interest or changing his dynamics.

23     There was also conversations where Redeemer Committee had

24 agreed to sell their interest in Cornerstone for ninety

25 million bucks but then changed their mind.

Dondero - Cross                              136

1      There was agreements with -- there was negotiations going

2   on all over the place.  And I needed help, since I'd been

3   isolated, and Scott Ellington, as my settlement counsel, or as

4   the go-between with Seery and with the creditors, was an

5   important piece of trying to get something done.

6   Q    Mr. Dondero, were you aware that on December 10th you were

7   restrained from interfering with or otherwise impeding,

8   directly or indirectly, the Debtor's business, including but

9   not limited to the Debtor's decisions concerning its

10  operations, management, treatment of claims, disposition of

11  assets owned or controlled by the Debtor, and pursuit of the

12  plan or any alternative to the plan?

13  A    Yes.  I mean, it was -- it was clear this was the final

14  step in the divide-and-conquer strategy.  It was clear that

15  Pachulski and Seery were going to be rewarded a multiple of

16  ten or fifteen times compensation for becoming liquidating

17  trustees instead of Chapter 11 trustees.  And the best way to

18  do that was to isolate me by creating gigantic awards to

19  claimants who six, nine months earlier, Seery would bet his

20  career had zero claims, all of a sudden got a hundred million

21  bucks.

22      It was a way of distorting those claims between Class 8

23  and Class 9 so that there would never be a residual interest,

24  and then for Pachulski and Seery to get paid large incentive

25  compensation for administering a liquidation, even though they

Dondero - Cross                                    137

1  were betraying the estate that they had been hired for to do a

2  Chapter 11.

3  Q    Given all that, did you do anything that you believed

4  would violate the -- that provision of the TRO?

5  A    No.  I don't believe that objecting to the 9019s that had

6  no basis in economic reality or legal risk, that were never

7  scrutinized, you know, by the Court, I did not believe that

8  objecting to those in any way violated the TRO.

9  Q    All right.  Well, in any event, are you -- are you aware

10  that the TRO included a footnote that says, For the avoidance

11  of doubt, this order does not enjoin or restrain Mr. Dondero

12  from seeking judicial relief upon proper notice or from

13  objecting to any motion filed in the above-referenced

14  bankruptcy case?

15  A    Yes.

16  Q    Were you aware that on December 10th you were restrained

17  from otherwise violating Section 362(a) of the Bankruptcy

18  Code?

19  A    Yes.

20  Q    And do you know what Section 362(a) of the Bankruptcy Code

21  is?

22  A    That's -- is that the one with disturbing contracts or

23  taking property?  It's one of those two, right?

24  Q    Well, would it -- would it be the automatic stay, in your

25  understanding?

Dondero - Cross                                      138

1   A    Yeah, okay, the automatic stay regarding contracts.

2   Q    And did you violate, after December 10th, that provision

3   of the TRO?

4   A    No.

5   Q    Were you aware that on December 10th you were restrained

6   from causing, encouraging, or conspiring with any entity owned

7   or controlled by him -- meaning you -- and/or any person or

8   entity acting on his behalf from, directly or indirectly,

9   engaging in any prohibited conduct?

10  A    Again, yes.  Again, it's broad and far-reaching, but it's

11  an intent to isolate anybody who -- myself and any other third

12  party or related party that has bona fide interests in

13  stopping this destruction of an estate that started with $450

14  million of assets and $110 or $120 million of claims the first

15  three months in.  And that was Pachulski's work and everybody

16  else's.  And then somehow at the end we end up with $200

17  million of assets and $300 million of claims.

18       Where did it go?  Where's the examiner?  Where's the --

19  where's the -- where's the scrutiny of giving HarbourVest more

20  of an award than they had in investment in the funds?  Where

21  is the scrutiny of giving Josh Terry another $28 million on

22  top of the 18 he's already taken out of Acis on a $1 million

23  employee dispute?  Where's the scrutiny of Redeemer getting

24  more in terms of cash, noncash, keeping of Cornerstone, than

25  their original arbitration award?  Where is the fairness in

Dondero - Cross                                        139

1   this process?

2   Q    Despite your personal beliefs on those matters, did you do

3   anything that would violate that provision of the TRO?

4   A    No.

5   Q    And, in fact, after December 10th, did you do anything at

6   all that you believed would violate the TRO?

7   A    I've done nothing except, in a complex, shifting betrayal,

8   trying to provide continuity for the business and for the

9   employees.  I've tried nothing except try to settle this.  But

10  as the -- as the Court's best judgment is to relentlessly

11  pound on everything we do, there's no way to ever to reach a

12  compromise because the other side figures they're going to win

13  everything and has no downside.  So I don't see how I could

14  ever negotiate more on a settlement.

15       (Interruption.)

16  Q    So, to clarify, after December 10th, did you ever do

17  anything that you believed might violate the TRO?

18  A    No.

19  Q    All right.  I'm going to show you an exhibit -- and I

20  think Bryan Assink is going to put it on the screen -- that

21  was previously admitted for the Debtor.  And that would be

22  Debtor's 55.  And I want to go to Page 14 of that document.

23           MR. WILSON:  And scroll down just a hair, Bryan.  All

24  right.  That'll work.

25  BY MR. WILSON:

Dondero - Cross                              140

1    Q    All right.  Mr. Dondero, you were asked to read some

2    provisions from this.  And to refresh you, this is the

3    Highland Capital Management Employee Handbook, Exhibit 55 for

4    the Debtor.  But you were asked to review and read some

5    provisions from this exhibit in your earlier testimony, but I

6    want to point you to one sentence that you were not asked to

7    read, and that would be the last sentence of the paragraph in

8    the middle of the page there that starts with "Participation

9    in this policy."  Can you read that sentence, starting with

10   "Your obligations"?

11   A    I'm sorry.  Where is it?  In the first full paragraph or

12   the second full paragraph?

13   Q    Yeah.  The first -- the last sentence of the first full

14   paragraph, starting with "Your obligations."

15   A    Okay.  (reading)  Your obligations under this policy shall

16   terminate upon the termination of your employment, provided

17   that you will remain obligated to furnish historical call

18   records covering the period through the date of your

19   termination, as requested, through the termination of your

20   employment.

21        So I had been terminated -- I had been terminated long

22   ago, if that's what you're asking.

23   Q    Yes.  What day were you terminated?

24   A    Well, I was terminated as a Highland employee early on in

25   the case, and I was -- well, I guess I was paid by NexPoint,

Dondero - Cross                              141

1  but no, then I was terminated by Highland -- you know what, I

2  don't remember, honestly.

3  Q   Well, do you -- do you recall if you submitted a letter of

4  resignation on October 9th?

5  A   You know what, that -- that sounds familiar.  Yeah, I

6  would have -- yes.  I would have preferred not to resign, but

7  I contractually had to.

8  Q   Well, so what were the reasons that led to you resigning?

9  A   I was asked to resign.

10 Q   And who asked you?

11 A   Jim Seery.

12 Q   During your time with Highland, did Highland pay for your

13 personal cell phone bill?

14 A   I -- I don't know.  I -- pre-bankruptcy, I assume yes.  I

15 don't know what was going on after bankruptcy.

16 Q   Do you know whether you or Highland paid for the cell

17 phone itself?

18 A   I don't know.

19 Q   And by cell phone itself, I'm referring to the cell phone

20 you had up until around mid-December.  You don't recall who

21 paid for that cell phone?

22 A   No.

23 Q   How often do you get a new --

24 A   But that'd be a --

25 Q   -- cell phone?  I'm sorry.  You --

Dondero - Cross                           142

1  A    That'd be a good -- I was going to say, that would be a

2  good question to research.  It might not have even being been

3  paid by Highland.  I don't -- I just don't know the answer.

4  Q    Did you --

5  A    Yeah.

6  Q    Did you routinely replace your cell phone?

7  A    Usually every three or four years, although I really do

8  not like this new 5G phone at all.

9  Q    Well, do you know when you last got a phone prior to

10 December of 2020?

11 A    Three years ago.

12 Q    And did Highland have a procedure for replacing your cell

13 phone?

14 A    Yes.  It was -- it was put in place by Thomas Surgent as

15 head of compliance with the goal of protecting investor

16 information or anything that could be business communication

17 being misused by a recycled or destroyed phone.  So there was

18 a process by which, when you got a new phone, you gave it to

19 Jason Saffery -- I'm sorry, wrong Jason -- Jason Rothstein,

20 and -- or one of the tech guys, and then they would order your

21 new phone and they would wipe the old phone clean.  I think --

22 I think in this case they had my phone for -- my old phone for

23 the better part of a week.

24 Q    All right.  And you said it was Thomas Surgent who put

25 that policy in place?

Dondero - Cross                                    143

1   A    Yeah.  That's been a policy for at least a decade.

2   Q    And who is Thomas Surgent?

3   A    He heads up -- he's a very experienced, very thoughtful

4   compliance guy.  He's headed up compliance at Highland for

5   over a decade.

6   Q    And did Mr. Surgent hold compliance training sessions for

7   Highland employees and executives?

8   A    Yes.

9   Q    And how often would those training sessions be held?

10  A    I remember them as an annual event.  And it was really --

11  it wasn't a page by page, line by line, through, you know,

12  hundreds of pages of manuals.  It was really what had changed

13  in the environment, you know, usually more from a compliance

14  standpoint than anything.  But it would also include a refresh

15  of any sort of manual stuff.

16  Q    And so you attended these compliance training sessions?

17  A    Yes.

18  Q    And did these compliance training session specifically

19  include training on Highland's cell phone replacement policy?

20  A    That's part of the employee manual.  You know, again, to

21  not have to be aware of every single rule at Highland, when I

22  have something that I know requires compliance issues, I don't

23  solve the compliance issues myself, I give the proposed

24  investment or solution to Compliance and they come back and

25  tell me if it's okay or how to do it.

Dondero - Cross                          144

1      If I have a phone or technology issue, I give my phone to

2  the technology guys and tell them that I want a new phone, and

3  then they handle it in a compliant manner.

4  Q    Do you recall when you first got your very first cell

5  phone?

6  A    In 1980 -- '89.

7  Q    Okay.  And when did you start Highland?

8  A    1994.

9  Q    Okay.  So you had a --

10  A    '93.

11  Q    So you had a cell phone prior to Highland ever existing,

12  correct?

13  A    Yes.  That was in California.  But once we moved to

14  Dallas, I've had the same phone number, probably half a dozen

15  different phones or more in Dallas.

16  Q    So when did you move to Dallas?

17  A    '93, '94.

18  Q    Okay.  And you've had the same cell phone number ever

19  since that time?

20  A    Yes.

21  Q    And did you keep your cell phone number when you got a new

22  phone in December of 2020?

23  A    Yes.

24  Q    Do you use that cell phone number for personal use?

25  A    Yes.

Dondero - Cross                                      145

1    Q    Do you have --

2    A    I only have one cell phone.

3    Q    Okay.  You only have one cell phone?  Do you use that cell

4    phone number to communicate with your friends and family?

5    A    Yes.

6    Q    Do you use that cell phone number to communicate with your

7    attorneys?

8    A    Yes.

9    Q    And is there personal information on your cell phone?

10   A    Yes.

11   Q    Is there information on your cell phone related to

12   business interests other than Highland?

13   A    Yes.  Some.

14   Q    And are there communications from your attorneys on your

15   cell phone?

16   A    Yes.

17   Q    Have any Highland employees with company-paid phones ever

18   left Highland in the past?

19   A    Yes.

20   Q    And did Highland ever keep an employee's cell phone number

21   when an employee would leave Highland?

22   A    No.  We didn't have a unique prefix like some companies do

23   that designates that it's a company phone.  So there was no

24   reason for the company to ever keep cell phone numbers versus

25   new random numbers.

Dondero - Cross                              146

1    Q    All right.  So let's go back to December of 2020.  And you

2    may have hit on this earlier.  But why specifically did you

3    decide to make changes to your cell phone plan in December of

4    2020?

5    A    You know, and again, as I said, I didn't even know if my

6    phones were -- my phone was being paid for or by who, but I

7    assumed they were still being paid by Highland, and it's just

8    the notice to all Highland employees they were going to be

9    terminated without bonuses, without '19 or '20 bonuses, was

10   going to be December 31st, then it was pushed off until

11   January 31st, then February 15th, then February 28th.  But

12   part of that was that their benefits were ceasing at that

13   point in time, too.  So, as far as I knew, everybody was

14   migrating their phone over, and I did mine in the most

15   compliant way I knew how to, by giving it to the -- to the

16   tech guys.

17   Q    So, if Highland was still paying for your cell phone, and

18   you're not a hundred percent sure of that, your testimony is

19   that Highland was going to discontinue paying for that cell

20   phone?

21   A    That was -- that's what they had told all the employees as

22   part of their termination.

23   Q    Okay.  So were you changing the financial responsibility

24   to ensure that it was in your name?

25            MR. MORRIS:  Objection, Your Honor.  Just leading

Dondero - Cross                                    147

1  | questions.

2  |          THE COURT:  Sustained.

3  | BY MR. WILSON:

4  | Q    Did you put the financial responsibility for your cell

5  | phone in your name in December 2020?

6  | A    I -- December -- yes.

7  | Q    And when you were doing that, why did you decide to get a

8  | new cell phone at the time?

9  |          MR. MORRIS:  Objection.  Asked and answered.

10 |          THE COURT:  Sustained.

11 | BY MR. WILSON:

12 | Q    Mr. Dondero, did you -- did you keep the cell phone you

13 | had in December 2020 when you changed the financial

14 | responsibility on your phone?

15 | A    I got a more advanced 5G with better picture-taking

16 | capability and more -- more storage.

17 | Q    And do you recall when you made the decision to get that

18 | new cell phone?

19 | A    A couple weeks before the 10th.  It take -- it take -- it

20 | took -- during COVID, it takes longer to get the phones, so it

21 | took a couple weeks to get it and then for the tech guys to

22 | swipe or clean out the old one and then for me to get the new

23 | one and for the old one that hit Tara's desk on the 10th.

24 | Q    Okay.  Well, who ordered the new cell phone?

25 | A    I don't know.  Sometimes -- most of the time, it's the

Dondero - Cross                                    148

1   guys in tech who do it, and then they coordinate people's

2   credit card to pay for it.

3   Q   Okay.  But it was not you that actually made the order?

4   A   No.  I was not involved.

5   Q   Okay.  And you say you think it was ordered about a week

6   to ten days before your new phone was set up?

7   A   At least.  The iPhone 12 is -- is and has been backlogged.

8   Q   After the cell phone policy that you testified to earlier

9   was put in place, did you follow this policy every time you

10  got a new cell phone?

11  A   Yes.

12  Q   Did you do anything differently with respect to the

13  process of replacing your cell phone in December of 2020?

14  A   No, I did not.

15  Q   At the time you got a new phone, were you aware that Scott

16  Ellington was also getting a new phone?

17  A   No.

18  Q   So did you discuss your decision to get a new phone with

19  Mr. Ellington?

20  A   No.  Again, I assumed everybody was doing it.  It wasn't

21  something I needed to discuss with him.

22  Q   So, --

23  A   Yeah.

24  Q   -- do you recall if you had any discussions with Isaac

25  Leventon about getting a new cell phone?

1    A    No.

2    Q    No, you don't recall, or no, you did not?

3    A    No, I did not.

4    Q    At the time you got your new phone, were you aware that

5    any party was seeking information from your old phone?

6    A    No.

7    Q    Did Isaac Leventon ever tell you that anyone wanted to

8    preserve text messages on your old phone?

9    A    No.

10   Q    Were you ever provided a litigation hold letter or other

11   notification to preserve information on your phone?

12   A    No.

13   Q    Did you ever receive -- or, I'm sorry -- did you receive a

14   text message from Jason -- Jason Rothstein on December 10th

15   stating that your old phone was in Tara's desk drawer?

16   A    Yes.

17   Q    And who is Tara?

18   A    Tara is my assistant.

19   Q    Did you ever see your old phone again after receiving that

20   text?

21   A    No.

22   Q    And who -- do you recall who -- the individual you handed

23   your phone to when you initiated the process to getting a new

24   one?

25   A    It was Jason Rothstein in the Systems or the Technology

Dondero - Cross                              150

1   Group.

2   Q    And to be clear, Mr. Rothstein is a Highland employee,

3   right?

4   A    Yes.

5   Q    Do you have any personal knowledge about what happened to

6   your phone after Jason Rothstein texted you that he left it in

7   Tara's desk?

8   A    No.

9   Q    Did you ever look to see if it was in Tara's desk?

10  A    No.

11  Q    Did you -- you -- you didn't take the phone out of Tara's

12  desk?

13  A    No.

14  Q    So did you ever see the phone again after you turned it

15  over to Jason Rothstein?

16  A    No.

17  Q    Do you know where the phone is today?

18  A    No.  But, again, I don't know why this is relevant.  They

19  can get the text messages from the phone company if they think

20  it's that big of a deal.

21  Q    When you previously testified that the phone was disposed

22  of, what did you mean?

23  A    I mean, that's -- that's the last step.  That's what

24  always happens to the old phones.  But to say it was tossed in

25  the garbage, I have no idea.  I have no idea what happened to

1  it after it went back to Tara's desk.

2  Q    So do you have any personal knowledge that your phone was

3  actually disposed of?

4  A    I don't know.

5  Q    When did you first become aware that the Debtor wanted to

6  see your phone?

7  A    Again, when I had given it to Jason, I thought they had

8  seen it.  You know, so I was surprised by the communication

9  during the week of Christmas, I think it was, when I was -- I

10 was out of town.

11 Q    Well, yeah, I'll rephrase my question.  When did you first

12 become aware that the Debtor's counsel wanted to see your

13 phone?

14 A    I had some communication from my counsel the week of

15 Christmas.

16 Q    Okay.  And what did you do for Christmas last year?

17 A    I took my girls to Aspen.

18 Q    And do you recall the dates that you were in Aspen?

19 A    Until the 28th.

20 Q    I'm sorry.  I think you cut out.

21 A    Until the -- until the 28th.

22 Q    Okay.  And were you working while you were in Aspen?

23 A    A little bit.

24 Q    So, there was some talk earlier about the Committee filing

25 a motion to get ESI from Highland and certain individuals.

Dondero - Cross                           152

1    Did anyone, after or contemporaneously with the filing of that

2    motion, ever inform you that the Committee was seeking your

3    text messages?

4    A    No.  And -- yeah.  No.  And it's -- that's an indirect

5    request versus a direct request, right?

6    Q    Well, so no one at the Debtor ever asked you to preserve

7    text messages?

8    A    Correct.

9    Q    And so would that include Isaac Leventon?  He never asked

10   you to preserve any text messages?

11   A    Correct.  No one -- no one -- no one from the Debtor did.

12   Q    And, so, going back, you were in Aspen when the Debtor's

13   December 23rd letter was sent to Mr. Lynn, correct?

14   A    Yes.

15   Q    And Mr. Lynn communicated that letter to you?

16   A    Yes.

17   Q    And did you discuss that letter with Mr. Lynn?

18   A    Yes.

19   Q    And are you aware that Mr. Lynn wrote a response to Jeff

20   Pomerantz regarding that letter?

21   A    Yes.

22   Q    And are you aware that that response was sent on or about

23   December 29th?

24            THE WITNESS:  You want to -- can John Morris maybe

25   put his phone on mute, because he's -- he's shuffling papers

Dondero - Cross                           153

1   and it's -- it's throwing it off on this end.

2           THE COURT:  I --

3           MR. WILSON:  Yeah.  My question was, are you aware

4   that that letter was sent on or about December 29th?

5           THE WITNESS:  Yes.

6   BY MR. WILSON:

7   Q   And are you aware that that letter from Mr. Lynn to Mr.

8   Pomerantz stated that, we are, at present, not sure of the

9   location of the cell phone issued to Mr. Dondero by the

10  Debtor?

11  A   Yes.

12  Q   On December 29, 2020, did you know the location of your

13  cell phone?

14  A   No.

15          MR. WILSON:  Your Honor, at this time I would like to

16  ask for the admission of the exhibits on my second amended

17  witness and exhibit list.

18          THE COURT:  All right.  Are you talking about

19  Exhibits 1 through 20 at Docket Entry 106?

20          MR. WILSON:  That's correct.  Exhibits 1 through 20.

21          THE COURT:  Any objection?

22          MR. MORRIS:  No, Your Honor.

23          THE COURT:  All right.  They're admitted.

24          MR. WILSON:  All right.  All right, thank you.

25        (Dondero's Exhibits 1 through 20 are received into

Dondero - Cross                                        154

1    evidence.)

2              MR. WILSON:  Can you turn to 1?

3    BY MR. WILSON:

4    Q    We're going to put an exhibit -- Dondero Exhibit No. 1 on

5    the screen.  Mr. Dondero, have you seen this document before?

6    A    Yes.

7    Q    And can you identify what this document is?

8    A    It's a shared services agreement -- (pause).  It's a

9    shared services agreement between Highland and NexPoint

10   Advisors.

11   Q    Okay.  And in the first paragraph, is NexPoint Advisors

12   defined as the Management Company?

13   A    Yes.

14             MR. WILSON:  Go to Page 3, the bottom.  Article 2.

15   BY MR. WILSON:

16   Q    Now, I want to direct your attention to the bottom of Page

17   3, Article 2.  Can you read the first paragraph, Section 2.01?

18   A    (reading)  Highland is hereby appointed as staff and

19   services provider for the purpose of providing such services

20   and assistance as the management company may request from time

21   to time to -- and as applicable to make available the shared

22   employees to the management company, in accordance with and

23   subject to the provisions of this agreement, and the staff and

24   services provided -- and the staff and services provider

25   hereby accepts such appointment.  The staff and services

Dondero - Cross                                    155

1   provider hereby agrees to such engagement during the term

2   hereof and to render the services described herein for the

3   compensation provided herein, subject to the limitations

4   contained herein.

5   Q    All right.  And can you read for me the first part of

6   Paragraph 2.02, please?

7   A    (reading)  Without limiting the generality of 2.01, and

8   subject to Section 2.04, applicable asset criterion

9   concentrations below, the staff and services provider hereby

10  agrees from the date hereof to provide the following back and

11  middle office services, administrative infrastructure, and

12  other services to the management company.

13  Q    All right.  In Paragraph A, under Back and Middle Office,

14  if we go down to the next page, does that include Finance and

15  Accounting Services?

16  A    Yes.

17  Q    And then Paragraph B, does that include Legal, Compliance,

18  and Risk Analysis services?

19  A    Yes.

20  Q    And specifically, would that be assistance and advice with

21  respect to legal issues, litigation support, management of

22  outside counsel, compliance support and implementation and

23  general risk analysis?

24  A    Yes.

25  Q    So, did NexPoint Bank have its own accountants?

Dondero - Cross                              156

1  A    No.  NexPoint -- NexPoint Advisors, that's who we're

2  talking about here, --

3  Q    I'm sorry.  NexPoint Advisors.

4  A    -- yeah, relied on Highland for those services.  I mean,

5  it subsequently -- it subsequently had to hire a couple

6  lawyers because it wasn't getting those services to the extent

7  it used to.  But it used to have zero, zero of its own

8  accountants and lawyers.

9  Q    Okay.  And then you had -- you said it had zero lawyers

10 initially.  Was it the intention that, that by shared

11 services, that NexPoint Advisors would use Highland's lawyers

12 and accountants without the need of having to hire their own?

13 A    Yes.  I mean, the structure might be unusual compared to

14 other companies that run through bankruptcy, but in financial

15 services, there's -- there's generally a centralized model for

16 high-cost people in the legal, accounting, and tax arena so

17 that each subsidiary doesn't have to have their own expensive,

18 duplicative set of employees.

19 Q    Okay.

20            MR. WILSON:  Can you go to the next exhibit?  2?

21 BY MR. WILSON:

22 Q    I'm going to put up Dondero Exhibit 2.  (Pause.)  It

23 should be here momentarily.  All right.  Can you see that

24 document, Mr. Dondero?

25 A    Yes.

1    Q    And have you seen this document before?

2    A    This is a similar shared services agreement, but this time

3    with HCMFA, the other asset management arm.

4    Q    Okay.  And you would agree with me that Highland Capital

5    Management, LP is defined as HCMLP and that Highland Capital

6    Management Fund Advisors, LP is identified as HCMFA?  Do you

7    agree with that?

8    A    Yes.

9    Q    Okay.

10                MR. WILSON:  Go to Page 3.

11   BY MR. WILSON:

12   Q    Now, can you read Paragraph 2.01 to me?

13   A    It's almost the exact same as the other one.  Do you

14   really want me to read it?  I mean, it just -- is there

15   something different in this paragraph?  It's just a different

16   entity.

17   Q    Right.  Well, just -- just read the Paragraph 2.01.

18   A    Okay.  (reading)  During -- during the term, service

19   provider -- service provider will provide recipient with

20   shared services, including, without limitation, all of the

21   finance and accounting services, human resources services,

22   marketing services, legal services, corporate services,

23   information technology services, and operations services, each

24   as requested by HCMFA and as described more fully on Annex A

25   attached hereto, the shared services exhibit, it being

1    understood that personnel providing shared services may be

2    deemed to be employees of HCMFA to the extent necessary for

3    purposes of the Investment Advisers Act of 1940, as amended.

4    Q    All right.  And you stated a minute ago that, although

5    worded differently, this paragraph has the same structure and

6    intent of the prior document we looked at, correct?

7    A    Yes.

8    Q    And there's a -- a sentence and a portion of a sentence

9    that you read that says that the personnel providing shared

10   services may be deemed to be employees of HCMFA.  Do you see

11   that?

12   A    Yes.

13   Q    And do you know why that provision is in there?

14   A    Sometimes the Investment Advisers Act requires

15   specifically employees to be named that are key man in

16   different -- whatever.  So sometimes people have to be dual

17   employees or -- or in the entity.  Even if there are very few

18   people in the entity and it's relying on shared services,

19   sometimes, yeah, sometimes you need to have split people or

20   move them in.

21   Q    All right.  I just want to ask you a couple questions

22   about your depositions given in this case.  Did you give a

23   deposition on December 14th?

24   A    Yes.

25   Q    And who took that deposition?

1   A    I believe that -- I believe that was John Morris.

2   Q    Okay.  And was that deposition given remotely by Zoom?

3   A    Yes.

4   Q    And December 14th is four days after the TRO was entered,

5   correct?

6   A    Yes.

7   Q    And at that deposition, did Mr. Morris ask you where you

8   were located?

9   A    Yes.

10  Q    And what did you tell him?

11  A    In the Madrone conference room.  Or the main conference

12  room at Highland.

13  Q    Okay.  Now, you acknowledged that you personally

14  intervened to stop trades that Mr. Seery wanted to make around

15  the time of Thanksgiving, correct?

16  A    Yes.

17  Q    Were any trades halted as a result of your actions?

18  A    I -- I don't believe, even when I directly impacted it in

19  November, I don't believe it actually stopped or slowed

20  anything down.  And I believe he testified similarly.  And I

21  know for sure in December, because I had no contact with any

22  of the traders, I know I did nothing to disrupt anything in

23  December 20th --

24  Q    But in any event, it's your understanding, as you earlier

25  testified, that those events around Thanksgiving led to the

Dondero - Cross                                    160

1  entry of the TRO?

2  A    Yeah.  I mean, again, I think he intentionally did it to

3  get my attention.  He sold illiquid restructured equities that

4  the CLOs had owned for ten years, had no reason to sell, would

5  have liked to have held longer, and he sold them for almost --

6  for about half the price that they were two months later.  It

7  was -- it was a colossal, intentional harm of investors.

8  Q    But you believe that those events led to the entry of the

9  TRO?

10 A    Yes.  I reacted severely and -- by telling him not to do

11 it again.  And then that got perceived as a threat and got

12 perceived as somehow usurping his power to harm the beneficial

13 holders of those CLO assets, which are the retail funds, the

14 DAF, HarbourVest at the time, et cetera.

15 Q    Since that TRO was entered, have you taken any actions to

16 try to stop Mr. Seery's trading?

17 A    No.

18 Q    Have you interfered with the Debtor's trading in any way

19 since the TRO was entered on December 10th?

20 A    No.

21 Q    Have you agreed with every trade that the Debtor has made

22 since December 10th?

23 A    No.

24 Q    Now, you -- there's -- there's been testimony in this case

25 that Mr. Seery wanted to make more trades in December of 2020.

Dondero - Cross                              161

1  Do you recall that testimony?

2  A    More trades between Thanksgiving and New Year's like the

3  other ones?  I mean, I -- I don't know how crazy we could get

4  here, but I -- I don't remember that testimony.

5  Q    Okay.  Well, did you become aware that Mr. Seery was

6  making trades in December of 2020?

7  A    I believe in the same names, you know, the same AVYA at

8  $17, $18, $20 a share, $21, before it hit $35, $37, you know,

9  after he sold it.  You know, that kind of stuff.

10 Q    But you did become aware that Mr. Seery was attempting to

11 make trades in December, correct?

12 A    Yes.

13 Q    And did you attempt to stop any of those trades?

14 A    No.

15 Q    Did you call Mr. Seery about those trades?

16 A    Nope.  I didn't call the traders.  I just -- again, I

17 thought it was another compliance breach, I thought it was

18 another violation of the Registered Investers Act, and so I

19 just highlighted it to Jason Post, the NexPoint compliance

20 guy, said, take a look at it.

21 Q    Did you send Mr. Seery any texts or emails about the

22 trades?

23 A    Nope.

24 Q    Did you threaten Mr. Seery in any way about the trades?

25 A    No.

1  Q   Do you recall how you became aware that Mr. Seery wanted

2  to make trades in December of 2020?

3  A   He was -- he was either still using Highland Fund traders

4  or he was using NexPoint or the OMS system.  Somehow, he was

5  using either traders or an OMS system that wasn't his and was

6  ours.  It -- the -- either the OMS system or the general

7  blotter or something, where other employees made me aware of

8  it.

9  Q   And so did you -- did you receive that notification

10  through an email?

11  A   I don't believe -- yeah, no, I think I did, because that's

12  what I forwarded to Jason Post, I believe.

13  Q   Okay.  And who is Mr. Post?

14  A   Jason Post is the compliance officer at NexPoint.

15  Q   Okay.  And he's not a Highland employee, correct?

16  A   No.

17  Q   Did you have any follow-up communications with Mr. Post

18  after you forwarded him that email?

19  A   No, I did not.

20  Q   Did you ever give Mr. Post any direction or any

21  instruction to take any action with respect to those December

22  trades?

23  A   No.  And like I said, the first time I found out he did

24  anything, which I just found them to be noncompliant and I

25  think he would have let them go through our order management

Dondero - Cross                                        163

1  system, I didn't find that out until a month, month and a half

2  later.

3  Q    And how did you find that out?

4  A    When I was in Davor's offices and he testified.

5  Q    Was that hearing in January of this year?

6  A    Yes.

7  Q    And so did -- did Mr. Post, to your understanding, end up

8  interfering with the booking of trades?

9  A    I -- I think what ended up happening was, instead of using

10 the order management system, I think Seery just started going

11 directly through Jefferies without any compliance oversight.

12 That's how I understood.

13      (Interruption.)

14          THE COURT:  All right.  Someone needs to put their

15 phone on mute.

16      Go ahead.

17 BY MR. WILSON:

18 Q    Okay.  Can you tell me what you mean by booking of trades?

19 A    If you don't have access to the order management system,

20 then you have to book them directly with the dealer.

21 Q    Well, so when the trade is booked, has it already been

22 executed?

23 A    Yeah, generally.

24 Q    Okay.  And you talked about the OMS or the order

25 management system.  What is that?

Dondero - Cross                                    164

1   A    Well, it's like an automated version of the old trade

2   blotter that used to be a gigantic book that everything had to

3   be written in in pen back in the old days.  That's essentially

4   the source document for all trades that an organization

5   performs.

6   Q    Okay.  So what's the benefit of using the OMS system?

7   A    It's a necessary part of compliance with the SEC.  You

8   have to show that you have a discrete and protected primary

9   source for all your trades, all your trade information.

10  Q    And so, if I understand you, you said that these trades

11  that Mr. Seery executed in December weren't run through the

12  OMS?

13  A    I understand that when Jason Post, I think, made the

14  determination with outside counsel that they weren't properly

15  -- that they weren't proper trades for some reason, and then

16  he didn't allow them to go through the order management

17  system, so I think Seery's testimony was he wasn't impaired at

18  all, he just did the trades himself through Jefferies.  But it

19  -- yeah, that's all from -- that's all from memory.

20  Q    Well, had the Advisors booked trades for Highland in the

21  past?

22  A    Yes.

23  Q    And were the trades that the Advisors booked for Highland

24  run through the OMS?

25  A    Yes.

1   Q    Were the Advisors contractually obligated to book trades

2   for Highland?

3   A    I don't know.  But first and foremost, they have to be

4   compliant, you know.

5   Q    Did you have any role in instructing the employees of the

6   Advisors not to book Mr. Seery's trades in December of 2020?

7   A    I had no involvement whatsoever.

8   Q    Now, are you familiar with letters that were sent in

9   December of 2020 from the K&L Gates law firm to the Pachulski

10  law firm?

11  A    Yes.

12  Q    Do you know how those letters came about?

13  A    I believe the CLO equity investors -- and remind you,

14  those are old CLOs where there's almost no debt on them at

15  all; they're just pools of assets -- that the CLOs -- that the

16  CLO investors had owned for years and wanted to keep the

17  exposure, they were witnessing Seery selling things from their

18  portfolio for no business purpose.  And as the beneficial

19  holders of, I think, in aggregate, between the retail funds

20  and the DAF, they owned more than a majority of 13 of the 18

21  yields and a supermajority of seven of them, and they had

22  every intention of replacing Highland as manager once the

23  bankruptcy ended because Highland had no staff, it was going

24  to have no staff post the bankruptcy and would not qualify

25  under key man provisions and would not have the expertise

Dondero - Cross                                166

1    necessary to manage their CLO.

2        We had seen what happened in Acis when a manager has no

3    employees and no skill to manage a CLO.  You end up with the

4    Fort Worth performing CLOs in the universe and the destruction

5    of value.  And so I think that NexPoint and DAF investors were

6    -- were worried --

7        (Interruption.)

8            THE WITNESS:  -- about what would happen if they

9    didn't get control of the CLOs.

10           THE COURT:  Someone needs to put their device on

11   mute.  I'm not sure who it is.  Caller 77.  Anyway, it went

12   away.  Continue.

13           MR. WILSON:  Okay.  Can you pull up Debtor's 14?

14   BY MR. WILSON:

15   Q   All right.  I'm going to pull up the Debtor's Exhibit No.

16   14.

17           MR. WILSON:  And go to Page 5.  Yeah, that's right.

18   BY MR. WILSON:

19   Q   All right.  Do you recognize this document as being one of

20   the letters sent from K&L Gates to the Pachulski firm?

21   A   Yes.

22   Q   Did you instruct anyone at K&L Gates to send this letter?

23   A   No.

24           MR. WILSON:  Let's go to 15, hopefully.  And then go

25   to Page 6.

Dondero - Cross                                      167

1  BY MR. WILSON:

2  Q    And I'm now going to show you 15, Exhibit -- Debtor's

3  Exhibit 15.  And this is Page 6.  This is another letter from

4  K&L Gates, it looks like sent the following day from the last

5  letter we looked at.  And so I'm going to ask a few questions

6  referring to both of these letters.  But did you instruct K&L

7  Gates to send either one of these letters?

8  A    No.  If I -- if I had had involvement in these, I would

9  have written them much stronger than these letters are

10  written.  You know, these letters are written with a little

11  bit of needing approval from the independent board, a little

12  bit of fear of the, you know, bankruptcy process, not

13  understanding what's going on or why Seery is doing what he's

14  doing, you know, understanding the detriment of the portfolios

15  from -- from me or the manager, et cetera.

16      So it's -- both these letters are fairly diluted in what

17  they say they'll do.  You know, it's -- they both say subject

18  to bankruptcy court approval or subject to this, we may do

19  that or this, or we're concerned about this.  But I think the

20  behavior was egregious and self-serving.  I would have had

21  much stronger letters if I had anything to do with them.

22  Q    So you're saying that these letters don't contain your

23  words?

24  A    They do not.

25  Q    Did you participate in the drafting of these letters in

Dondero - Cross                                      168

1    any way?

2    A    I did not.  Like I said, I would have done something much

3    stronger and I was disappointed on how watered down they were.

4    Q    Did you instruct anyone as to the general substance that

5    these letters should convey?

6    A    No, I -- it's -- I applauded it and I encourage people to

7    do their jobs, which is to watch out for the investors and

8    watch out for capricious behavior on the part of Jim Seery.

9    But -- yeah, but no, I did not -- I did not draft it or have

10   direct input into it.

11   Q    Did you read or approve the letters before they went out?

12   A    No.

13   Q    Did you have any part in putting together these letters?

14   A    No.  I mean, like I said, I was -- I was disappointed in

15   the soft -- I would have had more umbrage.  I was disappointed

16   in the softness of the letters.

17   Q    But were -- you were provided a copy of these letters

18   after they were sent?

19   A    Yes.

20   Q    So was the sending of the letters in general your idea?

21   A    In general, I thought it was a good idea.  I mean, in

22   general, like I said, I viewed it as a violation of the

23   Advisers Act and the spirit of the Advisers Act, when the

24   beneficial holders have told you they're going to change

25   managers and don't want their account liquidated.  And I still

Dondero - Cross                                        169

1   to this day believe -- believe that.  And if it was -- if it

2   was money I inherited from my grandmother, I would be

3   extremely annoyed if a financial advisor or something did this

4   to the portfolio.

5   Q    And I appreciate your answer, but that wasn't exactly what

6   I asked you.  Was the sending of the letters your idea?

7   A    No.  The sending -- I believe Jason used outside counsel

8   to, you know, validate the impropriety, and then he championed

9   the letter dealing with independent boards and third parties

10  and, you know, whatever, and this is -- these are the letters

11  that came out.

12  Q    So did he cause the sending of these letters?

13  A    I wouldn't use the word cause.  I mean, like, again, I was

14  supportive.  I encouraged them.  I think they were the right

15  thing to do.  I would -- I would do them again.  Would

16  encourage someone to do them again.  I still think this issue

17  isn't resolved.  I still think it's -- it's craziness that

18  Highland is managing these CLOs.

19  Q    Since December 10th, have you ever communicated with any

20  Highland employee to coordinate your litigation strategy?

21  A    No.

22  Q    And you're familiar with Scott Ellington?

23  A    Yes.

24  Q    And he was a Highland employee?

25  A    Yes.

Dondero - Cross                                   170

1  Q    And what was your understanding of his role at Highland

2  after December 10th?

3  A    Again, I was being -- I was being, you know, increasingly

4  without support and isolated.  I didn't even -- you know, I

5  was trying to put pot plants together without even knowledge

6  of the assets, you know, and I was -- I was increasingly in a

7  vacuum.  But Scott Ellington was helping, as settlement

8  counsel, trying to reach some kind of agreement to exit

9  Highland, transition the employees, et cetera.

10      It was important for him to know everything that was going

11 on, in my opinion.  Because whether it included the letters we

12 just went over that reduced the value of the assets at the

13 Debtor such that, you know, you know, we could pay less,

14 whether it was legal matters or legal risks, you know, I

15 thought it was important for him to be -- important for him to

16 be aware and important for him to be fully informed so that he

17 could be nimble in his role as settlement counsel and in his

18 role on shared services.  Because, again, we were trying to --

19 we were trying to transition 40 or 50 employees that were

20 being treated extremely harshly by the Debtor.  And we were

21 trying to provide fair and proper continuity for them also.

22 Q    When you refer to settlement counsel, are you referring to

23 what others may have referred to as a go-between between you

24 and Mr. Seery?

25 A    Go-between was part of it, but he had -- Ellington had

Dondero - Cross                                171

1   been anointed in the late spring/early summer as a go-between

2   to work different parties and angles during the mediation and

3   after the mediation and around the pot plan, et cetera.  And

4   he was integrally involved in all of those.

5        And then as far as the shared services and transitioning

6   employees, he was deeply involved in that, and I think he

7   actually spoke as almost a union rep for the employees.  So

8   there was -- he was intimately involved in that.

9        And then how the shared services were going to work going

10  forward, once everybody was terminated from Highland, you

11  know, to treat people as fairly and smoothly as possible.

12  Q    Was Mr. Ellington --

13  A    I'm sorry.  Let me just say the last thing.  I don't

14  think, other than the Thanksgiving time frame, I don't think I

15  talked to Seery in the last seven or eight months.  So he was

16  an important go-between and an acknowledged go-between and

17  used as a go-between by Seery as much as by me.  So whether

18  his role was official, he was def... the form -- or, the

19  substance over form is that he was being used in that role,

20  literally having meetings on shared services a day or two

21  before he was terminated for cause.

22  Q    And was Mr. Ellington general counsel at Highland?

23  A    Yes, he was.

24  Q    And as part of Highland's legal department, did he provide

25  shared services to the Advisors?

Dondero - Cross                                    172

1   A    Yes.

2   Q    And would those Advisors be Highland Capital Management

3   Fund Advisors and NexPoint Fund Advisors?

4   A    Yes.

5   Q    And those are both entities that -- that you -- that are

6   part of your umbrella?

7   A    Yes.

8   Q    After the independent board was established, you testified

9   that Mr. Ellington started serving as a go-between between you

10  and the board, correct?

11  A    Yeah, I'd say the official go-between role, because I was

12  actively talking to board members and I was actively talking

13  to Seery, and every time Seery sold something in a non-arm's-

14  length transaction or below market or without court approval,

15  I went and I complained to the other independent board

16  members.

17       So I was having active conversation around the life

18  settlement transactions with the independent board, around the

19  SSP transaction, et cetera.  But by the summertime, like I

20  said, Ellington was the primary contact person for me and I --

21  to deal with Seery, and I think the primary contact person for

22  Seery to deal with me.

23  Q    And did Mr. Ellington -- I'm sorry.  Did you use, actually

24  use Mr. Ellington to communicate ideas to the boards or Mr.

25  Seery concerning your pot plan proposals?

1  A    Yes.  We did a couple pot plans of our own when we

2  couldn't get the independent board to focus.  And once Seery

3  shifted to whispering to creditors about a liquidation plan,

4  we couldn't get Seery to buy into a pot plan at all, so

5  Ellington and I went forward with a couple of pot plans on our

6  own, and then -- but the last pot plan was solely with Judge

7  Lynn and the independent board members, without me and without

8  Ellington.

9  Q    Well, did Mr. Seery use Mr. Ellington to communicate ideas

10 back to you?

11 A    Yes.

12 Q    Did Mr. Seery use Mr. Ellington to communicate ideas to

13 you after December 10th?

14 A    Yes.  Like I said, up until literally a day or two before

15 he was terminated, there were authorized shared services

16 meetings, because there was a couple-week period there where

17 no one was allowed to have a shared services meeting unless

18 approved by Seery in advance, and nothing was getting done.

19 So he -- Seery anointed a couple people at Highland to be able

20 to deal with a few people at NexPoint and to have a couple

21 meetings, and Ellington was one of those people who actually

22 led the meetings in the last week of December.

23 Q    Did you ever discuss entering a common interest agreement

24 with Mr. Ellington?

25 A    I believe -- I believe the lawyers had a couple different

Dondero - Cross                                174

1  conference calls on it, and then I think the lawyers for the

2  employees and for the senior employees determined that their

3  strategies and tactics would be best served by not being a

4  part of it.  But I think in the beginning there was thought

5  that it would be good for them to be in the group.  But that

6  wasn't a conversation I had with Ellington.  Those were

7  decisions the lawyers made amongst themselves.

8  Q    Did you ever have any discussions about a common interest

9  agreement with Mr. Leventon?

10 A    No.

11 Q    Did you ever discuss entering a common interest agreement

12 with any current or former Highland employee?

13 A    No.  No.

14 Q    Did you have discussions regarding a common interest

15 agreement with Douglas Draper?

16 A    Yes.

17 Q    And who, again, is Douglas Draper?

18 A    He represents Dugaboy and the Get Good Trust.  And, you

19 know, more importantly, there needed to be some coordination

20 among the lawyers, and then I think it was clear to him that

21 positioning for the Fifth Circuit was going to be important,

22 so he -- he coordinated -- or, he led the coordination of the

23 law firms.

24 Q    Did you ever participate in any conference calls regarding

25 a common interest agreement?

1  A    I'm going to say maybe one, but it quickly -- I'm not a

2  lawyer by training, so it was quickly not something that I

3  added value in, and I wasn't the one that made the decisions

4  or influenced anybody to be in or out of the agreement.  So,

5  again, maybe once, but -- but --

6  Q    Well, was -- was Mr. Leventon or Mr. Ellington on any

7  conference calls you might have been on regarding a common

8  interest agreement?

9  A    Not that I'm aware of.  I have not talked a single word to

10  Mr. Ellington or Isaac since they were terminated, which was,

11  I believe, the last week of December.  Because I have not

12  spoken a single word to either one of them since then.

13      But, again, as recently as a day or two before they were

14  terminated, they were actively involved in shared services

15  meetings.

16  Q    So you're not aware that they were on any conference calls

17  that you were on regarding a common interest agreement?

18  A    Correct.

19  Q    And other than you, are you aware that there were any

20  other current or former Highland employees on a conference

21  call about a common interest agreement?

22  A    I believe it was all employees.  I mean, it was all

23  lawyers for the different entities.

24  Q    Would -- would -- were you aware if counsel for Mr.

25  Ellington or Mr. Leventon were on any of these conference

Dondero - Cross                                   176

1    calls?

2    A    That, I believe, is true.  Yeah, I believe his -- their

3    counsels were.

4    Q    So, you're familiar with the Dugaboy and the Get Good

5    Trusts?

6    A    Yes.

7    Q    And are you the trustee for either one of those trusts?

8    A    No.

9    Q    Do you control either one of those trusts?

10   A    No.  Not directly.  I'm a lifetime beneficiary of the

11   Dugaboy Trust, but I don't control it.

12   Q    When did you become aware that the U.C.C. was seeking

13   production of documents from Dugaboy and the Get Good Trust?

14   A    Around when -- a day or two before that Melissa email

15   requesting a subpoena, for whoever -- but it -- I think it was

16   a midlevel person at DSI was asking or demanding Dugaboy

17   financials, and that was her response to that person.

18   Q    So would that have been approximately December 2020 when

19   you learned of that?

20   A    Right.  And, again, that was -- that response was the

21   exact specific wording I was given by counsel to tell them at

22   that moment.

23   Q    Were you served with any formal requests for the Dugaboy

24   or Get Good Trust documents?

25   A    No.

1   Q    And you stated that the Dugaboy and Get Good Trusts have

2   hired counsel to represent them?

3   A    Yes.

4   Q    And that counsel is Douglas Draper?

5   A    Yes.

6   Q    And to your knowledge, has Mr. Draper been working with

7   the Debtor's counsel to produce the Dugaboy and Get Good

8   documents?

9   A    Yes.  I think he investigated the requests.  I think he

10  got a more formal official request, and then I think he

11  analyzed it and said, as long as he got to review what was

12  provided, he was okay with it.  That's -- that's what I

13  understand.

14  Q    Well, have you or Mr. Draper ever taken the position that

15  the documents would not be turned over?

16  A    No.  I mean, I've -- I've delegated it to Douglas to

17  handle.

18  Q    Have those documents, at this point, actually been

19  produced?

20  A    I have no idea.

21  Q    Do you have any objection to the documents being produced?

22  A    No.

23  Q    And you testified that Melissa Schrath is an accountant?

24  A    Yes.

25  Q    And so she was a Highland employee that was contracted to

Dondero - Cross                                     178

1  the Advisors under the shared services agreement?

2  A    Yeah.  That's -- that's the way I would describe it,

3  because she was -- you know, I was a NexBank and -- a NexPoint

4  employee.  I was being paid by NexPoint.  And she was a

5  hundred percent -- well, 80 percent servicing me, 20 percent

6  servicing Mark Okada.  And so she was properly, as was my

7  administrative assistant, properly lumped as part of the

8  NexPoint shared services.

9  Q    Okay.  And in December of 2020, did Melissa have access to

10 the Dugaboy documents?

11 A    Yes.

12 Q    Did you say "I guess" or "Yes"?

13 A    Oh, yes, she did.  And as a matter of fact, she said 70-80

14 percent of them were on the server and non-password protected.

15 Q    So, why did you send a text message to Melissa in

16 December?

17 A    I didn't know they were non-password protected at that

18 time.  But, again, that was a specific advice of counsel, that

19 it was -- it was a personal entity, not involved in the

20 bankruptcy, and for a midlevel DSI person to ask my accountant

21 was not -- I believe that wasn't perceived as adequate proper

22 channels.  So that was -- that was the legal advice I got from

23 your firm.  So, --

24 Q    All right.  When was your access to the Highland computer

25 system shut down?

1   A    I believe at night right around the 30th.

2   Q    All right.  So I just want to -- I just want to ask you a

3   couple more questions.  Did you, after the entry of the TRO,

4   did you make an effort to modify your behavior in such a way

5   that you would comply with the TRO?

6   A    Yes.  And, you know, something I want to make clear that I

7   discovered during the break when I went through my phone, the

8   January 5th deposition that has somehow become important, even

9   though there were no Highland employees in the office other

10  than the receptionist, is memorialized by a calendar invite on

11  my phone -- which will also be in the Highland system -- where

12  it was an invite a week earlier from Sarah Goldsmith, who was

13  one of the Highland employees supporting the legal team that

14  was largely supporting Jim Seery, sent me a calendar invite to

15  the conference room at Highland for the deposition on the 5th.

16  It's right front and center in my calendar.  It'll be on the

17  Highland Outlook program.  And Sarah Smith -- I mean, Sarah

18  Goldsmith works directly for Jim Seery.

19      So, just to maybe put that issue to bed, I would highlight

20  that for everybody.

21  Q    So, the answer to my last question was you made a

22  concerted effort to modify your behavior in response to the

23  TRO?

24  A    Yes.  The only two times I've been in Crescent was for

25  those two depos.  I don't even go to -- when people have happy

Dondero - Cross                    180

1   hour at Moxie's, because it's in the lobby of the other -- one

2   of the adjacent buildings, I don't even attend happy hours at

3   the bar in the lobby for fear of somehow violating the

4   building order.

5   Q    All right.  So, have you thought better of your actions

6   that you took around Thanksgiving of last year?

7   A    I mean, you know, in due respect for the Court and the

8   Court may be thinking that the investor allegations are

9   fanciful or frivolous, it granted nonetheless an injunction,

10  and I respect it.  And I -- so I've been -- I handle things

11  differently as far as what I think are material breaches on

12  the 20th and I've -- I've adjusted my behavior.  But I do not

13  regret or think differently about the -- liquidating the

14  portfolio the week of Thanksgiving, liquidating illiquid

15  assets for no business purpose.  I still think that was highly

16  irregular and highly wrong.

17  Q    So, to sum up, your opinions of the way Highland is

18  currently being managed are not -- sorry, start over.

19  Although your opinions of the way Highland is being managed

20  have not changed, has your outlook on what your behavior ought

21  to be changed?

22  A    Yeah, my outlook really is the same, that material assets

23  are being sold without court approval, material assets are

24  being bought without court approval, material assets are being

25  sold in a non-arm's-length noncompetitive way for less than

1   full value.  I still believe that it's impacted the estate

2   materially.  I know somehow my limited involvement in

3   portfolio management responsibility on very limited funds only

4   through March or April, and then the performance of Highland

5   is somehow laid at my feet, but the destruction of value has

6   been entirely based on major asset sales by Jim Seery.  Number

7   one.

8        And then I would say, number two, how analysis of

9   liabilities against Highland go from an estimate of a total of

10  $100 to $120 million in the first quarter and end up ending up

11  at almost $300 million, with nothing ever being litigated or

12  challenged, just business judgment rule, that somehow it would

13  be cheaper than litigating some of these frivolous litigation

14  claims, has destroyed the liability side of the balance sheet.

15       But, anyway, but I -- you know, life goes on and I'm doing

16  the best I can to move the rest of the business forward, move

17  the employees forward, and we will do the best we can to get

18  justice for the Highland estate at some point.

19  Q   And just to clarify your testimony earlier, the last time

20  that you saw your old cell phone in December of 2020 was when

21  you handed it to a Highland employee, correct?

22  A   Yes.

23  Q   And do you have any personal knowledge whether that cell

24  phone was actually wiped, according to company policy?

25              MR. MORRIS:  Objection to the form of the question.

Dondero - Cross                          182

1           THE COURT:  Overruled.

2           THE WITNESS:  I was told that it was.

3  BY MR. WILSON:

4  Q   Okay.  But you don't have personal knowledge as to whether

5  the phone was indeed wiped by Highland, in accordance with its

6  policies?

7           MR. MORRIS:  Objection to the form of the question.

8           THE WITNESS:  I was told by --

9           THE COURT:  Sustained.

10           THE WITNESS:  -- Jason Rothstein --

11           THE COURT:  Sustained.

12           THE WITNESS:  -- that it was wiped.

13           THE COURT:  Sustained.  Rephrase the question.

14           MR. WILSON:  I'm just trying to get him to let us

15  know if he has any personal knowledge that the phone was ever

16  actually wiped in accordance with Highland's policies.

17           THE COURT:  Okay.

18           MR. MORRIS:  Objection to the form of the question.

19           THE COURT:  Overruled.

20           THE WITNESS:  Jason Rothstein told me that it had

21  been wiped according to Highland policies.

22           MR. MORRIS:  Objection to the form of the -- I move

23  to strike.  It's hearsay.

24           THE COURT:  Sustained.

25           MR. WILSON:  Your Honor, that -- Your Honor, that

Dondero - Cross                           183

1  would be a statement by a party opponent.

2           THE COURT:  Who --

3           MR. WILSON:  And it's --

4           THE COURT:  Who's the party opponent here?

5           MR. WILSON:  And it's just going to show Mr.

6  Dondero's state of knowledge.

7           THE COURT:  All right.  Well, the party opponent, how

8  do you justify that exception?

9           MR. MORRIS:  I --

10           MR. WILSON:  Well, Mr. Rothstein is an employee of

11  Highland, as we've talked about, and -- and then the second

12  point of my response will be that it's not to go to the truth

13  of the matter asserted, just that that's the extent of Mr.

14  Dondero's state of mind, is what he was told by Mr. Rothstein,

15  not whether it was actually true or not.

16           THE COURT:  All right.  I'll overrule the objection.

17           MR. WILSON:  All right.  Thank you.  We'll pass the

18  witness.

19           THE COURT:  All right.  That was an hour thirty-three

20  minutes.  Mr. Dondero, do you need a five-minute break?

21           THE WITNESS:  Sure.

22           THE COURT:  Okay.  We'll take a five-minute break,

23  please.

24           THE CLERK:  All rise.

25      (A recess ensued from 3:15 p.m. to 3:25 p.m.)

Dondero - Redirect                         184

1          THE COURT:  All right.  Please be seated.  All right.

2    Just --

3          MS. SMITH:  Your Honor, Frances Smith --

4          THE COURT:  Go ahead.

5          MS. SMITH:  -- for Scott Ellington and Isaac

6    Leventon.

7      Your Honor, I have more good news.  After the break, we

8    reached an agreement with Mr. Wilson that they would not be

9    calling Mr. Ellington.

10         THE COURT:  All right.  Mr. Wilson, you confirm?

11         MR. WILSON:  I do, Your Honor.

12         THE COURT:  All right.  Well, they're excused, then.

13         MS. SMITH:  With that, Your Honor, may he be excused?

14         THE COURT:  Yes, ma'am.

15         MS. SMITH:  Thank you.

16         THE COURT:  All right.  Thank you.

17     All right.  Mr. Morris, do you have further examination of

18   Mr. Dondero?

19         MR. MORRIS:  I do.  I hope, I hope it's not too

20   lengthy, particularly if I'm allowed to ask my leading

21   questions on cross-examination.

22         THE COURT:  All right.  And let me --

23                     REDIRECT EXAMINATION

24   BY MR. MORRIS:

25   Q   Mr. Dondero, can you hear me, sir?

1       THE COURT:  Let me just let you all know where you

2  are timing-wise.

3       MR. MORRIS:  Yeah.

4       THE COURT:  You used two hours and sixteen minutes

5  this morning on examination.  But as I told you, I think

6  you're entitled to some credit, so to speak, on your three-

7  and-a-half hour total because of the narrative answers.  So

8  I'm not -- I'm not sure yet where I'm going to chop time, but

9  please be mindful that's where we are.  Okay?

10       MR. MORRIS:  I'll try to limit this to 15 or 20

11  minutes, Your Honor.

12       THE COURT:  All right.

13  BY MR. MORRIS:

14  Q   Mr. Dondero, can you hear me, sir?

15  A   Yes.

16  Q   You testified that you're seeking justice for the estate.

17  Is that right?

18  A   Yes.

19  Q   Your claims against the Debtor consist solely of

20  indemnification claims and tax claims; is that right?

21  A   Well, I mean, with proper 9019s, I think there's a

22  residual equity value to Highland, and Highland should be able

23  to resurrect and go forward.

24       MR. MORRIS:  Your Honor, I move to strike.

25       THE COURT:  Sustained.

Dondero - Redirect                              186

1   BY MR. MORRIS:

2   Q    Sir, the only claims that you have filed against the

3   Debtor are for indemnification and for taxes, right?

4   A    Yes.

5   Q    Okay.  And you made a lot of -- a lot of allegations about

6   Mr. Seery, my firm, and the Debtor, and your views on what

7   we're doing in this bankruptcy case.  Isn't that right?

8   A    I think it's transparent now, yes.

9   Q    And you -- one of the complaints you have were the

10  settlements that the Debtor entered into with certain of the

11  creditors, right?

12  A    Yes.

13  Q    And you said that they weren't -- there was no scrutiny.

14  Isn't that the word you used?

15  A    Yes.

16  Q    But you had every single opportunity in the world to take

17  discovery with respect to every single one of these

18  settlements; isn't that right?

19  A    We did and we tried.

20  Q    Okay.  And you failed; isn't that right?

21  A    Yeah, I -- yes.  I guess that's --

22  Q    Right?  And you could have -- you, with all of your

23  knowledge, with all of your wisdom, you could have tried to

24  persuade the Court that these settlements were wrong.

25  Correct?

1  A    Yes.

2  Q    And you did not personally ever take the stand to try to

3  explain to the judge why these settlements were wrong.  Isn't

4  that right?

5  A    Willing to.

6  Q    But those hearings are over long ago.  Isn't that right?

7  A    Yes.

8  Q    So you sit here and you complain about them, but when you

9  had the opportunity, you chose not to testify in order to

10  educate the judge and try to -- and try to show the judge that

11  those were bad settlements.  Isn't that right?  You didn't do

12  that?

13  A    Counsel chose their strategy, which evidently, based on

14  our success in overturning them, maybe it wasn't the right

15  strategy, but their strategy was for me not to be the expert.

16  Q    And the U.C.C. represents the interests of general

17  unsecured creditors; isn't that correct?

18  A    Yes.

19  Q    And to the best of your knowledge, the U.C.C. did not

20  object to any of the settlements that you complain about,

21  correct?

22  A    Everybody got three or four times more than they deserved,

23  except for Redeemer, that got about 20 percent more.

24            MR. MORRIS:  I move to strike, Your Honor.

25            THE COURT:  Sustained.

1   BY MR. MORRIS:

2   Q    Sir, the U.C.C. did not object to any of the settlements

3   that you complain about, correct?

4   A    I don't -- I don't know the answer to that.  I thought

5   more than one person objected to Josh Terry and Acis and I --

6   we haven't seen the 9019 for UBS or Pat Daugherty yet.

7            MR. MORRIS:  I move to strike and I'll try one more

8   time, Your Honor.

9            THE COURT:  Sustained.

10  BY MR. MORRIS:

11  Q    Mr. Dondero, it's a very simple question.  The settlements

12  that you complained about -- Acis, HarbourVest -- the U.C.C.

13  didn't object to them at all.  Correct?

14  A    Yeah, I guess not.  I don't know if they did or -- yes.  I

15  don't know.

16  Q    Okay.  And Mr. Seery, we -- the Debtor made a motion last

17  summer to have Mr. Seery appointed as the CEO.  Do you

18  remember that?

19  A    Yes.

20  Q    And you didn't object to that, correct?

21  A    We didn't realize he had betrayed the estate at that

22  point.  We thought he was still trying to negotiate a

23  settlement, not give the company away.

24           MR. MORRIS:  I move to strike.

25           THE WITNESS:  So we did not --

1          THE COURT:  Sus...

2          THE WITNESS:  We did not object.

3          THE COURT:  Okay.

4    BY MR. MORRIS:

5    Q   And the Debtor didn't -- I mean, the U.C.C. --

6          THE COURT:  Wait.  It's happening again, --

7          MR. MORRIS:  -- didn't object, correct?

8          THE COURT:  -- Mr. Dondero.  Okay?  Please.  Yes or

9    no where you get a yes-or-no question.

10        Go ahead, Mr. Morris.

11   BY MR. MORRIS:

12   Q   And to the best of your recollection, the U.C.C. was

13   supportive of the appointment of Mr. Seery as CEO, correct?

14   A   Yes.

15   Q   And the Debtors just had a plan of reorganization

16   confirmed, correct?

17   A   Yes.

18   Q   And as part of that plan, Mr. Seery is going to continue

19   on as the post-confirmation executive, correct?

20   A   I believe so.

21   Q   And the U.C.C. is supportive of that, to the best of your

22   understanding, correct?

23   A   Yes.

24   Q   Yeah.  Let's talk about the phone for bit.  You testified

25   at length about this policy pursuant to which phones can just

1  be discarded and wiped down.  Do you remember that?

2  A    Yes.

3  Q    You took some time to prepare for your testimony today.

4  Isn't that right?

5  A    No, not really.

6  Q    You did meet with your counsel and communicate with your

7  counsel over what grounds would be covered, right?

8  A    Half an hour last night.

9  Q    Okay.  And despite all of the testimony that you provided

10 about the policy of discarding phones and changing phone

11 numbers and the rest of it, your counsel didn't show you

12 anything in that 50-page employment handbook to corroborate

13 what you were saying, correct?

14 A    I don't know what you're asking.  I'm sorry.

15 Q    There's nothing in the employee handbook that reflects any

16 of the policies you described with respect to cell phones,

17 correct?

18 A    That wasn't my testimony.  I don't -- I don't know.

19 Q    Okay.  And your lawyer didn't show you anything, to the

20 best of your recollection, that would corroborate what you

21 said about this cell phone policy, correct?

22 A    My testimony was I gave my phone to the Debtor's employee,

23 the technology folks, and I knew they knew what to do in a

24 compliant manner.  I did not know the specifics of the

25 employee manual.  That was my testimony.  I'm sorry.  I --

1  you're asking me something else, but I don't -- I can't answer

2  what you're asking.  I don't know the employee manual.

3  Q    Okay.  And as you sit here right now, you're not prepared

4  to give the judge any information that would show that there's

5  any written policy of any kind that corroborates your -- the

6  policy that you've described, correct?

7  A    Written evidence?  I know it to be approved at the highest

8  levels by Thomas Surgent, whatever Jason Rothstein does with

9  the phones.  That's all I know.  I assume it's memorialized in

10  -- somehow in the employee manual, but I don't know, nor

11  should I.

12          MR. MORRIS:  I move to strike, Your Honor.  It's a

13  very simple question.

14          THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q    Sir, Jason Rothstein was on your witness list for this

17  hearing; isn't that right?

18  A    I believe he was at one point.

19  Q    And you and your lawyers actually served him with a

20  subpoena; isn't that right?

21  A    I do believe -- yes, I do believe I heard something about

22  that.

23  Q    And so you had him under your control to come here today

24  to give testimony to corroborate what you testified to on the

25  cell phone policy.  Isn't that right?  You could have had him

1   come tell the judge what you've testified to, correct?

2   A    I guess.

3   Q    But you didn't, right?

4   A    We didn't believe it was necessary.

5   Q    So, so you're not aware of anything in the employee

6   handbook that corroborates the cell phone policy that you've

7   described, correct?

8   A    We went over it in detail.  I don't want to pull up those

9   pages again.  But it either says it or it doesn't on those

10  pages.  So, --

11  Q    Okay.  I'm going to try once again.  You are not aware, as

12  you sit here right now, that there is anything in the employee

13  handbook that corroborates the cell phone policy that you've

14  described, correct?

15  A    I don't know.

16  Q    And there's not a single document on your exhibit list

17  that corroborates the cell phone policy that you've described,

18  correct?

19  A    I don't know.

20  Q    And Jason Rothstein, who you've testified a whole lot

21  about, was on your witness list, but you didn't call him today

22  to testify, correct?

23  A    Yes.  We didn't believe we needed him.

24  Q    Okay.  And let's talk about the policy itself that you've

25  described.  Is there any exception to the policy that you've

Dondero - Redirect                                          193

1   described for saving text messages if you are personally a

2   target of an investigation?

3   A    I have no idea.

4   Q    So, so the policy that you've described, to the best of

5   your knowledge, doesn't contain an exception that maybe you

6   shouldn't do those things if you're the target of an

7   investigation.  Is that right?

8   A    No.  I'm just saying that when Jason and Thomas Surgent

9   had my phone, they could have done anything they wanted to.

10          MR. MORRIS:  I move to strike, Your Honor.  I'm

11  asking him about the policy that he's described.

12          THE COURT:  Sustained.

13  BY MR. MORRIS:

14  Q    Sir, when you negotiated the corporate governance

15  settlement, part of that settlement was to state that the

16  Creditors' Committee would share the privilege for estate

17  claims.  Do you remember that?

18  A    Not specifically.

19  Q    Do you remember that the Creditors' Committee had the

20  authority to investigate claims against you?

21  A    I believe they were doing that during that six, seven

22  months in the beginning of the estate.

23  Q    Okay.  So is there any exception to your policy that

24  you've described with regard to cell phones that would say

25  maybe I shouldn't throw away the cell phone if I'm the subject

Dondero - Redirect                          194

1   of an investigation?

2   A    I don't want to speculate.

3   Q    Okay.  You're not aware of an exception to that policy,

4   right?

5   A    I don't want, yeah, I don't want to speculate.  I don't

6   know.

7   Q    Is there an exception -- is there an exception to the

8   policy to perhaps not throw away the cell phone if there's a

9   court order that grants a Creditors' Committee the right to

10  the text messages?

11  A    I don't know.

12  Q    You don't know?  Okay.  We talked about Mr. Rothstein.  We

13  talked about the handbook.  Just to complete it, are you aware

14  of any document anywhere in the world that's going to be put

15  before the judge today that's going to corroborate the cell

16  phone policy that you've described?

17  A    I -- I don't know.  But I would say I challenge you to

18  tell me a different policy.

19  Q    Okay.  We looked briefly at the letter that my firm sent

20  to your lawyers on December 23rd when they asked for the cell

21  phone back and they made a very specific statement about the

22  text messages.  Do you remember that?

23  A    No.

24  Q    All right.  Let's take a quick look at it.  And it's

25  Exhibit -- (pause).

1              MR. MORRIS:  It's Exhibit 27, please.  And if we can

2     go down to the bottom of Page 2.

3     BY MR. MORRIS:

4     Q    And this is where they -- they -- the Debtor informed your

5     lawyers that it would be terminating the cell phone plan and

6     they asked for the immediate turnover of the cell phone and

7     they told you to refrain from deleting or wiping any

8     information, right?

9     A    Yes.

10    Q    And you testified earlier that you actually discussed this

11    letter with your lawyers, right?

12    A    Yes.

13    Q    Okay.  And let's look back at what your lawyers' response

14    is.

15             MR. MORRIS:  Exhibit 22, please.

16    BY MR. MORRIS:

17    Q    Now, in this letter, it says, in the second sentence,

18    quote, We are at present not sure of the location of the cell

19    phone issued to Mr. Dondero by the Debtor.

20         There is no doubt that the -- that the phone that's at

21    issue here was the -- was the Debtor's cell phone, the Debtor

22    paid for it, correct?

23    A    I don't know that.

24    Q    But you've already testified to it; isn't that right?

25    A    Well, if I did, I was guessing.  I don't know.

1            MR. MORRIS:  Can we put up Page 55 from the

2     transcript, please?  And -- I'm sorry.  One sec.  Lines 10

3     through 13.

4     BY MR. MORRIS:

5     Q    (reading)  "Until December 10th, the day the TRO was

6     entered, you had a cell phone that was bought and paid by the

7     Debtor, right?"  Answer, "Yes."

8          Did you give that answer the last time you were examined

9     in this courtroom, sir?

10    A    Yes.

11    Q    Okay.  And in fact, not only did you know that it was paid

12    for by the Debtor, but you actually knew the last time you

13    testified that the phone was thrown in the garbage, right?

14    A    That's correct.

15    Q    Is that correct?

16    A    Again, I just assumed.  But I -- I don't know the answer

17    for sure to either question.  But there's a way to find out

18    whether or not the company paid for it and there's a way to

19    find out whether or not it was in the garbage, too.  But I

20    don't know for sure.

21           MR. MORRIS:  Can we go to Page 65, please?  Right

22    there, Lines 6 through 8.  We'll go to Line 4.

23    BY MR. MORRIS:

24    Q    Question, "We were a couple of weeks too late, huh?"

25    Answer, "It sounds like it."  Question, "Yeah.  Because the

1    phones were already in the garbage, right?"  Answer, "Yes."

2         That was the testimony you gave then, right?

3    A    Yeah.  We went over this earlier today.

4    Q    Okay.  I just want to make sure.

5              MR. MORRIS:  And now let's go back to Mr. Lynn's

6    letter to the Debtor about the cell phone.

7    BY MR. MORRIS:

8    Q    There's absolutely nothing in this letter about the policy

9    that you testified to under questioning from Mr. Wilson,

10   correct?

11   A    Not that I could see.

12   Q    There's nothing in this letter, after discussing --

13   withdrawn.  After discussing the Debtor's letter with your

14   lawyer, your lawyer wrote this letter and it doesn't say

15   anything about a practice, a company practice that would align

16   itself with the policies and procedures that you've described,

17   correct?

18   A    Yes.  We'll have to -- I was on vacation.  We'll have to

19   chastise Judge Lynn for not reading the employee manual or my

20   deposition.  I don't know what to say here.

21   Q    Well, forget about the employee manual and the deposition.

22   You actually spoke to him about the Debtor's letter, right?

23   A    Not -- not for an extended period of time, I'll tell you

24   that.

25   Q    Okay.  Well, in any event, Mr. Lynn doesn't tell the

1  Debtor, what are you talking about, Mr. Seery knows all about

2  this and approved it all, right?

3  A    Okay.

4  Q    He -- right?  Mr. Seery's not mentioned in this letter,

5  correct?

6  A    Correct.

7  Q    The only statements in this letter about that cell phone

8  are that it was issued to you by the Debtor, that they're not

9  sure of the location, and that you're not prepared to turn it

10 over.  Correct?

11 A    Yes.  I guess that's what it says here.

12 Q    Okay.  Let's talk about that trespass for a bit.  You

13 testified that on December 14th you gave a deposition in the

14 Debtor's office and nobody complained.  Isn't that right?

15 A    Yes.

16 Q    That's because the Debtor had not yet evicted you from

17 their offices.  Isn't that right?

18 A    Yeah, correct.  But the TRO was in place.

19 Q    But the reason that the TRO becomes important is because,

20 as you testified earlier, it has that provision about the

21 automatic stay relating to the Debtor's property.  Right?

22 A    Yes.

23 Q    And the Debtor evicted you from the property on January --

24 on December 23rd, right?

25 A    Effective the 30th, yes.

1    Q    Yeah.  And the Debtor told you that if you were on their

2    property again, they would consider it trespass, correct?

3    A    They sent me a calendar invite.

4    Q    All right.  We looked at those shared services agreements

5    before.  Is that right?

6    A    Yes.

7    Q    Okay.  Anything in the shared services agreements that

8    requires Debtor employees to take actions that are adverse to

9    the Debtor?

10   A    No.

11   Q    Okay.  So when you were the CEO, would you have allowed or

12   required your employees to take action on behalf of the shared

13   services partner that you believed or knew were adverse to the

14   Debtor's interests?

15   A    I'd expect them to honor the contracts.  I -- it would

16   depend on what the issue was.

17   Q    Okay.  Does the contract require the Debtor's employees to

18   take actions that are adverse to the Debtor's interests?

19   A    Read implicitly, yes, because whenever you manage money

20   for somebody, your fiduciary responsibility trumps what issues

21   that might be adverse to the Debtor.  Or adverse to the

22   company.

23   Q    Can -- if I put the documents on the screen, will you be

24   able to tell me where the shared services agreement provides

25   for the resolution of conflicts between the service provider

Dondero - Redirect                                    200

1   and the service receiver?

2   A    I don't believe it does, unless there's an arbitration

3   clause.  But -- but I don't know.

4   Q    Okay.  Let's talk about the trading for a minute.  You

5   insist that you did absolutely nothing to interfere with the

6   trading; isn't that right?

7   A    I tried hard to interfere with the November trades.  I did

8   nothing to interfere with the December trades.

9   Q    Okay.  Let's test that theory for a moment.

10         MR. MORRIS:  If we can go back to Exhibit 27, please.

11  Page 2, the top of Page 2.

12  BY MR. MORRIS:

13  Q    This is where the -- this is where the Debtors tell your

14  lawyers of their belief that you've interfered with the

15  trading of the AVYA and the SKY securities on December 22nd,

16  correct?

17  A    Okay.  But I'm telling you, I did not interfere on the

18  22nd.

19  Q    I'm just asking you, sir, a very simple question.  This is

20  where the Debtors are informing your lawyers of their belief

21  that you interfered with the trades on December 22nd.

22  Correct?

23  A    Yes.

24  Q    Okay.  Can you point to me where your lawyers wrote back

25  and disputed that contention?

Dondero - Redirect                                        201

1  A    I don't know if they did.

2  Q    But they did write back in response to this very specific

3  letter on the issue of the cell phone?  We just looked at that

4  response, right?

5  A    Yes.

6  Q    But you don't have any recollection and there's nothing in

7  the record that will show that your lawyers disputed the

8  allegations about your conduct on December 22nd, correct?

9  A    Not that I'm aware of.

10 Q    Okay.  I appreciate that.  And, in fact, notwithstanding

11 what you testified to today, you testified previously rather

12 unambiguously that, in fact, you did interfere with the

13 Debtor's business, right?

14 A    I clarified that -- I clarified that half a dozen times in

15 the last few weeks.  I mixed up the November and the December

16 time frames a couple times.  Or once, really.

17 Q    Okay.

18       MR. MORRIS:  Okay.  Can we go to Page 73?

19 BY MR. MORRIS:

20 Q    In case you were confused about the date, let's just look

21 at the transcript, Page 73.

22    Were you asked these questions and did you give this

23 answer?  Question, "And you personally instructed, on or about

24 December 22, 2020, employees of those Advisors to stop doing

25 the trades that Mr. Seery had authorized with respect to SKY

Dondero - Redirect                                          202

1   and AVYA, right?"  Answer, "Yeah.  Maybe we're splitting hairs

2   here, but I instructed them not to trade them.  I never gave

3   instructions not to settle trades that occurred, but that's a

4   different ball of wax."  Question, "Okay.  But you did

5   instruct them not to execute the trades that had not yet been

6   made, right?"  Answer, "Yeah," and then you went on.

7        That was the testimony that you gave at the time, correct?

8   A    We went over this earlier today.  I've clarified this

9   several times.  There is nobody, there's no emails, there's no

10  one who says I contacted them on the 22nd.  I misspoke.  I

11  contacted everybody the week of Thanksgiving.  The only thing

12  I did on the 22nd of December was one email to Jason Post,

13  full stop, period.  You have the system.  If I am lying or you

14  had any evidence of me talking to somebody else, you would

15  have it, instead of just making me clarify this for the

16  fifteenth time.

17  Q    Well, I do have evidence, sir.  I have -- I have the

18  Debtor's letters to your lawyers that your lawyers didn't

19  respond to.  Isn't that correct?

20  A    That's not evidence.

21  Q    Okay.  It actually is evidence, but I won't argue with

22  you.

23       You testified a bit about Dugaboy and the financial

24  statements.  Do you remember that?

25  A    Yes.

Dondero - Redirect                                    203

1  Q    And you had no objection to those documents being

2  produced?  Is that right?

3  A    Well, once I delegated it to my -- to Douglas, I let him

4  handle it, and I haven't kept abreast of him.  I don't even

5  know where it stands at this point.  But I trust him to do the

6  right thing.

7  Q    Does Ms. Schrath work for one of your -- one of the

8  companies that you own or control?

9  A    Yes.  We -- yes, she does now.

10 Q    Will you -- will you to authorize her to speak with the

11 Debtor in order to identify where on the Debtor's server the

12 Dugaboy financial statements are located?

13 A    I think the proper channel is I'll authorize -- and he is

14 fully authorized already -- Douglas Draper to appropriately

15 work with you guys on an appropriate request for appropriate

16 materials.  But I -- I'll do whatever Douglas tells me is

17 appropriate, but otherwise I'm -- I'm not going to get

18 involved.

19 Q    But Melissa Schrath was the one who knew where the

20 documents were.  Isn't that right?  That's why you

21 specifically went to her and told her not to produce the

22 documents without a subpoena, correct?

23 A    She keeps the records.  So, --

24 Q    Okay.

25 A    But anyway, but she will -- she will march to what -- I

Dondero - Redirect                                        204

1   promise you she'll march to whatever Douglas tells her to do,

2   so you work it out with Douglas.

3   Q    I'm not asking you about Douglas.  I'm asking about you,

4   James Dondero, would you authorize your employee, Melissa

5   Schrath, to provide information to the Debtor that will allow

6   the Debtor to obtain these documents?

7   A    Only after approved by Douglas, the counsel for Dugaboy.

8   Q    Okay.  Let's see what Douglas said previously, because

9   they're your exhibits, actually.

10             MR. MORRIS:  You know what, Your Honor, I'm not going

11  to do this.  I'll save it for argument.  Because Exhibits 16

12  through 20 on the -- on Mr. Dondero's exhibit list are all the

13  emails with Mr. Draper.  He has no knowledge of the -- of Mr.

14  Dondero's email about the subpoena.  He has -- he is actually

15  looking to get the documents, but he's being undermined.

16  BY MR. MORRIS:

17  Q    Let's talk -- let's talk briefly about Mr. Ellington.

18  You testified that he was settlement counsel, right?

19  A    Correct.

20  Q    After the TRO was entered into, do you know whether your

21  lawyers ever made any attempt to confirm with the Debtor that

22  the Debtor was comfortable, notwithstanding the TRO, having

23  Mr. Ellington talk to you about issues other than shared

24  services?

25  A    No, but he was.

Dondero - Redirect                                   205

1   Q    Okay.  Do you have any documents to corroborate your

2   testimony that, after the TRO was entered into, and

3   notwithstanding the very strict prohibition on communicating

4   with employees other than shared services, any document at all

5   that corroborates your testimony that Jim Seery authorized Mr.

6   Ellington to continue to talk about topics other than shared

7   services?

8   A    No.

9   Q    Okay.  I appreciate that.

10          MR. MORRIS:  Your Honor, I have no further questions.

11          THE COURT:  All right.  Mr. Wilson, anything further?

12          MR. WILSON:  I'll have a short redirect or recross,

13   whatever this is.

14          THE COURT:  Okay.

15                      RECROSS-EXAMINATION

16   BY MR. WILSON:

17   Q    Mr. Dondero, you testified under my examination and then

18   again under Mr. Morris's about the cell phone policy that was

19   put in place by Thomas Surgent.  Do you remember that

20   testimony?

21   A    Yes.

22   Q    Are you aware if there was ever a written policy regarding

23   the cell phones?

24   A    I -- I don't know.  But I would have assumed it was in the

25   employee manual.

Dondero - Recross                                  206

1  Q    But whether there was or there was not a written policy in

2  place, you testified that you were instructed in compliance

3  with that policy with annual meetings, correct?

4            MR. MORRIS:  Objection to the form of the question.

5            THE COURT:  Overruled.

6            MR. MORRIS:  Leading.

7            THE COURT:  Overruled.

8  BY MR. WILSON:

9  Q    Do you recall my question, Mr. Dondero?

10 A    I think I said yes.

11 Q    Okay.  Were you the only one at Highland who followed

12 that cell phone replacement procedure that you were trained

13 on by Thomas Surgent?

14           MR. MORRIS:  Objection to the form of the question.

15           THE COURT:  Sustained.

16           MR. MORRIS:  Calls for speculation.

17           THE COURT:  Sustained.

18           THE WITNESS:  Again, the --

19           THE COURT:  Sustained.

20           THE WITNESS:  The policy wasn't --

21           THE COURT:  No, no, no, no.

22           THE WITNESS:  -- set --

23           THE COURT:  That means don't answer.  I sustained

24 the objection.

25       Mr. Wilson, go ahead.

1  BY MR. WILSON:

2  Q   All right.  Mr. Dondero, are you aware of any other

3  employees that followed that cell phone replacement policy at

4  Highland?

5          MR. MORRIS:  Objection to the form of the question.

6  There's no foundation that anybody else -- I'll just leave it

7  at that.  No foundation.

8          MR. WILSON:  Well, I'm -- Your Honor, I'm asking if

9  he has personal knowledge of other employees.  We're trying

10 to establish a foundation.

11         THE COURT:  Overruled.

12         THE WITNESS:  My belief, the policies weren't set up

13 in anticipation of bankruptcy or anticipation of infighting.

14 In anticipation --

15     (Interruption.)

16         THE WITNESS:  John, you're -- John Morris, you're

17 making noise in front of the speaker again.

18         MR. MORRIS:  I apologize.  Thank you.

19         THE WITNESS:  The policy wasn't set up in

20 anticipation of bankruptcy.  The policy was set up to prevent

21 recycled, refurbished cell phones of former executives

22 forming -- falling into a Sony-type scandal where the

23 business emails get promulgated all over the Internet or

24 something.  It was meant to protect investor information, and

25 that's -- that's my belief regarding the wiping of the phone.

Dondero - Recross                                        208

1   And I believed and my knowledge is that it was for every

2   senior manager, senior executive when they got a new phone at

3   Highland.  It wasn't just me.

4   BY MR. WILSON:

5   Q    And to confirm your earlier testimony, the last time you

6   saw your cell phone was when you handed it to Jason

7   Rothstein, who's a former Highland employee, correct?

8   A    Yes.

9   Q    And if that phone was indeed wiped of the information on

10  it, who performed that wiping?

11  A    Jason --

12           MR. MORRIS:  Objec...

13           THE WITNESS:  -- or one of the guys on his team.

14           THE COURT:  Okay.  Hang on.

15           MR. MORRIS:  Objection to the form of the question.

16  Speculation.

17           THE COURT:  Yeah.  Sustained.

18  BY MR. WILSON:

19  Q    Did you wipe the phone yourself, Mr. Dondero?

20  A    No.

21  Q    Why would you have testified in the past that the phone

22  might have been destroyed or disposed of?

23  A    Because that's what I assumed or thought happened to

24  prior cell phones.

25  Q    But in any event, you did not destroy or dispose of your

Dondero - Recross                                             209

1    cell phone in December of 2020, correct?

2    A    No, I did not.

3    Q    Now, in December of 2020, did Dugaboy and the Get Good

4    Trust hire Douglas Draper to represent their interests, and

5    one of the issues that Mr. Draper had to address was the

6    production of trust documents, correct?

7    A    Yes.

8    Q    Did you communicate with Mr. Draper any unwillingness to

9    produce those documents?

10   A    What I said, which I had testified to, I bought he was

11   aware of the initial response of not without a subpoena, but

12   then he was -- he didn't consider the information a big deal

13   and so he just wanted to see it before it went out.  And

14   again, I thought that he was negotiating well with the

15   Pachulski lawyers and I didn't know where that stood, but I

16   wouldn't have been surprised if the information had been

17   provided or was about to be.  I don't know.  I delegated it

18   to him.

19   Q    In the text that was sent to Melissa, --

20            MR. WILSON:  Can you pull up Debtor's 19?

21   BY MR. WILSON:

22   Q    I'm going to pull up Debtor's 19, which is the text

23   string with Melissa.  And what's --

24            MR. WILSON:  Go down.

25   BY MR. WILSON:

1  Q    What's the date on the text regarding the Dugaboy Trust?

2  A    The 16th.

3          MR. WILSON:  Okay.  Go to our -- go to our 16. And

4  this is going to be Dondero Exhibit 16.  Go to the bottom of

5  Page 2.

6  BY MR. WILSON:

7  Q    Do you see this email at the bottom of the page from

8  Douglas Draper --

9  A    Yes.

10 Q    -- to John Morris and Isaac Leventon?  And what's the

11 date of that email?

12 A    The 15th.

13 Q    Okay.  So that's the day before you sent the text message

14 to Melissa, correct?

15 A    Yes.

16 Q    So Mr. Draper was already coordinating with the Debtor's

17 counsel to produce these documents prior to your text to

18 Melissa, correct?

19 A    Yes.

20 Q    All right.

21         MR. WILSON:  I have no further questions.

22         MR. MORRIS:  Can we keep that document up on the

23 screen for a moment?

24         THE COURT:  All right.  Normally, this would be the

25 end of Mr. Dondero's examination, with recross, but it was

Dondero - Further Redirect                    211

1  technically redirect as well, so Mr. Morris, you get the last

2  short, and please make it brief.

3              MR. MORRIS:  Yeah.  Sure.

4                    FURTHER REDIRECT EXAMINATION

5  BY MR. MORRIS:

6  Q    The email that -- the email we just looked at was from

7  Douglas Draper dated December 15th, right?

8  A    Yes.

9  Q    And Douglas Draper represents Dugaboy, correct?

10 A    Yes.

11 Q    And yet you're telling the Court that your lawyers told

12 you, notwithstanding a TRO that prohibits you from

13 communicating with Debtor's employees, except for shared

14 services, that they thought you should be the one to instruct

15 Melissa Schrath not to produce the Dugaboy documents without

16 a subpoena?  Is that your testimony, --

17 A    That's correct.

18 Q    -- that your lawyers told you to do that?

19 A    That's absolutely correct.

20 Q    Okay.

21             MR. MORRIS:  No further questions, Your Honor.

22             THE COURT:  All right.  Mr. Dondero, that concludes

23 your testimony today.

24     All right.  We have one more witness, Mr. Seery, correct?

25             MR. MORRIS:  Yes, Your Honor.

 1              THE COURT:  All right.  Maybe --

 2              MR. MORRIS:  I hope this isn't too long, actually.

 3              THE COURT:  Maybe some people want to watch

 4    basketball.  I don't know.

 5         All right.  Mr. Seery, could you say "Testing, one, two"

 6    so we pick up your video?

 7              MR. SEERY:  Testing, one, two.

 8              THE COURT:  All right.  I hear you but I don't see

 9    you yet.  Let's see if we --

10              MR. SEERY:  Testing, one, two, Your Honor.

11              THE COURT:  Okay.

12              MR. SEERY:  Testing, one, two.

13              THE COURT:  There you are.  Please raise your right

14    hand.

15         (The witness is sworn.)

16              THE COURT:  All right.  Thank you.  Mr. Morris, go

17    ahead.

18              MR. MORRIS:  All right, Your Honor.  I'll try to be

19    as quick as I can here.

20              JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

21                        DIRECT EXAMINATION

22    BY MR. MORRIS:

23    Q   Mr. Seery, did the Debtor -- did the Debtor's independent

24    board --

25         (Interruption.)

 1            THE COURT:  All right.  We are getting some sort of

 2   feedback.  So everyone but Mr. Morris, and Mr. Seery, when he

 3   answers, please have your device on mute.

 4        Go ahead.

 5            THE CLERK:  Mr. Morris is on mute.

 6            THE COURT:  Okay.  Now you're on mute, Mr. Morris.

 7            MR. MORRIS:  All-righty.  Let's see if this works.

 8   BY MR. MORRIS:

 9   Q    Mr. Seery, can you hear me now?

10   A    I can, yes.

11   Q    Okay.  Did the Debtor's independent board make a decision

12   in early October to demand Mr. Dondero's resignation?

13   A    Yes.

14   Q    And why -- what were the reasons?

15   A    Quite simply, he was taking aggressive actions,

16   interfering with the operations of the Debtor and our pursuit

17   of a plan.  Objections, claim objections, even things as far-

18   fetched as piercing the corporate veil, which we're surely

19   going to see later on in this case.

20   Q    And did there come a time a few weeks later that the

21   Debtor sought and obtained a TRO against Mr. Dondero?

22   A    That's correct, yes.

23   Q    And is it fair to characterize Mr. Dondero's relationship

24   to the Debtor in December of 2020 as adverse?

25   A    Extremely.

Seery - Direct                                     214

1   Q   And why would you describe the Debtor's relationship with

2   Mr. Dondero in December 2020 as adverse?

3   A   Well, the discussions regarding any kind of bargain plan

4   had really fallen apart.  Mr. Dondero was actively objecting

5   to the pursuit of the monetization plan, either individually

6   or through his multiple entities.  He had begun to move

7   forward on litigation strategies versus me.  And those, among

8   other reasons, were the reasons that it had become extremely

9   obvious that we were adverse.

10  Q   I'll try to do this as quickly and as easily as I can.

11  You were here this morning for my opening statement; is that

12  right?

13  A   Yes.

14  Q   And did you listen in and watch my examination of Mr.

15  Dondero when I went through the 13 email communications with

16  the Debtor's employees?

17  A   Yes.

18  Q   Were you aware of any of the communications that we

19  looked at today --

20  A   No.

21  Q   -- at the time that the communications were made?

22  A   Well, yeah, I'm obviously aware of them today.  They're

23  on your schedule.  But I was not aware of them at the time

24  they were made, no.

25  Q   Okay.  And is it fair to say, then, that you did not

1    authorize any of those communications?

2    A    They were definitely not authorized.

3    Q    And having reviewed those communications, do you believe

4    that those communications, each of those communications was

5    adverse to the Debtor's interests?

6    A    They were extremely adverse to the Debtor's interests.

7    They -- they even went so far as to be coordinating shared

8    privilege among adverse parties who were contesting the

9    Debtor's actions with respect to both claims and the plan

10   monetization process.  What could be more adverse?

11   Q    Had you known of these communications at the time they

12   were made, do you have any idea as to what you would have

13   thought or what you would have done?

14   A    We would have terminated the employees involved.  In

15   fact, when they found out about them, we terminated the

16   employees involved.

17   Q    Okay.  And why did you take that step when you learned

18   about these communications?

19   A    The -- some of the issues with respect to Mr. Dondero and

20   certain employees have been brewing for some time, but these

21   were just all examples of employees breaching their duties to

22   the Debtor and taking adverse interests and pursuing them

23   against the Debtor.  And we couldn't continue to have those

24   employees in place.

25   Q    Okay.  Let's just move quickly to the issue of the cell

Seery - Direct                           216

1  phone policy.  Did you listen to Mr. Dondero's description of

2  the cell phone policy pursuant to which they could recycle

3  phone numbers or change the account holders and wipe phones

4  clean?

5  A    Yes, I heard it.

6  Q    Okay.  Are you aware of any written policy that supports

7  that?

8  A    No.  That testimony was largely made up.  The policy --

9  just so we're clear, and this is pretty typical -- and he

10  knows this, of course -- but when someone has a phone at a

11  financial firm, often you get your emails on the phone.  When

12  you leave the employ, that's deleted, because it's gone --

13  the server is the one that connects with your phone.  It's

14  not like your Yahoo.  This is very standard.  The rest of the

15  data on the phone is not deleted and wiped unless you go wipe

16  it.

17      Mr. Dondero's phone was paid for by the Debtor.  Not only

18  Mr. Dondero's phone, his housekeeper's phone, Ellington's

19  phone, his driver's phone, his iPad in Florida.  This -- he

20  knows this.

21  Q    And --

22  A    They have the documents.  I have them in front of me.

23  Sorry.

24  Q    That's okay.  With respect to the trades, you heard some

25  testimony about the trades and how Mr. Dondero insists that

Seery - Direct                    217

1   he didn't do anything to interfere with the trades in

2   December.  Do you have any -- any knowledge or information

3   that you can share with the Court on the Debtor's allegation

4   as set forth in the letter that we looked at, that, indeed,

5   on December 22nd, Mr. Dondero was involved in interfering

6   with the Debtor's trading activity at that time?

7   A    I think it's pretty clear, and my recollection was that

8   he very directly instructed employees of HCMFA as well as

9   Jason Post to prevent those trades from going through.  His

10  description of an OMS system and compliance was complete

11  nonsense.  These trades are compliant.  You don't have to run

12  a trade through an OMS system to be compliant.  They were

13  screened against the restricted list.  It's -- it didn't have

14  any basis in fact, what he was saying.

15  Q    Okay.  Let's talk just about -- about harm to the Debtor

16  from the breaches that we have been discussing today.  Has

17  the Debtor suffered any economic harm, any financial harm,

18  from Mr. Dondero's conduct with respect to the TRO

19  violations?

20  A    Well, I think -- I think the combination of the TRO

21  violations and the continuing attempts to just make the

22  Debtors spend a lot of money.  We've spent literally

23  millions, more than a million dollars, just on litigating TRO

24  issues, just dealing with the initial TRO, the hearing, the

25  order, the various appearances, the preliminary injunction,

Seery - Direct                                      218

1  and taking the preliminary injunction to this stage.  We

2  then, with respect to the trades, had to litigate those

3  issues with both Mr. Dondero and his multiple related

4  parties.  We had to both pay your firm, DSI, not to mention

5  individual time, but also Kasowitz, as you mentioned, we went

6  out and hired with respect to some of the CLO issues in the

7  litigation.

8      It's literally millions of dollars.  And that doesn't

9  even get to the multiple millions that were spent negotiating

10  the transition that Mr. Dondero talked so glowingly about

11  that he did nothing but throw (garbled).  These are not --

12  these are not my guesses.  This is not my supposition.  I'm

13  not thinking these are the case.  These are just facts.  And

14  that's been his design, and he's doing it well.  He's making

15  us spend a lot of money.

16      There's no rebuilding Highland.  The employees have been

17  terminated.  The contracts have been rejected.  Highland,

18  remember, was run to lose money.  I've testified to this

19  before.  It was designed and he uses it to siphon off lots of

20  value to these other entities.  And we're going to keep

21  seeing this.  So it will continue to come.

22      But these actions with respect to blaming it on Jason

23  Rothstein or claiming that Thomas Surgent ever touched his

24  phone:  complete nonsense.  Not true.  Didn't happen.

25  Rothstein followed his orders.  Great example of Dondero's

Seery - Direct                                    219

 1  interference and contempt.  He's just controlling these

 2  employees because they know ultimately they're going to be,

 3  many of them, working for him again.  So their only avenue to

 4  remuneration is -- continued employment, is to do what he

 5  asks them to do.  And you figure these are, you know, these

 6  are some really good folks.  Jason Rothstein is a very

 7  talented and I think very ethical guy.  To throw him under

 8  the bus like that is absurd.  He doesn't --

 9  Q    Um, --

10  A    By the way, he doesn't work for me.  Right now.

11  Q    Okay.  Let's talk about noneconomic harm.  We -- you saw

12  the three categories that we went through from the -- from

13  the 13 communications with the Debtor's employees, the three

14  alleged violations of the automatic stay, the interference

15  with the trading.  Do you have a view or a, you know,

16  knowledge that you can share what the Court as to whether the

17  Debtor suffered noneconomic harm from these violations of the

18  TRO?

19  A    Well, absolutely.  And I think it's pretty clear, and

20  some of it is from Mr. Dondero's own testimony.  A lot of

21  confusion among the employees during the transition.  So, in

22  order to make sure that we could try to hold them through the

23  transition and to complete a transition, we -- we entered

24  into a KERP program.  We actually spent a lot of money in

25  designing it, coming up with it and bringing it to this

Seery - Direct                           220

1  Court.

2      These employees are confused about where they're going.

3  Are they going to go to this Newco, which is going to have to

4  provide services to Dondero entities?  Are they going to go

5  to Dondero entities?  That confusion made it more difficult

6  for us to retain employees, and more expensive.

7      In addition, we went through the whole process of the

8  KERP program.  No one who is retaining employee -- employment

9  with either Mr. Dondero or with the Newco actually ended up

10 taking the KERP.  They turned down money because he required

11 them, in order to get a job with them, to give that money up

12 and assign their claims to him, which he intends to try to

13 use in some other way to slow up the case or cause more

14 damage, make us spend more money.  It's inconceivable.  And

15 I'm talking about employees who had a $2,500 KERP payment.

16 He took them.  It's crazy.

17 Q    Um, --

18 A    I apologize if -- since I'm not in the courtroom, Your

19 Honor, I'm probably not as formal as I should be.  I will --

20 I will -- I will endeavor to be a little bit more formal.  My

21 apologies.

22            THE COURT:  Okay.

23 BY MR. MORRIS:

24 Q    Did you have any -- did you have any concerns about the

25 conduct that's been presented today in terms of undermining

1   your own authority as the CEO of the Debtor?

2   A    Well, it's -- it's been very clear.  And, again, that

3   relates to both retaining employees and then working on

4   transition services arrangements.  We had a whole hearing a

5   couple weeks ago on how the Fund Advisors and the Funds

6   didn't need anything from Highland.  They just needed old

7   records.  Well, it turns out, we've been working three weeks

8   negotiating the shared resource agreement, that wasn't quite

9   true.

10       And so we think we have something in place, but it's been

11  much more difficult to get these kinds of arrangements done

12  because authority has been undermined and because employees

13  who are working in that sphere and working on the transition

14  are worried about what the next opportunity is going to be

15  for them.  So it's been very, very difficult.

16       In addition, during January, because of this undermining,

17  we saw some significant cover-ups around certain transfers.

18  Those will be coming to light soon.  But it -- I don't think

19  these would have happened without Mr. Dondero's influence,

20  his -- his contumacious conduct with respect to the Court,

21  with respect to the authority, with respect to the

22  transition, frankly, that he initiated when he started this

23  bankruptcy.

24       MR. MORRIS:  I have no further questions, Your

25  Honor.

1          THE COURT:  All right.  Mr. Wilson, cross?

2          MR. WILSON:  Yes, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. WILSON:

5    Q    Mr. Seery, the Debtor filed the contempt motion on

6    January 7th, correct?

7    A    I don't recall the specific date, but if you represent

8    it, I assume that to be true.  Don't know.

9    Q    Do you recall that the Debtor also filed a motion for an

10   expedited hearing on the motion for contempt?

11   A    I -- I believe so.  I don't recall the specifics.

12   Q    And the Debtor filed a memorandum of law setting forth

13   the actions that it contends constitute violations of the

14   TRO.  Were you aware of that?

15   A    I assume there was an accompanying memorandum of law,

16   yes.

17   Q    Well, did you see a memorandum of law that was filed?

18   A    I certainly would have seen the pleadings.  I don't

19   recall whether I read the memorandum of law.

20   Q    Well, did you participate in the process of determining

21   the allegations that the Debtor was alleging should be held

22   in contempt?

23   A    I'm sure they were reviewed with me.  I don't recall the

24   specifics of how they were laid out in the pleadings.  But

25   I'm sure that counsel reviewed them with me.

1  Q   Well, who decided for the Debtor to make the contempt

2  allegations?

3  A   Ultimately, the decision would have been mine, under the

4  advice of counsel.

5  Q   But did you -- did you not tell counsel what you -- what

6  you contended was a violation of the TRO?

7         MR. MORRIS:  Objection to the form of the question

8  and direct the witness not to answer.  He's really asking

9  about Mr. Seery's communications with his lawyers, Your

10 Honor.

11        THE COURT:  Sustained.

12        MR. WILSON:  I'll ask it a different way.

13 BY MR. WILSON:

14 Q   Who came up with the idea of which allegations were going

15 to be made, were contempt?

16        MR. MORRIS:  Objection.  Direct the witness not to

17 answer.

18    He can ask him about Mr. Seery, but these questions are

19 going to get into attorney-client privilege.

20        THE COURT:  All right.  Sus...

21        MR. WILSON:  Your Honor, I'm not asking him to

22 reveal any attorney-client privilege.  I'm just asking for

23 his knowledge of who came up with these allegations, outside

24 of counsel.

25        THE COURT:  I sustain the objection.

Seery - Cross                                    224

1   BY MR. WILSON:

2   Q    Did you yourself form the allegations that were going to

3   be in the contempt motion?

4   A    I certainly gave the recitation of facts to my counsel as

5   to what was happening in the case and Mr. Dondero's actions.

6   Q    Is it the Debtor's contention that Mr. Dondero's willful

7   ignorance of the TRO and the evidence supporting the entry of

8   the TRO is itself contemptible?

9   A    I think I'm answering your question.  I -- I don't

10  believe that he was ignorant of it.  I think the insinuation,

11  if it's claimed that he's ignorant of it, is highly

12  contemptible, yes.

13  Q    I'm sorry.  I didn't understand that.  You don't believe

14  that Mr. Dondero was ignorant of the TRO?

15  A    No, I don't believe that at all.

16  Q    Well, so if Mr. Dondero -- if the Debtor contended that

17  Mr. Dondero was willfully ignorant of the TRO, do you

18  disagree with that statement?

19       MR. MORRIS:  Objection to the form of the question.

20  I mean, the -- the evidence is what the evidence is.  It's

21  not about our contentions at this point.

22       THE COURT:  I overrule.  He can answer.

23       THE WITNESS:  Yeah, I don't -- I don't -- I disagree

24  with that statement.  I think, to some degree, I think that

25  the idea that a -- no one's that obtuse, that a relatively

1   sophisticated man who is fighting for this wouldn't have any

2   idea that there was a TRO in place I think is -- is far

3   afield.

4   Q    Which specific provision of the TRO do you contend that

5   Mr. Dondero violated with respect to his cell phone?

6   A    I'd have to go through each of the -- each of the

7   provisions.  I -- I don't have a list of them in front of me.

8   Q    Well, I can put it up on the screen.

9   A    Okay.

10        MR. WILSON:  Can you pull up Debtor's 11?

11      (Pause.)

12  BY MR. WILSON:

13  Q    Well, there's provision -- well, Paragraph 2, which has

14  the various provisions in it.

15  A    Just, just starting from there, this is -- this is -- I'm

16  walking through this now.  You're going to hear the same.  He

17  clearly communicated with Debtor employees, directing them to

18  do something with his phone that had no basis in policy, was

19  clearly destroying property of the Debtors, and I think

20  violates (a) to start with.  I -- just to start.  I don't

21  have the rest of the -- rest of the paragraph.

22        MR. MORRIS:  Can we -- can we scroll down so he can

23  see the rest of it before he finishes his answer?

24        MR. WILSON:  I thought he was finished.

25        MR. MORRIS:  Well, you haven't shown him the whole

Seery - Cross                                    226

1   document.

2            THE WITNESS:  I mean, as we talked about earlier,

3   (e) is pretty clear, too.  This is destruction of property of

4   the estate and these records.  And -- and with respect to

5   wiping it clear, as was previously discussed.  I don't think

6   that that's really debatable.

7   Q    Who is Jason Rothstein?

8   A    Jason was the head of IT at Highland.  He's a longtime

9   employee of Highland, had worked for Highland I think at

10  least ten years.

11  Q    Have you ever had a conversation with Mr. Rothstein about

12  the Debtor's cell phone policy?

13  A    I think I have.

14  Q    And when was that conversation?

15  A    I believe in and around this time, we talked about it.

16  Because it was pretty clear -- the testimony that Mr. Dondero

17  gave was completely untrue.  I've never issued any edict,

18  order, or statement that people lose their job --

19            MR. WILSON:  I'm going to object to nonresponsive.

20            THE COURT:  Sustained.

21  BY MR. WILSON:

22  Q    What did Mr. Rothstein tell you that the Debtor's cell

23  phone policy was?  And by that, I mean the replacement

24  policy.

25            MR. MORRIS:  Objection to the form of the question.

1           THE WITNESS:  I didn't testify to that.  I didn't

2    say that.

3           THE COURT:  I overrule.

4           THE WITNESS:  I know -- it -- that's not what I

5    said.

6    BY MR. WILSON:

7    Q    Well, did Mr. Rothstein ever tell you anything about the

8    Debtor's telephone policy?

9    A    I don't believe so, no.

10   Q    But in any event, we can agree that Mr. Dondero turned

11   over his phone to Mr. Rothstein, correct?

12   A    It appears that way from the information we have.

13   Q    And you testified that Mr. Rothstein is an ethical and

14   honest individual, correct?

15   A    I believe he is, yes.

16   Q    And so are you -- are you insinuating by your testimony

17   earlier that Mr. Dondero caused Mr. Rothstein to do something

18   improper with the cell phone?

19   A    Yes.

20   Q    But yet you said that Mr. Rothstein is an honorable and

21   ethical person, correct?

22   A    Yes.

23   Q    And so does -- how do you square your opinion with him as

24   being honest and ethical, but yet he did something improper

25   under Mr. Dondero's direction?

1    A    I think Mr. Dondero told him to get him a new cell phone

2    or wipe that one clean and he did so.  And he's not a lawyer.

3    He's an IT professional.  If there was email, it was backed

4    up.  He may or may not have known how much Dondero used texts

5    to conduct business.

6         But he would have done what he was told to do because

7    that's what he was expecting -- where he expects to be

8    working at some time in the future.  It's a perfect example

9    of why there was a TRO in place and why this kind of

10   contumacious conduct is harmful to the estate.

11   Q    From the time that you took over as an independent board

12   member and also as CEO later, did you or anyone else at the

13   Debtor ask Mr. Rothstein to back up anyone's text messages

14   when they turned their phone in for replacement?

15   A    No.  Not to my knowledge.

16   Q    Did anyone at the Pachulski firm, to your knowledge, ask

17   Mr. Rothstein to back up text messages from anyone's phone?

18   A    Not to my knowledge, no.

19   Q    And you're aware that other Highland executives have left

20   the employment of Highland during the pending of this

21   bankruptcy, correct?

22   A    Not who had a phone that was Highland's phone.

23   Q    So did Mark Okada not have a Highland phone?

24   A    No, he did not.

25   Q    Did Mark Okada have any Highland information on his phone

1   when he left?

2   A    I don't know.  He didn't have a Highland phone.  We

3   didn't seize his personal phone.

4   Q    So does it depend on whether the phone was paid for by

5   Highland whether or not that Highland should be able to

6   access the information on the phone?

7   A    That's not the policy, no.

8   Q    Well, my question is, is that did you -- were you at all

9   concerned about any information that might have been on Mr.

10  Okada's phone when he left Highland?

11  A    I wasn't because I had no experience with him texting me

12  to conduct business.

13  Q    Has the Debtor ever requested the phone company to search

14  and see if they can recover any text messages from Mr.

15  Dondero's phone?

16  A    No, we haven't.

17  Q    But the Debtor established a protocol for conducting

18  electronic discovery in this case, correct?

19  A    That's very different.  The phone company doesn't

20  maintain text chains for those who use Apple products.  Apple

21  maintains them.

22        MR. WILSON:  Your Honor, I object as nonresponsive.

23  BY MR. WILSON:

24  Q    I'm asking you a different question.

25        THE COURT:  Okay.

Seery - Cross                                    230

1  BY MR. WILSON:

2  Q    Did the Debtor establish a protocol for conducting

3  electronic discovery in this case?

4  A    I -- I believe there's an order in place.

5         MR. WILSON:  Why don't you pull up 8?  Yes.  And go

6  -- just scroll on the first page.

7  BY MR. WILSON:

8  Q    This is Dondero Exhibit 8 that we're pulling up.  Do you

9  recognize this document?

10  A    I'd have to see -- I don't.  I'd have to see more of it.

11  I'm only seeing a small snippet.

12  Q    Okay.  Well, we can -- we can scroll down to satisfy you.

13  (Pause.)  The top of the document is Notice of Final Term

14  Sheet, and it looks like the date is January 14, 2020.

15  A    Yes, I recognize this document.

16        MR. WILSON:  Okay.  Go to Page 44.  Actually, go to

17  43.  Yeah, that's it.

18  BY MR. WILSON:

19  Q    Do you see -- I'm now looking at Page 43 of the document

20  where it says Exhibit C, Document Production Protocol.

21  A    I see it.

22        MR. WILSON:  All right.  Scroll down to the next

23  page.

24  BY MR. WILSON:

25  Q    And then it, in (a), it talks about ESI or

 1  Electronically-Stored Information.  And this appears to be

 2  the protocol for preservation of ESI.  Would you agree with

 3  that?

 4  A    In accordance with the term sheet, yes.

 5  Q    Right.  Are text messages referenced in this document?

 6  A    I don't know.

 7  Q    Well, if we scroll through letter C, where it says

 8  Preservation of ESI, do you see anywhere under Preservation

 9  of ESI where it refers to text messages?

10  A    I -- I don't -- I don't see --

11          MR. WILSON:  Then I --

12          THE WITNESS:  I don't see it.  This seems to be

13  dealing with the server.

14          MR. WILSON:  And then scroll down to I.

15  BY MR. WILSON:

16  Q    And here's the final --

17          MR. WILSON:  It's -- no, no, no.  It's -- it's Page

18  45.

19  BY MR. WILSON:

20  Q    This is -- letter (i) at the top is the final paragraph

21  under that section.  That seems to refer to hard drives and

22  laptops and work computers, but does it -- do you see

23  anywhere where it mentions phones or text messages?

24  A    Doesn't use those words, but it certainly covers it.

25  Q    But this would be the protocol that covers ESI that the

Seery - Cross                                    232

1    -- that Debtor agreed to, correct?

2    A    I believe so, yes.

3    Q    And you approved this protocol prior to its adoption?

4    A    I don't believe so, no.

5    Q    You didn't approve it?

6    A    My recollection is this was right around the time we came

7    in.  I think this was part of the agreement that the Debtor

8    had with the Committee.  And I don't believe it was subject

9    to independent board approval before its entry.  I don't -- I

10   just don't recall specifically.  That's my recollection.

11   Q    Did you -- do you recall if you participated in the

12   development of this protocol?

13   A    I did not.

14   Q    But you would agree that this is the protocol that the

15   Debtor agreed to adopt in connection with this bankruptcy

16   case, correct?

17   A    It is a protocol entered in January of 2020.

18   Q    Do you have a Highland email account?

19   A    I do.

20   Q    Do you have a personal email account?

21   A    I do.

22   Q    And do you conduct Highland business on your personal

23   email account?

24   A    I do.

25   Q    Do you preserve your personal emails?

Seery - Cross                                    233

1    A    I do.

2    Q    Do you have a Highland cell phone?

3    A    No.

4    Q    So do you use your personal cell phone for Highland

5    business?

6    A    Yes.

7    Q    Do you preserve all your text messages?

8    A    I don't delete them.  I believe that they're accessible,

9    yes.

10   Q    Are your personal emails stored on the Highland server?

11   A    No.

12   Q    Are your text messages stored on the Highland server?

13   A    No.

14   Q    With respect to the motion filed by the U.C.C. in January

15   2020 relating to discovery, did the Debtor oppose the motion?

16   Or I'm sorry.  I said January.  I meant July 2020.

17   A    I believe we did.

18   Q    Did the Debtor agree with the U.C.C. at that time to

19   preserve and produce text messages?

20   A    I believe that we did.

21   Q    Do you know if that's in writing anywhere?

22   A    The order was pretty broad.  There was obviously

23   significant -- I don't know if it's in writing anywhere.

24   Q    During the pendency of this case -- well, I guess I need

25   to ask a question before that.  Who at the Debtor is

1  responsible for sending litigation preservation notices?

2           MR. MORRIS:  Objection to the form of the question.

3           THE COURT:  Overruled.

4           THE WITNESS:  Currently, the general counsel.

5  BY MR. WILSON:

6  Q    Currently, the general counsel?  Well, who would -- who

7  would have been responsible for sending it during the year

8  2020?

9  A    Scott Ellington.

10 Q    Were you aware of Thomas Surgent ever sending any

11 litigation preservation notices?

12 A    Since he became general counsel, he has, yes.

13 Q    When did Mr. Surgent become general counsel?

14 A    After Mr. Ellington was terminated.

15 Q    Well, during the pendency of this case, have either Mr.

16 Ellington or Mr. Surgent ever sent around any preservation

17 notices pertaining to text messages?

18 A    I was -- I don't know if it -- I assume they pertain to

19 text messages.  I -- I believe there was one, and I asked

20 about it my first day at Highland, that it was -- it was a

21 litigation preservation notice.

22 Q    And that was around the time of your first day at

23 Highland?

24 A    Correct.

25 Q    So, but since that time, are you aware of any

Seery - Cross                         235

1  preservation notices pertaining to text messages sent?

2  A    Not specifically, no.  Well, certainly, Mr. Surgent's

3  preservation notice since he became general counsel would

4  cover that.  I am certain of that.

5  Q    But that would have been in January of this year,

6  correct?

7  A    Correct.

8  Q    Did you ever ask Mr. Ellington or Mr. Surgent to send any

9  preservation notices pertaining to text messages prior to Mr.

10 Ellington's termination?

11 A    I believe I asked on the first day that I was there about

12 document preservation notice, did it go out?  Didn't

13 specifically reference text messages.

14 Q    But after that -- after that preservation notice at the

15 beginning of your employment, you're not aware of any other

16 preservation notices that you requested should go out?

17 A    I didn't make any requests after the first one went out.

18 Q    And that -- and that request that went out or that notice

19 that went out in January of 2020 did not specifically refer

20 to text messages, correct?

21 A    I don't know.  I actually think, when it would have gone

22 out in -- at the filing, any responsible general counsel

23 would have issued it, and I was told that they did.

24 Q    Are you aware of anyone at the Pachulski firm that asked

25 Mr. Surgent or Mr. Ellington to send any preservation notices

Seery - Cross                                        236

1    pertaining to text messages?

2    A    Certainly, Mr. Surgent, I don't know if Pachulski asked

3    him, I certainly did, to redo it after we made some

4    significant discoveries in January.  But I don't know if

5    Pachulski -- the Pachulski firm or anyone there asking -- it

6    wouldn't have been Mr. Surgent.  He was the CCO.  It would

7    have been Mr. Ellington, the GC.  Other than the, as I said,

8    the request I made in January to confirm that one was sent

9    out at the start of the case.

10   Q    Referring back to Mr. Mark Okada and also Trey Parker,

11   were those individuals covered by the custodians of the

12   U.C.C.'s request?

13   A    I didn't -- I didn't understand your question.  I'm

14   sorry.

15   Q    Were Trey Parker and Mark Okada custodians under the

16   U.C.C.'s preservation request or discovery request?

17   A    I don't -- I don't know.

18   Q    Did you ever -- did -- both of those individuals left

19   during the pendency of the Highland bankruptcy, correct?

20   A    Yes.

21   Q    Did the Debtor do anything to preserve text messages from

22   either Mr. Parker or Mr. Okada when they left Highland?

23   A    Not to my knowledge.

24   Q    Now, earlier, you tried to testify about your knowledge

25   of cell phone policies from other financial companies.  Do

Seery - Cross                                    237

1  you recall that testimony?

2  A    Yes.

3  Q    And which financial companies are you referring to?

4  A    River Birch Capital.  And Lehman Brothers.

5  Q    So you've -- you have two examples of cell phone policies

6  that you were referring to?

7  A    Well, I -- I know of others as well.

8  Q    But you don't have any firsthand knowledge of Highland's

9  policy, particularly going back ten years, correct?

10  A    That's incorrect.

11  Q    Well, were you -- did you -- were you a Highland employee

12  ten years ago?

13  A    No.

14  Q    Did you attend training by Thomas Surgent on cell phone

15  replacement policies?

16  A    I don't believe there was such a thing.  I attended

17  compliance training with Mr. Surgent, yes.

18  Q    But yet you -- you claim that Mr. Dondero made that

19  testimony up, correct?

20  A    Yes.

21  Q    And you heard Mr. Dondero's testimony that ever since

22  he's been attending these compliance training sessions over

23  the last ten years, every time he's replaced his cell phone,

24  he's followed the same procedure:  handed it over to a

25  Highland employee and then the Highland employee would wipe

Seery - Cross                              238

1  it and provide him with a new cell phone.  You heard that

2  testimony, correct?

3  A    I heard it, yes.

4  Q    And you have reason to doubt the veracity of that

5  testimony?

6  A    Yes.

7  Q    And what is that reason?

8  A    Well, for one, his testimony about the numbers and how

9  they got them was untrue, at least from information I've

10  received from the earliest days.

11      Number two is that's not how you wipe a phone.  You can

12  wipe it remotely.  That's how you remove access to the

13  system.  You don't need the guy's phone in order to wipe it.

14  He had already done that after threatening me with a text and

15  engaging in numerable -- innumerable engagements on texts to

16  conduct business.  And then when it became crucial and there

17  were issues regarding his texts, he suddenly decided to get a

18  new phone and destroy it.  I found it to be incredible.

19  Q    But you would have to agree with me that, regardless of

20  whether Highland had a written policy, it was actually the

21  Debtor who wiped Mr. Dondero's phone, correct?

22  A    I don't -- I don't believe that to be the case and I

23  don't know.  Again, Highland can wipe the phone without

24  having access to it.  It can do it remotely.  It doesn't

25  delete the texts.  It just removes your access to Highland's

Seery - Cross                               239

1   system and the records of your emails.  You'd still have your

2   phone.  You'd still have your texts.  It's your phone.

3        Dondero's problem is it wasn't his phone.  It was

4   Highland's phone.  So he couldn't just wipe it.  He had to

5   get rid of it.

6   Q   But you would agree with me that if anyone wiped the

7   phone, it was Jason Rothstein or someone working under his

8   direction?  You testified to that just a few minutes ago.

9   A   The wiping of the phone does not wipe the texts.  The

10  wiping of the phone removes the email access and the email

11  records that you can get on your phone when you work for a

12  financial institution.  Law firms may have the same thing, if

13  they're sophisticated enough.  It prevents that person from

14  getting it.  It doesn't clean out the phone.  It doesn't get

15  rid of everything you have.

16       The one problem with it is it does tend to remove your

17  Out... a lot of your Outlook names, because those are

18  connected to your work server.

19            MR. WILSON:  I'll object as nonresponsive.

20  BY MR. WILSON:

21  Q    You testified --

22            THE COURT:  Overruled.

23            MR. MORRIS:  Your Honor, can I -- can I have a

24  ruling on that, please?

25            THE COURT:  I said overruled.

 1              MR. MORRIS:  Because I thought it was terribly

 2    responsive.

 3              THE COURT:  I said overruled, yes.  Thank you.

 4              MR. MORRIS:  Thank you.

 5    BY MR. WILSON:

 6    Q    So, do you know who wiped the text messages off Mr.

 7    Dondero's phone?

 8              MR. MORRIS:  Objection --

 9              THE WITNESS:  I don't know --

10              MR. MORRIS:  -- to the form of the question.

11              THE COURT:  I didn't hear -- okay.

12              THE WITNESS:  I don't know that the text messages

13    were wiped.

14              THE COURT:  Okay.

15              THE WITNESS:  I'm sorry.

16              THE COURT:  Time out.  Would you repeat the

17    question, Mr. Wilson?

18    BY MR. WILSON:

19    Q    My question was, do you -- do you know who wiped text

20    messages from Mr. Dondero's phone?

21              MR. MORRIS:  Objection to the form of the question.

22    No foundation.

23              THE COURT:  Sustained.

24              MR. WILSON:  Again, I'm trying to ask him if he has

25    personal knowledge of something.

1            THE COURT:  It -- you'll have to rephrase it.

2            MR. MORRIS:  Your Honor, there's no -- he --

3            THE COURT:  You'll have to rephrase what you said.

4    BY MR. WILSON:

5    Q    Do you have personal knowledge of whether text messages

6    were actually ever wiped off Mr. Dondero's phone?

7    A    No, I don't.

8    Q    So, therefore, if text messages were wiped on Mr.

9    Dondero's phone, you would not have personal knowledge of who

10   actually did it.  Correct?

11           MR. MORRIS:  Objection to the form of the question.

12   Calls for speculation.

13           THE COURT:  Sustained.

14   BY MR. WILSON:

15   Q    Well, if you -- if you don't have personal knowledge that

16   they've been wiped, I don't understand how it would be

17   speculation that you don't know who would have wiped them if

18   they were wiped, but --

19           MR. MORRIS:  Objection.  (garbled).

20           THE COURT:  Sustained.

21   BY MR. WILSON:

22   Q    Prior to becoming the CEO of Highland, did you change or

23   implement a cell phone replacement policy?

24   A    No.

25   Q    Prior to Mr. Pomerantz sending his letter to Mr. Lynn on

Seery - Cross                          242

1   December 23, 2020, had the Debtor notified Mr. Dondero that

2   the Debtor wanted his cell phone?

3   A    No.

4   Q    And you're now aware that Mr. Dondero began the process

5   of acquiring a new cell phone well before the TRO was entered

6   on December 10th, correct?

7            MR. MORRIS:  Objection to (garbled) question.

8            THE COURT:  I couldn't hear.  Was there an

9   objection, Mr. Morris?

10           MR. MORRIS:  Yes, Your Honor.

11           THE COURT:  Say again what the objection was.

12           MR. MORRIS:  To the form of the question, the use of

13  the phrase "well before."  I think the testimony is two

14  weeks.

15           THE COURT:  Okay.

16           MR. MORRIS:  According to Mr. Dondero.

17           THE COURT:  Sustained.  If you could rephrase.

18  BY MR. WILSON:

19  Q    So, you heard Mr. Dondero's testimony that he began the

20  process of acquiring a new cell phone two weeks before the

21  TRO was entered, correct?

22  A    I heard it.

23  Q    And as of December 10th, Mr. Dondero was still performing

24  work at the Highland offices for the Funds and Advisors,

25  correct?

1   A    I don't know what he was performing.  He was there.

2   Q    Is it the Debtor's contention that Mr. Dondero violated

3   the TRO by personally intervening to prevent the Debtor from

4   executing certain securities transactions on December 22,

5   2020?

6   A    Among other things, yes.

7   Q    What actions of Mr. Dondero does the Debtor contend

8   constitute Mr. Dondero's personal intervention to prevent the

9   Debtor from executing certain securities transactions?

10  A    With respect to the December ones?

11  Q    Yes.

12  A    Yeah, he -- he instructed, through either Post or Joseph

13  Sowin, I don't recall specifically, that the trades not be

14  completed.  And notwithstanding that we were trying to get it

15  done because we thought it was an advantageous time to make

16  those trades, he got involved and prevented it.

17  Q    What evidence have you presented that Mr. Dondero

18  instructed Mr. Post not to complete trades?

19  A    I believe when you put together his email and the letters

20  from counsel, you'll see, when you piece them together, that

21  that's what happened.  I don't think Jason Post did this on

22  his own.

23  Q    So your testimony is speculation, correct?

24  A    No.  I think there's -- there's very specific

25  instructions.

Seery - Cross                              244

1    Q    Well, have you brought that email with those very

2    specific instructions before the Court?

3    A    I think Mr. Morris did earlier.

4    Q    Can you point me in the record to where that is?

5    A    I -- I don't keep track of the exhibits, but this is the

6    -- this is the stuff that Mr. Morris went through earlier

7    today.  I don't have -- I don't have it specifically in front

8    of me.

9    Q    In December of 2020, did Mr. Dondero send you any emails

10   regarding the trades that you wanted to make?

11   A    I don't believe he did, although he did email me on

12   December 14th and -- or 4th, and he did email me on December

13   8th with an apology, and he did email me on December 17th

14   with some material nonpublic information.

15   Q    In December of 2020, did Mr. Dondero send you a text

16   regarding trades that you wanted to make?

17   A    In December?  December 3rd, I believe, was his threat,

18   and I don't believe I got a text from him after that.

19   Q    In December of 2020, did Mr. Dondero call you regarding

20   the trades he wanted to make?  Regarding that you wanted to

21   make.

22   A    I don't believe so, no.

23   Q    Did Mr. Dondero block any trades in December of 2020 that

24   you wanted to make?

25   A    I don't recall if we completed the -- the end of December

Seery - Cross                                    245

1  trades or we just determined not -- not to do them because it

2  was too difficult.

3  Q    But, in fact, every trade you initiated in December 2020

4  closed, correct?

5  A    I don't -- I don't recall if the ones that we're

6  referring to now actually closed or if we just decided not to

7  do them.  If I made a trade with --

8       (Interruption.)

9  A    -- with a dealer, then we completed it.  We didn't fail

10 on any trades.

11          MR. WILSON:  Which exhibit is it?

12 BY MR. WILSON:

13 Q    All right.  I'm going to pull up Debtor's 37.

14          MR. WILSON:  Go to Page 173.  Of the transcript.  Go

15 down where it says, "By Mr. Hogewood."

16 BY MR. WILSON:

17 Q    Sir, do you recall giving testimony on January 26th in

18 connection with Plaintiff's motion for a preliminary

19 injunction against certain entities owned and/or controlled

20 by Mr. James Dondero?

21 A    I believe I did.

22 Q    Do you recall being asked this question by Mr. Hogewood

23 on Line 16?  "Yeah, let me -- let me say it differently.

24 Focusing solely on December of 2020, every trade that you

25 initiated closed; isn't that correct?"  A, "Every trade, yes.

Seery - Cross                                246

1  We did not fail one trade."

2        MR. MORRIS:  Objection.  Objection.  He's seeking to

3  impeach Mr. Seery with the exact same testimony that he just

4  gave.

5        THE COURT:  What --

6        MR. WILSON:  Well, I would disagree, Your Honor.

7  Mr. Seery has equivocated on whether all of his trades went

8  through in December of 2020.

9        THE COURT:  He equivocated?  I don't remember him

10 being equivocal.  Remind me of what the testimony was.

11       MR. WILSON:  Well, I believe that Mr. Seery said

12 that he thinks he gave up on some trades and decided not to

13 complete them.

14       MR. MORRIS:  Objection.  The testimony that's being

15 read into the record from the earlier hearing is not

16 inconsistent with anything that Mr. Seery just testified to.

17       THE COURT:  (reading)  "Every trade that you

18 initiated closed; isn't that correct?"  "Every trade, yes."

19    I sustain the objection.  I don't think it's

20 inconsistent.

21 BY MR. WILSON:

22 Q   Okay.  Mr. Seery, would it be fair to say that the trades

23 that we are referring to in that December 22nd time frame

24 were initiated?

25 A   I -- I don't recall.  The -- and that's -- and I think

Seery - Cross                                  247

1    you're -- you're trying to create some ambiguity where there

2    is none or inconsistency where there is none.  I'm sorry.

3    That if we initiated a trade, because I did them through a

4    broker and told them sell or -- at a particular level on a

5    particular day, if he was able to complete that and get a

6    buyer on the other side, we completed the trade.  So if we

7    initiated it, we got it done.

8        I don't recall if those trades that we're talking about

9    earlier were initiated.  And this is a little bit of, I

10   guess, inside baseball knowledge Mr. Dondero started going

11   through a little bit before.  Typically, the trades are put

12   in through the order management system.  It's easier to track

13   the trades then.  It's all automated.  What we did instead,

14   where we actually initiated a trade, was we did it manually.

15   So we closed those trades manually.  And to be clear, the

16   order management system is not -- is not the Advisors'.  It's

17   Highland's.

18   Q   Well, Mr. Seery, if the -- if the complaint is that the

19   Advisors' employees did not book the trades, then those

20   trades were initiated.  Would you agree with that?

21            MR. MORRIS:  Objection to the form of the question.

22   Conflicts with the testimony.

23            THE COURT:  Sustained.

24   BY MR. WILSON:

25   Q   Do you understand the -- what's implicated by booking a

Seery - Cross                                      248

1    trade?

2    A    Do I understand what's implicated by booking a trade?

3    Q    Yes.

4    A    Do I know how to book a trade?  Yeah.

5    Q    And would that not be a trade that has been executed?  A

6    trade that would be booked would not be booked until after it

7    was executed, correct?

8    A    That's correct.

9    Q    And so the -- the trades that we are talking about in the

10   December 22nd time frame were initiated and executed and then

11   later booked, correct?

12   A    Any trade would have been initiated, executed, and

13   booked.  That's the correct order.

14   Q    All right.  And you've previously testified, and you

15   testified again today, that every trade that you initiated

16   closed, correct?

17   A    If --

18   Q    In December 2020?

19   A    If we initiated it and we got it done, of course.  The

20   issue is whether, when calling up the traders, if they refuse

21   to actually initiate the trade or take it, that -- that

22   wouldn't have closed.

23        Mr. Dondero didn't get this from some strange, you know,

24   premonition from the sky.  He's on a -- he was on a system

25   that showed all of the trades.  And that's where the email

Seery - Cross                                          249

1    back and forth, where he's on that list and says, Don't --

2    don't do this, both earlier and later, that's where those

3    come from.  It's not -- it's not that he had some great

4    insight into what's going on.  He's getting email.

5    Q    And, in fact, you did not fail one trade in December

6    2020, correct?

7    A    No.  Didn't fail.

8    Q    Is it the Debtor's contention that the K&L Gates law firm

9    sending letters to the Pachulski law firm on December 22nd

10   and 23rd was a violation of the TRO?

11   A    I think it was, yes.

12   Q    To be clear, these are letters between counsel, correct?

13   A    They are.

14   Q    And, in fact, K&L Gates is not Mr. Dondero's personal

15   counsel, correct?

16   A    That's what I'm hearing.

17   Q    And K&L Gates at the time represented the Funds and

18   Advisors, correct?

19   A    I -- there's so many counsel, I don't recall if they

20   represent just the Fund -- I think they represent just the

21   Funds, not the Advisors.  But if they represent the Funds and

22   the Advisors, then I'd precedent your next question, because

23   Mr. Dondero clearly controls the Advisors and he's -- he

24   basically said so earlier today.

25   Q    Can you tell me what threat means in the context of a

1   TRO?

2   A    What a threat is?

3   Q    Well, what -- what's meant by threat in the context of a

4   TRO.

5   A    I believe -- I believe that a threat is a -- either a

6   statement or action that one takes against another that puts

7   them at risk of some kind of loss or harm in order to get

8   someone to do or not do something.  I think that's the common

9   -- relatively common usage of threat as I would use it.

10           THE COURT:  Mr. Wilson, how much longer do you think

11   you're going to take?  I probably need to take a break if

12   you're going to be much longer.

13           MR. WILSON:  Yeah.  Now would be a great time for a

14   break, Your Honor.

15           THE COURT:  What was the answer to my question?

16           MR. WILSON:  Well, I said now would be a great time

17   for a break, but I don't have an exact time estimate on the

18   remainder of my questions for Mr. Seery.

19           THE COURT:  All right.  Well, we're going to stop at

20   5:30 tonight.  I've got a very long day tomorrow so I've got

21   to prepare for it at some point.

22       Nate will check the time, see how much time you've each

23   used.  But we'll take a five-minute break.

24           MR. WILSON:  All right.  Thanks, Your Honor.

25           THE CLERK:  All rise.

Seery - Cross                         251

1        (A recess ensued from 5:01 p.m. until 5:07 p.m.)

2               THE CLERK:  All rise.

3               THE COURT:  All right.  Please be seated.  We're

4   going back on the record in Highland.

5        All right.  Nate has told me that, Mr. Wilson, you're at

6   two hours and twenty minutes.  So you're actually well within

7   your time frame.  And what did you say Mr. Morris is at,

8   without deductions?

9               THE CLERK:  Three hours.

10              THE COURT:  You're at three hours, Mr. Morris,

11  without deductions.

12       Here's what we'll try to do.  We'll try to get through

13  Mr. Seery today, but we're not going to do closing arguments

14  tonight.  And what I'm thinking is we're coming back

15  Wednesday on the bond, the supersedeas bond issue with regard

16  to the requested stay pending appeal.  So we'll roll into

17  closing arguments on Wednesday after we're finished with that

18  matter.  That matters starts at 9:30.  So, presumably you'll

19  all be here for that anyway, so we'll defer closing arguments

20  until Wednesday.

21              MR. MORRIS:  Your Honor?

22              THE COURT:  Yes?

23              MR. MORRIS:  Can we put a time limit on that, too,

24  just to make sure it's sufficient?  I don't think I'd need

25  more than 15 or 20 minutes.

Seery - Cross                              252

1              THE COURT:  Okay.  I think 20 minutes is plenty per

2       side.  In fact, hopefully, with this gap in time, I'll be

3       able to kind of go through the exhibits and have my thoughts

4       collected, so therefore that I don't I'll need a lengthy

5       closing at that point.

6          Mr. Wilson, sound like a deal to you, 20 minutes?

7              MR. WILSON:  I think 20 minutes will be sufficient,

8       Your Honor.

9              THE COURT:  All right.  So you may proceed now with

10      your questioning of Mr. Seery.

11             MR. WILSON:  All right.  Thank you.

12                     CROSS-EXAMINATION, RESUMED

13      BY MR. WILSON:

14      Q   When we left off, Mr. Seery, we were talking about the

15      letters sent by K&L Gates on the 22nd and the 23rd.  You

16      would agree with me that these letters did not have any

17      effect on the Debtor, correct?

18      A   The lett... well, they certainly caused us to spend a lot

19      of time and money dealing with the issues that we thought

20      were handled at the prior hearing, where it was basically

21      found to be frivolous.  So I disagree with that.

22      Q   You weren't intimidated by the letters, correct?

23      A   No.

24      Q   And the letters didn't cause you or the Debtor to refrain

25      from operating the company in the manner that you perceived

Seery - Cross                                        253

1   to be in its best interest, correct?

2   A    It did not.

3   Q    The letters didn't cause you to change any of your

4   trading decisions, correct?

5   A    Nope, they did not.

6   Q    The letters didn't cause you to change your investment

7   strategy, correct?

8   A    No.

9   Q    And the letters didn't cause you to trade or not trade in

10  a particular manner, correct?

11  A    That's correct.

12  Q    And you continued to function the Debtor's operations as

13  you deemed appropriate, right?

14  A    Yes.

15  Q    In fact, the Debtor rejected the requests made in the

16  letters and demanded a withdrawal, correct?

17  A    Yes.

18  Q    So the letters did not cause you to conduct yourself in

19  any other manner than you would have conducted yourself had

20  you not received the letters, correct?

21  A    Well, as I said, we spent a lot of time and money

22  responding to them and dealing with them because we didn't

23  just leave them hanging out there.  So that's not correct.

24  Q    Did the letters cause the Debtor to breach any contracts?

25  A    No.

1    Q    And, again, every trade you initiated in December 2020

2    closed, correct?

3    A    Yes.

4    Q    But yet the Debtor considers the sending of these letters

5    between counsel to be an interference with or impeding the

6    Debtor's business?

7    A    Yes.

8    Q    So is it your contention that that provision of the TRO

9    is clear and unambiguous?

10   A    Yes.

11   Q    But could you see where someone might disagree?

12   A    No.

13   Q    Could you see where someone might believe that a letter

14   sent between counsel that did not cause the Debtor to alter

15   its course in any way was not an interference with the

16   Debtor's business?

17   A    A threat doesn't have to be successful in order to be a

18   threat and one that could affect us, and I said it did

19   actually affect what we did because we had to spend money and

20   time dealing with it.

21   Q    Who is Scott Ellington?

22   A    Who is Scott Ellington?

23             THE COURT:  Okay.

24             THE WITNESS:  He's the former general --

25             THE COURT:  Mr. Wilson, --

Seery - Cross                                    255

 1            THE WITNESS:  -- general -- former --

 2            THE COURT:  Mr. Wilson, we all know who Scott

 3   Ellington is, okay?  Please.  Let's --

 4            MR. WILSON:  Oh, I'm sorry.  I was just asking the

 5   question for the record.

 6            THE WITNESS:  He's the former general counsel of

 7   Highland.

 8   BY MR. WILSON:

 9   Q    And as general counsel, did you believe that Mr.

10   Ellington owed duties to Highland?

11   A    Absolutely.

12   Q    As general counsel, Mr. Ellington would have been part of

13   the legal department at Highland, correct?

14   A    Yes.

15   Q    And that legal department was part of the shared services

16   agreements between the Debtor and the Advisors, correct?

17   A    No, it wasn't.

18   Q    Can you tell me what you mean by that?

19   A    It was not, meaning no.  In answer to your question, it

20   was not.

21   Q    Are you saying that the shared services agreements

22   between the Debtor and the Advisors did not cover legal

23   services?

24   A    They included legal services, yes, but you asked me if

25   the legal department was part of it.  No.

Seery - Cross                                      256

1   Q    Can you tell me what you mean by when you hear the term

2   legal department?

3   A    Highland's legal department was a pretty unusual thing.

4   It included lawyers and non-lawyers.  Not just, you know,

5   administrators, administrative assistants, and paralegals,

6   but even some people who were accountants or MBAs.  It did

7   work all over the -- either the Highland complex or even

8   through numbers of entities for which it didn't get paid.

9   Dondero entities.  It was a -- it was a pretty standalone odd

10  thing, one of the most unusual I've seen.  It's really

11  unusual to have an investment firm with more people in the

12  tax department and in the legal department than in the

13  investing side.

14  Q    Would you agree with me that this is a pretty broad

15  shared services agreement, correct?

16  A    There are a number of services that are performed under

17  it, yes.

18  Q    And it, in fact, says in Provision 2.02 of Exhibit 1

19  that, without limiting the generality of Section 2.01, and

20  subject to 2.04, the following are the services that are

21  going to be provided.  So this -- this document wasn't

22  intended to be limited, correct?

23  A    I can't speak to what was intended.  It's a pretty

24  unusual document.  Legal services, typically, you don't split

25  legal services, since it's unethical to split fees, so it

1  wouldn't be providing attorney services.  Highland often used

2  it to, in the past, to shield things based on a claim of

3  attorney-client privilege.  But I think that that document,

4  whether it's intended to be broad or not, is certainly

5  ambiguous in places.

6  Q    Did you task Mr. Ellington with the role of a go-between

7  between the board and Mr. Dondero?

8  A    No.  This -- this settlement counsel is something I'd

9  never heard until Dondero raised it and made it up.  It --

10  it's wholly fictitious.

11      Now, what Ellington did do is he was on a number of calls

12  with me and Dondero, and he had a communication line with

13  Dondero.  This was through the first half of the case and

14  into -- into the summer.  But as it started to become more

15  adversarial, particularly around the mediation, he wasn't

16  invited.  So, for example, Mr. Ellington was not invited to

17  -- to participate in the mediation.  He asked.  I said no.

18      The -- in addition, this idea that he was drafting the

19  pot plan, well, not to my knowledge or understanding, because

20  I drafted it for Dondero and his lawyers because you guys

21  couldn't.

22          MR. WILSON:  Object as nonresponsive.

23          THE COURT:  Overruled.

24  BY MR. WILSON:

25  Q    Did you send Mr. Dondero messages through Mr. Ellington?

1    A    No.

2    Q    So you're denying Mr. Dondero's testimony to the

3    contrary?

4    A    Yes.

5    Q    Did Mr. Dondero send messages to you through Mr.

6    Ellington?

7    A    No.  Mr. Ellington often came back and gave me messages.

8    They were often critical of Mr. Dondero.  I didn't always

9    believe them, because I figured Mr. Ellington had an ulterior

10   motive.  But he took a number of, you know, shots at Mr.

11   Dondero and he came back and gave his color of what he

12   thought was going on in Mr. Dondero's mind.

13            MR. WILSON:  Object as nonresponsive.

14            THE COURT:  Overruled.

15   BY MR. WILSON:

16   Q    Did you task Mr. Ellington with negotiating certain items

17   with Mr. Dondero?

18   A    No.

19   Q    Was there not a time, in January, early January, before

20   Mr. Ellington's termination, that you tasked him with

21   negotiating a new shared services agreement with Mr. Dondero?

22   A    No.

23   Q    Did you believe that there were legitimate items that Mr.

24   Ellington needed to discuss with Mr. Dondero?

25   A    I'm sorry.  Can you say that again?  It --

Seery - Cross                              259

1   Q    Did you believe that there were legitimate items that Mr.

2   Ellington needed to discuss with Mr. Dondero?

3   A    When?

4              MR. MORRIS:  Objection to the form of the question.

5              THE COURT:  Sustained.

6   BY MR. WILSON:

7   Q    During the year of 2020, were there legitimate items that

8   Mr. Dondero [sic] needed to discuss with Mr. Dondero?

9              MR. MORRIS:  Objection.  Vague and ambiguous.

10             THE COURT:  Sustained.

11             THE WITNESS:  Well, I believe you just asked me if

12  --

13             THE COURT:  Sustained.

14             THE WITNESS:  -- Mr. Dondero could discuss with Mr.

15  Dondero.  I think --

16             THE COURT:  I --

17             THE WITNESS:  -- the question is --

18             THE COURT:  I sustained the objection.

19             THE WITNESS:  I'm sorry, Your Honor.

20             THE COURT:  I need it to be rephrased.

21  BY MR. WILSON:

22  Q    Did you ever instruct Mr. Ellington to keep taking Mr.

23  Dondero's calls after the entry of the TRO?

24  A    No.

25  Q    So are you denying that on January 4, 2021, you

Seery - Cross                              260

1  instructed Mr. Ellington to communicate with Mr. Dondero and

2  negotiate a number of expense items?

3  A    Expense items?  Not to my knowledge.  No, I don't recall

4  that at all.

5  Q    Did you ever tell Mr. Ellington that he could talk to

6  Michael Lynn as much as he wanted because Mr. Lynn was an

7  honorable and ethical person?

8  A    I believe over the summer I did.  Meaning summer of 2020.

9  I don't know if I used the honorable and -- but I -- I

10  thought Mr. Lynn, if he needed to talk to Mr. Ellington, that

11  would be appropriate at that time.

12            MR. WILSON:  Pull up Debtor's 17.

13  BY MR. WILSON:

14  Q    This was the Debtor's Exhibit No. 17.

15            MR. WILSON:  Go down to the bottom.

16  BY MR. WILSON:

17  Q    Do you remember this email that came into evidence

18  earlier?

19  A    I saw it earlier, yes.  I've seen it before.

20  Q    And it starts at the bottom with a discussion between

21  Michael Lynn and Mr. Dondero and other counsel.

22            MR. WILSON:  Scroll up.

23  BY MR. WILSON:

24  Q    Do you see where -- apparently, Mr. Lynn forwarded that

25  email to Mr. Ellington at 8:44.  We can't tell all the

Seery - Cross                                     261

1  senders and recipients.  But do you see where Mr. Ellington

2  responds later that evening on December 12th?

3  A    Yes, I see the email.

4  Q    And is it the Debtor's contention that this email between

5  Mr. Dondero's counsel, Michael Lynn, and Scott Ellington is a

6  violation of the TRO?

7  A    Yeah, I think it is.  I think that they're -- they're

8  reaching out, I assume on behalf of Mr. Dondero, to try to

9  create a witness.  I assume this is for the confirmation

10 hearing.  I don't have the -- the times.  But it's a pretty

11 unusual thing to do.  I know they ended up ultimately serving

12 a subpoena on Mr. Sevilla but then not calling him.

13 Q    Do you agree that Footnote 2 -- and we can pull it up if

14 you want to.

15           MR. WILSON:  Pull up 11.  Debtor's 11.  Bottom of

16 Page 2.  Bottom of Page 3.  No, no.  Bottom of the Page 4 on

17 the document.  Go to the very bottom of the footnote.

18 BY MR. WILSON:

19 Q    I'm going to represent to you that this is Debtor's

20 Exhibit 11, and this is the last page of it, and the footnote

21 at the bottom says, "For the avoidance of doubt, this order

22 does not enjoin or restrain Mr. Dondero from seeking judicial

23 relief upon proper notice or from objecting to any motion

24 filed in the above-referenced bankruptcy case."

25      Were you -- were you aware that that provision was in

Seery - Cross                                    262

1   this order?

2   A   I'm sure I was at the time.  I read it closely.

3   Q   Would you agree with me that attempting to identify a

4   witness for a hearing could be considered seeking judicial

5   relief?

6   A   No, I don't.  I don't agree with you, no.

7   Q   Are you aware that Mr. Ellington testified that while at

8   Highland he'd been asked dozens of time by opposing counsel

9   who they should subpoena to testify?

10           MR. MORRIS:  Objection.  I move to strike.

11           THE COURT:  I --

12           MR. MORRIS:  If they wanted Mr. Ellington to

13   testify, he should have been here.

14           THE COURT:  Yes.  Actually, I couldn't even

15   understand what the question was.  Could you say what the

16   question was again?

17           MR. WILSON:  The question was, are you aware that

18   Mr. Ellington testified that while at Highland he had been

19   asked dozens of times by opposing counsel who they should

20   subpoena to testify about a certain topic?

21           MR. MORRIS:  Objection to the form of the question.

22   No foundation.

23           THE COURT:  Okay.  Sustained.

24           THE WITNESS:  I'm sorry?

25           THE COURT:  Okay.  I sustained the objection.  You

Seery - Cross                                          263

1   don't have to answer it.

2            THE WITNESS:  Oh, okay.  I'm sorry, Your Honor.

3   BY MR. WILSON:

4   Q    The Debtor's memorandum of law says that Mr. Dondero knew

5   that several times in the last year several entities had

6   requested the Dugaboy financial statements.  Who are these

7   several entities?

8   A    Well, certainly, the U.C.C.  I don't -- we did from Ms.

9   Schrath, who was working for us at the time.  And he

10  instructed her, notwithstanding that she was working for

11  Highland, to not give it over.  I don't know who else had

12  requested them.

13  Q    Are these documents located on the Highland servers?

14  A    I believe so.  We haven't been able to find all of them

15  yet.

16  Q    So, have you looked for them?

17  A    Yes.

18  Q    How -- how many of the documents have you located?

19  A    I don't know.

20  Q    How do you know that there are documents that you haven't

21  located?

22  A    There are numbers of documents that are listed around

23  different servers -- I don't know, I haven't done this work

24  myself -- that indicate that they're Dugaboy.  But we haven't

25  been able to get to all of them.

Seery - Cross                              264

1   Q    How did Mr. Dondero personally interfere with the

2   Debtor's search for the documents?

3   A    I think it's pretty clear.  He told a Debtor employee who

4   worked extensively for him, who probably looked to work for

5   him in the future, to not turn them over, notwithstanding

6   that they're on the Debtor's server and they're the Debtor's

7   property.

8              MR. WILSON:  I'll object as nonresponsive.

9              THE WITNESS:  You asked me how.

10             THE COURT:  Overruled.

11             MR. WILSON:  Turn to the list of -- 19.

12  BY MR. WILSON:

13  Q    We're going to pull up Debtor's 19.  Now, my problem with

14  the answer you gave to the last question, Mr. Seery, is that

15  you said that Mr. Dondero ordered that the documents not be

16  turned over.  But does the text he sent to Melissa Schrath on

17  December 16th in fact say, No Dugaboy details without

18  subpoena?

19  A    That's what it says, yes.

20  Q    So, in fact, Mr. Dondero wasn't saying that the documents

21  couldn't be turned over, correct?

22  A    It says, No -- No Dugaboy details without subpoena.  I

23  read that to mean don't give up anything unless ordered to do

24  so, notwithstanding that they're on Highland's server and

25  that make them Highland's property.

1   Q    Well, I object to your legal conclusion.

2               THE COURT:  Overruled.

3               THE WITNESS:  I think it's factual, but --

4               MR. WILSON:  Can I get a ruling, Your Honor?

5               THE COURT:  I said overruled.

6               MR. WILSON:  Okay.  Thank you.

7   BY MR. WILSON:

8   Q    But you're aware that prior to the communication that

9   Dondero sent to Melissa Schrath on December 16th, that

10  Douglas Draper had been communicating with Mr. Morris about

11  producing these documents, correct?

12  A    I'm aware of that, yes.

13              MR. WILSON:  Let's go to our 16 real quick.

14  BY MR. WILSON:

15  Q    If you look at the bottom of this, this is Debtor's --

16  I'm sorry -- Dondero's Exhibit 16.  If you look at the

17  bottom, do you see the email from Douglas Draper on

18  Wednesday, December 16th, that said, Do you have a

19  confidentiality agreement with the party requesting the

20  information?

21  A    I see that it says that, yes.

22              MR. WILSON:  Can you go to 17?  And can we go to

23  Page 2?

24  BY MR. WILSON:

25  Q    At the top of this -- this is Dondero Exhibit 17.  The

1  first email on this page is from Douglas Draper on Friday,

2  December 18th, to John Morris, that says, Would like to see

3  them before they go out.  I now need to look at the issue in

4  light of the complaint filed (garbled).

5      Were you aware that Mr. Draper wanted to see the

6  documents before they went out?

7  A    I've -- I've seen this email, yes.

8  Q    Do you know, as of December 16th, whether a formal

9  request for the documents had been made to the trusts or Mr.

10  Dondero?

11          MR. MORRIS:  Objection to the form of the question.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes, I do.  They were requested by the

14  Committee long prior.  Remember that these were documents in

15  the Debtor's possession.  Mr. Draper doesn't represent the

16  Debtor.  Mr. Draper represents Dugaboy.  These are the

17  Debtor's -- this is the Debtor's information.  He doesn't

18  have a right to see anything.

19  BY MR. WILSON:

20  Q    But do you know whether a formal request for the

21  documents had been made to the trusts or Mr. Dondero at this

22  point?

23  A    I don't know.  Certainly, to the Debtor, I know, but I

24  don't know.

25  Q    And the Debtor -- strike that.  Do you believe it's

Seery - Cross                              267

 1 │ unreasonable for Mr. Dondero to ask that a formal request,

 2 │ such as a subpoena, be sent regarding the documents?

 3 │ A    Yes.  (garbled) control of the Debtor.  That -- that's

 4 │ totally unreasonable.  He completely interfered with our

 5 │ employee who was required to respond to me, who specifically

 6 │ directed her multiple times to produce them as requested.

 7 │ Initially, to our own counsel.  I'm entitled to see them as

 8 │ the CEO.  Our counsel is entitled to see them.  I requested

 9 │ it multiple times, and she didn't.  She rather would be fired

10 │ because she knew she was being picked up by him.

11 │ Q    Is it reasonable that counsel for the trusts might want

12 │ to review the documents before they're produced?

13 │ A    It might be helpful, but they're not his documents.  And

14 │ from a --

15 │         MR. WILSON:  I object again.

16 │         THE WITNESS:  -- perspective, it's not reasonable.

17 │ The man should be able --

18 │         MR. WILSON:  Object again as nonresponsive.

19 │         THE WITNESS:  I don't think it's reasonable.

20 │         THE COURT:  Overruled.

21 │         MR. WILSON:  All right.  I'll pass the witness.

22 │         THE COURT:  All right.  Redirect?

23 │         MR. MORRIS:  Your Honor, I'm going to spare any

24 │ further examination here.

25 │     Actually, just two questions.

Seery - Redirect                                           268

1                       REDIRECT EXAMINATION

2    BY MR. MORRIS:

3    Q    Mr. Seery, was -- was Trey Parker -- withdrawn.  Was Mark

4    Okada an employee of the Debtor at the time the independent

5    board was appointed?

6    A    You know, he wasn't on the payroll and he didn't have any

7    real authority.  He had an office.  I don't believe he

8    actually was.  I think he had left, according to Mr. Okada,

9    actually before that.  He hadn't actually just vacated.  But

10   he wasn't doing any work.  He wasn't involved in the

11   business.

12   Q    Okay.

13   A    He certainly wasn't on the payroll.  He may have been --

14   he may still have been getting some kind of benefits.  I

15   don't know.

16   Q    All right.

17             MR. MORRIS:  Your Honor, I'm mindful of the Court's

18   time.  If I may, I'd like to just take three minutes on the

19   exhibits so that -- so that I can rest, and I guess -- I

20   guess Mr. Dondero will rest, too.

21             THE COURT:  All right.  All right.  All right.  I --

22             MR. MORRIS:  But there's only a couple of exhibits

23   that were objected to.

24             THE COURT:  As a technical matter, --

25             MR. MORRIS:  Very quickly.

Seery - Redirect                          269

1          THE COURT:  As a technical matter, I have to ask Mr.

2    Wilson, did you have any recross on that redirect regarding

3    Mr. Okada?

4          MR. WILSON:  No, Your Honor.  That's --

5          THE COURT:  All right.  So, thank you, Mr. Seery.

6    Your testimony is concluded.

7       All right.  Now, Mr. Morris?

8          MR. SEERY:  Thank you, Your Honor.

9          THE COURT:  You were saying?

10          MR. MORRIS:  Okay.  So, yes, just going through the

11    list, I believe -- and Mr. Wilson, please correct me if I

12    miss anything here -- but I believe that they objected to

13    Exhibits 3, 4, 5, and 6.  Do I have that right?

14          THE COURT:  That's what I show.

15          MR. MORRIS:  Okay.  The Debtor would -- will

16    withdraw those exhibits.

17          THE COURT:  Okay.

18       (Debtor's Exhibits 3 through 6 are withdrawn.)

19          MR. MORRIS:  The Debtor will also withdraw Exhibit

20    16.

21          THE COURT:  Okay.

22       (Debtor's Exhibit 16 is withdrawn.)

23          MR. MORRIS:  But 17 through 22 are in evidence,

24    right?

25          THE COURT:  Correct.

1          MR. MORRIS:  The Debtor will withdraw No. 23.

2      (Debtor's Exhibit 23 is withdrawn.)

3          THE COURT:  Okay.

4          MR. MORRIS:  But the Debtor does seek to admit into

5  evidence Exhibits 29, 30, 31, and 32, in light of the

6  testimony that we just had, because these, in fact, are the

7  very formal requests by the Creditors' Committee for the

8  Dugaboy financials.

9          THE COURT:  All right.

10         MR. MORRIS:  So we would -- we would move them into

11  evidence for that limited purpose.

12         THE COURT:  All right.  Your response, Mr. Wilson?

13         MR. WILSON:  My response was not contesting that the

14  Creditors' Committee had ever sent requests to Highland.  My

15  question to Mr. Seery was whether anyone had ever sent a

16  request to the trusts or Mr. Dondero.

17         MR. MORRIS:  Your Honor, I still think that it's

18  relevant to support Mr. Seery's testimony where he testified

19  that he had asked Ms. Schrath to produce the documents on

20  multiple occasions, and this is the reason why he did it.

21  Here is the requests.

22         THE COURT:  All right.  I overrule the objection,

23  and so will allow 29, 30, 31, and 32.

24    (Debtor's Exhibits 29, 30, 31, and 32 are received into

25  evidence.)

1          MR. MORRIS:  Next, Your Honor, Exhibit 35, which is

2     the transcript from the hearing on the protective order.  I'd

3     like to offer that into evidence for the limited purpose of

4     any admissions by Mr. Dondero's counsel that he knew and was

5     aware that the -- that the Creditors' Committee was seeking

6     ESI from Mr. Dondero, including text messages.

7          THE COURT:  Okay.  Mr. Wilson, your response?

8          MR. WILSON:  I think, yeah, I think we're talking

9     about two different issues.  We're -- Mr. Morris is focusing

10    on these events that occurred earlier in the year in 2020,

11    and we're focusing on what Mr. Dondero himself knew in -- in

12    the time frame that's relevant at this -- for this hearing.

13    And not to mention, we called into question, I believe, the

14    definition of ESI under the Debtor's own protocols and

15    whether that would even include text messages.  I don't

16    believe that the text messages are -- you know, knowledge

17    that the Committee was seeking those from Mr. Dondero can be

18    imputed onto this transcript of statements by his attorneys.

19         THE COURT:  Okay.  I'll overrule the objection.

20    I'll find that these have some relevance.  So 35 will get in.

21        (Debtor's Exhibit 35 is received into evidence.)

22         MR. MORRIS:  Okay.  And then the last two, Your

23    Honor, are Exhibits 38 and 39.  38 and 39 are the -- are two

24    exhibits that were on Docket 128 that was filed last night.

25    We had placeholders there previously.  These are my firm's

1    time entries, bankruptcy litigation time entries related to

2    the Dondero litigation in December, is No. 38.  And No. 39 is

3    the time entries for January of 2021.

4        This material was specifically requested by Mr. Dondero

5    in discovery.  We produced a form of it at that time, but it

6    had not yet been completed at the time we produced it, and

7    that's why we supplemented it last night.  But it's directly

8    responsive both to Mr. Dondero's discovery requests as well

9    as the Debtor's claim for economic harm, at least partially.

10        THE COURT:  All right.  Mr. Wilson, any objection to

11   those?

12        MR. WILSON:  My objection to these would be that the

13   requests -- or, I'm sorry, the statements aren't limited to

14   -- or I assume they're not limited to what he's seeking in

15   this hearing, because the fee statements start on November 3,

16   2020.  And, you know, for instance, Exhibit 38 is 46 pages

17   long of fee entries, and they seem to include every entry

18   that Highland's made on this case, that the Pachulski's firm

19   has made on this case, and -- and we can't tell which ones of

20   these items that they are seeking to -- as part of their

21   damage model.

22        MR. MORRIS:  Your Honor, that's just not an accurate

23   characterization of the document.  The document is

24   specifically limited to bankruptcy litigation.  It's not

25   nearly all of the fees that have been incurred in this case.

1       You know, to the extent that somebody disputes any

2   particular entry, they have every right to do that.  But we

3   believe that it accurately reflects only the litigation

4   matters that are related to Mr. Dondero's conduct.  For --

5   for January and February.

6           THE COURT:  Wait.  December and January, you mean?

7           MR. MORRIS:  Yes.  I apologize.  Thank you very

8   much, Your Honor.

9           THE COURT:  All right.  And you're saying it relates

10  to just this TRO matter, or are you saying it also relates

11  maybe to the Advisor dispute as well?

12          MR. MORRIS:  It does relate to both, Your Honor.  It

13  does, in all candor, it definitely relates to both, from this

14  same period of time, because, you know, as Your Honor knows,

15  the Court found that whole litigation in December of 2020 to

16  be frivolous, and it was directly related to the letters that

17  were subsequently written.

18      So, you know, they can argue otherwise, but that's our

19  position.

20          THE COURT:  All right.  Well, Mr. Wilson, it sounds

21  like it's perfectly acceptable to allow it to in as their

22  evidence of some of the alleged damages, and then you're

23  certainly able to argue on closing arguments why, you know, *x*

24  amount would not be compensable if I were to allow damages on

25  this front.

1        So it's at Docket Entry 128 from last night.  38 and 39

2   are admitted.

3        (Debtor's Exhibits 38 and 39 are received into evidence.)

4            THE COURT:  But you also talked about earlier today

5   a cleaned-up version of Exhibit 11, a replacement version to

6   just clean the --

7            MR. MORRIS:  Correct.

8            THE COURT:  -- the heading at the top.  So I assume

9   no one has a problem with that replacement No. 11 getting in.

10  So all three of those will be allowed.

11       (Debtor's Replacement Exhibit 11 is received into

12  evidence.)

13           THE COURT:  All right.  Anything else?

14           MR. MORRIS:  No.  With that, Your Honor, the

15  Plaintiff rests.

16           THE COURT:  Okay.  Let me be clear on a couple of

17  these.  There was an objection to your Exhibit 34 that we

18  carried this morning.  Is that not being offered?  I don't

19  show it as either withdrawn --

20           MR. MORRIS:  I'll withdraw that exhibit as well,

21  Your Honor.

22           THE COURT:  Okay.  So that's withdrawn.  All right.

23           MR. MORRIS:  Yeah.

24       (Debtor's Exhibit 34 is withdrawn.)

25           THE COURT:  So, with that, the Debtor rests?  All

1  right.

2       Mr. Wilson, I know you don't have any other witnesses.

3  Do you have any documents that you need to clarify the record

4  on?  I admitted all of your exhibits earlier, so I presume

5  no.

6            MR. MORRIS:  Correct.

7            MR. WILSON:  No, I think that that's -- I think

8  that's all we have.

9            THE COURT:  Okay.  All right.  Well, thank you.  If

10  there's nothing further in the way of a housekeeping matter,

11  again, what we'll do is reconvene on Wednesday at 9:30.  I'll

12  start with the bond issue pertaining to the requested stay

13  pending appeal, and then we'll allow closing arguments, 20

14  minutes each side, for this matter.  All right?

15            MR. MORRIS:  Thank you for your patience, Your

16  Honor.

17            MR. WILSON:  Thank you, Your Honor.

18            THE COURT:  All right.  And I didn't mean the thing

19  about the basketball tournament earlier that someone wanted

20  to get to.  My team got utterly humiliated --

21            MR. MORRIS:  We know.

22            THE COURT:  -- Saturday night, so at this point I

23  don't care so much.  I do, but all right.

24            MR. MORRIS:  So did Colgate.

25            THE COURT:  Okay.  Good evening.

276

1          THE CLERK:  All rise.

2          MR. MORRIS:  Good night, Your Honor.

3          MR. WILSON:  Thanks, Judge.

4       (Proceedings concluded at 5:41 p.m.)

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21       I certify that the foregoing is a correct transcript from
         the electronic sound recording of the proceedings in the
22       above-entitled matter.

23    **/s/ Kathy Rehling**                          **03/24/2021**

24   _____      _____
     Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

277

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Morris                                               6
- By Mr. Wilson                                              25

WITNESSES

Debtor's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris                          30
- Cross-Examination by Mr. Wilson                          127
- Redirect Examination by Mr. Morris                       184
- Recross-Examination by Mr. Wilson                        205
- Further Redirect Examination by Mr. Morris               211

James P. Seery, Jr.
- Direct Examination by Mr. Morris                         212
- Cross-Examination by Mr. Wilson                          222
- Redirect Examination by Mr. Morris                       268

EXHIBITS

Dondero's Exhibits 1 through 20              Received 153

Debtor's Exhibits 1 and 2                    Received 33
Debtor's Exhibits 3 through 6               Withdrawn 269
Debtor's Exhibits 7 through 15               Received 33
Debtor's Replacement Exhibit 11             Received 274
Debtor's Exhibit 16                         Withdrawn 269
Debtor's Exhibits 17 through 22              Received 33
Debtor's Exhibit 23                         Withdrawn 270
Debtor's Exhibits 24 through 28              Received 33
Debtor's Exhibits 29 through 32             Received 270
Debtor's Exhibit 33                          Received 48
Debtor's Exhibit 34                         Withdrawn 274
Debtor's Exhibit 35                         Received 271
Debtor's Exhibits 36 and 37                  Received 33
Debtor's Exhibits 38 and 39                 Received 274
Debtor's Exhibits 41 through 46             Withdrawn 34
Debtor's Exhibits 47 through 55              Received 34
Debtor's Exhibits 56 and 57                  Received 45
Debtor's Exhibits 58 and 59                 Withdrawn 34

278

RULINGS

Motion in Limine - Denied                                          24
Show Cause Continued to 03/24/2021 at 9:30 a.m.                   275

END OF PROCEEDINGS                                                276

INDEX                                                        277-278

# EXHIBIT 41

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                                    )    Case No. 19-34054-sgj-11
3    In Re:                         )    Chapter 11
                                    )
4    HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Wednesday, March 24, 2021
5                                   )    9:30 a.m. Docket
            Debtor.                 )
6    _____ )
                                    )
7    HIGHLAND CAPITAL               )    Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,              )
8                                   )
            Plaintiff,              )    PLAINTIFF'S MOTION FOR ORDER
9                                   )    REQUIRING JAMES DONDERO TO
     v.                             )    SHOW CAUSE WHY HE SHOULD NOT
10                                  )    BE HELD IN CIVIL CONTEMPT FOR
     JAMES D. DONDERO,              )    VIOLATING THE TRO [48]
11                                  )
            Defendant.              )    Continued from 03/22/2021
12   _____ )

13                        TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                     UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX APPEARANCES:

16   For the Debtor/Plaintiff:   John A. Morris
                                 PACHULSKI STANG ZIEHL & JONES, LLP
17                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
18                               (212) 561-7700

19   For the Debtor/Plaintiff:   Jeffrey Nathan Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
20                               10100 Santa Monica Blvd.,
                                  13th Floor
21                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
22
     For Defendant James D.      John T. Wilson
23   Dondero:                    BONDS ELLIS EPPICH SCHAFER
                                  JONES, LLP
24                               420 Throckmorton Street,
                                  Suite 1000
25                               Fort Worth, TX  76102
                                 (817) 405-6900
```

2

1  APPEARANCES, cont'd.:

2  For Certain Advisors:           Julian Vasek
                                   MUNSCH, HARDT, KOPF & HARR
3                                  500 N. Akard Street, Suite 3800
                                   Dallas, TX  75201-6659
4                                  (214) 855-7587

5  For Certain Funds:              A. Lee Hogewood, III
                                   K&L GATES, LLP
6                                  4350 Lassiter at North Hills
                                     Avenue, Suite 300
7                                  Raleigh, NC  27609
                                   (919) 743-7306
8
   For Get Good Trust and          Douglas S. Draper
9  Dugaboy Investment Trust:       HELLER, DRAPER & HORN, LLC
                                   650 Poydras Street, Suite 2500
10                                 New Orleans, LA  70130
                                   (504) 299-3300
11
   For the Official Committee      Matthew A. Clemente
12 of Unsecured Creditors:         SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
13                                 Chicago, IL  60603
                                   (312) 853-7539
14
   Recorded by:                    Michael F. Edmond, Sr.
15                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
16                                 Dallas, TX  75242
                                   (214) 753-2062
17
   Transcribed by:                 Kathy Rehling
18                                 311 Paradise Cove
                                   Shady Shores, TX  76208
19                                 (972) 786-3063

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

3

1          DALLAS, TEXAS - MARCH 24, 2021 - 9:40 A.M.

2          THE COURT:  All right.  We have Highland settings.

3     We're going to talk about what's set and what's not set and

4     what's requested to be set.  But let's start by getting lawyer

5     appearances.  First, for the Debtor team, who will be

6     appearing?

7          MR. MORRIS:  Good morning, Your Honor.  John Morris;

8     Pachulski, Stang, Ziehl & Jones; for the Debtor.

9          MR. POMERANTZ:  Your Honor, Jeff Pomerantz is also

10    here, to the extent necessary.

11         THE COURT:  Okay.  Thank you.  All right.  For Mr.

12    Dondero, who is appearing?  (Pause.)  If you're appearing, I

13    can't hear you.

14         MR. WILSON:  Your Honor?  Sorry, Your Honor.  John

15    Wilson with Bonds, Ellis, Eppich, Schafer, Jones for Mr.

16    Dondero.

17         THE COURT:  All right.  Well, I'll see if we have

18    people appearing for the Advisors or Funds, because we did

19    originally have matters set involving them.  Do we have

20    counsel, Mr. Rukavina or anyone, for the Advisors?

21         MR. VASEK:  Good morning, Your Honor.  Julian Vasek

22    for the Advisors.

23         THE COURT:  All right.  Thank you.  All right.  What

24    about the Funds?  Do we have Mr. Hogewood?

25         MR. HOGEWOOD:  Good morning, Your Honor.  Lee

4

1    Hogewood with K&L Gates for the Funds is on the line.

2              THE COURT:  All right.  Mr. Draper, do we have you

3    for the Trusts?

4              MR. DRAPER:  Yes, Your Honor.  Douglas Draper on the

5    line.

6              THE COURT:  All right.  Thank you.  And for the

7    Committee, I think I saw Mr. Clemente, correct?

8              MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

9    Clemente, Sidley Austin, on behalf of the Committee.

10             THE COURT:  All right.  Thank you.

11       All right.  Because there were some late afternoon

12   decisions made yesterday with regard to our calendar, let me

13   just make sure the record is clear.  We originally had a

14   follow-up hearing regarding the Motion for Stay Pending

15   Appeal, the Motion for Stay Pending Appeal of the Confirmation

16   Order that was filed by Mr. Dondero, the Advisors, the Funds,

17   and the Trusts.  The follow-up hearing was regarding, I guess

18   to phrase it most clearly, whether Bankruptcy Rule 7062 and

19   Federal Rule of Civil Procedure 62 might apply here, so that

20   if the Appellants offered a sufficient monetary bond,

21   supersedeas bond, I would be required to ender a mandatory

22   stay.

23       There was a little bit of confusion, I guess I should say

24   on my part maybe more than anybody else's, at the end of our

25   hearing last Friday whether someone was suggesting that,

5

1  because there was some discussion of a monetary appeal.  So I

2  invited parties to -- in fact, the Appellants asked that I

3  allow them an opportunity to brief that and maybe we'd have a

4  follow-up hearing on that today.  So I gave the affected

5  parties until 3:00 p.m. Central time yesterday to submit

6  briefs, and shortly before 3:00 p.m. the Court received a

7  letter from the Funds and from the Advisors' counsel saying

8  that they had concluded that there was no legally-viable path

9  there and so they were withdrawing their request for a follow-

10 up hearing on that.

11     I did get briefing from the Debtor and the Committee that

12 was quite persuasive and convinced me that, in the context of

13 confirmation order, you either meet the 8007 discretionary

14 standards for a stay pending appeal and maybe add on a request

15 for a bond if the four prongs are met or not.

16     So I was glad not to have a hearing.  I understand the

17 Debtor still wanted to have a hearing, thinking there might be

18 some efficiencies in putting on a record at the bankruptcy

19 court if the Appellants plan on next going to the district

20 court seeking a stay pending appeal, or the Fifth Circuit.

21 But I concluded that was not an appropriate way to go forward.

22     So I instructed Debtor's counsel late yesterday afternoon

23 to submit an order, and I indicated in the email that should

24 have been copied on all counsel what I thought that order

25 should say to make clear for the record that the Court had

6

1    concluded, and I think all parties had concluded, that there

2    was no possibility of a mandatory stay here pursuant to Rule

3    7062.

4         So, while our posted calendar still shows a follow-up

5    hearing on the stay pending appeal issue, I have cancelled

6    that.

7         So what we are here on today, what we're definitely here

8    on today is scheduled closing arguments on the motion that the

9    Debtor had filed several weeks ago, a couple months ago,

10   asking this Court to hold Mr. Dondero in contempt of court for

11   allegedly violating a TRO that the Court issued December 10th,

12   2020.  I had allotted twenty minutes per side when we came

13   back this morning for closing arguments on that contempt

14   matter.

15        Now I see at 9:01 this morning -- news flash for anyone

16   who didn't check their docket this morning within the last

17   half hour or so -- Mr. Dondero's counsel has filed a Motion to

18   Reopen Evidence to Allow for Additional Rebuttal Witness

19   Testimony, and this pertains to what I'll call the cell phone

20   issue that Mr. Dondero and Mr. Seery had inconsistent

21   testimony on.

22        So, I'll ask, has the Debtor seen this motion?  Again, it

23   was filed at 9:01 this morning.  Are you aware, I'll ask Mr.

24   Morris, are you aware of the motion?

25             MR. MORRIS:  Your Honor, John Morris; Pachulski,

1    Stang, Ziehl & Jones.  I am aware of the motion.  I read it

2    briefly, and I've got argument and commentary to the extent

3    the Court wants to hear anything.

4              THE COURT:  All right.  Well, --

5              MR. MORRIS:  I'm prepared to proceed.  The fact of

6    the matter is, Your Honor, this is a motion.  It's not on an

7    emergency basis.  It should be heard on regular notice.

8         What I would say, having read it, Your Honor, is that I

9    give Mr. Dondero and his law firm 24 hours to withdraw it or

10   we will be filing a motion under Rule 11 for sanctions.  It is

11   frivolous.  This motion has been pending -- the motion for

12   contempt has been pending since January 7th, more than two

13   months ago.  The issue of the cell phone has been front and

14   center.  So concerned were they about the cell phone that they

15   actually made a motion to try to exclude it from evidence.

16   Your Honor has made very specific comments about the cell

17   phone.  There is nothing here that would allow them in good

18   faith to make this motion.  They've got 24 hours to withdraw

19   it or we will be seeking sanctions.

20        They seek to introduce testimony from Jason Rothstein?

21   Jason Rothstein, as Mr. Dondero testified yesterday under

22   oath, was under subpoena.  He was on their witness list.  Why

23   they chose not to call him I'll leave for them to explain.

24   Mr. Ellington was in the courtroom on Monday.  He was their

25   witness.  They released him.  And now they want to put in his

1   evidence?

2       They ended the proceedings on Monday and they rested.

3   They made no reservation of rights.  They did nothing of the

4   kind.  This motion is not made in good faith, and we will seek

5   sanctions if it's not withdrawn in 24 hours.

6           THE COURT:  All right.  Well, Mr. Wilson, tell me

7   about the filing of this motion.  I'll let you know, by the

8   way, you may think I'm being very technical, but one of the

9   first things I do whenever I get a motion, especially when

10  it's kind of emergency, short-notice in nature, is I go see if

11  you have the required certificate of conference that our Local

12  Rules require.  And that always makes me grimace when I don't

13  see that, because, you know, I know there are some contexts in

14  a complex Chapter 11 case where you obviously can't have a

15  conference with every affected party, but certainly in this

16  one you could have had that conference.

17      So, anyway, but let's talk about the motion beyond just

18  that technical point.  What would you like to say, Mr. Wilson?

19          MR. WILSON:  Well, Your Honor, Mr. Morris is correct

20  that Mr. Rothstein and Mr. Ellington were on our witness list,

21  although we did amend our witness to omit Mr. Rothstein prior

22  to the time that this matter was heard yesterday.

23      The real substance of it is, is that Mr. Rothstein and Mr.

24  Ellington's testimony, in our estimation, would have just been

25  cumulative of other testimony in this proceeding.  And because

9

1   Mr. Morris had, you know, released Mr. Ellington yesterday and

2   said he would not be calling him -- or not yesterday, but

3   Monday, I'm sorry -- we ended up thinking it through over the

4   course of the hearing and determining that, you know, his

5   testimony would just merely be cumulative of testimony that

6   Mr. Dondero would offer and that we suspected that Mr. Seery

7   would confirm.

8       However, we were greatly surprised by some of Mr. Seery's

9   testimony, including his statements made about Mr. Rothstein

10  and also statements regarding Mr. Ellington, stuff that

11  directly contradicts what was in Mr. Ellington's deposition

12  testimony and what we learned from our client, Mr. Dondero,

13  and that he testified to yesterday.

14      So we ended up releasing Mr. Ellington prior to the

15  testimony of Mr. Seery, and at such time that Mr. Seery made

16  the statements, he was no longer under the Court's control to

17  call as a witness, and that's why we had to work hurriedly to

18  put this motion together.  We had to go through Mr.

19  Rothstein's counsel to get the declaration we got.  We were

20  finally able to get that early this morning.  You know, I

21  apologize if there's no certificate of conference.  That was

22  merely an oversight in a rush to get this filed.

23      So, you know, my other thought is that I'm not sure that

24  we officially rested our evidence yesterday.  But in any

25  event, I understand the Court may --

1          THE COURT:  Okay.  Stop right there.  You did.  The

2     whole discussion was we'll come back for closing arguments

3     Wednesday.  I mean, there's no way you could have been

4     mistaken about that.

5          MR. WILSON:  I understand that, Your Honor.  And I'm

6     not trying to -- I'm not trying to argue the point.  My next

7     statement was going to be that I, you know, I suspect the

8     Court considers that we did.  So I would say, if it is to be

9     treated as a motion to reopen the evidence, I mean, there

10    actually is case law on that from the Fifth Circuit.  And

11    there's a relevant case, *Garcia v. Woman's Hospital*, 97 F.3d

12    810, from 1996, and that case says that among the factors the

13    trial court should examine in deciding whether to allow

14    reopening are the importance and probative value of the

15    evidence, the reason for the moving party's failure to

16    introduce the evidence earlier, and the possibility of

17    prejudice to the nonmoving party.  And we think that analysis

18    of those factors supports allowing this testimony from Mr.

19    Ellington and Mr. Rothstein, and potentially Mr. Surgent, to

20    rebut specific testimony given by Mr. Seery that we did not

21    anticipate --

22          THE COURT:  Okay.  Let me stop --

23          MR. WILSON:  -- that he would give.

24          THE COURT:  Let me stop you right there.  Those are

25    broad principles, and every situation is going to be fact-

1   specific as far as reopening evidence.  But you've more than

2   once used the word rebuttal.  You used it in the title of the

3   pleading you filed at 9:01 this morning, and you've used it in

4   oral argument.  Mr. Seery was in the case in chief of the

5   Movants, the Debtor.  Okay?  Then you all had your chance to

6   put in your responsive evidence.  Why are you calling it

7   rebuttal?  Rebuttal is --

8          MR. WILSON:  Well, --

9          THE COURT:  -- is if the Debtor then came along and

10  said, you know, hey, I didn't have this person on my witness

11  list but their witness said something completely different

12  than what he said in discovery and I think, you know, I need

13  rebuttal evidence, not just impeaching him or whatever with a

14  prior depo.  I mean, that's a -- there are other examples I

15  could give, but my point is, this isn't rebuttal.  This would

16  have been your defensive evidence to the motion, okay?

17  Rebuttal has a more, I don't know, sympathetic, equitable ring

18  to it, like something came out you just had no way of

19  anticipating.  Okay?  And so now, beyond everyone's case in

20  chief and defensive case, we need something to shed new light.

21      That's not what we're talking about.  You had every reason

22  to know, if you chose to do a deposition of Mr. Seery -- which

23  I'm guessing you did, but I don't know -- to know what he

24  might say.  And then he was in their case in chief, so you had

25  your chance to put in a defensive witness at that point.

12

1    I have no idea why you decided, eh, we don't need

2  Ellington, eh, we don't need Rothstein.  We named them on our

3  witness list.  You know, there was a subpoena, I guess, it

4  sounds like, of Rothstein.  But correct me if you think I'm

5  viewing this too harshly.  It just seems like a litigation

6  strategy that came back to haunt you.

7         MR. WILSON:  Well, I would -- I would disagree with

8  that, Your Honor.  I mean, I -- the rebuttal term may be an

9  imprecise moniker for this particular motion, but in essence

10  that's exactly what it is.  I mean, we were -- we were greatly

11  surprised by the way Mr. Seery testified and we did not have

12  another witness that was in court at the time to come on and

13  to --

14         THE COURT:  Because of your own --

15         MR. WILSON:  -- counter it.

16         THE COURT:  Because of your own litigation strategy

17  to release them.  No one forced you to do that.  No one forced

18  you to do that.

19         MR. WILSON:  That may be true, Your Honor.  Decisions

20  were made.  I've explained, you know, why decisions were made.

21  And -- because I think we do have a couple options here.  As I

22  suggested in my motion, I don't believe a continuance is

23  necessary to the extent that we can bring in Mr. Ellington's

24  testimony by deposition.  And secondly, if --

25         THE COURT:  They don't agree to that.  They don't

1    agree to that.  They don't agree to this --

2           MR. WILSON:  Well, I understand that.

3           THE COURT:  -- entire motion, but I guarantee you, if

4    I said I'm granting the motion, they're not going to agree to

5    a declaration or deposition testimony.  I'm sure they would

6    want to cross-examine them.  I mean, Mr. Morris, am I making a

7    wrong assumption here?

8           MR. MORRIS:  Your Honor, a couple -- just a couple of

9    things.  First of all, they actually never did take Mr.

10   Seery's deposition in connection with the TRO enforcement

11   contempt proceedings.  They didn't even do that.  Number two,

12   I was specifically asked by Mr. Ellington's counsel at a break

13   yesterday whether I would consent to the entry of Mr.

14   Ellington's deposition transcript, and I categorically said

15   no.  I'm not going to call him, but if Mr. Dondero calls him,

16   I'm going to cross-examine him live.  And they knew that.  And

17   then they had the choice.  They had the choice, Your Honor, to

18   call him live or to not call him, and they chose not to call

19   him.

20       And not only did they rest, if this -- if Mr. Seery's

21   testimony was so stunning, if they were so surprised by the

22   testimony, how come nobody said anything on Monday?  How come

23   they let the Court close the evidence?  How come they didn't

24   reserve the right?  How come they didn't say, We'd like the

25   opportunity to put on a rebuttal case because we just heard

1    something we didn't anticipate?

2        They did none of that, Your Honor.  This is frivolous, and

3    if it's not withdrawn in 24 hours we will move for sanctions.

4            THE COURT:  All right.  Well, Mr. Wilson, anything

5    else you want to urge that you think I'm not hearing, missing

6    here?

7            MR. WILSON:  Well, Your Honor, I think I've

8    explained, you know, our reasons for why we filed this motion.

9    I would say that, in -- that --

10            THE COURT:  And by the way -- I'm sorry to interrupt

11    you again -- but I'm not clear even what you think you heard

12    from Mr. Seery that you think is so surprising it made your

13    team conclude we've got to call -- you say rebuttal evidence

14    -- we've got to call Ellington or Rothstein.  What even was

15    it?

16            MR. WILSON:  Well, there were -- there were a few

17    things, Your Honor.  I mean, as with respect to Mr. Rothstein,

18    the issue was the written or unwritten -- and I believe the

19    testimony was there was an unwritten policy of how cell phones

20    were disposed of.  There was testimony from Mr. Seery,

21    although I believe it was speculation on his part, that the --

22    that Mr. Dondero actually instructed Mr. Rothstein to do

23    something different in this instance when he submitted his

24    cell phone for replacement.  Mr. Rothstein, as shown in his

25    affidavit, would say that --

1              THE COURT:  Okay.  Stop.

2              MR. WILSON: -- you know, he's been --

3              THE COURT:  Stop right now.  I feel like you're about

4    to try to get in front of me evidence that you chose not to

5    try to get in front of me Monday.  I asked, what did Mr. Seery

6    say in testimony Monday that you think warrants a reopening of

7    evidence?  I really, I get it that it's about a cell phone and

8    company policy, but what specifically did he say, --

9              MR. WILSON:  Well, the specific --

10             THE COURT:  -- Seery say?

11             MR. WILSON:  Right.  And I gave one instance.  But

12   the specific testimony was that Mr. Seery accused Mr. Dondero

13   of making up his testimony regarding the fact that there was

14   ever a cell phone policy, number one.  And number two, that

15   Mr. Dondero persuaded Mr. Rothstein to do something improper

16   that was out of the ordinary course with respect to the

17   replacement of his cell phone.

18             THE COURT:  All right.  Well, again, if you had

19   deposed Mr. Seery, or even just listening to him, you would

20   have known at the conclusion of that.  I mean, you could have

21   cross-examined him and then decided did you need to call

22   Rothstein or Ellington.

23      I just, it's not like you are articulating unfair

24   surprise.  You had every reason to know the theory of the case

25   was he exercised control over property of the estate, *i.e.*,

1    the phone, in a way that violated the automatic stay.  And I

2    guess if you looked at their witness list you knew that the

3    employee handbook and its policy stated therein might be a

4    focus of their evidence.  I mean, I'm just not getting what

5    the unfair surprise is here, if that's one of the ways I

6    should look at this.

7            MR. WILSON:  Well, Your Honor, it's true that we did

8    not depose Mr. Seery, but to be honest, we did not believe it

9    was necessary at the time.  We had no indication, no idea that

10   he would have a completely different testimony on this from

11   the employees who'd worked at Highland for, you know, many,

12   many years.  And we had -- we'd heard from three people,

13   including Mr. Ellington, who confirms that testimony, and

14   that's why we let Mr. Rothstein go.

15      With respect to Mr. Ellington, the issue runs deeper.

16   It's not only --

17            THE COURT:  I am not --

18            MR. WILSON:  -- his testimony --

19            THE COURT:  -- asking -- I'm not going to allow you

20   to get in evidence before me.  I'm really just trying to give

21   you every opportunity to articulate why Seery said something

22   that was an unfair surprise or you think somehow rises to the

23   level where I should reopen the evidence.  And I'm just, I'm

24   not hearing --

25            MR. WILSON:  Well, that's --

1          THE COURT:  -- either an unfair surprise or some

2    other reason.  And I'm just trying to give you every

3    opportunity to convince me if you think I'm missing something.

4          MR. WILSON:  Well, I appreciate it, Your Honor.  I

5    was trying to get to a second point without trying to

6    improperly admit evidence at this stage.  But with respect to

7    Mr. Ellington, he -- I did depose Mr. Ellington and got the

8    pages of deposition testimony that I submitted with that

9    motion.  Among those pages, there were -- there were

10   statements that contradicted Mr. Seery's testimony yesterday

11   that he did not use Mr. Ellington as a go-between between Mr.

12   Seery and Mr. Dondero.  And Mr. Ellington's testimony directly

13   conflicts with what Mr. Seery offered yesterday.

14         MR. MORRIS:  Your Honor, if I might just --

15         THE COURT:  All I can say is you should not have

16   released him.  I'm just baffled.  I am baffled.  I was baffled

17   when it happened Monday, and now I'm baffled that you would

18   argue, I guess, we rethought it after we left and we really

19   wished we would have called him.  I mean, that's not grounds

20   to reopen the evidence.  All right?  So your motion is denied.

21         MR. WILSON:  All right.  Thank you, Your Honor.  I'd

22   like to make an offer of proof of the Rothstein declaration as

23   well as the Ellington deposition testimony that I've

24   submitted.

25         MR. MORRIS:  We object, Your Honor.  The motion was

18

1  just denied.  There is no basis to offer proof in a record

2  that's been closed.

3         THE COURT:  All right.  I'm not getting your

4  procedural request.  It's one thing if I deny the

5  admissibility of evidence during a trial.  Obviously, then a

6  smart lawyer asks to make an offer of proof so a higher court

7  can decide if that was error in not considering the evidence.

8  But this different.  Right, Mr. Wilson?

9         MR. WILSON:  Well, I don't know that it's that

10  different.  But I think for purposes of review, I want to make

11  a complete record, and I would offer the evidence as an offer

12  of proof.

13         THE COURT:  Well, didn't you say you attached to the

14  motion -- I didn't look at the attachments -- the substance of

15  the evidence you want to --

16         MR. WILSON:  Yes.  Both of the --

17         THE COURT:  -- the substance of the evidence you want

18  to get in?

19         MR. WILSON:  That's true, Your Honor.  It's in the

20  attachments to our motion.

21         THE COURT:  All right.  Well, then it's there in the

22  record if you want to appeal my denial of your motion to

23  reopen evidence, okay?

24     All right.  Well, let's hear closing arguments, then.

25     Mr. Morris, as you all will recall, I've limited you to

19

1   twenty minutes each, so I'm ready to hear your argument.

2             MR. MORRIS:  Before we go on the clock, Your Honor,

3   just one housekeeping matter.

4             THE COURT:  Okay.

5             MR. MORRIS:  Filed at Docket No. 130 is a list of the

6   exhibits that were admitted into evidence.  And because I have

7   some feeling that there might be an appeal, I'd like to make

8   sure that that's accurate, and there are several items that

9   need to be corrected.

10            THE COURT:  Okay.  Let me pull this up.  Where is the

11   adversary?  Here it is.  Okay.  So you're looking at what the

12   --

13            MR. MORRIS:  I think it's Exhibit -- I think it's

14   Docket No. 130, is the list of exhibits.

15            THE COURT:  Okay.  I have it in front of me.  You're

16   saying it's inconsistent with what you thought was --

17            MR. MORRIS:  Yeah.  There are -- there are three

18   errors, Your Honor.

19            THE COURT:  Okay.  I'm trying to -- I don't think I

20   have in here with me my notes on the exhibits because I didn't

21   anticipate this.  They must be back in chambers, or maybe --

22   all right.  Well, let's just let you present what you think is

23   missing, and --

24            MR. MORRIS:  Thank you, Your Honor.

25            THE COURT:  Okay.  Go ahead.

1          MR. MORRIS:  First is actually -- first is actually

2     an item that we had on our exhibit list that I agreed to

3     withdraw, so it's actually, it's an exhibit against the

4     Debtor.

5          THE COURT:  Okay.

6          MR. MORRIS:  And that's Exhibit No. 3.  We had agreed

7     to withdraw that exhibit from evidence, so it should not be on

8     the list.

9          THE COURT:  Okay.  So we'll revise that to show No. 3

10    was withdrawn.  Okay.

11         MR. MORRIS:  Correct.

12       (Debtor's Exhibit 3 is withdrawn.)

13         MR. MORRIS:  But Exhibits 35 and 36, which are the

14    transcripts from the oral argument on the Committee's Motion

15    for a Protective Order, and Exhibit 36, which is the

16    transcript from the preliminary injunction hearing on January

17    8th, both of those transcript were admitted into evidence.

18    And we would respectfully request that the Court amend the

19    list to exclude Exhibit 3 and to add Exhibits 35 and 36.

20         THE COURT:  Okay.  Tell me again what the 35

21    transcript was.  What hearing?

22         MR. MORRIS:  That's the July 21, 2020 hearing on the

23    discovery motions where the issue was the Committee's request

24    for, among other things, ESI, including text messages from

25    nine custodians, including Mr. Dondero.

1          THE COURT:  All right.  Mr. Wilson, do you have any

2    contradictory view of that?  I can go back in my chambers and

3    get my own list if I need to.  I definitely remember the

4    preliminary injunction transcript coming in.  I just couldn't

5    remember for certain the July one.  Do you have any contrary

6    view?

7          MR. WILSON:  I think that that's true.  Was Exhibit

8    37 admitted?

9          MR. MORRIS:  Yes, and it's on the list.

10          THE COURT:  It's on the list.

11          MR. WILSON:  That was my question.  So 35, 36, and 37

12    are all admitted and in evidence?

13          THE COURT:  Well, he is pointing out, Mr. Wilson,

14    that the official record of the Court does not show 35 and 36,

15    and he's saying that is a mistake.  And I'm just asking, do

16    you agree that they were admitted?  Otherwise, we can go back

17    and listen to the audio and I can pull my notes from chambers.

18    But --

19          MR. WILSON:  Well, I'm being told by my co-counsel

20    that Your Honor admitted 35 and 36 yesterday.

21          THE COURT:  Okay.  Very good.  So we will correct the

22    official record here to show 35 and 36 are part of the

23    evidence and No. 3 is not.

24       All right.  Any other housekeeping matters?

25          MR. MORRIS:  No, Your Honor.  I'm ready to proceed if

1  Your Honor is.

2       THE COURT:  Okay.  I am ready.  And it's 10:12.  I

3  have no problem if you save some of your twenty minutes for

4  rebuttal.  And if I stop either one of you and ask questions,

5  Nate, you'll stop counting the time.

6     All right.  You may proceed.

7       MR. MORRIS:  That's my intention.

8        CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

9       MR. MORRIS:  Good morning, Your Honor.  John Morris;

10 Pachulski, Stang, Ziehl & Jones; for the Debtor.

11    Your Honor, as you'll recall, in the face of explicit

12 threats to Mr. Seery and Mr. Surgent, as well as the brash

13 interference with the Debtor's operations a few weeks after

14 the board asked for Mr. Dondero's resignation, the Debtor

15 sought and obtained a TRO against Mr. Dondero.  Mr. Dondero

16 has questioned the Debtor's motivation in seeking the TRO, but

17 the motivation could not be clearer.  Leave the Debtor alone.

18 Unless he's in the courtroom, unless he's on the phone with

19 lawyers or communicating with lawyers or is communicating with

20 shared services, leave the Debtor alone.  That's what the TRO

21 was about, and that's exactly what it says.

22    But Mr. Dondero cannot help himself.  Whether because he

23 wants to burn the house down or he just cannot listen to

24 authority, Mr. Dondero refuses to leave the Debtor alone.

25    The Debtor has proven by clear and convincing evidence

1    that in the few short weeks between the time the TRO was

2    issued and the time it was converted to a preliminary

3    injunction, he violated the TRO at least 18 separate times.

4    Section 2(c) of the TRO says clearly and unambiguously, do not

5    communicate with the Debtor's employees unless it's about

6    shared services.  It could not be any clearer.  It was -- that

7    was the only exception, shared services.

8         Can we put Slide 2 from the opening dep up on the screen?

9         Mr. Dondero -- while we wait for that, I'll continue.  Mr.

10   Dondero did offer into evidence two shared services

11   agreements.  We didn't dispute that shared services agreements

12   existed.  That's why there's an exception in the TRO for that.

13   But while Mr. Wilson went through some of the communications

14   that are at issue with Mr. Seery, it's interesting that he did

15   not put one of these 13 communications in front of his client

16   to try to show how any of the communications connected to

17   shared services.  And the reason he didn't do that, Your

18   Honor, is because he can't.  Every one of these communications

19   is adverse to the Debtor's interests.  Mr. Seery testified

20   that he did not know of or authorize any of these

21   communications, and that if he had known, he would have fired

22   the employees on the spot.

23        And I ask Your Honor to put yourself in Mr. Seery's chair.

24   If you were the CEO of the Debtor and you learned that your

25   employees were engaged in these kinds of communications, what

24

1   would you have thought, what would you have done?  These are

2   not technical violations.  They are not foot faults.  Every

3   one of these communications is adverse to the Debtor.

4       Look at the topics.  Getting a witness to testify against

5   the -- to testify on Mr. Dondero's behalf at a hearing against

6   the Debtor.  Discussions concerning the entry into a common

7   interest agreement between certain of the Debtor's employees,

8   Mr. Dondero, and other entities owned or controlled by him.

9   Challenging the Debtor's decision to enter into the settlement

10  agreements with Acis and HarbourVest.

11      And by the way, there's no problem with Mr. Dondero

12  challenging those.  The problem is when he brings the Debtor's

13  employees, and in this case, Mr. Ellington, into those

14  discussions.

15      He directed an employee not to produce documents that were

16  in the Debtor's possession, custody, and control.  He engaged

17  in numerous communications between December 22nd and December

18  24th with Mr. Ellington concerning K&L Gates, the Advisors,

19  the interference with the trading, the letters that were sent.

20  Mr. Ellington's name was all over that.

21      This is wrong.  And Mr. Dondero knows it.  How do we know

22  that he knows it was wrong?  Because of one singular statement

23  that he made that wasn't even in response to a question that I

24  asked.  If you recall, Your Honor, as I was putting these

25  documents up on the screen, there were privileged

1   communications between Mr. Dondero and his lawyers, and at one

2   point Mr. Dondero said -- and I can't quote because I don't

3   have the transcript -- what are my privileged communications

4   doing up on the screen?  They were up on the screen because

5   Mr. Dondero chose to forward them to the Debtor's general

6   counsel.

7       We are going to deal with the consequences of that for a

8   long time.  It is a plain and blatant breach of the attorney-

9   client privilege.  It is on a number of topics.  It is

10  expensive.  The ramifications will be felt for a long time in

11  this case.

12      But the important point here, Your Honor, is consciousness

13  of guilt.  Mr. Dondero's statement of surprise that his

14  communications could be shared with Mr. Ellington but would

15  otherwise have been shielded from the rest of the world both

16  completely destroys any argument, and there was no credible

17  argument to begin with, that he was engaged in shared

18  services, because if it were shared services, he would have no

19  problem with the Debtor seeing the documents, he would have no

20  problem with the Debtor seeing the communications that he

21  voluntarily and knowingly shared with Debtor's general

22  counsel.

23      But what it really shows is that he never thought these

24  communications would see the light of day.  The Court should

25  hear Mr. Dondero's surprise for exactly what it is, an

1  admission of guilt.

2       Mr. Dondero wasn't shown any of these 13 communications.

3  He offers no testimony as to how to connect any of them to

4  shared services.  And the explanations that he provided have

5  no credibility and are completely undermined by the documents.

6       I'm just going to take a couple of examples.  Exhibit 19

7  is the text message that he sent to Ms. Schroth:  No Dugaboy

8  details without the subpoena.  Clearly, it's a violation of

9  the TRO.  Ms. Schroth was an employee of the Debtor.  It can't

10 have anything to do with shared services because the

11 unrebutted testimony was that Dugaboy was not party to a

12 shared services agreement.  But it was -- his explanation is

13 that the lawyers told him to do it.

14      Think about the credibility.  Your Honor really should

15 make some credibility findings here.  Think about the

16 credibility of blaming the lawyers.  A lawyer who six days

17 earlier heard a court enter a TRO against his client

18 preventing him from speaking to the Debtor's employees except

19 for shared services instructed his client to speak to the

20 Debtor's employees about something other than shared services?

21 Does that make any sense at all?  Bonds Ellis is not that bad.

22 They -- they -- I mean, they're good lawyers.  They're good

23 lawyers.  I don't meant to demean them at all.  I'm sure that

24 they had no idea that this was happening.  There is no way

25 that somebody at Bonds Ellis -- and I specifically didn't ask

1 Mr. Dondero to identify the lawyer who told him that, because

2 that wouldn't have been fair -- but somebody from Bonds Ellis,

3 six days after the TRO is entered, instructs Jim Dondero to

4 communicate with the Debtor's employee about something other

5 than shared services? It makes no sense.

6 You know how I also know it makes no sense? Because Mr.

7 Dondero put into evidence at Exhibits 16 through 20 a string

8 of emails between and among me and Mr. Draper and Mr. Leventon

9 concerning the Dugaboy financials. Mr. Draper was the lawyer

10 for Dugaboy, and he and I are going back and forth about the

11 documents, and he wants to know if I have them. And as Mr.

12 Dondero did testify, Mr. Draper wanted to see them and I told

13 him, I'll give you a copy when I get them, but they're in the

14 Debtor's subject -- custody and control. You can see it.

15 It's at Exhibit 20. I told that to Mr. Draper. I'll give you

16 a copy, but I've got to get them and I've got to produce them.

17 None of us knew, right, and it's reflected in those

18 exhibits, nobody ever says you need a subpoena. Mr. Draper

19 never says they're not the Debtor's documents. He never seeks

20 to exercise control of the documents. This is the lawyer for

21 Dugaboy, with no knowledge that Mr. Dondero has instructed the

22 one person at the Debtor who knows where the documents are not

23 to produce them. And nobody knows that.

24 It's not right, Your Honor. This stuff is not right. So

25 there you have 13 different instances where Mr. Dondero is

1   communicating with the Debtor's employees in ways that are

2   adverse to the Debtor that have nothing to do with shared

3   services.

4        Next, 362(a).  Again, the TRO at Section 2(e) could not be

5   clearer.  There's nothing ambiguous.  It's not overbroad.  It

6   simply says, don't violate the automatic stay.

7        362(a)(3), as we talked about the other day, prevents

8   anyone from trying to exercise control over property of the

9   Debtor.  Mr. Dondero violated this at least three separate

10   ways.  The phone twice, because the phone, as he admitted, was

11   the Debtor's property, and as the employee handbook of his

12   baby showed, the text messages were the Debtor's property.  I

13   know on cross-examination or direct Mr. Wilson had him point

14   to a line that says the Debtor's obligations or the employee's

15   obligations, you know, maybe they terminate upon the end of

16   the employment.  The statement about the text messages being

17   the Debtor's property, that's not an obligation of the

18   employee.  That's not an obligation at all.  It's completely

19   irrelevant.

20        The important point is that Mr. Dondero knew that the text

21   messages were the property of the Debtor.  And how do we know

22   that?  Because not once, but twice, in 2020 he executed

23   certifications where he acknowledged that, and those can be

24   found at Exhibits 56 and 57.  Your Honor will recall, as part

25   of the corporate governance settlement, Mr. Dondero agreed

1  that the Committee would do an investigation on related-party

2  claims.  Related-party claims included an investigation of Mr.

3  Dondero.  Mr. Dondero knew since no later than January 9, 2020

4  that he was under investigation.

5      If that were not enough, we had the motion practice last

6  summer and the Committee said, I want the documents and I want

7  the ESI and I want the text messages of nine custodians.  We

8  know that Mr. Dondero knew that.  How do we know?  Because he

9  filed a pleading in this Court that said so.  He said

10  specifically at Paragraph 3 of his response to the Committee's

11  motion, I know the Committee wants my ESI.  I know the

12  Committee wants my text messages.  And yet there we were, in

13  December, after he's fired, he changes out the phone, the text

14  messages are gone, and we know the phone existed, we know the

15  phone existed after the TRO was entered into.

16      And let's think about -- so, you know, again, not clear

17  and convincing evidence, Your Honor.  Beyond reasonable doubt.

18  It's beyond reasonable doubt that he knew the text messages

19  were the company's property.  It's beyond reasonable doubt

20  that he knew the company -- that he was under investigation.

21  It's beyond reasonable doubt that he knew the U.C.C. wanted

22  the text messages.  And it's beyond reasonable doubt that the

23  phone existed after the TRO was entered into.  Beyond

24  reasonable doubt.  No dispute.

25      Let's look at some of his excuses as to why none of this

 1  really matters.  Again, you know, I'll just repeat, he refers

 2  to Rothstein and Surgent and Ellington.  Again, Rothstein was

 3  under subpoena.  He didn't call him here.  Ellington was in

 4  the courtroom yesterday, or on Monday.  He didn't sign -- he

 5  didn't sign -- where are the people corroborating his story?

 6  He had them here and he chose not to put them on.

 7       There's no corroboration in any documents.  A 50-page

 8  employee handbook that does say text messages are the Debtor's

 9  property, does not say anything that corroborates anything

10  that Mr. Dondero said.

11       There's no communication.  There no email.  There's no

12  document.  There's nothing to corroborate what he said at all.

13       He says, oh, but there's no litigation hold letter.  I

14  have to tell you, Your Honor, I'm a little -- it's -- I don't

15  know what to say when he just keeps trying to blame others.

16  Litigation hold letters -- and this is argument, so I'm going

17  to say what my view is -- litigation hold letters are used to

18  put somebody who might not otherwise be on notice that claims

19  might be asserted against them.  You don't send a litigation

20  hold letter to somebody who has agreed to submit to an

21  investigation.  You don't send a litigation hold letter to

22  somebody who has acknowledged to a court that they know their

23  text messages are being sought in the context of litigation.

24  It's just, it's just ridiculous, Your Honor.  It really is

25  just ridiculous.  As my kids would say, give me a break.

1    In the end, the evidence clearly and convincingly showed

2    that Mr. Dondero controlled the Debtor's property, and in

3    violation of TRO Section 2(e) he controlled it, he discarded

4    it when he knew investigation was underway and when he knew

5    the text messages were at issue.

6    The third part is trespass. I won't spend a lot of time

7    on it, Your Honor. But, you know, it doesn't matter that he

8    didn't trespass before the TRO was entered. What matters is

9    that on January -- on December 23rd, in the letter, the Debtor

10   told Mr. Dondero that it was going to exercise control over

11   its property. And they told him, don't enter our premises

12   after December 30th or we will consider it a trespass. The

13   Debtor has every right to do that. So Mr. Dondero walking in

14   on January 5th is a violation of the TRO.

15   Interference with trading. Mr. Dondero, his admission of

16   interference with the trading is clear. It's unambiguous.

17   The Debtor told his lawyers in that December 23rd letter that

18   one of the very reasons they were evicting him was because of

19   his interference with the trading and his interference with

20   the Debtor's operations, and they never, ever rebut that. His

21   lawyers never contest that. They never respond to it. They

22   just let it go.

23   And so all you have now is Mr. Dondero backpedaling, you

24   have the failure of his lawyers to respond, and you have his

25   plain unambiguous admission, really, with the words December

1  22nd in my question from the earlier trial.

2      Your Honor can make whatever credibility findings the

3  Court thinks is appropriate, but that's the evidence that

4  exists, his backpedaling from clear and unambiguous

5  admissions.

6      We can take down the slide.

7      I did want to point out just one more thing on the phone,

8  right.  The -- he thinks all of these people are going to

9  corroborate what he has to say.  You know who actually spoke

10  on the topic and who didn't corroborate a single thing that he

11  said was he lawyers.  Because if you remember that one-

12  paragraph letter, Your Honor, where his lawyers actually

13  responded to the Debtor's demand for the cell phone -- let me

14  see if I can find the exhibit number for you.  I don't have it

15  handy.  But it's the one-page letter from Bonds Ellis where

16  they respond on the issue of the cell phone, and they don't

17  say anything that Mr. Dondero testified to.  They don't say

18  that Mr. Seery told them all to swap out their phones.  They

19  don't tell the Debtor that there's a longstanding company

20  practice or policy that allows people to switch phones.  They

21  don't say anything.  All they say is, we can't find it.  They

22  do admit that it's the company's phone, though.  They do make

23  that admission in their letter.  So I just wanted to make that

24  clear.

25      You know, they want to bring those guys in, Rothstein or

1   Surgent or Ellington.  What about their lawyers?  Just think

2   about what their lawyers said contemporaneously in response to

3   the Debtors' demand for the cell phone.  They say nothing

4   other than it is the Debtor's cell phone and we can't find it.

5        Let's just talk quickly about damages, Your Honor, and an

6   appropriate sanction.  It's very difficult to quantify.  We've

7   put in time records.  I know people can have different views

8   of what should and should not be included.  I know there's a

9   lot of stuff in there that's not included that probably should

10  be.  We don't have any evidence of the costs that the Debtor

11  has borne as a result of these violations from FTI or Sidley

12  or DSI.  Kasowitz Benson was hired to analyze some of the

13  issues my firm admittedly is not an expert on.  So there's a

14  lot of other expenses.

15       There's -- Mr. Seery testified extensively, and it's not

16  contradicted, it's not rebutted at all, that there's

17  noneconomic harm here, that his authority was undermined.  You

18  know, one could say the communications about a common interest

19  agreement, how can you quantify the harm of knowing that your

20  employees are engaged in discussions about entering into a

21  common interest agreement with your adversary?  How can you

22  quantify that harm?

23       So I don't think that we have a burden, frankly, of

24  proving to the dollar of the harm that the Debtor suffered,

25  but it has suffered immensely.  And it's suffered both

1  economically and non-economically.  And we respectfully

2  request that the Court enter a sanction for the violation of

3  the TRO.

4      I think, Your Honor, I'm at eighteen minutes, and I'm

5  going to save my last two minutes for rebuttal.

6          THE COURT:  Okay.  Thank you.  Mr. Wilson?

7          MR. WILSON:  Yes, Your Honor.  May it please the

8  Court.

9          THE COURT:  Yes.

10         CLOSING ARGUMENT ON BEHALF OF JAMES D. DONDERO

11         MR. WILSON:  A party commits contempt when he

12 violates a definite and specific order of the court requiring

13 him to perform or refrain from performing a particular act or

14 acts with knowledge of the court's order.  To hold a party in

15 civil contempt, the court must find such a violation by clear

16 and convincing evidence.  And I cited you a similar passage

17 from a case yesterday from the Fifth Circuit.  That passage is

18 from *Waste Management of Washington v. Kattler*, 776 F.3d 336.

19 That's a case that I believe is in our briefing, but I'd like

20 to highlight that in that case the Fifth Circuit was

21 considering a contempt order issued by a district court, and

22 the district court had issued a TRO enjoining a guy named Mr.

23 Moore from disclosing confidential information and requiring

24 Moore to produce images of electronic devices containing the

25 confidential information.

1      The district court held Mr. Moore in contempt for failing

2  to produce an iPad, and the Fifth Circuit reversed that

3  contempt finding, holding, however, no contempt liability may

4  attach if a party does not violate a definite and specific

5  order of the court.

6      After the district judge determined that the iPad was a

7  personal device that should have been produced to WM on

8  December 22nd, Moore stated, If you want that device turned

9  over directly to Waste Management, we'll do it tomorrow.  The

10  court responded, I think that's what the order said.  The

11  court was mistaken.  The order required Kattler to produce an

12  image of the device only, not the device itself.  Several days

13  later, after WM determined the image did not contain the

14  relevant information, WM moved to hold Kattler in contempt

15  because he had failed to produce the device itself in

16  accordance with the court's alleged order from the bench.  But

17  Moore was under the understandable impression that the only

18  order in place was to produce an image of the device.

19  Therefore, given the degree of confusion surrounding whether

20  the district court ordered production of the physical device,

21  we conclude that Moore did not violate a definite and specific

22  order of the court.

23      So with respect of each of charges of contempt that the

24  Debtor makes here, Your Honor, you must determine whether the

25  Debtor has met its burden by clear and convincing evidence

1  that Mr. Dondero violated a definite and specific order of the

2  Court.  I submit to you that the Debtor has failed to meet

3  that burden.

4     With respect to the first charge of willful ignorance of

5  the TRO, it's important to note that willful ignorance of a

6  TRO is not a violation of a definite and specific order of the

7  Court.

8     But equally important, I would point to you that the

9  allegation simply isn't true.  You heard testimony from Mr.

10  Dondero that he was aware of why the TRO was entered.  He

11  discussed the order with his counsel.  He became aware of what

12  he could and couldn't do through those discussions.  Mr.

13  Dondero testified that he respected the Court's order.  He

14  took it seriously.  He followed up with his counsel over the

15  next few weeks, seeking advice regarding whether certain

16  actions may or may not violate that order.  And it was

17  important to him.  He made a conscious effort to modify his

18  behavior after the TRO.  He told you that yesterday.  Or, I'm

19  sorry, on Monday.

20     Moreover, Mr. Dondero testified that he did not believe

21  that any action that he took would violate the TRO.  And in

22  fact, you heard Mr. Seery testify on Monday that he did not

23  believe that Mr. Dondero was, in fact, ignorant of the TRO, in

24  contradiction to what his papers would say.

25     Number two, the second charge that Mr. Dondero is alleged

1  to have violated is by throwing away his cell phone.  Again,

2  this is not a clear violation of any definite and specific

3  order of the Court.  Mr. Dondero did not have any reason to

4  believe that getting a new phone would violate the TRO.  Mr.

5  Dondero testified that he changed over the financial

6  responsibility for his phone and got a new device because he

7  was made aware that the Debtor would be terminating all

8  employees and discontinue paying for their cell phone plans.

9  In fact, Mr. Dondero decided to get a new cell phone and

10  initiated the process two weeks before the TRO had been

11  entered.

12     Moreover, the evidence shows that when Mr. Dondero got a

13  new phone, he simply followed the procedure that Highland had

14  always required its employees to follow.  In fact, the wiping

15  of the cell phone was performed by the Debtor's own employee,

16  Jason Rothstein, the head of IT.

17     And finally, Mr. Dondero did not personally throw away or

18  destroy his phone.  He turned it over to the Debtor and he

19  never saw it again.

20     And I remind you, he turned it over to the Debtor well

21  before the entry of the TRO, up to two weeks.  The Debtor was,

22  of course, free at that point, when they had possession of the

23  phone, to preserve any information on the phone that they

24  deemed appropriate.  They apparently chose not to do so.  Mr.

25  Dondero testified that he assumed that the phone had been

1   destroyed in compliance with Highland's policies and

2   procedures, but the evidence shows that the last he heard

3   about his phone, it was actually in the Highland offices.

4       And finally, the Debtor's request for the phone did not

5   come until nearly two weeks after the entry of the TRO and two

6   weeks after Mr. Dondero had received his replacement cell

7   phone, up to four weeks since Mr. Dondero had actually seen

8   his cell phone.

9       But, however, we were surprised by Mr. Seery's testimony

10  on Monday that accused Mr. Dondero of making up his testimony

11  about the cell phone policy.  And in fact, despite testifying

12  that Mr. Rothstein was honest and ethical, Mr. Seery attempted

13  to slander Mr. Rothstein by claiming that he did something

14  nefarious at Mr. Dondero's instruction.  Of course, there was

15  no direct evidence of any nefarious conduct on Mr. Rothstein's

16  part.

17      But in any event, Mr. Dondero's actions in replacing the

18  cell phone, which actually occurred two weeks before the TRO,

19  cannot violate the TRO itself.  And there's two very specific

20  reasons for that.  Number one, it's not in the time frame.

21  The evidence was that Mr. Dondero has not seen his cell phone

22  since the TRO has been entered.

23      Second, that provision of -- to enforce that order -- oh,

24  I'm sorry -- to enforce that action against Mr. Dondero does

25  not violate any clear and specific provision in the TRO.  The

1    TRO does not order Mr. Dondero not to replace his cell phone

2    or destroy the old one, even if he did.  And it -- in any

3    event, the Debtor has tried to tie it into 362 and its letter

4    that it sent on December 23rd.  Both of those documents are

5    documents outside of the TRO itself and cannot be considered

6    to be a part of the TRO for enforcement purposes because that

7    would violate Rule 65(d).

8         Now, finally, the Debtor, on this point, the Debtor wants

9    a spoliation instruction against Mr. Dondero, apparently.  But

10   the spoliation instruction is confusing to us, Your Honor,

11   because in the context of the Debtor's request, the Debtor

12   would actually be seeking a spoliation instruction against

13   itself as it relates to the litigation with the U.C.C..  This

14   Court discussed spoliation in the *Carrera* case, writing,

15   Generally, a party claiming spoliation of evidence must show

16   the following events -- I'm sorry -- elements.  That, one, the

17   party had an obligation to preserve the electronic evidence at

18   the time it was destroyed; number two, the electronic evidence

19   was destroyed with a culpable state of mind; and three, the

20   destroyed evidence was relevant and favorable to the party's

21   claim, such that a reasonable trier of fact could support that

22   claim.  A duty to preserve arises when a party knows or should

23   know that certain evidence is relevant to pending or future

24   litigation.

25        The Debtor did not plead or prove any of these elements,

1  particularly the elements that electronic evidence was

2  destroyed and that Mr. Dondero had an obligation to preserve

3  that evidence at the time.

4      In any event, it did not occur during the pendency of this

5  TRO and so it cannot be a violation of the TRO.

6      The third charge that the Debtor brings is that Mr.

7  Dondero trespassed on the Debtor's property.  Again, it is not

8  a clear violation of any specific and definite order of the

9  Court.  Mr. Dondero did not have any reason to believe that

10  going to the Highland office would violate the TRO.  The

11  charge relates to Mr. Dondero giving his deposition in a

12  conference room at the Highland office on January 5, 2021.

13  However, Mr. Dondero testified that he gave his deposition in

14  the Highland offices on December 14th, four days after the

15  entry of the TRO.  And at that TRO [sic], Mr. Dondero made

16  clear to Mr. Morris that he was giving his deposition in the

17  Highland conference room.  No one at the Debtor claimed that

18  it violated the TRO for Mr. Dondero to give his deposition on

19  December 14th from the Highland conference room, and the TRO

20  did not change between the time that Mr. Dondero gave his

21  deposition on the 14th and the time that he gave it on January

22  5th.

23      Therefore, if it wasn't a violation of the TRO on December

24  14th, it wasn't a violation on January 5th.  The only thing

25  that changed was that Mr. Pomerantz, in his letter on December

1    23rd to Mr. Lynn, but as we discussed in our objection to this

2    line of questioning, that -- that violates Rule 65(d) because

3    that is a document outside of the TRO itself.

4        Fourth, the Debtor claims that Mr. Dondero violated the

5    TRO by interfering with the Debtor's trading as the portfolio

6    manager of certain CLOs.  This charge is admittedly closer to

7    the language of the TRO.  However, this allegation is

8    insufficient to hold Mr. Dondero in contempt.  There is no

9    clear and convincing evidence that Mr. Dondero violated the

10   TRO.

11       In fact, Mr. Morris just told you in his argument that his

12   evidence of this charge is that the Debtor alleged in the

13   December 23rd letter that Mr. Dondero had interfered with the

14   Debtor's business and that Mr. Dondero's lawyers did not

15   respond.

16       There were various reasons of why the response that was

17   given by Mr. Dondero's lawyers was quick and to the point and

18   addressed what seemed to be the main thrust of the letter,

19   being the cell phone.  Mr. Dondero was on vacation in Aspen at

20   the time, he was communicating with his lawyers over the phone

21   around the Christmas holidays, and the letter is what it is.

22   But in any event, the letter that went unresponded to with

23   respect to that allegation is not clear and convincing

24   evidence of anything that Mr. Dondero did.

25       But there's a real question as to what interference means.

1  Mr. Seery testified that Mr. Dondero did not stop trades.  Mr.

2  Seery was able to execute every trade he wanted to make in

3  December.  He didn't change his investment strategy.  He

4  didn't change his trading decisions.  He continued to operate

5  the Debtor as he deemed appropriate.

6      So it begs the question of what does interference mean?

7  We cite an Eighth Circuit case in our brief, *Robinson vs.*

8  *Rothwell*, that holds that an order that prevented any actions

9  to interfere in any way with the administration of those

10  jointly administered bankruptcies was neither sufficiently

11  specific to be enforceable, nor clear and unambiguous.

12      The evidence shows that the only action Mr. Dondero took

13  was to ask Jason Post, his chief compliance officer, to take a

14  look into some of the trades that Mr. Dondero was made aware

15  of.  Mr. Dondero did not know what Mr. Post did with respect

16  to the trades until he heard Mr. Post's testimony at the

17  January 23rd hearing.  He testified to that on Monday.

18      But to be clear, all of the trades were executed and they

19  all closed.  Mr. Post's actions were merely to instruct the

20  Advisors' employees not to book the trades after the fact

21  because they did not conform to compliance procedures, but the

22  Advisors' employees were under no obligation to book those

23  trades in the first place.

24      In any event, those are actions of Mr. Post, not of Mr.

25  Dondero, and there was no evidence that Mr. Dondero even took

1  those actions or even encouraged those actions.

2       Number five, the Debtor claims that Mr. Dondero violated

3  the TRO by pushing and encouraging the K&L Gates clients to

4  make further demands and threats against the Debtor.  This

5  charge attempts to invoke Paragraph 3 of the TRO that Mr.

6  Dondero is enjoined from causing, encouraging, or conspiring

7  with a person or entity to engage in any of the prohibited

8  conduct, the allegation being threats against the Debtor.

9  This charge is problematic for two reasons.  First, what is a

10 threat?  The evidence consisted of two letters from the K&L

11 Gates law firm to the Pachulski law firm.  The first letter

12 was a December 22nd letter that was simply a request between

13 counsel that Debtor refrain from certain actions.  The Debtor

14 rejected that request.  The Debtor was not intimidated or

15 threatened by the request and did not change its course in any

16 way.  Mr. Seery testified to that.

17      In fact, the Debtor sent a rejection of the request the

18 following day, and also demanded a withdrawal of the request

19 and threatened sanctions for filing it, but -- or for sending

20 it, but it was -- it did not change the Debtor's course in any

21 way.

22      The next letter referred to was the Funds and Advisors

23 letter, that they may take subject to the automatic stay to

24 exercise a contractual right that they along with their

25 counsel felt that they had.  That was a letter that -- that,

1    again, Mr. Dondero testified he had nothing to do with the

2    sending of, and although he later approved the position taken

3    in the letter, agreed with the position taken in the letter,

4    he did not do anything to cause the sending of the letter.

5        But, and that goes to my next point, that there was no

6    evidence, other than the Debtor's suspicions, and Mr. Seery

7    testified that his only evidence of this was that Mr. Dondero

8    admitted that he sent an email to Mr. Post and that

9    subsequently these letters were sent.  And he concluded that,

10   based on those two facts, that Mr. Dondero was pushing,

11   encouraging, or directing the sending of these letters.

12   However, you heard evidence directly to the contrary from Mr.

13   Dondero himself.

14       Number six, the Debtor alleges that Mr. Dondero violated

15   the TRO by communicating with the Debtor's employees to

16   coordinate their litigation strategies against the Debtor.

17   The first problem with this charge is the ambiguity of what

18   Mr. Dondero is and is not allowed to do under the TRO, because

19   you've got Footnote 2 of the TRO that says, For the avoidance

20   of doubt, this order does not enjoin or restrain Mr. Dondero

21   from seeking judicial relief upon proper notice or from

22   objecting to any motion filed in the above-referenced

23   bankruptcy case.

24       That footnote is at the very end of Paragraph 2, so that

25   footnote apparently applies to every single prohibited conduct

1  element in Paragraph 2.  So, therefore, you've got that

2  exception to the TRO.

3      Second, you've got an exception to the TRO that's built

4  into letter (c) that says that the -- Mr. Dondero was

5  specifically allowed to communicate with employees related to

6  shared services.  The employees, Mr. Ellington and Mr.

7  Leventon, were both part of Highland's legal department, which

8  was part of a shared services agreement.

9      Third, Mr. Ellington was tasked with the role of go-

10  between between Mr. Seery and Mr. Dondero.  Mr. Dondero

11  testified to that.  Mr. Dondero testified that that role did

12  not change after December 10th and that he continued to

13  receive communications from Mr. Ellington that were -- or, I

14  guess sent through Mr. Ellington that were from Mr. Seery.

15  And moreover, Mr. Seery continued to talk to Mr. Ellington and

16  send such messages up until January 4, 2021.

17      Given these exceptions to the TRO and the necessity of

18  analyzing each communication to determine if it's permissible

19  creates uncertainty and ambiguity.  Therefore, this provision

20  is not sufficiently specific to be enforceable.

21      In any event, the Debtor has not proved its allegation

22  that Mr. Dondero coordinated his legal strategy against the

23  Debtor with Mr. Ellington and Mr. Leventon.  All you have is a

24  few text messages and emails that may have been forwarded to

25  Mr. Ellington or text message -- one text message sent to Mr.

1  Leventon.  There's no evidence of a coordination of legal

2  strategies against the Debtor.

3      Even if they had a common interest to pursue in this

4  bankruptcy, the evidence showed that neither Mr. Ellington nor

5  Mr. Leventon discussed a common interest agreement with Mr.

6  Dondero's lawyers or participated in a drafting of a common

7  interest agreement with Mr. Dondero and his lawyers, and that

8  they never entered a common interest agreement with Mr.

9  Dondero and his lawyers.

10      Number seven, finally, the Debtor alleges that Mr. Dondero

11  violated the TRO by preventing the Debtor from completing its

12  document production.  This relates to the production of

13  financial documents for the Get Good and Dugaboy Trusts.  Once

14  again, this is not a clear, direct violation of a specific

15  order of the TRO because there's no provision in the TRO

16  regarding the Debtor's document production or Mr. Dondero's

17  document production or the document production of trusts that

18  he may be related to.

19      But the evidence does not even support a finding that Mr.

20  Dondero prevented the Debtor from completing its document

21  production with the U.C.C..  In fact, Douglas Draper has been

22  attempting to work, as you see from our exhibits, with Mr.

23  Morris to get these documents produced since mid-December.

24  Mr. Draper simply requested that he be allowed to look at the

25  documents before they went out.

1     The only action that Mr. Dondero has taken in this regard

2  was to ask that Melissa Schrath not produce the documents

3  without a subpoena, which is to say that he wanted the proper

4  legal protocols followed.

5     I will address their damages, Your Honor.  With respect to

6  damages, I submit that Mr. Dondero does not have fair notice

7  of the damages that the Debtor seeks in this proceeding.  The

8  Debtor has put on no evidence of any monetary damage.

9  Instead, the Debtor appeared to seek its fees in connection

10  with bringing the contempt charges.

11     However, the evidence the Debtor submits is over 85 pages

12  of fee statements reflecting time entries starting on November

13  3, 2020.  Those entries date back well before the relevant

14  time period.

15     And moreover, the Debtor did not introduce the fee

16  statements with a sponsoring witness, so we have no testimony

17  as to the reasonableness or necessity of these fees or any of

18  the other loadstar factors.

19     But more problematic, we have no way to sort through the

20  85 pages of the statements and identify which entries the

21  Debtor contends were incurred in connection with the Debtor's

22  motion.

23     Although the burden is not on Mr. Dondero to do so, an

24  examination of the fee statements would suggest that hundreds

25  of thousands of dollars in fees were wholly unrelated to the

1   proper time period or the subject matter.

2        In sum, Your Honor, there is simply no clear and

3   convincing evidence that Mr. Dondero violated a definite and

4   specific order of this Court.  The TRO had its intended

5   effect.  Mr. Dondero changed his behavior.  Even though he may

6   not have agreed, and he testified that he did not agree with

7   many decisions that Mr. Seery made after the entry of a TRO,

8   he made a conscious effort not to interfere.

9        However, the TRO had unintended effects as well, creating

10  a situation where Mr. Dondero tried to comply with the order

11  and he thought he was complying with the order but he wound up

12  defending himself in a contempt proceeding.

13       The mere fact that the Debtor contends that Mr. Dondero

14  getting a new phone, appearing at the Highland offices to give

15  his deposition, or attempting to ensure that proper procedures

16  for discovery are followed violates the TRO means that the TRO

17  does not give fair notice to Mr. Dondero of what he was and

18  was not allowed to do.

19       I'll close with a reference back to the case I cited in my

20  opening.  It's *United States Steel Corp. v. United Mine*

21  *Workers* from the U.S. Supreme Court.  This is 598 [F.2d] 363

22  (5th Cir. 1979).  It says that a party may avoid a contempt

23  finding where it can show that it substantially complied with

24  the order or has made every reasonable effort to comply.

25       The evidence shows, at a bare minimum, Mr. Dondero

1   substantially complied with the Court's order.

2        And I misspoke.  That wasn't the case I thought I was

3   closing with.  This is the case from the Supreme Court.  The

4   judicial contempt power is a potent weapon.  When it is

5   founded upon a decree too vague to be understood, it can be a

6   deadly one.

7        Congress responded to that danger by requiring a federal

8   court frame its orders so that those who must obey them will

9   know what the court intends to require and what it means to

10  forbid.  That's the *Longshoremen Association v. Philadelphia*

11  *Marine Trade Association* case, 389 U.S. 64.

12              THE COURT:  All right.  Your time is up.  Thank you.

13              MR. WILSON:  Thank you, Your Honor.

14              THE COURT:  I'm going to have some questions for you

15  and Mr. Morris, but I'm going to wait and hear the rebuttal

16  and then have some questions for -- a couple of questions for

17  each of you.

18       Mr. Morris, go ahead.

19              MR. MORRIS:  Sure.  Two minutes, Your Honor.

20       There's nothing ambiguous about the order.  It says don't

21  talk to employees except for shared services.  Mr. Wilson just

22  talked about all kinds of things that have -- he made no

23  attempt to argue that any of these communications have to do

24  with shared services.

25       The order says don't violate the automatic stay.  You

1   didn't need the order to do that.  Your Honor actually made

2   the observation at the time.  So, you didn't need it, but it

3   was in there, and he knew it.  There's nothing vague and

4   ambiguous about that.

5       Don't interfere with the Debtor's business.  I don't know

6   how it could be any clearer, Your Honor.  They seem to suggest

7   that you should have put in the order, don't communicate about

8   discovery.  Don't communicate about common interests.  Don't

9   communicate -- no.  That's not what's required.  There's a

10  blanket prohibition on communication, and that applies to

11  everything except for shared services.

12      With respect to Mr. Rothstein, Mr. Seery testified

13  accurately, it will never be factually disputed, that what Mr.

14  Rothstein did with the wiping down of the phones was to wipe

15  down the information that was on the Debtor's server, *i.e.*,

16  emails and things that are on the Debtor's server.  He

17  testified very clearly that text messages are not part of

18  that.  So the wiping that Mr. Rothstein did was really at Mr.

19  Seery's instruction and it was just to get him off the

20  Debtor's system.

21      Interference.  Mr. Wilson seems to think that the only

22  thing we have here is the Debtor's letter.  No.  The Debtor's

23  letter said you interfered.  There's no response.  But more

24  importantly, we rely on Mr. Dondero's sworn testimony.

25  Question, "You personally instructed on or about December 22,

1    2020 employees of those Advisors to stop doing the trades that

2    Mr. Seery had authorized?"  Answer, "Yeah."  That's at Page

3    73.  He's trying to walk it back, but the testimony is what it

4    is.

5         We have proven beyond clear and convincing evidence.

6    We've actually proven beyond reasonable doubt that Mr. Dondero

7    has violated the TRO multiple ways.

8         With respect to damages, if Your Honor wants to have a

9    hearing, if we really need to go down that path, that's fine,

10   but it's always going to be subject to dispute because there's

11   so many professionals involved.  Think about all the people on

12   the phone today.

13        I have nothing further, Your Honor.

14             THE COURT:  All right.  A couple of follow-up

15   questions.

16        With regard to the cell phone, tell me what evidence I

17   really have before me.  I mean, there's a lot of, you know,

18   argument and commentary of Mr. Dondero whether this is much

19   ado about nothing or not, but what really is my evidence

20   besides the testimony I heard?  You've mentioned the I forget

21   what date letter from the Bonds Ellis law firm regarding the

22   phone, but what other evidence do I have that you would say is

23   relevant on this issue?

24             MR. MORRIS:  I'm sorry, who's the question directed

25   to, Your Honor?

1            THE COURT:  You, and then I'm going to ask Mr. Wilson

2    the same thing.

3            MR. MORRIS:  Okay.  Very, very, very simply.  Just

4    one second, Your Honor.  The evidence that I have on the issue

5    of the cell phone.  Exhibit 55 says that text messages are the

6    Debtor's property.  Right?  And this is an allegation -- this

7    is an allegation that Mr. Dondero violated Section 2(e) of the

8    TRO, which (audio gap) him from violating the automatic stay.

9    Section 263(a)(3) prevents anyone from exercising control over

10   the Debtor's property.  So the handbook itself describes text

11   messages related to company business are the property of

12   Highland.  Right?  So you've got the word property in the

13   handbook, you've got the word property in Section 263(a)(3),

14   and you've got the TRO provision that prevents the violation

15   of the automatic stay.

16            THE COURT:  All right.  So the evidence --

17            MR. MORRIS:  Next, --

18            THE COURT:  -- Exhibit 55, the employee handbook.

19   And what other evidence?

20            MR. MORRIS:  Right.  And then, next, we know that Mr.

21   Dondero understood that.  How do we know that he understood

22   that?  Because twice in the year 2020, including just moments

23   before he left, he agreed to the certifications that can be

24   found at Exhibits 56 and 57.  And those certifications state,

25   among other things, this is Mr. Dondero's certification:  I

1    have received, have access to, and have read a copy of the

2    employee handbook, and I am in compliance with the obligations

3    applicable therein.

4        So he -- that's what the handbook, that was the company

5    policy, and he said that he knew it.

6        We know that in January of 2020 he specifically entered

7    into a corporate governance agreement in which the U.C.C.

8    obtained the right to conduct an investigation of related-

9    party claims.  We know that Mr. Dondero was the subject of

10   related-party claims.  We know that the U.C.C. shares the

11   privilege with the Debtor with respect to related party-

12   claims.  This was part of the agreement that he entered into.

13   He knew no later than January 9, 2020 that the Debtor -- that

14   the U.C.C. was conducting an investigation of him.

15       And if there was any doubt about that, in July 2020 the

16   U.C.C. filed its motion for -- to compel the production of

17   documents.  And Mr. Dondero's own lawyers, at Exhibit 40,

18   submitted a response to the U.C.C.'s motion to compel in which

19   it said the proposed protocol the Committee seeks, among other

20   things, documents, emails, and other electronically-stored

21   information, exchanged from or between nine different

22   custodians, who include Dondero.  The Committee has requested

23   all ESI for the non-custodians, including, without limitation,

24   text messages.

25       So he knew he was under investigation.  He knew the

1  Committee wanted them.  His lawyers told you that he knew the

2  Committee wanted them.  And Your Honor subsequently issued an

3  order relating to those text messages.

4      With no notice to the Debtor, and this is his testimony,

5  with no notice to the Debtor, with no approval of the Debtor,

6  he went out and swapped the phone.  And nobody knows where the

7  phone is today, but he had it.  He knew where it was after the

8  TRO was entered.  He knew because Jason Rothstein told him on

9  December 10th at 6:25 p.m. at Exhibit 8 that the cell phone

10  exists.  Okay?  He swapped out the number without the

11  knowledge and consent of the Debtor.  He, you know, did

12  whatever he did with the cell phone and the information.

13  Nobody knows where it is.

14      He actually testified, and I don't have the line, he

15  actually testified that it was thrown in the garbage last

16  time.  Now he says I don't know what happened to it.  I could

17  dig it out, Your Honor, if I had the time.  I don't even think

18  it's necessary.  But at the last hearing on January 8th, it's

19  in the evidence and I'll pull it out on appeal when that

20  happens, Mr. Dondero testified that it was disposed of and

21  thrown in the garbage.

22      That's the evidence that I have, Your Honor, as to what

23  happened to the cell phone, why it was the company's property,

24  and why it's a violation of the TRO Section 2(e) to have

25  thrown it in the garbage without notice, when he knew he was

1    subject to investigation, when his lawyers told you that they

2    knew the U.C.C. wanted the text messages, when you ordered

3    that those text messages be produced.

4          THE COURT:  All right.  And I can go back and look at

5    the transcript I'm sure we're going to have shortly from

6    Monday's hearing to verify my memory of this, but maybe you

7    can tell me.  Am I remembering correctly that Mr. Seery

8    testified that Highland should have -- the Debtor should have

9    the emails that might have been on the phone because they

10   would be on either Highland's server or the cloud, Highland's

11   cloud or something, correct?

12         MR. MORRIS:  Yes.  This is not about emails.  We do

13   have emails, and that's how we were able to offer some of them

14   into evidence, frankly, because we do have emails, if it was

15   on the Debtor's server.  Now, we understand that Mr. Dondero

16   may have used other URLs, other email addresses that we would

17   never have.  But any information that was on the Debtor's

18   server, we admittedly have.  Text messages are not among them.

19   And you heard Mr. Seery testify that we cannot go to AT&T or

20   Verizon or whatever the carrier is.  You have to go to Apple,

21   and they won't give them to you.  Okay?  We can't -- they will

22   never, ever be found.  They just won't.

23         And so it's only the text messages that we're talking

24   about.  We're not talking about email.  In fact, Your Honor,

25   in compliance with the Court's order, because we were able to

1    do it as Debtor's counsel, in compliance with your Court's

2    order, the Debtor  produced, I think, seven or eight or nine

3    million emails of the nine custodians over the five years

4    prior to the petition date to the Committee over the summer.

5    It was a gargantuan task.  So, just to be clear, this is about

6    text messages, not about emails.

7                THE COURT:  Okay.  All right.  Well, let me --

8                MR. MORRIS:  Oh, I'm sorry.  If I may, just one more

9    thing.

10                THE COURT:  Uh-huh.

11                MR. MORRIS:  Because the evidence is also in the

12    record that he used text messages to communicate with

13    business.  There's no dispute about that.

14                THE COURT:  Okay.

15                MR. MORRIS:  Now I'm through.

16                THE COURT:  All right.  Well, I'm going to go to Mr.

17    Wilson now.  What do you think is the evidence in the record

18    that is relevant to this whole cell phone issue?

19                MR. WILSON:  Well, I would -- I would say two, two

20    things, two big-picture items, Your Honor.  Number one, like I

21    referred to on Monday and like I referred to in my closing,

22    Rule 65(d) says that every restraining order or injunction

23    must describe in a reasonable detail and not by referring to

24    the complaint or other document the act or acts restrained or

25    required.

1        They're having to refer to Section 362 of the Bankruptcy

2   Code.  They're having to refer to --

3        THE COURT:  Okay, Mr. Wilson, I'm going to stop you.

4   This is turning into legal argument.  And I understand your

5   legal argument, that you don't think the TRO was specific

6   enough with regard to the cell phone.  I understand that, and

7   you may be right.  You may be wrong; you may be right.  But

8   I'm asking now, assuming you're wrong and this cell phone

9   issue is a big deal, tell me what evidence you think I should

10  focus on.

11       MR. WILSON:  Well, Your Honor, there's really only

12  one document that I think is relevant to this issue, and that

13  would be the Debtor's Exhibit 8, which is the text message

14  from Jason Rothstein to Mr. Dondero on Thursday, December

15  10th, at 6:25 p.m.  And that text message says, I left your

16  old phone --

17       THE COURT:  Right.

18       MR. WILSON:  -- in the top drawer of Tara's desk.

19       THE COURT:  Uh-huh.

20       MR. WILSON:  Your Honor, that testimony confirms what

21  Mr. Dondero said about how he already had a new cell phone by

22  December 10th.  And I would say that the other -- the other

23  issue is that if anybody improperly wiped the cell phone, it

24  was Highland itself.  Highland had possession of the cell

25  phone up to two weeks before December 10th.  And so the

1  actions --

2       THE COURT:  Okay, again, not argument, evidence.  My

3  evidence.

4       MR. WILSON:  Well, I think that this -- I think this

5  exhibit is this evidence, because Jason Rothstein was a

6  Highland employee, and the Highland employee is telling Mr.

7  Dondero on December 10th that he's returning his cell phone to

8  the desk drawer.  So that's why I think this is the most

9  relevant piece of written evidence on this.  I think that the

10  testimony also addresses it, and you can review that if you

11  would like, Your Honor.

12       THE COURT:  Okay.  Let me figure out my notes here.

13  My next question is for you, Mr. Morris.  The prohibition in

14  the TRO on Mr. Dondero communicating with Highland employees

15  except as it pertained to shared services agreement, I think I

16  hear you making the argument that Mr. Ellington was in

17  Highland's legal department and shared services agreements

18  encompassed the legal department of Highland; therefore, it

19  was okay for him to talk to Mr. Ellington about anything.  Am

20  I putting words in your mouth, or is that your argument?

21       MR. MORRIS:  That's for Mr. Wilson or for me?

22       THE COURT:  That's for Mr. Wilson.  Okay?  And I have

23  a second -- a follow-up to that, but go ahead and help me to

24  understand.  Is that your argument?

25       MR. WILSON:  I think that my argument is, on this

1  matter, that the -- that the provision is not clear and

2  specific enough to be enforceable because it's vague and

3  unambiguous -- I'm sorry, vague and ambiguous, given that

4  there's two exceptions in the TRO itself that are subject to

5  interpretation, as well as an exception --

6         THE COURT:  Okay.  Again, again -- okay.  I

7  understand there's the exception with regard to the shared

8  services agreement and with regard to you can file court

9  pleadings or take legal positions in court.  But I'm trying to

10  get at, is your -- is the thrust of your argument that hey,

11  any communications with Scott Ellington were fine because he

12  was in the legal department and legal services are part of

13  shared services agreements, which were excepted out of the

14  TRO.  Is that a proper characterization of your legal

15  argument?

16         MR. WILSON:  Well, I've got to tell you, Your Honor,

17  I think that that is part of it.  I think that the real -- the

18  real issue goes to Mr. Dondero's state of mind and what he

19  believed he was and was not restrained from doing and what the

20  order on its face clearly and specifically restrains him from

21  doing.

22      And my argument is that, with the exceptions and with the

23  other testimony that was offered about Mr. Ellington's role

24  between Mr. Seery and Mr. Dondero, that he was simply unclear

25  as to what he was restrained --

1          THE COURT:  Okay.  Tell me -- tell me -- okay.  I'm

2     trying to get a direct answer, and what I think I'm hearing is

3     you don't necessarily think conversations with Ellington would

4     fit into the shared services agreement but you think that's

5     what James Dondero thought.  Is that what you're now saying?

6          MR. WILSON:  Well, I believe that Mr. Dondero's

7     testimony was that he was under the impression that because,

8     for various reasons, because that he had been doing this for

9     twelve months and also because it continued after the December

10    10th hearing, that he was allowed to communicate items to the

11    Debtor in what he termed the role as settlement counsel.  And

12    despite Mr. Seery's denial of giving Mr. Ellington any

13    instruction, I think that the issue is what was Mr. Dondero's

14    state of mind, and so I do believe that Mr. Dondero thought he

15    was communicating pursuant to shared services.  I do believe

16    he thought he was communicating in a permissible way pursuant

17    to the settlement counsel issue, because he thought that a lot

18    of these issues that he was forwarding text messages to Mr.

19    Ellington would only -- would keep him apprised of where they

20    were, because the whole time Mr. Dondero was still attempting

21    to settle this case through a pot plan.

22         THE COURT:  Okay.  And I guess, since you've

23    mentioned it, what is my evidence that Mr. Ellington was the

24    designated, recognized settlement counsel?  You know, he --

25    Mr. Dondero says it.  Mr. Seery says absolutely no.  Do I have

1    any other evidence on that point in the record?

2            MR. WILSON:  Well, there -- there was proposed

3    evidence that I submitted earlier this morning on that issue

4    from Mr. Ellington's deposition.

5            THE COURT:  I am not -- I'm asking what's in the

6    record.  What's in the record?

7            MR. WILSON:  Right.  Well, the evidence in the record

8    on that is Mr. Dondero's testimony.

9            THE COURT:  Okay.  And here was a follow-up I meant

10   to ask on shared services, and I'm going to ask Mr. Morris

11   this, too.  I thought I heard Mr. Seery testify that -- he

12   testified about what he considered kind of the bizarreness of

13   the legal department at Highland as it had historically been

14   set up, and I thought he said legal was not part of the shared

15   services agreement.  Do you want to respond to that?

16           MR. WILSON:  Well, I would respond to that, Your

17   Honor.  The shared services agreements were in place many

18   years before Mr. Seery came into being.

19           THE COURT:  Right.  Okay.

20           MR. WILSON:  And Mr. Dondero had been operating under

21   those agreements for many years before Mr. Seery came into

22   being.

23           THE COURT:  Was legal covered by the shared services

24   agreement or not?

25           MR. WILSON:  It was, Your Honor.  I put -- I put both

1  of the shared services agreements in the record, and I had Mr.

2  Dondero read the provisions that talked about how broadly the

3  legal services were covered by shared services.

4       THE COURT:  Did it change during the bankruptcy?

5       MR. WILSON:  Your Honor, there was no amendments or

6  modifications to those agreements until they were eventually

7  terminated by the --

8       THE COURT: Okay.

9       MR. WILSON:  -- Debtor.  We had the --

10      THE COURT:  Okay.  So there were no written --

11      MR. WILSON:  We had the evidence in our record.

12      THE COURT:  There were no written amendments that --

13  all right.

14      MR. MORRIS:  If I may, Your Honor?  Because I --

15      THE COURT:  You may.  Mr. Morris, go ahead.

16      MR. MORRIS:  I've got -- I've got a number of

17  thoughts on this.

18      THE COURT:  Okay.

19      MR. MORRIS:  If Mr. Dondero -- let's look at the

20  language.  It's always helpful to look at the language of the

21  order.  The language of the order could not be clearer.

22  Section 2(c) prohibited him from communicating with any of the

23  Debtor's employees.  Full stop.  That is a blanket,

24  unambiguous prohibition.  Total and complete.  There is one

25  exception.  Not two, but one:  except as it specifically

1  relates to shared services currently provided to affiliates

2  owned or controlled by Mr. Dondero.

3      Mr. Dondero was not party to a shared services agreement.

4  You have two entities that are.  They're the Advisors.  Those

5  shared services are in Exhibits 1 and 2 of the -- of the

6  Defendant.

7      There is no dispute that among the services provided were

8  legal services.  The point that Mr. Seery was making and the

9  objection that he took to the way the question was phrased was

10  the notion that the legal department was somehow kind of

11  assigned or available.  The Debtor wasn't obligated to provide

12  legal services.  He just -- he was making a very technical but

13  very accurate and careful distinction between the legal

14  department and the obligation to provide legal services.

15              THE COURT:  Okay.

16              MR. MORRIS:  We don't dispute it.  It's, in fact,

17  precisely why we agreed to put it in there, because the Debtor

18  had a contractual obligation to provide all kinds of services,

19  whatever they may be, under those agreements.  So I want to be

20  really clear about that.

21      What Mr. Wilson cannot do and what he will never be able

22  to do is show you that any of the communications that are at

23  issue in this case have anything to do with shared services.

24  And if they're not related to shared services, they are a

25  violation of the TRO.

1    There's only arguably, arguably, two that could be -- and

2    why do I know that?  I know that because none of these

3    communications have any -- have any employee of the Advisors

4    on it.  They don't have the lawyers for the Advisors on it.

5    They have people who represent entities other than anybody --

6    Mr. Draper doesn't represent -- this is the evidence.  Mr.

7    Draper doesn't represent anybody who's party to a shared

8    services agreement.  Bonds Ellis doesn't do that.  Right?

9    There is only two.

10    Exhibits 26 and 52 are with K&L Gates and Mr. Ellington.

11    And so you can say, well, at least K&L Gates represents

12    Advisors, and at least Advisors are party to shared services

13    agreements.  But those communications themselves are adverse

14    to the Debtor.  And I asked Mr. Dondero specifically, is there

15    any provision in the shared services agreements that requires

16    the Debtor to provide services to the counterparty that are

17    adverse to itself?  Right?  And he said no, I can't think of

18    any.  It was a candid admission on his part.

19    So, there's -- there's nothing in this long list, Your

20    Honor, there's nothing in here that has anything to do with

21    shared services.  Getting a witness for a hearing to testify

22    on behalf of Mr. Dondero doesn't concern shared services.

23    Discussions, discussions with employees about entering a

24    common interest agreement has nothing to do with shared

25    services.  Discussing Mr. Dondero's interest in the UBS appeal

65

1  of Acis or the potential appeal of HarbourVest's settlement

2  agreement has absolutely nothing to do with shared services.

3  Asking Mr. Dondero to provide leadership in the coordination

4  of his counsel has nothing to do with shared services.  Talk

5  -- telling Mr. Seery about no Dugaboy without a subpoena, what

6  does that have to do with shared services?  Dugaboy doesn't

7  have a shared services agreement.  There is nothing that fits

8  into the exception.

9       Mr. Wilson talks about the footnote.  We want -- I wrote

10  that footnote, okay, and I wanted to make it clear that this

11  injunction would not permit him -- would not prohibit him from

12  seeking relief before Your Honor.  And that's all it says.  It

13  doesn't say that he can communicate with the Debtor's

14  employees about these things.  It says for the avoidance of

15  doubt because I didn't -- I didn't think it would be

16  appropriate, I didn't think it would be proper to clip his

17  wings and prevent him from coming to the Court to seek relief.

18  He could come to the Court to seek relief.  What he can't do

19  is call up the Debtor's general counsel and say hey, I need a

20  witness to testify on my behalf.  That's not what the footnote

21  -- that's not what the footnote says, Your Honor.  It says he

22  can come to this Court or to seek judicial relief upon proper

23  notice.

24       I mean, certainly have no notice that Mr. Ellington was

25  identifying witnesses who would testify against the Debtor.

1    Had -- Mr. Seery testified to, to that.  That's in the record.

2    That if he knew that was happening, he would have fired them

3    on the spot.

4         So, there's no exception.  None of this stuff falls into

5    any -- the one exception is shared services.  Yes, there's a

6    shared services agreement.  Yes, it includes provision of

7    legal services.  But none of these communications have

8    anything to do with that.

9         Mr. Wilson has made no attempts -- he never put one of the

10   communications in front of Your Honor.  He never had Mr.

11   Dondero try to explain how any particular communication

12   related to shared services, because they can't.  They just

13   can't.  So they say, oh, well, there is a shared services

14   agreement, and so -- or, he was talking about settlement

15   counsel.  They knew -- here's -- we have the consciousness of

16   guilt that I mentioned earlier.  We know that Mr. Dondero

17   didn't think these communications would ever see the light of

18   day because he expressed surprise that his privileged

19   communications were up on the screen.  That's the tell.  If

20   you play poker, Your Honor, that's the tell.  He tipped his

21   hand and he gave me the signal, I didn't think anybody was

22   going to see this stuff because I'm really mad that my

23   privileged communications are out there.  But he shared them

24   with Mr. Ellington.  That's number one.

25        And number two, Mr. Dondero and his lawyers knew how to

1   get -- knew how to seek clarification if they thought there

2   was any ambiguity.  And how do we know that?  Because at

3   Docket No. 24 they filed a motion, and the motion was to

4   clarify the TRO in order to permit Mr. Dondero to speak

5   directly with board members about the pot plan.  He wanted the

6   permission, he wanted it to be clear that he had the right to

7   talk to the independent directors about the pot plan.  That

8   can be found at Exhibit 24.  But a week later or six days

9   later, at Docket No. 29, he withdrew that motion.

10   So he knew that if he was confused about what this allowed

11   and what it didn't allow, he knew he could make a motion.

12   There was absolutely nothing preventing him or his lawyers

13   from coming to the Debtor and saying look, there's a blanket

14   prohibition against shared services, can we still talk to Mr.

15   Ellington about settlement?  Nothing prevented him from doing

16   that.

17   But here's the kicker.  Number three.  What do any of

18   these communications have to do with settlement?  There's not

19   a settlement proposal.  There's not a request for information

20   about the settlement.  They have nothing to do with

21   settlement.  This is Mr. Dondero trying to say Scott Ellington

22   had to know everything I thought about every issue in this

23   case.

24   I mean, if Your Honor buys that, then we've wasted many,

25   many, many, many, many hours of time and hundreds of thousands

1    of dollars on this process, if he can just say, I'm basically

2    allowed to talk to Scott Ellington about anything because it's

3    in my head and I want to try to settle the case and therefore

4    I can share it with Scott Ellington.

5        Number one, there's nothing in the order that allows him

6    to talk to Scott Ellington about settlement.  Number two,

7    there's nothing on the face of any of these communications

8    that are about settlement.  And number three, again,

9    consciousness of guilt.  He was shocked that his privileged

10    communications were disclosed.  He thought he could share them

11    with Mr. Ellington but not with you and not with me and not

12    with Mr. Seery.

13        I have nothing further.

14            THE COURT:  All right.

15            MR. WILSON:  May I respond to that, Your Honor?

16            THE COURT:  Um, --

17            MR. WILSON:  Just briefly.

18            THE COURT:  Briefly.

19            MR. WILSON:  Yeah.  So, I pointed you to Exhibits 1

20    and 2 in the -- in the Dondero exhibits.

21            THE COURT:  The shared services agreements.

22            MR. WILSON:  Those exhibits are --

23            THE COURT:  The shared services agreements.

24            MR. WILSON:  That's correct.  Those --

25            THE COURT:  Uh-huh.

69

1          MR. WILSON:  That's correct.  Those two shared

2     services agreements relate to Exhibits 4 and 5, which show

3     that those agreements were in place up until they were

4     terminated by the Debtor effective January 31, 2021.

5          The next point I'd make is that the order itself says

6     specifically relates to shared services.  And those shared

7     services agreements are drafted very broadly.  They talk about

8     legal compliance and risk analysis, and one of them says

9     assistance with advice with respect to legal issues,

10    litigation support, management of outside counsel, compliance

11    support, and implementation and general risk analysis.  The

12    other agreement just says legal services.

13         But the agreements themselves were drafted very broadly

14    and intended to cover a large array of services to be

15    provided, because the parties receiving the services in these

16    agreements did not provide any of their own accountants or any

17    of their own lawyers or any of their own back office people or

18    any of their own various other providers that are covered by

19    these agreements.  And so, therefore, over the years that

20    these agreements were in place, Mr. Dondero was used to going

21    to his lawyers, which were both employees of Highland and

22    employees of the Advisors under these agreements, for

23    compliance purposes, and he was able to talk to them about all

24    of these various issues.  And so if on December 10th Mr. --

25    and accountants as well.

1      Mr. Dondero then on December 10th was prohibited from

2  doing certain things, with the exception of items that

3  specifically relate to shared services.  So my argument would

4  be that Mr. Dondero did not know whether he could talk to

5  these people or not under the Court's order because the order

6  was not clear and specific enough.

7      If these agreements broadly covered legal services and

8  accounting services, and Mr. Dondero was free to talk to these

9  people whenever he wants before the order, but then the order

10  creates a carve-out for talking about anything specifically

11  relating to the shared services, that broadly does cover legal

12  and accounting, and the people he's accused of talking to in

13  violation of the TRO are lawyers and accountants.

14          THE COURT:  All right.  Here's my last question.

15  With regard to the trespassing argument, as I understand it,

16  we're talking about December 14th and January 5th, two times,

17  both of which --

18          MR. MORRIS:  Your Honor, if I may, I really apologize

19  for interrupting, but that's not -- that's not accurate.

20          THE COURT:  Okay.

21          MR. MORRIS:  As I brought out in the questioning

22  yesterday, the Debtor had no problem with Mr. Dondero being in

23  their offices on December 14th.

24          THE COURT:  Okay.

25          MR. MORRIS:  Okay?  What happened was it was a change

1  because the Debtor exercised control over its property in its

2  letter of December 23rd when it evicted Mr. Dondero from its

3  premises and informed him in writing that any entry by him in

4  the future would be deemed a trespass.  So we take no issue --

5          THE COURT:  Okay.

6          MR. MORRIS:  -- and have no quarrel with December

7  14th.

8          THE COURT:  Okay.  I'm glad I asked.  I was

9  forgetting that train of event, chain of events.

10     All right.  So we're just talking about the January 5th

11  occasion where he came onsite for a deposition, correct, Mr.

12  Morris?

13          MR. MORRIS:  Yes, Your Honor.

14          THE COURT:  All right.  Do we have any evidence of

15  that, other than, I guess, the testimony that is relevant for

16  me to consider -- and this is to you, but it's especially

17  going to be to Mr. Wilson, because I heard some testimony of

18  Mr. Dondero:  oh, look, I've got a calendar invite, or I don't

19  know if he looked at his phone or was just recalling he had a

20  calendar invite from someone on behalf of the Debtor saying,

21  Go to the Highland conference room.  Do I have any evidence of

22  that calendar invite or any other evidence that is in the

23  record you think I need to focus on?

24          MR. WILSON:  Your Honor, we did not admit the

25  calendar invite into the record, although we could do so.  Mr.

 1   Dondero, you know, testified about it, but the testimony he

 2   gave was that someone from the Highland legal department named

 3   Sarah Goldsmith sent him a calendar invite for his deposition

 4   to appear the same way he did at the December 14th deposition.

 5           THE COURT:  Okay.  So we have just the testimony?

 6   Okay.

 7       Mr. Morris, anything further?

 8           MR. WILSON:  Your Honor, we'd be -- we'd be willing

 9   to supplement the record with the actual calendar invite.

10           THE COURT:  I'm not --

11           MR. WILSON:  We have it --

12           THE COURT:  We've already gone through that.

13           MR. WILSON:  -- on PDF.

14           THE COURT:  We've already gone through that.  I'm

15   just asking was it in there and I just missed it on Monday?

16   And the answer is no.

17       Any other evidence that I need to consider, you think, on

18   the trespassing issue that's in the record?

19           MR. WILSON:  Well, Your Honor, just that -- that, I

20   mean, as you pointed out earlier, the -- it's the evidence

21   that Mr. Dondero appeared in the Highland conference room on

22   December 14th, which was after the entry of the TRO, and if

23   that's not a violation of the TRO, then it can't be a

24   violation of the TRO on January 5th.

25           MR. MORRIS:  Your Honor, I do have evidence.

1              THE COURT:  Okay.  Tell me.

2              MR. MORRIS:  Okay.  So this would be at Exhibit --

3     Exhibit 36, which is the transcript of the preliminary

4     injunction hearing, at Page 70, beginning at Line 20.  I asked

5     the following questions and got the following answers:

6     Question, "You did not have the Debtor's approval to enter

7     their offices on Tuesday to give your deposition, correct?"

8     Answer, "No."  "You did not even bother to ask the Debtor for

9     permission, correct?"  Answer, "I'm prohibiting -- I'm

10    prohibited from contacting them, so, no, I did not."

11             THE COURT:  Okay.

12             MR. MORRIS:  So, he was in the offices.  He didn't

13    have approval.  He didn't obtain consent.  He didn't seek

14    consent.  That's his unambiguous testimony at Page 70, Line

15    22, continuing on through Page 71, Line 2.

16             THE COURT:  All right.  Thank you.

17        All right.  Well, I'm going to wrap it up here.  This

18    obviously warrants very careful consideration of the evidence,

19    and so I'm going to take under advisement this matter and get

20    you out a detailed written ruling as soon as I can get it out.

21    So you'll be expecting something from me, again, detailed, in

22    writing, in the hopefully very near future.

23        All right.  If there's nothing else, we're adjourned.

24             MR. MORRIS:  Thank you, Your Honor.

25             MR. WILSON:  Thank you, Your Honor.

74

1          THE CLERK:  All rise.

2          MR. POMERANTZ:  Thank you, Your Honor.

3       (Proceedings concluded at 11:27 a.m.)

4                        --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                              **03/25/2021**

24   _____        _____
Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

75

INDEX

PROCEEDINGS                                              3

WITNESSES

-none-

EXHIBITS

Debtor's Exhibit 3                            Withdrawn 20

CLOSING ARGUMENTS

- By Mr. Morris                                         22
- By Mr. Wilson                                         34
- By Mr. Morris                                         49

RULINGS

Defendant's Motion to Reopen Evidence - *Denied*        17
Show Cause - *Taken Under Advisement*                   73

END OF PROCEEDINGS                                      74

INDEX                                                   75

# EXHIBIT 42

## Bankruptcy Litigation [L430]

| 11/03/2020 | LSC | BL | Retrieve appendices regarding Daugherty motion and prepare file for attorney review. | 0.40 | 425.00 | $170.00 |
|---|---|---|---|---|---|---|
| 11/06/2020 | RMP | BL | Conference with I. Kharasch re UBS. | 0.20 | 1445.00 | $289.00 |
| 11/07/2020 | LSC | BL | Retrieve exhibits in connection with Daugherty 3018 motion and opposition to summary judgment for E. Wagner (.5). | 0.50 | 425.00 | $212.50 |
| 11/09/2020 | LSC | BL | Retrieve exhibits for H. Winograd in connection with 3018 pleadings. | 0.30 | 425.00 | $127.50 |
| 11/18/2020 | RMP | BL | Conferences with I. Kharasch re plan and litigation issues. | 0.40 | 1445.00 | $578.00 |
| 11/20/2020 | RMP | BL | Conferences with J. Pomerantz and I. Kharasch re UBS and other claim issues. | 0.40 | 1445.00 | $578.00 |
| 12/01/2020 | JAM | BL | Review e-mails re: document production (0.3); telephone conference with J. Romey, T. Jeremiassen re: document production (financial documents) (0.4); telephone conference with T. Jeremiassen, J. Romey, P. Montgomery, C. Rognes, FTI re: document production (financial documents) (0.6); e-mail to J. Seery re: Daugherty?s Delaware II case (0.1); e-mails with J. Kane, I. Leventon, S. Vitiello, DSI re: Grant Scott e-mails (0.2); communications with J. Seery, Z. Annable, J. Pomerantz, I. Kharasch, G. Demo re: Daugherty motion to lift the automatic stay (0.2); review Daugherty motion to lift the automatic stay (0.4); review/revise letter to K&L Gates re: Dondero (0.4). | 2.60 | 1075.00 | $2,795.00 |
| 12/01/2020 | GVD | BL | Multiple conferences with J. Morris and J. Romey re discovery issues (0.5); correspondence with J. Seery re potential structured products issues (0.6); review correspondence re CLO issuers and next steps (0.2); review cease and desist letters (0.5) | 1.80 | 825.00 | $1,485.00 |
| 12/02/2020 | KKY | BL | Draft 3rd removal extension motion | 0.60 | 425.00 | $255.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/02/2020 | JAM | BL | Review/revise cease and desist letter to KL &Gates re: CLO investment decisions (0.2); e-mails with J. Seery, G. Demo re: revised letter to K&L Gates (0.1); e-mails with M. Hankin, G. Demo, E. Wagner re: appellate record for UBS appeal of Redeemer 9019 order (0.1); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: demands for payment on Promissory Notes and related matters (0.8). | 1.20 | 1075.00 | $1,290.00 |
| 12/02/2020 | LSC | BL | Prepare and transmit document production to Committee. | 0.50 | 425.00 | $212.50 |
| 12/02/2020 | GVD | BL | Review revisions to cease and desist letter | 0.30 | 825.00 | $247.50 |
| 12/03/2020 | IDK | BL | Review of numerous correspondence with J Morris, I Leventon, CEO on issues of production of certain docs to UCC and related Dugaboy issues (.2); Review of related correspondence with J Morris, Klos, re UCC discovery and next steps, as well as further production issues (.1). | 0.30 | 1145.00 | $343.50 |
| 12/03/2020 | IDK | BL | E-mails to J Morris, J. Pomerantz re cease and desist letter to NextPoint (.1); E-mails to G Demo re CLO issuers and Dondero communication to same (.1). | 0.20 | 1145.00 | $229.00 |
| 12/03/2020 | IDK | BL | E-mails to G Demo re revised draft cease and desist letter to Dondero, including review of same, and J Morris markup (.2); E-mails to J Morris re his markup of same and my feedback, and next steps (.2). | 0.40 | 1145.00 | $458.00 |
| 12/03/2020 | JNP | BL | Conference with J. Dubel regarding Dondero actions, response thereto and other issues. | 0.50 | 1075.00 | $537.50 |
| 12/03/2020 | JNP | BL | Review email regarding Committee request for discovery. | 0.10 | 1075.00 | $107.50 |
| 12/03/2020 | JNP | BL | Conference with Gregory V. Demo, John A. Morris and Ira D. Kharasch regarding Dondero conduct and next steps. | 0.50 | 1075.00 | $537.50 |
| 12/03/2020 | JNP | BL | Conference with John A. Morris regarding Dondero conduct and letter. | 0.10 | 1075.00 | $107.50 |
| 12/03/2020 | JNP | BL | Conference with Gregory V. Demo (2x) regarding letter to Dondero. | 0.30 | 1075.00 | $322.50 |
| 12/03/2020 | JNP | BL | Review letter to Dondero regarding interference. | 0.10 | 1075.00 | $107.50 |
| 12/03/2020 | JNP | BL | Conference with J. Seery regarding Dondero conduct and call with M. Lynne (2x). | 0.30 | 1075.00 | $322.50 |
| 12/03/2020 | JNP | BL | Emails with M. Lynne regarding call. | 0.10 | 1075.00 | $107.50 |
| 12/03/2020 | JNP | BL | Conference with Ira D. Kharasch and M. Lynne | 0.30 | 1075.00 | $322.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | regarding call to discuss concerns with Dondero conduct. | | | |
| 12/03/2020 | RMP | BL | Conference with I. Kharasch and review agreements. | 0.60 | 1445.00 | $867.00 |
| 12/03/2020 | JAM | BL | Telephone conference with T. Jeremiassen, J. Romey re: status of document production (0.2); e-mails with I. Leventon, S. Vitiello, T. Jeremiassen, J. Romey re: Dugaboy documents (0.2); e-mails with J. Seery, J. Pomerantz, I. Kharasch, G. Demo re: document production issues (0.2); e-mail to I. Leventon, S. Vitiello, T. Jeremiassen, J. Romey re: text messages/cell phones (0.1); review of record for UBS appeal for Redeemer Rule 9019 motion (2.4); e-mails w/ Z. Annable re: counter-designations for UBS appeal of Redeemer Rule 9019 order (0.1); telephone conference with M. Hankin re: potential counter-designations for UBS appeal of Redeemer Rule 9019 order (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo (partial) re: Dondero threats and related conduct (0.4); revise letter to M. Lynn re: Dondero threats and related conduct (0.2). | 4.00 | 1075.00 | $4,300.00 |
| 12/03/2020 | LSC | BL | Prepare and transmit document production to Committee. | 0.50 | 425.00 | $212.50 |
| 12/03/2020 | GVD | BL | Revise and send cease and desist letter to K&L Gates (0.6); conference with J. Morris re litigation strategy (0.3); multiple correspondence with B. Assink re Dondero claims (0.5); conference with H. O'Neill re Foley proof of claim (0.1); conference re potential CLO issues (0.8); conference with J. Pomerantz re cease & desist letters (0.2); revise additional cease & desist letter re comments from J. Pomerantz (0.5); conference with K&L Gates re cease and desist letter (0.5); conference with J. Pomerantz, I. Kharasch, and J. Morris re potential litigation issues (partial attendance) (0.3); conference with J. Romey re discovery issues (0.2) | 4.00 | 825.00 | $3,300.00 |
| 12/04/2020 | IDK | BL | E-mails with attorneys re my recommendations on steps re injunction action vs Dondero (.2); E-mails to attorneys re draft of cease and desist letter vs Dondero, including feedback from Board, others re same, and re timing and status on same (.3); Review of revised and then finalized letter re same (.1). | 0.60 | 1145.00 | $687.00 |
| 12/04/2020 | IDK | BL | Consider Stern issues re actions vs Dondero on notes (.2); E-mails to J. Pomerantz re anticipated collection action vs Dondero and Stern issues (.1); Numerous E-mails with G Glazer re same, jurisdictional concerns, initial feedback on turnover | 0.70 | 1145.00 | $801.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | of assets as core proceeding, and need for memo for Board (.4). | | | |
| 12/04/2020 | IDK | BL | Review of various E-mails with CEO, J Morris on update on discovery issues with UCC and next steps. | 0.10 | 1145.00 | $114.50 |
| 12/04/2020 | JNP | BL | Conference with Latham, Elissa A. Wagner and Robert J. Feinstein regarding UBS summary judgment order. | 0.60 | 1075.00 | $645.00 |
| 12/04/2020 | JNP | BL | Conference with J. Dubel regarding Dondero litigation. | 0.20 | 1075.00 | $215.00 |
| 12/04/2020 | JAM | BL | Revise letter to M. Lynn re: Dondero business interference (0.1); draft letter to M. Lynn re: Dondero threats to J. Seery (0.5); e-mails with Board, J. Pomerantz, I. Kharasch, G. Demo re: letter to M. Lynn concerning Dondero threats to J. Seery (0.2); e-mails with I. Leventon re: production of valuation report (0.1); revise letter to M. Lynn concerning Dondero threats to J. Seery (0.1); e-mail to J. Pomerantz, I. Kharasch, G. Demo re: Disclosure of Interested Parties for UBS appeal of Redeemer Rule 9019 motion (0.1); telephone conference with R. Patel re: indemnification claim relating to Acis and NWCC (0.2); telephone conference with G. Demo re: litigation matters (0.2); telephone conference with J. Seery re: discovery issues (0.4); telephone conference with J. Romey re: document production issues (0.2); e-mails to J. Seery, J. Pomerantz, I. Kharasch, G. Demo re: discovery issues (0.3); e-mail to UCC counsel re: document production (0.1). | 2.50 | 1075.00 | $2,687.50 |
| 12/04/2020 | GIG | BL | Multiple emails with Ira D. Kharasch re jurisdiction issue | 0.30 | 895.00 | $268.50 |
| 12/04/2020 | GIG | BL | Research re bankruptcy court jurisdiction over note claims | 3.60 | 895.00 | $3,222.00 |
| 12/04/2020 | GVD | BL | Correspondence with Board re cease & desist letters (0.1); attend to matters re service of cease and desist letters (1.2); conference with J. Morris re litigation strategy (0.3) | 1.60 | 825.00 | $1,320.00 |
| 12/05/2020 | IDK | BL | Telephone conferences with J Morris re logistics of preparing injunction papers vs Dondero, issues on potential other defendants, this weekend to file Sunday night (.2); E-mails to J. Pomerantz re same and consider (.2); E-mails to J Morris, others re his draft order re same and list of tasks for motion, TRO re same, further issues (.3). | 0.70 | 1145.00 | $801.50 |
| 12/05/2020 | JEO | BL | Initial drafting of complaint for injunctive relief against James Dondero | 3.00 | 925.00 | $2,775.00 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/05/2020 | JAM | BL | Work on Seery affidavit in support of TRO against Dondero (3.7); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, J. O?Neill re: complaint and TRO against Dondero (0.3); telephone conference I. Kharasch re: complaint and TRO against Dondero (0.1); telephone conference with G. Demo re: complaint and TRO against Dondero (0.1); telephone conference J. O?Neill re: complaint and TRO against Dondero (0.1). | 4.30 | 1075.00 | $4,622.50 |
| 12/05/2020 | GIG | BL | Research re bankruptcy court jurisdiction over note claims | 2.20 | 895.00 | $1,969.00 |
| 12/05/2020 | GVD | BL | Conference with J. Morris re litigation strategy (0.2); draft insert to J. Seery declaration (1.4); conference with J. Seery re litigation issues and next steps (0.5) | 2.10 | 825.00 | $1,732.50 |
| 12/06/2020 | IDK | BL | E-mails to attorneys re draft of CEO declaration in support of TRO vs Dondero, including brief review of same, and feedback on same from CEO (.2); Review of revised motion papers and declaration (.2); E-mail and telephone conference with J. Pomerantz re same and re other related motions vs Dondero and CLO noteholders issues (.3). | 0.70 | 1145.00 | $801.50 |
| 12/06/2020 | JNP | BL | Conference with Board, John A. Morris, H. Winograd and Gregory V. Demo regarding Dondero litigation. | 1.00 | 1075.00 | $1,075.00 |
| 12/06/2020 | JNP | BL | Review J. Seery Declaration regarding Dondero litigation. | 0.20 | 1075.00 | $215.00 |
| 12/06/2020 | JEO | BL | Drafting ancillary documents for complaint for injunctive relief against James Dondero | 2.50 | 925.00 | $2,312.50 |
| 12/06/2020 | JAM | BL | Complete/review/revise J. Seery declaration in support of TRO (2.9): e-mails to J. Pomerantz, I. Kharasch, G. Demo, J. O'Neill, H. Winograd re: revised versions of the Seery declaration (0.3); e-mails to G. Demo, H. Winograd, L. Canty re: exhibits to J. Seery declaration (0.5); further revisions to J. Seery declaration in support of TRO (1.3); e-mails to Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: J. Seery declaration, proposed order on TRO, and revisions thereto (0.2); e-mail to Z. Annable re: potential counter-designations concerning Dondero's appeal of Acis Rule 9019 order (0.2); further revisions to Seery declaration in light of comments received from J. Seery and J. Dubel (0.2); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised Seery declaration (0.1); e-mails with J. O'Neill, H. Winograd re: status of Complaint against | 6.90 | 1075.00 | $7,417.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Dondero and related matters (0.1); e-mail to J. O'Neill, H. Winograd, L. Canty re: status, filings (0.1) ; telephone conference with J. Seery, J. Dubel, R. Nelms, J. Pomerantz, G. Demo, H. Winograd (partial participation) re: Dondero filings, Daugherty settlement, and related matters (1.0). | | | |
| 12/06/2020 | GVD | BL | Review Seery declaration (0.7); conference with Board re potential litigation issues (1.0) | 1.70 | 825.00 | $1,402.50 |
| 12/06/2020 | HRW | BL | Draft MOL and Complaint in support of application for TRO (10.0); Call with J. Morris, J. Pomerantz, G. Demo, and client re: Dondero issues and TRO (0.5). | 10.50 | 625.00 | $6,562.50 |
| 12/07/2020 | IDK | BL | E-mails with Board, J Morris re draft complaint vs Dondero, including brief review of same, and feedback from CEO (.3); E-mails with attorneys re need to contact UCC re upcoming complaint vs Dondero, and feedback from CEO re same (.1); E-mails with Board, attorneys re draft of motion in support of TRO vs Dondero, and need for substantial revisions, including review of same, and further changes to complaint, as well as motion for expedited hearing (.4); Review briefly correspondence with local counsel on filing such documents and questions on verified complaint (.1). | 0.90 | 1145.00 | $1,030.50 |
| 12/07/2020 | IDK | BL | E-mails with attorneys re filing of complaint/TRO vs Dondero and next steps, including communications with Lynn. | 0.20 | 1145.00 | $229.00 |
| 12/07/2020 | IDK | BL | Telephone conference with J. Pomerantz re his call with Lynn on Dondero (.1); Attend conference call with Board on complaint vs Dondero and communications with Dondero counsel re same (.5); Telephone conference with J. Pomerantz re his next call with Lynn re same (.1). | 0.70 | 1145.00 | $801.50 |
| 12/07/2020 | IDK | BL | E-mails with G Glazer on status of Stern issues re demand note litigation vs Dondero related entities. | 0.10 | 1145.00 | $114.50 |
| 12/07/2020 | JNP | BL | Review complaint and TRO against Dondero. | 0.20 | 1075.00 | $215.00 |
| 12/07/2020 | JNP | BL | Conference with John A. Morris regarding complaint and TRO against Dondero. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | JNP | BL | Conference with M. Clemente regarding complaint and TRO against Dondero. | 0.20 | 1075.00 | $215.00 |
| 12/07/2020 | JNP | BL | Conference with J. Dubel regarding complaint against Dondero. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | JNP | BL | Email to M. Lynn regarding Complaint and TRO. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | JNP | BL | Conference with John A. Morris regarding Dondero | 0.30 | 1075.00 | $322.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Complaint and TRO (multiple). | | | |
| 12/07/2020 | JNP | BL | Conference with John A. Morris in preparation for call with M. Lynn regarding Dondero complaint. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | JNP | BL | Conference with John A. Morris  and M. Lynn regarding Dondero complaint and TRO (2x). | 0.60 | 1075.00 | $645.00 |
| 12/07/2020 | JNP | BL | Email to Board regarding call to discuss call with M. Lynn regarding Dondero complaint. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | JNP | BL | Conference with Board and PSZJ regarding debrief of call with M. Lynn regarding Dondero complaint. | 0.50 | 1075.00 | $537.50 |
| 12/07/2020 | JNP | BL | Email to John A. Morris regarding proposed email to local counsel regarding TRO. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | JNP | BL | Conference with Ira D. Kharasch regarding call with M.Lynn. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | JNP | BL | Review email regarding CLOs; Conference with Gregory V. Demo and Ira D. Kharasch regarding same. | 0.30 | 1075.00 | $322.50 |
| 12/07/2020 | JNP | BL | Conference with J. Dubel regarding UBS (2x). | 0.50 | 1075.00 | $537.50 |
| 12/07/2020 | JNP | BL | Conference with Robert J. Feinstein regarding UBS. | 0.10 | 1075.00 | $107.50 |
| 12/07/2020 | RMP | BL | Conference with I. Kharasch re claims status. | 0.30 | 1445.00 | $433.50 |
| 12/07/2020 | JEO | BL | Emails with PSZJ team re new adv proceeding against James Dondero | 0.40 | 925.00 | $370.00 |
| 12/07/2020 | JMF | BL | Review complaint re Dondero and prohibited actions. | 0.40 | 925.00 | $370.00 |
| 12/07/2020 | JAM | BL | Review/revise Complaint, Memorandum of Law, Seery Declaration, proposed Order, Emergency Motion and Motion for TRO in connection action against James Dondero (7.9); review/revise Motion for Expedited Hearing (0.2); communications with Z. Annable re: Motion for Expedited Hearing (0.1); telephone conference with J. Pomerantz, M. Lynn re: ?meet and confer? on injunction papers (0.3); telephone conference with Board, J. Pomerantz, G. Demo, H. Winograd re: action against James Dondero (0.4); communications with H. Winograd, Z. Annable, M. Heyward re: preparation of papers to be filed against James Dondero (0.6); communications with J. Pomerantz re: papers to be filed against James Dondero (0.4); communications with G. Demo re: papers to be filed against James Dondero (0.3); telephone conference with J. Pomerantz, M. Lynn re: ?meet and confer? on injunction papers (0.2); telephone conference with J. Kathman re: Daugherty litigation and settlement | 11.50 | 1075.00 | $12,362.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | matters (0.4); telephone conference with G. Demo re: litigation matters (0.1); telephone conference with J. Pomerantz re: litigation matters (0.2); review Adversary Cover Sheet and communications with Z. Annable, J. Pomerantz re: same (0.1); e-mail to J. Pomerantz re: Dondero compliance with January 9, 2020, Order (0.3). |  |  |  |
| 12/07/2020 | GIG | BL | Research re bankruptcy court jurisdiction over note claims | 5.50 | 895.00 | $4,922.50 |
| 12/07/2020 | GIG | BL | Research re bankruptcy court jurisdiction over note claims | 4.30 | 895.00 | $3,848.50 |
| 12/07/2020 | GVD | BL | Attend to issues re Dondero TRO (2.2); conference with J. Seery re Dondero TRO (0.3); attend Board call re Dondero issues (0.4); conference with J. Morris re litigation strategy (0.1) | 3.00 | 825.00 | $2,475.00 |
| 12/07/2020 | HRW | BL | Edit and review Complaint, Memorandum of Law, Seery Declaration, proposed Order, Emergency Motion and Motion for TRO in connection action against James Dondero (8.5); Call with Board, J. Pomerantz, G. Demo J. Morris re: action against James Dondero (0.4); Communications with J. Morris, Z. Annable, M. Heyward re: preparation of papers to be filed against James Dondero (0.6). | 9.50 | 625.00 | $5,937.50 |
| 12/08/2020 | IDK | BL | Attend conference call on TRO papers (.4); E-mails with J Morris re court?s setting of hearing on same (.1). | 0.50 | 1145.00 | $572.50 |
| 12/08/2020 | IDK | BL | E-mail to Board, J. Pomerantz re Dondero counsel?s comments to proposed TRO, including review of same, as well as separate communication from Dondero personally re his text/threat (.2); E-mails with Board, J Morris, others re proposed markup to TRO in light of Lynn?s feedback re same, including review of same, and comments/feedback re same (.3); Review of correspondence with Lynn re our demand for permanent injunction, and Lynn response (.1). | 0.60 | 1145.00 | $687.00 |
| 12/08/2020 | IDK | BL | E-mails with J Fried re his comments to draft of removal motion, and my feedback re same, including review of same and draft motion. | 0.30 | 1145.00 | $343.50 |
| 12/08/2020 | JNP | BL | Email to and from M. Hankin regarding TRO hearing on Dondero matter. | 0.10 | 1075.00 | $107.50 |
| 12/08/2020 | JNP | BL | Review email from B. Assink and email to Board regarding proposed modifications to TRO. | 0.10 | 1075.00 | $107.50 |
| 12/08/2020 | JNP | BL | Conference with Gregory V. Demo, John A. Morris and Ira D. Kharasch regarding Dondero TRO | 0.40 | 1075.00 | $430.00 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027  - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | changes requested. | | | |
| 12/08/2020 | JNP | BL | Conference with J. Dubel regarding TRO against Dondero. | 0.10 | 1075.00 | $107.50 |
| 12/08/2020 | JNP | BL | Review revised Injunction Order. | 0.10 | 1075.00 | $107.50 |
| 12/08/2020 | JNP | BL | Emails to and from M. Lynne regarding TRO. | 0.20 | 1075.00 | $215.00 |
| 12/08/2020 | JNP | BL | Review Motion for Temporary Restraining Order by CLOs regarding sales and emails regarding same. | 0.20 | 1075.00 | $215.00 |
| 12/08/2020 | RMP | BL | Conference with J. Pomerantz and I. Kharasch re Dondero issues and review e-mails re same. | 0.60 | 1445.00 | $867.00 |
| 12/08/2020 | JMF | BL | Review and comment re removal extension motion. | 0.80 | 925.00 | $740.00 |
| 12/08/2020 | JAM | BL | Telephone conference with J. Seery re: Dondero motion and related matters (0.2); telephone conference with J. Seery, G. Demo, Kasowitz attorney re: potential litigation (0.5); telephone conference with T. Jeremiassen, J. Romey re: document production (0.1); e-mails w/ P. Montgomery, C. Rognes re: document production (0.1); telephone conference with P. Montgomery, C. Rognes re: document production (0.3); telephone conference with G. Demo re: CLO/Dondero litigation matters (0.3); e-mails with J. Kathman re: Daugherty litigation and related matters (0.3); e-mail to L. Drawhorn, G. Demo re: SE Multifamily scheduling order (0.1); e-mail to S. Tomkowiak, J. Pomerantz, A. Clubok re: UBS record on appeal (0.1); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: ?as filed? papers concerning Dondero (0.1); review amended Memorandum of Law on Dondero TRO motion (0.2); e-mails with H. Winograd re: amended Memorandum of Law on Dondero TRO motion (0.2); e-mail to M. Katz, C. Woods re: Daugherty litigation issues (0.2); e-mail to K. Lee, J. O'Neill, J. Fried re: litigation scheduling matters (0.1); e-mail to Z. Annable re: amended Memorandum of Law on Dondero TRO motion (0.1); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: M. Lynn's comments to proposed Order resolving Dondero TRO (0.4); review/revise proposed Order resolving Dondero litigation (0.5); e-mails re: J. Pomerantz re: revisions to proposed Order resolving Dondero litigation (0.1); further revisions to proposed Order resolving Dondero litigation (0.2); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised proposed Order resolving Dondero litigation (0.2); review draft notice re: hearing on TRO motion (0.1); communications with Z. Annable | 4.50 | 1075.00 | $4,837.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | re: draft notice for TRO motion (0.1); | | | |
| 12/08/2020 | GIG | BL | Research re bankruptcy court jurisdiction over note claims | 1.20 | 895.00 | $1,074.00 |
| 12/08/2020 | GIG | BL | Prepare memo re jurisdiction issue | 6.90 | 895.00 | $6,175.50 |
| 12/08/2020 | GIG | BL | Emails Ira D. Kharasch re jurisdiction memo | 0.10 | 895.00 | $89.50 |
| 12/08/2020 | GVD | BL | Review discovery related to UBS litigation | 1.10 | 825.00 | $907.50 |
| 12/08/2020 | GVD | BL | Review Dondero motion re 363 and respond to same | 2.00 | 825.00 | $1,650.00 |
| 12/08/2020 | GVD | BL | Conference with PSZJ team re Dondero TRO | 0.40 | 825.00 | $330.00 |
| 12/08/2020 | GVD | BL | Conference with J. Morris re bankruptcy strategy | 0.40 | 825.00 | $330.00 |
| 12/08/2020 | HRW | BL | Edit and review Memorandum of Law in Support of TRO against Dondero (2.0). | 2.00 | 625.00 | $1,250.00 |
| 12/09/2020 | IDK | BL | Review of new motion by NPA re motion to stop CLOs from selling assets, and consider response (.3); Numerous E-mails with attorneys re basis of same and next steps to respond, as well as need for call on Dondero motion (.2); Attend conference call with J. Pomerantz, others, on new litigation from CLO, demand note upcoming litigation, Debtors? TRO litigation vs Dondero, others, Daugherty, Hunter Mountain, and other (.8). | 1.30 | 1145.00 | $1,488.50 |
| 12/09/2020 | IDK | BL | E-mails with CEO and attorneys re CLO litigation and retention of Kasowitz, and correspondence with Wilmer Hale re same, as well as correspondence with CLO issuers on supporting our position vs NPA, and our position on expedited hearing (.3); Review of correspondence with local counsel re our position to chambers re not consenting to NPA motion for expedited hearing, and feedback from chambers (.2). | 0.50 | 1145.00 | $572.50 |
| 12/09/2020 | IDK | BL | Various E-mails with attorneys re communications with Lynn re issues on form of TRO and need for permanent injunction language and their disagreement, as well as need for indemnity for damages if sales not occurring (.2); Numerous E-mails with CEO and attorneys re further markup of draft order re Dondero TRO and timing for Board (.2). | 0.40 | 1145.00 | $458.00 |
| 12/09/2020 | IDK | BL | E-mails with G Demo re his correspondence with NPA re their motion to compel (.1); Numerous E-mails with CEO and attorneys re NPA?s counter to resolution of timing of expedited hearing re sale limitations in interim, and how to respond on limitations on trade issues, and my feedback on same (.3). | 0.40 | 1145.00 | $458.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/09/2020 | JNP | BL | Email to and from team regarding status of TRO Order. | 0.10 | 1075.00 | $107.50 |
| 12/09/2020 | JNP | BL | Email to M. Lynn enclosing Order on TR. | 0.10 | 1075.00 | $107.50 |
| 12/09/2020 | JNP | BL | Conference with PSZJ team regarding CLO litigation and other pending litigation. | 0.80 | 1075.00 | $860.00 |
| 12/09/2020 | JNP | BL | Conference with Gregory V. Demo, John A. Morris and KL Gates regarding scheduling hearing on NPA motion. | 0.20 | 1075.00 | $215.00 |
| 12/09/2020 | JNP | BL | Conference with John A. Morris after call with KL Gates. | 0.10 | 1075.00 | $107.50 |
| 12/09/2020 | JNP | BL | Conference with M. Clemente regarding Dondero TRO hearing. | 0.20 | 1075.00 | $215.00 |
| 12/09/2020 | JNP | BL | Review and respond to emails regarding hearing date for CLO litigation. | 0.10 | 1075.00 | $107.50 |
| 12/09/2020 | JNP | BL | Conference with John A. Morris regarding Dondero TRO hearing. | 0.30 | 1075.00 | $322.50 |
| 12/09/2020 | JNP | BL | Begin to review draft opposition to Dondero sale motion. | 0.10 | 1075.00 | $107.50 |
| 12/09/2020 | JNP | BL | Email to Board regarding  Dondero response to injunction. | 0.10 | 1075.00 | $107.50 |
| 12/09/2020 | RMP | BL | Conference with I. Kharasch re pending litigation issues. | 0.30 | 1445.00 | $433.50 |
| 12/09/2020 | JEO | BL | Review issues and scheduling re TRO for Dondero | 0.40 | 925.00 | $370.00 |
| 12/09/2020 | JMF | BL | Review motion for TRO. | 0.40 | 925.00 | $370.00 |
| 12/09/2020 | JMF | BL | Review HCMFA motion to restrict sales. | 0.50 | 925.00 | $462.50 |
| 12/09/2020 | JAM | BL | Review/analyze motion for TRO filed by NexPoint (0.6); e-mail to J. Pomerantz, I. Kharasch, G. Demo re: motion for TRO filed by NexPoint (0.1); review draft Notice of Adjournment for HarbourVest Rule 3018 hearing (0.1); communications with Z. Annable, E. Weinberger, D. Stroik re: Notice of Adjournment for HarbourVest Rule 3018 hearing (0.1); telephone conference with J. Seery, G. Demo, Quinn Emanuel re: potential engagement for CLO litigation (0.6); revise draft Order resolving Dondero injunction proceedings (0.1); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: TRO litigation matters (0.8); e-mails with Board, J. Pomerantz, I. Kharasch, G. Demo re: revised draft Order resolving Dondero injunction proceedings (0.1); e-mails with I. Leventon, S. Vitiello, T. Jeremiassen, J. Romey re: document production | 7.60 | 1075.00 | $8,170.00 |

**HIGHLY CONFIDENTIAL**                                                                                    **HCMLP 000750**

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | (0.1); telephone conference with I. Leventon re: document production, Daugherty litigation (0.3); draft Stipulation resolving Daugherty (second) Adversary Proceeding concerning stay extension (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo re: revised draft Order resolving Dondero injunction proceedings (0.1); prepare for TRO hearing (2.3); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, B. Sharp, T. Jeremiassen, J. Romey re: document production issues (0.3); e-mail to J. Kathman re: draft Stipulation resolving Daugherty (second) Adversary Proceeding concerning stay extension (0.1); review draft stipulation extending UCC deadline to commence an action against CLO HoldCo (0.1); e-mails with C. Rognes, P. Montgomery re: draft stipulation extending UCC deadline to commence an action against CLO HoldCo (0.1); e-mails with C. Rognes, P. Montgomery re: document production (0.1); telephone conference with J. Seery re: preparation for TRO hearing (0.5); telephone conference with J. Pomerantz re: preparation for TRO hearing (0.3). | | | |
| 12/09/2020 | GVD | BL | Draft response to Dondero 363 motion | 3.40 | 825.00 | $2,805.00 |
| 12/09/2020 | GVD | BL | Revise and circulate response to Dondero 363 re additional research | 2.40 | 825.00 | $1,980.00 |
| 12/09/2020 | GVD | BL | Conference with PSZJ litigation team re open litigation items | 0.80 | 825.00 | $660.00 |
| 12/09/2020 | GVD | BL | Conference with U. Itkin re CLO litigation issues | 0.60 | 825.00 | $495.00 |
| 12/09/2020 | GVD | BL | Conference with counsel to CLO issuers counsel re CLO litigation | 0.40 | 825.00 | $330.00 |
| 12/09/2020 | GVD | BL | Compile documents re CLO litigation issues | 0.20 | 825.00 | $165.00 |
| 12/09/2020 | GVD | BL | Conference with J. Seery re CLO litigation | 0.10 | 825.00 | $82.50 |
| 12/09/2020 | GVD | BL | Conference with counsel to CLO issuers re expedited hearing | 0.30 | 825.00 | $247.50 |
| 12/09/2020 | GVD | BL | Multiple conferences with J. Elkin re research issues | 0.60 | 825.00 | $495.00 |
| 12/09/2020 | JE | BL | Telephone conference with Mr. Demo regarding research issues in response to Dondero motion (.3); review Dondero motion; draft response and operations protocol (1.2); research issues relating to same as to property of estate, operations in the ordinary course of business and standing (4.8); review revised response (.5). | 6.80 | 1100.00 | $7,480.00 |
| 12/09/2020 | HRW | BL | PSZJ call re: litigation update (0.8). | 0.80 | 625.00 | $500.00 |
| 12/10/2020 | IDK | BL | Review and consider revised opposition to Dondero | 0.90 | 1145.00 | $1,030.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | 363 motion (.2); E-mails with G Demo re my extensive comments for changes to same, as well as feedback of others (.4); Further correspondence with attorneys on other issues to address in opposition to Dondero motion, including competitive bidding issues, Multi Strat sales re comp bidding and other examples (.3). | | | |
| 12/10/2020 | IDK | BL | Review of various revised oppositions to Dondero 363 motion, including J. Pomerantz revision to intro and my feedback re same (.3); E-mails with attorneys re Lynn  proposal on resolving 363 motion by agreement on no sales, and how to respond (.2); E-mails with J. Pomerantz re his draft response to Lynn re counter proposal, and feedback/changes of G Demo to same (.2);  Review of correspondence with Lynn re same and Lynn further counter-proposal re notice of sales, and intention to depose all 3 directors (.1); E-mails with Board and attorneys re same and how to respond, including CEO feedback on asset sale issues/procedure (.2). | 1.00 | 1145.00 | $1,145.00 |
| 12/10/2020 | IDK | BL | E-mails with J Morris re his draft notes on opening and other remarks for today?s upcoming hearing, including feedback of others (.3); Attend most of court hearing on motion for injunction against Dondero conduct (2.0); Office conference from J. Pomerantz re result of same and next steps for Dondero motion next week, and need for call re same (.2); Attend conference call with attorneys re same (.3). | 2.80 | 1145.00 | $3,206.00 |
| 12/10/2020 | IDK | BL | E-mails with DSI re NPA and DLA, and potential conflict issues given NPA motion (.1); Attend conference call with attorneys re K&L Gates motion for Nextpoint re CLOs (.4); Telephone conference with J. Pomerantz and RMP re Dondero hearing on TRO (.2); Telephone conference with J. Pomerantz re opposition to 363 motion (.1). | 0.80 | 1145.00 | $916.00 |
| 12/10/2020 | IDK | BL | Review of correspondence to Board, others re current issues on discovery with UCC. | 0.10 | 1145.00 | $114.50 |
| 12/10/2020 | IDK | BL | Review of correspondence with NPA counsel on their motion re CLO sales and discovery issues, as well as with Hayley re same (.2);  Review of Kasowitz outline of arguments vs NPA on its motion re CLO contracts/manager obligations, and consider (.2); Review briefly G Demo?s initial outline of argument for opposition to NPA motion (.1); E-mail to G Demo re his communication with CLO issuers re NPA motion and its role re same (.1). | 0.60 | 1145.00 | $687.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| Date | | | Description | Hours | Rate | Amount |
|------|------|------|-------------|-------|------|--------|
| 12/10/2020 | IDK | BL | E-mails with attorneys re revised removal motion and outstanding issues re same. | 0.20 | 1145.00 | $229.00 |
| 12/10/2020 | JNP | BL | Review and comment on John A. Morris argument notes. | 0.10 | 1075.00 | $107.50 |
| 12/10/2020 | JNP | BL | Conference with Ira D. Kharasch regarding opposition to Dondero ordinary course motion. | 0.10 | 1075.00 | $107.50 |
| 12/10/2020 | JNP | BL | Participate in Dondero injunction hearing. | 2.40 | 1075.00 | $2,580.00 |
| 12/10/2020 | JNP | BL | Conference with J. Dubel after Dondero injunction hearing. | 0.10 | 1075.00 | $107.50 |
| 12/10/2020 | JNP | BL | Conference with Ira D. Kharasch after Dondero injunction hearing. | 0.10 | 1075.00 | $107.50 |
| 12/10/2020 | JNP | BL | Conference with Wilmer Hale, Kasowitz, John A. Morris, H. Winograd and Gregory V. Demo regarding CLO motion. | 0.50 | 1075.00 | $537.50 |
| 12/10/2020 | JNP | BL | Conference with Gregory V. Demo, H. Winograd, Ira D. Kharasch and John A. Morris regarding planning for hearing in connection with CLO motion and Dondero ordinary course motion. | 0.40 | 1075.00 | $430.00 |
| 12/10/2020 | JNP | BL | Conference with John A. Morris regarding  email from M. Lynn regarding asset sales. | 0.10 | 1075.00 | $107.50 |
| 12/10/2020 | JNP | BL | Conference with J. Seery regarding email from M. Lynn and proposed response. | 0.30 | 1075.00 | $322.50 |
| 12/10/2020 | JNP | BL | Draft email to M. Lynn regarding request to halt asset sales and emails regarding same. | 0.30 | 1075.00 | $322.50 |
| 12/10/2020 | JNP | BL | Revise intro to brief in opposition to Dondero motion. | 0.50 | 1075.00 | $537.50 |
| 12/10/2020 | JNP | BL | Conference with Ira D. Kharasch and  Richard M. Pachulski regarding Dondero hearing. | 0.20 | 1075.00 | $215.00 |
| 12/10/2020 | JNP | BL | Conference with Gregory V. Demo regarding Dondero ordinary course motion. | 0.10 | 1075.00 | $107.50 |
| 12/10/2020 | JNP | BL | Conference with J. Dubel regarding Dondero hearing and pending motion. | 0.30 | 1075.00 | $322.50 |
| 12/10/2020 | JNP | BL | Conference with John A. Morris regarding  Dondero pending motion. | 0.10 | 1075.00 | $107.50 |
| 12/10/2020 | JEO | BL | Revisions to Highland Removal extension motion | 1.20 | 925.00 | $1,110.00 |
| 12/10/2020 | JMF | BL | Review and comment re removal extension. | 0.40 | 925.00 | $370.00 |
| 12/10/2020 | JMF | BL | Review HCRE stipulation and protective order. | 0.20 | 925.00 | $185.00 |
| 12/10/2020 | JAM | BL | Draft outline for Opening in connection with motion for TRO against Dondero (1.5); prepare for hearing | 8.80 | 1075.00 | $9,460.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027  - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | (1.0); e-mails to J. Seery, I. Kharasch, G. Demo re: outline for Opening in connection with motion for TRO against Dondero (0.1); e-mail to D. Klos, J. Seery, T. Jeremiassen, R. Romey re: meeting with FTI/Sidley (0.1); review/revise draft objection to Dondero section 363 motion (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo re: revisions to draft objection to Dondero section 363 motion (0.1); court hearing on Debtor?s motion for TRO and related matters (2.3); telephone conference with J. Seery, G. Demo re: court hearing and follow up issues (0.4); telephone conference with J. Pomerantz re: court hearing (0.1); telephone conference with J. Pomerantz, G. Demo, Y. Itkin, T. Silva re: CLO issues (0.5); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: discovery, next week's hearings (0.4); review TRO and communications with Z. Annable re: same (0.1); e-mail to K&L Gates, J. Pomerantz, G. Demo re: discovery on Advisors? motion (0.2); e-mails with D. Klos, T. Jeremiassen, J. Romey re: meeting with FTI/Sidley and discovery (0.1); e-mails with P. Montgomery, C. Rognes re: document production (0.1); e-mails with E. Weinberger, D. Stroik, G. Demo re: protective order and confidential information (0.1); e-mails with J. Pomerantz, I. Kharasch, G. Demo re: M. Lynn communications and discovery (0.3); telephone conference with H. Winograd re: legal research for opposition to Daugherty lift stay motion (0.3); telephone conference with G. Demo re: litigation matters (0.2); telephone conference with J. Pomerantz re: upcoming litigation issues (0.1). | | |
| 12/10/2020 | GIG | BL | Emails Ira D. Kharasch re jurisdiction memo | 0.10 | 895.00 | $89.50 |
| 12/10/2020 | GVD | BL | Draft outline re response to NPA on CLO issues | 0.90 | 825.00 | $742.50 |
| 12/10/2020 | GVD | BL | Review NPA motion on CLO standstill | 0.50 | 825.00 | $412.50 |
| 12/10/2020 | GVD | BL | Revise and circulate response to Dondero 363 motion | 1.50 | 825.00 | $1,237.50 |
| 12/10/2020 | GVD | BL | Review outline for presentation at hearing | 0.40 | 825.00 | $330.00 |
| 12/10/2020 | GVD | BL | Conference with J. Morris re litigation strategy | 0.30 | 825.00 | $247.50 |
| 12/10/2020 | GVD | BL | Review correspondence to M. Lynn re Dondero issues | 0.10 | 825.00 | $82.50 |
| 12/10/2020 | GVD | BL | Conference with WilmerHale/Kasowitz re response to CLO motion | 0.50 | 825.00 | $412.50 |
| 12/10/2020 | GVD | BL | Conference with J. Morris and J. Seery re follow up to TRO hearing | 0.40 | 825.00 | $330.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  - 00002

| Date | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/10/2020 | GVD | BL | Attend hearing on Dondero TRO | 2.20 | 825.00 | $1,815.00 |
| 12/10/2020 | JE | BL | Consolidate and write up additional research on property of the estate, standing and ordinary course of business (3.8); review and revise several drafts of response to Dondero motion (1.6); miscellaneous correspondence regarding same (.5); review report of TRO hearing (.2). | 6.10 | 1100.00 | $6,710.00 |
| 12/10/2020 | HRW | BL | Call with J. Morris re: opposition to Daugherty stay lift motion (0.2); Dondero TRO Hearing (1.5); Draft deposition notice for Dustin Norris (1.3). | 3.00 | 625.00 | $1,875.00 |
| 12/11/2020 | IDK | BL | E-mails with J Morris re his suggested changes to opposition to Dondero 363 motion, including mine and others feedback, and status of Board feedback re Lynn counter-proposal to resolve (.4); Review of UCC opposition to Dondero 363 motion (.2). | 0.60 | 1145.00 | $687.00 |
| 12/11/2020 | IDK | BL | Telephone conference with J. Pomerantz re issues on negotiations with Dondero on CLOs/ordinary course motion (.1); Attend part of conference call with attorneys on various pending litigation with Dondero and his 363 motion, and CLO motion to stop trading (.4); E-mails with J Morris and CEO re discovery to go out re NPA motion to stop CLO trades (.1). | 0.60 | 1145.00 | $687.00 |
| 12/11/2020 | IDK | BL | E-mail to Dondero counsel re depos (.1);  E-mails with attorneys re same and taking other depos, and issues re same, and info on moving parties ? independent? boards (.3). | 0.40 | 1145.00 | $458.00 |
| 12/11/2020 | IDK | BL | Review and consider G Demo draft of response to NPA motion to prevent CLO trading (.3); E-mail to G Demo re my feedback on changes to be made, and feedback of others (.3). | 0.60 | 1145.00 | $687.00 |
| 12/11/2020 | JNP | BL | Conference with J. Dubel regarding pending litigation matters. | 0.20 | 1075.00 | $215.00 |
| 12/11/2020 | JNP | BL | Conference with Gregory V. Demo regarding pending litigation matters. | 0.10 | 1075.00 | $107.50 |
| 12/11/2020 | JNP | BL | Review opposition to Dondero ordinary course motion. | 0.10 | 1075.00 | $107.50 |
| 12/11/2020 | JNP | BL | Conference with John A. Morris, Gregory V. Demo, Ira D. Kharasch and H. Winograd regarding pending litigation matters. | 0.50 | 1075.00 | $537.50 |
| 12/11/2020 | JNP | BL | Conference with J. Seery, Gregory V. Demo, John A. Morris and H. Winograd regarding pending litigation issues. | 0.70 | 1075.00 | $752.50 |
| 12/11/2020 | JNP | BL | Review letter from HCLOF. | 0.10 | 1075.00 | $107.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| Date | Init. | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/11/2020 | JNP | BL | Review Committee brief regarding Dondero motion. | 0.10 | 1075.00 | $107.50 |
| 12/11/2020 | RMP | BL | Conference with I. Kharasch re Dondero litigation. | 0.40 | 1445.00 | $578.00 |
| 12/11/2020 | JMF | BL | Review opposition to motion to prohibit ordinary course transactions. | 0.30 | 925.00 | $277.50 |
| 12/11/2020 | JAM | BL | Review/revise draft objection to Dondero 363 motion (0.7); e-mail to J. Pomerantz, I. Kharasch, G. Demo re: JAM comments to draft objection to Dondero 363 motion (0.1); review stipulation concerning resolution of Daugherty Adversary Proceeding No. 2 (0.1); e-mail to Z. Annable, J. Pomerantz, G. Demo re: stipulation concerning resolution of Daugherty Adversary Proceeding No. 2 (0.1); e-mails with J. Pomerantz, I. Kharasch, G. Demo re: Dondero 363 motion (0.2); review/revise deposition notice for Advisors (0.3); e-mails with L. Canty, Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: deposition notice for Advisors (0.1); telephone conference with G. Demo re: litigation matters (0.2); telephone conference with J. Seery re: litigation matters (0.1); work on objection to Daugherty lift stay motion (3.6); draft deposition notice for James Dondero (0.2); e-mails with Dondero?s counsel re: discovery (0.2); telephone conference with J. Pomerantz, Redeemer counsel, UBS counsel re: Redeemer intervention on UBS appeal of Rule 9019 order (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo. H. Winograd re: litigation matters, strategy (0.5); telephone conference with J. Seery, J. Pomerantz, G. Demo, H. Winograd re: litigation matters, strategy (0.7); telephone conference with B. Assink re: meet and confer over discovery on Dondero motion (0.3); e-mails with  B. Assink re: meet and confer over discovery on Dondero motion (0.2); communications with J. Wright, Pomerantz, G. Demo, H. Winograd re: discovery for Advisors? hearing (0.3). | 8.10 | 1075.00 | $8,707.50 |
| 12/11/2020 | GIG | BL | Emails with Gregory V. Demo re jurisdiction question, review memo re same | 0.20 | 895.00 | $179.00 |
| 12/11/2020 | GVD | BL | Review offering memoranda re CLO litigation | 0.40 | 825.00 | $330.00 |
| 12/11/2020 | GVD | BL | Finalize response to Dondero 363 motion and file same | 1.20 | 825.00 | $990.00 |
| 12/11/2020 | GVD | BL | Review research re bankruptcy jurisdiction | 0.30 | 825.00 | $247.50 |
| 12/11/2020 | GVD | BL | Conduct research re CLO litigation | 1.50 | 825.00 | $1,237.50 |
| 12/11/2020 | GVD | BL | Draft response re CLO litigation | 2.60 | 825.00 | $2,145.00 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| Date | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/11/2020 | GVD | BL | Multiple conferences with PSZJ and J. Seery re litigation strategy and next steps | 1.20 | 825.00 | $990.00 |
| 12/11/2020 | GVD | BL | Revise and circulate outline re CLO motion | 0.20 | 825.00 | $165.00 |
| 12/11/2020 | JE | BL | Discuss TRO ruling with Mr. Pomerantz. | 0.20 | 1100.00 | $220.00 |
| 12/11/2020 | HRW | BL | Draft document requests to NexPoint Advisors and related parties (1.8); PSZJ litigation update call (1.0); Call with G. Demo re: document requests to NexPoint Advisors and related parties (0.1). | 2.90 | 625.00 | $1,812.50 |
| 12/12/2020 | IDK | BL | Numerous E-mails with CEO, J Morris re communications with Dondero counsel on their changing depo demands/ideas of today (.2); Numerous E-mails with attorneys re draft of potential settlement proposal to Dondero re sales, and issues/problems with same and fiduciary out issues (.2). | 0.40 | 1145.00 | $458.00 |
| 12/12/2020 | IDK | BL | E-mails with Board re its feedback on potential settlement proposal to Dondero (.1); Review of correspondence with Dondero counsels re their reaction to same proposal (.1); Telephone conference with J. Pomerantz re status on settlement negotiations re same (.1); E-mails with Board, J. Pomerantz, re how to respond to Dondero counsel?s concerns re proposal to resolve (.2); E-mails with and review of correspondence with Dondero counsel on our response to their counter, and how to respond (.2). | 0.70 | 1145.00 | $801.50 |
| 12/12/2020 | JNP | BL | Draft email to Board regarding resolution to Dondero motion. | 0.20 | 1075.00 | $215.00 |
| 12/12/2020 | JNP | BL | Emails to and from M. Lynn regarding proposal to resolve Dondero motion. | 0.40 | 1075.00 | $430.00 |
| 12/12/2020 | JNP | BL | Emails with Board regarding proposal to resolve Dondero motion. | 0.10 | 1075.00 | $107.50 |
| 12/12/2020 | JNP | BL | Conference with J. Dubel regarding Dondero motion and related matters (2X). | 0.60 | 1075.00 | $645.00 |
| 12/12/2020 | JNP | BL | Conference with John A. Morris regarding Dondero proposal and response. | 0.10 | 1075.00 | $107.50 |
| 12/12/2020 | JNP | BL | Review emails regarding discovery on Dondero motion. | 0.10 | 1075.00 | $107.50 |
| 12/12/2020 | JAM | BL | E-mails with B. Assink, J. Wilson, J. Pomerantz, G. Demo, H. Winograd re: depositions (0.2); e-mails to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: depositions for Dondero motion (0.1); amend Notice of Deposition for Dondero and | 7.20 | 1075.00 | $7,740.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | communications with Z. Annable concerning the same (0.2); e-mail to L. Canty, G. Demo, H. Winograd re: depositions, court reporter (0.2); work on Objection to Daugherty Lift Stay Motion (4.7); telephone conference with J. Seery re: negotiations concerning Dondero motion (0.5); telephone conference with L. Canty re: depositions (0.1); e-mails to B. Assink, J. Wilson, J. Pomerantz, G. Demo re: depositions (0.4); e-mails with J. Seery, J. Dubel, R. Nelms, J. Pomerantz, I. Kharasch. G. Demo re: negotiations concerning Dondero (0.5); e-mails with J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft Objection to Daugherty Lift Stay Motion (0.2); telephone conference with L. Canty re: depositions (0.1). | | | |
| 12/12/2020 | GVD | BL | Research and draft response to NexPoint CLO motion | 6.10 | 825.00 | $5,032.50 |
| 12/12/2020 | GVD | BL | Conference with U. Itkin re status of insert to NexPoint CLO motion | 0.20 | 825.00 | $165.00 |
| 12/12/2020 | HRW | BL | Draft opposition to Daugherty stay relief motion (7.5). | 7.50 | 625.00 | $4,687.50 |
| 12/13/2020 | IDK | BL | Review of further correspondence with Dondero counsels re discovery and depo issues re 363 motion (.1); E-mails with Board re same and finalized deposition schedule tomorrow (.1);  E-mails with Board, J Morris re new subpoena for Caruso, Sevilla, and our intention to prepare motions to quash/protective order (.2). | 0.40 | 1145.00 | $458.00 |
| 12/13/2020 | IDK | BL | E-mails with G Demo re status on our response to NPA motion re CLO sales, and its prior position in Acis on same. | 0.20 | 1145.00 | $229.00 |
| 12/13/2020 | IDK | BL | E-mails with G Demo re his draft response to NPA/HCMFA motion re CLO sales, including J. Pomerantz comments to same. | 0.30 | 1145.00 | $343.50 |
| 12/13/2020 | JNP | BL | Review letter from Next Point regarding claims and review and revise proposed response. | 0.20 | 1075.00 | $215.00 |
| 12/13/2020 | JNP | BL | Review and revise opposition to CLO motion. | 1.00 | 1075.00 | $1,075.00 |
| 12/13/2020 | JNP | BL | Conference with John A. Morris regarding discovery in connection with Dondero motion and CLO motion. | 0.20 | 1075.00 | $215.00 |
| 12/13/2020 | JNP | BL | Review TRO transcript. | 0.20 | 1075.00 | $215.00 |
| 12/13/2020 | JAM | BL | Telephone conference with J. Dubel re: Dondero litigation tactics (0.2); telephone conference with G. Demo re: litigation issues (0.4); telephone | 1.90 | 1075.00 | $2,042.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | conference with J. Pomerantz re: Dondero litigation tactics (0.2); telephone conference with J. Seery re: Dondero litigation (0.2); e-mails with all counsel re: deposition instructions (0.2); review/revise witness and exhibit list (0.2); e-mail to Z. Annable, L. Canty, G. Demo, H. Winograd re: witness and exhibit list (0.1); prepare for depositions (0.4). | | | |
| 12/13/2020 | GVD | BL | Draft response to K&L Gates demand letter | 0.20 | 825.00 | $165.00 |
| 12/13/2020 | GVD | BL | Further research and revise response to NPA motion on CLOs | 2.60 | 825.00 | $2,145.00 |
| 12/13/2020 | GVD | BL | Conference with U. Itkin re CLOs | 0.40 | 825.00 | $330.00 |
| 12/13/2020 | HRW | BL | Draft opposition to Daugherty stay relief motion (4.5); Call with J. Morris re: opposition to Daugherty stay relief motion (0.1). | 4.60 | 625.00 | $2,875.00 |
| 12/14/2020 | IDK | BL | E-mails with Board, others re J Morris draft of motion to quash and for protective order, including brief review of same, and feedback for changes (.3); E-mails with J Morris and local counsel re status of feedback from chambers on same motion, including later court?s direction on same, and Dondero agreement to expedited hearing (.3). | 0.60 | 1145.00 | $687.00 |
| 12/14/2020 | IDK | BL | Review and consider numerous correspondence with Dondero counsels re our motion to quash and their continued insistence on depos of others, as well as various new proposals from Dondero counsels re temporary resolution of the 363 motion, including feedback from Board and attorneys as to how to respond (.5); Review of further various correspondence with Dondero counsel re our issues with their proposal and Dondero?s prior interference, as well as scheduling of call tomorrow (.3). | 0.80 | 1145.00 | $916.00 |
| 12/14/2020 | IDK | BL | E-mails with Board and attorneys re Dondero opposition to motion to quash, including brief review of same, and Dondero proposal to continue contained therein, including problems on same and how to respond. | 0.30 | 1145.00 | $343.50 |
| 12/14/2020 | IDK | BL | E-mails with J Morris re questions for upcoming Dondero deposition, and issue of J Terry attendance and Board feedback. | 0.20 | 1145.00 | $229.00 |
| 12/14/2020 | IDK | BL | Telephone conference with J Pomerantz re result of Seery deposition re Dondero motion (.1); Attend internal conference call with attorneys re status of litigation hearings for 12/16, and today?s motion to quash re Dondero, and prep for hearings on 12/16 (.4). | 0.50 | 1145.00 | $572.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/14/2020 | IDK | BL | Telephone conference with J. Pomerantz re result of Board call on motion to quash (.1); Telephone conference with J. Pomerantz in break of Dondero deposition of questions needed to be asked (.1); Telephone conference with J. Pomerantz re result of deposition on the opposition to NPA motion re CLOs (.1). | 0.30 | 1145.00 | $343.50 |
| 12/14/2020 | IDK | BL | Attend most of Dondero deposition (1.5). | 1.50 | 1145.00 | $1,717.50 |
| 12/14/2020 | IDK | BL | E-mails with G Demo re questions on our draft response to NPA motion re CLOs, including review of his revised response re same (.3); E-mails with G Demo, J. Pomerantz re my comments to revised draft and timing of running by CEO and others, including review of correspondence to same (.3). | 0.60 | 1145.00 | $687.00 |
| 12/14/2020 | JNP | BL | Review motion to quash. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JNP | BL | Conference with John A. Morris regarding motion to quash. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JNP | BL | Conference with  J. Dubel regarding pending litigation matters. | 0.20 | 1075.00 | $215.00 |
| 12/14/2020 | JNP | BL | Listen in to J. Seery deposition. | 1.60 | 1075.00 | $1,720.00 |
| 12/14/2020 | JNP | BL | Conference with Ira D. Kharasch regarding J. Seery deposition. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JNP | BL | Conference with Ira D. Kharasch, John A. Morris, Gregory V. Demo and H. Winograd regarding litigation planning. | 0.40 | 1075.00 | $430.00 |
| 12/14/2020 | JNP | BL | Conference with Board, John A. Morris and Gregory V. Demo regarding Dondero proposal. | 0.30 | 1075.00 | $322.50 |
| 12/14/2020 | JNP | BL | Email to and from M. Lynn regarding proposal. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JNP | BL | Participate in J. Dondero deposition. | 2.00 | 1075.00 | $2,150.00 |
| 12/14/2020 | JNP | BL | Conference with Ira D. Kharasch after j. Dondero deposition. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JNP | BL | Conference with J. Dubel after J. Dondero deposition. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JNP | BL | Review Dondero opposition to motion to quash. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JNP | BL | Conference with John A. Morris regarding Dondero opposition and motion to quash. | 0.20 | 1075.00 | $215.00 |
| 12/14/2020 | JNP | BL | Email to Gregory V. Demo regarding Dondero opposition to motion to quash. | 0.10 | 1075.00 | $107.50 |
| 12/14/2020 | JMF | BL | Review motion to quash (.3) and opposition to same (.2). | 0.50 | 925.00 | $462.50 |

**HIGHLY CONFIDENTIAL**                                                            **HCMLP 000760**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| Date | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/14/2020 | JMF | BL | Review request re temporary restrictions on non debtor CLO vehicle sales. | 0.40 | 925.00 | $370.00 |
| 12/14/2020 | JAM | BL | Draft motion for a protective order/motion to quash subpoenas (3.5); telephone conference with J. Pomerantz re: draft motion for a protective order/motion to quash subpoenas (0.1); review/revise draft motion for a protective order/motion to quash subpoenas (0.1); e-mails with Board, J. Pomerantz, I. Kharasch, G. Demo re: draft motion for a protective order/motion to quash subpoenas (0.1); communications with Z. Annable, H. Winograd, G. Demo re: draft motion for a protective order/motion to quash subpoenas (0.2); prepare for Dondero deposition (1.6); telephone conference with J. Seery re: deposition (0.1); Seery deposition (1.6); telephone conference with J. Seery re: deposition (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: Seery deposition (0.3); telephone conference with Board, J. Pomerantz, I. Kharasch, G. Demo re: potential settlement with Dondero (0.3); prepare for Dondero deposition (1.4); Dondero deposition (2.0); e-mails with L. Canty re: exhibit and witness list (0.2); telephone conference with G. Demo, Cameron, Sean re: Norris deposition (0.4); review objection to motion for protective order/motion to quash (0.2); telephone conference with J. Seery re: depositions (0.5). | 12.80 | 1075.00 | $13,760.00 |
| 12/14/2020 | GVD | BL | Attend Dondero deposition (partial) | 1.50 | 825.00 | $1,237.50 |
| 12/14/2020 | GVD | BL | Revise and circulate response to CLO motion | 5.00 | 825.00 | $4,125.00 |
| 12/14/2020 | GVD | BL | Conference with J. Morris re preparation for Norris deposition | 0.60 | 825.00 | $495.00 |
| 12/14/2020 | GVD | BL | Correspondence with J. Pomerantz re current protocols | 0.10 | 825.00 | $82.50 |
| 12/14/2020 | GVD | BL | Review motion re Daugherty automatic stay | 0.20 | 825.00 | $165.00 |
| 12/14/2020 | GVD | BL | Conference with Board re Dondero motion and potential resolution | 0.30 | 825.00 | $247.50 |
| 12/14/2020 | GVD | BL | Review exhibit list re CLO motion | 0.20 | 825.00 | $165.00 |
| 12/14/2020 | GVD | BL | Attend to issues re potential resolution of Dondero motion | 0.20 | 825.00 | $165.00 |
| 12/14/2020 | HRW | BL | Edit and review opposition to Daugherty stay relief motion (1.1); PSZJ call re: Deposition Prep  (0.4); PSZJ call re: Motion to Quash (0.3); Seery deposition (1.4); Dondero deposition (1.5); Review NPA/CLO pleadings (0.8); Review Dondero section | 6.10 | 625.00 | $3,812.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | 363 pleadings (0.6). | | | |
| 12/15/2020 | IDK | BL | E-mails with Board, others re court?s partial ruling on our motion to quash, and next steps (.2); Review of correspondence with Dondero counsel re their cancellation of call, and court?s ruling on motion to quash re same (.2); Telephone conference with J. Pomerantz re Dondero request to speak to entire Board (.1); Review of numerous correspondence with Dondero counsel re his request to speak to non-Seery board members, and willingness to continue hearing on 363 motion, and next steps re implementing same (.3). | 0.80 | 1145.00 | $916.00 |
| 12/15/2020 | IDK | BL | E-mails with Board, J Morris re status on tomorrow?s hearing (.1); E-mails with same re order to adjourn same hearing (.1); E-mails with attorneys re Dondero counsel disputes with form of order on same and related discovery issues (.2). | 0.30 | 1145.00 | $343.50 |
| 12/15/2020 | IDK | BL | E-mails with Morris re his correspondence with internal staff on pushback on UCC discovery, including review of same, and how to respond (.2); Telephone conference with J. Pomerantz re problems on UCC discovery on employees and Klos position and next steps (.2). | 0.40 | 1145.00 | $458.00 |
| 12/15/2020 | IDK | BL | Review of correspondence with DSI, J. Pomerantz re asset sale summaries re NPA motion to restrict CLO sales (.2); E-mail to G Demo re prior stipulation with Dondero re Strand (.1); Review of G Demo?s draft of oral argument for tomorrow?s hearing with NPA and consider, as well as feedback from J. Pomerantz re same (.3). | 0.60 | 1145.00 | $687.00 |
| 12/15/2020 | IDK | BL | E-mails with G Demo re my comments and Board feedback to revised motion to extend removal deadline, including review of such motion. | 0.30 | 1145.00 | $343.50 |
| 12/15/2020 | JNP | BL | Conference with John A. Morris regarding deposition. | 0.10 | 1075.00 | $107.50 |
| 12/15/2020 | JNP | BL | Participating in deposition of Dustin Norris. | 2.70 | 1075.00 | $2,902.50 |
| 12/15/2020 | JNP | BL | Conference with J. Dubel regarding Dondero motion and next steps. | 0.20 | 1075.00 | $215.00 |
| 12/15/2020 | JNP | BL | Emails to and from M. Lynn regarding resolution of Dondero motion. | 0.10 | 1075.00 | $107.50 |
| 12/15/2020 | JNP | BL | Conference with CLO issuers counsel, Ira D. Kharasch and Gregory V. Demo regarding status and moving forward. | 0.60 | 1075.00 | $645.00 |
| 12/15/2020 | JNP | BL | Review Gregory V. Demo outline for CLO hearing | 0.50 | 1075.00 | $537.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | and provide comments. | | | |
| 12/15/2020 | JNP | BL | Conference with M. Clemente regarding discovery issues. | 0.20 | 1075.00 | $215.00 |
| 12/15/2020 | JNP | BL | Emails to and from M. Lynn regarding hearing resolution and request for Board meeting. | 0.50 | 1075.00 | $537.50 |
| 12/15/2020 | JNP | BL | Emails to and from PSZJ team regarding pending litigation; Calls with Gregory V. Demo and John A. Morris regarding  same. | 0.50 | 1075.00 | $537.50 |
| 12/15/2020 | JNP | BL | Review order regarding Dondero motion; Conference with John A. Morris regarding same. | 0.10 | 1075.00 | $107.50 |
| 12/15/2020 | JNP | BL | Conference with  Ira D. Kharasch regarding pending litigation issues. | 0.10 | 1075.00 | $107.50 |
| 12/15/2020 | JNP | BL | Review and respond to several emails with M. Lynn regarding Order on Dondero motion. | 0.50 | 1075.00 | $537.50 |
| 12/15/2020 | RMP | BL | Conference with I. Kharasch re litigation status. | 0.20 | 1445.00 | $289.00 |
| 12/15/2020 | BEL | BL | Telephone conference with John A. Morris regarding complaint regarding demand notes. | 0.20 | 825.00 | $165.00 |
| 12/15/2020 | BEL | BL | Review demand notes. | 0.50 | 825.00 | $412.50 |
| 12/15/2020 | JMF | BL | Review removal extension motion. | 0.30 | 925.00 | $277.50 |
| 12/15/2020 | JMF | BL | Review opposition to motion to restrain ordinary course training. | 0.40 | 925.00 | $370.00 |
| 12/15/2020 | JMF | BL | Review docket re CLO sales and draft memorandum re case issues (.6); telephone call with G. Demo, J.N. Pomerantz, I. Kharasch, J. O'Neill, H, Winograd re same (.6); telephone call with J. Donahue, I. Kharasch, G. Demo, James Romey (.4). | 1.60 | 925.00 | $1,480.00 |
| 12/15/2020 | JAM | BL | Prepare for Norris deposition (3.8); telephone conference with G. Demo re: Norris deposition (0.1); telephone conference with J. Dubel re: status of hearing, motion for protective order (0.1); e-mails with J. Pomerantz, I. Kharasch, G. Demo, M. Lynn re: issues related to Dondero and hearing (0.3); Norris deposition (1.7); telephone conference with J. Pomerantz re: Norris deposition (0.1); telephone conference with G. Demo re: Norris deposition (0.1); telephone conference with D. Draper re: Dugaboy, Get Good document productions (0.1); telephone conference with B. Levine re: collection actions on demand notes (0.1); telephone conference with J. Seery re: document production (0.1); telephone conference with G. Demo, J. Romey re: document production (0.1); telephone conference with G. Demo re: document production and related | 9.20 | 1075.00 | $9,890.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | matters (0.1); telephone conference with J. Dubel, J. Pomerantz re: discovery issues and related matters (0.4); telephone conference with Board, J. Pomerantz, I. Kharasch, G. Demo re: employee issues, discovery (0.7); telephone conference with J. Seery re: employee issues, discovery (0.2); telephone conference with P. Montgomery re: meeting with FTI (0.1); telephone conference with J. Seery re: discovery issues (0.1); review/revise draft order adjourning Dondero Rule 363 motion (0.4); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft order adjourning Dondero Rule 363 motion (0.1); telephone conference with J. Seery re:  Klos and FTI meeting (0.1); e-mails with J. Seery, D. Klos, D. Neier re: Klos and FTI meeting (0.1); telephone conference with P. Montgomery re: FTI meeting (0.1); review G. Demo draft opening statement for hearing on NexPoint motion (0.2). | | | |
| 12/15/2020 | GVD | BL | Prepare for hearing re CLO standstill | 2.40 | 825.00 | $1,980.00 |
| 12/15/2020 | GVD | BL | Revise and file objection to CLO motion | 0.70 | 825.00 | $577.50 |
| 12/15/2020 | GVD | BL | Review and revise deposition outline re D. Norris | 0.70 | 825.00 | $577.50 |
| 12/15/2020 | GVD | BL | Attend deposition of D. Norris (partial) | 1.50 | 825.00 | $1,237.50 |
| 12/15/2020 | GVD | BL | Conference with J. Morris and J. Pomerantz re discovery issues | 0.30 | 825.00 | $247.50 |
| 12/15/2020 | HRW | BL | Draft proposed order to adjourn Dondero motion (2.3); D. Norris Deposition (2.0). | 4.30 | 625.00 | $2,687.50 |
| 12/16/2020 | IDK | BL | E-mails with Board, others on temporary resolution of UCC discovery and employee role in same. | 0.10 | 1145.00 | $114.50 |
| 12/16/2020 | IDK | BL | E-mails with G Demo, others on his revised summary of his oral argument for today?s hearing on NPA motion, including my feedback, questions on same. | 0.30 | 1145.00 | $343.50 |
| 12/16/2020 | IDK | BL | Review and consider Dondero just filed motion to modify TRO to communicate with Board (.2); E-mails with CEO, others re same and next steps (.2). | 0.40 | 1145.00 | $458.00 |
| 12/16/2020 | IDK | BL | E-mails with internal team on need for hearing prep call (.1); Attend conference call with J. Pomerantz, G Demo and J Morris re prep for today?s hearing on NPA/HCLOF motion re CLOs (.4); Attend hearing today re same (1.7); Office conference with J. Pomerantz re same (.1). | 2.30 | 1145.00 | $2,633.50 |
| 12/16/2020 | IDK | BL | E-mails with Dondero counsel, J. Pomerantz re Lynn?s request to speak to entire Board. | 0.10 | 1145.00 | $114.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/16/2020 | IDK | BL | E-mail to J Morris re result of UCC counsel interview with Klos (.1). | 0.10 | 1145.00 | $114.50 |
| 12/16/2020 | IDK | BL | Review and consider briefly extensive UBS correspondence re both MS settlement concerns and CDO Fund collection re judgment (.2); Review briefly extensive correspondence with Board, others re legal issues on CDO collection efforts by UBS, and possible responses (.2). | 0.40 | 1145.00 | $458.00 |
| 12/16/2020 | JNP | BL | Review revisions to Gregory V. Demo opening on CLO motion. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Review emails regarding modifications to Order on Dondero motion. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Conference with Gregory V. Demo regarding CLO motion and J. Seery call with HCLOF. | 0.20 | 1075.00 | $215.00 |
| 12/16/2020 | JNP | BL | Conference with Gregory V. Demo, Ira D. Kharasch and John A. Morris regarding hearing preparation. | 0.40 | 1075.00 | $430.00 |
| 12/16/2020 | JNP | BL | Review Dondero motion to amend TRO. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Participate in hearing on CLO motion. | 1.90 | 1075.00 | $2,042.50 |
| 12/16/2020 | JNP | BL | Conference with Gregory V. Demo regarding UBS (2x). | 0.20 | 1075.00 | $215.00 |
| 12/16/2020 | JNP | BL | Conference with Gregory V. Demo regarding CLO Holdco demand. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Conference with J. Dubel regarding hearing and UBS, and hearing (several). | 1.30 | 1075.00 | $1,397.50 |
| 12/16/2020 | JNP | BL | Conference with John A. Morris regarding hearing and related issues. | 0.20 | 1075.00 | $215.00 |
| 12/16/2020 | JNP | BL | Review issues relating to UBS letter asking for assistance in transferring assets. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Email from M. Lynn regarding communications with Board and forward to Board. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Review Order regarding hearing on CLO motion. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | .Email to Z. Anabale regarding Order resolving Dondero motion and motion to quash. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Conference with .J. Seery regarding UBS, hearing and related. | 0.30 | 1075.00 | $322.50 |
| 12/16/2020 | JNP | BL | Conference with Ira D. Kharasch regarding UBS and litigation issues. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Review demand letters from CLO Holdco. | 0.10 | 1075.00 | $107.50 |
| 12/16/2020 | JNP | BL | Email to Board regarding CLO Fund and SOHC | 0.10 | 1075.00 | $107.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | issues. |  |  |  |
| 12/16/2020 | KKY | BL | Serve (.1) and prepare for service (.1) removal extension motion | 0.20 | 425.00 | $85.00 |
| 12/16/2020 | KKY | BL | Draft (.1) and prepare for filing (.1) certificate of service for removal extension motion | 0.20 | 425.00 | $85.00 |
| 12/16/2020 | RMP | BL | Conferences with J. Pomerantz and I. Kharasch re pending motions and responses thereto. | 0.60 | 1445.00 | $867.00 |
| 12/16/2020 | BEL | BL | Review notes and draft complaint. | 3.70 | 825.00 | $3,052.50 |
| 12/16/2020 | JAM | BL | Prepare for hearing on CLO motion (6.2); telephone conference with J. Donohue re: discovery meeting with UCC (0.1); telephone conference with G. Demo re: today?s hearing (0.1); telephone conference with D. Klos, D. Neier re: discovery meeting with UCC (0.3); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: preparation for hearing (0.3); telephone conference with J. Seery re: preparation for hearing (0.2); review Demo draft opening statement for CLO hearing (0.2); telephone conference with G. Demo re: opening statement (0.1); review/revise proposed order on Dondero-related motions (0.2); e-mail to Bond Ellis, J. Pomerantz, I. Kharasch, G. Demo re: proposed order on Dondero-related motions (0.1); court hearing on Dondero-related motion and CLO motion (1.8); telephone conference with J. Seery re: CLO hearing (0.3); telephone conference with J. Dubel re: CLO hearing (0.2); telephone conference with J. Pomerantz re: CLO hearing (0.1); telephone conference with D. Draper re: Dugaboy and Get Good document production (0.1); e-mails with J. Seery, DSI, HCMLP personnel re: discovery (0.1); telephone conference with Z. Annable re: Daugherty lift stay motion (0.1); e-mails with J. Kathman, Z. Annable, J. Pomerantz, I. Kharasch, G. Demo re: Daugherty lift stay motion (0.2); telephone conference with D. Klos, D. Neier, Sidley, FTI re: discovery (0.8); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo re: discovery call with UCC (0.1); telephone conference with I. Leventon re: CLO hearing, Daugherty lift stay motion (0.3); telephone conference with J. Seery re: UCC discovery meeting (0.1); e-mail to J. Kathman re: Stipulation, proposed order concerning Adversary Proceeding No. 2 (0.1); review/revise proposed Order on CLO motion (0.3); e-mails with J. Pomerantz, I. Kharasch, G. Demo, Z. Annable re: proposed order on CLO motion (0.1). | 12.50 | 1075.00 | $13,437.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/16/2020 | GVD | BL | Review D. Norris transcript in preparation for hearing | 0.50 | 825.00 | $412.50 |
| 12/16/2020 | GVD | BL | Prepare for hearing re CLO motion | 2.10 | 825.00 | $1,732.50 |
| 12/16/2020 | GVD | BL | Correspondence re affiliate status under CLO agreements | 0.30 | 825.00 | $247.50 |
| 12/16/2020 | GVD | BL | Conference with J. Pomerantz re preparation for hearing | 0.20 | 825.00 | $165.00 |
| 12/16/2020 | GVD | BL | Attend hearing re CLO issues | 1.60 | 825.00 | $1,320.00 |
| 12/16/2020 | GVD | BL | Conference with J. Morris and J. Seery re follow up to hearing | 0.20 | 825.00 | $165.00 |
| 12/16/2020 | GVD | BL | Multiple conferences with J. Pomerantz re UBS demand letters | 0.20 | 825.00 | $165.00 |
| 12/16/2020 | GVD | BL | Draft multiple emails re UBS demand letters | 1.00 | 825.00 | $825.00 |
| 12/16/2020 | HRW | BL | Draft proposed order denying CLO Motion (1.5); Hearing on CLO Motion (1.8). | 3.30 | 625.00 | $2,062.50 |
| 12/17/2020 | IDK | BL | E-mails with local counsel re court?s order denying Dondero emergency hearing on motion to modify tentative and setting on January 4. | 0.10 | 1145.00 | $114.50 |
| 12/17/2020 | JNP | BL | Email to Elissa A. Wagner regarding response to UBS letters. | 0.10 | 1075.00 | $107.50 |
| 12/17/2020 | JNP | BL | Conference with Robert J. Feinstein regarding UBS letters. | 0.20 | 1075.00 | $215.00 |
| 12/17/2020 | BEL | BL | Draft, review and revise complaint. | 3.20 | 825.00 | $2,640.00 |
| 12/17/2020 | JAM | BL | Prepare for hearing on Daugherty Lift Stay Motion (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo re: Daugherty lift stay hearing (0.1); e-mails with J. Wright, G. Demo, Z. Annable re: order on CLO motion (0.1); hearing on Daugherty lift stay motion (1.2); telephone conference with J. Pomerantz re: Daugherty lift stay motion, other potential litigation matters (0.3); telephone conference with J. Seery re: Daugherty lift stay motion and other potential litigation matters (0.1). | 2.60 | 1075.00 | $2,795.00 |
| 12/17/2020 | GVD | BL | Attend hearing re Daugherty relief from stay | 1.20 | 825.00 | $990.00 |
| 12/17/2020 | HRW | BL | Draft proposed order denying Daugherty Lift Stay Motion (0.8); Hearing on Daugherty Lift Stay Motion (1.0). | 1.80 | 625.00 | $1,125.00 |
| 12/18/2020 | IDK | BL | E-mails with J Morris re draft amended complaint vs Dondero and UCC complaint re Holdco. | 0.20 | 1145.00 | $229.00 |
| 12/18/2020 | JMF | BL | Review motion to seal and  preliminary injunction motion re CLO Holdco. | 0.40 | 925.00 | $370.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/18/2020 | JAM | BL | E-mail to J. Kathman re: proposed Order on Daugherty Lift Stay motion (0.1); prepare Amended Complaint against Dondero to extend injunctive relief to Successor Parties (as defined in the Amended Complaint) (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: proposed Amended Complaint against Dondero (0.1); review UCC?s complaint and motion for injunctive relief against CLO HoldCo and related entities (0.5); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: UCC?s complaint and motion for injunctive relief against CLO HoldCo and related entities (0.1); telephone conference with P. Montgomery, C. Rognes re: sealing issues pertaining to UCC?s complaint against CLO HoldCo and related entities (0.2); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: UCC pleadings and confidentiality (0.1); e-mail to S. Vitiello, I. Leventon, T. Jeremiassen, J. Romey re: Get Good and Dugaboy document production (0.1); e-mail with D. Draper re: Get Good and Dugaboy document productions (0.1). | 2.10 | 1075.00 | $2,257.50 |
| 12/18/2020 | GVD | BL | Multiple conferences with J. Pomerantz, I. Kharasch, and J. Seery re potential litigation issues and next steps | 0.70 | 825.00 | $577.50 |
| 12/18/2020 | HRW | BL | PSZJ call with Debevoise re: HarbourVest settlement (0.5). | 0.50 | 625.00 | $312.50 |
| 12/19/2020 | JAM | BL | Telephone conference with G. Demo re: litigation matters (0.2); e-mails with J. Kane, D. Draper, M. Lynn, J. Pomerantz, I. Kharasch, G. Demo re: confidentiality and UCC's suit against CLO Holdco, Dondero and others (0.3);  e-mails with M. Lynn, M. Clemente, J. Bond, P. Montgomery, J. Pomerantz, G. Demo re: UCC Complaint against CLO Holdco, Dondero and others and related issues of confidentiality (0.3); review documents cited in UCC Complaint as confidential (0.2). | 1.00 | 1075.00 | $1,075.00 |
| 12/20/2020 | IDK | BL | Telephone conference with J. Pomerantz on 12/19 re general case and litigation issues, including Dondero counsel communications (.2); E-mails with J. Pomerantz and CEO re same and Moodys (.1). | 0.30 | 1145.00 | $343.50 |
| 12/20/2020 | JNP | BL | Conference with J. Seery regarding UBS, Harbourvest and other litigation related issues. | 0.40 | 1075.00 | $430.00 |
| 12/20/2020 | BEL | BL | Review rules regarding attachment and emails regarding same. | 0.20 | 825.00 | $165.00 |
| 12/20/2020 | JAM | BL | Review/revise draft Scheduling Order for litigation | 1.30 | 1075.00 | $1,397.50 |

**HIGHLY CONFIDENTIAL**                                    HCMLP 000768

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | of Dugaboy claim objections (0.2); e-mails with G. Demo, H. Winograd, Z. Annable re: draft Scheduling Order for litigation of Dugaboy claim objections (0.2); review/revise complaint against Dondero for breach of demand notes (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, B. Levine re: complaint against Dondero (0.1). | | | |
| 12/20/2020 | HRW | BL | Draft HarbourVest 9019 motion (9.9). | 9.90 | 625.00 | $6,187.50 |
| 12/21/2020 | IDK | BL | Attend conference call with J Pomerantz, G Demo, J Morris re HarbourVest claim settlement issues, 3018 motion re same, claim of HCLOM re note transfer, other issues (1.0). | 1.00 | 1145.00 | $1,145.00 |
| 12/21/2020 | JNP | BL | Review email from Latham regarding Summary Judgment Order and forward to Board. | 0.10 | 1075.00 | $107.50 |
| 12/21/2020 | JNP | BL | Conference with Robert J. Feinstein regarding UBS Order and Latham request regarding appealability. | 0.10 | 1075.00 | $107.50 |
| 12/21/2020 | JNP | BL | Internal team on Harbourvest Settlement Agreement and other claims issues. | 1.00 | 1075.00 | $1,075.00 |
| 12/21/2020 | JNP | BL | Review Committee complaint against CLO Holdco. | 0.20 | 1075.00 | $215.00 |
| 12/21/2020 | JNP | BL | Conference with Board regarding UBS issues and go forward strategy. | 0.80 | 1075.00 | $860.00 |
| 12/21/2020 | JNP | BL | Conference with Ira D. Kharasch and Robert J. Feinstein regarding UBS issues and go forward strategy (several separate and together). | 0.50 | 1075.00 | $537.50 |
| 12/21/2020 | JNP | BL | Email to and from T. Mascherin regarding call to discuss UBS issues. | 0.10 | 1075.00 | $107.50 |
| 12/21/2020 | JNP | BL | Review draft complaint against Dondero for demand notes. | 0.10 | 1075.00 | $107.50 |
| 12/21/2020 | JNP | BL | Conference with Richard M. Pachulski regarding litigation issues and strategy. | 0.30 | 1075.00 | $322.50 |
| 12/21/2020 | RMP | BL | Conference with I. Kharasch and then J. Pomerantz re UBS issues. | 0.60 | 1445.00 | $867.00 |
| 12/21/2020 | JAM | BL | Telephone conference with J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: HarbourVest settlement, demand notes, other litigation matters (1.0); e-mails with P. Montgomery re: HCLO Holdco Complaint (0.1); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: complaint against Dondero (demand notes) (0.1). | 1.20 | 1075.00 | $1,290.00 |
| 12/21/2020 | GVD | BL | Conference with PSZJ re litigation matters | 1.00 | 825.00 | $825.00 |
| 12/21/2020 | JE | BL | Correspondence with Mr. Kharasch and Mr. Glazer; research issue on breach of one related contracts | 4.20 | 1100.00 | $4,620.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | excusing breach of other. | | | |
| 12/21/2020 | HRW | BL | Review HarbourVest 9019 motion and settlement papers (1.9); PSZJ call re: HarbourVest Settlement (1.0). | 2.90 | 625.00 | $1,812.50 |
| 12/22/2020 | IDK | BL | Telephone conference with J. Pomerantz re litigation issues re Dondero and his new behavior, UBS next steps (.3) ; Attend conference call with J. Pomerantz, R. Pachulski and G Demo re same, and potential alternatives (1.0) ; Review and consider G Demo?s summary of same and next steps/tasks re same on UBS potential reach out to MS redeemers, and additions by J. Pomerantz re same (.2) ; E-mails with G Demo re need for info/data for starting draft letter to MS redeemers re potential sales re same, and his response (.2). | 1.70 | 1145.00 | $1,946.50 |
| 12/22/2020 | IDK | BL | E-mails with attorneys re potential sanctions re K&L Gates motion (.1). | 0.10 | 1145.00 | $114.50 |
| 12/22/2020 | IDK | BL | Review of extensive correspondence with Board re NextPoint and its related parties new correspondence on CLO management and demand for no more sales, including consider next steps. | 0.20 | 1145.00 | $229.00 |
| 12/22/2020 | IDK | BL | Review of correspondence with Dondero counsel re new interference with estate and TRO with Klos. | 0.10 | 1145.00 | $114.50 |
| 12/22/2020 | JNP | BL | Review issues regarding UBS request for determination of order status and emails regarding same. | 0.20 | 1075.00 | $215.00 |
| 12/22/2020 | JNP | BL | Conference with Ira D. Kharasch regarding litigation strategy issues | 0.30 | 1075.00 | $322.50 |
| 12/22/2020 | JNP | BL | Conference with Jenner and Ira D. Kharasch regarding UBS issues. | 0.50 | 1075.00 | $537.50 |
| 12/22/2020 | JNP | BL | Conference with J. Dubel regarding UBS litigation issues. | 0.20 | 1075.00 | $215.00 |
| 12/22/2020 | JNP | BL | Conference with Richard M. Pachulski, Ira D. Kharasch, and Gregory V. Demo regarding UBS litigation issues. | 1.00 | 1075.00 | $1,075.00 |
| 12/22/2020 | JNP | BL | Review and revise email regarding litigation strategy. | 0.20 | 1075.00 | $215.00 |
| 12/22/2020 | JNP | BL | Review letter from KL Gates regarding CLOs. | 0.10 | 1075.00 | $107.50 |
| 12/22/2020 | JNP | BL | Email to and from M. Lynn regarding Mr. Dondero violation of TRO. | 0.30 | 1075.00 | $322.50 |
| 12/22/2020 | JNP | BL | Conference with Ira D. Kharasch after Board call regarding litigation issues. | 0.20 | 1075.00 | $215.00 |

**HIGHLY CONFIDENTIAL**                                                                 **HCMLP 000770**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/22/2020 | JNP | BL | Participate in Board call regarding various litigation issues. | 1.20 | 1075.00 | $1,290.00 |
| 12/22/2020 | RMP | BL | Conference call with team re UBS issues. | 1.00 | 1445.00 | $1,445.00 |
| 12/22/2020 | RMP | BL | Review MCSF analysis and telephone conference re same. | 0.30 | 1445.00 | $433.50 |
| 12/22/2020 | GVD | BL | Conference with J. Pomerantz, I. Kharasch, and R. Pachulski re litigation matters | 1.00 | 825.00 | $825.00 |
| 12/22/2020 | GVD | BL | Draft correspondence re proposed response to litigation issues | 0.30 | 825.00 | $247.50 |
| 12/22/2020 | GVD | BL | Attend Acis hearing re final decree | 0.90 | 825.00 | $742.50 |
| 12/22/2020 | JE | BL | Review cases on contract breach and prepare summary memo on same; correspondence with Mr. Glazer on issues. | 6.40 | 1100.00 | $7,040.00 |
| 12/23/2020 | IDK | BL | Telephone conference with J. Pomerantz re issues on draft letter to MS investors re UBS (.1); Review and consider briefly draft letter to UBS counsel in response to its correspondence and communications with MS investors, as well as comments to same (.2); E-mails with attorneys re need for call on same (.1); Attend conference call with internal team on draft letter to UBS counsel and issues on letter to investors in MS (.5); Attend later conference call with R Feinstein and J. Pomerantz re UBS letter on settlement just with MS and next steps (.3). | 1.20 | 1145.00 | $1,374.00 |
| 12/23/2020 | IDK | BL | Telephone conferences with J. Pomerantz re issues on draft letters re MS (.2); E-mails with G Demo re same and information needed (.1); E-mail to J Morris re draft deposition notices for Dondero, Clubock re MS (.1). | 0.40 | 1145.00 | $458.00 |
| 12/23/2020 | IDK | BL | Review of various documents, phone summaries of Dondero/Clubock statements re approaching Redeemer claimants in Multi-Strat (.3); Prep of draft letter to Redeemer claimants of Multi-Strat re potential approaches by Dondero and UBS and issues re same (.4); E-mails with J. Pomerantz re his comments/questions on same letter (.3); Further revise letter to such claimants, along with memo to Board re same (.2). | 1.20 | 1145.00 | $1,374.00 |
| 12/23/2020 | IDK | BL | E-mails with Board, J. Pomerantz re further correspondence with Dondero counsel on interference and Dondero requested discovery re plan | 0.10 | 1145.00 | $114.50 |
| 12/23/2020 | IDK | BL | Telephone conference with Dondero counsel and J. Pomerantz re further interference and next steps (.1); | 0.30 | 1145.00 | $343.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Review and consider draft of extensive letter to Dondero counsel re same and CLO instances and consequences, along with J Morris revisions of same (.2). | | | |
| 12/23/2020 | IDK | BL | Review and consider extensive letter from UBS on MS issues, and also re settlement offer on same (.2); E-mail to attorneys re same and need to revise letter to UBS/Clubock re same (.1);  Review of further revised letter to UBS on interference and MS, and intent to take depos of Dondero and Clubock (.1); E-mails to R Feinstein re need to revise letter to UBS to address new items on settlement history, delinking, and other items (.3); Review of further revised letter to UBS re same (.1); E-mails with R Feinstein re same, as well as his correspondence to Board (.1). | 0.90 | 1145.00 | $1,030.50 |
| 12/23/2020 | IDK | BL | Review of Dondero withdrawal of motion to clarify TRO and E-mail to J Morris re same (.1). | 0.10 | 1145.00 | $114.50 |
| 12/23/2020 | IDK | BL | E-mails with attorneys re draft of letter to NextPoint in response to its latest demands/threats yesterday re CLOs and asset sales, and issues of sanctions (.2); Review of new correspondence of today from NextPoint, others re their attempt to remove Debtor as manager of CLOs (.1); E-mails with attorneys re same and impact on next steps re NextPoint, and need for further revisions and sending to Board (.2). | 0.50 | 1145.00 | $572.50 |
| 12/23/2020 | IDK | BL | Review of further correspondence tonight with Dondero counsel on discovery and TRO issues (.1); Review briefly further revisions to letters to K&L Gates re NP and violations, and with Lynn (.2). | 0.30 | 1145.00 | $343.50 |
| 12/23/2020 | JNP | BL | Review and revise letter to Latham regarding Multi Strat and review drafts regarding same. | 0.90 | 1075.00 | $967.50 |
| 12/23/2020 | JNP | BL | Conference with Ira D. Kharasch regarding Multi Strat. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Conference with John A. Morris regarding document preservation issues. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Conference with PSZJ regarding letter to UBS regarding pending issue. | 0.50 | 1075.00 | $537.50 |
| 12/23/2020 | JNP | BL | Review letter to KL Gates regarding demand for sanctions. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Review 2 versions of letter to M. Lynn regarding Dondero and emails regarding same. | 0.20 | 1075.00 | $215.00 |
| 12/23/2020 | JNP | BL | Conference with  M. Lynn  and Ira D. Kharasch regarding termination of Dondero access. | 0.10 | 1075.00 | $107.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/23/2020 | JNP | BL | Conference with J. Dubel regarding UBS issues. | 0.20 | 1075.00 | $215.00 |
| 12/23/2020 | JNP | BL | Conference with Robert J. Feinstein regarding letter to Latham regarding UBS. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Review draft discovery. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Conference with John A. Morris regarding discovery. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Conference with Ira D. Kharasch regarding Latham latest letter regarding Multi Strat. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Participate on Board call regarding UBS and other litigation issues. | 1.20 | 1075.00 | $1,290.00 |
| 12/23/2020 | JNP | BL | Conference with Robert J. Feinstein and Ira D. Kharasch regarding UBS issues and strategy. | 0.30 | 1075.00 | $322.50 |
| 12/23/2020 | JNP | BL | Conference with Robert J. Feinstein after Board call regarding UBS. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | JNP | BL | Review letter to KL Gates and email regarding same. | 0.10 | 1075.00 | $107.50 |
| 12/23/2020 | RMP | BL | Conference with I. Kharasch re litigation issues. | 0.20 | 1445.00 | $289.00 |
| 12/23/2020 | JAM | BL | E-mail to M. Clemente, P. Montgomery, D. Draper, G. Demo re: UCC complaint against Dugaboy (0.1); e-mail to D. Draper, W. Horn re: UCC?s suit against Dugaboy and related matters (0.1); telephone conference with G. Demo re: CLOs demand letter and related litigation matters (0.2); telephone conference with P. Montgomery re: confidentiality and work-product issues (0.4); e-mail to P. Montgomery, M. Clemente, C. Rognes re: confidentiality issues relating to the Appendix to the UCC?s complaint against Dondero and others (0.1); telephone conference with J. Pomerantz, R. Feinstein, I. Kharasch, G. Demo re: litigation issues relating to Dondero, Clubok, and MultiSrat (0.5); review/revise deposition notices and document requests for Dondero and Clubok (0.6); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: discovery demands for Clubok and Dondero (0.1); telephone conference with J. Pomerantz, G. Demo, I. Kharasch, R. Feinstein re: UBS, Dondero issues (0.5); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, B. Sharp, J. Seery re: document preservation and related matters (1.0); telephone conference with J. Pomerantz re: Dondero issues (0.1); review/revise HarbourVest Rule 9019 motion (0.2); further revisions to discovery demands for Dondero and Clubok (0.4); e-mails with J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, R. | 7.70 | 1075.00 | $8,277.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | Feinstein re: discovery demands for Dondero and Clubok (0.2); review e-mails between G. Demo, Debevoise re: HarbourVest settlement, including revisions to agreement (0.5); review/revise letter to M. Lynn re: Dondero and TRO violations (0.5); telephone conference with Board, J. Pomerantz, I. Kharasch, R. Feinstein re: Dondero and Clubok issues and other litigation matters (0.2); e-mails w/ H. Winograd re: revisions to discovery demands for Dondero, Clubok (0.1); review draft letter to K&L Gates re: CLOs (0.3); e-mail to Board re: discovery demands for Dondero, Clublok (0.1); telephone conference with Board, J. Pomerantz, I. Kharasch, R. Feinstein re: Dondero and Clubok issues and other litigation matters (1.0); e-mail to J. Pomerantz, I. Kharasch, G. Demo draft letter to K&L Gates re: CLOs (0.1); telephone conference with J. Pomerantz, G. Demo re: letter to K&L Gates concerning CLO issues (0.4). |  |  |  |
| 12/23/2020 | GVD | BL | Review letter from R. Feinstein re discovery issues | 0.90 | 825.00 | $742.50 |
| 12/23/2020 | GVD | BL | Conference with J. Morris re litigation strategy | 0.20 | 825.00 | $165.00 |
| 12/23/2020 | GVD | BL | Draft response letters to K&L Gates | 1.20 | 825.00 | $990.00 |
| 12/23/2020 | GVD | BL | Draft letter to M. Lynn re J. Dondero | 1.20 | 825.00 | $990.00 |
| 12/23/2020 | GVD | BL | Attend internal conference re potential litigation | 0.50 | 825.00 | $412.50 |
| 12/23/2020 | HRW | BL | Review and edit HarbourVest 9019 motion (1.5); Review letters to K&L Gates (0.6); Draft notice of hearing for HarbourVest 9019 motion (0.5); PSZJ call re: HarbourVest Settlement (0.3); PSZJ call with Debevoise re: HarbourVest Settlement (0.5); Review and edit document requests and depo notices (1.3). | 4.10 | 625.00 | $2,562.50 |
| 12/24/2020 | IDK | BL | E-mails with attorneys re status of various litigation items, need for call and agenda of items (.2); Attend conference call with attorneys re various litigation matters ongoing, including Dondero issues, UBS issues (.7);  Review of J Morris extensive summary of numerous tasks re same (.1). | 1.00 | 1145.00 | $1,145.00 |
| 12/24/2020 | IDK | BL | Review of numerous E-mails with attorneys re deposition logistics on Clubock. | 0.20 | 1145.00 | $229.00 |
| 12/24/2020 | IDK | BL | Review of E-mails with CEO, others on further revised letters to K&L Gates on responses to their NextPoint letters re CLOs. | 0.20 | 1145.00 | $229.00 |
| 12/24/2020 | IDK | BL | E-mail to J Morris re revised complaint for injunction vs Dondero re plan, including brief review. | 0.20 | 1145.00 | $229.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/24/2020 | IDK | BL | E-mails with Dondero counsel re his feedback on our letters to and from NextPoint counsel on CLOs, interference, sales from same, and Dondero role. | 0.20 | 1145.00 | $229.00 |
| 12/24/2020 | JNP | BL | Email to team regarding litigation call and agenda. | 0.10 | 1075.00 | $107.50 |
| 12/24/2020 | JNP | BL | Review letters to KL Gates regarding CLOs. | 0.10 | 1075.00 | $107.50 |
| 12/24/2020 | JNP | BL | Conference with J. Dubel regarding outstanding litigation issue. | 0.70 | 1075.00 | $752.50 |
| 12/24/2020 | JNP | BL | Conference with PSZJ regarding discovery and litigation issues. | 0.70 | 1075.00 | $752.50 |
| 12/24/2020 | JNP | BL | Review and forward M Lynn email regarding discovery to the Board. | 0.10 | 1075.00 | $107.50 |
| 12/24/2020 | JNP | BL | Email to M. Lynn enclosing letters to K&L Gates and subsequent emails regarding same. | 0.20 | 1075.00 | $215.00 |
| 12/24/2020 | JNP | BL | Email to and from M. Lynn regarding discovery. | 0.10 | 1075.00 | $107.50 |
| 12/24/2020 | JAM | BL | Draft JAM Declaration in support of HarbourVest Rule 9019 motion (0.3); e-mail to G. Demo, H. Winograd re: JAM Declaration in support of HarbourVest Rule 9019 motion (0.1); review/revise letter to K&L Gates re: interference with Debtor?s role as CLO portfolio manager (0.4); e-mail to G. Demo re: revisions to K&L Gates re: interference with Debtor?s role as CLO portfolio manager (0.1); review/revise letter to K&L Gates re: threatened termination of Debtor as CLO portfolio manager (0.3); review e-mails between H. Winograd, Z. Annable re: HarbourVest filings (0.2); e-mail to G. Demo re: revisions to letter to K&L Gates re: threatened termination of Debtor as CLO portfolio manager (0.1); e-mails with J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: Clubok deposition (0.1); e-mails with H. Winograd, L. Canty, K. Klausner re: court reporter for Dondero and Clubok depositions (0.2); telephone conference with G. Demo re: status of letters to K&L Gates and related litigation issues (0.3); review proposed Order for HarbourVest Rule 9019 motion (0.1); e-mails with Z. Annabel re: filing of Dondero and Clubok deposition notices (0.1); telephone conference with J. Pomerantz, R. Feinstein, I. Kharasch, G. Demo, H. Winograd re: litigation workstreams (0.7); e-mail to J. Pomerantz, R. Feinstein, I. Kharasch, G. Demo, H. Winograd re: litigation workstreams (0.7); review e-mails between J. Pomerantz, M. Lynn re: document requests and CLO issues (0.2); telephone conference with H. Winograd re: litigation workstream issues (0.1); e-mail to J. Seery re: | 4.10 | 1075.00 | $4,407.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | proposed amended Complaint against Dondero (0.1). | | | |
| 12/24/2020 | GVD | BL | Revise and circulate letters to K&L Gates re CLO issues | 1.00 | 825.00 | $825.00 |
| 12/24/2020 | GVD | BL | Conference with J. Morris re litigation strategy | 0.30 | 825.00 | $247.50 |
| 12/24/2020 | GVD | BL | Conference with PSZJ team re litigation strategy and next steps | 0.70 | 825.00 | $577.50 |
| 12/24/2020 | HRW | BL | Draft and prepare Proposed Order and Declaration for HarbourVest 9019 Motion (3.5); PSZJ Scheduling Call (0.6); Call with J. Morris re: TRO against Advisors, Funds, CLO Holdco (0.1). | 4.20 | 625.00 | $2,625.00 |
| 12/25/2020 | JAM | BL | Review documents and begin working on outline for Dondero deposition (3.4). | 3.40 | 1075.00 | $3,655.00 |
| 12/26/2020 | IDK | BL | E-mails with J Morris re IFA counsel request to attend depo and status of IFA. | 0.20 | 1145.00 | $229.00 |
| 12/26/2020 | JNP | BL | Conference with J. Dubel regarding UBS and related litigation matters (2x). | 0.60 | 1075.00 | $645.00 |
| 12/26/2020 | JNP | BL | Conference with Gregory V. Demo and Robert J. Feinstein regarding Multi Strat state court litigation. | 0.20 | 1075.00 | $215.00 |
| 12/26/2020 | JNP | BL | Conference with Gregory V. Demo regarding litigation matters. | 0.20 | 1075.00 | $215.00 |
| 12/26/2020 | JNP | BL | Emails regarding request to participate in J. Dondero deposition. | 0.10 | 1075.00 | $107.50 |
| 12/26/2020 | JAM | BL | Continued work on outline for Dondero deposition (2.2); e-mail to J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: Dondero deposition outline (0.1); review documents and draft statement of facts for TRO against K&L Gates? clients (1.1). | 3.40 | 1075.00 | $3,655.00 |
| 12/26/2020 | GVD | BL | Conference with R. Feinstein and J. Pomerantz re UBS litigation | 0.20 | 825.00 | $165.00 |
| 12/26/2020 | GVD | BL | Review issues re state court litigation for UBS claim | 0.70 | 825.00 | $577.50 |
| 12/26/2020 | HRW | BL | Draft Complaint and Memo of Law in support of TRO against Advisors, Funds, CLO Holdco (1.8). | 1.80 | 625.00 | $1,125.00 |
| 12/27/2020 | IDK | BL | Review of correspondence re draft of amended complaint vs Dondero for violation of TRO, as well as correspondence with Dondero counsel re discovery re TRO and Board. | 0.30 | 1145.00 | $343.50 |
| 12/27/2020 | JNP | BL | Review email from B. Assink regarding Dondero discovery and forward to Board. | 0.10 | 1075.00 | $107.50 |
| 12/27/2020 | JNP | BL | Review email from Gregory V. Demo regarding Multi Strat litigation and respond. | 0.10 | 1075.00 | $107.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/27/2020 | JAM | BL | Continued work on Seery Declaration in support of TRO (2.9); e-mail to G. Demo, H. Winograd re: draft Seery Declaration (0.1); e-mails to L. Canty, G. Demo, H. Winograd re: exhibits for Seery Declaration (0.2); e-mails with G. Demo re: various litigation issues (0.2); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft Seery Declaration (0.1); draft proposed temporary restraining order against the Advisors, Funds and CLO Holdco (0.4); e-mails with H. Winograd re: form of papers in support of TRO (0.1). | 4.00 | 1075.00 | $4,300.00 |
| 12/27/2020 | GVD | BL | Review docket entries in UBS matter and respond to same | 0.30 | 825.00 | $247.50 |
| 12/27/2020 | GVD | BL | Review and revise declaration in support of restraining order | 1.10 | 825.00 | $907.50 |
| 12/27/2020 | GVD | BL | Review and revise complaint re demand notes | 0.50 | 825.00 | $412.50 |
| 12/27/2020 | GVD | BL | Review outline re Dondero deposition | 0.80 | 825.00 | $660.00 |
| 12/27/2020 | GVD | BL | Review amended complaint re TRO | 0.50 | 825.00 | $412.50 |
| 12/27/2020 | HRW | BL | Draft Complaint and Memo of Law in support of TRO against Advisors, Funds, CLO Holdco (7.5). | 7.50 | 625.00 | $4,687.50 |
| 12/28/2020 | IDK | BL | E-mails with CEO, attorneys re today's e-mail exchanges with Dondero counsel re its objection to Dondero deposition later this week, including review of same, and next steps re pulling e-mails with Dondero (.2); Brief review of various e-mails produced by Dondero (.3). | 0.50 | 1145.00 | $572.50 |
| 12/28/2020 | IDK | BL | Numerous e-mails with attorneys re draft TRO, including brief review of same, re Dondero, as well as draft complaint vs NPA and HCMFA (.3); E-mails with attorneys re Dondero's just filed motion to quash discovery and potential responses, and potential draft response to same, including finalized version for filing today (.3); Review of Court's chambers message on Dondero motion to quash (.1); E-mails with attorneys re our draft of order re same, as well as Dondero counsel comments/disputes to same (.1). | 0.80 | 1145.00 | $916.00 |
| 12/28/2020 | IDK | BL | Review of numerous e-mails with Board, others on MS and Reid Collins role and inquiries re same (.2); Review of correspondence from Reid Collins after call re same today and its reaction (.1); Telephone conference with J. Pomerantz re same (.1). | 0.40 | 1145.00 | $458.00 |
| 12/28/2020 | IDK | BL | E-mails with Board, others re NPA/Holdco extensive response letter to Debtor on allegations of breach of TRO and potential response and hearing | 0.20 | 1145.00 | $229.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | (.2). | | | |
| 12/28/2020 | IDK | BL | Telephone conference with R. Pachulski and J. Pomerantz on various litigation issues with UBS, Clubbock, Dondero. | 0.40 | 1145.00 | $458.00 |
| 12/28/2020 | JNP | BL | Review emails regarding Dondero discovery. | 0.10 | 1075.00 | $107.50 |
| 12/28/2020 | JNP | BL | Review Dondero motion for protective order. | 0.10 | 1075.00 | $107.50 |
| 12/28/2020 | JNP | BL | Review proposed TRO regarding CLO investors and advisors. | 0.10 | 1075.00 | $107.50 |
| 12/28/2020 | JNP | BL | Review J. Seery Declaration regarding TRO regarding CLO investors and advisors. | 0.30 | 1075.00 | $322.50 |
| 12/28/2020 | JNP | BL | Conference with John A. Morris regarding Dondero discovery motion and related issues. | 0.20 | 1075.00 | $215.00 |
| 12/28/2020 | JNP | BL | Conference with Robert J. Feinstein and John A. Morris regarding Dondero and UBS discovery. | 0.30 | 1075.00 | $322.50 |
| 12/28/2020 | JNP | BL | Conference with J. Dubel regarding Dondero discovery dispute and UBS (Several). | 0.80 | 1075.00 | $860.00 |
| 12/28/2020 | JNP | BL | Review opposition to discovery motion by Dondero. | 0.10 | 1075.00 | $107.50 |
| 12/28/2020 | JNP | BL | Conference with John A. Morris regarding opposition to discovery motion by Dondero. | 0.10 | 1075.00 | $107.50 |
| 12/28/2020 | JNP | BL | Review emails with Reid Collins regarding UBS and Multi Strat. | 0.20 | 1075.00 | $215.00 |
| 12/28/2020 | JNP | BL | Conference with John A. Morris and Gregory V. Demo regarding UBS Multi Strat litigation. | 0.20 | 1075.00 | $215.00 |
| 12/28/2020 | JNP | BL | Email regarding creditor participation in J. Dondero deposition. | 0.10 | 1075.00 | $107.50 |
| 12/28/2020 | JNP | BL | Conference with Reid Collins, John A. Morris and Gregory V. Demo regarding UBS Multi Strat litigation. | 0.30 | 1075.00 | $322.50 |
| 12/28/2020 | JNP | BL | Conference with J. Seery, Robert J. Feinstein, John A. Morris and Gregory V. Demo regarding UBS Multi Strat litigation. | 0.70 | 1075.00 | $752.50 |
| 12/28/2020 | JNP | BL | Conference with Richard M. Pachulski and Ira D. Kharasch regarding UBS and Multi Strat. | 0.40 | 1075.00 | $430.00 |
| 12/28/2020 | JNP | BL | Conference with Gregory V. Demo and John A. Morris regarding discovery from Dondero. | 0.30 | 1075.00 | $322.50 |
| 12/28/2020 | JNP | BL | Conference with Gregory V. Demo regarding J. Seery compensation proposal. | 0.10 | 1075.00 | $107.50 |
| 12/28/2020 | JNP | BL | Email to and from John A. Morris regarding Dondero edits to Order. | 0.10 | 1075.00 | $107.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/28/2020 | JNP | BL | Review internal emails regarding Preliminary Injunction. | 0.20 | 1075.00 | $215.00 |
| 12/28/2020 | RMP | BL | Conferences with J. Pomerantz and I. Kharasch re UBS and Dondero issues. | 0.60 | 1445.00 | $867.00 |
| 12/28/2020 | JMF | BL | Review Harborvest 9019 pleadings. | 0.40 | 925.00 | $370.00 |
| 12/28/2020 | JMF | BL | Review motion for protective order re discovery. | 0.30 | 925.00 | $277.50 |
| 12/28/2020 | JAM | BL | E-mail to B. Assink, M. Lynn, J. Bonds, J. Pomerantz, I. Kharasch, G. Demo re: Dondero?s emergency motion for a protective order (0.4); review/revise Seery declaration in support of TRO (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised version of Seery Declaration in support of TRO (0.1); review/revise Complaint for declaratory and injunctive relief against Dondero-related entities (1.2); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised version of Complaint for declaratory and injunctive relief against Dondero-related entities (0.1); review/revise proposed Temporary Restraining Order against Dondero-related entities (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised version of Temporary Restraining Order against Dondero-related entities (0.1); e-mail to H. Winograd re: Complaint (0.1); e-mails to Z. Annable, G. Demo, H. Winograd, M. Hayward re: further filings (0.1); review Dondero emergency motion for a protective order (0.7); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: objection to Dondero emergency motion for protective order (0.7); draft objection to Dondero emergency motion for a protective order (2.2); telephone conference with G. Demo re: Dondero emails (0.1); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft objection to Dondero emergency motion for a protective order (0.1); revise draft objection to Dondero emergency motion for a protective order (0.1); telephone conference with J. Pomerantz, R. Feinstein re: Dondero motion for protective order and related matters (0.3); telephone conference with J. Pomerantz, G. Demo, W. Reid re: UBS litigation (0.3); telephone conference with J. Seery, J. Pomerantz, R. Feinstein, G. Demo re: UBS litigation and related matters (0.7); review communications from Court re: Dondero emergency motion for a protective order (0.1); telephone conference with J. Kathman re: Daugherty claim and litigation (0.1); draft Amended Notices of Deposition for Dondero | 10.90 | 1075.00 | $11,717.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | and Clubok (0.2); draft proposed Order resolving Dondero motion for a protective order (0.7); e-mail to B. Assink, M. Lynn, J. Bond, J. Pomerantz, G. Demo re: proposed Order resolving Dondero motion for protective order (0.1); telephone conference with G. Demo re: document review (0.1); telephone conference with J. Pomerantz, G. Demo re: document review (0.3); review revised Complaint against Dondero-related entities (0.4). | | | |
| 12/28/2020 | GVD | BL | Review Dondero motions to quash discovery | 0.20 | 825.00 | $165.00 |
| 12/28/2020 | GVD | BL | Conference with Reid Collins, J. Pomerantz, and J. Morris | 0.30 | 825.00 | $247.50 |
| 12/28/2020 | GVD | BL | Conference re compiling discovery requests | 0.30 | 825.00 | $247.50 |
| 12/28/2020 | GVD | BL | Conference with J. Seery re discovery issues | 0.20 | 825.00 | $165.00 |
| 12/28/2020 | GVD | BL | Review multiple motions re potential Dondero litigation | 1.30 | 825.00 | $1,072.50 |
| 12/28/2020 | GVD | BL | Review discovery materials and correspondence re same | 1.50 | 825.00 | $1,237.50 |
| 12/28/2020 | GVD | BL | Conference with J. Dubel re correspondence with Reid Collins; revise and send same | 0.70 | 825.00 | $577.50 |
| 12/28/2020 | GVD | BL | Conference with J. Pomerantz, J. Morris, R. Feinstein, and J. Seery re open litigation issues and next steps | 0.70 | 825.00 | $577.50 |
| 12/28/2020 | HRW | BL | Draft and prepare Complaint, Memo of Law, and ancillary papers in support of TRO against Advisors, Funds, CLO Holdco (9.8). | 9.80 | 625.00 | $6,125.00 |
| 12/29/2020 | JNP | BL | Review and respond to draft email to A. Clubock. | 0.10 | 1075.00 | $107.50 |
| 12/29/2020 | JNP | BL | Conference with John A. Morris regarding discovery. | 0.10 | 1075.00 | $107.50 |
| 12/29/2020 | JNP | BL | Conference with J. Dubel regarding status of various litigation matters (4x). | 0.70 | 1075.00 | $752.50 |
| 12/29/2020 | JNP | BL | Conference with D. Draper, John A. Morris and Gregory V. Demo regarding claims. | 0.30 | 1075.00 | $322.50 |
| 12/29/2020 | JNP | BL | Conference with Ira D. Kharasch, John A. Morris, H.. Winograd, Gregory V. Demo and Robert J. Feinstein regarding various pending litigation matters including UBS, CLOs and Dondero. | 1.00 | 1075.00 | $1,075.00 |
| 12/29/2020 | JNP | BL | Review M. Sosland letter regarding discovery. | 0.10 | 1075.00 | $107.50 |
| 12/29/2020 | JNP | BL | Conference with John A. Morris regarding M. Sosland letter. | 0.10 | 1075.00 | $107.50 |
| 12/29/2020 | JNP | BL | Conference with Ira D. Kharasch regarding litigation | 0.10 | 1075.00 | $107.50 |

**HIGHLY CONFIDENTIAL**                                                    **HCMLP 000780**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | issues. |  |  |  |
| 12/29/2020 | JNP | BL | Meet and confer with M. Sosland, Latham, John A. Morris and Robert J. Feinstein regarding discovery. | 0.80 | 1075.00 | $860.00 |
| 12/29/2020 | JNP | BL | Email to and from M. Lynn regarding discovery. | 0.10 | 1075.00 | $107.50 |
| 12/29/2020 | JNP | BL | Conference with Robert J. Feinstein and John A. Morris after Latham Sosland meet and confer. | 0.40 | 1075.00 | $430.00 |
| 12/29/2020 | JNP | BL | Review email regarding summary of Multi Strat issues. | 0.20 | 1075.00 | $215.00 |
| 12/29/2020 | JNP | BL | Review email regarding response to Dondero letter regarding missing phone. | 0.10 | 1075.00 | $107.50 |
| 12/29/2020 | JNP | BL | Review emails regarding AT&T wireless account. | 0.10 | 1075.00 | $107.50 |
| 12/29/2020 | JMF | BL | Review motion and entered order re Dondero protective request. | 0.20 | 925.00 | $185.00 |
| 12/29/2020 | JMF | BL | Review committee complaint (.3) and seal order re court registry. | 0.30 | 925.00 | $277.50 |
| 12/29/2020 | JAM | BL | Review documents in connection with Dondero contempt motion (0.5); e-mail to the Board re: documents reviewed in connection with the Dondero contempt motion (0.8); draft e-mail to A. Clubok re: discovery (0.4); e-mails with J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo re: A. Clubok discovery (0.2); revisions to e-mail to A. Clubok (0.1); e-mails with A. Clubok re: discovery (0.2); revise proposed Order resolving Dondero emergency motion for protective Order (0.1); e-mails with B. Assink, Z. Annable re: revised Order resolving Dondero emergency motion for protective Order (0.1); telephone conference with J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: various litigation issues (1.0); telephone conference with G. Demo re: privilege issues (0.1); telephone conference with J. Pomerantz re: Clubok response on discovery issues (0.1); e-mails with J. Seery, J. Kathman re: extension of deadline to serve discovery in Daugherty case (0.2); e-mails with B. Assink, M. Lynn, J. Pomerantz, G. Demo re: status of Dondero motions for TRO modifications and future estate transactions (0.2); telephone conference with J. Pomerantz, R. Feinstein, M. Sosland, A. Clubok re: meet and confer on discovery directed to Clubok (0.8); telephone conference with J. Pomerantz, R. Feinstein re: meet and confer on discovery directed to Clubok (0.4); revise document request for Andrew Clubok (0.2); draft e-mail to J. Pomerantz, R. Feinstein, M. Sosland, A. Clubok re: meet and confer on discovery directed to Clubok | 7.00 | 1075.00 | $7,525.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | (0.4); telephone conference with J. Pomerantz re: draft e-mail concerning meet and confer on Clubok discovery (0.1); revise draft e-mail to  J. Pomerantz, R. Feinstein, M. Sosland, A. Clubok re: meet and confer on discovery directed to Clubok (0.2); e-mail to J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: Dondero cell phone (0.4); e-mail to M. Lynn, B. Assink, J. Pomerantz, R. Feinstein, I. Kharasch, G. Demo, re: Dondero?s cell phone (0.3); telephone conference with J. Seery re: Dondero/Clubok discovery issues (0.2). | | | |
| 12/29/2020 | EAW | BL | Review letter from A. Clubok re: claims against MultiStrat. | 0.20 | 825.00 | $165.00 |
| 12/29/2020 | GVD | BL | Review correspondence re email discovery | 0.20 | 825.00 | $165.00 |
| 12/29/2020 | GVD | BL | Conference with J. Morris re discovery issues | 0.10 | 825.00 | $82.50 |
| 12/29/2020 | GVD | BL | Review draft correspondence re deposition and discovery notices | 0.30 | 825.00 | $247.50 |
| 12/29/2020 | GVD | BL | Review presentation re historic trading | 0.30 | 825.00 | $247.50 |
| 12/29/2020 | GVD | BL | Conference with Draper firm re Dugaboy claims | 0.30 | 825.00 | $247.50 |
| 12/29/2020 | GVD | BL | Conference with PSZJ team re litigation issues (1.0); draft notes re same (0.2) | 1.20 | 825.00 | $990.00 |
| 12/29/2020 | GVD | BL | Conference with J. Morris re privilege issues | 0.20 | 825.00 | $165.00 |
| 12/29/2020 | GVD | BL | Multiple conferences with J. Seery re discovery issues | 0.30 | 825.00 | $247.50 |
| 12/29/2020 | GVD | BL | Correspondence with K&L Gates re litigation issues | 0.20 | 825.00 | $165.00 |
| 12/29/2020 | HRW | BL | Draft and edit TRO papers (1.5); Draft Document requests directed to Hunter Mountain (1.3); PSZJ call re: Discovery Issues (0.8); Review Clubok objections to document requests (0.2); Review Dondero objections to document production (0.2). | 4.00 | 625.00 | $2,500.00 |
| 12/30/2020 | JNP | BL | Review proposed email to clerk regarding discovery. | 0.10 | 1075.00 | $107.50 |
| 12/30/2020 | JNP | BL | Conference with Ira D. Kharasch and John A. Morris regarding Dondero phone and clerk email regarding discovery. | 0.30 | 1075.00 | $322.50 |
| 12/30/2020 | JNP | BL | Conference with J. Dubel regarding call with KL Gates and UBS matters. | 0.20 | 1075.00 | $215.00 |
| 12/30/2020 | JNP | BL | Conference with J. Kane, KL Gates, Gregory V. Demo and John A. Morris regarding CLO issues. | 0.50 | 1075.00 | $537.50 |
| 12/30/2020 | JNP | BL | Conference with Gregory V. Demo and John A. Morris after call with KL Gates. | 0.30 | 1075.00 | $322.50 |
| 12/30/2020 | JNP | BL | Conference with Ira D. Kharasch regarding call with | 0.20 | 1075.00 | $215.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | KL Gates and UBS matters. | | | |
| 12/30/2020 | JNP | BL | Email to and from M. Lynn regarding request to allow Dondero one more day to clean out office. | 0.10 | 1075.00 | $107.50 |
| 12/30/2020 | JNP | BL | Conference with John A. Morris regarding discovery. | 0.20 | 1075.00 | $215.00 |
| 12/30/2020 | RMP | BL | Conferences with J. Pomerantz and I. Kharasch re various litigation and plan issues. | 0.80 | 1445.00 | $1,156.00 |
| 12/30/2020 | JMF | BL | Review amended complaint re CLO Holdco entities. | 0.30 | 925.00 | $277.50 |
| 12/30/2020 | JAM | BL | E-mail to J. Donohue, G. Demo re: AT&T contract (0.1); e-mails with R. Feinstein, H. Winograd re: AT&T and cell phone issues (0.1); draft e-mail to court re: Dondero document production and privilege issues (0.7); telephone conference with J. Pomerantz re: discovery issues (0.3); revise e-mail to court re: Dondero document production and privilege issues (0.1); telephone conference with J. Pomerantz, G. Demo, J. Kane, K&L Gates lawyers re: management and control of CLOs (0.5); telephone conference with J. Pomerantz, G. Demo re: follow-up to call with K&L Gates concerning management and control of CLOs (0.3); draft letter to M. Lynn re: Dondero?s cell phones (0.4); draft e-mail to M. Sosland re: Clubok discovery issues (0.3); communications with J. Pomerantz re: draft e-mail to M. Sosland re: Clubok discovery issues (0.1); revise e-mail to M. Sosland re: Clubok discovery issues (0.1). | 3.00 | 1075.00 | $3,225.00 |
| 12/30/2020 | GVD | BL | Conference with counsel to employees re indemnification issues | 0.30 | 825.00 | $247.50 |
| 12/30/2020 | GVD | BL | Compile and email transcripts to counsel to employees | 0.30 | 825.00 | $247.50 |
| 12/30/2020 | GVD | BL | Review discovery issues | 0.70 | 825.00 | $577.50 |
| 12/30/2020 | GVD | BL | Conference with counsel to NPA/HCMFA/DAF re CLO issues and follow up re same | 0.80 | 825.00 | $660.00 |
| 12/30/2020 | GVD | BL | Conference with J. Seery re discovery issues | 0.20 | 825.00 | $165.00 |
| 12/30/2020 | GVD | BL | Correspondence with M. Lynn re discovery issues | 0.30 | 825.00 | $247.50 |
| 12/30/2020 | GVD | BL | Conference with J. Morris re discovery issues | 0.20 | 825.00 | $165.00 |
| 12/30/2020 | HRW | BL | Draft document requests directed to Hunter Mountain and HCRE (3.9); Call AT&T to retrieve HCMLP phone records (0.3); Call with K&L Gates re: Discussion of open issues (0.5). | 4.70 | 625.00 | $2,937.50 |
| 12/31/2020 | JNP | BL | Conference with Gregory V. Demo regarding discovery and related issues. | 0.20 | 1075.00 | $215.00 |

**HIGHLY CONFIDENTIAL**                                                      HCMLP 000783

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/31/2020 | JNP | BL | Conference with John A. Morris regarding discovery. | 0.10 | 1075.00 | $107.50 |
| 12/31/2020 | JNP | BL | Review discovery provided by J. Dondero. | 0.20 | 1075.00 | $215.00 |
| 12/31/2020 | JNP | BL | Conference with J. Dubel regarding UBS status and related matters. | 0.70 | 1075.00 | $752.50 |
| 12/31/2020 | JNP | BL | Conference with Ira D. Kharasch regarding call with J. Dubel regarding UBS. | 0.20 | 1075.00 | $215.00 |
| 12/31/2020 | JAM | BL | Review documents/e-mails in connection with Preliminary Injunction motion (0.9); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, L. Canty re: document review (0.3); communications with Court, B. Assink, M. Lynn, J. Pomerantz, G. Demo re: Dondero document production (0.1); review documents produced by Dondero (0.8); review/revise document requests for Hunter Mountain (0.4); e-mail to J. Pomerantz, I. Kharasch, G. Demo, J. Seery, H. Winograd re: document requests for Hunter Mountain (0.1) review/revise document requests for HCREP (0.3); e-mail to J. Pomerantz, I. Kharasch, G. Demo, J. Seery, H. Winograd re: document requests for HCREP (0.1); telephone conference with J. Seery re: litigation issues (0.2): telephone conference with J. Pomerantz re: Dondero discovery issues (0.1); e-mail to G. Demo, H. Winograd, L. Drawhorn re: document requests for HCREP (0.1); e-mail to G. Demo, H. Winograd, P. Keiffer re: document requests for Hunter Mountain (0.1). | 3.50 | 1075.00 | $3,762.50 |
| 12/31/2020 | GVD | BL | Review discovery materials | 4.30 | 825.00 | $3,547.50 |
| 12/31/2020 | GVD | BL | Review letters from K&L Gates re Dondero issues | 0.30 | 825.00 | $247.50 |
| 12/31/2020 | HRW | BL | Review document requests directed to Hunter Mountain and HCRE (0.6). | 0.60 | 625.00 | $375.00 |
| | | | | **562.10** | | **$526,686.00** |

**HIGHLY CONFIDENTIAL**

# EXHIBIT 43

# Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700 Dallas,
TX  75201

January 31, 2021
Invoice    127077
Client     36027
Matter     00002
**JNP**

RE:  Postpetition

---

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH   01/31/2021

FEES                                                                    $698,770.00

                                                        _____

**TOTAL CURRENT CHARGES**                               **$698,770.00**

## Bankruptcy Litigation [L430]

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/10/2020 | LSC | BL | Prepare for and attend hearing on emergency TRO hearing. | 3.00 | 425.00 | $1,275.00 |
| 12/14/2020 | LSC | BL | Prepare for and assist at deposition of James Dondero (3.4); prepare exhibits and related documents for Norris deposition (3.7). | 7.10 | 425.00 | $3,017.50 |
| 12/15/2020 | LSC | BL | Prepare for and assist at Norris deposition. | 3.70 | 425.00 | $1,572.50 |

**HIGHLY CONFIDENTIAL**                                           **HCMLP 000786**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/23/2020 | JNP | BL | Conference with J. Dubel regarding UBS and Multi Strat. | 0.20 | 1075.00 | $215.00 |
| 12/23/2020 | JNP | BL | Conference with Gregory V. Demo and John A. Morris regarding CLO issues and Dondero issues. | 0.50 | 1075.00 | $537.50 |
| 12/23/2020 | JNP | BL | Review and respond to M. Lynn email regarding discovery requests (2x). | 0.20 | 1075.00 | $215.00 |
| 12/23/2020 | JNP | BL | Conference with J. Seery regarding litigation and discovery related issues. | 0.20 | 1075.00 | $215.00 |
| 12/24/2020 | RJF | BL | Internal emails regarding pending litigation matters, including UBS discovery. | 0.70 | 1245.00 | $871.50 |
| 12/26/2020 | RJF | BL | Telephone conference with Jeffrey N. Pomerantz, Gregory V.Demo, Multi-Strat litigation counsel. | 0.30 | 1245.00 | $373.50 |
| 12/28/2020 | RJF | BL | Telephone conference with John A. Morris regarding discovery motion. | 0.30 | 1245.00 | $373.50 |
| 12/28/2020 | RJF | BL | Review Dondero motion to quash, related emails. | 0.30 | 1245.00 | $373.50 |
| 12/28/2020 | RJF | BL | Internal call regarding litigation issues. | 0.70 | 1245.00 | $871.50 |
| 12/29/2020 | IDK | BL | Attend conference call with internal team on next steps re UBS and Dondero interference, upcoming depos with Clubok, issues on employees conspiring with Dondero (1.0). | 1.00 | 1145.00 | $1,145.00 |
| 12/29/2020 | IDK | BL | Review of UBS extensive letter denying conspiracy allegations with Dondero, and correspondence with attorneys re same and related discovery, and draft response to same on discovery (.3). | 0.30 | 1145.00 | $343.50 |
| 12/29/2020 | IDK | BL | E-mails with attorneys re draft memo to Board on E-mails found on system re Dondero, others on TRO issues (.1); E-mail to DSI re CLO similar trades made by Dondero (.1); E-mails with attorneys re next steps in UBS/Clubok discovery given non-production by same, including draft E-mail to Clubok, and later re Clubok response to same, and how to respond (.2). | 0.40 | 1145.00 | $458.00 |
| 12/29/2020 | IDK | BL | E-mails with Board, others re summary of E-mails of Dondero, others on system demonstrating breach of TRO and evidence (.2); E-mails with attorneys re Dondero counsel letter re lost cell phone and next steps re same, including draft of letter re same (.2). | 0.40 | 1145.00 | $458.00 |
| 12/29/2020 | IDK | BL | Telephone conference with J. Pomerantz re depos and Scott Ellington (.1). | 0.10 | 1145.00 | $114.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 12/29/2020 | RJF | BL | Review emails regarding Multi-Strat and draft discovery request regarding same. | 0.10 | 1245.00 | $124.50 |
| 12/29/2020 | RJF | BL | Attend Board Meeting. | 1.30 | 1245.00 | $1,618.50 |
| 12/29/2020 | RJF | BL | Call with Jeffrey N. Pomerantz, John A. Morris, Ira Kharasch, Gregory V. Demo and Hayley R. Winograd regarding pending litigation matters. | 1.00 | 1245.00 | $1,245.00 |
| 12/29/2020 | RJF | BL | Review internal claims memo, related research. | 2.00 | 1245.00 | $2,490.00 |
| 12/29/2020 | RJF | BL | Review Latham letter regarding multi-strat and related docs. | 0.40 | 1245.00 | $498.00 |
| 12/29/2020 | RJF | BL | Call with Sosland, Clubok, John A. Morris, and Jeffrey N. Pomerantz regarding Clubok discovery meet and confer (.7), follow up call with Jeffrey N. Pomerantz and John A. Morris regarding Clubok discovery (.3). | 1.00 | 1245.00 | $1,245.00 |
| 12/29/2020 | RJF | BL | Review UBS correspondence. | 0.50 | 1245.00 | $622.50 |
| 12/30/2020 | IDK | BL | Telephone conference with J. Pomerantz and J Morris re draft letter to clerk of court on dispute over attorney client privilege in discovery disputes with UBS/Dondero (.2); E-mails with J Morris, others re same, as well as my feedback for changes to same (.2). | 0.40 | 1145.00 | $458.00 |
| 12/30/2020 | IDK | BL | Telephone conference with J. Pomerantz re result of call with NextPoint counsel and related litigation issues (.2). | 0.20 | 1145.00 | $229.00 |
| 12/30/2020 | IDK | BL | E-mails with Board, others on proposed response to Dondero counsel's latest on lost cell phone, and revisions to same (.2); E-mail to J Morris re going for contempt of TRO based on various violations (.1). | 0.30 | 1145.00 | $343.50 |
| 12/30/2020 | IDK | BL | Review of numerous correspondence with Board, others on drafts response to UBS counsel on discovery/depos. | 0.20 | 1145.00 | $229.00 |
| 12/30/2020 | RJF | BL | Review debtor emails and related research regarding Multi-Strat. | 1.00 | 1245.00 | $1,245.00 |
| 12/30/2020 | RJF | BL | Telephone conference with Rob Saunders regarding multi-strat research. | 0.40 | 1245.00 | $498.00 |
| 12/30/2020 | RJF | BL | Internal emails regarding cell phones. | 0.30 | 1245.00 | $373.50 |
| 12/30/2020 | RJF | BL | Review and comment on correspondence with UBS | 0.70 | 1245.00 | $871.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | regarding discovery, related internal emails. | | | |
| 12/30/2020 | RJF | BL | Review and comment on response to Clubok motion for protective order. | 0.30 | 1245.00 | $373.50 |
| 12/31/2020 | IDK | BL | Review of NPA counsel letter re eviction of Dondero from office and consequences (.1); E-mails with attorneys, Board re same (.1). | 0.20 | 1145.00 | $229.00 |
| 12/31/2020 | IDK | BL | Review briefly correspondence from Dondero re document production, as well as summary of document review re same, and lost cell phone issues. | 0.20 | 1145.00 | $229.00 |
| 12/31/2020 | RJF | BL | Attend Board of Directors meeting. | 1.00 | 1245.00 | $1,245.00 |
| 12/31/2020 | RJF | BL | Review docs produced by Clubok and related internal emails. | 1.00 | 1245.00 | $1,245.00 |
| 01/01/2021 | IDK | BL | E-mails with J Morris, and G Demo re discovery on E-mails with Ellington, Leventon re Dondero and conflicts, including getting Gov Re to authorized payments to employees for law firms. | 0.20 | 1325.00 | $265.00 |
| 01/01/2021 | IDK | BL | Attend conference call with J. Pomerantz, others on UBS issues (.5). | 0.50 | 1325.00 | $662.50 |
| 01/01/2021 | IDK | BL | Review of correspondence with CEO with J Morris on Harbourvest negotiations. | 0.20 | 1325.00 | $265.00 |
| 01/01/2021 | JNP | BL | Conference with John A. Morris (several) regarding litigation issues. | 0.50 | 1295.00 | $647.50 |
| 01/01/2021 | JNP | BL | Conference with Ira D. Kharasch, Robert J. Feinstein and John A. Morris regarding UBS issues. | 0.50 | 1295.00 | $647.50 |
| 01/01/2021 | JNP | BL | Various calls with J. Dubel regarding UBS issues. | 0.90 | 1295.00 | $1,165.50 |
| 01/01/2021 | RJF | BL | Internal call regarding UBS developments. | 0.50 | 1395.00 | $697.50 |
| 01/01/2021 | JAM | BL | Review documents produced by Dondero (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: review of documents (0.2); e-mail to J. Pomerantz, I. Kharasch, G. Demo H. Winograd re: Dondero request for HarbourVest deposition (0.2); review documents produced by Clubok (1.1); telephone conference with J. Dubel re: UBS litigation issues (0.2); e-mail to J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: documents produced by Clubok (0.3); telephone conference with J. Dubel re: follow up on UBS litigation issues (0.2); e-mails to J. Dubel re: UBS litigation issues (0.1); telephone conference with G. Demo, E. Weisgerber, D. Stroik re: Dondero request | 3.90 | 1245.00 | $4,855.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | for HarbourVest deposition (0.1); telephone conference with J. Pomerantz re: litigation issues (0.1); telephone conference with J. Dubel re: further discussion about UBS-related litigation issues (0.1); telephone conference with J. Pomerantz re: Dondero, UBS, and related litigation matters (0.2); telephone conference with J. Pomerantz, I. Kharasch, R Feinstein (partial participation) re: Dondero, UBS and related litigation matters (0.3). |  |  |  |
| 01/01/2021 | GVD | BL | Conference with J. Morris re discovery issues | 0.20 | 950.00 | $190.00 |
| 01/01/2021 | GVD | BL | Review discovery | 1.80 | 950.00 | $1,710.00 |
| 01/02/2021 | IDK | BL | Attend conference call with J. Pomerantz, R Feinstein, G Demo re UBS and litigation issues (.6). | 0.60 | 1325.00 | $795.00 |
| 01/02/2021 | IDK | BL | E-mails J Morris, others on Seery deposition and form of TRO, and list of issues for deposition (.2). | 0.20 | 1325.00 | $265.00 |
| 01/02/2021 | IDK | BL | Telephone conferences with I Nasatir re Gov Re issues (.2); Review and consider I Nasatir memo on Gov Re policy issues on coverage and Ellington/Leventon use for wage issues (.2); E-mail to I Nasatir re follow up issues for same (.1). | 0.50 | 1325.00 | $662.50 |
| 01/02/2021 | JNP | BL | Conference with J. Seery, John A. Morris, Gregory V. Demo and Robert J. Feinstein regarding UBS and other litigation issues. | 1.50 | 1295.00 | $1,942.50 |
| 01/02/2021 | JNP | BL | Conference with Robert J. Feinstein regarding UBS issues. | 0.10 | 1295.00 | $129.50 |
| 01/02/2021 | JNP | BL | Email to and from Robert J. Feinstein issues relating to UBS settlement. | 0.10 | 1295.00 | $129.50 |
| 01/02/2021 | JNP | BL | Conference with J. Dubel regarding status of various litigation issues. | 0.70 | 1295.00 | $906.50 |
| 01/02/2021 | JNP | BL | Conference with J. Seery regarding UBS and related issues. | 0.40 | 1295.00 | $518.00 |
| 01/02/2021 | JNP | BL | Review Seery Declaration and order regarding CLO Advisors, Funds and emails regarding same. | 0.30 | 1295.00 | $388.50 |
| 01/02/2021 | JNP | BL | Conference with John A. Morris, Gregory V. Demo, Richard J. Gruber and Ira D. Kharasch regarding UBS and litigation issues. | 0.60 | 1295.00 | $777.00 |
| 01/02/2021 | JNP | BL | Review email from Gregory V. Demo regarding issues to address in UBS settlement. | 0.10 | 1295.00 | $129.50 |
| 01/02/2021 | RJF | BL | Internal call regarding open UBS items (.6), analysis | 3.90 | 1395.00 | $5,440.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | of claim vs. multi-strat (1.8), call with Seery regarding multi-strat claim (1.5). |  |  |  |
| 01/02/2021 | JAM | BL | Review documents/prepare for Dondero deposition (2.1); review/revise Seery Declaration in support of TRO (0.7); review/revise proposed TRO (0.2); review/revise Emergency Motion for TRO (0.3); review/revise Notice of Hearing (0.2); review/revise Complaint (1.4); telephone conference with G. Demo re: litigation issues (0.2); e-mails to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: papers against Advisors, Funds, and CLO Holdco (0.2); telephone conference with J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo re: UBS and litigation issues (0.6); telephone conference with J. Seery, J. Pomerantz, R. Feinstein, G. Demo re: Multistrat litigation and potential UBS settlement analysis (1.5). | 7.40 | 1245.00 | $9,213.00 |
| 01/02/2021 | GVD | BL | Draft response to third K&L Gates letter | 0.90 | 950.00 | $855.00 |
| 01/02/2021 | GVD | BL | Multiple conferences with J. Seery re bankruptcy litigation and discovery issues | 0.70 | 950.00 | $665.00 |
| 01/02/2021 | GVD | BL | Review discovery | 0.90 | 950.00 | $855.00 |
| 01/02/2021 | GVD | BL | Conference with PSZJ team and J. Seery re potential litigation issues and next steps | 1.50 | 950.00 | $1,425.00 |
| 01/02/2021 | GVD | BL | Internal PSZJ conference re open litigation items and next steps | 0.60 | 950.00 | $570.00 |
| 01/02/2021 | GVD | BL | Review draft motion for TRO and related documents | 1.00 | 950.00 | $950.00 |
| 01/02/2021 | GVD | BL | Draft list of open settlement items | 0.50 | 950.00 | $475.00 |
| 01/02/2021 | HRW | BL | PSZJ internal call (0.6); Review TRO documents re: Advisors, Funds, CLO Holdco (1.5). | 2.10 | 695.00 | $1,459.50 |
| 01/03/2021 | IDK | BL | E-mail to I Nasatir re his responses to questions re Gov Re policy issues (.2); E-mail to team re same (.1); E-mails with G Demo re his draft memo to CEO re Gov Re and renewal, other issues (.2); Numerous E-mails with CEO, J. Pomerantz re issues on Ellington/Leventon raid on Gov Re policy and implications re estate issues (.4). | 0.90 | 1325.00 | $1,192.50 |
| 01/03/2021 | IDK | BL | E-mails with J Morris, J. Pomerantz, re revised complaint re CLOs, including numerous E-mails re legal issues on CLOs and changes to Seery declaration re same (.3). | 0.30 | 1325.00 | $397.50 |
| 01/03/2021 | JNP | BL | Conference with John A. Morris regarding litigation | 0.10 | 1295.00 | $129.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | issues. | | | |
| 01/03/2021 | JNP | BL | Conference with J. Dubel regarding pending litigation matters (several). | 0.50 | 1295.00 | $647.50 |
| 01/03/2021 | JNP | BL | Review letter to KL Gates regarding J. Dondero. | 0.10 | 1295.00 | $129.50 |
| 01/03/2021 | JNP | BL | Review email regarding returns of UBS settlement. | 0.10 | 1295.00 | $129.50 |
| 01/03/2021 | JNP | BL | Participate on Board call regarding UBS, Dondero and related issues. | 1.50 | 1295.00 | $1,942.50 |
| 01/03/2021 | RJF | BL | Email and telephone conference with Seery regarding f.c. claims. | 0.20 | 1395.00 | $279.00 |
| 01/03/2021 | RJF | BL | Review research regarding NY debtor and creditor law. | 0.40 | 1395.00 | $558.00 |
| 01/03/2021 | RJF | BL | Attend BOD meeting. | 1.40 | 1395.00 | $1,953.00 |
| 01/03/2021 | RJF | BL | Review emails regarding settlement proposal. | 0.40 | 1395.00 | $558.00 |
| 01/03/2021 | JAM | BL | Review/revise letter to K&L Gates re: Dondero (0.7); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised letter to K&L Gates (0.1); e-mails to L. Canty, G. Demo, H. Winograd re: exhibits to Seery Declaration (0.2); review/revise Seery declaration in support of TRO based on comments received (0.8); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised Seery declaration (0.1); review/revise Complaint against the Advisors, the Funds, and CLO Holdco (0.7); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: revised Complaint (0.1); e-mails with G. Demo (copies to J. Pomerantz, I. Kharasch, H. Winograd re: facts concerning ownership and control of Advisors and the Funds, and related matters (0.3); telephone conference with G. Demo re: e-mail concerning Gov Re (0.1); telephone conference with J. Pomerantz, G.Demo, T. Silva, E. Weisgerber, D. Stroik re: HCLOF (0.3); telephone conference with J. Pomerantz, G. Demo, R. Patel, B. Shaw re: Dondero request for deposition on HarbourVest settlement (0.5); telephone conference with Board, J. Pomerantz, I. Kharasch, G. Demo, R. Feinstein re: litigation issues, UBS settlement (1.4); telephone conference with J. Dubel re: litigation issues, UBS settlement (0.4); further discussion with J. Dubel re: UBS issues (0.2); telephone conference with J. Pomerantz re: UBS issues (0.1); e-mails J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: UBS issues (0.2). | 6.20 | 1245.00 | $7,719.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| Date | | | Description | Hours | Rate | Amount |
|------|---|---|-------------|-------|------|--------|
| 01/03/2021 | GVD | BL | Review J. Morris revisions to litigation materials | 0.70 | 950.00 | $665.00 |
| 01/03/2021 | GVD | BL | Conference with J. Morris re litigation strategy | 0.20 | 950.00 | $190.00 |
| 01/03/2021 | HRW | BL | Call re: HCLOF/HarbourVest (0.2). | 0.20 | 695.00 | $139.00 |
| 01/04/2021 | IDK | BL | Numerous correspondence with DSI on Gov Re policy concerns on improper use of proceeds, need for further related docs re bylaws, certificate of incorporation. | 0.30 | 1325.00 | $397.50 |
| 01/04/2021 | IDK | BL | Telephone conferences with  J. Pomerantz re Gov Re D&O policy issues on improper taking of funds, and UBS settlement issues (.5); Telephone conference with  G Demo re Gov Re documents on authority of Dondero, others to direct payment of proceeds (.2); Telephone conferences with  J Morris re Gov Re issues for his upcoming depositions and related questions to ask re Gov Re (.3); E-mails with J. Pomerantz and G Demo re CEO issues on Gov Re and damage issue, and structure of Gov Re control issues (.3). | 1.30 | 1325.00 | $1,722.50 |
| 01/04/2021 | IDK | BL | E-mails J Morris, others re his memo on confirmation discovery schedule (.1);  E-mails with J Morris, client, Leventon re Leventon and Ellington request to attend Dondero deposition (.1). | 0.20 | 1325.00 | $265.00 |
| 01/04/2021 | IDK | BL | Review of draft agenda for 1/6 hearing and correspondence re same (.1). | 0.10 | 1325.00 | $132.50 |
| 01/04/2021 | JNP | BL | Conference with John A. Morris regarding discovery issues (multiple). | 0.50 | 1295.00 | $647.50 |
| 01/04/2021 | JNP | BL | Conference with Robert J. Feinstein regarding UBS settlement. | 0.10 | 1295.00 | $129.50 |
| 01/04/2021 | JNP | BL | Review John A. Morris proposed litigation time line. | 0.10 | 1295.00 | $129.50 |
| 01/04/2021 | JNP | BL | Email regarding participation of senior employees in deposition. | 0.10 | 1295.00 | $129.50 |
| 01/04/2021 | JNP | BL | Conference with J. Dubel regarding UBS settlement. | 0.20 | 1295.00 | $259.00 |
| 01/04/2021 | JNP | BL | Conference with J. Dubel regarding UBS and related issues. | 0.40 | 1295.00 | $518.00 |
| 01/04/2021 | KKY | BL | Draft 1/16/21 agenda | 1.70 | 460.00 | $782.00 |
| 01/04/2021 | RJF | BL | Emails Jeffrey N. Pomerantz, Elissa A. Wagner regarding UBS settlement. | 0.30 | 1395.00 | $418.50 |
| 01/04/2021 | JAM | BL | Draft Second Amended Notice of deposition for | 10.20 | 1245.00 | $12,699.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | Clubok (0.2); telephone conference with G. Demo re: various litigation issues (0.4); telephone conference with L. Canty re: Dondero deposition, exhibits (0.2); telephone conference with J. Pomerantz re: various litigation issues (0.1); e-mails with Z. Annable, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: Second Amended Notice of deposition for Clubok (0.1); telephone conference with J. Pomerantz re: various litigation issues (0.2); emails with Z. Annable, J. Pomerantz re: court availability (0.1); communications with J. Seery, I. Soto re: changes to Seery declaration and related documents for action against Advisors, Funds (0.2); prepare for Dondero deposition (7.4); communications with counsel re: Dondero deposition logistics (0.4); communications with M. Sosland re: Dondero and UBS depositions (0.2); telephone conference with I. Kharasch re: various litigation issues (0.2); telephone conference with J. Seery re: Dondero deposition, Ellington, Leventon (0.2); e-mails concerning Ellington, Leventon and the Dondero deposition (0.2); telephone conference with J. Seery re: Dondero deposition, Ellington, Leventon (0.1). |  |  |  |
| 01/04/2021 | GVD | BL | Conference with J. Morris re bankruptcy litigation | 0.10 | 950.00 | $95.00 |
| 01/04/2021 | GVD | BL | Finalize and send response letter to K&L Gates | 0.20 | 950.00 | $190.00 |
| 01/04/2021 | GVD | BL | Conference with WilmerHale re employee issues | 0.80 | 950.00 | $760.00 |
| 01/04/2021 | GVD | BL | Conference with WilmerHale, J. Seery, and J. Pomerantz re employee issues | 0.50 | 950.00 | $475.00 |
| 01/04/2021 | GVD | BL | Review discovery | 0.30 | 950.00 | $285.00 |
| 01/04/2021 | GVD | BL | Correspondence with H. Winograd re document review issues | 0.10 | 950.00 | $95.00 |
| 01/04/2021 | GVD | BL | Review J. Seery revisions to TRO and correspondence re same | 0.30 | 950.00 | $285.00 |
| 01/04/2021 | GVD | BL | Conference with H. Winograd re review of open discovery issues | 0.30 | 950.00 | $285.00 |
| 01/04/2021 | GVD | BL | Conference with J. Pomerantz re open plan issues | 0.10 | 950.00 | $95.00 |
| 01/04/2021 | HRW | BL | Document review in preparation for Dondero deposition (3.8); HCLOF/HCM Call (0.5). | 4.30 | 695.00 | $2,988.50 |
| 01/05/2021 | IDK | BL | Attend and participate in most of Dondero deposition, including internal calls during breaks (3.5); Telephone conference with J. Pomerantz after | 3.60 | 1325.00 | $4,770.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | deposition re same (.1). | | | |
| 01/05/2021 | IDK | BL | E-mails with CEO, J Morris re deposition issues and Senior Employee counsel demands on attendance. | 0.10 | 1325.00 | $132.50 |
| 01/05/2021 | IDK | BL | E-mails with M. Lynn re issues (.2). | 0.20 | 1325.00 | $265.00 |
| 01/05/2021 | IDK | BL | E-mails with local counsel, J O'Neill re agenda and potential cancellation of hearing tomorrow. | 0.10 | 1325.00 | $132.50 |
| 01/05/2021 | JNP | BL | Participate in J. Dondero deposition. | 4.50 | 1295.00 | $5,827.50 |
| 01/05/2021 | JNP | BL | Conference with Board after J. Dondero deposition. | 0.70 | 1295.00 | $906.50 |
| 01/05/2021 | JNP | BL | Review and respond to Robert J. Feinstein email regarding UBS Settlement Agreement. | 0.30 | 1295.00 | $388.50 |
| 01/05/2021 | JNP | BL | Conference with Richard M. Pachulski regarding J. Dondero deposition. | 0.10 | 1295.00 | $129.50 |
| 01/05/2021 | JNP | BL | Conference with John A. Morris regarding litigation issues. | 0.10 | 1295.00 | $129.50 |
| 01/05/2021 | JNP | BL | Review and respond to email regarding senior employee participation in Dondero deposition. | 0.10 | 1295.00 | $129.50 |
| 01/05/2021 | JNP | BL | Conference with John A. Morris regarding trial subpoenas. | 0.10 | 1295.00 | $129.50 |
| 01/05/2021 | JNP | BL | Review outline for J. Dondero deposition. | 0.30 | 1295.00 | $388.50 |
| 01/05/2021 | JNP | BL | Email to Baker and McKenzie and local counsel regarding trial subpoenas. | 0.10 | 1295.00 | $129.50 |
| 01/05/2021 | KKY | BL | Review and revise 1/6/21 agenda | 0.20 | 460.00 | $92.00 |
| 01/05/2021 | JAM | BL | Review/revise deposition subpoenas for Ellington and Leventon and Notice of Service of Subpoena (0.3); e-mail to J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: revised deposition subpoenas for Ellington and Leventon and Notice of Service of Subpoena (0.1); prepare for Dondero deposition (1.5); e-mail to J. Pomerantz, I. Kharasch, R. Feinstein, G. Demo, H. Winograd re: Dondero deposition outline and exhibits (0.3); e-mail to L. Canty, G. Demo, H. Winograd re: Dondero exhibits (0.1); review scripts for termination of Ellington and Leventon (0.2); Dondero deposition (4.6); telephone conference with Board, J. Pomerantz, I. Kharasch, G Demo re: Dondero deposition and strategic issues (0.7); telephone conference with G. Demo, H. Winograd re: litigation issues (0.4); telephone conference with | 9.70 | 1245.00 | $12,076.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | H. Winograd, A. Clubok re: UBS settlement and related matters (0.3); telephone conference with P. Montgomery re: Dondero deposition and related matters (0.1); telephone conference with J. Pomerantz re: Ellington and Leventon issues (0.1); telephone conference with Board, J. Pomerantz, I. Kharasch, G. Demo re: litigation issues, confirmation (1.0). | | | |
| 01/05/2021 | GVD | BL | Attend board conference re deposition of J. Dondero and next steps | 0.80 | 950.00 | $760.00 |
| 01/05/2021 | GVD | BL | Attend to issues re serving of termination notices | 0.20 | 950.00 | $190.00 |
| 01/05/2021 | GVD | BL | Conference with J. Morris and H. Winograd re litigation strategy | 0.40 | 950.00 | $380.00 |
| 01/05/2021 | GVD | BL | Review outline re Dondero deposition and attend to issues re same | 1.10 | 950.00 | $1,045.00 |
| 01/05/2021 | GVD | BL | Attend deposition of J. Dondero | 4.50 | 950.00 | $4,275.00 |
| 01/05/2021 | HRW | BL | Draft trial subpoenas for Dondero preliminary injunction hearing (2.2); Dondero deposition (3.5); Document review in preparation for Dondero deposition (0.1); Document review to corroborate Ellington's address (0.5); Call with G. Demo and J. Morris re: Dondero deposition (0.1); Call with G. Demo re: Cameron Baynard and Sean Fox document review (0.1); Document review re: Cameron Baynard and Sean Fox (0.8); Edit Memo of Law in support of TRO against Advisors, Funds, CLO Holdco (0.5). | 7.80 | 695.00 | $5,421.00 |
| 01/06/2021 | IDK | BL | Telephone conference with J. Pomerantz re Redeemer feedback on UBS settlement (.1);  Attend initial conference call with attorneys on R Feinstein draft UBS settlement agreement (.5); Attend 2d conference call re same (.5). | 1.10 | 1325.00 | $1,457.50 |
| 01/06/2021 | JNP | BL | Emails to and from M. Hartman regarding deposition transcript and trial subpoena. | 0.20 | 1295.00 | $259.00 |
| 01/06/2021 | JNP | BL | Review emails regarding scheduling of TRO hearing. | 0.10 | 1295.00 | $129.50 |
| 01/06/2021 | JNP | BL | Review and comment on UBS Settlement Agreement. | 0.50 | 1295.00 | $647.50 |
| 01/06/2021 | JNP | BL | Conference with J. Dubel regarding pending litigation issues. | 0.20 | 1295.00 | $259.00 |
| 01/06/2021 | JNP | BL | Conference with Ira D. Kharasch, Robert J. | 1.00 | 1295.00 | $1,295.00 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Feinstein and Gregory V. Demo regarding UBS settlement (2x). | | | |
| 01/06/2021 | JNP | BL | Review email from M. Hankin and call regarding same regarding UBS settlement. | 0.10 | 1295.00 | $129.50 |
| 01/06/2021 | JNP | BL | Conference with John A. Morris (several) regarding response to requests for transcript by employees and related issues. | 0.30 | 1295.00 | $388.50 |
| 01/06/2021 | JAM | BL | Review/revise Dondero subpoena and Notice of Service (0.2); e-mail to Bond Ellis, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: Dondero subpoena (0.1); revise/revise Amended Complaint against Dondero (0.1); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, Z. Annable, M. Hayward re: Amended Complaint against Dondero (0.1); review/revise Ellington and Leventon subpoena and Notice of Service (0.2); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, Z. Annable, M. Hayward re: Amended Complaint against Dondero (0.2); further revisions to Ellington and Leventon subpoena (0.1); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, Z. Annable, M. Hayward re: revised subpoena for Ellington and Leventon (0.1); review/revise draft Witness and Exhibit list for January 8 hearing (0.3); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, Z. Annable, M. Hayward re: draft Witness and Exhibit list for January 8 hearing (0.2); telephone conference with J. Dubel re: various litigation matters (0.4); telephone conference with G. Demo, E. Weisgerber re: HarbourVest matters (0.4); review/revise Memorandum of Law in Support of TRO against K&L Gates clients (1.8); prepare for hearing (including analysis of Dondero deposition transcript and preparation of cross-examination) (8.6); telephone conference with J. Pomerantz re: witness and exhibit list (0.1); review/revise witness and exhibit list (0.2); e-mails with Z. Annable, J. Pomerantz, G. Demo, H. Winograd, L. Canty re: witness and exhibit list (0.2); telephone conference with J. Seery re: litigation and employee matters (0.1); telephone conference with P. Montgomery, C. Rognes re: discovery (0.4); communications with J. Seery re: Complaint and TRO against K&L Gates clients (0.2); communications with Z. Annable, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: filing of Complaint and TRO papers against K&L Gates clients (0.3); e-mails with Z. Annable, J. | 14.50 | 1245.00 | $18,052.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Pomerantz, G. Demo, H. Winograd re: attempted service of subpoenas on Ellington and Leventon (0.2). | | | |
| 01/06/2021 | GVD | BL | Attend to issues re subpoena | 0.10 | 950.00 | $95.00 |
| 01/06/2021 | GVD | BL | Review supplemental Dondero discovery production | 0.20 | 950.00 | $190.00 |
| 01/06/2021 | GVD | BL | Conference with PSZJ and Winstead re plan issues | 0.50 | 950.00 | $475.00 |
| 01/06/2021 | HRW | BL | Draft Dondero memorandum of law in support of Dondero motion for order to show cause (7.5); Prepare and review documents in support of TRO against Advisors, Funds, CLO Holdco (1.2). | 8.70 | 695.00 | $6,046.50 |
| 01/07/2021 | IDK | BL | Review briefly numerous correspondence with Dondero counsel, court clerk, others on need for expedited hearing for contempt vs Dondero, and drafts of pleadings on same (.3);  Review of correspondence on demand letters to Dondero and related entities (.1). | 0.40 | 1325.00 | $530.00 |
| 01/07/2021 | JNP | BL | Review Dondero opposition to preliminary injunction. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Conference with John A. Morris regarding hearing and Plan confirmation. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Conference with John A. Morris regarding call with Latham. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Email to KCC regarding ballots. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Conference with Latham regarding UBS settlement. | 0.20 | 1295.00 | $259.00 |
| 01/07/2021 | JNP | BL | Conference with Robert J. Feinstein regarding call with Latham. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Review and comment on motion to hold J. Dondero in contempt for violating TRO. | 0.30 | 1295.00 | $388.50 |
| 01/07/2021 | JNP | BL | Email to A. Clubok and J. Bjork regarding settlement. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Prepare notes for hearing to raise scheduling issues. | 0.30 | 1295.00 | $388.50 |
| 01/07/2021 | JNP | BL | Conference with John A. Morris regarding contempt motion. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Review proposed response to KL Gates regarding offer to assume and assign agreements. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Conference with Robert J. Feinstein regarding UBS settlement status. | 0.10 | 1295.00 | $129.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| Date | | | | Hours | Rate | Amount |
|------|---|---|---|-------|------|--------|
| 01/07/2021 | JNP | BL | Emails to team regarding UBS. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | JNP | BL | Review and revise letter to KL Gates regarding CLO proposal. | 0.20 | 1295.00 | $259.00 |
| 01/07/2021 | JNP | BL | Email to Board regarding call to discuss UBS settlement agreement. | 0.10 | 1295.00 | $129.50 |
| 01/07/2021 | KKY | BL | Draft (.1) certification of no objection re removal extension motion; and prepare (.1) order re same | 0.20 | 460.00 | $92.00 |
| 01/07/2021 | JAM | BL | Work on documents (including JAM Declaration, Memorandum of Law, Motion, Emergency Motion, and proposed form of Order) relating to motion to hold Dondero in contempt (8.6); draft amended witness and exhibit list (0.2); e-mails with M. Lynn, B. Assink, J. Pomerantz, G. Demo re: HarbourVest and confirmation depositions (0.3); e-mails with Z. Annable, G. Demo, H. Winograd, L. Canty re: exhibits (0.3); telephone conference with H. Winograd re: Dondero motion papers (0.1); telephone conference with Z. Annable re: motion papers (0.2); telephone conference with J. Pomerantz, G. Demo, KCC re: Dondero subpoenas for ballots (0.2); telephone conference with J. Pomerantz re: Dondero contempt motion (0.1); telephone conference with J. Seery re: Dondero contempt motion (0.2); e-mails with M. Lynn, J. Bonds, B. Assink, J. Pomerantz, G. Demo re: "meet and confer" on emergency motion for contempt (0.2); communications with Z. Annable, H. Winograd re: Dondero contempt motion papers and "meet and confer" with Dondero's attorneys (0.5); e-mails with Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re; Dondero contempt motion (0.3); e-mails with J. Seery, J. Dubel, J. Pomerantz, G. Demo, H. Winograd re: UBS and Clubok issues (0.4); telephone conference with J. Dubel re: UBS and Clubok issues (0.2); e-mail to M. Clemente, P. Montgomery, J. Pomerantz, G. Demo re: complaint against defaulting demand note parties (0.2); e-mail to M. Lynn, B. Assink, J. Pomerantz, G. Demo, KCC re: subpoenas (0.1). | 12.10 | 1245.00 | $15,064.50 |
| 01/07/2021 | GVD | BL | Review discovery issues | 0.20 | 950.00 | $190.00 |
| 01/07/2021 | GVD | BL | Draft fourth K&L Gates response letter | 0.90 | 950.00 | $855.00 |
| 01/07/2021 | GVD | BL | Conference with KCC re subpoena issues | 0.20 | 950.00 | $190.00 |
| 01/07/2021 | GVD | BL | Review Dondero response to preliminary injunction | 0.20 | 950.00 | $190.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 01/07/2021 | GVD | BL | Conference with I. Kharasch re fourth K&L Gates letter | 0.20 | 950.00 | $190.00 |
| 01/07/2021 | HRW | BL | Draft Dondero motion for order to show cause and ancillary documents (3.8); Call with J. Morris re: contempt motion (0.1); Review Dondero deposition transcript and cross in preparation for January 8, 2021 hearing (2.5). | 6.40 | 695.00 | $4,448.00 |
| 01/08/2021 | IDK | BL | E-mails with J Morris, others on UBS statement to read at hearing (.1); Attend substantial part of hearing on Dondero contempt of TRO/preliminary injunction (5.3). | 5.40 | 1325.00 | $7,155.00 |
| 01/08/2021 | IDK | BL | Attend conference call with Board, J Pomerantz, J Morris and G Demo re result of hearing and next steps (.6). | 0.60 | 1325.00 | $795.00 |
| 01/08/2021 | JNP | BL | Conference with J. Dubel and John A. Morris in preparation for hearing. | 0.10 | 1295.00 | $129.50 |
| 01/08/2021 | JNP | BL | Participate in Dondero preliminary injunction hearing. | 7.00 | 1295.00 | $9,065.00 |
| 01/08/2021 | JNP | BL | Conference with John A. Morris in preparation for hearing. | 0.20 | 1295.00 | $259.00 |
| 01/08/2021 | JNP | BL | Conference with Board, Ira D. Kharasch, John A. Morris, and Gregory V. Demo after hearing regarding next steps. | 0.60 | 1295.00 | $777.00 |
| 01/08/2021 | JMF | BL | Review motion for contempt and response | 0.70 | 1050.00 | $735.00 |
| 01/08/2021 | JAM | BL | Prepare for hearing on motion for preliminary injunction against Dondero (3.7); e-mails with G. Demo, L. Canty re: trial exhibits (0.2); draft e-mail to A. Clubok re: statement concerning UBS (0.2); telephone conference with J. Dubel, J. Pomerantz re: statement concerning UBS (0.1); telephone conference with J. Pomerantz re: statement concerning UBS (0.1); telephone conference with J. Dubel re: statement concerning UBS (0.1); hearing on Debtor's motion for preliminary injunction against Dondero (6.7); telephone conference with Board, J. Pomerantz re: hearing on Debtor's motion for preliminary injunction (0.2). | 11.30 | 1245.00 | $14,068.50 |
| 01/08/2021 | GVD | BL | Prepare for hearing on Dondero injunction | 1.10 | 950.00 | $1,045.00 |
| 01/08/2021 | GVD | BL | Attend multiple board calls re status of action against J. Dondero | 0.80 | 950.00 | $760.00 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 01/08/2021 | HRW | BL | Draft proposed PI hearing (2.3); Preliminary Injunction Hearing (6.0). | 8.30 | 695.00 | $5,768.50 |
| 01/09/2021 | IDK | BL | E-mails with J Morris re pending discovery and related staffing on same (.2). | 0.20 | 1325.00 | $265.00 |
| 01/09/2021 | JNP | BL | Review J. Bonds email regarding response to proposed order and email to John A. Morris regarding same. | 0.10 | 1295.00 | $129.50 |
| 01/09/2021 | JNP | BL | Conference with J. Seery regarding retention of Multi Strat litigation counsel. | 0.10 | 1295.00 | $129.50 |
| 01/09/2021 | JAM | BL | Review/revise draft order on Preliminary Injunction against Dondero (0.3); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft order on Preliminary Injunction against Dondero (0.1); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft order on Preliminary Injunction against Dondero (0.1); review/respond to litigation-related e-mails from Friday (0.6); telephone conference with G. Demo re: 1/8 hearing and related matters (0.2); telephone conference with G. Demo, H. Winograd, E. Weisgerber, D. Stroik re: hearing on HarbourVest Rule 9019 motion (0.6); telephone conference with J. Seery re: draft order on Preliminary Injunction against Dondero and related matters (0.3); further revisions to draft order on Preliminary Injunction (0.1); e-mail to M. Lynn, J. Bonds, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft order on Preliminary Injunction (0.1); e-mail to F. Smith, D. Dandeneau, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft order on Preliminary Injunction (0.1); communications with L. Canty, H. Winograd re: Witness and Exhibit list for CLO/TRO hearing (0.2); review/revise Witness and Exhibit list for CLO/TRO hearing (0.2). | 2.90 | 1245.00 | $3,610.50 |
| 01/09/2021 | GVD | BL | Conference with J. Morris re litigation strategy | 0.20 | 950.00 | $190.00 |
| 01/09/2021 | HRW | BL | Call with Debevoise re: HarbourVest-Highland 9019 hearing (0.5); Review proposed PI Order (0.3); Draft summary of claims against Advisors, Funds, CLO Holdco for confirmation brief (0.6); Gather and review exhibits for TRO hearing on 1.13.2021 (0.7). | 2.10 | 695.00 | $1,459.50 |
| 01/10/2021 | IDK | BL | Conference call with J. Pomerantz and G Demo re Harbourvest and CLO litigation (.8); E-mails with G Demo re his summary and analysis of same objections, as well as J. Pomerantz feedback (.2); | 1.10 | 1325.00 | $1,457.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | Review of correspondence with G Demo, Wilmer Hale on transferability issues of interests from Harbourvest (.1). |  |  |  |
| 01/10/2021 | IDK | BL | Review briefly E-mails with attorneys re discovery and cell phone issues. | 0.10 | 1325.00 | $132.50 |
| 01/10/2021 | IDK | BL | E-mails with K Brown re overseeing demand note complaints and related litigation (.2). | 0.20 | 1325.00 | $265.00 |
| 01/10/2021 | JNP | BL | Conference with John A. Morris Harbourvest and CLO litigation. | 0.30 | 1295.00 | $388.50 |
| 01/10/2021 | JNP | BL | Conference with John A. Morris, Gregory V. Demo and Ira D. Kharasch regarding Harbourvest and CLO litigation. | 0.80 | 1295.00 | $1,036.00 |
| 01/10/2021 | BEL | BL | Review discovery request and telephone conference with John A. Morris regarding discovery. | 0.30 | 950.00 | $285.00 |
| 01/10/2021 | JAM | BL | E-mail to B. Levine re: responding to confirmation and other discovery requests (0.1); telephone conference with B. Levine re: responding to confirmation and other discovery requests (0.2); e-mails with P. Montgomery, C. Rognes re: document preservation letters (0.1); review documents and e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo re: Ellington's cell phone (0.2); e-mail to J. Bonds, M. Lynn, J. Pomerantz, G. Demo, H. Winograd re: Dondero as a witness at the CLO/TRO hearing (0.1); prepare for HarbourVest Rule 9019 hearing (0.7); e-mails w/ D. Rukavina, L. Hodgwood, J. Pomerantz, G. Demo, H. Winograd re: K&L Gates Clients' exhibit and witness list for CLO/TRO hearing (0.2); telephone conference with G. Demo re: (0.1); telephone conference with J. Pomerantz re: objections to HarbourVest settlement (0.3); telephone conference with B. Levine re: document production (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: HarbourVest Rule 9019 motion and CLO/TRO hearing and related issues (0.8); e-mails with E. Weisgerber, J. Pomerantz, G. Demo re: HarbourVest issues for hearing (0.1); e-mails with J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: Grant Scott as witness for CLO/TRO hearing (0.1); e-mail to J. Kane, J. Pomerantz, G. Demo re: Grant Scott as CLO Holdco witness (0.1). | 3.30 | 1245.00 | $4,108.50 |
| 01/10/2021 | GVD | BL | Conference with PSZJ team re open litigation items | 0.80 | 950.00 | $760.00 |
| 01/10/2021 | HRW | BL | Draft amended notice of confirmation hearing (1.2); | 2.30 | 695.00 | $1,598.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Review Dondero objection to 9019 motion (0.5); Review CLO Holdco objection to 9019 motion (0.5); Gather exhibits for response to Dondero 9019 objection (0.1). | | | |
| 01/11/2021 | IDK | BL | Telephone conference and e-mails with K Brown re prosecuting demand notes vs Dondero (.2). | 0.20 | 1325.00 | $265.00 |
| 01/11/2021 | IDK | BL | E-mails with B Levine re demand notes and need to commence actions and prior draft of complaint (.2); E-mails with local counsel re same re writs of attachment for same (.3). | 0.50 | 1325.00 | $662.50 |
| 01/11/2021 | IDK | BL | Brief review of correspondence with Dondero counsel, others on resolution of timing/expiration of TRO, as well as with counsels to Ellington/Leventon re issues on missing phones re discovery. | 0.20 | 1325.00 | $265.00 |
| 01/11/2021 | IDK | BL | E-mails with J. Pomerantz re Gov Re and need for demand letter re same (.1). | 0.10 | 1325.00 | $132.50 |
| 01/11/2021 | JNP | BL | Review emails regarding request for Ellington phone and response and related emails. | 0.10 | 1295.00 | $129.50 |
| 01/11/2021 | JNP | BL | Review of Order regarding CLO TR litigation. | 0.10 | 1295.00 | $129.50 |
| 01/11/2021 | JNP | BL | Conference with KL Gates, Munsch and J. Kane regarding TRO and related issues. | 0.30 | 1295.00 | $388.50 |
| 01/11/2021 | JNP | BL | Conference with John A. Morris and Gregory V. Demo after call with KL Gates. | 0.10 | 1295.00 | $129.50 |
| 01/11/2021 | JNP | BL | Conference with John A. Morris regarding Harbourvest deposition. | 0.10 | 1295.00 | $129.50 |
| 01/11/2021 | JNP | BL | Review emails regarding TRO Order for CLO litigation. | 0.10 | 1295.00 | $129.50 |
| 01/11/2021 | JNP | BL | Review modifications to agreed TRO; Conference with John A. Morris regarding same. | 0.20 | 1295.00 | $259.00 |
| 01/11/2021 | JNP | BL | Review Dondero Answer to Complaint. | 0.10 | 1295.00 | $129.50 |
| 01/11/2021 | KHB | BL | Telephone call with Ira Karasch re  litigation matter (.2); emails with Ira Karasch re same (.1). | 0.30 | 1225.00 | $367.50 |
| 01/11/2021 | JAM | BL | Prepare for CLO/TRO hearing (2.2); e-mail to G. Demo, H. Winograd, L. Canty re: exhibit and witness list for HarbourVest Rule 9019 motion (0.2); telephone conference with G. Demo re: HarbourVest issues (0.2); telephone conference with E. Weisgerber, D. Stroik, G. Demo re: HarbourVest deposition (0.2); prepare for HarbourVest hearing | 10.20 | 1245.00 | $12,699.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | (1.5); telephone conference with J. Pomerantz, G. Demo, counsel to K&L Gates Parties re: CLO/TRO hearing (0.3); telephone conference with J. Pomerantz re: hearings this week (0.1); telephone conference with J. Seery re: Daugherty, HarbourVest, CLO/TRO hearings (0.1); e-mails with Court re: order granting Debtor's motion for Preliminary Injunction against Dondero (0.2); HarbourVest deposition (3.7); telephone conference with G. Demo re: HarbourVest deposition (0.3); e-mails to G. Demo, H. Winograd, counsel to parties to HCLOF re: sealing of documents (0.2); telephone conference with J. Pomerantz re: call with Lynn and Bonds (0.1); e-mails with J. Pomerantz, G. Demo, Z. Annable re: K&L Gates Clients' proposed revisions to proposed order resolving TRO hearing (0.3); e-mails with Z. Annable, others re: Debtor's exhibit and witness list for hearing on HarbourVest Rule 9019 motion (0.3); e-mail to F. Smith, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, D. Dandeneau re: Ellington phone (0.3). |  |  |  |
| 01/11/2021 | GVD | BL | Conference with counsel to NPA/HCMFA re resolution of temporary restraining order | 0.30 | 950.00 | $285.00 |
| 01/11/2021 | GVD | BL | Conference with J. Pomerantz and J. Morris re issues re TRO on NPA/HCMFA | 0.20 | 950.00 | $190.00 |
| 01/11/2021 | HRW | BL | Call with K&L Gates re: TRO and 30(b)(6) witness (0.2); Review and prepare amended notice of confirmation hearing (0.2); Review reply in support of HarbourVest 9019 motion (0.5); Review proposed TRO re: related entities (0.2); Review PI order against Dondero (0.1); Gather and review exhibits for HarbourVest 9019 W&E list (0.2); Review Dondero's answer to Complaint for Injunctive relief (0.5); M. Pugatch Deposition (3.2); Communicate with Debevoise re: 9019 W&E list filing (0.1). | 5.20 | 695.00 | $3,614.00 |
| 01/12/2021 | JNP | BL | Emails with John A. Morris regarding deposition transcript. | 0.10 | 1295.00 | $129.50 |
| 01/12/2021 | JNP | BL | Emails with John A. Morris regarding scheduling contempt motion. | 0.10 | 1295.00 | $129.50 |
| 01/12/2021 | JNP | BL | Conference with J. Seery regarding document production. | 0.10 | 1295.00 | $129.50 |
| 01/12/2021 | JNP | BL | Conference with M. Clemente regarding letter regarding examiner. | 0.10 | 1295.00 | $129.50 |
| 01/12/2021 | JNP | BL | Review of letter regarding examiner; conference | 0.20 | 1295.00 | $259.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | with John A. Morris and then Ira D. Kharasch regarding same. | | | |
| 01/12/2021 | JNP | BL | Conference with John A. Morris regarding CLO litigation (several). | 0.50 | 1295.00 | $647.50 |
| 01/12/2021 | JNP | BL | Emails regarding employee indemnity letter. | 0.10 | 1295.00 | $129.50 |
| 01/12/2021 | JNP | BL | Draft proposed response to D. Draper letter regarding examiner. | 0.30 | 1295.00 | $388.50 |
| 01/12/2021 | JNP | BL | Conference with Ira D. Kharasch regarding Gov Re and review draft letter. | 0.20 | 1295.00 | $259.00 |
| 01/12/2021 | KHB | BL | Emails with I. Kharasch and Hayley R. Winograd re complaints on promissory notes and writs of attachment. | 0.20 | 1225.00 | $245.00 |
| 01/12/2021 | MDJ | BL | Email exchanges re hearing binder preparation; Organize and arrange for delivery to I. Kharasch and J. Pomerantz. | 0.70 | 395.00 | $276.50 |
| 01/12/2021 | BEL | BL | Emails regarding draft complaint. | 0.20 | 950.00 | $190.00 |
| 01/12/2021 | JAM | BL | Prepare for hearing on HarbourVest Rule 9019 motion (4.4); telephone conference with J. Dubel re: status of various litigation matters (0.3); telephone conference with G. Demo re: matters concerning HarbourVest Rule 9019 motion (0.2); review/revise draft omnibus reply to objections to HarbourVest Rule 9019 motion (2.8); telephone conference with S. Vitiello re: document production (0.1); communications with S. Vitiello, B. Levine re: document production (0.1); telephone conference with T. Frohne re: document production and Robert Half role (0.1); telephone conference with S. Seery re: M. Schroth and Dugaboy financial statements (0.1); e-mails with J. Kane, D. Rukavina, L. Hodgwood, J. Pomerantz, G. Demo, H. Winograd re: consensual TRO against G&L Gates parties (0.4); revisions to consensual TRO against G&L Gates parties (0.3); e-mails with Z. Annable, J. Pomerantz, I. Kharasch, G. Demo re: consensual TRO against G&L Gates parties and communications with the court (0.2); telephone conference with I. Kharasch re: complaints to collect on notes (0.1); telephone conference with J. Seery re: various litigation matters (0.3); telephone conference with J. Pomerantz re: M. Schroth and Dugaboy document production (0.1); telephone conference with E. Weisgerber re: HarbourVest hearing (0.2). | 9.70 | 1245.00 | $12,076.50 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 01/12/2021 | GVD | BL | Correspondence with PSZJ litigation team re demand letters | 0.20 | 950.00 | $190.00 |
| 01/12/2021 | GVD | BL | Conference with PSZJ team re NPA/HCMFA TRO | 0.40 | 950.00 | $380.00 |
| 01/12/2021 | HRW | BL | Highland WIP call (0.4); Review proposed TRO re: related entities (0.2)  Edit and review reply in support of HarbourVest 9019 (3.2); Review Dondero demand note complaint (0.2); Research writ of attachment procedure (1.5); Draft Motion/MOL for writ of attachment (2.5); Review demand letters (0.3); Review Dondero notice of appeal (0.1); Review draft of Seery direct (0.2). | 8.60 | 695.00 | $5,977.00 |
| 01/13/2021 | JNP | BL | Emails regarding stipulated facts for Harbourvest hearing. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Draft insert into opposition to examiner motion. | 0.20 | 1295.00 | $259.00 |
| 01/13/2021 | JNP | BL | Conference with J. Seery regarding letter to Draper regarding examiner. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Conference with J. Dubel regarding letter to Draper regarding examiner. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Review and revise letter to Draper regarding examiner. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Email to Board regarding status of UBS Settlement Agreement. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Review Dondero motion for leave to appeal preliminary injunction. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Conference with Robert J. Feinstein regarding opposition to emergency motion for examiner. | 0.20 | 1295.00 | $259.00 |
| 01/13/2021 | JNP | BL | Conference with M. Clemente regarding letter to Draper regarding examiner. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Email response to reporter regarding CLO litigation. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Conference with Ira D. Kharasch regarding Gov Re issues. | 0.30 | 1295.00 | $388.50 |
| 01/13/2021 | JNP | BL | Conference with John A. Morris regarding document preservation. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Review Committee response to request to support an examiner. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Conference with Ira D. Kharasch regarding letter to attorneys regarding Gov Re. | 0.10 | 1295.00 | $129.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 01/13/2021 | JNP | BL | Further review of examination for Harbourvest hearing. | 0.10 | 1295.00 | $129.50 |
| 01/13/2021 | JNP | BL | Conference with Ira D. Kharasch regarding anticipated examiner motion. | 0.20 | 1295.00 | $259.00 |
| 01/13/2021 | JNP | BL | Conference with John A. Morris regarding Harbourvest hearing. | 0.20 | 1295.00 | $259.00 |
| 01/13/2021 | KHB | BL | Emails to client re plan supplement (.2); conference call with client and R. Pachulski re next steps and litigation strategy (1.1); confer with Cia Mackel re fraud analysis (.2); emails to Cia Mackel re same (.1). | 1.60 | 1225.00 | $1,960.00 |
| 01/13/2021 | KHB | BL | Review complaint and demand letters re promissory notes (.4); consider jurisdictional and Stern issues and emails to Hayley Winpograd (HG) and Greg Demo (GD) re same (.4); review authorities re jurisdictional and Stern issues (.5); conference call with HG and GD re complaints on promissory notes and applications for writs of attachment (.6); emails with Beth Levine re core vs. non-core issues (.2); review Texas authority re writs of attachment and preliminary injunctions and consider required evidence and timing issues (2.3); consider nature of additional claims necessary to obtain injunction from bankruptcy court and analyze authority re same (1.3); emails with HG re same (.2); emails with L. Forrester re obtaining pleadings from Texas bankruptcy court on writs of attachment and preliminary injunctions (.2). | 6.10 | 1225.00 | $7,472.50 |
| 01/13/2021 | KKY | BL | Draft (.1) and prepare for filing (.1) certificate of service for [signed] removal extension order | 0.20 | 460.00 | $92.00 |
| 01/13/2021 | KKY | BL | Serve [signed] removal extension order | 0.10 | 460.00 | $46.00 |
| 01/13/2021 | RJF | BL | Review emails regarding examiner motion. | 0.30 | 1395.00 | $418.50 |
| 01/13/2021 | RJF | BL | Telephone conference with Cia H. Mackle regarding examiner research. | 0.30 | 1395.00 | $418.50 |
| 01/13/2021 | RJF | BL | Telephone conference with Jeffrey N. Pomerantz regarding examiner motion. | 0.30 | 1395.00 | $418.50 |
| 01/13/2021 | RJF | BL | Begin drafting opposition to expected motion to shorten time. | 0.90 | 1395.00 | $1,255.50 |
| 01/13/2021 | BEL | BL | Emails regarding draft Dondero complaint. | 0.20 | 950.00 | $190.00 |
| 01/13/2021 | BEL | BL | Review Nexpoint claim and response to claim | 0.60 | 950.00 | $570.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | objection. | | | |
| 01/13/2021 | BEL | BL | Review Nexpoint discovery requests and Telephone conference with Stephanie Vitello and John A. Morris regarding discovery request. | 0.80 | 950.00 | $760.00 |
| 01/13/2021 | BEL | BL | Review memo regarding jurisdiction issues and draft email regarding same. | 0.30 | 950.00 | $285.00 |
| 01/13/2021 | JMF | BL | Review reply to HarvourVest objection to 9019 motion. | 0.40 | 1050.00 | $420.00 |
| 01/13/2021 | JAM | BL | Communications with J. Seery re: M. Schroth (0.3); review/revise Omnibus Reply on HarbourVest Rule 9019 motion (1.3); telephone conference with J. Pomerantz re: litigation matters (0.2); telephone conference with B. Levine, S. Vitiello re: document production issues (0.3); telephone conference with J. Pomerantz, G. Demo, H. Winograd, E. Weisgerber re: hearing on HarbourVest Rule 9019 hearing (0.3); prepare for hearing on HarbourVest Rule 9019 motion (4.3); e-mails with Z. Annable, G. Demo re: exhibits and sealing issues (0.4); telephone conference with B. Sharp re: document retention/preservation issues (0.2); telephone conference with J. Seery re: litigation matters (0.1); telephone conference with B. Sharp, J. Romey, Sidley, FTI re: document retention/preservation issues (0.6); follow up call with B. Sharp on document retention/preservation issues (0.2); e-mails with J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: Seery direct examination (0.1); telephone conference with J. Pomerantz re: document retention/preservation issues (0.1); e-mails with J. Pomerantz, Z. Annable, court re: hearing on Debtor's contempt motion against Dondero (0.2); review correspondence concerning Dugaboy's request for the appointment of an examiner (0.2); telephone conference with J. Seery to prepare for direct testimony on HarbourVest Rule 9019 motion (1.1); e-mails with Trial Graphics, G. Demo, J. Seery re: revised demonstrative exhibits (0.2). | 10.10 | 1245.00 | $12,574.50 |
| 01/13/2021 | GVD | BL | Review draft letter re insurance reclamation issues | 0.30 | 950.00 | $285.00 |
| 01/13/2021 | GVD | BL | Conference with Committee re data preservation issues | 0.30 | 950.00 | $285.00 |
| 01/13/2021 | GVD | BL | Conference with K. Brown and H. Winograd re demand note issues | 0.80 | 950.00 | $760.00 |
| 01/13/2021 | HRW | BL | Call re: HarbourVest settlement (0.2): Call with G. | 9.00 | 695.00 | $6,255.00 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Demo and K. Brown re: demand note complaints (0.6); Call with G. Demo re: demand note complaints (0.1); Research re: bankruptcy court's jurisdiction over turnover claims and contractual disputes (1.8); Research re: alter ego claims (1.0); Review Demand Notes and related documents (0.8) Draft Demand Note Complaints against Dondero and related entities (4.5). | | | |
| 01/14/2021 | JNP | BL | Review email regarding suits against noteholders and next steps. | 0.10 | 1295.00 | $129.50 |
| 01/14/2021 | JNP | BL | Conference with Robert J. Feinstein regarding examiner motion. | 0.10 | 1295.00 | $129.50 |
| 01/14/2021 | JNP | BL | Conference with J. Dubel regarding hearing on Harbourvest and Plan related matters. | 0.40 | 1295.00 | $518.00 |
| 01/14/2021 | JNP | BL | Conference with Robert J. Feinstein regarding court hearing and examiner motion. | 0.10 | 1295.00 | $129.50 |
| 01/14/2021 | KHB | BL | Confer with L. Forrester re Texas authority on writs of attachment and preliminary injunctions (.2); review authorities and email to internal litigation team re same (1.6);  call with Greg Demo (GD), J. Morris (JM) and Hayley Winograd ("HG") re litigation strategy on promissory notes (.4); confer with HG re form of complaints (.2); review and revise complaint (1.6); emails with HG re revisions to complaints (.5). | 4.50 | 1225.00 | $5,512.50 |
| 01/14/2021 | RJF | BL | Telephone conference with Jeffrey N. Pomerantz regarding examiner motion. | 0.20 | 1395.00 | $279.00 |
| 01/14/2021 | RJF | BL | Review examiner motion and related emails. | 0.30 | 1395.00 | $418.50 |
| 01/14/2021 | RJF | BL | Work on opposition to expected motion to shorten time. | 0.40 | 1395.00 | $558.00 |
| 01/14/2021 | JMF | BL | Review motion to appoint examiner. | 0.30 | 1050.00 | $315.00 |
| 01/14/2021 | JAM | BL | Prepare for hearing on HarbourVest Rule 9019 motion (1.7); e-mails w/ J. Pomerantz, G. Demo, E. Weisgerber, D. Stroik re: potential stipulation concerning ROFR (0.1); e-mails with L. Canty re: exhibits for hearing (0.1); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo re: Seery direct testimony (0.1); e-mails with J. Pomerantz, I. Kharasch, G. Demo re: Gov Re, Ellington, and Leventon (0.2); hearing on HarbourVest Rule 9019 motion (with intermittent communications with J. Seery, J. Pomerantz, I. Kharasch, G. Demo) (4.8); | 9.70 | 1245.00 | $12,076.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | review/revise order concerning motion to pay (0.2); e-mail to G. Demo re: revised order on motion to pay (0.1); telephone conference with G. Demo re: litigation matters (0.1); telephone conference with J. Pomerantz re: HarbourVest hearing telephone conference with Board, J. Pomerantz, G. Demo re: HarbourVest hearing and employment related issues (0.7); telephone conference with G. Demo re: complaints against makers of notes (0.2); telephone conference with J. Seery re: litigation matters (0.2); e-mail to J. Seery re: confirmation and CLO/TRO depositions (0.2); telephone conference with K. Brown, H. Winograd, G. Demo (partial participation) re: complaints against makers of notes (0.5); telephone conference with G. Demo re: litigation matters (0.1); telephone conference with B. Sharp re: document preservation issues (0.1); telephone conference with J. Seery re: depositions, litigation issues (0.2). | | | |
| 01/14/2021 | EAW | BL | Review emails from R. Feinstein re: examiner motion (J. Dondero). | 0.10 | 925.00 | $92.50 |
| 01/14/2021 | GVD | BL | Conference with PSZJ litigation team re litigation strategy | 0.60 | 950.00 | $570.00 |
| 01/14/2021 | GVD | BL | Conference with J. Morris re litigation strategy | 0.30 | 950.00 | $285.00 |
| 01/14/2021 | HRW | BL | Draft Demand Note Complaints against Dondero and related entities (5.5); Research re: alter ego claims (0.6); PSZJ call re: Demand Note Complaints and litigation strategy (0.5); Review Demand Notes and related documents (1.0); Call with K. Brown re: Demand Note Complaints (0.1); Draft proposed HarbourVest Settlement Order (1.9). | 9.60 | 695.00 | $6,672.00 |
| 01/15/2021 | JNP | BL | Email to Board regarding Dondero request regarding UBS settlement. | 0.10 | 1295.00 | $129.50 |
| 01/15/2021 | JNP | BL | Conference with Robert J. Feinstein regarding examiner motion and emails regarding same. | 0.10 | 1295.00 | $129.50 |
| 01/15/2021 | JNP | BL | Conference with Dubel regarding UBS status. | 0.20 | 1295.00 | $259.00 |
| 01/15/2021 | KHB | BL | Work on complaints on promissory notes (4.4). emails with G. Demo re payment on NPA note (.2); review draft letter to NPA re same (.2); email from J. Pomerantz re writs of attachment (.1); email from I. Kharasch re same (.1); emails with H. Winograd and G. Demo re complaints (.2). | 5.20 | 1225.00 | $6,370.00 |
| 01/15/2021 | RJF | BL | Emails Jeffrey N. Pomerantz regarding UBS status. | 0.10 | 1395.00 | $139.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 01/15/2021 | RJF | BL | Emails regarding denial of motion to shorten time. | 0.10 | 1395.00 | $139.50 |
| 01/15/2021 | RJF | BL | Review examiner research. | 0.50 | 1395.00 | $697.50 |
| 01/15/2021 | RJF | BL | Telephone conference with Jeffrey N. Pomerantz regarding examiner motion. | 0.10 | 1395.00 | $139.50 |
| 01/15/2021 | BEL | BL | Review SE Multifamily partnership agreement. | 0.20 | 950.00 | $190.00 |
| 01/15/2021 | JAM | BL | E-mail to counsel for K&L Gates Parties, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: depositions (0.3); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: depositions (0.1); e-mail to counsel for Ellington and Leventon re: depositions (0.3); e-mail to J. Bonds, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: witness(es) for hearing on contempt motion (0.1); review/revise draft order on HarbourVest settlement (0.4); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, Z. Annable, M. Hayward re: draft order on HarbourVest settlement (0.1); telephone conference with J. Seery re: depositions (0.1); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: litigation issues (0.4); e-mail to objecting parties on HarbourVest Rule 9019 motion (0.1); revise proposed order on HarbourVest settlement (0.1); e-mails to J. Bonds, J. Kane, D. Draper, J. Pomerantz, G. Demo re: proposed order on HarbourVest settlement (0.1); telephone conference with B. Sharp, J. Vaughn re: forensic investigation of computers (0.3); telephone conference with B. Sharp re: forensic investigation of computers (0.1); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, B. Sharp re: iDiscovery Solutions and forensic investigation (0.3); draft deposition notice for Seery (confirmation) (0.3); e-mail to J. Pomerantz, I. Kharasch, G. Demo, Z. Annable re: deposition notice (0.1); telephone conference with J. Seery re: litigation matters (0.2). | 3.40 | 1245.00 | $4,233.00 |
| 01/15/2021 | GVD | BL | Draft and send response to NPA letter | 1.10 | 950.00 | $1,045.00 |
| 01/15/2021 | GVD | BL | Conference with T. Surgent re discovery issues | 0.30 | 950.00 | $285.00 |
| 01/15/2021 | GVD | BL | Review and revise demand note complaint | 0.30 | 950.00 | $285.00 |
| 01/15/2021 | GVD | BL | Conference with PSZJ team re open discovery issues | 0.50 | 950.00 | $475.00 |
| 01/15/2021 | HRW | BL | Review and edit HarbourVest proposed Settlement Order (0.7); Draft Demand Note Complaints against Dondero and related entities (7.5). | 8.20 | 695.00 | $5,699.00 |

**HIGHLY CONFIDENTIAL**                                                                      **HCMLP 000811**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| Date | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 01/16/2021 | JAM | BL | E-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, DSI re: forensic analysis of computers (0.2); e-mail to J. Kane, J. Pomerantz, G. Demo re: document production (0.1); revise deposition notice for Seery confirmation deposition (0.2); e-mail to Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: Seery confirmation deposition (0.1); e-mail to counsel for K&L Gates parties re: discovery (0.2); draft deposition notice for Grant Scott (0.3); e-mail to Z. Annable, J. Pomerantz, G. Demo, H. Winograd re: Scott deposition notice (0.1); e-mail to counsel to all parties objecting to confirmation re: depositions (0.4); e-mail to M. Lynn, J. Bonds, J. Pomerantz, I. Kharasch, G. Demo re: Dondero purported notice and appeal of preliminary injunction (0.8); e-mail to K. Klausner, H. Winograd, L. Canty re: depositions (0.1); e-mail to L. Canty re: depositions (0.1); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: draft response to Senior Employees (0.7); telephone conference with J. Seery re: forensic investigation (0.4); telephone conference with J. Pomerantz re: litigation, forensic investigation (0.5); telephone conference with B. Sharp re: forensic investigation (0.1); telephone conference with J. Seery re: forensic investigation (0.1); revise draft e-mail to counsel for the Senior Employees (0.2). | 4.60 | 1245.00 | $5,727.00 |
| 01/16/2021 | GVD | BL | Conference with J. Morris re bankruptcy litigation | 0.20 | 950.00 | $190.00 |
| 01/16/2021 | GVD | BL | Correspondence with J. Pomerantz re discovery issues | 0.10 | 950.00 | $95.00 |
| 01/16/2021 | HRW | BL | Draft complaints against Dondero and related entities re: demand notes (4.8). | 4.80 | 695.00 | $3,336.00 |
| 01/17/2021 | JNP | BL | Conference with John A. Morris,. J. Seery, company employees, DSI and outside consultant regarding services relating to protection of evidence. | 0.50 | 1295.00 | $647.50 |
| 01/17/2021 | BEL | BL | Review discovery requests and emails regarding same. | 0.30 | 950.00 | $285.00 |
| 01/17/2021 | BEL | BL | Telephone conference with John A. Morris regarding discovery requests. | 0.40 | 950.00 | $380.00 |
| 01/17/2021 | JAM | BL | E-mail to counsel to K&L Gates Clients, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: discovery in connection with PI motion and confirmation (1.2); revise and send e-mail to counsel for Senior Employees, J. Pomerantz, I. Kharasch, G. | 3.80 | 1245.00 | $4,731.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | Demo, H. Winograd re: discovery (0.2); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd re: confirmation witnesses (0.2); e-mail to J. Seery, PSZJ, DSI re: follow up litigation matters, including document production and email searches (0.8); telephone conference with B. Levine re: document production (0.4); telephone conference with J. Seery re: Senior Employee issues (0.1); telephone conference with J. Seery, J. Pomerantz (partial), H. Winograd, DSI, J. Vaughn, T. Surgent, J. Rothstein re: forensic investigation (0.8); telephone conference with J. Seery re: forensic investigation (0.1). |  |  |  |
| 01/17/2021 | GVD | BL | Review draft complaints re demand letters | 0.40 | 950.00 | $380.00 |
| 01/17/2021 | GVD | BL | Correspondence re negotiation of senior employee stipulation | 0.20 | 950.00 | $190.00 |
| 01/17/2021 | GVD | BL | Correspondence re discovery issues | 0.30 | 950.00 | $285.00 |
| 01/17/2021 | HRW | BL | Call re: forensic investigation and return of Debtor's property (0.7); Draft complaints against Dondero and related entities re: demand notes (4.5). | 5.20 | 695.00 | $3,614.00 |
| 01/18/2021 | JNP | BL | Conference with Sidley, John A. Morris, Ira D. Kharasch and Gregory V. Demo regarding litigation matters including notes, Plan confirmation and related. | 0.70 | 1295.00 | $906.50 |
| 01/18/2021 | JNP | BL | Review emails regarding discovery and comments to John A. Morris email regarding same. | 0.10 | 1295.00 | $129.50 |
| 01/18/2021 | JNP | BL | Review F. Smith response regarding indemnification letter. | 0.10 | 1295.00 | $129.50 |
| 01/18/2021 | JNP | BL | Emails to and from M. Lynn regarding discovery issues. | 0.10 | 1295.00 | $129.50 |
| 01/18/2021 | KHB | BL | Review local rules re summary judgment motions (.2); review comments to complaints on promissory notes by J. Morris and email to J. Morris and H. Winograd re same (.2); work on complaints (.7); call with Committee counsel, J. Morris and J. Pomerantz re litigation strategy (.7). | 1.80 | 1225.00 | $2,205.00 |
| 01/18/2021 | BEL | BL | Review document requests and relevant and background and emails regarding searches for documents. | 1.30 | 950.00 | $1,235.00 |
| 01/18/2021 | JAM | BL | E-mails with G. Demo, E. Weisgerber re: HarbourVest settlement (0.1); e-mails with PSZJ and Sidley lawyers re: litigation strategy call (0.1); telephone conference with I. Kharasch, G. Demo, | 8.00 | 1245.00 | $9,960.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | Bermuda counsel (who participated for a part of the call) (0.5); e-mails with J. Seery, J. Pomerantz, I. Kharasch, G. Demo re: deposition dates (0.1); review/revise draft Complaint against Dondero for recovery under demand notes (0.9); e-mail to K. Brown, H. Winograd, J. Pomerantz, I. Kharasch, G. Demo re: revisions to draft Complaint against Dondero for recovery under demand notes (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, F. Smith, D. Dandeneau re: Senior Employee issues (0.7); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: litigation issues (0.5); e-mail to counsel for K&L Gates Clients re: discovery (0.5); e-mail to D. Dandeneau, F. Smith, J. Pomerantz, G. Demo, I. Kharasch re: Firm Phones (0.6); telephone conference with PSZJ and Sidley over litigation, document preservation, and confirmation issues (0.8); telephone conference with J. Pomerantz re: call with Sidley (0.1); e-mails to Sidley, J. Pomerantz, G. Demo, H. Winograd re: complaints for recovery under demand notes (0.3); telephone conference with J. Seery, J. Pomerantz, I. Kharasch, G. Demo re: plan and litigation issues (1.3); e-mails with E. Sonderlund, F. Smith, D. Dandeneau, J. Pomerantz, I. Kharasch, G. Demo re: discovery (0.3); draft e-mail to plan objectors re: confirmation witnesses and discovery (0.3); e-mails with E. Sonderlund, J. Pomerantz, I. Kharasch, G. Demo, F. Smith re: discovery (0.1); revise and send e-mail to plan objectors re: confirmation witnesses and discovery (0.2); e-mails with P. Montgomery, M. Clemente, J. Pomerantz, G. Demo re: deposition schedule (0.1); telephone conference with J. Pomerantz, counsel for UDF re: Dondero tender offer and related matters (0.2); e-mails with J. Seery, D. Rukavina re: Rule 30(b)(6) topics for deposition (0.1). |  |  |  |
| 01/18/2021 | GVD | BL | Conference with Carey Olsen re Bermuda discovery issues | 0.50 | 950.00 | $475.00 |
| 01/18/2021 | GVD | BL | Conference with Committee re open litigation items | 0.80 | 950.00 | $760.00 |
| 01/18/2021 | GVD | BL | Prepare for conference with Bermuda counsel | 0.10 | 950.00 | $95.00 |
| 01/18/2021 | HRW | BL | Draft complaints against Dondero and related entities re: demand notes (7.5); Call with Committee re: litigation strategy (0.8). | 8.30 | 695.00 | $5,768.50 |
| 01/19/2021 | JNP | BL | Conference with J. Seery, John A. Morris, Gregory V. Demo and Ira D. Kharasch regarding deposition | 0.50 | 1295.00 | $647.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | preparation for J. Seery. | | | |
| 01/19/2021 | JNP | BL | Email to Latham regarding status of Settlement Agreement. | 0.10 | 1295.00 | $129.50 |
| 01/19/2021 | BEL | BL | Review documents to be produced to senior employees. | 0.60 | 950.00 | $570.00 |
| 01/19/2021 | BEL | BL | Emails regarding discovery response. | 0.10 | 950.00 | $95.00 |
| 01/19/2021 | BEL | BL | Finalize search terms for response to document requests. | 0.50 | 950.00 | $475.00 |
| 01/19/2021 | JAM | BL | Analysis of Rule 30(b)(6) topics for Seery deposition (3.6); telephone conference with J. Pomerantz re: confirmation evidence (0.1); draft Amended Deposition Notice for Seery confirmation deposition and e-mail to Z. Annable re: same (0.1); e-mails with counsel re: logistics for Seery deposition (0.2); draft Deposition Notice for Jason Post and e-mail to Z. Annable re: same (0.3); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, Gov Re representatives re: D&O Issues (0.2); telephone conference with J. Pomerantz re: confirmation evidence (0.1); analysis of confirmation evidence and exhibits (1.6); telephone conference with J. Seery, J. Dubel, J. Pomerantz, I. Kharasch, G. Demo re: confirmation evidence and exculpation (0.5); telephone conference with J. Dubel re: confirmation evidence and exculpation (0.1); telephone conference with J. Seery, J. Pomerantz, G. Demo re: preparation for deposition (0.7); e-mails with L. Canty re: documents/exhibits for deposition and confirmation hearing (0.2); e-mails with counsel for objecting parties re: confirmation witnesses (0.2). | 7.90 | 1245.00 | $9,835.50 |
| 01/19/2021 | HRW | BL | Draft deposition subpoena and notices for M. Schroth (1.2); Call with J. Morris re: demonstratives for Seery testimony during confirmation hearing (0.2); Review Omnibus Reply to Confirmation Objections (0.3). | 1.70 | 695.00 | $1,181.50 |
| 01/20/2021 | JNP | BL | Conference with John A. Morris regarding CLO deposition, discovery and related. | 0.30 | 1295.00 | $388.50 |
| 01/20/2021 | JNP | BL | Conference with J. Seery regarding CLO deposition and related. | 0.10 | 1295.00 | $129.50 |
| 01/20/2021 | BEL | BL | Review documents. | 1.20 | 950.00 | $1,140.00 |
| 01/20/2021 | JAM | BL | Prepare for Seery deposition (0.3); telephone | 6.30 | 1245.00 | $7,843.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | conference with J. Seery re: deposition preparation (0.2); telephone conference with L. Canty re: depositions (0.1); Seery deposition (CLO preliminary injunction) (2.3); telephone conference with J. Seery re: deposition (0.1); telephone conference with J. Pomerantz re: various litigation issues (0.3); e-mail to D. Draper, J. Pomerantz, I. Kharasch, G. Demo re: Dondero Trusts' requests for document (0.5); e-mail to D. Draper re: document requests by Dugaboy and Get Good (0.5); e-mails with D. Rukavina, J. Kane re: deposition exhibits (0.2); telephone conference with J. Seery re: JP Sevilla and discovery (0.1); e-mail to D. Draper, J. Bonds, J. Wilson re: confidentiality and document production (0.3); e-mails with Trial Graphix team re: demonstrative exhibits (0.3); e-mail to D. Dandeneau, F. Smith, J. Pomerantz, G. Demo re: Leventon deposition and related matters (0.3); review documents and prepare for depositions (0.8). | | | |
| 01/20/2021 | GVD | BL | Attend deposition of J. Seery | 2.00 | 950.00 | $1,900.00 |
| 01/20/2021 | HRW | BL | Review draft plan of reorganization (0.3). | 0.30 | 695.00 | $208.50 |
| 01/21/2021 | JNP | BL | Email to and from Robert J. Feinstein regarding examiner motion. | 0.10 | 1295.00 | $129.50 |
| 01/21/2021 | JNP | BL | Review and respond to email from Bond Ellis regarding discovery; Conference with Ira D. Kharasch regarding same. | 0.20 | 1295.00 | $259.00 |
| 01/21/2021 | BEL | BL | Review documents. | 2.20 | 950.00 | $2,090.00 |
| 01/21/2021 | BEL | BL | Emails to Gregory V. Demo regarding document production. | 0.20 | 950.00 | $190.00 |
| 01/21/2021 | BEL | BL | Telephone conference with La Asia Canty regarding document production issues. | 0.20 | 950.00 | $190.00 |
| 01/21/2021 | BEL | BL | Review documents. | 0.20 | 950.00 | $190.00 |
| 01/21/2021 | BEL | BL | Telephone conference with John A. Morris and Stephanie Vitiello regarding discovery request. | 0.50 | 950.00 | $475.00 |
| 01/21/2021 | JAM | BL | E-mails with I. Pomerantz, H. Winograd re: Dondero appeal of preliminary injunction (0.1); e-mail to PSZJ Team re: confirmation hearing exhibits (0.1); e-mail to counsel for objectors re: Post deposition (0.1); e-mails with court reporting service re: depositions (0.2); e-mails with L. Canty re: exhibits for Scott deposition (0.2); review/revise demonstrative exhibit for Scott deposition (0.1); | 9.60 | 1245.00 | $11,952.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | prepare for Scott deposition (3.4); telephone conference with F. Smith re: discovery (0.1); e-mails with F. Smith re: discovery (0.1); Scott deposition (3.0); telephone conference with H. Winograd re: litigation projects (0.2); telephone conference with J. Pomerantz re: Scott deposition (0.1); review analyses of Dondero trading (0.2); telephone conference with B. Sharp, J. Romey, G. Demo re: analyses of Dondero trading (0.3); telephone conference with J. Kane re: Scott deposition, CLO Holdco (0.3); telephone conference with G. Demo re: Scott deposition (0.1); telephone conference with S. Vitiello, B. Levine re: document production (0.4); telephone conference with J. Seery re: Scott deposition and litigation update (0.4); telephone conference with J. Pomerantz re: status of various litigation matters (0.1); e-mails with I. Nasatir re: exhibits for insurance matters (0.1). | | | |
| 01/21/2021 | GVD | BL | Review CLO agreements re termination date | 1.00 | 950.00 | $950.00 |
| 01/21/2021 | GVD | BL | Conference with PSZJ team re evidentiary issues | 0.50 | 950.00 | $475.00 |
| 01/21/2021 | GVD | BL | Review transcript from G. Scott deposition | 0.30 | 950.00 | $285.00 |
| 01/21/2021 | HRW | BL | Call with J. Morris re: opposition to Dondero's motion for leave to appeal PI (0.1); Research re: opposition to Dondero's motion for leave to appeal PI (1.5); PSZJ call re: witness & exhibit list (0.5); Draft demonstrative re: Terry-Acis litigation for Seery testimony at confirmation hearing (7.5). | 9.60 | 695.00 | $6,672.00 |
| 01/22/2021 | KHB | BL | Emails  with H. Winograd and J. Morris re complaints on promissory notes. | 0.20 | 1225.00 | $245.00 |
| 01/22/2021 | MDJ | BL | Work with H. Winogard on preparing Highland adversary complaint exhibits for filing. | 0.90 | 395.00 | $355.50 |
| 01/22/2021 | RJF | BL | Emails Cia H. Mackle, Jeffrey N. Pomerantz regarding examiner motion. | 0.30 | 1395.00 | $418.50 |
| 01/22/2021 | BEL | BL | Emails regarding document production. | 0.50 | 950.00 | $475.00 |
| 01/22/2021 | JAM | BL | Review documents concerning AVAYA and SKY trading and e-mail to J. Pomerantz, I. Kharasch, G, Demo, B. Sharp, J. Romey re: same (0.3); revise e-mail to Court re: possible adjournment of confirmation and send to Z. Annable, J. Pomerantz, I. Kharasch, G. Demo (0.2); review complaints concerning demand notes and send e-mail to Z. Annable, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd concerning the same (0.2); work on | 11.90 | 1245.00 | $14,815.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | exhibit list for preliminary injunction hearing against K&L Gates Clients and CLO Holdco (0.7); prepare for Post deposition (2.6); e-mail to H. Winograd re: work priorities (0.3); e-mail to H. Winograd, L. Canty re: insurance-related exhibits (0.1); e-mail to H. Winograd, L. Canty re: exhibits from J. Pomerantz list (0.1); revise confirmation witness and exhibit list (0.1); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, L. Canty re: revised confirmation witness and exhibit list (0.1); e-mail to L. Canty re: exhibits for Post deposition (0.3); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, L. Canty re: confirmation exhibits (0.5); Post deposition (3.0); telephone conference with P. Montgomery re: litigation issues (0.1); telephone conference with J. Seery re: Post deposition (0.2); telephone conference with J. Pomerantz, I. Nasatir, M. Tauber re: insurance issues and trial preparation (0.9); telephone conference with J. Pomerantz re: litigation issues (0.1); telephone conference with C. Taylor re: meet and confer on discovery issues (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: litigation issues (0.4); review Z. Annable comments to note complaints and cover sheets (0.2); e-mail to Z. Annable re: note complaints and cover sheets (0.1); telephone conference with J. Seery re: note complaints (0.1); review witness and exhibits lists filed by objectors (0.3); telephone conference with J. Pomerantz re: litigation issues (0.2); review court filings (0.5); communications with Z. Annable, L. Canty, H. Winograd re: witness and exhibit lists (0.1). | | | |
| 01/22/2021 | HRW | BL | Prepare Witness & Exhibit List for confirmation hearing (3.9); Draft Opposition to Dondero motion for leave to appeal and for expedited hearing (2.8); PSZJ plan coordination call (0.4). | 7.10 | 695.00 | $4,934.50 |
| 01/23/2021 | JNP | BL | Conference with Robert J. Feinstein regarding UBS Settlement Agreement. | 0.20 | 1295.00 | $259.00 |
| 01/23/2021 | JAM | BL | Review filings, including UCC memorandum in support of confirmation, witness and exhibit lists for confirmation and the preliminary injunction hearing and related matters (1.3); e-mail to counsel for the objecting parties re: Seery deposition (0.2); prepare Grant Scott cross-examination (5.3); e-mails with L. Canty re: exhibits (0.2); e-mails with D. Rukavina, J. Pomerantz re: Seery deposition (0.1); telephone conference with J. Seery re: deposition (0.1); draft | 10.20 | 1245.00 | $12,699.00 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | Second Amended Deposition Notice for Seery (0.1); e-mail to counsel for all objecting parties adjourning the Seery deposition (0.1); e-mail to Board, PSZJ team re: schedule (0.1); review Seery transcript and prepare direct (1.5); telephone conference with J. Pomerantz, I. Kharasch re: confirmation and preliminary injunction trial issues (0.5); analyze fact issues to support motion for preliminary injunction (0.7). |  |  |  |
| 01/23/2021 | GVD | BL | Review transcript of J. Post deposition | 0.60 | 950.00 | $570.00 |
| 01/23/2021 | HRW | BL | Draft Opposition to Dondero motion for leave to appeal and for expedited hearing (6.0). | 6.00 | 695.00 | $4,170.00 |
| 01/24/2021 | JNP | BL | Conference with J. Dubel regarding UBS. | 0.10 | 1295.00 | $129.50 |
| 01/24/2021 | JNP | BL | Conference with J. Kane, Ira D. Kharasch, and John A. Morris regarding Preliminary Injunction hearing and Plan Confirmation potential settlement. | 0.50 | 1295.00 | $647.50 |
| 01/24/2021 | JNP | BL | Conference with J. Seery and John A. Morris regarding potential resolution with CLO Holdco. | 0.20 | 1295.00 | $259.00 |
| 01/24/2021 | JNP | BL | Conference with Robert J. Feinstein regarding UBS Settlement Agreement. | 0.20 | 1295.00 | $259.00 |
| 01/24/2021 | JNP | BL | Review and comment on Robert J. Feinstein mark-up of UBS Settlement Agreement and email regarding same. | 0.70 | 1295.00 | $906.50 |
| 01/24/2021 | JNP | BL | Review and revise CLO Holdco Term Sheet. | 0.50 | 1295.00 | $647.50 |
| 01/24/2021 | JMF | BL | Review motion to appoint examiner and status of hearing. | 0.30 | 1050.00 | $315.00 |
| 01/24/2021 | JAM | BL | E-mails to J. Pomerantz, I. Kharasch, G. Demo, DSI re: discovery (0.2); review e-mails re: litigation matters (0.3); telephone conference with D. Neier re: JP Sevilla subpoena (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, DSI re: discovery (0.8); tel c. G. Demo re: litigation issues (0.2); telephone conference with J. Pomerantz, I. Kharasch, J. Kane re: potential settlement with CLO Holdco (0.6); telephone conference with J. Seery, J. Pomerantz re: potential settlement with CLO Holdco (0.2); telephone conference with G. Demo re: CLO Holdco and related matters (0.2); prepare for CLO-related preliminary injunction hearing (1.6); review e-mails re: Dondero appeal of preliminary injunction (0.2). | 4.50 | 1245.00 | $5,602.50 |
| 01/24/2021 | GVD | BL | Conference with PSZJ team re outstanding | 0.80 | 950.00 | $760.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
|  |  |  | discovery issues |  |  |  |
| 01/24/2021 | GVD | BL | Multiple conferences with J. Morris re outstanding discovery issues | 0.20 | 950.00 | $190.00 |
| 01/24/2021 | GVD | BL | Conference with J. Romey re open discovery issues | 0.10 | 950.00 | $95.00 |
| 01/24/2021 | GVD | BL | Review research and draft response re response to NPA objection to preliminary injunction | 0.60 | 950.00 | $570.00 |
| 01/24/2021 | HRW | BL | Draft Opposition to Dondero motion for leave to appeal and for expedited hearing (7.5). | 7.50 | 695.00 | $5,212.50 |
| 01/25/2021 | JNP | BL | Conference with Ira D. Kharasch and Gregory V. Demo regarding UBS Settlement Agreement. | 0.70 | 1295.00 | $906.50 |
| 01/25/2021 | JNP | BL | Brief review of opposition to preliminary injunction and reply. | 0.20 | 1295.00 | $259.00 |
| 01/25/2021 | JNP | BL | Conference with John A. Morris and Gregory V. Demo regarding CLO Holdco settlement. | 0.10 | 1295.00 | $129.50 |
| 01/25/2021 | JNP | BL | Review of J. Kane response to CLO Holdco settlement. | 0.10 | 1295.00 | $129.50 |
| 01/25/2021 | JNP | BL | Review of UBS Settlement Agreement before Board call; Conference with Gregory V. Demo regarding same. | 0.20 | 1295.00 | $259.00 |
| 01/25/2021 | JNP | BL | Conference with Robert J. Feinstein regarding UBS Settlement Agreement. | 0.20 | 1295.00 | $259.00 |
| 01/25/2021 | JNP | BL | Conference with Ira D. Kharasch, Gregory V. Demo and John A. Morris regarding CLO Holdco agreement (2x). | 1.20 | 1295.00 | $1,554.00 |
| 01/25/2021 | JMF | BL | Review CLO Holdco opposition to preliminary injunction. | 0.30 | 1050.00 | $315.00 |
| 01/25/2021 | JAM | BL | Communications with Z. Annable, J. Pomerantz, I. Kharasch, G. Demo re: Dondero appeal of preliminary injunction (0.1); review/revise proposed term sheet to settle dispute with CLO Holdco, Ltd. (0.6); e-mails to J. Pomerantz, I. Kharasch, G. Demo re: revised term sheet for CLO Holdco (0.1); prepare for preliminary injunction hearing (6.1) telephone conference with G. Demo re: litigation issues, CLO Holdco (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: CLO Holdco term sheet/agreement (0.8);  telephone conference with H. Winograd re: Dondero emergency motion for leave to appeal preliminary injunction (0.3); meet and confer with K&L Gates, J. Kane re: | 9.90 | 1245.00 | $12,325.50 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | preliminary injunction hearing (0.4); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: CLO Holdco settlement issues (0.3); telephone conference with J. Dondero, Board, counsel for Dondero, counsel for Board re: settlement (0.5); telephone conference with Board, PSZJ team re: CLO Holdco settlement and related matters (partial participation) (0.2); telephone conference with J. Kane re: CLO Holdco settlement (0.1); telephone conference with D. Rukavina re: CLO Holdco settlement and related matters (0.1); telephone conference with J. Seery re: trial preparation (0.1). | | | |
| 01/25/2021 | GVD | BL | Conference with PSZJ working group re additional changes to CLO Holdco settlement | 0.40 | 950.00 | $380.00 |
| 01/25/2021 | GVD | BL | Review CLO Management Agreements re termination | 1.10 | 950.00 | $1,045.00 |
| 01/25/2021 | GVD | BL | Conference with J. Morris re open bankruptcy issues | 0.20 | 950.00 | $190.00 |
| 01/25/2021 | GVD | BL | Multiple conferences with J. Kane re CLO Holdco settlement | 0.30 | 950.00 | $285.00 |
| 01/25/2021 | GVD | BL | Conference with PSZJ working group re CLO Holdco settlement | 0.80 | 950.00 | $760.00 |
| 01/25/2021 | GVD | BL | Draft response to NPA objection to preliminary injunction and file same | 4.20 | 950.00 | $3,990.00 |
| 01/25/2021 | GVD | BL | Review and revise settlement with CLO Holdco | 2.30 | 950.00 | $2,185.00 |
| 01/25/2021 | GVD | BL | Review discovery issues | 1.00 | 950.00 | $950.00 |
| 01/25/2021 | HRW | BL | Draft Opposition to Dondero motion for leave to appeal and for expedited hearing (7.0); Communicate with DSI re: confirmation witness & exhibit list redactions (0.3); Review redacted exhibits for amended W&E list filing (0.4);  Review and edit motion to redact and proposed order regarding W&I list for confirmation hearing (0.5); Draft notice of settlement with CLO Holdco (0.4). | 8.60 | 695.00 | $5,977.00 |
| 01/26/2021 | JNP | BL | Participate in KERP and CLO Preliminary Injunction hearing. | 7.30 | 1295.00 | $9,453.50 |
| 01/26/2021 | JNP | BL | Conference with John A. Morris regarding hearing. | 0.10 | 1295.00 | $129.50 |
| 01/26/2021 | JAM | BL | Prepare Dondero cross (5.8); draft Notice of Agreement (0.4); communications with L. Canty re: trial exhibits (0.2); telephone conference with G. Demo re: Notice of Settlement and related matters (0.1); prepare opening statement (1.5); trial | 16.60 | 1245.00 | $20,667.00 |

**HIGHLY CONFIDENTIAL**

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | (morning session) (2.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: morning session hearing (0.2); prepare for afternoon session (0.3): telephone conference with J. Seery re: trial (0.1); trial (afternoon session) (5.3); telephone conference with J. Seery, G. Demo re: court hearing (0.1); telephone conference with Board, J. Pomerantz, G. Demo re: court hearing, next steps (0.4). | | | |
| 01/26/2021 | GVD | BL | Conference with J. Morris re preparation for hearing | 0.10 | 950.00 | $95.00 |
| 01/26/2021 | GVD | BL | Attend hearing re NPA preliminary injunction | 6.80 | 950.00 | $6,460.00 |
| 01/26/2021 | GVD | BL | Prepare for hearing on preliminary injunction | 0.20 | 950.00 | $190.00 |
| 01/26/2021 | GVD | BL | Conference with Board re preliminary injunction hearing | 0.40 | 950.00 | $380.00 |
| 01/26/2021 | GVD | BL | Review and finalize CLO Holdco settlement | 0.40 | 950.00 | $380.00 |
| 01/26/2021 | HRW | BL | Draft and prepare opposition and ancillary papers for opposition to Dondero motion for leave to appeal and for expedited hearing (6.5); K&L Gates Preliminary Injunction Hearing (7.0). | 13.50 | 695.00 | $9,382.50 |
| 01/27/2021 | JNP | BL | Conference with J. Dubel before and after call with Latham regarding UBS. | 0.10 | 1295.00 | $129.50 |
| 01/27/2021 | JNP | BL | Review emergency motion to continue contempt motion. | 0.10 | 1295.00 | $129.50 |
| 01/27/2021 | JNP | BL | Conference with J. Dubel, J. Seery, Latham, Robert J. Feinstein and Gregory V. Demo regarding UBS Settlement Agreement. | 1.30 | 1295.00 | $1,683.50 |
| 01/27/2021 | JNP | BL | Conference with John A. Morris regarding meet and confer with D. Draper and email regarding same. | 0.10 | 1295.00 | $129.50 |
| 01/27/2021 | JNP | BL | Conference with John A. Morris regarding discovery issues and related and opposition to Dondero district court motion on preliminary injunction. | 0.20 | 1295.00 | $259.00 |
| 01/27/2021 | JNP | BL | Emails internally regarding examiner motion. | 0.10 | 1295.00 | $129.50 |
| 01/27/2021 | JNP | BL | Conference with Ira D. Kharasch, Gregory V. Demo and John A. Morris regarding employees, Plan and UBS (partial). | 0.40 | 1295.00 | $518.00 |
| 01/27/2021 | JNP | BL | Review and respond to emails regarding Dondero request to continue contempt hearing. | 0.10 | 1295.00 | $129.50 |
| 01/27/2021 | JNP | BL | Review opposition regarding Dondero preliminary | 0.20 | 1295.00 | $259.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

|            |     |    |                                                                                                                                                | Hours | Rate    | Amount      |
|------------|-----|----|------------------------------------------------------------------------------------------------------------------------------------------------|-------|---------|-------------|
|            |     |    | injunction appeal.                                                                                                                              |       |         |             |
| 01/27/2021 | JNP | BL | Email to and from D. Draper regarding hearing on examiner motion.                                                                               | 0.10  | 1295.00 | $129.50     |
| 01/27/2021 | JNP | BL | Conference with Gregory V. Demo regarding CLO litigation and potential settlement.                                                              | 0.10  | 1295.00 | $129.50     |
| 01/27/2021 | JNP | BL | Conference with J. Seery regarding UBS settlement, Plan hearing, contempt and related issues.                                                   | 0.30  | 1295.00 | $388.50     |
| 01/27/2021 | RJF | BL | Internal emails regarding examiner response.                                                                                                    | 0.20  | 1395.00 | $279.00     |
| 01/27/2021 | JAM | BL | Draft e-mail to Funds' counsel re: Waterhouse deposition (0.1); communications with B. Levine re: confirmation discovery (0.3); revise draft e-mail to Gov Re re: documents (0.3); review/revise opposition to Dondero emergency appeal of preliminary injunction (2.7); draft Leventon deposition notice (0.2); e-mail to objecting parties re: Leventon deposition (0.2); telephone conference with H. Winograd re: opposition to Dondero emergency appeal of preliminary injunction (0.1); telephone conference with M Matteo re: analysis of expenses incurred addressing Dondero misconduct (0.1); e-mail to M. Matteo, J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, M. Hayward re: analysis of expenses incurred addressing Dondero misconduct (0.5); e-mail with court reporter re: Leventon deposition (0.1); telephone conference with L. Hogewood re: Funds and PI motion (0.2); e-mail to Board, J. Pomerantz, I. Kharasch, G. Demo re: Funds and PI motion (0.1); telephone conference with J. Pomerantz re: Waterhouse deposition (0.1); telephone conference with J. Seery re: call with Hogewood concerning Funds and PI motion (0.1); telephone conference with J. Pomerantz re: call with Hogewood, Funds, and the PI motion (0.1); revise e-mail to Funds' counsel re: Waterhouse deposition (0.1); telephone conference with J. Pomerantz re: various litigation matters (0.2); e-mails with D. Rukavina, J. Pomerantz, G. Demo, others re: Waterhouse deposition (0.3); reviewing Winograd declaration in support of opposition to Dondero emergency appeal of preliminary injunction (0.2); prepare for Leventon deposition (0.6); review revisions to opposition papers to Dondero emergency appeal of preliminary injunction (0.2); review e-mails among H. Winograd, Z. Annable, K. Brown, L. Canty re: finalizing and filing opposition to Dondero emergency appeal of preliminary injunction (0.5); video meeting with J. Pomerantz, I. | 8.80  | 1245.00 | $10,956.00  |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | Kharasch, G. Demo, DSI re: liquidation analysis (1.0); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re: Gov Re and litigation issues (0.5). | | | |
| 01/27/2021 | GVD | BL | Conference re potential insurance litigation issues | 0.50 | 950.00 | $475.00 |
| 01/27/2021 | GVD | BL | Conference with J. Romey re discovery issues | 0.30 | 950.00 | $285.00 |
| 01/27/2021 | GVD | BL | Correspondence with B. Assink re potential adjournment of contempt motion | 0.30 | 950.00 | $285.00 |
| 01/27/2021 | GVD | BL | Draft response to Dondero objection to assumption of contracts | 0.40 | 950.00 | $380.00 |
| 01/27/2021 | GVD | BL | Analyze open discovery issues | 0.10 | 950.00 | $95.00 |
| 01/27/2021 | HRW | BL | PSZJ call re: Gov Re (0.5); PSZJ WIP Call (1.0); Draft and prepare opposition and ancillary papers for opposition to Dondero motion for leave to appeal and for expedited hearing (6.5); Draft Notice of Hearing for Dondero Contempt Motion (0.3); Review Dondero motion for continuance of contempt hearing (0.1). | 8.40 | 695.00 | $5,838.00 |
| 01/28/2021 | JNP | BL | Conference with Ira D. Kharasch regarding CLO potential settlement terms. | 0.10 | 1295.00 | $129.50 |
| 01/28/2021 | JNP | BL | Review and respond to emails regarding potential CLO settlement terms. | 0.10 | 1295.00 | $129.50 |
| 01/28/2021 | JNP | BL | Review email from H. Winograd regarding Dondero District Court motion regarding preliminary injunction. | 0.10 | 1295.00 | $129.50 |
| 01/28/2021 | JNP | BL | Conference with J. Dubel regarding UBS and related. | 0.30 | 1295.00 | $388.50 |
| 01/28/2021 | JNP | BL | Email to J. Bjork regarding UBS settlement status. | 0.20 | 1295.00 | $259.00 |
| 01/28/2021 | JMF | BL | Review complaints and background re notes receivables re HCMS, HCRE, and HCMFA. | 1.10 | 1050.00 | $1,155.00 |
| 01/28/2021 | JAM | BL | Analysis and e-mail to PSZJ and DSI teams concerning Dondero additional discovery demands (1.3); telephone conference with G. Demo re: litigation matters (0.1); meet and confer call with D. Draper, J. Pomerantz (0.2); telephone conference with J. Pomerantz re: litigation matters (0.1); e-mail to G. Demo, T. Surgent, DSI re: document production issues (0.8); telephone conference with D. Demo, DSI re: document production issues (0.3); telephone conference with G. Demo, T. Surgent, | 11.60 | 1245.00 | $14,442.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | DSI re: document production issues (0.6); telephone conference with G. Demo re: litigation issues/shared services transition (0.3); telephone conference with J. Pomerantz re: litigation issues (0.2); prepare for Seery deposition (1.3); telephone conference with L. Hogewood re: Fund litigation, transition issues (0.1); e-mail to J. Seery, J. Pomerantz, I. Kharasch, G. Demo re: call with Hogewood (0.1); telephone conference with J. Seery, J. Pomerantz, I. Kharasch, G. Demo (partial participation) (2.5); review Dondero reply on appeal of preliminary injunction (0.3); telephone conference with J. Seery, G. Demo re: Funds, transition issues (0.5); telephone conference with T. Silva, M. Hartmann, [another B&M attorney] re: Frank Waterhouse and fund issues (0.5); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, DSI re: fund transition and litigation issues (0.6); telephone conference with J. Seery, J. Pomerantz, G. Demo, T. Silva re: fund transition and litigation issues (0.8); telephone conference with G. Demo, T. Silva, K&L Gates lawyers re: fund transition and litigation issues (0.4); telephone conference with G. Demo, T. Silva re: follow up to call with K&L Gates (0.1); telephone conference with J. Pomerantz re: follow up call with K&L Gates (0.1); telephone conference with J. Seery re: follow up call with K&L Gates (0.2); e-mails with J. Pomerantz re: Daugherty litigation issues (0.2). | | | |
| 01/28/2021 | GVD | BL | Attend to issues re discovery | 0.90 | 950.00 | $855.00 |
| 01/28/2021 | GVD | BL | Conference with J. Morris re discovery issues | 0.30 | 950.00 | $285.00 |
| 01/28/2021 | GVD | BL | Conference with T. Surgent and J. Morris re discovery issues | 0.50 | 950.00 | $475.00 |
| 01/28/2021 | GVD | BL | Conference re preparation of J. Seery for deposition | 2.00 | 950.00 | $1,900.00 |
| 01/28/2021 | GVD | BL | Draft response to Dondero objection to contract assumption | 0.60 | 950.00 | $570.00 |
| 01/28/2021 | HRW | BL | Review Dondero's reply in support of motion for leave to appeal (1.8); Draft demonstratives re: Highland litigation (2.5); Communicate with DSI re: redactions on org chart and legal entities list (0.6); Review redactions on org chart and legal entities list (0.5); Review Dondero's requests for production (0.9). | 6.30 | 695.00 | $4,378.50 |
| 01/29/2021 | JMF | BL | Review motion and opposition re continuation of preliminary injunction. | 0.40 | 1050.00 | $420.00 |

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| 01/29/2021 | JAM | BL | Prepare for Seery deposition (0.4); draft opposition to Dondero motion for continuance (1.7); telephone conference with J. Kathman re: Daugherty settlement (0.2); telephone conference with J. Seery re: deposition (0.1); Seery deposition (5.0); telephone conference with J. Seery re: deposition (0.3); e-mails with Z. Annable, H. Winograd, L. Canty re: amended exhibit list (0.3); telephone conference with J. Pomerantz, I. Kharasch re: Seery deposition (0.5); telephone conference with B. Levine re: document production (0.1); review Ellington and Leventon deposition notices and e-mails with Z. Annable, H. Winograd concerning the same (0.1); review stipulation dismissing Daugherty adversary proceeding and e-mails with Z. Annable, H. Winograd concerning the same (0.1); prepare for confirmation hearing (0.6); telephone conference with G. Demo re: funds' transition and related issues (0.2); telephone conference with J. Pomerantz, I. Kharasch, G. Demo, J. Fried re: confirmation preparation and analysis (0.8); telephone conference with M. Hartmann re: Waterhouse (0.1); telephone conference with D. Rukavina re: Waterhouse, confirmation evidence (0.1). | 10.60 | 1245.00 | $13,197.00 |
| 01/29/2021 | GVD | BL | Conference with J. Morris re litigation issues | 0.20 | 950.00 | $190.00 |
| 01/29/2021 | GVD | BL | Attend Seery deposition (in part) | 0.50 | 950.00 | $475.00 |
| 01/29/2021 | HRW | BL | Draft demonstratives re: Highland litigation (1.9); Review and edit w&e list for confirmation hearing (0.5); Prepare notice of depositions for Ellington/Leventon (0.9); Prepare notice of withdrawal re: Daugherty adversary proceeding (1.3); Call with DSI re: redacting exhibits for confirmation hearing (0.5); Review redactions on org chart and legal entities chart (1.5). | 6.60 | 695.00 | $4,587.00 |
| 01/30/2021 | JAM | BL | Review/revise written responses to Dondero's discovery requests (2.2); e-mail to J. Pomerantz, I. Kharasch, G. Demo, H. Winograd, L. Canty, DSI re: written responses to Dondero's discovery requests (0.3); create and revise demonstrative exhibits (0.7); telephone conference with G. Demo, T. Silva, DSI re: funds transition and litigation issues (0.7); telephone conference with J. Seery re: deposition, trial preparation (0.3); telephone conference with J. Pomerantz, I. Kharasch, G. Demo re analysis of issues of confirmation/J. Pomerantz presentation (1.8); prepare for confirmation (1.8); telephone | 8.10 | 1245.00 | $10,084.50 |

Pachulski Stang Ziehl & Jones LLP

Highland Capital Management LP

36027 - 00002

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| | | | conference with G. Demo, H. Winograd re: projects for Dondero contempt hearing (0.3). | | | |
| 01/30/2021 | GVD | BL | Conference with J. Morris re litigation strategy | 0.10 | 950.00 | $95.00 |
| 01/30/2021 | GVD | BL | Conference with H. Winograd and J. Morris re discovery issues | 0.30 | 950.00 | $285.00 |
| 01/30/2021 | HRW | BL | Call with J. Morris and G. Demo re: document review and production (0.2); Draft demonstratives re: Highland litigation for confirmation hearing (1.5). | 1.70 | 695.00 | $1,181.50 |
| 01/31/2021 | JAM | BL | Prepare direct examination for J. Seery (4.8); telephone conference with J. Pomerantz re: Seery testimony (0.1); e-mails with H. Winograd, L. Canty re: document review for Dondero contempt hearing (0.1); telephone conference with G. Demo re: litigation issues (0.1); telephone conference with J. Pomerantz re: evidence, testimony of Aon representative (0.1). | 5.20 | 1245.00 | $6,474.00 |
| 01/31/2021 | HRW | BL | Review documents for Dondero production (5.8) Review documents for contempt motion (3.9) Draft demonstratives re: Highland litigation for confirmation hearing (1.5) | 11.20 | 695.00 | $7,784.00 |
| | | | | **670.90** | | **$698,770.00** |

**HIGHLY CONFIDENTIAL**

# EXHIBIT 44

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

<div align="center">

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

</div>

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| Debtor. | § | **Chapter 11** |

<div align="center">

### RESPONSE OF JAMES DONDERO TO THE OFFICIAL
### COMMITTEE OF UNSECURED CREDITORS' EMERGENCY
### MOTION TO COMPEL PRODUCTION BY THE DEBTOR
[Relates to Docket No. 808]

</div>

James Dondero ("Dondero"), a party in interest, hereby files this Response to the *Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor* [Docket No. 808] (the "Motion"). In support thereof, Dondero respectfully represents as follows:

<div align="center">

### BACKGROUND

</div>

1.     Through the Motion, the Committee seeks the production by the Debtor of a wide variety of documents, including emails, to aid in its investigation of potential Estate Claims[1] and other potential causes of action against third parties, which includes "any and all estate claims and causes of action against Dondero, [Mark] Okada, other insiders of the Debtor, and each of the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦
1934054200714000000000004

Related Entities,[2] including promissory notes held by any of the foregoing." In accordance with the Final Term Sheet, the Committee also seeks "any privileged documents or communications that related to the Estate Claims."

2.      The Final Term Sheet grants the Committee access to privileged documents and communications in the Debtor's possession, custody, or control specifically related to the investigation and pursuit of the Estate Claims.  The term sheet provides that "solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege")."

3.      Accordingly, the Proposed Protocol of the Committee seeks, among other things, documents, emails, and other electronically stored information (ESI) exchanged from or between nine different custodians, who include Dondero.[3] The Committee has requested all ESI for the nine custodians, including without limitation, email, chat, text, Bloomberg messaging, or any other ESI attributable to the custodians.

4.      The Debtor's document production to the Committee in this case is subject to the terms and conditions of the Agreed Protective Order [Docket No. 382] entered into between the Committee and the Debtor on January 21, 2020. Under this protective order and the Committee's

---

[2] As described in the Motion, "[t]he Final Term Sheet defines "Related Entities," as, collectively, "(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis . . . has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis . . . ; (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative . . . of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, . . .; and (viii) to the extent not included in [the above], any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"))." (Dkt. 354-1, at 52.) The Related Entities Listing lists thousands of entities related to the Debtor. CLO Holdco i[s] a shareholder and limited partner of various entities on the Related Entities Listing."

[3] These nine custodians are Patrick Boyce, Jim Dondero, Scott Ellington, David Klos, Isaac Leventon, Mark Okada, Trey Parker, Tom Surgent ("Surgent"), and Frank Waterhouse.

Proposed Protocol, any document not including one of the agreed-upon set of privilege terms (that is, those likely to identify attorney-client privileged communications or attorney work product, but not those related to the Estate Claims) would be produced to the Committee for review, subject to the Agreed Protective Order's provisions on "No Waiver" and "Claw Back of Inadvertently Produced Protected Materials." Thereafter, after review by Debtor's contract attorneys, the Committee's Proposed Protocol suggests that non-privileged documents and "privileged documents related to the Estate Claims would be produced to the Committee on a rolling basis."

5.     While the Agreed Protective Order provides these and other protections to the Debtor related to the production of documents and information in this proceeding, the order provides that it does not apply to any third-party beneficiaries. Specifically, the order states that it "precludes non-Debtor affiliates, and their Representatives, including any entity affiliated with, owned by, or controlled in any way, directly or indirectly, by James Dondero and his affiliates (the "Dondero Parties") from seeking to enforce or rely on this Order in any way, unless any of the Dondero Parties is asked (formally or informally) to produce or receive Discovery Materials thereby becoming a "Party" as defined herein."[4]

6.     On July 9, 2020, Highland Capital Management, L.P. (the "Debtor" or "Highland") filed *Debtor's Motion for Entry of (I) A Protective Order, or, in the Alternative, (II) an Order Directing the Debtor to Comply with Certain Discovery Demands Tendered by the Official Committee of Unsecured Creditors, Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034* [Docket No. 810].

7.     Because the production of certain privileged information is implicated by the Committee's Motion, including as it relates to Dondero, both individually and in connection with

---

[4] *See* Agreed Protective Order [Docket No. 382], para. 17.

his affiliated entities, Dondero is a Party that may seek relief with this Court in connection with the Agreed Protective Order.

## RESPONSE

8.     While Dondero takes no position as to the relief requested by the Committee in the Motion, he files this Response to ensure his rights are protected in connection with the production of any confidential or privileged documents and other information sought by the Committee.

9.     Under the Final Term Sheet, the Committee is entitled to "privileged documents and communications that are within the Debtor's possession, custody, or control" with respect to its investigation and pursuit of Estate Claims. In turn, members of the Committee will be entitled to access and review such information. Because of the broad scope of access granted to the Committee through the Final Term Sheet and the Shared Privilege, each of the committee members will have access to much more material than in the typical case.

10.     One such member, Joshua Terry ("Terry"), along with his wholly-owned or controlled entities, Acis Capital Management GP, LLC, and Acis Capital Management, L.P. (collectively, "Acis"), would enjoy access to this privileged and confidential information. As the Court is aware, Terry and Acis have commenced a number of proceedings against Dondero, Highland, and various related parties, which are not intended to benefit Highland's creditors generally, but are meant to benefit primarily Terry himself. Because of these pending actions, if the Court grants the Motion, the Court should restrict Terry and Acis's access to the information sought by the Committee, especially that which is privileged or confidential.

11.     While Dondero has found no case law directly on point, there is an analogous situation. Under Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Court may order the examination of any entity. Fed. R. Bankr. P. 2004. Rule 2004

further provides that the Court may order the examination and the production of documentary evidence concerning any matter that relates "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or . . . any matter relevant to the case or the formulation of a plan." Fed. R. Bankr. P. 2004(b).

12.     The scope of discovery under Rule 2004 is very broad. Courts have likened the examination to be in the nature of a "fishing expedition." *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008).

13.     Although discovery under Rule 2004 is extremely broad, "once an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004." *In re SunEdison, Inc.*, 572 B.R. 482, 490 (Bankr. S.D.N.Y. 2017); *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (citing *Snyder v. Soc'y Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994), aff'd sub nom. *In re Snyder*, 52 F.3d 1067 (5th Cir. 1995)); *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) ("The well recognized rule is that once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to the Fed. R. Bankr. P. 7026 *et seq.*, rather than by a [Rule] 2004 examination."). Because Rule 2004 is designed to provide the examining party with "broad power to investigate the estate, it does not provide the procedural safeguards offered by Fed. R. Bankr. P. 7026." *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996).

14.     In this case, the Committee and the Debtor have, through the Final Term Sheet, agreed to allow the Committee to conduct broad discovery concerning the Debtor's assets and financial affairs (akin to a 2004 examination) to aid in the Committee's investigation and pursuit of potential Estate Claims and other causes of action. Thus, to the extent there are pending

proceedings to which the Committee or any of its members is a party, they may be affected by this discovery.

15.     While the Committee itself has not commenced an adversary proceeding or contested matter against the Debtor, Dondero, or any related entities, Terry has done so. Terry, either on behalf of himself or his wholly-owned and controlled entity, Acis, has commenced a number of adversary proceedings and state court lawsuits against the Debtor, Dondero, a number of Debtor's employees, and certain related entities. These proceedings remain pending and discovery may (for the most part) be taken by the parties.

16.     Specifically, the pending proceedings commenced by Terry are (i) by Terry, related to his 401(k), in state court against Dondero and Surgent; (ii) by Acis in state court against former Highland attorneys including in-house counsel; (iii) by Acis in this Court against Highland and its related parties (stayed by Highland's chapter 11 filing); (iv) by Acis against Dondero and certain Highland employees, recently commenced in this Court; and (v) the frivolous motion for contempt by Acis against Dondero, Highland, and certain Highland employees and others, if Acis ever gets around to actually filing it (it has been before the Court as an exhibit to the motion for relief from stay filed in connection with it).

17.     If the Committee and each of its members is given access to the confidential and privileged information of Dondero and his affiliates related to the Estate Claims, Terry and by extension his wholly owned and controlled entity, Acis, Highland's competitor and litigation adversary, stand to gain an unfair advantage by accessing proprietary, confidential, or privileged information of Dondero and related parties for the purposes of pending litigation. Allowing Terry to participate in such discovery in Highland's bankruptcy case would circumvent the procedural

protections provided by Bankruptcy Rule 7026 and give Terry unprecedented access to sensitive information he may use to gain undue leverage in these various actions.

18.     Moreover, with the existence of the multitude of the pending actions commenced by Terry and Acis against Dondero and Highland's employees, there is another significant problem posed by Terry's service on the Committee: now that Terry has sued (sometimes in a different case) not only Dondero but numerous other Highland employees, Terry's access to the Committee's privileged information in the Highland case may create significant problems for Dondero and Highland's employees in fulfilling their duties to Highland.

19.     The successful operations of Highland, especially during this critical time, require the close attention and candid disclosures of its employees, including in-house counsel, to the Independent Board and the Committee.  Dondero, for example, often exchanges views with the Independent Directors. In doing so he must be cognizant of the possibility that his words may prejudice him in pending litigation.

20.     The foregoing concerns were first brought to the Court's attention by Dondero in his filed Comment[5] to the *Motion for Leave to File Redacted Quarterly Operating Reports* [Acis Docket No. 1161] (the "QOR Motion") filed by Acis in the Acis case, pursuant to which Acis seeks to conceal critical portions of its quarterly operating report from all creditors and interested parties in the Acis case while at the same time utilizing this Court's time and resources to pursue litigation against Dondero, Highland, its employees, and certain related parties. The QOR Motion remains pending. As discussed in the Comment to the QOR Motion, the advantages to Terry resulting from the Shared Privilege and access to information provided to the Committee are significant.

---

[5] *See* Docket No. 1168 filed in the Acis case.

21.     The observations and concerns raised by Dondero in that Comment are even more striking and relevant in this contested matter. If Terry and Acis are allowed access to the privileged and confidential information being sought by the Committee, such information will undoubtedly be utilized by Terry and Acis in their pursuit of Dondero and Highland. Terry, either on behalf of himself or Acis, has litigation pending against (i) Highland; (ii) Highland's founder, Mr. Dondero; (iii) various Highland related entities; (iv) Highland's former attorneys; and (v) Highland's own employees. Given the extraordinary breadth of these actions, there is an existential threat of abuse by Terry of his access to the information available to the Committee, including through the Shared Privilege, to the detriment of Dondero, the Debtor-related parties, Debtor's employees, and the Debtor's estate.

## CONCLUSION

For the reasons set forth above, in the event the Court grants the Motion, Dondero respectfully requests that the Court bar Terry's access to the information sought by the Committee in the Motion. The information sought may be used by Terry and Acis to circumvent the discovery protections under Bankruptcy Rule 7026 to gain an unfair advantage in the litigation Terry has commenced against Dondero, Highland, Highland's employees, and various related parties.

Dated: July 14, 2020

Respectfully submitted,

*/s/ D. Michael Lynn*
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: bryan.assink@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on July 14, 2020, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Committee, the Debtor, and on all other parties requesting or consenting to such service in this case.

*/s/ Bryan C. Assink*
Bryan C. Assink

# EXHIBIT 45

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "'ileventon@highlandcapital.com'" <ileventon@highlandcapital.com>, "'Stephanie Vitiello (SVitiello@highlandcapital.com)'" <SVitiello@highlandcapital.com>
**Cc:** "Gregory V. Demo" <GDemo@pszjlaw.com>
**Subject:** RE: Highland: Privilege Terms Searches
**Date:** Mon, 26 Oct 2020 18:23:19 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg

---

And if anyone has one, when was it issued/provided?

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

---

**From:** John A. Morris
**Sent:** Monday, October 26, 2020 2:23 PM
**To:** ileventon@highlandcapital.com; Stephanie Vitiello (SVitiello@highlandcapital.com)
**Cc:** Gregory V. Demo
**Subject:** FW: Highland: Privilege Terms Searches

Isaac/Stephanie:

Please see below.

Who among the Highland custodians has a Highland-issued phone?

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

**From:** John A. Morris
**Sent:** Monday, October 26, 2020 2:08 PM
**To:** 'Montgomery, Paige'; Rognes, Chandler; Foley, Patrick G.
**Cc:** Reid, Penny
**Subject:** RE: Highland: Privilege Terms Searches

Taking Meta-e off.

The only possibility that I'm aware of and we've discussed is the cell phone/text.

As previously mentioned, there is a strict policy prohibiting the conduct of business on phone/text (you have the policies), and (b) nearly all of the employee's phones are personal, not company issued.

Nevertheless, I will follow up and see whether any of the custodians have company-issued phones.

Thanks,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

**From:** Montgomery, Paige [mailto:pmontgomery@sidley.com]
**Sent:** Monday, October 26, 2020 1:36 PM
**To:** Margaret Wolf; Adam Magazine; Rognes, Chandler; Foley, Patrick G.
**Cc:** McVoy, Paul (NON-SIDLEY @METAEDISCOVERY.COM); Reid, Penny; John A. Morris
**Subject:** RE: Highland: Privilege Terms Searches

Thank you.

John-can you confirm that there was data collected and provided to Meta-E other than just emails and Bloomberg chats? We just want to make sure that the depository now has all data attributable to the custodians under the Court's order.

Thanks,

Paige

**PAIGE HOLDEN MONTGOMERY**

**SIDLEY AUSTIN LLP**
+1 214 969 3500
pmontgomery@sidley.com

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

# EXHIBIT 46

|  |  |
|---|---|
| **From:** | "John A. Morris" <jmorris@pszjlaw.com> |
| **To:** | "'Isaac Leventon'" <ILeventon@HighlandCapital.com>, "Stephanie Vitiello" <SVitiello@HighlandCapital.com> |
| **Subject:** | RE: Highland: Document Production issues |
| **Date:** | Fri, 13 Nov 2020 17:07:49 +0000 |
| **Importance:** | Normal |
| **Inline-Images:** | image001.jpg |

---

Just want to make sure we're addressing, and I have the correct information on:

1. Grant Scott issues
2. JP Sevilla issues
3. DSI/FTI issues (SV's response)
4. HarbourVest issues
5. Cell phone issues (who has company cell phones)

Most of these have been covered, but I want to prepare a singular response and a call will be easier to whip through this.

Let me see if there is anything else.

Thanks,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

**From:** Isaac Leventon [mailto:ILeventon@HighlandCapital.com]
**Sent:** Friday, November 13, 2020 12:04 PM
**To:** Stephanie Vitiello; John A. Morris
**Subject:** RE: Highland: Document Production issues

Out of curiosity John, what is the production issue?

**From:** Stephanie Vitiello
**Sent:** Friday, November 13, 2020 11:00 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Re: Highland: Document Production issues

Yes.  I have a hard stop at 3:30.

Sent from my iPhone


On Nov 13, 2020, at 10:54 AM, John A. Morris <jmorris@pszjlaw.com> wrote:


Stephanie:

Can we speak at 3 pm eastern about document production issues?

Let me know.

Thanks.

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

<image001.jpg>

Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

---

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

---

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING

Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

# EXHIBIT 47

**From:** John A. Morris
**Sent:** Thursday, December 03, 2020 5:30 PM
**To:** ileventon@highlandcapital.com
**Cc:** Stephanie Vitiello (SVitiello@highlandcapital.com); Thomas P. Jeremiassen; jromey@DSIConsulting.com
**Subject:** Highland: Firm Phones

Isaac,

The UC is still pushing for text messages.

I know you've told me that few people have firm-issued phones, but I'm following up on my requests and need to know who has firm-issued phones.

Please let me know as soon as possible.

Thanks.


**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

# EXHIBIT 48

**From:** Isaac Leventon <ILeventon@HighlandCapital.com>
**To:** Helen Kim <HKim@HighlandCapital.com>, Melissa Schroth <MSchroth@HighlandCapital.com>
**Subject:** Trusts
**Date:** Thu, 3 Dec 2020 14:52:29 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Do either Dugaboy or Get Good have services and/or management agreements with HCMLP or any other entity that utilizes HCMLP employees?

**ISAAC LEVENTON** | ASSISTANT GENERAL COUNSEL



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4100 | D: 972.419.4482 | F: 972.628.4147

ileventon@highlandcapital.com | www.highlandcapital.com

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 49

**From:** Isaac Leventon <ILeventon@HighlandCapital.com>
**To:** John Bonds <john@bondsellis.com>
**Subject:** FW: Dugaboy Investment Trust
**Date:** Fri, 4 Dec 2020 14:02:34 -0600
**Importance:** Normal
**Embedded:** Fwd:_Note_valuation
**Inline-Images:** image001.jpg

---

**From:** Isaac Leventon
**Sent:** Thursday, December 3, 2020 3:56 PM
**To:** 'John Bonds'
**Cc:** Stephanie Vitiello ; Bryan Assink ; Michael Lynn
**Subject:** RE: Dugaboy Investment Trust

John - Please see attached what has already been produced. The October 28 draft that the report is addressed to Hunton & Williams and the note, at the time, was between the Dugaboy Investment Trust and the Get Good Trust. Debtor was not a party, and therefore did not retain Hunton. Therefore, communications with Hunton are not the Debtor's and cannot be subject to the Debtor's waiver of privilege for Estate Claims. Debtor believes there are other bases for claiming privilege has been waived, and asked me to locate, and provide for production to the UCC, the final version of the draft report. If Dugaboy believes that any of these documents are its privileged materials, then please contact John Morris (jmorris@pszjlaw.com).


Thanks, Isaac

---

**From:** John Bonds <john@bondsellis.com>
**Sent:** Thursday, December 3, 2020 3:44 PM
**To:** Isaac Leventon <ILeventon@HighlandCapital.com>; John J. Kane <jkane@krcl.com>
**Cc:** Stephanie Vitiello <SVitiello@HighlandCapital.com>; Bryan Assink <bryan.assink@bondsellis.com>; Michael Lynn <dmljng@gmail.com>
**Subject:** RE: Dugaboy Investment Trust

Isaac,

Can you send it to us? Thanks,

John

---

**From:** Isaac Leventon <ILeventon@HighlandCapital.com>
**Sent:** Thursday, December 3, 2020 1:27 PM
**To:** John Bonds <john@bondsellis.com>; John J. Kane <jkane@krcl.com>
**Cc:** Stephanie Vitiello <SVitiello@HighlandCapital.com>
**Subject:** Dugaboy Investment Trust

Johns:

I need to give notice to Dugaboy of the production of related documents. I know that Mr. Bonds represents Dondero (beneficiary of the Trust) and Mr. Kane represents Mr. Scott (trustee for the Trust). Please let me

know which of you (or neither) should be given notice on behalf of the Trust.

Thanks,

**ISAAC LEVENTON |** ASSISTANT GENERAL COUNSEL



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4100 | D: 972.419.4482 | F: 972.628.4147

ileventon@highlandcapital.com | www.highlandcapital.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

HCMLP 000427

# EXHIBIT 50

**From:** Michael Lynn <michael.lynn@bondsellis.com>
**To:** Douglas Draper <ddraper@hellerdraper.com>
**Cc:** Isaac Leventon <ileventon@sasmgt.com>, "dmljng@gmail.com" <dmljng@gmail.com>, Bryan Assink <bryan.assink@bondsellis.com>, Jim Dondero <JDondero@highlandcapital.com>
**Subject:** Re: Engagement
**Date:** Mon, 7 Dec 2020 02:13:02 +0000

---

Jim Dondero should get the engagement letter. I am happy to talk at your convenience. I suggest though that you talk with Jim first.

Sent from my BlackBerry 10 smartphone.

**From:** Douglas Draper
**Sent:** Sunday, December 6, 2020 8:05 PM
**To:** Michael Lynn
**Cc:** Isaac Leventon; dmljng@gmail.com; Bryan Assink
**Subject:** Re: Engagement

Judge Lynn should I send you the engagement letter ? Now that I have read some of the forwarded material would like to talk with you and the client to get a better idea of what is expected and how I can prioritize. The material to digest is significant.

Sent from my iPhone


On Dec 5, 2020, at 6:58 PM, Michael Lynn wrote:


Bryan will be in touch if necessary.

Sent from my BlackBerry 10 smartphone.

**From:** Isaac Leventon
**Sent:** Saturday, December 5, 2020 4:58 PM
**To:** Douglas Draper
**Cc:** dmljng@gmail.com; Michael Lynn
**Subject:** Re: Engagement

Douglas - I think we start with an EL with James D Dondero personally. Judge Lynn, please let me know if Bryan Assink needs any help gathering materials for Douglas.

Thanks, Isaac
Sent from my iPhone


On Dec 5, 2020, at 4:53 PM, Douglas Draper wrote:


I have talked with judge Lynn. What is the next step to 1) figure out who I will be representing 2) exactly what I need to do and 3) prepare a retention letter etc.
I look forward to taking the next steps.

HCMLP 000374

Sent from my iPhone

On Dec 5, 2020, at 12:39 PM, Isaac Leventon wrote:

Douglas – Mr. Dondero would like to get you engaged as soon as reasonably possible. Please contact Judge Lynn at the email above or at 817-405-6915.

Thanks,

**Isaac Leventon, Esq.**

SAS Asset Recovery Ltd.

Grand Pavilion Commercial Centre

802 West Bay Road

Grand Cayman KY1-1102

(o) 972.419.4482

ileventon@sasmgt.com

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.

CONFIDENTIALITY NOTICE:
INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax

penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

Due to the current health crisis, the staff of Heller Draper & Horn . LLC will be working remotely and there may be some delay in responding to your email.

CONFIDENTIALITY NOTICE:
INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper & Horn, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

# EXHIBIT 51

**From:** Sarah Goldsmith <SGoldsmith@HighlandCapital.com>
**To:** "sellington@sasmgt.com" <sellington@sasmgt.com>
**Subject:** FW: AT&T Post Call Notification Summary of Change(s) to Your Account
**Date:** Mon, 11 Jan 2021 12:07:02 -0600
**Importance:** Normal
**Inline-Images:** image001.png

---

Best,

**Sarah Bell Goldsmith** | Executive Assistant

O: 972.628.4102 | M: 214.642.3487

---

**From:** Sarah Goldsmith
**Sent:** Wednesday, December 9, 2020 2:37 PM
**To:** Scott Ellington
**Subject:** FW: AT&T Post Call Notification Summary of Change(s) to Your Account

Your number has officially been switched! Thank you so much ☺

Best,

**Sarah Bell Goldsmith** | Executive Assistant

O: 972.628.4102 | M: 214.642.3487

---

**From:** AT&T Account Management <update@emaildl.att-mail.com>
**Sent:** Wednesday, December 9, 2020 2:33 PM
**To:** Sarah Goldsmith <SGoldsmith@HighlandCapital.com>
**Subject:** AT&T Post Call Notification Summary of Change(s) to Your Account



SCOTT ELLINGTON

Thank you for using AT&T!

It was my pleasure to help you today. Below is a summary of our discussion:

- We've completed your request to assume financial responsibility for 2146495475.

  As I mentioned to you during our call today, we'll bill you for your monthly service charges and all applicable taxes and fees, including the monthly Regulatory Cost Recovery Fee of up to $1.25 and any local surcharges.

If we can help you further, please refer to http://www.att.com/biz or call us at (888)-444-4410.

HCMLP 000372

Sincerely,

Marco D.
BCSS-Business Mobility Enablement
(888)-444-4410

Freedom to change! Authorized users who have access to Premier Online Care (POC) can change rate plans, add or remove features and reinstate wireless service after voluntary suspension. Make these account changes today! Login at: https://www.wireless.att.com/businesscare/login. Authorized users of POC may include your company's Telecom Manager, Billing Account Number Administrators and/or authorized Corporate Responsibility Users. To learn more about POC or Premier Online Store go to: http://www.wireless.att.com/businesscenter/premier. Interested in having an AT&T Premier Enterprise Portal for your business? Contact your sales team for assistance. Get account support right from your mobile device: - Download the myAT&T Business application to view usage, make a payment, get technical support, and more! Visit www.att.com/BusinessMobile. (via smartphone only)

This is an automated email so replies to the address will not be answered. Please use the contact information above for questions regarding this message. © 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.

CSVC_X016EH

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

# EXHIBIT 52

**From:** Michael Lynn <dmljng@gmail.com>
  **To:** Scott Ellington <SEllington@highlandcapital.com>
  **Cc:** Jim Dondero <JDondero@highlandcapital.com>, John Wilson <john.wilson@bondsellis.com>
**Subject:** Testimony
  **Date:** Fri, 11 Dec 2020 12:02:54 -0600

---

Scott, you were going to talk with John Wilson of our firm or have JP do so. He needs to speak today so we know whom to put on the witness and exhibit list and will be waiting for a call. Thanks.

Sent from my BlackBerry 10 smartphone.

HCMLP 000498

# EXHIBIT 53

**From:** Michael Lynn <dmljng@gmail.com>
  **To:** Bryan Assink <bryan.assink@bondsellis.com>, John Wilson <john.wilson@bondsellis.com>,
    Scott Ellington <SEllington@highlandcapital.com>, Jim Dondero
    <JDondero@highlandcapital.com>
**Subject:** Re: Witnesses for hearing
  **Date:** Sat, 12 Dec 2020 19:33:18 -0600

---

As you can see, we are getting into a real bind and probably harming ourselves in the process.

As to deposing both directors, we will go with Dubel, but we reserve the right to call Nelms at trial. Tell Morris that and that I am hoping for a resolution and am waiting to hear from Jeff Pomerantz. Meantime we must as he must go forward.

Sent from my BlackBerry 10 smartphone.

**From:** Bryan Assink
**Sent:** Saturday, December 12, 2020 7:22 PM
**To:** John Wilson
**Cc:** Michael Lynn
**Subject:** Witnesses for hearing

John, have you heard from Ellington or Sevilla yet? We really need to let the other side know if we are going to call one of them as a witness. I can list either/or on the exhibit list and tell that to Morris but he is insisting on being able to depose one of them before the hearing, but telling them one or the other (when we really haven't confirmed that) does not help him.

Judge, do you have any way of contacting Sevilla so he can talk to John?

**Bryan C. Assink, Associate**
**Bonds Ellis Eppich Schafer Jones LLP**
420 Throckmorton St. | Suite 1000 | Fort Worth, Texas 76102
office 817.779.4297 | fax 817.405.6902
bryan.assink@bondsellis.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message. IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter.

# EXHIBIT 54

**From:** Jim Dondero <JDondero@highlandcapital.com>

**To:** "D. Lynn (Judge Lynn)" <michael.lynn@bondsellis.com>, Scott Ellington <SEllington@HighlandCapital.com>, "ddraper@hellerdraper.com" <ddraper@hellerdraper.com>

**Subject:** Spoke with Clubok for 30 mins

**Date:** Tue, 15 Dec 2020 22:34:39 -0600

**Importance:** Normal

---

2 takeaways:

Redeemer filed a intervene request yesterday with district court ( I'm not a lawyer, don't know what that means) regarding UBS objection to their 9019.... but Clubok asked us to support his objection or write amicus brief

Give him evidence of Seery ineptitude or improper asset sales (life settlement, Omni max, SSP) and he will run with it...

Sent from my iPhone

_____

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

HCMLP 000496

# EXHIBIT 55

**From:** Michael Lynn <dmljng@gmail.com>

**To:** Scott Ellington <SEllington@highlandcapital.com>

**Subject:** Call

**Date:** Wed, 16 Dec 2020 15:19:13 -0600

Please give me a call when you get a minute.

Sent from my BlackBerry 10 smartphone.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

# EXHIBIT 56

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** Fwd: Highland -- Letters to and From K&L Gates
**Date:** Thu, 24 Dec 2020 18:58:45 -0600
**Importance:** Normal

---

Sent from my iPhone

Begin forwarded message:

**From:** Jim Dondero
**Date:** December 24, 2020 at 5:53:30 PM MST
**To:** Michael Lynn
**Cc:** John Bonds , Bryan Assink
**Subject: Re: Highland -- Letters to and From K&L Gates**

Who knows how Jernigan reacts but they are not correct re the inappropriateness of Seery activities.....

Sent from my iPhone

On Dec 24, 2020, at 3:49 PM, Michael Lynn wrote:

Sent from my BlackBerry 10 smartphone.

Original Message

From: Jeff Pomerantz

Sent: Thursday, December 24, 2020 4:40 PM

To: Michael Lynn

Cc: Jeff Pomerantz

Subject: Re: Highland -- Letters to and From K&L Gates

Michael --

HCMLP 000509

At the hearing on 12-16 we clearly established to Judge Jernigan's satisfaction, thorugh Dustin Norris, K&L Gates' witness, that Jim Dondero makes the material investment decisions for all the entities that filed the Motion and whom K&L Gates represents. Accordingly we do believe these issues directly implicate your client, the January 9, 2020 order which is being violated by any efforts to terminate the Debtor and the Temporary Restraining Order that the Court recently entered.

Best,

Jeff

On 12/24/20, 2:33 PM, "Michael Lynn" wrote:

Thank you for providing these. I had not seen them and have had no contact with K&L Gates (though Bryan Assink did regarding certain claims). I do not have familiarity with the Investors Act but do not agree with some of the statements in your letters; as I am not involved, however, that is a matter for you and K&L Gates.

I have not reviewed the transcript of the December 16 hearing, so I do not know on what evidence Judge Jernigan based her conclusion that my client engineered the motion then heard. While there are relationships between my client and some of the movants, I believe they are separate entities and should be treated as such.

Sent from my BlackBerry 10 smartphone.

Original Message

From: Jeff Pomerantz

Sent: Thursday, December 24, 2020 4:02 PM

To: Michael Lynn

Cc: Jeff Pomerantz

Subject: Highland -- Letters to and From K&L Gates

Michael –

Attached are two letters we received from K&L Gates and the Debtor's response that I believe will be of interest to you and your client.

HCMLP 000510

Best.

Jeff


Jeff Pomerantz

Pachulski Stang Ziehl & Jones LLP

Tel: 310.277.6910 | Cell: 310.489.0285 | Fax: 310.201.0760

jpomerantz@pszjlaw.com

vCard | Bio | LinkedIn

Los Angeles | San Francisco | Wilmington, DE | New York


_____


CONFIDENTIALITY

This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.


NOT INTENDED AS A SUBSTITUTE FOR A WRITING

Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.


_____


CONFIDENTIALITY

HCMLP 000511

This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.


NOT INTENDED AS A SUBSTITUTE FOR A WRITING

Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

HCMLP 000512

# EXHIBIT 57

**From:** Jim Dondero <JDondero@HighlandCapital.com>
**To:** Scott Ellington <SEllington@HighlandCapital.com>
**Subject:** Fwd: Highland - Letter & Discovery Requests
**Date:** Thu, 24 Dec 2020 11:34:24 -0600
**Importance:** Normal
**Attachments:** Letter_to_D.M._Lynn_-_12.23.20.pdf; DOCS_NY-_41817-v3-Document_Requests_Dondero.pdf; DOCS_NY-_41819-v3-Depo_Notice_Dondero.pdf
**Inline-Images:** image001.jpg

---

Sent from my iPhone

Begin forwarded message:

**From:** Michael Lynn
**Date:** December 24, 2020 at 9:57:02 AM MST
**To:** Jim Dondero , John Bonds
**Cc:** Bryan Assink
**Subject: Fw: Highland - Letter & Discovery Requests**

Please see the attachments. I think much of what's on Jim's phone is privileged and must be protected. John, you may want to take this up with Morris.

Sent from my BlackBerry 10 smartphone.

**From:** Gregory V. Demo
**Sent:** Wednesday, December 23, 2020 10:19 PM
**To:** Michael Lynn; Michael Lynn; Bryan Assink
**Cc:** Jeff Pomerantz; Ira Kharasch; John A. Morris; Hayley R. Winograd
**Subject:** Highland - Letter & Discovery Requests

Dear Judge Lynn,

Please see attached letter and discovery requests.

Best,

Greg

**Gregory V. Demo**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Fax: 212.561.7777
GDemo@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.





PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

TELEPHONE: 310/277 6910

FACSIMILE: 310/201 0760

SAN FRANCISCO

150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: 415/263 7000

FACSIMILE: 415/263 7010

DELAWARE

919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: 302/652 4100

FACSIMILE: 302/652 4400

NEW YORK

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: 212/561 7700

FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

Jeffrey N. Pomerantz

December 23, 2020

310.772.2336
jpomerantz@pszjlaw.com

**Via E-mail**

D. Michael Lynn
Bonds Ellis Eppich Schafer Jones
LLP
420 Throckmorton Street
Suite 1000
Fort Worth, Texas 76102

> Re: **Termination of James Dondero Access to Office and Services**

Dear Judge Lynn:

As you know, on December 10, 2020, a temporary restraining order was entered against Mr. James Dondero by the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "TRO"). Case No. 20-03190-sgj, Docket No. 10 (Bankr. N.D. Tex. Dec. 10, 2020.

Pursuant to the TRO, Mr. Dondero was, among others things, prohibited from communicating with the employees of Highland Capital Management, L.P. (the "Debtor") (subject to certain limited exceptions) and interfering with or otherwise impeding, directly or indirectly, the Debtor's business. We have discussed with you several instances in which Mr. Dondero breached the terms of the TRO and will not repeat them here.

As you also know, the Debtor manages certain collateralized loan obligations (the "CLOs"). The Debtor sought to cause the CLOs to sell certain publicly-traded equity securities, including AVYA and SKY (tickers), prior to Thanksgiving. Mr. Dondero blocked these trades. That conduct, among other things, caused the TRO to be entered.

These trades were also the subject to the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager,*

DOCS_NY:41828.4 36027/002

HCMLP 000608



December 23, 2020
Page 2

*to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "CLO Motion"), which was filed by, among others, NexPoint Advisors, L.P. ("NPA") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"). At the hearing on December 16, 2020, Judge Jernigan stated both that she agreed that the CLO Motion was brought by "Mr. Dondero, through different entities" and that it was frivolous.

On December 22, 2020, employees of NPA and HCMFA notified the Debtor that they would not settle the CLOs' sale of the AVYA and SKY securities. To justify their conduct, those employees mimicked the frivolous arguments made in the CLO Motion. This conduct violated the TRO, and HCMLP reserves all rights to seek appropriate sanctions with respect to such violation.

As a result of this conduct, among other things, HCMLP has concluded that Mr. Dondero's presence at the HCMLP office suite and his access to all telephonic and information services provided by HCMLP are too disruptive to HCMLP's continued management of its bankruptcy case to continue.

As a consequence, Mr. Dondero's access to the offices located at 200/300 Crescent Court, Suite 700, Dallas, Texas 75201 (the "Office"), will be revoked effective Wednesday, December 30, 2020 (the "Termination Date"). As of the Termination Date, Mr. Dondero's key card will be de-activated and building staff will be informed that Mr. Dondero will no longer have access to the Office.

Further, as of the Termination Date, Mr. Dondero's access to his @highlandcapital.com email account will be revoked, and Mr. Dondero will no longer have access to that email account or any emails, calendars, or contacts associated with that email account.

In addition, Mr. Dondero's access to the HCMLP system and all services maintained on that system, including his Bloomberg terminal, will be revoked as of the Termination Date.

HCMLP will also terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the "Cell Phones"). HCMLP demands that Mr. Dondero immediately turn over the Cell Phones to HCMLP by delivering them to you; we can make arrangements to recover the phones from you at a later date. The Cell Phones and

HCMLP 000609



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

December 23, 2020
Page 3

the accounts are property of HCMLP. HCMLP further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone. HCMLP, as the owner of the account and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information.

Any attempt by Mr. Dondero to enter the Office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass. Similarly, any attempts by Mr. Dondero to access his @highlandcapital.com email account or any other service previously provided to Mr. Dondero by HCMLP will be viewed as an act of trespass, theft, and/or an attempted breach of HCMLP's security protocols.

Finally, HCMLP demands that Mr. Dondero take all steps necessary to retain and protect from loss, destruction, alteration or defacement all documents, communications, and information relating to the Debtor, the Debtor's assets, any assets managed by the Debtor, or the Debtor's employees.

HCMLP reserves all rights that it may have whether at law, equity, or in contract, including the right to restrict the access of HCMFA and NPA employees to the Office and HCMLP-provided services. Nothing herein will be construed as a waiver of any such rights.

Sincerely,

*J. Pomerantz/gud*

Jeffrey N. Pomerantz

cc:     Ira Kharasch, Esq.
        John Morris, Esq.
        Gregory Demo, Esq.

HCMLP 000610

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adversary Proceeding |
| vs. | § § § | No. 20-3190-sgj11 |
| JAMES D. DONDERO, | § § § | |
| Defendant. | § § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

HCMLP 000611

## DEBTOR'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS
## DIRECTED TO JAMES DONDERO

**PLEASE TAKE NOTICE** that, pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034, incorporating by reference Federal Rules of Civil Procedure 26 and 36, Highland Capital Management, L.P., the Plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case ("Bankruptcy Case") hereby requests that, in connection with *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Mr. James Dondero* [Docket No. 2] (the "Motion"), James Dondero, the Defendant in the Adversary Proceeding ("Defendant" or "Mr. Dondero") produce for inspection and copying, the documents identified below, on or before **December 28, 2020 by 5:00 p.m. Central Time** (the "Requests").

## INSTRUCTIONS

1.      For each Document (as defined below) withheld by reason of a claim of privilege, provide a privilege log identifying such Document together with:  (a) the date of the Document; (b) the identity of the author or preparer; (c) the identity of each person who was sent or furnished with the Document or who received or had possession or custody of the Document; (d) a description of the Document, including identification of any attachments or appendices; (e) a statement of the basis of the claim of privilege; and (f) the paragraph of these Requests to which the Document is responsive.  In the case of Documents concerning a meeting or conversation, identify all participants in the meeting or conversation.

2.      Each Document shall be produced in a fashion that indicates clearly the file in which it was located.

HCMLP 000612

3.      If a Document cannot be produced in full, produce it to the extent possible, identify the portion that cannot be produced, and specify the reasons for Your (as defined below) inability to produce the remainder.

4.      You are required to produce ESI (as defined below) in searchable form on DVDs, CD-ROMs or other media to be mutually agreed by the parties.

5.      Documents may be produced in paper format or electronically.  If Documents are produced electronically, or if any ESI is produced, the following formatting should be used:

- Use .tif format for all Documents that were not originally in Excel format, in which case, use .xls or .xlsx format;

- If possible, without creating undue delay, please produce Documents in Summation-ready DVDs, CD-ROMs or other media to be mutually agreed by the parties with .tif and text format, and with a Summation load file; and

- Transmit electronic Documents or ESI on DVDs, CD-ROMs or other media to be mutually agreed by the parties or use an ftp site upload.

6.      These Requests shall be deemed continuing and supplemental answers shall be required if You directly or indirectly obtain further information after Your initial response as required by Fed. R. Bank. P. 7026(e).

7.      The use of either the singular or plural shall not be deemed a limitation. The use of the singular includes the plural, and vice versa.

8.      Unless noted otherwise, **the requests for documents set forth herein seek Documents and Communications created between December 10, 2020 and December 28, 2020**.

HCMLP 000613

## **DEFINITIONS**

1.      "<u>Communications</u>" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

2.      "<u>Document</u>" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whomever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information.  Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

3.      "<u>ESI</u>" has the meaning ascribed to it in Federal Rules of Civil Procedure 16, 26, and 34(a).

4.      "<u>Hearing</u>" refers to the hearing described in the *Notice of Hearing* filed at Docket No. 16 in the Adversary Proceeding.

5.      "<u>MultiStrat</u>" means Highland Multi Strategy Credit Fund, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.).

6.      "<u>You</u>" or "<u>Your</u>" refers to Mr. Dondero.

4

HCMLP 000614

## **DOCUMENT REQUESTS**

**Request No. 1:**

For the period August 1, 2020, to the present, all Communications between You and Andrew

Clubok.

**Request No. 2:**

For the period August 1, 2020, to the present, all Documents provided to or received from

Andrew Clubok.

**Request No. 3:**

All Communications between You and any person employed by the Debtor.

**Request No. 4:**

All Documents provided to or received from any person employed by the Debtor.

**Request No. 5:**

All Documents and Communications concerning MultiStrat.

**Request No. 6:**

All Documents and Communications that You intended to introduce into evidence at the
Hearing.

HCMLP 000615

Dated: December 23, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

6

HCMLP 000616

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding |
| vs. | § § § | No. 20-3190-sgj11 |
| JAMES D. DONDERO, | § § § | |
| Defendant. | § § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

HCMLP 000617

## <u>NOTICE OF DEPOSITION</u>

**PLEASE TAKE NOTICE** that, pursuant to Rule 30 of the Federal Rules of Civil Procedure 30, incorporated by reference in Rule 7030 of the Federal Rules of Bankruptcy Procedure, Highland Capital Management, L.P., the Plaintiff in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>"), and the debtor and debtor-in-possession (the "<u>Debtor</u>") in the above-captioned chapter 11 case ("<u>Bankruptcy Case</u>"), shall take the deposition of James Dondero, the Defendant in the above-captioned Adversary Proceeding ("<u>Defendant</u>" or "<u>Mr. Dondero</u>"), in connection with *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Mr. James Dondero* [Docket No. 2] (the "<u>Motion</u>") on **December 30, 2020, beginning at 9:30 a.m. Central Time**, or at such other day and time as counsel for the Debtor and counsel for Mr. Dondero agree.

**The deposition will be taken remotely** via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime. Parties who wish to participate in the deposition should contact **John A. Morris**, Pachulski Stang Ziehl & Jones LLP, at [jmorris@pszjlaw.com](mailto:jmorris@pszjlaw.com) **no fewer than 24 hours before the start of the deposition** for more information regarding participating in this deposition remotely.

HCMLP 000618

Dated: December 23, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

3

# EXHIBIT 58

*To: All employees of Highland Capital Management, L.P. ("Highland")*
*Re: Highland's New Cell Phone Reimbursement Policy*
*Date: March 27, 2012*

As of March 27, 2012, Highland will be implementing a new policy regarding monthly employee reimbursement for cell phone expenses.  This policy supersedes all prior cell phone reimbursement policies, agreements, and understandings, oral or written, between employees and Highland.

Under the new policy, in consideration for Highland subsidizing employees' cell phone expenses, employees must provide Highland with online access information (user ID and password) for their cell phone bills and records.  Employees who choose to provide online access to Highland must do so within five (5) days of the date of execution below by submitting the requisite information, in writing, to Human Resources.  Employees may not change their submitted access information without concurrently notifying Human Resources, in writing, of their new access information.  Participating employees who fail to provide Highland with sufficient online access will be in ineligible for reimbursement and liable to Highland for repayment of the full reimbursement amount received during any month in which Highland is unable gain access.  Participating employees expressly authorize Highland to make any deductions from their compensation necessary to fulfill repayment obligations.

Participation in this policy is entirely voluntary.  Should you wish to participate, please sign and date below and return the executed document to Human Resources.  Employees who choose not to participate are no longer eligible to be reimbursed by Highland for cell phone expenses.  Employees who choose to participate in this policy may later terminate their participation, and forego future reimbursement, by providing at least fourteen (14) days advance written notice to Human Resources. Your obligations under this policy shall terminate upon the termination of your employment, provided that you will remain obligated to furnish historical call records covering the period through the date of your termination, as requested following the termination of your employment.

Employees participating in this policy should have no expectation of privacy regarding e-mail, voice mail, text messages, graphics, and other electronic data composed, sent, and/or received on their cell phones.  Notwithstanding the foregoing, Highland agrees not to review any call records on an employee's bill other than those associated with the phone number of employee.  Further, regardless of whether employees choose to participate in this policy, all e-mail, voice mail, text messages, graphics, and other electronic data composed, sent, and/or received **related to company business** remain the property of the Highland.  Finally, employees are reminded that, at all times, they are expected to abide by Highland's applicable codes of conduct and employment policies.

By signing below, you also agree to waive any and all claims you may have against Highland or any of its affiliates related to this new policy, including, but not limited to, claims for invasion of privacy, and authorize Highland to access, view, and possess your cell phone records and billing information.

**EMPLOYEE:**

Printed Name: _____

Signature: _____

Date: _____

# EXHIBIT 59

# *Employee Handbook*



**This Employee Handbook applies to all employees of Highland Capital Management, L.P, Highland Capital Management Fund Advisors, L. P., Highland Capital Funds Distributor, Inc., Highland Capital of New York, Inc., NexPoint Advisors, L.P., and NexPoint Residential Trust, Inc.**

## TABLE OF CONTENTS

**THE PURPOSE AND SCOPE OF THIS HANDBOOK** ....................................................4

**HIGHLAND EMPLOYMENT POLICIES** .......................................................................4

    Equal Employment Opportunity ................................................................ 4

    Harassment and Discrimination ............................................................... 4

    Fraternization ........................................................................................... 6

    Non-Disparagement ................................................................................. 6

    Highland - An "At-Will" Employer ............................................................. 7

    Hiring Policies ......................................................................................... 7

        The Handbook Acknowledgment .................................................. 7

        Applicant Screening ..................................................................... 8

        Nepotism ..................................................................................... 8

**HOURS OF WORK, PAYROLL INFORMATION & PERSONNEL POLICIES** ...............8

    Employment Classifications ...................................................................... 8

        Position Type ............................................................................... 8

        Work Schedule ............................................................................ 9

    The Standard Work Day and Work Schedules .......................................... 9

    Overtime and Holiday Pay ........................................................................ 9

    Pay Periods ............................................................................................. 9

    Direct Deposit ........................................................................................ 10

    Payroll Deductions ................................................................................. 10

    Reimbursement of Business Expenses ................................................... 10

**COMPENSATION & CAREER OPPORTUNITIES** .....................................................10

    Career Growth, Transfers and Promotions ............................................. 11

**EMPLOYEE BENEFITS** ...........................................................................................11

    Introduction ........................................................................................... 11

    Differential Pay ...................................................................................... 12

    Cell Phone Benefit ................................................................................. 12

    Professional Membership Reimbursement Program ............................... 14

    Employee Referral Awards Program ...................................................... 14

    Matching Charitable Gifts ...................................................................... 14

    Paid Time Off ........................................................................................ 14

    Holidays and Floating Days .................................................................... 17

    Workers' Compensation ......................................................................... 17

    Long and Short Term Disability Policies ................................................. 18

    FMLA Policy .......................................................................................... 18

    Jury or Witness Leave ........................................................................... 25

    Voting Leave ......................................................................................... 25

    Military Leave ........................................................................................ 26

    Limitation On Leaves Of Absence ......................................................... 27

**OTHER IMPORTANT HIGHLAND POLICIES & EMPLOYEE RESPONSIBILITIES** .....28

    Attendance ............................................................................................ 28

    TimeKeeper ........................................................................................... 28

    Professional Appearance ....................................................................... 28

    Information Technology Acceptable Use Policy ...................................... 30

Workplace Audio and Video Recording Policy ........................................ 33
Safety and Health ............................................................................... 35
Drug and Alcohol Policy ...................................................................... 35
Solicitation and Distribution ................................................................. 36
Outside Employment ("Moonlighting") and Conflicts of Interest ............. 36
Press and Media Relations ................................................................... 36
Personal Phone Calls .......................................................................... 37
Use and Care of Highland Assets and Records ..................................... 37
Confidentiality ................................................................................... 37
**JOB PERFORMANCE** ....................................................................... **38**
General Expectations .......................................................................... 38
Problem Resolution ............................................................................. 39
Corrective and Disciplinary Action ........................................................ 39
Causes for Corrective Action and/or Immediate Dismissal ..................... 40
References and Verification of Employment .......................................... 41
**LEAVING THE COMPANY** ................................................................. **41**
Voluntary Termination ......................................................................... 41
Involuntary Termination ....................................................................... 41
Exit Interviews ................................................................................... 41
Return of Company Property ................................................................ 42
Benefits Continuation (COBRA) ............................................................ 42
Post-Employment Contact with Investors, Prospective Investors, and
Counterparties ................................................................................... 42
**HIGHLAND CODE OF ETHICS AND BUSINESS PRACTICES** .................... **44**
Introduction ....................................................................................... 44
Proper Recording Of Assets And Disbursements .................................. 45
Business Solicitation Practices ............................................................. 45
Relationships With Government Officials ............................................... 45
Conflicts Of Interest - Outside Activities ............................................... 46
Political Campaign Laws ...................................................................... 46
Antitrust Law And Competitive Practices ............................................... 46
Trade Secrets And Other Proprietary Information ................................... 46
Compliance With Laws And Regulations ................................................ 46
Implementation .................................................................................. 47
Trading Policy .................................................................................... 47
**HIGHLAND EMPLOYEE HANDBOOK ACKNOWLEDGMENT FORM** .......... **48**

# THE PURPOSE AND SCOPE OF THIS HANDBOOK

This Handbook (the "Handbook") is designed to inform employees of Highland Capital Management, L.P.  and its Affiliates (collectively "Highland" or the "Company") of the company's policies and practices.  You should read the contents of this Handbook carefully and consult your supervisor if you have questions or desire additional information. Affiliates ("Affiliates") is defined to include Highland Capital Management Fund Advisors, L. P., Highland Capital Funds Distributor, Inc., Highland Capital of New York, Inc., NexPoint Advisors, L.P., and NexPoint Residential Trust, Inc.

This Employee Handbook is only a general guide to Highland's current employment policies and to some of your responsibilities as an employee.  It is informational only and is not intended to be and should not be construed as a contract of employment.  From time to time, Highland reviews and makes revisions to its policies, procedures and benefits without notice.  Highland reserves the right to modify the policies and procedures contained in this Handbook at any time.

Included as part of this handbook is an Acknowledgment form.  After you have read this handbook, you must sign and return the form to Human Resources.

*(Revised 06-15-17)*

# HIGHLAND EMPLOYMENT POLICIES

Equal Employment Opportunity

Highland is committed to a policy of equal employment opportunity.  This means that employment decisions affecting applicants and employees will not be based upon the individual's race, color, religion, gender, national origin, age, disability or any other unlawful basis.  Employees who engage in such discrimination will be subject to disciplinary action, up to and including discharge from employment.  If you feel you have been discriminated against, you should notify your supervisor, the Human Resources department, or any other person in management whom you are comfortable in approaching.

Harassment and Discrimination

***(Please see Sexual Harassment Addendum in New Hire Packet)***

Highland will not tolerate harassment or discrimination of its employees, whether committed by a fellow employee, a member of management, or a visitor to our workplace, such as a vendor, supplier or customer.  Harassment or discrimination based on race, color, religion, gender, national origin, age, disability, sexual orientation or any other unlawful basis violates Company policy.  All employees are responsible for ensuring that the workplace is free from harassment and discrimination.  This policy also applies to work-related settings outside of the workplace, such as during business trips, business meetings and business-related

social events. All employees, including managers and supervisors, will be subject to disciplinary action, up to and including discharge from employment, for any act of harassment or discrimination they commit.

Examples of prohibited harassment include, but are not limited to:

- Use of slurs, epithets or words that degrade an individual or group of individuals, even when used in a joking fashion;

- Unwelcome advances, demands or requests for sexual acts or favors, and other verbal or physical conduct of an offensive nature, such as leering, touching, gestures and graphic comments about another person's body or personal conduct;

- Display of cartoons, email, photographs, drawings, pin-ups, posters, calendars, or images that are offensive or degrading to others;

- Conduct that has the purpose or effect of substantially interfering with an individual's work performance or which creates an intimidating, hostile or offensive work environment; or

- Conditioning hire, continued employment, or terms and conditions of employment (such as raises, promotions, assignments) upon submission to sexual advances or requests for sexual favors.

It is also unacceptable to shun or exclude an individual from participation in work or work-related social events in order to avoid allegations of harassment.

If you feel you are being harassed or discriminated against, or if you have knowledge of harassment or discrimination of a co-worker, you should take immediate action to bring the matter to the attention of the Human Resources Department. If you are comfortable doing so, you should also advise the offender that his or her behavior is unwelcome and request that it stop. This approach is effective in situations where the offender truly does not realize that his or her conduct is offensive to others. If this does not work, or if you are not comfortable confronting the offender, notify your supervisor. If for any reason you do not feel comfortable discussing the matter with your supervisor, contact the Human Resources Department or any member of management whom you feel comfortable in approaching. All reports will be promptly investigated in as confidential a manner as possible. Based upon the findings of the investigation, Highland will take prompt and appropriate action to remedy any violations of this policy. Remedial action may include, but is not limited to, individual counseling, verbal warning, written warning, suspension, and discharge from employment, depending upon the nature of the offense.

No employee who brings a good faith report of harassment or discrimination to the attention of the Company will suffer retaliation or other adverse employment

actions as a consequence. Any employee, including managers and supervisors, who is found to have retaliated against an employee who reported a violation of this policy, in good faith, will be subject to disciplinary action up to and including discharge from employment. It is important for employees to report incidents of harassment or discrimination because, without your assistance, violations could go undetected and uncorrected. Furthermore, if you feel you are being subjected to retaliation, please notify your supervisor, the Human Resources department, or any other member of management.

Fraternization

Consenting romantic or sexual relationships between a supervisor or manager and an employee may at some point lead to complications and significant difficulties for all concerned – the employee, the supervisor or manager, co-workers, and the Company. The problems can range from actual or perceived favoritism, lowered productivity, unfair alliances, to domestic disputes that can enter the workplace.

As a result, the Company discourages such relationships and any conduct that is designed or may reasonably be expected to lead to the formation of a romantic or sexual relationship between a supervisor or manager and an employee. If such a relationship should exist or develop, the supervisor or manager must disclose the existence of the relationship to Human Resources within 2 weeks. The involved employee may also make the disclosure, but the burden of disclosure rests upon the supervisor or manager who is in the relationship with the employee. Upon notice, Human Resources may take all steps deemed necessary. At a minimum, the supervisor or manager and the employee will not be permitted to work together on the same matters, and the supervisor or manager must withdraw from participation in activities or decisions (including but not limited to hiring, evaluations, promotions, compensation, work assignments, discipline and discharge) that may reward or disadvantage the employee with whom the supervisor or manager is involved.

The Company does not intend this policy to inhibit or discourage friendships or social activities that are or should be an important part of the work environment. This policy is not to be relied upon as justification or excuse for a supervisor or manager to refuse to engage in appropriate social interaction with employees.

This policy will apply without regard to gender or sexual orientation of the parties to the romantic or sexual relationship.

Non-Disparagement

Highland is committed to promoting a culture of collaboration and ensuring a workplace where everyone is treated with dignity and respect, and Highland expects its employees to support that commitment by helping to maintain a workplace based on mutual understanding and cooperation. This means that employees should not make statements or remarks, whether oral or written, about other employees or former employees that could be found offensive,

discriminatory, disparaging, profane, derogatory, abusive, or maliciously false. Engaging in such conduct, or encouraging or instructing others to engage in such conduct, is strictly prohibited and will not be tolerated. However, to be very clear, nothing in this or any other Highland policy should be construed as prohibiting employees from engaging in concerted activity protected by the National Labor Relations Act.

*(Revised 03-29-17)*

Highland - An "At-Will" Employer

The fact that you have been hired as an employee at Highland does not imply that the company has established any form of contractual arrangement with you. To the contrary, your employment relationship with the company is considered an "employment at-will" arrangement that either you or Highland may terminate at any time and for any reason. (Certain employees may have written employment contracts that govern the terms and conditions of their employment. If you are one of these employees, you will have been notified of your status as a contract employee at the time you were hired.) No employee except the President of the Company's general partner may change or alter the at-will nature of the employment relationship, and then only by a written document signed by the President.

Hiring Policies

*The Handbook Acknowledgment*

Each of Highland's employees, both existing and new, must sign a Handbook acknowledgment. At the end of this booklet is a form acknowledging receipt of the Handbook. After you have completely reviewed this Handbook, this form must be detached from the Handbook, signed by you and returned to Human Resources. In addition, you will be expected to re-read and acknowledge compliance with the Employee Handbook at a minimum annually as a part of continued employment

*(Revised 03-29-17)*

### *Items to be covered for Each New Employee*

- Read the Highland Employee Handbook and sign the Acknowledgment Form

- Learn about and sign required payroll and employment forms (I-9, tax forms, etc.)

- Learn about your benefits and sign benefit enrollment forms

- Learn about your specific job responsibilities and performance standards

- Learn your work and lunch hours and the procedures to follow in case of absence

Once you accept employment with Highland, you are required to provide evidence of your right to work and verification of your identification within seventy-two hours of your hire date. Without appropriate documentation (completed and approved federal government Form I-9) you are subject to immediate termination of employment.

*Applicant Screening*

All new employees are required to undergo a background screening process, which includes providing historical Form W-2s and Wage and Tax Statements as part of their application. The purpose of applicant screening is to confirm past employment and research any other issues that Highland may consider relevant for employment qualification. These issues may include licenses and educational certifications, criminal records, driving records and others. In most cases the applicant screening process will be completed prior to the first day of Highland employment. Our offer of employment and your employment is contingent on the completion of applicant background screening to the satisfaction of Highland.

*(Revised 04-17-12)*

*Nepotism*

There will be no hiring of close relatives such as spouses, parents, grandparents, siblings and children as full-time or part-time regular employees.

# HOURS OF WORK, PAYROLL INFORMATION & PERSONNEL POLICIES

Employment Classifications

Employees at Highland are classified in several ways. Please see your supervisor if you have any questions concerning your employment status.

*Position Type*

**Non-Exempt**: Employees classified as hourly or non-exempt are paid for the actual number of hours they work and are eligible to receive overtime pay after working more than 40 hours in a work week.

***Exempt:*** Employees classified as exempt are paid annual salaries which are divided into semi-monthly payments. They are not eligible to receive overtime pay.

*Work Schedule*

***Full-time:*** Full-time employees are scheduled to work an average of 40 hours or more per week on a continuing basis.

***Part-time:*** Part-time employees are scheduled to work an average of 20 hours or more but less than 40 hours per week on a continuing basis.

The Standard Work Day and Work Schedules

Highland is open for business, meaning the switchboard is covered and the doors are open, between the hours of 7:30 a.m. and 5:30 p.m., Monday through Friday. Arrival and departure time for staff is determined by the business needs and schedules of each department and may be flexible in nature. Full-time hourly employees are generally expected to work a minimum of 50 hours per week. The department manager will set each individual's specific work hours.

*(Revised 12-16-13)*

Overtime and Holiday Pay

Hourly employees will be paid at the rate of 1 and 1/2 times their regular rate of pay for all hours actually worked in excess of 40 hours in any week. Paid time off and holidays are "hours worked" for purposes of calculating overtime pay, while unpaid leave is not included in "hours worked." Overtime pay will normally be included in the paycheck following the pay period during which an employee works overtime hours. Exempt employees are not eligible for overtime compensation.

If an employee is required to work on a holiday and he or she is a full-time hourly employee, they will have the option to be paid for all hours actually worked plus an additional eight hours at their regular rate of pay regardless of whether they have worked 40 hours or more in that work week, or to receive an extra floating PTO day to be used during the year and be paid for hours actually worked on the holiday**.**

Pay Periods

Highland employees are paid twice a month, on the 15th and last day of the month. Upon hire, you will receive your first paycheck (prorated for number of days) on the regularly scheduled pay date. If you are scheduled to be on leave for a certain payday, see Human Resources to make arrangements for your paycheck to be held or deposited. Checks will not be issued in advance.

If payday falls on a Holiday or weekend, you will be paid on the last scheduled workday prior to the Holiday or weekend.

*(Revised 12-16-16)*

Direct Deposit

Direct deposit is available to qualified NexBank customers. Employees may elect to have their paycheck deposited directly into their NexBank checking account, savings account, or a combination of these accounts. Direct deposit request forms are available from Human Resources. For further information regarding direct deposit, please see the Human Resources Department. Included below is the direct deposit policy and process:

1. Establish an account through NexBank for direct deposit. NexBank will provide Highland Capital employees with free checking.

2. For those employees who wish to use direct deposit to more than one account, Highland will permit employees to allocate their payroll checks through direct deposit in the following manner: direct deposit through their non-NexBank account of $200.00 per payroll check, and the balance through a NexBank account.

3. In lieu of direct deposit as outlined above, employees may elect to receive their physical payroll checks which will be distributed at work on regularly scheduled payroll dates.

*(Revised 04-17-12)*

Payroll Deductions

Highland will deduct all amounts required by law, such as federal income tax, social security and Medicare (FICA), or ordered by the court, such as wage garnishment. Highland will also deduct amounts authorized by employees in writing. If an employee believes there was an improper deduction from their pay, they should report it to Human Resources immediately so that any error can be promptly corrected or a proper deduction can be explained.

Reimbursement of Business Expenses

Employees will be reimbursed for all ordinary, reasonable and necessary business expenses they incur while conducting authorized Highland business. Please check with your Administrative Assistant or the Intranet for the specific policies and procedures for reimbursement of business expenses.

*(Revised 04-17-12)*

# COMPENSATION & CAREER OPPORTUNITIES

Career Growth, Transfers and Promotions

Highland is a growing company that encourages teamwork, initiative and continuous improvement. As such, employees are expected to become knowledgeable and involved in all aspects of the business and to stretch across department boundaries in their daily work and in their career development.

It is Highland's policy to fill positions, where possible, through transfers and promotions of current employees. Open positions may be posted and an opportunity made available for an employee to express their interest in applying for the position. Employees are encouraged to pursue such opportunities for advancement. Employees should remain in a position for a minimum of one year before applying for an internal position. Also, employees must be in good standing (i.e., not on a corrective action plan or have been the recipient of a written warning within the last 12 months) in order to apply for an internal position. To apply for an internal position, employees must obtain manager approval and submit an Employee Transfer Request Form (available on the intranet) to Recruiting.

*(Revised 09-17-08)*

# EMPLOYEE BENEFITS

Introduction

Highland offers you a wide variety of benefits, depending on your employment status with the Company. Highland will provide Summary Plan Descriptions ("SPD") regarding certain benefits. Please see the actual Plans or SPD, if applicable, for details concerning eligibility and benefits. Set out below is a list of benefits available upon eligibility.

| Health and Life | Retirement |
|---|---|
| • Comprehensive Medical & Dental Benefits<br>• Short and Long Term Disability Benefits<br>• Life Insurance (GTL) and AD&D | • 401k Plan with company match<br>• Discretionary Profit Sharing |
| **Leave Benefits**<br>• Paid Time Off<br>• Paid Holidays | **Other Benefits**<br>• Professional Membership Reimbursement<br>• Health Club Membership<br>• Employer Matching Gifts<br>• Worker's Compensation Insurance<br>• Employee Referral Gift<br>• Paid Parking<br>• Cell Phone Co-Pay/ Reimbursement<br>• In-Office Lunch |

*(Revised 12-16-16)*

Differential Pay

All New York employees will receive differential pay of $20.00 per day after 9:00 p.m. EST to cover meals and cab fares.

Cell Phone Benefit

In order to be eligible for the $100/month cell phone service reimbursement, Highland employees are required to update their billing address with the cell carrier to the Highland Dallas office address and you must also request that detailed paper billing be activated. A paper copy of the detailed bill should be mailed by the carrier to Highland's Dallas office.

The Highland / AT&T co-pay plan is no longer accepting new entrants due to AT&T policies.

*(Revised 12-16-16)*

In consideration for Highland subsidizing employees' cell phone expenses, employees must direct their cell phone carrier to activate detailed paper billing for their mobile phone that is subsidized by Highland and also direct the carrier to send the detailed paper bill to Highland's Dallas office address (300 Crescent Court, Suite 700, Dallas, TX 75201). Employees who choose to activate detailed paper billing and to have the paper bill sent to Highland must initiate the change with AT&T within five (5) days of the date that they choose to participate in this policy. Participating employees may not change the paper billing settings without

concurrently notifying Human Resources, in writing, of the change. Participating employees for whom Highland does not receive a detailed paper bill will be ineligible for reimbursement and liable to Highland for repayment of the full reimbursement amount received during any month in which Highland does not receive the detailed paper bill. Participating employees expressly authorize Highland to make any deductions from their compensation necessary to fulfill repayment obligations.

Participation in this policy is entirely voluntary. Should you wish to participate, you must complete the steps above and then send Human Resources an email confirming you have completed these steps. Employees who choose not to participate will have the level of applicable reimbursement limited to that set forth in the table below. Employees who choose to participate in this policy may later terminate their participation, and have future reimbursement limited to that set forth in the table below, by providing at least fourteen (14) days advance written notice to Human Resources. Your obligations under this policy shall terminate upon the termination of your employment, provided that you will remain obligated to furnish historical call records covering the period through the date of your termination, as requested, following the termination of your employment.

Employees participating in this policy should have no expectation of privacy regarding e-mail, voice mail, text messages, graphics, and other electronic data composed, sent, and/or received on their cell phones. Notwithstanding the foregoing, Highland agrees not to review any call records on an employee's bill other than those associated with the phone number of employee. Further, regardless of whether employees choose to participate in this policy, all e-mail, voice mail, text messages, graphics, and other electronic data composed, sent, and/or received related to company business remain the property of Highland. Finally, employees are reminded that, at all times, they are expected to abide by Highland's applicable codes of conduct and employment policies.

You also agree to waive any and all claims you may have against Highland or any of its Affiliates related to this new policy, including, but not limited to, claims for invasion of privacy, and authorize Highland to access, view, and possess your cell phone records and billing information.

Non- Participating Employee Reimbursement Limits

| |
|---|
| Fixed reimbursement of $5/month for data |
| $0.09 / minute reimbursement for business related mobile calls |
| Must submit detailed invoice with business calls highlighted |
| Reimbursement provided once per quarter upon submission of appropriate documents |

*(Revised 12-16-16)*

Professional Membership Reimbursement Program

In addition to encouraging you to continue your education and training, Highland also supports your involvement and participation in professional groups and associations that represent your field. With the written permission of your supervisor, Highland may pay up to 100% for any reasonable professional organization membership dues or fees. Where the company has specifically requested that you join an organization, 100% of your membership dues or fees will be paid. See Human Resources for more information on this program.

Employee Referral Awards Program

If you know someone who is qualified for an open position at Highland, please submit his/her name to Recruiting. If the person you identified is hired, you will receive a gift from Highland after the referred individual has been an employee with Highland for six months. The hiring manager of a referred employee is not eligible to receive a referral award.

*(Revised 09-17-08)*

Matching Charitable Gifts

Highland is committed to supporting the work of charitable, non-profit organizations. Therefore, Highland will match employee contributions to qualified organizations up to a maximum of $300 per employee per calendar year. Please note that this policy does not include gifts to political campaign funds.

Contact Highland Capital Management's Fund Accounting team to submit your request for a matching charitable gift. Requests for charitable donations that exceed the $300 annual threshold should be submitted to the Corporate Accounting team for review by the President.

*(Revised 04-17-12)*

Paid Time Off

Employees that work 20 or more hours per week may be eligible for paid time off (PTO). PTO is awarded at the beginning of the year and accrues throughout the year. PTO is awarded each calendar year as follows:

| Employment Classification | Annual Days Earned |
| --- | --- |
| Non-exempt | 15 |
| Exempt | 17 |
| Managing Directors, tenured Directors* | 19 |
| New Team Leaders | 22 |

| Tenured Team Leaders/Partners | 24 |
|---|---|

*Directors with 3+ years of Highland tenure*

New hires will receive a prorated amount of PTO to use between the date of hire and the end of the calendar year.  Part-time employees receive a prorated amount of PTO based on their target hours.

Highland reserves the right to modify or terminate the PTO policy at any time.

*(Revised 04-17-12)*

### Approval for PTO

Please note that, as with other planned leaves, employees must notify their Manager prior to taking PTO.  All vacation requests must be submitted through TimeKeeper and approved by the employee's Manager.  Generally, a minimum of two weeks prior notice is required to receive approval for taking paid time off.  Exceptions to this notice period may be made for personal or family emergencies.  Failure to directly notify an employee's supervisor in advance of taking PTO may result in the request for leave being denied, the leave being without pay, or corrective action, up to and including termination of employment.

### PTO for Non-Exempt Employees

Each day of PTO will be compensated at ten (10) hours for non-exempt, full-time (50 hours/week) employees. A day of PTO for a part-time hourly employee will be based upon their weekly hours (e.g., 30 hours/week receives 6 hours for PTO day).  PTO is treated as "hours worked" for purposes of calculating overtime pay.

### PTO for Team Leader, Managing Directors, and tenured Directors

Team Leaders, Managing Directors and tenured Directors must take a portion of their PTO during the following periods:

- Week of Spring Break
- Week of July 4th
- Any two weeks in August
- Rosh Hashanah
- Week of Thanksgiving
- Any two weeks in December
- Any Friday before or Monday following a 3-day weekend

On an annual basis, Managing Directors and tenured Directors should take 9 days of PTO or floating days during the periods listed above.  Team Leaders should take 19 days of PTO or floating days during the periods listed above.

*(Revised 12-16-16)*

*Rollover and Borrowed PTO*

Employees should use their PTO in the year it was granted, but up to ten (10) days of Regular PTO may be rolled over each calendar year. Additional rollover may be authorized by the President. An employee's cumulative rollover PTO balance may exceed ten days if he or she has accumulated rollover from more than one year.

An employee may borrow PTO from the upcoming year with approval from the President. Employees must use all remaining PTO prior to requesting borrowed PTO.

*(Revised 04-17-12)*

*Boondoggle Time Off*

Some employees receive additional time off for boondoggles. Boondoggle PTO hours should be used for non-work activities with clients, such as hunting trips, golf outings, skiing trips, etc. Boondoggle time is not eligible for rollover.

*Unpaid Time Off*

Under special circumstances, employees may request unpaid time off. Unpaid time off requests should be approved by the President. Employees must use all remaining PTO prior to requesting unpaid time off. Unauthorized unpaid time off may result in corrective action, up to and including termination.

*PTO at Termination*

Accrued unused PTO is paid out to employees that resign or retire and give their supervisor at least two weeks written notice. After providing written notice employees must work a reasonable transition period, as determined by their supervisor, of up to two weeks.

Employees who provide notice of resignation or retirement when their direct supervisor is not physically present in the office (e.g., on vacation or a business trip) are not entitled to accrued unused PTO upon termination of employment. Also, employees who are involuntarily terminated by Highland are not entitled to accrued unused PTO upon termination of employment.

Entitlement to accrued unused PTO upon termination of employment is also contingent, where applicable, upon compliance with the Post-Employment Contact with Investors, Prospective Investors, and Counterparties policy, which can found in this Employee Handbook.

If, upon termination, an employee has used more than their leave accrual for the year, Highland will deduct the amount of the overage from their final paycheck.

*(Revised 04/17/2012)*

Holidays and Floating Days

*Scheduled Holidays*

Highland observes eleven (11) paid holidays each year. Highland's scheduled holidays are as follows:

- New Year's Day
- Martin Luther King, Jr. Day
- Presidents Day
- Good Friday
- Memorial Day
- Independence Day
- Friday before Labor Day
- Labor Day
- Thanksgiving Day
- Friday after Thanksgiving
- Christmas Day

The holidays will be compensated at ten (10) hours for non-exempt, full-time employees (50 hours/week). Holidays are "hours worked" for purposes of calculating overtime pay.

If a holiday falls during an employee's scheduled vacation (PTO), the day will be counted as holiday instead of PTO. If a holiday falls on a Saturday or Sunday, the company will designate, in advance, what day will be treated as a holiday. Paid holidays are not granted during unpaid leaves of absence.

*(Revised 12-16-16)*

*Floating Days*

Employees are also eligible for two (2) floating holidays each year to be used at their discretion. Unused floating days may not be carried over to the next calendar year. Generally, a minimum of two weeks prior notice to the employee's supervisor is required to receive approval for the floating day. Failure to directly notify a supervisor in advance may result in the request for a floating day being denied, the leave being without pay, or corrective action, up to and including termination of employment.

*(Revised 09-17-08)*

Workers' Compensation

Highland provides workers' compensation coverage for employees who have been injured on the job or who have sustained an occupational illness. Every employee who is injured on the job should report the injury immediately to his or her supervisor. The supervisor will complete an accident investigation report and

coordinate with the Human Resources Department toward the completion of the necessary paperwork to apply for workers' compensation benefits.

Long and Short Term Disability Policies

Highland has long-term and short-term disability plans. The Company will provide a Summary Plan Description regarding these plans.

FMLA Policy

*Purpose*

Highland Capital Management, L.P. complies with the provisions of the Family and Medical Leave Act ("FMLA"). Where State or local family and medical leave laws offer more protections or benefits to employees, the protections or benefits provided by such laws will apply. Highland Capital Management, L.P. has created this policy to outline the conditions under which an employee may request time off without pay for a limited period with job protection and no loss of accumulated service if the employee returns to work.

*Scope*

This policy applies to all family and medical leaves of absence including leaves that are covered under paid employment benefit plans or policies for any part of the leave to which the employee may be entitled under this policy. In other words, if an employee is entitled to both FMLA leave and paid leave under another benefit plan or policy, the employee is required to use all applicable paid leave plans or policies before unpaid leave and the FMLA leave and the paid leave will run concurrently.

*Employee Eligibility*

To be eligible for leave under this policy, an employee must have been employed here for at least 12 months and must have worked at least 1,250 hours during the 12-month period preceding the beginning of the leave. An employee must also establish the existence of a qualifying event in order to be entitled to leave under this policy.

*Qualifying Events*

Eligible employees are entitled to a total of 12 workweeks of leave during any calendar year when leave is taken for one or more of the following qualifying events:

(1) birth and care of the employee's newborn child;

(2) placement of a child with the employee for adoption, or by the State for foster care;

(3) to care for the employee's spouse, child or parent (called a "Covered Relation") with a serious health condition (this does not include in-laws);

(4) the employee's own serious health condition which prevents him or her from performing the essential functions of the job, including workers' compensation leaves;

(5) existence of a "Qualifying Exigency"; or

(6) To care for "covered service member."

A "child" does not have to be a biological child. A "parent" does not need to be a biological parent as long as the person stood "in loco parentis" (in the place of the parent) to the employee when the employee was a "son" or "daughter." FMLA leave may be taken to care for adopted children, foster children, legal wards, or a niece, nephew or grandchild whom the employee is actively raising. A "son or daughter" includes a child 18 years or over who is "incapable of self-care because of a mental or physical disability." An individual with a disability is a person who has a physical or mental impairment that substantially limits one or more major life activities.

For FMLA purposes, a "spouse" is defined in accordance with applicable state law and may include common-law spouses in states where common-law marriages are recognized. Unmarried domestic partners generally do not qualify as spouses under the FMLA.

*Serious Health Condition*

For FMLA purposes, when an employee takes FMLA leave for his/her own serious health condition, this means the employee has a mental or physical illness, injury or impairment that involves inpatient care (including any ensuing period of incapacity) or continued treatment by a health care provider. Continued treatment by a health care provider means the following: (1) incapacity for more than three calendar days plus two or more doctor's visits or one visit plus treatment (prescribed medication or therapy); (2) incapacity due to pregnancy, or for prenatal care; (3) incapacity due to a chronic condition involving periodic medical visits for treatment of recurring or episodic conditions (such as asthma, diabetes or epilepsy); (4) permanent or long-term incapacity (such as Alzheimer's, severe stroke or terminal stages of a disease); or (5) an absence to receive treatment for restorative surgery after an accident or other injury, or for treatment of a condition that would result in incapacity if left untreated (such as chemotherapy for cancer, physical therapy for severe arthritis, or dialysis for kidney disease).

*Qualifying Exigency*

A right to Qualifying Exigency leave arises when a child, spouse or parent of an employee is on active duty or has been notified of an impending call to active duty in support of a contingency operation. A contingency operation includes:

- any operation designated by Secretary of Defense in which the armed forces are or may become involved in military actions, operations or restitutions against an enemy of the U.S.; or

- results in the active duty of members of the armed forces during a war or national emergency declared by the President or Congress; or

- action in response to events such as natural disasters, turnout or subservice activities or required military operations.

Examples of Qualifying Exigencies include the following: arranging for child or elder care in the service member's absence, assisting with economic or legal concerns, attending official ceremonies/programs, attending the service member's farewell or arrival, attending to affairs caused by the missing status or death of a service member.

*Covered Service Member*

A right to leave under this provision of the policy arises when an employee must care for a child, spouse, parent or next of kin of an employee, who is a member of the armed forces and that service member is undergoing medical treatment, recuperation or therapy, is on outpatient status of a military medical treatment facility, or is otherwise on the temporary disability retired list for a serious injury or illness. For purposes of covered service member leave, a "serious illness or injury" means an injury or illness incurred while on active duty in the armed forces which renders the service member medically unfit to perform the duties of their office, grade, rank or rating.

*Amount of Leave*

Eligible employees may take up to twelve weeks of leave during a rolling twelve month period for the first five categories of leave outlined above.

Eligible employees may take up to 26 weeks of leave to care for a covered service member during a 12 month period. Leave to care for an injured or ill servicemember, when combined with other FMLA-qualifying leave, may not exceed 26 weeks in a single 12-month period. For example, employees who have used 12 weeks of FMLA for any of the other categories described above are only entitled to 14 weeks of covered service member leave. In addition,

Servicemember FMLA runs concurrent with other leave entitlements provided under federal, state and local law.

For purposes of determining whether employees have exhausted their FMLA leave entitlement under this policy, the twelve month period is determined by measuring backward from the date an employee takes any FMLA leave. In other words, any FMLA leave that was taken by the employee during the 12 months preceding the date that the employee takes additional FMLA leave will be counted to determine the amount of FMLA leave remaining.

*Both Spouses Working for the Company*

Spouses who are employed by the Company, and who request FMLA leave for the birth, adoption, or foster care placement of a child with the employee, are eligible for a combined twelve weeks between the two employees. For example, both employees continue to be eligible for twelve weeks of leave apiece for their own serious health condition, but may only take twelve weeks between them for the birth or placement of a child. If the leave is for birth, adoption or foster placement of a child with the employee, available leave can be taken before the event and any time during the 12 months after the birth or placement

Similarly, spouses who are employed by the Company, and who request FMLA leave to care for a covered servicemember, are eligible for a combined 26 weeks between the two employees. In other words, both employees may only take twenty-six weeks of leave between them for this event.

*Conditions of Leave*

*Employee Notification and Reporting Requirements*

If the reason for the FMLA leave is foreseeable (such as planned surgeries or normal births), the employee is to give the Company at least 30 days written notice. Similarly, if the need for exigency leave is foreseeable, such as receipt of advance notification of impending call to active duty, the employee must give the company advance written notice of the need for leave. If the need for leave is not foreseeable (such as a car accident or premature birth or injury of a covered service member), the employee is expected to notify the Company as soon as possible and, in no event, more than (2) two business days after knowing of the need for leave, except in extraordinary circumstances. Failure to provide such notice may be grounds for delay of leave. Additionally, if you are planning a medical treatment you must consult with the Company first regarding the dates of such treatment. The Company has Request for

Family/Medical Leave forms available from the Human Resources Department. You should use these forms when requesting leave.

If you take leave because of your own serious health condition or to care for a Covered Relation, you may be required to contact the Company on a regular basis regarding the status of the condition and your intention to return to work.  A reporting schedule will be worked out with the Human Resources Department.

*Intermittent and Reduced Schedule Leave*

Leave because of a serious health condition, Qualifying Exigency, or covered service member leave may be taken intermittently (in separate blocks of time or on a reduced leave schedule, reducing the usual number of hours you work per workweek or workday) if medically necessary. In addition, while you are on an intermittent or reduced schedule leave, the Company may temporarily transfer you to an available alternative position which better accommodates your recurring leave and has equivalent pay and benefits.

*Medical Certification*

If you are requesting leave because of your own or a Covered Relation's serious health condition, you may obtain a Medical Certification Form from the Human Resources Department. You and the relevant health care provider must supply appropriate medical certification to the Human Resources Department within 15 calendar days of receiving the Medical Certification Form.  If you provide at least thirty (30) days' notice of medical leave, you should also provide the medical certification before leave begins. Failure to provide requested medical certification in a timely manner may result in denial of leave.

Highland Capital Management, L.P., at its expense, may require an examination by a second health care provider designated by the Company, if it reasonably doubts the medical certification you initially provide. If the second health care provider's opinion conflicts with the original medical certification, the Company, at its expense, may require a third, mutually agreeable, health care provider to conduct an examination and provide a final and binding opinion. The Company may require subsequent medical recertification. Failure to provide requested certification within fifteen (15) days of the Company's request, if such is practicable, may result in delay of further leave until it is provided.

*Certification for Exigency Leave*

Employees seeking exigency leave will be required to provide confirmation of the service member's activation or active duty status and certification that leave is needed due to a Qualifying Exigency.

*Certification for Covered Service Member Leave*

Employees seeking leave to care for a covered service member must provide certification to establish that a service member has a serious injury or illness incurred in the line of duty while in active status.

*Status of Employee Benefits During Leave of Absence*

*Medical and Other Benefits*

During an approved family/medical leave, Highland Capital Management, L.P. will maintain your medical, dental, and life benefits as if you continued to be actively employed. If you elect not to return to work for at least thirty (30) calendar days at the end of the leave period, you may be required to reimburse the Company for the cost of the benefit premiums paid by the Company for maintaining coverage during your unpaid leave, unless you cannot return to work because of a serious health condition or other circumstances beyond your control.

An employee will not accrue vacation during a FMLA leave. An employee on FMLA leave is not eligible for holiday pay for a holiday which falls during a FMLA leave.

*Leave Is Unpaid*

Leave provided under this policy is unpaid leave, although you may be eligible for short or long-term disability payments and/or workers' compensation benefits under those insurance plans or policies if you are taking leave for your own serious health condition. If you are entitled to receive money from these sources, your leave will be considered "paid leave" for the period during which you receive that money.

If your leave is "unpaid" leave you will be required to substitute paid time off (vacation, personal days) for "unpaid" FMLA leave as described below. If you request leave because of a birth, adoption or foster care placement of a child, any accrued paid vacation and personal days first will be substituted for unpaid family/medical leave. If you request leave because of your own serious health condition, or to care for a Covered Relation with a serious health condition, any accrued paid vacation and personal days first will be substituted for any unpaid family/medical leave. The substitution of paid leave time for unpaid leave time does not extend the 12-week leave period. Further, in no case can the substitution of paid leave time for unpaid leave time result in your receipt of more than 100% of your salary. Your family/medical leave runs concurrently with other types of leave (i.e., paid vacation, state family leave laws, etc.). Those other leaves may provide for paid leave.

*No Work While on Leave*

The taking of another job while on family/medical leave or any other authorized leave of absence is grounds for immediate termination, to the extent permitted by law.

*Return to Work and Reinstatement*

If you take leave because of your own serious health condition (except if you are taking intermittent leave), you are required to provide medical certification that you are fit to resume work. You may obtain Return to Work Medical Certification Forms from the Human Resources Department. Employees failing to provide the Return to Work Medical Certification Form will not be permitted to resume work until it is provided. In addition, you must give notice as soon as practicable (within two (2) business days if feasible) if the dates of leave change or are extended or initially were unknown.

If the employee cannot return to work at the end of the employee's FMLA leave, there is no guarantee of reinstatement. If an employee has been medically released to return to work and fails to report to work or call in with a satisfactory explanation, the Company will treat this as a voluntary resignation.

If the employee returns to work on or before expiration of available FMLA leave, the employee will normally be returned to his or her former position or an equivalent position.

*Key Employees*

The FMLA provides a significant exemption for "key employees." The Company is not required to offer key employees reinstatement to a similar position following the end of their leave. Key employees are those salaried employees who are among the highest paid 10% of the employees paid by the Company within 75 miles of the facility at which the employee is employed and must be the highest paid 10% of all salaried and non-salaried, eligible and ineligible employees. Year-to-date earnings as of the date leave is requested are used to determine who are the highest paid.

An eligible key employee may be denied reinstatement of employment after leave has been taken if:

(1) such denial is necessary to avoid substantial and grievous economic injury to the operations of the Company,

(2) the Company notified the key employee of its intent to deny restoration on such basis when the Company determined that such injury would occur, and

(3) if the leave has commenced, the employee elects not to return to employment after receiving such notice.

The employee will be notified by the Company of his status as a key employee upon requesting leave if a chance exists that the Company may deny reinstatement after the leave.

An employee may also be regarded as a key employee if the employee is the most highly compensated employee at a facility even if the employee is not among the highest paid 10% of the employees in the Company. If the employee is among the highest paid 10% of employees at a remote facility, the employee could be denied reinstatement of employment and benefits even if the employee's salary fell within the middle range of overall employee salaries.

*(Revised 09-17-08)*

New York Paid Family Leave

Effective January 1, 2018 Highland and its affilates' New York-based employees are covered under the New York Paid Family Leave Policy. ***Please see separate New York Paid Family Leave Policy for details.***

*(Revised 06-14-18)*

Jury or Witness Leave

An employee who is summoned to serve on a jury will be allowed time off to fulfill his or her civic duty. Employees must use Personal Time Off (PTO) for any time away from work while serving on a jury. This policy is subject to review by the President on a case-by-case basis.

As soon you receive the summons, present it to your supervisor so that arrangements can be made for your absence. If you are released from jury duty during a workday, you are expected to return to work. Upon completion of jury duty, bring your supervisor the court-issued receipt, if one is available, reflecting the day(s) of service.

An employee who receives a subpoena to serve as a witness in a civil, criminal, legislative or administrative proceeding will be given time off. Employees must use PTO for time away from work while serving as a witness unless the employee is testifying on behalf of Highland or one of its Affiliates. This policy is subject to review by the President on a case-by-case basis.

*(Revised 09-17-08)*

Voting Leave

Highland encourages its employees who are eligible voters to exercise their right to vote in general, primary and special elections at the federal, state and local

level. The Company will provide time off in which to vote if you do not have two consecutive nonworking hours while the polls are open, which is generally 7 a.m. to 7 p.m., on Election Day. If you do not have two consecutive nonworking hours while the polls are open, and have not voted early or absentee, you must notify your supervisor at least one day before Election Day. Your supervisor will designate a time, either at the start or end of your normal workday, in which to vote. You may be asked to provide proof that you have voted if you were absent during your regular work hours.

Military Leave

As required by the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), Highland's applicants and employees who apply or perform military service, whether on a voluntary or involuntary basis, will not be denied initial employment, reemployment, retention in employment, promotion or any benefit of employment on the basis of the performance of military service.

Eligible military service includes performance of a duty on a voluntary or involuntary basis in a uniformed service, including active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, and a period of time for which the employee is absent to determine fitness for duty or to perform funeral honors duty.

Any employee who enters the uniformed services of the United States will be granted a military leave of absence. To qualify for reemployment, an employee must have:

- Given Highland written or verbal notice in advance of service, unless the giving of notice is precluded by military necessity;

- A cumulative length of absence, including any previous military absence while employed by Highland, which does not exceed five years; and

- Applied for reemployment with Highland according to these guidelines:

| Length of Period of Service | Reapply No Later Than |
|---|---|
| Less than 31 days | Next regular work day after completion of service and time to travel from place of service to residence, plus eight hours. |
| More than 30 days, but less than 181 days | Fourteen days after completion of service. |
| More than 180 days | Ninety days after completion of service. |

Upon reemployment, the employee will be placed in the position he or she would have attained were it not for the break in employment, unless the employee is not qualified to perform that job and cannot be trained through reasonable efforts of Highland. If not so qualified, the employee will be placed in the position the employee held when the military leave commenced, or a position of like seniority, status and pay. If a disability incurred during or aggravated by military service prevents the employee from performing the job he or she would have held were it not for the break in service, despite Highland efforts at reasonable accommodation of the disability, the employee will be placed in a position of like seniority, status and pay, if one is available. If no such position is available, the employee will be placed in a job which is the nearest approximation of like seniority, status and pay.

Military leaves are unpaid, but the employee may use accrued PTO, floating holidays, etc. pay during the absence. Employees will be allowed to continue health care coverage at their current level of coverage by paying the employee contribution during the absence. Coverage will continue until the earlier of (1) twenty-four months from the date the military absence began; or (2) the day after the date on which the employee was to have applied for reemployment, as defined above. Upon reemployment, any break in employment due to military service will not be treated as a break in service for purposes of determining forfeiture of accrued benefits and accrual of benefits under any retirement plan.

Limitation On Leaves Of Absence

Except as required by law, if any employee away from work on a leave of absence of any type does not return to work, or is unable to return to work to an available position for which the employee is qualified for any reason (including, without limitation, for lack of a health care provider's release to return to work), within six (6) months of the date the absence commenced, the employee's employment will automatically terminate at the end of the six month leave period. A "leave of absence" is defined as an approved absence from work under specific circumstances for a defined period of time.

This policy applies from the date of its implementation, June 2006, forward. It applies to all current and future employees, including, without limitation, employees currently out on a leave of absence.

Employees whose employment terminates under this policy are welcome to re-apply for employment after their discharge.

# OTHER IMPORTANT HIGHLAND POLICIES & EMPLOYEE RESPONSIBILITIES

Attendance

Occasionally it may be necessary for you to be absent from work as a result of illness or unavoidable personal reasons. In the case of an unexpected absence, you are expected to notify your supervisor as soon as possible, and no later than an hour before your normal starting time.

If you fail to follow proper procedures for notifying Highland of your absence, the absence may be considered unexcused. Unexcused absence can result in disciplinary action up to and including termination of employment. In addition, Highland will consider three consecutive days of unexcused, unapproved absence to be a voluntary termination of employment. Excused absences will be charged to your PTO accounts depending on the reason for your absence.

TimeKeeper

***Please see separate TimeKeeper Policy for details.***

Professional Appearance

Highland employees should maintain a neat and professional appearance at all times in the office, with clients, at work-related activities, at company-sponsored events, or at any meetings/events where the employee is representing Highland.

On most days, Highland has a Semi-Business Casual dress policy. However, there are times that employees will be required to follow a Business Casual dress policy. Highland will generally attempt to notify employees when Business Casual dress is required. There may also be days throughout the year where the more formal business attire (suit, tie, dress) will be required. However, in all work-related situations, employees should use good judgment to determine appropriate dress and maintain a well-groomed appearance. Employees should approach their manager or Human Resources with any questions regarding appropriate professional appearance.

The employee's manager or Human Resources has the sole discretion to determine appropriateness in appearance. Employees who do not meet a

professional standard may be sent home to change and may not be paid for that time off. Violations of this policy may result in corrective action.

*General Guidelines*

- Clothing should be worn and fit in such a manner that it is not revealing or suggestive (e.g., does not expose the abdomen, chest or back, etc.). Employees should avoid wearing tank tops, sleeveless shirts, halter tops, strapless tops, spaghetti straps, crop tops, and clothing made out of see-through material.

- Clothing should not be excessively tight or form-fitting nor excessively baggy or loose.

- Clothing should not be distracting or offensive. Clothing should be free from sexually-related references, foul language, or the suggestion or promotion of the use of illegal drugs.

- Clothing should be neat, clean and in good condition. Employees should avoid clothing that has holes, is torn or is ripped.

- Skirts and dresses should be of appropriate and tasteful length.

- Body piercing jewelry should be limited to jewelry on the ear. No other body piercing jewelry should be visible.

- Jewelry, make-up, and perfume or cologne should be used in good taste and clothes should be free from offending odors.

*Semi-Business Casual Attire*

The following are guidelines of what may generally be considered acceptable Semi-Business Casual attire and are the minimum dress requirements which are expected from all employees any day of the workweek:

- It would be appropriate to wear jeans, khakis, casual slacks and trousers, and casual skirts or dresses for women. Clothing should not be torn or ripped in any way.

- Appropriate tops include long sleeve button-up shirts with collars, long-sleeve blouses, sweaters, and turtlenecks. During the months of May through September, short sleeve button-up shirts, short sleeve blouses, and polo style shirts with a collar are acceptable. All other months, any short sleeved attire must be worn with a cover up (i.e. cardigan, blazer, jacket, sweater, & etc.).

- Closed toed shoes must be worn by men, and women can wear open toed shoes with a strap, and must have polished and

presentable toes. Conservative athletic or walking shoes, loafers, boots, flats, and dress heels are acceptable.

- It would not be appropriate to wear shorts, sweatpants, T-shirts, flip flops, sandals or hats/caps.

*Business Casual Attire*

The following guidelines define acceptable Business Casual attire which is expected from all employees on days that are designated as Business Casual dress:

- It would be appropriate to wear khakis, casual slacks, dress slacks, and dress skirts or dresses for women.

- Appropriate tops include long sleeve button-up shirts with collars, long sleeve blouses, or sweater sets.

- Closed toed dress shoes must be worn by men. Open toed shoes worn by women are acceptable as long as they have a strap on the top.

- It would not be appropriate to wear short sleeve shirts, jeans, shorts, sweatpants, T-shirts, flip flops, sandals, athletic shoes, open toe shoes or open heel, or hats/cap.

*(Revised 04-28-17)*

Information Technology Acceptable Use Policy

Highland provides computer systems and various other equipment and information systems to employees at the Company's expense in order for employees to access information for the benefit of the Company and its customers. This includes, but is not limited to, personal computers (e.g., desktops, laptops, and tablets), email, Internet, Intranet, telephones, cellular phones, facsimile, voicemail, PDAs, smart phones (e.g., iPhones and similar Android devices). Every employee is expected to use these tools in a productive, appropriate, and responsible manner to maintain and enhance the Company's image, and in accordance with Company policies. The following guidelines are established toward meeting this purpose.

*Acceptable Uses*

The Company's electronic communications systems are part of the business technology platform and are primarily intended to be used for business purposes. Limited, reasonable, and appropriate use of these systems for personal purposes is allowed.

*Unacceptable Uses*

*General:*

These systems are not to be used for personal gain or the advancement of individual views. All messages must be communicated using your name and not an assumed name. The Company forbids the storage, transmission or viewing of "adult materials" on any Company system or in any other form, whether done on the Company's premises or using the Company's equipment. Creating, sending or forwarding verbal or graphic messages which are intimidating, harassing, offensive, profane or hostile on the basis of race, gender, color, national origin, religion, disability, age or any other protected status is also prohibited. These systems may not be used for gambling, participation in chat rooms, and viewing webcams or excessive personal use.  Also, any investment research opinions, conclusions and/or advice distributed to outside parties via anonymous or broad distribution such as email or chat rooms are prohibited.

The Company recognizes that the use of a cell/smart phone while driving a motor vehicle can cause distraction to the driver, which can result in accident and injury.  Employees are required to comply with all state and local laws regarding the use of cell/smart phones while driving in the course of performing any duties for the Company, including receiving or making any cellular, digital or other wireless business calls while driving at any time.  Whenever possible, employees should not make or receive any telephone calls while driving in the course of business for the Company, nor should employees make or receive business-related telephone calls while driving at any time.  Employees should let incoming calls go to their voicemail and then find a safe place to pull over and park before initiating a call.  If phone usage while driving is unavoidable, a hands-free device must be utilized.  Further, under no circumstances should employees use phones, even with a hands-free device, while driving in adverse weather or difficult traffic conditions.  The Company takes its cell/smart phone usage policy seriously.  Any violations of this policy will subject employees to corrective action, up to and including termination of employment.

*Internet:*

Highland maintains a strict internet usage policy.  All internet access is based upon business need and specific site approval. The following actions as it pertains to internet access are strictly prohibited:

- Attempting to bypass Highland IT security systems, including the firewall and proxy, in an effort to gain unapproved internet access.

- Accessing public proxy sites that would allow bypassing internet security systems.

- Modifying your computer or network in any way, including adjunctive hardware or telecom equipment, allowing for unfettered internet access.

- Using any remote control software to remote to external sources in order to gain internet access.

*Computer Usage:*

- Installing software on your computer without first gaining approval of the Highland IT department is strictly prohibited.

- Removing network documents, either from network share or the mail system, either through removable media or mail transmission, and transporting them outside company premises is strictly prohibited unless explicit authorization has been granted by your manager.

- Installing tools that would allow you remote access to your computer from outside the Highland corporate LAN is strictly prohibited.

*Security Issues:*

All messages created, sent or retrieved on the Company's systems are the property of Highland. All electronic data stored, sent, received or created on Highland's computer system or other electronic equipment is the exclusive property of Highland and can be accessed by Highland at any time. Employees do not have privacy right in any matter that is stored, created, sent or retrieved on the Company's systems. The Company will monitor these systems and access any message in order to assure superior service to our customers and to enforce this policy. You must provide your password(s) to the Company, as your mailbox may need to be accessed in your absence. You must not, however, disclose your password, messages or other information gained via the Company's systems to unauthorized personnel. Consider the proprietary or confidential nature of the Company's and its customers' information before relaying it via email. Do not presume that the information will be kept confidential. To minimize the introduction of viruses into the Company's systems, all downloads will be done through Highland's IT department.

*Copyright Issues:*

Copyrighted materials, including but not limited to software, belonging to entities other than the Company may not be copied or transmitted on the Internet or via email. Failure to observe copyright or license agreements may result in disciplinary action by the Company, legal action by the copyright or license owner, or both.

Any investment research opinions, conclusions and/or advice can only be released outside the office through authorized channels and for normal authorized business purposes.

***Engaging in an unacceptable use of the Company's systems will result in disciplinary action, up to and including immediate discharge from employment without prior warning.***

*(Revised 12-16-16)*

Workplace Audio and Video Recording Policy

*Purpose*

An employee's use of audio and video recording can pose risks to the protection of Highland Capital Management, L.P.'s and its affiliates' ("Highland" or the "Company") confidential and proprietary information, reputation, and brands, together with those of its clients and the investors therein.  More troublesome, it can jeopardize the Company's compliance with business rules and laws. At the same time, Highland recognizes that in some limited cases, such as for authorized marketing activities, video and audio recording can provide a unique opportunity to participate in interactive communication and share information on particular topics using a wide variety of social media, such as Facebook, LinkedIn, Twitter, Pinterest, Tumblr, blogs, and wikis, of course to the extent used consistent with Company policy.

To minimize these business and legal risks, avoid loss of productivity and distraction from employees' job performance, and ensure that the Company's, its clients and the investors' therein confidential data and sensitive information are protected, Highland expects its employees to adhere to the following guidelines and rules regarding video and audio recording.

*Restrictions on Employee Audio and Video Recording*

Unauthorized audio or video recording of employees is disruptive to employee morale and inconsistent with the respectful treatment required of the Company's employees. For this reason, no employee may record the conversation of another employee or service provider without his or her full knowledge and consent.  In addition, the employee planning to record another employee or service provider must request consent in advance for any recording from Human Resources and receive written consent (via email is acceptable) from Human Resources prior to recording. Secret recordings are strictly prohibited.

 In addition, the following policies should be kept in mind:
- Employees are prohibited from bringing cameras, tape recorders, or other audio or visual recording devices into areas where client privacy may be compromised. Please note that cell phones with camera, video and audio recording capabilities are permitted, however, the video and audio recording functions are prohibited from use.

- Employees may only record workplace activities where such recording would not be prohibited by law, does not compromise confidential information, and does not violate this policy as described above.

- Any recordings made, whether or not in accordance with this policy, shall at all times remain the exclusive property of the Company. Accordingly, Employees are required to surrender to Human Resources originals of any such recordings immediately following creation. Furthermore, no copies of any such recordings made be retained or otherwise distributed by Employee, except to the extent (i) expressly permitted under this policy, (ii) expressly permitted in writing by Highland's Human Resources department, or (iii) as may be required under applicable law. Employees agree to surrender to Highland's Director of IT any electronic equipment or other media upon which any non-permitted copies may be stored or contained so that such deletion can be confirmed.

Any violation of this provision may result in disciplinary action up to termination.

### Scope

This policy is not intended to preclude or dissuade employees from engaging in legally protected activities/activities protected by state or federal law, including the National Labor Relations Act, or from making disclosures that are protected under whistleblower provisions of law.

### Company Monitoring

Highland may find it necessary to monitor work areas with security cameras when there is a specific job- or business-related reason to do so. The Company will do so only after first ensuring that such action is in compliance with state and federal laws. Highland reserves the right to install security cameras in work areas for specific business reasons, such as security, theft protection, or protection of proprietary information.

Employees should not have any expectation of privacy in work-related areas. Employee privacy in non-work areas will be respected to the extent possible.

If an employee suspects one or more employees may be conducting unauthorized recordings, they must contact Highland's Human Resource department immediately.

Employees should contact their supervisor or the human resource department if they have questions about this policy.

*(Revised 01-05-17)*

Safety and Health

Highland is committed to providing a safe and healthy work environment. All work-related injuries and accidents, no matter how slight they may appear, must be reported at once to your supervisor. Please report all hazardous conditions and unsafe practices to Human Resources immediately.

Drug and Alcohol Policy

***Please see separate Drug Testing Policy for details on Highland's testing procedures and further prohibitions.***

It is Highland's policy to provide a drug-free work environment. Employees who violate this policy will be subject to disciplinary action up to and including termination of employment.

*Illegal Drugs*

It is against Highland policy for employees, guests, and/or other third parties to unlawfully possess, use, purchase, manufacture, sell, dispense, distribute or be under the influence of any controlled substance in the workplace. "Illegal Drugs" and "Controlled substances" include but are not limited to illegal inhalants, amphetamines, barbiturates, cocaine, narcotics, opiates, heroin, morphine, codeine, methadone, PCP and other hallucinogens and marijuana. "Workplace" is defined as any and all premises and property owned, operated or managed by Highland or its Affiliates and includes any place where company business is conducted.

*Prescription Drugs*

The possession and use of prescription drugs in the workplace is permitted if such drugs are legally obtained and they are being used in the prescribed manner.

*Alcohol*

The possession, distribution, use or being under the influence of alcohol by Highland employees in the workplace or on Company business is strictly prohibited except at company sanctioned events so long as the event is authorized in advance by a department director and the alcohol is served and consumed in moderation. Under no circumstances should an employee operate a motor vehicle while impaired by alcohol.

Highland encourages alcohol-free activities. However, in certain circumstances such as annual holiday parties, the entertainment of clients and business-related travel, the responsible consumption of alcoholic beverages by employees of lawful age may be permitted. Highland strongly encourages employees to drink non-alcoholic beverages, eat food when

consuming alcohol, stop the consumption of alcohol at least one hour before the end of the event and make arrangements for alternative transportation. After participating in a business-related event where alcoholic beverages are served, employees will be reimbursed for the reasonable cost of using alternate transportation to get home from the event.

*Fitness for duty*

Any employee that reports to work while intoxicated or who is found to be under the influence of alcohol or illegal drugs/controlled substances, or who is otherwise considered by his/her supervisor to be unfit for safe and effective performance of work will be subject to disciplinary action up to and including termination of employment. He/She will be prevented from entering or remaining in the workplace and/or will be sent home with alternative transportation, if appropriate.

*Assistance for Drug and Alcohol Abuse*

Employees are encouraged to seek treatment for drug and alcohol abuse and related problems from the Highland health plan.

*(Revised 09-17-08)*

Solicitation and Distribution

In order to avoid disruption of work, no employee shall be permitted to engage in solicitation for any purpose during his or her working time or the working time of the person being solicited. Working time means time that employees are expected to be performing their job. Likewise, employees shall not engage in distribution of any material, during his or her working time or in working areas. Literature, notices, or other material of any kind may not be posted or distributed in the working areas of any employees at any time. Persons who are not employees of the Company will not be permitted to come upon Company premises for the purposes of making solicitations of any kind to employees, or posting or distributing literature, notices, messages, or material of any kind.

Outside Employment ("Moonlighting") and Conflicts of Interest

Outside employment ("moonlighting") by full time employees is discouraged and you must report outside employment to your supervisor. Approval for outside employment may be withdrawn if work performance or attendance becomes unsatisfactory. Outside employment that results in, or could potentially result in, a conflict of interest with Highland is expressly forbidden.

Press and Media Relations

Communications with the media regarding Highland must be managed via designated Highland communications personnel. Employees are not permitted to respond to media requests and enquiries without prior approval from designated

Highland communications personnel or Highland's external public relations firm. This includes all on the record (attributed quotes/comments) and off the record (on background or anonymous) conversations. All requests from the media should be documented (name, contract information, subject matter) and passed on immediately to communications personnel via the Media Enquires email distribution list. This includes formal requests for interviews as well as enquiries, and includes all media – TV/radio, newspapers, magazines, local/national and trade media and internet sites. Communications personnel will either respond on Highland's behalf, or assist in identifying the appropriate person from Highland to handle the response.

Personal Representation in the Media

It is recognized that from time to time, employees may be approached by the media on topics related to their personal interests or non-work related activities. Employees may participate in such interviews. However, in order to avoid any confusion about whether an employee is speaking on their own behalf or on behalf of Highland, employees may not reference Highland or their role with the company, unless they have obtained prior approval to do so from the Highland. In addition, employees must alert designated Highland communications personnel anytime they communicate with the media on topics related to their personal interests or non-work related activities.

*(Revised 04-17-2012)*

Personal Phone Calls

Highland's telephones are important business tools. As such, every effort should be made to minimize personal telephone usage. You are expected to reimburse Highland for any personal toll calls you make.

Use and Care of Highland Assets and Records

Company records and papers are valuable and confidential. You are expected to keep all records, files and valuables properly secured. No company records or equipment are to be taken from the premises without permission from your supervisor. Special care should be taken to secure electronic data by following appropriate procedures.

Confidentiality

Employees may have, may be furnished with or may have access to private information that relates to the financial condition of the company, trade secrets, trademarks, patents, proprietary databases and client lists, and other confidential information that is not easily available from public sources. Except for any information which at the time of disclosure to the employee was or thereafter became publicly available or a matter of public knowledge, all such information

shall be considered as proprietary and confidential. Employees will not disclose any proprietary information except in the course of their duties for the Company, and where the employee reasonably, and in good faith, believes that any such disclosure is in the best interests of the company. In addition, employees shall not remove proprietary or confidential information from the company's premises without a valid business purpose or use such information for their own benefit or for the benefit of a third party.

Employees acknowledge that all proprietary and/or confidential information used or generated during the course of working for the company is the exclusive property of the company. Employees must deliver to the company all documents and other tangible items, including storage media containing proprietary or confidential information, including all copies of such documents or tangibles, immediately upon notice of termination of employment with the company. Employees assign the entire right, title and interest in any invention, technique, process, device, discovery, improvement or know-how for which a patent is obtained or that is patentable which is created using the company's facilities, supplies, information, trade secrets or time which directly relates to the company's business or actual or anticipated research and development and directly results from any work performed by the employee. Nothing in this Handbook prohibits Employees from reporting possible violations of federal law or regulation to any government agency or entity or making other disclosures that are protected under whistleblower provisions of law. Employee does not need prior authorization to make such reports or disclosures and is not required to notify the Company that he/she has made any such report or disclosure.

Notwithstanding the above, all employees will be required to sign a non-disclosure agreement (NDA) upon beginning employment. To the extent these provisions are inconsistent with the NDA, the NDA will govern all provisions.

*(Revised 12-16-16)*

# JOB PERFORMANCE

General Expectations

Your manager will clarify the expectations Highland has for you and for your job and the impact your performance has on the business. Communication, feedback and objectivity are important in ensuring your best performance and effective work relationships. You are expected to share in the responsibility for your success, your training and your career growth. Toward this end, Highland expects its employees to achieve results by:

- Exceeding Performance Expectations
- Demonstrating Initiative and Creativity
- Making Continuous Improvements
- Demonstrating Teamwork and Professionalism

- Demonstrating Responsibility to Clients and Community

Problem Resolution

Employees who believe they have a problem or situation affecting their work or job performance and who would like advice and counsel are encouraged to discuss these problems with Highland management, Human Resources, Compliance or Legal teams without fear of reprisal.  If you are experiencing such a situation, you are urged to discuss the problem first with your immediate supervisor.  You may submit a request, in writing or verbally, for a meeting with a second level supervisor or another upper level manager if the situation you have presented cannot be resolved by your immediate supervisor or if you believe it is inappropriate to raise the matter with your immediate supervisor.  The Human Resources Department is also in a position to listen to and direct your concerns.  An unresolved work-related problem may be pursued to the Executive Management level.  Employees should describe the situation in writing in a letter to the senior manager of their department.  All efforts will be made to review the situation quickly and arrive at a final decision.

*(Revised 03-29-17)*

Corrective and Disciplinary Action

Highland employees are expected to maintain high standards of job performance and conduct.  These standards may be applied in any situation deemed necessary by Highland, including but not limited to situations where the employee's performance or conduct may impact Highland's operations, reputation or relationship with clients.  In the event that an employee's performance or conduct fails to meet Company expectations, corrective action may be taken in the Company's sole discretion.

Highland may utilize, but is not obligated to, one or more forms of corrective action, including but not limited to verbal warnings, written warnings, final warnings and/or immediate termination.

*Verbal Warning*

A verbal warning may be given by an employee's manager regarding concerns about performance or conduct.  The manager and/or employee may develop a plan for improvement.

*Written Warning*

A written warning is prepared by the manager and describes the performance or behavior issue and expected change.  The manager and employee will discuss a plan for improvement and the consequence of failing to successfully complete the corrective action plan.  The employee will sign the written warning to acknowledge that he/she has been notified of the concern.

*Final Warning*

A final warning is given in situations which require corrective action just short of termination.  The employee is notified through a final warning that any additional infractions or failure to successfully complete a corrective action plan will result in termination.

Issues which may require corrective action will be determined by the Company on a case-by-case basis in its sole discretion, and may include, but are not limited to: substandard job performance, work of unacceptable quality or quantity, violations of company policies, misconduct, insubordination, unauthorized release of confidential information, threatening or disrespectful treatment of co-workers or clients, poor attitude, and unethical or illegal conduct.

Performance or conduct problems can be addressed using a progressive approach so that the employee is given coaching and time to improve.  However, this policy does not guarantee progressive corrective action and in some cases, in the Company's sole discretion, immediate termination may be warranted or appropriate, and nothing in this policy alters or should be construed to alter the at-will nature of employees' employment.

*(Revised 09-17-08)*

Causes for Corrective Action and/or Immediate Dismissal

Listed below are some examples of performance or behavior which may result in immediate dismissal.  (This list in not inclusive of all reasons for immediate dismissal and should not be construed as limiting Highland's freedom to act in any way.)

- Failure to provide evidence of right to work at time of employment
- Unauthorized release of confidential information
- Intentional misrepresentation in order to receive Highland benefits
- Willful or negligent damage, destruction, theft or unauthorized use of Highland property
- Deliberate falsification of records or reports
- Unauthorized possession, distribution or use of weapons, drugs or alcohol while on Highland premises
- Immoral or indecent conduct while on Highland premises, or away from Highland's premises which causes damage to the reputation of the Company
- Conviction for criminal conduct while employed by Highland
- Fighting or other disorderly conduct while on Highland premises
- Violation of Highland's Equal Employment Opportunity on Harassment and Discrimination Policy

- Excessive absence and/or lateness
- Violation of Highland's IT Acceptable Use Policy
- Unsatisfactory job performance or behavior
- Violation of Highland's Code of Ethics and Business Practices
- Being unfit for work as judged by your immediate supervisor
- Improper use of Highland leave or other benefits
- Solicitation and distribution during work hours
- Other violations of Highland policy
- Threatening or intimidating conduct

References and Verification of Employment

The only personnel authorized to give recommendations on behalf of Highland for former employees are Team Leaders and Back Office Leaders. No other personnel are authorized to speak on behalf of Highland with regard to recommendations.

If a positive recommendation is not warranted for a former employee, the policy is to confirm only dates of employment, job title and salary for an employee or former employee and to provide no further information.

*(Revised 09-17-08)*

# LEAVING THE COMPANY

Voluntary Termination

To allow time to make proper arrangements in the work schedule and begin the process of recruitment, employees are requested to give at least two weeks notice of resignation or retirement, in writing. Employees are requested to give notice of resignation or retirement only when their direct supervisor is physically present in the office (i.e. not on vacation or a business trip).

*(Revised 03-26-09)*

Involuntary Termination

Whenever possible and appropriate, you will be notified in advance of your termination date and informed by your supervisor of any benefits to which you are entitled. Immediate dismissal may be warranted in certain cases.

Exit Interviews

Whenever possible, an Exit Interview will be conducted when leaving the Company. Either the employee's immediate supervisor or Human Resources will conduct the interview. It is to your advantage to have this interview so that you may receive complete information on the benefits to which you are entitled and what procedures are applicable upon leaving Highland.

Return of Company Property

On your last day of employment, you are required to return all company property to Human Resources. Company property includes all keys, equipment, office supplies and any other materials that are owned or leased by Highland. Employees must deliver to the company all documents and other tangible items, including storage media, containing proprietary information, including all copies of such documents or tangibles, immediately upon notice of termination of employment with the company. Any questions regarding this policy should be directed to your supervisor or Human Resources.

*(Revised 09-17-08)*

Benefits Continuation (COBRA)

The Consolidated Omnibus Budget Reconciliation Act (COBRA) ensures that an employee who faces a reduction of work hours or who is terminated from Highland (for reasons other than gross misconduct) has the option to continue Health/ Dental coverage for a fixed period of time at his/her own expense. This law is specifically designed to help bridge any gap which you or your dependents might experience if you end your employment with the company, if your hours are reduced making you no longer eligible for insurance coverage, or if the status of your marital or dependent relationships change.

To the extent required by law, you may continue your coverage under Highland's Health / Dental plan. The cost of COBRA coverage is borne entirely by you. You will be notified of your COBRA rights soon after termination and will then be required to either accept or reject COBRA continuation. See Human Resources for further details.

Post-Employment Contact with Investors, Prospective Investors, and Counterparties

Effective immediately, upon the earlier of notice of resignation or termination of employment, and continuing for thirty (30) calendar days following the earlier of notice of resignation or termination of employment (the "Non-Contact Period"), former employees are prohibited from contacting any of Highland Capital Management, L.P. ("Highland" or the "Company") or its Affiliates' (including any other corporation, partnership, limited liability company, joint venture, or other entity of which an aggregate of 25 percent or more of the issues and outstanding capital stock or other equity interest is now or at any time afterward owned, of record or beneficially, directly or indirectly, by Highland) (the "Affiliates"), current investors, prospective investors, or current counterparties without receiving advance written permission from Highland. Regardless of the duration of an employee's notice of resignation period, in no event shall the Non-Contact Period extend less than fourteen (14) days following termination of employment. For purposes of this policy, current investors include any investing entity or individual who has invested with Highland or its Affiliates within the subject former

employee's previous twenty-four (24) months of employment, and prospective investors include any investing entity or individual contacted by Highland or its Affiliates regarding a potential investment within the subject former employee's previous twenty-four (24) months of employment, regardless of whether that entity or individual ultimately invested. For purposes of this policy, investors do not include individuals who are solely invested in Highland's or its Affiliates' retail funds. All Highland employees must enter into and agree to this policy as a condition of employment. However, Highland reserves the right to enforce this policy only against employees that it so chooses, and Highland will notify those employees accordingly at the appropriate time.

In order to receive consideration for permission to contact current investors, prospective investors or counterparties, former employees must submit a written request via e-mail or physical mail to Highland's Human Resources Department, HR@hcmlp.com or Human Resources, 300 Crescent Court, Suite 700, Dallas, TX 75201, at least fourteen (14) days in advance of any proposed contact. Such request must include the name of the entity or individual that the former employee wishes to contact and state the purpose of the proposed contact. Former employees will then be notified, in writing (at their last known e-mail address or mailing address), whether permission has been granted. Should current investors, prospective investors or counterparties contact former employees (without former employees contacting them first), former employees must immediately notify Highland's Human Resources Department (at the above addresses), in writing, of the contact and request permission from Highland to respond if they so desire. Former employees will then be notified, in writing (at their last known e-mail or mailing address), whether permission has been granted.

Employees who terminate with either at least two weeks notice of resignation or who are involuntarily terminated are entitled to their regular base pay for the duration of the Non-Contact Period that follows their last day of employment, subject to their adherence to this policy. Employees who resign without at least two weeks notice are not eligible for their base pay during the Non-Contact Period.

Adherence to this policy is also a material condition of former employees being entitled to and receiving payment for any paid time off ("PTO") that is accrued but unused as of the conclusion of employment. If former employees fully adhere to this policy for the entirety of the Non-Contact Period, they will receive payment for any accrued but unused PTO within ten (10) business days following the proscribed period.

This policy is understood to be clear and enforceable as written. However, should any former employee later challenge any provision as unclear, unenforceable, or inapplicable to any contact that former employee intends to engage in, he or she will first notify Highland's Human Resources Department (at the above addresses), in writing, and meet with a Highland representative to discuss resolution of any disputes between the parties. Former employees will provide this notification at least fourteen (14) days before they engage in any activity contact that could

foreseeably fall within a questioned restriction. The failure to comply with this requirement shall waive former employees' rights to challenge the reasonable scope, clarity, applicability, or enforceability of this policy and its restrictions at a later time. All rights of both parties will be preserved if this early resolution conference requirement is complied with even if no agreement is reached in the conference.

If employees are not chosen by Highland to have this policy enforced against them, they are not entitled to receive additional base pay beyond the conclusion of their employment, and the condition of adherence to this policy to receive payment for any accrued but unused PTO is inapplicable. By entering into and agreeing to this policy, you expressly acknowledge and agree that any and all investor and counterparty information you have acquired or will acquire during your employment with Highland, including, but not limited to, investor and counterparty contact information, is Highland's confidential and proprietary information and property, and, moreover, because you are entering into this policy, Highland will be providing you with additional confidential and proprietary information, including, but not limited to investor and counterparty contact information, which you would not otherwise be entitled to. Finally, you expressly acknowledge and agree that the covenants contained herein are reasonable and necessary agreements for the protection of Highland and its Affiliates' business interests covered in the fully enforceable, ancillary agreements set forth in this policy.

*(Revised 06-22-17)*


# HIGHLAND CODE OF ETHICS AND BUSINESS PRACTICES

Introduction

Highland employees are expected to maintain the highest standards of ethical conduct and professionalism. Employees are expected to:

- perform all job duties and responsibilities with integrity and in good faith;
- engage in and encourage honesty at all times;
- make every effort to exercise good judgment in all matters;
- comply with all applicable laws, rules and regulations;
- avoid actual or potential conflicts of interest between personal and professional relationships;
- uphold the firm's public image and reputation;
- treat every individual with respect, dignity, and courtesy;
- maintain truthfulness in all communication so as to preserve the trust of other employees, clients, the public, etc.;
- abide by the Company's moonlighting policies and expend all of their regular business time and efforts to the business of the Company,

avoid creating any conflict of interest with the Company or otherwise contravening their duty of loyalty to the Company; and

- safeguard the confidentiality of all Company information and materials.

The Code of Ethics and Business Practices is not exhaustive and is not designed to anticipate every situation. Highland will interpret and apply these standards as it deems appropriate. Compliance with this Code of Ethics and Business Practices is a condition of employment. Failure to adhere to this Code of Ethics and Business Practices can result in corrective or disciplinary action, up to and including termination. Violations of this Code of Ethics and Business Practices may also constitute violations of law, which may expose both the employee and the firm to criminal or civil penalties.

Actual or potential violations of this Code of Ethics and Business Practices must be promptly reported to the employee's manager, Human Resources, or the Chief Compliance Officer. Highland prohibits retaliation for reports of ethical misconduct that are made in good faith.

*(Revised 09-17-08)*

Proper Recording Of Assets And Disbursements

Making false or fictitious entries on the books and records of Highland and/or issuing false or misleading reports about Highland and its operations, whether intentionally or in a grossly negligent manner, are prohibited. No employee shall knowingly engage in any transaction that requires or contemplates such prohibited activities. All funds, disbursements, assets and liabilities of Highland shall be accurately recorded on the appropriate corporate books and records.

Business Solicitation Practices

All business solicitations by Highland employees must be in accordance with Highland's approved business plans. If a representative of a business contact or potential business contact makes overtures or suggests that a Highland employee make any direct or indirect payment, gift or gratuity in order to obtain business, such an overture or suggestion must be reported to the Chief Compliance Officer. However, the extension of normal business courtesies in accordance with ethical business practices is not prohibited.

Relationships With Government Officials

No payment (including business gifts, business meals and reimbursements of any expenses) shall be made to any federal, state or local government official or employee in circumstances where it may be construed as an attempt to influence the judgment of the recipient or to obtain preferential treatment for Highland.

Conflicts Of Interest - Outside Activities

A Highland employee:

- May not engage in an outside interest, activity or investment that places his or her economic interests in significant, actual or potential conflict with those of Highland except for those activities that are approved by the Chief Compliance Officer; or

- May not solicit or accept salaries, fees, commissions or other types of compensation, rebate or reward from contractors, suppliers, customers, consultants, or other persons, firms or organizations doing business with Highland.

Political Campaign Laws

No political contribution, at any level of government, shall be made out of any Highland fund or account, whether directly or indirectly, by reimbursement or otherwise without the express prior approval of Highland's President and Chief Compliance Officer. No corporate political contribution of any kind shall be made in violation of any applicable law or regulation. However, nothing in Highland's policies prohibits employees from engaging in political activities in their individual capacities on their own time and at their own expense or from making political contributions or expenditures of their own personal funds.

*(Revised 09-17-08)*

Antitrust Law And Competitive Practices

National antitrust laws and regulations (including but not limited to the Hart-Scott-Rodino pre-merger notification requirements) shall, where applicable, be observed at all times, in all situations, by all employees of Highland. Particularly, price-fixing or bid-rigging acts or arrangements with competitors to divide or allocate markets or customers or exclude others from a market are absolutely prohibited.

Trade Secrets And Other Proprietary Information

All Highland employees must act affirmatively to maintain the confidentiality of Highland's trade secrets and proprietary information. Some of the types of information that must be kept confidential (unless disclosure is properly authorized) include proprietary software, customer and tenant lists, investor lists, planning materials, marketing plans and much of the technical information that Highland generates in its business.

Compliance With Laws And Regulations

All activities of Highland shall be conducted in compliance with all applicable laws and regulations of the United States (federal, state and local) and of the countries where Highland might transact business.

Implementation

Any questions about interpretation of this Code of Ethics and Business Practices, or any need for legal advice concerning compliance with this Code or about any law or regulation to which Highland is subject, should be referred to the President.

Trading Policy

Please refer to the separate Highland Capital Management, L.P. Compliance Manual and Highland Capital Management, L.P. Personal Trading Policy for details.

## HIGHLAND EMPLOYEE HANDBOOK ACKNOWLEDGMENT FORM

### *Highland Employee Handbook and "Employment at Will"*

***INSTRUCTIONS:***

This form must be completed and signed by all Highland Capital Management, L.P. ("Highland") employees within 15 days of receipt.  By signing this form you are acknowledging that you have received, read and understand the Highland Employee Handbook ("Handbook") and also that your employment with Highland is at-will.

***Please READ, SIGN and RETURN to Human Resources:***

I have received a copy of the Handbook.  I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of Highland senior management prior to signing this acknowledgment.  I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment at Highland.

I understand that Highland may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that this Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by Highland. I understand I will be required to read and acknowledge this Handbook on at least an annual basis.

I understand that absent a signed written agreement by the President of Highland providing a guaranteed term of employment, my employment with Highland is at-will, which means it is not for any guaranteed period of time and is terminable at any time by either Highland or myself.  Accordingly, I understand that Highland may terminate my employment at any time with or without cause and with or without notice.  Further, I understand that neither the Handbook, any other company documents, nor any oral agreement or representation by an employee or representative of Highland constitutes an employment contract or guarantee of employment for any period of time, or otherwise alters the at-will nature of my employment at Highland.  No one at Highland, other than the President of its general partner, may alter or change the at-will nature of the employment relationship, and then only by a written agreement signed by the President.

_____     _____     _____
**Employee Name**                              **Signature**                             **Date**

# EXHIBIT 60

| Document Name: | **Annual Certification and Conflicts of Interest Disclosure 2019** | Due Date: | **02/07/2020** |
| --- | --- | --- | --- |

| Employee Group: | **General** |
| --- | --- |

**Attachments:**

| Effective Date: | **01/02/2020** |
| --- | --- |

| | | Send Email Reminder: | **Every 4 day(s) before due date 02/07/2020 and on Effective date** |
| --- | --- | --- | --- |

| Employee Name: | **James Dondero** |
| --- | --- |

**Document:**

| Do you currently conduct any outside business activities? | Yes |
| --- | --- |
| If yes, please disclose your current outside business activity and whether or not you received pre-clearance from the Compliance Department. | 1905 Wylie LLC 3801 Shenandoah, L.P. 3820 Goar Park LLC, 4201 Locust, L.P. 5833 Woodland, L.P. 401 AME LP, Apex Care, L.P Ascendant Advisors Dallas Lease and Finance, L.P. Dolomiti, LLC, DrugCrafters, L.P. Dugaboy Management, LLC Dugaboy Project Management GP, LLC Empower Dallas Foundation, Inc. Gardens of Denton II, L.P. Gardens of Denton III, L.P. Gardens of Denton, L.P. HCRE Partners, LLC, 201 Tarrant Partners, HCREP WP, LLC, HCBH Rent Investors, LLC, HCBH 11611 Ferguson LLC, HCREF-IX Holding Corp. HCREF-V Holding Corp. HCREF-VI Holding Corp. HCREF-VII Holding Corp. HCREF-VIII Holding Corp, Heron Pointe, LLC, Jewelry Ventures I, LLC JMIJM, LLC Markham Fine Jewelers, L.P. Nexbank Capital Inc., Park Central Residential LLC, PCMG Trading Partners XXIII, L.P. Pharmacy Ventures I, LLC Pharmacy Ventures II, LLC PWM1 Holdings, LLC PWM1, LLC Serena Residential Partners, LLC, Sevilla Residential Partners, LLC, Strand Advisors III, Inc. Strand Advisors IV, LLC Strand Advisors IX, LLC Strand |

Advisors V, LLC Strand Advisors VI, LLC,Strand Advisors XIII, LLC Strand Advisors XVI, Inc. Strand Advisors, Inc., SV TIC Residential Partners, LLC The Dugaboy Investment Trust The Get Good Non-Exempt Trust No. 1 The Get Good Non-Exempt Trust No. 2, The Get Good Trust VB Holding, LLC Yellow Metal Merchants, Inc. SLHC Trust, 11 Estates Lane, LLC, 1110 Waters, LLC, 140 Albany, LLC, 3409 Rosedale, LLC,3801 Maplewood, LLC, 4312 Belclaire, LLC,7758 Ronnie, LLC,7759 Ronnie, LLC,Camelback Residential Investors, LLC,HCBH Buffalo Pointe, LLC,HCBH Buffalo Pointe II, LLC,HCRE 1775 James Ave, LLC,HCRE Addison, LLC (fka HWS Addison, LLC),HCRE Hotel Partner, LLC (fka HCRE HWS Partner, LLC),HCRE Las Colinas, LLC (fka HWS Las Colinas, LLC),HCRE Plano, LLC (fka HWS Plano, LLC),Heron Pointe Investors, LLC,Powderhorn, LLC, Meritage Residential Partners, LLC,Rundberg Residential Partners, LLC,Rundberg Residential Partners SM, Inc.,Tuscany Acquisition, LLC, NexVest LLC, NexStrat LLC

| | |
|---|---|
| Do you or any of your immediate family members serve on the Board of Directors, Credit Committee, Advisory Board of, act as a Trustee, Officer, Director, Senior Executive of, or hold any position or have any business relationship with a publicly or privately traded entity? | Yes |
| If yes, please disclose the name(s), entity and positons(s) held. | CCS Medical Chairman Cornerstone Healthcare Group Holdings Chairman Metro-Goldwyn-Mayer Director Nexbank Capital, Inc. Chairman and Director Nexbank SSB Chairman and Director Jernigan Capital NYSE: JCAP Director Reasoning Mind North Texas Regional Board Director Edwin L Cox School of Business Director Triple T Director |

| | |
|---|---|
| Are any of your immediate family members employed by a financial services business, broker/dealer, investment adviser, fund administrator or other private investment vehicle (i.e. hedge fund, private equity firm, etc.)? | No |
| Have you received any gifts or participated in any entertainment events during the past year which were outside the scope of the Gifts and Entertainment Policy? | No |
| Did you or your spouse make any political contributions over the amount of $350 for a local candidate that you can vote for, $150 for a local candidate that you cannot vote for, or $2,700 for a federal candidate which were not disclosed to Compliance? | No |
| Do you hold any professional certifications currently? | Yes |
| If yes, please list all current professional certifications including the date that you last renewed. | CMA #113851 Certified Management Acct. 12/01/19-11/30/20 CPA #10473 VA CPA license renewal 4/30/19-4/30/20 CFA #10443 Certified Financial Analyst 06/30/19-06/30/20 |
| Are there any other existing or potential conflicts of interest as they relate to your employment with Highland Capital Management, L.P.? | No |
| Did you invest in or hold any private offerings or funds in 2019? | No |
| I hereby certify that the below is a complete and accurate record of all of my holdings as of December 31, 2019. | Yes |

# Holdings

## Unconfirmed Holdings



**Note:** If any of this information is incorrect or any securities are missing, please contact Compliance before attesting to this form. In addition, please be sure to include any private offerings or funds that you are invested in or hold.

## Confirmed Holdings

<div align="center">

**No record found.**

</div>

**Note:**

I hereby certify that I have disclosed all existing and potential conflicts of interest, for which I am aware, as they relate to my employment with Highland Capital Management, L.P. Should any additional conflicts of interest arise, I agree to promptly notify the Chief Compliance Officer. I also certify that I have read, understood and will continue to comply with the most current version, as provided on the firm's intranet, of the Compliance Manual, Code of Ethics and Privacy Policy. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of Highland senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment at Highland. I understand that Highland may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by Highland. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between me and Highland and I acknowledge and agree that neither Highland nor any affiliate of Highland has made any statements altering the at-will nature of employment, and have not made guarantees or promises of continuing employment.

Printed By: Cyrus Eftekhari
Tue Feb 16 2021 16:31:56

# EXHIBIT 61

| | | | |
|---|---|---|---|
| **Document Name:** | **Q3 2020 Questionnaire and Transactions Certification** | **Due Date:** | **12/11/2020** |
| **Employee Group:** | **General** | | |

**Attachments:**

| | | | |
|---|---|---|---|
| **Effective Date:** | **10/07/2020** | | |
| | | **Send Email Reminder:** | **Every 3 day(s) before due date 12/11/2020 and on Effective date** |
| **Employee Name:** | **James Dondero** | | |

**Document:**

| | |
|---|---|
| Have you been convicted, within the past ten years (or five years, in the case of the Funds affiliated issuers), of any felony or misdemeanor in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities? | No |
| Are you subject to any order, judgment, or decree of any court of competent jurisdiction, entered within the past five years, that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser, or paid solicitor of purchasers of securities? | No |
| Are you subject to a final order of a state securities commission (or an agency or officer of a state performing like functions), a state authority that supervises or examines banks, savings associations, or credit unions, a state insurance commission (or an agency or officer of a state performing like functions), an appropriate federal banking agency, the U.S. Commodity Futures Trading Commission, or the National Credit Union Administration that currently bars you from association with an entity regulated by such commission, authority, agency or officer, engaging in the business of securities, insurance or banking, engaging in savings association or credit union activities, or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within the past ten years? | No |
| Are you subject to an order of the SEC entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the Exchange Act), or Section 203(e) or 203(f) of the Investment Advisers Act of 1940, as amended (the Advisers Act) that currently suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations of, or imposes civil money penalties on, such person, or bars you from being associated with any entity or from participating in the offering of any penny stock? | No |
| Are you subject to any order of the SEC, entered within the past five years, that, currently orders you to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including, without limitation, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b(5) thereunder, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act or any other rule or regulation thereunder or Section 5 of the Securities Act? | No |
| Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade? | No |
| Have you filed (as a registrant or issuer), or were you named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within the past five years, was the subject of a refusal order, stop order, or order suspending the | No |

| Regulation A exemption, or is currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued? | |
|---|---|
| Are you subject to a United States Postal Service false representation order entered within the past five years, or are you currently subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations? | No |
| Are you the subject of any ongoing proceeding, arbitration, action, indictment or charge that if resolved against you or such person could result in a yes answer to any of the above questions? | No |
| If you responded yes to any of the questions above, have you obtained a waiver from disqualification under Rule 506(d) either (i) from the SEC or (ii) from the court or regulatory authority that entered the relevant order, judgment or decree? | NA |
| I hereby certify that the below is a complete and accurate record of all of my reportable securities transactions. This is for the quarter beginning July 1, 2020 and ending September 30, 2020. | Yes |

# Transactions

## Unconfirmed Transactions

<p align="center">No record found.</p>

Note:

## Confirmed Transactions





**Note:**

I hereby certify that the above information is true and accurate. I hereby certify to continue to comply with obligations as set forth in the firm's Compliance Manual, including without limitation, provisions around confidentiality and reporting compliance violations if they occur. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of Highland senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment at Highland. I understand that Highland may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by Highland. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between me and Highland and I acknowledge and agree that neither Highland nor any affiliate of Highland has made any statements altering the at-will nature of employment, and have not made guarantees or promises of continuing employment.

Printed By: Cyrus Eftekhari
Tue Feb 16 2021 16:26:12

# EXHIBIT 62

| | | | |
|---|---|---|---|
| **Document Name:** | **Annual Certification and Conflicts of Interest Disclosure 2019** | **Due Date:** | **02/07/2020** |
| **Employee Group:** | **General** | | |

**Attachments:**

| | | | |
|---|---|---|---|
| **Effective Date:** | **01/02/2020** | | |
| | | **Send Email Reminder:** | **Every 4 day(s) before due date 02/07/2020 and on Effective date** |
| **Employee Name:** | **Scott Ellington** | | |

**Document:**

| | |
|---|---|
| Do you currently conduct any outside business activities? | No |
| Do you or any of your immediate family members serve on the Board of Directors, Credit Committee, Advisory Board of, act as a Trustee, Officer, Director, Senior Executive of, or hold any position or have any business relationship with a publicly or privately traded entity? | No |
| Are any of your immediate family members employed by a financial services business, broker/dealer, investment adviser, fund administrator or other private investment vehicle (i.e. hedge fund, private equity firm, etc.)? | No |
| Have you received any gifts or participated in any entertainment events during the past year which were outside the scope of the Gifts and Entertainment Policy? | No |
| Did you or your spouse make any political contributions over the amount of $350 for a local candidate that you can vote for, $150 for a local candidate that you cannot vote for, or $2,700 for a federal candidate which were not disclosed to Compliance? | No |
| Do you hold any professional certifications currently? | Yes |
| If yes, please list all current professional certifications including the date that you last renewed. | Juris Doctor |
| Are there any other existing or potential conflicts of interest as they relate to your employment with Highland Capital Management, L.P.? | No |
| Did you invest in or hold any private offerings or funds in 2019? | No |
| I hereby certify that the below is a complete and accurate record of all of my holdings as of December 31, 2019. | Yes |

# Holdings

## Unconfirmed Holdings

<div align="center">**No record found.**</div>

**Note:** If any of this information is incorrect or any securities are missing, please contact Compliance before attesting to this form. In addition, please be sure to include any private offerings or funds that you are invested in or hold.

## Confirmed Holdings

<div align="center">**No record found.**</div>

**Note:**

I hereby certify that I have disclosed all existing and potential conflicts of interest, for which I am aware, as they relate to my employment with Highland Capital Management, L.P. Should any additional conflicts of interest arise, I agree to promptly notify the Chief Compliance Officer. I also certify that I have read, understood and will continue to comply with the most current version, as provided on the firm's intranet, of the Compliance Manual, Code of Ethics and Privacy Policy. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of Highland senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment at Highland. I understand that Highland may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by Highland. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between me and Highland and I acknowledge and agree that neither Highland nor any affiliate of Highland has made any statements altering the at-will nature of employment, and have not made guarantees or promises of continuing employment.

Printed By: Cyrus Eftekhari
Tue Feb 16 2021 16:29:50

2/2

# EXHIBIT 63

| Document Name: | **Q3 2020 Questionnaire and Transactions Certification** | Due Date: | **12/11/2020** |
|---|---|---|---|

**Employee Group:** General

**Attachments:**

**Effective Date:** 10/07/2020

| | | Send Email Reminder: | **Every 3 day(s) before due date 12/11/2020 and on Effective date** |
|---|---|---|---|

**Employee Name:** Scott Ellington

**Document:**

| Question | Answer |
|---|---|
| Have you been convicted, within the past ten years (or five years, in the case of the Funds affiliated issuers), of any felony or misdemeanor in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment advisor or paid solicitor of purchasers of securities? | No |
| Are you subject to any order, judgment, or decree of any court of competent jurisdiction, entered within the past five years, that currently restrains or enjoins you from engaging or continuing to engage in any conduct or practice in connection with the purchase or sale of any security, involving the making of any false filing with the SEC, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser, or paid solicitor of purchasers of securities? | No |
| Are you subject to a final order of a state securities commission (or an agency or officer of a state performing like functions), a state authority that supervises or examines banks, savings associations, or credit unions, a state insurance commission (or an agency or officer of a state performing like functions), an appropriate federal banking agency, the U.S. Commodity Futures Trading Commission, or the National Credit Union Administration that currently bars you from association with an entity regulated by such commission, authority, agency or officer, engaging in the business of securities, insurance or banking, engaging in savings association or credit union activities, or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within the past ten years? | No |
| Are you subject to an order of the SEC entered pursuant to Section 15(b) or 15B(c) of the Securities Exchange Act of 1934, as amended (the Exchange Act), or Section 203(e) or 203(f) of the Investment Advisers Act of 1940, as amended (the Advisers Act) that currently suspends or revokes your registration as a broker, dealer, municipal securities dealer or investment adviser, places limitations on the activities, functions or operations of, or imposes civil money penalties on, such person, or bars you from being associated with any entity or from participating in the offering of any penny stock? | No |
| Are you subject to any order of the SEC, entered within the past five years, that, currently orders you to cease and desist from committing or causing a violation or future violation of any scienter-based anti-fraud provision of the federal securities laws, including, without limitation, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b(5) thereunder, Section 15(c)(1) of the Exchange Act and Section 206(1) of the Advisers Act or any other rule or regulation thereunder or Section 5 of the Securities Act? | No |
| Are you currently suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self regulatory organization (e.g., a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade? | No |
| Have you filed (as a registrant or issuer), or were you named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within the past five years, was the subject of a refusal order, stop order, or order suspending the | No |

| | |
|---|---|
| Regulation A exemption, or is currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued? | |
| Are you subject to a United States Postal Service false representation order entered within the past five years, or are you currently subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations? | No |
| Are you the subject of any ongoing proceeding, arbitration, action, indictment or charge that if resolved against you or such person could result in a yes answer to any of the above questions? | No |
| If you responded yes to any of the questions above, have you obtained a waiver from disqualification under Rule 506(d) either (i) from the SEC or (ii) from the court or regulatory authority that entered the relevant order, judgment or decree? | NA |
| I hereby certify that the below is a complete and accurate record of all of my reportable securities transactions. This is for the quarter beginning July 1, 2020 and ending September 30, 2020. | Yes |

# Transactions

## Unconfirmed Transactions

<p align="center">No record found.</p>

 Note:

## Confirmed Transactions

<p align="center">No record found.</p>

 Note:

I hereby certify that the above information is true and accurate. I hereby certify to continue to comply with obligations as set forth in the firm's Compliance Manual, including without limitation, provisions around confidentiality and reporting compliance violations if they occur. I have received, have access to, and have read a copy of the Employee Handbook (the "Handbook") and I am in compliance with the obligations applicable to employees set forth therein. I understand it is my responsibility to read the Handbook and to bring any questions I may have about its provisions to my supervisor, Human Resources, or an appropriate member of Highland senior management prior to signing this acknowledgment. I further understand that if I do not abide by the policies and procedures outlined in the Handbook that my actions might result in the termination of my employment at Highland. I understand that Highland may change, modify, amend, add to or subtract from any or all of the contents of this Handbook at any time, in its sole discretion, and with or without notice, and that the current Handbook replaces and supersedes any previous Handbooks that I have received or that have been issued by Highland. I understand and acknowledge that my employment is at-will, and nothing contained in the Handbook in any way alters the at-will employment relationship between me and Highland and I acknowledge and agree that neither Highland nor any affiliate of Highland has made any statements altering the at-will nature of employment, and have not made guarantees or promises of continuing employment.

Printed By: Cyrus Eftekhari
Tue Feb 16 2021 16:31:15

# EXHIBIT 64

**Highland Capital Management, L.P.**

**Professional Fees**

| Company | November 2019 [1] | December 2019 | January 2020 | February | March | April | May | June | July | August | September | October | November | December 2020 | January 2021 | Total | Average [2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pachulski Stang Ziehl & Jones LLP | $ 1,218,628 | 615,958 | 926,949 | 949,136 | 1,241,549 | 1,116,960 | 807,882 | 821,992 | 741,165 | 676,243 | 835,900 | 1,138,808 | 761,101 | 1,050,155 | 2,590,511 | 15,492,937 | $ 1,019,594 |
| Hayward & Associates PLLC | - | 18,776 | 78,234 | 41,689 | 37,040 | 24,914 | 17,705 | 18,477 | 30,766 | 28,324 | 25,208 | - | - | - | - | 321,132 | 32,113 |
| Sidley Austin LLP | 1,004,067 | 908,738 | 724,038 | 574,372 | 610,452 | 554,039 | 432,290 | 622,995 | 674,339 | 586,865 | 448,317 | 675,428 | 505,719 | 525,852 | 826,268 | 9,673,777 | 619,265 |
| Young Conaway Stargatt & Taylor, LLP | 281,156 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 281,156 | N/A |
| FTI Consulting | 407,531 | 365,474 | 514,338 | 479,274 | 611,860 | 619,150 | 281,038 | 410,672 | 229,506 | 248,270 | 214,381 | 245,534 | 251,844 | 299,122 | - | 5,177,996 | 366,959 |
| Foley Gardere, Foley & Lardner LLP | 87,653 | 146,137 | 90,701 | 88,271 | 82,283 | 32,603 | 28,312 | 21,586 | 6,265 | 8,932 | 3,143 | 18,676 | 14,528 | - | - | 629,088 | 45,120 |
| Wilmer Hale [3] | - | 27,006 | 33,438 | 120,781 | 79,401 | 118,262 | 147,424 | 94,566 | 141,851 | 141,851 | 141,851 | 141,851 | 141,851 | | | 1,330,134 | 110,845 |
| KCC | 54,917 | 68,002 | 64,586 | 44,399 | 147,841 | 53,843 | 29,008 | 39,720 | 41,966 | 41,435 | 54,170 | 85,495 | 75,183 | 114,950 | 113,217 | 1,028,730 | 69,558 |
| Development Specialists, Inc. | 283,490 | 243,795 | 277,398 | 272,594 | 295,290 | 254,029 | 237,409 | 249,391 | 237,828 | 249,129 | 236,492 | 236,496 | 226,078 | 237,816 | 296,650 | 3,833,885 | $ 253,600 |
| **Total** | $ 3,337,440 | 2,393,885 | 2,709,682 | 2,570,516 | 3,105,716 | 2,773,799 | 1,981,069 | 2,279,400 | 2,103,685 | 1,981,050 | 1,959,462 | 2,542,288 | 1,976,304 | 2,227,894 | 3,826,646 | 37,768,836 | $ 2,517,053 |

[1] November fee applications include fees from October 15th to October 31st; month not included in average calculation

[2] Average only includes months with filed fee applications

[3] July 1, 2020 to November 30, 2020 fees were filed as one consolidated amount; for purposes of this chart, amounts averaged over 5 month span

# EXHIBIT 65

**From:** Jim Dondero <JDondero@highlandcapital.com>

**To:** Thomas Surgent <TSurgent@HighlandCapital.com>, Jim Seery <jpseeryjr@gmail.com>, Scott Ellington <SEllington@HighlandCapital.com>, "Joe Sowin" <JSowin@HighlandCapital.com>, Jason Post <JPost@NexpointAdvisors.com>

**Cc:** "D. Lynn (\"Judge Lynn\")" <michael.lynn@bondsellis.com>, Bryan Assink <bryan.assink@bondsellis.com>

**Subject:** Trading restriction re MGM - material non public information

**Date:** Thu, 17 Dec 2020 14:14:39 -0600

**Importance:** Normal

---

Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and Apple actively diligencing in Data Room. Both continue to express material interest.
Probably first quarter event, will update as facts change. Note also any sales are subject to a shareholder agreement.

Sent from my iPhone