```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
In Re:                              )    Chapter 11
                                    )
HIGHLAND CAPITAL                    )    Dallas, Texas
MANAGEMENT, L.P.,                   )    Friday, January 8, 2021
                                    )    9:30 a.m. Docket
          Debtor.                   )
_____    )
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,                   )
                                    )
          Plaintiff,                )    PRELIMINARY INJUNCTION
                                    )    HEARING [#2]
v.                                  )
                                    )
JAMES D. DONDERO,                   )
                                    )
          Defendant.                )
_____    )
```

                   TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                               13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor/Plaintiff:    John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

Dondero Ex. 13

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero,          D. Michael Lynn
     Defendant:                  John Y. Bonds, III
 3                               Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
 4                                  JONES, LLP
                                 420 Throckmorton Street,
 5                                  Suite 1000
                                 Fort Worth, TX  76102
 6                               (817) 405-6900

 7   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 8                               One South Dearborn Street
                                 Chicago, IL  60603
 9                               (312) 853-7539

10   For the Funds and           Davor Rukavina
     Advisors:                   MUNSCH HARDT KOPF & HARR, P.C.
11                               500 N. Akard Street, Suite 3800
                                 Dallas, TX  75201-6659
12                               (214) 855-7554

13   For Certain Employees:      Frances A. Smith
                                 ROSS & SMITH, P.C.
14                               Plaza of the Americas
                                 700 N. Pearl Street, Suite 1610
15                               Dallas, TX  75201
                                 (214) 593-4976
16
     Recorded by:                Michael F. Edmond, Sr.
17                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
18                               Dallas, TX  75242
                                 (214) 753-2062
19
     Transcribed by:             Kathy Rehling
20                               311 Paradise Cove
                                 Shady Shores, TX  76208
21                               (972) 786-3063

22

23

24
            Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

1          <u>DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.</u>

2          THE COURT:  All right.  We are here for Highland

3  Capital Management, L.P. versus James Dondero, a preliminary

4  injunction hearing.  This is Adversary 20-3190.

5      All right.  Let's start out by getting appearances from

6  counsel.  First, for the Plaintiff/Debtor, who do we have

7  appearing?

8          MR. MORRIS:  Your Honor, John Morris; Pachulski Stang

9  Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and

10  others.

11          THE COURT:  All right.  Good morning.  All right.

12  For Mr. Dondero, who do we have appearing?

13          MR. LYNN:  Michael Lynn, together with John Bonds,

14  for Mr. Dondero.

15          THE COURT:  Good morning.

16      All right.  I know we have a lot of parties in interest

17  represented on the video or phone today.  I'm not going to go

18  through a roll call, other than I'll see if we have the

19  Committee, the Unsecured Creditors' Committee counsel on the

20  line.  Do we have anyone appearing for them?

21          MR. CLEMENTE:  Yes, good morning, Your Honor.

22  Matthew Clemente from Sidley Austin on behalf of the

23  Committee.

24          THE COURT:  Okay.  Thank you.  All right.

25          MR. CLEMENTE:  Thank you, Your Honor.

1              THE COURT:  Well, as I said, I'm not going to do a

2      roll call.  I don't think we had any specific parties in

3      interest, you know, file a pleading, or any other parties

4      other than the Debtor and Mr. Dondero in this adversary.  So

5      I'll just let the others kind of listen in without appearing.

6          All right.  Mr. Morris, are you going to start us off this

7      morning with, I don't know, an opening statement or any

8      housekeeping matters?

9              MR. MORRIS:  I have both an opening statement and

10     housekeeping matters.  I just wanted to see if Mr. Pomerantz

11     has anything he wants to convey to the Court before I begin.

12             MR. POMERANTZ:  (garbled)

13             THE COURT:  Mr. Pomerantz, if you could take your

14     device off mute, please.

15             THE CLERK:  He's off mute.  I don't know what --

16             THE COURT:  Okay.  Well, we're showing you're not on

17     mute, but we can't hear you.  What now?

18             THE CLERK:  He's not on mute now.  He's --

19             THE COURT:  Okay.  Go ahead, Mr. Pomerantz.

20         (Pause.)

21             THE CLERK:  He's not coming through.

22             THE COURT:  We're -- you're not coming through, and

23     we're not sure what the problem is.  We're not showing you on

24     mute.

25         (Pause.)

1          THE COURT:  All right.  Should we have him call back

2    in on his phone?  All right.  If you could, if you have a

3    phone, maybe you can try calling in on your phone and speak

4    through your phone, not your computer.

5          MR. MORRIS:  You know what, Your Honor?  I'm going to

6    proceed, and Mr. Pomerantz will address the Court at the

7    conclusion of the hearing on the motion.

8          THE COURT:  Okay.  Very good.  We usually hear him

9    loud and clear, so I don't know what's going on this morning.

10   Go ahead, Mr. Morris.

11         OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12         MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13   John Morris; Pachulski Stang; for the Debtor.

14      We are here this morning, Your Honor, on the Debtor's

15   motion for preliminary injunction against Mr. Dondero.  We

16   filed last night also an emergency motion for an order to show

17   cause as to why this Court should not hold Mr. Dondero in

18   contempt of court --

19         THE COURT:  All right.

20         MR. MORRIS:  -- for violating a previously-issued

21   TRO.

22         THE COURT:  Yes.  Let me just interject, in case

23   there's any confusion by anyone.  I am not going to hear the

24   motion for show cause order this morning.  While I understand

25   you think there might be some efficiency and overlap in

1  evidence, it's not enough notice.  So we'll talk about

2  scheduling that at the end of the presentations this morning.

3  All right?

4          MR. MORRIS:  Thank you for addressing that, Your

5  Honor.

6          THE COURT:  Okay.

7          MR. MORRIS:  Your Honor, then let's just proceed

8  right to the preliminary injunction motion.  There is ample

9  evidence to support the Debtor's motion for a preliminary

10  injunction.  There would have been substantial evidence to

11  support it based on the conduct that occurred prior to the

12  issuance of the TRO, but the conduct that did occur following

13  the TRO only emphasizes the urgent need for an injunction in

14  this case.

15      I want to begin by just telling Your Honor what evidence

16  we intend to introduce here today.  We filed at Docket 46 in

17  the adversary proceeding our witness and exhibit list.  The

18  exhibit list contains Exhibits A through Y.  And at the

19  appropriate time, I will move for the admission into evidence

20  of those exhibits.

21      The exhibit list and the witness list also identifies

22  three witnesses for today.  Mr. Dondero.  Mr. Dondero is here

23  today.  Notwithstanding Your Honor's comments on December 10th

24  and on December 16th, when I deposed him on Tuesday he was

25  unsure whether he was going to come here today to testify.

1  And he will inform Your Honor of that on cross-examination.

2  And so the Debtor was forced to prepare and serve a subpoena

3  to make sure that he was here today.  But Mr. Dondero is here

4  today.

5       Following the conclusion of Mr. Dondero's deposition on

6  Tuesday, and based in part on the evidence adduced during that

7  deposition, the Debtor terminated for cause Scott Ellington

8  and Isaac Leventon.  We had asked counsel for those former

9  employees to accept service of a trial subpoena so that they

10 would appear today.  We were told that they would do so if we

11 gave them a copy of the transcript of Mr. Dondero's

12 deposition.

13      We thought that was inappropriate and we declined to do

14 so, and they declined to accept service of the subpoenas.  We

15 have spent two days with a professional process server

16 attempting to effectuate service of the trial subpoenas for

17 Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18 doing that.  So we'll only have one witness today, unless we

19 have cause to call anybody on rebuttal, and that witness will

20 be Mr. Dondero.

21      I want to talk for a few moments as to what Mr. Dondero

22 will testify to and what the evidence will show.  Mr. Dondero

23 will testify that he never read the TRO, Your Honor.  He will

24 testify that he didn't participate in the motion on the

25 hearing for the TRO, that he never read Mr. Seery's

1   declaration in support of the Debtor's motion for the TRO,

2   that he never bothered to read the transcript of the

3   proceedings on December 10th so that he could understand the

4   evidence that was being used against him.  He had no knowledge

5   of the terms of the TRO when he was deposed on Tuesday.

6       And that's the backdrop of what we're doing here today,

7   because he didn't know what he was enjoined from doing, other

8   than speaking to employees.  He actually did testify and he

9   will testify that he knew he wasn't supposed to speak with the

10  Debtor's employees, but he spoke with the Debtor's employees

11  in all kinds of ways, as the evidence will show.

12      The evidence will also show that Mr. Dondero violated the

13  TRO by throwing away the cell phone that the company bought

14  and paid for after the TRO was entered into.  He's going to be

15  unable to tell you who threw it away.  He's going to be unable

16  to tell you who gave the order to throw it away.  He's going

17  to be unable to tell you when after the TRO was entered the

18  phone was thrown away.

19      But we do have as one fact and as I believe one violation

20  of the TRO --

21          MR. POMERANTZ:  So, I'm on a WebEx.

22          MR. MORRIS:  Jeff, --

23          THE COURT:  Mr. Pomerantz, we heard you.  We heard

24  you say something.  So, apparently, you got your audio

25  working.

1        All right.  Mr. Morris, continue.

2            MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3   you, Your Honor, is that it's really Mr. Seery's fault that

4   the phone got thrown away, because Mr. Seery announced that

5   all of the employees were going to be terminated at the end of

6   January, and because Mr. Seery did that, he and I believe Mr.

7   Ellington thought it was appropriate to just throw their

8   phones away, without getting the Debtor's consent, without

9   informing the Debtor, and switching the phone numbers that

10  were in the Debtor's account to their own personal names.  So

11  that's Item No. 1.

12      Item No. 2 -- and this is in no particular order, Your

13  Honor.  I don't want you to think that I'm bringing these

14  things up in terms of priority.  But they're just the order in

15  which they came up in the deposition, and so I'm just

16  following it as well.

17      Item No. 2 is trespass.  On December 22nd, you will hear

18  evidence that Mr. Dondero personally intervened to yet again

19  stop trades that Mr. Seery was trying to effectuate in his

20  capacity as portfolio managers of the CLOs.  He did that just

21  six days after Your Honor dismissed as frivolous a motion

22  brought by the very Advisors and Funds that he owns and

23  controls.

24      Therefore, the very next day, the Debtor sent him a

25  letter, sent through counsel a letter, evicting him from the

1   premises, demanding the return of the phone, and telling him

2   that he had to be out by December 30th.

3       I was stunned, Your Honor, stunned, when I took his

4   deposition on Tuesday and he was sitting in Highland's

5   offices.  He hadn't asked for permission to be there.  He

6   hadn't obtained consent to be there.  But he just doesn't care

7   what the Debtor has to say here.  He just doesn't.

8       I don't know when he got there or when he left.  I don't

9   know if he spoke to anybody while he was there.  But he just

10  took it upon himself to show up in the Debtor's office,

11  notwithstanding the very explicit eviction notice that he got

12  on December 23rd.

13      Mr. Dondero, as I mentioned, clearly violated the TRO by

14  knowingly and intentionally and purposely interfering with the

15  Debtor's trading as the portfolio manager of the CLOs.  This

16  has just gone on too long.  There have been multiple hearings

17  on this matter, but he doesn't care.  So he gave the order to

18  stop trades that Mr. Seery had effectuated.  That's a clear

19  violation of the TRO, and it certainly supports the imposition

20  of a preliminary injunction.

21      Mr. Seery -- Mr. Dondero is going to testify that multiple

22  letters -- that I'm going to refer to them, Your Honor, as the

23  K&L Gates Parties, and those are the two Advisors and the

24  three investment funds and CLO Holdco that are all owned and/

25  or controlled by Mr. Dondero -- after that hearing on the

1  16th, K&L Gates, the K&L Gates Parties sent not one, not two,

2  but three separate letters. They said they may take steps to

3  terminate the CLO management agreements. After we evicted Mr.

4  Dondero, sent a letter suggesting that we would be held liable

5  for damages because we were interfering with their business.

6  And Mr. Dondero is going to tell you, Your Honor, that he

7  encouraged the sending of those letters, that he approved of

8  those letters, that he thought those letters were the right

9  things to send to the Debtor, even after -- even with the

10  knowledge of what happened on December 16th.

11  He's going to tell you he knew about that hearing and he

12  still, he still approves of those letters, and never bothered

13  to exercise his control to have those letters withdrawn upon

14  the Debtor's request. We asked them to withdraw it, and when

15  they wouldn't do it, Your Honor, that's what prompted the

16  filing of yet another adversary proceeding. And we're going

17  to have another TRO hearing next Wednesday because they won't

18  stop.

19  Next, a preliminary injunction should issue because Mr.

20  Dondero violated the TRO by communicating with the Debtor's

21  employees to coordinate their legal strategy against the

22  Debtor. The evidence will show, in documents and in

23  testimony, that on December 12th, while he was prohibited from

24  speaking to any employee except in the context of shared

25  services, you're going to see the documents and you're going

1    to hear the evidence that on December 12th Scott Ellington was

2    actively involved in identifying a witness to support Mr.

3    Dondero's interests at the December 16th hearing.

4        You will receive evidence that on December 15th Mr.

5    Ellington and Mr. Leventon collaborated with Mr. Dondero's

6    lawyers to prepare a common interest agreement.

7        You will hear evidence that on the next day, December

8    16th, the day of that hearing, that Mr. Dondero solicited Mr.

9    Ellington's help to coordinate all of the lawyers representing

10   Mr. Dondero's interests, telling Mr. Ellington that he needed

11   to show leadership, and Mr. Ellington readily agreed to do

12   just that.

13       You will hear evidence that on December 23rd Mr. Ellington

14   and Grant Scott communicated in connection with calls that

15   were being scheduled with Mr. Dondero and with K&L Gates, the

16   very K&L Gates Clients who filed the frivolous motion that was

17   heard on December 16th and that persisted in sending multiple

18   letters threatening the Debtor thereafter.

19       You will hear evidence that late in December Mr. Dondero

20   sought contact information for Mr. Ellington and Mr.

21   Leventon's lawyer, and he will tell you that he did it for the

22   explicit purpose of advancing their mutual shared interest

23   agreement, while they were employed by the Debtor.  While they

24   were employed by the Debtor.

25       Finally, you will hear evidence, and it will not be

1  disputed, you will see the evidence, it's on the documents,

2  that Mr. Dondero personally intervened to stop the Debtor from

3  producing the financial statements of Get Good and Dugaboy,

4  two entities that he controls, that the U.C.C. had been asking

5  for for some time, that the Debtor had been asking of its

6  employees for some time to produce.  And it was only when we

7  got, frankly, the discovery from Mr. Dondero when there's a

8  text message that says, Not without a subpoena.

9      The documents are on the Debtor's system.  We just don't

10  know where they are because they're hidden someplace.  But Mr.

11  Dondero knows where they are.  He can certainly force -- he

12  can certainly get them produced.  And one of the things we'll

13  be asking for when we seek the contempt motion is the

14  production of those very documents.

15      So, Your Honor, that's what the evidence is going to show.

16  I don't think there's going to be any question that a

17  preliminary injunction ought to issue.  But I do want to spend

18  just a few minutes rebutting some of the assertions made in

19  the filing by Mr. Dondero last night.

20      Of course, they offer no evidence.  There is no

21  declaration.  There is no document.  There is merely argument.

22  It's been that way throughout this case.  For a year, Mr.

23  Dondero has never stood before Your Honor to tell you why

24  something was wrong being done to him, why -- he hasn't

25  offered to be here at all, and he's here today, again, only

1  because he got a subpoena.  That's the only reason we know

2  he's here today.

3      So let's just spend a few minutes talking about the

4  assertions made in the document last night.  Mr. Dondero

5  complains about the scope of the injunction, and I say to

6  myself, in all seriousness, Are you kidding me?  You didn't

7  even read the TRO and you're going to be concerned about what

8  the scope of the injunction is?  You didn't even have enough

9  respect for the Court to read the TRO and we're going to worry

10  about the scope of some future injunction?  Doesn't make any

11  sense to me.

12      But let's talk about the specific arguments that they

13  make.

14      Third parties.  They're concerned that somehow third

15  parties don't have notice of the injunction.  Your Honor,

16  third parties are not impacted by the injunction.  The only

17  third parties that are impacted by the injunction are those

18  that are owned and/or controlled by Mr. Dondero.  If he

19  doesn't tell them, that's his breach of duty.  He created the

20  Byzantine empire of over 2,000 entities, and he wants the

21  Debtor to have the burden of notifying all of them so that

22  they can all come in here and make 2,000 arguments as to why

23  they shouldn't be enjoined?

24      He owns and controls them.  They are the only third

25  parties who are impacted by this proposed preliminary

 1   injunction, and he has the responsibility, he has the duty to

 2   inform them, because he owns and controls them.

 3       We know of the K&L Gates Parties.  We know Get Good and

 4   Dugaboy are in this courtroom.  We know CLO Holdco.  So many

 5   of these parties have been so -- they're on the phone now.

 6   They don't have notice?  It is insulting, frankly, to suggest

 7   that the Debtor somehow has some obligation to figure out who

 8   Mr. Dondero owns and controls.  He should know that.  That's

 9   number one.

10       Number two, there is a statement in there about employees

11   and how he should be able to speak with them about personal

12   and routine matters.  As to that, Your Honor, he has forfeited

13   that opportunity.  He cannot be trusted.  There cannot be any

14   communication because nobody can police it.  And so we think a

15   complete bar to any discussion with any employee, except as it

16   relates to shared services -- because we do have a contractual

17   obligation; that's what was in it -- ought to be barred.

18   That's number one.

19       Number two, there's a reference in the objection to Mr.

20   Dondero's personal assistant.  I'd like to know who that is,

21   Your Honor.  I wasn't aware that he still was using a personal

22   assistant at the Debtor.  I want to know specifically who that

23   is.  I don't know that they -- you know, I just -- we need to

24   cut that off.  And he should not be communicating with any

25   employee.  The Debtor should not be paying for his personal

1  assistant.

2      It's offensive to think that he's still doing that,

3  particularly after he was terminated or his resignation was

4  requested back in October precisely because his interests were

5  adverse to the Debtor.

6      Number three, he's concerned that the Debtor is somehow

7  preventing him from speaking to former employees.  We now

8  know, Your Honor, that that's a, I'm sure, a very specific

9  reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10 a green light to be able to do that.  And you know, I'll leave

11 it to Your Honor as to whether that's appropriate.  I'll leave

12 it to their counsel as to whether, going forward, colluding

13 together against the Debtor at this point in time is in

14 anybody's best interest.  But I will -- what I will demand in

15 the preliminary injunction is a very explicit statement that

16 Mr. Ellington and Mr. Leventon are not to share any

17 confidential or privileged information that they received in

18 their capacity as general counsel and assistant general

19 counsel of the Debtor.

20     The pot plan.  He's afraid somehow the order is going to

21 prevent him from pursuing the pot plan.  He's had over a year

22 to pursue this pot plan, Your Honor.  Frankly, I don't, you

23 know, I don't know what to say.  He has never made a proposal

24 that has gotten any traction with the only people who matter.

25 And it's not the Debtor.  It's the creditors.  It's the

1   Creditors' Committee.

2       If you want to put in an exception that he can call Matt

3   Clemente, I don't mean to put this on Mr. Clemente, he can

4   decide whether or not that's appropriate, but the creditors

5   are the only ones who matter here.  Your Honor, it's not the

6   Debtor.

7       And I'll let Mr. Dondero's counsel explain to Your Honor

8   why he thinks he still needs to pursue a pot plan, and Your

9   Honor can decide.  I trust Your Honor to decide what

10  boundaries and what guardrails might be appropriate for him to

11  continue to pursue his pot plan.

12      That's all I have, Your Honor.  Not much.

13          THE COURT:  All right.

14          MR. MORRIS:  But I think there's going to be --

15  there's going to be an awful lot of evidence.  This is going

16  to be a lengthy examination.  I ask the Court for your

17  patience.

18          THE COURT:  I've got --

19          MR. MORRIS:  But that's all I have.

20          THE COURT:  I've got all day, if we need it.

21          MR. MORRIS:  Okay.

22          THE COURT:  I hope we don't, but I've got all day if

23  we need it.  All right.

24          MR. MORRIS:  That's what I have, Your Honor.

25          THE COURT:  All right.  Mr. Dondero's counsel, your

1 opening statement?

2     MR. BONDS:  Your Honor, I would reserve my opening

3 statement to the end of the hearing.

4   I would also point out that anything that Mr. Morris just

5 said was not evidence, and we think that the evidence will

6 show completely differently than argued or articulated by Mr.

7 Morris.

8     THE COURT:  All right.

9     MR. BONDS:  That's all.

10     THE COURT:  Thank you, Mr. Bonds.

11   Mr. Morris, you may call your witness.

12     MR. MORRIS:  The Debtor calls James Dondero.

13     THE COURT:  All right.  Mr. Dondero, this is Judge

14 Jernigan.  I would ask you to say, "Testing, one, two," so we

15 pick up your video so I can swear you in.

16   All right.  Mr. Dondero, if you're speaking up, we're not

17 hearing you, so please make sure you're unmuted and have your

18 video --

19   (Echoing.)

20     MR. DONDERO:  Hello.  One, two.

21     THE COURT:  Okay.  We got you.

22     MR. DONDERO:  One, two three.

23     THE COURT:  We got you now.

24     JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25     THE COURT:  All right.  Thank you.

1            Mr. Morris, go ahead.

2                  MR. MORRIS:  Thank you, Your Honor.

3            (Echoing.)

4                  THE COURT:  I'm going to ask everyone except Mr.

5    Dondero and Mr. Morris to put your device on mute.  We're

6    getting a little distortion.

7            All right.  Go ahead.

8                          DIRECT EXAMINATION

9    BY MR. MORRIS:

10   Q    Good morning, Mr. Dondero.  Can you hear me?

11   A    Yes.

12           (Echoing.)

13                 THE COURT:  Ooh.  Okay.  We're having a little echo

14   when you speak, Mr. Dondero.  Do you have -- well, first, you

15   have headphones.  That always helps.

16           (Echoing.)

17                 THE COURT:  Okay.  That may help as well.

18           (Pause.)

19                 THE COURT:  Okay.  Let's try again.  If you could

20   say, "Testing, one, two."

21                 THE WITNESS:  Is that better?

22                 THE COURT:  That is better, yes.

23           All right.  Go ahead.

24                 THE WITNESS:  Okay.  Great.

25                 MR. MORRIS:  Thank you.

 1  BY MR. MORRIS:

 2  Q    Can you hear me, Mr. Dondero?

 3  A    You're a bit faint.  Give me one second.  Okay.  Got you.

 4  Q    Okay.  Thank you.  Who is in the room with you right now?

 5  A    Bonds, Lynn, and a tech.

 6          A VOICE:  Bryan Assink.

 7          THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm

 8  sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

 9  BY MR. MORRIS:

10  Q   Okay.  You're testifying today pursuant to a subpoena,

11  correct?

12  A    Yes.

13  Q    Okay.

14          MR. MORRIS:  And Your Honor, that subpoena can be

15  found at Docket No. 44 in the adversary proceeding.

16          THE COURT:  All right.

17  BY MR. MORRIS:

18  Q    In the absence of a subpoena, in the absence of a

19  subpoena, you didn't know if you would show up to testify at

20  this hearing; is that right?

21  A    I -- I do what my counsel directs me to do, and I didn't

22  know at that time whether they would direct me to come or not.

23  Q    Okay.  And when I -- when I deposed you earlier this week,

24  you agreed that you may or may not testify; is that right?

25  A    It depends on what counsel instructs me to do, correct.  I

Dondero - Direct                                    21

1    didn't know at the time.

2    Q    Okay.  And you didn't mention anything about counsel when

3    I asked you the questions earlier this week, correct?

4    A    That was the undertone in almost all my answers, that I

5    relied on counsel.

6              MR. MORRIS:  Your Honor, I move to strike.  I'm

7    asking very specific questions.  And if I need to go to the

8    deposition transcript, I'm happy to do that.

9              THE COURT:  All --

10             MR. MORRIS:  Just going forward, Your Honor, this is

11   cross-examination.  It's really yes or no at this point.

12   That's what I would request, anyway.

13             THE COURT:  All right.  Mr. Dondero, do you

14   understand --

15        (Echoing.)

16             THE COURT:  Do you understand what Mr. Morris was

17   raising there?  We really need you to give specific answers --

18   and usually they're going to be yes or no answers -- to Mr.

19   Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20   go ahead.

21             THE WITNESS:  Yeah.

22   BY MR. MORRIS:

23   Q    Mr. Dondero, you're aware that Judge Jernigan granted the

24   Debtor's request for a TRO against you on December 10th,

25   correct?

1  A    Yes.

2  Q    But you never reviewed the declaration that Mr. Seery

3  filed in support of the Debtor's motion for a TRO, correct?

4  A    I relied on counsel.

5  Q    Sir, you never reviewed the declaration that Mr. Seery

6  filed in support of the Debtor's motion for a TRO, correct?

7  A    Correct.

8  Q    You didn't even know the substance of what Mr. Seery

9  alleged in his declaration at the time that I deposed you on

10 Tuesday, correct?

11 A    Correct.

12 Q    And that's because you didn't even think about the fact

13 that the Debtor was seeking a TRO against you; isn't that

14 right?

15 A    No.

16 Q    That's not right?

17 A    No.

18 Q    All right.

19         MR. MORRIS:  Your Honor, could I ask my assistant,

20 Ms. Canty, to put up on the screen what had been designated as

21 the Debtor's Exhibit Z in connection with the motion for

22 contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23         THE COURT:  All right.

24         MR. MORRIS:  And I would like to -- I'd like to

25 cross-examine Mr. Dondero on his testimony on Tuesday.

 1          THE COURT:  All right.  You may.

 2          MR. MORRIS:  Can we put up Page 15, please?  And go

 3   to Lines 15 through 17.

 4   BY MR. MORRIS:

 5   Q    Sir, you recall being deposed on Tuesday by my -- by me,

 6   correct?

 7   A    Yes.

 8   Q    Okay.  Did you hear this question and did you hear this

 9   answer?

10        "Q    Did you care that the Debtor was seeking a TRO

11        against you?

12        "A    I didn't think about it."

13   Q    Is that -- is that your testimony from the other day?

14   A    Yes.

15   Q    You didn't dial in to the hearing when the Court

16   considered the Debtor's motion for a TRO against you, did you?

17   A    I -- I don't recall.  I don't think so.

18   Q    You never read the transcript in order to understand what

19   took place in this courtroom when Judge Jernigan decided to

20   enter a TRO against you; isn't that right?

21   A    I relied on counsel, which has been my testimony all

22   along.

23          MR. MORRIS:  Can we go to Page 13 of the transcript,

24   please?  Beginning at Line 24.

25   BY MR. MORRIS:

1   Q    (reading)

2        "Q   Did you read a transcript of the hearing?

3        "A   No."

4   Q    Did you testify on Tuesday that you did not read a

5   transcript of the hearing?

6   A    Yes.

7   Q    In fact, as of at least last Tuesday, you hadn't even

8   bothered to read the TRO that this Court entered against you.

9   Isn't that right?

10       MR. BONDS:  Your Honor, I'm going to object.

11       (Echoing.)

12       THE COURT:  Okay.  We're getting that echo from you

13  now, Mr. Bonds.  So maybe you need to turn your volume down a

14  little.  But what is the basis for your objection?

15       (Echoing.)

16       MR. BONDS:  Leading and rhetorical.

17       MR. MORRIS:  I think it's because they're in the same

18  room.

19       THE COURT:  Okay.  Do you have -- I don't know what

20  you're doing.  I guess you're moving to a different room?

21       MR. BONDS:  I am, Your Honor.

22       THE COURT:  Okay.

23       (Echoing.)

24       THE COURT:  Okay.  I'm waiting for the objection

25  basis.

1      MR. BONDS:  The basis of the objection, Your Honor,

2  is that --

3     (Echoing.)

4      THE COURT:  Okay.  We're going to have to do

5  something different here.  We can't have this issue for the

6  entire hearing.  Do you need to get a tech person in there, or

7  maybe call in on your phone?  I don't know.

8      MR. BONDS:  Your Honor, I'm going into the conference

9  room.

10     (Pause.)

11      THE COURT:  Okay.  Are we going to try again here?

12      MR. BONDS:  Yes.  Is this working?

13      THE COURT:  Yes.

14      MR. BONDS:  Perfect.  Your Honor, my objection is

15  that Mr. Dondero has already testified that he relied on his

16  lawyers.  I don't know where Mr. Morris is going with this,

17  but it's pretty clear that Mr. Dondero simply relies on his

18  lawyers to tell him what happened.  I don't know that that's

19  that different than any other layperson.

20      MR. MORRIS:  Your Honor, if this is --

21      THE COURT:  Well, --

22      MR. MORRIS:  If I may?

23      THE COURT:  Yes.

24      MR. MORRIS:  I believe it's terribly relevant to know

25  how seriously Mr. Dondero takes this Court and this Court's

1  proceedings and this Court's orders.  If the Court decides

2  that it doesn't matter whether or not he read the transcript,

3  you're the fact-finder and you'll make that decision.  But I

4  believe it's at least relevant.

5          THE COURT:  Okay.  I agree and I overrule the

6  objection.

7      Go ahead.

8  BY MR. MORRIS:

9  Q   Mr. Dondero, as of at least Tuesday, you never bothered to

10 read the TRO that was entered against you, correct?

11 A   I'm sorry.  We're dealing with some tech stuff here for a

12 second.  Can you repeat the question?

13 Q   Yes.

14     (Echoing.)

15 Q   As of Tuesday, you had not bothered to read the TRO that

16 was entered against you?

17     (Echoing.)

