```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                   )    Case No. 19-34054-sgj-11
 In Re:                            )    Chapter 11
                                   )
 HIGHLAND CAPITAL                  )    Dallas, Texas
 MANAGEMENT, L.P.,                 )    Monday, March 22, 2021
                                   )    9:30 a.m. Docket
          Debtor.                  )
 _____  )
                                   )
 HIGHLAND CAPITAL                  )    Adversary Proceeding 20-3190-sgj
 MANAGEMENT, L.P.,                 )
                                   )
          Plaintiff,               )    PLAINTIFF'S MOTION FOR ORDER
                                   )    REQUIRING JAMES DONDERO TO
 v.                                )    SHOW CAUSE WHY HE SHOULD NOT
                                   )    BE HELD IN CIVIL CONTEMPT FOR
 JAMES D. DONDERO,                 )    VIOLATING THE TRO [48]
                                   )
          Defendant.               )
 _____  )


                       TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

 WEBEX APPEARANCES:

 For the Debtor/Plaintiff:   John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

 For Defendant James D.      John T. Wilson
 Dondero:                    Bryan C. Assink
                             BONDS ELLIS EPPICH SCHAFER
                               JONES, LLP
                             420 Throckmorton Street,
                               Suite 1000
                             Fort Worth, TX  76102
                             (817) 405-6900
```

Dondero Ex. 15

2

```
1
2   APPEARANCES, cont'd.:

3   For Scott Ellington and    Debra A. Dandeneau
    Isaac Leventon:            BAKER & MCKENZIE, LLP
4                              452 Fifth Avenue
                               New York, NY 10018
5                              (212) 626-4875

6   For Scott Ellington and    Michelle Hartmann
    Isaac Leventon:            BAKER & MCKENZIE, LLP
7                              1900 North Pearl Street,
                                 Suite 1500
8                              Dallas, TX  75201
                               (214) 978-3421
9   For Scott Ellington and    Frances A. Smith
    Isaac Leventon:            ROSS & SMITH, P.C.
10                             Plaza of the Americas
                               700 N. Pearl Street, Suite 1610
11                             Dallas, TX  75201
                               (214) 593-4976
12
    Recorded by:               Michael F. Edmond, Sr.
13                             UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
14                             Dallas, TX  75242
                               (214) 753-2062
15
    Transcribed by:            Kathy Rehling
16                             311 Paradise Cove
                               Shady Shores, TX  76208
17                             (972) 786-3063
18
19
20
21
22
23
24
25        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.
```

1          <u>DALLAS, TEXAS - MARCH 22, 2021 - 9:39 A.M.</u>

2          THE COURT:  We have a setting in Highland Capital

3     Management, Case No. 20-3190.  It's an adversary.  We have

4     Plaintiff's Motion to Hold Mr. James Dondero in Civil Contempt

5     of Court.

6       Let's get lawyer appearances to start out with.  Who do we

7     have appearing for Highland this morning?

8          MR. MORRIS:  Good morning, Your Honor.  It's John

9     Morris from Pachulski Stang Ziehl & Jones on behalf of the

10    Debtor.

11         THE COURT:  Good morning.  All right.  And who is

12    appearing for Mr. Dondero's legal team?

13         MR. WILSON:  This is John Wilson, Bonds Ellis Eppich

14    Schafer Jones, for Mr. Dondero.

15         THE COURT:  All right.  I know we have lots of other

16    observers on the video, but those are the only appearances I

17    will take for this matter.

18      All right.  Well, let's talk about some housekeeping

19    matters before we get underway.  Just to be clear, the motion

20    --

21         MS. SMITH:  I can't hear.

22         THE COURT:  Who says they can't hear?  All right.

23    Can everyone hear me?

24         MR. MORRIS:  Yes, Your Honor.

25         THE COURT:  Okay.  Mr. Wilson, you can hear me okay?

1          MS. DANDENEAU: Excuse me, Your Honor.  This is Debra

2     Dandeneau from Baker McKenzie.  I believe that our local --

3     our co-counsel, Ms. Smith, wanted to make an appearance

4     because we will be participating in this hearing, and I

5     believe she's the one who's having the audio issues.  Sorry to

6     interrupt.

7          THE COURT: All right.  Now, well, first, Ms. Smith,

8     can you hear me okay?

9        (No response.)

10          THE COURT: All right.  Ms. Dandeneau, remind me who

11     your clients are and what their role is in this matter.

12          MS. DANDENEAU: Your Honor, our clients are Mr.

13     Leventon and Mr. Ellington, at least in this matter.  And they

14     have been -- they've -- they were requested to appear as

15     witnesses at this hearing.  And so we are appearing to

16     represent them in connection with this hearing.  By agreement

17     with the Pachulski firm, we're voluntarily producing them.  We

18     are appearing -- I'm here.  My partner, Michelle Hartmann from

19     Baker McKenzie, is here.  Ms. Smith is here -- unfortunately,

20     without audio.

21        And we do have an agreement with the Debtor that, among

22     other things, they are -- they are not parties to this

23     proceeding.  We are producing them voluntarily.  But we do

24     have an agreement with the Pachulski firm that we will be

25     permitted to at least ask questions on redirect of these

1 witnesses, and just wanted to make that clear, why we are here

2 and why our -- and Mr. Ellington and Mr. Leventon are

3 appearing voluntarily in this matter.

4 THE COURT: All right. Well, thank you, Ms.

5 Dandeneau. Hopefully, Ms. Smith will get her audio working

6 here shortly.

7 So I guess I should ask at this point, are there any other

8 attorneys in a similar posture that want to make an appearance

9 before we get started?

10 All right. Well, then let me get going with some

11 preliminary housekeeping matters. I'm noting for the record

12 that this motion asking the Court to hold Mr. Dondero in

13 contempt of court was filed January 7, 2021, and the order

14 that Mr. Dondero is alleged to have violated is a December 10,

15 2020 TRO the Court issued in this adversary proceeding, a

16 short three-page order.

17 So what I want to clarify at the outset is this. There's

18 been a lot of activity in the adversary. For example, on the

19 very day after this motion to hold Mr. Dondero in contempt was

20 filed, the Court issued a preliminary injunction, okay, in

21 other words, the follow-up to the TRO, on January 8th. So

22 sort of a weird posture, you might say. We're having a

23 hearing now, over two months later, on a motion to hold Mr.

24 Dondero in contempt of the TRO from December 10th, even though

25 we've subsequently had a preliminary injunction.

1    I'm just clarifying that point to make sure our evidence

2  is carefully tailored here today.  I think it would only be

3  evidence for activity between December 10, 2020 and January 7,

4  2021, because, again, you know, order entered December 10th,

5  motion to hold Mr. Dondero in contempt filed January 7th.  So

6  this doesn't pertain to any alleged violations of the

7  preliminary injunction after it was issued on January 8th.

8    So, with that, I will allow opening statements.  And if

9  you have anything to clarify about what the Court just said,

10  if someone views this any differently, please let me know in

11  your opening statements.

12    All right.  Mr. Morris, you may proceed.

13    OPENING STATEMENT ON BEHALF OF THE DEBTOR

14    MR. MORRIS:  Good morning, Your Honor.  John Morris;

15  Pachulski Stang Ziehl & Jones; for the Debtor.  Let me begin

16  by saying you have it exactly right.

17    THE COURT:  Okay.

18    MR. MORRIS:  We are only going to put forth evidence

19  of violations of the TRO that took place between December 10th

20  and the day that the preliminary injunction was issued on

21  January 8th.  So it's a very short 29-period -- 29-day period,

22  and that really is what we're focused on here today.

23    As Your Honor just alluded to, on December 10th the Debtor

24  obtained a TRO against Mr. Dondero.  The TRO was based on

25  uncontroverted testimony, including written threats to Mr.

1  Seery and Mr. Surgent.  It included evidence of interference

2  with Mr. Seery's trading activities as the CLO manager.  And

3  so that happened on December 10th.

4      The TRO, Your Honor, is very clear.  It is completely

5  unambiguous.  If Your Honor will recall, on December 10th you

6  actually read out word for word of the operative portion of

7  the TRO and you made assessments with respect to every

8  provision in it as to whether or not it was clear and

9  unambiguous and whether or not it was reasonable.  And after

10  that painstaking analysis, Your Honor signed the order.

11      In their opposition, Mr. Dondero now asserts -- and this

12  is said several times -- the exact opposite.  He claims not to

13  know what conduct was prohibited.  This is just not credible.

14  We are going to go through the TRO as applicable to the

15  violations that the Debtor is alleging here and we will show

16  that there is no room for debate as to what the TRO provided

17  and how his conduct was in violation of those very clear and

18  unambiguous provisions.

19      Mr. Dondero makes much in his opposition papers of the

20  clear and convincing evidence standard, Your Honor, and they

21  suggest that it's such a high hurdle we can't possibly meet

22  that here.  Your Honor, the evidence that we will present

23  today doesn't prove that Mr. Dondero violated the TRO by clear

24  and convincing evidence.  It proves it, not that we have to,

25  beyond reasonable doubt.  Okay?  There is no doubt that he

1    violated the TRO in more than a dozen ways, and we're going to

2    prove that to you today.

3         Again, we don't have to meet that high standard, but clear

4    and convincing evidence is easy.  Why is it easy?  It's easy

5    for two very simple reasons.  Mr. Dondero has already admitted

6    to certain of the violations, and you are going to see

7    documents today that say what they say, their meaning is

8    unambiguous, you will see the parties to the communications,

9    you will see the interference with the business, you will see

10   -- there is just no room for debate.  It is not clear and

11   convincing.  It's to a certainty that he violated the TRO more

12   than a dozen times.

13        Mr. Dondero claims repeatedly in his papers that he

14   substantially complied with the TRO.  I don't know of any law,

15   any case that says that the Court is supposed to overlook

16   violations of a TRO if the person against whom it was entered

17   is otherwise in substantial compliance, but it's really

18   irrelevant.  He did not substantially comply with anything.

19   The fact is that, despite being in place for only 29 days, we

20   are going to present evidence today of 17 specific violations

21   that are beyond dispute.  Seventeen violations in just 29

22   days.  The notion that he was in substantial compliance is not

23   credible.

24        I've got a short deck, Your Honor, that I just want to go

25   through with the Court so that I can preview the evidence that

1   we're going to present today.  And if Ms. Canty can just put

2   up the first page of the deck.

3       So, I don't know that the evidence is going to come in in

4   exactly this order, but the TRO states in Section 2(c) that

5   Mr. Dondero is enjoined, quote, from communicating with any of

6   the Debtor's employees except as it specifically relates to

7   shared services.  It is a blanket prohibition on communicating

8   with the Debtor's employees unless it relates to shared

9   services.  Not ambiguous.  Pretty clear.  The conduct couldn't

10  -- right?  Put yourself in Mr. Dondero's position.  You have

11  been ordered by a court of law not to communicate with the

12  Debtor's employees unless it relates to shared services.

13      And so if you read the opposition, you'll see all the

14  different kinds of excuses as to these communications.  You'll

15  see that they talked about the pot plan.  There's nothing in

16  the TRO that allowed Mr. Dondero to speak with any of the

17  Debtor's employees about the pot plan.  And he knew that and

18  his lawyers knew that.  And how do you know they knew that?

19  Because on December 16th, just six days after the TRO was

20  entered into, they filed a motion at Docket 24 seeking to

21  modify the TRO to allow Mr. Dondero to speak directly with the

22  independent board about a pot plan.  Right?  He knew he

23  couldn't speak to anybody about the pot plan.  He wanted to

24  speak with the board about the pot plan.

25      If he thought that the TRO allowed him to speak with the

1   Debtor's employees about the pot plan, why didn't he think

2   that it was -- allowed him to talk to the independent board

3   about the pot plan?

4        He withdrew that motion, Your Honor, but that's -- that

5   was his state of mind.  He knew he couldn't do that.

6        But here's the thing, Your Honor.  None of the

7   communications that we're going to be -- put before you today

8   have anything to do with the pot plan.  So not only is

9   discussion about the pot plan not permitted, it's not even --

10  it's not even relevant to today's discussion.  But it's in

11  their papers.

12       They also put in their papers that somehow these

13  communications were authorized.  Other than what Mr. Dondero

14  may say, there will be no evidence of any kind that the Debtor

15  authorized any of the communications.  In fact, Mr. Seery is

16  going to testify and he will tell Your Honor that he did not

17  only not know of these communications, but had he known of

18  them, whether there was a TRO or not, he would have fired the

19  employees on the spot.  And we're going to see the

20  communications, and Your Honor can form your own judgment as

21  to whether or not an employer, particularly an employer in

22  bankruptcy, should tolerate the communications that we're

23  about to look at.

24       Shared services.  You might hear, oh, oh, these

25  communications were about shared services.  They will never be

1    able to prove that because they have not put on their exhibit

2    list any shared services agreement.  And why don't they have a

3    shared services agreement on their exhibit list?  Because Mr.

4    Dondero is not party to one.  He is not party to one.  The

5    lawyers at Bonds Ellis do not represent an entity that was

6    party to a shared services agreement.  Doug Draper, who you

7    will see on some of these emails, does not represent an entity

8    who was party to any shared services agreements.  There is no

9    exception in the TRO for the communications that we will look

10   at.

11        Can you go to the next slide, please?

12        Here are 13 separate communications that we're going to go

13   through today that included Mr. Dondero and one of the

14   Debtor's employees or Mr. Dondero's lawyers and one or more of

15   the Debtor's employees.  They cover topics.  The first three

16   relate to the Bonds Ellis firm's request of Mr. Ellington to

17   provide a witness who was going to testify on behalf of Mr.

18   Dondero against the Debtor.  There's communications about a

19   common interest agreement that was going to be between and

20   among, among others, Mr. Dondero and certain of the Debtor's

21   employees.  There's communications about the UBS appeal of the

22   Redeemer 9019 settlement and the HarbourVest settlement.

23   There's -- there is communications where Mr. Dondero asks Mr.

24   Ellington to provide leadership in the coordination of all of

25   the lawyers representing Mr. Dondero's interests.

1     There's more.  We're going to go through these in detail,

2   Your Honor, but there's 13 different communications that took

3   place in just the two weeks after the TRO was entered into.

4   Every single one of them -- these are not technical

5   violations.  This is not Mr. Dondero saying hello to an

6   employee in the hallway.  This is not Mr. Dondero asking about

7   somebody's, you know, family.  Every single one of these

8   communications is adverse to the Debtor.  Adverse to the

9   Debtor's interests.  And the Debtor knew about none of them.

10     Go back to the first slide, please.

11     The automatic stay.  Section 2(e) of the TRO prohibits Mr.

12   Dondero from otherwise violating Section 362(a) of the

13   Bankruptcy Code.  Section 362(a)(3) states that the filing of

14   a bankruptcy acts as, quote, to prevent any act to exercise

15   control over the property of the estate.  There can't be

16   anything ambiguous about a TRO that says don't violate the

17   automatic stay.  If there's an ambiguity in that provision,

18   there must be an ambiguity in Section 362(a).  And I submit,

19   Your Honor, there's no ambiguity in Section 362(a)(3) that

20   says you are prohibited from exercising control over property

21   of the estate.  But that's exactly what Mr. Dondero did, not

22   once, not twice, but three times in the short 29-day period

23   following the entry of the TRO.

24     Can we go to the third slide, please?

25     As Your Honor may recall from the preliminary injunction

1  hearing, Mr. Dondero's cell phone that he admitted was the

2  company's property was thrown in the garbage. So that's stay

3  violation one. I remember Mr. Lynn kind of flippantly saying

4  he offered to pay the $500, but he completed missed the point

5  then and I think they continue to miss the point now. Because

6  the second stay violation was the tossing in the garbage of

7  the Debtor's text messages.

8      The Debtor, for years, right -- Mr. Dondero, this is his

9  baby, he ran this company -- they had an employee handbook.

10  The employee handbook were the company's policies that guided

11  and dictated the conduct of its employees. And they have a

12  provision in there, and we're going to look at it carefully

13  with Mr. Dondero. They had an option where the company might

14  subsidize some of the phone bill if employees participated.

15  But importantly, Your Honor, on this slide is an excerpt from

16  Page 13 of the handbook. It'll be Debtor's Exhibit 55. And

17  it says, regardless of whether the employee chooses to

18  participate in the policy, right -- this is for people who had

19  their own phone, not even ones that were paid by the company

20  -- this says specifically all text messages, quote, sent and/

21  or received related to company business remain the property of

22  Highland.

23      There's that word property again, right out of 362(a)(3).

24  Property. Do not control the Debtor's property. All

25  employees, including Mr. Dondero, were told that text messages

1  related to company business shall remain the property of

2  Highland.

3       Mr. Dondero knew this.  How do we know that Mr. Dondero

4  knew this?

5       Let's go to the next slide, please.

6       Mr. Dondero is going to tell you, because it's going to be

7  in evidence, that periodically each year Mr. Surgent, as the

8  chief compliance officer, had certain senior employees fill

9  out certifications.  On the screen is an excerpt from Mr.

10 Dondero's certification done in early 2020.  And in that

11 certification, he says, among other things, quote, I have

12 received, have access to, and have read a copy of the employee

13 handbook and I am in compliance with the obligations

14 applicable to employees set forth therein.

15      So this is his certification that he understands that text

16 messages are the Debtor's property -- to the extent that they

17 relate to company business, admittedly.  And he knew long ago

18 that the U.C.C. wanted his text messages.  How do we know

19 that?  Because he filed a pleading and he told Your Honor

20 that.

21      If we can go to the next slide, please.

22      If Your Honor will recall, last summer the U.C.C. made a

23 motion to compel the production of documents.  They sought to

24 get emails and ESI from nine custodians.  Mr. Dondero's

25 lawyers filed a response to that motion.  On the screen now is

1  Paragraph 3 from Docket No. 942, which is Debtor's Exhibit 40

2  for this purpose.  And in Mr. Dondero's own pleading to the

3  Court, he tells the Court the Committee seeks the ESI from

4  nine different custodians, who include the Dondero.  The

5  Committee has requested all ESI for the nine custodians,

6  including text messages.

7      So, so Mr. Dondero knew.  Certainly, his lawyers knew.  He

8  knew in July that the U.C.C. wanted the text messages.  The

9  employee handbook provided that they're the Debtor's property.

10  He certified that he understood that.  He told the Court that

11  he was aware the U.C.C. wanted Mr. Dondero's text messages.

12     The TRO is entered into, is entered by the Court during

13  the afternoon of December 10th, and later in the evening we

14  know the phone still exists.  How do we know that?  Again, not

15  clear and convincing evidence, beyond a reasonable doubt,

16  because if we go to the next slide, certainty.  Forget beyond

17  a reasonable doubt.  Certainty.  At 6:25 p.m., Mr. Dondero is

18  told, on the day that the TRO is entered into, that the phone

19  exists.

20     The phone doesn't exist now.  It was thrown in the

21  garbage.  Mr. Dondero doesn't know how, why, who, when, what.

22  He had the phone.  He knew it was -- it contained the Debtor's

23  text messages.  He knew the U.C.C. wanted them.  And the phone

24  doesn't exist today.

25     Call it spoliation.  Call it a violation of 362(a).

1   There's no question that this is a violation of the TRO.

2   The third way he violated the TRO, Section 2(e) under

3   362(a)(3), is by entering the Debtor's premises without

4   permission.  Now, I will admit and Mr. Seery will probably

5   tell Your Honor that if this was the only thing that Mr.

6   Dondero did, you know, maybe it wouldn't be a big deal.  But

7   it's not, and it's consistent -- we're seeking to hold him in

8   contempt today, Your Honor, but here's the thing.  He holds

9   the Debtor in contempt.  He holds this Court in contempt.  He

10  could not care less what anybody has to say.  He will do what

11  he wants.  And how do we know that?  How do we know that, that

12  this is not a gotcha thing?  Because we sent a letter to him.

13      Can we go to the next slide, please?

14      This is going to be in evidence.  It's going to be at

15  Exhibit 12.  You will see the letter that we sent on December

16  23rd, while the TRO is in effect, where we gave him seven days

17  before we were evicting him.  We were evicting him because the

18  Debtor believed he was interfering with the business, but the

19  Debtor didn't need a reason, frankly.  But they gave notice.

20  Not only did they give notice of eviction, look at what they

21  told Mr. Dondero.  Any attempt by Mr. Dondero to enter the

22  office, regardless of whether he is entering on his own or as

23  a guest, will be viewed as an act of trespass.

24      We told him.  He knew that.  And yet what does he do?  He

25  waltzes right into the Debtor's offices right after the new

1   year to give a deposition.  If you read carefully Mr.

2   Dondero's response to the Debtor's motion here, he says, well,

3   there was nobody in the office, like -- he says he used his

4   judgment.  He thought it was okay.  They even make the

5   argument that maybe the shared services allowed this, the

6   shared services agreement.

7       Again, there's no shared services agreement.  Mr.

8   Dondero's not a party to a shared services agreement.  But

9   let's remember what the purpose of the exercise was.  He went

10  to the office to give a deposition in connection with a motion

11  for a preliminary injunction against him personally.  How

12  could this -- every time you hear this shared services,

13  remember -- ask yourself, where is the agreement, how do I

14  know, and how could this possibly relate to shared services?

15      And Mr. Seery is going to tell you he's not going to be

16  able to say, oh, I need $10 or $100 or I can quantify the

17  damage.  He's going to tell you, Your Honor, that this and all

18  of the communications that we looked at, he just completely

19  undermined his authority.  They undermined the Debtor.  They

20  created -- because everybody knows that Mr. Dondero was

21  evicted from the office.  But he walks right in.  And he's

22  creating -- this is what Mr. Seery will tell you --

23  noneconomic harm that the Debtor has suffered by Mr. Dondero's

24  unmitigated arrogance and contempt that he has for the Debtor.

25      The Debtor is a company in bankruptcy.  They have -- they

1  have asked for your resignation.  They have sought and

2  obtained a TRO.  They have evicted you from the offices.  They

3  told you that if you come back we will treat it as trespass.

4  He is in contempt of the Debtor, of the TRO, of this Court.

5  He could not care less, Your Honor.  And that's really why --

6  that's why we're here.  That's what all of this shows.

7       Contempt.  I've got more.

8       Can we go back to the first page, please?

9       Section 3(a) of the TRO enjoins Mr. Dondero from causing,

10  encouraging, or conspiring with any entity owned or controlled

11  by him to engage in any of the prohibited conduct.  And the

12  prohibited conduct includes interfering or otherwise impeding

13  the Debtor's business.

14       Now, you remember, when we got the TRO, one of the things

15  that happened -- and I'm not saying that this is a violation

16  of the TRO, I'm just trying to provide some context, and

17  you'll hear it from Mr. Dondero himself -- one of the reasons

18  we got the TRO is, remember about Thanksgiving, he interfered

19  with Mr. Seery's attempt to sell AVYA and SKY stock on behalf

20  of the CLOs, right?  And that's where he made the threat to

21  Mr. Surgent, right?  So, --

22       And go to the last slide here.

23       He does the exact same thing on December 22nd.  He engages

24  in the exact same conduct that formed the basis of the TRO

25  just 12 days after the TRO was entered.  And he admits to it,

1  Your Honor.  This is not can I meet a clear and convincing?

2  It is not even beyond a reasonable doubt.  There is no doubt.

3  There is a certainty.  Because he admitted to it right here at

4  the preliminary injunction hearing.

5       Question, "And you personally instructed, on or about

6  December 22nd, employees of those Advisors to stop doing the

7  trades that Mr. Seery had authorized, right?"  Answer, "Yeah.

8  Maybe we're splitting hairs here, but I instructed them not to

9  trade them.  I never gave instructions not to settle the

10 trades that occurred, but that's a different ball of wax."

11      And later on, question, "And you would agree with me,

12 would you not, that you personally instructed the employees of

13 the Advisors not to execute the very trades that Mr. Seery

14 identifies in this email, correct?"  Answer, "Yes."

15      You know, certainty, Your Honor.  Not clear and

16 convincing.  Not beyond a reasonable doubt.  Certainty,

17 because he has admitted to it.

18      So there you have it, Your Honor.  We're going to present

19 evidence today of -- I think I've got 17 separate violations

20 in just a 29-day period.  Mr. Seery will testify, hopefully

21 quite briefly, that he never authorized any of this, that he

22 had no knowledge of this, that if he knew any of this was

23 occurring he would have fired these people immediately,

24 whether or not there was a TRO in place.

25      We're going to put evidence before the Court as to the

1  fees that my firm has charged the Debtor's estate dealing with

2  all of this.  Mr. Seery will testify that those fees don't

3  begin to adequately compensate the Debtor because they don't

4  include the fees that are incurred by the Creditors' Committee

5  or FTI or DSI.  Mr. Seery will testify that the Debtor went

6  out and hired Kasowitz Benson because they needed some very

7  technical advice on the CLOs.  Another $70,000.

8      He's going to testify that there's noneconomic harm here.

9  The undermining of his authority.  The -- just the contempt

10 with which all of the employees clearly saw Mr. Dondero

11 treating the Debtor with.  And all of that is really

12 problematic.

13     So, at the end of the day, Your Honor, I don't know what

14 Mr. Dondero's excuses are going to be here, but I want to be

15 really, really clear:  These provisions could not be more

16 clear.  They're going to have to explain away 17 different

17 things.  There is no pot plan exception, there is no

18 settlement exception, although there will be no communications

19 that relate to either topic.  There will be no shared services

20 exception because nobody party to these communications are

21 party to a shared services agreement, and there will be no

22 shared services agreement in the record.

23     The Debtor is tired of this.  I'm tired of it, personally.

24 I've really gone through this way too much.  I know this

25 record better than I should, to be honest with you.  But we're

1    going to do it today, and I'm glad we're going to do it today,

2    and I assure you, Your Honor, that I will do my very best to

3    make sure this hearing is concluded today.

4        Thank you very much.

5        THE COURT:  All right.  A couple of follow-up

6    questions on that point, concluding today.  I know that at one

7    point there was some back-and-forth through my courtroom

8    deputy about putting limitations on the time this hearing

9    would take.  And I never weighed in, I don't think, on that.

10   How many witnesses and how much time do you expect your case

11   in chief to take?  You've mentioned Seery and we've heard

12   about Leventon and Ellington.

13       MR. MORRIS:  Yeah.  Well, I'll just -- I'll just put

14   it out there right now, Your Honor.  We made a decision

15   yesterday, because we are so desirous of getting this done

16   today, I don't think we're going to call Mr. Leventon and Mr.

17   Ellington today.  I think that they have information that

18   corroborates some of the allegations and some of the facts

19   that we'll be adducing, but I think, between the documents and

20   Mr. Dondero himself, you know, we thought long and hard about

21   it, but I'm prepared to try to limit -- I don't know how long

22   I took on the opening, but I offered to do this with Mr.

23   Dondero and say three-and-a-half hours each, and that way we

24   get done today.  And I'm still prepared to do that.

25       And so now, you know, now the cat's out of the bag.  I'm

1   not going to call Mr. -- I mean, I'll cross them if -- because

2   they're on -- they're on Mr. Dondero's list, too.  I mean, you

3   know, I heard counsel talk about agreements with the Debtor

4   and all of that.  I don't know what agreement she has with Mr.

5   Dondero.  But he's on their list, too, so that, you know, Mr.

6   Dondero may call them, and if they do, I'll certainly cross

7   them then.  But I want to get this case done today.  I'm going

8   to call Mr. Dondero, I'm going to call Mr. Seery, and I'm

9   going to rest.  So there's no surprises.

10          THE COURT:  All right.  Well, it sounds like you're

11  not committing a hundred percent to no Leventon and no

12  Ellington.

13          MR. MORRIS:  No, I am, in fact.  I'm committing a

14  hundred percent --

15          THE COURT:  You're just saying --

16          MR. MORRIS:  -- to my case in chief.

17          THE COURT:  Okay.

18          MR. MORRIS:  To my case in chief.  If Mr. --

19          THE COURT:  You're just saying if --

20          MR. MORRIS:  If Mr. Dondero chooses to call them, --

21          THE COURT:  If Dondero calls them, --

22          MR. MORRIS:  -- I'll cross them.

23          THE COURT:  -- you'll cross them?

24          MR. MORRIS:  Yeah.

25          THE COURT:  Okay.

1          MS. DANDENEAU:  Your Honor, this is Debra Dandeneau.

2   In light of what we just heard from Mr. Morris, which we have

3   not heard up until now, may Mr. Ellington and Mr. Leventon be

4   excused?  We have no agreement with any other party to produce

5   Mr. Ellington and Mr. Leventon for this hearing.

6          THE COURT:  All right.  Mr. Wilson, --

7          MR. WILSON:  Yes, Your Honor.

8          THE COURT:  -- do you have anything to say on this?

9          MR. WILSON:  Yes.  I was planning to ask some

10  questions, not a whole lot, but I did want to ask questions of

11  both Mr. Ellington and Mr. Leventon.  They are on our witness

12  list as well.

13         MS. DANDENEAU:  Okay.  Thank you.

14         THE COURT:  All right.  Let's have them stick around.

15         MS. DANDENEAU:  I tried, Mr. Morris.

16         THE COURT:  Okay.

17         MR. MORRIS:  And I tried for you.

18         THE COURT:  All right.  Well, Mr. Wilson, let me hear

19  from you on how many witnesses and how long you think your

20  case will take.

21         MR. WILSON:  Your Honor, I am planning to conclude my

22  presentation in the time that we've agreed to.  I don't have

23  any additional witnesses that I plan on calling except those

24  that have been mentioned already.

25       There is a reference to Jason Post on our exhibit list,

1 || but he will not be called today.

2 ||         THE COURT:  All right.  So you expect to have

3 || questions of Seery, Dondero, and Leventon and Ellington.  Is

4 || that correct?

5 ||         MR. WILSON:  That's correct, Your Honor.

6 ||         THE COURT:  All right.  Well, can we talk about

7 || mechanics?  Rather than recalling them, I mean, can we just

8 || all agree that any cross can go beyond the scope of direct so

9 || we can --

10 ||         MR. MORRIS:  Yes, Your Honor.

11 ||         THE COURT:  -- only call them one time?  Everyone

12 || agree?  Mr. Morris says yes.

13 ||         MR. MORRIS:  Yes.

14 ||         THE COURT:  Can you agree?

15 ||         MR. WILSON:  Yes, I agree to that.

16 ||         THE COURT:  Okay.  All right.  Well, do you agree to

17 || three-and-a-half hours total for your case?

18 ||         MR. WILSON:  Are you speaking to me, Your Honor?  If

19 || so, yes, I do.

20 ||         THE COURT:  Okay.  Very good.

21 ||     Well, Nate, we've got the time parameters to work within.

22 ||     Mr. Wilson, the one other housekeeping matter I had was I

23 || see on the docket that I never specifically entered an order

24 || on your motion *in limine*.  I did remember telling you all at

25 || one point in open court right after it was filed that I was

1  not inclined to grant it, but I want you to know that I'm not

2  going to grant that.

3      As you know, there's no jury.  And as we judges tend to

4  say in this context, we can weed out what is relevant versus

5  irrelevant.  And so I think we need to go ahead and sustain

6  the objection on that and allow the full amount of testimony

7  and evidence that Movant seeks to put in.

8      All right.  So, with that, you may make your opening

9  statement.

10          MR. WILSON:  All right.  Thank you, Your Honor.  May

11  it please the Court?

12          THE COURT:  Go ahead.

13      OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

14          MR. WILSON:  The Fifth Circuit instructs that a party

15  commits contempt when he violates a definite and specific

16  order of the court requiring him to perform or refrain from

17  performing a particular act or acts with knowledge of the

18  court's order.  And we know that from a variety of Fifth

19  Circuit cases, but the one I was just quoting from is

20  *Travelhost v. Blandford*, 68 F.3rd 958.

21      We also know that in a civil contempt proceeding the

22  burden of proof, as Mr. Morris alluded to, is clear and

23  convincing evidence.  And the Fifth Circuit in the *Travelhost*

24  case defines clear and convincing evidence as that weight of

25  proof which produces in the mind of the trier of fact a firm

1   belief or conviction as to the truth of the allegations sought

2   to be established, evidence so clear, direct and weighty and

3   convincing as to enable the factfinder to come to a clear

4   conviction without hesitancy of the truth of the precise facts

5   of the case.

6       And I submit to you, Your Honor, that the evidence that

7   you will hear today does not rise to the level of clear and

8   convincing that Mr. Dondero violated a definite and specific

9   order of the Court.

10      In fact, I think the evidence will demonstrate just the

11  opposite.  Mr. Dondero recognized why the Court entered the

12  temporary restraining order, and he's going to talk to you

13  about that.  He took the Court's order seriously.  He

14  discussed it with his counsel and he even had follow-up

15  discussions with his counsel to ask specific questions about

16  what the order allowed him and did not allow him to do.  And

17  then, accordingly, he tried to shape his behavior so that he

18  would not run afoul of the order.

19      But unfortunately, the Debtor interprets the order much

20  more broadly than Mr. Dondero and his counsel did, and therein

21  lies the problem.  If the Debtor is correct and Mr. Dondero

22  getting a new phone or appearing at the Highland office to

23  give his deposition or attempting to ensure that the proper

24  procedures for discovery are followed violates the TRO, it is

25  simply too broad and too vague to be enforceable.

1      In reality, what the Debtor wants to do is hold Mr.

2  Dondero in contempt for violating not the TRO but a letter

3  that the Debtor's counsel sent to Mr. Dondero's counsel two

4  weeks after the TRO was entered.  You're going to see that

5  letter today.

6      The prohibitions against communications in the order are

7  confusing and problematic.  There's a nonspecific carve-out

8  for communications regarding shared services.  And by the way,

9  contrary to what Mr. Morris told you, Mr. Dondero has both the

10  shared services agreements on his exhibit list today, Exhibits

11  1 and 2.

12      The only two Highland employees that the Debtor alleges

13  that Mr. Dondero communicated with are two lawyers who are

14  covered by the shared services agreement.  Moreover, Mr.

15  Ellington was also tasked -- and you'll hear about this -- as

16  being a go-between between Mr. Seery and Mr. Dondero from the

17  inception of the independent board and continuing through Mr.

18  Seery becoming the CEO and until the day Mr. Ellington was

19  terminated in January.

20      Mr. Seery never told Mr. Ellington that he was to stop

21  performing his go-between role with Mr. Dondero, even after

22  the December 10th TRO was entered.  In fact, he instructed Mr.

23  Ellington to take Mr. Dondero's calls, and he continued to

24  send messages to Mr. Dondero through Mr. Ellington up until

25  the day before Mr. Ellington was terminated.

1      The footnote in the TRO is equally confusing because the

2    footnote states that, for the avoidance of doubt, this order

3    does not enjoin or restrain Mr. Dondero from seeking judicial

4    relief upon proper notice or from objecting to motions filed

5    in the above-referenced bankruptcy case.  However, the Debtor

6    now says that Mr. Lynn, Mr. Dondero's attorney, sending emails

7    to Mr. Ellington seeking to identify a witness for a hearing

8    violates the TRO.  This is true even though Mr. Seery

9    instructed Mr. Ellington that he could talk to Mr. Lynn as

10   much as he wanted to.

11      The evidence will further reveal that the meaning of the

12   words "interference" and "threat" are subject to varying

13   interpretations.  And you'll hear evidence of what the Debtor

14   contends are threats and interference, and you'll hear

15   testimony from Mr. Seery about how he was impeded, if at all,

16   in his conduct running the Debtor.

17      Now, Mr. Dondero has conceded that the events that led to

18   the TRO in the first place were inappropriate, and he will

19   testify about that today.  He sent emails and texts that

20   ultimately led to the TRO.  But he changed his behavior.  He

21   conscientiously tried to avoid doing any like thing after the

22   entry of the TRO.

23      I think Mr. Seery will testify today that no trades were

24   stopped, he has not changed his investment strategies or any

25   other aspect of his responsibility since the entry of the TRO.

1   And so therefore, even if Mr. Morris is going to argue that

2   the violations of the TRO by Mr. Dondero impeded the Debtor, I

3   think the evidence will reflect otherwise.  At most, it could

4   be considered a technical violation, but I believe that Mr.

5   Dondero tried his best to do nothing to violate this TRO and

6   only operate -- tried to operate within its bounds.

7        Now, the Supreme Court has stated in a case called

8   *Longshoremen Association v. Philadelphia Marine Trade*, 389

9   U.S. 64, that the judicial contempt power is a potent weapon.

10  When it's founded upon a decree too vague to be understood, it

11  can be a deadly one.  Congress responded to that danger by

12  requiring that a federal court frame its orders so that those

13  who obey them will know what the court intends to require and

14  what it means to forbid.

15       The evidence today is going to show that Mr. Dondero did

16  not understand that the items that the Debtor contends violate

17  the TRO were, in fact, violations of the TRO.  Because as

18  you'll see when you look at the language of the TRO and

19  compare it to the allegations made by the Debtor, that there's

20  no violation of a clear and specific provision of the TRO.

21       Thank you.

22            THE COURT:  All right.  Thank you.

23       Mr. Morris, you may call your first witness.

24            MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

25  Mr. James Dondero.

Dondero - Direct                    30

1           THE COURT:  All right.  Mr. Dondero, could you speak

2    up and say, "Testing, one, two" so I can pick up your --

3           MR. DONDERO:  Testing, one, two.

4           THE COURT:  All right.  I hear you but I don't see

5    you yet.  Is your video turned on?

6           MR. DONDERO:  Here we go.

7           THE COURT:  Okay.  Gotcha.  Please raise your right

8    hand.

9        (The witness is sworn.)

10           THE COURT:  All right.  Thank you.

11        Mr. Morris, go ahead.

12           MR. MORRIS:  Thank you, Your Honor.

13            JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

14                          DIRECT EXAMINATION

15    BY MR. MORRIS:

16    Q   Good morning, Mr. Dondero.  You're aware, sir, are you

17    not, that Judge Jernigan entered a TRO against you on December

18    10th, correct?

19    A   Yes.

20    Q   But you never reviewed the declaration that Mr. Seery

21    filed in support of the Debtor's motion for the TRO, correct?

22    A   I don't believe so.

23    Q   You didn't even know the substance of what Mr. Seery

24    alleged in his declaration, correct?

25    A    I discussed the TRO itself and I guess, broadly, the

Dondero - Direct                                    31

1  supporting documents with counsel.

2          MR. MORRIS:  Just one moment, Your Honor.

3          THE COURT:  Okay.

4      (Pause.)

5  BY MR. MORRIS:

6  Q   I'll ask the question again.  You didn't even know the

7  substance of what Mr. Seery alleged in his declaration,

8  correct?

9  A   As far as I know, it hinged on the trades in the week of

10 Thanksgiving.

11 Q   Okay.  As of the time of the preliminary -- withdrawn.  Do

12 you recall that you testified at the preliminary injunction

13 hearing on January 8th?

14 A   Yes.

15 Q   Okay.  And do you recall, as of that time, you did not

16 even know the substance of what Mr. Seery alleged in his

17 declaration?

18 A   I don't recall what I said then.

19 Q   That's because you didn't even think about the fact that

20 the Debtor was seeking a TRO against you; isn't that right?

21 A   That I don't -- what do you mean by that?

22 Q   You didn't even think about the fact that the Debtor was

23 obtaining a TRO against you when you put yourself back in

24 December; isn't that right?

25 A   When the TRO was put in, I changed my behavior materially,

Dondero - Direct                        32

1  and I -- I got enough of an understanding of it from my

2  counsel.

3          MR. MORRIS:  Move to strike, Your Honor.

4          THE COURT:  Sustained.

5  BY MR. MORRIS:

6  Q   You did not care that the Debtor was seeking a TRO against

7  you; isn't that right?

8  A   I wouldn't describe it like that, no.

9          MR. MORRIS:  Can we go to -- you know what?  Before I

10 do that, Your Honor, in order to just make this easier, I'd

11 like to move into evidence the Debtor's exhibits at one time,

12 now that we have Your Honor's ruling on the motion *in limine*.

13 The Debtor has Exhibits 1 through 37 that were lodged at

14 Adversary Proceeding Docker No. 80 on February 1st.  I guess

15 let's just do them one at a time.  And the Debtor would

16 respectfully request that those documents be admitted into

17 evidence.

18         THE COURT:  All right.  Mr. Wilson, any objection?

19 (Pause.)  You're on mute.  Mr. Wilson, you're on mute.

20         MR. WILSON:  I didn't understand the request.  Did he

21 say all of his evidence?

22         THE COURT:  Well, he's got --

23         MR. MORRIS:  We're --

24         THE COURT:  -- a couple of different batches on the

25 docket.  He's asked for 1 through 37 at Docket Entry No. 80 to

1 | be admitted at this time.

2 |         MR. WILSON:  Okay.  I do have some objections to some

3 | of those items.

4 |         THE COURT:  Okay.  Do you want to go through which

5 | ones you want to object to?

6 |         MR. WILSON:  Yeah.  I would object to 3, 4, 5, 6, 16,

7 | 23, 29, 30, 31, 32, 33, 34, and 35.

8 |         THE COURT:  Well, so shall we just let you offer

9 | those the old-fashioned way, Mr. Morris, as you want a witness

10 | to testify about them?  Or do you have a response right now?

11 | I haven't really heard the substance of the objection, but it

12 | probably makes more sense to just admit what's not objected to

13 | now and you can --

14 |         MR. MORRIS:  Yeah.  Let's start, let's start with

15 | that.

16 |         THE COURT:  All right.

17 |         MR. MORRIS:  Let's start with that.

18 |         THE COURT:  All right.  So the Court is admitting 1,

19 | 2, 7 through 15, 17 through 22, 24 through 28, and then 36 and

20 | 37 at this time.  All right?

21 |     (Debtor's Exhibits 1, 2, 7 through 15, 17 through 22, 24

22 | through 28, 36, and 37 are received into evidence.)

23 |         MR. MORRIS:  All right.  And next we have, Your

24 | Honor, Exhibits 40 through 59 that can be found at Adversary

25 | Proceeding Docket No. 101 that was filed on February 19th.

1          THE COURT:  All right.  You're offering all of those?

2          MR. MORRIS:  Yes.

3          THE COURT:  All right.  Mr. Wilson, any objection?

4          MR. WILSON:  Yes.  I object to 40 through 46 and then

5  56 through 69.

6          THE COURT:  All right.  Well, so I will admit 47

7  through 55, and then we'll let Mr. Morris offer the others the

8  old-fashioned way if he wants to.

9      (Debtor's Exhibits 47 through 55 are received into

10  evidence.)

11          MR. MORRIS:  Okay.  And just to make this easy for

12  the Court, the Debtor will withdraw Exhibits 41 through 46 --

13          THE COURT:  Okay.

14          MR. MORRIS:  -- and 58 and 59.

15          THE COURT:  All right.

16      (Debtor's Exhibits 41 through 46 and Exhibits 58 and 59

17  are withdrawn.)

18          MR. MORRIS:  All right.  So if we go back now,

19  Exhibit 36 is in evidence.  Exhibit 36 is the transcript from

20  the preliminary injunction hearing on January 8th.  And I

21  would ask Ms. Canty to put up Page 23, Lines 10 through 12.

22  BY MR. MORRIS:

23  Q    Mr. Dondero, were you asked this question and did you give

24  this answer?  Actually, beginning at Line 8.  Question, "You

25  didn't even know the substance of what Mr. Seery alleged in

1  his declaration at the time I deposed you on Tuesday,

2  correct?"  Answer, "Correct."

3       And that's because --

4  A    I'm sorry, what page are you on?

5  Q    Yeah, it's Page -- I apologize -- 23.

6            MR. MORRIS:  And then you can see, Your Honor, we

7  read from his deposition transcript and I ask the following

8  question and get the following answer beginning at Line 10.

9  BY MR. MORRIS:

10 Q    (reading)  Question, "Did you care that the Debtor was

11 seeking a TRO against you?"  Answer, "I didn't think about

12 it."

13      That was the testimony that you gave at your deposition

14 and that you affirmed at the hearing on January 8th.  Isn't

15 that right, Mr. Dondero?

16 A    Yes.

17 Q    Okay.

18           MR. MORRIS:  Can we take this down, please?

19 BY MR. MORRIS:

20 Q    You didn't listen to the hearing where the Court

21 considered the Debtor's motion for the TRO, correct?

22 A    Correct.

23 Q    You never read the transcript in order to understand what

24 took place in the courtroom when Judge Jernigan decided to

25 enter the TRO against you, correct?

```
1   A    Correct.  I relied on counsel.

2            MR. MORRIS:  I move to strike the latter portion of

3   the answer.

4            THE COURT:  Overruled.

5   BY MR. MORRIS:

6   Q    Mr. Dondero, at least as of the preliminary injunction

7   hearing on January 8th, you never bothered to read the TRO

8   that was entered against you, correct?

9   A    Again, I relied on counsel.  I don't -- I don't remember

10  exactly when I read it.  But I -- I think you're correct.

11  Q    Okay.  Let's talk about the cell phone for a bit.  How

12  long were you the CEO of Highland Capital Management?

13  A    Since 1994.

14  Q    And Highland had an employee handbook; isn't that right?

15  A    Yes.

16  Q    And they had that handbook during the period of time that

17  you were the CEO, right?

18  A    I'm not sure we had one for the first half-dozen years,

19  but more recently, for sure, we've had a handbook.

20  Q    Is it fair to say that you had the handbook for at least

21  ten years prior to the petition date?

22  A    Yes.

23  Q    Okay.  And as the CEO of Highland Capital Management, you

24  knew that the purpose of maintaining the handbook was to

25  inform Highland's employees of Highland's policies and
```

Dondero - Direct                             37

1   practices, correct?

2   A    Yes.

3   Q    Okay.  And you personally reviewed the handbook, right?

4   A    Once a year, in compliance training, we go over the

5   compliance manual or any major changes for about half an hour.

6   Q    Can you describe for the Court the compliance training

7   that you just referred to?

8   A    Usually, senior executives would meet with Thomas Surgent

9   for -- one-on-one for about half an hour to go over any

10  changes or anything different on the regulatory front that

11  affect the manual.

12  Q    And that included both the compliance manual and the

13  employee handbook, correct?

14  A    I -- I believe so.  Mainly the compliance manual, but --

15  yeah, I believe so.

16  Q    And you actually completed certifications on an annual

17  basis with respect to your compliance with the compliance

18  policies and the employee handbook, right?

19  A    When the meeting is concluded, yes, we sign what was gone

20  over in the meeting.  But that paper would probably explain

21  what was gone over in the meeting.  I don't remember exactly

22  what was gone over.

23  Q    Okay.  That's fair.

24        MR. MORRIS:  Can we -- let's take a look at Exhibit

25  55, if we could.  That's a copy of the employee handbook, and

Dondero - Direct                                    38

1   that's been admitted into evidence.

2   BY MR. MORRIS:

3   Q   Do you recall that one of the --

4           MR. MORRIS:  If we could just go to the first page of

5   the document.  Yeah.

6   BY MR. MORRIS:

7   Q   Do you recall that one of the policies in the handbook

8   pertained to a cell phone benefit that HCMLP made available to

9   employees?

10  A   No.

11          MR. MORRIS:  Okay.  Can we go to Page 12, please?

12  Scroll down just a little bit.

13  BY MR. MORRIS:

14  Q   You see there's a cell phone benefit there?  And do you

15  recall that under the cell phone benefit employees could

16  obtain up to a hundred dollars a month towards the cost of

17  their own cell phone if they -- if they complied with the

18  policy?

19  A   Yes, I see that.

20  Q   Yeah.  And participation in the cell phone benefit, that

21  was voluntary, right?  Nobody was required to do that?

22  A   I -- I -- I don't know.

23          MR. MORRIS:  All right.  Let's go to the next page,

24  Page 13.

25  BY MR. MORRIS:

Dondero - Direct                              39

1    Q    Do you see the first sentence of the first full paragraph,

2    "Participation in this policy is entirely voluntary"?  Do you

3    see that?

4    A    Yes.

5    Q    So does that refresh your recollection that the cell phone

6    benefit policy was voluntary?

7    A    We can go through the manual.  I don't have a detailed

8    memory of the employee manual.  It says what it says.  I --

9    Q    Okay.

10   A    I don't know.

11   Q    Okay.

12        MR. MORRIS:  Let's just scroll down a little bit.

13   Right there.

14   BY MR. MORRIS:

15   Q    Do you see the paragraph beginning, Employees?

16   A    Yes.

17   Q    And about halfway through that paragraph, there's a

18   sentence that begins, "Further."  Can you just read that

19   sentence out loud?

20   A    (reading)  Further, regardless of whether employees choose

21   to participate in this policy, all email, voicemail, text

22   messages, graphics, and other electronic data composed, sent,

23   and/or received related to company business remain the

24   property of Highland.

25   Q    So that was the company's policy, correct?

1   A    Yes.

2   Q    And that was --

3   A    It appears so.

4   Q    And that was the company's policy that applied to all

5   employees, correct?

6   A    As far as I know, although didn't we just establish it's

7   voluntary, the participation, or no?

8   Q    Voluntary to participate in the -- in the cell phone

9   benefit.  But what you just read says, quote, Further,

10  regardless of whether the employees choose to participate in

11  this policy, all --

12  A    Okay.

13  Q    And then it goes on.  So will you agree with me that it

14  applies to all employees?

15  A    Yes.

16  Q    Okay.  The compliance group was responsible for making

17  sure that all of its -- all of Highland's employees were in

18  compliance with the various firm policies, correct?

19  A    Yes.

20  Q    And for a number of years prior to the petition date,

21  Thomas Surgent served as the chief compliance officer,

22  correct?

23  A    Yes.

24  Q    And I think, as you just alluded to, at least on an annual

25  basis, Mr. Surgent sat down with senior executives to go over

Dondero - Direct                              41

1  the compliance in the -- the compliance policies in the

2  employee handbook, correct?

3  A    Yes.

4  Q    And you personally participated in those meetings, right?

5  A    Yes.  And I believe I followed it to the letter.

6  Q    Okay.  And as part of the process, you certified that you

7  were in compliance with the obligations applicable as set

8  forth in the employee handbook, correct?

9  A    Yes, and I believe I have been.

10          MR. MORRIS:  Can we put up Exhibit 56, please?

11  BY MR. MORRIS:

12  Q    And is this the certification --

13          MR. MORRIS:  And we can scroll down.

14  BY MR. MORRIS:

15  Q    Again, this is the first like real document we're looking

16  at here, Mr. Dondero.  The same rule always applies:  If

17  there's anything that you think you need to see in the

18  document, just let me know.  We've taken pains to redact all

19  of your personal information.

20          MR. MORRIS:  If we go down.

21  BY MR. MORRIS:

22  Q    But this is the form that was completed for you in 2020

23  with respect --

24          MR. MORRIS:  If we go to the top.

25  BY MR. MORRIS:

Dondero - Direct                         42

1   Q    This is the Annual Certification and Conflicts of Interest

2   Disclosure in 2019.  This is the firm you were referring to

3   earlier, right?

4   A    Can you show me the part that talks about the employee

5   manual?  Because I didn't see that.

6   Q    Sure.

7         MR. MORRIS:  Let's go to the last page, please.

8   BY MR. MORRIS:

9   Q    Do you see Notes there?

10  A    Yes.

11  Q    All right.  And about five lines down -- and I'm just

12  going to read from it -- it says, quote, I have received, have

13  access to, and have a -- and have read a copy of the employee

14  handbook, and I am in compliance with the obligations

15  applicable to employees set forth therein.

16       Have I read that correctly?

17  A    Yes.

18  Q    So this is your compliance certification in which, among

19  other things, you certify that you had access to and had read

20  and were in compliance with the employee handbook, right?

21  A    Yes.

22  Q    Okay.

23  A    I believe I was, within my tenure at Highland, compliant

24  with it.

25  Q    Okay.

1          MR. MORRIS:  Can we go to Exhibit 57, please?

2    BY MR. MORRIS:

3    Q    And this is a Q3 2020 questionnaire and transaction

4    certification from you effective as of October 7th.  Do you

5    see that?

6    A    Yes.

7    Q    And is this just another periodic compliance certification

8    that Mr. Surgent and the compliance group obtained from senior

9    employees?

10   A    I'm not aware of this one.  I mean, I -- I don't remember

11   these questions being part of a --

12        (Echoing.)

13   Q    Okay.

14          MR. MORRIS:  Let's look to the bottom of the

15   document, Page 8 of 8.

16   BY MR. MORRIS:

17   Q    Again, we've tried to redact everything that's personal to

18   you, sir.  You'll see that there's another certification that

19   you had, quote, received, have access to, and are otherwise in

20   compliance with the handbook.  Do you see that?

21   A    Yes.

22   Q    And was that a true statement in October 2020?

23   A    Yes.

24   Q    Okay.

25          MR. MORRIS:  Your Honor, these two exhibits, 56 and

1  57, are two exhibits that Mr. Dondero's counsel had objected

2  to, so I move for their admission into evidence.

3          THE COURT:  All right.  Mr. Wilson, your objection?

4          MR. WILSON:  I'm sorry, Your Honor, were you asking

5  for a response from me?

6          THE COURT:  Yes.  Earlier you had objected to 56 and

7  57 --

8      (Echoing.)

9          MR. WILSON:  I'm getting a lot of feedback.  I'm

10  having trouble hearing.

11          THE COURT:  Yes.  Mr. Dondero, your past few answers

12  have had some distortion.  So I don't know if you've got

13  anyone there to kind of help you make some adjustments.  I'm

14  not sure what --

15      It's coming from Mr. Dondero, correct?

16          THE WITNESS:  I'm sorry, are you saying it's on my

17  end, the distortion?

18          THE COURT:  Yes.  Right now you're loud and clear,

19  but your -- a few answers previously, it's been distorted.

20      All right.  So let's just turn to Mr. Wilson.  You had

21  earlier objected to Exhibits 56 and 57.  They are now being

22  offered.  Do you have an objection still?

23          MR. WILSON:  Well, I do, Your Honor.  I don't believe

24  that Mr. Dondero has authenticated these exhibits.  He wasn't

25  familiar with them.  They're not signed by him.  I think that

1    -- I think they're also hearsay.

2        Without -- without more confirmation by Mr. Dondero as to

3    what's in these, that he actually made these statements and he

4    signed them, I don't think that they qualify as competent

5    evidence.

6               THE COURT:  Mr. Morris?

7               MR. MORRIS:  If I may, Your Honor.

8               THE COURT:  Uh-huh.

9               MR. MORRIS:  Number one, Mr. Dondero testified

10   unambiguously that each year he -- he completed this form.

11   Particularly as it relates to Exhibit 56, he specifically

12   acknowledged that that was the form that was prepared for him

13   at that time as of the date.

14       It is true that he did say that with respect to 57 he

15   didn't specifically recall it, but he did testify that he was

16   in compliance and that he understood and agreed with the

17   statement that's in the note itself.  And that's the only

18   reason that we're offering the document.  So, based on his

19   testimony, I'd respectfully request that both documents be

20   admitted into evidence.

21              THE COURT:  All right.  I'll overrule the objections.

22   56 and 57 are admitted.

23       (Debtor's Exhibits 56 and 57 are received into evidence.)

24              THE COURT:  All right.  Mr. Morris, --

25              MR. MORRIS:  Mr. Dondero?

1          THE COURT:  -- you may continue.

2          MR. MORRIS:  Yes.

3   BY MR. MORRIS:

4   Q   Mr. Dondero, you knew no later than July 2020 that the

5   U.C.C. wanted your text messages; isn't that right?

6   A   I heard your opening but I was not specifically aware or

7   noticed, nor did I -- nor did I believe getting a new phone

8   changed any of that.

9          MR. MORRIS:  I move to strike, Your Honor.

10         THE COURT:  Sustained.

11  BY MR. MORRIS:

12  Q   Mr. Dondero, you knew no later than July 2020 that the

13  U.C.C. wanted your text messages, correct?

14  A   No.

15  Q   In fact, this Court and all parties in interest were

16  explicitly told in July that you knew the U.C.C. wanted your

17  text messages; isn't that correct?

18  A   I was not specifically aware.

19  Q   Okay.  Do you remember last summer that the Creditors'

20  Committee made a motion to compel?

21  A   I have no recollection of that.

22  Q   Okay.

23         MR. MORRIS:  Can we put up Exhibit 34, please?

24         Okay.  Your Honor, this is a copy of the Creditors'

25  Committee Emergency Motion to Compel Production by the Debtor

1    dated -- I'm not sure of the date.

2        Can we just go up to the top?

3        Dated July 8th, 2020, that was lodged at Docket No. 808.

4    And I'd like to offer this into the record simply to establish

5    that a request was publicly made by the U.C.C. for Mr.

6    Dondero's text messages.

7            THE COURT:  All right.  Mr. Wilson, you had an

8    objection earlier.  What would you like to say?

9            MR. WILSON:  Yes.  Yes, Your Honor.  My objection is

10   just primarily relevance.  As you stated in your opening

11   remarks, the time period we're concerned with is December 10th

12   through January 7th, I believe, and the Debtor is trying to

13   use a document from July of 2020 to impute some knowledge to

14   Mr. Dondero and tie it into that time period six months later.

15   I don't believe that's proper and I would object.

16           MR. MORRIS:  If I may, Your Honor?

17           THE COURT:  You may.

18           MR. MORRIS:  This is -- this is a very simple

19   connect-the-dots.  Mr. Dondero was the CEO of Highland Capital

20   Management.  Highland Capital Management had an employee

21   handbook.  The employee handbook specifically said that text

22   messages related to the company's business were the company's

23   property.  Mr. Dondero certified in the exhibits that were

24   just admitted into evidence that he was familiar with the

25   company's employee handbook and that he was in compliance

Dondero - Direct                              48

1    thereof.

2        This document establishes that the Debtor -- that the

3    Creditors' Committee wanted Mr. Dondero's text messages.  The

4    next document that we're going to look at is from Mr.

5    Dondero's own lawyers where he acknowledges that he

6    understands that the Creditors' Committee wants his text

7    messages.  And all of that is directly relevant to why, when

8    the phone gets thrown away after the TRO is entered into, the

9    damage that is caused the Debtor.  The Debtor has lost its

10   property, in violation of 362(a)(3) of the Bankruptcy Code.

11   It's property that Mr. Dondero knew was the Debtor's property.

12   It's property that Mr. Dondero's -- at least his lawyers knew

13   the U.C.C. wanted.

14       So I'm not charging that anything that happened in July

15   2020 was a violation of the TRO.  What I am saying, though,

16   and what the evidence clearly shows, is that when that phone

17   was disposed of after the TRO was entered, it was disposed of

18   at a time when Mr. Dondero knew that these text messages were

19   the company's property and that the U.C.C. wanted them.

20           THE COURT:  All right.  I overrule the objection.  33

21   is admitted.

22       (Debtor's Exhibit 33 is received into evidence.)

23           MR. MORRIS:  Go to Paragraph 6, please, just to make

24   it clear.

25   BY MR. MORRIS:

Dondero - Direct                                    49

1    Q    Okay.  In Paragraph 6 there, there is a sentence that

2    says, quote, In particular, the Committee has spent a

3    considerable amount of time attempting to obtain any

4    production of emails, chats, texts, or ESI communications from

5    the Debtor.

6         Do you see that?

7    A    Yes.

8    Q    And the U.C.C. specifically identified you as one of the

9    custodians from whom it was seeking this information.  Do you

10   recall that?

11   A    Vaguely.

12   Q    All right.  Let's just go to Paragraph 10 and Footnote 8.

13   There's a reference to nine identified custodians.  Do you see

14   Footnote 8?  You're among the custodians that the U.C.C.

15   identified as folks from whom they wanted text messages and

16   other ESI.  Right?

17   A    Yes.

18   Q    And your lawyers certainly knew that the U.C.C. wanted

19   your text messages, right?

20   A    Why didn't they just get them from the phone company?

21   Just, if they were trying that hard, why -- why did they --

22   why did they not get them from -- directly from the phone

23   company?

24             MR. MORRIS:  I move to strike, Your Honor.

25             THE COURT:  Sustained.

Dondero - Direct                    50

1    BY MR. MORRIS:

2    Q    Mr. Dondero, your lawyers knew that the U.C.C. wanted your

3    text messages.  Isn't that correct?

4    A    I don't know.

5    Q    Do you recall that your lawyers filed a response to the

6    U.C.C.'s motion?

7    A    (no immediate response)

8    Q    Do you recall that your lawyers filed a response to the

9    U.C.C.'s motion?

10   A    I -- I do not.  I hope they said, just get all the texts

11   you want from the phone company.  I hope that's what they

12   said.

13            MR. MORRIS:  Okay.  Can we put up -- I move to

14   strike, Your Honor.

15            THE COURT:  Overruled.

16            MR. MORRIS:  Can we put up Exhibit 40, please?

17   BY MR. MORRIS:

18   Q    And this document is in evidence.  Do you see that this is

19   your response or the response that was filed on your behalf?

20   A    Yes.

21            MR. MORRIS:  Can we go to Paragraph 3, please?

22   BY MR. MORRIS:

23   Q    Can you just read that paragraph out loud?

24   A    (reading)  Accordingly, the proposed protocol of the

25   Committee seeks, among other things, documents, emails, and

Dondero - Direct                              51

1  other electronically-stored information, ESI, exchanged from

2  or between nine different custodians, to include Dondero.  The

3  Committee has requested all the ESI for the nine custodians,

4  including, without limitation, email, chat, and text,

5  Bloomberg Messaging, or any other ESI attributable to the

6  custodians.

7  Q    So, on July 14th, your lawyers told the Court on your

8  behalf that it knew -- that they knew that you were on one of

9  nine custodians from whom the Committee wanted text messages.

10 Correct?

11 A    That's what it says.

12 Q    Okay.  And are you aware that the Court subsequently

13 entered an order giving the Committee the relief that it

14 sought?

15 A    Okay.  No, I'm not specifically aware.

16 Q    Okay.  Until -- until at least December 10th, the day that

17 the TRO was entered into, you had a cell phone that was bought

18 and paid for by the Debtor.  Correct?

19 A    Yes.

20 Q    And that cell phone had text messages on it.  Correct?

21 A    Yes.

22 Q    And from time to time, you use your phone to exchange text

23 messages concerning company business.  Correct?

24 A    Very rarely.  But yes.

25 Q    But you do.  Correct?

Dondero - Direct                         52

1  A    Yes.

2  Q    And in fact, in fact, we're going to look at certain text

3  messages that were sent to you or that were sent by you on

4  your new phone concerning company business.  Correct?

5  A    Yes, we will.

6  Q    And we know that the cell phone existed after the TRO was

7  entered, correct?

8  A    I don't -- maybe a day or two, but it -- it -- I don't

9  know if it's fair to say it existed.  I followed protocol.  I

10 gave my old phone to the tech group.  They got me a new phone.

11 They handled it according to the manual and the protocol.

12 When it was put back in Tara's drawer, I don't know if it had

13 any information on it at that point in time.  But, again, you

14 could have gotten all the texts you want from the phone

15 company.

16         MR. MORRIS:  I move to strike, Your Honor.

17         THE COURT:  Sustained.

18         MR. WILSON:  Your Honor, can Mr. Morris state the

19 objection that he has to that testimony?

20         MR. MORRIS:  It's not responsive to the question.

21 It's a speaking -- it's just -- it's what he wants to say.

22 I'm asking a leading question, Your Honor, that's a yes or no

23 answer, and he's giving me the answer that he wants, --

24         THE COURT:  All right.  I agree --

25         MR. MORRIS:  -- not the answer that I've asked for.

1

2          THE COURT:  I agree.  It was nonresponsive.

3          MR. MORRIS:  Your Honor, I forgot in my -- in going

4    over the exhibits.  Last night, we filed a notice of a

5    replacement of certain exhibits.  That could be found at

6    Docket No. 128.  And among the three exhibits that were

7    replaced was Exhibit 11.

8        Exhibit 11 is a copy of the TRO.  The reason that we

9    replaced it is because the version that was on Docket No. 80

10   had -- I guess there was typing along the top so you couldn't

11   see the date and time of the entry.

12       But I would ask Ms. Canty just to put up onto the screen

13   the version of Exhibit 11 that was attached to Document 128

14   last night.

15          THE COURT:  Okay.

16   BY MR. MORRIS:

17   Q    And so here, you can see -- you see this is the TRO, Mr.

18   Dondero?  We can scroll down a little bit if that's helpful.

19   All right.  This is the TRO, right?

20   A    Yep.

21   Q    And if you go to the top, you can see that it's entered on

22   December 10th at 1:31 in the afternoon.  Am I reading that

23   correctly?

24   A    Yes.

25   Q    Okay.  And later that night, you were told that your own

Dondero - Direct                                  54

1   -- your old phone was in the top of Tara's desk drawer.

2   Correct?

3   A    Yes.

4   Q    Okay.

5        MR. MORRIS:  Can we just put up Exhibit 8, please?

6   BY MR. MORRIS:

7   Q    And this is the text message that Mr. Rothstein sent to

8   you on December 10th at 6:25 p.m. at night.  Right?

9   A    Yes.

10  Q    And so your phone existed after the TRO was put into

11  effect, correct?

12  A    Again, I have to answer that question by saying that the

13  process for getting a new phone started two weeks earlier.

14  The technology group, Jason and crew, could have saved or done

15  whatever with the phone, but they followed protocol and they

16  wiped the phone exactly as Thomas Surgent and the employee

17  manual says, and the phone that was put back on my desk, the

18  old phone, had nothing on it.

19       MR. MORRIS:  I move to strike, Your Honor.

20       THE COURT:  Okay.  Sustained.

21       MR. MORRIS:  It's a very simple question.

22       THE COURT:  Mr. Dondero, I'm going to --

23       MR. MORRIS:  Sir, --

24       THE COURT:  I'm going to remind you of the rules.

25  You need to give direct answers to the questions, and most of

Dondero - Direct                              55

1    these questions are yes or no answers.  And then when Mr.

2    Wilson has the chance to examine you, presumably he will ask

3    follow-up questions that allow you to give some of these

4    answers that I guess you're wanting to give.  Okay?  So

5    please, please listen carefully and just directly answer the

6    questions.

7        All right.  Mr. Morris, go ahead.

8            THE WITNESS:  I'll do the best -- Your Honor, listen,

9    I'll do the best I can.  In all due respect, I will do the

10   best I can.  But if I don't believe I can give an honest or

11   not misleading answer with a yes/no, I need to give a more

12   detailed answer or I need to say I can't answer the question

13   that you've put forward.

14           THE COURT:  Okay.  I understand why it's difficult,

15   but, again, that's why we allow direct, cross, redirect,

16   recross, because it is your own lawyer's responsibility, in

17   cooperation with you, to ask questions that allow you to give

18   the fulsome answers that you think the Court needs to hear.

19   But at this juncture, please just try to directly answer the

20   question yes or no when that's all it is aimed at asking.

21       All right, Mr. Morris.  Go ahead.

22           MR. MORRIS:  Thank you, Your Honor.

23   BY MR. MORRIS:

24   Q   On December 10th at 6:25 p.m., after the TRO was entered

25   into, Mr. Rothstein told you that your old phone was in the

Dondero - Direct                              56

1   top of Tara's desk.  Correct?

2   A    Yes.

3   Q    Okay.  And Mr. Rothstein is not going to testify in this

4   proceeding, is he?  You're not calling him to testify on your

5   behalf, right?

6   A    I don't know.

7   Q    Mr. Surgent is not being called to testify in connection

8   with this proceeding, correct?

9   A    I -- I don't -- I didn't hear him mentioned earlier.  I

10  don't think so.

11  Q    Okay.  Tara was still serving as your assistant as of

12  January 8, 2021, right?

13  A    Yes.

14  Q    So it's fair to say that you were informed on December

15  10th that the phone, the old phone, was not thrown in the

16  garbage, had not been disposed of, but was instead sitting in

17  Tara's desk.  Correct?

18  A    Yes.

19  Q    And it's also fair to say that, as of December 10th, Mr.

20  Rothstein didn't take it upon himself to throw your old cell

21  phone away.  Correct?

22  A    I don't know.

23  Q    So it's fair to say that you were informed on December

24  10th that the phone was not thrown in the garbage --

25  withdrawn.  It's also fair to say that, as of December 10th,

Dondero - Direct                    57

1  Mr. Rothstein didn't take it upon himself to throw your old

2  phone in the garbage.  Right?

3  A    I don't know what happened to the phone.  I don't know

4  what Jason did or did not do.

5           MR. MORRIS:  Can we pull up Page 61 from the

6  transcript of the preliminary injunction proceeding?  And if

7  we can go down to Line 20 to 23?

8  BY MR. MORRIS:

9  Q    Were you asked this question and did you give this answer:

10 "And it's also fair to say that, as of December 10th, Mr.

11 Rothstein didn't take it upon himself to throw your old phone

12 in the garbage, right?"  Answer, "Not as that moment, but like

13 I said, I can find out how it was disposed of."

14      Did you give that answer to that question at that time?

15 A    Yes.

16 Q    Okay.  But you don't know who threw your phone away,

17 right?

18 A    No.

19 Q    It never occurred to you to get the Debtor's consent

20 before the phone was thrown away, correct?

21 A    I -- everything I did with regard to the phone was with

22 the Debtor's consent and process.  If that answers your

23 question.

24 Q    Sir, you never -- you never asked the Debtor for

25 permission to throw your phone away, did you?

Dondero - Direct                    58

1  A    I -- I didn't have to because I handled it according to

2  the employee manual by giving it to the tech group.

3  Q    Does the employee manual tell you that you're allowed to

4  throw away a phone with the Debtor's property on it when a

5  party to a litigation has asked for the text messages?

6  A    There were no text messages on the phone by that point in

7  time.

8  Q    So, so you -- so you allowed the text messages to be

9  erased, even though your lawyers told the Court that the --

10 that they understood that the U.C.C. wanted your text

11 messages, and in fact, the Court entered an order in order to

12 get those text messages?

13 A    No, that is not correct.  I gave it to the tech group,

14 which was part of the Debtor, and they handled it in any which

15 way they could have, but in compliance with the manual.  And

16 they wiped the old phone as they got me a new phone.  And the

17 Debtor at that point in time could have downloaded, copied, or

18 got from the phone company whatever text messages they wanted.

19 Q    But Mr. Seery didn't even know you were doing this; isn't

20 that right?

21 A    I have no idea.

22 Q    You have no reason to believe that Mr. Seery had any

23 knowledge that you were trading out your phone, correct?

24 A    I believe he knew because he had told all employees to get

25 new phones within the next 30 days.  So it wasn't -- it wasn't

Dondero - Direct                    59

1   a surprise, I don't think, to him or anybody else.  And I

2   don't under -- this -- I don't understand the brouhaha over

3   what's really nonsense.

4   Q   Do you think it's nonsense that text messages that are the

5   company's property were disposed of even though they were

6   specifically requested by the U.C.C. and ordered by the Court

7   to be produced?  That's what you describe as nonsense?

8   A   I describe it as nonsense when everybody was told to get

9   new phones and everybody got new phones and everybody went

10  through the protocol of giving them to the tech group.  The

11  tech group ordered the new phones, got rid of the old phones

12  to protect client data, et cetera, like they've always done.

13  And the Debtor could have made as much copies of anything,

14  knowing that everybody had to get new phones because they were

15  canceling everybody's cell phone in the next 30 days.  The

16  Debtor could have done whatever it wanted with the material.

17  And just because the tech group went through the normal

18  historic process, you're trying to hold me and other people on

19  that list somehow accountable, and it's craziness.

20  Q   Okay.  It never occurred to you to get the Debtor's

21  consent before you did this, right?

22  A   By not doing it on my own, by not ordering my own phone, I

23  didn't think it was necessary to get Debtor consent because I

24  gave the phone to the Debtor as part of getting a new phone.

25        MR. MORRIS:  Can we get Exhibit -- go to Page 58,

Dondero - Direct                        60

1  please, Line 15?

2  BY MR. MORRIS:

3  Q   Were you asked this question and did you give this answer?

4          MR. MORRIS:  If we can scroll down to Line 15.

5  BY MR. MORRIS:

6  Q   Question, "Did it ever occur to you to get the Debtor's

7  consent before doing this?"  Answer, "No."

8      Did you give that testimony, sir?

9  A   Yes.  Because I gave the Debtor my phone.  When I got a

10 new phone, I gave them my old phone.  The Debtor wiped the

11 phone and gave it back to me.

12         THE COURT:  Is it --

13         MR. MORRIS:  I move to strike every -- after -- after

14 he confirms that he gave that answer to his prior testimony.

15         THE COURT:  Sustained.

16         MR. MORRIS:  Sir, --

17         MR. WILSON:  Your Honor, I'll object that Mr. Morris

18 has asked and answered these questions several times.  At this

19 point, he's badgering the witness.

20         THE COURT:  Overruled.

21 BY MR. MORRIS:

22 Q   Sir, you had the billing changed from the company account

23 to your personal account, correct?

24 A   As did everybody, at the direction of Seery.

25 Q   Sir, you had your account changed; isn't that correct?

Dondero - Direct                    61

1  A    I -- I handled my personal -- or, I had my assistant

2  handle my own personal phone based on the notice that Seery

3  had given everybody.

4  Q    Do you have a copy of that notice?  Are we going to have

5  that in evidence today?

6  A    I don't think Seery would deny it.  He's not -- hasn't --

7  well, whatever.  No, I don't have a -- I don't have a copy of

8  a memo.

9  Q    So you're telling me that Mr. Seery gave an instruction

10  for everybody to throw the cell phones away that had been

11  asked for by the U.C.C., and he didn't even do that in

12  writing?  That's your testimony, is that -- is that he gave

13  that instruction to throw cell phones away that had been

14  specifically requested by the U.C.C., and he didn't even do

15  that in writing?

16         MR. WILSON:  Objection, Your Honor.  Mr. Morris is

17  mischaracterizing the testimony.

18         THE WITNESS:  He's -- he's horribly mischaracterizing

19  it.

20         THE COURT:  Okay.

21         THE WITNESS:  I'm saying he told everybody and he

22  stopped paying everybody's cell phone bill at the end of

23  January and he told everybody to get new phones.  And to be as

24  compliant as possible, I gave it to the Debtor's employees to

25  handle buying a new phone and handling the old phone according

1  to the manual and whatever else the Debtor needed to do with

2  the phone.

3          THE COURT:  Okay.  Let's try to --

4          THE WITNESS:  So the Debtor --

5          THE COURT:  -- get back on track.

6          THE WITNESS:  -- wiped the phone.

7          THE COURT:  Let's try to get back on track --

8          MR. MORRIS:  So, so you --

9          THE COURT:  -- with the instruction --

10         MR. MORRIS:  Go ahead.

11         THE COURT:  -- of giving yes and no answers.  Again,

12  Mr. Wilson is going to get all the time he needs to follow up

13  with his own questions.  All right?

14     Go ahead, Mr. Morris.

15         MR. MORRIS:  Sir, -- thank you, Your Honor.

16  BY MR. MORRIS:

17  Q   Sir, you never asked the Debtor for permission to change

18  the phone from its account to your personal account.  Correct?

19  A   As I've stated, I gave the Debtor my phone.  No, I did not

20  ask specific permission.  That would be ridiculously

21  redundant.

22         MR. MORRIS:  I move to strike, Your Honor.  It's a

23  really simple question.  Either he -- either he -- either he

24  asked for permission or he did not.  The commentary really

25  needs to stop.

Dondero - Direct                           63

1              THE COURT:  Sustained.

2         Yes or no?  Permission or not?

3    BY MR. MORRIS:

4    Q    I'll ask the question again.  Sir, you never asked the

5    Debtor for permission to change the phone from its account to

6    your personal account, correct?

7    A    I believe I implicitly did by giving them the phone, so

8    I'm going to say yes.

9              MR. MORRIS:  Go to Page 59, please, Line -- Line 11.

10   BY MR. MORRIS:

11   Q    Were you asked this question and did you give this answer?

12   Question, "And you never asked the Debtor for permission to do

13   that.  Correct?"  Answer, "No."

14        Did you give that testimony on January 8th?

15   A    Yes.  But I'd like to correct it as I just said.

16   Q    Sir, you never even told the Debtor you were doing what

17   you did.  You never even told the Debtor that you were

18   changing, let alone -- withdrawn.  Not only didn't you obtain

19   their consent, you never told the Debtor that you were

20   changing the account from its account to your personal

21   account.  Correct?

22   A    We were required to move our phones, so no, I didn't tell

23   them that we were honoring their request.

24   Q    This notion of being required to do that, did your lawyers

25   mention that in their papers in opposition to this motion

Dondero - Direct                              64

1  today, that Mr. Seery had required all of this?  Do you recall

2  reading the papers?  Is there anything in there about that?

3  A    It's the truth.  I -- I don't -- in the papers.  I don't

4  know.

5  Q    Okay.  Let's look at Line 14, since it's just still on the

6  screen, and I'll ask it again.  Were you asked this question

7  and did you give this answer?  "You never told the Debtor you

8  were doing that.  Correct?"  Answer, "No."

9       Was that the testimony you gave then?

10 A    Again, yes, but I'd like to --

11 Q    Okay.

12 A    -- clarify with what I just said.

13 Q    And you never told Mr. Seery or anybody at my firm that

14 the phone was being thrown in the garbage, correct?

15 A    They knew what the protocol was.  You knew what the

16 protocol was.  I didn't think there was a reason to.

17 Q    Sir, you never told anybody at my firm or Mr. Seery that

18 you were throwing -- that the phone was being thrown in the

19 garbage, correct?

20 A    No, I did not.

21 Q    Okay.  That's all I'm asking.  You didn't believe it was

22 necessary to give the Debtor notice that you were taking the

23 phone number for your own personal account and throwing the

24 phone in the garbage, correct?

25 A    I'm sorry.  Can you repeat that question?

1  Q    You didn't believe it was necessary to give the Debtor

2  notice that you were taking the phone number for your own

3  personal account and throwing the phone in the garbage.

4  Correct?

5  A    I didn't think -- correct.  I didn't think I needed to do

6  anything other than what I did.

7        MR. MORRIS:  I move to strike after the word

8  "Correct," Your Honor.

9        THE COURT:  Overruled.

10 BY MR. MORRIS:

11 Q    Do you remember, a couple of weeks after Mr. Rothstein

12 told you that your own -- old phone was in Tara's drawer, that

13 the Debtor sent a letter to your lawyers in which it gave

14 notice to you to vacate the offices and return its cell phone?

15 A    I believe, yeah, I believe that was the end of December.

16       MR. MORRIS:  Can we look at that document, please?

17 It's Exhibit 27.

18     This document is in evidence, Your Honor.

19     And if we can go to the bottom of the second page.

20 BY MR. MORRIS:

21 Q    This is a letter from my firm to your lawyers, right?

22 A    Yes.

23 Q    You want to read the first sentence of that last paragraph

24 out loud?  "HCMLP."

25 A    (reading)  HCMLP will also terminate Mr. Dondero's cell

 1   phone plan and those cell phone plans associated with parties

 2   providing personal services to Mr. Dondero -- collectively,

 3   the cell phones.  HCMLP demands that Mr. Dondero immediately

 4   turn over the cell phones to HCMLP by delivering them to you.

 5   We can make arrangements to recover the phones from you at a

 6   later date.

 7           MR. MORRIS:  Okay.  Can we just scroll back --

 8           MR. WILSON:  Your Honor?

 9           MR. MORRIS:  -- to see the

10           MR. WILSON:  Can I -- can I make a request that the

11   rule of optional completeness be invoked and the date of the

12   letter be shown?

13           MR. MORRIS:  Yeah.  I was just about to get there,

14   sir.  I join.

15           THE COURT:  All right.  Fair enough.

16           MR. MORRIS:  It's December 23rd.

17   BY MR. MORRIS:

18   Q    Do you see that, sir?

19   A    Yes.

20   Q    So, if we can go back to what you just read down at the

21   bottom there.  So, on December 23rd, my firm, on behalf of the

22   Debtor, is informing your lawyers that it will terminate your

23   cell phone plan.  Isn't that right?

24   A    Yes.

25   Q    Can you think of any reason why they would be informing

1  your lawyers of that on December 23rd if they had already told

2  you that?

3          MR. WILSON:  Objection, Your Honor.  He has no

4  knowledge of what the Debtor's lawyers were thinking when they

5  wrote this letter.

6          THE COURT:  Overruled.  He can answer if he has an

7  answer.

8          THE WITNESS:  I have -- I have no idea.

9  BY MR. MORRIS:

10 Q   Okay.  But it's true that, on December 23rd, my firm, on

11 behalf of the Debtor, informed your lawyer of its intent to

12 terminate the phone plan of which you were a part.  Correct?

13 A   Again, no.  I believe the notice happened much sooner, and

14 that's why a whole bunch of people changed their phones at or

15 around the time I did.

16 Q   Who else had phones that were paid for by the Debtor?

17 A   I believe a significant majority of the firm.

18 Q   Isn't it true that only you and Mr. Ellington had phones

19 that were paid for by the Debtor?  I'm not talking about the

20 $100 policy that we looked at before.  But isn't it true that

21 you and Scott Ellington were the only people in the whole firm

22 who had phones that were paid for by the Debtor?

23 A   I did not know that.

24 Q   Okay.  All right.  So do you see later on in that

25 paragraph, at the top of Page 3 -- I'll just read it.  Quote,

Dondero - Direct                           68

1   HCMLP further demands --

2            MR. MORRIS:  Oh, no.  I'm sorry.  Can we go back up a

3   little bit?  I'm having trouble.  Yeah.  Right there.

4   BY MR. MORRIS:

5   Q    (reading)  The cell phones and the accounts are property

6   of HCMLP.  HCMLP further demands that Mr. Dondero refrain from

7   deleting or wiping any information or messages on the cell

8   phone.  HCMLP, as the owner of the account and the cell

9   phones, intends to recover all information relating to the

10  cell phones and the accounts and reserves the right to use the

11  business-related information.

12           Have I read that correctly?

13  A    Yes.

14  Q    And that's what your -- that's what -- that's what the

15  Debtor told your lawyers on December 23rd.  Correct?

16  A    Yes.

17  Q    But the Debtor was a couple of weeks too late in making

18  these demands.  Correct?

19  A    Because the Debtor wiped my phone.  I never wiped my

20  phone.

21  Q    Sir, the Debtor was a couple of weeks too late in making

22  these demands.  Correct?

23  A    No.

24           MR. MORRIS:  Page 65 of the transcript, please.  Line

25  4 through 5.

Dondero - Direct                              69

1  BY MR. MORRIS:

2  Q    (reading)  "We were a couple of weeks too late, huh?"

3  Answer, "It sounds like it."

4       Did you give that answer back on January 8th?

5  A    Yes.

6  Q    And that's because the phones were already in the garbage.

7  Correct?

8  A    No, it -- the phones were already wiped by the Debtor's

9  personnel.

10 Q    Look at Line 6 and Line -- through Line 8 and see if you

11 gave this testimony on January 8th.  Question, "Because the

12 phones were already in the garbage; isn't that right?"

13 Answer, "Yes."

14      Did you give that answer back on January 8th?

15 A    Yes.

16 Q    And that's not -- but that's not what Mr. Lynn told the

17 Debtor in response to the Debtor's letter of January 20 --

18 December 23rd.  Correct?

19 A    I don't know.

20 Q    Well, let's see.

21      MR. MORRIS:  Can we go to Exhibit 22, please?

22 BY MR. MORRIS:

23 Q    This is your lawyer's response to the December 23rd letter

24 that we just saw.  Do you see that?

25 A    Yep.

Dondero - Direct                    70

1  Q   Mr. Lynn doesn't say anything about the cell phone being

2  thrown in the garbage, right?

3  A   He doesn't know what happened to the phone.  Neither do I.

4  Q   Sir, Mr. Lynn doesn't say anything about the cell phone

5  being thrown in the garbage, does he?

6  A   No.

7  Q   And Mr. Lynn doesn't say that the phone was disposed of,

8  correct?

9  A   (no immediate response)

10  Q   Mr. Lynn didn't say that the phone was disposed of, did

11  he?

12  A   No, I don't see it in that paragraph.

13  Q   Okay.  Mr. Lynn didn't describe any company or policy

14  whereby old cell phones are to be thrown in the garbage or

15  otherwise disposed of, correct?

16  A   I don't know if he would have awareness of that, but no,

17  he doesn't mention it.

18  Q   Mr. Lynn doesn't cite to anything Mr. Seery said with

19  respect to the wiping of phones, right?

20  A   No.

21  Q   Mr. Seery -- Mr. Lynn doesn't reference Mr. Seery at all

22  in this letter response to my colleague, correct?

23  A   Nope.

24  Q   He doesn't cite to any policy in the employee handbook to

25  justify the loss of the cell phone, correct?

1   A    No.

2   Q    And you have no reason to believe that Mr. Lynn would

3   withhold from the Debtor the information that the cell phone

4   had been thrown in the garbage consistent with company

5   practice, correct?

6   A    No.

7   Q    Let's talk about the trespass issue for a moment.  Where

8   are the Debtor's offices located, to the best of your

9   knowledge?

10  A    300 Crescent Court, Suite 700.

11  Q    And how long have they --

12  A    Dallas, Texas.

13  Q    And they're a tenant in that space; is that correct?

14  A    Yes.

15  Q    And they're a tenant pursuant to a lease; is that right?

16  A    Yes.

17  Q    And to the best of your knowledge, Suite 300, the Debtor

18  is the sole tenant under the lease for that space.  Correct?

19  A    I -- yeah, I bel... I don't know.  I -- the building has

20  rules for subleases.  I don't know if it -- affiliates are on

21  the lease or not.  I -- I don't -- I don't have an awareness

22  of the lease.

23  Q    So, but you don't have any reason to believe that

24  anybody's on the lease other than the Debtor.  Is that fair?

25  A    I -- I just don't know.  But it -- I don't -- when it

Dondero - Direct                            72

1   started, when the lease started ten years ago or eight and a

2   half years ago, I'm sure it had just Highland, but I don't

3   know who's on it now.

4   Q    Okay.  Okay.  To the best -- you understand the Debtor is

5   subject to the bankruptcy court's jurisdiction, correct?

6   A    Yes.

7   Q    And in that December 23rd letter that we just looked at,

8   the Debtor demanded that you vacate their offices.  Correct?

9   A    Yes.

10          MR. MORRIS:  Okay.  Let's just look at a little bit

11  of that letter, if we can call back Exhibit 27, please.

12  BY MR. MORRIS:

13  Q    On the second page, do you see that there's a statement,

14  the paragraph beginning, "As a consequence."  That's the

15  paragraph where the Debtor informed your lawyers that your

16  access, quote, will be revoked effective Wednesday, December

17  30, 2020.  Do you see that?

18  A    Yes.

19  Q    And the Debtor informed your lawyers that it was taking

20  steps to revoke your access to the offices because the Debtor

21  believed that you were interfering with the Debtor's business.

22  Right?

23  A    It doesn't say that here, but --

24  Q    Well, look at the paragraph above, if we can.  And I don't

25  mean to -- I don't mean to, you know, play games, but the

Dondero - Direct                                73

1   paragraph above says specifically that, as a result of the

2   conduct, your presence at the offices is being revoked because

3   it's too disruptive to continued management.  Do you see that?

4   A    Yes.

5   Q    So I'm not asking you if you agree with it, but there's no

6   question that, on December 23rd, the Debtor told your lawyers

7   that your access was being revoked as of December 30th because

8   the Debtor believed that you were being a disruptive force in

9   the offices.  Right?

10  A    Yes.

11  Q    Okay.

12          MR. MORRIS:  And if we can go to the last page,

13  please.  If we could just push it down a little bit, because I

14  have this in the upper right corner.  No, the other way.  I'm

15  sorry.  Yeah.  Right there.

16  BY MR. MORRIS:

17  Q    And the Debtor told your lawyers, quote, any attempt by

18  Mr. Dondero to enter the office, regardless of whether he is

19  entering on his own or as a guest, will be viewed as an act of

20  trespass.  Do you see that?

21  A    Yes.

22  Q    So the Debtor's position was very, very, very clear to

23  your lawyers as of January -- as of December 23rd.  Is that

24  fair?

25  A    No.

Dondero - Direct                    74

1   Q    The Debtor never -- no, you think -- is it -- are you

2   aware of any exception that Debtor made in this letter that

3   would allow you entry into the offices without protest by the

4   Debtor?

5   A    As I've stated before, my belief was, for the deposition

6   on the 4th, I had no other way to electronically appear, I

7   would have had to cancel, other than coming back to the main

8   conference room at Highland.  It looks like there's four days'

9   difference, but with New Year's and the holiday and days off,

10  there's really one business day difference between when I got

11  kicked out and the deposition.  I wouldn't have been able to

12  attend the deposition otherwise if -- I didn't -- I still

13  don't believe attending the deposition that you required was a

14  trespass.

15  Q    The Debtor never told you that you would be permitted to

16  enter their offices after December 30th if you, in your own

17  personal discretion, believed it was appropriate.  Correct?

18       MR. WILSON:  Objection, Your Honor.  I'm going to

19  object to this line of questioning because this doesn't have

20  anything to do with the TRO and instead it's a letter dated

21  December 23rd, 2020 from the Debtor's counsel.

22       THE COURT:  Your response?

23       MR. MORRIS:  Yeah.  This is just so simple, Your

24  Honor.  The TRO prevents Mr. Dondero from violating the

25  automatic stay.  The automatic stay says that Mr. Dondero

1  cannot take any steps to control the Debtor's property.

2      The evidence is now in the record that the Debtor is a

3  lease -- is the leaseholder on this space.  The Debtor told

4  Mr. Dondero not to enter the space because he was a disruptive

5  force, and the Debtor told Mr. Dondero that if he attempted to

6  enter the space for any purpose, that they would be viewing it

7  as an act of trespass.

8      So, by entering into the Debtor's premises, by entering

9  into the Debtor's property without the Debtor's consent, is a

10  violation of the automatic stay.

11      As I said at the beginning of this, if this were the only

12  thing, Your Honor, I probably wouldn't belabor the point.  But

13  it's -- it is just more evidence of his complete contempt for

14  the Debtor and for the automatic stay and for the TRO.  And I

15  believe it's completely relevant.

16          THE COURT:  All right.  I'm going to --

17          MR. WILSON:  Your Honor, my response to that is that

18  he's now got the TRO and trying to invoke two different

19  documents, one of which being 362 itself and the other being

20  this letter, but Rule 65(d) states that a restraining order

21  must describe in reasonable detail, and not by referring to

22  the complaint or other document, the act or acts restrained or

23  required.

24          THE COURT:  Okay.  I'm going to sustain the

25  objection.  Let's move on.

Dondero - Direct                                    76

1          MR. MORRIS:  Okay.

2     BY MR. MORRIS:

3     Q    During the first week of January, you just walked right

4     into the Debtor's office and sat for the deposition.  Correct?

5     A    Yes.

6     Q    And you didn't have the Debtor's approval to enter their

7     offices at any time in the year 2021.  Correct?

8     A    Not explicitly.

9     Q    You didn't have the Debtor's approval to enter their

10    offices to give a deposition.  Correct?

11    A    Not explicitly.  Correct.

12    Q    Now, --

13         MR. WILSON:  Your Honor, I believe you sustained my

14    objection, and I would renew it to the extent that Mr. Morris

15    is trying to establish that entering the Debtor's property on

16    January 4th was a violation of the temporary restraining

17    order.

18         THE COURT:  All right.  Well, I think we have a

19    legitimate issue whether the so-called trespass, the entry of

20    Mr. Dondero onto the premises in early January, violated the

21    explicit terms of the TRO, so I'm going to sustain the

22    objection, and move on, please.

23         MR. MORRIS:  Okay.

24    BY MR. MORRIS:

25    Q    Mr. Dondero, in December, after the TRO was entered into,

1    you interfered with the Debtor's business, correct?

2    A    No, I did not.

3    Q    Well, one of the reasons that the Debtor evicted you is

4    precisely because you were interfering with their business.

5    Correct?

6    A    No, I did not.

7             MR. MORRIS:  Can we go back to Exhibit 27, please?

8    BY MR. MORRIS:

9    Q    Do you see on the first page, at the bottom, there is an

10   explanation about the Debtor's management of the CLOs?

11   A    Yes.

12   Q    And there's a recitation of the history where, around

13   Thanksgiving, you intervened to block those trades?

14   A    Yes.

15   Q    And if we can continue, the next paragraph refers to a

16   prior motion that was brought by K&L Gates on behalf of the

17   Advisors and certain funds managed by the Advisors?

18            MR. MORRIS:  If we keep going.  Yeah.

19            THE WITNESS:  Yes.

20   BY MR. MORRIS:

21   Q    You were aware of that motion when it was filed, correct?

22   A    Yes.

23   Q    And you were -- you were supportive of making that motion.

24   Right?

25   A    Yes.  Generally.

1  Q    Okay.

2         MR. MORRIS:  And just scroll down, down to the next

3  paragraph.

4  BY MR. MORRIS:

5  Q    The next paragraph says, quote, on December 22, 2020,

6  employees of NPA and HCMFA.

7         MR. MORRIS:  I'm sorry.  I can't read it.  If we can

8  just push the language down.  Let me try again.

9  BY MR. MORRIS:

10 Q    (reading)  On December 22, 2020, employees of NPA and

11 HCMFA notified the Debtor that they would not settle the CLOs'

12 sale of AVYA and SKY securities.  Have I read that correctly?

13 A    Yes.

14 Q    NPA refers to NexPoint, right?

15 A    Yes.

16 Q    That's an entity that you largely own and control,

17 correct?

18 A    Yes.

19 Q    And HCMFA refers to Fund Advisors, another advisory firm

20 that you own and control.  Correct?

21 A    Yes.

22 Q    On or about December 22, 2020, you personally instructed

23 employees of the Advisors not to execute trades that Mr. Seery

24 had authorized with respect to SKY and AVYA, correct?

25 A    No.  That's absolutely not true.  I've corrected that

Dondero - Direct                              79

1  several times now.

2  Q   Sir, you personally instructed employees of the Advisors

3  not to execute the very trades that Mr. Seery wanted executed.

4  Correct?

5  A   Not on December 22nd.  The week before Thanksgiving, yes.

6  I respected the -- I respected the TRO and the week of

7  Christmas trades that also gave a multimillion dollar loss to

8  the Funds.  I just asked Jason Post to look at the trades.

9          MR. MORRIS:  Can we go to Page 76 of the transcript,

10  please?  Line 15 through Line 19.

11  BY MR. MORRIS:

12  Q   Did you give this answer to this question?  Question, "And

13  you would agree with me, would you not, that you personally

14  instructed the employees of the Advisors not to execute the

15  very trades that Mr. Seery identifies in this email, correct?"

16  Answer, "Yes."

17          Is that the answer you gave back on January 8th?

18  A   I have corrected this half a dozen times.

19  Q   Okay.  When you said you corrected it, let me ask you

20  this, is that because instead of saying that the letter

21  shouldn't have referred to the refusal to settle trades, that

22  -- that it would be more appropriate that you instructed

23  Advisors' employees not to execute the trades?

24  A   No, that is not correct.

25          MR. MORRIS:  Can we go to Page 73, please?

1  BY MR. MORRIS:

2  Q   Were you asked these questions and did you give these

3  answers?  Question, "And you personally instructed, on or

4  about December 22, 2020, employees of the Advisors to stop

5  doing the trades that Mr. Seery had authorized with respect to

6  SKY and AVYA.  Right?"  Answer, "Yeah.  Maybe we're splitting

7  hairs here, but I instructed them not to trade them.  I never

8  gave instructions to settle trades that occurred, but that's a

9  different ball of wax."  "Okay."  Question, "But you did

10 instruct them not to execute trades that had not yet been

11 made.  Right?"  Answer, "Yeah.  Trades that I thought were

12 inappropriate for no business purpose, I -- I told them not to

13 execute."

14     Was that truthful testimony at the time you gave it?

15 A   No.  It's -- this is part of the -- this is part of the

16 clarification from 6 or 8 lines ago or 10 or 15 lines ago.

17 It's all the same.  I was in a truly emotional disapproving

18 state during this part of the deposition.  I believed it was

19 against the Advisers' Act and Seery was intentionally causing

20 harm to the CLOs.  And I stopped the trades around

21 Thanksgiving.  I called the traders.  I specifically stopped

22 them.

23     Once the TRO was in effect, I respected the TRO.  I

24 respected the Court.  I did not call anybody.  There's no

25 evidence of me calling anybody.  No one said I called anybody.

1  I just sent one email to Jason Post, a non-Highland employee,

2  that he should look at the trades.  And all this gobbledygook

3  is -- is  -- for the last 10 or 15 lines is the same question

4  that I've clarified half a dozen times.

5  Q   Okay.  That's fine.  Let's talk about some of your

6  communications with the Debtor's employees.

7          MR. MORRIS:  I apologize.  Before I -- I'm going to

8  move to the next and last topic, Your Honor, but this will be

9  a little bit -- while longer, and I just wanted to check and

10 make sure, I don't know if the Court wanted to take a short

11 break.  I'm okay.  Or if the witness did.  We've been going

12 for a while.

13         THE COURT:  All right.  Let's take a ten-minute

14 break.  It's 11:40 Central time.  We'll come back at 11:50.

15         MR. MORRIS:  Okay.  Thank you, Your Honor.

16         THE CLERK:  All rise.

17    (A recess ensued from 11:40 a.m. until 11:52 a.m.)

18         THE CLERK:  All rise.

19         THE COURT:  Please be seated.  All right.  We are

20 going back on the record in the Highland matter.

21    Mr. Morris, are you ready?

22         MR. MORRIS:  I am, Your Honor.

23         THE COURT:  All right.  Mr. Dondero, are you ready to

24 go forward?  (No response.)  Mr. Dondero, are you there?

25         MR. WILSON:  Mr. Dondero will be on his line

Dondero - Direct                              82

1  momentarily.  He's attending from a different room so we don't

2  have feedback issues.

3          THE COURT:  All right.

4      (Pause.)

5          THE COURT:  All right.  Are we almost ready, Mr.

6  Wilson?  You're on mute.

7          MR. WILSON:  I believe so, Your Honor.  He -- he

8  walked out of our room right before you came on and said he

9  was going to run to the restroom and go back to his room.  So

10  I think it should just be a second.

11      (Pause.)

12          THE WITNESS:  I'm back.

13          THE COURT:  All right.  Mr. Dondero, you're still

14  under oath.

15      Mr. Morris, you may proceed.  (Pause.)  Mr. Morris, now

16  you're on mute.

17          MR. MORRIS:  Thanks for letting me know.

18                  DIRECT EXAMINATION, RESUMED

19  BY MR. MORRIS:

20  Q   Mr. Dondero, you understand that the TRO prevented you

21  from communicating with any of the Debtor's employees except

22  as it specifically related to shared services to affiliates

23  owned or controlled by you.  Correct?

24  A   Well, shared services broadly, as I would -- I would

25  describe it.  And -- yes.  But -- but the -- the proposal for

Dondero - Direct                                    83

1    quite a while, for months, was shared services partly to

2    affiliates but partly to a new entity also.

3            MR. MORRIS:  Okay.  Can we pull up Exhibit 11,

4    please, from the Docket No. 128?  And if we can go to Page --

5    the bottom of Page 2, just to make sure that we're on the same

6    point here.

7    BY MR. MORRIS:

8    Q    Paragraph 2 says, James Dondero is temporarily enjoined

9    and refrained from, little (c) at the bottom, communicating

10   with any of the Debtor's employees except as it specifically

11   relates to shared services currently provided to affiliates

12   owned or controlled by Mr. Dondero.

13       Do you see that?

14   A    Okay.  That's correct as far as it goes, but yes.

15   Q    Okay.  And there's nothing ambiguous to you about the

16   language that's in the order, correct?

17   A    That's correct.  That -- yes.

18   Q    And you personally don't have a shared services agreement

19   with the Debtor, do you?

20   A    Not at this -- no -- with the Debtor.  No, I don't.  Not

21   with the Debtor.

22   Q    Okay.

23   A    No.

24   Q    And the Bonds Ellis firm only represents you in your

25   individual capacity in the bankruptcy case, right?

Dondero - Direct                                84

1   A    Yes.

2   Q    The Bonds Ellis firm doesn't represent any entity that is

3   owned or controlled by you.  Right?

4   A    Correct.

5   Q    So the Bonds Ellis firm doesn't represent any entity owned

6   or controlled by you that's party to a shared services

7   agreement with the Debtor.  Correct?

8   A    I believe that's correct.

9   Q    Okay.  And Douglas Draper is a lawyer who represents the

10  Get Good and Dugaboy Investment Trusts.  Right?

11  A    Yes.

12  Q    And you're a lifetime beneficiary of each of those trusts,

13  correct?

14  A    For Dugaboy, yes.  For Get Good, I'm not sure.

15  Q    Okay.  To the best of your knowledge, neither the Get Good

16  nor the Dugaboy Investment Trust ever had a shared services

17  agreement with the Debtor, correct?

18  A    No.  They didn't have a formal agreement.

19  Q    Okay.  And Scott Ellington is not your personal lawyer.

20  Is that right?

21  A    Not in this bankruptcy.

22  Q    Okay.  He was not your personal lawyer in December 2020,

23  correct?

24  A    No.

25  Q    He never represented you personally.  Scott Ellington, as

Dondero - Direct                        85

1  a human being, never represented Jim Dondero as a human being

2  at any time after the petition date.  Fair?

3  A    I don't know how to answer that with regard to settlement

4  counsel.  I -- in his role as settlement counsel, I'm not a

5  lawyer, who does he work for when he's been tasked with being

6  settlement counsel and he can talk to all parties on behalf of

7  all parties in order to get a deal done?  I don't know -- I

8  don't know how to describe that role.

9  Q    To the best of your knowledge, has Mr. Ellington ever been

10 employed by anybody after the petition date other than the

11 Debtor?

12 A    I don't believe so.

13 Q    Did you ever retain Mr. Ellington to represent you?

14 A    Not -- not formally, but in his role as settlement

15 counsel, I believe he was in some ways trying to represent all

16 parties to try and kick a deal to the altar, so to speak.

17 Q    Did he owe you a duty?

18 A    I don't think in a classic -- I don't -- that -- I don't

19 know.  That's a legal -- I don't want to make a legal

20 interpretation.

21 Q    You've represented -- you've retained and engaged lots of

22 lawyers and law firms over time.  Is that fair?

23 A    Yes.

24 Q    Did you engage or retain Mr. Ellington at any time after

25 the petition date?

Dondero - Direct                    86

1   A    Well, I mean, very recently, he's heading up our shared

2   services group or our shared services entity.  But again, I

3   don't know how to answer.  The role of settlement counsel was

4   an in-between role that I don't think it was documented

5   formally, so I don't know how to -- I don't know how to answer

6   that.

7   Q    When did -- have you -- has Mr. Ellington been hired by

8   you or any company you own or control since the time that he

9   was terminated in early January?

10  A    No.  But he's the owner of the entity that houses a lot of

11  the employees that migrated over.

12  Q    Okay.  So I want to -- I want to try to clear this up.

13  I'm not asking you about settlement counsel.  It's a very,

14  very specific question.  Did James Dondero ever retain or

15  engage Scott Ellington to represent him?  Did you ever engage

16  or retain Scott Ellington for the purpose of providing legal

17  advice to you?

18  A    And that's the question I'm struggling with, because I

19  believe, as settlement counsel, he was representing -- trying

20  to represent multiple parties to strike a deal.

21  Q    Did you ever pay him any money for services rendered to

22  you in your individual capacity?

23  A    No.

24  Q    Did you ever give him anything of value in exchange for

25  legal services rendered by him to you in your individual

1  capacity?

2  A    No.

3  Q    Did you ever sign an engagement letter with Scott

4  Ellington pursuant to which he provided legal services to you

5  in your individual capacity?

6  A    No.

7  Q    How about Isaac Leventon?  Did Isaac Leventon ever

8  represent you in your individual capacity?

9  A    You mean since the advent of the bankruptcy, right?  Yeah,

10  no.

11  Q    Okay.  Let's say after the TRO was in place.  Did Mr. --

12  did you ever retain or engage Mr. Leventon to provide legal

13  services to you in your individual capacity?

14  A    No.

15  Q    Between December 10, 2020, the date the TRO was entered,

16  and January 8, 2021, excuse me, the date the TRO was converted

17  to a preliminary injunction, you communicated with certain of

18  the Debtor's employees about matters that did not concern

19  shared services, correct?

20  A    No.

21  Q    No, it's your testimony that all of your communications

22  concerned shared services?

23  A    Yes.  Yeah, and shared services or the pot plan or in his

24  go-between role where he would be used as a messenger by Seery

25  or by me to get to Seery because I hadn't communicated

Dondero - Direct                          88

1    directly with Seery in six or seven months other than that

2    interaction around Thanksgiving.

3    Q    Sir, between the time the TRO was entered and the

4    preliminary injunction was entered, you communicated with

5    certain of the Debtor's employees about matters that were

6    adverse to the Debtor's interests, correct?

7    A    Absolutely not.  I respectfully disagree with that

8    characterization whenever it occurs.

9    Q    Okay.  After the TRO was entered, you and your lawyers at

10   Bonds Ellis worked with Scott Ellington to identify a witness

11   who would testify on your behalf in support of a motion

12   against the Debtor, correct?

13   A    I don't know what the witness was for.  I know there was

14   -- I know there was some back and forth on the witness, but I

15   don't remember what the witness was for.

16   Q    All right.  Let's just see if we can get through this

17   quickly.

18          MR. MORRIS:  Can we put up Exhibit 48, please?

19   BY MR. MORRIS:

20   Q    So this is December 11th.  Do you see that?

21   A    Yes.

22   Q    The day after the TRO was entered into, correct?

23   A    Yes.

24   Q    It's sent from Mr. Lynn to Mr. Ellington and is entitled

25   "Testimony," correct?

Dondero - Direct                        89

1    A    Yes.

2    Q    Mr. Ellington was the Debtor's general counsel at the

3    time, correct?

4    A    Among other things, yes.

5    Q    In fact, Mr. Ellington was the Debtor's general counsel

6    throughout the month of December 2020, to the best of your

7    knowledge, correct?

8    A    Yes, but not solely, yeah.

9    Q    Was he -- was he a general counsel for somebody else?

10   A    No, but he was also settlement counsel and he was also the

11   go-between with Seery.

12   Q    Sir, really, I respectfully ask that you listen to my

13   question.  To the best of your knowledge, Mr. Ellington was

14   the Debtor's general counsel throughout the month of December

15   2020, correct?

16   A    Yes.

17   Q    Can you please read Mr. Lynn's email out loud?

18   A    (reading)  Scott, you are going to talk with John Wilson

19   of our firm or have JP do so.  He needs to speak today so we

20   know who to put on the witness and exhibit list and will be

21   waiting for a call.  Thanks.

22   Q    Now, again, the Bonds Ellis firm doesn't represent any

23   party to a shared services agreement, correct?

24   A    Well, they represent me and I'm on the other side of the

25   shared services agreement we were trying to put together.

Dondero - Direct                          90

1    Q    You're not a party to shared services agreements, are you,

2    sir?

3    A    No, but the solution that everybody was negotiating that

4    fell apart that we had a hearing on a couple weeks ago,

5    everybody was trying hard in good faith until negotiations

6    failed to migrate the shared services in a way that would have

7    resulted in $3 or $5 million to the Debtor.  But the

8    negotiations fell apart.

9    Q    Sir, in this email from Mr. Lynn in which you're copied to

10   the Debtor's general counsel the day after the TRO is entered,

11   your lawyer is asking the Debtor's general counsel to have a

12   conversation about a witness and exhibit list that your

13   lawyers were putting together.  Fair?

14   A    That appears to be what it's about.

15   Q    Okay.  And the next day, the topic of identifying a

16   witness who would testify on your behalf continued, correct?

17   A    I don't know.

18         MR. MORRIS:  Can we go to Exhibit 49, please?

19   BY MR. MORRIS:

20   Q    This is an email string from Saturday evening, December

21   12th, in which the Bonds Ellis firm's -- firm brings you and

22   Mr. Ellington into the discussion about identifying a witness

23   who would testify on your behalf at the upcoming hearing,

24   correct?

25   A    Yeah, but I -- okay.  I have no idea what this refers to,

1 though, or what this is in regard.

2 Q   Well, if you look at Mr. Assink's email at the bottom

3 dated December 12, do you see the subject is "Witnesses for

4 Hearing"?  Do you see that?

5 A   Yes.

6 Q   And he asks Mr. Wilson whether Mr. Wilson had heard from

7 Ellington or Sevilla yet.  Do you see that?

8 A   Yes.

9 Q   And he -- he says that he needs to let the other side know

10 if you're going to call one of them as a witness.  Isn't that

11 right?

12 A   Yes.  I can read all that.  But again, I don't know -- I

13 don't know -- I have no idea what witness for what, if it

14 represents -- and what the witness would represent and if it

15 is in any way adverse to the Debtor.  I have no idea.

16 Q   Well, you're adverse to the Debtor, are you not?

17 A   Well, I do not believe so.  I mean, I -- I've been doing

18 everything possible to try and preserve this estate as it's

19 getting run into the ground.  But no, I mean, I've -- I've

20 done everything to try and maximize value.

21 Q   Well, Mr. Lynn brings you and Mr. Ellington in the

22 conversation on Saturday, December 20th, on the topic of

23 witnesses for a hearing, right?  That's -- that's what's

24 happening at the top of the page?  You and Mr. Ellington are

25 now included, correct?

Dondero - Direct                              92

1   A    Okay.

2   Q    It's true; isn't that right?

3   A    Right.

4   Q    Okay.  And this is the debate over whether to include Mr.

5   Ellington or Mr. Sevilla on your witness list, correct?

6   A    Again, I don't know with regard to what or for, you know

7   -- I don't know if it's background context.  I don't know if

8   it's corporate rep.  I don't know -- I don't know -- I have no

9   idea what this is about.

10  Q    Okay.  Do you recall that the issue of identifying a

11  witness who would testify on your behalf was resolved later

12  that night?

13  A    No.

14        MR. MORRIS:  Can we go to Exhibit 17, please?

15  BY MR. MORRIS:

16  Q    And if we start at the bottom, you'll see there's an email

17  from Mr. Lynn to you and other lawyers at Bonds Ellis where he

18  says the possible deal with the Debtor went nowhere, and I

19  think he meant to say it looks like trial.  Is that a fair

20  reading of Mr. Lynn's email to you on the evening of December

21  12th?

22  A    Yes.

23  Q    And then if we scroll up he says, quote, that said, we

24  must have a witness now.

25        Do you see that?

1  A    Yes.

2  Q    And the "we" there refers to you and the Bond Ellis firm,

3  right?  You guys needed a witness now.  Is that fair?

4  A    I don't know.

5  Q    Well, if you look -- if you look up at the top, Mr.

6  Ellington responds.  So this is an email from Mr. Ellington to

7  you and your personal lawyers at Bonds Ellis.  Do I have that

8  right?

9  A    Yes.

10 Q    And in that email, Mr. Ellington responds to Mr. Lynn's

11 request for a witness and he identifies Mr. Sevilla, correct?

12 A    Yes.

13 Q    And Mr. Ellington told your lawyers that he would instruct

14 Mr. Sevilla to contact them the first thing in the morning,

15 correct?

16 A    That seems to be what it says.

17 Q    Okay.  Is there any exception in the TRO that we looked at

18 that you're aware of that would allow you and your lawyers to

19 communicate with Mr. Ellington for the purpose of having Mr.

20 Ellington identify a witness who would testify on your behalf

21 against the Debtor?

22 A    Again, I go back to his role as settlement counsel and go-

23 between with Seery.  If you look at the subject line here, it

24 says "Possible Deal."  I -- I think this is all perfectly

25 within the scope and not adverse to the Debtor, but I'm

1  willing to be educated if you think otherwise.

2  Q    Sure.  I'll try.  Let's go back to Mr. Lynn's email at the

3  bottom.  The email is titled, Possible Deal, and what he says

4  is, quote, the possible deal with the Debtor went nowhere.  It

5  looks like trial.

6      Does that refresh your recollection that this string of

7  communications had nothing to do with a deal, but it had to do

8  with a trial, and it specifically had to do with your lawyers

9  communicating with Mr. Ellington to identify a witness who

10  would testify on your behalf against the Debtors?

11  A    That's not how I view this and that's not how I view

12  Ellington's role.

13  Q    Okay.  I'm going to ask you again.  Very simple.  And I'll

14  put it back up on the screen if you want.

15          MR. MORRIS:  In fact, let's do that.  Let's go back

16  to Exhibit 11.  And let's look at Paragraph 2(c).

17  BY MR. MORRIS:

18  Q    And if you can tell me, right, Paragraph 2(c) prohibited

19  you from communicating with any of the Debtor's employees

20  except as it specifically relates to shared services currently

21  provided to affiliates owned or controlled by you.  Do you see

22  that?

23  A    Yes.

24  Q    Okay.  Does that provision authorize you and your lawyers

25  to communicate with the Debtor's general counsel for the

1   purpose of identifying a witness who would testify on your

2   behalf, your personal behalf, against the Debtor?

3   A    Again, we haven't established that it's on my behalf

4   against the Debtor, so I can't say -- I can't say yes to that.

5   And again, you know, Scott Ellington, up until the day he was

6   terminated, was settlement counsel and go-between for Seery,

7   and that role never changed, even after the TRO was put into

8   place.  And Seery even acknowledged it after the TRO was put

9   in place and continued to use Ellington as a go-between.

10  Q    So, so the Bonds Ellis --

11            THE COURT:  All right.  All right.  Let me just

12  interject again,--

13            MR. MORRIS:  -- firm represents --

14            THE COURT:  -- because here we go again with the

15  narrative answer way beyond yes or no.  Here is a big, big

16  concern I have.  You both estimated three and a half hours,

17  but if I continue to get the long narrative answers, I don't

18  think it's fair to count all of this against Mr. Morris.

19  Okay?  So, Mr. Wilson, what can we do about this?  We've had

20  this witness on the stand since 10:24 minus 14 minutes, so

21  we're getting close to two hours.  But again, you know, I've

22  been, I think, extremely overly-patient with allowing these

23  narrative answers.

24       So, Mr. Wilson, can you help us out here and -- I mean, I

25  don't know how many more times I can say it, that yes, no, and

1   then when it's Mr. Wilson's time to cross-examine you, to

2   examine you, Mr. Dondero, that's when you can give all of

3   these more fulsome answers.  All right?  We're going to be

4   here much beyond today if we don't get this under control.

5   All right?

6        So, Mr. Wilson, --

7            MR. MORRIS:  I appreciate --

8            THE COURT:  Mr. Wilson, please make sure your client

9   understands this.  Can you add to this?  Can you let him know

10  you're going to examine him later?

11           MR. WILSON:  Yeah, I agree -- I agree with that, Your

12  Honor, but I also would just state that a lot of Mr. Morris's

13  questions don't call for a simple yes or no answer, and I

14  think Mr. Dondero maybe needs to change his response to "I

15  can't answer that yes or no."

16           THE COURT:  Well, you can't coach your client like

17  that.  Okay?

18           MR. MORRIS:  Your Honor?  Your Honor, with all due

19  respect, every single question I'm asking is a leading

20  question.  When it ends "Is that correct?" or "Is that right?"

21  he either says yes, it is, or no, it's not.

22           THE COURT:  All right.

23           MR. MORRIS:  Then I'll have the decision as to what

24  to do at that point.  Every single question I'm asking is

25  leading.

1          THE COURT:  All right.  Well, I tend to agree with

2     that, Mr. Wilson.  All right?

3        So, Mr. Dondero, you've heard us say it a few times now.

4     Yes.  No.  I understand you want to say more in many

5     situations, but Mr. Wilson can get at that later when he

6     examines you.  Okay?

7        Continue, Mr. Morris.

8          MR. MORRIS:  Thank you, Your Honor.

9     BY MR. MORRIS:

10    Q    On this series of emails that we've looked at, these last

11    three exhibits that are to and from the Bonds Ellis firm, the

12    Bonds Ellis firm only represents you in your individual

13    capacity, correct?

14    A    Correct.

15    Q    And the Bonds Ellis firm was communicating with Mr.

16    Ellington in order to have Mr. Ellington identify a witness

17    for their witness and exhibit list, correct?

18    A    Yes.

19    Q    Okay.  At the same time you and your lawyers were

20    communicating with Mr. Ellington about identifying a witness

21    who would testify on your behalf, you and your lawyers were

22    also engaged in discussions about entering into a common

23    interest agreement among you, certain entities in which you

24    have an interest, and certain of the Debtor's then-employees,

25    correct?

Dondero - Direct                              98

1  A    I have no idea -- conversations like that happened.  I

2  don't know when they occurred.

3  Q    Okay.  Let's see if we can put a time on it.

4        MR. MORRIS:  Can we please put up Exhibit 24?

5  BY MR. MORRIS:

6  Q    And starting at the bottom, you'll see there's an email

7  string from Deborah Heckin (phonetic) on behalf of Douglas

8  Draper.  Do you see that?

9  A    Yes.

10  Q    And this email string is dated December 15th, right after

11  the TRO was entered into?

12  A    Why isn't this privileged?

13  Q    We'll talk about that in a moment, but --

14  A    What was your question?

15  Q    -- be that as it may, this email string is dated December

16  15th, after the TRO was entered into, correct?

17  A    Yes.

18  Q    Okay.  And you'll see that Mr. Draper, or at least on his

19  behalf, attaches a form of a common interest agreement.  Do

20  you see the reference to that in his email?

21  A    Yes.

22  Q    Okay.  And Mr. Lynn responds, if we scroll up, and he

23  includes Scott Ellington on this email, right?

24  A    Yes.

25  Q    And Mr. Lynn informs Mr. Ellington and his colleagues that

Dondero - Direct                                99

1    Bryan or John would review the agreement.  Is that -- is that

2    right?

3    A    Yes.

4    Q    And if we scroll up, Mr. Assink then later that day sends

5    your lawyer's comments -- sends your lawyer's comments to his

6    colleagues and to Mr. Ellington, right?

7    A    Yes.

8    Q    And Mr. Ellington then forwards the revised common

9    interest agreement to Mr. Leventon, right?

10   A    Yes.

11   Q    As contemplated at that time, you and the Get Good Trust

12   and the Dugaboy Investment Trust and certain of the Debtor's

13   then-employees were engaged in discussions about entering into

14   a common interest agreement, correct?

15   A    Yes.

16   Q    And those discussions continued for a while in December;

17   isn't that right?

18   A    I believe so.

19   Q    You're familiar with the law firm Baker & McKenzie,

20   correct?

21   A    Generally.

22   Q    That firm has never represented you or any entity in which

23   you have an ownership interest, correct?

24   A    Boy, I don't know.  It depends on how far back you went,

25   but I don't know.

1    Q    To the best of your knowledge, Baker and McKenzie has

2    never represented you or any entity in which you have an

3    ownership interest, correct?

4    A    Don't know.

5    Q    Okay.  In December, there was an employee group.  There

6    was a group of Debtor employees that were known as the

7    Employee Group; is that right?

8    A    I believe there was a general employee group and then

9    there was a senior management group.

10   Q    Okay.

11   A    I don't know what they were called.

12   Q    And Mr. Ellington and Mr. Leventon were part of the group

13   who were considering in December changing their counsel from

14   Winston & Strawn to Baker & McKenzie, correct?

15   A    I -- I only have -- I don't know for sure.  That sounds

16   correct, but I don't know for sure.

17   Q    All right.  But that was your belief at the time, right?

18   A    I don't remember.

19   Q    Well, because of that, you specifically asked Mr. Leventon

20   for the contact information for the lawyers at Baker &

21   McKenzie, right?

22   A    I remember asking Isaac for Clemente's number.  I may have

23   asked -- yeah, yeah, I think I -- I needed to speak to

24   somebody at some point over there, so I did ask -- I asked

25   somebody for the number.  If I asked Isaac, it could have

1   been.

2   Q    Okay.

3           MR. MORRIS:  Can we put up Exhibit 20, please?

4   BY MR. MORRIS:

5   Q    And this is -- that's Mr. Leventon at the top.  Is that

6   right?

7   A    Yes.

8   Q    And on December 22nd, you specifically asked him to send

9   you Mr. Clemente's contact information as well as the Baker &

10  McKenzie contact information, correct?

11  A    Yes.

12  Q    And this was a week after the -- after your lawyers

13  provided their comments to the common interest agreement and

14  Mr. Leventon -- Mr. Ellington forwarded the draft agreement to

15  Mr. Leventon, right?  That was December 15th, so this is a

16  week later?

17  A    Yes.

18  Q    And Mr. Leventon was an employee of the Debtor at the

19  time, correct?

20  A    Yes, I believe so.

21  Q    And you specifically wanted the contact information from

22  Baker & McKenzie in order to help Mr. Draper coordinate the

23  mutual shared defense agreement that was the subject of the

24  December 15th email, right?

25  A    I don't know if that was the purpose.

1          MR. MORRIS:  Can we go back to the transcript line,

2    Line -- Page 97, please?  Down at Line 16.  To be clear, I'm

3    reading at the January 8th hearing from the deposition

4    transcript.

5    BY MR. MORRIS:

6    Q    But can you confirm for me, sir, that when asked the

7    following question, you gave the following answer?  Question,

8    "Why did you want the Baker & McKenzie contact information?"

9    Answer, "I was trying to help Draper coordinate the mutual

10   shared defense agreement, period."

11        Is that your -- was that the answer that you gave in your

12   deposition?

13   A    Yes.

14   Q    And is that the answer that you confirmed at the

15   preliminary injunction hearing on January 8th?

16   A    I don't remember.

17   Q    Are you aware of any exception in the TRO that would

18   permit you and your lawyers to communicate with the Debtor's

19   employees about entering into a common interest agreement?

20   A    To the extent Scott Ellington was continuing as settlement

21   counsel, I -- I viewed these types of things as very

22   appropriate.

23   Q    The only exception in the TRO was for shared services,

24   right?

25   A    Shared services, yes, but shared services broadly

Dondero - Direct                                            103

1   incorporates a lot of things, in my opinion.

2   Q    And in your opinion, it's perfectly appropriate for you to

3   be discussing, after a TRO is entered that prohibits you from

4   discussing anything with any of the Debtor's employees except

5   for shared services, in your opinion, it's perfectly

6   appropriate for you and your lawyers to be engaged in

7   conversation with the Debtor's employees about possibly

8   entering into a common interest agreement?  That's your

9   testimony?

10  A    Yes.

11  Q    Okay.  Let's go back in time, December 15th.  Do you

12  recall writing to Mr. Lynn and Mr. Draper and Mr. Ellington

13  about a conversation you had with Mr. Clubok, UBS's counsel?

14  A    I don't remember, but I'm willing to be refreshed.

15  Q    Okay.

16          MR. MORRIS:  Let's do that, and put up Exhibit 50,

17  please.  Five zero.

18  BY MR. MORRIS:

19  Q    This is an email that you wrote, correct?

20  A    (no immediate response)

21  Q    This is your email, sir?

22  A    Yes.

23  Q    Okay.  Why did you decide to -- this is an email about a

24  conversation that you had with Mr. Clubok, right?

25  A    Yes.

1  Q    And you understood at the time that Mr. Clubok represented

2  UBS, right?

3  A    Yes.

4  Q    And at the time, you knew that UBS was going to appeal the

5  settlement that had been entered into between the Debtor and

6  Acis, correct?  I'm sorry, between the Debtor and the Redeemer

7  Committee?

8  A    Yes.

9  Q    Okay.  And so the Debtor had entered into a -- you knew

10 that the Debtor entered into a settlement with the Redeemer

11 Committee, right?

12 A    Yes.

13 Q    And that settlement was approved by the Court, correct?

14 A    I don't remember if it was ever scrutinized at all.  It

15 wasn't -- I don't know if it was approved.

16 Q    Well, this email is about the appeal of the approved

17 order, the order approving the settlement, right?

18 A    Appears to be.

19 Q    Okay.  And so UBS was challenging the very agreement that

20 the Debtor wanted to enter into, right?

21 A    Yes.

22 Q    And you -- and you decided, after the TRO was entered

23 into, to bring Scott Ellington into the discussion between you

24 and your lawyers about supporting UBS and otherwise getting

25 evidence against Mr. Seery.  Is that right?

1    A    We already had the evidence against Seery not seeking

2    court approval, being inept in asset sales.  We already had

3    all that evidence.

4    Q    But you're bringing -- you voluntarily brought Mr.

5    Ellington into this discussion; isn't that right?

6    A    Because Ellington was settlement counsel.  We were trying

7    to push -- he was trying to push all parties to some kind of

8    reasonable settlement before the estate got wiped out by

9    tripling everybody's claims.

10   Q    And you thought it would be helpful to bring Mr. Ellington

11   into a conversation where you're discussing with your lawyers

12   supporting UBS in their objection to the Debtor's settlement

13   and to -- and to give him evidence of Seery's ineptitude and

14   improper asset sales?  You think that was going to advance the

15   cause of the settlement, right?

16   A    Yes.

17   Q    Okay.  And again, there's no -- there's no exception in

18   the TRO for settlement, right?  That's just your own thinking,

19   fair?

20   A    Since the summertime, more than a few people have

21   testified Scott Ellington was settlement counsel.

22           MR. MORRIS:  I move to strike.

23           THE COURT:  Sustained.

24   BY MR. MORRIS:

25   Q    Is there anything in TRO that you are aware of that

1  authorizes you to speak with Mr. Ellington in his capacity as

2  so-called settlement counsel?

3          MR. WILSON:  Objection to the extent it calls for a

4  legal conclusion.

5          THE COURT:  Overruled.

6          MR. MORRIS:  I'll reframe the question.  I'll reframe

7  the question, Your Honor.

8          THE COURT:  Okay.

9  BY MR. MORRIS:

10 Q   Do you have any -- is there anything that you are aware of

11 in the TRO that would permit you to speak with Mr. Ellington

12 as settlement counsel?

13 A   I think it's trickery to try and say it takes that away.

14 That's my opinion.

15 Q   Okay.  But other than your opinion, you can't point to

16 anything in the TRO that you're relying upon that would permit

17 you to speak with Mr. Ellington as settlement counsel.  Fair?

18 A   Other than broadly, settlement or not settlement all

19 filters into shared services and whether or not we buy the

20 employees, don't buy the employees, etc.

21 Q   Okay.  This email has absolutely nothing to with shared

22 services, right?

23 A   It's one step removed but ultimately leads into it.

24 Q   The settlement between the Debtor and the Redeemer

25 Committee has nothing to do with shared services, correct?

Dondero - Direct                              107

1   A    Ultimately, the settlement with Redeemer and Clubok had

2   everything to do with shared settlement.  With shared

3   services.

4   Q    All right.  Maybe your lawyer will put that up on the

5   screen later.

6        After the TRO was entered, you also communicated with one

7   or -- one of the Debtor's employees to make sure that she

8   didn't produce the Dugaboy financial statements to the U.C.C.,

9   correct?

10  A    Yeah.  They weren't properly requested, and they weren't

11  requested of me.

12  Q    Sir, you communicated with one of the Debtor's employees

13  to make sure she did not produce the Dugaboy financial

14  statements to the U.C.C. without a subpoena, correct?

15  A    That was my -- the advice of counsel to say exactly that

16  in response, and I think ultimately -- I think ultimately

17  counsel was okay with it.  They just wanted to review the

18  documents first.

19  Q    Dugaboy's financial statements were maintained on the

20  Debtor's server, correct?

21  A    Yeah, and I think most of them weren't even password-

22  protected.

23  Q    You communicated with at least one employee concerning the

24  production of the Dugaboy financial statements, correct?

25  A    Under advice of counsel, yes.

Dondero - Direct                                        108

1    Q    And that's Melissa Schrath, right?

2    A    Yes.

3    Q    Ms. Schrath was employed by the Debtor as an executive

4    accountant in December 2020, correct?

5    A    Yes, solely working on mine and Mark Okada's financials.

6    Q    She's the one -- she's the Debtor employee who maintained

7    the Dugaboy financial statements, right?

8    A    Yes.

9    Q    And on December 16th, after the TRO was entered, you

10   communicated with Ms. Schrath for the very specific purpose of

11   instructing her not to produce the Dugaboy financials without

12   a subpoena, correct?

13   A    I gave her a legal response that came directly from my

14   lawyers from an improper -- what my lawyers viewed as an

15   improper request improperly done.

16   Q    Dugaboy had their own lawyer, right?  Mr. Draper?

17   A    I -- uh, I believe -- I believe he was coming on board or

18   up to speed around that time.

19   Q    Yeah.  Why didn't Mr. Draper take a hold of this issue?

20   Why did you do that?

21   A    I think, again, I think he was just coming up to speed at

22   that point.  I think ultimately he was okay with it; he just

23   said he wanted to review the documents first.  But I think he

24   was agreeable in trying to work with you guys.

25   Q    He was, in fact.  So why did you, instead of letting him

1   do his job on behalf of his client, the Dugaboy Investment

2   Trust, why did you, after the TRO was entered, communicate

3   with the Debtor's employees to give instructions not to

4   produce the Dugaboy financial statements without a subpoena?

5   Why did you do that?

6   A    Those words and requiring a subpoena were the specific

7   legal advice I got from counsel at Bonds Ellis before Draper

8   was up to speed on the issue.  And then when Draper got up to

9   speed on the issue, which I think was only a couple days

10  later, he tried hard to work with you guys.

11  Q    And he never asked for a subpoena, did he?

12  A    I -- I don't believe he did.  I think he asked to just

13  review stuff first.

14  Q    Did you ever tell him that you had made a demand for a

15  subpoena, that -- withdrawn.  Did you ever tell Mr. Draper

16  that you had instructed one of the Debtor's employees not to

17  produce the documents without a subpoena?

18  A    I -- I think Draper was fully -- fully informed of

19  everything that happened with regard to the Dugaboy financials

20  before he got involved.  Yes.

21  Q    So, so for all of the communications that occur after the

22  time that you instruct Ms. Schrath not to produce the

23  documents without a subpoena, would it surprise you to learn

24  that Mr. Draper never once mentions the subpoena?  Never once

25  mentions that the documents shouldn't be produced without a

1  subpoena?

2  A    Different -- different lawyers have different views at

3  different times.  I don't know what else to tell you.

4  Q    All right.  Let's just confirm for the record.

5         MR. MORRIS:  Can we please put up Exhibit 19?

6  BY MR. MORRIS:

7  Q    And that's Ms. Schrath at the top; is that right?

8  A    Yes.

9  Q    And this is, if we scroll down a bit, this is where you

10  give her the instruction after the -- you communicate with her

11  -- withdrawn.  This text messages show that you communicated

12  with Ms. Schrath, one of the Debtor's employees, after the TRO

13  was entered into, for the purpose of instructing her not to

14  provide the Dugaboy details without a subpoena, correct?

15  A    Yes.

16  Q    There is no exception in the TRO that you are aware of

17  that permits you to communicate with any of the Debtor's

18  employees about the production of documents, right?

19  A    Regarding a personal entity that's not in bankruptcy and

20  not subject to the estate, it -- this -- I believe this was

21  appropriate.  And again, the advice I got from counsel.

22  Q    Sir, are you aware of anything in the TRO that permits you

23  -- is there any exception in the TRO that permits you to give

24  instructions to one of the Debtor's employees about whether

25  and how to produce documents that are on the Debtor's system?

1        MR. WILSON:  Objection.  It calls for a legal

2   conclusion.

3        THE COURT:  Overruled.

4        THE WITNESS:  I don't know.

5   BY MR. MORRIS:

6   Q    Okay.  You can't point to anything as we sit here right

7   now, right?

8   A    Don't know.

9   Q    And again, Dugaboy is not party to a shared services

10  agreement, correct?

11  A    Not formally.  It is -- I think -- I believe it is now.

12  Q    On the same day that you were instructing Ms. Schrath not

13  to produce Dugaboy financials without a subpoena, you were

14  also communicating with Mr. Ellington about providing

15  leadership with respect to the coordination of counsel for you

16  and the various entities owned and controlled by you.

17  correct?

18  A    I don't -- I think that may be a mischaracterization of

19  the leadership email.  Let's go to that, please.

20  Q    Okay.

21       MR. MORRIS:  Exhibit 18, please.

22  BY MR. MORRIS:

23  Q    On December -- December 16th, Mr. Draper wrote to you, at

24  the bottom of the exhibit, Mr. Draper wrote to you and to Mr.

25  Lynn, correct?

Dondero - Direct                                112

1    A    Yep.

2    Q    And again, Mr. Draper represents Dugaboy and Get Good,

3    right?

4    A    Yep.

5    Q    And the subject matter of his email is a List for a Joint

6    Meeting.  Do you see that?

7    A    Yes.

8    Q    And Mr. Draper proceeded to list a number of lawyers and

9    entities, correct?

10   A    Yes.

11   Q    And first is John Kane, counsel to the DAF, right?

12   A    Yes.

13   Q    And then you have George Zarate (phonetic), who was

14   counsel to HCM Advisor, correct?

15   A    Yes, sir.

16   Q    And third is Lauren Drawhorn, counsel to NexPoint,

17   correct?

18   A    Yes.

19   Q    Fourth is Mark Maloney, counsel to CLO Funding, correct?

20   A    Yes.

21   Q    And last is David Neier, who was then counsel to certain

22   of the Debtor's employees, correct?

23   A    Yes.

24   Q    And Mr. Draper specifically asked you and Mr. Lynn whether

25   anyone should be added or removed from the list, correct?

1    A    Yes.

2    Q    And neither you nor Mr. Lynn identified anyone to be added

3    or removed, correct?

4    A    No.

5    Q    And then you, you forwarded the email string to Mr.

6    Leventon -- Ellington, correct?

7    A    Yes.

8    Q    And so you're the one who's sharing your attorney-client

9    communications with Mr. Ellington, right, in this email?

10   A    Yes.

11   Q    Okay.  And he's not your lawyer, right?

12   A    He's settlement counsel.

13   Q    Yeah.  Okay.  Why don't you read what you wrote to Mr.

14   Ellington?

15   A    (reading)  I'm going to need you to provide leadership

16   here.

17   Q    But reviewing this email, at least as of the January 8th

18   hearing, you had no recollection of why you forwarded the

19   email string to Mr. Ellington and why you told him you needed

20   him to provide leadership, correct?

21   A    Correct.

22   Q    But Mr. Ellington did respond; isn't that right?

23   A    Yeah.  I think he just said "I'm on it" or "I'll handle

24   it" or something.

25   Q    Okay.  Are you aware of any exception in the TRO that

Dondero - Direct                          114

1    would permit you to ask Mr. Leventon -- Ellington to provide

2    leadership in the context of working on a joint meeting that

3    would include lawyers for you and any entities -- and various

4    entities owned or controlled by you?

5    A    I -- I don't know.  I don't have any answers other than

6    some of the narrative ones I've given before.

7    Q    Okay.  And again, there's no lawyer on this whole email

8    string that represents any entity that's subject to a shared

9    services agreement, right?

10   A    That's not true.

11   Q    I apologize.  Let me rephrase the question.  There's no

12   lawyer who sent, received, or were copied on any of these

13   emails who represents an entity that was subject to a shared

14   services agreement, correct?

15   A    That's not true.

16   Q    Well, does Mr. Lynn or Mr. Draper represent an entity

17   who's subject to a shared services agreement?

18   A    No, but the other lawyers referenced in the text of the

19   email, almost all of them are.

20   Q    Right.  I'm just -- I'm asking you very specifically just

21   about the people to whom this email string was sent or

22   received from.  Right?  Sent to or received from.  And they

23   only include Mr. Draper and Mr. Lynn, right?  They're the only

24   ones who were --

25   A    Yes.

1    Q    Right?

2    A    Yes.

3    Q    And neither one of them represents a party to a shared

4    services agreement, right?

5    A    Not a formal one, correct.

6    Q    Right.  So there's nobody on this email string where

7    you're asking Mr. Ellington to provide leadership, there's

8    nobody who's sending or receiving this email string that

9    represents a party to a shared services agreement, right?

10   A    No formal -- yes.  Those three people, there's no formal

11   shared services agreement.

12   Q    Later on in December is when you learn that Mr. Seery was

13   again seeking to trade in certain securities held in the CLOs,

14   correct?

15   A    Yes.

16   Q    And as soon as you learned that Mr. Seery was again

17   seeking to trade in certain securities, you sent an email to

18   Mr. Ellington letting him know that, right?

19   A    Oh, yes.  Yes.

20   Q    And this is the information that caused you to personally

21   instruct employees of the Advisors not to execute the trades

22   that Mr. Seery had authorized, correct?

23   A    No.  We've gone through this before.  I did nothing in the

24   December 20th trades to do anything to interrupt or speak with

25   any Highland employees.  I sent one email to Jason Post to say

Dondero - Direct                              116

1  you should look into this.  It was -- it was a completely

2  different interaction.  It was respectful of the TRO.  It was

3  completely different than the November trades.

4      But the trades were the same.  He handed a couple million-

5  dollar lawsuits to the Funds, he sold things during the least

6  liquid week of the year, the day before Thanksgiving and the

7  day before Christmas, and he was purposely trying to push

8  losses to investors.

9          MR. MORRIS:  I move to strike, Your Honor.

10         THE COURT:  Sustained.  And I'm just letting you know

11 it's 12:50.  We're taking a break at 1:00 o'clock.

12         MR. MORRIS:  Yeah, that's fine.  I think I should be

13 done right there, Your Honor.

14 BY MR. MORRIS:

15 Q   The next day, on December 23rd, you had a call among you,

16 Scott Ellington, Grant Scott, and certain lawyers representing

17 various entities you own and control, correct?

18 A   Yeah.  I don't remember specifically, but yeah, I remember

19 a couple conference calls.

20 Q   Yeah.

21         MR. MORRIS:  Can we go to Exhibit 26, please?

22 BY MR. MORRIS:

23 Q   You'll see the subject matter is "It appears Jim will be

24 available for a 9:00 a.m. Central time conference call."

25     Do you see that?

Dondero - Direct                                    117

1   A    Yes.

2   Q    Okay.  And this email string is between and among

3   employees of the Advisors, Grant Scott, Scott Ellington, and

4   outside counsel to the Advisors, correct?

5   A    Can you scroll up or down?  I mean, I --

6   Q    Sure.

7   A    What was the question again regarding the people?

8   Q    Yeah.  The folks on this email string are employees of the

9   Advisors, outside counsel to the Advisors, and Scott

10  Ellington, right?

11  A    I'm sorry.  I'm struggling to see Ellington on this one.

12  Q    Oh, it's at the top.  There you go.

13  A    Okay.

14  Q    And Mr. -- and Grant Scott, right?

15  A    Yes.

16  Q    And Grant Scott is the director of the DAF, correct?

17  A    Yes.

18  Q    And this is the exact same time that K&L Gates are sending

19  the letters to the Debtor concerning the CLOs, correct?

20  A    I believe it's around that same time.

21       (Interruption.)

22          MR. MORRIS:  Your Honor, somebody's not on mute.

23          THE COURT:  Yeah, who is that, Mike?  Can you tell?

24          THE CLERK:  It was one of the call-ins.  I just muted

25  them.

Dondero - Direct                                    118

1              THE COURT:  Okay.  It was one of the call-ins.  We've

2    muted them.

3              MR. MORRIS:  Okay.  Yeah.

4    BY MR. MORRIS:

5    Q    It's your understanding that those letters -- in those

6    letters, the Advisors and Funds represented by K&L Gates asked

7    that the Debtor not trade in securities on behalf of the CLOs,

8    correct?

9    A    Yes.

10   Q    And this was just days after the Court dismissed as

11   frivolous the motion that they brought seeking the exact same

12   relief?

13   A    I believe it was about that same time frame, yes.

14   Q    Okay.  So, all in this same time frame, December 22nd,

15   December 23rd, K&L Gates is sending those letters and Mr. --

16   and Mr. Ellington is participating in conversations with you

17   and lawyers for the Advisors and Mr. Scott, right?  This is

18   all happening in the same two or three days?

19   A    I continue to struggle to see the issue, but yes.

20   Q    Okay.  You were aware of the letters that K&L Gates sent

21   at the time they sent them, correct?

22   A    Yes.

23   Q    Okay.  And despite the outcome at the December 16th

24   hearing, you were supportive of the sending of those letters,

25   right?

Dondero - Direct                                        119

1  A    I still believe they are bona fide.  I still believe we

2  just -- maybe not as good a presentation to make the Court

3  understand.  But yes, I still believe they're bona fide and

4  were done in good faith.

5  Q    Okay.  And so you think it was a problem with presentation

6  at that hearing; is that right?

7  A    Yeah.  I mean, you have -- yes.  I believe you have no

8  business purpose booking losses for investors that asked that

9  their accounts not be traded while they were being migrated,

10  and instead they were handed a bunch of losses and then

11  they've been, they've, in a backdoor way, lost control by the

12  Advisor buying assets without court approval to block the DAF

13  and the retail funds' rights.  I mean, it's craziness.

14  Q    And then you brought Mr. Ellington into the discussion

15  about these letters specifically; isn't that right?

16  A    No.  I -- I remember my main --

17            MR. MORRIS:  Your Honor, it's a --

18            THE COURT:  Okay.

19            THE WITNESS:  Well, the answer is no.

20            THE COURT:  It's a yes or no, a yes or no question.

21            THE WITNESS:  No.  The answer is no.

22            MR. MORRIS:  Okay.  Can we go to Exhibit 52, please?

23  BY MR. MORRIS:

24  Q    And if we look at the bottom and scroll up, the email

25  string begins with some back and forth between your lawyers

1  and my colleague, Mr. Pomerantz.  Do you see that?  And they

2  discuss specifically the K&L Gates letters.

3  A    Yep.

4  Q    Okay.  And then they're forwarded to you and you respond

5  to Mr. Lynn and to your lawyers, right?

6  A    Yep.

7          MR. MORRIS:  Can we scroll up just a bit more?

8  BY MR. MORRIS:

9  Q    And you write to your lawyers -- now, this is -- this is

10  at this time a very private conversation between you and your

11  lawyers, right?  And -- and --

12  A    Yeah.

13  Q    And you could share whatever view you had at the time with

14  your lawyers, because at least as of December 24th at 5:53,

15  you thought that that would be a protected conversation and

16  communication, correct?

17  A    I don't know what I thought then.

18  Q    Well, you told Mr. Lynn, "Who knows how Jernigan reacts."

19  Do you see that?

20  A    Yes.

21  Q    And that's because you were unsure of how Judge Jernigan

22  was going to react; is that right?

23  A    Yes.

24  Q    You didn't express the view to your lawyer on December

25  24th that Judge Jernigan was going to rule against you because

1  she was biased, did you?

2  A    I don't know if that's in this email chain.

3  Q    I'm happy to look at it from top to bottom.

4  A    I -- but I -- I don't know.

5  Q    And it's certainly not in this email, right?  You didn't

6  -- you didn't tell -- you didn't tell your lawyers in this

7  private conversation that you had any concerns about Judge

8  Jernigan's bias, right?

9  A    Not -- not here.

10 Q    And you didn't -- you didn't say anything in this email on

11 December 24th that you thought Ms. -- that you thought Judge

12 Jernigan was anything but partial, right?

13 A    The issue is not addressed in this email.

14 Q    In fact, you told -- you told your lawyers just the

15 opposite, didn't you?  Isn't that right?

16 A    No.

17 Q    You told your lawyers "Who knows how Judge Jernigan is

18 going to react;" isn't that right?

19 A    Yes.

20 Q    Okay.  And then you forward your private communications

21 with your lawyers to Mr. Ellington, correct?

22 A    Yes.

23 Q    And in your communications with Mr. Ellington, you

24 included the K&L Gates letters, correct?

25 A    Yes.

Dondero - Direct                          122

1   Q    Are you aware of anything in the TRO that would allow you

2   to communicate with Mr. Ellington concerning the letters

3   between the Debtor and the K&L Gates clients?

4   A    I don't know.  Goes back to settlement counsel.

5   Q    Okay.  You had other communications with Mr. Ellington on

6   Christmas Eve, didn't you?

7   A    I did.

8   Q    And in fact, you communicated with Mr. Ellington about

9   your decision to object to the Debtor's settlement with

10  HarbourVest; isn't that right?

11  A    Yes.

12  Q    Okay.

13         MR. MORRIS:  Can we just see that for the record,

14  Exhibit 21?

15  BY MR. MORRIS:

16  Q    You recall that, in late December, the Debtor filed notice

17  of a settlement it reached with HarbourVest, correct?

18  A    Yeah.

19  Q    And in this email string, Mr. Assink, one of your personal

20  lawyers, purported to summarize the terms of the settlement

21  for Mr. Lynn and other attorneys at Bonds Ellis.  Do you see

22  that at the bottom?

23         MR. MORRIS:  Yep, right there.

24         THE WITNESS:  Yes.

25  BY MR. MORRIS:

Dondero - Direct                                      123

1  Q    And then Mr. Lynn forwarded Mr. Assink's email to you,

2  correct?

3  A    Yep.

4  Q    And you responded to your lawyers and told him to make

5  sure that you objected, correct?

6  A    Yes.

7  Q    You didn't like the terms of the deal; isn't that right?

8  A    Well, at the time -- at the time, we didn't realize that

9  -- yeah.  And -- yes.  It was -- it was a ridiculous way of

10 destroying the estate, in our opinion.

11 Q    Okay.  So, so you were adverse to the Debtor at this

12 moment in time with respect to the Debtor's decision to enter

13 into the HarbourVest settlement, correct?

14 A    We disagreed with the HarbourVest settlement is as far as

15 I want to answer that question.

16 Q    And you wanted to challenge the Debtor's decision to reach

17 an agreement on the terms set forth in Mr. Assink's email,

18 correct?

19 A    Yes.

20 Q    And you decided to forward your communications with your

21 lawyers on the topic of your decision to object to the

22 HarbourVest settlement to Mr. Ellington on Christmas Eve,

23 correct?

24 A    Yes.

25 Q    Okay.  Can you identify anything in the TRO that would

Dondero - Direct                               124

1   authorize you to communicate with the Debtor's employees after

2   the TRO was entered into about your decision to object to the

3   HarbourVest settlement that the Debtor was seeking to enter

4   into?

5   A    I don't know.  I was relying on Ellington's role as

6   settlement counsel.

7   Q    Okay.

8            THE COURT:  All right.  We're going to have to stop.

9   Are you almost through, Mr. Morris?

10            MR. MORRIS:  I have one more document.

11            THE COURT:  Okay.

12            MR. MORRIS:  Literally three -- two or three minutes.

13            THE COURT:  Okay.

14   BY MR. MORRIS:

15   Q    You had one more communication on Christmas Eve with Mr.

16   Ellington; isn't that right?

17   A    Uh-huh.

18   Q    Okay.  And this is -- this is where you told him about the

19   Debtor's letter evicting you from the offices and about their

20   demand for your cell phone, right?

21   A    I -- please refresh me.

22   Q    Okay.

23            MR. MORRIS:  Exhibit 53, please.

24   BY MR. MORRIS:

25   Q    On December 23rd, the Debtor sent your lawyers that letter

1  that we looked at earlier giving notice of eviction and

2  demanding the return of your cell phones, correct?

3  A    Yep.

4  Q    And then the next day, on December 24th, Mr. Lynn

5  forwarded the letter to you, correct?

6  A    Yep.

7  Q    And Mr. Lynn forwards that to you and he provides advice

8  about the contents of the cell phone, correct?

9  A    Yes.

10 Q    And you pass this advice, along with the letter, to Mr.

11 Ellington, correct?

12 A    Yes.

13 Q    This email string and the letter have nothing to do with

14 shared services, correct?

15 A    Okay.  Broadly, shared services includes everything trying

16 to get to a settlement of what to do with the employees.  And

17 so I, again, I view it broadly as yes.

18 Q    Okay.  Mr. Lynn's advice that you're passing along to Mr.

19 Ellington is limited to the cell phone, correct?

20 A    I think he has the same view that I do regarding Ellington

21 as settlement counsel should be -- should be restricted and

22 not open up a window into all legal communication with me and

23 my lawyers.  But obviously you're taking a different view.

24      MR. MORRIS:  I move to strike.  Real simple.  Last

25 question, Your Honor.

1                THE COURT:  Sustained.

2    BY MR. MORRIS:

3    Q    Mr. Dondero, you forwarded -- the email that you forwarded

4    to Mr. Ellington included the advice from your lawyer about

5    your cell phone and the letter that evicted you from the

6    Debtor's offices and made the demand for the cell phones back,

7    correct?

8    A    Yes.

9    Q    Okay.

10               MR. MORRIS:  I have no further questions, Your Honor.

11               THE COURT:  All right.  It's --

12               MS. SMITH:  Your Honor, this is Frances Smith.

13   Before we go on break, I just wanted to give Your Honor one

14   piece of good news that might help save you some time this

15   afternoon.

16               THE COURT:  Okay.

17               MS. SMITH:  We now have an agreement with Mr.

18   Dondero's counsel that they will not be calling Mr. Leventon,

19   and the Debtor has already agreed that they would not be

20   calling Mr. Leventon.  So if we could please release Mr.

21   Leventon for the rest of the afternoon, we would appreciate

22   that, Your Honor.

23               THE COURT:  All right.  Mr. Wilson, you confirm?

24               MR. WILSON:  Yes, Your Honor.

25               THE COURT:  All right.  Well, Mr. Leventon is

 1  excused.  Thank you for that.

 2          MS. SMITH:  Thank you, Your Honor.

 3          THE COURT:  All right.  It's 1:06.  We're going to

 4  take a 30-minute break.  We'll come back at 1:36.

 5          THE CLERK:  All rise.

 6          MR. MORRIS:  Thank you, Your Honor.

 7      (A luncheon recess ensued from 1:06 p.m. until 1:42 p.m.)

 8          THE CLERK:  All rise.

 9          THE COURT:  All right.  Please be seated.  All right.

10  We are going back on the record, a few minutes late, 1:42, in

11  Highland Capital Management.

12      Mr. Morris had just passed the witness, Mr. Dondero, to

13  Mr. Wilson.  And remember, we were clear earlier on that this

14  can be both cross as well as direct, beyond the scope of Mr.

15  Morris's direct, so that we can hopefully be more efficient

16  with our time.

17      All right.  So, Mr. Dondero, you're still under oath.  Mr.

18  Wilson, you may go ahead.  (Pause.)  All right.  Mr. Wilson,

19  can you hear me?

20          MR. WILSON:  I apologize, Judge.  I forgot to unmute.

21          THE COURT:  All right.  You may proceed.

22          MR. WILSON:  All right.

23                      CROSS-EXAMINATION

24  BY MR. WILSON:

25  Q   Mr. Dondero, when did you learn that the Debtor was

Dondero - Cross                                              128

1  seeking a TRO against you?

2  A    On or about the time they filed it.

3  Q    And did anyone at that time explain to you the relief the

4  Debtor was seeking?

5  A    Shortly thereafter, counsel went over it with me.

6  Q    And did they -- your counsel explain the relief to you?

7  A    Yes.

8  Q    And did you end up attending the hearing on the TRO?

9  A    No.

10 Q    And why did you not attend the hearing on the TRO?

11 A    Well, all of these hearings tend to start with a diatribe

12 of what I think are untruthful, hurtful, and insulting

13 comments about me that seem to go on for hours.  And I -- I

14 don't know, what's the expression, twisted by knaves to make a

15 trap for fools, but I hate -- I hate hearing it, so I -- I've

16 done nothing but try and help the estate and buy the estate in

17 good faith, but people are moving to different agendas, and I

18 think we've been betrayed by Seery morphing from a Chapter 11

19 to a Chapter 7 trustee for his own benefit.

20 Q    After the hearing, did you learn that there was a TRO

21 entered against you?

22 A    Yes.

23 Q    And how did you learn that a TRO had been entered against

24 you?

25 A    From counsel.

1  Q    And how long after the hearing did you learn about that?

2  A    Shortly thereafter.  I'm not sure exactly when.

3  Q    And did your counsel provide you a copy of the TRO?

4  A    Yes.

5  Q    And did anyone explain to you what the TRO meant?

6  A    Yeah, I -- again, I take seriously anything that comes

7  from the Court, and I did adjust my behavior, but the overall

8  theme, that somehow I was doing something to hurt the creditor

9  or hurt the Debtor or hurt investors I viewed as incongruent

10 with any of my behavior.  So I didn't think it was going to

11 require much adjustment.  I -- I -- yes.  So, anyway.  But I

12 paid attention.  I listened.  I understood that we're still

13 moving forward with pot plan activities.  I understood we were

14 still moving forward on trying to migrate the employees

15 peacefully under a shared services agreement.  And I

16 understood that we were still trying to figure a settlement,

17 either individually with different creditors or globally with

18 different creditors.

19 Q    Okay.  Did you -- you said that your counsel provided you

20 a copy of the TRO and you discussed the TRO with your counsel.

21 Did you -- did you form an understanding of what you could and

22 could not do under the TRO?

23 A    Yeah, I -- again, like I -- like I just said, I thought

24 the spirit was to make sure I didn't do anything that could be

25 interpreted as moving against the Debtor, but still

Dondero - Cross                          130

1  nonetheless trying to preserve value and reach a settlement.

2  And, you know, the -- the employees have been treated more

3  shoddy than in any bankruptcy we've ever been involved in, and

4  so I was also wanting to make sure that shared services went

5  as smoothly as possible.

6  Q    Did you have an opportunity to ask your counsel questions

7  about the TRO?

8  A    Yes.

9  Q    And did you rely on your counsel to explain to you what

10  the TRO meant?

11  A    Yes.

12  Q    And in the weeks that followed the entry of the TRO, did

13  you continue to seek advice from your counsel regarding what

14  you could and could not do under the TRO?

15  A    Yes.

16  Q    And why did you do that?

17  A    Again, to stay compliant, not -- to stay compliant and

18  avoid any specific tripwires or any trickery that might have

19  been in the agreement.

20  Q    Did you -- why do you believe that the TRO was entered

21  against you?

22  A    It goes back to the trades that were done for no business

23  purpose the week of Thanksgiving, two days before

24  Thanksgiving, I think, actually, the Friday after

25  Thanksgiving, when only five percent of the people on Wall

Dondero - Cross                                    131

1  Street are actually in the office, selling securities for no

2  business purpose at a 10 percent loss to where they were

3  trading and a 50 percent loss to where they were trading a

4  month later.

5  Q    Well, did you interfere with Mr. Seery's trading

6  activities?

7  A    I've been as clear as I can be.  I take much umbrage in

8  capricious, wanton destruction of investor value.  And I

9  interfered with the trades around Thanksgiving directly by

10 telling the traders that they shouldn't put the trades

11 through, there's no business purpose, there's no rationale,

12 that the investors that control a vast majority of the CLOs

13 are going to move the contracts and they don't want the

14 securities traded.  So, yes, I objected strenuously in the

15 November Thanksgiving time frame.

16     As far as December 20th is concerned -- I know I've

17 corrected this testimony three or four times -- there is no

18 evidence of me talking to anybody other than sending one email

19 to Jason Post, who is a NexPoint employee, not a Highland

20 employee, and just saying, you know, Jason, you need to look

21 at these trades.  Because I couldn't believe they would pass

22 through compliance when they were against the specific

23 interests of investors.

24 Q    Well, Mr. Dondero, did you rethink your actions around

25 Thanksgiving, after the filing of the TRO motion by the

Dondero - Cross                                        132

1   Debtors?

2   A    Yeah.  I mean, yes.  I mean, just to repeat, again, I did

3   nothing regarding the December 20th trades except for one

4   email to Jason Post saying you should take a look at it.  I

5   never followed up with him.  I never knew what he was doing.

6   It wasn't until he testified a month later that he looked at

7   it with outside counsel, agreed that the trades were improper,

8   so he wouldn't put them through the order management system,

9   so Seery and Highland had to come up with their own workaround

10  to do trades that I still believe are improper.

11  Q    Did you respect the Court's authority to enter a TRO

12  against you?

13  A    Yes.  I mean, like I said, I didn't interfere directly or

14  -- and I think Seery has testified twice that he had his own

15  workarounds, he did what he wanted to do, regardless of

16  investor thoughts or compliance, and no one stopped him or

17  slowed him down anyway.  So there's no -- there was no harm

18  whatsoever regarding the December trades.

19  Q    So you took the TRO seriously?

20  A    Absolutely.

21  Q    And the TRO was important to you?

22  A    Well, I -- yes.  I mean, I understood, I respected, you

23  know, I modified my direct behavior, but I still had my views

24  on what's proper for the estate and what's proper for

25  investors, so I have to reflect those, you know, differently

Dondero - Cross                                        133

1   or indirectly.

2   Q    So I guess a fair characterization of what you just said

3   is that you may have had differing opinions on the actions the

4   Debtor was taking but you changed the way that you reacted to

5   those actions?

6            MR. MORRIS:  Objection to the form of the question.

7   Leading.

8            THE COURT:  Sustained.

9   BY MR. WILSON:

10  Q    Well, Mr. Dondero, did you -- did you agree with

11  everything Mr. Seery did after December 10, 2021?  I'm sorry,

12  2020?

13  A    No.

14  Q    Did you take any action -- did you take any action after

15  December 10, 2020 to -- that you understood might violate the

16  TRO?

17  A    No.  And, again, with the goal of trying to transition

18  employees fairly, make up to them the fact that their 401(k)

19  contributions were canceled, their 2019 bonuses were canceled,

20  their 2020 bonuses were canceled.  You know, I tried to do

21  what was best and fair for everybody, but not in a way that

22  disrupted the Debtor or even contacted, you know, people

23  directly.

24  Q    And so were you aware on December 10th that you were

25  restrained from communicating, whether orally, in writing, or

Dondero - Cross                                      134

1  otherwise, directly or indirectly, with any board member

2  unless Mr. Dondero's counsel and counsel for the Debtor are

3  included in any such communication?

4  A   Yes.  And that's how we handled it.  We had a meeting with

5  -- or, in fact, I wasn't even at the meeting, but Judge Lynn

6  had a meeting with the independent board members to discuss

7  the pot plan towards the end of the month of December.

8  Q   And in your understanding, did you ever do anything to

9  violate that provision of the TRO?

10 A   No.

11 Q   Were you aware that on December 10th you were restrained

12 from making any express or implied threats of any nature

13 against the Debtor or any of its directors, officers,

14 employees, professionals, or agents?

15 A   Yes.

16 Q   And did you do, in your understanding, did you do anything

17 after December 10th to violate that provision of the TRO?

18 A   No.  I mean, that's -- I had very -- very little, if any,

19 contact with any Highland employees or board members, or

20 Seery, other than the day after Thanksgiving, in that period

21 of time whatsoever.  So I never -- I never threatened anybody

22 -- I'm going to say period -- but even during the injunction

23 period, for sure.

24 Q   Were you aware that on December 10th you were restrained

25 from communicating with any of the Debtor's employees except

1  as it specifically relates to shared services currently

2  provided to affiliates owned or controlled by Mr. Dondero?

3  A    Yes.

4  Q    And did you knowingly do anything to violate this

5  provision of the TRO?

6  A    No.  I said this before, probably not in the right format,

7  on whatever it was, cross or direct earlier, but shared

8  services was a broad, multifaceted discussion that a lot of

9  people were involved in and moving towards for three or four

10  months.  It included systems, it included accounting

11  personnel, it included what was going to happen to 40-odd

12  employees, which asset management contracts were potentially

13  going to move or not move.  At one point, the CLOs were, and

14  then those CLOs weren't.  You know, whatever.

15       So, there was -- it was not just about moving back office.

16  It was also about front office and valuation and whether or

17  not there was going to be an overall settlement, whether or

18  not the pot plan was going to work out, whether or not there

19  was going to be an ability to buy out individual creditors.

20  All those things were being explored, as you saw in the emails

21  earlier, like with Clubok.  There was a -- exploring buying

22  out his interest or changing his dynamics.

23       There was also conversations where Redeemer Committee had

24  agreed to sell their interest in Cornerstone for ninety

25  million bucks but then changed their mind.

1      There was agreements with -- there was negotiations going

2   on all over the place.  And I needed help, since I'd been

3   isolated, and Scott Ellington, as my settlement counsel, or as

4   the go-between with Seery and with the creditors, was an

5   important piece of trying to get something done.

6   Q    Mr. Dondero, were you aware that on December 10th you were

7   restrained from interfering with or otherwise impeding,

8   directly or indirectly, the Debtor's business, including but

9   not limited to the Debtor's decisions concerning its

10  operations, management, treatment of claims, disposition of

11  assets owned or controlled by the Debtor, and pursuit of the

12  plan or any alternative to the plan?

13  A    Yes.  I mean, it was -- it was clear this was the final

14  step in the divide-and-conquer strategy.  It was clear that

15  Pachulski and Seery were going to be rewarded a multiple of

16  ten or fifteen times compensation for becoming liquidating

17  trustees instead of Chapter 11 trustees.  And the best way to

18  do that was to isolate me by creating gigantic awards to

19  claimants who six, nine months earlier, Seery would bet his

20  career had zero claims, all of a sudden got a hundred million

21  bucks.

22      It was a way of distorting those claims between Class 8

23  and Class 9 so that there would never be a residual interest,

24  and then for Pachulski and Seery to get paid large incentive

25  compensation for administering a liquidation, even though they

Dondero - Cross                           137

1  were betraying the estate that they had been hired for to do a

2  Chapter 11.

3  Q    Given all that, did you do anything that you believed

4  would violate the -- that provision of the TRO?

5  A    No.  I don't believe that objecting to the 9019s that had

6  no basis in economic reality or legal risk, that were never

7  scrutinized, you know, by the Court, I did not believe that

8  objecting to those in any way violated the TRO.

9  Q    All right.  Well, in any event, are you -- are you aware

10  that the TRO included a footnote that says, For the avoidance

11  of doubt, this order does not enjoin or restrain Mr. Dondero

12  from seeking judicial relief upon proper notice or from

13  objecting to any motion filed in the above-referenced

14  bankruptcy case?

15  A    Yes.

16  Q    Were you aware that on December 10th you were restrained

17  from otherwise violating Section 362(a) of the Bankruptcy

18  Code?

19  A    Yes.

20  Q    And do you know what Section 362(a) of the Bankruptcy Code

21  is?

22  A    That's -- is that the one with disturbing contracts or

23  taking property?  It's one of those two, right?

24  Q    Well, would it -- would it be the automatic stay, in your

25  understanding?

Dondero - Cross                                    138

1    A    Yeah, okay, the automatic stay regarding contracts.

2    Q    And did you violate, after December 10th, that provision

3    of the TRO?

4    A    No.

5    Q    Were you aware that on December 10th you were restrained

6    from causing, encouraging, or conspiring with any entity owned

7    or controlled by him -- meaning you -- and/or any person or

8    entity acting on his behalf from, directly or indirectly,

9    engaging in any prohibited conduct?

10   A    Again, yes.  Again, it's broad and far-reaching, but it's

11   an intent to isolate anybody who -- myself and any other third

12   party or related party that has bona fide interests in

13   stopping this destruction of an estate that started with $450

14   million of assets and $110 or $120 million of claims the first

15   three months in.  And that was Pachulski's work and everybody

16   else's.  And then somehow at the end we end up with $200

17   million of assets and $300 million of claims.

18       Where did it go?  Where's the examiner?  Where's the --

19   where's the -- where's the scrutiny of giving HarbourVest more

20   of an award than they had in investment in the funds?  Where

21   is the scrutiny of giving Josh Terry another $28 million on

22   top of the 18 he's already taken out of Acis on a $1 million

23   employee dispute?  Where's the scrutiny of Redeemer getting

24   more in terms of cash, noncash, keeping of Cornerstone, than

25   their original arbitration award?  Where is the fairness in

Dondero - Cross                                     139

1    this process?

2    Q    Despite your personal beliefs on those matters, did you do

3    anything that would violate that provision of the TRO?

4    A    No.

5    Q    And, in fact, after December 10th, did you do anything at

6    all that you believed would violate the TRO?

7    A    I've done nothing except, in a complex, shifting betrayal,

8    trying to provide continuity for the business and for the

9    employees.  I've tried nothing except try to settle this.  But

10   as the -- as the Court's best judgment is to relentlessly

11   pound on everything we do, there's no way to ever to reach a

12   compromise because the other side figures they're going to win

13   everything and has no downside.  So I don't see how I could

14   ever negotiate more on a settlement.

15        (Interruption.)

16   Q    So, to clarify, after December 10th, did you ever do

17   anything that you believed might violate the TRO?

18   A    No.

19   Q    All right.  I'm going to show you an exhibit -- and I

20   think Bryan Assink is going to put it on the screen -- that

21   was previously admitted for the Debtor.  And that would be

22   Debtor's 55.  And I want to go to Page 14 of that document.

23             MR. WILSON:  And scroll down just a hair, Bryan.  All

24   right.  That'll work.

25   BY MR. WILSON:

Dondero - Cross 140

1 Q   All right.  Mr. Dondero, you were asked to read some

2 provisions from this.  And to refresh you, this is the

3 Highland Capital Management Employee Handbook, Exhibit 55 for

4 the Debtor.  But you were asked to review and read some

5 provisions from this exhibit in your earlier testimony, but I

6 want to point you to one sentence that you were not asked to

7 read, and that would be the last sentence of the paragraph in

8 the middle of the page there that starts with "Participation

9 in this policy."  Can you read that sentence, starting with

10 "Your obligations"?

11 A   I'm sorry.  Where is it?  In the first full paragraph or

12 the second full paragraph?

13 Q   Yeah.  The first -- the last sentence of the first full

14 paragraph, starting with "Your obligations."

15 A   Okay.  (reading)  Your obligations under this policy shall

16 terminate upon the termination of your employment, provided

17 that you will remain obligated to furnish historical call

18 records covering the period through the date of your

19 termination, as requested, through the termination of your

20 employment.

21     So I had been terminated -- I had been terminated long

22 ago, if that's what you're asking.

23 Q   Yes.  What day were you terminated?

24 A   Well, I was terminated as a Highland employee early on in

25 the case, and I was -- well, I guess I was paid by NexPoint,

Dondero - Cross                                    141

1   but no, then I was terminated by Highland -- you know what, I

2   don't remember, honestly.

3   Q   Well, do you -- do you recall if you submitted a letter of

4   resignation on October 9th?

5   A   You know what, that -- that sounds familiar.  Yeah, I

6   would have -- yes.  I would have preferred not to resign, but

7   I contractually had to.

8   Q   Well, so what were the reasons that led to you resigning?

9   A   I was asked to resign.

10  Q   And who asked you?

11  A   Jim Seery.

12  Q   During your time with Highland, did Highland pay for your

13  personal cell phone bill?

14  A   I -- I don't know.  I -- pre-bankruptcy, I assume yes.  I

15  don't know what was going on after bankruptcy.

16  Q   Do you know whether you or Highland paid for the cell

17  phone itself?

18  A   I don't know.

19  Q   And by cell phone itself, I'm referring to the cell phone

20  you had up until around mid-December.  You don't recall who

21  paid for that cell phone?

22  A   No.

23  Q   How often do you get a new --

24  A   But that'd be a --

25  Q   -- cell phone?  I'm sorry.  You --

Dondero - Cross                          142

1  A    That'd be a good -- I was going to say, that would be a

2  good question to research.  It might not have even being been

3  paid by Highland.  I don't -- I just don't know the answer.

4  Q    Did you --

5  A    Yeah.

6  Q    Did you routinely replace your cell phone?

7  A    Usually every three or four years, although I really do

8  not like this new 5G phone at all.

9  Q    Well, do you know when you last got a phone prior to

10 December of 2020?

11 A    Three years ago.

12 Q    And did Highland have a procedure for replacing your cell

13 phone?

14 A    Yes.  It was -- it was put in place by Thomas Surgent as

15 head of compliance with the goal of protecting investor

16 information or anything that could be business communication

17 being misused by a recycled or destroyed phone.  So there was

18 a process by which, when you got a new phone, you gave it to

19 Jason Saffery -- I'm sorry, wrong Jason -- Jason Rothstein,

20 and -- or one of the tech guys, and then they would order your

21 new phone and they would wipe the old phone clean.  I think --

22 I think in this case they had my phone for -- my old phone for

23 the better part of a week.

24 Q    All right.  And you said it was Thomas Surgent who put

25 that policy in place?

1    A    Yeah.  That's been a policy for at least a decade.

2    Q    And who is Thomas Surgent?

3    A    He heads up -- he's a very experienced, very thoughtful

4    compliance guy.  He's headed up compliance at Highland for

5    over a decade.

6    Q    And did Mr. Surgent hold compliance training sessions for

7    Highland employees and executives?

8    A    Yes.

9    Q    And how often would those training sessions be held?

10    A    I remember them as an annual event.  And it was really --

11    it wasn't a page by page, line by line, through, you know,

12    hundreds of pages of manuals.  It was really what had changed

13    in the environment, you know, usually more from a compliance

14    standpoint than anything.  But it would also include a refresh

15    of any sort of manual stuff.

16    Q    And so you attended these compliance training sessions?

17    A    Yes.

18    Q    And did these compliance training session specifically

19    include training on Highland's cell phone replacement policy?

20    A    That's part of the employee manual.  You know, again, to

21    not have to be aware of every single rule at Highland, when I

22    have something that I know requires compliance issues, I don't

23    solve the compliance issues myself, I give the proposed

24    investment or solution to Compliance and they come back and

25    tell me if it's okay or how to do it.

Dondero - Cross                              144

1        If I have a phone or technology issue, I give my phone to

2   the technology guys and tell them that I want a new phone, and

3   then they handle it in a compliant manner.

4   Q    Do you recall when you first got your very first cell

5   phone?

6   A    In 1980 -- '89.

7   Q    Okay.  And when did you start Highland?

8   A    1994.

9   Q    Okay.  So you had a --

10  A    '93.

11  Q    So you had a cell phone prior to Highland ever existing,

12  correct?

13  A    Yes.  That was in California.  But once we moved to

14  Dallas, I've had the same phone number, probably half a dozen

15  different phones or more in Dallas.

16  Q    So when did you move to Dallas?

17  A    '93, '94.

18  Q    Okay.  And you've had the same cell phone number ever

19  since that time?

20  A    Yes.

21  Q    And did you keep your cell phone number when you got a new

22  phone in December of 2020?

23  A    Yes.

24  Q    Do you use that cell phone number for personal use?

25  A    Yes.

Dondero - Cross                                    145

1    Q    Do you have --

2    A    I only have one cell phone.

3    Q    Okay.  You only have one cell phone?  Do you use that cell

4    phone number to communicate with your friends and family?

5    A    Yes.

6    Q    Do you use that cell phone number to communicate with your

7    attorneys?

8    A    Yes.

9    Q    And is there personal information on your cell phone?

10   A    Yes.

11   Q    Is there information on your cell phone related to

12   business interests other than Highland?

13   A    Yes.  Some.

14   Q    And are there communications from your attorneys on your

15   cell phone?

16   A    Yes.

17   Q    Have any Highland employees with company-paid phones ever

18   left Highland in the past?

19   A    Yes.

20   Q    And did Highland ever keep an employee's cell phone number

21   when an employee would leave Highland?

22   A    No.  We didn't have a unique prefix like some companies do

23   that designates that it's a company phone.  So there was no

24   reason for the company to ever keep cell phone numbers versus

25   new random numbers.

Dondero - Cross                                      146

1    Q    All right.  So let's go back to December of 2020.  And you

2    may have hit on this earlier.  But why specifically did you

3    decide to make changes to your cell phone plan in December of

4    2020?

5    A    You know, and again, as I said, I didn't even know if my

6    phones were -- my phone was being paid for or by who, but I

7    assumed they were still being paid by Highland, and it's just

8    the notice to all Highland employees they were going to be

9    terminated without bonuses, without '19 or '20 bonuses, was

10   going to be December 31st, then it was pushed off until

11   January 31st, then February 15th, then February 28th.  But

12   part of that was that their benefits were ceasing at that

13   point in time, too.  So, as far as I knew, everybody was

14   migrating their phone over, and I did mine in the most

15   compliant way I knew how to, by giving it to the -- to the

16   tech guys.

17   Q    So, if Highland was still paying for your cell phone, and

18   you're not a hundred percent sure of that, your testimony is

19   that Highland was going to discontinue paying for that cell

20   phone?

21   A    That was -- that's what they had told all the employees as

22   part of their termination.

23   Q    Okay.  So were you changing the financial responsibility

24   to ensure that it was in your name?

25            MR. MORRIS:  Objection, Your Honor.  Just leading

1    questions.

2              THE COURT:  Sustained.

3    BY MR. WILSON:

4    Q    Did you put the financial responsibility for your cell

5    phone in your name in December 2020?

6    A    I -- December -- yes.

7    Q    And when you were doing that, why did you decide to get a

8    new cell phone at the time?

9              MR. MORRIS:  Objection.  Asked and answered.

10             THE COURT:  Sustained.

11   BY MR. WILSON:

12   Q    Mr. Dondero, did you -- did you keep the cell phone you

13   had in December 2020 when you changed the financial

14   responsibility on your phone?

15   A    I got a more advanced 5G with better picture-taking

16   capability and more -- more storage.

17   Q    And do you recall when you made the decision to get that

18   new cell phone?

19   A    A couple weeks before the 10th.  It take -- it take -- it

20   took -- during COVID, it takes longer to get the phones, so it

21   took a couple weeks to get it and then for the tech guys to

22   swipe or clean out the old one and then for me to get the new

23   one and for the old one that hit Tara's desk on the 10th.

24   Q    Okay.  Well, who ordered the new cell phone?

25   A    I don't know.  Sometimes -- most of the time, it's the

Dondero - Cross                                    148

1    guys in tech who do it, and then they coordinate people's

2    credit card to pay for it.

3    Q    Okay.  But it was not you that actually made the order?

4    A    No.  I was not involved.

5    Q    Okay.  And you say you think it was ordered about a week

6    to ten days before your new phone was set up?

7    A    At least.  The iPhone 12 is -- is and has been backlogged.

8    Q    After the cell phone policy that you testified to earlier

9    was put in place, did you follow this policy every time you

10   got a new cell phone?

11   A    Yes.

12   Q    Did you do anything differently with respect to the

13   process of replacing your cell phone in December of 2020?

14   A    No, I did not.

15   Q    At the time you got a new phone, were you aware that Scott

16   Ellington was also getting a new phone?

17   A    No.

18   Q    So did you discuss your decision to get a new phone with

19   Mr. Ellington?

20   A    No.  Again, I assumed everybody was doing it.  It wasn't

21   something I needed to discuss with him.

22   Q    So, --

23   A    Yeah.

24   Q    -- do you recall if you had any discussions with Isaac

25   Leventon about getting a new cell phone?

1   A    No.

2   Q    No, you don't recall, or no, you did not?

3   A    No, I did not.

4   Q    At the time you got your new phone, were you aware that

5   any party was seeking information from your old phone?

6   A    No.

7   Q    Did Isaac Leventon ever tell you that anyone wanted to

8   preserve text messages on your old phone?

9   A    No.

10  Q    Were you ever provided a litigation hold letter or other

11  notification to preserve information on your phone?

12  A    No.

13  Q    Did you ever receive -- or, I'm sorry -- did you receive a

14  text message from Jason -- Jason Rothstein on December 10th

15  stating that your old phone was in Tara's desk drawer?

16  A    Yes.

17  Q    And who is Tara?

18  A    Tara is my assistant.

19  Q    Did you ever see your old phone again after receiving that

20  text?

21  A    No.

22  Q    And who -- do you recall who -- the individual you handed

23  your phone to when you initiated the process to getting a new

24  one?

25  A    It was Jason Rothstein in the Systems or the Technology

Dondero - Cross                                150

1   Group.

2   Q    And to be clear, Mr. Rothstein is a Highland employee,

3   right?

4   A    Yes.

5   Q    Do you have any personal knowledge about what happened to

6   your phone after Jason Rothstein texted you that he left it in

7   Tara's desk?

8   A    No.

9   Q    Did you ever look to see if it was in Tara's desk?

10  A    No.

11  Q    Did you -- you -- you didn't take the phone out of Tara's

12  desk?

13  A    No.

14  Q    So did you ever see the phone again after you turned it

15  over to Jason Rothstein?

16  A    No.

17  Q    Do you know where the phone is today?

18  A    No.  But, again, I don't know why this is relevant.  They

19  can get the text messages from the phone company if they think

20  it's that big of a deal.

21  Q    When you previously testified that the phone was disposed

22  of, what did you mean?

23  A    I mean, that's -- that's the last step.  That's what

24  always happens to the old phones.  But to say it was tossed in

25  the garbage, I have no idea.  I have no idea what happened to

Dondero - Cross                                      151

1    it after it went back to Tara's desk.

2    Q    So do you have any personal knowledge that your phone was

3    actually disposed of?

4    A    I don't know.

5    Q    When did you first become aware that the Debtor wanted to

6    see your phone?

7    A    Again, when I had given it to Jason, I thought they had

8    seen it.  You know, so I was surprised by the communication

9    during the week of Christmas, I think it was, when I was -- I

10   was out of town.

11   Q    Well, yeah, I'll rephrase my question.  When did you first

12   become aware that the Debtor's counsel wanted to see your

13   phone?

14   A    I had some communication from my counsel the week of

15   Christmas.

16   Q    Okay.  And what did you do for Christmas last year?

17   A    I took my girls to Aspen.

18   Q    And do you recall the dates that you were in Aspen?

19   A    Until the 28th.

20   Q    I'm sorry.  I think you cut out.

21   A    Until the -- until the 28th.

22   Q    Okay.  And were you working while you were in Aspen?

23   A    A little bit.

24   Q    So, there was some talk earlier about the Committee filing

25   a motion to get ESI from Highland and certain individuals.

Dondero - Cross                                    152

1  Did anyone, after or contemporaneously with the filing of that

2  motion, ever inform you that the Committee was seeking your

3  text messages?

4  A    No.  And -- yeah.  No.  And it's -- that's an indirect

5  request versus a direct request, right?

6  Q    Well, so no one at the Debtor ever asked you to preserve

7  text messages?

8  A    Correct.

9  Q    And so would that include Isaac Leventon?  He never asked

10 you to preserve any text messages?

11 A    Correct.  No one -- no one -- no one from the Debtor did.

12 Q    And, so, going back, you were in Aspen when the Debtor's

13 December 23rd letter was sent to Mr. Lynn, correct?

14 A    Yes.

15 Q    And Mr. Lynn communicated that letter to you?

16 A    Yes.

17 Q    And did you discuss that letter with Mr. Lynn?

18 A    Yes.

19 Q    And are you aware that Mr. Lynn wrote a response to Jeff

20 Pomerantz regarding that letter?

21 A    Yes.

22 Q    And are you aware that that response was sent on or about

23 December 29th?

24         THE WITNESS:  You want to -- can John Morris maybe

25 put his phone on mute, because he's -- he's shuffling papers

Dondero - Cross                                153

1    and it's -- it's throwing it off on this end.

2            THE COURT:  I --

3            MR. WILSON:  Yeah.  My question was, are you aware

4    that that letter was sent on or about December 29th?

5            THE WITNESS:  Yes.

6    BY MR. WILSON:

7    Q    And are you aware that that letter from Mr. Lynn to Mr.

8    Pomerantz stated that, we are, at present, not sure of the

9    location of the cell phone issued to Mr. Dondero by the

10   Debtor?

11   A    Yes.

12   Q    On December 29, 2020, did you know the location of your

13   cell phone?

14   A    No.

15           MR. WILSON:  Your Honor, at this time I would like to

16   ask for the admission of the exhibits on my second amended

17   witness and exhibit list.

18           THE COURT:  All right.  Are you talking about

19   Exhibits 1 through 20 at Docket Entry 106?

20           MR. WILSON:  That's correct.  Exhibits 1 through 20.

21           THE COURT:  Any objection?

22           MR. MORRIS:  No, Your Honor.

23           THE COURT:  All right.  They're admitted.

24           MR. WILSON:  All right.  All right, thank you.

25         (Dondero's Exhibits 1 through 20 are received into

Dondero - Cross                                    154

1   evidence.)

2                MR. WILSON:  Can you turn to 1?

3   BY MR. WILSON:

4   Q    We're going to put an exhibit -- Dondero Exhibit No. 1 on

5   the screen.  Mr. Dondero, have you seen this document before?

6   A    Yes.

7   Q    And can you identify what this document is?

8   A    It's a shared services agreement -- (pause).  It's a

9   shared services agreement between Highland and NexPoint

10  Advisors.

11  Q    Okay.  And in the first paragraph, is NexPoint Advisors

12  defined as the Management Company?

13  A    Yes.

14               MR. WILSON:  Go to Page 3, the bottom.  Article 2.

15  BY MR. WILSON:

16  Q    Now, I want to direct your attention to the bottom of Page

17  3, Article 2.  Can you read the first paragraph, Section 2.01?

18  A    (reading)  Highland is hereby appointed as staff and

19  services provider for the purpose of providing such services

20  and assistance as the management company may request from time

21  to time to -- and as applicable to make available the shared

22  employees to the management company, in accordance with and

23  subject to the provisions of this agreement, and the staff and

24  services provided -- and the staff and services provider

25  hereby accepts such appointment.  The staff and services

1  provider hereby agrees to such engagement during the term

2  hereof and to render the services described herein for the

3  compensation provided herein, subject to the limitations

4  contained herein.

5  Q    All right.  And can you read for me the first part of

6  Paragraph 2.02, please?

7  A    (reading)  Without limiting the generality of 2.01, and

8  subject to Section 2.04, applicable asset criterion

9  concentrations below, the staff and services provider hereby

10  agrees from the date hereof to provide the following back and

11  middle office services, administrative infrastructure, and

12  other services to the management company.

13  Q    All right.  In Paragraph A, under Back and Middle Office,

14  if we go down to the next page, does that include Finance and

15  Accounting Services?

16  A    Yes.

17  Q    And then Paragraph B, does that include Legal, Compliance,

18  and Risk Analysis services?

19  A    Yes.

20  Q    And specifically, would that be assistance and advice with

21  respect to legal issues, litigation support, management of

22  outside counsel, compliance support and implementation and

23  general risk analysis?

24  A    Yes.

25  Q    So, did NexPoint Bank have its own accountants?

Dondero - Cross                                        156

1    A    No.  NexPoint -- NexPoint Advisors, that's who we're

2    talking about here, --

3    Q    I'm sorry.  NexPoint Advisors.

4    A    -- yeah, relied on Highland for those services.  I mean,

5    it subsequently -- it subsequently had to hire a couple

6    lawyers because it wasn't getting those services to the extent

7    it used to.  But it used to have zero, zero of its own

8    accountants and lawyers.

9    Q    Okay.  And then you had -- you said it had zero lawyers

10   initially.  Was it the intention that, that by shared

11   services, that NexPoint Advisors would use Highland's lawyers

12   and accountants without the need of having to hire their own?

13   A    Yes.  I mean, the structure might be unusual compared to

14   other companies that run through bankruptcy, but in financial

15   services, there's -- there's generally a centralized model for

16   high-cost people in the legal, accounting, and tax arena so

17   that each subsidiary doesn't have to have their own expensive,

18   duplicative set of employees.

19   Q    Okay.

20            MR. WILSON:  Can you go to the next exhibit?  2?

21   BY MR. WILSON:

22   Q    I'm going to put up Dondero Exhibit 2.  (Pause.)  It

23   should be here momentarily.  All right.  Can you see that

24   document, Mr. Dondero?

25   A    Yes.

1   Q    And have you seen this document before?

2   A    This is a similar shared services agreement, but this time

3   with HCMFA, the other asset management arm.

4   Q    Okay.  And you would agree with me that Highland Capital

5   Management, LP is defined as HCMLP and that Highland Capital

6   Management Fund Advisors, LP is identified as HCMFA?  Do you

7   agree with that?

8   A    Yes.

9   Q    Okay.

10          MR. WILSON:  Go to Page 3.

11  BY MR. WILSON:

12  Q    Now, can you read Paragraph 2.01 to me?

13  A    It's almost the exact same as the other one.  Do you

14  really want me to read it?  I mean, it just -- is there

15  something different in this paragraph?  It's just a different

16  entity.

17  Q    Right.  Well, just -- just read the Paragraph 2.01.

18  A    Okay.  (reading)  During -- during the term, service

19  provider -- service provider will provide recipient with

20  shared services, including, without limitation, all of the

21  finance and accounting services, human resources services,

22  marketing services, legal services, corporate services,

23  information technology services, and operations services, each

24  as requested by HCMFA and as described more fully on Annex A

25  attached hereto, the shared services exhibit, it being

Dondero - Cross                                            158

1   understood that personnel providing shared services may be

2   deemed to be employees of HCMFA to the extent necessary for

3   purposes of the Investment Advisers Act of 1940, as amended.

4   Q    All right.  And you stated a minute ago that, although

5   worded differently, this paragraph has the same structure and

6   intent of the prior document we looked at, correct?

7   A    Yes.

8   Q    And there's a -- a sentence and a portion of a sentence

9   that you read that says that the personnel providing shared

10  services may be deemed to be employees of HCMFA.  Do you see

11  that?

12  A    Yes.

13  Q    And do you know why that provision is in there?

14  A    Sometimes the Investment Advisers Act requires

15  specifically employees to be named that are key man in

16  different -- whatever.  So sometimes people have to be dual

17  employees or -- or in the entity.  Even if there are very few

18  people in the entity and it's relying on shared services,

19  sometimes, yeah, sometimes you need to have split people or

20  move them in.

21  Q    All right.  I just want to ask you a couple questions

22  about your depositions given in this case.  Did you give a

23  deposition on December 14th?

24  A    Yes.

25  Q    And who took that deposition?

1    A    I believe that -- I believe that was John Morris.

2    Q    Okay.  And was that deposition given remotely by Zoom?

3    A    Yes.

4    Q    And December 14th is four days after the TRO was entered,

5    correct?

6    A    Yes.

7    Q    And at that deposition, did Mr. Morris ask you where you

8    were located?

9    A    Yes.

10   Q    And what did you tell him?

11   A    In the Madrone conference room.  Or the main conference

12   room at Highland.

13   Q    Okay.  Now, you acknowledged that you personally

14   intervened to stop trades that Mr. Seery wanted to make around

15   the time of Thanksgiving, correct?

16   A    Yes.

17   Q    Were any trades halted as a result of your actions?

18   A    I -- I don't believe, even when I directly impacted it in

19   November, I don't believe it actually stopped or slowed

20   anything down.  And I believe he testified similarly.  And I

21   know for sure in December, because I had no contact with any

22   of the traders, I know I did nothing to disrupt anything in

23   December 20th --

24   Q    But in any event, it's your understanding, as you earlier

25   testified, that those events around Thanksgiving led to the

1   entry of the TRO?

2   A    Yeah.  I mean, again, I think he intentionally did it to

3   get my attention.  He sold illiquid restructured equities that

4   the CLOs had owned for ten years, had no reason to sell, would

5   have liked to have held longer, and he sold them for almost --

6   for about half the price that they were two months later.  It

7   was -- it was a colossal, intentional harm of investors.

8   Q    But you believe that those events led to the entry of the

9   TRO?

10  A    Yes.  I reacted severely and -- by telling him not to do

11  it again.  And then that got perceived as a threat and got

12  perceived as somehow usurping his power to harm the beneficial

13  holders of those CLO assets, which are the retail funds, the

14  DAF, HarbourVest at the time, et cetera.

15  Q    Since that TRO was entered, have you taken any actions to

16  try to stop Mr. Seery's trading?

17  A    No.

18  Q    Have you interfered with the Debtor's trading in any way

19  since the TRO was entered on December 10th?

20  A    No.

21  Q    Have you agreed with every trade that the Debtor has made

22  since December 10th?

23  A    No.

24  Q    Now, you -- there's -- there's been testimony in this case

25  that Mr. Seery wanted to make more trades in December of 2020.

1  Do you recall that testimony?

2  A   More trades between Thanksgiving and New Year's like the

3  other ones?  I mean, I -- I don't know how crazy we could get

4  here, but I -- I don't remember that testimony.

5  Q   Okay.  Well, did you become aware that Mr. Seery was

6  making trades in December of 2020?

7  A   I believe in the same names, you know, the same AVYA at

8  $17, $18, $20 a share, $21, before it hit $35, $37, you know,

9  after he sold it.  You know, that kind of stuff.

10 Q   But you did become aware that Mr. Seery was attempting to

11 make trades in December, correct?

12 A   Yes.

13 Q   And did you attempt to stop any of those trades?

14 A   No.

15 Q   Did you call Mr. Seery about those trades?

16 A   Nope.  I didn't call the traders.  I just -- again, I

17 thought it was another compliance breach, I thought it was

18 another violation of the Registered Investers Act, and so I

19 just highlighted it to Jason Post, the NexPoint compliance

20 guy, said, take a look at it.

21 Q   Did you send Mr. Seery any texts or emails about the

22 trades?

23 A   Nope.

24 Q   Did you threaten Mr. Seery in any way about the trades?

25 A   No.

1  Q    Do you recall how you became aware that Mr. Seery wanted

2  to make trades in December of 2020?

3  A    He was -- he was either still using Highland Fund traders

4  or he was using NexPoint or the OMS system.  Somehow, he was

5  using either traders or an OMS system that wasn't his and was

6  ours.  It -- the -- either the OMS system or the general

7  blotter or something, where other employees made me aware of

8  it.

9  Q    And so did you -- did you receive that notification

10  through an email?

11  A    I don't believe -- yeah, no, I think I did, because that's

12  what I forwarded to Jason Post, I believe.

13  Q    Okay.  And who is Mr. Post?

14  A    Jason Post is the compliance officer at NexPoint.

15  Q    Okay.  And he's not a Highland employee, correct?

16  A    No.

17  Q    Did you have any follow-up communications with Mr. Post

18  after you forwarded him that email?

19  A    No, I did not.

20  Q    Did you ever give Mr. Post any direction or any

21  instruction to take any action with respect to those December

22  trades?

23  A    No.  And like I said, the first time I found out he did

24  anything, which I just found them to be noncompliant and I

25  think he would have let them go through our order management

Dondero - Cross                                    163

1    system, I didn't find that out until a month, month and a half

2    later.

3    Q    And how did you find that out?

4    A    When I was in Davor's offices and he testified.

5    Q    Was that hearing in January of this year?

6    A    Yes.

7    Q    And so did -- did Mr. Post, to your understanding, end up

8    interfering with the booking of trades?

9    A    I -- I think what ended up happening was, instead of using

10   the order management system, I think Seery just started going

11   directly through Jefferies without any compliance oversight.

12   That's how I understood.

13        (Interruption.)

14        THE COURT:  All right.  Someone needs to put their

15   phone on mute.

16        Go ahead.

17   BY MR. WILSON:

18   Q    Okay.  Can you tell me what you mean by booking of trades?

19   A    If you don't have access to the order management system,

20   then you have to book them directly with the dealer.

21   Q    Well, so when the trade is booked, has it already been

22   executed?

23   A    Yeah, generally.

24   Q    Okay.  And you talked about the OMS or the order

25   management system.  What is that?

Dondero - Cross                                164

1   A    Well, it's like an automated version of the old trade

2   blotter that used to be a gigantic book that everything had to

3   be written in in pen back in the old days.  That's essentially

4   the source document for all trades that an organization

5   performs.

6   Q    Okay.  So what's the benefit of using the OMS system?

7   A    It's a necessary part of compliance with the SEC.  You

8   have to show that you have a discrete and protected primary

9   source for all your trades, all your trade information.

10  Q    And so, if I understand you, you said that these trades

11  that Mr. Seery executed in December weren't run through the

12  OMS?

13  A    I understand that when Jason Post, I think, made the

14  determination with outside counsel that they weren't properly

15  -- that they weren't proper trades for some reason, and then

16  he didn't allow them to go through the order management

17  system, so I think Seery's testimony was he wasn't impaired at

18  all, he just did the trades himself through Jefferies.  But it

19  -- yeah, that's all from -- that's all from memory.

20  Q    Well, had the Advisors booked trades for Highland in the

21  past?

22  A    Yes.

23  Q    And were the trades that the Advisors booked for Highland

24  run through the OMS?

25  A    Yes.

1  Q    Were the Advisors contractually obligated to book trades

2  for Highland?

3  A    I don't know.  But first and foremost, they have to be

4  compliant, you know.

5  Q    Did you have any role in instructing the employees of the

6  Advisors not to book Mr. Seery's trades in December of 2020?

7  A    I had no involvement whatsoever.

8  Q    Now, are you familiar with letters that were sent in

9  December of 2020 from the K&L Gates law firm to the Pachulski

10 law firm?

11 A    Yes.

12 Q    Do you know how those letters came about?

13 A    I believe the CLO equity investors -- and remind you,

14 those are old CLOs where there's almost no debt on them at

15 all; they're just pools of assets -- that the CLOs -- that the

16 CLO investors had owned for years and wanted to keep the

17 exposure, they were witnessing Seery selling things from their

18 portfolio for no business purpose.  And as the beneficial

19 holders of, I think, in aggregate, between the retail funds

20 and the DAF, they owned more than a majority of 13 of the 18

21 yields and a supermajority of seven of them, and they had

22 every intention of replacing Highland as manager once the

23 bankruptcy ended because Highland had no staff, it was going

24 to have no staff post the bankruptcy and would not qualify

25 under key man provisions and would not have the expertise

Dondero - Cross                                  166

1    necessary to manage their CLO.

2        We had seen what happened in Acis when a manager has no

3    employees and no skill to manage a CLO.  You end up with the

4    Fort Worth performing CLOs in the universe and the destruction

5    of value.  And so I think that NexPoint and DAF investors were

6    -- were worried --

7        (Interruption.)

8            THE WITNESS:  -- about what would happen if they

9    didn't get control of the CLOs.

10           THE COURT:  Someone needs to put their device on

11   mute.  I'm not sure who it is.  Caller 77.  Anyway, it went

12   away.  Continue.

13           MR. WILSON:  Okay.  Can you pull up Debtor's 14?

14   BY MR. WILSON:

15   Q    All right.  I'm going to pull up the Debtor's Exhibit No.

16   14.

17           MR. WILSON:  And go to Page 5.  Yeah, that's right.

18   BY MR. WILSON:

19   Q    All right.  Do you recognize this document as being one of

20   the letters sent from K&L Gates to the Pachulski firm?

21   A    Yes.

22   Q    Did you instruct anyone at K&L Gates to send this letter?

23   A    No.

24           MR. WILSON:  Let's go to 15, hopefully.  And then go

25   to Page 6.

Dondero - Cross                                               167

1  BY MR. WILSON:

2  Q   And I'm now going to show you 15, Exhibit -- Debtor's

3  Exhibit 15.  And this is Page 6.  This is another letter from

4  K&L Gates, it looks like sent the following day from the last

5  letter we looked at.  And so I'm going to ask a few questions

6  referring to both of these letters.  But did you instruct K&L

7  Gates to send either one of these letters?

8  A   No.  If I -- if I had had involvement in these, I would

9  have written them much stronger than these letters are

10 written.  You know, these letters are written with a little

11 bit of needing approval from the independent board, a little

12 bit of fear of the, you know, bankruptcy process, not

13 understanding what's going on or why Seery is doing what he's

14 doing, you know, understanding the detriment of the portfolios

15 from -- from me or the manager, et cetera.

16      So it's -- both these letters are fairly diluted in what

17 they say they'll do.  You know, it's -- they both say subject

18 to bankruptcy court approval or subject to this, we may do

19 that or this, or we're concerned about this.  But I think the

20 behavior was egregious and self-serving.  I would have had

21 much stronger letters if I had anything to do with them.

22 Q   So you're saying that these letters don't contain your

23 words?

24 A   They do not.

25 Q   Did you participate in the drafting of these letters in

Dondero - Cross                                    168

1   any way?

2   A    I did not.  Like I said, I would have done something much

3   stronger and I was disappointed on how watered down they were.

4   Q    Did you instruct anyone as to the general substance that

5   these letters should convey?

6   A    No, I -- it's -- I applauded it and I encourage people to

7   do their jobs, which is to watch out for the investors and

8   watch out for capricious behavior on the part of Jim Seery.

9   But -- yeah, but no, I did not -- I did not draft it or have

10  direct input into it.

11  Q    Did you read or approve the letters before they went out?

12  A    No.

13  Q    Did you have any part in putting together these letters?

14  A    No.  I mean, like I said, I was -- I was disappointed in

15  the soft -- I would have had more umbrage.  I was disappointed

16  in the softness of the letters.

17  Q    But were -- you were provided a copy of these letters

18  after they were sent?

19  A    Yes.

20  Q    So was the sending of the letters in general your idea?

21  A    In general, I thought it was a good idea.  I mean, in

22  general, like I said, I viewed it as a violation of the

23  Advisers Act and the spirit of the Advisers Act, when the

24  beneficial holders have told you they're going to change

25  managers and don't want their account liquidated.  And I still

Dondero - Cross                                         169

1   to this day believe -- believe that.  And if it was -- if it

2   was money I inherited from my grandmother, I would be

3   extremely annoyed if a financial advisor or something did this

4   to the portfolio.

5   Q   And I appreciate your answer, but that wasn't exactly what

6   I asked you.  Was the sending of the letters your idea?

7   A   No.  The sending -- I believe Jason used outside counsel

8   to, you know, validate the impropriety, and then he championed

9   the letter dealing with independent boards and third parties

10  and, you know, whatever, and this is -- these are the letters

11  that came out.

12  Q   So did he cause the sending of these letters?

13  A   I wouldn't use the word cause.  I mean, like, again, I was

14  supportive.  I encouraged them.  I think they were the right

15  thing to do.  I would -- I would do them again.  Would

16  encourage someone to do them again.  I still think this issue

17  isn't resolved.  I still think it's -- it's craziness that

18  Highland is managing these CLOs.

19  Q   Since December 10th, have you ever communicated with any

20  Highland employee to coordinate your litigation strategy?

21  A   No.

22  Q   And you're familiar with Scott Ellington?

23  A   Yes.

24  Q   And he was a Highland employee?

25  A   Yes.

Dondero - Cross                                    170

1   Q    And what was your understanding of his role at Highland

2   after December 10th?

3   A    Again, I was being -- I was being, you know, increasingly

4   without support and isolated.  I didn't even -- you know, I

5   was trying to put pot plants together without even knowledge

6   of the assets, you know, and I was -- I was increasingly in a

7   vacuum.  But Scott Ellington was helping, as settlement

8   counsel, trying to reach some kind of agreement to exit

9   Highland, transition the employees, et cetera.

10       It was important for him to know everything that was going

11  on, in my opinion.  Because whether it included the letters we

12  just went over that reduced the value of the assets at the

13  Debtor such that, you know, you know, we could pay less,

14  whether it was legal matters or legal risks, you know, I

15  thought it was important for him to be -- important for him to

16  be aware and important for him to be fully informed so that he

17  could be nimble in his role as settlement counsel and in his

18  role on shared services.  Because, again, we were trying to --

19  we were trying to transition 40 or 50 employees that were

20  being treated extremely harshly by the Debtor.  And we were

21  trying to provide fair and proper continuity for them also.

22  Q    When you refer to settlement counsel, are you referring to

23  what others may have referred to as a go-between between you

24  and Mr. Seery?

25  A    Go-between was part of it, but he had -- Ellington had

Dondero - Cross                                                     171

1   been anointed in the late spring/early summer as a go-between

2   to work different parties and angles during the mediation and

3   after the mediation and around the pot plan, et cetera.  And

4   he was integrally involved in all of those.

5       And then as far as the shared services and transitioning

6   employees, he was deeply involved in that, and I think he

7   actually spoke as almost a union rep for the employees.  So

8   there was -- he was intimately involved in that.

9       And then how the shared services were going to work going

10  forward, once everybody was terminated from Highland, you

11  know, to treat people as fairly and smoothly as possible.

12  Q    Was Mr. Ellington --

13  A    I'm sorry.  Let me just say the last thing.  I don't

14  think, other than the Thanksgiving time frame, I don't think I

15  talked to Seery in the last seven or eight months.  So he was

16  an important go-between and an acknowledged go-between and

17  used as a go-between by Seery as much as by me.  So whether

18  his role was official, he was def... the form -- or, the

19  substance over form is that he was being used in that role,

20  literally having meetings on shared services a day or two

21  before he was terminated for cause.

22  Q    And was Mr. Ellington general counsel at Highland?

23  A    Yes, he was.

24  Q    And as part of Highland's legal department, did he provide

25  shared services to the Advisors?

Dondero - Cross                                    172

1    A    Yes.

2    Q    And would those Advisors be Highland Capital Management

3    Fund Advisors and NexPoint Fund Advisors?

4    A    Yes.

5    Q    And those are both entities that -- that you -- that are

6    part of your umbrella?

7    A    Yes.

8    Q    After the independent board was established, you testified

9    that Mr. Ellington started serving as a go-between between you

10   and the board, correct?

11   A    Yeah, I'd say the official go-between role, because I was

12   actively talking to board members and I was actively talking

13   to Seery, and every time Seery sold something in a non-arm's-

14   length transaction or below market or without court approval,

15   I went and I complained to the other independent board

16   members.

17        So I was having active conversation around the life

18   settlement transactions with the independent board, around the

19   SSP transaction, et cetera.  But by the summertime, like I

20   said, Ellington was the primary contact person for me and I --

21   to deal with Seery, and I think the primary contact person for

22   Seery to deal with me.

23   Q    And did Mr. Ellington -- I'm sorry.  Did you use, actually

24   use Mr. Ellington to communicate ideas to the boards or Mr.

25   Seery concerning your pot plan proposals?

1  A    Yes.  We did a couple pot plans of our own when we

2  couldn't get the independent board to focus.  And once Seery

3  shifted to whispering to creditors about a liquidation plan,

4  we couldn't get Seery to buy into a pot plan at all, so

5  Ellington and I went forward with a couple of pot plans on our

6  own, and then -- but the last pot plan was solely with Judge

7  Lynn and the independent board members, without me and without

8  Ellington.

9  Q    Well, did Mr. Seery use Mr. Ellington to communicate ideas

10 back to you?

11 A    Yes.

12 Q    Did Mr. Seery use Mr. Ellington to communicate ideas to

13 you after December 10th?

14 A    Yes.  Like I said, up until literally a day or two before

15 he was terminated, there were authorized shared services

16 meetings, because there was a couple-week period there where

17 no one was allowed to have a shared services meeting unless

18 approved by Seery in advance, and nothing was getting done.

19 So he -- Seery anointed a couple people at Highland to be able

20 to deal with a few people at NexPoint and to have a couple

21 meetings, and Ellington was one of those people who actually

22 led the meetings in the last week of December.

23 Q    Did you ever discuss entering a common interest agreement

24 with Mr. Ellington?

25 A    I believe -- I believe the lawyers had a couple different

Dondero - Cross                                    174

1    conference calls on it, and then I think the lawyers for the

2    employees and for the senior employees determined that their

3    strategies and tactics would be best served by not being a

4    part of it.  But I think in the beginning there was thought

5    that it would be good for them to be in the group.  But that

6    wasn't a conversation I had with Ellington.  Those were

7    decisions the lawyers made amongst themselves.

8    Q    Did you ever have any discussions about a common interest

9    agreement with Mr. Leventon?

10   A    No.

11   Q    Did you ever discuss entering a common interest agreement

12   with any current or former Highland employee?

13   A    No.  No.

14   Q    Did you have discussions regarding a common interest

15   agreement with Douglas Draper?

16   A    Yes.

17   Q    And who, again, is Douglas Draper?

18   A    He represents Dugaboy and the Get Good Trust.  And, you

19   know, more importantly, there needed to be some coordination

20   among the lawyers, and then I think it was clear to him that

21   positioning for the Fifth Circuit was going to be important,

22   so he -- he coordinated -- or, he led the coordination of the

23   law firms.

24   Q    Did you ever participate in any conference calls regarding

25   a common interest agreement?

1  A    I'm going to say maybe one, but it quickly -- I'm not a

2  lawyer by training, so it was quickly not something that I

3  added value in, and I wasn't the one that made the decisions

4  or influenced anybody to be in or out of the agreement.  So,

5  again, maybe once, but -- but --

6  Q    Well, was -- was Mr. Leventon or Mr. Ellington on any

7  conference calls you might have been on regarding a common

8  interest agreement?

9  A    Not that I'm aware of.  I have not talked a single word to

10  Mr. Ellington or Isaac since they were terminated, which was,

11  I believe, the last week of December.  Because I have not

12  spoken a single word to either one of them since then.

13      But, again, as recently as a day or two before they were

14  terminated, they were actively involved in shared services

15  meetings.

16  Q    So you're not aware that they were on any conference calls

17  that you were on regarding a common interest agreement?

18  A    Correct.

19  Q    And other than you, are you aware that there were any

20  other current or former Highland employees on a conference

21  call about a common interest agreement?

22  A    I believe it was all employees.  I mean, it was all

23  lawyers for the different entities.

24  Q    Would -- would -- were you aware if counsel for Mr.

25  Ellington or Mr. Leventon were on any of these conference

Dondero - Cross                                        176

1    calls?

2    A    That, I believe, is true.  Yeah, I believe his -- their

3    counsels were.

4    Q    So, you're familiar with the Dugaboy and the Get Good

5    Trusts?

6    A    Yes.

7    Q    And are you the trustee for either one of those trusts?

8    A    No.

9    Q    Do you control either one of those trusts?

10   A    No.  Not directly.  I'm a lifetime beneficiary of the

11   Dugaboy Trust, but I don't control it.

12   Q    When did you become aware that the U.C.C. was seeking

13   production of documents from Dugaboy and the Get Good Trust?

14   A    Around when -- a day or two before that Melissa email

15   requesting a subpoena, for whoever -- but it -- I think it was

16   a midlevel person at DSI was asking or demanding Dugaboy

17   financials, and that was her response to that person.

18   Q    So would that have been approximately December 2020 when

19   you learned of that?

20   A    Right.  And, again, that was -- that response was the

21   exact specific wording I was given by counsel to tell them at

22   that moment.

23   Q    Were you served with any formal requests for the Dugaboy

24   or Get Good Trust documents?

25   A    No.

Dondero - Cross                          177

1  Q    And you stated that the Dugaboy and Get Good Trusts have

2  hired counsel to represent them?

3  A    Yes.

4  Q    And that counsel is Douglas Draper?

5  A    Yes.

6  Q    And to your knowledge, has Mr. Draper been working with

7  the Debtor's counsel to produce the Dugaboy and Get Good

8  documents?

9  A    Yes.  I think he investigated the requests.  I think he

10  got a more formal official request, and then I think he

11  analyzed it and said, as long as he got to review what was

12  provided, he was okay with it.  That's -- that's what I

13  understand.

14  Q    Well, have you or Mr. Draper ever taken the position that

15  the documents would not be turned over?

16  A    No.  I mean, I've -- I've delegated it to Douglas to

17  handle.

18  Q    Have those documents, at this point, actually been

19  produced?

20  A    I have no idea.

21  Q    Do you have any objection to the documents being produced?

22  A    No.

23  Q    And you testified that Melissa Schrath is an accountant?

24  A    Yes.

25  Q    And so she was a Highland employee that was contracted to

Dondero - Cross                                            178

1    the Advisors under the shared services agreement?

2    A    Yeah.  That's -- that's the way I would describe it,

3    because she was -- you know, I was a NexBank and -- a NexPoint

4    employee.  I was being paid by NexPoint.  And she was a

5    hundred percent -- well, 80 percent servicing me, 20 percent

6    servicing Mark Okada.  And so she was properly, as was my

7    administrative assistant, properly lumped as part of the

8    NexPoint shared services.

9    Q    Okay.  And in December of 2020, did Melissa have access to

10   the Dugaboy documents?

11   A    Yes.

12   Q    Did you say "I guess" or "Yes"?

13   A    Oh, yes, she did.  And as a matter of fact, she said 70-80

14   percent of them were on the server and non-password protected.

15   Q    So, why did you send a text message to Melissa in

16   December?

17   A    I didn't know they were non-password protected at that

18   time.  But, again, that was a specific advice of counsel, that

19   it was -- it was a personal entity, not involved in the

20   bankruptcy, and for a midlevel DSI person to ask my accountant

21   was not -- I believe that wasn't perceived as adequate proper

22   channels.  So that was -- that was the legal advice I got from

23   your firm.  So, --

24   Q    All right.  When was your access to the Highland computer

25   system shut down?

Dondero - Cross                                                                 179

1    A    I believe at night right around the 30th.

2    Q    All right.  So I just want to -- I just want to ask you a

3    couple more questions.  Did you, after the entry of the TRO,

4    did you make an effort to modify your behavior in such a way

5    that you would comply with the TRO?

6    A    Yes.  And, you know, something I want to make clear that I

7    discovered during the break when I went through my phone, the

8    January 5th deposition that has somehow become important, even

9    though there were no Highland employees in the office other

10   than the receptionist, is memorialized by a calendar invite on

11   my phone -- which will also be in the Highland system -- where

12   it was an invite a week earlier from Sarah Goldsmith, who was

13   one of the Highland employees supporting the legal team that

14   was largely supporting Jim Seery, sent me a calendar invite to

15   the conference room at Highland for the deposition on the 5th.

16   It's right front and center in my calendar.  It'll be on the

17   Highland Outlook program.  And Sarah Smith -- I mean, Sarah

18   Goldsmith works directly for Jim Seery.

19        So, just to maybe put that issue to bed, I would highlight

20   that for everybody.

21   Q    So, the answer to my last question was you made a

22   concerted effort to modify your behavior in response to the

23   TRO?

24   A    Yes.  The only two times I've been in Crescent was for

25   those two depos.  I don't even go to -- when people have happy

Dondero - Cross                              180

1    hour at Moxie's, because it's in the lobby of the other -- one

2    of the adjacent buildings, I don't even attend happy hours at

3    the bar in the lobby for fear of somehow violating the

4    building order.

5    Q    All right.  So, have you thought better of your actions

6    that you took around Thanksgiving of last year?

7    A    I mean, you know, in due respect for the Court and the

8    Court may be thinking that the investor allegations are

9    fanciful or frivolous, it granted nonetheless an injunction,

10   and I respect it.  And I -- so I've been -- I handle things

11   differently as far as what I think are material breaches on

12   the 20th and I've -- I've adjusted my behavior.  But I do not

13   regret or think differently about the -- liquidating the

14   portfolio the week of Thanksgiving, liquidating illiquid

15   assets for no business purpose.  I still think that was highly

16   irregular and highly wrong.

17   Q    So, to sum up, your opinions of the way Highland is

18   currently being managed are not -- sorry, start over.

19   Although your opinions of the way Highland is being managed

20   have not changed, has your outlook on what your behavior ought

21   to be changed?

22   A    Yeah, my outlook really is the same, that material assets

23   are being sold without court approval, material assets are

24   being bought without court approval, material assets are being

25   sold in a non-arm's-length noncompetitive way for less than

Dondero - Cross                                         181

1   full value.  I still believe that it's impacted the estate

2   materially.  I know somehow my limited involvement in

3   portfolio management responsibility on very limited funds only

4   through March or April, and then the performance of Highland

5   is somehow laid at my feet, but the destruction of value has

6   been entirely based on major asset sales by Jim Seery.  Number

7   one.

8        And then I would say, number two, how analysis of

9   liabilities against Highland go from an estimate of a total of

10  $100 to $120 million in the first quarter and end up ending up

11  at almost $300 million, with nothing ever being litigated or

12  challenged, just business judgment rule, that somehow it would

13  be cheaper than litigating some of these frivolous litigation

14  claims, has destroyed the liability side of the balance sheet.

15       But, anyway, but I -- you know, life goes on and I'm doing

16  the best I can to move the rest of the business forward, move

17  the employees forward, and we will do the best we can to get

18  justice for the Highland estate at some point.

19  Q    And just to clarify your testimony earlier, the last time

20  that you saw your old cell phone in December of 2020 was when

21  you handed it to a Highland employee, correct?

22  A    Yes.

23  Q    And do you have any personal knowledge whether that cell

24  phone was actually wiped, according to company policy?

25            MR. MORRIS:  Objection to the form of the question.

1            THE COURT:  Overruled.

2            THE WITNESS:  I was told that it was.

3    BY MR. WILSON:

4    Q    Okay.  But you don't have personal knowledge as to whether

5    the phone was indeed wiped by Highland, in accordance with its

6    policies?

7            MR. MORRIS:  Objection to the form of the question.

8            THE WITNESS:  I was told by --

9            THE COURT:  Sustained.

10           THE WITNESS:  -- Jason Rothstein --

11           THE COURT:  Sustained.

12           THE WITNESS:  -- that it was wiped.

13           THE COURT:  Sustained.  Rephrase the question.

14           MR. WILSON:  I'm just trying to get him to let us

15   know if he has any personal knowledge that the phone was ever

16   actually wiped in accordance with Highland's policies.

17           THE COURT:  Okay.

18           MR. MORRIS:  Objection to the form of the question.

19           THE COURT:  Overruled.

20           THE WITNESS:  Jason Rothstein told me that it had

21   been wiped according to Highland policies.

22           MR. MORRIS:  Objection to the form of the -- I move

23   to strike.  It's hearsay.

24           THE COURT:  Sustained.

25           MR. WILSON:  Your Honor, that -- Your Honor, that

1  would be a statement by a party opponent.

2           THE COURT:  Who --

3           MR. WILSON:  And it's --

4           THE COURT:  Who's the party opponent here?

5           MR. WILSON:  And it's just going to show Mr.

6  Dondero's state of knowledge.

7           THE COURT:  All right.  Well, the party opponent, how

8  do you justify that exception?

9           MR. MORRIS:  I --

10           MR. WILSON:  Well, Mr. Rothstein is an employee of

11  Highland, as we've talked about, and -- and then the second

12  point of my response will be that it's not to go to the truth

13  of the matter asserted, just that that's the extent of Mr.

14  Dondero's state of mind, is what he was told by Mr. Rothstein,

15  not whether it was actually true or not.

16           THE COURT:  All right.  I'll overrule the objection.

17           MR. WILSON:  All right.  Thank you.  We'll pass the

18  witness.

19           THE COURT:  All right.  That was an hour thirty-three

20  minutes.  Mr. Dondero, do you need a five-minute break?

21           THE WITNESS:  Sure.

22           THE COURT:  Okay.  We'll take a five-minute break,

23  please.

24           THE CLERK:  All rise.

25      (A recess ensued from 3:15 p.m. to 3:25 p.m.)

Dondero - Redirect                    184

1          THE COURT:  All right.  Please be seated.  All right.

2     Just --

3          MS. SMITH:  Your Honor, Frances Smith --

4          THE COURT:  Go ahead.

5          MS. SMITH:  -- for Scott Ellington and Isaac

6     Leventon.

7       Your Honor, I have more good news.  After the break, we

8     reached an agreement with Mr. Wilson that they would not be

9     calling Mr. Ellington.

10         THE COURT:  All right.  Mr. Wilson, you confirm?

11         MR. WILSON:  I do, Your Honor.

12         THE COURT:  All right.  Well, they're excused, then.

13         MS. SMITH:  With that, Your Honor, may he be excused?

14         THE COURT:  Yes, ma'am.

15         MS. SMITH:  Thank you.

16         THE COURT:  All right.  Thank you.

17       All right.  Mr. Morris, do you have further examination of

18    Mr. Dondero?

19         MR. MORRIS:  I do.  I hope, I hope it's not too

20    lengthy, particularly if I'm allowed to ask my leading

21    questions on cross-examination.

22         THE COURT:  All right.  And let me --

23                    REDIRECT EXAMINATION

24    BY MR. MORRIS:

25    Q   Mr. Dondero, can you hear me, sir?

Dondero - Redirect                    185

1          THE COURT:  Let me just let you all know where you

2     are timing-wise.

3          MR. MORRIS:  Yeah.

4          THE COURT:  You used two hours and sixteen minutes

5     this morning on examination.  But as I told you, I think

6     you're entitled to some credit, so to speak, on your three-

7     and-a-half hour total because of the narrative answers.  So

8     I'm not -- I'm not sure yet where I'm going to chop time, but

9     please be mindful that's where we are.  Okay?

10          MR. MORRIS:  I'll try to limit this to 15 or 20

11     minutes, Your Honor.

12          THE COURT:  All right.

13     BY MR. MORRIS:

14     Q    Mr. Dondero, can you hear me, sir?

15     A    Yes.

16     Q    You testified that you're seeking justice for the estate.

17     Is that right?

18     A    Yes.

19     Q    Your claims against the Debtor consist solely of

20     indemnification claims and tax claims; is that right?

21     A    Well, I mean, with proper 9019s, I think there's a

22     residual equity value to Highland, and Highland should be able

23     to resurrect and go forward.

24          MR. MORRIS:  Your Honor, I move to strike.

25          THE COURT:  Sustained.

Dondero - Redirect                                186

1    BY MR. MORRIS:

2    Q    Sir, the only claims that you have filed against the

3    Debtor are for indemnification and for taxes, right?

4    A    Yes.

5    Q    Okay.  And you made a lot of -- a lot of allegations about

6    Mr. Seery, my firm, and the Debtor, and your views on what

7    we're doing in this bankruptcy case.  Isn't that right?

8    A    I think it's transparent now, yes.

9    Q    And you -- one of the complaints you have were the

10   settlements that the Debtor entered into with certain of the

11   creditors, right?

12   A    Yes.

13   Q    And you said that they weren't -- there was no scrutiny.

14   Isn't that the word you used?

15   A    Yes.

16   Q    But you had every single opportunity in the world to take

17   discovery with respect to every single one of these

18   settlements; isn't that right?

19   A    We did and we tried.

20   Q    Okay.  And you failed; isn't that right?

21   A    Yeah, I -- yes.  I guess that's --

22   Q    Right?  And you could have -- you, with all of your

23   knowledge, with all of your wisdom, you could have tried to

24   persuade the Court that these settlements were wrong.

25   Correct?

1   A    Yes.

2   Q    And you did not personally ever take the stand to try to

3   explain to the judge why these settlements were wrong.  Isn't

4   that right?

5   A    Willing to.

6   Q    But those hearings are over long ago.  Isn't that right?

7   A    Yes.

8   Q    So you sit here and you complain about them, but when you

9   had the opportunity, you chose not to testify in order to

10  educate the judge and try to -- and try to show the judge that

11  those were bad settlements.  Isn't that right?  You didn't do

12  that?

13  A    Counsel chose their strategy, which evidently, based on

14  our success in overturning them, maybe it wasn't the right

15  strategy, but their strategy was for me not to be the expert.

16  Q    And the U.C.C. represents the interests of general

17  unsecured creditors; isn't that correct?

18  A    Yes.

19  Q    And to the best of your knowledge, the U.C.C. did not

20  object to any of the settlements that you complain about,

21  correct?

22  A    Everybody got three or four times more than they deserved,

23  except for Redeemer, that got about 20 percent more.

24          MR. MORRIS:  I move to strike, Your Honor.

25          THE COURT:  Sustained.

1   BY MR. MORRIS:

2   Q    Sir, the U.C.C. did not object to any of the settlements

3   that you complain about, correct?

4   A    I don't -- I don't know the answer to that.  I thought

5   more than one person objected to Josh Terry and Acis and I --

6   we haven't seen the 9019 for UBS or Pat Daugherty yet.

7          MR. MORRIS:  I move to strike and I'll try one more

8   time, Your Honor.

9          THE COURT:  Sustained.

10  BY MR. MORRIS:

11  Q    Mr. Dondero, it's a very simple question.  The settlements

12  that you complained about -- Acis, HarbourVest -- the U.C.C.

13  didn't object to them at all.  Correct?

14  A    Yeah, I guess not.  I don't know if they did or -- yes.  I

15  don't know.

16  Q    Okay.  And Mr. Seery, we -- the Debtor made a motion last

17  summer to have Mr. Seery appointed as the CEO.  Do you

18  remember that?

19  A    Yes.

20  Q    And you didn't object to that, correct?

21  A    We didn't realize he had betrayed the estate at that

22  point.  We thought he was still trying to negotiate a

23  settlement, not give the company away.

24         MR. MORRIS:  I move to strike.

25         THE WITNESS:  So we did not --

1            THE COURT:  Sus...

2            THE WITNESS:  We did not object.

3            THE COURT:  Okay.

4    BY MR. MORRIS:

5    Q    And the Debtor didn't -- I mean, the U.C.C. --

6            THE COURT:  Wait.  It's happening again, --

7            MR. MORRIS:  -- didn't object, correct?

8            THE COURT:  -- Mr. Dondero.  Okay?  Please.  Yes or

9    no where you get a yes-or-no question.

10       Go ahead, Mr. Morris.

11   BY MR. MORRIS:

12   Q    And to the best of your recollection, the U.C.C. was

13   supportive of the appointment of Mr. Seery as CEO, correct?

14   A    Yes.

15   Q    And the Debtors just had a plan of reorganization

16   confirmed, correct?

17   A    Yes.

18   Q    And as part of that plan, Mr. Seery is going to continue

19   on as the post-confirmation executive, correct?

20   A    I believe so.

21   Q    And the U.C.C. is supportive of that, to the best of your

22   understanding, correct?

23   A    Yes.

24   Q    Yeah.  Let's talk about the phone for bit.  You testified

25   at length about this policy pursuant to which phones can just

Dondero - Redirect                              190

1  be discarded and wiped down.  Do you remember that?

2  A    Yes.

3  Q    You took some time to prepare for your testimony today.

4  Isn't that right?

5  A    No, not really.

6  Q    You did meet with your counsel and communicate with your

7  counsel over what grounds would be covered, right?

8  A    Half an hour last night.

9  Q    Okay.  And despite all of the testimony that you provided

10  about the policy of discarding phones and changing phone

11  numbers and the rest of it, your counsel didn't show you

12  anything in that 50-page employment handbook to corroborate

13  what you were saying, correct?

14  A    I don't know what you're asking.  I'm sorry.

15  Q    There's nothing in the employee handbook that reflects any

16  of the policies you described with respect to cell phones,

17  correct?

18  A    That wasn't my testimony.  I don't -- I don't know.

19  Q    Okay.  And your lawyer didn't show you anything, to the

20  best of your recollection, that would corroborate what you

21  said about this cell phone policy, correct?

22  A    My testimony was I gave my phone to the Debtor's employee,

23  the technology folks, and I knew they knew what to do in a

24  compliant manner.  I did not know the specifics of the

25  employee manual.  That was my testimony.  I'm sorry.  I --

1    you're asking me something else, but I don't -- I can't answer

2    what you're asking.  I don't know the employee manual.

3    Q    Okay.  And as you sit here right now, you're not prepared

4    to give the judge any information that would show that there's

5    any written policy of any kind that corroborates your -- the

6    policy that you've described, correct?

7    A    Written evidence?  I know it to be approved at the highest

8    levels by Thomas Surgent, whatever Jason Rothstein does with

9    the phones.  That's all I know.  I assume it's memorialized in

10   -- somehow in the employee manual, but I don't know, nor

11   should I.

12          MR. MORRIS:  I move to strike, Your Honor.  It's a

13   very simple question.

14          THE COURT:  Sustained.

15   BY MR. MORRIS:

16   Q    Sir, Jason Rothstein was on your witness list for this

17   hearing; isn't that right?

18   A    I believe he was at one point.

19   Q    And you and your lawyers actually served him with a

20   subpoena; isn't that right?

21   A    I do believe -- yes, I do believe I heard something about

22   that.

23   Q    And so you had him under your control to come here today

24   to give testimony to corroborate what you testified to on the

25   cell phone policy.  Isn't that right?  You could have had him

1    come tell the judge what you've testified to, correct?

2    A    I guess.

3    Q    But you didn't, right?

4    A    We didn't believe it was necessary.

5    Q    So, so you're not aware of anything in the employee

6    handbook that corroborates the cell phone policy that you've

7    described, correct?

8    A    We went over it in detail.  I don't want to pull up those

9    pages again.  But it either says it or it doesn't on those

10   pages.  So, --

11   Q    Okay.  I'm going to try once again.  You are not aware, as

12   you sit here right now, that there is anything in the employee

13   handbook that corroborates the cell phone policy that you've

14   described, correct?

15   A    I don't know.

16   Q    And there's not a single document on your exhibit list

17   that corroborates the cell phone policy that you've described,

18   correct?

19   A    I don't know.

20   Q    And Jason Rothstein, who you've testified a whole lot

21   about, was on your witness list, but you didn't call him today

22   to testify, correct?

23   A    Yes.  We didn't believe we needed him.

24   Q    Okay.  And let's talk about the policy itself that you've

25   described.  Is there any exception to the policy that you've

1  described for saving text messages if you are personally a

2  target of an investigation?

3  A    I have no idea.

4  Q    So, so the policy that you've described, to the best of

5  your knowledge, doesn't contain an exception that maybe you

6  shouldn't do those things if you're the target of an

7  investigation.  Is that right?

8  A    No.  I'm just saying that when Jason and Thomas Surgent

9  had my phone, they could have done anything they wanted to.

10          MR. MORRIS:  I move to strike, Your Honor.  I'm

11  asking him about the policy that he's described.

12          THE COURT:  Sustained.

13  BY MR. MORRIS:

14  Q    Sir, when you negotiated the corporate governance

15  settlement, part of that settlement was to state that the

16  Creditors' Committee would share the privilege for estate

17  claims.  Do you remember that?

18  A    Not specifically.

19  Q    Do you remember that the Creditors' Committee had the

20  authority to investigate claims against you?

21  A    I believe they were doing that during that six, seven

22  months in the beginning of the estate.

23  Q    Okay.  So is there any exception to your policy that

24  you've described with regard to cell phones that would say

25  maybe I shouldn't throw away the cell phone if I'm the subject

1  of an investigation?

2  A    I don't want to speculate.

3  Q    Okay.  You're not aware of an exception to that policy,

4  right?

5  A    I don't want, yeah, I don't want to speculate.  I don't

6  know.

7  Q    Is there an exception -- is there an exception to the

8  policy to perhaps not throw away the cell phone if there's a

9  court order that grants a Creditors' Committee the right to

10  the text messages?

11  A    I don't know.

12  Q    You don't know?  Okay.  We talked about Mr. Rothstein.  We

13  talked about the handbook.  Just to complete it, are you aware

14  of any document anywhere in the world that's going to be put

15  before the judge today that's going to corroborate the cell

16  phone policy that you've described?

17  A    I -- I don't know.  But I would say I challenge you to

18  tell me a different policy.

19  Q    Okay.  We looked briefly at the letter that my firm sent

20  to your lawyers on December 23rd when they asked for the cell

21  phone back and they made a very specific statement about the

22  text messages.  Do you remember that?

23  A    No.

24  Q    All right.  Let's take a quick look at it.  And it's

25  Exhibit -- (pause).

1          MR. MORRIS:  It's Exhibit 27, please.  And if we can

2    go down to the bottom of Page 2.

3    BY MR. MORRIS:

4    Q    And this is where they -- they -- the Debtor informed your

5    lawyers that it would be terminating the cell phone plan and

6    they asked for the immediate turnover of the cell phone and

7    they told you to refrain from deleting or wiping any

8    information, right?

9    A    Yes.

10   Q    And you testified earlier that you actually discussed this

11   letter with your lawyers, right?

12   A    Yes.

13   Q    Okay.  And let's look back at what your lawyers' response

14   is.

15          MR. MORRIS:  Exhibit 22, please.

16   BY MR. MORRIS:

17   Q    Now, in this letter, it says, in the second sentence,

18   quote, We are at present not sure of the location of the cell

19   phone issued to Mr. Dondero by the Debtor.

20          There is no doubt that the -- that the phone that's at

21   issue here was the -- was the Debtor's cell phone, the Debtor

22   paid for it, correct?

23   A    I don't know that.

24   Q    But you've already testified to it; isn't that right?

25   A    Well, if I did, I was guessing.  I don't know.

Dondero - Redirect                          196

1          MR. MORRIS:  Can we put up Page 55 from the

2    transcript, please?  And -- I'm sorry.  One sec.  Lines 10

3    through 13.

4    BY MR. MORRIS:

5    Q    (reading)  "Until December 10th, the day the TRO was

6    entered, you had a cell phone that was bought and paid by the

7    Debtor, right?"  Answer, "Yes."

8          Did you give that answer the last time you were examined

9    in this courtroom, sir?

10   A    Yes.

11   Q    Okay.  And in fact, not only did you know that it was paid

12   for by the Debtor, but you actually knew the last time you

13   testified that the phone was thrown in the garbage, right?

14   A    That's correct.

15   Q    Is that correct?

16   A    Again, I just assumed.  But I -- I don't know the answer

17   for sure to either question.  But there's a way to find out

18   whether or not the company paid for it and there's a way to

19   find out whether or not it was in the garbage, too.  But I

20   don't know for sure.

21         MR. MORRIS:  Can we go to Page 65, please?  Right

22   there, Lines 6 through 8.  We'll go to Line 4.

23   BY MR. MORRIS:

24   Q    Question, "We were a couple of weeks too late, huh?"

25   Answer, "It sounds like it."  Question, "Yeah.  Because the

Dondero - Redirect                                      197

1    phones were already in the garbage, right?"  Answer, "Yes."

2         That was the testimony you gave then, right?

3    A    Yeah.  We went over this earlier today.

4    Q    Okay.  I just want to make sure.

5         MR. MORRIS:  And now let's go back to Mr. Lynn's

6    letter to the Debtor about the cell phone.

7    BY MR. MORRIS:

8    Q    There's absolutely nothing in this letter about the policy

9    that you testified to under questioning from Mr. Wilson,

10   correct?

11   A    Not that I could see.

12   Q    There's nothing in this letter, after discussing --

13   withdrawn.  After discussing the Debtor's letter with your

14   lawyer, your lawyer wrote this letter and it doesn't say

15   anything about a practice, a company practice that would align

16   itself with the policies and procedures that you've described,

17   correct?

18   A    Yes.  We'll have to -- I was on vacation.  We'll have to

19   chastise Judge Lynn for not reading the employee manual or my

20   deposition.  I don't know what to say here.

21   Q    Well, forget about the employee manual and the deposition.

22   You actually spoke to him about the Debtor's letter, right?

23   A    Not -- not for an extended period of time, I'll tell you

24   that.

25   Q    Okay.  Well, in any event, Mr. Lynn doesn't tell the

Dondero - Redirect                                              198

1    Debtor, what are you talking about, Mr. Seery knows all about

2    this and approved it all, right?

3    A    Okay.

4    Q    He -- right?  Mr. Seery's not mentioned in this letter,

5    correct?

6    A    Correct.

7    Q    The only statements in this letter about that cell phone

8    are that it was issued to you by the Debtor, that they're not

9    sure of the location, and that you're not prepared to turn it

10   over.  Correct?

11   A    Yes.  I guess that's what it says here.

12   Q    Okay.  Let's talk about that trespass for a bit.  You

13   testified that on December 14th you gave a deposition in the

14   Debtor's office and nobody complained.  Isn't that right?

15   A    Yes.

16   Q    That's because the Debtor had not yet evicted you from

17   their offices.  Isn't that right?

18   A    Yeah, correct.  But the TRO was in place.

19   Q    But the reason that the TRO becomes important is because,

20   as you testified earlier, it has that provision about the

21   automatic stay relating to the Debtor's property.  Right?

22   A    Yes.

23   Q    And the Debtor evicted you from the property on January --

24   on December 23rd, right?

25   A    Effective the 30th, yes.

1   Q    Yeah.  And the Debtor told you that if you were on their

2   property again, they would consider it trespass, correct?

3   A    They sent me a calendar invite.

4   Q    All right.  We looked at those shared services agreements

5   before.  Is that right?

6   A    Yes.

7   Q    Okay.  Anything in the shared services agreements that

8   requires Debtor employees to take actions that are adverse to

9   the Debtor?

10  A    No.

11  Q    Okay.  So when you were the CEO, would you have allowed or

12  required your employees to take action on behalf of the shared

13  services partner that you believed or knew were adverse to the

14  Debtor's interests?

15  A    I'd expect them to honor the contracts.  I -- it would

16  depend on what the issue was.

17  Q    Okay.  Does the contract require the Debtor's employees to

18  take actions that are adverse to the Debtor's interests?

19  A    Read implicitly, yes, because whenever you manage money

20  for somebody, your fiduciary responsibility trumps what issues

21  that might be adverse to the Debtor.  Or adverse to the

22  company.

23  Q    Can -- if I put the documents on the screen, will you be

24  able to tell me where the shared services agreement provides

25  for the resolution of conflicts between the service provider

Dondero - Redirect                              200

1  and the service receiver?

2  A    I don't believe it does, unless there's an arbitration

3  clause.  But -- but I don't know.

4  Q    Okay.  Let's talk about the trading for a minute.  You

5  insist that you did absolutely nothing to interfere with the

6  trading; isn't that right?

7  A    I tried hard to interfere with the November trades.  I did

8  nothing to interfere with the December trades.

9  Q    Okay.  Let's test that theory for a moment.

10          MR. MORRIS:  If we can go back to Exhibit 27, please.

11 Page 2, the top of Page 2.

12 BY MR. MORRIS:

13 Q    This is where the -- this is where the Debtors tell your

14 lawyers of their belief that you've interfered with the

15 trading of the AVYA and the SKY securities on December 22nd,

16 correct?

17 A    Okay.  But I'm telling you, I did not interfere on the

18 22nd.

19 Q    I'm just asking you, sir, a very simple question.  This is

20 where the Debtors are informing your lawyers of their belief

21 that you interfered with the trades on December 22nd.

22 Correct?

23 A    Yes.

24 Q    Okay.  Can you point to me where your lawyers wrote back

25 and disputed that contention?

1   A    I don't know if they did.

2   Q    But they did write back in response to this very specific

3   letter on the issue of the cell phone?  We just looked at that

4   response, right?

5   A    Yes.

6   Q    But you don't have any recollection and there's nothing in

7   the record that will show that your lawyers disputed the

8   allegations about your conduct on December 22nd, correct?

9   A    Not that I'm aware of.

10  Q    Okay.  I appreciate that.  And, in fact, notwithstanding

11  what you testified to today, you testified previously rather

12  unambiguously that, in fact, you did interfere with the

13  Debtor's business, right?

14  A    I clarified that -- I clarified that half a dozen times in

15  the last few weeks.  I mixed up the November and the December

16  time frames a couple times.  Or once, really.

17  Q    Okay.

18       MR. MORRIS:  Okay.  Can we go to Page 73?

19  BY MR. MORRIS:

20  Q    In case you were confused about the date, let's just look

21  at the transcript, Page 73.

22       Were you asked these questions and did you give this

23  answer?  Question, "And you personally instructed, on or about

24  December 22, 2020, employees of those Advisors to stop doing

25  the trades that Mr. Seery had authorized with respect to SKY

Dondero - Redirect 202

 1  and AVYA, right?"  Answer, "Yeah.  Maybe we're splitting hairs

 2  here, but I instructed them not to trade them.  I never gave

 3  instructions not to settle trades that occurred, but that's a

 4  different ball of wax."  Question, "Okay.  But you did

 5  instruct them not to execute the trades that had not yet been

 6  made, right?"  Answer, "Yeah," and then you went on.

 7      That was the testimony that you gave at the time, correct?

 8  A   We went over this earlier today.  I've clarified this

 9  several times.  There is nobody, there's no emails, there's no

10  one who says I contacted them on the 22nd.  I misspoke.  I

11  contacted everybody the week of Thanksgiving.  The only thing

12  I did on the 22nd of December was one email to Jason Post,

13  full stop, period.  You have the system.  If I am lying or you

14  had any evidence of me talking to somebody else, you would

15  have it, instead of just making me clarify this for the

16  fifteenth time.

17  Q   Well, I do have evidence, sir.  I have -- I have the

18  Debtor's letters to your lawyers that your lawyers didn't

19  respond to.  Isn't that correct?

20  A   That's not evidence.

21  Q   Okay.  It actually is evidence, but I won't argue with

22  you.

23      You testified a bit about Dugaboy and the financial

24  statements.  Do you remember that?

25  A   Yes.

1  Q    And you had no objection to those documents being

2  produced?  Is that right?

3  A    Well, once I delegated it to my -- to Douglas, I let him

4  handle it, and I haven't kept abreast of him.  I don't even

5  know where it stands at this point.  But I trust him to do the

6  right thing.

7  Q    Does Ms. Schrath work for one of your -- one of the

8  companies that you own or control?

9  A    Yes.  We -- yes, she does now.

10 Q    Will you -- will you to authorize her to speak with the

11 Debtor in order to identify where on the Debtor's server the

12 Dugaboy financial statements are located?

13 A    I think the proper channel is I'll authorize -- and he is

14 fully authorized already -- Douglas Draper to appropriately

15 work with you guys on an appropriate request for appropriate

16 materials.  But I -- I'll do whatever Douglas tells me is

17 appropriate, but otherwise I'm -- I'm not going to get

18 involved.

19 Q    But Melissa Schrath was the one who knew where the

20 documents were.  Isn't that right?  That's why you

21 specifically went to her and told her not to produce the

22 documents without a subpoena, correct?

23 A    She keeps the records.  So, --

24 Q    Okay.

25 A    But anyway, but she will -- she will march to what -- I

Dondero - Redirect                                    204

1    promise you she'll march to whatever Douglas tells her to do,

2    so you work it out with Douglas.

3    Q    I'm not asking you about Douglas.  I'm asking about you,

4    James Dondero, would you authorize your employee, Melissa

5    Schrath, to provide information to the Debtor that will allow

6    the Debtor to obtain these documents?

7    A    Only after approved by Douglas, the counsel for Dugaboy.

8    Q    Okay.  Let's see what Douglas said previously, because

9    they're your exhibits, actually.

10            MR. MORRIS:  You know what, Your Honor, I'm not going

11   to do this.  I'll save it for argument.  Because Exhibits 16

12   through 20 on the -- on Mr. Dondero's exhibit list are all the

13   emails with Mr. Draper.  He has no knowledge of the -- of Mr.

14   Dondero's email about the subpoena.  He has -- he is actually

15   looking to get the documents, but he's being undermined.

16   BY MR. MORRIS:

17   Q    Let's talk -- let's talk briefly about Mr. Ellington.

18   You testified that he was settlement counsel, right?

19   A    Correct.

20   Q    After the TRO was entered into, do you know whether your

21   lawyers ever made any attempt to confirm with the Debtor that

22   the Debtor was comfortable, notwithstanding the TRO, having

23   Mr. Ellington talk to you about issues other than shared

24   services?

25   A    No, but he was.

Dondero - Redirect                                              205

1  Q    Okay.  Do you have any documents to corroborate your

2  testimony that, after the TRO was entered into, and

3  notwithstanding the very strict prohibition on communicating

4  with employees other than shared services, any document at all

5  that corroborates your testimony that Jim Seery authorized Mr.

6  Ellington to continue to talk about topics other than shared

7  services?

8  A    No.

9  Q    Okay.  I appreciate that.

10          MR. MORRIS:  Your Honor, I have no further questions.

11          THE COURT:  All right.  Mr. Wilson, anything further?

12          MR. WILSON:  I'll have a short redirect or recross,

13  whatever this is.

14          THE COURT:  Okay.

15                   RECROSS-EXAMINATION

16  BY MR. WILSON:

17  Q    Mr. Dondero, you testified under my examination and then

18  again under Mr. Morris's about the cell phone policy that was

19  put in place by Thomas Surgent.  Do you remember that

20  testimony?

21  A    Yes.

22  Q    Are you aware if there was ever a written policy regarding

23  the cell phones?

24  A    I -- I don't know.  But I would have assumed it was in the

25  employee manual.

1  Q    But whether there was or there was not a written policy in

2  place, you testified that you were instructed in compliance

3  with that policy with annual meetings, correct?

4           MR. MORRIS:  Objection to the form of the question.

5           THE COURT:  Overruled.

6           MR. MORRIS:  Leading.

7           THE COURT:  Overruled.

8  BY MR. WILSON:

9  Q    Do you recall my question, Mr. Dondero?

10  A    I think I said yes.

11  Q    Okay.  Were you the only one at Highland who followed

12  that cell phone replacement procedure that you were trained

13  on by Thomas Surgent?

14           MR. MORRIS:  Objection to the form of the question.

15           THE COURT:  Sustained.

16           MR. MORRIS:  Calls for speculation.

17           THE COURT:  Sustained.

18           THE WITNESS:  Again, the --

19           THE COURT:  Sustained.

20           THE WITNESS:  The policy wasn't --

21           THE COURT:  No, no, no, no.

22           THE WITNESS:  -- set --

23           THE COURT:  That means don't answer.  I sustained

24  the objection.

25      Mr. Wilson, go ahead.

Dondero - Recross                    207

1  BY MR. WILSON:

2  Q    All right.  Mr. Dondero, are you aware of any other

3  employees that followed that cell phone replacement policy at

4  Highland?

5         MR. MORRIS:  Objection to the form of the question.

6  There's no foundation that anybody else -- I'll just leave it

7  at that.  No foundation.

8         MR. WILSON:  Well, I'm -- Your Honor, I'm asking if

9  he has personal knowledge of other employees.  We're trying

10 to establish a foundation.

11        THE COURT:  Overruled.

12        THE WITNESS:  My belief, the policies weren't set up

13 in anticipation of bankruptcy or anticipation of infighting.

14 In anticipation --

15    (Interruption.)

16        THE WITNESS:  John, you're -- John Morris, you're

17 making noise in front of the speaker again.

18        MR. MORRIS:  I apologize.  Thank you.

19        THE WITNESS:  The policy wasn't set up in

20 anticipation of bankruptcy.  The policy was set up to prevent

21 recycled, refurbished cell phones of former executives

22 forming -- falling into a Sony-type scandal where the

23 business emails get promulgated all over the Internet or

24 something.  It was meant to protect investor information, and

25 that's -- that's my belief regarding the wiping of the phone.

Dondero - Recross                                                          208

1   And I believed and my knowledge is that it was for every

2   senior manager, senior executive when they got a new phone at

3   Highland.  It wasn't just me.

4   BY MR. WILSON:

5   Q    And to confirm your earlier testimony, the last time you

6   saw your cell phone was when you handed it to Jason

7   Rothstein, who's a former Highland employee, correct?

8   A    Yes.

9   Q    And if that phone was indeed wiped of the information on

10  it, who performed that wiping?

11  A    Jason --

12          MR. MORRIS:  Objec...

13          THE WITNESS:  -- or one of the guys on his team.

14          THE COURT:  Okay.  Hang on.

15          MR. MORRIS:  Objection to the form of the question.

16  Speculation.

17          THE COURT:  Yeah.  Sustained.

18  BY MR. WILSON:

19  Q    Did you wipe the phone yourself, Mr. Dondero?

20  A    No.

21  Q    Why would you have testified in the past that the phone

22  might have been destroyed or disposed of?

23  A    Because that's what I assumed or thought happened to

24  prior cell phones.

25  Q    But in any event, you did not destroy or dispose of your

1  cell phone in December of 2020, correct?

2  A    No, I did not.

3  Q    Now, in December of 2020, did Dugaboy and the Get Good

4  Trust hire Douglas Draper to represent their interests, and

5  one of the issues that Mr. Draper had to address was the

6  production of trust documents, correct?

7  A    Yes.

8  Q    Did you communicate with Mr. Draper any unwillingness to

9  produce those documents?

10  A    What I said, which I had testified to, I bought he was

11  aware of the initial response of not without a subpoena, but

12  then he was -- he didn't consider the information a big deal

13  and so he just wanted to see it before it went out.  And

14  again, I thought that he was negotiating well with the

15  Pachulski lawyers and I didn't know where that stood, but I

16  wouldn't have been surprised if the information had been

17  provided or was about to be.  I don't know.  I delegated it

18  to him.

19  Q    In the text that was sent to Melissa, --

20       MR. WILSON:  Can you pull up Debtor's 19?

21  BY MR. WILSON:

22  Q    I'm going to pull up Debtor's 19, which is the text

23  string with Melissa.  And what's --

24       MR. WILSON:  Go down.

25  BY MR. WILSON:

1    Q    What's the date on the text regarding the Dugaboy Trust?

2    A    The 16th.

3          MR. WILSON:  Okay.  Go to our -- go to our 16.  And

4    this is going to be Dondero Exhibit 16.  Go to the bottom of

5    Page 2.

6    BY MR. WILSON:

7    Q    Do you see this email at the bottom of the page from

8    Douglas Draper --

9    A    Yes.

10   Q    -- to John Morris and Isaac Leventon?  And what's the

11   date of that email?

12   A    The 15th.

13   Q    Okay.  So that's the day before you sent the text message

14   to Melissa, correct?

15   A    Yes.

16   Q    So Mr. Draper was already coordinating with the Debtor's

17   counsel to produce these documents prior to your text to

18   Melissa, correct?

19   A    Yes.

20   Q    All right.

21          MR. WILSON:  I have no further questions.

22          MR. MORRIS:  Can we keep that document up on the

23   screen for a moment?

24          THE COURT:  All right.  Normally, this would be the

25   end of Mr. Dondero's examination, with recross, but it was

Dondero - Further Redirect                    211

1   technically redirect as well, so Mr. Morris, you get the last

2   short, and please make it brief.

3          MR. MORRIS:  Yeah.  Sure.

4                    FURTHER REDIRECT EXAMINATION

5   BY MR. MORRIS:

6   Q    The email that -- the email we just looked at was from

7   Douglas Draper dated December 15th, right?

8   A    Yes.

9   Q    And Douglas Draper represents Dugaboy, correct?

10  A    Yes.

11  Q    And yet you're telling the Court that your lawyers told

12  you, notwithstanding a TRO that prohibits you from

13  communicating with Debtor's employees, except for shared

14  services, that they thought you should be the one to instruct

15  Melissa Schrath not to produce the Dugaboy documents without

16  a subpoena?  Is that your testimony, --

17  A    That's correct.

18  Q    -- that your lawyers told you to do that?

19  A    That's absolutely correct.

20  Q    Okay.

21         MR. MORRIS:  No further questions, Your Honor.

22         THE COURT:  All right.  Mr. Dondero, that concludes

23  your testimony today.

24     All right.  We have one more witness, Mr. Seery, correct?

25         MR. MORRIS:  Yes, Your Honor.

1              THE COURT:  All right.  Maybe --

2              MR. MORRIS:  I hope this isn't too long, actually.

3              THE COURT:  Maybe some people want to watch

4    basketball.  I don't know.

5        All right.  Mr. Seery, could you say "Testing, one, two"

6    so we pick up your video?

7              MR. SEERY:  Testing, one, two.

8              THE COURT:  All right.  I hear you but I don't see

9    you yet.  Let's see if we --

10             MR. SEERY:  Testing, one, two, Your Honor.

11             THE COURT:  Okay.

12             MR. SEERY:  Testing, one, two.

13             THE COURT:  There you are.  Please raise your right

14   hand.

15        (The witness is sworn.)

16             THE COURT:  All right.  Thank you.  Mr. Morris, go

17   ahead.

18             MR. MORRIS:  All right, Your Honor.  I'll try to be

19   as quick as I can here.

20             JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

21                       DIRECT EXAMINATION

22   BY MR. MORRIS:

23   Q   Mr. Seery, did the Debtor -- did the Debtor's independent

24   board --

25        (Interruption.)

Seery - Direct                                          213

1          THE COURT:  All right.  We are getting some sort of

2     feedback.  So everyone but Mr. Morris, and Mr. Seery, when he

3     answers, please have your device on mute.

4        Go ahead.

5          THE CLERK:  Mr. Morris is on mute.

6          THE COURT:  Okay.  Now you're on mute, Mr. Morris.

7          MR. MORRIS:  All-righty.  Let's see if this works.

8     BY MR. MORRIS:

9     Q    Mr. Seery, can you hear me now?

10    A    I can, yes.

11    Q    Okay.  Did the Debtor's independent board make a decision

12    in early October to demand Mr. Dondero's resignation?

13    A    Yes.

14    Q    And why -- what were the reasons?

15    A    Quite simply, he was taking aggressive actions,

16    interfering with the operations of the Debtor and our pursuit

17    of a plan.  Objections, claim objections, even things as far-

18    fetched as piercing the corporate veil, which we're surely

19    going to see later on in this case.

20    Q    And did there come a time a few weeks later that the

21    Debtor sought and obtained a TRO against Mr. Dondero?

22    A    That's correct, yes.

23    Q    And is it fair to characterize Mr. Dondero's relationship

24    to the Debtor in December of 2020 as adverse?

25    A    Extremely.

Seery - Direct                                   214

1  Q   And why would you describe the Debtor's relationship with

2  Mr. Dondero in December 2020 as adverse?

3  A   Well, the discussions regarding any kind of bargain plan

4  had really fallen apart.  Mr. Dondero was actively objecting

5  to the pursuit of the monetization plan, either individually

6  or through his multiple entities.  He had begun to move

7  forward on litigation strategies versus me.  And those, among

8  other reasons, were the reasons that it had become extremely

9  obvious that we were adverse.

10  Q   I'll try to do this as quickly and as easily as I can.

11  You were here this morning for my opening statement; is that

12  right?

13  A   Yes.

14  Q   And did you listen in and watch my examination of Mr.

15  Dondero when I went through the 13 email communications with

16  the Debtor's employees?

17  A   Yes.

18  Q   Were you aware of any of the communications that we

19  looked at today --

20  A   No.

21  Q   -- at the time that the communications were made?

22  A   Well, yeah, I'm obviously aware of them today.  They're

23  on your schedule.  But I was not aware of them at the time

24  they were made, no.

25  Q   Okay.  And is it fair to say, then, that you did not

Seery - Direct                            215

1    authorize any of those communications?

2    A    They were definitely not authorized.

3    Q    And having reviewed those communications, do you believe

4    that those communications, each of those communications was

5    adverse to the Debtor's interests?

6    A    They were extremely adverse to the Debtor's interests.

7    They -- they even went so far as to be coordinating shared

8    privilege among adverse parties who were contesting the

9    Debtor's actions with respect to both claims and the plan

10   monetization process.  What could be more adverse?

11   Q    Had you known of these communications at the time they

12   were made, do you have any idea as to what you would have

13   thought or what you would have done?

14   A    We would have terminated the employees involved.  In

15   fact, when they found out about them, we terminated the

16   employees involved.

17   Q    Okay.  And why did you take that step when you learned

18   about these communications?

19   A    The -- some of the issues with respect to Mr. Dondero and

20   certain employees have been brewing for some time, but these

21   were just all examples of employees breaching their duties to

22   the Debtor and taking adverse interests and pursuing them

23   against the Debtor.  And we couldn't continue to have those

24   employees in place.

25   Q    Okay.  Let's just move quickly to the issue of the cell

Seery - Direct                           216

1   phone policy.  Did you listen to Mr. Dondero's description of

2   the cell phone policy pursuant to which they could recycle

3   phone numbers or change the account holders and wipe phones

4   clean?

5   A    Yes, I heard it.

6   Q    Okay.  Are you aware of any written policy that supports

7   that?

8   A    No.  That testimony was largely made up.  The policy --

9   just so we're clear, and this is pretty typical -- and he

10  knows this, of course -- but when someone has a phone at a

11  financial firm, often you get your emails on the phone.  When

12  you leave the employ, that's deleted, because it's gone --

13  the server is the one that connects with your phone.  It's

14  not like your Yahoo.  This is very standard.  The rest of the

15  data on the phone is not deleted and wiped unless you go wipe

16  it.

17       Mr. Dondero's phone was paid for by the Debtor.  Not only

18  Mr. Dondero's phone, his housekeeper's phone, Ellington's

19  phone, his driver's phone, his iPad in Florida.  This -- he

20  knows this.

21  Q    And --

22  A    They have the documents.  I have them in front of me.

23  Sorry.

24  Q    That's okay.  With respect to the trades, you heard some

25  testimony about the trades and how Mr. Dondero insists that

Seery - Direct                                    217

1   he didn't do anything to interfere with the trades in

2   December.  Do you have any -- any knowledge or information

3   that you can share with the Court on the Debtor's allegation

4   as set forth in the letter that we looked at, that, indeed,

5   on December 22nd, Mr. Dondero was involved in interfering

6   with the Debtor's trading activity at that time?

7   A    I think it's pretty clear, and my recollection was that

8   he very directly instructed employees of HCMFA as well as

9   Jason Post to prevent those trades from going through.  His

10  description of an OMS system and compliance was complete

11  nonsense.  These trades are compliant.  You don't have to run

12  a trade through an OMS system to be compliant.  They were

13  screened against the restricted list.  It's -- it didn't have

14  any basis in fact, what he was saying.

15  Q    Okay.  Let's talk just about -- about harm to the Debtor

16  from the breaches that we have been discussing today.  Has

17  the Debtor suffered any economic harm, any financial harm,

18  from Mr. Dondero's conduct with respect to the TRO

19  violations?

20  A    Well, I think -- I think the combination of the TRO

21  violations and the continuing attempts to just make the

22  Debtors spend a lot of money.  We've spent literally

23  millions, more than a million dollars, just on litigating TRO

24  issues, just dealing with the initial TRO, the hearing, the

25  order, the various appearances, the preliminary injunction,

Seery - Direct                                              218

1   and taking the preliminary injunction to this stage.  We

2   then, with respect to the trades, had to litigate those

3   issues with both Mr. Dondero and his multiple related

4   parties.  We had to both pay your firm, DSI, not to mention

5   individual time, but also Kasowitz, as you mentioned, we went

6   out and hired with respect to some of the CLO issues in the

7   litigation.

8       It's literally millions of dollars.  And that doesn't

9   even get to the multiple millions that were spent negotiating

10  the transition that Mr. Dondero talked so glowingly about

11  that he did nothing but throw (garbled).  These are not --

12  these are not my guesses.  This is not my supposition.  I'm

13  not thinking these are the case.  These are just facts.  And

14  that's been his design, and he's doing it well.  He's making

15  us spend a lot of money.

16      There's no rebuilding Highland.  The employees have been

17  terminated.  The contracts have been rejected.  Highland,

18  remember, was run to lose money.  I've testified to this

19  before.  It was designed and he uses it to siphon off lots of

20  value to these other entities.  And we're going to keep

21  seeing this.  So it will continue to come.

22      But these actions with respect to blaming it on Jason

23  Rothstein or claiming that Thomas Surgent ever touched his

24  phone:  complete nonsense.  Not true.  Didn't happen.

25  Rothstein followed his orders.  Great example of Dondero's

1  interference and contempt.  He's just controlling these

2  employees because they know ultimately they're going to be,

3  many of them, working for him again.  So their only avenue to

4  remuneration is -- continued employment, is to do what he

5  asks them to do.  And you figure these are, you know, these

6  are some really good folks.  Jason Rothstein is a very

7  talented and I think very ethical guy.  To throw him under

8  the bus like that is absurd.  He doesn't --

9  Q    Um, --

10 A    By the way, he doesn't work for me.  Right now.

11 Q    Okay.  Let's talk about noneconomic harm.  We -- you saw

12 the three categories that we went through from the -- from

13 the 13 communications with the Debtor's employees, the three

14 alleged violations of the automatic stay, the interference

15 with the trading.  Do you have a view or a, you know,

16 knowledge that you can share what the Court as to whether the

17 Debtor suffered noneconomic harm from these violations of the

18 TRO?

19 A    Well, absolutely.  And I think it's pretty clear, and

20 some of it is from Mr. Dondero's own testimony.  A lot of

21 confusion among the employees during the transition.  So, in

22 order to make sure that we could try to hold them through the

23 transition and to complete a transition, we -- we entered

24 into a KERP program.  We actually spent a lot of money in

25 designing it, coming up with it and bringing it to this

Seery - Direct                                           220

1    Court.

2        These employees are confused about where they're going.

3    Are they going to go to this Newco, which is going to have to

4    provide services to Dondero entities?  Are they going to go

5    to Dondero entities?  That confusion made it more difficult

6    for us to retain employees, and more expensive.

7        In addition, we went through the whole process of the

8    KERP program.  No one who is retaining employee -- employment

9    with either Mr. Dondero or with the Newco actually ended up

10   taking the KERP.  They turned down money because he required

11   them, in order to get a job with them, to give that money up

12   and assign their claims to him, which he intends to try to

13   use in some other way to slow up the case or cause more

14   damage, make us spend more money.  It's inconceivable.  And

15   I'm talking about employees who had a $2,500 KERP payment.

16   He took them.  It's crazy.

17   Q    Um, --

18   A    I apologize if -- since I'm not in the courtroom, Your

19   Honor, I'm probably not as formal as I should be.  I will --

20   I will -- I will endeavor to be a little bit more formal.  My

21   apologies.

22            THE COURT:  Okay.

23   BY MR. MORRIS:

24   Q    Did you have any -- did you have any concerns about the

25   conduct that's been presented today in terms of undermining

Seery - Direct                                221

1    your own authority as the CEO of the Debtor?

2    A    Well, it's -- it's been very clear.  And, again, that

3    relates to both retaining employees and then working on

4    transition services arrangements.  We had a whole hearing a

5    couple weeks ago on how the Fund Advisors and the Funds

6    didn't need anything from Highland.  They just needed old

7    records.  Well, it turns out, we've been working three weeks

8    negotiating the shared resource agreement, that wasn't quite

9    true.

10       And so we think we have something in place, but it's been

11   much more difficult to get these kinds of arrangements done

12   because authority has been undermined and because employees

13   who are working in that sphere and working on the transition

14   are worried about what the next opportunity is going to be

15   for them.  So it's been very, very difficult.

16       In addition, during January, because of this undermining,

17   we saw some significant cover-ups around certain transfers.

18   Those will be coming to light soon.  But it -- I don't think

19   these would have happened without Mr. Dondero's influence,

20   his -- his contumacious conduct with respect to the Court,

21   with respect to the authority, with respect to the

22   transition, frankly, that he initiated when he started this

23   bankruptcy.

24            MR. MORRIS:  I have no further questions, Your

25   Honor.

1            THE COURT:  All right.  Mr. Wilson, cross?

2            MR. WILSON:  Yes, Your Honor.

3                       CROSS-EXAMINATION

4    BY MR. WILSON:

5    Q    Mr. Seery, the Debtor filed the contempt motion on

6    January 7th, correct?

7    A    I don't recall the specific date, but if you represent

8    it, I assume that to be true.  Don't know.

9    Q    Do you recall that the Debtor also filed a motion for an

10   expedited hearing on the motion for contempt?

11   A    I -- I believe so.  I don't recall the specifics.

12   Q    And the Debtor filed a memorandum of law setting forth

13   the actions that it contends constitute violations of the

14   TRO.  Were you aware of that?

15   A    I assume there was an accompanying memorandum of law,

16   yes.

17   Q    Well, did you see a memorandum of law that was filed?

18   A    I certainly would have seen the pleadings.  I don't

19   recall whether I read the memorandum of law.

20   Q    Well, did you participate in the process of determining

21   the allegations that the Debtor was alleging should be held

22   in contempt?

23   A    I'm sure they were reviewed with me.  I don't recall the

24   specifics of how they were laid out in the pleadings.  But

25   I'm sure that counsel reviewed them with me.

1  Q    Well, who decided for the Debtor to make the contempt

2  allegations?

3  A    Ultimately, the decision would have been mine, under the

4  advice of counsel.

5  Q    But did you -- did you not tell counsel what you -- what

6  you contended was a violation of the TRO?

7         MR. MORRIS:  Objection to the form of the question

8  and direct the witness not to answer.  He's really asking

9  about Mr. Seery's communications with his lawyers, Your

10  Honor.

11         THE COURT:  Sustained.

12         MR. WILSON:  I'll ask it a different way.

13  BY MR. WILSON:

14  Q    Who came up with the idea of which allegations were going

15  to be made, were contempt?

16         MR. MORRIS:  Objection.  Direct the witness not to

17  answer.

18     He can ask him about Mr. Seery, but these questions are

19  going to get into attorney-client privilege.

20         THE COURT:  All right.  Sus...

21         MR. WILSON:  Your Honor, I'm not asking him to

22  reveal any attorney-client privilege.  I'm just asking for

23  his knowledge of who came up with these allegations, outside

24  of counsel.

25         THE COURT:  I sustain the objection.

1   BY MR. WILSON:

2   Q   Did you yourself form the allegations that were going to

3   be in the contempt motion?

4   A   I certainly gave the recitation of facts to my counsel as

5   to what was happening in the case and Mr. Dondero's actions.

6   Q   Is it the Debtor's contention that Mr. Dondero's willful

7   ignorance of the TRO and the evidence supporting the entry of

8   the TRO is itself contemptible?

9   A   I think I'm answering your question.  I -- I don't

10  believe that he was ignorant of it.  I think the insinuation,

11  if it's claimed that he's ignorant of it, is highly

12  contemptible, yes.

13  Q   I'm sorry.  I didn't understand that.  You don't believe

14  that Mr. Dondero was ignorant of the TRO?

15  A   No, I don't believe that at all.

16  Q   Well, so if Mr. Dondero -- if the Debtor contended that

17  Mr. Dondero was willfully ignorant of the TRO, do you

18  disagree with that statement?

19          MR. MORRIS:  Objection to the form of the question.

20  I mean, the -- the evidence is what the evidence is.  It's

21  not about our contentions at this point.

22          THE COURT:  I overrule.  He can answer.

23          THE WITNESS:  Yeah, I don't -- I don't -- I disagree

24  with that statement.  I think, to some degree, I think that

25  the idea that a -- no one's that obtuse, that a relatively

Seery - Cross                                              225

 1  sophisticated man who is fighting for this wouldn't have any

 2  idea that there was a TRO in place I think is -- is far

 3  afield.

 4  Q    Which specific provision of the TRO do you contend that

 5  Mr. Dondero violated with respect to his cell phone?

 6  A    I'd have to go through each of the -- each of the

 7  provisions.  I -- I don't have a list of them in front of me.

 8  Q    Well, I can put it up on the screen.

 9  A    Okay.

10       MR. WILSON:  Can you pull up Debtor's 11?

11    (Pause.)

12  BY MR. WILSON:

13  Q    Well, there's provision -- well, Paragraph 2, which has

14  the various provisions in it.

15  A    Just, just starting from there, this is -- this is -- I'm

16  walking through this now.  You're going to hear the same.  He

17  clearly communicated with Debtor employees, directing them to

18  do something with his phone that had no basis in policy, was

19  clearly destroying property of the Debtors, and I think

20  violates (a) to start with.  I -- just to start.  I don't

21  have the rest of the -- rest of the paragraph.

22       MR. MORRIS:  Can we -- can we scroll down so he can

23  see the rest of it before he finishes his answer?

24       MR. WILSON:  I thought he was finished.

25       MR. MORRIS:  Well, you haven't shown him the whole

Seery - Cross                                    226

1  document.

2           THE WITNESS:  I mean, as we talked about earlier,

3  (e) is pretty clear, too.  This is destruction of property of

4  the estate and these records.  And -- and with respect to

5  wiping it clear, as was previously discussed.  I don't think

6  that that's really debatable.

7  Q    Who is Jason Rothstein?

8  A    Jason was the head of IT at Highland.  He's a longtime

9  employee of Highland, had worked for Highland I think at

10 least ten years.

11 Q    Have you ever had a conversation with Mr. Rothstein about

12 the Debtor's cell phone policy?

13 A    I think I have.

14 Q    And when was that conversation?

15 A    I believe in and around this time, we talked about it.

16 Because it was pretty clear -- the testimony that Mr. Dondero

17 gave was completely untrue.  I've never issued any edict,

18 order, or statement that people lose their job --

19           MR. WILSON:  I'm going to object to nonresponsive.

20           THE COURT:  Sustained.

21 BY MR. WILSON:

22 Q    What did Mr. Rothstein tell you that the Debtor's cell

23 phone policy was?  And by that, I mean the replacement

24 policy.

25           MR. MORRIS:  Objection to the form of the question.

1          THE WITNESS:  I didn't testify to that.  I didn't

2   say that.

3          THE COURT:  I overrule.

4          THE WITNESS:  I know -- it -- that's not what I

5   said.

6   BY MR. WILSON:

7   Q    Well, did Mr. Rothstein ever tell you anything about the

8   Debtor's telephone policy?

9   A    I don't believe so, no.

10  Q    But in any event, we can agree that Mr. Dondero turned

11  over his phone to Mr. Rothstein, correct?

12  A    It appears that way from the information we have.

13  Q    And you testified that Mr. Rothstein is an ethical and

14  honest individual, correct?

15  A    I believe he is, yes.

16  Q    And so are you -- are you insinuating by your testimony

17  earlier that Mr. Dondero caused Mr. Rothstein to do something

18  improper with the cell phone?

19  A    Yes.

20  Q    But yet you said that Mr. Rothstein is an honorable and

21  ethical person, correct?

22  A    Yes.

23  Q    And so does -- how do you square your opinion with him as

24  being honest and ethical, but yet he did something improper

25  under Mr. Dondero's direction?

1    A    I think Mr. Dondero told him to get him a new cell phone

2    or wipe that one clean and he did so.  And he's not a lawyer.

3    He's an IT professional.  If there was email, it was backed

4    up.  He may or may not have known how much Dondero used texts

5    to conduct business.

6         But he would have done what he was told to do because

7    that's what he was expecting -- where he expects to be

8    working at some time in the future.  It's a perfect example

9    of why there was a TRO in place and why this kind of

10   contumacious conduct is harmful to the estate.

11   Q    From the time that you took over as an independent board

12   member and also as CEO later, did you or anyone else at the

13   Debtor ask Mr. Rothstein to back up anyone's text messages

14   when they turned their phone in for replacement?

15   A    No.  Not to my knowledge.

16   Q    Did anyone at the Pachulski firm, to your knowledge, ask

17   Mr. Rothstein to back up text messages from anyone's phone?

18   A    Not to my knowledge, no.

19   Q    And you're aware that other Highland executives have left

20   the employment of Highland during the pending of this

21   bankruptcy, correct?

22   A    Not who had a phone that was Highland's phone.

23   Q    So did Mark Okada not have a Highland phone?

24   A    No, he did not.

25   Q    Did Mark Okada have any Highland information on his phone

Seery - Cross                                    229

1    when he left?

2    A    I don't know.  He didn't have a Highland phone.  We

3    didn't seize his personal phone.

4    Q    So does it depend on whether the phone was paid for by

5    Highland whether or not that Highland should be able to

6    access the information on the phone?

7    A    That's not the policy, no.

8    Q    Well, my question is, is that did you -- were you at all

9    concerned about any information that might have been on Mr.

10   Okada's phone when he left Highland?

11   A    I wasn't because I had no experience with him texting me

12   to conduct business.

13   Q    Has the Debtor ever requested the phone company to search

14   and see if they can recover any text messages from Mr.

15   Dondero's phone?

16   A    No, we haven't.

17   Q    But the Debtor established a protocol for conducting

18   electronic discovery in this case, correct?

19   A    That's very different.  The phone company doesn't

20   maintain text chains for those who use Apple products.  Apple

21   maintains them.

22          MR. WILSON:  Your Honor, I object as nonresponsive.

23   BY MR. WILSON:

24   Q    I'm asking you a different question.

25          THE COURT:  Okay.

Seery - Cross                                    230

1   BY MR. WILSON:

2   Q    Did the Debtor establish a protocol for conducting

3   electronic discovery in this case?

4   A    I -- I believe there's an order in place.

5         MR. WILSON:  Why don't you pull up 8?  Yes.  And go

6   -- just scroll on the first page.

7   BY MR. WILSON:

8   Q    This is Dondero Exhibit 8 that we're pulling up.  Do you

9   recognize this document?

10  A    I'd have to see -- I don't.  I'd have to see more of it.

11  I'm only seeing a small snippet.

12  Q    Okay.  Well, we can -- we can scroll down to satisfy you.

13  (Pause.)  The top of the document is Notice of Final Term

14  Sheet, and it looks like the date is January 14, 2020.

15  A    Yes, I recognize this document.

16        MR. WILSON:  Okay.  Go to Page 44.  Actually, go to

17  43.  Yeah, that's it.

18  BY MR. WILSON:

19  Q    Do you see -- I'm now looking at Page 43 of the document

20  where it says Exhibit C, Document Production Protocol.

21  A    I see it.

22        MR. WILSON:  All right.  Scroll down to the next

23  page.

24  BY MR. WILSON:

25  Q    And then it, in (a), it talks about ESI or

 1  Electronically-Stored Information.  And this appears to be

 2  the protocol for preservation of ESI.  Would you agree with

 3  that?

 4  A    In accordance with the term sheet, yes.

 5  Q    Right.  Are text messages referenced in this document?

 6  A    I don't know.

 7  Q    Well, if we scroll through letter C, where it says

 8  Preservation of ESI, do you see anywhere under Preservation

 9  of ESI where it refers to text messages?

10  A    I -- I don't -- I don't see --

11              MR. WILSON:  Then I --

12              THE WITNESS:  I don't see it.  This seems to be

13  dealing with the server.

14              MR. WILSON:  And then scroll down to I.

15  BY MR. WILSON:

16  Q    And here's the final --

17              MR. WILSON:  It's -- no, no, no.  It's -- it's Page

18  45.

19  BY MR. WILSON:

20  Q    This is -- letter (i) at the top is the final paragraph

21  under that section.  That seems to refer to hard drives and

22  laptops and work computers, but does it -- do you see

23  anywhere where it mentions phones or text messages?

24  A    Doesn't use those words, but it certainly covers it.

25  Q    But this would be the protocol that covers ESI that the

Seery - Cross                                        232

1   -- that Debtor agreed to, correct?

2   A    I believe so, yes.

3   Q    And you approved this protocol prior to its adoption?

4   A    I don't believe so, no.

5   Q    You didn't approve it?

6   A    My recollection is this was right around the time we came

7   in.  I think this was part of the agreement that the Debtor

8   had with the Committee.  And I don't believe it was subject

9   to independent board approval before its entry.  I don't -- I

10  just don't recall specifically.  That's my recollection.

11  Q    Did you -- do you recall if you participated in the

12  development of this protocol?

13  A    I did not.

14  Q    But you would agree that this is the protocol that the

15  Debtor agreed to adopt in connection with this bankruptcy

16  case, correct?

17  A    It is a protocol entered in January of 2020.

18  Q    Do you have a Highland email account?

19  A    I do.

20  Q    Do you have a personal email account?

21  A    I do.

22  Q    And do you conduct Highland business on your personal

23  email account?

24  A    I do.

25  Q    Do you preserve your personal emails?

1   A    I do.

2   Q    Do you have a Highland cell phone?

3   A    No.

4   Q    So do you use your personal cell phone for Highland

5   business?

6   A    Yes.

7   Q    Do you preserve all your text messages?

8   A    I don't delete them.  I believe that they're accessible,

9   yes.

10  Q    Are your personal emails stored on the Highland server?

11  A    No.

12  Q    Are your text messages stored on the Highland server?

13  A    No.

14  Q    With respect to the motion filed by the U.C.C. in January

15  2020 relating to discovery, did the Debtor oppose the motion?

16  Or I'm sorry.  I said January.  I meant July 2020.

17  A    I believe we did.

18  Q    Did the Debtor agree with the U.C.C. at that time to

19  preserve and produce text messages?

20  A    I believe that we did.

21  Q    Do you know if that's in writing anywhere?

22  A    The order was pretty broad.  There was obviously

23  significant -- I don't know if it's in writing anywhere.

24  Q    During the pendency of this case -- well, I guess I need

25  to ask a question before that.  Who at the Debtor is

1   responsible for sending litigation preservation notices?

2           MR. MORRIS:  Objection to the form of the question.

3           THE COURT:  Overruled.

4           THE WITNESS:  Currently, the general counsel.

5   BY MR. WILSON:

6   Q   Currently, the general counsel?  Well, who would -- who

7   would have been responsible for sending it during the year

8   2020?

9   A   Scott Ellington.

10  Q   Were you aware of Thomas Surgent ever sending any

11  litigation preservation notices?

12  A   Since he became general counsel, he has, yes.

13  Q   When did Mr. Surgent become general counsel?

14  A   After Mr. Ellington was terminated.

15  Q   Well, during the pendency of this case, have either Mr.

16  Ellington or Mr. Surgent ever sent around any preservation

17  notices pertaining to text messages?

18  A   I was -- I don't know if it -- I assume they pertain to

19  text messages.  I -- I believe there was one, and I asked

20  about it my first day at Highland, that it was -- it was a

21  litigation preservation notice.

22  Q   And that was around the time of your first day at

23  Highland?

24  A   Correct.

25  Q   So, but since that time, are you aware of any

1  preservation notices pertaining to text messages sent?

2  A   Not specifically, no.  Well, certainly, Mr. Surgent's

3  preservation notice since he became general counsel would

4  cover that.  I am certain of that.

5  Q   But that would have been in January of this year,

6  correct?

7  A   Correct.

8  Q   Did you ever ask Mr. Ellington or Mr. Surgent to send any

9  preservation notices pertaining to text messages prior to Mr.

10  Ellington's termination?

11  A   I believe I asked on the first day that I was there about

12  document preservation notice, did it go out?  Didn't

13  specifically reference text messages.

14  Q   But after that -- after that preservation notice at the

15  beginning of your employment, you're not aware of any other

16  preservation notices that you requested should go out?

17  A   I didn't make any requests after the first one went out.

18  Q   And that -- and that request that went out or that notice

19  that went out in January of 2020 did not specifically refer

20  to text messages, correct?

21  A   I don't know.  I actually think, when it would have gone

22  out in -- at the filing, any responsible general counsel

23  would have issued it, and I was told that they did.

24  Q   Are you aware of anyone at the Pachulski firm that asked

25  Mr. Surgent or Mr. Ellington to send any preservation notices

1  pertaining to text messages?

2  A   Certainly, Mr. Surgent, I don't know if Pachulski asked

3  him, I certainly did, to redo it after we made some

4  significant discoveries in January.  But I don't know if

5  Pachulski -- the Pachulski firm or anyone there asking -- it

6  wouldn't have been Mr. Surgent.  He was the CCO.  It would

7  have been Mr. Ellington, the GC.  Other than the, as I said,

8  the request I made in January to confirm that one was sent

9  out at the start of the case.

10  Q   Referring back to Mr. Mark Okada and also Trey Parker,

11  were those individuals covered by the custodians of the

12  U.C.C.'s request?

13  A   I didn't -- I didn't understand your question.  I'm

14  sorry.

15  Q   Were Trey Parker and Mark Okada custodians under the

16  U.C.C.'s preservation request or discovery request?

17  A   I don't -- I don't know.

18  Q   Did you ever -- did -- both of those individuals left

19  during the pendency of the Highland bankruptcy, correct?

20  A   Yes.

21  Q   Did the Debtor do anything to preserve text messages from

22  either Mr. Parker or Mr. Okada when they left Highland?

23  A   Not to my knowledge.

24  Q   Now, earlier, you tried to testify about your knowledge

25  of cell phone policies from other financial companies.  Do

1  you recall that testimony?

2  A    Yes.

3  Q    And which financial companies are you referring to?

4  A    River Birch Capital.  And Lehman Brothers.

5  Q    So you've -- you have two examples of cell phone policies

6  that you were referring to?

7  A    Well, I -- I know of others as well.

8  Q    But you don't have any firsthand knowledge of Highland's

9  policy, particularly going back ten years, correct?

10  A    That's incorrect.

11  Q    Well, were you -- did you -- were you a Highland employee

12  ten years ago?

13  A    No.

14  Q    Did you attend training by Thomas Surgent on cell phone

15  replacement policies?

16  A    I don't believe there was such a thing.  I attended

17  compliance training with Mr. Surgent, yes.

18  Q    But yet you -- you claim that Mr. Dondero made that

19  testimony up, correct?

20  A    Yes.

21  Q    And you heard Mr. Dondero's testimony that ever since

22  he's been attending these compliance training sessions over

23  the last ten years, every time he's replaced his cell phone,

24  he's followed the same procedure:  handed it over to a

25  Highland employee and then the Highland employee would wipe

1  it and provide him with a new cell phone.  You heard that

2  testimony, correct?

3  A    I heard it, yes.

4  Q    And you have reason to doubt the veracity of that

5  testimony?

6  A    Yes.

7  Q    And what is that reason?

8  A    Well, for one, his testimony about the numbers and how

9  they got them was untrue, at least from information I've

10  received from the earliest days.

11      Number two is that's not how you wipe a phone.  You can

12  wipe it remotely.  That's how you remove access to the

13  system.  You don't need the guy's phone in order to wipe it.

14  He had already done that after threatening me with a text and

15  engaging in numerable -- innumerable engagements on texts to

16  conduct business.  And then when it became crucial and there

17  were issues regarding his texts, he suddenly decided to get a

18  new phone and destroy it.  I found it to be incredible.

19  Q    But you would have to agree with me that, regardless of

20  whether Highland had a written policy, it was actually the

21  Debtor who wiped Mr. Dondero's phone, correct?

22  A    I don't -- I don't believe that to be the case and I

23  don't know.  Again, Highland can wipe the phone without

24  having access to it.  It can do it remotely.  It doesn't

25  delete the texts.  It just removes your access to Highland's

Seery - Cross                                               239

1    system and the records of your emails.  You'd still have your

2    phone.  You'd still have your texts.  It's your phone.

3         Dondero's problem is it wasn't his phone.  It was

4    Highland's phone.  So he couldn't just wipe it.  He had to

5    get rid of it.

6    Q    But you would agree with me that if anyone wiped the

7    phone, it was Jason Rothstein or someone working under his

8    direction?  You testified to that just a few minutes ago.

9    A    The wiping of the phone does not wipe the texts.  The

10   wiping of the phone removes the email access and the email

11   records that you can get on your phone when you work for a

12   financial institution.  Law firms may have the same thing, if

13   they're sophisticated enough.  It prevents that person from

14   getting it.  It doesn't clean out the phone.  It doesn't get

15   rid of everything you have.

16        The one problem with it is it does tend to remove your

17   Out... a lot of your Outlook names, because those are

18   connected to your work server.

19             MR. WILSON:  I'll object as nonresponsive.

20   BY MR. WILSON:

21   Q    You testified --

22             THE COURT:  Overruled.

23             MR. MORRIS:  Your Honor, can I -- can I have a

24   ruling on that, please?

25             THE COURT:  I said overruled.

1            MR. MORRIS:  Because I thought it was terribly

2    responsive.

3            THE COURT:  I said overruled, yes.  Thank you.

4            MR. MORRIS:  Thank you.

5    BY MR. WILSON:

6    Q   So, do you know who wiped the text messages off Mr.

7    Dondero's phone?

8            MR. MORRIS:  Objection --

9            THE WITNESS:  I don't know --

10            MR. MORRIS:  -- to the form of the question.

11            THE COURT:  I didn't hear -- okay.

12            THE WITNESS:  I don't know that the text messages

13    were wiped.

14            THE COURT:  Okay.

15            THE WITNESS:  I'm sorry.

16            THE COURT:  Time out.  Would you repeat the

17    question, Mr. Wilson?

18    BY MR. WILSON:

19    Q   My question was, do you -- do you know who wiped text

20    messages from Mr. Dondero's phone?

21            MR. MORRIS:  Objection to the form of the question.

22    No foundation.

23            THE COURT:  Sustained.

24            MR. WILSON:  Again, I'm trying to ask him if he has

25    personal knowledge of something.

1            THE COURT:  It -- you'll have to rephrase it.

2            MR. MORRIS:  Your Honor, there's no -- he --

3            THE COURT:  You'll have to rephrase what you said.

4    BY MR. WILSON:

5    Q    Do you have personal knowledge of whether text messages

6    were actually ever wiped off Mr. Dondero's phone?

7    A    No, I don't.

8    Q    So, therefore, if text messages were wiped on Mr.

9    Dondero's phone, you would not have personal knowledge of who

10   actually did it.  Correct?

11           MR. MORRIS:  Objection to the form of the question.

12   Calls for speculation.

13           THE COURT:  Sustained.

14   BY MR. WILSON:

15   Q    Well, if you -- if you don't have personal knowledge that

16   they've been wiped, I don't understand how it would be

17   speculation that you don't know who would have wiped them if

18   they were wiped, but --

19           MR. MORRIS:  Objection.  (garbled).

20           THE COURT:  Sustained.

21   BY MR. WILSON:

22   Q    Prior to becoming the CEO of Highland, did you change or

23   implement a cell phone replacement policy?

24   A    No.

25   Q    Prior to Mr. Pomerantz sending his letter to Mr. Lynn on

Seery - Cross                           242

1    December 23, 2020, had the Debtor notified Mr. Dondero that

2    the Debtor wanted his cell phone?

3    A    No.

4    Q    And you're now aware that Mr. Dondero began the process

5    of acquiring a new cell phone well before the TRO was entered

6    on December 10th, correct?

7              MR. MORRIS:  Objection to (garbled) question.

8              THE COURT:  I couldn't hear.  Was there an

9    objection, Mr. Morris?

10             MR. MORRIS:  Yes, Your Honor.

11             THE COURT:  Say again what the objection was.

12             MR. MORRIS:  To the form of the question, the use of

13   the phrase "well before."  I think the testimony is two

14   weeks.

15             THE COURT:  Okay.

16             MR. MORRIS:  According to Mr. Dondero.

17             THE COURT:  Sustained.  If you could rephrase.

18   BY MR. WILSON:

19   Q    So, you heard Mr. Dondero's testimony that he began the

20   process of acquiring a new cell phone two weeks before the

21   TRO was entered, correct?

22   A    I heard it.

23   Q    And as of December 10th, Mr. Dondero was still performing

24   work at the Highland offices for the Funds and Advisors,

25   correct?

1   A    I don't know what he was performing.  He was there.

2   Q    Is it the Debtor's contention that Mr. Dondero violated

3   the TRO by personally intervening to prevent the Debtor from

4   executing certain securities transactions on December 22,

5   2020?

6   A    Among other things, yes.

7   Q    What actions of Mr. Dondero does the Debtor contend

8   constitute Mr. Dondero's personal intervention to prevent the

9   Debtor from executing certain securities transactions?

10  A    With respect to the December ones?

11  Q    Yes.

12  A    Yeah, he -- he instructed, through either Post or Joseph

13  Sowin, I don't recall specifically, that the trades not be

14  completed.  And notwithstanding that we were trying to get it

15  done because we thought it was an advantageous time to make

16  those trades, he got involved and prevented it.

17  Q    What evidence have you presented that Mr. Dondero

18  instructed Mr. Post not to complete trades?

19  A    I believe when you put together his email and the letters

20  from counsel, you'll see, when you piece them together, that

21  that's what happened.  I don't think Jason Post did this on

22  his own.

23  Q    So your testimony is speculation, correct?

24  A    No.  I think there's -- there's very specific

25  instructions.

Seery - Cross                                        244

1    Q    Well, have you brought that email with those very

2    specific instructions before the Court?

3    A    I think Mr. Morris did earlier.

4    Q    Can you point me in the record to where that is?

5    A    I -- I don't keep track of the exhibits, but this is the

6    -- this is the stuff that Mr. Morris went through earlier

7    today.  I don't have -- I don't have it specifically in front

8    of me.

9    Q    In December of 2020, did Mr. Dondero send you any emails

10   regarding the trades that you wanted to make?

11   A    I don't believe he did, although he did email me on

12   December 14th and -- or 4th, and he did email me on December

13   8th with an apology, and he did email me on December 17th

14   with some material nonpublic information.

15   Q    In December of 2020, did Mr. Dondero send you a text

16   regarding trades that you wanted to make?

17   A    In December?  December 3rd, I believe, was his threat,

18   and I don't believe I got a text from him after that.

19   Q    In December of 2020, did Mr. Dondero call you regarding

20   the trades he wanted to make?  Regarding that you wanted to

21   make.

22   A    I don't believe so, no.

23   Q    Did Mr. Dondero block any trades in December of 2020 that

24   you wanted to make?

25   A    I don't recall if we completed the -- the end of December

1 trades or we just determined not -- not to do them because it

2 was too difficult.

3 Q    But, in fact, every trade you initiated in December 2020

4 closed, correct?

5 A    I don't -- I don't recall if the ones that we're

6 referring to now actually closed or if we just decided not to

7 do them.  If I made a trade with --

8        (Interruption.)

9 A    -- with a dealer, then we completed it.  We didn't fail

10 on any trades.

11        MR. WILSON:  Which exhibit is it?

12 BY MR. WILSON:

13 Q    All right.  I'm going to pull up Debtor's 37.

14        MR. WILSON:  Go to Page 173.  Of the transcript.  Go

15 down where it says, "By Mr. Hogewood."

16 BY MR. WILSON:

17 Q    Sir, do you recall giving testimony on January 26th in

18 connection with Plaintiff's motion for a preliminary

19 injunction against certain entities owned and/or controlled

20 by Mr. James Dondero?

21 A    I believe I did.

22 Q    Do you recall being asked this question by Mr. Hogewood

23 on Line 16?  "Yeah, let me -- let me say it differently.

24 Focusing solely on December of 2020, every trade that you

25 initiated closed; isn't that correct?"  A, "Every trade, yes.

1  We did not fail one trade."

2         MR. MORRIS:  Objection.  Objection.  He's seeking to

3  impeach Mr. Seery with the exact same testimony that he just

4  gave.

5         THE COURT:  What --

6         MR. WILSON:  Well, I would disagree, Your Honor.

7  Mr. Seery has equivocated on whether all of his trades went

8  through in December of 2020.

9         THE COURT:  He equivocated?  I don't remember him

10 being equivocal.  Remind me of what the testimony was.

11        MR. WILSON:  Well, I believe that Mr. Seery said

12 that he thinks he gave up on some trades and decided not to

13 complete them.

14        MR. MORRIS:  Objection.  The testimony that's being

15 read into the record from the earlier hearing is not

16 inconsistent with anything that Mr. Seery just testified to.

17        THE COURT:  (reading)  "Every trade that you

18 initiated closed; isn't that correct?"  "Every trade, yes."

19     I sustain the objection.  I don't think it's

20 inconsistent.

21 BY MR. WILSON:

22 Q   Okay.  Mr. Seery, would it be fair to say that the trades

23 that we are referring to in that December 22nd time frame

24 were initiated?

25 A   I -- I don't recall.  The -- and that's -- and I think

Seery - Cross                                    247

1   you're -- you're trying to create some ambiguity where there

2   is none or inconsistency where there is none.  I'm sorry.

3   That if we initiated a trade, because I did them through a

4   broker and told them sell or -- at a particular level on a

5   particular day, if he was able to complete that and get a

6   buyer on the other side, we completed the trade.  So if we

7   initiated it, we got it done.

8       I don't recall if those trades that we're talking about

9   earlier were initiated.  And this is a little bit of, I

10  guess, inside baseball knowledge Mr. Dondero started going

11  through a little bit before.  Typically, the trades are put

12  in through the order management system.  It's easier to track

13  the trades then.  It's all automated.  What we did instead,

14  where we actually initiated a trade, was we did it manually.

15  So we closed those trades manually.  And to be clear, the

16  order management system is not -- is not the Advisors'.  It's

17  Highland's.

18  Q   Well, Mr. Seery, if the -- if the complaint is that the

19  Advisors' employees did not book the trades, then those

20  trades were initiated.  Would you agree with that?

21          MR. MORRIS:  Objection to the form of the question.

22  Conflicts with the testimony.

23          THE COURT:  Sustained.

24  BY MR. WILSON:

25  Q   Do you understand the -- what's implicated by booking a

Seery - Cross                                    248

1  trade?

2  A    Do I understand what's implicated by booking a trade?

3  Q    Yes.

4  A    Do I know how to book a trade?  Yeah.

5  Q    And would that not be a trade that has been executed?  A

6  trade that would be booked would not be booked until after it

7  was executed, correct?

8  A    That's correct.

9  Q    And so the -- the trades that we are talking about in the

10  December 22nd time frame were initiated and executed and then

11  later booked, correct?

12  A    Any trade would have been initiated, executed, and

13  booked.  That's the correct order.

14  Q    All right.  And you've previously testified, and you

15  testified again today, that every trade that you initiated

16  closed, correct?

17  A    If --

18  Q    In December 2020?

19  A    If we initiated it and we got it done, of course.  The

20  issue is whether, when calling up the traders, if they refuse

21  to actually initiate the trade or take it, that -- that

22  wouldn't have closed.

23       Mr. Dondero didn't get this from some strange, you know,

24  premonition from the sky.  He's on a -- he was on a system

25  that showed all of the trades.  And that's where the email

Seery - Cross                                    249

1    back and forth, where he's on that list and says, Don't --

2    don't do this, both earlier and later, that's where those

3    come from.  It's not -- it's not that he had some great

4    insight into what's going on.  He's getting email.

5    Q    And, in fact, you did not fail one trade in December

6    2020, correct?

7    A    No.  Didn't fail.

8    Q    Is it the Debtor's contention that the K&L Gates law firm

9    sending letters to the Pachulski law firm on December 22nd

10   and 23rd was a violation of the TRO?

11   A    I think it was, yes.

12   Q    To be clear, these are letters between counsel, correct?

13   A    They are.

14   Q    And, in fact, K&L Gates is not Mr. Dondero's personal

15   counsel, correct?

16   A    That's what I'm hearing.

17   Q    And K&L Gates at the time represented the Funds and

18   Advisors, correct?

19   A    I -- there's so many counsel, I don't recall if they

20   represent just the Fund -- I think they represent just the

21   Funds, not the Advisors.  But if they represent the Funds and

22   the Advisors, then I'd precedent your next question, because

23   Mr. Dondero clearly controls the Advisors and he's -- he

24   basically said so earlier today.

25   Q    Can you tell me what threat means in the context of a

Seery - Cross                                    250

1  TRO?

2  A    What a threat is?

3  Q    Well, what -- what's meant by threat in the context of a

4  TRO.

5  A    I believe -- I believe that a threat is a -- either a

6  statement or action that one takes against another that puts

7  them at risk of some kind of loss or harm in order to get

8  someone to do or not do something.  I think that's the common

9  -- relatively common usage of threat as I would use it.

10         THE COURT:  Mr. Wilson, how much longer do you think

11  you're going to take?  I probably need to take a break if

12  you're going to be much longer.

13         MR. WILSON:  Yeah.  Now would be a great time for a

14  break, Your Honor.

15         THE COURT:  What was the answer to my question?

16         MR. WILSON:  Well, I said now would be a great time

17  for a break, but I don't have an exact time estimate on the

18  remainder of my questions for Mr. Seery.

19         THE COURT:  All right.  Well, we're going to stop at

20  5:30 tonight.  I've got a very long day tomorrow so I've got

21  to prepare for it at some point.

22      Nate will check the time, see how much time you've each

23  used.  But we'll take a five-minute break.

24         MR. WILSON:  All right.  Thanks, Your Honor.

25         THE CLERK:  All rise.

Seery - Cross                          251

1          (A recess ensued from 5:01 p.m. until 5:07 p.m.)

2                THE CLERK:  All rise.

3                THE COURT:  All right.  Please be seated.  We're

4    going back on the record in Highland.

5        All right.  Nate has told me that, Mr. Wilson, you're at

6    two hours and twenty minutes.  So you're actually well within

7    your time frame.  And what did you say Mr. Morris is at,

8    without deductions?

9                THE CLERK:  Three hours.

10               THE COURT:  You're at three hours, Mr. Morris,

11   without deductions.

12       Here's what we'll try to do.  We'll try to get through

13   Mr. Seery today, but we're not going to do closing arguments

14   tonight.  And what I'm thinking is we're coming back

15   Wednesday on the bond, the supersedeas bond issue with regard

16   to the requested stay pending appeal.  So we'll roll into

17   closing arguments on Wednesday after we're finished with that

18   matter.  That matters starts at 9:30.  So, presumably you'll

19   all be here for that anyway, so we'll defer closing arguments

20   until Wednesday.

21               MR. MORRIS:  Your Honor?

22               THE COURT:  Yes?

23               MR. MORRIS:  Can we put a time limit on that, too,

24   just to make sure it's sufficient?  I don't think I'd need

25   more than 15 or 20 minutes.

1          THE COURT:  Okay.  I think 20 minutes is plenty per

2  side.  In fact, hopefully, with this gap in time, I'll be

3  able to kind of go through the exhibits and have my thoughts

4  collected, so therefore that I don't I'll need a lengthy

5  closing at that point.

6      Mr. Wilson, sound like a deal to you, 20 minutes?

7          MR. WILSON:  I think 20 minutes will be sufficient,

8  Your Honor.

9          THE COURT:  All right.  So you may proceed now with

10  your questioning of Mr. Seery.

11          MR. WILSON:  All right.  Thank you.

12                  CROSS-EXAMINATION, RESUMED

13  BY MR. WILSON:

14  Q   When we left off, Mr. Seery, we were talking about the

15  letters sent by K&L Gates on the 22nd and the 23rd.  You

16  would agree with me that these letters did not have any

17  effect on the Debtor, correct?

18  A   The lett... well, they certainly caused us to spend a lot

19  of time and money dealing with the issues that we thought

20  were handled at the prior hearing, where it was basically

21  found to be frivolous.  So I disagree with that.

22  Q   You weren't intimidated by the letters, correct?

23  A   No.

24  Q   And the letters didn't cause you or the Debtor to refrain

25  from operating the company in the manner that you perceived

1  to be in its best interest, correct?

2  A    It did not.

3  Q    The letters didn't cause you to change any of your

4  trading decisions, correct?

5  A    Nope, they did not.

6  Q    The letters didn't cause you to change your investment

7  strategy, correct?

8  A    No.

9  Q    And the letters didn't cause you to trade or not trade in

10  a particular manner, correct?

11  A    That's correct.

12  Q    And you continued to function the Debtor's operations as

13  you deemed appropriate, right?

14  A    Yes.

15  Q    In fact, the Debtor rejected the requests made in the

16  letters and demanded a withdrawal, correct?

17  A    Yes.

18  Q    So the letters did not cause you to conduct yourself in

19  any other manner than you would have conducted yourself had

20  you not received the letters, correct?

21  A    Well, as I said, we spent a lot of time and money

22  responding to them and dealing with them because we didn't

23  just leave them hanging out there.  So that's not correct.

24  Q    Did the letters cause the Debtor to breach any contracts?

25  A    No.

1    Q    And, again, every trade you initiated in December 2020

2    closed, correct?

3    A    Yes.

4    Q    But yet the Debtor considers the sending of these letters

5    between counsel to be an interference with or impeding the

6    Debtor's business?

7    A    Yes.

8    Q    So is it your contention that that provision of the TRO

9    is clear and unambiguous?

10   A    Yes.

11   Q    But could you see where someone might disagree?

12   A    No.

13   Q    Could you see where someone might believe that a letter

14   sent between counsel that did not cause the Debtor to alter

15   its course in any way was not an interference with the

16   Debtor's business?

17   A    A threat doesn't have to be successful in order to be a

18   threat and one that could affect us, and I said it did

19   actually affect what we did because we had to spend money and

20   time dealing with it.

21   Q    Who is Scott Ellington?

22   A    Who is Scott Ellington?

23           THE COURT:  Okay.

24           THE WITNESS:  He's the former general --

25           THE COURT:  Mr. Wilson, --

1            THE WITNESS:  -- general -- former --

2            THE COURT:  Mr. Wilson, we all know who Scott

3    Ellington is, okay?  Please.  Let's --

4            MR. WILSON:  Oh, I'm sorry.  I was just asking the

5    question for the record.

6            THE WITNESS:  He's the former general counsel of

7    Highland.

8    BY MR. WILSON:

9    Q    And as general counsel, did you believe that Mr.

10   Ellington owed duties to Highland?

11   A    Absolutely.

12   Q    As general counsel, Mr. Ellington would have been part of

13   the legal department at Highland, correct?

14   A    Yes.

15   Q    And that legal department was part of the shared services

16   agreements between the Debtor and the Advisors, correct?

17   A    No, it wasn't.

18   Q    Can you tell me what you mean by that?

19   A    It was not, meaning no.  In answer to your question, it

20   was not.

21   Q    Are you saying that the shared services agreements

22   between the Debtor and the Advisors did not cover legal

23   services?

24   A    They included legal services, yes, but you asked me if

25   the legal department was part of it.  No.

Seery - Cross                                            256

1  Q    Can you tell me what you mean by when you hear the term

2  legal department?

3  A    Highland's legal department was a pretty unusual thing.

4  It included lawyers and non-lawyers.  Not just, you know,

5  administrators, administrative assistants, and paralegals,

6  but even some people who were accountants or MBAs.  It did

7  work all over the -- either the Highland complex or even

8  through numbers of entities for which it didn't get paid.

9  Dondero entities.  It was a -- it was a pretty standalone odd

10 thing, one of the most unusual I've seen.  It's really

11 unusual to have an investment firm with more people in the

12 tax department and in the legal department than in the

13 investing side.

14 Q    Would you agree with me that this is a pretty broad

15 shared services agreement, correct?

16 A    There are a number of services that are performed under

17 it, yes.

18 Q    And it, in fact, says in Provision 2.02 of Exhibit 1

19 that, without limiting the generality of Section 2.01, and

20 subject to 2.04, the following are the services that are

21 going to be provided.  So this -- this document wasn't

22 intended to be limited, correct?

23 A    I can't speak to what was intended.  It's a pretty

24 unusual document.  Legal services, typically, you don't split

25 legal services, since it's unethical to split fees, so it

1   wouldn't be providing attorney services. Highland often used

2   it to, in the past, to shield things based on a claim of

3   attorney-client privilege. But I think that that document,

4   whether it's intended to be broad or not, is certainly

5   ambiguous in places.

6   Q    Did you task Mr. Ellington with the role of a go-between

7   between the board and Mr. Dondero?

8   A    No. This -- this settlement counsel is something I'd

9   never heard until Dondero raised it and made it up. It --

10  it's wholly fictitious.

11       Now, what Ellington did do is he was on a number of calls

12  with me and Dondero, and he had a communication line with

13  Dondero. This was through the first half of the case and

14  into -- into the summer. But as it started to become more

15  adversarial, particularly around the mediation, he wasn't

16  invited. So, for example, Mr. Ellington was not invited to

17  -- to participate in the mediation. He asked. I said no.

18       The -- in addition, this idea that he was drafting the

19  pot plan, well, not to my knowledge or understanding, because

20  I drafted it for Dondero and his lawyers because you guys

21  couldn't.

22            MR. WILSON: Object as nonresponsive.

23            THE COURT: Overruled.

24  BY MR. WILSON:

25  Q    Did you send Mr. Dondero messages through Mr. Ellington?

1    A    No.

2    Q    So you're denying Mr. Dondero's testimony to the

3    contrary?

4    A    Yes.

5    Q    Did Mr. Dondero send messages to you through Mr.

6    Ellington?

7    A    No.  Mr. Ellington often came back and gave me messages.

8    They were often critical of Mr. Dondero.  I didn't always

9    believe them, because I figured Mr. Ellington had an ulterior

10   motive.  But he took a number of, you know, shots at Mr.

11   Dondero and he came back and gave his color of what he

12   thought was going on in Mr. Dondero's mind.

13            MR. WILSON:  Object as nonresponsive.

14            THE COURT:  Overruled.

15   BY MR. WILSON:

16   Q    Did you task Mr. Ellington with negotiating certain items

17   with Mr. Dondero?

18   A    No.

19   Q    Was there not a time, in January, early January, before

20   Mr. Ellington's termination, that you tasked him with

21   negotiating a new shared services agreement with Mr. Dondero?

22   A    No.

23   Q    Did you believe that there were legitimate items that Mr.

24   Ellington needed to discuss with Mr. Dondero?

25   A    I'm sorry.  Can you say that again?  It --

1  Q    Did you believe that there were legitimate items that Mr.

2  Ellington needed to discuss with Mr. Dondero?

3  A    When?

4              MR. MORRIS:  Objection to the form of the question.

5              THE COURT:  Sustained.

6  BY MR. WILSON:

7  Q    During the year of 2020, were there legitimate items that

8  Mr. Dondero [sic] needed to discuss with Mr. Dondero?

9              MR. MORRIS:  Objection.  Vague and ambiguous.

10             THE COURT:  Sustained.

11             THE WITNESS:  Well, I believe you just asked me if

12 --

13             THE COURT:  Sustained.

14             THE WITNESS:  -- Mr. Dondero could discuss with Mr.

15 Dondero.  I think --

16             THE COURT:  I --

17             THE WITNESS:  -- the question is --

18             THE COURT:  I sustained the objection.

19             THE WITNESS:  I'm sorry, Your Honor.

20             THE COURT:  I need it to be rephrased.

21 BY MR. WILSON:

22 Q    Did you ever instruct Mr. Ellington to keep taking Mr.

23 Dondero's calls after the entry of the TRO?

24 A    No.

25 Q    So are you denying that on January 4, 2021, you

1    instructed Mr. Ellington to communicate with Mr. Dondero and

2    negotiate a number of expense items?

3    A    Expense items?  Not to my knowledge.  No, I don't recall

4    that at all.

5    Q    Did you ever tell Mr. Ellington that he could talk to

6    Michael Lynn as much as he wanted because Mr. Lynn was an

7    honorable and ethical person?

8    A    I believe over the summer I did.  Meaning summer of 2020.

9    I don't know if I used the honorable and -- but I -- I

10   thought Mr. Lynn, if he needed to talk to Mr. Ellington, that

11   would be appropriate at that time.

12            MR. WILSON:  Pull up Debtor's 17.

13   BY MR. WILSON:

14   Q    This was the Debtor's Exhibit No. 17.

15            MR. WILSON:  Go down to the bottom.

16   BY MR. WILSON:

17   Q    Do you remember this email that came into evidence

18   earlier?

19   A    I saw it earlier, yes.  I've seen it before.

20   Q    And it starts at the bottom with a discussion between

21   Michael Lynn and Mr. Dondero and other counsel.

22            MR. WILSON:  Scroll up.

23   BY MR. WILSON:

24   Q    Do you see where -- apparently, Mr. Lynn forwarded that

25   email to Mr. Ellington at 8:44.  We can't tell all the

1  senders and recipients.  But do you see where Mr. Ellington

2  responds later that evening on December 12th?

3  A    Yes, I see the email.

4  Q    And is it the Debtor's contention that this email between

5  Mr. Dondero's counsel, Michael Lynn, and Scott Ellington is a

6  violation of the TRO?

7  A    Yeah, I think it is.  I think that they're -- they're

8  reaching out, I assume on behalf of Mr. Dondero, to try to

9  create a witness.  I assume this is for the confirmation

10  hearing.  I don't have the -- the times.  But it's a pretty

11  unusual thing to do.  I know they ended up ultimately serving

12  a subpoena on Mr. Sevilla but then not calling him.

13  Q    Do you agree that Footnote 2 -- and we can pull it up if

14  you want to.

15          MR. WILSON:  Pull up 11.  Debtor's 11.  Bottom of

16  Page 2.  Bottom of Page 3.  No, no.  Bottom of the Page 4 on

17  the document.  Go to the very bottom of the footnote.

18  BY MR. WILSON:

19  Q    I'm going to represent to you that this is Debtor's

20  Exhibit 11, and this is the last page of it, and the footnote

21  at the bottom says, "For the avoidance of doubt, this order

22  does not enjoin or restrain Mr. Dondero from seeking judicial

23  relief upon proper notice or from objecting to any motion

24  filed in the above-referenced bankruptcy case."

25      Were you -- were you aware that that provision was in

1   this order?

2   A    I'm sure I was at the time.  I read it closely.

3   Q    Would you agree with me that attempting to identify a

4   witness for a hearing could be considered seeking judicial

5   relief?

6   A    No, I don't.  I don't agree with you, no.

7   Q    Are you aware that Mr. Ellington testified that while at

8   Highland he'd been asked dozens of time by opposing counsel

9   who they should subpoena to testify?

10           MR. MORRIS:  Objection.  I move to strike.

11           THE COURT:  I --

12           MR. MORRIS:  If they wanted Mr. Ellington to

13   testify, he should have been here.

14           THE COURT:  Yes.  Actually, I couldn't even

15   understand what the question was.  Could you say what the

16   question was again?

17           MR. WILSON:  The question was, are you aware that

18   Mr. Ellington testified that while at Highland he had been

19   asked dozens of times by opposing counsel who they should

20   subpoena to testify about a certain topic?

21           MR. MORRIS:  Objection to the form of the question.

22   No foundation.

23           THE COURT:  Okay.  Sustained.

24           THE WITNESS:  I'm sorry?

25           THE COURT:  Okay.  I sustained the objection.  You

1   don't have to answer it.

2           THE WITNESS:  Oh, okay.  I'm sorry, Your Honor.

3   BY MR. WILSON:

4   Q    The Debtor's memorandum of law says that Mr. Dondero knew

5   that several times in the last year several entities had

6   requested the Dugaboy financial statements.  Who are these

7   several entities?

8   A    Well, certainly, the U.C.C.  I don't -- we did from Ms.

9   Schrath, who was working for us at the time.  And he

10  instructed her, notwithstanding that she was working for

11  Highland, to not give it over.  I don't know who else had

12  requested them.

13  Q    Are these documents located on the Highland servers?

14  A    I believe so.  We haven't been able to find all of them

15  yet.

16  Q    So, have you looked for them?

17  A    Yes.

18  Q    How -- how many of the documents have you located?

19  A    I don't know.

20  Q    How do you know that there are documents that you haven't

21  located?

22  A    There are numbers of documents that are listed around

23  different servers -- I don't know, I haven't done this work

24  myself -- that indicate that they're Dugaboy.  But we haven't

25  been able to get to all of them.

Seery - Cross                                264

1    Q    How did Mr. Dondero personally interfere with the

2    Debtor's search for the documents?

3    A    I think it's pretty clear.  He told a Debtor employee who

4    worked extensively for him, who probably looked to work for

5    him in the future, to not turn them over, notwithstanding

6    that they're on the Debtor's server and they're the Debtor's

7    property.

8              MR. WILSON:  I'll object as nonresponsive.

9              THE WITNESS:  You asked me how.

10             THE COURT:  Overruled.

11             MR. WILSON:  Turn to the list of -- 19.

12   BY MR. WILSON:

13   Q    We're going to pull up Debtor's 19.  Now, my problem with

14   the answer you gave to the last question, Mr. Seery, is that

15   you said that Mr. Dondero ordered that the documents not be

16   turned over.  But does the text he sent to Melissa Schrath on

17   December 16th in fact say, No Dugaboy details without

18   subpoena?

19   A    That's what it says, yes.

20   Q    So, in fact, Mr. Dondero wasn't saying that the documents

21   couldn't be turned over, correct?

22   A    It says, No -- No Dugaboy details without subpoena.  I

23   read that to mean don't give up anything unless ordered to do

24   so, notwithstanding that they're on Highland's server and

25   that make them Highland's property.

1    Q    Well, I object to your legal conclusion.

2              THE COURT:  Overruled.

3              THE WITNESS:  I think it's factual, but --

4              MR. WILSON:  Can I get a ruling, Your Honor?

5              THE COURT:  I said overruled.

6              MR. WILSON:  Okay.  Thank you.

7    BY MR. WILSON:

8    Q    But you're aware that prior to the communication that

9    Dondero sent to Melissa Schrath on December 16th, that

10   Douglas Draper had been communicating with Mr. Morris about

11   producing these documents, correct?

12   A    I'm aware of that, yes.

13             MR. WILSON:  Let's go to our 16 real quick.

14   BY MR. WILSON:

15   Q    If you look at the bottom of this, this is Debtor's --

16   I'm sorry -- Dondero's Exhibit 16.  If you look at the

17   bottom, do you see the email from Douglas Draper on

18   Wednesday, December 16th, that said, Do you have a

19   confidentiality agreement with the party requesting the

20   information?

21   A    I see that it says that, yes.

22             MR. WILSON:  Can you go to 17?  And can we go to

23   Page 2?

24   BY MR. WILSON:

25   Q    At the top of this -- this is Dondero Exhibit 17.  The

1   first email on this page is from Douglas Draper on Friday,

2   December 18th, to John Morris, that says, Would like to see

3   them before they go out.  I now need to look at the issue in

4   light of the complaint filed (garbled).

5       Were you aware that Mr. Draper wanted to see the

6   documents before they went out?

7   A    I've -- I've seen this email, yes.

8   Q    Do you know, as of December 16th, whether a formal

9   request for the documents had been made to the trusts or Mr.

10  Dondero?

11          MR. MORRIS:  Objection to the form of the question.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes, I do.  They were requested by the

14  Committee long prior.  Remember that these were documents in

15  the Debtor's possession.  Mr. Draper doesn't represent the

16  Debtor.  Mr. Draper represents Dugaboy.  These are the

17  Debtor's -- this is the Debtor's information.  He doesn't

18  have a right to see anything.

19  BY MR. WILSON:

20  Q    But do you know whether a formal request for the

21  documents had been made to the trusts or Mr. Dondero at this

22  point?

23  A    I don't know.  Certainly, to the Debtor, I know, but I

24  don't know.

25  Q    And the Debtor -- strike that.  Do you believe it's

Seery - Cross                                    267

 1  unreasonable for Mr. Dondero to ask that a formal request,

 2  such as a subpoena, be sent regarding the documents?

 3  A    Yes.  (garbled) control of the Debtor.  That -- that's

 4  totally unreasonable.  He completely interfered with our

 5  employee who was required to respond to me, who specifically

 6  directed her multiple times to produce them as requested.

 7  Initially, to our own counsel.  I'm entitled to see them as

 8  the CEO.  Our counsel is entitled to see them.  I requested

 9  it multiple times, and she didn't.  She rather would be fired

10  because she knew she was being picked up by him.

11  Q    Is it reasonable that counsel for the trusts might want

12  to review the documents before they're produced?

13  A    It might be helpful, but they're not his documents.  And

14  from a --

15          MR. WILSON:  I object again.

16          THE WITNESS:  -- perspective, it's not reasonable.

17  The man should be able --

18          MR. WILSON:  Object again as nonresponsive.

19          THE WITNESS:  I don't think it's reasonable.

20          THE COURT:  Overruled.

21          MR. WILSON:  All right.  I'll pass the witness.

22          THE COURT:  All right.  Redirect?

23          MR. MORRIS:  Your Honor, I'm going to spare any

24  further examination here.

25      Actually, just two questions.

1                          REDIRECT EXAMINATION

2    BY MR. MORRIS:

3    Q    Mr. Seery, was -- was Trey Parker -- withdrawn.  Was Mark

4    Okada an employee of the Debtor at the time the independent

5    board was appointed?

6    A    You know, he wasn't on the payroll and he didn't have any

7    real authority.  He had an office.  I don't believe he

8    actually was.  I think he had left, according to Mr. Okada,

9    actually before that.  He hadn't actually just vacated.  But

10   he wasn't doing any work.  He wasn't involved in the

11   business.

12   Q    Okay.

13   A    He certainly wasn't on the payroll.  He may have been --

14   he may still have been getting some kind of benefits.  I

15   don't know.

16   Q    All right.

17        MR. MORRIS:  Your Honor, I'm mindful of the Court's

18   time.  If I may, I'd like to just take three minutes on the

19   exhibits so that -- so that I can rest, and I guess -- I

20   guess Mr. Dondero will rest, too.

21        THE COURT:  All right.  All right.  All right.  I --

22        MR. MORRIS:  But there's only a couple of exhibits

23   that were objected to.

24        THE COURT:  As a technical matter, --

25        MR. MORRIS:  Very quickly.

Seery - Redirect                              269

1          THE COURT:  As a technical matter, I have to ask Mr.

2   Wilson, did you have any recross on that redirect regarding

3   Mr. Okada?

4          MR. WILSON:  No, Your Honor.  That's --

5          THE COURT:  All right.  So, thank you, Mr. Seery.

6   Your testimony is concluded.

7       All right.  Now, Mr. Morris?

8          MR. SEERY:  Thank you, Your Honor.

9          THE COURT:  You were saying?

10          MR. MORRIS:  Okay.  So, yes, just going through the

11   list, I believe -- and Mr. Wilson, please correct me if I

12   miss anything here -- but I believe that they objected to

13   Exhibits 3, 4, 5, and 6.  Do I have that right?

14          THE COURT:  That's what I show.

15          MR. MORRIS:  Okay.  The Debtor would -- will

16   withdraw those exhibits.

17          THE COURT:  Okay.

18       (Debtor's Exhibits 3 through 6 are withdrawn.)

19          MR. MORRIS:  The Debtor will also withdraw Exhibit

20   16.

21          THE COURT:  Okay.

22       (Debtor's Exhibit 16 is withdrawn.)

23          MR. MORRIS:  But 17 through 22 are in evidence,

24   right?

25          THE COURT:  Correct.

1      MR. MORRIS:  The Debtor will withdraw No. 23.

2    (Debtor's Exhibit 23 is withdrawn.)

3      THE COURT:  Okay.

4      MR. MORRIS:  But the Debtor does seek to admit into

5   evidence Exhibits 29, 30, 31, and 32, in light of the

6   testimony that we just had, because these, in fact, are the

7   very formal requests by the Creditors' Committee for the

8   Dugaboy financials.

9      THE COURT:  All right.

10      MR. MORRIS:  So we would -- we would move them into

11   evidence for that limited purpose.

12      THE COURT:  All right.  Your response, Mr. Wilson?

13      MR. WILSON:  My response was not contesting that the

14   Creditors' Committee had ever sent requests to Highland.  My

15   question to Mr. Seery was whether anyone had ever sent a

16   request to the trusts or Mr. Dondero.

17      MR. MORRIS:  Your Honor, I still think that it's

18   relevant to support Mr. Seery's testimony where he testified

19   that he had asked Ms. Schrath to produce the documents on

20   multiple occasions, and this is the reason why he did it.

21   Here is the requests.

22      THE COURT:  All right.  I overrule the objection,

23   and so will allow 29, 30, 31, and 32.

24    (Debtor's Exhibits 29, 30, 31, and 32 are received into

25   evidence.)

1          MR. MORRIS:  Next, Your Honor, Exhibit 35, which is

2     the transcript from the hearing on the protective order.  I'd

3     like to offer that into evidence for the limited purpose of

4     any admissions by Mr. Dondero's counsel that he knew and was

5     aware that the -- that the Creditors' Committee was seeking

6     ESI from Mr. Dondero, including text messages.

7          THE COURT:  Okay.  Mr. Wilson, your response?

8          MR. WILSON:  I think, yeah, I think we're talking

9     about two different issues.  We're -- Mr. Morris is focusing

10    on these events that occurred earlier in the year in 2020,

11    and we're focusing on what Mr. Dondero himself knew in -- in

12    the time frame that's relevant at this -- for this hearing.

13    And not to mention, we called into question, I believe, the

14    definition of ESI under the Debtor's own protocols and

15    whether that would even include text messages.  I don't

16    believe that the text messages are -- you know, knowledge

17    that the Committee was seeking those from Mr. Dondero can be

18    imputed onto this transcript of statements by his attorneys.

19         THE COURT:  Okay.  I'll overrule the objection.

20    I'll find that these have some relevance.  So 35 will get in.

21       (Debtor's Exhibit 35 is received into evidence.)

22         MR. MORRIS:  Okay.  And then the last two, Your

23    Honor, are Exhibits 38 and 39.  38 and 39 are the -- are two

24    exhibits that were on Docket 128 that was filed last night.

25    We had placeholders there previously.  These are my firm's

1    time entries, bankruptcy litigation time entries related to

2    the Dondero litigation in December, is No. 38.  And No. 39 is

3    the time entries for January of 2021.

4        This material was specifically requested by Mr. Dondero

5    in discovery.  We produced a form of it at that time, but it

6    had not yet been completed at the time we produced it, and

7    that's why we supplemented it last night.  But it's directly

8    responsive both to Mr. Dondero's discovery requests as well

9    as the Debtor's claim for economic harm, at least partially.

10            THE COURT:  All right.  Mr. Wilson, any objection to

11   those?

12            MR. WILSON:  My objection to these would be that the

13   requests -- or, I'm sorry, the statements aren't limited to

14   -- or I assume they're not limited to what he's seeking in

15   this hearing, because the fee statements start on November 3,

16   2020.  And, you know, for instance, Exhibit 38 is 46 pages

17   long of fee entries, and they seem to include every entry

18   that Highland's made on this case, that the Pachulski's firm

19   has made on this case, and -- and we can't tell which ones of

20   these items that they are seeking to -- as part of their

21   damage model.

22            MR. MORRIS:  Your Honor, that's just not an accurate

23   characterization of the document.  The document is

24   specifically limited to bankruptcy litigation.  It's not

25   nearly all of the fees that have been incurred in this case.

1        You know, to the extent that somebody disputes any

2   particular entry, they have every right to do that.  But we

3   believe that it accurately reflects only the litigation

4   matters that are related to Mr. Dondero's conduct.  For --

5   for January and February.

6            THE COURT:  Wait.  December and January, you mean?

7            MR. MORRIS:  Yes.  I apologize.  Thank you very

8   much, Your Honor.

9            THE COURT:  All right.  And you're saying it relates

10  to just this TRO matter, or are you saying it also relates

11  maybe to the Advisor dispute as well?

12           MR. MORRIS:  It does relate to both, Your Honor.  It

13  does, in all candor, it definitely relates to both, from this

14  same period of time, because, you know, as Your Honor knows,

15  the Court found that whole litigation in December of 2020 to

16  be frivolous, and it was directly related to the letters that

17  were subsequently written.

18       So, you know, they can argue otherwise, but that's our

19  position.

20           THE COURT:  All right.  Well, Mr. Wilson, it sounds

21  like it's perfectly acceptable to allow it to in as their

22  evidence of some of the alleged damages, and then you're

23  certainly able to argue on closing arguments why, you know, *x*

24  amount would not be compensable if I were to allow damages on

25  this front.

1     So it's at Docket Entry 128 from last night.  38 and 39

2   are admitted.

3      (Debtor's Exhibits 38 and 39 are received into evidence.)

4         THE COURT:  But you also talked about earlier today

5   a cleaned-up version of Exhibit 11, a replacement version to

6   just clean the --

7         MR. MORRIS:  Correct.

8         THE COURT:  -- the heading at the top.  So I assume

9   no one has a problem with that replacement No. 11 getting in.

10  So all three of those will be allowed.

11     (Debtor's Replacement Exhibit 11 is received into

12  evidence.)

13        THE COURT:  All right.  Anything else?

14        MR. MORRIS:  No.  With that, Your Honor, the

15  Plaintiff rests.

16        THE COURT:  Okay.  Let me be clear on a couple of

17  these.  There was an objection to your Exhibit 34 that we

18  carried this morning.  Is that not being offered?  I don't

19  show it as either withdrawn --

20        MR. MORRIS:  I'll withdraw that exhibit as well,

21  Your Honor.

22        THE COURT:  Okay.  So that's withdrawn.  All right.

23        MR. MORRIS:  Yeah.

24     (Debtor's Exhibit 34 is withdrawn.)

25        THE COURT:  So, with that, the Debtor rests?  All

1   right.

2       Mr. Wilson, I know you don't have any other witnesses.

3   Do you have any documents that you need to clarify the record

4   on?  I admitted all of your exhibits earlier, so I presume

5   no.

6               MR. MORRIS:  Correct.

7               MR. WILSON:  No, I think that that's -- I think

8   that's all we have.

9               THE COURT:  Okay.  All right.  Well, thank you.  If

10  there's nothing further in the way of a housekeeping matter,

11  again, what we'll do is reconvene on Wednesday at 9:30.  I'll

12  start with the bond issue pertaining to the requested stay

13  pending appeal, and then we'll allow closing arguments, 20

14  minutes each side, for this matter.  All right?

15              MR. MORRIS:  Thank you for your patience, Your

16  Honor.

17              MR. WILSON:  Thank you, Your Honor.

18              THE COURT:  All right.  And I didn't mean the thing

19  about the basketball tournament earlier that someone wanted

20  to get to.  My team got utterly humiliated --

21              MR. MORRIS:  We know.

22              THE COURT:  -- Saturday night, so at this point I

23  don't care so much.  I do, but all right.

24              MR. MORRIS:  So did Colgate.

25              THE COURT:  Okay.  Good evening.

276

1          THE CLERK:  All rise.

2          MR. MORRIS:  Good night, Your Honor.

3          MR. WILSON:  Thanks, Judge.

4        (Proceedings concluded at 5:41 p.m.)

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                          **03/24/2021**

24   _____    _____
   Kathy Rehling, CETD-444                        Date
25   Certified Electronic Court Transcriber

277

                                INDEX

PROCEEDINGS                                                3

OPENING STATEMENTS

- By Mr. Morris                                            6
- By Mr. Wilson                                          25

WITNESSES

Debtor's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris                       30
- Cross-Examination by Mr. Wilson                       127
- Redirect Examination by Mr. Morris                    184
- Recross-Examination by Mr. Wilson                     205
- Further Redirect Examination by Mr. Morris            211

James P. Seery, Jr.
- Direct Examination by Mr. Morris                      212
- Cross-Examination by Mr. Wilson                       222
- Redirect Examination by Mr. Morris                    268

EXHIBITS

Dondero's Exhibits 1 through 20              Received 153

Debtor's Exhibits 1 and 2                     Received 33
Debtor's Exhibits 3 through 6                Withdrawn 269
Debtor's Exhibits 7 through 15                Received 33
Debtor's Replacement Exhibit 11              Received 274
Debtor's Exhibit 16                          Withdrawn 269
Debtor's Exhibits 17 through 22               Received 33
Debtor's Exhibit 23                          Withdrawn 270
Debtor's Exhibits 24 through 28               Received 33
Debtor's Exhibits 29 through 32              Received 270
Debtor's Exhibit 33                           Received 48
Debtor's Exhibit 34                          Withdrawn 274
Debtor's Exhibit 35                          Received 271
Debtor's Exhibits 36 and 37                   Received 33
Debtor's Exhibits 38 and 39                  Received 274
Debtor's Exhibits 41 through 46              Withdrawn 34
Debtor's Exhibits 47 through 55               Received 34
Debtor's Exhibits 56 and 57                   Received 45
Debtor's Exhibits 58 and 59                  Withdrawn 34

278

RULINGS

Motion in Limine - Denied                                              24
Show Cause Continued to 03/24/2021 at 9:30 a.m.                        275

END OF PROCEEDINGS                                                     276

INDEX                                                              277-278