PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding |
| vs. | § § § | No. 20-3190-sgj11 |
| JAMES D. DONDERO, | § § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## DEBTOR'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Highland Capital Management, L.P. ("Plaintiff" or "HCMLP" or the "Debtor"), the debtor in the above-captioned adversary proceeding (the "Adversary Proceeding"), submits the following *Proposed Findings of Fact and Conclusions of Law* in connection with its claim for injunctive relief asserted in the Adversary Proceeding pursuant to section 105(a) of the United States Bankruptcy Code (the "Bankruptcy Code").

## PROPOSED FINDINGS AND CONCLUSIONS

1.     The Debtor's claim for permanent injunctive relief in this Adversary Proceeding was tried before the Court on [**date**], 2021. The Court heard testimony from [**number**] witnesses, including [**names**], and admitted [**number**] exhibits into evidence. A substantial record already existed because, as recited below, the Court previously conducted three separate and substantial evidentiary hearings covering many of the same factual issues in dispute.

2.     The Debtor seeks permanent injunctive relief against James Dondero ("Mr. Dondero"). For the reasons set forth below, the Court finds that the Debtor has met its burden of proving that:

- it will succeed on the merits of its claim;

- it will likely suffer irreparable injury in the absence of injunctive relief;

- the Debtor has no adequate remedy at law;

- the likely harm that the Debtor would suffer in the absence of injunctive relief greatly outweighs any harm Mr. Dondero may face by the imposition of a permanent injunction; and

- the public interest strongly favors protecting the Debtor from interference, baseless claims, threats, and collusive conduct.

3. Mr. Dondero has asserted a singular affirmative defense, unclean hands, yet failed to offer any admissible evidence to establish that defense. Accordingly, the Court finds and determines that Mr. Dondero has failed to meet his burden of proving the validity of his affirmative defense.

4. In reaching these conclusions, the Court has considered all of the admissible evidence, including documentary evidence and other proceedings in the Bankruptcy Case specifically referred to herein and for which the Court takes judicial notice. The Court has also carefully considered the credibility of the witnesses for each of the litigants.

5. As specifically described below, the Court has substantial concerns regarding Mr. Dondero's credibility for at least the following reasons: (a) Debtor's counsel frequently and effectively impeached Mr. Dondero with his prior deposition and trial testimony; (b) Mr. Dondero's testimony on certain important matters (*e.g.*, the "cell phone") changed considerably over time; (c) in a number of important instances, Mr. Dondero vainly attempted to retract unambiguous admissions (*e.g.*, his admission that he interfered with the Debtor's trading on or around December 22, 2020); (d) Mr. Dondero's testimony was often contradicted by documentary evidence (*e.g.*, the written communications with the Debtor's employees, the Debtor's *Employee Handbook*, and Mr. Dondero's own pleadings); and (e) Mr. Dondero offered little corroborating evidence (whether documentary or testimonial) during the hearing or during the related hearings on the Debtor's motions for a temporary restraining order, a preliminary injunction, and an order of contempt despite the numerous opportunities to do so.

6.      Of particular concern to the Court is the lack of legitimate interest that Mr. Dondero has in the Debtor, having transferred the vast majority of the interests held by his trust and the general partner to another trust prior to the filing and admitted that his only claims are for indemnification and claims relating to taxes.  While the Court has been and remains sensitive to Mr. Dondero's role as a founder of HCMLP and the emotional attachment that surely entails, the reality is that with the pre-petition partnership interest transfers and confirmation of the Debtor's Plan,[2] this relationship is now permanently severed and Mr. Dondero no longer has a legitimate and foreseeable pecuniary interest in the Debtor and its estate.  This is significant because it goes to the balancing of the equities and shows that Mr. Dondero should have no motivation to engage in Prohibited Conduct (as defined below) except as acts of revenge and retribution.

7.      The Court is well aware that this Bankruptcy Case was born out of years of contentious litigation in multiple forums with multiple parties that resulted in substantial judgments and awards against HCMLP and its affiliates.  The Court is also cognizant of the fact that Mr. Dondero's adversaries (*e.g.*, Joshua Terry, Patrick Daugherty, UBS, and the Redeemer Committee) stand to recover the lion's share of the value of the Debtor's estate on account of their allowed claims and that Mr. Dondero is extremely frustrated by that.  But "burning down the house" is no answer and has (and will have) its own consequences for Mr. Dondero, including the entry of this permanent injunction.

---

[2] "Plan" means the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808], which includes certain amendments filed on February 1, 2021.  *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Docket No. 1875].

8.      In contrast to Mr. Dondero, the Debtor offered the testimony of James P. Seery, Jr., its Chief Executive Officer, and the Court finds Mr. Seery credible and reliable for the following reasons: (a) his testimony was generally consistent over time, (b) Mr. Dondero's counsel did not impeach Mr. Seery with his prior testimony much, if at all, (c) Mr. Seery made no attempt to retract or change any of his testimony, (d) the Court admitted into evidence substantial documentary evidence corroborating Mr. Seery's testimony, (e) in general, Mr. Seery's testimony made sense and was free of hyperbole and exaggeration, and (f) there is nothing in the record that causes the Court to question Mr. Seery's motivations.

9.      As described in detail below, there is ample evidence proving that after the Debtor demanded his resignation in October 2020, Mr. Dondero immediately embarked on a course of conduct intended to disrupt and interfere with the Debtor's business and efforts to reach a consensual asset monetization plan.  Beginning less than a week after his ouster, Mr. Dondero, entities he owns and controls, and others working on his behalf, made threats and specious claims, engaged in frivolous litigation, controlled and destroyed the Debtor's property, interfered with the Debtor's business, and colluded with certain of the Debtor's then-employees in ways that were clearly adverse to the Debtor's interests and improper.

10.      Much of this conduct occurred after the Court entered a temporary restraining order against Mr. Dondero and is the subject of the Debtor's contempt motion.  While the contempt motion remains under consideration, the factual findings described below relating to the TRO are relevant here because they raise the question of what Mr. Dondero might do to the Debtor in the absence of any restraints at all.

11.     For the reasons set forth herein, it is hereby **ORDERED** that James Dondero is permanently enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any member of the Independent Board[3] unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the implementation of the Debtor's Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[4]

12.     It is further **ORDERED** that Mr. Dondero is also preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

13.     It is further **ORDERED** that Mr. Dondero is also preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or

---

[3] "Independent Board" means the board of directors at Strand Advisors, Inc., the Debtor's general partner, appointed on January 9, 2020, and their successors. The current members of the Independent Board are John Dubel, James P. Seery, Jr., and Russell Nelms.

[4] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case.

any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel. If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

## I.     PROPOSED FINDINGS OF FACT

### A.     Background Information

14.     James Dondero controlled the Debtor as of October 16, 2020 (the "Petition Date") but agreed to relinquish control of it on or about January 9, 2020, pursuant to an agreement reached with the Committee.  [Bankr. Docket Nos. 338, 339]

15.     Mr. Dondero remained with the Debtor as an unpaid employee/portfolio manager until early October 2020 when the Independent Board demanded Mr. Dondero's resignation because he was "taking aggressive actions, interfering with the operations of the Debtor and [the Debtor's] pursuit of a plan" of reorganization.  **Ex. 40 at 213:11-19**.

16.     Within weeks, the Debtor's relationship with Mr. Dondero had become "extremely adverse" as discussions concerning a "bargain plan had really fallen apart," Mr. Dondero and entities he controlled were "actively objecting to the pursuit of the monetization plans," and Mr. Dondero had "begun to move forward on litigation strategies" against the Debtor. *Id*. **at 213:23-214:9**.

17.     In addition, Mr. Dondero and entities he controls began interfering with the Debtor's business, making explicit threats, and engaging in other conduct more fully described

below that caused the Debtor to commence this Adversary Proceeding and seek and obtain a temporary restraining order against Mr. Dondero.  **Ex. 2, 11, 40 at 213:20-22**; s*ee also* Adv. Proc. Docket Nos. 1 through 8.

18.    Notably, Mr. Dondero only has a tangential interest in the Debtor. Admittedly, the only claims Mr. Dondero potentially has against the Debtor are for indemnification and for claims relating to taxes.  **Ex. 40 at 186:2-4**.  As discussed herein, Mr. Dondero's lack of meaningful economic interest in the Debtor and its estate is a substantial factor to consider in the balancing of the equities.

**B.**    **Procedural Background**

19.    This action involves a claim for permanent injunctive relief under sections 105(a) and 362(a) Bankruptcy Code and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The operative complaint in this action is *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Proc. Docket No. 1] (the "Complaint"), filed on December 7, 2020.

20.    On December 7, 2020, the Debtor filed its *Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Proc. Docket No. 3].

21.    An evidentiary hearing was held on December 10, 2020 with respect to the Debtor's motion for a temporary restraining order. [Adv. Proc. Docket No. 13].  Following the hearing, the Court issued its *Order Granting Debtor's Motion for a Temporary Restraining Order*

*against James Dondero* [Adv. Proc. Docket No. 10] (the "TRO"), which enjoined and restrained

Mr. Dondero from:

> (2)(a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Independent Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication;
>
> (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents;
>
> (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero;
>
> (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan;
>
> (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, (a)-(e) constitutes the "Prohibited Conduct"); and
>
> (3) causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

*Id*.

22.     On January 7, 2021, the Debtor filed its *Motion for an Order Requiring Mr.*

*Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO*

[Adv. Proc. Docket No. 48] (the "Contempt Motion").

23.     The following day, January 8, 2021, the Court granted the Debtor's motion

for a preliminary injunction following an evidentiary hearing [Adv. Proc. Docket No. 59] (the "PI

Order").  The PI Order preliminarily enjoined and restrained Mr. Dondero from, among other

things:

(1) engaging in any Prohibited Conduct (as defined above).

(2) causing, encouraging, or conspiring with (a) any entity owned or controlled by him and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

(3) communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

(4) physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel. If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

24.     On January 11, 2021, Mr. Dondero filed his *Original Answer to Verified Original Complaint for Injunctive Relief* [Adv. Proc. Docket No. 57] (the "Answer").

25.     Notably, Mr. Dondero asserted only one affirmative defense, contending that "Plaintiff has unclean hands because it has not acted fairly and without deceit."  Answer ¶53.

26.     On March 22 and March 24, 2021, the Court held an evidentiary hearing on the Contempt Motion.  The Contempt Motion is *sub judice*.

C.     **Mr. Dondero Ignored the TRO Proceedings and was Unfamiliar with its Terms**

27.     Although Mr. Dondero knew the Court had granted the Debtor's request for a TRO on December 10, 2020, at least as of January 8, 2021—the date of the preliminary injunction hearing—Mr. Dondero claimed that he (a) had never reviewed the declaration that Mr. Seery filed in support of the Debtor's motion for the TRO, and (b) was unaware of the substance of Mr. Seery's allegations against him.  **Ex. 38 at 21:23-22:11; Ex. 40 at 30:16-22**.

28.     And that's because Mr. Dondero did not give the TRO any thought.  **Ex. 38 at 22:12-23:14; Ex. 40 at 34:18-35:16**.

29.     Indeed, Mr. Dondero did not dial into the hearing when the Court considered the Debtor's motion for a TRO and did not read the transcript from the proceedings. **Ex. 38 at 23:15-24:6; Ex. 40 at 35:20-36:1**.  Not surprisingly, Mr. Dondero had only a vague understanding of the TRO's terms.  **Ex. 38 at 31:8-32:9** (Mr. Dondero apparently believed that the TRO only restrained him from talking directly to the Independent Board and the Debtor's employees).