18          MR. MORRIS:  Your Honor, can we take a break?  I

19 can't do this.  I just --

20          THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21 do we need to do to fix these technical problems?  Do I need

22 to get my IT guy in here and help you?  This is terrible.

23 This connection is terrible.  And I understand people have

24 technical problems sometimes, but we've been doing these video

25 hearings since March, so --

1        MR. BONDS:  Your Honor, I have simply gone to another

2   conference room.  The Debtor (garbled) I think that Mr.

3   Dondero should be fine.

4        THE COURT:  Okay.  I don't know what you said except

5   that you think Mr. Dondero should be fine.  I --

6        MR. MORRIS:  Is there anybody in that room with a

7   cell phone on, Mr. Dondero?

8        THE WITNESS:  No.

9        MR. BONDS:  And I'm completely over in --

10       THE COURT:  Okay.

11       MR. MORRIS:  Can I try and proceed?

12       THE COURT:  Try to proceed.

13       MR. MORRIS:  Okay.

14    (Echoing.)

15 BY MR. MORRIS:

16 Q   Mr. Dondero, as of Tuesday you only had a general view of

17 what this Court restrained you from doing; is that correct?

18     (Echoing.)

19       MR. MORRIS:  I'd still -- I -- there's too much

20 noise, Your Honor.  I can't do it.

21       THE COURT:  Okay.  We're going to take a five-minute

22 break.  Mr. Bonds, can you get a technical person there to

23 work through these problems?

24    And Mike, let's get Bruce up here to --

25       THE CLERK:  It's because they're in the same room.

Dondero - Direct                                    28

1    That's the problem.

2              THE COURT:  They're -- they're --

3              THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

4    on his way up there.

5              THE COURT:  Thank you.

6        Mike, explain it to me, because I don't understand.

7    You're saying if they have two devices on in the same room?

8              THE CLERK:  The same -- that's the problem.  They're

9    so close.  And they're trying to use the same device, give it

10   back to you.

11             A VOICE:  He has a phone on in the room.

12             MR. MORRIS:  I asked that question.

13             THE COURT:  Okay.

14             MR. MORRIS:  Please instruct the witness to exclude

15   everybody from the room, to turn off all electronic devices

16   except the device that's being used for this (garbled).  At

17   least have --

18             THE COURT:  All right.  So, the consensus of more

19   technical people than me is you've got two devices on in the

20   same room and that's what's causing the distortion and echo.

21   So I don't know if it's somebody's phone that needs to be

22   turned off or if you have two iPads or laptops.

23        (Court confers with Clerk.)

24        (Pause.)

25             MR. BONDS:  I think I'm unmuted.  Can people hear me?

Dondero - Direct                          29

1          THE WITNESS:  Yes.

2       (Pause.)

3          THE COURT:  Okay.  Bruce, can you walk their office

4   through?  They have, I think, two devices in the same room.

5   It's a horrible echo.  So, Mr. Bonds or some --

6          MR. BONDS:  Yes, Your Honor.

7          THE COURT:  We have a lawyer and the lawyer's client

8   who is testifying right now in the same room.

9          I.T. STAFF:  Uh-huh.

10          THE COURT:  And --

11          I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-

12   in user on a telephone?

13          THE COURT:  I don't know.  I don't --

14          I.T. STAFF:  Yeah.  Whatever's coming -- the audio is

15   feeding back in.  They need to separate if they're both on.

16   Or just use one and the attorney can slide over and the client

17   can --

18          THE COURT:  Okay.

19          I.T. STAFF:  -- go in his place.  Just use one --

20          THE COURT:  Our IT person is confirming what everyone

21   else has been saying, that you really can only have one device

22   in the same room.  It's just unavoidable, the echoing.

23          I.T. STAFF:  Unless everybody has --

24          THE COURT:  Unless everyone has headphones on.

25          I.T. STAFF:  Right.

Dondero - Direct                    30

1          THE COURT:  So we either need everyone to have

2    headphones on, or one device in the room.  And you all,

3    awkward as it is, just have to share.  Or I guess you could

4    have two laptops, but one person has to --

5          I.T. STAFF:  Has to have a headset.

6          THE COURT:  Has to --

7          I.T. STAFF:  Because the other one, the audio is

8    going to be feeing into the microphone of the other one.

9          THE COURT:  Okay.  So, Mr. Bonds, I don't know if

10   you've heard any of that, but --

11         THE CLERK:  He needs to unmute himself.

12         THE COURT:  You're on mute, Mr. Bonds.

13         MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit

14   next to Mr. Dondero and answer any questions that may come up.

15         THE COURT:  Okay.

16         MR. BONDS:  If any objections --

17         THE COURT:  Okay.  So we're going to have one device?

18         MR. BONDS:  Yes.

19         THE COURT:  Okay.  Let's try again.

20      Okay.  Go ahead, Mr. Morris.

21   BY MR. MORRIS:

22   Q    Mr. Dondero, is Mr. Ellington listening to this hearing?

23         THE COURT:  I didn't hear you, Mr. Morris.  What?

24   BY MR. MORRIS:

25   Q    Mr. Dondero, is Mr. Ellington listening to this hearing?

Dondero - Direct                          31

1    A    I have no idea.

2    Q    Is Mr. Leventon listening to this hearing?

3    A    I have no idea.  I haven't spoken with him.

4    Q    Okay.  So let's try again.  At least as of today, you

5    never bothered to read the TRO that was entered against you,

6    correct?

7    A    Correct.

8    Q    As of Tuesday, you only had a general understanding of

9    what the Court restrained you from doing, correct?

10        (Echoing.)

11   A    I had an adequate understanding.

12   Q    You had a what?

13   A    Adequate understanding.

14   Q    Your understanding --

15            A VOICE:  Your Honor?

16   BY MR. MORRIS:

17   Q    -- was that you were prohibited from speaking to the

18   Debtor's board without counsel and from speaking to the

19   Debtor's employees; is that right?

20   A    No.

21   Q    Okay.

22            MR. MORRIS:  Can we go to Page 13, Line 8, please?

23   BY MR. MORRIS:

24   Q    Were you asked this question and did you give this answer?

25        "Q    Tell me your understanding of what the temporary

1    restraining order restrains you from doing.

2    "A    To talk to Independent Board directly or talking

3    directly with employees.

4    "Q    Is there any other aspect of the temporary

5    restraining order that you're aware of that would

6    otherwise constrain or restrain your conduct?

7    "A    Those are the points I (garbled)."

8  Q    Did you give those answers to the questions that I asked?

9  A    Yes.

10  Q    And even with that general understanding, you went ahead

11  and communicated directly (garbled) employees many, many, many

12  times after the TRO was entered?

13  A    Only with regard to shared services, pot plan, and

14  Ellington, the settlement counsel.

15  Q    Does the restraining order permit you to speak with

16  Debtor's employees about the pot plan?

17      (Echoing.)

18          THE COURT:  Mr. Morris, let me stop.

19          MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20          THE COURT:  Even --

21          MR. MORRIS:  It's not working.

22          THE COURT:  Even your sound is not coming through

23  clearly.  And I think it's the echo coming out of their

24  speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25  conclude that, would you turn off your video and ask your

Dondero - Direct                    33

1   question again and see if it's any better, just to confirm

2   it's not a bandwidth issue on your end?  I doubt it is, but --

3   okay.  So, try asking your question again, and I'm going to

4   see if it's still distorted.

5   BY MR. MORRIS:

6   Q    There's nothing in the TRO that permitted you to speak

7   with Debtor employees about the pot plan, correct?

8            THE COURT:  Okay.  Mr. Morris, it's not at your end.

9   It's -- it's their end.  Okay.  So you can turn your video

10  back on.

11      Mr. Bonds?

12           MR. BONDS:  Yes, ma'am.

13           THE COURT:  You all are going to have to use earbuds,

14  apparently.  We're getting -- we're getting a feedback loop,

15  okay?  Whenever Mr. Morris talks or I talk, we're hearing

16  ourselves echo through your speakers.

17           MR. BONDS:  Can you check right now to see if it's

18  true, if we're experiencing the same problem?

19           THE WITNESS:  In other words, is this better?  We

20  unplugged the cord here.

21           THE COURT:  Well, when you all speak, it's -- it's

22  better now.  But when --

23           MR. MORRIS:  It is better.

24           THE COURT:  But when Mr. Morris asks a question, it's

25  echoing through your speakers.  But I don't hear myself

1  echoing through your speakers.

2              I.T. STAFF:  Can Mr. Morris say something, please?

3              THE COURT:  Mr. Morris, say something.

4              MR. MORRIS:  They may have solved the problem.  They

5  may have solved the problem.  How's that?

6              THE COURT:  Okay.  I think the problem is solved,

7  whatever you did, so let's try once again.

8         Go ahead, Mr. Morris.  Repeat your last question.  I

9  didn't hear it.

10 BY MR. MORRIS:

11 Q   Mr. Dondero, the temporary restraining order doesn't

12 permit you to speak with the Debtor's employees about a pot

13 plan; isn't that right?

14 A    There was a presentation on the pot plan given to the

15 Independent Board after the restraining order was put in

16 place.  What are you implying, that that wasn't proper?

17             MR. MORRIS:  Your Honor, I move to strike.  It's a

18 very simple question.

19             THE COURT:  Okay.  Sustained.  If you could just

20 answer the specific question, Mr. Dondero.

21             THE WITNESS:  I don't know.

22 BY MR. MORRIS:

23 Q   Fair enough.  Sir, let's talk about some of the events

24 that led up to the imposition of the TRO.  I appreciate the

25 fact that you hadn't read Mr. Seery's declaration or any of

Dondero - Direct                                35

1    the evidence that was submitted in connection with the TRO, so

2    let's spend some time talking about that now.  CLO stands for

3    Collateralized Loan Obligation, correct?

4    A    Yes.

5    Q    And the Debtor is party to certain contracts that give it

6    the exclusive right and responsibility to manage certain CLOs,

7    correct?

8    A    Yes.

9    Q    NexPoint Advisors, LP is an advisory firm.  Do I have that

10   right?

11   A    Yes.

12   Q    And we can refer to that, that firm, as NexPoint; is that

13   fair?

14   A    Yes.

15   Q    You have a direct or indirect ownership interest in

16   NexPoint, correct?

17   A    Yes.

18   Q    You're the president of NexPoint; isn't that right?

19   A    Yes.

20   Q    And as the president of NexPoint, it's fair to say that

21   you control that entity, correct?

22   A    To a certain extent.

23   Q    Sir, as the president of NexPoint, it's fair to say that

24   you control that entity, correct?

25   A    To a certain extent.

Dondero - Direct                              36

1          MR. MORRIS:  Can we go to Page 18 of the transcript,

2   please?  Lines 19 and 21.

3   BY MR. MORRIS:

4   Q    Were you asked this question and did you give this answer?

5        "Q    As the president of NexPoint, it's fair to say

6        that you control that entity?

7        "A    Generally."

8   Q    Is that the right answer that you gave the other day?

9   A    I think it's similar to what I just said, yeah, yeah.

10  Q    Sir, you're familiar with Highland Capital Management Fund

11  Advisors, LP; is that right?

12  A    Yes.

13  Q    And we'll call that Fund Advisors; is that fair?

14  A    Yes.

15  Q    And we'll refer to Fund Advisors and NexPoint together as

16  the Advisors; is that okay?

17  A    Yes.

18  Q    Fund Advisors is also an advisory firm, correct?

19  A    Yes.

20  Q    You have a direct or indirect ownership interest in Fund

21  Advisors, correct?

22  A    Yes.

23  Q    You're the president of Fund Advisors, correct?

24  A    Yes.

25  Q    And you also have an ownership interest in the general

Dondero - Direct                              37

1  partner of Fund Advisors; isn't that right?

2  A    I believe so.

3  Q    It's fair to say that you control Fund Advisors, correct?

4  A    Generally.

5  Q    NexPoint and Fund Advisors manage certain investments

6  funds; is that right?

7  A    Yes.

8  Q    Among the funds that they manage are High Point Income

9  Fund; is that right?

10 A    I don't think that's a name that we manage.

11 Q    Let's put it this way.  There are three funds that are

12 represented by K&L Gates that are managed by the Advisors,

13 correct?

14 A    I don't know.

15 Q    Okay.  You're the portfolio manager of the investment

16 funds advised by NexPoint and Fund Advisors, correct?

17 A    Largely.

18 Q    And NexPoint and Fund Advisors caused the investment funds

19 that they manage to invest in CLOs that are managed by the

20 Debtors, correct?

21 A    Years ago, they bought the equity interests, if that -- if

22 that's what you're asking me, in various CLOs.

23 Q    The two Advisors that you own and control caused the

24 investment funds to purchase interests in CLOs that are

25 managed by the Debtor, correct?

 1  A    Not recently.  Not recently.  Years ago.  Yes.

 2  Q    And they still hold those interests today, correct?

 3  A    Yes.

 4  Q    And K&L Gates represents all of those entities, correct?

 5  A    Yes.

 6  Q    And we'll call those the K&L Gates Clients; is that fair?

 7  A    Yes.

 8  Q    Before the TRO was entered, the K&L Gates Clients sent two

 9  letters to the Debtor concerning the Debtor's management of

10  certain CLOs, right?

11  A    Yes.

12  Q    Okay.

13          MR. MORRIS:  Your Honor, I just want to take a moment

14  now, because we're going to start to look at some documents.

15  The Debtor would respectfully move into evidence Exhibits A

16  through Y that are on their exhibit list.

17          THE COURT:  All right.

18          MR. BONDS:  Your Honor, we have no objection.

19          THE COURT:  A through Y are admitted.  And for the

20  record, these appear at Docket No. 46 in this adversary.

21      (Plaintiff's Exhibits A through Y are received into

22  evidence.)

23          MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24  in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25  us know.

Dondero - Direct                              39

1          MS. CANTY:  Yeah.  I'm pulling it up right now.

2          MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3   down just a bit?

4   BY MR. MORRIS:

5   Q    All right.  Can you see this letter was sent on October

6   16th?

7   A    Yes.

8   Q    And we see the entities that are reflected on this letter.

9   We've got Highland Capital Management, LP.  That's the

10  question that they're asking.  And the questions and the

11  statements are being asserted on behalf of NexPoint Advisors,

12  LP.  Do you see that?

13  A    Yes.

14  Q    And Highland Capital Management Fund Advisors, LP.  Those

15  are the two Advisors that you own and control, correct?

16  A    Control to a large extent.

17  Q    Okay.

18          MR. MORRIS:  And can we put up Exhibit C, please?

19  BY MR. MORRIS:

20  Q    This is a second letter sent by NexPoint on November 24th.

21  Do you see that?

22  A    Yes.

23  Q    Okay.  And you're familiar with the substance of these

24  letters, correct?

25  A    Yes.

Dondero - Direct                              40

1    Q    And you were familiar -- you were aware of these letters
2    before they were sent.  Is that correct?
3    A    Yes.
4    Q    And you generally discussed the substance of these letters
5    with NexPoint; is that right?
6    A    Generally, yes.
7    Q    And you discussed the substance of the letters with the
8    Advisors' internal counsel; is that right?
9    A    Yes.
10   Q    That's D.C. Sauter?
11   A    Yes.
12   Q    And you have been on some calls with K&L Gates about these
13   letters, right?
14   A    I believe so.
15   Q    And you knew these letters were being sent, correct?
16   A    Yeah, they're -- they're reported.
17   Q    You knew these letters for being sent; isn't that right,
18   sir?
19   A    Yes.
20   Q    And you didn't object to the sending of these letters,
21   correct?
22   A    No.
23   Q    In fact, you supported the sending of these letters.  Is
24   that right?
25   A    Yes.

Dondero - Direct                         41

1    Q    And you have never directed NexPoint to withdraw these

2    letters, correct?

3    A    No.

4    Q    Around Thanksgiving, you learned that Mr. Seery had given

5    a direction to sell certain securities owned by the CLOs

6    managed by the Debtors, correct?

7    A    Yes.

8    Q    And when you learned that, you personally intervened to

9    stop the trades, correct?

10   A    Yes.  I believe they were inappropriate.

11           MR. MORRIS:  I move to strike the latter part of the

12   answer, Your Honor.

13           THE COURT:  It's stricken.

14           MR. MORRIS:  Can we put up Exhibit D, please?

15   BY MR. MORRIS:

16   Q    We looked at this email string the other day.  Do you

17   recall that?

18   A    Yes.

19           MR. MORRIS:  Can we start at the bottom, please?

20   BY MR. MORRIS:

21   Q    There's an email from Hunter Covitz.  Do you see that?

22   A    Yes.

23   Q    Now, this is November 24th.  It's before the TRO.  Is that

24   fair?

25   A    Yes.

1   Q    Mr. Covitz is an employee of the Debtor, right?

2   A    I believe so.

3   Q    And Mr. Covitz helps manage the CLOs on behalf of the

4   Debtor.  Is that your understanding?

5   A    Yes.

6   Q    And Mr. Covitz in this email is giving directions to Matt

7   Pearson and Joe Sowin to sell certain securities held by the

8   CLOs.  Is that correct?

9   A    No.  He's giving Jim Seery's direction.

10          MR. BONDS:  And Your Honor, I'm going to object.

11  This is all before the TRO was ever entered.  It doesn't have

12  anything to do with today's hearing.

13          THE COURT:  Overruled.

14          MR. MORRIS:  May I respond, Your Honor?

15          THE COURT:  I --

16          MR. MORRIS:  Okay.  Thank you.

17          THE COURT:  I think it's relevant.  Go ahead.

18          MR. MORRIS:  Thank you.  Okay.

19  BY MR. MORRIS:

20  Q    Mr. Seery is the CEO of the Debtor; is that right?

21  A    Yes.

22  Q    And the Debtor is the contractual party with the CLOs

23  charged with the exclusive responsibility of managing the

24  CLOs, correct?

25  A    I don't believe so.  The Debtor is in default of the

Dondero - Direct                              43

1   agreements.

2            MR. MORRIS:  I move to strike, Your Honor.

3            THE COURT:  Sustained.

4   BY MR. MORRIS:

5   Q    Sir, the Debtor has the exclusive contractual right and

6   obligation to manage the CLOs, correct?

7   A    I don't agree with that.

8   Q    Okay.

9            MR. MORRIS:  Can we scroll up to the -- just --

10  BY MR. MORRIS:

11  Q    Do you see that Mr. Pearson acknowledges receipt of Mr.

12  Covitz's email?

13  A    Yes.

14  Q    And you received a copy of Mr. Covitz's email, did you --

15  did you not?

16  A    Yes.

17           MR. MORRIS:  Can you scroll up a little bit, please?

18  BY MR. MORRIS:

19  Q    And can you just read for Judge Jernigan your response

20  that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21  November 24th?

22  A    (reading)  No, do not.

23  Q    You instructed the recipients of Mr. Covitz's email not to

24  sell the SKY securities as had been specifically instructed by

25  Mr. Seery, correct?

1   A    Yes.

2   Q    And you understood when you gave that instruction that the

3   people on the email were trying to execute trades that Mr.

4   Seery had authorized, correct?

5   A    No.  I -- no, that isn't how I would describe it.

6            MR. MORRIS:  A second, Your Honor?

7            THE COURT:  Okay.

8        (Pause.)

9   BY MR. MORRIS:

10  Q    Sir, when you gave the instruction reflected in this

11  email, you knew that you were stopping trades that were

12  authorized and directed by Mr. Seery, correct?

13  A    I don't think -- I -- I wasn't -- I wasn't sure at the

14  moment I did that.  I didn't find out until later that it was

15  Seery who directed it.

16           MR. MORRIS:  Can we please go back to the deposition

17  transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20       "Q   At the time that you gave the instruction, "No, do

21       not," you knew that you were stopping trades that had

22       been authorized and directed by Mr. Seery, correct?

23       "A   Yes."

24  Q    Did you give that answer to my question on Tuesday?

25  A    I'd like to clarify it, but yes, I did give that answer.

Dondero - Direct                    45

1  Q    Okay.  You didn't speak with Mr. Seery before sending your

2  instructions interfering with his trade, the trades that he

3  had authorized, correct?

4  A    No, I did not.

5  Q    And you took no steps to seek the Debtor's consent before

6  instructing the recipients of your email to stop executing the

7  SKY transactions that had been authorized by Mr. Seery,

8  correct?

9  A    I'm sorry.  Can you repeat the question?

10 Q    You took no steps to seek the Debtor's consent before

11 stepping in to stop the trades that Mr. Seery had authorized,

12 correct?

13 A    I took other actions instead.

14 Q    Okay.  But you didn't seek the Debtor's consent?  That's

15 not one of the actions you took, right?

16 A    No, I educated the traders as to why it was inappropriate.

17         MR. MORRIS:  I move to strike, Your Honor.

18         THE COURT:  Sustained.

19 BY MR. MORRIS:

20 Q    Sir, did you seek the Debtor's consent before stepping in

21 to stop the trades that Mr. Seery had authorized?

22 A    No, I did not seek consent.

23 Q    In response to your instruction, Mr. Pearson canceled all

24 of the trades that Mr. Seery had authorized, correct?

25 A    Yes.

1      MR. MORRIS:  Can we go back to the exhibit, please?

2  And if we could just scroll -- stop right there.

3  BY MR. MORRIS:

4  Q    That's -- that's Mr. Pearson's response to your email,

5  confirming that he had canceled both the SKY and the AVAYA

6  trades that had not yet been executed, correct?

7  A    Yes.

8      MR. MORRIS:  Can we scroll to the response to that?

9  BY MR. MORRIS:

10 Q    Is this your response?

11 A    Yes.

12 Q    Can you read that aloud, please?

13 A    (reading)  HFAM and DAF have instructed Highland in

14 writing not to sell any CLO underlying assets.  There is

15 potential liability.  Don't do it again, please.

16 Q    The writings that you're referring to are the two letters

17 from NexPoint, Exhibits B and C that we just looked at,

18 correct?

19 A    Yeah.  There might have been a third letter.  I don't

20 know.  But, yes, generally, those letters.

21 Q    Okay.  And at this juncture, the reference to potential

22 liability was a statement intended for Mr. Pearson.  Is that

23 correct?

24 A    Um, I -- no.  Pearson wouldn't have had any personal

25 liability.  It was -- it was meant for the -- there was

 1   potential liability to the Debtor or to the compliance

 2   officers at the Debtor.

 3          MR. MORRIS:  Can we go to Page 45 of the deposition

 4   transcript, please?  Line -- beginning at Line 11, through 18.

 5   BY MR. MORRIS:

 6   Q    Did I ask these questions and did you give these answers?

 7        "Q   Do  you  see  the  reference  there  in  the  latter

 8        portion  of  your  email,  'There  is  potential  liability.

 9        Don't do it again'?

10        "A   Yes.

11        "Q   Who  was  the  intended  recipient  of  that  message?

12        "A   At this juncture, it's Matt Pearson, I believe."

13   Q    Did you give those answers to my questions on Tuesday?

14   A    Yeah.  That's not inconsistent.

15          MR. MORRIS:  Let's go back to the email, please.

16   BY MR. MORRIS:

17   Q    Mr. Sowin responded to your email; is that right?

18          MR. MORRIS:  Can we scroll up?

19   BY MR. MORRIS:

20   Q    Okay.  Who's Mr. Sowin?

21   A    He's the head trader.

22   Q    Who's he employed by?

23   A    I believe he's employed by HFAM but not the Debtor.

24   Q    Okay.  So he's -- he's somebody who's employed by one of

25   the Advisors; is that right?

Dondero - Direct                              48

1    A    I believe so.

2    Q    And Mr. Sowin responded to your email and he indicated

3    that he would follow your instructions.  Is that right?

4    A    Yeah.  He understands that it's inappropriate.  That's

5    what he's reflecting.  Yes.

6              MR. MORRIS:  I move to strike, Your Honor.

7              THE COURT:  Sustained.

8    BY MR. MORRIS:

9    Q    Sir, Mr. Sowin responded and indicated that he would

10   follow your instructions, correct?

11   A    (no audible response)

12   Q    Did you answer?  I'm sorry.

13   A    No, I didn't answer.  It's -- I don't know if you could

14   expressly say that from that email.  Maybe we should read the

15   email.

16             MR. MORRIS:  Let's just move on, Your Honor.

17             THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q    A few days later, you learned -- you learned that Mr.

20   Seery was trying a workaround to effectuate the trades anyway,

21   correct?

22   A    I believe so.

23   Q    Uh-huh.  And when you learned that, you wrote to Thomas

24   Surgent; is that right?

25   A    I -- I believe so.

1  Q    I don't -- I don't mean to -- this is not a test here.

2          MR. MORRIS:  Can we just scroll up to the next email,

3  please?  Okay.  Stop right there.

4  BY MR. MORRIS:

5  Q    When you -- when you learned that Mr. Seery was trying a

6  workaround, you wrote to Mr. Surgent when you learned that,

7  right?

8  A    Yes.

9  Q    And Mr. Surgent is an employee of the Debtor; is that

10  correct?

11  A    I believe he's still the chief compliance officer of the

12  Debtor.

13  Q    Okay.  Now, as a factual matter, you never asked Mr. Seery

14  why he wanted to make these trades; isn't that right?

15  A    I -- I did not.

16  Q    Okay.  And before the TRO was entered, there was nothing

17  that prevented you from picking up the phone and asking Mr.

18  Seery why he wanted to make these trades, correct?

19  A    That's not true.

20          MR. MORRIS:  One second, please, Your Honor.

21          THE COURT:  Okay.

22      (Pause.)

23          MR. MORRIS:  Can we go to Page 60 of the transcript?

24  Mr. Bonds says -- beginning at Line 14.  There is an objection

25  there, Your Honor, and I would ask that the Court rule on the

Dondero - Direct                    50

1   objection before I read from the transcript.

2                THE COURT:  Okay.

3                MR. MORRIS:  There you go.

4                THE COURT:  (sotto voce)  (reading)  Is there

5   anything that you're aware of that prevented you from picking

6   up the phone and asking Mr. Seery for his business

7   justification for these trades prior to December 10.

8   Objection, form.

9       I overrule the objection to the form of that question.

10               MR. MORRIS:  Okay.

11  BY MR. MORRIS:

12  Q   Mr. Dondero, were you asked this question and did you give

13  this answer?

14      "Q   Is  there  anything  that  you're  aware  of  that

15      prevented  you  from  picking  up  the  phone  and  asking  Mr.

16      Seery  for  his  business  justification  for  these  trades

17      prior  to  December 10, 2010?

18      "A   No.  I expressed my disapproval via email."

19  Q   Is that right?

20  A   I'd like to adjust that answer to the answer I just gave.

21  Q   Okay.

22               MR. MORRIS:  And I move to strike.

23  BY MR. MORRIS:

24  Q   I'm just asking you if that's the answer you gave on

25  Tuesday.

Dondero - Direct                                    51

1          THE COURT:  Sustained.

2          THE WITNESS:  Yes.

3    BY MR. MORRIS:

4    Q    Thank you.  Now, you wrote to Mr. Surgent because you

5    wanted to remind him of his personal liability for regulatory

6    breaches and for doing things that aren't in the best interest

7    of investors, correct?

8    A    Yes.

9    Q    And you actually thought about this and you -- because you

10   didn't believe that Mr. Surgent had extra insurance and

11   indemnities like Mr. Seery, right?

12   A    No.

13   Q    Didn't you testify to that the other day?

14   A    I don't remember, but that isn't the only reason.

15   Q    I didn't ask you if it was the only reason.  Listen

16   carefully to my question.  Did you send this email because you

17   -- because you wanted to remind him of his personal liability

18   for regulatory breaches and for doing things that aren't in

19   the -- I apologize.  Withdrawn.

20        You did not believe at the time that you sent this email

21   that he, Mr. Surgent, had insurance and indemnities like Mr.

22   Seery, correct?

23   A    Yes.

24   Q    Okay.

25          MR. MORRIS:  Can we go back to the email, please?

1   BY MR. MORRIS:

2   Q    Can you just read the entirety of your email to Mr.

3   Surgent out loud?

4   A    (reading)  I understand Seery is working on a workaround

5   to trade these securities anyway, trades that contradict

6   investor desires and have no business purpose or investment

7   rationale.  You might want to remind him and yourself that the

8   chief compliance officer has personal liability.

9   Q    Okay.  That's -- that's the message you wanted to convey

10  to Mr. Surgent, right?

11  A    Yes.

12  Q    And, again, you never bothered to ask Mr. Seery what his

13  businessperson -- purpose or investment rationale was,

14  correct?

15  A    I -- I didn't believe I could talk to him directly.

16  Q    This is before the --

17  A    That's why I never picked up the phone.

18  Q    Okay.  You intended to convey the message to Mr. Surgent

19  that, by following Mr. Seery's orders to execute the trades,

20  that Mr. Surgent faced personal liability, correct?

21  A    Yes, he does.

22  Q    And that's the message you wanted to send to him, right?

23  A    It's a true and accurate message, yes.

24  Q    Okay.  Just a few days earlier, you also threatened Mr.

25  Seery, right?

1    A    I wouldn't use the word "threatened."

2    Q    Okay.  Let's let -- let's let it speak for itself.

3              MR. MORRIS:  Can we go to Exhibit E, please?  Keep

4    scrolling down just a bit.

5    BY MR. MORRIS:

6    Q    This is an email that you sent to Mr. Seery on November

7    24th.  And as always, Mr. Dondero -- this is the third time

8    we're meeting -- if there's something in the document that you

9    need to see, please just let me know, because I don't -- I

10   don't mean to test your memory if the document can help

11   refresh your recollection.

12             MR. MORRIS:  Can we just scroll up a little bit

13   further to the top to see the date?