**D.      Interference with the Debtor's Management of the CLOs**

**1.      The Pre-TRO Letters from the Advisors**

30.     "CLO" stands for "collateralized debt obligations."  **Ex. 38 at 35:2-4**.

31.     The Debtor is party to certain contracts that give it the exclusive right and responsibility to manage certain CLOs.  **Ex. 38 at 35:5-8**.

32.     NexPoint Advisors, L.P. ("NexPoint") is an advisory firm in which Mr. Dondero has a direct or indirect ownership interest.  Mr. Dondero controls NexPoint in his capacity as President and as the sole owner of NexPoint's general partner.  **Ex. 38 at 35:9-36:9**.

33.     Highland Capital Management Fund Advisors, L.P. ("Fund Advisors" and together with NexPoint, the "Advisors") is an advisory firm in which Mr. Dondero has a direct or indirect ownership interest.  Mr. Dondero controls NexPoint in his capacity as President and as the sole owner of Fund Advisors' general partner.  **Ex. 38 at 36:10-37:4**.

34.     The Advisors manage certain investment funds for which Mr. Dondero serves as the portfolio manager.  **Ex. 38 at 37:5-17**.

35.     "Years ago[,]" the Advisors caused the funds they manage to invest in CLOs that were managed by the Debtor; the funds continue to hold the interests in the CLOs managed by the Debtor.  **Ex. 38 at 37:18-38-3**.

36.     At the time of the injunction hearing, K&L Gates represented the Advisors and certain of the funds they managed (together, the "K&L Gates Clients").  **Ex. 38 at 38:4-7**.

37.     Before the TRO was entered, the Advisors sent two letters to the Debtor concerning the Debtor's management of the CLOs and related matters (together, the "Pre-TRO Letters").  **Ex. 3; Ex. 4; s**ee also **Ex. 38 at 38:8-11**, **38:23-39:22.**

38.     The Advisors sent the first Pre-TRO Letter on October 16, 2020—less than a week after Mr. Dondero was forced to resign—and made the following assertions:

- the Debtor had allegedly refused to permit its "employees to work on certain [unidentified] matters that jointly affect HCMLP and the Advisors" and that allegedly caused the Advisors to unnecessarily incur third-party costs;

- *if* the Debtor terminated employees at the end of the year, the Debtor "will no longer be able to carry out its duties and responsibilities under the Agreements" (the "Prospective Complaint"); and

- the Debtor's contemplated sale of certain assets held in CLOs could result in the loss of value, and the Advisors asked that no such assets be sold without their prior consent.

**Ex. 3**.

39.     The Advisors sent the second Pre-TRO Letter on November 24, 2020, this time only to reiterate its complaints about the Debtor's sale of CLO assets and its demand that all such sales cease in the absence of the Advisors' prior consent.  **Ex. 4**.

40.    Mr. Dondero was (i) familiar with the substance of the Pre-TRO Letters; (ii) was aware of the Pre-TRO Letters before they were sent; (iii) had discussed the substance of the Pre-TRO Letters with the Advisors and their internal counsel before they were sent; (iv) communicated with the Advisors' outside counsel, K&L Gates, about the Pre-TRO Letters; (v) knew the Pre-TRO Letters were being sent; and (vi) supported the sending of the Pre-TRO Letters. **Ex. 38 at 39:23-40:25**.

41.    Seen in their full context, the Court finds as a matter of fact that the Pre-TRO Letters were not sent for any legitimate purpose or to protect any legitimate interest but were instead sent in an attempt to coerce the Debtor into acceding to Mr. Dondero's demands.   The Court bases this conclusion on the following facts and reasonable inferences: (a) Mr. Dondero caused the Advisors to send the Pre-TRO Letters; (b) the Pre-TRO Letters were sent promptly after Mr. Dondero was forced to resign, with no corroborating evidence of any prior expression of concern; (c) the Debtor has the sole contractual right and obligation to manage the CLOs at issue and did not need to seek or obtain the Advisors' prior consent for anything; (d) nothing has ever been offered (let alone admitted) into evidence to support (let alone prove) the Advisors' assertion that the Debtor was "rush[ing]" to sell CLO "assets at fire sale prices" (**Ex. 3 at 2**); (e) the Advisors have never identified any "matters that jointly affect HCMLP and the Advisors" for which the Advisors have had to incur third-party costs; (f) Mr. Dondero and the Debtor were in an adversarial relationship at the time the Pre-TRO Letters were sent and he used his control over the Advisors to improperly seek leverage against the Debtor; and (g) the Pre-TRO Letters were subsequently used as a pretext to justify Mr. Dondero's interference with Mr. Seery's trading (*see* **Ex. 5** (after

interfering in the Debtor's transactions, Mr. Dondero referred to the Pre-TRO Letters, stating that the Advisors have "instructed Highland in writing not to sell any CLO underlying assets," and warned that "there is potential liability, don't do it again please."); **Ex. 38 at 46:8-20**)).

2. **Mr. Dondero Interferes with the Debtor's Trading Activities (Part I -- Thanksgiving)**

42.     Around Thanksgiving, at the same time the Advisors were sending the second of their Pre-TRO Letters, Mr. Dondero learned that Mr. Seery had given a direction to sell certain securities owned by the CLOs that were managed by the Debtor. **Ex. 38 at 41:4-7**.

43.     Mr. Dondero admitted that when he learned of Mr. Seery's directions, he personally intervened to stop the trades. **Ex. 38 at 41:8-13**.

44.     Specifically, on November 24, 2020, immediately upon learning that Hunter Covitz, one of the Debtor's employees at the time, had conveyed Mr. Seery's instructions to Matt Pearson and Joe Sowin, two employees of the Advisors who were to execute the trades, Mr. Dondero instructed the recipients of Mr. Covitz's e-mail not to sell the securities as had been instructed by Mr. Seery. **Ex. 5** (responding to Mr. Covitz's sell order, Mr. Dondero sent an e-mail with the simple command: "No ….. do not"); **Ex. 38 at 41:14-42:9, 43:11-44:1**.

45.     Mr. Dondero expressly relied on the Pre-TRO Letters as the basis for his direction to cancel the trades. **Ex. 5** (Mr. Dondero stated that the Advisors had "instructed Highland in writing not to sell any CLO underlying assets"); **Ex. 38 at 46:8-20**.

46.     Mr. Dondero instructed the Advisors' employees not to sell the securities knowing that he was stopping trades that were authorized by Mr. Seery. **Ex. 38 at 44:2-25**.

47.     Mr. Dondero did not (a) speak with Mr. Seery before interfering with Mr. Seery's trades, (b) seek the Debtor's consent before intervening to stop Mr. Seery's trades; or (c) ask Mr. Seery why he wanted to make the trades.  **Ex. 38 at 45:1-22; 49:16-51:2**.

48.     In response to Mr. Dondero's instructions, nearly all of Mr. Seery's trades were cancelled.  **Ex. 5** (Mr. Pearson responds to Mr. Dondero saying "I've cxl'd both SKY and AVAYA sales – only completed a small batch of each"); **Ex. 38 at 45:23-46:7**.

### 3.     Mr. Dondero Interferes with the Debtor's Trading Activities (Part II -- December)

49.     In late December, after the TRO was entered, Mr. Dondero again interfered with the Debtor's trading activities, an issue the Debtor immediately brought to the attention of Mr. Dondero's attorneys.

50.     On Friday, December 18, 2020, Mr. Seery gave instructions to sell SKY and AVAYA stock that was then owned by certain of the CLOs managed by the Debtor.  Joseph Sowin, an employee of the Advisors, immediately notified Mr. Dondero and DC Sauter, the Advisors' General Counsel, and Mr. Dondero later forwarded the entire e-mail string to Scott Ellington, the Debtor's then-General Counsel (in violation of the TRO).  *See* **Ex. 13**; s*ee also* **Ex. 38 at 74:24-75:23**.

51.     The Debtor subsequently learned that Mr. Dondero used this information to again interfere with Mr. Seery's contemplated trades, and the Debtor immediately objected.  In a letter dated December 23, 2020 (the "December 23 Letter"), the Debtor informed Mr. Dondero's attorneys that:

Case 20-03190-sgj Doc 156 Filed 05/03/21   Entered 05/03/21 16:55:07   Page 16 of 56


> On December 22, 2020, employees of NPA and HCMFA notified
> the Debtor that they would not settle the CLOs' sale of the AVAYA
> and SKY securities.  To justify their conduct, those employees
> mimicked the frivolous arguments made in the CLO Motion.  The
> conduct violated the TRO, and HCMLP reserves all rights to seek
> appropriate sanctions with respect to such violations."

**Ex.12**.[5]

52.     Mr. Dondero admitted that he knew of the CLO Motion when it was filed

and that he was "supportive" of the making of that motion.  **Ex. 38 at 71:21-72:5.**  *See also* **Ex.**

**40 at 77:15-25**.

53.     Mr. Dondero also admitted that (just as he had done around Thanksgiving)

he personally intervened to halt the Debtor's trades, as alleged by the Debtor:

> Q:     And you personally instructed, on or about December 22nd, 2020,
>        employees of those Advisors to stop doing the trades that Mr. Seery
>        had authorized with respect to SKY and AVAYA, right?
>
> A:     Yeah.  Maybe we're splitting hairs here, but I instructed them not to
>        trade them.  I never gave instructions not to settle trades that
>        occurred.  But that's a different ball of wax.
>
> Q:     Okay.  But you did instruct them not to execute trades that had not
>        been made yet, right?
>
> A:     Yeah.  Trades that I thought were inappropriate, for no business
>        purpose, I – I told them not to execute.

**Ex. 38 at 73:2-13**.

54.     In fact, Mr. Dondero admitted that the trades he stopped were the very trades

Mr. Seery authorized in his December 18, 2020 e-mail (**Ex. 13**):

---

[5] The Advisors previously sought a court order to stop the Debtor from trading CLO assets.  *See Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Bankr. Docket No. 1528] (the "CLO Motion").  At the hearing on December 16, 2020, before Mr. Dondero caused the Advisors to stop Mr. Seery's trades, the Court found, among other things, that the CLO Motion was brought by "Mr. Dondero, through different entities" and that the CLO Motion was "frivolous."

Q:    And you would agree with me, would you not, that you personally instructed employees of the Advisors not to execute the very trades that Mr. Seery identifie[d] in this e-mail [i.e., **Ex. 13**], correct?

A:    Yes.

**Ex. 38 at 76:15-19**.[6]

55.    These admissions are consistent with the failure of Mr. Dondero's lawyers to contest the Debtor's charges of interference as set forth in its December 23 Letter. **Ex. 40 at 200:19-201:9** (Mr. Dondero conceded that he does not know if his lawyers disputed the Debtor's charges and is unaware of anything in the record that would prove that they did).

56.    Notably, Mr. Dondero candidly admitted that at no time after December 10 (when the TRO was entered) did he ever instruct any employee of either of the Advisors that he owns and controls not to interfere with or impede the Debtor's business and management of the CLOs. **Ex. 38 at 77:1-6**.