14   BY MR. MORRIS:

15   Q    Okay.  So, Jim, there, JD, who is that?

16   A    That's me.

17   Q    Okay.  And can you tell by the substance of the email, of

18   the text messages, this is communications between you and Mr.

19   Seery, right?

20   A    Yes.

21   Q    Okay.  And you see that it's dated November 24th there?

22   A    Yes.  Right after we were discussing the pipeline.  Or

23   right when we were working on the pipeline.

24   Q    Okay.

25             MR. MORRIS:  Can you scroll down a little bit,

1  please?

2  BY MR. MORRIS:

3  Q   At 5:26 p.m., you sent Mr. Seery a text, correct?

4  A   Yes.

5  Q   Can you read that, please?

6  A   (reading)  Be careful what you do.  Last warning.

7  Q   Okay.  This was a warning telling Mr. Seery to stop

8  selling assets out of the CLOs or the beneficial owners would

9  take more significant action against him, correct?

10  A   It was a general statement that what he was doing was

11  regulatorily inappropriate and ethically inappropriate and he

12  was in breach of the contracts he was operating.

13  Q   Neither you nor any entity owned or controlled by you are

14  parties to the contracts you just referred to; isn't that

15  correct?

16  A   I believe they're indirectly parties to those contracts,

17  especially when they're in default.

18  Q   Neither you nor any entity owned or controlled by you is a

19  signatory to any CLO management contract pursuant to which the

20  Debtor is a party, correct?

21  A   I -- I don't know and I don't want to make legal

22  conclusions on that.

23  Q   Okay.  At the deposition the other day, some of the things

24  that you suggested the beneficial owners of the CLO interests

25  might do against Mr. Seery and the Debtor are class action

Dondero - Direct                                55

1  lawsuits.  Is that right?

2  A    I -- I did not suggest the entities I control would do

3  that.  If anybody on this call were to call a class action

4  lawsuit -- a class action law firm and tell them what's been

5  going on with the CLOs, I think a class action law firm would

6  file it on their own regard, not on the behalf of my entities.

7            MR. MORRIS:  I move to strike, Your Honor.

8            THE COURT:  Sustained.

9  BY MR. MORRIS:

10  Q    Let's talk about that cell phone.  Okay?  Until at least

11  December 10th, the day the TRO was entered, you had a cell

12  phone that was bought and paid by the Debtor, right?

13  A    Yes.

14  Q    But sometime after December 10th, your phone was disposed

15  of or thrown in the garbage; is that right?

16  A    Yes.

17  Q    And you don't know when after December 10th the cell phone

18  that was the Debtor's property was disposed of, right?

19  A    I don't believe at that point it was the Debtor's

20  property.  I think I paid it off in full and the Debtor had

21  announced that they were canceling everybody's cell phones so

22  it was appropriate for me to get another one.

23            MR. MORRIS:  I move to strike, Your Honor.

24            THE COURT:  Sustained.

25            MR. BONDS:  Your Honor, at some point, I mean, Mr.

Dondero - Direct                    56

1  Morris just ought to go on and testify.

2          MR. MORRIS:  No, this is Mr. Dondero's testimony,

3  Your Honor.  He gave it the other day.  I'm just asking him to

4  confirm it, basically.

5          THE COURT:  Okay.  I overrule the objection, if any

6  there was, on the part of Mr. Bonds.

7  BY MR. MORRIS:

8  Q    Sometime after December 10th, the cell phone that prior to

9  that time had been owned and paid for by the Debtor was thrown

10 in the garbage or otherwise disposed of, correct?

11 A    Yes.

12 Q    And you don't know when after December 10th that was --

13 the phone was disposed of, correct?

14 A    It was on or about that date, I'm sure.

15 Q    Well, we know it was after December 10th, right?

16 A    Okay.  Or about that date.

17 Q    You testified the other day that you just don't know who

18 made the decision to throw your phone away, right?

19 A    I could find out, but I don't know.  I would have to talk

20 to employees.

21 Q    Did you make any request of the Debtor since your

22 deposition to try to find out the answer as to who made the

23 decision to throw your phone away?

24 A    No.

25 Q    How did you learn that your phone was thrown away?

Dondero - Direct                          57

1  A    As I testified, it's standard operating procedures every

2  time a senior executive gets a new phone.

3  Q    Hmm.  You don't know exactly who threw the phone away; is

4  that right?

5  A    No, but I can find out.

6  Q    Okay.  I'm just asking -- I'm not asking you to find out.

7  I'm just asking you if you know.  Do you know who threw your

8  phone away?

9  A    No.

10 Q    Do you know who made the decision to throw your phone

11 away?

12 A    It -- there wasn't a decision.  It was standard operating

13 procedure.

14           MR. MORRIS:  I move to strike.

15           THE COURT:  Sustained.

16 BY MR. MORRIS:

17 Q    You and Mr. Ellington disposed of your phones at the same

18 time, correct?

19 A    I don't have specific awareness regarding what Mr.

20 Ellington did with his phone.

21 Q    It never occurred to you to get the Debtor's consent

22 before throwing the phone that they had purchased away, right?

23 A    I'm not permitted to talk to the Debtor.

24 Q    Sir, it never occurred to you to get the Debtor's consent

25 before throwing the phone away, correct?

1    A    I'm going to stick with the answer I just gave.

2              MR. MORRIS:  Can we go to Page 75 of the transcript?

3    Lines 12 through 15.  There is an objection there, Your Honor.

4    I would respectfully request that the Court rule on the

5    objection before I read the testimony.

6              THE COURT:  Okay.  Starting at Line 12?

7              MR. MORRIS:  12.

8              THE COURT:  (sotto voce)  (reading)  Did it ever

9    occur to you to get the Debtor's consent before doing this?

10   Objection, form.

11        That objection is overruled.

12   BY MR. MORRIS:

13   Q    All right.  Mr. Dondero, did you give this answer to my

14   question on Tuesday?

15        "Q   Did it ever occur to you to get the Debtor's

16        consent before doing this?

17        "A   No."

18   A    Yes, I gave that testimony.

19   Q    Okay.  And you also had the phone number changed from the

20   Debtor's account to your own personal account; is that right?

21   A    The phone number changed?  The phone number stayed the

22   same.

23   Q    But you had the number changed from the Debtor's account

24   to your own personal account, correct?

25   A    The Debtor said they wouldn't pay for it anymore.  Who

Dondero - Direct                         59

1   else could I change it to?

2            MR. MORRIS:  Your Honor, I move to strike.  It's a

3   very simple question.

4            THE COURT:  Sustained.

5   BY MR. MORRIS:

6   Q   I'll ask it one more time, Mr. Dondero.  You had the phone

7   number changed from the Debtor's account to your personal

8   account, correct?

9   A   I didn't change the number.  I had the billing changed to

10  my personal account versus the company account.

11  Q   And you never asked the Debtor for permission to do that,

12  correct?

13  A   No.

14  Q   And you never told Debtor you were doing that, correct?

15  A   No.

16  Q   And nobody ever told Mr. Seery or anybody at my firm that

17  the phone was being thrown in the garbage, correct?

18  A   Well, --

19            MR. BONDS:  To the extent he knows.

20            THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21  BY MR. MORRIS:

22  Q   You didn't believe it was necessary to give the Debtor

23  notice that you were taking the phone number for your own

24  personal account and throwing the phone in the garbage,

25  correct?

1    A    Correct.

2    Q    The phone --

3              MR. BONDS:  Your Honor, I'm going to object.  He --

4    Mr. Dondero did not testify he personally threw the phone in

5    the garbage.

6              MR. MORRIS:  Withdrawn.

7              THE COURT:  Okay.

8    BY MR. MORRIS:

9    Q    Mr. Dondero, the phone was in Highland's offices on

10   December 10th, the date the TRO was in effect, correct?

11   A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12   know.  It's -- I remember going over to -- well, anyway, I --

13   I don't know.  We'll leave it at that.

14             MR. MORRIS:  Can we go to Exhibit G, please?

15   BY MR. MORRIS:

16   Q    Who's Jason Rothstein, while we wait?

17   A    Jason, Jason is our -- is the Highland head of technology.

18   Q    Okay.  And did you text with him from time to time?  On or

19   about December 10th?

20   A    Yes.

21   Q    Okay.

22             MR. MORRIS:  Can we just scroll up a little bit?

23   BY MR. MORRIS:

24   Q    Is that Mr. Rothstein there?

25   A    Yes.  Yeah.

1  Q   Okay.  And do you see that there's a text message that you

2  sent to him on December 10th, right at the top?  Can you read

3  -- can you read the text message Mr. Rothstein --

4  A   He sent that to me.  At the top.

5  Q   I apologize.  Thank you for the correction.  Can you read

6  what Mr. Rothstein told you on December 10th?

7  A   That my old phone is in the top drawer of Tara's desk.

8  Q   And who's Tara?

9  A   My assistant.

10  Q   Is she still your assistant today?

11  A   Yes.

12  Q   And has she been serving as your assistant since the TRO

13  was entered into on December 10th?

14  A   Yes.

15  Q   Okay.  Is it fair to say that you were informed on

16  December 10th that the phone was not thrown in the garbage,

17  had not been disposed of, but was instead sitting in Tara's

18  desk?

19  A   As of that moment, yes.

20  Q   Okay.  And it's also fair to say that, as of December

21  10th, Mr. Rothstein didn't take it upon himself to throw your

22  old phone in the garbage, right?

23  A   Not as of that moment.  But like I said, I can find out

24  how it was disposed of.

25  Q   If you were curious to do that, would you have done that

1  before today?

2  A    I haven't been curious.

3  Q    Thank you very much.  Someone you can't identify made the

4  decision after December 10th to throw the phone in the garbage

5  without asking the Debtor for permission or seeking the

6  Debtor's consent, correct?

7           MR. BONDS:  I'm going to object, Your Honor.  To the

8  extent that the witness knows, he can answer.

9           THE COURT:  I -- I didn't hear --

10           THE WITNESS:  I don't know.

11           THE COURT:  I didn't hear what your objection was,

12  Mr. Bonds.  Repeat.

13           MR. BONDS:  Your Honor, my objection was along the

14  lines of to the extent that the witness knows, he could

15  testify, but if he doesn't know, he doesn't need to speculate.

16           THE COURT:  All right.  Well, I don't hear an

17  objection there, but go ahead, Mr. Dondero, if you have

18  knowledge and can answer the question.

19           THE WITNESS:  I don't know.

20  BY MR. MORRIS:

21  Q    Do you recall that the Debtor subsequently gave notice to

22  you to vacate its offices and to return its cell phone?

23  A    I don't know.

24  Q    Did you ever --

25  A    I know I -- I know I was told to vacate the offices.  I

Dondero - Direct                               63

1    didn't see the specific --

2    Q    Uh-huh.  Your lawyer -- your lawyers never told that

3    Debtor that the cell phone had been disposed of or thrown in

4    the garbage, consistent with company practice, right?

5    A    I don't know.

6             MR. MORRIS:  Can we put up Exhibit K, please?

7    BY MR. MORRIS:

8    Q    This is the letter that my firm sent to your lawyer on

9    December 23rd.  Do you see that?

10   A    Yeah, I see it.

11   Q    Okay.

12            MR. MORRIS:  Can we scroll down a little bit?  Keep

13   going.  Okay.  Stop right there.

14   BY MR. MORRIS:

15   Q    Do you see that it says that, as a result of the conduct

16   described above, that the Debtor "has concluded that Mr.

17   Dondero's presence at the HCMLP office suite and his access to

18   all telephonic and information services provided by HCMLP are

19   too disruptive"?

20   A    Yeah, I see it.

21   Q    And this is the letter that gave you notice that you had

22   to vacate the premises by December 30th, correct?

23   A    I believe so.

24            MR. MORRIS:  Can we scroll down a little bit?

25   BY MR. MORRIS:

Dondero - Direct                    64

1   Q    You see at the bottom there's a reference to a defined

2   term of "cell phones"?

3   A    Yes.

4   Q    And it says that the Debtor "will also terminate Mr.

5   Dondero's cell phone plan and those cell phone plans

6   associated with parties providing personal services to Mr.

7   Dondero."  Do you see that?

8   A    Yes.  Yeah.

9   Q    Have I read that accurately?

10  A    Yes.

11  Q    And then my colleagues went on to write, "HCMLP demands

12  that Mr. Dondero immediately turn over the cell phones to

13  HCMLP by delivering them to you, Mr. Lynn."  Do you see that?

14  A    Yes.

15  Q    Have I read that accurately?

16  A    Yes.

17  Q    The last sentence on the page begins, "The cell phones

18  and."

19          MR. MORRIS:  And let's scroll down further.

20  BY MR. MORRIS:

21  Q    "The cell phones and the accounts are property of HCMLP.

22  HCMLP further demands that Mr. Dondero refrain from deleting

23  or wiping any information or messages on the cell phone.

24  HCMLP, as the owner of the account and cell phones, intends to

25  recover all information related to the cell phones and

1　accounts, and reserves the right to use the business-related

2　information."  Have I read that accurately?

3　A    Yes.

4　Q    Okay.  We were a couple of weeks too late, huh?

5　A    It sounds like it.

6　Q    Yeah.  Because the phones were already in the garbage,

7　right?

8　A    Yes.

9　Q    Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10　your behalf, right?

11　A    I don't know.

12　Q    Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13　said.

14　　　　　MR. MORRIS:  Can we go to Exhibit U, please?

15　BY MR. MORRIS:

16　Q    It took Mr. Lynn six days to write a one-paragraph letter

17　in response, right?  December 29th, he responded?

18　　　　　MR. MORRIS:  Can we scroll down a bit?

19　BY MR. MORRIS:

20　Q    Let me read beginning with the second sentence of the

21　first substantive paragraph.  "We are at present not sure of

22　the location of the cell phone issued to Mr. Dondero by the

23　Debtor, but we are not prepared to turn it over without

24　ensuring the privacy of the attorney-client communications."

25　And then he goes on.

1      Have I read that correctly?

2  A   Yes.

3  Q   Okay.  So Mr. Lynn didn't say anything about the phone

4  being thrown in the garbage, right?

5  A   No.

6  Q   He didn't say that it was disposed of, did he?

7  A   No.

8  Q   He didn't refer to any company practice or policy, right?

9  A   No.

10 Q   Mr. Lynn's not a liar, is he?

11 A   No, he's not.

12 Q   He's a decent and honest professional.  Wouldn't you agree

13 with that?

14 A   Yes.

15 Q   And is it fair to say that he conveyed only the

16 information that he had at the time?

17 A   I don't know.

18 Q   Do you have any reason to believe that Mr. Lynn would

19 withhold from the Debtor the information that the cell phone

20 had been thrown in the garbage, consistent with company

21 practice?

22 A   No, I don't believe he would withhold whatever he knew.

23 Q   All right.  Let's talk about -- let's talk about other

24 matters.  You do know, sir, do you not, that the Debtor is

25 subject to the Bankruptcy Court's jurisdiction?

Dondero - Direct                    67

1    A    Yes.

2    Q    Okay.  And we just saw in the December 23rd letter that

3    the Debtor demanded that you vacate their offices a week

4    later, right?

5    A    Yes.

6    Q    And you knew that at or around the time the letter was

7    sent on December 23rd, correct?

8    A    I -- I don't remember when I knew.

9    Q    Well, in fact, in fact, you or through counsel asked for

10   an accommodation and asked for an extension of time to

11   December 31st; isn't that right?

12   A    I had to pack up 30 years of stuff in three days.  I -- I

13   know we asked for some forbearance.  I don't think we got any.

14   I don't remember the details.  I don't understand why it's

15   important.

16   Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17   gave you seven days' notice, right?  They sent the letter on

18   December 23rd and asked you to vacate on December 30th,

19   correct?

20   A    I don't -- I don't remember.  But, again, I think the

21   initial response was it was inconsistent with shared services

22   agreement.  No Highland employees are coming into the office

23   anyway.  So kicking me out of my office was -- seemed

24   vindictive and overreaching.  And we tried to get some, you

25   know, forbearance.

Dondero - Direct                                    68

1    Q    Okay.

2              MR. MORRIS:  I move to strike, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. MORRIS:

5    Q    Mr. Dondero, you were given seven days' notice before --

6    before you were going to be barred from the Debtor's office,

7    correct?

8    A    I don't know.

9    Q    Okay.

10             MR. MORRIS:  Can we go back to Exhibit K, please?

11   Oh, actually, it's okay.

12   BY MR. MORRIS:

13   Q    We just read, actually, the piece from the Debtor's letter

14   of December 23rd barring you from the Debtor's office.  Do you

15   remember that?  And we can go back and look at it if you want.

16   A    Yes.

17   Q    Was there anything ambiguous that you recall about the

18   Debtor's demand that you not enter their offices after

19   December 30th?

20   A    Ambiguous?  I can tell you what my understanding was or I

21   can tell you what the letter says.  What would you like to

22   know?

23   Q    I'd just like to know if, as you sit here right now, you

24   believe there was anything ambiguous about the Debtor's demand

25   that you vacate the offices as of December 30th?

Dondero - Direct                              69

1  A    I mean, I did vacate the offices as of December 30th.

2  Q    Correct.  And you knew that -- and you were complying with

3  the Debtor's demand you do that, right?

4  A    Well, with the Court's demand, I guess.

5  Q    Okay.  And it's your understanding that you would not be

6  permitted in the Debtor's offices after that time, correct?

7  A    Um, (pause), uh, I don't know how to answer that question.

8  I knew I wouldn't be residing in the offices anymore.  But for

9  legitimate business purposes, to visit the people at NexPoint

10 who were in the office, since there are no Highland people in

11 the office, or to handle a deposition, you know, there was

12 nothing I thought inappropriate about that.

13 Q    Did the Debtor tell you that they would allow you to enter

14 the offices any time you just believed that it would be

15 appropriate to do that?

16 A    I used my business judgment.

17       MR. MORRIS:  I move to strike.

18 BY MR. MORRIS:

19 Q    I'm asking you a very --

20       THE COURT:  Sustained.

21 BY MR. MORRIS:

22 Q    -- specific question, sir.  Did the Debtor ever tell you

23 that they -- that you would be permitted to enter their

24 offices after December 30th if you, in your own personal

25 discretion, believed it to be appropriate?

1   A    No.

2   Q    Did the Debtor provide you any exception to their demand

3   that you vacate the offices, without access, by and after

4   December 30th?

5   A    I always do what I think is appropriate and in the best

6   interests.  I don't know.  I didn't know the specifics of the

7   Debtor's -- okay, yeah, what the specifics of the Debtor was.

8   Q    Despite the unambiguous nature of the Debtor's demands

9   letter, on Tuesday you just walked right into the Debtor's

10  office and sat for the deposition, correct?

11  A    I believe that was reasonable, yes.

12  Q    Okay.  But you didn't -- you didn't have the Debtor's

13  approval to do that, correct?

14  A    We didn't have technology to do it anywhere else, so if

15  the deposition was going to occur, it had to occur there.

16  Q    Sir, --

17          MR. MORRIS:  Move to strike.

18          THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    And I ask you to just listen very carefully.  And if it's

21  not clear to you, please let me know.  You did not have the

22  Debtor's approval to enter their offices on Tuesday to give

23  your deposition, correct?

24  A    No.

25  Q    And you did not even bother to ask the Debtor for

1  permission, correct?

2  A    I'm prohibited from contacting them, so no, I did not.

3  Q    Okay.  Let's talk about other events that occurred after

4  the entry of the TRO.  We talked earlier about how you

5  interfered with Mr. Seery's trading activities on behalf of

6  the CLOs around Thanksgiving.  Do you remember that?

7  A    Yes.

8  Q    But after the TRO was entered, the K&L Gates Clients also

9  interfered with the Debtor's trading activities, correct?

10  A    No.

11          MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12  start at the first page?  And scroll down just a bit.

13  BY MR. MORRIS:

14  Q    Do you see there's an explanation there about the Debtor's

15  management of CLOs?

16  A    Yes.

17  Q    And there's a recitation of the history that we talked

18  about earlier, where around Thanksgiving you intervened to

19  block those trades?

20  A    Yes.

21  Q    And then the next paragraph refers to the prior motion

22  that was brought by the CLO entities?  I mean, the K&L Gates

23  entities, right?

24  A    Yes.

25  Q    And you were aware of that motion at the time it was made,

Dondero - Direct                              72

1  right?

2  A    Yes.

3  Q    And you were supportive of the making of that motion,

4  right?

5  A    Supportive?  Yes.

6          MR. MORRIS:  And scroll down to the next paragraph,

7  please.

8  BY MR. MORRIS:

9  Q    Okay.  So, my colleague wrote that, "On December 22nd,

10  2020, employees of NPA and HCMFA notified the Debtor that they

11  would not settle the CLO sale of the AVAYA and SKY

12  securities."  Have I read that right?

13  A    Yes.

14  Q    And that took place six days after the motion that the

15  Court characterized as frivolous was denied on December 16th?

16  A    Yes.  I wasn't aware of that, for what that's worth.

17  Q    Okay.  You personally instructed the employees --

18  withdrawn.  NPA -- that refers to NexPoint, correct?

19  A    Yes.

20  Q    That's an entity you own and control, right?

21  A    I -- largely.

22  Q    And that's one of the Advisors we defined earlier, right?

23  A    Yes.

24  Q    And HCMFA, that's Fund Advisors, another advisory firm

25  that you own and control, correct?

1  A    Yes.

2  Q    And you personally instructed, on or about December 22nd,

3  2020, employees of those Advisors to stop doing the trades

4  that Mr. Seery had authorized with respect SKY and AVAYA,

5  right?

6  A    Yeah.  Maybe we're splitting hairs here, but I instructed

7  them not to trade them.  I never gave instructions not to

8  settle trades that occurred.  But that's a different ball of

9  wax.

10  Q    Okay.  But you did instruct them not to execute trades

11  that had not been made yet, right?

12  A    Yeah.  Trades that I thought were inappropriate, for no

13  business purpose, I -- I told them not to execute.

14  Q    Okay.  You actually learned that Mr. Seery wanted to

15  effectuate these trades the Friday before, right?

16  A    I don't know, but what did I do?  When did I know it?

17  What did I do?  When I knew things are inappropriate, I

18  reacted immediately.  I don't -- I don't -- whenever --

19  whenever I found out about inappropriate things, I reacted to

20  the best of my ability.

21  Q    Okay.

22          MR. MORRIS:  I move to strike, Your Honor.

23          THE COURT:  Sustained.

24      Mr. Dondero, I'm going to -- I'm going to interject some

25  instructions once again here.  Remember we talked about early

Dondero - Direct                                 74

1  on, and I know you've testified before, but I'll repeat it:

2  You need to just give direct yes or no answers.

3       And let me just say that we see witnesses all the time do

4  what you're doing here, and that is they feel they need to say

5  more than yes or no.  They feel the need to clarify or

6  supplement the yes or no answer they give.  And just to remind

7  you how this works, your lawyer, Mr. Bonds, is going to be

8  given the opportunity when Mr. Morris is through to ask you

9  all the questions he wants, and that will be your chance to

10  clarify yes and no answers to the extent he asks you to

11  revisit certain of these questions and answers.  Okay?

12       So I'm going to remind you once again:  yes or no or

13  direct -- you know, other appropriate direct answers.  Mr.

14  Bonds can let you clarify later.  All right?

15       Mr. Morris, continue.

16            MR. MORRIS:  Okay.  Thank you, Your Honor.

17       Can we please put up on the screen Exhibit L?  And at the,

18  I guess, the bottom of Page 1.

19  BY MR. MORRIS:

20  Q    This is an email string.  And --

21            MR. MORRIS:  Go to the email below that, please.

22  Yeah.  Okay.  Right there.

23  BY MR. MORRIS:

24  Q    This is an email from Mr. Seery dated December 18th at

25  (garbled) :30 p.m.  Do you see that?

Dondero - Direct                    75

1    A    Yes.

2    Q    And in the substantive portion of his email, continuing on

3    to the next page, he's giving instructions to sell certain SKY

4    and AVAYA securities that are held by CLOs, correct?

5    A    Yes.

6    Q    And Mr. Sowin forwarded this email to you, right?

7    A    Yes.

8              MR. MORRIS:  If we can scroll up.

9    BY MR. MORRIS:

10   Q    And you forwarded it to Mr. Ellington, right?  I'm sorry.

11   Let's just give Ms. Canty a chance.

12             MR. MORRIS:  Keep scrolling up.

13   BY MR. MORRIS:

14   Q    So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15   that?

16   A    Yes.

17   Q    And if we scroll up, you turn around and give it to Mr.

18   Ellington a few minutes later, right?

19   A    Yes.

20   Q    So that you and Mr. Ellington and Mr. Sowin are all aware

21   that Mr. Seery wants to sell AVAYA and SKY securities on

22   behalf of the CLOs, right?

23   A    Yes.

24   Q    Why did you decide to forward this email to Mr. Ellington?

25   A    Ellington's role has been of settlement counsel that

Dondero - Direct                    76

1  supposedly everybody is able to talk to to try and bridge some

2  kind of settlement.  Ellington, I thought, should be aware of

3  things that would make settlement more difficult or create

4  liabilities for the Debtor.  And so I thought it was

5  appropriate for him to know.

6  Q   Okay.  This is the email that caused you to put a stop to

7  the trades that Mr. Seery wanted to effectuate, correct?

8  A   This is the -- I'm sorry.  Ask the question again.  This

9  is the email that what?

10  Q   This is -- this is how you learned that Mr. Seery wanted

11  to effectuate rates in AVAYA and SKY securities, right?

12  A   I -- I learned about it pretty early on of him trading it.

13  I don't know if it was this email or -- or one of the others.

14  But yes, it was from -- it was from Joe Sowin.

15  Q   And you would agree with me, would you not, that you

16  personally instructed the employees of the Advisors not to

17  execute the very trades that Mr. Seery identifies in this

18  email, correct?

19  A   Yes.

20  Q   At no time after December 10th, when the TRO was entered

21  into, did you instruct the employees of the Funds that you own

22  and control not to interfere or impede the Debtor's management

23  of the CLOs, correct?

24       MR. BONDS:  Can you repeat the question?  I'm sorry.

25  BY MR. MORRIS:

Dondero - Direct                           77

1   Q    At no time after December 10th, when the TRO was entered,

2   did Mr. Dondero instruct any employee of either of the

3   Advisors that he owns and controls not to interfere or impede

4   with the Debtor's business and management of the CLOs,

5   correct?

6   A    I did not.

7   Q    Okay.  Neither you nor anybody that you know of ever

8   provided a copy of the TRO to the employees of the Advisors

9   that you own and control, correct?

10  A    I don't know.

11  Q    Okay.  After the TRO was entered, the K -- after the TRO

12  was entered, and after the hearing on December 16th, the K&L

13  Gates Clients sent three more letters to the Debtor, right?

14  A    Yes.

15  Q    Okay.

16         MR. MORRIS:  Your Honor, those are Exhibits M as in

17  Mary, N as in Nancy, and X as in x-ray.

18         THE COURT:  Okay.

19         MR. MORRIS:  Unless the witness thinks there is a

20  need to look at them specifically -- oh, let me just ask a

21  couple of questions.

22  BY MR. MORRIS:

23  Q    Mr. Dondero, in those letters, it's your understanding

24  that the K&L Gates Clients again requested that the Debtor not

25  trade any securities on behalf of the CLOs, right?

1    A    Yes.

2    Q    And it's your understanding that in those letters the K&L

3    Gates Clients suggested that they might seek to terminate the

4    CLO management agreements to which the Debtor was a party,

5    correct?

6    A    I don't know specifically, but that wouldn't surprise me.

7    Q    Okay.

8    A    So, --

9    Q    Is it your understanding that the K&L Gates Clients also

10   sent the letter a Debtor -- the Debtor a letter in which they

11   asserted that your eviction from the offices might cause them

12   damages and harm?

13   A    I know there was objections to me -- I assume so.  I don't

14   know specifically.

15   Q    And you were aware of these letters at the time that they

16   were being sent, right?

17   A    I'm sorry, what?

18   Q    You were aware of these letters at the time they were

19   being sent by the K&L Gates Clients, right?

20   A    Generally, yes.

21   Q    And you were generally supportive of the sending of those

22   letters, right?

23   A    I'm always supportive of doing what we believe is the

24   right thing, yes.

25   Q    And in this case, you were supportive of the sending of

Dondero - Direct                          79

1    these three letters, correct?

2    A    I -- yes.

3    Q    In fact, you pushed and encouraged the chief compliance

4    officer and the general counsel to send these letters, right?

5    A    I push them to do the right thing.  I didn't push them

6    specifically.

7    Q    Okay.  At the time the letters were sent, you were aware

8    that the K&L Gates Clients had filed that motion that was

9    heard on the 16th of December, correct?

10   A    Yes.

11   Q    And you were aware that they advanced the very same --

12   withdrawn.  You're aware that in the letters they advance some

13   of the very same arguments that Judge Jernigan had dismissed

14   as frivolous just six days earlier, right?

15   A    I wasn't at the hearing.  I don't know if it was the same

16   arguments or similar arguments.  I -- I can't -- I can't

17   corroborate the similarity or contrast the differences between

18   the two.

19   Q    All right.  So it's fair to say, then, that you were

20   supportive of the sending of these letters, you were aware of

21   the December 16 argument, but you didn't take the time to see

22   whether or not any of the arguments being advanced in the

23   letters were consistent or any different from the arguments

24   that were made at the December 16th hearing, correct?

25   A    Correct.  I wasn't directly involved, but still believed

1    that fundamentally Seery's behavior was wrong.

2    Q    You never instructed the K&L Gates Clients to withdraw the

3    three letters that were sent after December 10th, correct?

4    A    No.

5    Q    And you're aware that the Debtor had demanded that those

6    letters be withdrawn or it would seek a temporary restraining

7    order against the K&L Gates Clients, correct?