### 4.    The Post-TRO Letters from K&L Gates

57.    After the TRO was entered, and at the very time Mr. Dondero was again admittedly interfering with the Debtor's trading activities as the manager of the CLOs, K&L Gates sent a series of letters that served no purpose other than to attempt to bully and cajole the Debtor into bending to Mr. Dondero's will.

---

[6] Apparently realizing that this testimony constituted a bald admission that he violated the TRO, Mr. Dondero subsequently attempted to walk it back, claiming that he thought the questioning was about the interference in the Thanksgiving time frame, before the TRO was entered. **Ex. 40 at 78:22-81:4** (tellingly, while contending that he did not call anyone to stop the trades, Mr. Dondero still admitted that he "just sent one email to Jason Post, a non-Highland employee, that he should look at the trades"), **201:10-202:22**. Mr. Dondero's attempt to effectively retract his clear testimony is not credible. The Debtor's line of inquiry during the January 8, 2021, preliminary injunction hearing (a) began with a specific reference to "December 22, 2020;" (b) followed immediately after the December 23 Letter was presented on the screen and Mr. Dondero acknowledged the Debtor's allegations concerning the interference occurring on December 22, 2020; and (c) was tied to the December 18, 2020, e-mail string on this topic. **Ex. 38 at 71:11-13; 76:15-19; Ex. 13**.

58.     On December 22, 2020, counsel for the K&L Gates Clients wrote to counsel for the Debtor (the "December 22 Letter") and, among other things, repeated the contentions and demands set forth in the Pre-TRO letters and the CLO Motion that the Court dismissed as "frivolous."  The K&L Gates Clients asserted that the Debtor's actions contravened "its duties under the Advisers Act, which ultimately will adversely impact" the funds managed by Mr. Dondero and the Advisors.  **Ex. 14, Ex. A**.

59.     On December 23, 2020, counsel for the K&L Gates Clients wrote again (the "December 23 Letter"), this time to inform the Debtor that their clients "had no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so" and that the "process of removal is being initiated. . ." **Ex. 15, Ex. A**.

60.     The Debtor obviously took the K&L Gates Clients' threats seriously because it promptly commenced an adversary proceeding seeking, among other things, injunctive relief to prevent the K&L Gates Clients from attempting to terminate the Debtor's CLO management contracts.  *See Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Declaratory and Injunctive Relief* (Adv. Pro. 21-03000) [Docket No. 1].

61.     Finally, on December 31, 2020, counsel to the K&L Gates Clients again wrote to the Debtor (the "December 31 Letter" and together with the December 22 Letter and the December 23 Letter, the "Post-TRO Letters"), this time for the sole purpose of registering complaints about the Debtor's decision to evict Mr. Dondero from the Debtor's offices, contending

that evicting Mr. Dondero "will materially and adversely affect the function and reputation of the Advisors and the Funds." **Ex. 25**.

62.     Mr. Dondero was aware of the Post-TRO Letters at the time they were sent and was supportive of the sending of those Letters, despite the outcome of the CLO Motion just days earlier. **Ex. 38 at 78-18:79:2; Ex. 40 at 118:20-119:4.**

63.     The Court finds as a matter of fact that the Post-TRO Letters were not sent for any legitimate purpose or to protect any legitimate interest but—like the Pre-TRO Letters— were instead a further attempt to coerce the Debtor into acceding to Mr. Dondero's demands. The Court bases this conclusion on the following facts and reasonable inferences: (a) Mr. Dondero caused the Advisors to send the Post-TRO Letters; (b) since filing the CLO Motion, the K&L Gates Clients have not sought any judicial relief of any kind arising from or relating to the Debtor's conduct; and (c) the demands concerning the Debtor's management of the CLOs were particularly baseless, coming as they did less than a week after the CLO Motion was denied as "frivolous."

E.     **Explicit Threats to Mr. Surgent and Mr. Seery**

64.     At around Thanksgiving, while interfering with the Debtor's trading activities and otherwise, Mr. Dondero also explicitly threatened Mr. Seery and Thomas Surgent, then the Debtor's Chief Compliance Officer.[7]

1.     **Mr. Dondero Threatens Mr. Surgent**

65.     In November, a few days after causing Mr. Seery's trades to be cancelled, Mr. Dondero learned that Mr. Seery was "trying a workaround to effectuate" the same trades.

---

[7] On November 24, 2020, just after intervening to stop Mr. Seery's trades, Mr. Dondero issued another threat but it is unclear to whom it was directed. **Ex. 5** (the Advisors have "instructed Highland in writing not to sell any CLO underlying assets….. there is potential liability, don't do it again please").

66.     Upon learning that, he wrote to Mr. Surgent for the express purpose of "remind[ing] him of his personal liability" (**Ex. 38 at 48:19-49:12; 51:4-23**), writing:

> "I understand Seery is working on a work around to trade these securities anyway.  Trades that contradict investor desires and have no business purpose or investment rational.  You might want to remind him (and yourself) that the chief compliance officer has personal liability."

**Ex. 5**.

67.     This was an explicit threat.  As Mr. Dondero acknowledged, he intended to convey the message to Mr. Surgent that he faced personal liability for following Mr. Seery's orders to execute the trades.  **Ex. 38 at 52:18-23**.  The Court finds that Mr. Seery had the right under the Debtor's CLO management contracts to order the sale of SKY and AVAYA securities, and that Mr. Dondero referred to "personal liability" in an attempt to bully Mr. Surgent and stop trades he personally opposed—not to protect any legitimate interest.

### 2.     <u>Mr. Dondero Threatens Mr. Seery</u>

68.     A few days before threatening Mr. Surgent, Mr. Dondero had threatened Mr. Seery.

69.     Specifically, on November 24, 2020, Mr. Dondero sent Mr. Seery a text message that ominously but simply stated:  "Be careful what you do - last warning."  **Ex. 6; Ex. 38 at 53:3-54:6**.

70.     While there is no evidence in the record of any prior warnings or what the consequences would be if Mr. Dondero concluded that Seery was not being "careful," the Court finds that—like the facts concerning Mr. Dondero's interference with the Debtor's business and

threats to Mr. Surgent—that Mr. Dondero's November 24, 2020, text message was (at the very least) an attempt to intimidate Mr. Seery, had no legitimate purpose, and was completely improper.

**F.**     **Mr. Dondero Destroys the Debtor's Property (Text Messages and Cell Phone)**

71.     As set forth below, the uncontroverted evidence in the record establishes that: (a) at least until the time the TRO was entered against him, Mr. Dondero possessed a cell phone that was bought and paid for by the Debtor, which cell phone was on the Debtor's account and for which the Debtor paid all use charges and fees, and that contained text messages relating to the Debtor's business; (b) the Debtor's written policies set forth in its *Employee Handbook* unambiguously provided that all text messages (regardless of whether the phone was owned by the Debtor or the employee) were the Debtor's property; (c) Mr. Dondero, like other senior executives, participated in periodic compliance reviews; (d) as part of the compliance process, Mr. Dondero twice certified in 2020 that he was familiar with, and in compliance with, all of the terms contained in the *Employee Handbook*; (e) in July 2020, the Official Committee of Unsecured Creditors (the "UCC") filed a motion seeking, among other things, Mr. Dondero's text messages; (f) Mr. Dondero responded to the UCC's motion and acknowledged the UCC's demand for his text messages; (g) in late November or early December 2020, Mr. Dondero changed the account holder for his cell phone from the Debtor to himself, and he obtained a new phone; (h) Mr. Dondero did not "back up" or otherwise save the Debtor's text messages; (i) Mr. Dondero knew the Debtor-issued cell phone was in his assistant's possession after the TRO was entered; (j) Mr. Dondero never sought or obtained the Debtor's approval to switch the account holder for his cell phone, or to dispose of the phone; and (k) after the Debtor sought to recover the cell phone and text messages

less than two weeks after the TRO was entered, Mr. Dondero's lawyers asserted that the whereabouts of Mr. Dondero's cell phone was unknown, but made no mention of any (1) informal policy or practice whereby employees would switch account holders, dispose of company-issued cell phones, and delete company text messages, or (2) any instruction by Mr. Seery to take any of the foregoing actions.

72.     Based on the foregoing, and the evidence cited to below, the Court finds as a matter of fact that Mr. Dondero knowingly and intentionally caused the loss of the Debtor's property; to wit, the cell phone and, more importantly, the text messages that Mr. Dondero knew or should have known were the Debtor's property and were sought by the UCC.[8]

**1.     The Debtor's Employee Handbook and Compliance Certifications**

73.     Mr. Dondero was the Chief Executive Officer ("CEO") of HCMLP from around 1994 through January 9, 2020, and a portfolio manager for the Debtor until October 9, 2020.  For at least ten (10) years prior to the Petition Date, HCMLP maintained an *Employee Handbook*.  **Ex. 40 at 36:11-22.**

74.     As HCMLP's CEO, Mr. Dondero "knew that the purpose of maintaining the handbook was to inform Highland's employees of Highland's policies and practices."  **Ex. 40 at 36:23-37:2**.

75.     The Debtor's *Employee Handbook* described a "cell phone benefit" policy pursuant to which employees could obtain up to $100 per month towards the cost of their own cell

---

[8] For the avoidance of doubt, the Court finds as a matter of fact that by discarding the Debtor's text messages when he knew or should have known that he was a target of the UCC's investigation and that the UCC obtained a court order relating to his text messages, Mr. Dondero has caused the spoliation of important evidence.  The consequences of this finding will be determined when, as, and if raised by a litigant.

phone provided that complied with company policy.  **Ex. 59 at 12**; *see also* **Ex. 40 at 38:7-19**.

The *Employee Handbook* further provided that:

> Further, regardless of whether employees choose to participate in this policy, all email, voicemail, **text messages**, graphics, and other electronic data **composed, sent, and/or received related to company business remain the property of Highland**.

**Ex. 59 at 13 (emphasis added)**.

76.     As Mr. Dondero admitted, "that was the company's policy" and it applied to all employees regardless of whether they participated in the "cell phone benefit" program.  **Ex. 40 at 39:17-40:15**.

77.     Mr. Dondero personally reviewed the Employee Handbook on an annual basis as part of the company's compliance training.  According to Mr. Dondero, all senior executives met with the Chief Compliance Officer on a periodic basis to review any changes to the *Employee Handbook* and the company's compliance manual.  *Id*. **at 37:3-15; 40:16-41:5.**

78.     At the conclusion of these meetings, each senior executive signed a certification about "what was gone over in the meeting."  *Id*. **at 37:16-22**.  Mr. Dondero was not excluded; he personally certified that "I have received, have access to, and have read a copy of the Employee Handbook, and I am in compliance with the obligations applicable to employees set forth therein."  **Ex. 60 at [last page];** *see also* **Ex. 61 at 8; Ex. 40 at 41:6-43:23.**

79.     Based on the foregoing, the Court finds as matters of fact that (a) pursuant to company policy as embodied in the *Employee Handbook*, all text messages "related to company business remain the property of Highland;" and (b) Mr. Dondero certified that he knew of this policy and was in compliance with it.

2. **Mr. Dondero Knew the UCC Was Seeking His Text Messages by July 2020**

80.     Mr. Dondero denied knowing no later than July 2020 that the UCC wanted his text messages. **Ex. 40 at 46:12-14**. Mr. Dondero's testimony in this regard is contradicted by his own submission to this Court and is otherwise not credible.