8    A    I'm not aware of the back and forth.

9    Q    Okay.  Let's talk about your communications with Mr.

10   Ellington and Mr. Leventon.  You communicated with them on

11   numerous occasions after December 16th, correct?

12   A    No.

13   Q    No, you didn't communicate with them many times after

14   December 10th?

15   A    You're lumping in Ellington and Isaac, and numerous times

16   is a bad clarifier, so the answer is no.

17   Q    I appreciate that.  You communicated many times with Mr.

18   Ellington after December 10th, right?

19   A    Not -- not outside shared services, pot plan, and him

20   being the go-between between me and Seery.  I would say

21   virtually none.

22   Q    Okay.  On Saturday, December 12th, two days after the

23   temporary restraining order was entered against you, Mr.

24   Ellington was involved in discussions with your personal

25   counsel about who would serve as a witness at the upcoming

Dondero - Direct                        81

1    December 16th hearing, correct?

2    A    I don't -- I don't remember.

3    Q    Let's see if we can refresh your recollection.

4                MR. MORRIS:  Can we please put up Exhibit P?  Can we

5    scroll down?  Okay.

6    BY MR. MORRIS:

7    Q    Do you see where Mr. Lynn writes you an email on Saturday,

8    December 12th, and he says, among other things, it looks like

9    trial?

10   A    Yes.

11   Q    And then if we scroll up a little bit, he wrote further,

12   "That said, we must have a witness now."  Have I read that

13   accurately?

14   A    Yes.

15   Q    Okay.

16                MR. MORRIS:  Can we scroll back up?

17   BY MR. MORRIS:

18   Q    And this is Mr. Ellington's response, right?

19   A    Yes.

20   Q    Can you read Mr. Ellington's response for Judge Jernigan?

21   A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22   needs to contact you first thing in the morning.

23   Q    Is it your testimony that this email relates to --

24   withdrawn.  Mr. Ellington is not your personal lawyer, right?

25   A    No.  Mr. Ellington has been functioning as settlement

Dondero - Direct                            82

 1  counsel, trying to bridge settlement, --

 2  Q    Okay.

 3  A    -- which is what this email looks like to me.

 4  Q    Okay.  I'll let -- I'll let the judge --

 5          MR. MORRIS:  I move to strike, Your Honor.

 6          THE COURT:  Sustained.

 7  BY MR. MORRIS:

 8  Q    So, after the TRO was entered, you and Mr. Ellington not

 9  only communicated but Mr. Ellington was actively involved in

10  identifying witnesses to testify on behalf of your interests

11  at the December 16th hearing, correct?

12  A    I -- I don't know what the witness was for, but I believe

13  Ellington was doing his job as settlement counsel, trying to

14  facilitate settlement.  I don't -- I have no reason to think

15  this was anything more nefarious.

16  Q    Okay.  You looked to Mr. Ellington for leadership in

17  coordinating with all of the lawyers who were working for you

18  and your personal interests, right?

19  A    I'm not agreeing with that.

20  Q    No?  All right.

21          MR. MORRIS:  Let's look at the next exhibit.  I think

22  it's Exhibit Q.  And if we could stop right there.

23  BY MR. MORRIS:

24  Q    There's an email from Douglas Draper, do you see that, on

25  December 16th?

1    A    Yes.

2    Q    So this is after the TRO was entered into, right?

3    A    I believe so.

4    Q    And Mr. Draper represents Get Good and Dugaboy; is that

5    right?

6    A    I believe so.

7    Q    And he was new to the case at that moment in time, right?

8    A    On or about, I believe so.

9    Q    And he was looking to -- he was looking for a joint

10   meeting among all of the lawyers representing your personal

11   interests, right?

12   A    No.  I think he was trying to coordinate -- coordinate or

13   understand whatever.  But not everybody -- he doesn't just

14   talk to lawyers around my interests.  I mean, and he hasn't

15   sought agreements with just lawyers reflecting my interests.

16   Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17   A    Yes.

18   Q    But you can't remember why you did that, right, or at

19   least -- withdrawn.  You couldn't remember as of Tuesday's

20   deposition why you forwarded this email to Mr. Ellington,

21   right?

22   A    Not specifically.  But, again, Ellington is settlement

23   counsel.

24        MR. MORRIS:  I move to strike, Your Honor, after the

25   initial phrase "Not specifically."

Dondero - Direct                        84

1          THE COURT:  Sustained.

2          MR. MORRIS:  Can we scroll up a little bit, please?

3    BY MR. MORRIS:

4    Q   Mr. Lynn responded initially with a reference to the

5    assumption that a particular lawyer was with K&L Gates, right?

6    A   Yes.

7          MR. MORRIS:  And if we could scroll up a little bit.

8    BY MR. MORRIS:

9    Q   That's where you forward this email to Mr. Ellington,

10   right?

11   A   Yes.

12   Q   And can you read to Judge Jernigan what you wrote at 1:33

13   p.m.?

14   A   (reading)  I'm going to need you to provide leadership

15   here.

16   Q   But at least as of Tuesday's deposition, you couldn't

17   remember why you needed Mr. Ellington to provide leadership,

18   right?

19   A   Correct.  Nor if he did.

20         MR. MORRIS:  I move to strike the latter portion of

21   the answer, Your Honor.

22         THE COURT:  Sustained.

23   BY MR. MORRIS:

24   Q   So you have no --

25         (Echoing.)

Dondero - Direct                          85

1              MR. MORRIS:  We're getting --

2              THE WITNESS:  Can I -- can I hold -- can I hold on

3    for one second here?  Can I just put you guys on mute, please?

4              MR. MORRIS:  Sure.

5         (Pause.)

6              THE COURT:  All right.

7              THE CLERK:  John, there's some feedback again.  I'm

8    sorry.

9              MR. MORRIS:  That's okay.

10             THE COURT:  Mr. Bonds, --

11             MR. MORRIS:  We lost Mr. --

12             THE COURT:  Mr. Bonds, what's going on?

13             MR. MORRIS:  We've lost -- the screen --

14             THE COURT:  You know you can't counsel your client in

15   the middle of court testimony.  I thought maybe Mr. Dondero

16   had some non-legal thing going on in the background.  Mr.

17   Bonds?

18             MR. BONDS:  Your Honor, I -- I did not in any way

19   counsel Mr. Dondero.

20             THE COURT:  Okay.  Well, I'll take your

21   representation on that.  Are we ready to go forward?

22             MR. MORRIS:  I'll readily accept Mr. Bonds'

23   representation as well, Your Honor.

24             THE COURT:  Okay.

25             MR. MORRIS:  But I'd ask that it not happen again.

1        THE COURT:  Well, fair enough.  I think Mr. Bonds

2   understands.

3   BY MR. MORRIS:

4   Q   Mr. Dondero, you have no recollection of why you forwarded

5   this email to Mr. Ellington and why you told him you needed

6   him to provide leadership, correct?

7   A   Correct.

8        MR. MORRIS:  And if we can scroll up, can we just see

9   how Mr. Ellington responded?

10  BY MR. MORRIS:

11  Q   All right.  And can you just read for Judge Jernigan what

12  Mr. Ellington said on December 16th in response to your

13  statement that you're going to need him to provide leadership

14  here?

15  A   (reading)  On it.

16  Q   Thank you.  In your deposition, you testified without

17  qualification that Scott Ellington and Isaac Leventon did not

18  participate in the drafting of a joint interest or mutual

19  defense agreement.  Do you recall that testimony?

20  A   Yes, as far as I knew.

21  Q   And you also testified that you never discussed with

22  either of them the topic of a joint defense or mutual defense

23  agreement; is that right?

24  A   Correct.  That was Draper.

25  Q   Okay.

Dondero - Direct                    87

1          MR. MORRIS:  Can we put up Exhibit 11, please?  I

2    apologize.  It's Exhibit W.  Okay.  Can we stop right there?

3    BY MR. MORRIS:

4    Q    This is an email between some of your counsel and Mr.

5    Ellington.  Do you see that?

6    A    Yes.

7    Q    And a common interest agreement is attached to the

8    communication.  Is that a fair reading of the portion of the

9    exhibit that's on the screen?

10   A    Yes.

11         MR. MORRIS:  And can we scroll to the top of the

12   exhibit, please?

13   BY MR. MORRIS:

14   Q    And do you see that there is an email exchange between Mr.

15   Ellington and Mr. Leventon concerning the common interest

16   agreement?

17   A    Yes.

18   Q    Okay.  So it's your testimony that this email may exist

19   but you had no idea that Mr. Ellington and Mr. Leventon were

20   working with your lawyers to draft a common interest

21   agreement?  Is that your testimony?

22   A    I wasn't part of this.  It looks to me like they were just

23   included in a -- a final draft.  And, again, Ellington is

24   settlement counsel.  I -- but I don't want to speculate why or

25   what they were doing.

Dondero - Direct                          88

1   Q    Do you remember that I asked you a few questions the other

2   day about Multi-Strat financial statements and whether or not

3   you'd ever given -- you'd ever received any of those documents

4   from Mr. Ellington and Mr. Leventon?

5   A    Yes.

6   Q    Okay.  And you testified under oath that you never got any

7   financial information, including balance sheets, concerning

8   Multi-Strat from either of those lawyers, correct?

9   A    I -- hmm.  I -- I don't remember.  Yeah, I don't remember.

10  I may have to clarify that, but I don't remember.

11  Q    You testified under oath the other day that you wouldn't

12  even think to ask them for financial information relating to

13  Multi-Strat because it's not natural for them to have it,

14  right?

15  A    I -- I'm sorry.

16          THE WITNESS:  Your Honor, do I just have to answer

17  these questions yes or no, or is that the -- can I clarify at

18  all, or can I --

19          THE COURT:  Well, I mean, if the question simply

20  directs a yes or no answer, that's correct, you just answer

21  yes or no.  And I think this one did.

22      Again, your lawyer is going to have the chance to do

23  follow-up examination later.

24  BY MR. MORRIS:

25  Q    So let me try again.  During your deposition, you

Dondero - Direct                         89

1  testified under oath without qualification that you never got

2  any financial information, including balance sheets,

3  concerning Multi-Strat from Scott Ellington or Isaac Leventon,

4  correct?

5  A    I believe I might have misspoken there.

6  Q    Okay.  But that was your testimony the other day, right?

7  A    Yes.

8  Q    And today, you believe you might have gotten that

9  information from them, right?

10 A    Only because Ellington was supposed to be the go-between

11 and I couldn't go directly to somebody.  But he wouldn't

12 normally have that information, which is what I was saying.

13         MR. MORRIS:  Your Honor, I have an exhibit that's not

14 on the Debtor's exhibit list, and I was going to use it for

15 impeachment purposes to establish the fact that Mr. Ellington

16 and Mr. Leventon in fact gave to Mr. Dondero, after December

17 10th, financial information concerning Multi-Strat, which Mr.

18 Dondero had previously denied receiving.  May I -- may I use

19 that document to impeach Mr. Dondero?

20         THE COURT:  You may.

21         MR. BONDS:  Your Honor, I'm going to object.  This is

22 pretty clearly something that should have been disclosed and

23 it wasn't.

24         THE COURT:  Well, he says it's purely to impeach the

25 testimony that Mr. Dondero just now gave.  So we'll -- we'll

Dondero - Direct                              90

1   see the document and, you know, I'll either agree with that

2   being impeachment or not.  So, he may proceed.

3           MR. BONDS:  Your Honor, I think that the testimony

4   -- Your Honor, I'm sorry.  I think that the testimony that was

5   (inaudible) given was that he thought that he may have talked

6   to Scott or Isaac, not that he did not.

7           MR. MORRIS:  Your Honor, if I may, the testimony the

8   other day was unequivocal and unambiguous that not only didn't

9   he get this information from the two lawyers, but that he had

10  no reason to believe he would ever get the information from

11  those two lawyers.

12    I appreciate the fact that Mr. Dondero today is suggesting

13  that he may have, but I -- I would still like to use this

14  document to refresh his recollection and to impeach even the

15  possibility that he's giving this qualified testimony that he

16  may have.

17          THE COURT:  All right.

18          MR. MORRIS:  There's no doubt that he did.

19          THE COURT:  I overrule the objection.  You can go

20  forward.

21          MR. MORRIS:  Can we please put up on the screen -- I

22  believe it's Debtor's Exhibit AA.  And if we can scroll down,

23  please.  And just stop, yeah, towards the top.  All right.

24  Stop right there.

25  BY MR. MORRIS:

Dondero - Direct                      91

1  Q    Do you see in the first email Mr. Klos -- he's an employee
2  of the Debtor, right?
3  A    Yes.
4  Q    And he provides Multi-Strat balance sheet and financial
5  information to Mr. Leventon, Mr. Ellington, and Mr.
6  Waterhouse.  Do you see that?
7  A    Yes.  He's the person I would normally go to.
8  Q    Okay.  And they're all Debtor employees, right?
9  A    Yes.
10 Q    Okay.  And then Mr. Leventon sends it to you and Mr.
11 Ellington on February 4th, 2020; is that correct?
12 A    Yes.
13 Q    And this is confidential information; is that fair?
14 A    No.
15 Q    Okay.  Let's -- let's talk about the next --
16 A    No, it's not -- wait, wait, hold on a second.  Judge, I
17 need to clarify this.  I -- it's not confidential information.
18 It's available to every investor, of which I was one of them.
19 Okay?  So, let's -- let's not mischaracterize this as some
20 corporate secret.
21 Q    Okay.  You interfered with the Debtor's production of
22 documents; isn't that right?
23 A    No.
24 Q    Several times in the last year, various entities have
25 requested that Dugaboy produce its financial statements,

1  correct?

2  A    Dugaboy is my personal trust.  It's not an entity of the

3  Debtor in any form or fashion.

4  Q    Sir, you're aware that several times in the last year

5  various entities requested that the Debtor produce Dugaboy

6  financial information, correct?

7  A    The Debtor is not in a position to do it.  I -- I don't

8  know if it's been several times or whatever, but it's not

9  appropriate.

10           MR. MORRIS:  I move to strike, Your Honor.

11           THE COURT:  Sustained.

12  BY MR. MORRIS:

13  Q    I'll try one more time.  If we need to go to the

14  transcript, we can.  It's a very simple question.  You knew

15  and you know that several times in the last year various

16  entities have requested that the Debtor produce Dugaboy

17  financial statements, correct?

18  A    Yes.

19  Q    Do you recall at the deposition the other day I asked you

20  whether you had ever discussed with Mr. Ellington and Mr.

21  Leventon whether or not the Dugaboy financial statements

22  needed to be produced, and you were directed not to answer the

23  question by counsel and you followed those directions?

24  A    Yes.

25  Q    But you communicated with at least one employee concerning

1   the production of the Dugaboy financial statements, correct?

2   A    Yes.

3   Q    And that's Melissa Schroth; is that right?

4   A    Yes.

5   Q    She's an executive accountant employed by the Debtor,

6   right?

7   A    Yes.

8   Q    And on December 16th, after the TRO was entered into, you

9   instructed Ms. Schroth not to produce the Dugaboy financials

10  without a subpoena, correct?

11  A    That was the advice I had gotten from counsel, yes.

12  Q    Okay.  The Dugaboy and Get Good financial statements are

13  on the Debtor's platform, correct?

14  A    I do not know.

15  Q    There is no shared services agreement between Dugaboy or

16  Get Good and the Debtor, correct?

17  A    I don't know.

18  Q    You're not aware of any; is that fair?

19  A    Yes.

20  Q    Okay.

21       MR. MORRIS:  Can we put on the screen Exhibit R?  And

22  can you scroll down a bit?

23  BY MR. MORRIS:

24  Q    Okay.  That's Melissa Schroth at the top there; is that

25  right?

1    A    Yes.

2    Q    And these are texts that you exchanged with her after the

3    TRO was entered into, correct?

4    A    Yes.

5             MR. MORRIS:  Can we scroll down a little bit?

6    BY MR. MORRIS:

7    Q    And do you see on December 16th you sent Ms. Schroth an

8    email -- I apologize -- a text that says, "No Dugaboy details

9    without subpoena"?

10   A    Yeah.

11   Q    But you can't remember why you sent this text, correct?

12   At least you couldn't as of Tuesday?

13   A    I believe it was on advice of counsel.

14   Q    But that's not what you said on Tuesday, correct?

15   A    I don't remember.

16   Q    You sent this text even though you knew that various

17   entities had requested the Dugaboy financials, but you have no

18   recollection of ever talking to anyone at any time about the

19   production of those documents, right?

20   A    Can you repeat the question?

21   Q    I'll move on.  Let me just -- last topic, and then I'm

22   going to respectfully request that we just take a short break.

23   You're familiar with the law firm of Baker & McKenzie; is that

24   right?

25       (Echoing.)

Dondero - Direct                                    95

1  A    I'm sorry.  You broke up on us there.

2  Q    No problem.  You're familiar with the law firm Baker &

3  McKenzie, correct?

4  A    Yes.

5  Q    That firm has never -- never represented you or any entity

6  in which you have an ownership interest, correct?

7  A    Correct.

8  Q    But in December, the Employee Group, of which Mr. Leventon

9  and Mr. Ellington was a part, was considering changing counsel

10 from Winston & Strawn to Baker & McKenzie, right?

11 A    I believe so.

12 Q    And you asked -- and because of that, you specifically

13 asked Mr. Leventon for the contact information for the lawyers

14 at Baker & McKenzie, right?

15 A    I believe so.

16 Q    Okay.

17      MR. MORRIS:  Can we put up Exhibit S, please?

18 BY MR. MORRIS:

19 Q    And who is that email sent from?  I apologize.  Withdrawn.

20 Who is that text message exchange with?

21 A    Isaac Leventon.

22 Q    Okay.  And Mr. Leventon was an employee of the Debtor

23 after December 10th, correct?

24 A    Yes.

25      MR. MORRIS:  Can we scroll down a little bit?

1  BY MR. MORRIS:

2  Q    And on December 22nd, you asked Mr. Leventon for the

3  contact information at Baker & McKenzie, correct?

4  A    Yes.

5  Q    And the reason you asked Mr. Leventon for the contact

6  information, that was in connection with the shared defense or

7  mutual defense agreement, right?

8  A    I -- I don't remember why.  It might have just been for my

9  records.  I don't know.

10 Q    The only reason that you could think of for asking for

11 this information was for the shared defense or mutual defense

12 agreement, correct?

13 A    I -- no, it -- I don't know and I don't want to speculate.

14 I don't want to -- I don't want to speculate.  I -- did -- I

15 don't think I ever got -- I don't know what your point is.

16          MR. MORRIS:  May we please go back to the transcript

17 at Page 136?  At the bottom, Line 23.

18 BY MR. MORRIS:

19 Q    Were you asked this question and did you give this answer?

20     "Q   Do  you  recall  asking  Isaac  Leventon  for  the

21     contact  information  for  the  --  for  the  lawyers  at

22     Bakers & McKenzie?

23     "A   I -- I don't -- I don't -- it might have been for

24     part  of  the  shared  defense,  mutual  defense  whatever

25     agreement, but that's -- that's the only reason I would

1    have asked for it."

2    Q    Did you give that answer to my question?

3    A    Yeah.  I shouldn't have speculated.

4    Q    Okay.  But that's the answer you gave the other day; is

5    that right?

6    A    I shouldn't have speculated.  That's my answer today.

7    Q    And today -- withdrawn.  In fact, you wanted the Baker

8    contact information in order to help Mr. Draper coordinate the

9    mutual defense agreement, correct?

10   A    I don't want to speculate.

11          MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12   to 5.

13   BY MR. MORRIS:

14   Q    Did you -- did you hear this question and did you give

15   this answer on Tuesday?

16        "Q    Why did you want the Baker & McKenzie contact

17        information?

18        "A    I was trying to help Draper coordinate the mutual

19        shared defense agreement, period."

20   Q    Did you give that answer to my question on Tuesday?

21   A    Yes.

22          MR. MORRIS:  Your Honor, I'd respectfully request a

23   short break to see if I've got anything more.

24          THE COURT:  All right.  Well, I was going to ask you

25   how much more do you think you have.  We've been going almost

1    two hours.

2        So we'll take a break.  Let's make it a ten-minute break.

3    And then, depending on how much more you have and how much Mr.

4    Bonds is going to have, we'll figure out are we going to need

5    a lunch break in just a bit.

6        All right.  So it's 12:00 noon Central.  We'll come back

7    at 12:10.  Ten minutes.

8            MR. MORRIS:  Your Honor, may I have an instruction of

9    the witness not to check his phone for any purposes, not to

10   make -- not to communicate with anybody until -- until his

11   testimony is completed?

12           THE COURT:  All right.  Any -- any --

13           MR. BONDS:  Your Honor, he's going to speak with me.

14           THE COURT:  Pardon?

15           MR. BONDS:  I assumed he will speak to me about just

16   general events.  I mean, I don't want to be in breach of some

17   order.

18           MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19   for -- you know, it's not -- he's on the stand.  He's still on

20   the stand.

21           THE COURT:  Yeah.  He --

22           MR. MORRIS:  He shouldn't be conferring with counsel,

23   either.  No disrespect to Mr. Bonds at all.

24           THE COURT:  Exactly.  I mean, you all can talk about,

25   you know, the national champion football game or whatever, but

Dondero - Direct                    99

1  it would be counseling your client in the middle of testimony

2  if you -- if you talk about this case at the moment.  So, you

3  know, --

4          MR. BONDS:  I understand, Your Honor.

5          THE COURT:  All right.

6          MR. BONDS:  I just didn't want to be --

7          THE COURT:  All right.  So now we'll come back at

8  12:11.

9          THE CLERK:  All rise.

10          MR. MORRIS:  Thank you, Your Honor.

11     (A recess ensued from 12:01 p.m. until 12:12 p.m.

12          THE CLERK:  All rise.

13          THE COURT:  Please be seated.  This is Judge

14  Jernigan.  We're going back on the record in Highland Capital

15  versus Dondero.  We have taken an 11-minute break.  It looks

16  like we have Mr. Dondero and counsel back.  And Mr. Morris,

17  are you out there, ready to proceed?

18          MR. MORRIS:  I am, Your Honor.  And I do have just a

19  few more questions.

20          THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21  there in the room with Mr. Dondero.  Now, did you want to --

22          MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23  the restroom.

24          THE COURT:  Okay.  All right.  Everyone ready to

25  proceed?

Dondero - Direct                              100

1          MR. MORRIS:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Morris, go ahead.

3          MR. MORRIS:  Thank you, Your Honor.

4                    DIRECT EXAMINATION, RESUMED

5     BY MR. MORRIS:

6     Q    Can you hear me, Mr. Dondero?

7     A    Yes.

8     Q    Did you ever discuss the request of any party to produce

9     the financial statements of Get Good and Dugaboy with Scott

10    Ellington?

11    A    Not that I recall.

12    Q    Did you ever communicate with Mr. Leventon on the subject

13    matter of whether or not the financial statements for Get Good

14    and Dugaboy needed to be produced by the Debtor?

15    A    No.

16    Q    Those are the two questions that you were directed not to

17    answer the other day, right?

18    A    I don't remember.

19    Q    Okay.  You mentioned that Mr. Ellington serves in some

20    capacity as settlement counsel.  Do I have that right?

21    A    Yes.

22    Q    Do you know if there's any exception in the TRO that

23    permits you to communicate directly with Mr. Ellington in his

24    so-called capacity as settlement counsel?

25    A    There was no change in his status in the TRO.  It's -- and

1    I think he was still used by both the Debtor and by me in that

2    function.

3    Q    You said that -- you testified earlier that you understood

4    that you were prohibited from speaking with the Debtor's

5    employees, correct?

6    A    Except for -- except for with regard to the pot plan,

7    shared services, and Ellington as settlement counsel.  But I

8    continued to talk to employees about the pot plan as recently

9    as the end of the year, and I continued to talk to employees

10   about shared services based on the shared services proposal

11   that was sent to Ellington and forwarded to me as recently as

12   two days ago.

13   Q    You never -- you never read the TRO, right?

14   A    No.

15         MR. MORRIS:  Can we have it put up on the screen?  I

16   don't know the exhibit number, Ms. Canty, but hopefully it's

17   clear on the exhibit list.

18         MS. CANTY:  I'm sorry, John.  Can you repeat what

19   you're looking for?

20         MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21   to Paragraph 2, please?  Okay.

22   BY MR. MORRIS:

23   Q    I appreciate the fact that you've never seen this before,

24   Mr. Dondero, but let me know if I'm reading Section 2(c)

25   correctly.  "James Dondero is temporarily enjoined and

1  refrained from" -- subparagraph (c) -- "communicating with any

2  of the Debtor's employees, except for specifically -- except

3  as it specifically relates to shared services currently

4  provided to affiliates owned or controlled by Mr. Dondero."

5       Have I read that correctly?

6  A    Yes.

7  Q    Does that provide for any exceptions concerning the pot

8  plan?

9  A    The Independent Board requested a meeting on the pot plan.

10 Q    Okay.  But does it -- I appreciate that, and we'll talk

11 about that in a moment, but my question is very specifically

12 looking at the order.  And I, again, appreciate that you've

13 never seen it before.  But looking at the order now, is there

14 any exception for you to communicate with the Debtor's

15 employees concerning the pot plan?

16 A    I would think the pot plan would fall under that, since

17 some of the pot plan value is coming from affiliated entities

18 that are subject to the shared services agreement.  I would

19 think that would be reasonable, again, plus the -- well, it

20 was the subject of a meeting with the Independent Board at the

21 end of the month.

22 Q    Okay.

23 A    I still think it's the best alternative for this estate.

24 Q    Okay.  Did you -- did you ever -- did you ever ask

25 anybody, on your behalf, have asked the Debtors whether they

1   agreed with what you believed was a reasonable interpretation

2   of the restraining order?

3   A    I did not.

4   Q    Okay.  And let's just deal with the notion of settlement

5   counsel.  Do you see anywhere in this TRO -- and if you want

6   to read anything more, please let me know -- do you see

7   anything in this TRO that would permit you to speak with Mr.

8   Ellington in his so-called role as settlement counsel?

9   A    Well, I would say, more importantly, I don't see anything

10  that takes away his role as settlement counsel, which was

11  formally done six months ago.

12  Q    Okay.  I did read Section 2(c) correctly, right?

13  A    Yes.

14  Q    And the only exception that's in Judge Jernigan's

15  restraining order that she entered against you relates to

16  shared services.  Have I read that correctly?

17  A    Yes.

18  Q    Okay.  Let's talk about the pot plan for a moment.  After

19  the TRO was entered, you were interested in continuing to

20  pursue the pot plan; is that right?

21  A    I still believe it's the best possible result for this

22  estate.

23  Q    And you sought a forum with the Debtor's board, correct?

24  A    Yes.

25  Q    And you knew that you couldn't speak directly with any

Dondero - Direct                    104

1   member of the Debtor's board unless your counsel and the

2   Debtor's counsel was -- was present at the same time.

3   Correct?

4   A    Yeah.  As a matter of fact, I didn't go.  I just had

5   counsel go.

6   Q    And the Debtor's board gave Mr. Lynn a forum for him to

7   present your pot plan after the TRO was entered.  Isn't that

8   right?

9   A    I believe so.

10  Q    And are you aware that the Debtor's board spent more than

11  an hour and a half with Mr. Lynn talking about your pot plan

12  after the TRO was entered?

13  A    Yes.

14  Q    And is it fair to say that, notwithstanding Mr. Lynn's

15  goodwill and Mr. Lynn's efforts to try to get to a successful

16  resolution here, the terms on which the pot plan were offered

17  were unacceptable to the Debtor?

18  A    I wasn't there.  I -- I don't know.

19  Q    The Debtor never made a counteroffer, did it?

20  A    Not that I heard.

21  Q    You'll admit, will you not, that over the last year you or

22  others acting on behalf -- on your behalf have made various

23  pot plan proposals to the Official Committee of Unsecured

24  Creditors?

25  A    Quite generous pot plans that I think will exceed any

1  other recoveries.

2  Q   Okay.  So you're aware that your pot plan was delivered

3  either by you or on your behalf to the U.C.C., correct?

4  A   I -- some were.  Some, I don't know.

5  Q   Okay.  Has the U.C.C. ever made a counterproposal to you?

6  A   Nope.

7           MR. MORRIS:  I have no further questions, Your Honor.

8           THE COURT:  All right.  Pass the witness.

9       Mr. Bonds, do you have any time estimate for me,

10  guesstimate?

11          MR. BONDS:  My guess is, Your Honor, it'll be about

12  an hour.  I would hope that we could take some type of a

13  break, just because I'm a diabetic and need to have some --

14          THE COURT:  All right.  Well, --

15          MR. MORRIS:  I have no objection, Your Honor.

16  Whatever suits the Court.  I'm willing to accommodate Mr.

17  Bonds always.

18          THE COURT:  Okay.  Let's take a 45-minute break.

19  Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20  minutes after 1:00 Central time.

21      All right.  We're in recess.

22          THE CLERK:  All rise.

23      (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24          THE CLERK:  All rise.

25          THE COURT:  Please be seated.  This is Judge

1  Jernigan.  We are going back on the record in Highland Capital

2  Management versus Dondero.  We took a lunch break.  And when

3  we broke, Mr. Bonds was going to have the chance to examine

4  Mr. Dondero.

5     Let me just make sure we have, first, Mr. Dondero and Mr.

6  Bonds.  Are you there?

7          MR. BONDS:  Yes, we are.

8          THE COURT:  All right.  Very good.  I don't see your

9  video yet, but -- there you are.  All right.  Mr. Morris, are

10 you there?