81.     On July 8, 2020, the UCC filed its *Emergency Motion to Compel Production by the Debtor* (the "UCC's Motion to Compel") [Bankr. Docket No. 808]. The UCC's Motion to Compel expressly stated that the UCC was seeking to compel the production of, among other things, Mr. Dondero's text messages. **Ex. 35 ¶¶6, 10, n. 8; Ex 40 at 49:1-17**.

82.     On July 14, 2020, Mr. Dondero filed his response to the UCC's Motion to Compel and expressly acknowledged that the UCC was seeking his text messages. [Bankr. Docket No. 832]. **Ex. 44 ¶3; Ex. 40 at 50:18-51:11**.

83.     To credit Mr. Dondero's testimony that he was unaware that the UCC was seeking his text messages, the Court would be required to find that (i) Mr. Dondero was unaware of or did not recall his own Court filing, and that (ii) although his lawyers acknowledged that the UCC sought Mr. Dondero's text messages, they either never discussed the issue with Mr. Dondero or Mr. Dondero did not recall such discussions. There is no evidence to support such findings and the Court concludes that any inferences in these regards would be unreasonable. Mr. Dondero knew or should have known in July 2020 that the UCC was seeking his text messages.

**3.      Mr. Dondero Switches Accounts and His Cell Phone Is Disposed of Without
the Debtor's Knowledge or Consent**

84.      Mr. Dondero admitted that until at least December 10, 2020—the day the
TRO was entered—he had a cell phone that was bought, paid for, and maintained by the Debtor
and that had text messages concerning HCMLP's business. **Ex. 40 at 51:16-52:1, 196:5-10**.

85.      Mr. Dondero also admitted that sometime after December 10, 2020, the cell
phone that, prior to that time had been owned and paid for by the Debtor, was thrown in the garbage
or otherwise disposed of. **Ex. 38 at 55:10-16; 56:8-11, 196:11-14**.

86.      Mr. Dondero did not back up the cell phone before it was thrown in the
garbage nor did it occur to Mr. Dondero that he should save the data. ***Id*. at 145:17-21**.

87.      Mr. Dondero claimed not to know who decided to throw his cell phone
away, but he also testified that he "could find out [who made that decision], but I don't know.  I
would have to talk to employees."  Yet, Mr. Dondero never asked the Debtor to try to determine
who made the decision to throw the cell phone away because he had no interest in identifying who
it was.  **Ex. 38 at 17-24; 57:6-9; 61:20-62:2**.

88.      Mr. Dondero admitted that he never told Mr. Seery or Debtor's counsel that
the phone was being thrown in the garbage. **Ex. 40 at 64:17-20**.  Indeed, Mr. Dondero cavalierly
testified that it never occurred to him to get the Debtor's consent before disposing of the cell phone.
**Ex. 38 at 57:24-58:18**.

89.     Mr. Dondero also had the billing changed from the company account to his own personal account without asking for the Debtor's permission or informing the Debtor that he was doing so. **Ex. 38 at 59:6-15**.[9]

90.     At the hearing on the Debtor's motion for a preliminary injunction, Mr. Dondero testified that did not believe it was necessary to give the Debtor notice that he was taking the phone number for his own personal account and throwing the phone in the garbage. **Ex. 38 at 59:22-60:1**.[10]

91.     Mr. Dondero knew the cell phone was in his assistant's desk at 6:25 p.m. on December 10, 2020, after the TRO was entered against him, because Jason Rothstein, then the

---

[9] At a later hearing on the Debtor's Contempt Motion, Mr. Dondero testified that he changed the billing account "at the direction of Mr. Seery" and sought to shift responsibility to his assistant. **Ex. 40 at 60:22-61:3**. *See also* **Ex. 40 at 62:17-63:15**. This testimony is not credible because (a) Mr. Dondero did not mention these facts during the preliminary injunction hearing; (b) Mr. Dondero admitted that he had no memo or other written notice reflecting Mr. Seery's alleged directions; (c) no witness corroborated Mr. Dondero's later testimony; (d) there is no evidence that anyone other than Mr. Dondero and Mr. Ellington had cell phone accounts paid for by the Debtor so the testimony is illogical; (e) Mr. Dondero's response and objection to the Debtor's contempt motion did not recite any facts consistent with Mr. Dondero's testimony (*see* Adv. Proc. Docket No. 110 ¶¶36-40); (f) Mr. Dondero's testimony is contradicted by the Debtor's December 23 Letter (defined below) stating, among other things, that *the Debtor* "will terminate Mr. Dondero's cell phone plan" (**Ex. 12 at 2; Ex. 40 at 66:20-67:8**); and (g) none of the alleged facts offered by Mr. Dondero were mentioned in his attorney's response to the Debtor's December 23 Letter. *See* **Ex. 22; Ex. 40 at 69:21-71:1**.

[10] Apparently realizing his dilemma, at the hearing on the Debtor's Contempt Motion, Mr. Dondero contended that he did not need to notify the Debtor or obtain its consent to switch the account to his name and dispose of his phone because (i) Mr. Seery allegedly told all employees to get new phones; (ii) he was purportedly following company policy, and (iii) the Debtor's technology group participated in the process. **Ex. 40 at 57:19-60:15**. This testimony is not credible because (a) it was not offered at the hearing on the preliminary injunction, (b) it directly conflicts with the mandate in the *Employee Handbook* that text messages are the Debtor's property (indeed, when pressed, Mr. Dondero could not identify anything in the *Employee Handbook* or anywhere else that reflects any policy he purportedly relied on (**Ex. 40 at 190: 9-18, 192:11-19, 194:12-18**)), (c) none of the alleged facts offered by Mr. Dondero were mentioned in his attorney's response to the Debtor's December 23 Letter (*see* **Ex. 22**); and (d) there is no evidence in the record corroborating Mr. Dondero's testimony; in fact, the *Employee Handbook*, Mr. Dondero's compliance certifications, and common sense contradict this testimony. Notably, Mr. Dondero served Jason Rothstein (the Debtor's then head of information technology) with a subpoena and included him on his initial witness list [Adv. Proc. Docket No. 83] and amended witness list [Adv. Proc. Docket No. 85], but then dropped him from his second amended witness list [Docket No. 106] because he "didn't believe it was necessary." *See* **Ex. 40 at 56:3-10, 191:3-192:4, 192:20-23**. Tellingly, Mr. Dondero testified that it did not know whether the informal policy he claims to have relied upon contained any exceptions that would require him to (i) save the text messages since he was the target of an investigation or (ii) refrain from throwing away the cell phone since the Court granted the UCC the right to obtain his text messages. *Id***. at 192:24-193:3, 193:23-194:11**.

Debtor's head of technology, sent Mr. Dondero a text message informing him of such.  **Ex. 8; Ex. 38 at 60:9-61:19; Ex. 40 at 53:17-54:9, 55:24-56:18**.[11]

92.     The Debtor was unaware that Mr. Dondero had switched the account from the Debtor to himself or that Mr. Dondero's cell phone was thrown in the garbage or otherwise disposed of.  These facts are established by the Debtor's December 23, 2020, letter to Mr. Dondero's attorneys (the "December 23 Letter") stating, among other things, that:

> HCMLP will also terminate Mr. Dondero's cell phone plan and those cell phone plans associated with parties providing personal services to Mr. Dondero (collectively, the "Cell Phones").  HCMLP demands that Mr. Dondero immediately turn over the Cell Phones to HCMLP by delivering them to you; we can make arrangements to recover the phones from you at a later date.  The Cell Phones and the accounts are property of HCMLP.  HCMLP further demands that Mr. Dondero refrain from deleting or "wiping" any information or messages on the Cell Phone.  HCMLP, as the owner of the account and the Cell Phones, intends to recover all information related to the Cell Phones and the accounts and reserves the right to use the business-related information."

**Ex. 12 at 2-3**.

93.     As Mr. Dondero admitted, the Debtor was "a couple of weeks too late" in making its demands concerning the cell phones "[b]ecause the phones were already in the garbage."  **Ex. 38 at 64:1-65:8; Ex. 40 at 68:2-69:15, 196:21-197:4**.

94.     Mr. Dondero discussed the Debtor's December 23 Letter with his attorneys.  **Ex. 40 at 195:10-12**.  But in their response, Mr. Dondero's attorneys did not (a) disclose that Mr. Dondero (i) switched the account to his own name or that (ii) the cell phones were thrown in the garbage or were otherwise disposed of, nor did they (b) contend that (i) there was an informal

---

[11] The TRO was entered on the docket on December 10, 2020, at 1:31 p.m.  **Ex. 11**.  The cell phone at issue was in the drawer of Mr. Dondero's assistant at 6:25 p.m. that evening.  **Ex. 8**.

company policy that Mr. Dondero followed permitting him to change the account and dispose of the cell phone without the knowledge or consent of Mr. Seery or the Independent Board, or that (ii) Mr. Seery instructed employees to get new phones. **Ex. 22**; *see also* **Ex. 38 at 65:16-66:9; Ex. 40 at 69:21-71:1, 197:5-198:11**.[12]

95.     Instead, in a carefully-phrased letter dated December 29, 2020, Mr. Dondero's attorneys said only that "it is our understanding that the phone Dondero is currently using was purchased by Dondero several weeks ago and that the Debtor is not paying for the use of that phone. We are at present not sure of location of the cell phone issued to Mr. Dondero by the Debtor . . ." **Ex. 22**.

96.     Tellingly, Mr. Dondero testified that he had no reason to believe that his attorney, Michael Lynn, would withhold from the Debtor the information that the cell phone had been thrown in the garbage consistent with company practice. **Ex. 38 at 65:4-22**. Based on Mr. Dondero's testimony, and the Court's own perception of Mr. Lynn as a person of integrity, the Court concludes that Mr. Dondero never shared with his attorneys any of the factual assertions he testified to at the contempt hearing.

## G.     Dondero Trespasses on the Debtor's Property

97.     The Debtor is a tenant under a lease for office space located at 300 Crescent Court, Suite 700, Dallas, Texas. **Ex. 40 at 71:7-16**.

---

[12] Mr. Seery refuted Mr. Dondero's assertion that there was a company policy that permitted Mr. Dondero to switch accounts and discard his cell phone with no notice to the Debtor's control parties. He also testified without dispute that the only information that the employer (in this case, the Debtor) "wipes" is the information connected to the employer's server, such as emails. **Ex. 40 at 216:1-20**. And, again, not only is there no documentary evidence to corroborate Mr. Dondero's claims about the Debtor's policies regarding cell phones, but the Debtor's *Employee Handbook* directly contradicts his claims. *See* **Ex. 59 at 13** (all text messages concerning company business are HCMLP's property).

98.     In its December 23 Letter, the Debtor also demanded, among other things, that Mr. Dondero vacate the Debtor's offices by December 30, 2020, because the Debtor had "concluded that Mr. Dondero's presence at the HCMLP office suite and his access to all telephonic and information services provided by HCMLP are too disruptive." **Ex. 12; Ex. 40 at 72:7-9, 73:5-10**.

99.     The Debtor also put Mr. Dondero on notice that "[a]ny attempt by Mr. Dondero to enter the office, regardless of whether he is entering on his own or as a guest, will be viewed as an act of trespass." **Ex. 12 at 3**.

100.    Mr. Dondero knew of the eviction notice contained in the December 23 Letter and could identify nothing ambiguous about it. **Ex. 38 at 63:21-23; 66:23-5; 68:17-69:4**.