11         MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12         THE COURT:  I can.  All right.

13         MR. MORRIS:  Thank you.

14         THE COURT:  Well, we've got lots of other people, but

15 that's all I'll make sure we have at this moment.  All right.

16 Mr. Bonds, you may proceed.

17    And, Mr. Dondero, I know you know this, but I'm required

18 to remind you you're still under oath.

19    Okay, go ahead.

20                      CROSS-EXAMINATION

21 BY MR. BONDS:

22 Q   Before you resigned as portfolio manager, how long had you

23 had with Highland Capital Management?

24 A   Since inception in 1994.

25 Q   Okay.  And how long have your offices been at the

1   Crescent?

2   A    Eight years.

3   Q    Okay.  Before you resigned as portfolio manager, did you

4   spend a lot of time in the office?

5   A    Yes.  I spent every business day this -- or 2020,

6   including COVID, in the office.

7   Q    Okay.  And this is the first time that you are not in the

8   office, is that right, in decades?

9   A    Yes.

10  Q    Can you tell us about the shared services agreement that

11  exists between the Debtor and the other entities in which you

12  have an interest?

13  A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14  what other entities paid.  Shared services, which is typical

15  in finance, for centralized tax, accounting, RICO function, so

16  that we don't have to have redundant, multiple high-paid

17  people in different entities.  We'd have them centralized and

18  with collective experience and collective functionality.  And

19  so, historically and recently, they pay Highland for those --

20  fees for those services.  And I, as a non-paid employee, or a

21  non-employee of Highland but a paid employee of NexBank -- of

22  NexPoint, was -- and my occupancy and support were part of

23  those shared services agreement.

24  Q    What do those agreements allow those entities to do?

25  A    Would it allow those entities to do?  Well, to access the

Dondero - Cross                                    108

1  Highland functionality as appropriate, because most of those

2  entities, as is typical in finance, did not have their own

3  functionality, legal, tax, and -- legal, tax, and accounting,

4  but although they've been -- they've been building it lately

5  in anticipation of the pot plan not going through at Highland.

6  Q   Okay.  Do those agreements allow you to share office space

7  with --

8            MR. MORRIS:  Objection --

9            THE WITNESS:  Yes.

10           MR. MORRIS:  -- to the form of the question, Your

11 Honor.  I think the exhibits and the agreements themselves

12 would be the best evidence.  They're not in evidence.  They

13 haven't been offered in evidence.  I have no way to challenge

14 the witness on anything he's saying.  And on that basis, I'd

15 -- it's not fair to the Plaintiff.

16           THE COURT:  All right.  Mr. Bonds, can I ask you to

17 repeat your question?  It was muffled and I was about to ask

18 you to repeat it before I got the objection.  So, repeat the

19 question so I can --

20           MR. BONDS:  Okay.  I'm going to repeat it and amend

21 it.

22           THE COURT:  Okay.

23 BY MR. BONDS:

24 Q   Is it your understanding that those agreements allow you

25 to share office space with the Debtor?

Dondero - Cross                                          109

1    A    Yes.  Virtually all of NexPoint's employees share the

2    Highland office space as part of a shared services agreement.

3    Q    Do those agreements allow you to share -- I'm sorry,

4    excuse me.  Strike that.  What else do they allow?

5    A    Typically is used in coordination of systems, servers,

6    software, cloud software, Internet software, office software,

7    tax, accounting, and legal functionality are all part of the

8    shared services agreement, although, you know, much of -- much

9    of that was stripped, you know, four or five months ago,

10   especially legal functionality and the accounting

11   functionality, without the concurrent adjustment in the

12   building.

13   Q    Okay.  And you previously testified that you generally

14   control NexPoint; is that correct?

15   A    Generally.  And the distinction I was trying to make is,

16   you know, following the financial crisis in '08, compliance

17   and the chief compliance officer has personal liability. along

18   with the rest of the C Suite, and operates independently, with

19   primary loyalty to the regulatory bodies.  And they're --

20   they're not controlled, bamboozled, or segued away from their

21   responsibility.  And at all times, they're supposed to be

22   doing what they believe is right, regulatorily-compliant, and

23   in the best interest of investors.

24        So that was the distinction I was drawing between, A, what

25   I was trying to remind Thomas of, that he should be

Dondero - Cross                                         110

1   independent of Seery, in terms of following what he believes

2   is correct and regulatory-compliant.  And I don't have to push

3   the NexPoint compliance people and general counsel to do

4   anything specific, nor could I.  They are supposed to do what

5   is right from a regulatory investor standpoint, and I believe

6   that's what they've done.

7   Q    All right.  And what do you mean by the term or the usage

8   of the word "generally"?

9   A    Well, that's the distinction I was just drawing.  I mean,

10  generally, on regular business strategy, you know, major

11  investments, you know, other business items, I'm in control of

12  those entities.  But in terms of the content and allegations,

13  regulatory opinions that come from compliance and the general

14  counsel, that is their best views on their own, knowing they

15  have compliance obligations and personal liability.

16  Q    Do you believe that NexPoint and its other owners and

17  interest holders have rights independent from your own in this

18  case?

19  A    Right, yes, and obligations, and responsibilities to

20  investors.  I believe the attempt by the Debtor or Seery to

21  hide behind contracts that the Debtor has with the CLOs are --

22  are a spurious, incomplete argument.  You know, they're not in

23  compliance with those contracts.  Bankruptcy alone is an event

24  of default.  Not having the key man -- the key men, the

25  required requisite professionals that they're obligated to

Dondero - Cross                                    111

1    contractually have working at the Debtor is a clear breach, in

2    violation of those CLO contracts.  Not having adequate staff

3    or investment professionals to analyze, evaluate, or follow

4    the investments in the portfolio is a clear violation.  And

5    specifically telling investors in the marketplace that you

6    plan to terminate all employees, a date certain January 24th,

7    is a proclamation that you're not going to be in any form able

8    to be a qualified registered investment advisor or qualified

9    in any which way to manage the portfolio or be in compliance

10   with the CLO contracts.

11       I would -- I would further add that the selling of the

12   securities, and the SKY securities, represent incomplete

13   intentional incurring of loss against the investors.  You have

14   securities that are less liquid with, you know, restructured

15   securities that have been owned for ten years, and they were

16   sold during the most illiquid weeks of the year, the couple

17   days before and after Thanksgiving, couple days before and

18   after Christmas, where the investors could have gotten 10 or

19   15 percent more on their monies if they were just sold in a

20   normal week.  It's -- it's preposterous to me.  It's

21   consistent with Seery not being an investment (garbled).

22       But it's preposterous to me that -- that this treatment of

23   investors is allowed or being camouflaged as some kind of

24   contractual obligation, when the investors have said these

25   funds are clearly in transition and the manager clearly is

Dondero - Cross                              112

1  incapable of managing them.  You know, please don't transact

2  until the transition is complete.  But Jim Seery has traded

3  every day, including -- I don't know about today, but every

4  day this week, selling securities for no investment rationale

5  and no business purpose.

6  Q    Are you also portfolio manager for NexPoint?

7  A    Yeah, I'm a portfolio manager for the closed-end retail

8  funds, which do have a higher fiduciary obligation than

9  anything on the institutional side.  I'm a portfolio manager

10  for those '40 Act funds that are the primary owners of the

11  CLOs that Seery is selling securities in for some unknown

12  reason.

13  Q    And what shared service agreements exist between NexPoint

14  and the Debtor?

15  A    Those are the shared service agreements I spoke of.  I

16  don't want to repeat myself.

17  Q    And I'm going to call Highland Capital Management Fund

18  Advisors, LP just Fund Advisors.  Is that okay with you?

19  A    Yes.

20  Q    Okay.  And you testified generally -- that you generally

21  control Fund Advisors; is that correct?

22  A    Yes.

23  Q    Do you believe that Fund Advisors and its owners and

24  interest holders have rights independent from your own in this

25  case?

Dondero - Cross                                          113

1    A    Yes.

2    Q    Are you the portfolio manager for Fund Advisors?

3    A    Yes.

4    Q    What shared services agreements exist between Fund

5    Advisors and the Debtor?

6         MR. MORRIS:  Objection, Your Honor.  The agreements

7    themselves are the best evidence of the existence in terms of

8    any agreement between the Debtor and these entities.

9         MR. BONDS:  Your Honor, I can fix that.

10         THE COURT:  Okay.

11   BY MR. BONDS:

12   Q    I'm just asking:  What is your understanding, Mr. Dondero,

13   of the shared service agreements between the Debtor and Fund

14   Advisors?

15   A    It's similar to the agreement I mentioned earlier.  It

16   covers a broad range of centralized services historically

17   provided by Highland, but now those, while still paying

18   smaller than historic fees, those entities now have been

19   required to incur the expenses of duplicating those functions.

20   Q    Okay.  Do you recall the email string dated November 24th

21   regarding SKY equity that the Debtor talked about?

22   A    Yes.

23   Q    What did you mean when you sent that email about the

24   trade?  What did you mean, I'm sorry?

25   A    I was trying to inform the traders, and once they knew --

Dondero - Cross                                          114

1   they weren't willing to do the trades anymore once they knew

2   that the underlying investors had requested that their

3   accounts not being traded until the transition be -- until the

4   transition of the CLOs was effectuated.

5       It's -- it's standard by, you know, statute or

6   understanding, in the money and management business, when

7   you're moving accounts from one asset manager to another, and

8   someone requests that you don't do anything to their account,

9   you don't trade it whimsically.  And so I was -- I was making

10  sure the traders knew that the underlying investors had

11  requested that no trades occur in their accounts.

12      And then I believed it was a clear violation of the

13  Registered Investment Adviser's Act.  I believe that people

14  involved at a senior level or at a compliance level could have

15  material liability, and could create material liability for

16  the Debtor.  And I think if, as I said before, I think if

17  anybody on this call were to call the SEC, they would start on

18  audit on this.

19          MR. MORRIS:  Your Honor, I move to strike the first

20  portion of the answer prior to when he started to describe

21  what he believes and what he thinks.  The first portion of the

22  answer was devoted to testifying about what is in the

23  knowledge of the people who he was communicating with.

24  There's no evidence.  Mr. Dondero, of course, was free to call

25  any witness he wanted.  He could have called the chief

Dondero - Cross                                    115

1  compliance officer.  He could have called the general counsel.

2  He could have called all the people he's now testifying on

3  behalf of, and he did not.

4     So I move to strike anything in the record that purports

5  to reflect or suggest the knowledge on behalf of any party

6  other than Mr. Dondero.

7              THE COURT:  Okay.  I'm --

8              MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9  to rephrase the question.

10             THE COURT:  Okay.  Very well.

11             MR. BONDS:  I'm sorry.

12             THE COURT:  So the motion to strike is granted.  If

13 you're going to rephrase, go ahead.

14             MR. BONDS:  Okay.

15 BY MR. BONDS:

16 Q   Mr. Dondero, what did you mean when you said -- that the

17 emails about the trade?

18 A   Okay.  I'll give my intention by sending emails to stop

19 the trade and my basis for those emails.  My intentions were

20 to inform the traders and to inform the compliance people that

21 I believe there was a trade that wasn't in the best interest

22 of the employees that had no business purpose for its

23 occurring.  And the people involved weren't aware that the

24 investors had sent over requests not to trade their accounts

25 while they were in transition.

Dondero - Cross                          116

1       So I made the traders aware of that.  I made compliance

2   aware of that also.  And it's my belief, based on 30 years'

3   experience in the industry, that it is entirely inappropriate

4   to trade the accounts of investors that are in transition, and

5   especially when you're not -- you're not contractually -- you

6   are contractually in default with that client, to trade their

7   account whimsically, for no business purpose.  And I thought

8   it was a clear breach of both regulatory, ethical, and

9   fairness with regard to the investors.

10      So I -- what did you know, when did you know it, what did

11  you do?  I did what I felt was the right thing, which I try

12  and do every day, and made all the relevant parties aware of

13  what was going on.

14  Q    Mr. Dondero, do you recall the text message you sent to

15  Mr. Seery in which you said, "Be careful what you do"?

16  A    Yes.

17  Q    What did you mean by that message?

18  A    It's -- I even said, Last warning.  I mean, I -- he's

19  doing things against the interests of investors.  He's

20  purposely incurring losses by trading in days and weeks and

21  time of the year, the day before and after Thanksgiving, where

22  any novice knows the markets are illiquid and anybody who can

23  read a computer screen can see you get ten percent less --

24  five or ten percent less than you would the week before or the

25  week after.  And with as much professional umbrage as

1  possible, I was recommending that he stop.

2  Q   Did you intend to personally threaten Mr. Seery in any

3  way?

4  A   No.  It was bad -- bad intentional professional acts

5  against the interests of investors that flow through to '40

6  Act retail mom-and-pop investors.  I was trying to prevent

7  those losses and those bad acts from occurring.  And I believe

8  everybody who's -- everybody around that issue should be

9  ashamed of themselves, in my opinion.

10  Q   Do you now regret sending the text?

11  A   No.  No, I mean, I could have worded it differently.  I

12  was angry on behalf of the investors.

13  Q   And Mr. Dondero, you have management ownership interest in

14  that entity; is that right?

15  A   Yes.

16  Q   Do you believe the interests or other entities in which

17  you are involved are independent from your personal rights in

18  this case?

19  A   Yes.

20  Q   And do you believe you caused anyone to violate the TRO?

21  A   No.  I've been -- I've been very conscious to just try and

22  champion the thing that -- things that I think are important

23  and the things that I've been tasked to do, like an attractive

24  pot plan to help resolve this case.  I spend time on that.

25  But every once in a while, do I have to access, let's say,

Dondero - Cross                                    118

1   David Klos, who is the person who put the model together, who

2   has been working on it for six or nine months, and no one else

3 S has a copy of? Yes. Yeah, I have to -- I have to access

4   him. I don't believe that's the -- inappropriate or in any

5   way violating the spirit of the TRO.

6       I believe settlement in this case is only going to happen

7   with somebody fostering communication. And Ellington's role,

8   which I thought was a good one and I thought he was performing

9   well as settlement counsel, was an important role. And I used

10  him for things like -- and Seery also used him for things. As

11  recently as two days before Ellington was fired, Seery gave

12  him a shared services proposal to negotiate with me.

13  Ellington has always been the go-between from a settlement and

14  a legal standpoint. I think his role there was -- it was

15  valued. To try to honor the TRO was things like Multi-Strat,

16  that I didn't remember correctly. Ninety percent of the time

17  or for the last 20 years I would have gone directly to

18  Accounting and Dave Klos for it, but I purposely went to

19  settlement counsel in terms of Ellington in order to get the

20  Multi-Strat information which we needed in order to put the

21  pot plan together that we went to the Independent Board with

22  at the end of December.

23  Q   (faintly) And do you recall the questions that Debtor's

24  counsel had regarding the letters sent by K&L Gates to clients

25  of the Debtor?

Dondero - Cross                                        119

1            MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2   hearing that question.

3            THE COURT:  Please repeat.

4            MR. BONDS:  Sure.

5   BY MR. BONDS:

6   Q    Do you recall the questions Debtor's counsel had regarding

7   the letters sent by K&L Gates to the clients of the Debtor --

8   to the Debtor?

9   A    Yes.

10  Q    You testified on direct that the letters were sent to do

11  the right thing; is that correct?

12  A    Yes.

13  Q    What did you mean by that?

14  A    I don't want to repeat too much of what I just said, but

15  the Debtor has a contract to manage the CLOs, which in no way

16  is it not in default of.  It doesn't have the staff.  It

17  doesn't have the expertise.  Seery has no historic knowledge

18  on the investments.  The investment staff of Highland has been

19  gutted, with me being gone, with Mark Okada being gone, with

20  Trey Parker being gone, with John Poglitsch being gone.

21       And there's -- there's a couple analysts that are a year

22  or two out of school.  The overall portfolio is in no way

23  being understood, managed, or monitored.  And for it to be

24  amateur hour, incurring losses for no business purpose, when

25  the investors have requested numerous times for their account

Dondero - Cross                    120

1   not to be traded, is crazy to me.  Where the investors say, We

2   just want our account left alone.  We just want to keep the

3   exposure.  And Jim Seery decides no, there's -- I'm going to

4   turn it into cash for no reason.  I'm just going to sell your

5   assets and turn them to cash and incur losses by doing it the

6   week of Thanksgiving and the week of Christmas.  I think it's

7   -- it's shameful.  I'm glad the compliance people and the

8   general counsel at HFAM and NexPoint saw it the same way.  I

9   didn't edit their letters, proof their letters, tell them how

10  to craft their letters.  They did that themselves, with

11  regulatory counsel and personal liability.  They put forward

12  those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14  Mr. Dondero just gave about these people saw it.  They're not

15  here to testify how they saw it.  We know that Mr. Dondero

16  personally saw and approved the letters before they went out.

17  He can testify what he thinks, what he believes.  I have no

18  problem with that.  But there should be no evidence in the

19  record of what the compliance people thought, believed,

20  understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24  lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25  response?

1          MR. BONDS:  Your Honor, my response would be that

2     there are several exhibits the Debtor introduced today that

3     stand for the proposition that the compliance officers were

4     concerned.  So I think there is ample evidence of that in the

5     record.

6          THE COURT:  I didn't --

7          MR. MORRIS:  Your Honor, the letter --

8          THE COURT:  I did not understand what you said is in

9     the record.  Say again.

10         MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11    -- there are references that are replete in the record that

12    have to do with the compliance officers' understanding of the

13    transactions.

14         THE COURT:  I don't know what you're referring to.

15         THE WITNESS:  Your Honor?

16         THE COURT:  I've got a lot of exhibits.  You're going

17    to have to point out what you think --

18         THE WITNESS:  Can I -- can I -- can I -- can I answer

19    for -- that for a second?  The letters that were signed by the

20    compliance people or by the businesspeople at NexPoint and

21    HFAM objecting to the transactions, those letters were their

22    beliefs, their researched beliefs.  They weren't --

23         THE COURT:  Okay.

24         THE WITNESS:  -- micromanaged by me.  You know, they

25    weren't -- I agree with them, but those weren't my beliefs

Dondero - Cross                                    122

1   that they've stated.  Those were their own beliefs and their

2   own research, --

3              THE COURT:  All right.

4              THE WITNESS:  -- and the record should reflect --

5              THE COURT:  This is clearly hearsay.  I mean, it's

6   one thing to have a letter, but to go behind the letter and

7   say, you know, what the beliefs inherent in the words were is

8   inadmissible.  All right?  So I strike that.

9              THE WITNESS:  Maybe ask your question again.

10  BY MR. BONDS:

11  Q   Yeah.  What is your understanding of the rights that these

12  parties had and what do you believe that was intended to be

13  conveyed by the compliance officers?

14             MR. MORRIS:  Objection.  Calls -- calls for Mr.

15  Dondero to divine the intent of third parties.  Hearsay.

16             THE COURT:  I sustain.

17             MR. BONDS:  Your Honor, --

18             MR. MORRIS:  No foundation.

19             MR. BONDS:  -- I don't agree.  I think that this is

20  asking Mr. Dondero what he thinks.

21             MR. MORRIS:  The letters speak for themselves, Your

22  Honor.

23             THE COURT:  Okay.  I sustain --

24             MR. MORRIS:  And Mr. --

25             THE COURT:  I sustain the objection.

Dondero - Cross                                    123

1          MR. MORRIS:  All right.  Thank you.

2          THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14        The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

Dondero - Cross                                    124

1   standing.  Okay?  Number one.

2      Number two, when the investors know that it's in

3   transition, you're not in compliance as a manager, you're not

4   going to be an RIA in three weeks, the accounts are going to

5   have to transition to somebody else in three weeks, and the

6   investors ask you, Please don't trade my accounts between now

7   and then, that is -- that is a -- if it's not a *per se*, it's

8   an ethical and a spirit violation of any relationship between

9   an investor and an asset manager.

10      To then sell assets -- not replace assets, just sell

11  assets for cash -- and purposely do it on the least liquid

12  days of the year -- the day before Thanksgiving, the day after

13  Thanksgiving, the week of Christmas, this past week, whatever

14  -- to purposely incur losses so that the investors suffer ten

15  or fifteen percent losses that other -- on each of those sales

16  that they wouldn't otherwise have to incur, and for no stated

17  business purpose, for no investment rationale, with no staff

18  to even say whether the investment is potentially going up or

19  down, is -- is -- is -- I've never seen anything else like it.

20      And I will stand up and say it every day:  I'm glad the

21  letters went out from HFAM and from NexPoint.  I would never

22  recommend they get retracted.  And I believe everybody who

23  signed those letters meant everything in those letters.  And I

24  believe the letters are correct.  And I believe the whole

25  selling of CLO assets is a travesty.

Dondero - Cross                                125

1      My personal opinion, we need an examiner or somebody here

2  to look at this junk and look at some of the junk that

3  occurred earlier this year.  This -- this stuff is

4  unbelievable to me.

5  Q    Generally, who holds interests in the CLOs?

6  A    A vast majority of the CLOs that we're speaking of that

7  Seery has been selling the assets of are owned by the two

8  mutual funds, the two '40 Act -- the two '40 Act mutual funds

9  and the DAF.  Between them, I think out of -- eleven out of

10  the sixteen CLOs, they own a vast majority, and then I think,

11  whatever, two or three they own a hundred percent, and I think

12  two or three they own a significant minority.

13      And just because they don't own a hundred percent doesn't

14  somehow allow a registered investment advisor to take

15  advantage of an investor.  And I -- I've never understood that

16  defense.  I wouldn't be able -- in my role of 30 years, I

17  wouldn't be able to tell that to an investor, that, hey, you

18  had a contract with us, we did something that wasn't in your

19  best interest, but we got away with it because you didn't own

20  a hundred percent, you only owned eighty percent.

21          MR. MORRIS:  Your Honor, I move to strike.  There's

22  no contract between the Debtor and Mr. Dondero's -- and the

23  entities that he owns and controls for purposes of the CLO.

24  The only contract is between the Debtor and the CLOs

25  themselves.

Dondero - Cross                          126

1          THE COURT:  All right.  Well, I overrule whatever

2     objection that is.  Again, if you want to bring something out

3     on cross-examination or through Mr. Seery, you know, you're

4     entitled to do that.

5          All right.  Please continue.

6     BY MR. BONDS:

7     Q    Do you believe these letters were sent by the Funds to the

8     Advisors because they are trying to protect the independent

9     entities?

10    A    They're trying to protect their investors.  They were

11    trying to protect their regulatory liability for activities

12    they see that are not in the best interests of investors.

13          MR. MORRIS:  Objection, Your Honor.  I move to

14    strike.  He's again testifying as to the intent of the people

15    who sent the letters who are not here to testify today.

16          THE COURT:  Sustained.

17    BY MR. BONDS:

18    Q    Mr. Dondero, what is your belief as to the letters that

19    were sent by the Funds and Advisor?  Is -- are they trying to

20    protect their independent interests?

21          MR. MORRIS:  Objection, Your Honor.  Asked and

22    answered.

23          THE COURT:  Sustained.

24          THE WITNESS:  Ask me --

25    BY MR. BONDS:

Dondero - Cross                                    127

1    Q    What is your understanding of why the letters were sent?

2                MR. MORRIS:  Objection, Your Honor.  Asked and

3    answered.

4                THE COURT:  Sustained.

5    BY MR. BONDS:

6    Q    Mr. Dondero, would you have sent the letters?

7    A    I would have sent the letters exactly or very similar or

8    probably even more strongly than the letters were stated, for

9    the purposes of protecting investors, to protecting mom-and-

10   pop mutual fund investors from incurring unnecessary losses by

11   an entity that was no longer in compliance with their -- with

12   their asset management contract and because the investors had

13   requested that their account just be frozen until it was

14   transitioned.

15        That's why I would have sent the letter.  That's why I

16   believe the letter should be sent.  That's why I'm happy they

17   were sent.  That's why we've never retracted.

18   Q    Mr. Dondero, who is Jason Rothstein?

19               THE COURT:  I did not hear the question.

20               THE WITNESS:  Jason -- Jason --

21               MR. BONDS:  Who --

22               THE COURT:  Please repeat.

23               MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24   Rothstein was.

25               THE WITNESS:  Jason Rothstein heads up our systems

Dondero - Cross                                    128

1   department at Highland Capital.

2   BY MR. BONDS:

3   Q    Can you explain what your text message to Mr. Rothstein

4   was about?

5   A    Which text message?  The one where it was in the drawer?

6   Q    Yeah.

7   A    Uh, --

8   Q    And that was actually from him, not you.

9   A    Yeah.  That was from him.  I think he transferred icons or

10  set up personal stuff to the new phone, and he was just saying

11  that the old phone was in Tara's drawer.

12  Q    And you don't know whether -- what's happened to the

13  phones, do you?

14  A    No.  Like I said, I believe they've been destroyed, but I

15  -- I can find out.  I mean, I can query and find out who

16  destroyed it, if that's important.

17  Q    And you understood that you were not supposed to talk to

18  the Debtor's employees; is that correct?

19  A    Like I said, except for my roles regarding shared

20  services, the pot plan, and trying to reach some type of

21  settlement, I've had painfully few conversations with the

22  Debtor's employees.

23  Q    When you talked to certain employees, did you think it was

24  an -- under an exception to the TRO, like shared services,

25  related to the pot plan, or settlement communications?

Dondero - Cross                                      129

1   A    Yes.

2           MR. MORRIS:  Your Honor, I move to strike.  Mr.

3   Dondero never read the TRO.  He's got no basis to say what the

4   TRO required and didn't require.

5           MR. BONDS:  That wasn't the -- that wasn't the

6   question.

7           THE COURT:  Okay.

8           MR. BONDS:  I'm sorry.

9           THE COURT:  Okay.  Rephrase the question, please.

10          MR. BONDS:  Okay.  I'm sorry.

11  BY MR. BONDS:

12  Q    When you talked to these -- to certain employees, did you

13  think it was under an exception to the TRO, like shared

14  services, relating to the pot plan, or settlement

15  communications?

16  A    Yes.  Absolutely.

17          MR. MORRIS:  I object.  No foundation.

18          THE COURT:  Sustained.

19  BY MR. BONDS:

20  Q    Mr. Dondero, do you understand -- did your lawyers explain

21  to you the TRO?

22  A    Yes.

23  Q    And who was the lawyer that explained the TRO to you?

24          MR. MORRIS:  Your Honor, I don't know if we're

25  getting into a waiver of privilege, but I just want to tell

Dondero - Cross                                    130

1  you that my antenna are up very high.

2          THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3  you about to waive the privilege?

4          MR. BONDS:  No, Your Honor, I am not.

5          THE COURT:  Okay.  Well, it sounded like perhaps we

6  were about to have the witness testify about conversations he

7  had with lawyers.

8          MR. BONDS:  I'm sorry, Your Honor.  That was not my

9  intention.  Again, I'm asking Mr. Dondero to explain for us

10 his contact with -- or, his impression of the TRO.

11 BY MR. BONDS:

12 Q    What did the TRO mean to you?

13 A    The TRO meant to me that I was precluded from talking to

14 Highland employees -- which, again, very few, if any, were

15 coming into the office.  I was not talking to Highland

16 employees with any regularity anyway.  But there was an

17 exception with regard to Scott Ellington regard -- Scott

18 Ellington in terms of him functioning as settlement attorney

19 to try and bridge the U.C.C., the Independent Board, Jim

20 Seery, other people, and things that impacted me or other

21 entities.

22     I also viewed that there was an exception for the pot

23 plan, which had been presented and gone over as recently as

24 December 18th and 20th.  And -- or December 18th, I think, was

25 the date.

Dondero - Cross                    131

1       And you know what, I want to clarify a characterization of

2  the pot plan.  I still believe it's the best and most likely

3  alternative for this estate in the long run.  I think what

4  we've proposed numerous times is more generous than what

5  anyone will receive in a liquidation and in a more timely

6  fashion.

7       And the last time we presented it to the Independent

8  Board, the Independent Board thought it was attractive and

9  thought we should go forward with it to the U.C.C. and other

10  parties.

11            MR. MORRIS:  Your Honor, I move to strike the last

12  portion of the answer that purports to describe what the

13  Independent Board thought.

14            THE COURT:  Well, --

15            MR. MORRIS:  No foundation.  Hearsay.

16            THE COURT:  What is your response to the hearsay

17  objection, Mr. Bonds?

18            MR. BONDS:  Your Honor, I don't have one.

19            THE COURT:  Okay.  I sustain.

20  BY MR. BONDS:

21  Q   What exceptions did you believe there were for

22  communications with employees?

23  A   Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24  Ellington and settlement counsel.  I covered the pot plan.

25  Q   Okay.

Dondero - Cross                                          132

1    A    My -- my view of the pot plan as -- my view of the pot

2    plan was that it was very attractive, and I had received

3    encouragement to go forward with it as something that should

4    be workable.  That's my testimony on that.

5         And then -- and we talk about negotiating shared services.

6    So, there's shared services in terms of overlap in

7    functionality, but there's also, in terms of negotiating the

8    shared services agreement, which, as I said, was something

9    that Ellington was put in charge of three or four days ago by

10   Jim Seery to negotiate with us.  And he reached out to me to

11   negotiate it.  And I think the Pachulski deadline on it was

12   three days later.  That whole process was something that I

13   viewed as separate from the TRO, especially since it was

14   initiated by Jim Seery, DSI, et cetera, and consistent with

15   what Scott Ellington's role had been for the last six, nine

16   months.

17   Q    As to the Debtor's request that you vacate the office

18   space, did you comply with this request?

19   A    Yes.

20   Q    What did you think that vacating meant?

21   A    I moved out all my -- my personal items to a new office at

22   NexBank.

23   Q    (faintly)  And, in fact, did you work on the last day over

24   to 3:00 a.m.?