101.    Moreover, Mr. Dondero admitted that the Debtor never told him that he would be permitted to enter its offices after December 30, 2020 if Mr. Dondero, in his own personal discretion, believed it was appropriate. **Ex. 38 at 69:22-70-1**.

102.    Nevertheless, just prior to the hearing on the Debtor's motion for a preliminary injunction against him, Mr. Dondero "just walked right into the Debtor's office and sat for [a] deposition." **Ex. 38 at 70:8-11**.

103.    Mr. Dondero admitted that he did not have the Debtor's approval to enter its offices and that he had not even bothered to ask the Debtor for permission. **Ex. 38 at 70:21-71:2**.

104.    The Court finds as a matter of fact that Mr. Dondero exercised control over the Debtor's property by entering its offices without consent. While this transgression is relatively

minor compared with others described herein, it is emblematic of the contempt and lack of respect

Mr. Dondero exhibits towards the Debtor and its authorized representatives.

**H.** **Mr. Dondero Violates the TRO More than a Dozen Times by Improperly Communicating with the Debtor's Employees**

105.    The TRO enjoined and restrained Mr. Dondero from, among other things,

"communicating with any of the Debtor's employees, except as it specifically relates to shared

services currently provided to affiliates owned or controlled by Mr. Dondero." **Ex. 11 ¶2(c); Ex.**

**40 at 82:20-83:17**.

106.    Despite these clear and unambiguous terms, Mr. Dondero initially

contended that he could speak with the Debtor's employees about "shared services, pot plan, and

Ellington, the settlement counsel." **Ex. 38 at 32:10-14; 101:3-12**.  However, when presented with

the TRO, Mr. Dondero was forced to concede that "the only exception that's in Judge Jernigan's

restraining order that she entered . . . relates to shared services." ***Id*. at 103:14-17**.

107.    Given the scope of the injunction as it relates to communications with the

Debtor's employees, it is important to understand the relationship between and among parties to

those communications.

108.    Mr. Dondero and Bonds Ellis.  Mr. Dondero was not personally a party to

any shared services agreement with the Debtor.  **Ex. 40 at 83:18-21**.  Moreover, according to Mr.

Dondero, his attorneys at Bonds Ellis (i) represent Mr. Dondero solely in his individual capacity

in the Bankruptcy Case, (ii) do not represent any entity that is owned or controlled by Mr. Dondero,

and (iii) do not represent any entity that is party to a shared services agreement with the Debtor.

***Id*. at 83:24-84:8.**

109.    <u>Douglas Draper</u>.  Mr. Draper is a lawyer for The Dugaboy Investment Trust ("<u>Dugaboy</u>") and The Get Good Trust ("<u>Get Good</u>" and together with Dugaboy, the "<u>Trusts</u>").  Mr. Dondero admitted to being a lifetime beneficiary of the Dugaboy trust, but was unsure of his status in relation to the Get Good trust.  In any event, according to Mr. Dondero, neither of the Trusts had a shared services or other "formal" agreement with the Debtor.  ***Id*. at 83:9-18**.

110.    <u>Scott Ellington</u>.  Mr. Ellington is a lawyer who, according to Mr. Dondero, (a) does not represent Mr. Dondero in the Bankruptcy Case, (b) was not Mr. Dondero's personal lawyer in December 2020, (c) was not employed by anyone after the Petition Date other than the Debtor; and (d) served as the Debtor's General Counsel in December 2020.  ***Id*. at 84:19-85:12, 88:20-89:8;** *see also* **Ex. 38 at 81:24-25**.  Moreover, Mr. Dondero admitted that he has never paid Mr. Ellington for legal services rendered in his individual capacity, or signed an engagement letter with him.  **Ex. 40 at 86:21-87:6**.

111.    As described in detail below, Mr. Dondero and others acting on his behalf communicated with certain of the Debtor's employees more than a dozen times between December 10, 2020 (the day the TRO was entered) and January 8, 2021 (the day of the hearing on the Debtor's motion for a preliminary injunction).  Mr. Dondero contended that ***all*** of the communications concerned "shared services" and that ***none*** of the communications concerned matters adverse to the Debtor's interest.  ***Id*. at 87:15-88:8**.

112.    As described in more detail below, the Court rejects Mr. Dondero's testimony in this regard as not being credible due to the relationship of the parties subject to the communications at issue (few of whom were parties to a shared service agreement or represented

parties to a shared services agreement), and the content of the actual communications.  Moreover, the Court finds and determines as a matter of fact that none of the communications described below were in furtherance of any "shared services agreement," and that all of the communications were adverse to the Debtor's interests and in violation of the plain terms of the TRO.  Importantly, Mr. Dondero conceded that there was nothing in any "shared services agreement[] that requires Debtor employees to take actions that are adverse to the Debtor."  **Ex. 40 at 199:7-10**.

113.    Mr. Seery testified that each of the communications at issue was (i) unauthorized, (ii) made without his knowledge, and (iii) was adverse to the Debtor's interests. From Mr. Seery's perspective as the Debtor's CEO, the communications "were extremely adverse to the Debtor's interests.  They – they even went so far as to be coordinating shared privilege among adverse parties who were contesting the Debtor's actions with respect to both claims and the plan monetization process.  What could be more adverse?"  **Ex. 40 at 214:10-215:10**.[13]

114.    Mr. Seery credibly testified that, had he contemporaneously known about the communications, he would have immediately terminated the employees in question.  In fact, the Debtor did exactly that after discovering the covert communications because they "were just all examples of employees breaching their duties to the Debtor and taking adverse interests against the Debtor.  And we couldn't continue to have those employees in place."  *Id*. **at 215:11-24**.

115.    The Court also finds as a matter of fact that Mr. Dondero knew the communications were improper based on his expectation that the communications would not be

---

[13] Mr. Dondero testified that—at least as of March 22, 2021—he did not believe he was adverse to the Debtor.  **Ex. 40 at 91:16-20**.  Based on the substantial evidence in the record in this Bankruptcy Case proving otherwise, including his explicit threats to Mr. Seery (**Ex. 6**) and Mr. Surgent (**Ex. 5**), Mr. Dondero's obstinate refusal to concede even this obvious point exemplifies a level of stubbornness that adds to the Court's concerns regarding Mr. Dondero's veracity.

shared beyond the recipients. Certain of the exhibits admitted into evidence contained communications subject to the attorney-client privilege or (arguably) the common interest doctrine (*e.g.*, **Exs. 18, 24, 26, 54, 56, 57**; *see also* **Ex. 40 at 119:24-121:22, 124:25-125:12, 126:3-8**). Nevertheless, Mr. Dondero and his attorneys apparently waived the privilege by voluntarily and intentionally sharing their privileged communications with Mr. Ellington and Mr. Leventon.[14] Despite doing so, in a moment of unprovoked candor, Mr. Dondero expressed surprise that his privileged communications were openly displayed in court. **Ex. 40 at 98:4-13** (Mr. Dondero reflexively asked: "Why isn't this privileged?" upon seeing certain privileged communications on the WebEx screen). Clearly, Mr. Dondero believed he could share his privileged communications with Mr. Ellington and Mr. Leventon but with no one else. That admission is fatal because if the communications were, in fact, about "shared services," Mr. Dondero should have had no concerns about their disclosure.

1. **Mr. Dondero Improperly Relied on Mr. Ellington to Identify a Witness to Testify on Mr. Dondero's Behalf**

116. On November 19, 2020, Mr. Dondero filed his *Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1439] ("Dondero's OOCB Motion"). A hearing on Dondero's OOCB Motion was scheduled for December 16, 2020. [Bankr. Docket No. 1467].

117. On December 11, 2020, just one day after the TRO was entered, Mr. Dondero's counsel turned to Mr. Ellington for help in identifying a witness who would testify on Mr. Dondero's behalf in connection with Dondero's OOCB Motion. In an e-mail titled

---

[14] The Court leaves for another day consideration of the scope and implications of Mr. Dondero's privilege waiver.

"Testimony," Mr. Dondero's counsel wrote: "Scott, you were going to talk with John Wilson of our firm or have JP do so. He needs to speak today so we know whom to put on the witness and exhibit list and will be waiting for a call." **Ex. 52**. Mr. Dondero was copied on the e-mail and acknowledged that his lawyer was "asking the Debtor's general counsel to have a conversation about a witness and exhibit list that [his] lawyers were putting together." **Ex. 40 at 90:9-14**.

118.    On December 12, 2020, Mr. Dondero's counsel continued communicating about identifying a witness who would testify on behalf of Mr. Dondero, and again brought Mr. Dondero and Mr. Ellington into the discussion. **Ex. 53; Ex. 40 at 91:21-92:3**.

119.    Later that night, Mr. Dondero's counsel wrote to Mr. Ellington that "we MUST have a witness NOW." In response, Mr. Ellington declared "[i]t will be JP Sevilla. I will tell him that he needs to contact you first thing in the morning." **Ex. 17; Ex. 40 at 93:6-16** (Mr. Dondero acknowledged that Exhibit 17 was an e-mail from Mr. Ellington to Mr. Dondero's personal lawyers at Bonds Ellis in which Mr. Ellington identified JP Sevilla as the witness).

120.    Mr. Dondero included JP Sevilla, then a senior attorney employed by the Debtor, on his witness list in connection with Mr. Dondero's OOCB Motion. [Bankr. Docket No. 1563].

121.    The Court finds as a matter of fact that the communications among Mr. Dondero, his counsel, and Mr. Ellington concerning Mr. Ellington's efforts to identify a witness to testify on Mr. Dondero's behalf violated the TRO and were otherwise improper because, among other things: (a) Mr. Dondero and the Debtor were adverse parties as reflected in (if nothing else) Mr. Dondero's OOCB Motion, the contested matter in which Mr. Sevilla's testimony was to be

offered; (b) regardless of the TRO, it is highly improper for an adverse party to surreptitiously work with in-house counsel to identify a witness to testify against his employer; (c) none of the parties included in the communications on this topic (*i.e.*, **Exs. 17, 52, and 53**) were parties to a shared services agreement or represented a party to a shared services agreement; and (d) there is no evidence that the communications were shared with, let alone approved by, the Debtor.

2.      **Mr. Dondero Improperly Communicated with the Debtor's Employees about Entering into a Common Interest Agreement**

122.    There is considerable evidence in the record that Mr. Dondero and others working on his behalf communicated with Mr. Ellington and Mr. Leventon, among others, about entering into a "Common Interest Agreement." Such communications would be highly improper under *any* circumstances; coming just days after the TRO was entered is deeply troubling.[15]

123.    Mr. Dondero falsely testified that "Scott Ellington and Isaac Leventon did not participate in the drafting of a joint interest or mutual defense agreement" and that his only communications on the topic were with Mr. Draper. **Ex. 38 at 86: 16-24**.

124.    The documentary evidence shows that days after the TRO was entered, Mr. Dondero and others acting on his behalf engaged in communications with certain of the Debtor's employees about the possibility of entering into a "Common Interest Agreement" and that Mr. Dondero personally sought to advance those communications.

---

[15] Obviously, issues abound concerning whether, and to what extent, Mr. Ellington and Mr. Leventon may have breached their fiduciary duties and duties of loyalty to the Debtor by engaging in, among other things, the communications described herein. Those issues are beyond the scope of this Adversary Proceeding but the Court anticipates that they might be addressed in this forum or in others at some future time.