25   A    Yes.  4:00.

1           THE COURT:  Mr. Bonds, I didn't hear your question.

2    I didn't hear your question.

3           MR. BONDS:  Okay.  I'm sorry.

4    BY MR. BONDS:

5    Q    Did -- isn't it true that you worked through the night, to

6    3:00 or 4:00 a.m., to vacate the premises?

7    A    Yes.  Until 4:00 a.m. on the last day, to organize and

8    pack up all my stuff, yes.

9    Q    Did you think your presence in the office, with no other

10   employees there, violated the spirit of the TRO?

11   A    No.  I thought it was over the top and meant to tweak me,

12   but, yeah, there's no -- there's not Debtor employees coming

13   in since COVID.

14   Q    (faintly)  Okay.  And you thought you could talk to Mr.

15   Ellington and -- as settlement counsel; is that correct?

16          MR. MORRIS:  I'm having trouble hearing it, Your

17   Honor.

18          THE WITNESS:  Yes.

19          THE COURT:  Yeah.  We're -- Mr. Bonds, please make

20   sure you speak into the device.

21          MR. BONDS:  I'm sorry.  I'll try to get closer.

22   Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.

23   Dondero if he thought he could talk to Ellington as a go-

24   between or settlement counsel.  And I asked him if that was

25   correct.

1           THE WITNESS:  Yes.  For settlement, shared services,

2   the pot plan.  Nothing that interrupts or affects the Debtor,

3   but for those purposes, as has consistently occurred for the

4   last six months.

5   BY MR. BONDS:

6   Q    Okay.  And you saw the texts and emails presented by the

7   Debtor between you and Mr. Leventon; is that correct?

8   A    The one regarding Multi-Strat?

9   Q    Yes.

10  A    Yes.

11  Q    In your understanding, did you believe those

12  communications were allowed under the TRO?

13  A    Well, yes.  And, again, to clarify my -- my contrasting

14  testimony, I would never typically have gone to them for that

15  kind of information, but to be compliant with the TRO, for

16  Multi-Strat information, which I needed in order to put

17  together the pot plan that the Independent Board audienced on

18  December 18, I needed the information on Multi-Strat, and I

19  requested it as appropriate through settlement counsel

20  Ellington.  And I think Ellington requested it from Isaac, who

21  requested it from David Klos.

22       The whole purpose, I believe -- my belief is the whole

23  purpose of this TRO is to make it impossible for us to get

24  information to come up with alternatives other than a -- the

25  plan proposed by Jim Seery.  It's our -- if -- if -- without

Dondero - Cross                                            135

1   Ellington in the go-between, which he's now no longer an

2   employee, I assume the only way we get any information,

3   balance sheet or anything from Highland Capital, is with a

4   subpoena.

5       And as much as I've tried to engage or make an attractive

6   pot plan for everybody, each one of them has been a complete

7   shot in the dark, without even knowing the assets and

8   liabilities of Highland, but just estimating where they were

9   or were likely to be.

10  Q   Do you believe your text message with Leventon caused any

11  harm to the Debtor's business?

12  A   No.  It potentially fostered a pot plan, because, you have

13  to know, the pot plan needed -- one of the aspects of the pot

14  plan was the --

15  Q   Do you still want to advocate for your pot plan?

16  A   I think that's eventually where we ultimately end up.  Or

17  -- or should end up.  Otherwise, I fear it's going to be an

18  extended, drawn-out process.

19  Q   And how much did you initially propose to pay creditors in

20  this case?

21  A   The most recent -- the most recent pot plan?

22  Q   No.  The -- initially.

23  A   The initial pot plan, I believe, was $160 million.

24  Q   And what about the notes?

25  A   There was $90 [million] of cash and I believe $70

Dondero - Cross                                     136

1   [million] of notes.

2   Q    And what is Multi-Strat?

3   A    Multi-Strat is a fund that's managed by Highland.  They

4   used to have $40 or $50 million in value.  It used to contain

5   a lot of life settlement policies.  And I believe now has $5

6   or $6 million of value, after assets have been sold.

7   Q    Do you recall the email Debtor's counsel presented

8   regarding the balance sheet today?

9   A    The balance sheet of Multi-Strat?

10  Q    Correct.

11  A    Yes.

12  Q    Do you believe you were entitled to see that document?

13  A    Yes.  It's just -- again, for the pot plan, I needed it.

14  But also I'm an investor in that fund and I'm entitled to it.

15  It's -- there was nothing in there that was improper or

16  untoward or in any way damaged the Debtor.

17  Q    And you recall the request for documents sent by the

18  Debtor; is that correct?

19  A    On my -- my personal estate plan?

20  Q    No, on Multi-Strat.

21  A    The Debtor's request on -- I'm sorry.  What was that?

22  Q    The Debtor sent you a request for Multi-Strat.  For Duga

23  -- I'm sorry.

24  A    For Dugaboy?  Okay.

25  Q    Dugaboy.

Dondero - Cross                                   137

1   A    Yeah.  There's -- there's personal estate planning trusts.

2   Some are active.  Some are inactive.  Some have been around

3   for 15 years.  But they're -- they're not assets or anything

4   that's related to the estate.  And that was -- that was my

5   text to Melissa that said, you know, Not without a subpoena.

6   Q    Mr. Dondero, if you remember back on Exhibit K, there was

7   some request that you terminate your offices at the Crescent,

8   and I think you were given seven days' notice to do that.  Do

9   you know if Christmas occurred during that time?

10  A    I believe it did.

11  Q    So, if Christmas and Christmas Eve are both holidays, how

12  many days, business days, did they give you to terminate or to

13  get out of the space?

14  A    There would have been three business days.  It was Monday

15  through Wednesday that I moved out.

16          MR. BONDS:  Your Honor, I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  Take a break.  I hope.

19          MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

20  minute break?  I think that I'm going to be through, but I

21  don't know.

22          THE COURT:  All right.  I'll give you a ten-minute

23  break.

24          MR. BONDS:  All right.  Thank you, Your Honor.

25          THE COURT:  We're coming back at 2:15.

Dondero - Cross                                    138

1              THE CLERK:  All rise.

2        (A recess ensued from 2:06 p.m. until 2:16 p.m.)

3              THE CLERK:  All rise.

4              THE COURT:  All right.  Please be seated.  We're back

5    on the record in Highland versus Dondero.  Mr. Bonds, do you

6    have more examination?

7              MR. BONDS:  Your Honor, I have one question.

8              THE COURT:  Okay.

9              MR. BONDS:  And that's --

10             MR. LYNN:  And one more witness.

11             MR. BONDS:  And one more witness.

12                    CROSS-EXAMINATION, RESUMED

13   BY MR. BONDS:

14   Q    Do you think that Scott Ellington and Isaac Leventon were

15   treated appropriately by the Debtor?

16   A    No, I do not.  I don't think they've been treated fairly,

17   nor do I think other senior employees have been treated

18   fairly.  I've never seen a bankruptcy like this where, during

19   complex unwinding of 20 years of various different entities

20   and structures, relying on the staff, working them hard,

21   working overtime, a lot of investment professionals like

22   lawyers and DSI just putting their name on the work of stuff

23   that was done by internal employees, getting to the end of the

24   year, trying to pay people zero bonuses and retract prior

25   years' bonuses, and try and come up with legal charges against

Dondero - Cross                                    139

1  those people is unusual to this case and my experience, in the

2  bankruptcies we've been involved in, where typically

3  management teams get paid multiples of current salary to stay

4  on and be the experts.

5      I also think they were put in difficult spots from the

6  very beginning.  It was Jim Seery that made Scott Ellington

7  the settlement counsel six, seven months ago.  It was a

8  broadly-defined role that was never retracted, never adjusted,

9  never modified, yet somehow he and Isaac violated it.  I don't

10 know.  I haven't spoken to them since they've been terminated.

11 They aren't allowed to speak to me, from what I hear.  But I

12 wish them luck in their claims.

13             THE COURT:  Okay.  You pass the witness?

14             MR. BONDS:  Yes, Your Honor.

15             THE COURT:  All right.  Mr. Morris, do you have

16 further examination?

17             MR. MORRIS:  Just a few questions.

18                    REDIRECT EXAMINATION

19 BY MR. BONDS:

20 Q   Mr. Dondero, you knew about this hearing for some time,

21 right?

22 A   No.

23 Q   When did you first learn this hearing was going to take

24 place?

25 A   Two days ago.

Dondero - Redirect                                140

1  Q   Two days ago?

2  A   When was the depo, three days ago?  Whatever.

3  Q   And you didn't know prior to the deposition that we would

4  be having a hearing today on the Debtor's motion for a

5  preliminary injunction?

6  A   No.  I thought it was going to be postponed or canceled.

7  I was waiting for the text last night.

8  Q   You had an opportunity to call any witness in the world

9  you wanted to today, right?

10 A   I guess.

11 Q   You could have called -- you could have called the chief

12 compliance officer at the Advisors if you thought the Court

13 should hear from him as to the compliance issues that you've

14 testified to, right?

15 A   I think their letters stand on their own.

16 Q   Okay.  So you didn't think that it was important for the

17 Court to hear from Mr. Sowin directly, correct?

18 A   Sowin is a trader.

19 Q   I'm sorry.  Who's the chief compliance officer of the

20 Advisors?

21 A   Jason Post, as far as NexPoint is concerned.  He's the one

22 that would have been behind the K&L -- K&L letters.

23 Q   And he is not here today to testify, right?

24 A   I think his letters stand on their own and I think

25 everybody should read them, make sure they read them.

1  Q    Okay.  But Mr. Post is not here to answer any questions;

2  is that right?

3  A    I don't know if there are any questions beyond what's

4  obviously stated in the letters.  You should read the letters

5  carefully.  They're -- they're -- they talk about clear

6  violations.

7        MR. MORRIS:  Your Honor, I move to strike.  It's a

8  very simple question.

9        THE COURT:  Sustained.  That was another yes or no

10  answer, Mr. Dondero.   Go ahead.

11        THE WITNESS:  I'm sorry.

12  BY MR. MORRIS:

13  Q    Mr. Dondero, Mr. Post is not here to testify in order to

14  explain to the Court what he thinks the regulatory issues are,

15  correct?

16  A    He's not here today.

17  Q    And you could have called him as a witness, correct?

18  A    Yes.

19  Q    And you thought Mr. Ellington and Mr. Leventon were

20  treated unfairly, right?

21  A    Yes.

22  Q    And there's no reason why they couldn't have come today to

23  testify, correct?

24  A    I guess they could have.

25  Q    And there's no reason why anybody on behalf of the K&L

Dondero - Redirect                              142

1   Gates clients couldn't have been here to testify, correct?

2   A    I didn't deem it necessary, I guess.

3   Q    Okay.  You could have offered into evidence, at least

4   offered into evidence, any document you wanted, right?

5   A    Yes.

6   Q    And you could have offered the judge, for example, the

7   shared services agreement, the shared services agreements for

8   which you gave the Court your understanding, right?

9   A    Which shared services, the one that Seery gave Ellington

10  three days ago or the original one from years ago?

11  Q    Any of the ones -- any of the ones that you have referred

12  to today.  You could have given any of them to the judge,

13  right?

14  A    Correct.

15  Q    And you didn't, right?

16  A    I did not.

17  Q    In fact, there's not a single piece of evidence in the

18  record that corroborates anything you say; isn't that right?

19  A    I -- I believe all those documents are in the record.

20  They're just not in the record of this TRO.  But they're all

21  --

22  Q    Oh.

23  A    They're all in the record.

24  Q    Do you remember that there was a hearing on December 16th?

25  I think you -- you testified that you're fully aware of that

Dondero - Redirect                                    143

1    hearing that was brought by the K&L Gates Clients.  Do you

2    remember that?

3    A    Yes.

4    Q    Who testified at that hearing on behalf of the K&L Gates

5    Clients?  Dustin Norris?

6    A    I believe -- I believe Dustin Norris testified.

7    Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?

8    A    He's one of the senior managers.

9    Q    Is he a compliance officer?

10   A    No.

11   Q    Is he a trader?

12   A    No.  But he's one of the senior managers.

13   Q    Okay.  They could have called anybody they wanted, to the

14   best of your understanding, right?

15   A    I don't think they got a chance to.  Wasn't it an

16   abbreviated hearing?

17   Q    They offered Mr. Norris as a witness.  Do you understand

18   that?

19   A    I -- all I -- I wasn't there.  I didn't attend virtually.

20   I -- but I did know that Norris testified.  But I don't know

21   who else was called, wasn't called, was going to be called,

22   was on the witness list.  I have no awareness.

23   Q    Okay.  You were pretty critical of the trades that Mr.

24   Seery wanted to make that you interfered to stop, right?

25   A    I think he's subsequently done most of those trades.

1  Q    And you called them preposterous because he wanted to do

2  it around Thanksgiving or around Christmas, at least based on

3  your testimony, correct?

4  A    That's when it did occur.

5  Q    And is it your testimony -- is it your testimony that

6  every single person in the world who trades securities near a

7  holiday is making a preposterous trade?

8  A    I think it's amateur and not what an investment

9  professional would do.

10  Q    So you never trade on holidays; is that your testimony?

11  You've never done it once in your life?

12  A    Very rarely, unless there's another overriding reason.

13  And there was no overriding reasons, period.

14  Q    How would you know that when you didn't even ask Mr. Seery

15  why he wanted to make the trades?

16  A    I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin

17  said that Jim Seery just said for risk reduction.

18          MR. MORRIS:  I move to strike on the grounds that

19  it's hearsay, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q    You never asked Mr. Seery why he wanted to make the

23  trades, correct?

24  A    I'm not allowed to talk to Mr. Seery.

25  Q    You certainly were around Thanksgiving; isn't that right?

Dondero - Redirect                                      145

1    A    I don't know.

2    Q    There was no TRO in place at that time, correct?

3    A    That's true.

4    Q    You're pretty critical of Mr. Seery and his capabilities;

5    is that right?

6    A    He's a lawyer.  He's not an investment professional.

7    Q    Did you object to his appointment as the CEO of the

8    Debtor?

9    A    No.

10   Q    Have you made any motion to the Court to have him removed

11   as unqualified?

12   A    Not yet.

13   Q    Okay.  But with all the knowledge of all the preposterous

14   things that he's been doing for months now, you haven't done

15   it, right?

16   A    No.

17   Q    When you -- when -- before you threw the phone in the

18   garbage, did you back it up?

19   A    No.

20   Q    Did it occur to you that maybe you should save the data?

21   A    No.

22   Q    You said that the only way you think you might be able to

23   get information going forward is through a subpoena.  Do I

24   have that right?

25   A    I mean, that's how it seems.  I mean, it seems at every

Dondero - Redirect                                      146

1  turn -- and now with Scott Ellington being gone and Isaac

2  being gone -- I have no idea how the Debtor is ever going to

3  defend against UBS.

4           THE COURT:  I did not --

5           THE WITNESS:  I have no idea how --

6           THE COURT:  I didn't hear the answer after with

7  Ellington and Leventon being gone.  I didn't hear the rest of

8  the answer.  Could you repeat?

9           THE WITNESS:  I said I have no idea how the Debtor is

10 ever going to defend itself against UBS.  But I also have no

11 idea how we're ever going to get any information or ever push

12 forward any kind of settlement without having any access to

13 information or anybody to talk to.

14 BY MR. MORRIS:

15 Q    Do you trust Judge Lynn?

16      (Echoing.)

17 A    Yes.

18 Q    Is he a good advocate?

19 A    Yes.  If anybody returns his phone calls.

20 Q    Do you recall that on October 24th Judge Lynn specifically

21 asked my law firm to provide information on your behalf in

22 connection with the Debtor's financial information, their

23 assets and their liabilities?

24 A    Yes.

25 Q    Do you recall that the Debtor simply asked that you

1    acknowledge in an email between and among counsel that you

2    would abide by the confidentiality agreement that was entered

3    by the Court?

4    A    I wasn't involved in those details.

5    Q    Didn't you send an email in which you agreed to receive

6    the financial information subject to the protective order that

7    this Court entered?

8    A    I'm sure I would.  I just don't remember.

9    Q    That was a condition that the Debtors made.  That doesn't

10   refresh your recollection?

11   A    I'm not denying it.  I just don't remember, and --

12   Q    Okay.  And --

13   A    (overspoken)

14   Q    I'm sorry, I don't mean to cut you off.  And in fact, on

15   December 30th, the day you were supposed to vacate the office,

16   the Debtor voluntarily provided to Judge Lynn all of the

17   information that had been requested on your behalf without the

18   need for a subpoena, right?

19   A    Yeah.  It took a week.  It's 40,000 pages of mixed

20   gobbledygook that we're -- we're going through.  But it should

21   provide enough information for us to negotiate a pot plan if

22   anybody so chose.

23   Q    So you didn't need to (echoing) the 40,000 pages of

24   financial information from the Debtor; all you needed was an

25   agreement that you would abide by the protective order.

1    Correct?

2    A    I think that was the first thing that was ever produced on

3    request that I can remember.  But yes.

4    Q    And it was just a week ago, right?

5    A    Yes.

6              MR. MORRIS:  I have no further questions, Your Honor.

7              THE COURT:  All right.  Mr. Bonds, do you have

8    anything else?

9              MR. BONDS:  I do not, Your Honor, as to this witness.

10   I have one other witness.

11             THE COURT:  All right.

12             MR. MORRIS:  Your Honor, I don't know who they plan

13   on calling, but he's not on the witness list.

14             THE COURT:  All right.  Well, --

15             MR. BONDS:  Your Honor, this other witness --

16             THE COURT:  Just a moment.  This concludes, for the

17   record, Mr. Dondero's testimony.  But, obviously, stick

18   around, because we're going to have a lot to talk about when

19   this is finished as far as the evidence.

20        All right.  Now, who are you wanting to call that you did

21   not identify?

22             MR. BONDS:  I'd like to call Mike Lynn for the

23   purpose -- or, to -- as a rebuttal witness.

24             THE COURT:  Lawyer as witness?

25             MR. MORRIS:  Your Honor?

1              THE COURT:  Well, you know, first off, rebuttal of

2      what?  Rebuttal --

3              MR. MORRIS:  Exactly.  He's going to rebut his own

4      client, Your Honor?  He's going to rebut his own client?

5      There's only been one witness to testify here.  He was on

6      their exhibit list.  How do they call a witness to rebut their

7      own client?

8              THE COURT:  Yes.  What -- I don't --

9              MR. BONDS:  Your Honor?

10             THE COURT:  Go ahead.

11             MR. BONDS:  Mr. Morris testified or attempted to

12     testify that the pot plan didn't gain any traction.  We will

13     submit Mike Lynn on that issue.

14             THE COURT:  No.

15             MR. MORRIS:  Your Honor?

16             THE COURT:  I'm not going to allow a lawyer to

17     testify to rebut lawyer argument.  That's very inappropriate,

18     in my view.  So, not going to happen.

19             MR. LYNN:  (garbled)

20             MR. BONDS:  Your Honor, he would be a fact witness to

21     discussions with the other side.

22             MR. MORRIS:  Your Honor, I strenuously object.

23     They're -- he's only rebutting -- my questions are not

24     evidence.  The only evidence in the record is Mr. Dondero's

25     testimony.  Mr. Dondero is their client.  Mr. Dondero was on

1  their witness list. They should not be permitted to call any

2  witness, with all due respect to Mr. Lynn, to rebut their own

3  witness.

4          THE COURT: All right.

5          MR. BONDS: Your Honor, we're not rebutting our

6  witness. We are rebutting the testimony that Mr. Morris gave.

7          THE COURT: Mr. Morris is a lawyer. He makes

8  argument. He asks questions. He was not a witness today.

9  Okay?

10     So if you want to say whatever you want to say as lawyers

11  in closing arguments, then obviously you can do that. But I'm

12  not going to allow a lawyer to be a witness to rebut something

13  another lawyer said in argument or in a question. I -- it's

14  -- so, I disallow that.

15     Anything else, then?

16          MR. BONDS: No.

17          THE COURT: Okay. And while we're talking about

18  procedure, actually, Mr. Morris, it's the Debtor's motion, and

19  I'm not even sure that's all of your evidence. So, do you

20  have any more evidence as Movant?

21          MR. MORRIS: No, Your Honor. The Plaintiff and the

22  Debtor rest.

23          THE COURT: All right. So, at the risk of repeating,

24  now that the Movant has rested, it would be Mr. Dondero's

25  chance to put on supplemental evidence. But what I'm hearing

151

1   from Mr. Morris is there were no witnesses identified on your

2   witness list?

3            MR. BONDS:  Other than Mr. Dondero, Your Honor.

4            THE COURT:  Okay.  All right.  Well, was there any

5   stipulated documentary evidence that -- that you had --

6            MR. BONDS:  No, Your Honor.

7            THE COURT:  All right.  Well, I guess we're done with

8   evidence.

9        Mr. Morris, your closing argument?

10            MR. MORRIS:  All right.  Before I get to that, Your

11   Honor, I just want to make a very brief statement.  When the

12   Debtor objected to Mr. Dondero's emergency motion for a

13   protective order, the Debtor stated that it sought discovery

14   from Mr. Dondero to determine whether Mr. Dondero may have

15   violated the TRO by interfering and impeding the Debtor's

16   business, including by potentially colluding with UBS.  After

17   that motion was decided, both Mr. Dondero and UBS produced

18   documents to the Debtor.

19        Based on the review of that information, the Debtor found

20   no evidence that Mr. Dondero and UBS colluded to purchase

21   redeemed limited partnership interests of Multi-Strat, nor any

22   inappropriate conduct by UBS or its counsel.

23        The Debtor appreciates the opportunity to clear that part

24   of the record.

25            THE COURT:  All right.

1          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

2          MR. MORRIS:  Now, with respect to the motion at hand

3    today, Your Honor, I want to take you back just about a month

4    ago to December 10th, 2020.  At that time, we had a hearing on

5    the Debtor's motion for a TRO.  The motion had been filed in

6    advance.  Mr. Dondero had filed an objection.  He had concerns

7    about the scope and the language of the terms of the proposed

8    TRO.

9          And at that hearing, Your Honor, if you'll recall, you

10   listened carefully to the arguments that were made on behalf

11   of Mr. Dondero.  You heard carefully -- you listened carefully

12   to the proposed changes that he sought to make.  And you went

13   through that proposed TRO word by word, Paragraph 2 and 3, and

14   you read them out loud, and you made decisions at that time as

15   to whether the Court believed any portion of that was

16   ambiguous or whether it was clear.  You made determinations at

17   that time whether or not the provisions were reasonable.

18         Mr. Dondero wasn't there.  He didn't read the transcript.

19   He has no idea what you said.  But his lawyers were there, and

20   they had an opportunity to object and they had an opportunity

21   to make comments, and the order is what the order is.  And for

22   whatever reason, Mr. Dondero chose not to read it, or,

23   frankly, even understand it, based on his testimony.

24         The fact is, Your Honor, the one thing that the evidence

25   shows very clearly here is that Mr. Dondero thinks that he is

153

1  the judge.  He believes that he is the decider.  He believes

2  that he decides what the TRO means, even though he never read

3  it.  He believes that he decides what exceptions exist in the

4  TRO, even though he never read it.

5      He believes that he decides that it's okay to ditch the

6  Debtor's cell phone without even seeking, let alone obtaining,

7  the Debtor's consent.  I guess he decides that he can ditch

8  the phone and trash it without seeking to back it up or

9  informing the Debtor.

10     Mr. Dondero believes that he gets to decide that it's okay

11 to take a deposition from the Debtor's office, even when the

12 Debtor specifically says you're evicted and you're not allowed

13 to have access.

14     Mr. Dondero believes that he gets to decide that Mr. Seery

15 has no justification for making trades, even though he

16 couldn't take the time to pick up the phone or otherwise

17 inquire as to why Mr. Seery wanted to do that.

18     Mr. Seery -- Mr. Dondero believes that he is the arbiter

19 and the decision-maker and gets to decide to stop trades,

20 notwithstanding the TRO, notwithstanding the CLO agreements

21 that he is not a party to, that his entities are not a party

22 to.

23     Mr. Dondero thinks that he gets to decide that the Debtor

24 has breached the agreements with the CLOs.  He gets to decide

25 that the Debtor is in default under those agreements.  He gets

154

1  to decide that it's perfectly fine for Ellington and Leventon

2  to support his interests while they have obvious duties of

3  loyalty to the Debtor.

4      It is not right, Your Honor. It is not right. I stood

5  here, I sat here, about four hours ago, five hours ago, and

6  told the Court what the evidence was going to show, and it

7  showed every single thing that I expected it to show and

8  everything I just described for the Court about Mr. Dondero's

9  belief that he's the decider.

10     He's not the decider, Your Honor. You are. And you made

11  a decision on June -- on December 10th that he ignored.

12     There is ample evidence in the record to support the

13  imposition of a preliminary injunction. And Your Honor, I'm

14  putting everybody on notice now that we're amending our

15  complaint momentarily to add all of the post-petition parties,

16  because this has to stop. The threats have to stop. The

17  interference has to stop. Mr. Dondero can always make a

18  proposal if he thinks that there's something that will capture

19  the imagination and the approval -- more importantly, the

20  approval -- of the Debtor's creditors. We have no interest in

21  stopping him from doing that. He's got very able and

22  honorable counsel, and he can go to them and through them any

23  time he wants.

24     But the record is crystal clear here that, notwithstanding

25  Your Honor's order, one entered after serious deliberation, is

1  of no meaning to him.  And we'll be back at the Court's

2  convenience on the Debtor's motion to hold him in contempt.

3  It'll just be a repeat of what we've heard today, because,

4  frankly, the evidence is exactly the same.

5      With that, Your Honor, unless you have any questions, the

6  Debtor rests.

7          THE COURT:  All right.  I do not.

8      Mr. Bonds?

9          MR. BONDS:  Your Honor, we would like to divide our

10  time between Mike Lynn and myself.  Is that a problem?

11          THE COURT:  That's fine.  Go ahead.

12          MR. LYNN:  Are we on mute?

13          MR. BONDS:  No.

14          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15          MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16  Phelan's book.  I happened to read the confirmation hearing in

17  the *Acis* case regarding what was referred to as Clients A, B,

18  and C.  And Mr. Phelan, who testified, really gave an oral

19  argument to the Court which was very persuasive and very

20  thorough.  So I'm going to sort of do the reverse, because I

21  hope that the Court would find useful some information

22  regarding the pot plan about which you've heard many words

23  spoken but very little to do with what that plan was or how it

24  came about.

25      The pot plan was proposed by Mr. Dondero for the first

1  time in September of 2020, shortly after the conclusion of the

2  first round of mediations.  Though there had been versions of

3  it before, and lesser versions, the pot plan was finally in

4  the form that would more or less survive it in September.

5  Under the pot plan, Mr. Dondero proposed to come up with $90

6  million of cash and $70 million in promissory notes, and that

7  was to form a pot which creditors would share in.

8      The proposal was provided to the Debtor and then shared

9  with the Committee.  Mr. Seery responded with a degree, a

10  degree only, of enthusiasm to the pot plan, and indeed

11  provided a counter-term sheet to the pot plan.  He also, so he

12  said, and I believe him, approached the Committee and said

13  this is a proposal to be taken seriously.

14      He proposed some improvements in his view to the pot plan.

15  No response was received from the Creditors' Committee at that

16  time.

17      After going back and forth with the Debtor -- and Mr.

18  Seery, not unreasonably, was unwilling to propose the pot plan

19  without some support on the Creditors' Committee -- I

20  contacted Matt Clemente.  We had a nice conversation.  And at

21  that time, Mr. Clemente raised two particular concerns.  The

22  $160 million, which creditors did not think was enough, was

23  not enough, in part, because that included no consideration

24  for the acquisition of promissory notes executed some by Mr.

25  Dondero and some by entities controlled by Mr. Dondero, which

1   notes total approximately $90 million.

2        The second concern was that Mr. Dondero would get a

3   release under the plan.  During that call, I said the issue of

4   the notes is subject to negotiation and might well result in a

5   transfer of those notes, possibly with some amendments, to the

6   pot, and that Mr. Dondero was prepared, in all likelihood, to

7   forego a release.

8        Mr. Clemente agreed to get back to me.  He did.  And he

9   said to me, I have talked to the Committee about this and they

10  would like you to go to or they want you to go first to Mr.

11  Seery, work off of his revised timesheet -- or term sheet,

12  sorry -- and after you have reached an agreement with him,

13  come to us, come to the Committee, and we'll negotiate with

14  you.

15       Now, I might have agreed that that was a reasonable

16  approach if there were a possibility that Mr. Seery would

17  propose a plan without the agreement of creditors.  But the

18  way I took it was that the Committee was saying go make a deal

19  with Seery and then we'll start negotiating, and we know,

20  correctly, that Mr. Seery will not propose a plan that does

21  not have our support.

22       So, effectively, we get to go through two rounds of

23  negotiations, even though effectively everything that is in

24  the estate, everything -- causes of action against Mr.

25  Dondero, promissory notes from Mr. Dondero -- everything that

 1   they would get under a plan or under a liquidation, they would

 2   get under the pot plan.

 3        Now, I wanted you to know that, Your Honor, not because

 4   I'm now trying to get you or anyone else to sell the pot plan.

 5   But I think it's important that Your Honor know that Mr.

 6   Dondero's approach in this case has not been a hostile

 7   approach.

 8        I know the Court had what it found to be an unsatisfactory

 9   experience with Mr. Dondero in the *Acis* case.  But from the

10   time I became involved in this case and Mr. Bonds became

11   involved, we have been quiet, we have said nothing, and we've

12   done virtually nothing in the case, up until the time after

13   the mediation, when negotiations regarding a pot plan broke

14   down.