125.     Specifically, on December 15, 2020, attorneys from Bonds Ellis and Mr. Draper included Mr. Ellington in an e-mail exchange entitled "The Dugaboy Investment Trust and Get Good Trust – Common Interest Agreement." **Ex. 24**.

126.     Mr. Draper prepared an initial draft "Common Interest Agreement" and sent it to Mr. Dondero and Bonds Ellis.  Bonds Ellis then brought Mr. Ellington into the discussion and circulated a revised draft agreement.  Five minutes later, Mr. Ellington forwarded the revised draft "Common Interest Agreement" to Mr. Leventon.  *Id*.

127.     Mr. Dondero sought to distance himself from this exchange because he was dropped from the portion of the e-mail string that included Mr. Ellington (**Ex. 38 at 87:18-25**), but his lawyers and Mr. Draper (with whom Mr. Dondero admittedly discussed the topic of joint defense or mutual defense agreement (**Ex. 38: 86:21-24**)) drove the discussion and chose to include Mr. Ellington, who in turn included Mr. Leventon.  **Ex. 24**.

128.     Mr. Dondero's attempt to distance himself fails for another reason:  He admitted that he, the Trusts, and "certain of the Debtor's then-employees were engaged in discussions about entering into a common interest agreement" and that those discussions "continued for a while in December."  **Ex. 40 at 99:11-18**.[16]

---

[16] Mr. Dondero testified that he broadly construed the phrase "shared services" (as used in the TRO) and that he believed it was "perfectly appropriate" for him and his "lawyers to be engaged in conversations with the Debtor's employees about possibly entering into a common interest agreement."  **Ex. 40 at 102:23-103:10**.  Mr. Dondero's testimony in this regard is not credible and demonstrates a troubling disregard for corporate and fiduciary duties.  As a threshold matter, Mr. Dondero is obviously and intentionally taking the phrase "shared services," as used in the TRO, out of context.  The TRO prohibited any communications between Mr. Dondero and those acting on his behalf "except as it specifically relates to ***shared services currently provided to affiliates owned or controlled by Mr. Dondero***").  **Ex. 11 ¶2(c)** (emphasis added).  The Court finds as a matter of fact that none of the communications admitted into evidence concern shared services provided to affiliates owned or controlled by Mr. Dondero and notes that Mr. Dondero did not offer any shared services agreement or other corroborating evidence to support his testimony.

129.    Indeed, about a week later, Mr. Dondero and Mr. Draper were still trying to cobble together a "Common Interest Agreement" with the Debtor's employees.  Knowing that certain of the Debtor's employees were then engaging new counsel at Baker & McKenzie, Mr. Dondero reached out to Mr. Leventon (then, still an employee of the Debtor) on December 22, 2020, to obtain his new lawyer's contact information.  **Ex. 20; Ex. 40 at 101:3-102:13**.  After professing not to remember why he wanted it, Mr. Dondero was confronted with his prior deposition testimony and forced to admit that he and Mr. Draper were still pursuing the Common Interest Agreement with the Debtor's employees:

> Q:    Do you recall asking Isaac Leventon for the contact information for the – for the lawyers at Baker & McKenzie?
>
> A:    I – I don't – I don't – it might have been for part of the shared defense, mutual defense whatever agreement, but that's – that's the only reason I would have asked for it.
>
> .   .   .   .   .
>
> Q:    Why did you want the Baker & McKenzie contact information?
>
> A:    I was trying to help Draper coordinate the mutual shared defense agreement, period.

**Ex. 38 at 96:16-97:3; 97:16-21**.

**3.    Mr. Dondero Improperly Relied on Mr. Ellington to Coordinate the Defense of His Interests**

130.    Mr. Dondero improperly relied on Mr. Ellington to coordinate the defense of his personal interests.

131.    On December 16, 2020, Mr. Dondero, his lawyers, and Mr. Draper were trying to identify and corral the many lawyers and law firms working on Mr. Dondero's behalf.  **Ex. 18; Ex. 40 at 111:23-113:4**.    Mr. Dondero admitted that he forwarded privileged

communications to Mr. Ellington (*id.* **at 113:5-10**), and that he and Mr. Ellington then engaged in the following exchange:

> MR. DONDERO:      *"I'm going to need you to provide leadership here."*
>
> MR. ELLINGTON:    *"On it."*

**Ex. 18**.

132.    Mr. Dondero professed not to recall why he forwarded the e-mail to Mr. Ellington and why he needed Mr. Ellington to "provide leadership." **Ex. 38 at 84:16-22; 86:4-7; Ex. 40 at 113:17-21**. Given the obvious significance of the communications (*i.e.*, Mr. Dondero enlisting Mr. Ellington to coordinate the lawyers working to advance his personal interests), and the fact that Mr. Dondero testified just three weeks after the exchange, Mr. Dondero's failure to recall was not credible. Notably, Mr. Dondero conceded that he was unaware of anything in the TRO permitting him to ask Mr. Ellington to "provide leadership in the context of working on a joint meeting that would include lawyers for" Mr. Dondero and entities owned and controlled by him. ***Id.* at 113:25-114:6**. Pressed, he also conceded that none of the senders or recipients of Exhibit 18 represented a party to a shared services agreement. ***Id.* at 114:11-115:11**.

133.    In any event, Mr. Dondero and those working to protect his interests continued to actively include Mr. Ellington in their deliberative processes. Thus, for example, on December 23, 2020, at around the same time that (a) Mr. Dondero was interfering with trades that Mr. Seery had authorized, and (b) the Post-TRO Letters were being sent (**Ex. 40 at 117:18-20**), Grant Scott (then the sole authorized representative of CLO Holdco and a director of the DAF (**Ex. 40 at 117: 14-17**)) invited Mr. Ellington to join a conference call with Mr. Dondero, Mr. Scott's

attorney, lawyers from K&L Gates, and DC Sauter (the Advisors' General Counsel). **Ex. 26**. Mr. Dondero recalled that "a couple of conference calls" occurred among these people at around this time. **Ex. 40 at 116:15-19**. Mr. Dondero relied on Mr. Ellington's role as "settlement counsel" to justify these communications. **Id. at 122:1-4.**

134. The Court finds as a matter of fact that the covert communications among Mr. Dondero, his counsel, other attorneys representing Mr. Dondero's interests, and Mr. Ellington described above violated the TRO and were otherwise improper because, among other things: (a) Mr. Dondero and the K&L Gates Clients were adverse to the Debtor and were adverse parties as reflected in (if nothing else) Mr. Dondero's OOCB Motion, the CLO Motion and the Post-TRO Letters, (b) regardless of the TRO, it is highly improper for an adverse party to surreptitiously work with in-house counsel to coordinate legal strategy against his employer, (c) the communications cannot reasonably be described as being in furtherance of "shared services," and (d) there is no evidence that the communications were shared with, let alone approved by, the Debtor.

### 4. Mr. Dondero Improperly Directed a Debtor Employee Not to Comply with the UCC's Information Request

135. Mr. Dondero is a beneficiary of The Dugaboy Investment Trust. Dugaboy never had a shared services agreement with the Debtor (*see* **Ex. 38 at 93:15-19**), but Dugaboy's financial statements were maintained on the Debtor's server (**Ex. 40 at 107:19-22**) and were therefore in the Debtor's possession, custody, and control.

136. Mr. Dondero knew that various entities asked the Debtor to produce Dugaboy's financial statements (**Ex. 38 at 92:14-18**), but Mr. Dondero intervened to prevent the

Debtor from producing those documents by instructing one of the Debtor's employees not to produce them without a subpoena. **Ex. 40 at 107:6-11** (admitting that he communicated "with one of the Debtor's employees to make sure that she didn't produce the Dugaboy financial statements" to the UCC).

137.    As of December 16, 2020, Melissa Schroth was employed by the Debtor as an Executive Accountant and maintained Dugaboy's financial statements. **Ex. 38 at 92:25-93:7; Ex. 40 at 108:3-8**.   On that day, while the TRO was in place, Mr. Dondero sent a text message to Ms. Schroth that said: "No Dugaboy details without subpoena." **Ex. 19**; **Ex. 38 at 93:24-94:10**.

138.    Mr. Dondero admitted that the text message "show[s] that he communicated with Ms. Schrath [sic] one of the Debtor's employees, after the TRO was entered into, for the purpose of instructing her not to provide the Dugaboy details without a subpoena." **Ex. 40 at 110:5-15**.   Pressed, Mr. Dondero conceded that he was unaware of anything in the TRO that permitted him to "give instructions to one of the Debtor's employees about whether and how to produce documents that are on the Debtor's system." *Id***. at 110:22-111:8**.

139.    Mr. Dondero contended that he sent the text to Ms. Schroth "on advice of counsel" (**Ex. 40 at 107:212-25, 108:9-15**), but that contention is not credible for two independent reasons.   First, no credible lawyer would have advised his or her client to violate the TRO by communicating directly with one of the Debtor's employees about matters indisputably unrelated to shared services.   And second, Mr. Draper, the lawyer for Dugaboy, was actively seeking the very same financial statements.   In fact, Mr. Dondero admitted that Mr. Draper was "ultimately . . . okay with it . . . he just said he wanted to review the documents first." *Id***. at 108 at 16-24**.

140.     The Court cannot reconcile Mr. Dondero's testimony that, upon the advice of counsel, he instructed Ms. Schroth not to produce Dugaboy's financial statements without a subpoena with his further testimony that Dugaboy's counsel, Mr. Draper, ultimately had no objection to the production of documents.  In any event, the Court finds as matters of fact that Mr. Dondero's text message to Ms. Schroth was (i) unrelated to shared services (the Debtor and Dugaboy were not parties to a shared services agreement), and (ii) adverse to the Debtor's interests in complying the with UCC's informal document requests, and therefore violated the TRO and was in any event improper.

### 5.     Mr. Dondero Improperly Communicated with Mr. Ellington about the Debtor's Proposed Settlements with Substantial Creditors

141.     Mr. Dondero improperly communicated with Mr. Ellington about (at least) two of the Debtor's proposed settlements with substantial creditors.

142.     The first concerned UBS's appeal of the order approving the Debtor's settlement with the Redeemer Committee.  On December 15, 2020, Mr. Dondero wrote to his lawyers, Mr. Draper, and Mr. Ellington about a telephone call he had with UBS's counsel.  Mr. Dondero reported that UBS's counsel "asked us to support his objection or write [an] amicus brief. Give him evidence of Seery ineptitude or improper asset sales (life settlement, Omni max, SSP) and he will run with it."  **Ex. 54**.

143.     Asked why he brought Mr. Ellington into this conversation, Mr. Dondero asserted that he did so because Mr. Ellington served as "settlement counsel" and he thought it would be helpful to have him join a discussion about supporting UBS's objection to the Redeemer

settlement and getting evidence of Mr. Seery's alleged improper asset sales. **Ex. 40 at 104:22-105:16**.

144.    The Court rejects entirely Mr. Dondero's contentions that (a) the Debtor appointed Mr. Ellington as "Settlement Counsel;" (b) despite the limited exception in the TRO for communications concerning "shares services currently provided to affiliates owned or controlled by Mr. Dondero" (**Ex. 11 ¶2(c)**); the TRO had an implied, additional exception permitting Mr. Dondero and his lawyers to speak with Mr. Ellington about "settlement" issues, and (c) any of the communications at issue could fairly be described as concerning "settlement" negotiations.