15        Since that time, regrettably, there has been a good deal

16   of hostility, and it's spreading.  I would like to see it stop

17   spreading.  I will do what I can to make it stop spreading.

18   But I need others to help me on that.  And it's my hope that I

19   can count on the Pachulski law firm, the Sidley law firm, and

20   the firms representing the major creditors to help make that

21   happen.

22        I do not think, and I would submit that it is not to the

23   benefit of the estate, it is not to the likely workout of this

24   case, that it would be best served by entering a preliminary

25   injunction, which it appears to me prevents Mr. Dondero from

1    saying good morning to one of the employees of the Debtor that

2    he knows.

3        It seems to me, Your Honor, that the injunction, by its

4    terms, as Mr. Morris would have it, is an injunction that

5    would prevent Mr. Dondero from discussing politics with Mr.

6    Ellington.  And it seems to me that an injunction that broad,

7    that extensive, and one which lasts, as far as I can tell,

8    until infinity, that such an injunction is not the right thing

9    to do, given, if nothing else, the First Amendment to the

10   United States Constitution.

11       That will conclude my presentation, and I will turn it

12   over to the wiser and better-spoken colleague, John Bonds.

13   Thank you, Your Honor.

14           THE COURT:  Thank you.  Mr. Bonds, what else do you

15   have to say?

16           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17           MR. BONDS:  Your Honor, has the Debtor met the

18   requirements for the issuance of a preliminary injunction?  We

19   submit that they have not.  And the Fifth Circuit's rules are

20   fairly clear as to the awarding of a preliminary injunction.

21       First, let's look at the type of preliminary injunction

22   that the Debtor would like you to enter today.  It provides

23   that Mr. Dondero cannot talk to any employee, regardless of

24   what is being communicated.  Mr. Dondero can pass an employee

25   on the street, but he can't acknowledge the employee, with

1   whom he may have worked for years.  Nor can he talk to his

2   personal assistants, again, which he has worked with for

3   years.  Does that violate the First Amendment of the

4   Constitution?

5        What about the shared services agreement?  What about the

6   pot plan which he is advocating as a means of reorganizing the

7   Debtor?  Not the liquidation proposed by the Debtor.  Can Mr.

8   Dondero communicate with creditors about the pot plan and the

9   other proposals without violating the TRO or the preliminary

10  injunction which deals with interfering with the Debtor's

11  business?

12       Your Honor, I think it's important to note that a

13  preliminary injunction is an extraordinary remedy that may

14  only be awarded upon a clear showing that the Plaintiff is

15  entitled to such relief.  Plaintiffs are entitled to a

16  preliminary injunction if they show, one, a substantial

17  likelihood that they will prevail on the merits of their

18  claims; two, a substantial threat that they will suffer an

19  irreparable injury if the injunction is not granted; three,

20  their threatened injury outweighs the harm to the estate or

21  the other party; and four, the public interest will not be

22  disserved, misserved, if the preliminary injunction is

23  granted.

24       The party seeking the preliminary injunction bears the

25  burden of persuasion on all four requirements.  We believe

1    that the Debtor today has failed to carry its burden of

2    persuasion of proof with regard to the second element, which

3    I'm going to refer to as the irreparable injury requirement.

4    In order to show irreparable harm to the Court, the Plaintiff

5    must prove that if the District Court denied the grant of a

6    preliminary injunction, irreparable harm would be the result.

7    Injuries are irreparable only when they cannot be undone

8    through monetary remedies. There is no evidence before the

9    Court today that Mr. Dondero cannot respond to any judgment

10    that is rendered against him by this Court.

11       Your Honor, this preliminary injunction does not involve

12    real property. Unlike the *Saldana* case, this request for the

13    issuance of a preliminary injunction involves personal

14    property only. The request that Mr. Dondero cease and desist

15    all contact with employees is just wrong and may violate the

16    First Amendment of the Constitution, as I previously stated.

17       We have other concerns regarding the issuance of a

18    preliminary injunction. We feel that the preliminary

19    injunction is too broad. It lacks a beginning and an end.

20    When does the preliminary injunction terminate? What about

21    the former employees? Once they are terminated, can Mr.

22    Dondero speak to them? What about the pot plan? Is it gone

23    forever? Can Mr. Dondero talk with the mediators about the

24    pot plan? Can Mr. Dondero speak with the members of the

25    U.C.C.?

1      It is easy to criticize Mr. Dondero.  Did he violate the

2   TRO?  We submit that he didn't and the Debtor says that he

3   did.  What matters going forward is the lack of evidence of

4   irreparable harm.

5      Mr. Seery sure wants to keep Mr. Dondero from talking to

6   anyone in this case.  Why is that?  Does Mr. Seery believe

7   that the only way to get his liquidation plan confirmed is to

8   keep Mr. Dondero from talking to anyone?  How will the

9   preliminary injunction help the Debtor's creditors?  Does

10  keeping Mr. Dondero from talking with anyone mean that there

11  will be a greater return to the creditor body?  Does

12  precluding Mr. Dondero from talking about his pot plan mean

13  that the creditors will take home more money on their claims,

14  or does it eliminate the possibility that they may take home

15  more money on their claims?

16     Your Honor, what we are seeing here today is an attempt by

17  a group to destroy what Mr. Dondero has built over the last

18  few years.  That isn't the way Chapter 11 should work.

19     Just one last thing to keep in mind, Your Honor.  Mr.

20  Seery's plan is a liquidation of the Debtor.  Mr. Dondero's

21  pot plan is a reorganization of the Debtor.

22     Thank you, Your Honor.

23         THE COURT:  All right.  Mr. Morris, you get the last

24  word.  Anything in rebuttal?

25         MR. MORRIS:  I would just point out, Your Honor, that

1   nobody here has objected to the Debtor's motion for the entry

2   of a preliminary injunction except Mr. Dondero.  While I

3   appreciate that this is an adversary proceeding, anybody who

4   felt strongly about the matter certainly could have moved to

5   intervene.  The Creditors' Committee could have moved to

6   intervene.  Mr. Clemente could have stood at the podium and

7   begged Your Honor not to impose the injunction because he

8   thought it was in the best interest of creditors to allow Mr.

9   Dondero to interfere with the Debtor's business and to speak

10  with their employees.  Nobody has done that, Your Honor.

11  Nobody's here speaking on behalf of Mr. Dondero.  Nobody's

12  here to testify on his behalf.  Nobody's -- there's no

13  evidence in the record that supports or corroborates anything

14  that he said at all, Your Honor.

15      Unless Your Honor has any specific questions, the Debtor

16  is prepared to rest.

17          THE COURT:  All right.  I do not have any follow-up

18  questions.

19      All right.  I have a lot to say.  I'm sorry, I apologize

20  in advance, but I've got a heck of a lot to say right now.

21  I'm going to give you a ruling on the motion before me, but

22  I've got a lot to add onto that, so I hope all the key parties

23  in interest are listening carefully.  Mr. Bonds, in the video,

24  I can only see you.  I hope Mr. Dondero is just right there

25  out of the video camera view.  Okay, there you are.  I wanted

1    to make sure you didn't wander off to take a bathroom break or

2    anything. So, again, I have a whole lot to say here today.

3        First, I'm going to rule on the motion. The Court does

4    find there is sufficient compelling evidence to grant a

5    preliminary injunction that is completely consistent with the

6    prior TRO. Okay? So, specifically, the Court today is going

7    to continue to prevent Mr. Dondero from (a) communicating in

8    any way, directly or indirectly, with any of the Debtor's

9    board members -- I think that's really Strand board members --

10    unless Mr. Dondero's counsel and counsel for the Debtor are

11    included. Okay. I'm saying those words slowly and carefully.

12    There is no bar on Mr. Dondero talking to the board about a

13    pot plan or anything else in the universe Mr. Dondero wants to

14    talk to them about. There's just a preclusion from him doing

15    it without his counsel and the Debtor's counsel present.

16    Okay?

17        I did that before and I'm doing it now because I've seen

18    concerning evidence that some communications to Mr. Seery and

19    others had an intimidating tone, a threatening tone one or two

20    times, an interfering tone. So, guess what, we're just going

21    to have lawyers involved if any more conversations happen.

22    Okay.

23        So (b) the preliminary injunction, just as the TRO did, is

24    going to prevent Mr. Dondero from making any threats of any

25    nature against the Debtor or any of its directors, officers,

165

1   employees, professionals, or agents.  Okay.  It's almost

2   embarrassing having to say that or order that with regard to

3   such an accomplished and sophisticated person, but, you know,

4   I saw the evidence.  I've got to do what I've got to do.  You

5   know, words in a text like, Don't do it, this is your last

6   warning, and some of the other things, that has a threatening

7   tone, so I'm going to order this.

8       Third, the preliminary injunction will prevent Mr. Dondero

9   from communicating with any of the Debtor's employees except

10  as it specifically relates to shared services provided to

11  affiliates owned or controlled by Mr. Dondero.

12      Now, I'm going to elaborate in a couple of ways here.  I

13  think in closing argument there was a suggestion that he can't

14  even talk to his friend, Mr. Ellington, about anything.  Well,

15  I heard today that Mr. Ellington and Mr. Leventon are no

16  longer employees of the Debtor, so actually that's not an

17  issue.  But while this is very restrictive, while this

18  prevents Mr. Dondero from engaging in small talk with Debtor

19  employees about the weather or the football game or whatever,

20  it's regrettable, but I feel like I'm forced to order this

21  now, because, again, the communications that were put in the

22  record.  Okay?  We just can't take any chances, as far as I'm

23  concerned, with regard to there being potential interference

24  with the Debtor's operations that might be harmful or contrary

25  to creditors' interests.

1      Fourth, the preliminary injunction, just like the TRO,

2   will prevent Mr. Dondero from interfering with or otherwise

3   impeding the Debtor's business, including but not limited to

4   the Debtor's decisions concerning its operations, management,

5   treatment of claims, disposition of assets owned or controlled

6   by the Debtor, and pursuit of any plan or alternative to the

7   plan.

8      Now, I understand the argument that this is pretty broad

9   and might be, I don't know, subject to some disputes regarding

10  was it interference, did it impede the Debtor's business or

11  not?  You know what, if you follow the other prongs of the

12  preliminary injunction, that you don't talk to the board

13  without your counsel, Mr. Dondero, and the Debtor's counsel,

14  and you don't talk to Debtor's employees except with regard to

15  matters pertaining to the shared services agreement, and,

16  bottom line, if you just run everything by your attorneys,

17  you'll be okay.  We won't have this ambiguous, vague,

18  problematic territory.

19     Fifth, I will go ahead and, for good measure, belts and

20  suspenders, whatever you want to call it, prevent Mr. Dondero

21  from otherwise violating Section 362(a) of the Bankruptcy

22  Code.

23     Now, I read the response filed at 9:30 last night by Mr.

24  Dondero's counsel.  It's a good response.  It makes legal

25  arguments about that being, you know, it just being too vague.

1   Well, to the contrary, it just restates what's already in the

2   Bankruptcy Code, right?  Persons are prohibited from violating

3   Section 362(a) of the Bankruptcy Code.  If anything, it's the

4   sky is blue, right, just stating what is true.  But I

5   understand Debtor wanting some clarity in an order, because we

6   want you to take this seriously, Mr. Dondero, and not just do

7   something and then say, well, you didn't know what was in the

8   Code.  You know, you need to consult with your lawyer.  That's

9   going to be in there.

10      Bottom line, I want that language in there because, Mr.

11  Dondero, I want you to see an order that this Court expects

12  you to comply with the Bankruptcy Code.  And again, if you

13  don't understand, if you're unsure whether you can take action

14  $x$ or $y$, consult with your very capable lawyers.

15      I note that if you listened carefully to these words,

16  there was nothing in here that stopped Mr. Dondero from

17  talking to the Creditors' Committee about a pot plan.  Nothing

18  in this injunction, nothing in the previous TRO, ever

19  prohibited that.

20      Last, with regard to the ruling -- and again, I've got a

21  lot more to say when I'm done -- I am going to further enjoin

22  Mr. Dondero from what we said in the TRO:  causing,

23  encouraging, or conspiring with any entity controlled by him

24  and/or any person or entity acting on his behalf from directly

25  or indirectly engaging in any of the aforementioned items.

168

 1  This is not an injunction as to nonparties to the adversary

 2  proceeding.  It is an injunction as to Mr. Dondero from doing

 3  the various enjoined acts that I previously listed under the

 4  guise of another entity or a person that he controls.

 5       Again, if you're dealing with and through your attorneys,

 6  Mr. Dondero, I don't think this will be hard to maneuver.

 7       I guess I'm actually not through with my ruling yet.  I do

 8  want to add that the Court rules that the injunction shall

 9  last through the time of confirmation of a plan in this case

10  unless otherwise ordered by this Court.

11       And as to the legal standards, I want to be clear for the

12  record that the Court believes this injunction is necessary to

13  avoid immediate and irreparable harm to the Debtor's estate

14  and to its reorganization prospects.  I believe that there's a

15  strong likelihood the Debtor will succeed in a trial on the

16  merits of this adversary proceeding.  I believe the public

17  interest strongly favors this injunction.  And I believe the

18  balance of harms weighs in favor of the Debtor on all of these

19  various issues.

20       Again, I want to reiterate, the intimidation and

21  interference that came through in some of these email and text

22  communications was concerning to the Court and is a motivation

23  for this preliminary injunction.

24       Now, I'm going to add on a couple of things today.  The

25  first thing I'm going to add on -- and I want this, Mr.

1    Morris, in the order you submit.  You didn't ask me for this,

2    but I'm going to do it.  I'm going to order you, Mr. Dondero,

3    to attend all future hearings in this bankruptcy case unless

4    and until this Court orders otherwise.  And I'm doing this --

5    it's not really that unusual a thing for me to do.  I

6    sometimes order this in cases when I'm concerned about, you

7    know, is the businessperson paying attention to what's going

8    on in the case and is he engaged, is he invested, is he

9    available when we need him?

10        In this case in particular, the evidence was that you

11   didn't read the TRO.  You were not aware of its basic terms

12   and you didn't read it.  Okay?  So that was what sent me over

13   the edge as far as requiring this new element that you're

14   going to attend every hearing.  Obviously, we're doing video

15   court, so that's not that much of a burden or imposition.  You

16   can pretty much be anywhere in the world and patch in by

17   video, since we're in the pandemic and not doing live court.

18   But I think it's necessary so I know you hear what I rule and

19   what goes on in this case.

20        I will tell you that I was having a real hard time during

21   your testimony deciding if I believe you didn't read the TRO

22   or know about the different things that were prohibited.  You

23   know, I was thinking maybe you're not being candid to help

24   yourself in a future contempt hearing, or actually maybe

25   you're being a hundred percent honest and candid but you're

170

1    kind of hiding behind your lawyers so that you can argue the

2    old plausible deniability when it suits you.

3        But no more.  No more.  I'm not going to risk this

4    situation again of you not knowing what's in an order that

5    affects you.  So you must be in court by video until I order

6    otherwise.

7        Second, and I regret having to do this, but I want it

8    explicit in the preliminary injunction that Mr. Dondero shall

9    not enter Highland Capital Management's offices, regardless of

10   whether there are subleases or agreements of Highland

11   affiliates or Dondero-controlled entities to occupy the

12   office, unless Mr. Dondero has explicit written permission

13   that comes from Highland's bankruptcy counsel to Dondero's

14   bankruptcy counsel.  Okay?  If he does, it will be regarded as

15   trespassing.

16       And, I don't know, are there security guards on the

17   premises?  I mean, gosh, I hate to be getting into this

18   minutia, but -- well, I just want it explicit in the order

19   that Mr. Dondero, I'm sorry, but you can't go to these offices

20   without written permission.  And again, that can only be given

21   from Debtor's counsel to Mr. Dondero's counsel.  Okay?  So

22   it's going to be trespassing.  You know, someone can call the

23   Dallas Police Department and have you escorted out.  Again, I

24   hate having to do that.  It's just, it's embarrassing for me.

25   I think it's embarrassing for everyone.  But I'm backed up in

1  that corner.

2      Next, I am going to ask that it be clear that Mr. Dondero

3  can deal with the Unsecured Creditors' Committee and its

4  professionals with regard to talking about a pot plan.

5      And next, I'm going to add -- and I think, Mr. Morris, you

6  requested this at some point today in oral argument -- Mr.

7  Ellington and Mr. Leventon shall not share any confidential

8  information that they received as general counsel, assistant

9  general counsel for the Debtor, without Debtor's counsel's

10 explicit written permission. Okay? So we've got that in

11 writing.

12     And, you know, that's a little awkward because they're not

13 here, they weren't parties to the injunction, but they were

14 Debtor employees until recently. If they want to risk

15 violating that and come back to the Court and argue about

16 whether they got notice and whatnot of that, they can argue

17 that, but I want it in the order regardless.

18     So that is the ruling. And now I want to kind of talk

19 about a few other things. And before we're done here, Mr.

20 Morris, I'll ask do you have questions, does Mr. Bonds have

21 questions, does anyone have questions about the ruling. But I

22 want to talk about a couple of things. And again, I hope that

23 I'm coming through loud and clear, Mr. Bonds, in your office

24 for Mr. Dondero to hear this. It's really, really important

25 that he heard what I'm about to say. I'm going to say some

 1  kind of unpleasant things and then I'm going to say some

 2  hopeful things, okay?

 3      Mr. Dondero?  Okay.  Mr. Dondero, I'm going to -- Mr.

 4  Morris, you've got your hands on your head.  Did I miss

 5  something?

 6          MR. MORRIS:  No.  I was just surprised to see Mr.

 7  Dondero on his phone.  I apologize, Your Honor.

 8          THE COURT:  Oh, my goodness.  Were you on your phone,

 9  Mr. Dondero?

10          MR. DONDERO:  No, I was not.

11          THE COURT:  Okay.  I want you to listen to this

12  really closely, and then I promise I'm going to have something

13  hopeful to say after this very unpleasant stuff.  You know, I

14  keep a whiteboard up at my bench.  I don't know if you can

15  read it.  But sometimes I hear something in a hearing and I

16  think, okay, this is one of my major takeaways from what I

17  heard today.  And I've got two, I've got two big takeaways

18  here.  Number one on my whiteboard is Dondero's spoliated

19  evidence.  Game-changer for all future litigation.  Okay.

20          MR. DONDERO:  I'm sorry.  I didn't hear that.  I

21  didn't hear that.  Could you repeat that, please?

22          THE COURT:  Mr. Dondero, spoliated evidence, game-

23  changer in future litigation.

24      Okay.  Let me tell you, the throwing away of the phone,

25  that was the worst thing I heard all day.  That was far and

1  away the worst thing I heard all today.  I don't know what I'm

2  going to hear down the road to fix this, but if it's really

3  gone, let me tell you how bad this is.  We have all sorts of

4  Federal Rules of Civil Procedure that talk about this being a

5  bad thing, but I wrote an opinion a couple years ago dealing

6  with spoliation of electronic evidence, and I think it might

7  be helpful for everyone to read.  It was called *In re Correra*,

8  C-O-R-R-E-R-A.  I have no idea what the cite on it is.  But in

9  this case, *Correra*, we had a debtor who had a laptop, and he

10  gave the laptop to his personal assistant, who took it away to

11  another state.  And at some point during the case, parties

12  discovered, oh, there's a laptop that may have a treasure

13  trove of information.  Who knows?  Maybe it does; maybe it

14  doesn't.  But there's a laptop that we just now learned about

15  that the personal assistant has.

16      And so I issued an order that she turn it over, and there

17  were subpoenas and depositions, blah, blah, blah.  Long story

18  short, the evidence ended up being that she deleted everything

19  on the laptop, and then -- this would almost be funny if it

20  wasn't so serious -- she downloaded thousands of pictures of

21  cats onto the laptop.  I kid you not, cats.  Meow, meow, cats.

22  And she downloaded a hundred-something full-length movies.

23  And we had two days of forensic experts come in and take the

24  witness stand and tell me about how, okay, this is like an

25  amateurish -- you've talked about amateur hour today -- this

1  is kind of an amateurish way of deleting data, right.  You

2  first delete all the files on the laptop and then you cover

3  over all the space to make sure the information is not

4  retrievable.  You know, this genius ended up retrieving some

5  of the information.

6      But the long story short is I sanctioned the debtor and

7  his assistant jointly and severally.  You'll have to go back

8  and look at the opinion.  I'm pretty sure it was over a

9  million dollars.  And I can't remember if that was attorneys'

10  fee-shifting only, or monetary, like penalty on top of the

11  attorneys' fees-shifting.  I just can't remember.  But maybe

12  poor Tara needs to be advised of that opinion, too.  I mean,

13  --

14      But the other reason I put game-changer in future

15  litigation is, in my *Correra* case, it wasn't just the monetary

16  million-dollar sanction or whatever it was; it was a game-

17  changer in future litigation because the adverse party to the

18  debtor ended up arguing -- and it was the state of New Mexico,

19  by the way -- they ended up saying, in all future litigation,

20  we want you -- some adversaries, we want you to make an

21  adverse inference.  In other words, for all of these elements

22  that we're trying to prove in our fraudulent transfer

23  litigation and whatever else was going on, we want you to make

24  an adverse inference that there would have been evidence there

25  on that laptop that would have supported some of our causes of

1  action and it was destroyed to keep us from having that

2  evidence.

3      And they brought forth all kinds of case law.  It's a hard

4  area.  It's a really, really hard area.  But I ended up --

5  again, it's not in the main opinion.  It was in subsequent

6  orders.  I ended up saying, yeah, I think you've met the

7  standard here to draw adverse inferences.

8      So, again, this is a very unpleasant message for me to

9  deliver today.  But the destruction of the phone is my biggest

10  takeaway of concern today, how that might have ramifications.

11  You know, there are other bad things, too, about that.  I'm

12  not even going to go there right now.  But the, you know,

13  Title 18, you can ask your lawyer what that means, but okay.

14      My second big takeaway before we get to the hopeful stuff

15  is -- and this is kind of harsh, what I'm about to say -- but

16  Ellington and Leventon maybe care more about you, Mr. Dondero,

17  than their law license.  You know, I guess it's great to have

18  people in your life who are very, very loyal to you.  I mean,

19  loyalty is a wonderful thing.  But I am just so worried about

20  things I've heard.  Again, the phone and in-house lawyers.

21  The biggest concerns in my brains right now.  I have worried

22  about them for a while.

23      You all will -- well, Mr. Dondero, you might not know

24  this.  But we had a hearing a few months ago, maybe September,

25  October, where the Creditors' Committee was trying to get

1  discovery of documents.  And we had some sort of hearing,

2  maybe a motion to compel production.  And we had many, many

3  entities that you control file objections:  NexPoint, NexBank.

4  I can't even remember.  We just had a whole slew.  CLO Holdco.

5  Many, many of these entities objected.  And I was trying to

6  figure out that day who was instructing them.  And oh my

7  goodness, I hope the in-house layers are not involved in this

8  document discovery dispute, because, you know, they have

9  fiduciary duties.  And are -- you know, is it -- it feels like

10  it's breaching a duty to the bankruptcy estate when it's in

11  the bankruptcy estate's best interest to get these documents

12  if you're meanwhile hiring lawyers for these other entities,

13  Holdco, et cetera, and saying, Fight this.

14      I never really pressed it very hard back then, but I

15  raised the issue and I said, I'm really, really concerned

16  about this.  And I continue to be concerned about it.  I had

17  experiences with Mr. Ellington in the *Acis* case where he

18  testified on the witness stand, and later it looked a heck of

19  a lot like he might have committed perjury.  I hate to use

20  such blunt terms.  But I let it go.  I'm just like, you know,

21  I'm not going to -- you know, I'm going to just hope for the

22  best that he misspoke.

23      But I'm getting a really bad taste in my mouth about

24  Ellington and Leventon, and I hope that they will be careful

25  and you will be careful, Mr. Dondero, in future actions.

1      Is Mr. -- I can't see Mr. Dondero.  I want to make sure

2  he's not on the phone.  Okay.  Okay.  Thank you.

3      So where was I going to head next?  I guess I want to say

4  a couple of things now that I would describe as a little bit

5  more hopeful, and that is pertaining to this whole pot plan

6  thing.

7      You know, I tend to think, without knowing what's being

8  said outside the courtroom, that a pot plan would be the best

9  of all worlds, okay, because the plan that we have set for

10  confirmation next week, I understand we have a lot of

11  objections, and if I approve it, if I confirm the plan, we're

12  going to have a lot of appeals and motions for stay pending

13  appeal, and no matter how that turns out, we're going to have

14  a lot of litigation.  Okay?  You know, we're going to have

15  adversaries.  And we have a not-very-workable situation here

16  where we have these Dondero-controlled affiliates questioning

17  Mr. Seery's every move.

18      I would love to have a pot plan that would involve, Mr.

19  Dondero, you getting to keep your baby, okay?  I acknowledge,

20  everyone here acknowledges, you are the founder of this

21  company.  This is your baby.  You created a multi-billion-

22  dollar empire, okay?  I would be shocked if you didn't want to

23  keep your baby.  Okay?  If there was a reasonable pot plan, I

24  would love it.

25      But I'm telling you, the numbers I heard didn't impress me

1   a heck of a lot.  I'm not an economic stakeholder.  It's not

2   my claim that would be getting paid.  But I can see where

3   these Creditor Committee members, they're not going to think

4   $160 million -- $90 million in cash, $70 million in notes, or

5   vive-versa -- is nearly enough.  Okay?

6       So I am going -- what just happened?  What just happened?

7   I lost Mr. Dondero.  Okay.  This is getting kind of humorous,

8   almost.

9       Okay.  I am going to order that between now and the end of

10  the day Tuesday there be good-faith, and I'll say face-to-face

11  -- Zoom, WebEx, whatever -- negotiations between Mr. Dondero

12  and his counsel and at least the Committee and its

13  professionals regarding this pot plan.

14      Now, the train is leaving the station next Wednesday,

15  okay?  If we don't have Creditors' Committee and Debtor and

16  Dondero rushing in here saying, Please continue the

17  confirmation hearing next Wednesday, if we don't have like

18  unanimous sentiment to do that, you know, this is a 15-month-

19  old case, I'm going to go forward with the plan that's on

20  file.

21      And it's been a long, expensive case.  I had great

22  mediators try to give it their best shot to get a grand

23  compromise.  I just, I'm not going to drag this out unless you

24  all tell me Wednesday morning, We want you to continue this a

25  week or two.

1      And let me tell you -- this may be the stars lining up, or

2  it may not be -- I was supposed to have a seven-day trial

3  starting the week after next, and then I was supposed to have

4  a four- or five-day day trial starting immediately after that.

5  And all of those lawyers came in and asked for a continuance

6  because of COVID.  They wanted a face-to-face trial, and so

7  I've put them off until April.

8      So if you wanted to postpone the confirmation hearing to

9  the following week or even the following week, I have the gift

10  of time to give you.  But I'm not going to do it lightly.

11  I'm, again, I'm just going to order face-to-face meetings.

12  And I said Dondero and his counsel and the Committee and its

13  professionals.  You know, if -- I'm not slighting the Debtor

14  here or Mr. Seery, but I'm kind of taking a cue from what Mr.

15  Morris, I think I heard you say, that at this point it's the

16  Committee, it's the Committee's money, and I think that's the

17  starting place.  And if they want to join the Debtor in at the

18  beginning or midway through, you know, wonderful, but I think

19  it needs --

20          MR. POMERANTZ:  Your Honor, this is Jeff -- this is

21  Jeff Pomerantz.  I hate to interrupt, and I never do that to a

22  judge, but I did have something to say in my comments about a

23  continuance that we've talked about with the Committee and

24  some other developments in the case.

25          THE COURT:  Oh.

1          MR. POMERANTZ:  I'm happy to wait.  But it has -- it

2    has nothing to do with the comments you said, although, as I

3    think you've heard from me before, the Debtor has been a

4    supporter, a supporter of a pot plan.  Mr. Seery has done a

5    tremendous amount of work working with Mr. Dondero, working

6    with Mr. Lynn, to try to make that happen.  And if the

7    Committee is willing to engage in a pot plan, we would

8    definitely support that.  Because we do agree with Your Honor

9    that, absent a pot plan, we are looking at a lot of

10   litigation.

11        Some of the issues you're going to have to deal with at

12   the confirmation hearing if we do not have a peace-in-the-

13   valley settlement is exculpations, releases, moratoriums on

14   litigation, extensions of your January 9th order --

15          THE COURT:  Uh-huh.

16          MR. POMERANTZ:  -- with respect to pursuing certain

17   people.

18        So, we get it, and we've gotten it from the beginning.

19   And Mr. Seery, sometimes even at a fault, has been

20   singlehandedly focused on trying to get that done.  It's just

21   unfortunate where we are here.

22        But having said that, I wanted to first apprise the Court

23   of a recent major development in the case.  I'm pleased to

24   report that the Debtor and UBS have reached a settlement in

25   principle which will resolve all of UBS's claims against the

1    estate, all of UBS's claims against Multi-Strat.  The parties

2    are working on documentation.  The settlement is subject to

3    internal approvals from UBS, but we've been led to believe

4    those approvals will occur, and we would hope to file a Rule

5    9019 motion in the near future.

6        I'm sure Your Honor is quite pleased to hear that.  The

7    UBS matters have taken a substantial amount of time.  And with

8    the settlement of UBS's claims, the only material unresolved

9    claim, unrelated to Mr. Dondero or the employees, are Mr.

10   Daugherty.  And Mr. Seery will continue to work with Mr.

11   Daugherty to try to settle that.

12               THE COURT:  Okay.

13               MR. POMERANTZ:  With respect to the scheduling, with

14   respect to the scheduling, Your Honor, there are three

15   significant matters on for hearing on the 13th.  The first is

16   the Debtor's motion to approve a settlement with HarbourVest,

17   which Mr. Dondero is contesting.  Depositions are being

18   conducted on Monday, and we anticipate an evidentiary hearing

19   in connection therewith.