145.    The Court rejects Mr. Dondero's contentions for (at least) the following reasons: *First*, no evidence (*e.g.*, a document, an e-mail, an admission by the Debtor) was offered or admitted by the Court to corroborate Mr. Dondero's testimony that Mr. Ellington was appointed as "Settlement Counsel," and Mr. Seery credibly refuted it.[17]    Indeed, the Court takes judicial notice that during the evidentiary hearings where the Court considered the Debtor's motions for approval of settlements with the Redeemer Committee, Acis, and HarbourVest, Mr. Ellington played no role and his name was not mentioned as having participated in the negotiations. *Second*, the TRO unambiguously describes the sole exception to the blanket prohibition on communications with the Debtor's employees and that exception does not implicate settlement discussions. *Third*, Mr. Dondero's contentions are contradicted by his own pleadings in this

---

[17] Significantly, Mr. Dondero did not know whether his attorneys "ever made any attempt to confirm with the Debtor that the Debtor was comfortable, notwithstanding the TRO, having Mr. Ellington talk to [Mr. Dondero] about issues other than shared services."  In addition, Mr. Dondero was unable to identify "any documents to corroborate [his] testimony that, after the TRO was entered into, and notwithstanding the very strict prohibition on communicating with employees other than shared services . . . Jim Seery authorized Mr. Ellington to continue to talk about topics other than shared services." **Ex. 40 at 204:20-205:8**.

Adversary Proceeding.[18]   ***Finally***, the Court finds as a matter of fact that none of the communications could ever be fairly described as concerning settlement negotiations.[19]

146.    Then, on December 24, 2020, after the Debtor filed its motion for approval of a proposed settlement with HarbourVest, Mr. Dondero's counsel laid out the material terms of the proposed settlement and the procedural steps and timing for the adjudication of the motion. Mr. Dondero instructed his lawyers to object to the proposed settlement, and then forwarded the privileged communications to Mr. Ellington. **Ex. 21**; **Ex. 40 at 122:8-123:24**.  Mr. Dondero relied on "Ellington's role as settlement counsel" to justify these communications. ***Id*. at 123:25-124:6**.

## I.    Mr. Dondero Harmed the Debtor in Economic and Non-Economic Ways

147.    The evidence establishes that since he was effectively terminated in October 2020, Mr. Dondero has engaged in a course of conduct with no purpose other than to make good on his promise to "burn the house down," and he has employed an army of lawyers and law firms to execute this "scorched earth" strategy on behalf of himself and entities he owns and/or controls.

148.    According to Mr. Seery, the damage sustained by the Debtor is considerable:

---

[18] On December 16, 2020, Mr. Dondero filed an emergency motion to modify the TRO "so that he may gain access to the Board and can communicate with the Board regarding the terms of his proposed Pot Plan." *James Dondero's Emergency Motion to Modify Temporary Restraining Order* (the "Modification Motion") [Adv. Proc. Docket No. 24] ¶11.  The Court finds that the Modification Motion contradicts Mr. Dondero's contentions concerning Mr. Ellington. If Mr. Dondero and the Debtor had agreed that Mr. Ellington would serve as "Settlement Counsel," and that the TRO allowed Mr. Dondero (and his lawyers) to communicate with Mr. Ellington is such capacity, the Modification Motion would have been completely unnecessary.  Indeed, the Modification Motion addresses the issue of settlement communications but does not refer to Mr. Ellington or his supposed role as "Settlement Counsel" nor does it explain why Mr. Dondero needed direct access to the Independent Board to engage in settlement discussions when Mr. Ellington was supposedly serving as the agreed-upon go-between.

[19] Indeed, Mr. Dondero admitted as much, at least with respect to his UBS-related e-mail (**Ex. 54**). **Ex. 40 at 106:21-23** (the e-mail is "one step removed [from shared services] but ultimately leads to it.").

> Well, I think – I think the combination of the TRO violations and the continuing attempts to just make the Debtors spend a lot of money. We've spent literally millions, more than a million dollars, just on litigating TRO issues, just dealing with the initial TRO, the hearing, the order, the various appearances, the preliminary injunction, and taking the preliminary injunction to this stage. We then, with respect to the trades, had to litigate those issues with both Mr. Dondero and his multiple related parties. We had to both pay [Pachulski Stang Ziehl & Jones LLP], DSI, not to mention individual time, but also Kasowitz, as you mentioned, we went out and hired with respect to some of the CLO issues in the litigation. It's literally millions of dollars.

**Ex. 40 at 217:20-218:8**.

149.    Mr. Seery also described in great detail the non-economic harm Mr. Dondero has caused the Debtor and how disruptive his actions have been. ***Id.* at 218:8-221:23**.

## II.    <u>PROPOSED CONCLUSIONS OF LAW</u>

### A.    <u>Jurisdiction and Venue</u>

150.    This Court has jurisdiction over this Adversary Proceeding, and this Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

151.    This Adversary Proceeding is commenced pursuant to Bankruptcy Rules 7001 and 7065, Bankruptcy Code sections 105(a) and 362, 28 U.S.C. §§ 2201 and 2202, and applicable Delaware law.

152.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

### B.    <u>Legal Standard</u>

153.    Federal Rules of Bankruptcy Procedure 7065 incorporates by reference Rule 65 of the Federal Rules of Civil Procedure and authorizes the Court to issue injunctive relief in adversary proceedings.

154.     *"The Fifth Circuit has recognized that § 105(a) grants bankruptcy courts the authority to grant injunctive relief."*  *In re Sanchez*, 372 B.R. 289, 319 (Bankr. S.D. Tex. 2007) (citing *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.),* 378 F.3d 511, 523 (5th Cir.2004)).

155.     Bankruptcy Code section 105(a) specifically provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a); *see also Marroma v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007) (noting that section 105(a) grants bankruptcy judges "broad authority … to take any action that is necessary or appropriate to prevent an abuse of process.") (internal quotations omitted). Section 105(a) permits the court to "take actions necessary to protect the integrity of the bankrupt's estate and enjoin actions that might impede the reorganization process." *FiberTower Network Servs. Corp. v. FCC (In re FiberTower Network Servs. Corp.)*, 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (internal quotations omitted); *see also In re Adelphia Communications Corp.*, 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ("Section 105(a) provides broad equitable power for a Bankruptcy Court to maintain its jurisdiction and to facilitate the reorganization process.").

156.     Section 105(a) is to be interpreted "liberally" and permits bankruptcy courts to fashion orders that are "necessary to further the substantive provisions of the Bankruptcy Code." *Sanchez*, 372 B.R. at 319 (internal quotations omitted); *see also In re Prudential Lines Inc.*, 928 F.2d 565, 574 (2d Cir. 1991) (noting that section 105(a) "has been construed liberally to enjoin [actions] that might impede the reorganization process") (internal quotations omitted).

157.    "Unlike a preliminary injunction, which is intended to preserve the status quo pending resolution of the issues, normally a permanent or final injunction is to be granted only after a right thereto has been established at a full trial on the merits." *Calmes v. United States*, 926 F. Supp. 582, 591 (N.D. Tex. 1996).   A permanent injunction is warranted where the plaintiff will suffer "irreparable harm and there does not exist an adequate remedy at law." *Id.*

158.    "The standard for a permanent injunction is 'essentially the same' as for a preliminary injunction, in that the plaintiff must show the existence of a substantial threat of irreparable harm, that outweighs any harm the relief would accord to the defendants, that there is no adequate remedy at law, and that granting the injunction will not disserve the public interest." *Calmes,* 926 F. Supp. at 591; *see also Sanchez*, 372 B.R. at 319 (same).   "To justify a permanent injunction, however, the plaintiff must demonstrate actual success on the merits, rather than a likelihood of success." *Calmes,* 926 F. Supp. at 591.

159.    "In applying this standard, '[i]t is important to recognize that the four considerations applicable to [] injunctions are factors to be balanced and not prerequisites that must be satisfied …. These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements.'" Collier on Bankruptcy ¶105.03 (16th 2021) (quoting *American Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 963 F.2d 855, 859 (6th Cir.1992); *see also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 436 (Bankr. S.D.N.Y. 2010 ("Because injunctions under section 105(a) are authorized by statute, they need not comply with traditional requirements of Rule 65.").

160.    Ultimately, permanent injunctive relief is warranted when the plaintiff will suffer irreparable harm and no adequate remedy at law exists. *See Sanchez*, 372 B.R. at 319. Unlike preliminary injunctive relief, permanent injunctive relief is granted after a full trial on the merits. *See Calmes*, 926 F. Supp. at 591.  Permanent injunctive relief is a "flexible" remedy, "to be molded to the necessities of a particular case." *Id.* (internal quotations omitted); *see also United States v. Rainbow Family*, 695 F. Supp. 314, 322 (E.D. Tex. 1988) (same).  "It is within the court's sound discretion to decide whether to exercise equity jurisdiction and grant permanent injunction relief" *Calmes*, 926 F. Supp. at 592; *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 681 (N.D. Tex. 2015) (it is within the "sound discretion of the district court" to grant injunctive relief); *Rainbow Family*, 695 F. Supp. at 322 ("It is within the court's sound discretion to decide whether to exercise equity jurisdiction and grant permanent injunctive relief.").   "Accordingly, a bankruptcy court is well within its authority if it exercises its equitable powers under § 105(a) to achieve a result the Code clearly requires." *Sanchez*, 372 B.R. at 310.

**C.    Permanent Injunctive Relief Is Warranted**

161.    The Debtor has met its burden of proving that permanent injunctive relief is warranted here.

**1.    The Debtor Will Be Irreparably Harmed Absent Injunctive Relief**

162.    In the absence of injunctive relief, a substantial threat exists that the Debtor and its estate will suffer imminent and irreparable harm.

163.    The analysis for determining whether harm is irreparable "encapsulates" the purpose of injunctive relief.  *ADT*, 145 F. Supp. 3d at 694.  "An injury is generally considered to

be irreparable if the injury cannot be undone through monetary relief." *Id.*; *see also Janvey*, 647

F.3d at 600 ("In general, a harm is irreparable where there is no adequate remedy at law, such as

monetary damages."). Injunctive relief is also warranted where, as here, the threatened harm is

imminent, not "speculative" or "remote." *Fiber-Tower*, 482 B.R. at 187; *see also Janvey*, 647 F.3d

at 601 ("The party seeking a preliminary injunction must also show that the threatened harm is

more than mere speculation.").

164. "Irreparable harm in the bankruptcy context refers to either irreparable

harm to the interest of a creditor or irreparable harm to the bankruptcy estate*." Hunt v. Commodity

Futures Trading Comm'n (In re Hunt)*, 93 B.R. 484, 495 (Bankr. N.D. Tex. 1988) (internal

quotations omitted). Irreparable harm to the debtor's estate arises from the "disruption of this

Court's exclusive authority to effectively manage" this case. *Id.*

165. To that end, bankruptcy courts have also found irreparable harm under

section 105(a) where a defendant's actions threaten the debtor's "reorganization efforts." *SAS

Overseas Consultants v. Benoit*, CIV.A. 99-1663, 2000 WL 140611, at *4 (E.D. La. Feb. 7, 2000);

*Fiber-Tower*, 482 B.R. at 182 (noting that section 105(a) is designed to enjoin actions that "might

impede the reorganization process.") (internal quotations omitted); *MacArthur Co. v. Johns-

Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988) (noting that section 105(a) "has been construed

liberally to enjoin suits that might impede the reorganization process."); *In re Calpine Corp.*, 365

B.R. 401, 410 (S.D.N.Y.2007) (affirming § 105(a) injunction because state court litigation against

non-debtors threatened debtor's reorganization efforts).