20       The Debtors, as Mr. Morris indicated earlier on in the

21   hearing, have also filed a complaint and a motion for a

22   temporary restraining order against certain of the Advisors

23   and Funds owned and controlled by Mr. Dondero which relate to

24   the CLO management agreements for which Your Honor has heard a

25   lot of testimony today.  We also expect that TRO to be

1   contested and for the Court to have an evidentiary hearing.

2         And as Your Honor mentioned, the confirmation of the plan

3   was scheduled for Wednesday, and there were 15 objections.  I

4   would point out, Your Honor, all but four of which were Mr.

5   Dondero, his related entities that he owns or controls, and

6   employees or former employees.

7         The Court previously gave us time on the 13th and the

8   14th, I think anticipating that we would have a lot and it may

9   be necessary to go into two days.  However, Your Honor, those

10  two days are not going to be enough to deal with all the

11  issues that we have before Your Honor.

12        So what we suggest, and we've spoken to the Committee and

13  the Committee is supportive, that we continue confirmation to

14  a day around January 27th.  This will enable the Debtor to not

15  only -- and the Committee -- not only to take Your Honor up on

16  what you'd like to see accomplished in the next few days.  I'm

17  sure the Debtor is supportive and will be supportive, and we

18  hope the Committee will engage in good-faith negotiations, and

19  if there's a way to do a pot plan, we are all for it.  It'll

20  give time for that to happen.

21        But at the same time, and I think what you'll hear from

22  Mr. Clemente, that we're willing to give a continuance, we all

23  know that if there is not a settlement to be had, if there is

24  not a pot plan to be had, this case has to confirm, it has to

25  exit bankruptcy, and at least from the Debtor's perspective, a

1  lot of protections will have to be in place that basically

2  this has not just been a pit stop in Bankruptcy Court and we

3  return to the litigation ways that Highland is involved in.

4      So, Your Honor, we believe that the two evidentiary

5  hearings on for next week probably will fill up both days.  We

6  would suggest that the first day be the complaint and the TRO

7  against the Advisors and the Funds for the 13th, and the 14th

8  be the HarbourVest.

9      We also recognized as we were preparing for today, Your

10 Honor, looking ahead, that we thought it was not fair for us,

11 although we know Your Honor works tirelessly and as hard as

12 anyone on this hearing and that Your Honor would be prepared

13 for confirmation and would be prepared for each of those

14 trials, given the gravity of these issues, the extensive

15 pleadings, pleadings that you would get in confirmation on

16 Monday from the Debtor, that it made sense to continue the

17 hearing.

18     So, again, fully supportive of Your Honor's mandate to try

19 to see if we could work things out, fully supportive of a

20 continuance until the 27th, if that date works for Your Honor,

21 but we believe we do need to go ahead with the two matters

22 that are on for calendar next week.

23         MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

24 May I be heard briefly?

25         THE COURT:  Oh my goodness.  Who do you represent,

1    Mr. Rukavina?

2         MR. RUKAVINA:  And I apologize -- Your Honor, I am

3    the new counsel who will be representing the Funds and

4    Advisors.  I will probably be taking the laboring oar at

5    confirmation.

6      I apologize I'm not wearing a suit and tie.  I did not

7    anticipate speaking right now.

8      I support -- to the extent that that's an oral motion for

9    continuance by Mr. Pomerantz, I certainly support that.  I

10   would suggest that the Court give us an understanding of that

11   today, because we do have depositions and discovery lined up

12   which we can then push if the hearing on confirmation is

13   pushed to the 27th.  And we have no problem going forward on

14   the other matters on the 13th.

15      So, I am co-counsel to K&L Gates, Your Honor, so whoever

16   the K&L Clients are, they're now my clients as well.  I just

17   wanted to be heard briefly that we support the recommendation

18   by Mr. Pomerantz and just urge that the Court give us finality

19   on that issue today so that we're not burning the midnight

20   oil, many sets of lawyers preparing for confirmation on the

21   13th.

22        Thank you for hearing me, Your Honor.

23         THE COURT:  All right.  So, just to be clear, the

24   proposal is that we go forward next Wednesday on the newest

25   request for a TRO with regard to -- is -- the CLO Funds and

1  the Advisors.  I'm forgetting the exact names.  And then that

2  would take likely the whole day, but whether it does or does

3  not, we would roll over to Wednesday of next week -- that'd be

4  the 14th -- to do the HarbourVest.  It's a compromise motion,

5  right?  Is there anything else?

6      MR. POMERANTZ:  No, correct, it's the compromise

7  motion, Your Honor.  There are two pending objections on this

8  and discovery scheduled for Monday.

9      THE COURT:  All right.  Well, as far as --

10     MR. CLEMENTE:  Your Honor?

11     THE COURT:  Yes, who is that?

12     MR. CLEMENTE:  Oh, Your Honor, it's Matt Clemente at

13  Sidley on behalf of the Committee.  I'm here, and I thought

14  maybe I'd offer just a couple of comments at this point, but

15  I'm happy to hold them.

16     THE COURT:  Well, --

17     MS. SMITH:  And Your Honor, this is Frances Smith.  I

18  would also like to be heard before you wrap up.

19     THE COURT:  Okay.  Well, I guess generally I want to

20  know, does anyone have any objection -- I can't imagine they

21  would -- but any objection to pushing confirmation out to

22  around the 27th?  I'm going to say that because I have an

23  issue middle of the day the 28th.  If we do it the 27th, I

24  could only go a day and a half, okay?  I have to go out of

25  town the evening of the 28th, and I would be out the 29th as

186

1    well.  That's Thursday and Friday.  So we'll talk about that.

2    But anyone, Mr. Clemente or anyone else, want to say anything

3    about continuing the confirmation?

4         MR. CLEMENTE:  Your Honor, it's Matt Clemente at

5    Sidley.  No, Your Honor, we're supportive of that schedule.

6         And Your Honor, just briefly, I heard my name discussed

7    quite a bit at this hearing as well as the Committee.  I'm not

8    going to get into it unless Your Honor would like me to, but

9    let me be very clear:  The committee has taken very seriously

10   the pot plan proposals that Mr. Dondero has presented, and

11   there's much more to the discussion other than what Mr. Lynn

12   suggested in his remarks.

13        So I'm not going to get into all that unless Your Honor

14   thinks it's necessary.  I think it's of no moment here.  But I

15   did want Your Honor to know that we have carefully considered

16   the pot plan proposals and have communicated a variety of

17   issues about that to Mr. Lynn and will continue to take the

18   direction of Your Honor and engage on a pot plan, Your Honor.

19   But I did not want there to be any suggestion that we did not

20   take it seriously and that there was much, much more

21   consideration and discussion about it than what was suggested.

22        THE COURT:  Uh-huh.

23        MR. CLEMENTE:  Thank you, Your Honor.

24        THE COURT:  All right.

25        MS. SMITH:  Your Honor, this is Frances Smith.

1          THE COURT:  Who do you represent, Ms. Smith?

2          MS. SMITH:  Your Honor, we were recently retained by

3     the four senior employees:  Tom Surgent, Frank Waterhouse,

4     Scott Ellington, Isaac Leventon, along with Baker & McKenzie,

5     and I believe we have the Baker & McKenzie lawyers Deb

6     Dandeneau and Michelle Hartmann on the line.

7          Your Honor, we have listened to the whole hearing.  And I

8     was not going to make an appearance.  I was following your

9     instructions and listening carefully.  But Your Honor, I --

10    first of all, we hate to be before you for the first time in a

11    discovery dispute.  We did file a very limited objection to

12    the plan because of the disparate treatment of our clients,

13    which we are not arguing today, of course.  We received -- it

14    is our usual practice, Your Honor -- you've known me for a

15    long time -- to cooperate on having witnesses appear.  We got

16    -- we were notified very late Tuesday that the Debtor's

17    counsel would like two of our clients to appear.  We made what

18    we thought was a reasonable request for a copy of the

19    transcript from the deposition.  We were invited to the

20    deposition and then told we could not attend, or our clients

21    could not attend.  When we offered to make it lawyers-only,

22    they said no.  So we did not produce our clients without a

23    subpoena.

24         Our clients have not been evading service.  As far as we

25    know, they were each attempted service one time, late

1  Wednesday, when they were -- around dinnertime.  Mr. Leventon

2  was home all day today.  Didn't go any -- or yesterday.

3  Didn't go anywhere.  Was not served.  Wasn't served this

4  morning.  The same, as far as we know, with Mr. Ellenton.

5      Your Honor, on the order that you just entered, I am a

6  little unclear of where your findings of fact stopped.  First

7  of all, I do not think that you can enjoin Mr. Ellenton and

8  Mr. Leventon.  They are not parties to the adversary

9  proceeding.

10     You know, we did some very quick research.  There's a

11 Seventh Circuit case, a district court may not enjoin

12 nonparties who are not either acting in concert with an

13 enjoined party nor in the capacity of agents, employees,

14 officers of the enjoined party.  Mr. Ellington and Mr.

15 Leventon are not agents, employees, officers of Mr. Dondero.

16 So I think that, Your Honor, you cannot make that ruling.

17     Of course, you can rule that Mr. Dondero cannot talk to

18 Mr. Leventon and Mr. Ellington.  That might be a way to fix

19 that one part.  But as nonparties, I don't believe that you

20 can enjoin them.

21     Also, Your Honor, there was just no evidence against them

22 to support that.  Out of more than two dozen exhibits, there

23 was one mention of Mr. Leventon, where all he did was give Mr.

24 Dondero Matt Clemente's phone number.  And you yourself ruled,

25 Your Honor, that Mr. Dondero could speak with the Committee,

1   so that wouldn't even have been a violation of your orders.

2   There's three related to Mr. Ellington, but no evidence of

3   confidential information.

4        And, Your Honor, I'm very concerned about the comments

5   that you made about Mr. Ellington and perjury. I just want to

6   make sure that it's clear on the record that those were not

7   findings of fact. That did not -- there was no evidence about

8   that today. And I understand Your Honor's frustration. I was

9   -- but I just want to be very clear on the record that those

10  were not findings of fact that you were making during that

11  part of your comments. I was a little unclear about where the

12  ruling exactly stopped when you said you wanted to add onto

13  the order and then you were going to make a few more comments.

14       So that's all I have, Your Honor.

15            THE COURT: Okay.

16            MS. SMITH: Thank you for listening and --

17            THE COURT: Thank you. Fair comments, one and all.

18  I'm first going to tweak. I was concerned. You heard me

19  express concern about, you know, Ellington and Leventon aren't

20  parties to this adversary. Not here. So here's -- Mr.

21  Morris, I assume you're the scrivener. Let's change what I

22  said earlier and have the injunction read that Mr. Dondero

23  shall not request that Mr. Ellington or Mr. Leventon share any

24  confidential information they received as general counsel or

25  assistant general counsel for the Debtor without Debtor's

1  counsel's explicit written permission, nor accept any

2  confidential information that the two of them may have

3  received as general counsel or assistant general counsel for

4  the Debtor. Okay? So the injunction is --

5          MR. MORRIS: Your Honor, if I may, --

6          THE COURT: Who?

7          MR. MORRIS: Your Honor, if I may, that is not

8  sufficient for us, because that means that they can actually

9  share it with him as long as he doesn't request it. I'm a

10  little surprised --

11          THE COURT: No. You didn't hear the accept -- the

12  last part.

13          MR. MORRIS: Okay.

14          THE COURT: I added on at the end, nor shall Mr.

15  Dondero accept any confidential information. They -- he shall

16  not request that they share it, nor shall he accept it. Okay?

17  I --

18          MR. MORRIS: So, but that -- my concern is that that

19  makes Mr. Dondero the arbiter of what's confidential and

20  what's privileged. And I think that's improper. I think it's

21  really reasonable, and I'm surprised -- you know, we're all

22  advocates here, so I take no issue with counsel, but the order

23  was going to be pretty simple: Don't disclose privileged or

24  confidential information. If they don't like that, that's

25  fine. Just bar Mr. Dondero from speaking to either one of

1　them, period, full stop.  Because we should not be in a

2　position where he doesn't request it but somehow they send it

3　to him.  It is confidential.

4　　I mean, who's deciding what's confidential here?  Mr.

5　Ellington?  Mr. Leventon?  Mr. Dondero?  Just stop their

6　communication.  Mr. Dondero is subject to the Court's order.

7　He's the one who's subject to this motion.  Bar him from

8　speaking to either one of them.  It's a very -- very simple

9　solution.

10　　　　MR. BONDS:  Your Honor, I agree that it's a simple

11　solution.  It's, I mean, not correct to assume that Mr.

12　Dondero is in any way going to breach his obligations to the

13　Court or to Mr. Ellington and Mr. Leventon.  I don't see where

14　-- what we're talking about.

15　　　　MS. SMITH:  Also, Your Honor, I have to object to him

16　disparaging my clients that way.  There's been no evidence

17　that they improperly shared any information.  They are

18　licensed lawyers and they know the Rules of Professional --

19　they know the rules of professionalism, so --

20　　　　THE COURT:  Okay.  I, you know, I didn't make a

21　finding earlier when I held out my two giant takeaways, to get

22　to your later question, no findings.  But I really hope you

23　share with them everything I said, the concerns I expressed.

24　Maybe get the transcript.

25　　　　MS. SMITH:  Absolutely, Your Honor.

1        THE COURT:  Because I have huge concerns about

2   conflicts of interest here.  Okay?  Huge, huge concerns.  I

3   had them back when we had the discovery fight, Committee

4   wanting documents, and, you know, and I still have them.  You

5   know, did Ellington know about the TRO?

6        MS. SMITH:  Understood, Your Honor.

7        THE COURT:  Okay.  So let me backtrack.  We already

8   had a TRO that prevented Mr. Dondero from talking to any

9   employees of the Debtor unless it was about shared services

10  agreement.

11      So, Mr. Bonds, I'm going to flip it back to you on this

12  one.  Why shouldn't I at this point just say, okay, guess

13  what, no talking to Mr. Leventon or Ellington for the time

14  being?  Why --

15       MR. BONDS:  First of all, --

16       MS. SMITH:  Your Honor, that's acceptable to us.

17       THE COURT:  Okay.  What's wrong with that, Mr. Bonds?

18       MR. BONDS:  Your Honor, we don't believe that Mr.

19  Dondero has violated the TRO.

20      And secondly and more importantly, we don't believe that

21  there's any way that you can enter an order that singles out

22  two former employees.  I mean, that's bizarre.

23       THE COURT:  If I'm concerned that it's thwarting the

24  reorganization efforts and there are conflicts of interest

25  here, why can't I?

1          You know, this is -- I hate to say it, but I feel like

2     I've been in the role of a divorce judge today.  We have very

3     much a corporate divorce that has been in the works, unless we

4     get this pot plan on track, okay, and I'm a judge having to

5     enter interim orders keeping one spouse away from the other,

6     keeping one spouse out of the house, keeping one spouse away

7     from the kids.  It's not pleasant at all.  But I don't -- the

8     more I think about it, the more I have authority to do it just

9     to protect, to protect the nest egg here.

10          MS. SMITH:  Your Honor, we are perfectly fine with

11    you enjoining Mr. Dondero from speaking to our clients, and we

12    will convey that to our clients.

13          THE COURT:  Okay.  Mr. Bonds, I can't hear you.

14          MR. BONDS:  I'm sorry, Your Honor.  What evidence is

15    there of irreparable harm as to Mr. Dondero talking with

16    either Mr. Leventon or Mr. Ellington?

17          THE COURT:  Okay.  Do I need to parse through the

18    communications I saw?  Do I need to parse-

19          MR. BONDS:  Yeah, I think so.  I mean, I don't

20    understand.

21          THE COURT:  Okay.  I never authorized Mr. Ellington

22    to be the settlement lawyer or whatever, okay?  I never would

23    have, okay?  And maybe Mr. Seery, you know, said something to

24    -- early on in the case to make him think he had that

25    authority, but no, we're done.  Okay?  And I feel like it's

194

1  causing more harm than good right now.  Okay?

2      I don't know who instructed all of these Dondero-

3  controlled entities to hire lawyers.  I don't know if

4  Ellington and Leventon have been giving instructions to these

5  entities.  But we've got conflicts everywhere now.  Okay?

6  We've got -- and by the way, I'm just going to list them now.

7  We have, of course, Bonds Ellis representing Dondero.  We have

8  Doug Draper, Heller Draper, now representing these trusts, Get

9  Good Trust, Dugaboy Investment Trust.  We have K&L Gates and

10  now Munsch Hardt also representing the Advisors, NexPoint and

11  the various CLO or other Funds.  We have CLO Holdco

12  represented by Kane Russell Coleman Logan.  We have NexPoint

13  Real Estate represented by Wick Phillips.  Who have I left --

14  and, of course, the employees, Baker & McKenzie and Ms. Smith.

15  We have Spencer Fane in there for other current or former

16  employees.  We have Loewinsohn Flegle in there for certain

17  former or current employees.

18      I mean, the proliferation of lawyers.  And again, I don't

19  know if Mr. Ellington and Mr. Leventon have had a role in

20  hiring counsel, wearing their hat for these other entities or

21  not.  Can anyone tell me?  Maybe I'm worried about something I

22  shouldn't be worried about.

23          MR. DONDERO:  You're worried about something you

24  shouldn't worry about, Your Honor.

25          THE COURT:  Okay.  So Ellington --

1          MR. MORRIS:  Your Honor, I would just point to the

2     evidence that's in the record, Your Honor.  You have Mr.

3     Dondero asking Mr. Ellington to show leadership in

4     coordinating all of the lawyers you just mentioned.  It's in

5     the record.

6          THE COURT:  Yes.  I'm just going to, until otherwise

7     ordered, no conversations between Dondero and Ellington and

8     Leventon, and that's just going to be my ruling until further

9     order.  That's what I feel best about.

10        Now, let me ask you, knowing that I could only give you a

11    half a day on the 28th of January, if we start the

12    confirmation hearing on whatever the plan looks like on

13    January 27th, I mean, do people want to go with that, --

14         MR. POMERANTZ:  Your --

15         THE COURT:  -- even knowing we might not finish that

16    day, or no?

17         MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

18    Maybe if we could start on the 26th, have the 26th, 27th, and

19    then maybe half of the 28th.  I would think two and a half

20    days should be enough, notwithstanding the volume of

21    objections, because I think you'll find that, while there may

22    be some evidence, I think the majority of the objections are

23    really legal in nature.

24         THE COURT:  All right.  Traci, are you out there in

25    video-land?

1          THE CLERK:  Yes, I'm here.

2          THE COURT:  Okay.  Have I overcommitted the 26th?  If

3     we start the 26th at 9:30 in the morning, can we do that?  Or

4     --

5          MR. BONDS:  Your Honor?

6          THE CLERK:  That'd be fine.

7          THE COURT:  Okay.

8          THE CLERK:  Just remember that you have an

9     appointment at lunchtime that day at noon on the 26th.

10          THE COURT:  Okay.  I --

11          THE CLERK:  You don't have any court hearings.

12          THE COURT:  Okay.

13          MR. BONDS:  Your Honor, I'm sorry.

14          THE COURT:  Go ahead.

15          MR. BONDS:  Your Honor, I'm sorry.  This is John

16     Bonds.  I have a hearing on the 26th that I can't miss.

17          THE COURT:  Well, can someone else --

18          MR. POMERANTZ:  Your Honor, we would request, right,

19     that Mr. Lynn lead the confirmation hearing.  There's a lot of

20     lawyers.  If we try to look at everyone's calendar, we're

21     never going to be able --

22          THE COURT:  Yes.

23          MR. POMERANTZ:  -- to get something that's good for

24     everyone.

25          THE COURT:  Okay.  Yes.  Well, Mr. Lynn or Mr. Assink

1  can handle it, Mr. Bonds.

2      So we're going to start the 26th at 9:30.  We'll go all

3  day, except I have something at lunchtime, apparently.  And

4  then we'll go all day on the 27th, and then I can give you

5  half a day on the 28th.

6      So you'll upload immediately a notice to that effect, Mr.

7  Pomerantz.

8          MR. POMERANTZ:  Yes, we would.

9      Your Honor, in terms of our documents in support of

10  confirmation, we want to make it convenient with the Court.

11  We know your Court would at least need one business day, so we

12  would prefer to file, say, by 2:00 Central on the 24th, on a

13  Sunday.  Everyone will have it, and have one business day.  I

14  mean, the old order only had one business day in advance as

15  well.  So that's what we would propose for our confirmation

16  documents to be filed.

17          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

18  An important issue here is how the creditors have voted, and I

19  have no idea how they have voted.  The voting deadline has

20  expired.  So I have no problem with what Mr. Pomerantz

21  suggests, but I do think that the Debtor should file its

22  tabulation of votes sooner rather than later so we all know

23  one of the central elements for the hearing that we'll have.

24          THE COURT:  Okay.

25          MR. POMERANTZ:  That's fair, Your Honor.  We're

1   prepared to file the summary of voting and tabulation by the

2   15th of January.

3           THE COURT:  Okay.  Very good.

4      So, backing up, Mr. Pomerantz, you asked that I approve

5   you filing any plan modifications by noon on Sunday, the 24th?

6   Is that what you said?

7           MR. POMERANTZ:  Yeah.  So, there's a couple of

8   things.  There's our confirmation brief.

9           THE COURT:  Uh-huh.

10          MR. POMERANTZ:  There is our -- any evidence we would

11  submit, although I suspect we are likely to provide live

12  testimony, as opposed to a declaration.  There was our summary

13  of ballots, which we will now do on the 15th.  And to the

14  extent we have any modifications, we would provide them on

15  Sunday by 12:00 noon Central time as well.  Yes.

16          THE COURT:  All right.

17          MR. RUKAVINA:  Well, Your Honor, this is Davor

18  Rukavina.  Does that mean the witness and exhibit lists also

19  will not be due until Sunday at noon?  Because I would request

20  that we have the normal period of time to exchange exhibits

21  and witnesses.

22          MR. BONDS:  Your Honor, I think that the normal time

23  period is also important in this case.

24          THE COURT:  Okay.  I'm going to --

25          MR. POMERANTZ:  Your Honor, we could -- if everyone

1   agrees on witness lists, we could do those by 5:00 p.m.

2   Central on the 22nd.

3            THE COURT:  Okay.  Let's do that.  Okay.

4            MR. POMERANTZ:  But that -- but that needs to be for

5   everybody.

6            THE COURT:  Oh, it will be for everyone.

7            MR. RUKAVINA:  Your Honor, no problem.

8            THE COURT:  Okay.  Let's --

9            MR. POMERANTZ:  5:00 p.m. Central Standard Time.

10           THE COURT:  No more discussions.  That'll be the

11  ruling, okay?  Everything is going to be due by 5:00 p.m.

12  Central time on Friday, the 22nd.  All right.

13           MR. POMERANTZ:  Your Honor, is that our brief as

14  well, or --

15           THE COURT:  Yes.

16           MR. POMERANTZ:  -- was that just the witness list?

17           THE COURT:  Everything.  Brief, witness list, and --

18           MR. POMERANTZ:  Okay.

19           THE COURT:  -- plan mods.

20      Let me look through my notes and see if there's anything

21  else I want to say.  You know, let me do some quick math here.

22  I know there was one other thing I wanted to say that involves

23  math.  Okay.  I think my math is right here.  Okay.  You know,

24  I mentioned the proliferation of lawyers.  And let me just say

25  this.  We had -- we've had about 90 people on the -- showing

1    up on the video screen today -- 89, 90, 91, 92. A few, a

2    little over 90. Okay? So let's say 90. It's been up to 95

3    earlier. But let's pretend that 60 of those are lawyers

4    billing by the hour. That's very conservative. Probably many

5    more than 60. And let's assume conservatively that the

6    average billing rate is $700 an hour. That's probably very

7    low, right? We probably don't have many baby lawyers on the

8    phone. So that's a very low average. So, 60 lawyers times

9    $700 an hour, $42,000 an hour this hearing has cost. And then

10    we've been going over seven hours. So let's say seven,

11    conservatively, times $42,000. This hearing has cost $294,000

12    today. A preliminary injunction hearing. I mean, no one

13    thinks that's chump change. I don't know, maybe some people

14    do. This just seems like a ridiculous way to spend resources.

15    No offense to all the wonderful lawyers, but this is just --

16    it's crazy-town, right? It is crazy-town. So I implore you,

17    okay, how about I use that word, I implore you to have these

18    good-faith discussions on a pot plan.

19    Please, Mr. Dondero, I mean, don't waste people's time.

20    $160 million, I know that's not going to cut it. Okay? So

21    it's going to have to be more meaningful. I just know that in

22    my gut.

23    But having said that, I mean, I honestly mean I think a

24    pot plan -- I think you getting your baby back is the best

25    thing for everyone. Okay? I think it's the best thing for

1  everyone.  So I want you all to --

2         MR. DONDERO:  Judge, I -- Judge, I just need to

3  interject for a second, because no one follows the big

4  picture.  We filed for bankruptcy with $450 million of assets.

5  $360 million of third-party net assets, $90 million of

6  affiliated notes.  The third-party assets are down to $130

7  million and falling fast.

8         MR. POMERANTZ:  Your Honor, I hate to interrupt Mr.

9  Dondero, but that is not the purpose of this hearing.

10         THE COURT:  Well, --

11         MR. POMERANTZ:  Mr. Dondero's statement of the assets

12  and value is just not something that the Debtors would agree

13  and support.  I'm sure it's not something the creditors -- I

14  think we understand what Your Honor is saying.  I think the

15  Committee understands.  And Your Honor knows that the Debtor

16  and the Committee are close to the asset values.  And Mr.

17  Dondero should be making his argument to the Debtor and the

18  Committee, not Your Honor, in this open forum.

19         THE COURT:  Okay.

20         MR. POMERANTZ:  It's just not appropriate.

21         THE COURT:  And I understand where you're both coming

22  from.  And he's saying that because I made the comment I made

23  about $160 million not being enough.

24     I've seen the evidence.  I've heard the evidence at prior

25  hearings, Mr. Dondero.  We've had a lot of hearings.  And I

1    remember writing that down.  Wow, why did that happen?  Seeing

2    the dissipation of value.  I couldn't remember the exact

3    numbers, but I thought it was like $500 million something and

4    then $300 million or whatever.  And I remember Multi-Strat,

5    that being sold, and blah, blah, blah, blah.

6        But having said that, there are a lot of causes of action

7    that have been hinted at by the Creditors' Committee and

8    others.  So, causes of action is one of the things they are

9    looking at when they start thinking about what's appropriate

10   value.

11       So I just, I get where everyone is coming from.  I get

12   where everyone is coming from.  But, again, let's take one

13   more stab at this, please.  Okay?

14            MR. POMERANTZ:  Yeah.  And Your Honor, my last

15   comment.  We're commercial people.  The creditors are

16   commercial people.  I think we've done a tremendous job in

17   being able to resolve most every one of the significant

18   claims.  I think the Court should trust the process.  Mr.

19   Dondero should trust the process.

20       And again, if there's a commercial deal to be worked out,

21   I don't think there's anyone more than of course the Debtor

22   and the people on the Committee, who have been litigating in

23   many cases with Mr. Dondero and Highland for ten years, I

24   don't think it's anyone's desire.  So if there's a reasonable,

25   rational proposal that the creditors can get behind and want

1    to engage, then there'll be a discussion.  If they don't

2    believe it's a reasonable, rational proposal, they won't.

3              THE COURT:  Yes.  All right.  Well, I do feel very

4    good about what I've heard about the UBS issues being worked

5    out.  I mean, we have come a long way in 15 months, even

6    though it's frustrating to me and others.  But, again, I know

7    you all are going to do what you need to do.  And I'll look

8    for the form of order.  I'm going to see you all, Mr. Dondero,

9    including you, next Wednesday.  And if there's nothing else,

10   we stand adjourned.

11             MS. SMITH:  Your Honor, I'd like to review the form

12   of order as it regards my clients before it's submitted.

13             THE COURT:  Okay.

14             MS. SMITH:  If I could have a courtesy copy, please.

15             THE COURT:  Yes.  Well, yes.  I'm not going to

16   require 90 lawyers to get the order, but I will ask Mr.

17   Pomerantz, Mr. Morris, make sure Ms. Smith gets it and

18   obviously Mr. Dondero's counsel gets it.  And I probably won't

19   get it until Monday, it sounds like, but --

20             MR. POMERANTZ:  That's likely.

21             THE COURT:  But I'll be on the lookout for it.  Okay.

22   Thank you.  We stand adjourned.

23             MS. SMITH:  Thank you, Your Honor.

24             THE CLERK:  All rise.

25             MR. MORRIS:  Thank you, Your Honor.

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 4:09 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                     CERTIFICATE

19      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
20 above-entitled matter.

21    **/s/ Kathy Rehling**                        **01/11/2021**

22  _____     _____

23 Kathy Rehling, CETD-444                        Date
   Certified Electronic Court Transcriber

24

25

205

INDEX

PROCEEDINGS                                                3

OPENING STATEMENTS

- By Mr. Morris                                            5

WITNESSES

Plaintiff's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris                        19
- Cross-Examination by Mr. Bonds                         106
- Redirect Examination by Mr. Morris                     139

EXHIBITS

Plaintiff's Exhibits A through Y              Received 38

CLOSING ARGUMENTS

- By Mr. Morris                                          152
- By Mr. Lynn                                            155
- By Mr. Bonds                                           159

RULINGS                                             163/189

END OF PROCEEDINGS                                       204

INDEX                                                    205

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25