166.    Here, in the absence of permanent injunctive relief, the Debtor's estate and

its creditors will be irreparably harmed. If Mr. Dondero is not enjoined, there is a substantial threat

that he will continue to wage his personal vendetta by engaging in some or all of the Prohibited

Conduct, thereby interfering with the Debtor's operations, management of assets, and

implementation of its plan of reorganization, all to the detriment of the Debtor, its estate, and its

creditors. The Court finds and determines that—for much of Mr. Dondero's wrongful conduct—

the Debtor has no adequate remedy at law because the harm cannot be remedied by money

damages.[20]  If Mr. Dondero is not enjoined from engaging in the Prohibited Conduct, the Debtor's

ability to monetize its assets, satisfy its claims, and implement its Plan will be jeopardized. *See*

*Fiber-Tower*, 482 B.R. at 187 (finding that the "record demonstrates that the threatened harm" is

"irreparable" where, in the absence of injunctive relief, "it would be nearly impossible for Debtors

to reorganize and continue their business"); *Adelphi*, 345 B.R. at 86 (granting permanent injunction

and noting that "this case is the poster child for the exercise of the Court's section 105(a) power"

where the "adverse effect on the [d]ebtors' reorganization could not be more pronounced."); 

*Janvey*, 647 F.3d at 601 (finding irreparable harm shown where in absence of injunctive relief,

there was imminent threat of dissipation of assets ); *Hunt*, 93 B.R. at 496 (finding irreparable harm

absent injunctive relief where conduct would "clearly disrupt the Debtor's efforts to effectuate

plans of reorganization … which would benefit all of the creditors in these proceedings.").

---

[20] For example, while clearly wrongful, the Debtor likely cannot obtain monetary damages for Mr. Dondero's threats; or his interference with trades that Mr. Seery was able to "work around;" or his causing the Pre-TRO Letters and Post-TRO Letters to be sent with no legitimate purpose; or his litany of improper communications with the Debtor's employees. Of course, the exception is the professional fees the Debtor has incurred from protecting its interests but questions of "fee shifting" are not the subject of injunctive relief but will be addressed as part of the resolution of the Debtor's contempt motion.

**2.      The Debtor Shows Success on the Merits**

167.    The evidence also establishes the Debtor's actual success on the merits.  The relevant likelihood of success on the merits inquiry in the context of section 105(a) injunctions depends on "the purpose of the requested injunctive" and will "track closely the bankruptcy right sought to be vindicated." *Fiber-Tower*, 482 B.R. at 182.  In other words, the relevant "merits" question is "not whether the Debtor[] is likely to prevail on appeal, but rather whether this [C]ourt is authorized and likely to grant the requested relief." *Id.*  Bankruptcy courts have also defined success on the merits as "the probability of a successful plan or reorganization." *SAS Oversees Consultants*, 2000 WL 140611, at *4 (internal quotations omitted) (collecting cases); *see also In re W.R. Grace & Co.*, 386 B.R. 17, 33 (Bankr. D. Del. 2008) (defining "success on the merits" test in the bankruptcy context as "whether the debtor has a reasonable likelihood of successful reorganization," noting that the "underlying objective of the request" for injunctive relief is to prevent defendant from "negatively impacting the Debtors' reorganization."); Collier on Bankruptcy ¶105.03 (16th 2021) ("If reorganization is at risk due to litigation," injunctions under section 105 are warranted if the movant can show a "likelihood of a plan of reorganization or the successful defense of vexatious litigation.").

168.    There is ample evidence establishing the Debtor's success on the merits because Mr. Dondero is impeding the Debtor's reorganization prospects and violating the automatic stay.

169.    For example, Mr. Dondero has plainly violated the automatic stay imposed under section 362 of the Bankruptcy Code.[21]   The automatic stay operates as a "statutory injunction" upon the commencement of a debtor's bankruptcy case. *Wilson v. Arbors of Central Park ICG, LLC (In re Wilson)*, 610 B.R. 255, 275 (Bankr. N.D. Tex. 2019).  It is the "single most important and fundamental protection" provided to a debtor in bankruptcy. *Id.*   Section 362(a)(3) of the Bankruptcy Code thus "operates as a stay, applicable to all entities, of ... any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. 362(a)(3).   "Without this broad protection, debtors would effectively be denied the 'breathing room' that bankruptcy is intended to provide*." Gates v. RAC Acceptance Tex, LLC d/b/a Acceptance Now (In re Gates)*, 621 B.R. 129, 135 (Bankr. W.D. Tex. 2020) (quoting *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 301 (5th Cir. 2005)).

170.    Mr. Dondero's engagement in the Prohibited Conduct violates, and if not enjoined, will continue to violate, section 362(a) of the Bankruptcy Code by interfering with, and exercising control over, the Debtor's operations and property of the Debtor's estate.   Specifically, Mr. Dondero has interfered with, and continues to interfere with, the operations of the Debtor and the Debtor's pursuit of a plan of reorganization by, *inter alia*, (i) threatening the Debtor and its employees, including by threatening to remove the Debtor as fund manager and unlawfully attempting to terminate the Debtor's CLO management contracts; (ii) interfering with the Debtor's trading activities; (iii) trespassing on the Debtor's property; (iv) destroying the Debtor's property; (v) colluding with former employees of the Debtor to coordinate legal strategy against the Debtor;

---

[21] *See generally supra* (Mr. Dondero discarded (cell phone and text messages), controlled (trespass), and interfered with (the CLO management agreements) the Debtor's property).

(vi) violating Court orders; and (vii) interfering with the Debtor's discovery obligations. *See Sanchez*, 372 B.R. at 313 (granting relief under section 105(a) where defendant has violated automatic stay by exercising control over, and taking property of the debtor's estate without court approval); *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990) (defendant willfully and intentionally violated automat stay where he "took affirmative action" to control debtor's property, caused loss in revenue, and "even after the bankruptcy court entered an order retraining" defendant "from further interference with the operations of the" debtor, "he continued to take possession of the Debtor's property).

171. It is also more likely the Debtor will successfully reorganize if Mr. Dondero is permanently enjoined from engaging in the Prohibited Conduct. *See SAS Oversees Consultants*, 2000 WL 140611, at *4 (finding success on the merits where "[a]t the outset … it is more likely that [the debtor] will successfully reorganize if" injunctive relief is granted); *Prudential*, 928 F. 2d at 574 (affirming bankruptcy court's permanent injunction pursuant to section 105(a) where adverse conduct would "impede" [debtor's] reorganization."); *Adelphi*, 345 B.R. at 86 (finding the debtor has made the "necessary showing for a permanent injunction" where the defendants' conduct has "adverse effect on the Debtor's reorganization" and the case is therefore "the poster child for exercise of the Court's section 105(a) power.").

172. Mr. Dondero's conduct violates section 362(a) and ultimately threatens the Debtor's bankruptcy's estate and the Debtor's reorganization process. Injunctive relief is, therefore, warranted.

### 3. The Balance of Equities Tips in the Debtor's Favor

173.    In light of, among other things, (a) the Debtor's status as a debtor in bankruptcy subject to the jurisdiction of this Court, (b) the Settlement Order,[22] (c) the Term Sheet,[23] (d) Mr. Dondero's resignations as the Debtor's President and Chief Executive Officer and later as portfolio manager and an employee, and (e) the authority vested in the Independent Board and Mr. Seery, as the Debtor's Chief Executive Officer and Chief Restructuring Officer, there is no legal or equitable basis for Mr. Dondero to engage in any of the Prohibited Conduct, and the balance of the equities strongly favors the Debtor in its request to permanently enjoin Mr. Dondero from engaging in any Prohibited Conduct.

174.    Indeed, as noted above, following confirmation of the Debtor's Plan and taking into account the extremely limited nature of his alleged claims against the estate, Mr. Dondero has no meaningful economic interest in the Debtor and no legitimate motivation in monitoring or participating in its asset monetization Plan because:

- All shared services agreements have expired or were otherwise terminated;

- The Debtor is not projected to provide equity with any recovery;

- Mr. Dondero is no longer employed by the Debtor in any capacity; and

- Most of the Debtor's former employees have migrated to entities owned and/or controlled by Mr. Dondero.

---

[22] The term "Settlement Order" refers to the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Bankr. Docket No. 339].

[23] The term "Term Sheet" refers to the term sheet attached as Exhibit A to the *Notice of Final Term Sheet* [Bankr. Docket No. 354-1].

175. The Court concludes as a matter of law that revenge and retribution are not legitimate interests to be protected and that the balance of equities strongly (perhaps exclusively) favors the Debtor.

### 4.    Injunctive Relief Serves the Public Interest

176. Finally, injunctive relief serves the public interest by re-enforcing the implicit mandate in the Bankruptcy Code that debtors are to be managed and controlled only by court-authorized representatives, free from threats and coercion.

177. "Courts have often held that injunctions that facilitate reorganizations serve the public interest." *Fiber-Tower*, 482 B.R. at 189 (collecting cases); *see also SAS Oversees Consultants*, 2000 WL 140611, at * 5 ("[I]t is clear that the public will be served by promoting [debtor's] successful reorganization."). "Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders." *Hunt*, 93 B.R. at 497 (citing H.R. Rep. No. 95–595, 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963). "The Bankruptcy Court is vested with management duties to further this interest and ensure a meaningful process for all of these competing entities." *Id.*; *see also In re Timbers of Inwood Forest Asss., LTD.*, 808 F.2d 363, 373 (5th Cir.1987) (noting that "ongoing judicial management of Chapter 11 cases is essential if the Chapter 11 process is to survive and the goals of reorganizability on the one hand, and creditor protection, on the other, are to be achieved.").

178. The public interest will be served by permanently enjoining Mr. Dondero from engaging in the Prohibited Conduct. As discussed above, the Debtor's chances at

successfully monetizing its assets and implementing its Plan would be jeopardized unless Mr. Dondero is permanently enjoined from engaging in the Prohibited Conduct.   Mr. Dondero's interference with the Debtor's disposition of its assets threatens the Debtor's ability to satisfy its claims, to the detriment of its many stakeholders.   By contrast, there is no public interest to be served by permitting Mr. Dondero to engage in the Prohibited Conduct.   His threats to the Debtor's employees, control and destruction of the Debtor's property, and general interference in the Debtor's operations disserves the public interest.  Such conduct hinders the Debtor's ability to successfully liquidate and reorganize.

## **CONCLUSION**

179.    Accordingly, for the foregoing reasons, Mr. Dondero should be permanently enjoined from engaging in any of the Prohibited Conduct pursuant to section 105(a) of the Bankruptcy Code.

180.    The Court will enter an appropriate judgment in favor of the Debtor and against Mr. Dondero on the Debtor's claim for injunctive relief and awarding the Debtor its reasonable costs incurred in this proceeding.

181.    The Court reserves the right to amend or modify any of the foregoing findings of fact or conclusions of law and to make such additional findings and conclusions as it deems advisable.

182.    If any of the foregoing findings of fact may be more properly deemed conclusions of law, or *vice versa*, such finding of fact shall constitute a conclusion of law and *vice versa*.

### # # # END OF FINDINGS AND CONCLUSIONS # # #

Submitted by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*